UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 20-[ 10322 ] |
| The Diocese of Buffalo, N.Y., | ) | Chapter 11 |
| Debtor. | ) | |

## AFFIDAVIT OF CHARLES MENDOLERA REGARDING THE DIOCESE'S ASSETS AND OPERATIONS AND IN SUPPORT OF THE CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

STATE OF NEW YORK   )
COUNTY OF ERIE     ) ss.:

Charles Mendolera, being duly sworn, deposes and states as follows:

1.    I am the Executive Director of Financial Administration ("Executive Director") for The Diocese of Buffalo, N.Y. (the "Diocese"). I have worked in the Diocese's finance department since 2004. Prior to being appointed as Executive Director in April 2019, I served as the Diocese's Controller and before that as Director of Accounting. I am familiar with the assets, liabilities and sources of income for the Diocese.

2.    I make this Affidavit based upon: (a) my personal knowledge of certain facts stated herein, (b) information supplied to me by others associated with the Diocese, (c) my review of relevant documents, and (d) upon my experience and knowledge of Diocesan operations. If I were called to testify, I would testify to the facts as set forth herein. I am authorized by the Diocese to submit this Affidavit.

3.    On February 28, 2020 (the "Petition Date"), the Diocese will file a voluntary petition under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq.*, the "Bankruptcy Code") commencing its chapter 11 reorganization case (this "Chapter 11 Case").

3501438.2

4. Contemporaneously with the petition, the Diocese will also be filing a number of motions and applications seeking various types of relief on an expedited basis (collectively the "First Day Motions"). The First Day Motions seek relief aimed at facilitating a smooth transition into this Chapter 11 Case, permitting the Diocese to continue its mission by maintaining employee compensation, maintaining the goodwill and morale of the employees, parishioners, clerics and others who rely on the programs and services provided by the Diocese and preserving and maintaining the property available to satisfy the Diocese's creditors. I have reviewed each of the First Day Motions and am familiar with their contents. I respectfully submit that all of the First Day Motions are vital to the Diocese's reorganization efforts and expedited approval of the First Day Motions is important to the Diocese's successful reorganization.

## OPERATIONS

5. The Diocese, through its central administrative offices (a) provides *operational support* to the Catholic parishes, schools and certain other Catholic entities that operate within the territory of the Diocese (each, an "Other Catholic Entity" or "OCE"); (b) conducts school operations through which it provides parish schools with financial and educational support; (c) provides comprehensive risk management services to the OCEs; (d) administers a lay pension trust and a priest pension trust (collectively, the "Pension Trusts") for the benefit of certain employees and priests of the OCEs; and (e) provides administrative support for St. Joseph Investment Fund, Inc. ("SJIF").

a. *Operational Support*. The Diocese provides operational and functional support to the OCEs in the areas of finance, building & properties, legal, human resources,

- 2 -

3501438.2

stewardship and communications, canonical tribunal, schools, evangelization and catechesis, pastoral services and clergy services.

b. **School Operations**. The Diocese provides financial support to Catholic elementary and high schools operating within the territory of the Diocese.

c. **Risk Management**. The Diocese maintains and manages a risk management program for itself and a large number of OCEs, inclusive of property, liability, Workers' Compensation, short-term disability, etc. The Diocese also administers a medical self-insurance program which provides coverage to employees of the Diocese and certain other participating OCEs. The risk management and health insurance programs are more fully described in the discussion below with respect to the Diocese's Self-Insurance Motion (defined below).

d. **Pension Trusts.** The Diocese sponsors and administers a priest's retirement plan, and contributes to a frozen pension plan for lay employees, each of which are described in greater detail in connection with the discussion of the Diocese's Wages Motion (as defined below).

e. **SJIF**. The Diocese provides administrative support to the St. Joseph Investment Fund, Inc. SJIF was incorporated as a separate not-for-profit entity in 2006. The purpose of SJIF is to receive funds from participants (which include the Diocese, parishes and other qualified organizations) that are pooled and collectively invested. All funds of the participants are separately accounted for by SJIF. A board of directors oversees the operation of SJIF and an investment committee of the board is responsible for adopting an investment policy and reviewing performance. The Diocese provides personnel to assist SJIF with accounting and administrative functions.

3501438.2

## REVENUE AND EXPENSES

6.      The Diocese is a not-for-profit Religious Corporation under New York State law. For the past several years, the Diocese's expenses have exceeded its revenue. Gross revenue for the fiscal year ending on August 31, 2019 ("2018/2019") was approximately $13.1 million while expenses before taking into account certain non-recurring activity were approximately $18.1 million. Gross revenue for the fiscal year ending on August 31, 2018 ("2017/2018") was approximately $18.1 million and expenses before taking into account certain non-recurring activity were approximately $19.9 million. In addition, the Diocese has expended nearly $20 million over the past two fiscal years in connection with voluntary settlement payments to abuse victims as part of its Independent Reconciliation and Compensation Program.

7.      The primary source of revenue used by the Diocese to support its operations comes from parish assessments. The Diocese assesses parishes an annual amount based primarily on historical parish offeratory. Assessments are due on a monthly basis. Assessments are collected for general Diocesan purposes and also for the purposes of supporting elementary education and priest retirement obligations. Additional sources of operating funds include (i) revenue from the annual Fund for the Faith appeal which is run in conjunction with Catholic Charities, (ii) contributions and bequests from the faithful, and (iii) realized investment gains.

## FINANCIAL UNCERTAINTY

8.      On January 28, 2019, the New York State Legislature passed the Child Victims Act (A.2683/S.2440) (the "CVA"). New York's Governor signed the legislation on February 14, 2019. This legislation modified the statute of limitations and created a one-year "window" during which victims of child sex abuse whose claim may have been time-barred may commence a timely civil

3501438.2

action. In addition, the CVA extends the statute of limitations for claims that were not time-barred on its date of passage, permitting such child victims to commence timely civil actions until they reach 55 years of age.

9.      From the opening of the CVA window on August 14, 2019 through the Petition Date, approximately 250 lawsuits have been filed against the Diocese by plaintiffs who are seeking damages as a result of alleged abuse. In addition, demand letters and or notices have been received from other claimants who have not yet commenced lawsuits against the Diocese. The Diocese anticipates that in excess of 400 individuals may assert abuse claims for which they may seek to hold the Diocese responsible. The Diocese may have insurance coverage for some of the CVA claims it will face.

## PURPOSE AND GOALS OF THE CHAPTER 11 FILING

10.     The Diocese does not seek Chapter 11 relief to shirk or avoid responsibility for any past misconduct by clergy or for any decisions made by Diocesan authorities when addressing that misconduct. The Diocese does not seek bankruptcy relief to hide the truth or deny any person a day in court. In fact, the Diocese is committed to pursuing the truth and has never prohibited any person from telling his/her story or speaking his/her truth in public. The Diocese has publicly disclosed perpetrators. The Diocese has made and requires criminal referrals to be made for all credible allegations of sexual abuse. The Diocesan Apostolic Administrator, The Most Reverend Edward B. Scharfenberger has acknowledged past shortcomings by the Diocese and have attempted to offer aid and comfort to victims of abuse. The Diocese has established standards for the training and background assessment of all employees, clerics and volunteers who will likely interact with children and young people.

3501438.2

11.     The Diocese has commenced this Chapter 11 Case in order to (a) provide an orderly claims administration process that will ensure a more equitable distribution of funds to creditors, including victims of abuse; and (b) bring about a reorganization of the Diocese that will ensure that the mission of the Diocese may continue to be fulfilled in service of the Catholic faith.

## FIRST DAY MOTIONS

12.     To further the Diocesan mission and continue operations, the Diocese respectfully requests that the following First Day Motions be granted.[1]

**I.      Motion for Entry of an Order Authorizing the Diocese to File Portions of Schedule F, the Master Creditor Mailing Matrix, and Other Pleadings and Documents Under Seal (the "Motion to File Under Seal")**

13.     Many of the unsecured creditors in this Chapter 11 Case are individuals whose claims against the Diocese are premised on allegations of sexual abuse ("Abuse Claimants"). Some Abuse Claimants have filed tort claims against the Diocese following the passage of New York's Child Victims Act (the "CVA Plaintiffs").  Many, but not all, of the CVA Plaintiffs have elected to file their litigation claims against the Diocese pseudonymously, with their real identity to be revealed only to the defendants in the course of litigation and with the understanding that their identities would not be publicly disclosed.  Other Abuse Claimants are non-litigants who contacted the Diocese pre-petition, either with or without the assistance of counsel, and asserted claims of abuse by Diocesan employees or agents with the understanding that the Diocese would protect their identities and keep their claims confidential.  The Diocese has previously entered into out-of-court settlements with some of those Abuse Claimants where the Diocese agreed to keep

---

[1]  Capitalized terms used but not defined in this affidavit have the meanings ascribed to them in the respective First Day Motions.

3501438.2

the Abuse Claimant's name confidential but did not require the Abuse Claimant to keep the settlement confidential.

14.     In light of the sensitive nature of the claims of the CVA Plaintiffs and other Abuse Claimants, to avoid causing unnecessary additional anguish or embarrassment, and to encourage such individuals to feel safe and secure in advancing their claims without fear of retribution or reprisal, the Diocese submits that it would be inappropriate and potentially harmful to require the public disclosure of identifying information relating to individuals who have, either informally, formally, or through filing a lawsuit, notified the Diocese of allegations of abuse by clergy members or other persons employed by Catholic entities or otherwise subject to Diocesan supervision.

15.     The Diocese has been operating under confidentiality restrictions for some time, and believes that it is imperative that the decision to come forward and identify oneself as an Abuse Claimant be left to the individuals in question, and that such accommodations can be made without adversely affecting the rights of any other parties in interest.

16.     The Diocese respectfully requests permission to protect the identities of CVA Plaintiffs and other Abuse Claimants while providing them notice of this Chapter 11 Case and notice of such events and motions as is required by the Bankruptcy Code and applicable Bankruptcy Rules.  The Diocese further seeks to share names and contact information for CVA Plaintiffs and other Abuse Claimants with the Court and Bankruptcy Clerk under seal.  It is proposed that CVA Plaintiffs and those Abuse Claimants currently represented by counsel be given notices in the Diocese's Chapter 11 Case only through their respective counsel.  The Diocese, through this Motion, seeks leave of the Court to serve notice of this Chapter 11 Case, and other

3501438.2

requisite notices, directly on Abuse Claimants who have advised the Diocese of potential claims but have not yet identified counsel, without disclosing those Abuse Claimants' names or addresses to other parties.

## II. Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, and (B) Granting Adequate Protection (the "Cash Collateral Motion")

17. As of the Petition Date, the Diocese is indebted to M&T pursuant to the following transactions and documents:

(i) On April 1, 2013, the Diocese executed and delivered to M&T that certain Letter of Credit Agreement, pursuant to which the Diocese agreed to reimburse M&T for any payment made by M&T under a letter of credit issued for the benefit of the Diocese (the "LOC Agreement").

(ii) Pursuant to the LOC Agreement, M&T issued to the New York State Worker's Compensation Board (the "WCB") a letter of credit in the amount of approximately $4.8 million (the "Letter of Credit") to secure the Diocese's obligations under its self-insured worker's compensation program. The WCB has made no attempt to draw upon the Letter of Credit and, upon information and belief, there exists no cause for the WCB to do so.

