UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | )<br>)<br>) Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | )<br>) Chapter 11 |
| Debtor. | )<br>) |

**ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF
CERTAIN REAL PROPERTY IN OLEAN, NEW YORK; (B) AUTHORIZING
AND APPROVING THE FORM OF PURCHASE AGREEMENT SUBMITTED
BY THE WALSH HUSKIES, LLC; (C) SCHEDULING AN AUCTION
AND HEARING TO CONSIDER THE SALE; (D) APPROVING
THE FORM AND MANNER OF SERVICE OF NOTICE OF AUCTION
AND SALE HEARING; AND (E) GRANTING RELATED RELIEF**

Upon consideration of the motion [Docket No. 2502] (the "Motion")[1] filed by The

Diocese of Buffalo, N.Y. (the "Diocese") for entry of an order pursuant to sections 105, 363, and

503 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (i)(a) approving bidding procedures in

connection with the sale of certain real property located at 208 N. 24th Street, Olean, New York

14760 (the "Property"); (b) authorizing and approving the form of the proposed purchase

agreement (the "Purchase Agreement") submitted by the Walsh Huskies, LLC ("Walsh

Huskies," or the "Stalking Horse Bidder"); (c) scheduling an auction (the "Auction") and the

date and time of the hearing to approve the sale (the "Sale Hearing") of the Property; and (d)

approving form and manner of service of notice of auction and sale hearing (the "Notice of

Auction and Sale Hearing"); (ii) approving and authorizing the sale of the Property (the "Sale

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the
Bidding Procedures, as applicable.

Transaction") free and clear of any liens, claims, encumbrances and other interests (collectively, "Encumbrances") pursuant to the terms of the Successful Bid (as defined herein); and (iii) granting related relief; and it appearing that the relief requested in the Motion is in the best interests of the Diocese, its estate, creditors, and other parties in interest; and good and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**[2]

A.      This Court has jurisdiction over the Motion and the transactions contemplated therein pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, and no other or further notice is required except as set forth herein.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties-in-interest.

C.      The Diocese has articulated good and sufficient business reasons for this Court to approve the bidding procedures attached hereto as Exhibit 1 (the "Bidding Procedures").

D.      The Bidding Procedures are reasonably designed to maximize the consideration to be received for the Property.

E.      Walsh Huskies is not an "insider" or "affiliate" of the Diocese, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between the Buyer and the Diocese.  Walsh Huskies and the Diocese, together with their respective counsel and advisors, have acted in "good faith"

---

[2]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when applicable.  *See* Bankruptcy Rule 7052.

16577826.1
Case 1-20-10322-CLB,    Doc 2521,    Filed 09/27/23    Entered 09/27/23 12:56:38,
Description: Main Document  , Page 2 of 40

and at "arm's length" within the meaning of section 363(m) of the Bankruptcy Code in connection with the negotiation of the agreement for the sale of the Property attached hereto as Exhibit 2 (the "Purchase Agreement").

F.      The Diocese has demonstrated and proved to the satisfaction of this Court that a sale of the Property, pursuant to the terms of the Purchase Agreement, subject to higher or better offers, is in the best interests of the Diocese, its creditors, and its estate, and the Diocese's decision to enter into the purchase agreement with Walsh Huskies represents a prudent exercise of the Diocese's sound business judgment.

G.      The publication and service of the Notice of the Auction and Sale Hearing attached hereto as Exhibit 3, as described in the Motion, is reasonably calculated to provide all interested parties with adequate and proper notice of the proposed Sale Transaction, the Bidding Procedures, the Auction, and the Sale Hearing.

H.      The Diocese has articulated good and sufficient reasons for this Court to grant the relief set forth herein. The entry of this Bidding Procedures Order is in the best interests of the Diocese, its estate, creditors, and other parties in interest.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein.

2.      All objections to the Motion relating to the relief provided herein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3.      The Bidding Procedures attached hereto as Exhibit 1 are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all bids to purchase the Property. Any party desiring to submit a bid for the Property shall comply with the Bidding Procedures and this Order.

3

4. The form of the Purchase Agreement attached hereto as Exhibit 2 is hereby approved. The offer by Walsh Huskies to purchase the Property pursuant to the terms of the Purchase Agreement is a Qualified Bid and Walsh Huskies is a Qualified Bidder for all purposes under the Bidding Procedures.

5. In accordance with the terms of the Purchase Agreement, the Diocese shall return to Walsh Huskies its $10,000 deposit, payable in the event the Diocese, at no fault of Walsh Huskies, consummates a sale of the Property to a Successful Bidder other than Walsh Huskies.

6. The deadline for submitting bids for the Property (the "Bid Deadline") is November 9, 2023 at 12:00 noon (prevailing Eastern time). No bid shall be deemed to be a Qualified Bid (as defined in the Bidding Procedures) or otherwise considered for any purposes unless such bid is received by the Diocese prior to the Bid Deadline and otherwise satisfies all requirements set forth in the Bidding Procedures.

7. If more than one Qualified Bid for the Property is timely received by the Diocese in accordance with the Bidding Procedures, the Diocese shall hold an Auction for the Property. The Auction shall take place at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107, on November 14, 2023 at 10:00 a.m. (prevailing Eastern Time), or on such other date and time as the Diocese shall notify all Qualified Bidders and other invitees.

8. Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed Sale Transaction. Walsh Huskies will be permitted, but not obligated, to submit overbids at the Auction.

9. The Notice of Auction and Sale Hearing, in substantially the form attached hereto as Exhibit 3, is hereby approved.

4

10.     Not later than seven (7) days following entry of the Bidding Procedures Order, the Diocese shall cause (a) a copy of the Notice of Auction and Sale Hearing, and (b) a copy of the Bidding Procedures Order, with exhibits, to be sent by first-class mail postage prepaid, to: (i) the Office of the United States Trustee for the Western District of New York; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) all parties filing Notices of Appearance and requests for papers in this Chapter 11 Case; (iv) all required governmental agencies; (v) all known parties who have expressed a bona fide interest in acquiring the Property during the pendency of this Chapter 11 Case; (vi) all creditors in the Chapter 11 Case; and (vii) all persons known or reasonably believed to have asserted any lien, claim, encumbrance, or other interest in or upon any of the Property.

11.     Not later than seven (7) days following entry of the Bidding Procedures Order, the Diocese shall arrange for publication of a copy of the Notice of Auction and Sale Hearing: (a) in the *Olean Times Herald*, the *Buffalo News*, and the *Rochester Democrat and Chronicle* (subject to applicable submissions deadlines), and (b) on those listing websites identified in the Pezzimenti Declaration.

12.     If the Diocese does not receive any Qualified Bids (other than the Purchase Agreement): (a) the Diocese may cancel the Auction; (b) Walsh Huskies will be deemed the Successful Bidder for the Property; and (c) the Diocese shall be authorized to seek approval of the Purchase Agreement and the Sale Transaction to Walsh Huskies at the Sale Hearing.

13.     The Sale Hearing shall be held before this Court on November 15, 2023 at 10:00 a.m. (prevailing Eastern time), or as soon thereafter as counsel and interested parties may be heard.

16577826.1

14.     The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest other than by announcement of said adjournment in open Court or on this Court's calendar on the date scheduled for the Sale Hearing.

15.     Except as otherwise provided in this Bidding Procedures Order, the Diocese reserves the right as it may reasonably determine to be in the best interests of its estate, in the Diocese's business judgment, in consultation with the Committee, and subject to conformity with the Bidding Procedures to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; (d) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) not in the best interests of the Diocese and its estate; (e) waive terms and conditions set forth herein with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) adjourn or cancel the Auction or Sale Hearing in open court without further notice; and (i) modify the Bidding Procedures as the Diocese, in its business judgment, may determine to be in the best interest of its estate or to withdraw the Motion at any time with or without prejudice; *provided*, *however*, that any exercise by the Diocese of its rights hereunder, in consultation with the Committee, shall not alter or modify the terms of the Purchase Agreement.

16.     The Diocese is hereby authorized to take all actions necessary or appropriate to effectuate the terms of this Bidding Procedures Order.

