# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------
In re

    THE DIOCESE OF BUFFALO, N.Y.,          BK 20-10322 CLB

                Debtor.                        <u>DECISION & ORDER</u>
------------------------------------------------------

Bond, Schoeneck & King, PLLC
Stephen A. Donato, Esq., Thomas W. Simcoe, Esq.,
Charles J. Sullivan, Esq., Grayson T. Walter, Esq.,
Andrew S. Rivera, Esq., of counsel
One Lincoln Center
Syracuse, New York 13202-1355
Attorneys for The Diocese of Buffalo, N.Y.

Pachulski Stang Ziehl & Jones LLP
Ilan D. Scharf, Esq., James I. Stang, Esq.,
Jeffrey M. Dine, Esq., Karen B. Dine, Esq., of counsel
780 Third Avenue, 34th Floor
New York, New York 10017
Attorneys for Official Committee of Unsecured Creditors

Woods Oviatt Gilman LLP
Timothy P. Lyster, Esq., of counsel
1900 Bausch & Lomb Place
Rochester, New York 14604
Co-Counsel for Parish Steering Committee

Elsaesser Anderson, CHTD.
J. Ford Elsaesser, Esq., of counsel
320 East Neider Avenue, Suite 102
Coeur d' Alene, Idaho 83815
Co-Counsel for Parish Steering Committee

Office of the U.S. Trustee
Joseph W. Allen, Esq.
Olympic Towers
300 Pearl Street, Suite 401
Buffalo, New York 14202

Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.

The Diocese of Buffalo has moved to release money that was placed into a segregated account from proceeds of a sale of real property. The primary issue is whether this escrow contains funds whose use must comply with the *cy pres* doctrine of New York law.

In 1959, Fred H. Reuter offered to donate approximately 80 acres of undeveloped land on Knox Road in the Town of Aurora, New York, to the Diocese of Buffalo for use as the campus of a new seminary for the training of clergy. Contemporaneously with its acceptance of this gift, the Diocese conducted what it called "The Seminary Fund Drive." Through this campaign, the Diocese collected more than $3.5 million, all of which was spent on costs of construction. Groundbreaking occurred on September 8, 1960. Originally named in honor of Saint John Vianney, the seminary opened for classes on October 1, 1961.

From 1961 until 2021, the Knox Road property was used as a Catholic seminary, although under several different governing and ownership arrangements. At the time of construction, the property was titled in the name of the Diocese of Buffalo, N.Y. Then in 1968, the Diocese transferred ownership to St. John Vianney Seminary, a New York Corporation. In 1974, St. John Vianney Seminary leased the property to Christ the King Seminary, a Catholic institution that relocated to the same site. The real estate was reconveyed to the Diocese of Buffalo in 1987. By 2010, Christ the King Seminary was experiencing an ongoing operating deficit which was offset in part by annual subsidies from the Diocese.

The Diocese of Buffalo, N.Y., filed a petition for relief under Chapter 11 of the Bankruptcy Code on February 28, 2020. Upon its commencement of the bankruptcy proceeding, the Diocese also discontinued its subsidy of Christ the King Seminary. Unable to rely on that financial support, the seminary ceased operations at the conclusion of the 2020-2021 academic year.

On July 18, 2024, the Diocese filed a motion to establish bidding procedures for an auction sale of the Knox Road Property. At the hearing on that request, we questioned whether sale proceeds might be subject to restrictions under the *cy pres* doctrine. In an order dated August 19, 2024, the Court approved the proposed sale procedures, but with a direction that "[t]he net proceeds of sale of the Property shall be placed in a segregated account held by the Diocese and shall not be disbursed therefrom except as directed by further Order of this Court." Pursuant to this authority, the Diocese conducted an auction on October 28, 2024. On November 20, 2024, the Court entered an Order confirming a sale to the high bidder for $4,200,000. The closing of this transaction then occurred on February 14, 2025.