(iii) To secure any obligations to M&T that might arise under the LOC Agreement if and when WCB were to draw upon the Letter of Credit, the Diocese (a) deposited approximately $5.1 million in securities into a blocked account (the "Blocked Account") held at M&T pursuant to a Securities Account Control Agreement dated October 11, 2019 (the "SACA"), and (b) granted to M&T a security interest in the securities in the Blocked Account as well as any other property of the Diocese in the possession or control of M&T pursuant to a Security Agreement dated October 11, 2019 (the "Security Agreement" and together with the LOC Agreement, the Letter of Credit, and the SACA, the "Prepetition Secured Debt Documents"). The securities held in the Blocked Account, as well as any cash or other collateral subject to M&T's lien under the Prepetition Secured Debt Documents, are collectively referred to in this Motion as the "Prepetition Collateral."

3501438.2

18. The Diocese seeks to use cash (other than cash or securities held in the Blocked Account) existing on or after the Petition Date that may be part of the Prepetition Collateral (the "Cash Collateral").

19. The Diocese has consulted with M&T regarding its continued use of Cash Collateral and M&T supports the relief requested in the Motion.

20. The Diocese has an urgent need to use Cash Collateral. Pursuant to the Security Agreement with M&T, the Prepetition Collateral includes, among other things, cash held by the Diocese in several accounts at M&T, including, without limitation, the Diocese's primary operating account (the "Operating Account"), as well as a segregated account for the payment of medical claims under the Diocese's self-insured health plan (the "Catholic Partnership Health Account").

21. As described more fully in the Diocese's Cash Management Motion (defined below), the Diocese relies upon its Operating Account to collect accounts receivable which are then used to fund other accounts within the Diocese's cash management system from which disbursements for payroll, vendor and utility payments, and other ordinary course expenses are made. The Diocese also relies upon the cash in the Catholic Partnership Health Account to pay self-insured medical claims. The Diocese does not have sufficient unencumbered cash in its cash management accounts held at other institutions to fund its business operations and pay operating expenses. Accordingly, absent the ability to use Cash Collateral, the Diocese would not be able to pay wages, utility charges, medical claims, and other critical operating expenses.

22. In order to adequately protect any interest M&T may have in the Cash Collateral, the Diocese proposes to grant M&T, to the extent of any diminution in the value of its interest in

- 9 -

3501438.2

the Prepetition Collateral, and effective as of the Petition Date, perfected replacement security interests in, and valid, binding, enforceable and perfected liens (the "Rollover Liens"), on all of the Diocese's cash, deposit accounts, and investment property in the possession of, or subject to the control of, M&T, and all proceeds of the foregoing, whether in existence on the Petition Date or thereafter created, acquired or arising (collectively, the "Postpetition Collateral") provided, however, that the Postpetition Collateral shall not include, and the Rollover Liens shall not attach to, any funds or property held by the Diocese (i) for the purpose of administering its self-insurance or charitable gift annuity programs, (ii) which represent trust fund taxes or employee payroll deductions, or (iii) which are endowed funds or subject to donor restrictions on use.

23. Because M&T's claim against the Diocese is contingent upon the WCB drawing down the Letter of Credit, and because the value of the Blocked Account is already in excess of M&T's potential exposure under the Letter of Credit, the Diocese submits that the proposed Rollover Liens more than adequately protect M&T's interest (if any) in the Cash Collateral.

24. The Diocese submits that, for the reasons set forth herein and in the Motion, immediate access to Cash Collateral is necessary to allow the Diocese to continue to operate and to preserve the value of the Diocese's estate for the benefit of all parties in interest. Moreover, M&T as the sole party with an interest in Cash Collateral has consented to such use.

**III.    Motion for Entry of Interim and Final Orders Authorizing the Diocese to (A) Pay Prepetition Compensation and Reimbursable Employee Expenses, (B) Pay and Honor Medical and Other Benefits and (C) Continue Employee Benefit Programs (the "Wages Motion")**

25. The Diocese respectfully requests that the Court enter interim and final orders authorizing, but not directing, the Diocese to (a) pay prepetition compensation, reimbursable business expenses, benefit plans, deductions and payroll taxes, all as described herein, (b) pay and

- 10 -

3501438.2

honor medical and other benefit plans, on a post-petition basis, and (c) continue employee benefit programs.

26. The Diocese's employees are essential to the administration of the Diocese's Chapter 11 Case, preservation of assets and continuation of the Diocese's mission. In addition to providing religious guidance and facilitating religious services and activities in the Diocese, the Diocese's employees also provide other critical functions including, without limitation, finance, human resources, risk management, informational technology, legal, catholic education, evangelization and catechesis, stewardship and communications, pastoral and clergy services, canonical tribunal, archives and building and grounds maintenance. Without these employees, the Diocese would be unable to provide these services to individuals of the Roman Catholic faith, parishes and schools within the Diocese and would also be unable to provide necessary support for a plan of reorganization to benefit all creditors.

27. The Diocese currently (i) employs 138 full-time employees including both non-clergy employees and active priests, and 51 part-time employees (collectively, the "Employees"); (ii) provides direct payments and benefits to 152 retired priests (the "Retired Clergy") and (iii) provides a stipend and benefits to 16 current seminarians (the "Seminarians"). Sixty (60) of the full-time Employees are salaried and 78 are paid on an hourly basis. Two of the part-time Employees are salaried, and 49 are paid on an hourly basis. The Diocese also employs 59 per diem employees paid on an hourly basis (the "Temporary Workers"). The Diocese has one Employee entitled to commissions as the Director of Camp Turner.[2]

---

[2] The Director of Camp Turner is entitled to a commission for facility rentals in the amount of 25% of the gross paid rental receipts above the minimum annual rental receipts of $32,000, subject to certain conditions.

3501438.2

28.     The vast majority of the Employees, Retired Clergy, Seminarians and Temporary Workers rely exclusively on the compensation and benefits they receive from the Diocese to provide for their daily living expenses and these Employees, Retired Clergy, Seminarians and Temporary Workers would be exposed to significant financial difficulties if the Diocese were not permitted to continue paying such compensation and benefits in the ordinary course of its business.

29.     To minimize the personal hardship that the Employees, Retired Clergy, Seminarians and Temporary Workers would suffer if prepetition obligations are not paid when due or as expected, and to maintain morale and stability in the Diocese during this critical time, the Diocese seeks authorization to (a) pay and honor, in its sole discretion, certain prepetition claims for the following items, each as described below: Compensation, Reimbursable Business Expenses and Benefit Plans, together with all other benefits that the Diocese has historically provided to its Employees, Retired Clergy, Seminarians and Temporary Workers in the ordinary course of business (collectively, the "Employee Wages and Benefits"), (b) pay all administrative costs associated with Employee Wages and Benefits, (c) continue to pay and provide the Employee Wages and Benefits in the ordinary course of business on and following the Petition Date, and (d) withhold (as applicable) and remit Deductions and Payroll Taxes as described below.

30.     ***Compensation***.     The Diocese's Central Administrative Office non-clergy Employees and Temporary Workers are paid bi-weekly in arrears, through the end of the prior week.  There are 4 days of wages earned by these Employees and Temporary Workers prior to the Petition Date that constitute prepetition wages which are due to be paid on March 12, 2020.  Based upon historical data, the average bi-weekly aggregate payroll for the Diocese's Central Administrative Office non-clergy Employees and Temporary Workers is approximately $228,000,

- 12 -

3501438.2

including applicable taxes and deductions. The Diocese estimates that $91,200 in prepetition payment obligations to non-clergy Employees and Temporary Workers has accrued prior to the Petition Date and remains unpaid.

31.     The Diocese's active clergy Employees (the "Active Priests"), are paid monthly in arrears. Based upon historical data, the average monthly aggregate payroll for the Active Priests is approximately $110,000 including applicable taxes and deductions. The Diocese estimates that $110,000 in prepetition payment obligations to Active Priests has accrued prior to the Petition Date and remains unpaid.

32.     Retired Clergy receive monthly payments of approximately $166,000 per month, inclusive of applicable taxes and deductions. The Diocese estimates that $166,000 in prepetition payment obligations to Retired Clergy has accrued prior to the Petition Date and remains unpaid.

33.     Seminarians average monthly aggregate stipends total approximately $2,500, with no applicable taxes or deductions. The Diocese estimates that no prepetition stipends to Seminarians remains unpaid as of the Petition Date.

34.     The Diocese estimates that total prepetition unpaid compensation for Employees (including Active Priests), Retired Clergy and Temporary Workers as of the Petition Date totals $367,200 (the "Unpaid Compensation"). The Diocese believes that it does not owe any Employee, Temporary Worker or Seminarian a prepetition amount in excess of the $13,650 cap on priority claim amounts imposed by section 507(a)(4) of the Bankruptcy Code. Accordingly, the Diocese is not seeking authority to pay any amount over the $13,650 cap to any Employee, Temporary Worker or Seminarian.

3501438.2

35. Items of Unpaid Compensation were due and owing on the Petition Date because, among other things:

    a. the Chapter 11 Case was filed during the Diocese's regular payroll periods;

    b. some checks issued to Employees, Retired Clergy, Seminarians and Temporary Workers prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date; and

    c. Employees, Retired Clergy, Seminarians and Temporary Workers have not yet been paid all their salaries and wages for services performed prior to the Petition Date because the Diocese pays payroll in arrears.

36. ***Reimbursable Business Expenses.*** Prior to the Petition Date and in the ordinary course of business the Diocese has reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Diocese ("Business Expenses"). As of the Petition Date, the Diocese's unpaid Business Expenses for Employees total less than $25,000. In addition, it is possible that certain Employees may have incurred prepetition Business Expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Diocese after the Petition Date.

37. The Business Expenses are incurred by Employees on the Diocese's behalf and with the understanding that they will be reimbursed. Accordingly, to avoid harming Employees who may have incurred Business Expenses, by this Motion the Diocese requests the authority, to be exercised in its sole discretion, to: (a) continue paying Business Expenses in accordance with

3501438.2

prepetition practices; (b) modify their prepetition policies relating thereto as they deem appropriate; and (c) pay all Business Expenses that relate to the prepetition period.

38.    ***Benefit Plans***.    The Diocese provides eligible Employees and their eligible dependents with various employee benefits as follows (collectively, the "Benefit Plans"):

a.    *Medical Plan: Employees*.    The Diocese's health coverage is provided through an independent self-insured health plan (the "Self-Insured Health Plan") for its eligible Employees, as set forth in greater detail in the Diocese's Self-Insurance Motion (defined below). The Diocese pays approximately $98,000 monthly in advance to the Self-Insured Health Plan. As of the Petition Date, no payments are owed by the Diocese under the Self-Insured Health Plan.

b.    *Medical Plan: Active Priests.*    Employees who are Active Priests are separately insured through Blue Cross Community Blue, and the Diocese pays approximately $155,000 per month to Blue Cross to cover these premiums for Active Priests. As of the Petition Date the Diocese believes that there are no premium payments owed to Blue Cross for insurance coverage for Active Priests.

c.    *Medical Plan: Retired Clergy*. Retired Clergy are insured through Aetna Silver Script and Supplement Medical Benefit Plan. Retired Clergy are also reimbursed for Medicare supplement premiums. The Diocese pays approximately $53,000 per month to Aetna to cover these premiums. Further, Medicare reimbursement obligations for Retired Clergy are paid monthly and total approximately $22,000 per month, including supplemental pension payments. As of the Petition Date, the Diocese believes that there are no premium payments owed to Aetna. The Diocese anticipates that $22,232 in payments are outstanding for Medicare reimbursements and supplemental pension payments to Retired Clergy as of the Petition Date.