17.     Notwithstanding anything to the contrary in Bankruptcy Rule 6004(h), or otherwise, this Bidding Procedures Order shall be effective immediately upon its entry.

18.    This Court shall retain jurisdiction over any matters related to or arising from the

implementation of this Order.

Dated: _____**SEP 2 7 2023**_____
       Buffalo, New York



_____
Hon. Carl L. Bucki
Chief United States Bankruptcy Judge

16577826.1

## Exhibit 1

(to Bidding Procedures Order)

Bidding Procedures

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

## BIDDING PROCEDURES FOR THE SALE OF CERTAIN REAL
## PROPERTY IN OLEAN, NEW YORK OF THE DIOCESE OF BUFFALO, N.Y.

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale Transaction") of certain real property located at 208 N. 24th Street, Olean, New York 14760 (the "Property") by The Diocese of Buffalo, N.Y. (the "Diocese"). The Sale Transaction is subject to competitive bidding as set forth herein and approval by the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court") pursuant to Section 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

On September 15, 2023, the Diocese filed the *Motion for Entry of Orders (I) (A) Approving Bidding Procedures for the Sale of Certain Real Property in Olean, New York; (B) Authorizing and Approving the Form of Purchase Agreement Submitted by Walsh Huskies, LLC; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief* [Docket No. 2502] (the "Sale Motion").

On _____, 2023, the Bankruptcy Court entered an order [Docket No. ____] (the "Bidding Procedures Order")[1] which, among other things, approved (i) these Bidding Procedures and (ii) the form of purchase agreement with Walsh Huskies, LLC (the "Stalking Horse Bidder") attached as an exhibit to the Sale Motion (the "Purchase Agreement").

These Bidding Procedures describe, among other things, the Property available for sale, the form of bids and the manner in which bidders and bids become qualified, the coordination of diligence efforts, the conduct of the Auction (as defined herein), the ultimate selection of the Successful Bidder (as defined herein) and the Court's approval thereof (the "Bidding Process"). If the Diocese and any parties in interest disagree as to the interpretation or application of these

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion and the Bidding Procedures Order, as applicable.

Bidding Procedures, the Bankruptcy Court shall have jurisdiction to hear and resolve such dispute.

Copies of the Sale Motion and all exhibits thereto may be obtained by contacting the Diocese's counsel: Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attn: Stephen A. Donato, Charles J. Sullivan and Grayson T. Walter (Telephone (315) 218-8000; email: sdonato@bsk.com, csullivan@bsk.com, and gwalter@bsk.com), or they may be downloaded by visiting the Bankruptcy Court's electronic case management website at https://ecf.nywb.uscourts.gov/ or for free at https://case.stretto.com/dioceseofbuffalo.

### Property to be Sold

The real property to be sold and improvements thereon is located at 160 N. 24th St., Olean, New York 14760, SBL No. 94.063-1-4.2, 210 x 131.9', Vacant Comm. 164-R N. 24th St., Olean, New York 14760, SBL No. 94.063-1-4.3, 15 x 28.12', Vacant Comm. 206 N. 24th St., Olean, New York 14760, SBL No. 94.063-1-4.4, 69' x 136.2', Religious Bldg. 117 N. 21st St., Olean, New York 14760, SBL No. 94.063-1-12, 35' x 202', Vacant Comm. 2230 State St W, Olean, New York 14760, 94.063-1-27.1, 2.1 acres Vacant Comm. 208 Twenty-Fourth St N., Olean, New York 14760, 8.1 acres, 94.063-1-4.1. School Bldg.

The Sale Transaction will be conducted on "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Diocese, its agents or the Diocese's bankruptcy estate, except to the extent set forth in the Purchase Agreement. Except as otherwise provided in the Purchase Agreement or in the Bankruptcy Court's order approving the Sale Transaction, the Property shall be sold to the Successful Bidder free and clear of all liens, claims, encumbrances, and other interests ("Encumbrances"), with such Encumbrances to attach solely to the net proceeds of the sale.

### Participation Requirements

In order to participate in the Bidding Process, a bidder for the Property (a "Potential Bidder") must be a "Qualified Bidder." A Qualified Bidder is a person or group of persons who has provided the Diocese with current audited financial statements, evidence of committed financing, or such other financial and credit-quality disclosures as may be reasonably requested by, and satisfactory to the Diocese, in consultation with the Official Committee of Unsecured Creditors (the "Committee"), evidencing the Potential Bidder's financial wherewithal to consummate the Sale Transaction and pay the purchase price for the Property to the Diocese in cash.

The Diocese, in its discretion, shall determine whether a bid qualifies as a "Qualified Bid." To constitute a Qualified Bid, a bid must be an offer from a Qualified Bidder received by the Diocese before the Bid Deadline (defined below) and:

(i)     be submitted in writing;

2

16577826.1
Case 1-20-10322-CLB,   Doc 2521,   Filed 09/27/23,   Entered 09/27/23 12:56:38,
Description: Main Document  , Page 10 of 40

(ii)  provide for a purchase price, payable in full, in cash, upon the Sale closing date, which exceeds the cash consideration set forth in the Purchase Agreement by at least $6,000.00 (the "Initial Minimum Overbid").

(iii)  be on terms that are not more burdensome or conditional in any material respect than the terms of the Purchase Agreement;

(iv)  not be conditioned on obtaining financing, the outcome of any due diligence investigation, or on the receipt of any third-party approvals or consents (excluding required Bankruptcy Court approval and any third-party approvals or consents contemplated in the Purchase Agreement);

(v)  not request or entitle the bidder to any break-up fee, expense reimbursement, or similar type of payment;

(vi)  include a binding and definitive purchase agreement for the Property, in substantially the same form as the Purchase Agreement and executed by the Qualified Bidder (a "Qualified Bidder Contract"), together with a marked copy showing any changes from the Purchase Agreement, and a clean electronic copy in Microsoft Word readable format;

(vii)  be accompanied by a cash, certified bank check, or wire transfer deposit equal to the greater of $10,000.00 or 10% of the purchase price set forth in the Qualified Bidder Contract;

(viii)  fully disclose the identity of each entity that will be bidding for the Property or otherwise participating in connection with such bid, the complete terms of any such participation, and identify no more than three (3) representatives authorized to appear and act on behalf of such Qualified Bidder at the Auction ("Authorized Bidder Representatives");

(ix)  include an acknowledgment and representation that the Qualified Bidder has had an opportunity to consider all due diligence regarding the Property prior to submitting its bid and that it has relied solely upon its own independent review, investigation and inspection of any documents or the Property in making its bid;

(x)  confirm that, if selected as the Successful Bidder or the Back-Up Bidder, such bidder will complete the Sale Transaction within five (5) business days following the date on which (A) the Bankruptcy Court's order approving the sale shall have become a final and non-appealable order, and (B) the Diocese shall have provided written notice of its readiness to consummate the Sale Transaction;

(xi)  certify that the bidder has not, and is not, engaged in any collusion with respect to its bid or the Sale Transaction; and

(xii)  provide that such bid shall remain open and irrevocable until:

16577826.1

Case 1-20-10322-CLB Doc 2521 Filed 09/27/23 Entered 09/27/23 12:56:38,
Description: Main Document , Page 11 of 40

(A)     if such bid is not the Successful Bid or Back-Up Bid (as each term is defined below), the entry by the Bankruptcy Court of an order approving the sale of the Property to another Qualified Bidder;

(B)     if such bid is the Successful Bid, the closing of the Sale Transaction to such Successful Bidder; or

(C)     if such bid is chosen by the Diocese to be the Back-Up Bid, the date which is the earlier to occur of: (i) the closing of the Sale Transaction to the Successful Bidder or (ii) the closing of the Sale Transaction to such Back-Up Bidder.

As promptly as practicable after receiving a bid from a Potential Bidder, the Diocese shall determine, in consultation with the Committee, and shall notify the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder and whether the bid is a Qualified Bid. Notwithstanding anything to the contrary herein, the Stalking Horse Bidder is a Qualified Bidder, and the Purchase Agreement is a Qualified Bid, for all purposes of these Bidding Procedures.