The Diocese of Buffalo has now moved to access the proceeds of the seminary sale. In paragraph 19 of its motion, the Diocese "submits that the Sale Proceeds are property of the estate, and as such, the Diocese is requesting that the Diocese be authorized, but not directed, to use such proceeds in connection with funding a settlement in this case pursuant to a chapter 11 plan." It contends that under the Not-For-Profit Corporation Law of New York, these proceeds are not subject to any trust limitations and therefore are unrestricted as to use. The Official Committee of

Unsecured Creditors supports the relief requested. No one has opposed the motion.

Discussion

The confirmation of a plan is the ultimate goal for cases filed under Chapter 9, Chapter 11, Chapter 12 and Chapter 13 of the Bankruptcy Code. In Chapter 12 and 13, some limitations apply only when "the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan." 11 U.S.C. § 1225(b)(1) and § 1325(b)(1). But here in Chapter 11, the requirements for confirmation are absolute, whether or not anyone objects. In particular, section 1129(a)(3) of the Bankruptcy Code states that the Court may confirm a Chapter 11 plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law."

The debtor has advised that it may wish to use the seminary proceeds to provide partial funding for its plan of reorganization. Before undertaking the complex process of presenting a disclosure statement and plan, the debtor seeks a ruling on whether this use of proceeds represents "a means forbidden by law." As in state court, however, the accessibility of estate property is an issue that this Court may review even on "its own motion." *Sherman v. Richmond Hose Co. No. 2*, 230 N.Y. 462, 473 (1921).

Under New York law, a charitable corporation must honor a donor's direction and intention. Thus, "it has been widely recognized that the stated purpose for which the donation was made constitutes a binding restriction as to the use of the donation." 18 NY JUR. 2d *Charities* § 26 (2011). If it becomes impossible to perform those directions, then "the cy pres doctrine will be applied." *Id.* This equitable doctrine allows a court

to reform "a gift to charity as closely to the donor's intention as possible, so that the gift does not fail." BLACK'S LAW DICTIONARY 470 (10TH ED. 2014).

In *Saint Joseph's Hospital v. Bennett*, 281 N.Y. 115 (1939), the New York Court of Appeals confirmed the controlling rule, that religious corporations may not divert donated funds from the stated purpose of a donor.

> "No authority has been brought to our attention that a gift to a charitable corporation with the express direction that it be applied to a specific corporate purpose in a specific manner may be accepted by the corporation, and then used for a different corporate purpose in a different manner. No trust arises, it is true, in a technical sense, from such a gift for trustee and beneficiary are one. The charitable corporation is not bound by all the limitations and rules which apply to a technical trustee. It may not, however, receive a gift made for one purpose and use it for another, unless the court applying the *cy pres* doctrine so commands."

281 N.Y. at 123.

The New York State legislature has codified the holding of *Saint Joseph's Hospital v. Bennett* into the Not-for-Profit Corporation Law. *See* Comment to N.Y. NOT-FOR-PROFIT CORP. LAW § 513 (McKinney 2015). Although the Diocese of Buffalo was not incorporated under the Not-for-Profit Law, it is still subject to section 513 of this statute:

> "A corporation which is, or would be if formed under this chapter, a charitable corporation shall hold full ownership rights in any assets consisting of funds or other real or personal property of any kind, that may be given, granted, bequeathed or devised to or otherwise vested in such corporation in trust for, or with a direction to apply the same to, any purpose specified in its certificate of incorporation."

N.Y. NOT-FOR-PROFIT CORP. LAW § 513(a) (McKinney 2015). Subdivision (a) thereby addresses the Rule against Perpetuities. Subdivision (b) then directs that unless the *cy pres* doctrine allows a variance, "the governing board shall apply all assets thus received to the purposes specified in the gift instrument as defined in section 551 (Definitions) and to the payment of the reasonable and proper expenses of administration of such assets."

Not all donations to the Diocese of Buffalo are subject to the restraints of the *cy pres* doctrine. To determine its applicability in the present instance, this Court must decide two forms of what is essentially the same question: whether in the language of *Saint Joseph's Hospital v. Bennett*, the seminary proceeds derive from a gift "with the express direction that it be applied to a specific corporate purpose;" or whether in the language of Not-for-Profit Law § 513(a), the seminary proceeds derive from a gift "with a direction to apply the same" to a specified purpose. The Appellate Division of New York's Supreme Court identified the relevant issue in *Lefkowitz v. Lebensfeld*, 68 A.D.2d 488, 495-96 (1st Dept. 1979): "[A] donor who attaches conditions to his gift has a right to have his intention enforced. But a donor who has attached no conditions has no such expectation. He is, in effect, relying on the good will and judgment of the donee charity to utilize his gift in what the donee perceives to be the most appropriate manner" (citations omitted).