3501438.2

d.    *Dental Plans*. The Diocese provides dental coverage through Pro-Dental for its eligible Employees. Pro-Dental is paid by the Diocese in arrears based on claims processed, and the estimated amount owed by the Diocese as of the Petition Date is $20,000. The Diocese pays the entire amount of these monthly premiums for single employees, and for family coverage, $25.00 per month is collected from participating Employees through payroll deductions.

e.    *Vision Plan*. The Diocese sponsors a vision plan for its eligible Employees through VSP Vision. The entire amount of their monthly premium, approximately $8 per month for a single employee and $21 for family coverage, is paid by participating Employees through payroll deductions. As of the Petition Date, no vision insurance premiums are owed to VSP Vision by the Diocese.

f.    *Paid Time Off ("PTO")*. The Diocese provides PTO to its Employees, the amount and accrual rate of which is based generally on an Employee's length of service and level within the Diocese's organization. Ordinarily, when an Employee elects to take PTO, that Employee is paid his or her regular hourly or salaried rate. Employees are paid for unused PTO when they cease employment with the Diocese. The Diocese estimates that its Employees have accrued no greater than $450,000 of accrued but unused PTO as of January 15, 2020. This amount, however, is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused PTO when employment is terminated. Any such payout of PTO to a terminated Employee would be subject to the cap imposed by section 507(a)(4) of the Bankruptcy Code for any pre-petition portion of this payment. Moreover, the Diocese anticipates that its Employees will utilize any accrued PTO in the ordinary course of business, which will not create any cash flow requirements beyond the Diocese's normal payroll obligations.

3501438.2

g.    *New York State Short-Term Disability Insurance*. The Diocese provides short-term disability benefits for all of its Employees as required by New York State law through ShelterPoint Life Insurance Co. The Diocese pays approximately $300,000 in premiums to ShelterPoint Life Insurance Co. each year, in quarterly installments. As of the Petition Date, the Diocese is current with respect to its payment obligations for short-term disability benefits.

h.    *Life Insurance*.   The Diocese sponsors basic life insurance for its eligible Employees. Employees working more than 28 hours per week are eligible for this benefit, which is paid by the Diocese. Eligible Employees receive life insurance benefits of 1.5x their annual salary, rounded up to the nearest $1,000, with a maximum benefit of $150,000. The Diocese pays Renaissance Life Insurance approximately $1,510 per month, in advance, for this benefit. As of the Petition Date, the Diocese is current with respect to its payment obligations to Renaissance Life Insurance.

i.    *Long-Term Disability Insurance*. The Diocese sponsors long-term disability benefits covering those Employees working more than 28 hours per week. The Diocese pays approximately $1,167.24 per month, in advance, to Northwestern Mutual Life for this benefit. As of the Petition Date, the Diocese is current with respect to its long-term disability insurance premium payments to Northwestern Mutual Life.

j.    *Supplemental Life Insurance and Long-Term Care Insurance*. The Diocese sponsors supplemental life insurance and long-term care insurance for current and former Bishops through Security Mutual Life Insurance Company of New York. Only three (3) current and former Bishops receive this benefit. The Diocese pays a total of approximately $10,000 annually, in quarterly increments, in advance, to Security Mutual Life Insurance Company of New York for

3501438.2

this benefit. As of the Petition Date, no supplemental life insurance or long-term care insurance premium is owed to Security Mutual Life Insurance Company of New York by the Diocese.

k. *Paid Family Leave.* The Diocese pays paid family leave premiums for its Employees. This is paid on a quarterly basis to ShelterPoint Life Insurance Co., as administrator for the Diocese's paid family leave program. The approximate annual premium is $200,000, paid quarterly. The Diocese does not have any outstanding obligations for paid family leave premiums as of the Petition Date.

l. *Flexible Spending Plans.* The Diocese sponsors flexible spending plans (medical/dental and dependent care) for its Employees. P&A Group, Inc. manages the flexible spending plan and charges the Diocese an administrative fee of $189 per month. The Diocese pays the administrative fees on a monthly basis. As of the Petition Date, approximately $47,222 is owed to P&A Group, Inc. for withholdings and administrative fees under the Flexible Spending Plans.

m. *Health Reimbursement Account.* P&A Group, Inc. manages the Diocese's Health Reimbursement Account and charges the Diocese an administrative fee of $166.50 per month for non-clergy Employees, $390.00 per month for Retired Clergy and $40.50 per month for Seminarians. The Diocese's monthly contribution to the Health Reimbursement Account on behalf of Employees, Retired Clergy and Seminarians is approximately $5,000. As of the Petition Date, no administrative fees are outstanding to P&A Group, Inc. and approximately $5,000 is owed to P&A Group, Inc. for the Diocese's contributions under the Health Reimbursement Account.

n. *403(b) Plan.* The Diocese also offers non-clergy Employees the opportunity to participate in a defined contribution qualified retirement plan under section 403(b) of the Internal Revenue Code. The Diocese makes a core contribution of between 2% and 6% based on

3501438.2

the age and length of service for each non-clergy Employee, with a further matching contribution of 100% for Employees with 5 or more years of service. AIG Retirement Services administers the plan, and charges a quarterly fee of $20,000, paid in arrears on April 1. As of the pay period end date of February 22, 2020, the Diocese's core contributions and employer matches under the 403(b) Plan were current, however quarterly fees remained outstanding in the amount of approximately $6,600.

        o.    *Retirement Plans.* The Diocese sponsors and administers a Priests Retirement Plan, the Retirement Plan for Secular Priests of the Diocese of Buffalo, New York (Priest Plan) (the "Priest Plan"), a multi-employer, non-qualified defined benefit pension plan covering all priests incardinated in the Diocese of Buffalo. The Diocese also contributes to a defined benefit pension plan for lay employees, the Diocese of Buffalo New York Retirement Plan (Lay Plan) (the "Lay Plan") that was frozen as of January 1, 2016. Upon freezing the Lay Plan, each participant's annual accrued benefit at the normal retirement date would remain the same as it was as of December 31, 2015, except for participants not vested at that time, for which vesting service will continue to be credited beyond January 1, 2016. Contributions to the Lay Plan will continue at a reduced rate until the plan is fully funded. Each of the Priest Plan and the Lay Plan are managed by independent boards of trustees. Plan assets for the Priest Plan and the Lay Plan are invested in separate investment trusts. The Diocese makes contributions to the Priest Plan on a quarterly basis, and as of the Petition Date approximately $700,000 is outstanding for this contribution. The Diocese makes contributions to the Lay Plan on a monthly basis in the amount of approximately $61,300. The Diocese submits this monthly contribution amount, along with the

3501438.2

collected contributions of other Lay Plan participants, to the Lay Plan. As of the Petition Date, no amounts are outstanding for the Diocese's contributions to the Lay Plan.

39. *Workers' Compensation.* The Diocese provides workers' compensation benefits ("Workers' Compensation Benefits") to all of its Employees and Temporary Workers. These benefits are covered primarily under the Diocese's self-insured workers' compensation insurance program, which is administered by USI Insurance Services, LLC, for the first $600,000 per occurrence with respect to any workers compensation claims. This benefit is also addressed in the Self-Insurance Motion, filed contemporaneously herewith. USI Insurance Services charges $742.50 per claim for indemnification and $160 per claim for medical benefits as an administration fee for each self-insured claim, paid monthly in arrears. The Diocese anticipates that approximately $3,000 in obligations to USI Services, LLC is owed as of the Petition Date.

40. Excess workers compensation coverage is provided by Star Insurance Company. The annual workers' compensation premium paid to Star Insurance Company is approximately $130,000 and was paid annually in July for the Diocese's 2019-2020 fiscal year. The Diocese does not believe there are any outstanding payments due to Start Insurance Company for excess workers compensation coverage premiums.

41. Failure to maintain workers compensation insurance could result in the institution of administrative or legal proceedings against the Diocese and its officers. By this Motion, the Diocese seeks authority to continue paying and/or contesting in good faith, as appropriate in the Diocese's business judgment, all amounts related to workers' compensation claims that arose prior to the Petition Date, including, without limitation, any payments to insurers required as a result of

3501438.2

such claims and wage loss makeup obligations, as they become due in the ordinary course of the Diocese's business.

42.      ***Deductions***. During each applicable pay period, the Diocese routinely withholds certain amounts from Employees' pay that the Diocese is required to transmit to third parties. Some examples of such withholding include HRA and FSA contributions, 403(b) contributions, United Way donations, child support payments, wage garnishments, and other pre-tax and after-tax deductions payable pursuant to certain of the benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, legally-ordered deductions, fees and assessments and miscellaneous deductions) (collectively, the "Deductions").

43.      The Diocese forwards the Deductions to the appropriate third-party recipients. On average, the Diocese deducts approximately $24,000 in non-tax items from its non-clergy Employees' paychecks each bi-weekly pay period and an additional $4,000 in non-tax items from Active Priests' monthly paychecks. Retired Clergy's monthly Deductions are approximately $55,000. Due to the commencement of the Chapter 11 Case, however, certain Deductions that were deducted from Employees', Active Priests' and Retired Clergy payments may not have been forwarded to the appropriate third-party recipients prior to the Petition Date.

44.      ***Payroll Taxes***. Further, the Diocese is required by law to withhold from its Employees' wages amounts related to federal and state income taxes and Social Security and Medicare taxes for remittance to the appropriate federal or state taxing authority (collectively the "Withheld Amounts"). On average, the Diocese pays approximately $24,800 in payroll taxes, including deductions from its non-clergy Employees' paychecks and employer contributions, for each bi-weekly pay period and an additional $17,000 for Active Priests for each monthly payroll.

3501438.2

Approximately $14,000 in payroll taxes, including deductions from Retired Clergy monthly payments and Diocese contributions, is paid for Retired Clergy. The Diocese must match from its own funds Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes"). The Diocese believes that accrued but unpaid Payroll Taxes as of the Petition Date totals $56,000.

45. The Diocese believes that the Deductions and Payroll Taxes, to the extent that they remain in the Diocese's possession, constitute monies held in trust and therefore are not property of the Diocese's bankruptcy estate. Accordingly, by this Motion the Diocese seeks authorization, but not direction, to forward any unpaid Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities and to continue to forward the Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

46. In order to retain Employees and Temporary Workers and support Retired Clergy and Seminarians in furtherance of the Diocese's mission, the Diocese must have authority to pay or otherwise satisfy the Employee Wages and Benefits as summarized above. The amounts requested to be paid pursuant to this Motion are reasonable compared with the importance and necessity of the Diocese's payments to Employees, Retired Clergy, Seminarians and Temporary Workers and the harm that these individuals and the Diocese would likely suffer if these amounts are not paid.