## Bid Deadline

All Qualified Bids must be actually received at or before 12:00 noon (prevailing Eastern Time) on November 9, 2023 (the "Bid Deadline"), by counsel to the Diocese, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202 (Attn: Stephen A. Donato, Charles J. Sullivan, and Grayson T. Walter (Telephone (315) 218-8000; email: sdonato@bsk.com, csullivan@bsk.com, and gwalter@bsk.com). The Diocese may extend the Bid Deadline in its discretion but is not obligated to do so.

As soon as practicable following the Bid Deadline, the Diocese will review all timely-received bids and will provide copies of all bids deemed to be Qualified Bids to counsel to the Committee, and the Office of the United States Trustee for the Western District of New York (the "UST").

## "As-is" Sale / Diligence

The Sale of the Property shall be on an "as-is" basis, without any representations or warranties provided by the Diocese, except those set forth in the Purchase Agreement.

Each Potential Bidder shall comply with all reasonable requests for information by the Diocese or its advisors regarding such Potential Bidder's financial wherewithal and ability to consummate the Sale. Failure by any Potential Bidder to comply with requests for additional information from the Diocese may be a basis for the Diocese, in its discretion, to determine that a Potential Bidder is not a Qualified Bidder, or that any bid is not a Qualified Bid.

Prior to the Bid Deadline, the Diocese shall provide any Potential Bidder deemed to be a Qualified Bidder with reasonable site access and due diligence information upon request. In no

4

instance shall the Diocese have any obligation to produce or furnish any information not already within the Diocese's possession and control.

Potential Bidders are advised to exercise their own discretion before relying on any information regarding the Property provided by anyone other than the Diocese or its representatives.

By submitting their bid, each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to inspect and examine the Property and that it has relied solely upon its own independent review, investigation and/or inspection of any documents in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property, or the completeness of any information provided in connection with the Bidding Process except as expressly stated in the Qualified Bidder Contract submitted with its Qualified Bid.

## Auction

If no Qualified Bids (other than the Purchase Agreement) are received on or prior to the Bid Deadline, the Stalking Horse Bidder shall be the Successful Bidder (as defined below) and the Diocese shall seek authorization to sell the Property to the Stalking Horse Bidder without further competitive bidding.

If the Diocese receives two or more Qualified Bids prior to the Bid Deadline, the Diocese shall conduct an auction (the "Auction") for the Sale of the Property. The Auction shall take place on November 14, 2023 at 10:00 a.m. (prevailing Eastern Time) at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107, or at such other time and place as the Diocese may notify all Qualified Bidders. Only the Stalking Horse Bidder and those Qualified Bidders who timely submitted a Qualified Bid will be eligible to participate in the Auction.

At the commencement of the Auction, the Diocese shall announce the Qualified Bid that it has determined represents the highest or otherwise best bid for the Property (the "Starting Qualified Bid") and the overall consideration value ascribed to such bid (the "Bid Value"). The Bid Value of the Starting Qualified Bid, if it is not the Purchase Agreement, must be at least higher than the Bid Value of the Purchase Agreement plus the Initial Minimum Overbid.

Each Qualified Bidder present at the Auction will be permitted to increase its Qualified Bid in turns (each such increased Qualified Bid, a "Qualified Overbid"), provided that each Qualified Overbid thereafter must exceed the Bid Value of the then-highest or otherwise best Qualified Overbid, by at least six thousand dollars ($6,000.00) (the "Minimum Bid Increment"). During the course of the Auction, the Diocese will inform the participants which Qualified Overbid reflects the then-highest or otherwise best offer for the Property and the Bid Value ascribed thereto.

The Auction may be adjourned from time to time by the Diocese, but it shall not be concluded until each Qualified Bidder present at the Auction has been given an opportunity to

submit a Qualified Overbid with knowledge of the Bid Value ascribed to the Starting Qualified Bid or then-highest Qualified Overbid, as applicable.

At the conclusion of the Auction the Diocese will announce the Qualified Bid which it deems to represent the highest or otherwise best bid for the Property (such bid being the "Successful Bid" and the Qualified Bidder submitting such bid, the "Successful Bidder") and the next highest or otherwise best bid (the "Back-Up Bid" and the party submitting such bid, the "Back-Up Bidder"). As a condition precedent to the Diocese declaring any bid the Successful Bid or the Back-Up Bid, the Diocese may require the Successful Bidder or Back-Up Bidder to deposit additional cash or immediately available funds such that their total deposit shall be not less than the greater of $10,000 or ten percent (10%) of the purchase price of their respective Successful Bid or Back-Up Bid. Any deposits not applied in satisfaction of the obligations of the Successful Bidder or Back-Up Bidder shall be returned not later than five (5) business days following the consummation of the Sale Transaction.

No bids submitted after the conclusion of the Auction shall be considered unless a motion to reopen the Auction is made on notice, prior to the Sale Hearing, to all Qualified Bidders who attended and submitted a bid at the Auction and such motion is granted by the Court.

All Qualified Bids and Qualified Overbids submitted by Qualified Bidders prior to or at the Auction shall remain open and irrevocable:

(a) if such bid is not the Successful Bid or Back-Up Bid, until the entry by the Bankruptcy Court of an order approving the Sale to another Qualified Bidder;

(b) if such bid is the Successful Bid, until the closing of the Sale to such Successful Bidder; or

(c) if such bid is the Back-Up Bid, until the date which is the earlier to occur of: (i) the closing of the Sale to the Successful Bidder or (ii) the closing of the Sale to such Back-Up Bidder.

## The Sale Hearing

A hearing to approve the Sale (the "Sale Hearing") is scheduled to take place on November 15, 2023 at 10:00 a.m. (prevailing Eastern time) before the Honorable Carl L. Bucki, Chief Judge of the United States Bankruptcy Court for the Western District of New York, at the Robert H. Jackson United States Courthouse, 2 Niagara Square, Buffalo, NY 14202. Objections to the Sale must be in writing, comply with the Local Bankruptcy Rules for the Western District of New York, and be filed with the Bankruptcy Court as soon as practicable in advance of the Sale Hearing. At the Sale Hearing, the Diocese will seek entry of an order (the "Sale Order"), among other things, authorizing and approving the Sale of the Property to the Successful Bidder (or in the alternative, the Back-Up Bidder), as determined by the Diocese in the Diocese's business judgment and in accordance with the Bidding Procedures, pursuant to the terms and conditions set forth in the Purchase Agreement or Qualified Bidder Contract, as applicable, and

6

as the same may be modified by any Qualified Overbid submitted at the Auction. The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date in open court at the Sale Hearing.

The Diocese shall be deemed to have accepted a Qualified Bid only when (i) such Bid is declared the Successful Bid (or the Back-Up Bid) in accordance with these Bidding Procedures, (ii) definitive documentation has been executed in respect thereof, and (iii) the Bankruptcy Court has entered the Sale Order.

Following the entry of the Sale Order, if the Successful Bidder fails to consummate the approved Sale Transaction in accordance with the terms of its Successful Bid because of a breach or failure to perform on the part of such Successful Bidder, the Diocese may terminate its agreement to sell the property to the Successful Bidder, retain the Successful Bidder's deposit, and maintain the right to pursue all available remedies, whether legal or equitable against such Successful Bidder. In the event the Diocese elects to so terminate, the Backup Bid, shall automatically be deemed to be the Successful Bid with respect to the Property, and the Diocese shall be authorized to effectuate the sale of the Property to the Backup Bidder without further order of the Bankruptcy Court.

The Diocese shall return any deposits to all Qualified Bidders, other than the Successful Bidder and the Back-Up Bidder, within five (5) Business Days following the date on which the Sale Order becomes a final and non-appealable order. The deposit of the Successful Bidder shall be applied to, and deducted from, the Successful Bidder's obligations under the Successful Bid at the closing of the Sale Transaction. The deposit of the Back-Up Bidder shall be returned to the Back-Up Bidder within five (5) Business Days following the date its bid is no longer required to remain open and irrevocable as set forth herein.