The Diocese of Buffalo began construction of the seminary on Knox Road more than 65 years ago. Most if not all of the benefactors for this project are now deceased. The Court was not surprised, therefore, when no one questioned the proposed

application of sale proceeds. Death may silence the testimony of objectors and supporting witnesses, but it cannot change promises whose existence is nonetheless documented by admissible evidence.

In considering the present motion, the Court relied upon two sources of information. The first is a compilation of archival records that were authenticated through a declaration from the debtor's Chief Operating Officer. Secondly, at the hearing on this matter, the Court advised the parties that it would also review editions of the Catholic Union and Echo, a weekly newspaper published by the Diocese. Newspaper articles are self-authenticating under Rule 902(6) of the Federal Rules of Evidence. Both sources are appropriately considered under hearsay exceptions for records of regularly conducted activity (*See* FED. R. EVID. 803(6)) or as statements in ancient documents (*See* FED. R. EVID. 803(16)). Based on a careful review of these factual sources, we find that most, but not all of the sale proceeds are subject to the restraints of New York's *cy pres* doctrine.

In 1959, the Diocese reported that the real property donated by Fred Reuter had a value of $100,000.[1] As for improvements, the Diocese has provided the minutes of a special meeting of the trustees of St. John Vianney Seminary that was held on December 13, 1968. At that session, the treasurer reported that the total cost of seminary construction was $6,129,330. Of this amount, $3,559,219 was collected through The Seminary Fund Drive. An additional $370,201 was received from subsequent bequests and other special donations. The balance of $2,200,000 was

---

[1] *Reuters Give 80-Acre Tract for Seminary*, CATHOLIC UNION AND ECHO, Nov. 6, 1959, at 1.

advanced from general funds of the Diocese.[2] Property financed from general funds would not be subject to any restriction for a specified purpose. On the other hand, the $370,201 from bequests and other donations appear to constitute gifts made with a direction for use in seminary construction. The more challenging issue is how to treat proceeds of The Seminary Fund Drive and the Reuter donation of undeveloped land.

Section 513(b) of the New York Not-for-Profit Corporation Law mandates that the Diocese apply gifted funds "to the purposes specified in the gift instrument as defined in section 551." This later section states that "'gift instrument' means a record or records, *including an institutional solicitation*, under which property is granted to, transferred to, or held by an institution as an institutional fund." N.Y. NOT-FOR-PROFIT CORP. LAW § 551(c) (McKinney 2015)(emphasis added). Subject to exclusions not here applicable, "institutional fund" is then broadly defined to mean "a fund held by an institution." N.Y. NOT-FOR-PROFIT CORP. LAW § 551(e) (McKinney 2015). For purposes of the present discussion, the controlling principle is that a gift instrument may include solicitations to the donor. Here, those solicitations confirm an expectation and understanding that proceeds of The Seminary Fund Drive would be used only for the construction of a seminary to train prospective clergy.

The historical record reveals three salient facts about The Seminary Fund Drive. The first is that its exclusive purpose was to raise funds for seminary construction. The very name of the campaign indicates this intent. In its edition for August 14, 1959, the

---

[2] It appears that the treasurer provided a rounded number for the advance from general funds of the Diocese, and that the precise number should have been stated as $2,199,910.