47. The Diocese's books and records indicate that in no instance should the amount owing to any Employee on account of the Employee Wages and Benefits as of the Petition Date exceed the sum of $13,650, which amount is allowable as a priority claim under sections 507(a)(4)

3501438.2

and 507(a)(5) of the Bankruptcy Code. Moreover, the Diocese only seeks authority to make payments to Employees up to the combined statutory maximum of $13,650 on account of wages and compensation earned within 180 days before the date of the filing of a petition, allowed as a priority claim under section 507(a)(4) and contributions to employee benefit plans allowed as a priority claim under section 507(a)(5).

48.     As part of the relief requested in the Wages Motion, the Diocese also seeks authority to pay the Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities. Indeed, certain of these amounts are not property of the Diocese's estate because they have been withheld from paychecks on another party's behalf. *See* 11 U.S.C. § 541(b). The Deductions principally represent earnings which Employees, Retired Clergy, Seminarians and Temporary Workers have designated for deduction from Employee paychecks and payment to third-party recipients. The failure to pay the Deductions could result in significant hardship. It is even possible that garnishments from wages result in funds that are not the Diocese's property, but rather must be withheld from paychecks for payment to third parties. Moreover, if the Diocese cannot remit these amounts, Employees, Retired Clergy, Seminarians and Temporary Workers may face legal action due to the Diocese's failure to make these payments. Additionally, the failure to pay Payroll Taxes may subject the Diocese and its officers to federal or state liability.

49.     Based upon the foregoing, the Diocese respectfully requests that the Court enter an Order authorizing the Diocese to pay or otherwise satisfy, in the ordinary course of business, the Employee Wages and Benefits. Such relief is justified because the failure to pay any such amounts will likely disrupt the services that the Employees, Retired Clergy, Seminarians and Temporary

3501438.2

Workers provide to the Diocese and ultimately, the Diocese's ability to successfully administer its Chapter 11 Case.

### IV. Motion for Entry of Interim and Final Orders (I) Authorizing the Continued Maintenance of the Diocese's Self-Insurance Programs; and (II) Authorizing the Payment of Prepetition Obligations in Respect Thereof (the "Self-Insurance Motion")

50.     The Diocese requests that the Court enter interim and final orders allowing the Diocese to continue to maintain its self-insurance program for property, casualty, workers' compensation and both general and automobile liability risks (the "SIP") and its self-insured health program (the "SIHP", and, collectively with SIP, the "Self-Insurance Programs"). The Diocese also seeks entry of an order authorizing, but not directing, the Diocese in its discretion, to pay any prepetition claims, premiums, defense costs, obligations and administrative costs related to the Self-Insurance Programs, and authorizing banks to honor checks and other withdrawals, whether for pre- or postpetition periods, for amounts representing payments or reimbursement of claims payable under the Self-Insurance Programs. To the extent coverage may be available under the Self-Insurance Programs' policies for claims made pursuant to the New York Child Victims Act (the "CVA"), the Diocese is not seeking authority to pay such claims at this time. The Diocese proposes to address all CVA claims, as well as any insurance coverage which may be available to cover them, in connection with its plan of reorganization.

51.     An order granting the requested relief is necessary to minimize unnecessary disruption to the Diocese and other participants in the Self-Insurance Programs and to continue the insurance coverage funded with their premium payments. The Diocese is not requesting the assumption or rejection of any executory contracts in connection with this Motion.

3501438.2

52. ***The Self-Insurance Program.*** The Diocese has implemented the SIP as a means of ensuring that the Diocese and certain Other Catholic Entities (collectively, the "SIP Participants") have adequate insurance protection at a reasonable price by spreading risk among a large number of participants and leveraging their collective buying power to secure excess coverage at favorable rates.

53. Under the SIP, the Diocese coordinates and administers a self-insurance program providing coverage and risk management services for itself and each of the SIP Participants. The SIP currently provides self-insurance coverage, subject to applicable excess policies, for (i) direct and indirect property loss, business interruption and equipment breakdown (ii) general liability claims, including personal injury, employee benefits, sexual misconduct, employment practices, directors and officers, school board legal liability, cyber liability, errors and omissions, as well as automobile liability, and (iii) workers' compensation.

54. The SIP utilizes third party insurance brokers to assist the Diocese in purchasing appropriate excess coverage and administer various risk management programs. The SIP also utilizes third party claims administrators to oversee the administration and payment of workers' compensation claims in compliance with New York State statutes.

55. The Diocese funds the SIP primarily by billing each SIP Participant a ratable portion of the projected overall cost of administering the program and paying claims, using allocation methodologies which take into account numerous different ratable exposure bases. The Diocese strives to achieve a consistent and fair allocation of premium costs among the SIP Participants. For fiscal year 2019-2020, the Diocese has budgeted approximately $7.4 million in

- 25 -

3501438.2

premium revenue related to the SIP. This premium revenue is used to pay administrative costs of the program, to pay claims for losses, and to pay premiums for excess coverage.

56. Under the SIP, the Diocese is responsible for paying all claims for losses by any SIP Participant, up to the point of available excess coverage. The Diocese has a $100 million excess policy with Travelers which provides coverage for property and business interruption losses in excess of the $500,000 Diocesan self-insured retention ("SIR") on a per occurrence basis. For general and automotive liability, the Diocese is responsible for paying claims of up to the $250,000 per occurrence SIR, with $14.75 million of excess coverage provided through National Catholic Risk Retention Group and an additional $25 million through W.R. Berkley. The Diocese also pays the first $600,000 per occurrence with respect to any workers compensation claims. Claims above the $600,000 SIR are paid by an excess insurance carrier, currently Star Insurance Co. If there are surplus SIP Funds remaining at the end of a fiscal year after payment of all costs and expenses related to the program, such surplus funds are deposited by the Diocese into a segregated reserve account and used to offset future obligations under the program.

57. The Diocese employs two full-time claims professionals with a combined sixty years of insurance claims handling experience who establish the case-specific reserves for each claim as well as calculate the reserves necessary to satisfy unknown claims that may have been incurred but not yet reported in accordance with standard insurance industry practice. As of the Petition Date, the SIP program had established case-specific reserves in the amount of approximately $350,000 for property damage claims, $2,850,000 for non-CVA general liability claims, and $7,200,000 for workers compensation claims. Reserves for workers compensation claims are either held directly by the New York Workers Compensation Board or held in an

3501438.2

investment account at Wilmington Trust (a subsidiary of M&T Bank) to collateralize a letter of credit issued by M&T Bank in favor of the Workers Compensation Board. All other program reserves are invested in the St. Joseph Investment Fund.

58. The SIP provides a practical, cost-effective way to manage risk for the SIP Participants under a single, comprehensive insurance program. If the SIP is not continued, the Diocese, together with each of the SIP Participants, will be forced to purchase separate insurance policies covering each entity and their respective properties. Upon information and belief, each of the Diocese and the other SIP Participants would incur substantially higher costs to obtain their own individualized insurance (with or without a retention or deductible) than what they are currently assessed under the SIP. Moreover, without the broad collective risk profile provided by the SIP, certain types of coverage and available coverage limits may simply not be available on an individualized basis or on commercially reasonable terms.

59. The Diocese seeks to continue to maintain the SIP for itself and on the behalf of the SIP Participants and to pay claims under the SIP in accordance with past practice and in the ordinary course of business. The Diocese believes that the maintenance of the SIP is in the best interest of the estate and its creditors.

60. *The Self-Insured Health Program.* The Diocese also coordinates and administers the SIHP, which provides voluntary self-insured medical coverage for Diocesan employees, employees other Catholic entities, and their dependents (the Diocese, together with such other participating employers, the "SIHP Participants"). The SIHP currently provides health insurance coverage for approximately 408 individuals.

3501438.2

61.     The SIHP utilizes a third-party administrator to assist the Diocese in processing claims and establishing appropriate financial contributions for the SIHP Participants and their employees.     Independent Health Association, Inc. ("Independent Health") serves as the administrator. Independent Health administers SIHP coverage through First Choice, a self-funded, tailored-network plan available for large group employers in Western New York.

62.     As the administrator for the SIHP, Independent Health evaluates reimbursement claims submitted by healthcare providers, determines the appropriate amounts owed, and coordinates payment of claims.  Independent Health bills the amount of any allowed claims and a per-capita administrative fee to the SIHP on a bi-weekly basis.  The dollar value of claims payable to Independent Health in any given billing cycle varies depending upon the medical services utilized from time to time by SIHP beneficiaries.  The administrative fee paid to Independent Health is, on average, approximately $15,000 per month.

63.     Each of the SIHP Participants pays premiums to cover the costs of providing coverage for its respective employees and their dependents under the SIHP.  SIHP premiums are paid on a per-head basis and are calculated based upon the prior year's claim experience.  In the event the SIHP experiences claims in excess of those budgeted, all SIHP Participants are required to contribute additional funds on a ratable basis to ensure the program remains fully funded.  All funds related to the SIHP are maintained by the Diocese in a separate segregated account at M&T Bank and are used to pay claims and other costs of administration.

64.     In the event a SIHP beneficiary requires extraordinary levels of medical care, the SIHP maintains a stop-loss policy with HM Insurance Group, Inc. ("HM"), which provides coverage for claims of any individual in excess of $175,000 per year. Premiums for the stop-loss

3501438.2

policy are paid directly to HM. The Diocese estimates that the ongoing monthly cost associated with maintaining SIHP stop-loss coverage is approximately $19,000.

65.     As of the Petition Date, the Diocese estimates that it has reserves for the SIHP of approximately $1,000,000, which it believes to be sufficient to cover all known and anticipated claims under the program for the current fiscal year.

66.     A majority of the funds used to fund the Self-Insurance Programs are derived from sources other than the Diocese for the purpose of providing risk management services to Other Catholic Entities. The Diocese believes that it holds these funds in trust for the benefit of such Other Catholic Entities and that they are therefore not property of the Diocese's bankruptcy estate. However, to the extent such funds could be characterized as estate assets, the Diocese believes the importance of maintaining appropriate insurance coverage for itself and the other participants in the Self-Insurance Programs without interruption justifies the relief sought in this Motion.

67.     For the reasons described above, and in view of the Diocese's need to maintain appropriate risk management programs to support its reorganization efforts and to ensure continued health care coverage for 408 individuals, authorizing the Diocese to continue to maintain the Self-Insurance Programs and to pay claims and other obligations under those programs in the ordinary course of business is in the best interests of all parties in interest in this case. The continuance of the Self-Insurance Programs is essential to the Diocese's ability to minimize disruption during this Chapter 11 Case and to maximize the value of its estate for the benefit of its creditors. Thus, the Diocese respectfully requests authorization (but not direction) to fully retain in place the existing Self-Insurance Programs and to honor prepetition obligations related thereto.

3501438.2

**V.  Motion for Interim and Final Orders (A) Authorizing, But Not Directing, the Diocese to (I) Continue Using Existing Bank Accounts, Banking Practices and Business Forms, (II) Maintain Investment Accounts and Practices, and (III) Continue Using Payment Cards, and (B) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b) (the "Cash Management Motion")**

68.     The Diocese respectfully requests that the Court enter interim and final orders authorizing the Diocese (i) continue to use, with the same account numbers, its existing Bank Accounts (as defined below), (ii) treat the Bank Accounts as debtor-in-possession accounts; (iii) continue to use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders and invoices) and other documents relating to its Bank Accounts existing immediately before the Petition Date, without reference to its status as a debtor-in-possession; (iv) maintain its prepetition investment practices, and (v) continue use of certain payment cards.