## Reservation of Rights

The Diocese reserves all rights to terminate the Bidding Process at any time if the Diocese determines, in consultation with the Committee, that the Bidding Process will not benefit the Diocese's bankruptcy estate. In addition, the Diocese reserves the right not to submit for approval to the Bankruptcy Court any bid (regardless of whether it may be a Qualified Bid under these Bidding Procedures) if the Diocese has reason to believe that such bid was not submitted in good faith or other similar reason. Without limiting the generality of the foregoing, the Diocese may reject at any time before entry of the Sale Order, any bid that it determines, in consultation with the Committee, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) not in the best interests of the Diocese, its estate and creditors. The Diocese shall further have the right to amend the rules set forth herein for the Bidding Process or impose such other or additional terms and conditions for the Bidding Process which the Diocese determines, in consultation with the Committee, are in the best interests of the chapter 11 estate, provided that such modifications are not inconsistent with these Bidding Procedures or the Bidding Procedures Order.

*     *     *

16577826.1

**<u>Exhibit 2</u>**

(to Bidding Procedures Order)

Purchase Agreement

PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of the 1st day of June, 2023 (the "Effective Date"), is entered into between The Diocese of Buffalo, NY, a New York religious corporation under the laws of the State of New York ("Seller"), having an address at 795 Main Street, Buffalo, NY 14203, and Walsh Huskies, LLC (Jess Anderson, Member), a citizen of the State of New York ("Purchaser"), having an address at 446 York Street, Olean, NY 14760.

**RECITALS**

WHEREAS, Seller is the owner of six (6) parcels of real property and the improvements thereon located at 208 North 24th St., Olean, New York 14760, which is more particularly described on **Exhibit A** attached hereto (together with all improvements and fixtures located thereon, the "Property").

WHEREAS, on February 28, 2020 (the "Petition Date") the Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 et seq., the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of New York (the "Court"), commencing the Seller's chapter 11 case (this "Bankruptcy Case");

WHEREAS, the Seller continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Seller retained Howard Hanna Professionals ("Howard Hanna") to serve as a real estate broker with respect to the Property.

WHEREAS, the Seller listed the Property for sale with Howard Hanna beginning on or about August 1, 2022;

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Purchaser, and Purchaser desires to purchase the Property from Seller; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated pursuant to a sale order to be entered in the Bankruptcy Case.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS**

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings ascribed to them below, unless the context clearly requires otherwise:

1

1.1  **"Bankruptcy Case"** shall have the meaning given to it in the Recitals to this Agreement.

1.2  **"Bankruptcy Code"** shall have the meaning given to it in the Recitals to this Agreement.

1.3  **"Bankruptcy Court"** shall have the meaning given to it in the Recitals to this Agreement.

1.4  **"Bidding Procedures"** shall mean the bidding procedures governing the process by which the sale of the Property shall occur, which are attached to the Bidding Procedures Order as Exhibit 1.

1.5  **"Bidding Procedures Order"** shall mean an order of the Bankruptcy Court: (i) approving the terms of this Agreement, subject to higher and better bids; (ii) establishing procedures for Seller's solicitation of competing offers to purchase the Property from third parties; (iii) establishing procedures for an auction to determine the highest or otherwise best offer for the Property; and (iv) scheduling a hearing to consider entry of the Sale Order.

1.6  **"Business Day(s)"** shall mean calendar days, exclusive of Saturdays, Sundays and holidays on which banking institutions in New York are authorized by Law to close.

1.7  **"Claim"** shall mean any claim within the meaning of section 101(5) of the Bankruptcy Code.

1.8  **"Closing"** shall mean the closing of the transaction as set forth in Section 7.1 of this Agreement.

1.9  **"Closing Date"** shall mean the date of Closing.

1.10  **"Encumbrance"** shall mean any Lien. Claim. Interest. or defect in title, whether imposed by Law, agreement, understanding or otherwise.  For the avoidance of doubt, rights of way and easements of record shall not be considered an Encumbrance under this Agreement.

1.11  **"Interest"** shall mean any interest in, or related to, the Property within the meaning of section 363(f) of the Bankruptcy Code, and all mortgages, Leases, or other interests, pledges, security interests, rights of setoff. successor liabilities. conditions. obligations to allow participation. agreements or rights, rights asserted in litigation matters, competing rights of possession, obligations to lend, matters filed of record that relate to. evidence or secure an obligation of the Sellers (and all created expenses and charges) of any type under, among other things. any document, instrument, agreement, affidavit. matter filed of record, cause. or state or federal law, whether known or unknown. legal or equitable, and all Liens, rights of offset, replacement liens, adequate protection liens, charges, obligations.

1.12  **"Law"** shall mean all federal, state and local laws. ordinances, rules. regulations. standards, and Orders.

2

1.13 **"Leases"** shall mean all leases, subleases, licenses, concessions, options, extension letters, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements, whether written or oral, and any amendments or supplements to any of the foregoing.

1.14 **"Liability"** shall mean any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due).

1.15 **"Lien"** shall mean any charge against or Interest in the Property to secure payment of a debt or performance of an obligation (statutory or otherwise), deed of trust, transfer restriction, mortgage, pledge, security interest, security agreement, hypothecation, preference, priority, or right of recovery.

1.16 **"Order"** shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, or administrative agency.

1.17 **"Permitted Exceptions"** shall mean (i) any matters of record or "survey exceptions" which do not materially interfere with the use or ownership of the Property as it is presently used and owned, including, but not limited to covenants, restrictions, reservations, rights, rights of way, easements and other matters of record and any encroachments, (ii) all zoning ordinances or statutes and building, use and occupancy restrictions of public record, (iii) all public and private roads and easements, (iv) the current use of buildings, athletic fields, and other improvements as an operating school through at least until the end of the 2023 academic term, and (v) and those matters determined to be Permitted Exceptions as set forth in Section 9.3 herein.

1.18 **"Person"** shall mean any individual, corporation, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

1.19 **"Proceeding"** shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Person.

1.20 **"Property"** shall have the meaning given to sch term in the Recitals of this Agreement.

1.21 **"Quitclaim Deed"** shall mean the deed to be delivered at Closing by the Seller to the Purchaser in the form attached hereto as **Exhibit B**.

1.22 **"Sale Order"** shall mean an Order of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller authorizing the sale of the Property to Purchaser in accordance with the terms and conditions set forth herein, free and clear of any Encumbrances pursuant to section 363(f) of the Bankruptcy Code.

3

1.23 **"Tax"** and **"Taxes"** shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

1.24 **"Title Company"** shall mean a reputable title company to be selected by Purchaser.

## ARTICLE II
## AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

2.1. **Agreement to Sell and Purchase the Property.** On the Closing Date, subject to the performance of the parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, the Seller shall sell, convey, assign, transfer, and deliver to Purchaser, and the Purchaser shall purchase, acquire, and accept from the Seller, the Property, free and clear of all Encumbrances.

2.2. **Condition of Property.** Seller is selling and Purchaser is acquiring the Property as-is, where-is, and with all faults.

## ARTICLE III
## PURCHASE PRICE

3.1. **Purchase Price.** The Purchase Price for the Property shall be Fifty Thousand Dollars ($50,000) (the "Purchase Price"), payable as follows:

   3.1.1. **Deposit.** Within two (2) days after the Effective Date, the Purchaser shall deposit in escrow with the Seller's attorneys, an earnest money deposit of Ten Thousand Dollars ($10,000) (the "Earnest Money Deposit") in a non-interest bearing account, which Earnest Money Deposit is to become part of the Purchase Price, or be returned, if required under the terms of this Agreement.

   3.1.2. **Balance.** The balance of the Purchase Price shall be paid, plus or minus Closing adjustments, as the case may be, in wire transferred funds of United States currency to the Seller in accordance with the terms of the Sale Order.

   3.1.3. **Purchase Price Allocation.** The Purchase Price shall be allocated among the six parcels constituting the Property as agreed upon by the parties prior to the Closing Date (the "Allocation"). The Allocation shall be agreed upon in writing, not less than three (3) days prior to the Closing Date. The Allocation will be binding upon the Purchaser and the Seller and their respective successors and assigns. The Seller and the Purchaser shall each be responsible for filing any required tax paperwork in accordance with the Allocation and shall not take any position inconsistent with the Allocation.