Diocesan newspaper reported that the bishop had "announced that a $2,500,000 fund drive to build the seminary will be conducted the first week of Advent this year."[3] On November 27, 1959, this same newspaper reiterated that "The Seminary Fund is designed to meet the need of the Diocese of Buffalo to erect a new seminary for the education and training of students preparing for the holy priesthood destined to minister unto the faithful of the Diocese of Buffalo."[4] Contributors of at least $25 were issued a "Spiritual Seminary Bond," which recited that the donation "has enabled the Diocese of Buffalo to erect The Seminary of Saint John Vianney, for the training and education of Priests."[5]

A second fact is that the Diocese contemplated that proceeds from The Seminary Fund Drive would remain distinct from general resources. One of the archival documents provided by the Diocese was a letter dated November 4, 1959, from the Seminary Fund Director to pastors of parishes. In this correspondence, the priests were given the following instructions for how to solicit contributions: "First, do not look upon The Seminary Fund just as another Appeal. It is unique. It is a Building Drive."

Third, donors were assured that their contributions would be used on a project of lasting duration. In a statement published on November 13, 1959, the Bishop declared that the "Seminary will stand, please God, for centuries to come as an

---

[3] *Bishop Names George Frauenheim to Direct Drive for Diocesan Seminary*, CATHOLIC UNION AND ECHO, Aug. 14, 1959, at 1.

[4] *Here are Some Facts About Seminary Fund*, CATHOLIC UNION AND ECHO, Nov. 27, 1959, at 11.

[5] *A Bond with a Blessing*, CATHOLIC UNION AND ECHO, Nov. 13, 1959, at 3.

eloquent monument to our Faith."[6] As the campaign was finishing, the Fund Director declared that the seminary "will stand in the Town of Aurora as a perpetual reminder of the great Seminary Fund of 1959."[7] This same theme was expressed in an editorial that the Diocesan newspaper published on December 11, 1959: "St. John Vianney Seminary, standing as a permanent monument in Western New York, will be for centuries a sacred tribute to the faith of our people, and to their love for Christ's priesthood."[8]

Both in its solicitations and in its acknowledgment of gifts, the Diocese told donors that contributions to The Seminary Fund Drive would be used for the specified and lasting purpose of establishing a permanent seminary to serve the Diocese of Buffalo. If fulfillment of that purpose becomes impractical, the *cy pres* doctrine may allow a reformation that is consistent with the donor's intent. *See* N.Y. NOT-FOR-PROFIT CORP. LAW § 555 (McKinney 2015) and N.Y. EST. POWERS & TRUSTS art. 8 (McKinney 2002). But today, the debtor's motion seeks to use sale proceeds for inconsistent purposes like funding a settlement of abuse claims. Such use of proceeds from targeted gifts would violate donor intent and is therefore not permitted under New York law.

The movant argues that at least with respect to proceeds attributable to the Reuter gift, this Court should follow the ruling in *Lefkowitz v. Cornell University*, 35

---

[6] *Bishop's Message*, CATHOLIC UNION AND ECHO, Nov. 13, 1959, at 2.

[7] *Seminary Drive is $2,000,000 over Goal, $4,492,613 Donated*, CATHOLIC UNION AND ECHO, Dec. 11, 1959, at 1.

[8] Editorial, *Our People Prove Their Zeal*, CATHOLIC UNION AND ECHO, Dec. 11, 1959, at 4.

BK 20-10322CLB                                                                                       11

A.D.2d 166 (4th Dept. 1970). In that case, Cornell was attempting to sell a laboratory and wind tunnel that the Curtiss-Wright Corporation had donated to the University in 1945. As with the seminary property, the real estate had been transferred to Cornell through a deed that contained no restrictions as to future use. Arguing that the sale violated the donor's intent, New York's Attorney General obtained from the trial court an injunction against the sale. In reversing that decision, the Appellate Division observed that "there is no evidence that Cornell received the gift of the laboratory as a result of representations on its part that it would forever operate it for the public benefit." *Id.* at 172. As to this factor, the sale of the seminary is distinguishable. Fred Reuter conveyed the Knox Road property through three deeds. The earliest of these indentures is dated December 10, 1959, at the same time that the Diocese was telling all donors that contributions would support the establishment of a permanent seminary. These representations were than particularized for Mr. Reuter and his wife. In acknowledging their gift, the Bishop issued the following statement:

> "It is also an eloquent manifestation of the faith and generosity of Mr. and Mrs. Reuter, who, for many years, have cherished the hope that their beautiful estate would some day become the site of a project which would benefit a vital activity in the life of the Church. Please God, for centuries to come, their names and their gift will be held in prayerful memory."[9]

As with all donations to The Seminary Fund Drive, the Diocese expressed an understanding that the real property would be used permanently as a seminary. Pursuant to the direction of Not-for-Profit Law § 513(b) and the precedent of *Saint*

---

[9] *Id.* at 13.