69.     The Diocese further requests that the Court authorize all banks and institutions at which any of the Bank Accounts are maintained (collectively, the "Banks") to continue to maintain, service and administer the Bank Accounts, including charging any undisputed, outstanding service charges owed to the Banks on the Petition Date, and that each of the Banks be authorized and directed to receive, process, honor, and pay (i) all post-petition checks, drafts, wire transfers and other electronic payment requests (to the extent of funds on deposit) together with (ii) any prepetition checks or payment requests, but solely to the extent they relate to payments or obligations approved by separate order of this Court.

70.     ***Bank Accounts***.  In the ordinary course of business, the Diocese utilizes the following accounts to receive, hold and distribute funds (collectively, the "Bank Accounts"), each of which is described in more detail below:

3501438.2

| Account name | Depositary Institution | Last four digits of account number |
|---|---|---|
| Operating Account | M&T Bank | 1200 |
| Diocesan Purchasing Division Account ("DPD Account") | M&T Bank | 5004 |
| National Collections Account | M&T Bank | 6516 |
| Catholic Partnership Health Account | M&T Bank | 1230 |
| Disbursement Account | HSBC Bank | 9447 |
| Dental Account | HSBC Bank | 7226 |
| Payroll Accounts | HSBC Bank | 4140 and 4174 |
| Charitable Gift Annuities Account ("CGA Payments Account") | Key Bank | 5423 |
| Self-Insurance Fund ("SIP Account") | Bank of America | 2016 |
| HRA Account | M&T Bank | 1539 |
| FSA Account | M&T Bank | 1547 |
| Department Bank Accounts | Various | See Exhibit C |

71. *Operating Account (xx1200)*. The Operating Account is the Diocese's primary account and is used to hold most of the Diocese's cash and to transfer funds to other Bank Accounts as necessary.

72. *DPD Account (xx5004)*. The DPD Account is used by the Diocese's purchasing division to procure goods and services on a collective basis for the Diocese and other Catholic institutions. By consolidating its purchasing efforts with parishes, schools and other entities, the Diocese leverages the buying power of all participants to obtain better pricing and other terms offered by vendors for volume purchases. Among other things, the Diocese uses funds in the DPD Account to purchase audio-visual equipment, cafeteria and kitchen supplies, apparel and vestments, office supplies and equipment, and various other church ware and religious goods, and then bills each parish, school or other purchaser for their respective portion of the purchase price.

73. *National Collections Account (xx6516)*. The National Collections Account is used by the Diocese to hold monies collected from second offertory collections or other appeals for the purpose of supporting national Catholic initiatives and which are payable by the Diocese to the

3501438.2

United States Conference of Catholic Bishops. The Code of Canon Law mandates the fundamental principle regarding donor intent. The canonical principle stipulates that "offerings given by the faithful for a certain purpose can be applied only for that same purpose." *See* Canon 1284 § 3.

74. *Catholic Partnership Health Account (xx1230).* The Catholic Partnership Health Account holds segregated funds collected from participants in the Diocese's Self-Insurance Health Care Plan ("SIHP") and used to pay health insurance claims, administrative costs, stop-loss premiums and other costs related to providing the SIHP.

75. *Disbursement Account (xx9447).* The Disbursement Account is used to pay the Diocese's accounts payable to vendors and service providers for goods and services procured outside of the purchasing department.

76. *Dental Account (xx7226).* The Dental Account is used to fund claims for dental insurance coverage for the Diocese's employees and retired priests.

77. *Payroll Accounts (xx4140 and xx4174).* The Payroll Accounts are used to fund payroll, benefits, and other payments to employees of the Diocese and retired priests.

78. *CGA Payments Account (xx5423).* The CGA Payments Account is part of the Diocese's charitable gift annuity program, which is described in greater detail below. From time to time, and in accordance with the requirements of the annuity program, the Diocese liquidates securities held in the CGA Investment Account (defined below). The proceeds of such liquidation are deposited into to the CGA Payments Account and used to make payments to annuitants.

79. *SIP Account (xx2016).* The SIP Account is used in connection with the Diocese's self-insurance program ("SIP") to pay covered property, casualty, workers compensation, automobile and general liability claims, as well as to make payments to carriers for the Diocese's

3501438.2

excess insurance policies.  The Diocese has by separate motion requested authorization to continue the SIP in the ordinary course of business and seeks to continue the use of this account in connection with that request.

80.     *HRA Account (xx 1539)*.  The HRA Account is used to fund contributions to health reimbursement accounts for Diocesan employees who are enrolled in the high deductible health plan.

81.     *FSA Account (xx1547)*.  The FSA Account is funded entirely through employee contributions via payroll deduction and is used to fund those employees' flexible spending accounts.

82.     *Department Bank Accounts*.  The Diocese maintains a number of low-balance accounts which are utilized by various departments within the Diocese for specific purposes related to their respective departmental functions.  A full list of these accounts is attached hereto as *Exhibit C*.

83.     ***Investment Accounts***.  In addition to its Bank Accounts, the Diocese maintains the following investment accounts in the ordinary course of its business (collectively, the "Investment Accounts"):

84.     *St. Joseph Investment Fund, Inc.*  The Diocese's non-cash investments are held primarily in an account with St. Joseph Investment Fund, Inc. ("SJIF").  SJIF is a not-for-profit corporation formed in 2006 to maintain pooled investments on behalf of the Diocese and various separately incorporated Catholic entities in conformity with Canon Law and the New York State Prudent Management of Institutional Funds Act.  SJIF's affairs are governed by its Certificate of Incorporation and By-laws.  As SJIF is a separate and distinct legal entity, the debts and liabilities

3501438.2

of SJIF lie solely with SJIF and are not guaranteed or payable by the Roman Catholic Church, the Diocese or any other person or entity. Similarly, the debts and liabilities of the Roman Catholic Church and the Diocese are solely their own and are not guaranteed or payable by SJIF.

85.     SJIF's purpose is to maximize investment returns through economies of scale and to provide participants with the opportunity to invest in harmony with the teaching and beliefs of the Roman Catholic Church. SJIF provides for administration and protection of temporal goods, as required by Canon Law. SJIF is exempted from certain federal and state securities laws pursuant to the Philanthropy Protection Act of 1995. *See, e.g.*, 15 U.S.C. §§ 77c(a)(4), 78c(a)(12)(A)(v), 80a-3(c)(10), 80a-3a.

86.     The participants in SJIF include: the Diocese, parishes, cemeteries, and other Catholic entities. As of December 31, 2019, SJIF had approximately $147 million in total assets under management, the majority of which constitute investments by entities other than the Diocese. Of the approximately $21.8 million in Diocesan funds under management, approximately $9.6 million is specifically designated for the payment of retired priest medical benefits, for seminarian programs, and to support the Diocese's obligations under its self-insurance program, and approximately $12.1 million is unrestricted and available for use at the discretion of the Diocese.

87.     SJIF manages both a short-term fund which seeks to provide current income while maintaining liquidity and which invests primarily in investment grade short term debt securities and high quality money market instruments, as well as a long-term fund which seeks to provide a blend of capital growth and current income by investing assets in a blend of equity securities, fixed income securities, institutional commingled mutual funds, and hedge funds of funds, with the goal of achieving the following allocation targets:

3501438.2

| Asset Class | Target % | Permissible Ranges | Target Benchmark |
|---|---|---|---|
| **Equity** | **47%** | **37 - 57%** | |
| Domestic Large Cap | 17% | 12 - 22% | S&P 500 |
| Domestic Small Cap | 7% | 4 - 10% | S&P 600 |
| International Equities | 23% | 17 - 29% | Various non-US equity market benchmarks |
| **Fixed** | **26%** | **10 - 35%** | |
| Domestic Core | 13% | 8 - 25% | Barclays Aggregate |
| Emerging Market | 3% | 0 - 6% | Local Currency Sovereign EM Debt |
| Global Multi-Sector | 5% | 0 - 8% | S&P/Citigroup WGBI |
| Absolute Return | 5% | 0 - 8% | Barclays Aggregate |
| **Alternatives** | **17%** | **12 - 22%** | |
| REITs | 3.5% | 0 - 7% | FTSE NAREIT Equity REIT |
| Natural Resource Equity | 3.5% | 0 - 7% | S&P Global Natural Resources |
| Hedge Fund of Funds | 10% | 7 - 13% | HFRI Hedge Fund of Funds Index |
| **Multi-Asset Managers** | **10%** | **5 - 15%** | |
| Global Asset Allocation | 10% | 5 - 15% | 50%/50% Global Stocks/Bonds |

88.     SJIF is managed by its board of directors, and investment oversight activities are delegated to the board's investment committee. The current members of the board, together with information regarding their qualifications, are as follows (*members of the investment committee are denoted in bold*):

- **Jennifer C. Balbach**, Chair; Partner, Summer Street Capital Partners, LLC; BA, Psychology, Harvard College, Cambridge, MA; MBA, Tuck School of Business at Dartmouth. Ms. Balbach has been a manager of a private equity fund for 19 years and serves on 4 other boards in the Buffalo area.

- **David P. Bauer**; National Fuel Gas Supply Corporation; BA, Accounting, Boston College, Boston, MA. Mr. Bauer has been employed by National Fuel for ten years and is a member of its Retirement Committee, which oversees the trust investments of National Fuel's various retirement benefit plans. Previously employed as a Senior Manager at PricewaterhouseCoopers. He serves on 2 other boards in the Buffalo area.

- Patrick Bohen; Advisor and member of the Leadership Group at Dopkins Wealth Management in Buffalo, NY. He is also a board member of the Leadership Council of The Massachusetts General Hospital Cancer Center. He has a BA in International Relations from Canisius College and over 20 years in the investment and financial

3501438.2

industry. Additionally, he is an active volunteer in the community and serves on another outside investment board.

- Eileen C. Crotty; Chief Financial Officer of Hodgson Russ LLP, B.S. Accounting from Canisius College. She formerly served on the Audit Committee of The Diocese of Buffalo, N.Y. She currently serves on the Canisius College Council on Accountancy, of which she was past chair.

- **Andrew W. Dorn Jr.**; Partner, Energy Solutions Consortium, LLC.; BS State University of New York at Buffalo; MBA, Canisius College, Buffalo, New York. Past President and CEO of the Greater Buffalo Savings Bank and the Jamestown Savings Bank. Currently, a Director of Financial Institutions, Inc. and the Western New York Foundation. Past Chair of D'Youville College and member of the investment committees of Sisters of Charity Hospital in Buffalo, NY; D'Youville College, St. Joseph's Collegiate Institute and the Northern Chautauqua Community Foundation.

- **Carrie B. Frank**; Healthcare Executive; B.S., Accounting from Canisius College, Buffalo, NY. Mrs. Frank held leadership positions in various healthcare delivery and financial capacities in her 36-year professional career. Former Vice President at Excellus Health Plan and CFO and COO of Buffalo General and Kaleida Health. Mrs. Frank currently serves on several volunteer boards and on two other investment committees.

- Sister Dorothy Mueller; Copywriter and Donor Relations Coordinator for Our Lady of Victory Homes of Charity, is a member of the Stella Niagara Franciscans; BS in Education from Rosary Hill/Daemen College; MS in Education from Xavier University, Cincinnati, Ohio; Sister was an educator, served her religious community as Finance Director for 20 years and Provincial Minister for 8 years. She currently serves as a member of the Board of Directors for Daemen College and chairs its Audit Committee.