4

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Seller makes no representations or warranties, express or implied, except those expressly contained or incorporated in this Agreement. All of the representations and warranties of Seller contained in this Agreement are made as of the Effective Date, and except as otherwise set forth herein, shall merge with the Quitclaim Deed and shall not survive the Closing. Subject to the foregoing, Seller represents and warrants unto Purchaser as of the date hereof, as follows:

4.1.    **Organization**.  Seller is a Religious Corporation duly organized, validly existing, and in good standing under the laws of the State of New York, and subject to the Bankruptcy Court's entry of the Sale Order, Seller has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate the transaction contemplated herein.

4.2.    **Power and Authority**.  All requisite action (corporate, trust, partnership or otherwise) has been taken by Seller in connection with entering into this Agreement, the documents and instruments referenced herein, and the consummation of the transaction contemplated hereby.  No consent, authority, licensing, or approval of any partner, shareholder, trustee, trustor, beneficiary, creditor, investor, or other party is required for Seller to execute and deliver this Agreement and the instruments and documents referenced herein or consummate the transaction contemplated by this Agreement. The individual executing this Agreement and the instruments referenced herein on behalf of Seller and the partners of Seller, if any, have the legal power, right, and actual authority to bind Seller to the terms and conditions hereof and thereof.

4.3.    **Consents**.  Subject to the Bankruptcy Court's entry of the Sale Order, no consent, approval, waiver, license, permit, or certificate of authority any other third Person is required in connection with the execution, delivery or performance by the Seller of this Agreement or the consummation by the Seller of the transactions contemplated hereby.

4.4.    **Foreign Person**. Seller is not a "foreign person" as defined in §1445(f)(3) of the Internal Revenue Code and regulations promulgated thereunder, which Seller shall so certify at Closing (via "Non-Foreign Person Affidavit").

4.5.    **Encumbrances**.  At the Closing, Seller will own and convey the Property free and clear of all Encumbrances, as provided in the Sale Order, subject to any rights of way or easements of record.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

5.1.    **Power and Authority**.  All requisite action (corporate, trust, partnership or otherwise) has been taken by Purchaser in connection with entering into this Agreement, the documents and instruments referenced herein, and the consummation of the transaction contemplated hereby.  No consent, authority, licensing or approval of any partner, shareholder, trustee, trustor, beneficiary, creditor, investor, regulatory authority or other party is required for Purchaser to execute and deliver this Agreement and the instruments and documents referenced herein or consummate the transaction contemplated by this Agreement. The individual executing

5

this Agreement and the instruments referenced herein on behalf of Purchaser have the legal power, right, and actual authority to bind Purchaser to the terms and conditions hereof and thereof.

5.2. **Sufficient Funds**. Purchaser has as of the date hereof, and will have as of the Closing, sufficient funds in cash in its possession to pay the Purchase Price and the Deposit as the same become due and payable under this Agreement.

5.3. **Certain Relationships**. Purchaser represents and warrants to Seller (i) that neither Purchaser nor any Person or entity that directly or indirectly owns any interest in Purchaser nor any of its officers, directors or members is a Person or entity with whom U.S. Persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the U.S. Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including, but not limited to, Executive Order 13224 ("Executive Order") signed on September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action, (ii) that Purchaser's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that so long as this Agreement is in full force and effect, Purchaser shall comply with the Executive Order and with the Money Laundering Act.

5.4. **Foreign Person**. Purchaser is not a "foreign person" as defined in §1445(f)(3) of the Internal Revenue Code and the regulations promulgated thereunder.

### ARTICLE VI
### CONDITIONS TO CLOSING

6.1. **Conditions to Obligations of Each Party**. The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of the following conditions:

6.1.1. **Sale Order**. The Bankruptcy Court shall have entered the Sale Order.

6.2. **Additional Conditions to Obligations of the Purchaser**. The obligations of the Purchaser to consummate the transactions contemplated hereby are subject to satisfaction or waiver by the following additional conditions:

6.2.1. **Representations and Warranties**. The representations and warranties of the Seller set forth in this Agreement shall be materially true and correct as of the Effective Date and as of the Closing Date, as if made at such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date).

6.2.2. **Agreements and Covenants**. The Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

6

6.2.3. **Documents.** All of the documents, instruments and agreements required to be executed and/or delivered by Seller on or prior to Closing pursuant to Section 7.1.1 of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

6.3. **Additional Conditions to Obligations of the Seller.** The obligations of the Seller to consummate the transactions contemplated hereby are subject to satisfaction or waiver by the Seller of the following additional conditions:

6.3.1. **Representations and Warranties.** The representations and warranties of the Purchaser set forth in this Agreement shall be materially true and correct as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date).

6.3.2. **Agreements and Covenants.** The Purchaser shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

6.3.3. **Documents.** All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to Section 7.1.2 of this Agreement shall have been executed by the parties thereto other than the Seller and delivered to the Seller.

## ARTICLE VII
## CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING

7.1. **Closing Date.** The Closing of the purchase and sale of the Property and other transactions contemplated in this Agreement shall occur no later than the date that is five (5) Business Days after the date of the Sale Order or such other later date as the parties may mutually agree. The parties agree that time is of the essence with respect to the occurrence of the Closing Date. The Closing shall be held via escrow and wire transfer through the offices of the Seller's attorney.

7.1.1. **Deliveries by the Seller at the Closing.** At the Closing, Seller shall cause to be executed and delivered to the Buyer the following documents with respect to the Property being conveyed:

7.1.1.1. a duly executed and acknowledged Quitclaim Deed;

7.1.1.2. two (2) counterparts of a duly executed Closing Statement setting forth all closing adjustments and prorations for the Property (the "Closing Statement");

7.1.1.3. a Non-Foreign Person Affidavit signed by Seller;

7.1.1.4. a copy of the Sale Order; and

7

7.1.1.5. such other agreements, instruments, and documents of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be reasonably necessary or desirable to convey the Property to Purchaser free and clear of all Encumbrances.

7.1.2. **Deliveries by the Purchaser at the Closing.** At the Closing, Purchaser shall cause to be delivered to the Seller the following:

7.1.2.1. the Purchase Price, by wire transfer of immediately available funds (subject to prorations and adjustments, including, but not limited to, a credit for the Earnest Money Deposit) by no later than 2:00 p.m. (eastern time);

7.1.2.2. two (2) counterparts of a Closing Statement setting forth all closing adjustments and prorations for the Property; and

7.1.2.3. such other agreements, instruments, and documents as Seller may reasonably request to consummate the purchase and sale transaction contemplated hereby.

**ARTICLE VIII**
**TERMINATION**

8.1. **Termination.** This Agreement may be terminated at any time prior to Closing:

8.1.1. by mutual written agreement of Purchaser and Seller;

8.1.2. by Seller, by written notice to Purchaser, if the Closing shall not have occurred on or before the date that is five (5) Business Days after the date the Sale Order (as may be extended by written agreement of Purchaser and Seller); provided, however, that the Seller is not in material breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder;

8.1.3. by Purchaser, by written notice to Seller, if there shall have been a material breach by the Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in this Agreement, and such material breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within twenty-one (21) calendar days after written notice thereof shall have been received by Seller; provided, that Purchaser is not in material breach of this Agreement as of such date;

8.1.4. by Seller, if there shall have been a material breach by Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more

8

of the conditions set forth in this Agreement, and such material breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) calendar days after written notice thereof shall have been received by Purchaser; provided, that no Seller is in material breach of this Agreement as of such date; or

8.1.5.　by Purchaser on or after the date the Final Sale Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction.

## ARTICLE IX
## EVIDENCE OF TITLE

9.1.　**Title Commitment.** Within three (3) Business Days after the Effective Date, as evidence of title, Seller shall order a title commitment for a fee owner's policy of title insurance with respect to the Property at the Purchaser's expense (the "Title Commitment"). The Title Commitment shall be issued by the Title Company and Seller shall deliver a copy of the Title Commitment to Purchaser, together with copies of all referenced exception documents, upon receipt thereof. Purchaser may, at the time of Closing, purchase extended coverage from the Title Company pursuant to said Title Commitment.

9.2.　**Survey.** Purchaser shall have the right to order a new survey of the Property (the "Survey"), at Purchaser's sole cost and expense and shall deliver copies of the Survey to Seller upon receipt.