*Joseph's Hospital v. Bennett*, the Reuter gift is subject to the restriction that it be used for the benefit of clergy education.

In 1970, the Board of Trustees of St. John Vianney Seminary passed the following resolution:

> RESOLVED that in the event the real property located on Knox Road in the Town of Aurora, owned by this corporation is no longer used as a seminary for the education of young men to the priesthood, title to this property shall be reconveyed to the previous owner, The Diocese of Buffalo, N.Y.

Fred Reuter was then a member of the Board of Trustees, although he was not present at the meeting. Admittedly, the resolution occurred more than a decade after Mr. Reuter's donation. Nonetheless, it does confirm a commitment to long term use of the property for its intended purpose. To the extent that the seminary corporation was no longer to operate, it would return the property to the Diocese, presumably so that the Diocese could either operate a seminary or find some other appropriate use consistent with *cy pres* requirements.

The Diocese contends that the seminary on Knox Road was property of the estate under 11 U.S.C. § 541(a). We agree, but find that it is also subject to the limitations of 11 U.S.C. § 541(c)(2), which reads as follows: "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." Here, the applicable nonbankruptcy law provides "that although gifts to a charitable organization do not create a trust in the technical sense, where a purpose is stated a trust will be

implied." *Lefkowitz v. Lebensfeld*, 68 A.D.2d 488, 496 (1st Dept. 1979). This implied trust imposes constraints that are enforceable in bankruptcy. Consequently, proceeds traceable to The Seminary Fund Drive and the Reuter donation are restricted and may not be used to settle unrelated claims against the Diocese.

In 1959, the Diocese of Buffalo solicited donations big and small[10] for the special purpose of building a seminary. We recognize that the debtor now has another special need for significant money to settle claims. This current need is distinct, however, and cannot sanction the application of resources committed by law to a different use.

When the seminary was built, the sources of funding derived from both restricted donations and advances from a general fund. Unfortunately, these sources were greater in amount than the net proceeds derived from the sale in 2025. Unable to identify any basis to prioritize the sources of funding, we find that the sale proceeds should be allocated between restricted and unrestricted interests on a pro-rata basis.

## Conclusion

The motion of the Diocese of Buffalo is granted in part and denied in part, all in accord with the following allocation. When donated for use as a seminary, the land on Knox Road had a value of $100,000. The cost of construction was $6,129,330 and was paid from three sources. The sum of $2,199,910 derived from unrestricted assets of the Diocese. However, specific bequests of $370,201 and proceeds from The Seminary Fund Drive in the amount of $3,559,219 were both subject to restrictions for the

---

[10] On December 11, 1959, the Diocesan newspaper reported that "a little boy met with [the Seminary Fund Director] and asked if a nickel would help the fund. He was assured that it would and it was duly recorded." *Sidelights on The News*, CATHOLIC UNION AND ECHO, Dec. 11, 1959, at 4.

benefit of that project. When added to the land value, restricted sources of funding total $4,029,420. This sum constitutes 64.68 percent of the land value and cost of construction. As an attribute of restricted donations, this percentage may be used only in ways consistent with donor intent.

Now that the property has been liquidated, any proceeds will be traced to their source. The Knox Road property was sold for $4,200,000. Certain closing costs may have been paid from the sale price, and presumably some interest has accrued after the net proceeds were placed into a segregated account. Unfortunately, the record does not establish the amount now on deposit. Whatever that sum may be, 35.32 percent of those moneys are unrestricted funds that the Diocese may use on any allowable expenditure. The remaining 64.68 percent remains restricted and may not be used to fund a settlement within a confirmed plan of reorganization.

So ordered.

Dated: June 6, 2025  
       Buffalo, New York

_____  
Hon. Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.

FILED  
JUN - 6 2025  
BANKRUPTCY COURT  
BUFFALO, NY