- **Edward P. Schneider**; Executive Director, University at Buffalo Foundation, Inc. (1976-Present); B.S., Accounting, Canisius College, Buffalo NY, 1974; MBA, State University of New York at Buffalo, 1980; currently director of 2 community not-for-profit organizations and investment committee member for 4 other organizations.

- **Edward F. Walsh, Jr.**; President and Chief Operating Officer, Walsh Duffield Companies, Inc.; BA (American Studies) Williams College, Williamstown, MA, 1976; Mr. Walsh has been employed in the insurance industry since 1977. Mr. Walsh is currently a director or trustee of 7 community human service organizations and foundations.

3501438.2

- **Lee C. Wortham**; Chief Operating Officer, Barrantys, LLC; BS Canisius College, Buffalo, NY; MBA, New York Institute of Technology, Westbury, NY. Mr. Wortham has over 35 years of experience in the financial services industry. Mr. Wortham is Chairman of the Roswell Park Alliance Foundation, Vice Chairman of Evans Bancorp, Inc., serves on the Board of the Patrick P. Lee Foundation and is a member of the Canisius College Board of Trustees where he is Chair of the Investment Committee.

89.     SJIF retains multiple investment managers to provide investment advice as to appropriate investments and to manage various portfolios of securities. The investment managers are selected by the Investment Committee and approved by the Board of Directors. All investment managers are registered with the Securities and Exchange Commission as "investment advisers" pursuant to the Investment Advisers Act of 1940. The performance of investment managers is reviewed and evaluated quarterly.

90.     NEPC, LLC ("NEPC") has been engaged as an independent consultant to provide consultant services with respect to investment policy development and risk control, asset allocation strategy, investment manager searches, and investment performance analysis. NEPC consultants meet quarterly with the Investment Committee to review performance trends and investment market projections.

91.     Custody services for SJIF are provided by US Bank, St. Louis, Missouri for separately managed portfolios. Custody services for multi-investor funds held by SJIF are provided by various custodians, including Bank of New York Mellon, The Northern Trust Co., Deutsche Bank Trust Co., and Citco.

92.     The Diocese and SJIF have entered into an administrative contract pursuant to which the Diocese supplies SJIF with the services of certain of its employees to assist in

3501438.2

maintaining participant and accounting records relating to the funds, and SJIF reimburses the Diocese for such services.

93.    *CGA Investment Account.*  The Diocese maintains a charitable gift annuity program pursuant to N.Y. Insurance Law § 1110, which allows the Diocese to enter into agreements with donors under which the Diocese receives gifts for the benefit of itself and other Catholic entities in exchange for its agreement to make annuity payments calculated based upon the actuarial projected lifespan of the annuitant.  Gifts received through this program are invested in an account (the "CGA Investment Account") maintained by the Diocese with Christian Brothers Investment Services, Inc. ("CBIS") and are used to fund quarterly payments to the annuitants during their lifetimes.  Upon the death of an annuitant, the remaining corpus of the gift becomes the property of the beneficiary named in the annuity agreement, which can be the Diocese or a parish, school, religious order, or other Catholic entity separate from the Diocese.  As of the Petition Date, all of the gifts in the program other than one are designated for a beneficiary other than the Diocese.

94.    The Diocese holds a permit, issued by the New York State Department of Financial Services ("DFS"), to run its charitable gift annuity program, and it submits annual reports and it submits annual reports and undergoes periodic audits by DFS with respect to the program. Investments in the CBIS Account are overseen by CBIS in consultation with the Diocese, and are made in accordance with the statutory requirements set forth in the N.Y. Insurance Law.

95.    As of the Petition Date, the value of the CGA Investment Account was approximately $434,216 and the Diocese was administering 24 annuity accounts established by 8 individual annuitants.  Annuity payments due under the program amount to approximately $21,273 annually.

3501438.2

96.     *LOC Collateral Account.*  As described more fully in the Diocese's Self-Insurance Motion, the Diocese is self-insured for workers compensation claims.  Like most self-insured organizations, the New York Workers Compensation Board ("WCB") has required that the Diocese post security to cover potential workers compensation liabilities.  The Diocese has fulfilled this requirement in part through an irrevocable standby letter of credit (the "WCB LOC") issued to WCB by M&T Bank on behalf of the Diocese in the amount of approximately $4.8 million.  The Diocese's repayment obligations to M&T Bank under the WCB LOC are collateralized by a restricted securities account (the "LOC Collateral Account") held with Wilmington Trust, N.A (a subsidiary of M&T Bank).  As of the Petition Date the LOC Collateral Account had a market value of approximately 5.1 million.

97.     *DOB Brokerage Account.*  Lastly, the Diocese maintains a brokerage account at M&T Bank (the "DOB Brokerage Account").  The DOB Brokerage Account does not typically maintain a balance but is used to receive and liquidate securities that may be gifted or bequeathed to the Diocese and other Catholic entities in the Buffalo area.

98.     **Payment Cards**.  The Diocese uses the following types of payment cards:

99.     *Prepaid Visa Cards.*  The Diocese utilizes 25 PEX Visa Prepaid Cards to manage business expenses for the Diocese and its employees.  Those cards are issued through Fifth Third Bank, N.A., and The Bancorp Bank.  The PEX Visa Prepaid Cards function similarly to a debit card.  The Diocese maintains a deposit in the amount of approximately $40,000 with Fifth Third Bank and any purchases made with the PEX Visa Prepaid Cards are deducted from the amount on deposit.  Periodically, the Diocese will replenish the deposit from its Operating Account.

3501438.2

100.  *Gas Cards*.  The Diocese has six Exxon Mobile Gas Cards which are used to purchase fuel for Diocesan vehicles and employees.  On average, the Diocese incurs less than $1,000 per month in fuel charges and the balance on the Exxon Mobile Gas Cards are paid in full at the end of each billing cycle in the ordinary course of business and generally costs the Diocese less than $1,000 a month.

101.  **Business Forms**.  In the ordinary course of business, the Diocese uses multiple check types associated with the Bank Accounts.  Additionally, the Diocese uses a variety of correspondence and business forms including, but not limited to, letterhead, purchase orders and invoices.  To minimize the expense and disruption to the Diocese's estate associated with developing and/or purchasing entirely new forms, the delay in conducting business prior to obtaining such forms and the confusion of employees, vendors and suppliers, the Diocese seeks authority to continue to use all correspondence and business forms as they existed immediately prior to the Petition Date, without reference to the Diocese's status as debtor-in-possession.  The Diocese will use its reasonable best efforts to mark "debtor-in-possession" on business forms as soon as reasonably practicable following the Petition Date.

102.  The Diocese respectfully requests that the Court authorize it to continue using its prepetition Bank Accounts rather than closing them and opening new post-petition accounts.  Closing the Diocese's Bank Accounts would cause disruption to the Diocese's operations and fulfillment of its mission.  As described above, the Diocese's maintains a sophisticated system of special purpose Bank Accounts in order to facilitate the orderly collection, management and disbursement of funds in the ordinary course of its business.  If the Diocese were required to open new accounts as of the Petition Date, it would unnecessarily distract the Diocese's key business

3501438.2

office personnel in an office that is already operating at maximum capacity. In addition, changing accounts would also cause disruptions in essential deposit and automated debit activity, potentially leading to loss of revenue, missed payments or overdraws and therefore causing harm to the Diocese's operations. As a result, the Diocese respectfully submits it is appropriate to maintain its prepetition Bank Accounts and practices.

103. The continued use of the existing Bank Accounts will facilitate the Diocese's transition into this chapter 11 case by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of post-petition debts. The Diocese respectfully submits that parties in interest will not be harmed by the continued maintenance of its Bank Accounts because, with the assistance of professionals, the Diocese has implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

104. The Diocese submits that maintaining the existing Bank Accounts will facilitate the Diocese's ability to collect, deposit and account for receipts and pay post-petition bills. Closing the Bank Accounts would require the Diocese to open new accounts and arrange alternative procedures for electronic and manual transfers to and from the Bank Accounts. The result would be a disruption of processing payments, and similarly would disrupt wire transfers, payroll obligations, and post-petition obligations to vendors and other creditors.

105. The Diocese also requests authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Bank Accounts. The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Bank Accounts. In accordance with existing

3501438.2

practices, the Diocese will maintain strict records of all receipts and disbursements from the Bank Accounts during the pendency of this case and will ensure that its records properly distinguish between pre-petition and post-petition transactions and report accordingly to the U.S. Trustee.

106.     The Diocese also respectfully submits that maintenance of the Bank Accounts will avoid delays in payments to administrative creditors, ensure a smooth transition into chapter 11, and facilitate the Diocese's efforts to complete this Chapter 11 Case rapidly and successfully. Thus, the Diocese respectfully requests that its existing Bank Accounts be deemed debtor-in-possession accounts and that the maintenance and continued use of those accounts, in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period, be authorized subject only to a prohibition against honoring prepetition checks without specific authorization from this Court.

107.     Strict adherence to the U.S. Trustee Guidelines in this Chapter 11 Case would significantly disrupt the ordinary financial operations of the Diocese, reducing efficiencies and causing unnecessary expense, while providing little benefit to creditors.  The Diocese respectfully requests that the Court waive the requirements of the U.S. Trustee Guidelines in this Chapter 11 Case as requested herein.

108.     To minimize expenses and disruption to the Diocese's chapter 11 estate, the Diocese respectfully requests authority to continue to use all correspondence and business forms (including letterhead, purchase orders, envelopes, charitable solicitation material, invoices and the like) as such forms were in existence immediately before the Petition Date, without reference to the Diocese's status as debtor-in-possession.  The Diocese also requests authorization to use the existing check stock without the "debtor-in-possession" label for checks that it manually writes

- 42 -

3501438.2

until such check stock runs out. As soon as practicable after the Petition Date, the Diocese will include "debtor-in-possession" on the checks it prints electronically. Upon depletion of the Diocese's check stock and/or business forms stock, the Diocese will obtain new check stock and/or business form stock reflecting its status as a debtor-in-possession.

109. By virtue of the nature and scope of the Diocese's operations and the number of suppliers of goods and services with whom the Diocese transacts on a regular basis, it is important that the Diocese be permitted to continue to use its existing checks and other business forms without alteration or change, except as requested herein. Indeed, because it would appear that parties doing business with the Diocese will be aware of the Diocese's status as debtor-in-possession as a result of the widely publicized nature of this Chapter 11 Case as well as the communications and notice of commencement of this Chapter 11 Case the Diocese intends to distribute to such parties, changing business forms is unnecessary and would be unduly burdensome. Moreover, if the Diocese is required to change its current business forms, the new forms may cause confusion to the Diocesan employees, vendors and donors. The Diocese also believes that it would be costly and disruptive to cease using all existing forms and to purchase new stationery and business forms. Accordingly, the Diocese seeks a waiver of the U.S. Trustee Guidelines with respect to the continued use of its business forms and checks.