9.3.　**Title Objections.** Purchaser shall raise written objections to the Title Commitment and/or the Survey within five (5) days following receipt of the Title Commitment (the "Title Review Period"), as to any matter which renders the title to the Property unmarketable (the "Title Objection Notice"), except for matters accepted according to the terms of this Agreement. Seller shall have five (5) Business Days after its receipt of the Title Objection Notice to notify Purchaser ("Seller's Title Notice") that Seller has decided to either: (i) remedy the title; or (ii) notify Purchaser that Seller is unable or unwilling to cure any such title defect, provided that if Seller fails to provide the Seller's Title Notice, Seller shall be deemed to have elected not to cure or otherwise resolve Purchaser's title objections. Purchaser may elect, by written notice to Seller within three (3) Business Days of Purchaser's receipt of Seller's Title Notice, to waive such defects and proceed with the Closing subject thereto. Purchaser's failure to deliver any written notice shall be a conclusive presumption that Purchaser has approved the Title Commitment and the Survey and this Agreement shall remain in full force and effect. If Seller is unable or unwilling to remedy the title objections and Purchaser does not elect to waive such defects, then Purchaser may terminate this Agreement by providing written notice thereof to Seller by no later than the later to occur of (i) three (3) Business Days after receiving Seller's Title Notice or after Seller is deemed to have elected not to cure any objections or (ii) the last day of the Title Review Period, in which event the Deposit shall be refunded forthwith in full termination of this Agreement. All matters affecting title to the Property, including those items identified in the Title Commitment and/or the Survey not objected to by Purchaser within the time frame specified or which Seller is unwilling or unable to remedy shall be deemed to be "Permitted Exceptions". If Purchaser fails to terminate

9

this Agreement as provided above, then Purchaser shall be required to proceed to Closing and take title to the Property, subject to the Permitted Exceptions.

## ARTICLE X
## CLOSING ADJUSTMENTS

10.1. **Apportionment**. The following shall be apportioned on the Closing Statement against sums due Seller at Closing:

10.1.1. Purchaser shall pay for all state, county and local fees and taxes required to be paid upon recording of the Quitclaim Deed with respect to the Property due in connection with this transaction. Seller shall pay for any New York real property transfer tax due in connection with this transaction.

10.1.2. Purchaser shall also pay for (1) the examination and search fees incurred by the Title Company to acquire the Title Commitment, and (2) the base premium charged on the owner's policy of title insurance issued to Purchaser pursuant to the Title Commitment and the costs of any endorsements or extended title insurance coverage requested by Purchaser.

10.1.3. Each party shall bear its own attorneys' fees in connection with its negotiation, due diligence investigation and conduct of the transaction.

10.2. **Real Estate Taxes and Other Charges**. Real estate taxes, utilities, including but not limited to water charges, sewer, rents and fuel, and all other customary items shall be adjusted, apportioned and allowed as of the Closing Date, if necessary by an estimated tax bill, with the Closing Date being a day of income and expense to the Purchaser. If at any time up to the Closing Date, the Property or any part thereof shall be or shall have been affected by an assessment or assessments for municipal improvements whether or not confirmed or completed an whether or not payable in installments, then for purpose of this Agreement, the proportional share of all of the unpaid installments of any such assessment(s), which are to become due and payable after the delivery of the Quitclaim Deed contemplated hereunder, shall be paid proportionally by Seller and Purchaser. Installments allocable to period prior to the Closing and unpaid as of the Closing Date shall be paid by the Seller or allowed as a reduction in the Purchase Price.

## ARTICLE XI
## POSSESSION

11.1. **Right to Possession**. Right to possession of, and control over, the Property shall transfer to Purchaser on the Closing Date. On the Closing Date, Seller shall:

11.1.1. Transfer possession to Purchaser with the Property in broom clean condition.

11.1.2. Transfer and deliver to Purchaser all keys, pass keys, pass codes, security codes, locks and safe combinations and all other similar items in Seller's possession as Purchaser may require to obtain occupation and control of the Property.

10

11.1.3. Make available to Purchaser originals of all documents, instruments and agreements in Seller's possession that are required to be transferred to Purchaser by this Agreement.

### ARTICLE XII
### AS-IS, WAIVER AND RELEASE

12.1. As a material inducement to the execution and delivery of this Agreement by Seller and the performance by Seller of its duties and obligations hereunder, Purchaser does hereby acknowledge, represent, warrant and agree, to and with the Seller, that (i) Purchaser is purchasing the Property in an "AS-IS" condition as of the Closing Date with respect to any facts, circumstances, conditions and defects, latent or patent; (ii) Seller has no obligation to repair or correct any such facts, circumstances, conditions or defects or compensate Purchaser for same; (iii) Purchaser has undertaken all such physical inspections and examinations of the Property as Purchaser deems necessary or appropriate under the circumstances, and that based upon same, Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its agents and officers, and Purchaser is and will be fully satisfied that the Purchase Price is fair and adequate consideration for the Property; (iv) Seller is not making and has not made any warranty or representation with respect to all or any part of the Property (including, but not limited to, any matters contained in documents made available or delivered to Purchaser in connection with this Agreement as an inducement to Purchaser to enter into this Agreement and thereafter to purchase the Property or for any other purpose); and (v) by reason of all of the foregoing, Purchaser shall assume the full risk of any loss or damage occasioned by any fact, circumstance, condition or defect pertaining to the physical and financial condition of the Property, including without limitation the presence of any asbestos containing material, hazardous, toxic or radioactive waste, substance or materials in, on, under or about the Property, and Purchaser hereby expressly and unconditionally waives and releases Seller and all of their parents, subsidiaries, Affiliates and partnerships, and its and their respective officers, directors, shareholders, partners, agents and employees, and their respective successors, heirs and assigns and each of them (individually and collectively, the "Released Parties") from any and all rights and claims against Seller and/or the Released Parties with respect to the condition of the Property, including without limitation any rights of Purchaser under the State or Federal Comprehensive Environmental Response. Compensation and Liability Act, as amended from time to time, or similar Laws. Purchaser acknowledges and agrees that the foregoing waiver and release includes all rights and claims of Purchaser against Seller pertaining to the condition of the Property, whether heretofore or now existing or hereafter arising. or which could. might, or may be claimed to exist, of whatever kind or nature, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, which in any way arise out of, or are connected with, or relate to, the condition of the Property. The foregoing provisions shall survive the Closing Date and the consummation of the transaction contemplated by this Agreement.

### ARTICLE XIII
### DEFAULT

13.1. **Seller Default.** In the event that Seller shall be in material default hereunder for any reason other than Purchaser's default, Purchaser may deliver a written notice to Seller stating with particularity the alleged default of Seller, the action required by Seller to cure such default,

11

and Purchaser's intent to exercise its remedies provided below if the default is not cured. Seller shall have twenty-one (21) days after receipt of such notice to cure the alleged default to Purchaser's reasonable satisfaction (and the Closing Date shall be delayed, if necessary, until the end of such twenty-one (21) day period). In the event such default is not cured within such twenty-one (21) day period, then Purchaser may elect, as its sole and exclusive remedy, to seek to enforce specific performance only for failure to cause the Property to be conveyed in accordance with the terms and provisions hereof (without any reduction in the Purchase Price) or to terminate this Agreement by written notice to Seller and the Title Company, whereupon Purchaser shall be entitled to a full refund of the Deposit. It is expressly understood and agreed that the remedy of specific performance shall not be available to enforce any other obligation of Seller hereunder other than a failure to cause the Property to be conveyed in accordance with the terms and provisions of this Agreement. Purchaser shall be deemed to have elected to terminate this Agreement if Purchaser fails to file suit for specific performance against Seller in a court having jurisdiction in the county and state in which the Property is located on or before thirty (30) days following the date upon which the Closing was to have occurred.