110. The Diocese requests further relief from adherence to the U.S. Trustee Guidelines to the extent doing so would require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. Considering the nature of the Diocese's operations, in certain instances, it may be necessary for the Diocese to conduct transactions by debit, wire or ACH Payments and other similar methods, as discussed above. The

3501438.2

Diocese maintains accurate records and will be able to properly account for any such transactions. The Diocese, therefore, requests that its Banks be authorized to continue to pay, honor and execute any and all debit instructions, wires and ACH Payments issued and drawn on the Bank Accounts after the Petition Date.

111.    In accordance with its contractual arrangements with the Banks, the Diocese incurs periodic service charges and other fees, costs, charges and expenses to the Banks in connection with the maintenance of the Bank Accounts (collectively, the "Service Charges"). Payment of the prepetition Service Charges is in the best interests of the Diocese and all parties in interest in this Chapter 11 Case, as it will prevent any disruption to the Bank Accounts. Further, because the Banks have setoff rights for the Service Charges, payment of prepetition Service Charges should not alter the rights of unsecured creditors in this Chapter 11 Case. Accordingly, by this Motion, the Diocese also seeks authority to pay, at the Diocese's sole discretion, the prepetition Service Charges, if any.

112.    The Diocese respectfully requests authority to continue to its prepetition investment practices and to maintain each of its Investment Accounts in the ordinary course of business. By retaining its prepetition investment practices and Investment Accounts, the Diocese will be able to earn reasonable returns on its investments, as contemplated by section 345(a) of the Bankruptcy Code, without incurring the administrative costs and compliance risk associated with converting its holdings to cash or U.S. Government Securities.

113.    The Diocese's investment practices with respect to SJIF and the CGA Investment Account are sophisticated and overseen by independent professional outside financial advisors who ensure that a diversified mix of investments is maintained to achieve moderate targeted

3501438.2

growth with minimal exposure to down-side risk in any particular investment. Moreover, the Diocese is itself a large, financially sophisticated organization that employs a professional accounting staff of fifteen (15) individuals devoted to proper oversight and management of the Diocese's finances. Moreover, the Diocese has retained Rick Szekelyi of Phoenix Management Services to serve as its financial advisor in this Chapter 11 Case. Mr. Szekelyi is a certified public accountant and has substantial experience helping companies reorganize through chapter 11 and advising them with respect to the management of their finances. Accordingly, the Diocese is not seeking to make unnecessarily risky or speculative investments, but merely to deploy its resources consistent with the recommendations of its professional advisors in an organized and diversified manner as most institutions of similar size do in the ordinary course.

114.    The Diocese has approximately $30 million in its Investment Accounts. The Diocese has a long track record of responsibly investing its funds (both restricted and unrestricted) to achieve reasonable growth with limited risk. Indeed, the Diocese uses the income generated from its holdings in SJIF to fund portions of its annual budget, and the CGA Investment Account is held and managed for the purpose of creating income to fund the Diocese's obligations to pay annuitants. If the Diocese were forced to liquidate its current holdings and instead invest in treasury securities or to maintain a collateralized deposit account in strict compliance with section 345(b), it would not be able to obtain a comparable rate of interest or growth, and the reduced income available could force the Diocese to curtail portions of its mission or, with respect to the CGA Investment Account, violate state law which dictates how charitable annuity funds must be invested. Moreover, the reduction in income inherent in disinvesting from SJIF would negatively affect creditors to the extent SJIF funds may be unrestricted and available to pay creditor claims.

3501438.2

115. In addition to the problem of replacing a valuable revenue stream, the Diocese respectfully submits that the sheer size of its investments will make it difficult and unnecessarily expensive, if not outright impossible, to obtain a bond or collateral securities to cover the full amount invested in SJIF and/or to find an authorized depository willing to take on such a deposit.

116. The Diocese submits that each of the custodians for the Diocese's investments in SJIF, and each of the financial institutions with which the other Investment Accounts are held, are large, stable, and financially secure institutions, which, in many cases, are on the U.S. Trustee's list of approved depositories. Accordingly, the Diocese respectfully submits that there is no reason to believe the institutions with whom the Investment Accounts are held present an unreasonable risk of loss.

117. As described herein, the Diocese's Investment Accounts represent just a part of the Diocese's sophisticated financial management system, and are critical to the Diocese's ability to continue its ordinary course practices in administering its self-insurance programs and the charitable gift annuity program. Forcing the Diocese to liquidate the Investment Accounts and set up alternative arrangements would require a substantial amount of time and effort which would distract from the Diocese's ability to focus on its goal of reorganizing and confirming a plan of reorganization. Moreover, if the Diocese were required to bring the CGA Investment Account and the LOC Collateral Account into strict compliance with section 345(b), the Diocese would be forced to violate its obligations under New York law and to breach its contractual commitments to M&T Bank.

118. The Diocese respectfully submits that appropriate safeguards are in place which render strict adherence with the investment requirements of section 345(b) unnecessary. First, the

- 46 -

3501438.2

Diocese is already subject to statutory requirements under New York state laws which mandate the prudent and responsible investment of its funds. Second, the Diocese has engaged the assistance of independent professional outside financial advisors who actively monitor the Diocese's Investment Account portfolios and ensure that a diversified mix of investments is maintained to achieve moderate targeted growth with minimal exposure to down-side risk in any particular investment. Third, the investment guidelines for SJIF and the CGA Investment Account direct that the Diocese's investments are comprised primarily of professionally managed mutual funds and other securities which are widely traded and thus exposed to constant market scrutiny and valuation – reducing the risk of unexpected or severe fluctuations in value and avoiding unduly speculative investments in favor of steady growth over a long-term investment horizon. Fourth, the size and diversification built into the Diocese's portfolios means that any increase or decrease in value of a particular investment is unlikely to have a substantial impact on the overall value of the Diocese's holdings. Because each of the Diocese's Investment Accounts is comprised of a diversified portfolio of securities, the failure of any individual investment should result in minimal adverse effects on the overall value of its investments.

119. As explained in detail above, the Diocese derives many benefits from the continuation of its current investment program. Most notably, the Diocese's investments provide it with a reliable and steady source of income upon which it relies to fund ordinary course operations as well as its obligations under the charitable annuity program. The Diocese also benefits from economies of scale in joining with other investors in SJIF to take advantage of professional advisory services which would be much more expensive in the absence of a pooled investment vehicle like SJIF. Moreover, keeping the Investment Accounts in place benefits the

3501438.2

Diocese benefits by allowing it to remain in compliance with its statutory and contractual obligations.

120.    The Diocese's estate will suffer if it is not allowed to continue its existing investment program.  As noted above, the Diocese will lose out on a valuable source of revenue which it simply will not be able to replicate if forced to comply with the requirements of section 345(b).  Second, it is highly unlikely that the Diocese could even procure a bond or collateral security to cover the significant amount of investments currently held in the Investment Accounts. Even if such security could be obtained, it would almost certainly be at an extraordinary expense to the Diocese's estate and would need to be funded out of unrestricted funds, to the detriment of the Diocese's creditors.

121.    The only realistic way for the Diocese to strictly comply with section 345(b) would be to liquidate the holdings in each of the Investment Accounts, reducing the current investment positions to cash, and then to place such cash into a deposit account with one of the U.S. Trustee's authorized depositories.  The Diocese respectfully submits that doing so would be neither practical nor prudent, and that doing so would put the Diocese at risk of failing to comply with its state law obligations under the New York Prudent Management of Institutional Funds Act and/or section 1110 of the New York Insurance Law to act as a prudent investor of the funds placed under its control, as well as to violate its contractual obligation to M&T Bank to maintain the LOC Collateral Account at Wilmington Trust.

122.    Accordingly, for the reasons set forth herein, the Diocese respectfully requests that it be authorized to continue to maintain its existing Bank Accounts and banking practices, business

3501438.2

forms, Investment Accounts and investment practices, as requested in the Cash Management Motion.

**VI.** **Motion for Entry of Interim and Final Orders Authorizing the Diocese to Pay Prepetition Taxes and Regulatory Fees (the "Taxes Motion")**

123. The Diocese seeks authority to pay, in its sole discretion, in the ordinary course of its business and on its normal due dates, all undisputed prepetition sales, gross receipts, utility-users, federal excise and use, and certain other governmental taxes, including any amounts subsequently determined to be owing upon audit (collectively, the "Taxes"), regulatory fees, including, but not limited to, federal, state and local regulatory fees (the "Regulatory Fees"), and permit or other licensing fees (the "Licensing Fees," and together with the Taxes and Regulatory Fees, the "Taxes and Fees") to the respective federal, state and local taxing authorities and other governmental agencies (each a "Taxing Authority" and collectively, the "Taxing Authorities"), including all Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date.

124. In the ordinary course of its business, the Diocese is required to pay Taxes and Fees. The Diocese must remit these Taxes and Fees to the various governmental entities of the jurisdictions in which the Diocese conduct business. The process by which the Diocese remits the Taxes and Fees varies, depending on the nature of liability at issue and the Taxing Authority to which the relevant payment is made.

125. As of the Petition Date, the Diocese believes that it is current with respect to the payment of Taxes and Fees except that approximately $1,594.00 is owed for certain sales taxes incurred with respect to the Diocese's cafeteria operations and its purchasing division. Additionally, certain Taxes may have accrued prepetition but have not yet come due for payment.

3501438.2

126.     The Diocese pays the Taxes and Fees to the Taxing Authorities on a periodic basis with funds drawn by checks or by means of electronic fund transfers whether sent directly to the Taxing Authorities or sent to a third-party administrator who pays the appropriate Taxing Authorities.  Prior to the Petition Date, certain Taxing Authorities were sent checks or electronic transfers in respect of such obligations that may not have cleared the Diocese's banks or other financial institutions as of the Petition Date.

127.     Certain Taxing Authorities may assert that the Taxes and Fees are so-called "trust fund" taxes that the Diocese is required to collect from third parties and hold in trust for the benefit of such Taxing Authorities.  Even if some of the Taxes and Fees would not ordinarily be considered "trust fund" taxes in a particular jurisdiction, failure to pay the Taxes and Fees may adversely affect the Diocese's good standing in a jurisdiction, potentially impairing its ability to engage in certain transactions and continue to conduct its business.  In addition, some Taxing Authorities may audit the Diocese, if such Taxes and Fees are not timely paid, which would needlessly divert the Diocese's attention from its reorganization efforts.  Finally, to the extent that any Taxes and Fees remain unpaid by the Diocese, the Diocese's directors and officers may be subject to lawsuits or criminal prosecution during the pendency of this Chapter 11 Case.  Any such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Diocese and its leadership from effectuating the Diocese's reorganization, to the detriment of all parties in interest in this Chapter 11 Case.

128.     Any delay in paying the obligations relating to the Taxes and Fees would be detrimental to the Diocese, its creditors, and its estate.  Indeed, the Diocese's ability to manage and run its operations with as little disruption as possible requires, in part, that it remain in good

3501438.2

standing with the relevant Taxing Authorities. For the foregoing reasons, the Diocese submits that the relief requested herein is necessary and appropriate and is in the best interests of the Diocese's estate, its creditors, and other parties in interest.