13.2. **Purchaser Default.** In the event that Purchaser shall be in default hereunder for any reason other than Seller's default, Seller may deliver a written notice to Purchaser stating with particularity the alleged default of Purchaser, the action required by Purchaser to cure such default and Seller's intent to terminate this Agreement if the default is not cured. Purchaser shall have ten (10) days after receipt of such notice to cure the alleged default to Seller's reasonable satisfaction (and the Closing Date shall be delayed, if necessary, until the end of such ten (10) day period). In the event such default is not cured within such ten (10) day period, then Seller may, as Seller's sole and exclusive remedy for such default, terminate this Agreement by written notice to Purchaser and the Title Company, whereupon Seller shall be entitled to retain the Deposit as full liquidated damages for such default of Purchaser. It is hereby agreed that Seller's damages in the event of a default by Purchaser hereunder are uncertain and difficult to ascertain, and that the Deposit constitutes a reasonable liquidation of such damages and is intended not as a penalty, but as full liquidated damages. Purchaser covenants not to bring any action or suit challenging the amount of liquidated damages provided hereunder in the event of such default. Notwithstanding anything to the contrary contained herein, this provision shall in no way affect or impair Seller's right of recovery under any indemnity given by Purchaser in favor of Seller under this Agreement.

## ARTICLE XIV
## INSPECTION

14.1. Purchaser expressly waives any and all right to an inspection of the Property by a licensed inspector, licensed contractor or licensed engineer prior to the Closing Date.

14.2. Seller grants Purchaser and any Representative of Purchaser, after reasonable notice to the Seller, reasonable access to conduct a final walk through of the Property with all utilities in service within forty-eight (48) hours prior to the Closing to assure that all conditions of this Agreement have been met.

12

## ARTICLE XV
## BROKER

15.1. **Broker Commission**. In connection with the consummation of the sale contemplated by this Agreement, Seller shall be solely responsible for paying a broker's commission to Howard Hanna Professionals ("Seller's Broker") and Howard Hanna Professionals ("Purchaser's Broker" and collectively, with the Seller's Broker, the "Brokers") from the proceeds of the Purchase Price and pursuant to the terms of a separate agreement in an amount not to exceed $6,000. No commissions shall be due or payable to the Brokers unless and until the Closing contemplated hereby occurs. Purchaser and Seller each represent and warrant to the other that, except for the Brokers, they have not employed, retained or consulted with any other broker, agent or finder in connection with the solicitation of Purchaser, the negotiations in connection with this Agreement or the purchase and sale referenced herein and Purchaser and Seller shall indemnify each other and hold each other harmless from and against any and all claims, demands, causes of action, debts, liabilities, judgments and damages (including costs and reasonable attorneys' fees) which may be asserted or recovered against each other on account of any brokerage fee, commission or other compensation arising by reason of Purchaser's or Seller's breach of this representation and warranty.

## ARTICLE XVI
## ALTERNATIVE TRANSACTION

16.1. **Sale Motion**. The Parties acknowledge that this Agreement is subject to approval of the Bankruptcy Court. Seller shall file a motion to approve this Agreement (the "Sale Motion") and establish reasonable bidding procedures (the "Bidding Procedures") within twenty-one (21) days of the execution of this Agreement.

16.2. **Higher Bids**. This Agreement is subject to higher and better offers pursuant to the Bidding Procedures to be established by the Bankruptcy Court.

16.3. **Alternative Transaction**. If the Bankruptcy Court shall enter a Final Sale Order approving an Alternative Transaction, then Seller shall terminate this Agreement and Purchaser shall be entitled to receive a refund of the Deposit.

16.4. **The Bidding Procedures**. The Bidding Procedures shall include the following:

16.2.1. the procedures for solicitation of competing offers from third parties for the purchase of the Property (each, a "Alternative Bidder");

16.2.2. any bid submitted by an Alternative Bidder shall include a signed Purchase and Sale Agreement along with a marked copy showing any changes from this Agreement;

16.2.3. any bid submitted by an Alternative Bidder must exceed the Purchase Price set forth in this Agreement by Six Thousand Dollars ($6,000.00) (the "Initial Overbid");

13

16.2.4.  any subsequent bidding after the Initial Overbid shall be in minimum increments of $6,000.00;

16.2.5.  the procedures for an auction to determine the highest and best offer for the Property (the "Successful Bidder"); and

16.2.6.  such further terms as are determined to be necessary by the Seller in order to obtain Court approval of the Bidding Procedures.

16.5.  **Backup Bidder**.  In the event that the Buyer is not the Successful Bidder, the Seller's bid shall remain irrevocable as the backup bidder (the "Backup Bidder") until the earliest of: (i) a period of thirty (30) days from the Sale Order, or (ii) the closing of a sale with the Successful Bidder.

## ARTICLE XII
## MISCELLANEOUS

17.1.  **Governing Law**.  This Agreement shall be governed by and construed, interpreted and enforced in accordance with the Laws of the State of New York without regard to conflicts of Laws or choice of Laws principles thereof that would cause the application of the Laws of any jurisdiction other than the State of New York.

17.2.  **Binding Effect**.  This Agreement shall bind the parties hereto, their respective heirs, successors and assigns.  Except as set forth in Section 17.5 hereof, neither Purchaser nor Seller may assign its interest hereunder without the prior written approval of the other party.

17.3.  **Notices**.  Any notices, communications, requests or consents which may be given or are required to be given under the terms of this Agreement shall be in writing and shall be sent (i) by registered or certified mail return receipt requested, (ii) by Federal Express (or other nationally recognized overnight service), or (iii) by facsimile or email, if confirmed by a copy sent by overnight courier to Seller or Purchaser, as the case may be, at such party's address, as set forth in this Article XII.  Such notice, communication, request or consent shall be deemed to have been given (a) the date indicated on the duly completed United States Postal Service return receipt, or (b) on the first (1st) Business Day after delivery to the custody of a nationally recognized overnight courier service or (c) on the date sent by facsimile or email if confirmed as hereinabove provided. Either party may designate any other name or address to receive notices.

If to Seller:  The Diocese of Buffalo, N.Y.
795 Main Street
Buffalo, New York 14203
Attn: Richard Suchan

With a copy to:  Bond Schoeneck & King PLLC
110 W. Fayette Street
One Lincoln Center
Syracuse, New York 13202
Attn:  Charles Sullivan
Jeffrey Eaton

14

If to Purchaser:

_____

_____

Email: _____

With a copy to:

_____

_____

Email: _____

Attn: _____

17.4.  **Time for Performance**.  Time shall be of the essence for purposes of this Agreement.

17.5.  **Assignability**.  Purchaser shall not have the right to assign this Agreement and its rights hereunder without Seller's prior written consent, unless such assignment is to a single asset entity in which Purchaser owns a controlling interest, in which case, Seller's consent shall not be required, provided, however, that upon such assignment, Purchaser shall in no way be released or relieved of any of its obligations under this Agreement.

17.6.  **Number and Gender**.  Whenever required by the context or use in this Agreement, the singular word shall include the plural word and the masculine gender shall include the feminine and/or neuter gender, and vice versa.

17.7.  **Captions**.  The paragraph titles, headings and/or captions contained herein have been inserted solely as a means of reference and convenience.  Such captions shall not affect the interpretation or construction of this Agreement and shall not define, limit, extend or otherwise describe the scope of this Agreement or the intent of any provision hereof.

17.8.  **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original, all of which shall be deemed to be one and the same instrument.  Facsimile or email transmission signatures shall be deemed original signatures.

17.9.  **Legal Counsel**.  Purchaser and Seller acknowledge that they have been, or have had the opportunity to be, represented by legal counsel in connection with this Agreement and that this Agreement is the product of extensive negotiations between the parties.  Purchaser and Seller agree that the fact that this Agreement or one or more provisions hereof were drafted by one party or the other shall not affect the meaning or interpretation of this Agreement.

17.10.  **Waiver**.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by any party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be

15

construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

17.11. **Third Party Beneficiaries**. Nothing in this Agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than the parties hereto and their permitted successors and assigns. There are no third party beneficiaries to this Agreement.

17.12. **Cooperation and Further Assurances**. The Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth herein and to consummate the transactions contemplated hereby as promptly as practicable and evidence the consummation of the transactions contemplated hereby, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing. Without further order of the Bankruptcy Court, Seller shall assist with such other post-closing matters as Purchaser may reasonably request.

17.13. **No Merger**. The provisions of this Agreement containing agreements between the parties relating to actions occurring after Closing shall not be merged into the instruments of Closing but shall expressly survive and be enforceable according to their terms.