**VII.  Motion for Entry of Interim and Final Orders (A) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service on Account of Prepetition Amounts Due, (B) Determining Adequate Assurance of Payment For Post-Petition Utility Services Under 11 U.S.C. § 366, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

129.    The Diocese respectfully requests that the Court enter interim and final orders, (a) prohibiting those utility companies that provide service to the Diocese (each a "Utility Company" and, collectively, the "Utility Companies") from altering, refusing or discontinuing service on account of prepetition amounts due, (b) determining that the Diocese's furnishing of deposits to Utility Companies, upon their timely request for adequate assurance, in an amount equal to two weeks of the Diocese's estimated average usage as calculated over the past year, constitutes adequate assurance of payment, and (c) establishing a procedure to address assertions by Utility Companies that they are entitled to additional adequate assurance.

130.    The Diocese's ongoing operations require the Diocese to maintain uninterrupted utility services, including electricity, natural gas, telephone, water, waste removal, internet and other services. Termination of a utility service would cause immediate and irreparable harm to the Diocese's operations and critical reorganization efforts.

131.    The Diocese receives utility services from several different providers for multiple facilities. These facilities include: the Saint Stanislaus residence at 123 Townsend, Bishop Grosz residence at 125 Townsend, the Archbishop Walsh Academy, Buffalo State Newman Center, Camp Turner, St. Joseph's Cathedral, the Catholic Center, Monsignor Conniff Residence, Bishop

3501438.2

Head Residence, Mother Teresa Home, Newman Center at University at Buffalo, Niagara Catholic School, O'Hara Residence, and St. Gianna Molla Outreach Center. The Diocese is generally current with respect to the payment of its prepetition obligations for all utility services and none of the Utility Companies hold prepetition deposits.

132.     Here, the Diocese proposes to provide each Utility Company, upon request, a cash Deposit equal to two weeks' average historical usage, calculated over the past year, and adequate funds have been budgeted for payment of all post-petition utility services.  Based upon the foregoing, the Diocese believes that most, if not all, of the Utility Companies have adequate assurance of payment even *without* the Diocese's proposed Deposit.  When the offered Deposit is complemented by the Diocese's ability to pay postpetition invoices through access to cash from continued operations, such assurance of payment significantly alleviates—if not eliminates—any honest concern of nonpayment on the part of the Utility Companies, and is therefore adequate.

133.     The Diocese submits that it satisfies the requirements of section 366 by proposing a Deposit as an acceptable form of adequate assurance of payment.  The Diocese has also proposed reasonable procedures that will allow for a Utility Company to submit an Assurance Request and for the scheduling of a hearing thereon. The Diocese anticipates that in conjunction with the Diocese's proposed Deposits, the Diocese will maintain post-petition liquidity, and therefore, the Utility Companies will not suffer any prejudice.

**VIII.   Motion for Entry of Interim and Final Orders Authorizing the Diocese to (I) Honor Prepetition Insurance Premium Financing Agreements and (II) Enter Into New Premium Financing Agreements in the Ordinary Course of Business (the "Insurance Premium Financing Motion")**

- 52 -

3501438.2

134.     The Diocese respectfully requests that the Court enter interim and final orders authorizing the Diocese to (i) honor its prepetition insurance premium financing agreements and (ii) enter into new premium finance agreements in the ordinary course of business.

135.     The Diocese is largely self-insured for most risks.  However, the Diocese does maintain excess insurance policies through a number of third-party insurers (collectively, the "Insurance Policies").  The Insurance Policies are essential to the preservation of the Diocese's business and the proper functioning of its self-insurance program.

136.     It is not always economically advantageous for the Diocese to pay the premiums on all of the Insurance Policies on a lump-sum basis.  Accordingly, in the ordinary course of business, the Diocese finances the premiums on some of their Insurance Policies by entering into premium finance agreements with premium finance companies.

137.     Currently, the Diocese finances excess property insurance premiums pursuant to a premium financing agreement (the "Property Agreement") with BankDirect Capital Finance ("BankDirect").  Pursuant to the terms of the Property Agreement, prior to the Petition Date, the Diocese made a cash down payment to BankDirect in the amount of $50,985.00 and financed the remaining $458,879.00 of premiums covered by the Property Agreement.  In exchange for these financing terms, the Diocese agreed to pay ten monthly installment payments in the amount of $46,727.00 including a total finance charge of $8,391, representing an annual interest rate of 3.97%.  In addition, the Diocese granted BankDirect a security interest in unearned premiums, dividend payments, and all payments on account of loss which result in reduction of any unearned premium.

3501438.2

138.     The Diocese also finances certain excess liability and auto insurance premiums pursuant to a financing agreement ("Package Agreement", together with the Property Agreement, the "Premium Financing Agreements") with BankDirect.  Prior to the Petition Date, the Diocese made a cash down payment to BankDirect in the amount of $81,568.79 and financed the remaining $802,790.65 of premiums covered by the Package Agreement.  In exchange for these financing terms, the Diocese agreed to pay ten monthly installment payments in the amount of $81,568.79 including a total finance charge of $12,897.25, representing an annual interest rate of 3.49%.  In addition, the Diocese granted BankDirect a security interest in unearned premiums, dividend payments, and all payments on account of loss which result in reduction of any unearned premium.

139.     If the Diocese is not able to pay its financing obligations under the Premium Financing Agreements, BankDirect could attempt to seek modification of the automatic stay to terminate the various underlying insurance policies in order to recoup its losses.  If such modification were permitted, the Diocese would then be required to obtain replacement insurance on an expedited basis and at tremendous cost to the Diocese's estate.  If the Diocese was required to obtain replacement insurance and pay a lump-sum premium in advance, this payment would likely be greater than what the Diocese currently pays.  Even if BankDirect was not permitted to terminate the underlying insurance policies, any interruption of payment would have a severe, adverse effect on the Diocese's ability to obtain a new policy or finance premiums in the future.

140.     In view of the importance of maintaining insurance coverage with respect to the Diocese's business activities, its obligations under its self-insurance program and New York law, and the preservation of the Diocese's cash flow and estate by financing the insurance premiums, the Diocese believes it is in the best interests of its estate to authorize the Diocese to honor its

3501438.2

financing obligations under the Premium Financing Agreements. Any other alternative would likely require considerable additional cash expenditures and would ultimately reduce available distributions for unsecured creditors.

141. In addition, because the Premium Financing Agreements and the Insurance Policies may expire during the course of the Chapter 11 Case, the Diocese seeks authority to renew the Premium Financing Agreements and enter into other similar agreements in connection with the continuation of Insurance Policies in the ordinary course of the Diocese's business, without further Court approval. The Diocese will need continued excess insurance coverage throughout the entire duration of the Chapter 11 Case. The Diocese respectfully submits that renewal of the Premium Financing Agreements falls squarely within the ordinary course of its business, and, but for the constraints of section 364 of the Bankruptcy Code, the Diocese would not need the Court's prior approval to renew these agreements. To reduce the administrative burden, as well as the expense of operating as debtor-in-possession, the Diocese seeks the Court's authority now to renew the Premium Financing Agreements or enter into new insurance financing agreements for the Insurance Policies, if and when necessary.

142. In light of the importance of maintaining excess insurance coverage and preserving the Diocese's liquidity by financing the insurance premiums, the Diocese believes it is in the best interests of its estate and all stakeholders to honor its prepetition financing obligations, and to renew the Premium Financing Agreements or enter into similar premium financing agreements for the Insurance Policies, as necessary.

3501438.2

## IX.   Motion for Entry of an Order Pursuant to Bankruptcy Rules 1007(c) and 9006(b)(1) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "Motion to Extend Time to File Schedules")

143.   The Diocese respectfully requests that the Court enter an order extending the time to file its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "Schedules and Statements") through and including March 31, 2020 (an extension of 17 days, for a total of 31 days from the Petition Date), without prejudice to the Diocese's ability to request additional time should it become necessary.

144.   The Diocese anticipates that there will be more than 700 creditors and interested parties involved in this Chapter 11 Case, including over 400 individuals whose claims relate to alleged instances of abuse and whose names and other identifying information will be sought to be filed under seal to protect their privacy.   Given the need for confidentiality, preparing the Schedules and Statements accurately and with sufficient detail and adherence to confidentiality requires significant attention from the Diocese's personnel and advisors.   Further, the Diocese's personnel will be heavily involved with public relations outreach in the days following the Petition Date, to facilitate the stabilization of the Diocese's operations and in support of its mission.

145.   In addition to the reasons set forth above, the Diocese respectfully submits that the complexity of its operations, the limited staff available to perform the required internal review of financial records and affairs, the numerous critical operational and mission stabilization matters that the Diocese's personnel must address in the early days of this Chapter 11 Case, the pressure incident to the commencement of this Chapter 11 Case, and the fact that certain prepetition

- 56 -

invoices may not be received or entered into the Diocese's accounting system prior to the Petition Date provide ample cause justifying the requested extension of the deadline to file the Schedules and Statements.

146.    The Diocese submits that focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of this Chapter 11 Case will help the Diocese make a smoother transition into chapter 11 and, therefore, will ultimately maximize the value of the Diocese's estate for the benefit of creditors and all parties in interest. Consequently, it is in the best interests of the Diocese and its creditors to obtain an extension of the filing deadline set forth under Bankruptcy Rule 1007(c), which would provide the Diocese with a total of 31 days from the Petition Date to file the Schedules and Statements.

X.    **Applications to Appoint Stretto as Notice and Claims Agent and as Administrative Advisor (the "Stretto Applications")**

147.    The Diocese is seeking separate orders appointing Stretto[3] as the notice and claims agent for this Chapter 11 Case (the "Claims Agent") and authorizing the retention of Stretto to assist the Diocese as an advisor with respect to certain case management and administrative tasks (the "Administrative Advisor").

148.    The Diocese anticipates that there will be more than 700 creditors or other interested entities to be noticed in these cases, including over 400 individuals whose claims relate to alleged instances of abuse and whose names and other identifying information the Diocese is seeking to maintain under seal out of respect for their privacy.  Utilization of a Claims Agent will relieve the Court and the Diocese of a significant administrative burden, and will also provide a

---

[3]    Stretto is the trade name of Bankruptcy Management Solutions, Inc. and its subsidiaries.

3501438.2

mechanism by which proofs of claim can be filed confidentially and by which any party in interest who wishes to effect notice on all creditors, including those whose names and addresses are filed under seal, may do so without the necessity to disclose any confidential identifying information. Moreover, Stretto's expertise in serving as an Administrative Advisor will assist the Diocese in carrying out its duties and obligations under chapter 11, particularly as it relates to soliciting and tabulating votes with respect to a proposed chapter 11 plan of reorganization.

149.    The Diocese respectfully submits that authorizing the relief requested in the Stretto Applications is in the best interests of the Diocese's estate and all parties in interest, and particularly appropriate in this Chapter 11 Case due to not only the large number of creditors and parties-in-interest involved but also due to the confidential nature of many of the claims and claimants' identities. Accordingly, the Diocese respectfully requests that the Court approve Stretto as both Claims Agent and Administrative Advisor.

## **CONCLUSION**

150.    For the reasons set forth herein, and in the First Day Motions, the Diocese respectfully requests that the Court grant the relief requested in the First Day Motions and provide such other and further relief as the Court may deem just and proper.

3501438.2

Dated:  February 27, 2020

_[signature]_

Charles Mendolera
Executive Director of Financial
Administration

Sworn to before me this
27th day of February 2020.

_[signature]_
Notary Public

MAUREEN C. RAZMUS
Notary Public - State of New York
Qualified in Erie Co. No. 01RA6286971
My Commission Expires August 5, 2021

3501438.2