17.14. **Notification of Certain Matters**. From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "Required Notification"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

17.15. **Entire Agreement**. This Agreement, including the exhibits and schedules, contains the entire agreement between Seller and Purchaser pertaining to the transaction contemplated hereby and fully supersedes all prior agreements and understandings between Seller and Purchaser pertaining to such transaction. If any provision hereof is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect. This Agreement may be amended, modified, or supplemented only by an instrument in writing signed by the parties.

*[Remainder of this page intentionally left blank. Signature page(s) follow.]*

16

**In Witness Whereof** the parties have executed this Agreement as of the day and year first written above.

SELLER:
Diocese of Buffalo, NY

By: _Richard C. Suchan_

Name: _RICHARD C. SUCHAN_

Title: _Chief Operating Officer_

PURCHASER:

_[signature]_

Walsh Huskies, LLC

17

# FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

This First Amendment to the Purchase and Sale Agreement is entered into as of this 5~~th~~ day of September, 2023 (the "Effective Date") by and between The Diocese of Buffalo, NY, a New York religious corporation under the laws of the State of New York ("Seller"), having an address at 795 Main Street, Buffalo, NY 14203, and Walsh Huskies, LLC (Jess Anderson, Member), a New York State limited liability company, having an address at 446 York Street, Olean, NY 14760 ("Purchaser" and together with the Seller, the "Parties").

## RECITALS

WHEREAS, Seller and Purchaser entered into a certain Purchase and Sale Agreement dated as of June 1, 2023 (the "Agreement") whereby the Seller agreed to sell and the Purchaser agreed to purchase the fee simple title to six parcels of real property and the improvements thereon located at 208 North 24th St., Olean, New York 14760, which is more particularly described in Exhibit A to the Agreement (the "Property").

WHEREAS, the Parties desire to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficient of which is hereby acknowledged, the Parties agree to this First Amendment as follows:

## FIRST AMENDMENT

1.  <u>Sale Motion</u>. Section 16.1 of the Agreement shall be deleted in its entirety and the following inserted in its place:

> 16.1.  **Sale Motion**. The Parties acknowledge that this Agreement is subject to approval of the Bankruptcy Court. Seller shall file a motion to approve this Agreement (the "Sale Motion") and establish bidding procedures (the "Bidding Procedures") on or before September 15, 2023.

2.  <u>Binding Effect</u>. This First Amendment shall be binding on, and shall inure to the benefit of the Parties, their successors and assigns.

3.  <u>Counterparts</u>. This First Amendment may be signed in counterparts, all of which, taken together, shall constitute one and the same instrument. Signatures on this First Amendment which are transmitted by facsimile or electronic delivery shall be valid for all purposes.

4.  <u>Integration</u>. Except as expressly modified by this First Amendment, in all other respects, the rest and remainder of the Agreement shall continue in full force and effect without modification. In the event of an express conflict between the Agreement and this First Amendment, this First Amendment shall control.

5.  <u>Capitalized Terms</u>. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

1

16460508.1

6.    Recitals. The recitals of this First Amendment are hereby incorporated herein as if fully set forth.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**SELLER:**
Diocese of Buffalo, NY

By: _____

Name:    Richard C. Suchan

Title:    Chief Operating Officer


**PURCHASER:**
Walsh Huskies, LLC

Jess Anderson, Member                    9/5/23

Case 1-20-10322-CLB,    Doc 2521,    Filed 09/27/23,    Entered 09/27/23 12:56:38,
Description: Main Document  , Page 35 of 40

6.    _Recitals_. The recitals of this First Amendment are hereby incorporated herein as if fully set forth.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**SELLER:**
Diocese of Buffalo, NY

By: _____

Name:    Richard C. Suchan

Title:    Chief Operating Officer

**PURCHASER:**
Walsh Huskies, LLC

_____

Jess Anderson, Member

2

16460508.1

**Exhibit 3**

(to Bidding Procedures Order)

Notice of Auction and Sale Hearing

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) |
| | ) Chapter 11 |
| Debtor. | ) |
| | ) |

### *NOTICE OF AUCTION AND SALE HEARING*

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.        On September 15, 2023, the Diocese filed the *Motion for Entry of Orders (I) (A) Approving Bidding Procedures for the Sale of Certain Real Property in Olean, New York; (B) Authorizing and Approving the Form of Purchase Agreement Submitted by Walsh Huskies, LLC; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief* [Docket No. 2502] (the "Sale Motion").[1]

2.        The Diocese is seeking to sell certain real property located at 208 N. 24th Street, Olean, New York 14760 (the "Property") to Walsh Huskies, LLC or such other purchaser who may submit the highest or otherwise best offer for the Property.

3.        On _____, 2023, the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court") entered an order [Docket No. _____] (the "Bidding Procedures Order") approving bidding procedures (the "Bidding Procedures") and granting other relief related to the proposed sale of the Property.  The Bidding Procedures approved by the Court are attached as Exhibit 1 to the Bidding Procedures Order.  Pursuant to the Bidding Procedures Order, if the Diocese receives more than one Qualified Bid for Property, an Auction for the Property shall take place on November 14, 2023 at 10:00 a.m. (prevailing Eastern time) at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107.  Only parties that have submitted Qualified Bids in accordance with the Bidding Procedures by November 9, 2023 at 12:00 noon (prevailing Eastern time) (the "Bid Deadline") may participate at the Auction.  Any party that wishes to take part in this process and submit a bid for the Property must submit a Qualified Bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion.

4. The Sale Hearing to consider approval of the sale of the Property to the Successful Bidder or Back-Up Bidder free and clear of all liens, claims, encumbrances and other interests will be held before the before the Honorable Carl L. Bucki, United States Bankruptcy Court for the Western District of New York, at the United States Courthouse, 2 Niagara Square, Buffalo, NY 14202 on November 15, 2023 at 10:00 a.m. (prevailing Eastern time), or at such other time thereafter as counsel may be heard. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

5. Parties can choose to appear either (i) in person at the Robert H. Jackson Courthouse, 2 Niagara Square, Buffalo, New York or (ii) telephonically (call in 1-571-353-2301, Courtroom ID 483077448#, and security pin 9999#).

6. Objections, if any, to the sale, or the relief requested in the Sale Motion must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Western District of New York (Buffalo Division), as soon as practicable in advance of the Sale Hearing; and (d) be served upon (i) counsel to the Diocese, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attn: Stephen A. Donato, Charles J. Sullivan, and Grayson T. Walter (ii) the Office of the United States Trustee for the Western District of New York, 300 Pearl Street, Suite 401, Buffalo, NY 14202. Attn: Joseph W. Allen, (iii) counsel to the Official Committee of Unsecured Creditors, Pachulski, Stang, Ziehl & Jones, LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California, 90067-4003, Attn. James I. Stang, and 780 Third Avenue, 34th Floor, New York, New York, 10017-2024, Attn. Ilan Scharf, and (iv) those persons who have formally appeared and requested service in this case pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER HEARING OR NOTICE.

7. This Notice is subject to the fuller terms and conditions of the Sale Motion, the Bidding Procedures Order, and the Bidding Procedures, which shall control in the event of any conflict and the Diocese encourages parties-in-interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Property or obtaining a copy of any of the foregoing documents may make a written request to counsel to the Diocese, Bond Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York, 13202, Attn: Stephen A. Donato, Charles J. Sullivan, and Grayson T. Walter. In addition, copies of the Sale Motion, the Bidding Procedures Order, the Bidding Procedures and this Notice can be obtained free of charge at https://case.stretto.com/dioceseofbuffalo and are on file with the Clerk of the Bankruptcy Court.

Dated: September ___, 2023

BOND, SCHOENECK & KING, PLLC

By: ___/s/ Charles J. Sullivan_____
Stephen A. Donato
Charles J. Sullivan
Grayson T. Walter
One Lincoln Center
Syracuse, NY 13202-1355
Telephone: (315) 218-8000
Fax: (315) 218-8100
Emails:      sdonato@bsk.com
              csullivan@bsk.com
              gwalter@bsk.com

*Attorneys for The Diocese of Buffalo, N.Y.*

16577826.1