# EXHIBIT A

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| | |
|---|---|
| **PRESENT:** **HON. SHAHABUDDEEN A. ALLY** *Justice* | **PART 16** |

| | |
|---|---|
| THE DIOCESE OF BUFFALO, | **INDEX NO.** 160558/2023 |
| Petitioner, | **MOTION DATE** 10/21/2024 |
| | **MOTION SEQ. NO.** 001 |
| For a Judgment Pursuant to Article 78 of the Civil Practice Law and Rules | |
| -against- | |
| OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL and ABISOLA FATADE, in her official capacity as Records Access Officer for the Office of the New York State Attorney General, | **DECISION, ORDER & JUDGMENT** |
| Respondents. | |

> The following e-filed documents, listed by NYSCEF document number, were read on this motion (Seq. No. 1) to/for **ARTICLE 78 (BODY OR OFFICER):** 1-11, 39-48, 51-52

In this Article 78 proceeding, petitioner THE DIOCESE OF BUFFALO (the "Diocese") seeks review of the administrative decisions of respondents OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL (the "OAG") and ABISOLA FATADE, in her official capacity as Records Access Officer for the OAG (the "RAO"; and, together with the OAG, "Respondents"), dated September 8 and October 12, 2023. (*See* Verified Art. 78 Pet., dated Oct. 27, 2023 ("Pet.") (NYSCEF Doc. 1), ¶ 1, wherefore ¶ A; Notice of Pet., dated Oct. 27, 2023 ("NOP") (NYSCEF Doc. 2)) These decisions denied the Diocese's request to exempt the 25,000 pages of documents that it had produced to the OAG pursuant to subpoena from production to a *Buffalo News* reporter pursuant to a request lodged under New York's Freedom of Information Law ("FOIL"), codified at Public Officers Law ("POL") ch. 47, art. 6. (Pet. ¶¶ 1, 14, 23, 32, 38-39) Specifically, the Diocese asserted before Respondents, and it continues to assert now before this Court, that the exemptions from disclosure under POL § 87(2)(d) and (e)(i) are applicable and should be applied by Respondents to deny access to the Diocese's documents. (*Id.* ¶¶ 2, 29, 43-44) As relief, the Diocese requests that

160558/2023 The Diocese of Buffalo v. Office of the New York State Attorney General et al.
Mot. Seq. No. 001

Page 1 of 29

Case 1-20-10322-CLB, Doc 4178-1, Filed 09/16/25, Entered 09/16/25 14:54:39, Description: Exhibit A, Page 2 of 30
1 of 29

the Court reverse Respondents' administrative decisions; invoke the allegedly applicable exemptions and decline to allow for public disclosure of the Diocese's documents pursuant to FOIL; and award the Diocese its counsel fees and expenses pursuant to POL § 89 and CPLR Article 86. (*Id.* wherefore ¶ A)

For the reasons discussed below, the Diocese's Verified Petition and Notice of Petition are **DENIED**.

## I.    BACKGROUND

The Diocese is based in Buffalo, New York and was incorporated in New York on May 19, 1951, by a Special Act of the New York State Legislature (Chapter 568 of the Laws of 1951). (Pet. ¶ 7; Affirm. of Melissa Potzler, dated Oct. 27, 2023 ("Potzler Affirm.") (NYSCEF Doc. 4), ¶ 2) As an incorporated legal entity, the Diocese has its own corporate structure and governance, with the Bishop, the Vicar General, and the Chancellor acting as its trustees. (Pet. ¶ 7; Potzler Affirm. ¶ 2)

The Diocese is the seat of the Catholic Church in Erie, Niagara, Genesee, Orleans, Chautaugua, Wyoming, Cattaraugus, and Allegany Counties. (Pet. ¶ 7; Potzler Affirm. ¶ 2) "[T]o advance the Catholic Church's mission of teaching, sanctifying, and serving," the Diocese maintains a number of administrative offices and ministries, employing more than 240 people. (Pet. ¶ 8; Potzler Affirm. ¶ 3) The Diocese serves more than 590,000 Catholic individuals through parishes separately incorporated under New York's Religious Corporations Law. (Pet. ¶ 8; Potzler Affirm. ¶ 3)

In 2018, the OAG commenced an investigation of all Catholic dioceses in New York. (Pet. ¶ 13; Potzler Affirm. ¶ 4; Verified Answer, dated Dec. 8, 2023 ("Answer") (NYSCEF Doc. 39), ¶ 13) As part of that investigation, the OAG served a subpoena on the Diocese requesting that it produce:

> files related to past allegations of clergy sexual abuse by individual victims, including complaints against clergy and other Diocesan employees; the Diocese's clergy personal records; the Diocese's internal discipline records; records of the Independent Review Board that investigates and addresses allegations of abuse within the Diocese; and a series of other files maintained by the Diocese concerning clergy accused of abuse.

Case 1-20-10322-CLB,    Doc 4178-1,    Filed 09/16/25,    Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 3 of 30
2 of 29

(Pet. ¶ 13; Potzler Affirm. ¶ 4; Answer ¶ 13) The Diocese responded to the subpoena by producing over 25,000 pages of its internal files to the OAG and, given the nature of the documents, requested, under POL § 89(5)(a)(1), that they be treated by the OAG as sensitive commercial documents that would cause injury to the Diocese if disclosed. (Pet. ¶¶ 14-15; Potzler Affirm. ¶ 5; Answer ¶ 15) The OAG treated the documents as confidential in accordance with the Diocese's request. (Answer ¶ 15)

In February 2020, the Diocese filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Western District of New York in a proceeding styled *In re The Diocese of Buffalo, N.Y.*, No. BK 20-10322 CLB (Bankr. W.D.N.Y.) (the "Bankruptcy Proceeding"). (Pet. ¶ 17; Potzler Affirm. ¶ 6; Answer ¶ 17) The filing was precipitated by the hundreds of civil actions that the Diocese faced after New York's enactment of the Child Victims Act (the "CVA") on February 14, 2019. (*See* Pet. ¶ 17; Potzler Affirm. ¶ 6) As of the commencement of this Article 78 proceeding, the Bankruptcy Proceeding is ongoing, with all stakeholders participating in mediation to attempt to reach a resolution of the claims against the Diocese. (Pet. ¶ 18; Potzler Affirm. ¶ 7) The 25,000 pages of documents that the Diocese produced to the OAG have also been produced to a Bankruptcy Court–appointed committee representing approximately 850 alleged victims of abuse, the Official Committee of Unsecured Creditors, as well as the Diocese's insurers on a strictly confidential basis according to a detailed protocol prohibiting the documents' public disclosure. (Pet. ¶ 18; Potzler Affirm. ¶ 7; Potzler Affirm., Exs. A & B (NYSCEF Docs. 5-6)) The Diocese emphasizes that no provision of the Bankruptcy Court's mediation orders or the agreed-upon protocols provides for the disclosure of the documents to the news media or to the public at large. (Pet. ¶ 19; Potzler Affirm. ¶ 8)

Based on its investigation of the Diocese, the OAG commenced a civil lawsuit against the Diocese in state court in November 2020. (Pet. ¶ 21; Potzler Affirm. ¶ 10; Answer ¶ 21) The Diocese subsequently removed that lawsuit to the U.S. District Court for the Southern District of New York. (Pet. ¶ 21; Potzler Affirm. ¶ 10; Answer ¶ 21) The lawsuit was ultimately settled pursuant to a Stipulated Final Order, entered on October 25, 2022. (Pet. ¶ 21 (citing Doc. No. 38, *New York v. Diocese of Buffalo*, No. 1:21-cv-00189-RA (S.D.N.Y.)); Potzler Affirm. ¶ 10 (same); Answer ¶ 21) None of the Diocese's documents produced to the OAG pursuant to subpoena, however, were

160558/2023 The Diocese of Buffalo v. Office of the New York State Attorney General et al.        Page 3 of 29
Mot. Seq. No. 001

Case 1-20-10322-CLB,    Doc 4178-1,    Filed 09/16/25,    Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 4 of 30
3 of 29

made public in connection with the lawsuit or its settlement. (Pet. ¶ 22; Potzler Affirm. ¶ 10; Answer ¶ 22)

In December 2022, after settlement of the OAG's lawsuit against the Diocese, a reporter from *Buffalo News* submitted a FOIL request to the OAG (the "FOIL Request"). (Pet. ¶ 23; Potzler Affirm. ¶ 10; Answer ¶ 23) The FOIL Request sought all of the documents that the Diocese produced to the OAG pursuant to subpoena, including "complaints against priests and other diocese employees, diocese clergy personnel records; diocese clergy discipline records; records of the proceedings of the diocese independent review board; diocese 'secret archive' files; and internal diocese documents and/or databases on accused priests." (Pet. ¶ 23; Potzler Affirm. ¶ 10; Answer ¶ 23; Affirm. of Kathryn Sheingold, dated Dec. 4, 2023 ("Sheingold Affirm.") NYSCEF Doc. 40), ¶ 5; Sheingold Affirm., Ex. A (NYSCEF Doc. 41))

By letter dated July 14, 2023, the OAG notified the Diocese of the FOIL Request and provided the Diocese with the opportunity, pursuant to POL § 89(5)(b)(2), to submit a written statement to the OAG within 10 days explaining why some or all of the documents should be exempted from disclosure pursuant to POL § 87(2)(d). (Potzler Affirm., Ex. C (NYSCEF Doc. 7); Sheingold Affirm., Ex. B (NYSCEF Doc. 42); *see also* Pet. ¶ 24; Potzler Affirm. ¶ 11; Answer ¶ 24) The Diocese responded by letter dated August 25, 2023, asserting that the documents should be exempt from disclosure pursuant to POL §§ 87(2)(d) and (e)(i), among others, because their release would interfere with the ongoing Bankruptcy Proceeding and otherwise cause injury to the Diocese. (Potzler Affirm, Ex. D (NYSCEF Doc. 8); Sheingold Affirm., Ex. C (NYSCEF Doc. 43); Pet. ¶¶ 27, 29; Potzler Affirm. ¶ 12)

On behalf of the OAG, by letter dated September 8, 2023, the RAO responded to the Diocese's August 15, 2023 letter. (Pet. ¶ 30; Potzler Affirm. ¶ 13; Answer ¶ 30) The RAO informed the Diocese that its arguments for exemption of the documents from production under FOIL were unpersuasive and that any records responsive to the FOIL Request would, accordingly, be released with all redactions necessary to maintain privacy. (*See* Potzler Affirm., Ex. E (NYSCEF Doc. 9); Sheingold Affirm, Ex. D (NYSCEF Doc. 44); *see also* Pet. ¶ 32; Potzler Affirm. ¶ 13) With respect to the Diocese's argument that release of the documents would interfere with a judicial proceeding within the meaning of POL § 87(2)(e)(i) because it would interfere with the Bankruptcy Proceeding, the RAO rejected that argument on the ground that "the assertion of § 87(2)(e) is the

Agency's to make pursuant to statute and not the Diocese's." (Potzler Affirm., Ex. E at 2; Pet. ¶ 32; Potzler Affirm. ¶ 13; Sheingold Affirm. ¶ 8) And, with respect to the Diocese's argument that the exemption from disclosure under POL § 87(2)(d) should apply to the documents because their release would cause the Diocese competitive harm, the RAO rejected that argument as well, writing:

> [N]one of the records constitute trade secrets as they do not contain information that would provide a competitor, to the extent one exists, with an advantage nor is the Diocese's reference to the bankruptcy proceeding an appropriate example of a competitive scenario. Any such stakeholders are likely in possession of similar, if not the same records, [sic] at issue here. Accordingly, I am releasing all the responsive records for which the Diocese has asserted "trade secrets" in its August 25, 2023, correspondence, with the necessary privacy redactions.

(*Id.* at 2-3; Pet. ¶ 32; Potzler Affirm. ¶ 13) The RAO informed the Diocese of its right to appeal the RAO's decision to the OAG's Records Appeals Officer, Kathryn Sheingold (the "Appeals Officer"). (Potzler Affirm, Ex. E at 3)

By letter dated September 26, 2023, the Diocese submitted an appeal of the RAO's decision to the Appeals Officer. (*Id.*, Ex. F (NYSCEF Doc. 10); Sheingold Affirm, Ex. E (NYSCEF Doc. 45); Pet. ¶ 33; Potzler Affirm. ¶ 14; Answer ¶ 33) In its letter, the Diocese specifically incorporated the arguments that it made before the RAO by reference and attachment of its prior August 15, 2023, letter. (Potzler Affirm., Ex. F at 1) The Diocese further reiterated its argument that the exemption under POL § 87(2)(d) should apply because release of the documents would "severely disrupt the stakeholders' confidential negotiations" in the Bankruptcy Proceeding, and it also argued for the first time that, because other organizations seeking charitable donations could not obtain the documents through any means other than FOIL, the documents are exempt from disclosure under the analysis set forth in *Encore College Bookstores, Inc. v. Auxiliary Service Corporation of the State University of New York at Farmingdale*, 87 N.Y.2d 410 (1995). (*Id.*) Moreover, the Diocese asserted that "[t]here is no support in the statute for the notice that the OAG has the sole authority to determine whether disclosure of the Diocese's documents will interfere with ongoing 'judicial proceedings.'" (*Id.* at 3)

The Appeals Officer denied the Diocese's appeal in full by letter dated October 12, 2023. (*See* Potzler Affirm., Ex. G (NYSCEF Doc. 11); Sheingold Affirm., Ex. F (NYSCEF Doc. 46); Pet. ¶¶ 36-39; Potzler Affirm. ¶¶ 15; Answer ¶ 36) In her letter, the Appeals Officer acknowledged that

the Diocese did not rely on the "trade secrets" prong of POL § 87(2)(d), but she found, nevertheless, that the "commercial enterprise" prong also did not apply:

> You do not rely on the trade secrets prong of the exception. You instead argue that the Diocese, which has filed for bankruptcy, is a "commercial enterprise," as evidenced by its involvement in the bankruptcy case. You further argue that disclosure of the responsive records would cause substantial injury to the Diocese as it negotiates with the claimants and the insurance carriers, with whom the Diocese is in competition.
>
> The purpose of the exception established by [POL] § 87(2)(d) is to protect businesses from the deleterious consequences of disclosing confidential commercial information, so as to further the State's economic development efforts and attract business to New York. *In re Encore Coll. Bookstores v. Auxiliary Serv. Corp.*, 87 N.Y.2d 410, 420 (1995). The commercial enterprise seeking the exception must show actual competition from members of the same industry and the likelihood of substantial competitive injury. *Id.*
>
> Your August 25 and September 26 letters do not demonstrate that the Diocese is engaged in actual marketplace competition of the sort contemplated by [POL] § 87(2)(d). That is, the Diocese does not engage in business for which it faces competition from members of the same business that would gain a potential windfall from not having to create their own comparable business model if they had access to the responsive records.
>
> I therefore agree with the [RAO]'s conclusion that the responsive records are not subject to withholding under [POL] § 87(2)(d).

(Potzler Affirm., Ex. G at 2; *see also* Pet. ¶ 39; Potzler Affirm. ¶ 16) The Appeals Officer next stated that the procedure established by POL § 89(5) did not allow the Diocese to assert the other exemptions to disclosure referenced in its August 25 and September 26, 2023 letters. (*Id.* at 3) Regardless, the Appeals Officer addressed the exemption under POL § 87(2)(e)(i), rejecting its application because the "OAG has concluded that disclosing the responsive records at this time will not interfere with its law enforcement investigation or judicial proceedings in which it is involved." (*Id.*; *see also* Pet. ¶ 38; Potzler Affirm. ¶ 15) Additionally, the Appeals Officer observed that the Diocese had not provided the OAG with a copy of the Bankruptcy Court's mediation order or any other documentation supporting the Diocese's claim that disclosure of the documents "would run counter to the Bankruptcy Court's mediation order, thereby interfering with the ongoing judicial proceedings in Bankruptcy Court." (Potzler Affirm., Ex. G at 3) Finally, the Appeals Officer noted that her decision was a final agency determination subject to judicial review pursuant to Article 78. (*Id.*; Pet. ¶ 40; Potzler Affirm. ¶ 17)

Subsequently, on October 27, 2023, the Diocese commenced this Article 78 proceeding by filing a Verified Petition, a Notice of Petition, a supporting affirmation and exhibits, and a memorandum of law. (*See* Pet.; NOP; Potzler Affirm. & Exs. A-G; Pet'r's Mem. of Law in Supp. of Its Verified Pet., dated Oct. 27, 2023 ("<u>Pet'r's Mem.</u>") (NYSCEF Doc. 3)) The OAG submitted its Verified Answer, supporting affirmation and exhibits, and memorandum of law on December 8, 2023. (Answer; Sheingold Affirm. & Exs. A-F; Resp't's Mem. of Law in Opp. to the Verified Pet., dated Dec. 8, 2023 ("<u>Resp't's Mem.</u>") (NYSCEF Doc. 47)) The Diocese filed its reply brief on January 2, 2024. (Pet'r's Reply Brief in Further Supp. of Its Verified Pet., dated Jan. 2, 2024 ("<u>Reply</u>") (NYSCEF Doc. 48))[1]

## II. DISCUSSION

FOIL has long been understood to "express[] this State's strong commitment to open government and public accountability and [to] impose[] a broad standard of disclosure upon the State and its agencies." *Capital Newspapers Div. of Hearts Corp. v. Burns*, 67 N.Y.2d 562, 565(1986); *Fink v. Lefkowitz*, 47 N.Y.2d 567, 571 (1979). "To implement this purpose, FOIL provides that all records of a public agency are presumptively open to public inspection and copying unless otherwise specifically exempted." *Burns*, 67 N.Y.2d at 566 (citing POL § 87(2)). Specifically, POL § 87(2) "mandates that '[e]ach agency *shall* . . . make available for public inspection and copying *all records*,' unless the records fall within a statutory exemption." *Encore Coll. Bookstores v. Auxiliary Serv. Corp. of State Univ. of N.Y. at Farmingdale*, 87 N.Y.2d 410, 417 (1995) (first emphasis added) (quoting POL § 87(2)). This mandate applies "regardless of 'the function or purpose for which [the records] are generated or held,' and regardless of the fact that the documents may have originated outside a government agency subject to FOIL." *City of Newark v. Law Dep't of City of N.Y.*, 305 A.D.2d 28, 31-32 (1st Dep't 2003) (quoting *Citizens for Alternatives to Animal Labs v. Bd. of Trustees*, 92 N.Y.2d 357, 361 (1998)) (citing *Washington Post Co. v. N.Y. State Ins. Dep't*, 61 N.Y.2d 557, 565 (1984)).

POL § 87(2) lists a number of categories of records to which an agency may deny the public access. It is well settled, however, that these statutory exemptions are to be "narrowly interpreted and must 'be given their natural and obvious meaning where such interpretation is

---

[1] The OAG has agreed not to produce any of the disputed documents until resolution of this proceeding and any ensuing appeals. (Potzler Affirm. ¶ 18)

consistent with the legislative intent and with the general purpose and manifest policy underlying FOIL.'" *Disability Rights N.Y. v. N.Y.S. Comm'n of Corr.*, 194 A.D.3d 1230, 1232 (3d Dep't 2021) (quoting *Abdur-Rashid v. N.Y.C. Police Dep't*, 31 N.Y.3d 217, 225 (2018)) (citing *Data Tree, LLC v. Romaine*, 9 N.Y.3d 454, 462 (2007)). Even if an exemption applies, "the language of the exemption provision contains permissive rather than mandatory language, and it is within the agency's discretion to disclose such records . . . if it so chooses." *Burns*, 67 N.Y.2d at 567 (citing *Short v. Bd. of Managers*, 57 N.Y.2d 399, 404 (1982)).

Here, the Diocese requests that the documents in question be barred from public disclosure under two exemptions: (1) POL § 87(2)(d)'s substantial-competitive-injury exemption; and (2) § 87(2)(e)(i)'s law-enforcement exemption. For the following reasons, the Diocese fails to satisfy its burden with respect to either.

### A. POL § 87(2)(d) – The Substantial-Competitive-Injury Exemption

The exemption from disclosure established by POL § 87(2)(d) has two prongs that apply independently of each other. *See Encore Coll. Bookstores*, 87 N.Y.2d at 419-20 (recognizing substantial-competitive-injury prong). The first prong allows an agency to deny access to records that constitute "trade secrets." POL § 87(2)(d). The second prong allows an agency to deny access to records that are "submitted to [it] by a commercial enterprise or derived from information obtained from a commercial enterprise and which if disclosed would cause substantial injury to the competitive position of the subject enterprise." *Id.* As the Appeals Officer correctly recognized, the Diocese relies on the second prong, arguing that it is a commercial enterprise and that release of the 25,000 pages of documents produced to the OAG would substantially injure the Diocese's competitive position.

As a preliminary matter, the Court notes that this proceeding involves a much more infrequent scenario, in that, here, the agency in possession of the disputed documents is *not* the party seeking to invoke an exemption to disclosure. Indeed, the OAG wishes to the release the documents in response to the FOIL Request. It is the Diocese, the entity that originally produced the documents to the OAG, that seeks to bar their release under the substantial-competitive-injury prong of POL § 87(2)(d). This proceeding, therefore, is what is typically referred to as a reverse-FOIL case.

160558/2023 The Diocese of Buffalo v. Office of the New York State Attorney General et al.        Page 8 of 29
Mot. Seq. No. 001

Case 1-20-10322-CLB,   Doc 4178-1,   Filed 09/16/25,   Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 9 of 30
8 of 29

The Diocese's standing to assert such a reverse-FOIL claim derives directly from FOIL. POL § 89(5) establishes the applicable procedure. Under its provisions, anyone who has submitted information to an agency pursuant to law or regulation may request that the information be exempt from disclosure under § 87(2)(d); the agency shall then inform the person if the information is requested via FOIL (or if the agency, on its own initiative, intends to determine whether the exemption applies) and permit the person an opportunity to submit a written statement explaining why the exemption should be applied to deny disclosure; and the agency must then issue a written determination, which can be appealed. *See* POL § 89(5)(a)-(c). Critically, § 89(5) expressly provides that an Article 78 proceeding may then be commenced to review an adverse determination by the agency. *Id.* § 89(5)(d)(i). There is no dispute that the parties followed this procedure prior to and in commencing this proceeding for review of the OAG's September 8 and October 12, 2023 decisions.

In an Article 78 proceeding, a court reviews an agency decision to determine whether it violates lawful procedures, is arbitrary or capricious, or is affected by an error of law. CPLR § 7803(3); *Kent v. Lefkowitz*, 27 N.Y.3d 499, 505 (2016); *W. 58th St. Coalition, Inc. v. City of N.Y.*, 188 A.D.3d 1, 8 (1st Dep't 2020). The Diocese challenges the OAG's decisions on the basis of an alleged error of law. In sum and substance, the Diocese argues that the OAG erred by misapplying the test set forth by the Court of Appeals in *Encore College Bookstores*, specifically, by failing to recognize and apply the alleged requirement that "[w]here FOI[L] disclosure is the sole means by which competitors can obtain the requested information, the inquiry ends [t]here." 87 N.Y.2d at 420.

In *Encore College Bookstores*, the Court of Appeals interpreted, for the first time, the substantial-competitive-injury prong of POL § 87(2)(d). Acknowledging that FOIL is patterned after the Federal Freedom of Information Act ("<u>FOIA</u>"), the Court of Appeals held that, "[b]y utilizing and continuing language virtually identical to the analogous Federal exemption for commercial information, the Legislature has signalled [*sic*] its intent that the substantial competitive injury prong of the FOIL exemption be similar in scope to the substantial competitive harm prong of its Federal counterpart." *Id.* at 419-20. To determine that scope, the Court of Appeals looked to applicable Federal caselaw, specifically, *Worthington Compressors v. Castle*, 662 F.2d 45 (D.C. Cir. 1981), explaining that

whether "substantial competitive harm" exists for purposes of FOIA's exemption for commercial information turns on the commercial value of the requested information to competitors and the cost of acquiring it through other means. Because the submitting business can suffer competitive harm only if the desired material has commercial value to its competitors, courts must consider how valuable the information will be to the competing business, as well as the resultant damage to the submitting enterprise. Where FOIA disclosure is the sole means by which competitors can obtain the requested information, the inquiry ends here.

Where, however, the material is available from other sources at little or no cost, its disclosure is unlikely to cause competitive damage to the submitting commercial enterprise. On the other hand, as explained in *Worthington*:

> "Because competition in business turns on the relative costs and opportunities faced by members of the same industry, there is a potential windfall for competitors to whom valuable information is released under FOIA. If those competitors are charged only minimal FOIA retrieval costs for the information, rather than the considerable costs of private reproduction, they may be getting quite a bargain. Such bargains could easily have competitive consequences not contemplated as part of FOIA's principal aim of promoting openness in government."

*Encore Coll. Bookstores*, 87 N.Y.2d at 420 (quoting *Worthington*, 662 F.2d at 51). "The reasoning underlying these considerations," the Court of Appeals found, "is consistent with the policy behind [POL § 87(2)(d)]—to protect businesses from the deleterious consequences of disclosing confidential commercial information, so as to further the State's economic efforts and attract business to New York." *Id.*; *Verizon N.Y., Inc. v. Bradbury*, 40 A.D.3d 1113, 1115 (2d Dep't 2007). Accordingly, as the test governing the substantial-competitive-injury prong of POL § 87(2)(d), the Court of Appeals adopted the test for whether substantial competitive harm exists under FOIA's equivalent exemption. *Encore Coll. Bookstores*, 87 N.Y.2d at 420.

Contrary to the Diocese's contention, the Appeals Officer correctly interpreted and summarized the Court of Appeals's holdings in *Encore College Bookstores*. The Diocese, by contrast, misreads *Encore College Bookstores* when it asserts that a finding that records are available only through FOIL is, in combination with a demonstration that the provider of the records is a commercial enterprise, determinative of the inquiry required under the substantial-competitive-injury prong of POL § 87(2)(d). Initially, the Diocese fails to identify even a single case in which another court interpreted and applied *Encore College Bookstores* as the Diocese proposes, and the Court is unable to locate any such case on its own. Furthermore, the Diocese's position depends

160558/2023 The Diocese of Buffalo v. Office of the New York State Attorney General et al.          Page 10 of 29
Mot. Seq. No. 001

10 of 29

Case 1-20-10322-CLB,    Doc 4178-1,    Filed 09/16/25,    Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 11 of 30

upon a single line from the Court of Appeals's opinion taken out of context. That single line concludes a paragraph of relevant discussion and analysis, and it is followed by additional relevant discussion and analysis in subsequent paragraphs. When the line is read properly within its surrounding context, it is clear that it constitutes but a factor or step (albeit a potentially significant one) in a multifactor or multistep inquiry, consisting also of whether competition exists, the commercial value of records to competitors, and the damage that would result to the submitting enterprise by disclosure.

Take *Encore College Bookstores* itself as an example. In applying the standard that it just adopted to the facts of that case, the Court of Appeals wrote:

> Encore concedes that it wants the textbook information in order to sell the very same books to the very same SUNY students that patronize Barnes & Noble, its competitor. Likewise, the booklist has obvious commercial value to Encore since it would enable Encore to offer the precise inventory that its target clientele—SUNY-Farmingdale students—is required to purchase and that is currently offered by Barnes & Noble. The potential damage to Barnes & Noble as a result is the loss of student customers to its competitor and a corresponding loss of profits. Indeed, Barnes & Noble alleges that after providing the 1993 spring semester booklist to Encore the campus bookstore suffered a significant decrease in sales revenue.
>
> The likelihood of harm to Barnes & Noble is enhanced by the economic windfall conferred upon Encore were it to receive the booklist at the mere cost of FOIL fees. The information in the booklist, accumulated by virtue of the effort and expense of Barnes & Noble, is also directly available to Encore. Disclosure through FOIL, however, would enable Encore to obtain the requisite information without expending its resources, thereby reducing its cost of business and placing Barnes & Noble at a competitive disadvantage.

*Id.* at 421 (internal citation omitted). While *Encore College Bookstores* did not involve a situation in which the disputed information was available to a competitor only by FOIL request, the Court of Appeals's analysis still illustrates that the availability of the information is a factor considered in assessing the likelihood of harm to the provider of the information should it be released. The Court of Appeals independently considered the commercial value of the information *before* assessing its availability. Had the information been available only by FOIL request, the Court of Appeals simply would not have had to conduct any further analysis of the economic windfall that the competitor would gain from not having to expend its own resources to obtain the same the information on its own.

Additionally, if, as the Diocese contends, the mere fact that records that a commercial enterprise provided to an agency are available only through FOIL is sufficient to invoke POL § 87(2)(d), without also independently demonstrating the existence of competition and the records' commercial value, the exemption could conceivably reach beyond information that has commercial value to a competitor. One can imagine numerous scenarios in which a commercial enterprise provides a state agency with information with little or no value to industry competitors but is available to others only by FOIL request. A test in which the unavailability of a commercial enterprise's information by means other than FOIL constituted the sole determinative factor would run counter to both the exemption's express language and the reasoning underlying it, and that, in turn, would run counter to the mandate to construe exemptions narrowly and consistent with legislative intent and the general purpose and policy underlying FOIL. The Court declines to read *Encore College Bookstores* in a manner inconsistent with the Court of Appeals's own long-standing FOIL precedent.

The Appeals Officer was also correct in concluding that the Diocese had not demonstrated the existence of circumstances necessary to invoke the substantial-competitive-injury prong of POL § 87(2)(d). Pursuant to POL § 89(5)(e), the Diocese "shall in all proceedings have the burden of proving entitlement" to the exemption. Therefore, the "normal CPLR article 78 'arbitrary and capricious' standard of review" is inapplicable. *Bahnken v. N.Y.C. Fire Dep't*, 17 A.D.3d 228, 229-30 (1st Dep't 2005), *lv. denied* 6 N.Y.3d 701. Rather, the Diocese must demonstrate "that the requested material falls squarely within a FOIL exemption by articulating a particularized and specific justification for denying access." *Burns*, 67 N.Y.2d at 566; *Fink*, 47 N.Y.2d at 571; *Bradbury, Inc.*, 40 A.D.3d at 1114 ("The entity resisting disclosure, whether an agency of government *or the provider of the information*, must articulate a particularized and specific justification for denying access." (emphasis added)).

Upon review and consideration of the Diocese's submissions here, the Court concludes that the Diocese has failed to satisfy its burden. While there does not appear to be a genuine dispute that the Diocese can function as a commercial enterprise within the meaning of § 87(2)(d), the Diocese must still demonstrate the existence of (1) actual competition and (2) the likelihood of substantial competitive injury. *Encore Coll. Bookstores*, 87 N.Y.2d at 421 (quoting *Gulf & W. Indus. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1979)); *Glen Falls Newspapers, Inc. v. Counties of Warren*

160558/2023 The Diocese of Buffalo v. Office of the New York State Attorney General et al.          Page 12 of 29
Mot. Seq. No. 001

Case 1-20-10322-CLB,    Doc 4178-1,    Filed 09/16/25,    Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 13 of 30
12 of 29

*& Wash. Indus. Dev. Agency*, 257 A.D.2d 948, 949 (3d Dep't 1999). The Diocese fails to demonstrate either.

The Diocese makes essentially no attempt to demonstrate the existence of actual competition between it and other members of the same industry, as contemplated by POL § 87(2)(d). Neither the Verified Petition nor the affirmation of the Diocese's General Counsel, Chief Compliance Officer, Chancellor, and Child Protection Policy Coordinator (the "<u>Potzler Affirmation</u>") submitted in support of the Verified Petition offer any explanation as to who or what the Diocese is actually in competition with and how, besides a single vague reference to "any other charitable organization that, like the Diocese, seeks charitable donations." (Pet. ¶ 39; Potzler Affirm. ¶ 16) The Diocese's letters from its counsel to the OAG, dated August 25 and September 26, 2023, submitted as exhibits to the Potzler Affirmation, are similarly devoid of any relevant explanation or proof. (*See generally* Potzler Affirm., Exs. D & F) Thus, to the extent that they address actual competition at all, the Diocese's submissions are entirely conclusory and lack the necessary factual and evidentiary support.[2] *See Burns*, 67 N.Y.2d at 570 ("Nor has intervenor satisfied his burden of proving exemption under clause (iv) because his assertion that he will suffer 'economic and personal hardship' if the 'Lost Time Report' is released to the newspaper is conclusory and not supported by any facts."); *Livson v. Town of Greenburgh*, 141 A.D.3d 658, 660 (2d Dep't 2016) ("Conclusory assertions that certain records fall within a statutory exemption are not sufficient; evidentiary support is needed." (internal quotation marks and citations omitted)); *Bahnken*, 17 A.D.3d at 230 (finding no entitlement to POL § 87(2)(d) exemption because agency arguments were "speculative and unsupported by any evidentiary documentation"); *Belth v. N.Y. State Dep't of Ins.*, 189 Misc. 2d 508, 511 (N.Y. Sup. Ct. N.Y. Cnty. 2001) ("Respondent's conclusory allegations cannot serve as a basis for denial of petitioner's FOIL request."). *But see Saratoga Harness Racing, Inc. v. The Task Force on the Future of Off-Track Betting in N.Y. State*, No. 9740-09, 2010 WL 928700 (N.Y. Sup. Ct. Albany Cnty. Mar. 9, 2010) (enjoining release of records pursuant to POL § 87(2)(d) based

---

[2] Even if the single line from *Encore College Bookstores* on which the Diocese relies is read out of context, it still expressly contemplates a prerequisite demonstration that competitors exist: "Where FOIA disclosure is the sole means by which *competitors* can obtain the requested information, the inquiry ends here." 87 N.Y.2d at 420 (emphasis added). Thus, the Diocese's entitlement to rely on the substantial-competitive-injury prong of POL § 87(2)(d) would still be untenable even if the Court were persuaded to adopt the Diocese's suggested approach to reading *Encore College Bookstores*.

160558/2023 The Diocese of Buffalo v. Office of the New York State Attorney General et al.                     Page 13 of 29
Mot. Seq. No. 001

Case 1-20-10322-CLB,   Doc 4178-1,   Filed 09/16/25,   Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 14 of 30
13 of 29

on affidavits providing specific, detailed evidentiary support regarding actual competition and competitive injury).

The Diocese similarly fails to demonstrate that it would be likely to suffer substantial competitive injury if the disputed documents were released by the OAG. Once again, the Verified Petition, the Potzler Affirmation, and the Diocese's letters to the OAG fail to even address the competitive injury that the Diocese might suffer upon release of the documents other than through the same vague allusion to other charitable organizations that also seek donations. The Diocese's argument—to the extent that the Court can infer one—appears to be that release of the disputed documents would cause those who donate to the Diocese to cease donating or, more to the point, to donate to another charitable organization. But the Diocese makes no attempt whatsoever to show, through facts supported by evidence, that this result is likely to occur.[3] Rather, it merely implies, in only the most cursory fashion, that disclosure might lead to such a result. This kind of speculative, ipse dixit argument is, again, insufficient to satisfy the Diocese's burden. *See Burns*, 67 N.Y.2d at 570; *Livson*, 141 A.D.3d at 660; *Verizon N.Y., Inc. v. Mills*, 60 A.D.3d 958, 959 (2d Dep't 2009) ("The party seeking the benefit of the exemption must 'present specific, persuasive evidence that disclosure will cause it to suffer a competitive injury; it cannot merely rest on a speculative conclusion that disclosure might potentially cause harm.'" (quoting *Markowitz v. Serio*, 11 N.Y.3d 43, 51 (2008))); *Bahnken*, 17 A.D.3d at 230; *Sunset Energy Fleet v. N.Y. State Dep't of Envtl. Conservation*, 285 A.D.2d 865, 868 (3d Dep't 2001); *Belth*, 189 Misc. 2d at 511.

In conclusion, the test established by the Court of Appeals in *Encore College Bookstores* requires that the party seeking to take advantage of POL § 87(2)(d)'s substantial-competitive-injury exemption demonstrate more than just that the disputed information was submitted to the agency by a commercial enterprise and that it would not be available to others except through a FOIL request. Such a party must demonstrate, in addition to the requisite status of the information's provider, the existence of actual competition and the likelihood of substantial competitive injury,

---

[3] The Diocese also fails to address how its alleged competitors would make use of the documents should they be released. Does the Diocese suggest that competing charitable organizations—presumably also religious in nature—would attempt to publicize the Diocese's internal information concerning its investigations into abuse allegations against its clergy in order to attract donations from Catholics living in the Diocese's area of coverage who are disillusioned by that information? Does the Diocese further suggest that these individuals would renounce their Catholic faith to follow, and donate to the churches or leadership organizations of, another Christian denomination in the same geographic area? If so, the Diocese makes no attempt whatsoever to articulate that theory of harm and substantiate it with facts and evidence.

**160558/2023 The Diocese of Buffalo v. Office of the New York State Attorney General et al.** **Page 14 of 29**
Mot. Seq. No. 001

Case 1-20-10322-CLB, Doc 4178-1, Filed 09/16/25, Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 15 of 30
14 of 29

and the availability of the information (whether solely through FOIL or also by other means) is one factor that a court must consider in assessing the likelihood of competitive injury. Here, the Diocese bore the burden of establishing the existence of the elements of the exemption but failed to do so.

### B.    POL § 87(2)(e)(i) – The Law-Enforcement Exemption

POL § 87(2)(e) establishes the law-enforcement exemption to FOIL disclosure. Pursuant to subsection (i) of that provision, an agency may deny the public access to records that "are compiled for law enforcement purposes" but "only to the extent that disclosure would . . . interfere with law enforcement investigations or judicial proceedings." POL § 87(2)(e)(i). There is no dispute that the 25,000 pages of documents relating to the abuse claims against the Diocese's clergy were compiled for law-enforcement purposes, specifically, the OAG's investigation into all Catholic dioceses in New York. Rather, the dispute here is whether release of those documents in response to the FOIL Request would interfere with "judicial proceedings" within the meaning of the exemption. The Diocese argues that the Bankruptcy Proceeding is a judicial proceeding under § 87(2)(e)(i) and that release of the documents would interfere with it; thus, the release of the documents should be barred.

> i.     *The Diocese's Claim Is Reviewable*

Preliminarily, the Appeals Officer noted that the Diocese's assertion to the OAG that the documents should be withheld pursuant to the law-enforcement exemption was "not subject to the procedure established by [POL] § 89(5)." (Potzler Affirm., Ex. G at 3) The Appeals Officer was correct; POL § 89(5) creates a procedure related only to POL § 87(2)(d).[4] Nor does any other provision of FOIL expressly permit an individual who or entity that provided information to an agency to object to that agency's release of the information based on the applicability of the law-enforcement exemption or to commence an Article 78 proceeding challenging an agency's decision *not* to invoke that exemption. Thus, the source of the Diocese's standing to seek relief forcing the OAG to withhold the disputed documents from production pursuant to POL § 87(2)(e)(i) is unclear.

---

[4] Pursuant to POL § 89(5)(1-a), the procedure also relates to "records or portions thereof that may contain critical infrastructure information."

Nevertheless, the OAG does not challenge the Diocese's standing in this proceeding. That term does not appear in any of the OAG's filings. In the absence of such a specific challenge, the Court may not dismiss *sua sponte* the Diocese's claim based on POL § 87(2)(e)(i) for lack of standing. *See Cayuga Nation v. Town of Seneca Falls*, 213 A.D.3d 1250, 1251-52 (4th Dep't 2023) (holding that "a party's lack of standing does not constitute a jurisdictional defect" and therefore lower court "erred in *sua sponte* reaching the issue of standing" when the defense was not raised by a party); *Emic Corp. v. Barenblatt*, 169 A.D.3d 621, 621 (1st Dep't 2019) (holding that trial court should not have raised issue of lack of standing *sua sponte*); *Wells Fargo Bank, N.A. v. Halberstam*, 166 A.D.3d 710, 711 (2d Dep't 2018) (holding that it was inappropriate for trial court to raise *sua sponte* affirmative defense of lack of standing where defense waived because not raised in answer or a pre-answer motion to dismiss).[5]

The OAG does, however, contend that "the decision of whether to assert the law enforcement exemption is entirely discretionary on the [OAG's] part . . . and hence not properly reviewable." (Answer ¶ 50) The basis for the OAG's position is its view that this proceeding is in the nature of mandamus to compel, rather than in the nature of mandamus to review. "[M]andamus to review . . . differs from mandamus to compel in that a petitioner seeking the latter must have a clear legal right to the relief demanded and there must exist a corresponding nondiscretionary duty on the part of the administrative agency to grant that relief." *Scherbyn v. Wayne-Finger Lakes Bd. of Co-op. Educ. Servs.*, 77 N.Y.2d 753, 757 (1991). An agency cannot be compelled to perform a discretionary act. *Saslow v. Cephas*, 198 A.D.2d 53, 53 (1st Dep't 1993). "In a proceeding in the nature of mandamus to review, however, a court examines an administrative action involving the exercise of discretion. . . . The standard of review in such a proceeding is whether the agency determination was arbitrary and capricious or affected by an error of law." *Scherbyn*, 77 N.Y.2d at 757-58.

The Diocese frames its request for relief as in the nature of mandamus to review, alleging that the OAG's decisions were affected by errors of law. (*See* Pet. ¶ 45; Pet'r's Mem. at 9-10) *See Barry v. O'Neill*, 185 A.D.3d 503, 505 (1st Dep't 2020) ("This proceeding is not in the nature of

[5] The Court notes that other trial courts have found that petitioners had standing to challenge a state agency's decision not to rely on a FOIL exemption even where FOIL did not expressly authorize the challenge, applying the traditional principles of standing. *Verizon of N.Y., Inc. v. Mills*, 24 Misc. 3d 1230(A), at *1-2 (N.Y. Sup. Ct. Westchester Cnty. Aug. 10, 2007); *N.Y. Regional Interconnect, Inc. v. Oneida Cnty. Indus. Dev. Corp.*, 21 Misc. 3d 1118(A), *3-4 (N.Y. Sup. Ct. Oneida Cnty. Feb. 28, 2007).

mandamus to compel. Instead, the standard of review is whether the denial of the FOIL request was 'affected by an error of law.'"). In the absence of a challenge to the Diocese's standing, therefore, the Court sees no reason why the Diocese's claim pursuant to POL § 87(2)(e)(i) should not proceed and be analyzed in the same manner as its claim pursuant to POL § 87(2)(d). The first question presented is whether the OAG's decision not to withhold production of the disputed documents based on POL § 87(2)(e)(i) was affected by an error of law. If there was no error of law, then the inquiry ends. But if there was an error of law, the next question is whether the OAG properly exercised its discretion in deciding to release the disputed documents despite the applicability of the exemption. The standard of review applicable to that question is the arbitrary-and-capricious standard applicable to all Article 78 proceedings in which an agency's discretionary decisionmaking is in question.

*Verizon of New York, Inc. v. Mills* provides the guiding example. There, the trial court determined that Verizon had demonstrated that the substantial-competitive-injury exemption should apply to bar release of certain records that it had provided to the Village of Elmsford to its competitor, Cablevision, pursuant to a FOIL request. *Verizon of N.Y., Inc. v. Mills*, 24 Misc. 3d 1230(A), at *1-4 (N.Y. Sup. Ct. Westchester Cnty. Aug. 10, 2007). Because an agency has discretion to release records even if a FOIL exemption applies, however, the trial court found that it still had to determine whether the Village's decision to release the records was an abuse of discretion, applying the typical arbitrary-and-capricious standard of review. *See id.* at *4. The Village's decision was found not to be reasonable and was vacated. *See id.* at *4-5. On appeal, the Second Department affirmed the trial court's judgment, expressly recognizing that "the Village retained discretionary authority under FOIL to disclose Verizon's franchise reports despite the applicability of the exemption," but modified it to the extent that the matter was "remitted to the Village to allow it to exercise its discretion as to whether, despite the exemption, the franchise reports should be disclosed." *Mills*, 60 A.D.3d at 960.

Here, as discussed below, the Court determines that the Diocese has not met its burden to demonstrate that the law-enforcement exemption applies. But even if the Diocese had met its burden, it is unclear that the OAG fully considered the facts and circumstances *in light of the exemption's application* and decided to release the disputed documents even despite the exemption.

Case 1-20-10322-CLB,   Doc 4178-1,   Filed 09/16/25,   Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 18 of 30
17 of 29

Therefore, in that event, the proper remedy, following *Mills*'s example, would likely be remand to the OAG for further consideration.

ii.  *The Diocese Fails to Demonstrate that the Law-Enforcement Exemption Applies*

The primary grounds on which the OAG challenges the Diocese's attempt to invoke the law-enforcement exemption is legal in nature, in that the OAG argues that the phrase "judicial proceedings" in POL § 87(2)(e)(i) means a judicial proceeding related to a law-enforcement investigation or litigation. And because the OAG determined that release of the disputed documents would not interfere with its own investigation into and litigation against the Diocese, and because the Bankruptcy Proceeding is not related to any law-enforcement investigation, the OAG argues that the exemption is inapplicable. For its interpretation of the scope of the exemption, the OAG relies on *Lesher v. Hynes*, 19 N.Y.3d 57 (2012).

The Diocese argues that the OAG's interpretation of the phrase "judicial proceedings" constitutes an error of law. According to the Diocese, the provision's plain language does not require that the subject judicial proceedings be related to a law-enforcement investigation or litigation. The Diocese emphasizes that in matters of pure statutory interpretation, an agency's interpretation is not afforded deference, and in any event the Legislature did not entrust the OAG to interpret and apply FOIL exclusively and thus it has no special expertise that should likewise be afforded deference. *Lesher*, the Diocese argues further, does not support the OAG's position. In any event, according to the Diocese, the Bankruptcy Proceeding is, in fact, related to the OAG's litigation against the Diocese.

As the Diocese expressly concedes, this case is unique. (Reply at 8) Based on the Court's own confirmatory research, no New York court has apparently considered many of the issues that the Diocese's attempt to invoke the law-enforcement exemption to bar release of the disputed documents by the OAG raises, including whether a separate bankruptcy proceeding not involving the law-enforcement agency that compiled the documents is a "judicial proceeding" within the meaning of the exemption. As a result, the circumstances of this case do not fit neatly within the governing precedent interpreting and applying the exemption, and the Court is therefore left to resolve the disputed issues with little directly relevant appellate guidance. The Court proceeds cautiously.

160558/2023 The Diocese of Buffalo v. Office of the New York State Attorney General et al.    Page 18 of 29
Mot. Seq. No. 001

Case 1-20-10322-CLB,   Doc 4178-1,   Filed 09/16/25,   Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 19 of 30
18 of 29

Addressing first the OAG's argument that certain language in *Lesher* indicates that a "judicial proceeding" *must* be related to a law-enforcement investigation or litigation for the exemption to apply, the Court rejects that position. In *Lesher*, the kinds of judicial proceedings subject to POL § 87(2)(e)(i) simply was not an issue before the Court of Appeals. *Lesher* involved a criminal investigation and potential prosecution, and, as the Diocese correctly observes, the Court of Appeals's "holding was focused on how specific an agency had to be in determining whether to withhold documents on the ground that their disclosure would interfere with criminal proceedings." (Reply at 7) *See* 19 N.Y.3d at 67. While this Court does not view it as *dicta*, as the Diocese does, the Court of Appeals's statement in *Lesher* that § 87(2)(e)(i) "does not bar disclosure of records compiled for law enforcement purposes in a criminal matter where the prosecution has been completed, absent some unusual circumstance such as the prospect that disclosure might compromise a related case," must be read in context of the questions presented to and answered by the court in the case.

The OAG presents no alternative analysis based on the language of the statute itself, the well-established starting point for any question of statutory interpretation. *Malta Town Centre I, Ltd. v. Town of Malta Bd. of Assessment Review*, 3 N.Y.3d 563, 568 (2004). Yet, the Diocese still bears the burden here to establish the applicability of the exemption—the Diocese is, after all, the party seeking to invoke it. It argues that POL § 87(2)(e)(i) uses the phrase "judicial proceedings" without any additional qualifying language; therefore, the phrase's "natural and obvious meaning" is that all judicial proceedings are covered, regardless of type or parties involved. (*See* Pet'r's Mem. at 13-14)

The Court disagrees. As the Court of Appeals has consistently held, "[w]hile FOIL exemptions are to be narrowly read, they must of course be given their natural and obvious meaning *where such interpretation is consistent with the legislative intent and with the general purpose and manifest policy underlying FOIL*." *Abdur-Rashid*, 31 N.Y.3d at 225 (emphasis added) (internal quotation marks and citation omitted).

In light, first, of how FOIL is designed to operate in practice, a limitation on the judicial proceedings subject to POL § 87(2)(e)(i) to those stemming from or related to the law-enforcement investigation through which the subject records were compiled makes sense. As previously mentioned, FOIL does not contain a procedure regarding POL § 87(2)(e)(i) equivalent to the procedure

regarding § 87(2)(d) established in § 89(5). An agency, therefore, is not obligated to inform the individual or entity whose records were compiled for law-enforcement purposes that those records are the subject of a FOIL request and to offer that individual or entity an opportunity to explain why the law-enforcement exemption should be applied to withhold the records from production. How, then, is an agency responding to a FOIL request that calls for the production of records compiled for law-enforcement purpose to know about a judicial proceeding unrelated to the law-enforcement investigation or how release of the records might interfere with such a proceeding? In this case, if the OAG had not been obligated under § 89(5) to inform the Diocese of the FOIL Request, the Diocese likely would not have known that the OAG was planning to produce the disputed documents to *Buffalo News* until after the OAG had already done so. The Diocese never would have had an opportunity to point to the Bankruptcy Proceeding and argue that the OAG's release of the disputed documents would interfere with it. Absent being informed independently by a FOIL requester or through some back-channel communication with an agency employee that a FOIL request had been made for records, other individuals and entities would find themselves in the same position if their records were compiled for law-enforcement purposes but there was never a request, pursuant to § 89(5), that the agency treat the records as subject to § 87(2)(d). It simply cannot be that state agencies are obligated to keep themselves apprised of *all* judicial proceedings that release of records compiled for law-enforcement purposes might potentially impact and to assess whether release of the records would interfere with an unrelated proceeding—as to which the agency would have little or no access or insight—as required under § 87(2)(e)(i).

Second, interpreting POL § 87(2)(e)(i) to apply to all types of judicial proceedings puts the exemption in conflict with the scope of the FOIA exemption that served as § 87(2)(e)'s model. As the Court of Appeals explained in *Lesher*,

> the law enforcement exemption [in FOIL] is modeled on 5 USC § 552(b)(7). As originally enacted by Congress, this provision of the Freedom of Information Act (FOIA) (5 USC § 552) exempted from disclosure "investigatory files compiled for law enforcement purposes except to the extent available by law to a private party." Similarly, the law enforcement exemption, as originally enacted in FOIL in 1974, shielded "information that is . . . part of investigatory files compiled for law enforcement purposes" ([POL] former § 88(7)(d)).
>
> Congress rewrote FOIA's law enforcement exemption in 1974 to permit the nondisclosure of "investigatory records compiled for law enforcement

purposes, but only to the extent that the production of such records would" create one of six specified dangers, the first of which was to "interfere with enforcement proceedings" (*see* 5 USC § 552(b)(7)(A)) (Exemption 7A). When the [New York] Legislature amended FOIL in 1977, it followed suit by enacting Public Officers Law § 87(2)(e)(i), which, as previously noted, denies access to records "compiled for law enforcement purposes and which, if disclosed, would . . . interfere with law enforcement investigations or judicial proceedings."

19 N.Y.3d at 64-65 (footnote omitted). FOIA Exemption 7A expressly applies to "enforcement proceedings." While an "enforcement proceeding" can be either criminal or civil in nature, *see Gen. Elec. Co. v. U.S. E.P.A.*, 18 F. Supp. 2d 138, 143 (D. Mass. 1998) ("It is well established that Exemption 7 'applies to civil and regulatory proceedings as well as to criminal matters.'" (quoting *Pope v. United States*, 599 F.2d 1383, 1386 (5th Cir. 1979))), the language still clearly envisions a proceeding commenced and maintained by a government agency to enforce a law. If the phrase "judicial proceedings" in POL § 87(2)(e)(i) were interpreted in isolation as the Diocese suggests, it would not possess the same inherent limited meaning but could mean any kind of judicial proceeding commenced and maintained by anyone, including an action for Chapter 11 bankruptcy protection.

Third, to interpret the phrase in such a way, giving it an expansive meaning that sweeps all judicial proceedings under POL § 87(2)(e)(i)'s protection from disclosure, would run directly counter to the well-established mandate to interpret FOIL exemptions narrowly, as well as the policy underlying FOIL—*i.e.*, maximum public access to government records—that such a mandate furthers.

Fourth, the phrase can be read in a more limited manner without doing violence to the plain language of the provision. The relevant clause of subsection (i) consists of a simple disjunctive phrase: "interfere with law enforcement investigations or judicial proceedings." The use of the "or" coordinating conjunction indicates two alternatives. *See In re Gerald R.M.*, 12 A.D.3d 1192, 1193 (1st Dep't 2004) ("The word 'or' as used in a statute is a disjunctive particle indicating an alternative and it often connects a series of words or propositions presenting a choice of either." (internal quotation marks, citations, and alterations omitted)); *McSweeney v. Bazinet*, 269 A.D.203, 216 (3d Dep't 1945), *aff'd*, 295 N.Y. 797 (1946). The question, however, is what the alternatives are. Grammatically, it would not be entirely unnatural to read the phrase "law enforcement" as modifying both the term "investigations" *and* the phrase "judicial proceedings." For example, in the

160558/2023 The Diocese of Buffalo v. Office of the New York State Attorney General et al.          Page 21 of 29
Mot. Seq. No. 001

Case 1-20-10322-CLB,   Doc 4178-1,   Filed 09/16/25,   Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 22 of 30
21 of 29

phrase "the lawyer didn't object to opposing counsel's inappropriate questions or comments," the term "inappropriate" could, and very likely should, be interpreted as applying to both the terms "questions" and "comments," despite the use of the "or" conjunction. At very least, it is ambiguous. In the same way, "law enforcement" could modify "judicial proceedings," or otherwise the Legislature's intent is ambiguous.

Regardless of any ambiguity, but best resolving any that exists, "judicial proceedings" should be interpreted as being modified by "law enforcement" because such an interpretation accords with the Court's prior observations: (1) an agency can only be expected to know whether the release of records compiled for law-enforcement purposes would interfere with a judicial proceeding related to the investigation; (2) a "law enforcement judicial proceeding," while an inartful phrase, is analogous to the "enforcement proceeding" language used in the model FOIA exemption, and thus it is consistent with the Legislature's intent, as recognized in *Lesher*, to "follow suit" with FOIA's earlier amendment; and (3) a narrow interpretation adheres to the mandate to read FOIL exemptions narrowly and serves FOIL's overarching purpose of maximum public access to government records.

The Court recognizes that two trial courts have concluded differently. The Diocese cites *Asian American Legal Defense & Education Fund v. New York City Police Department*, wherein the trial court held that POL § 87(2)(e)(i) "protects all types of judicial proceedings from the interference that would result from the premature disclosure of law enforcement records" and that the exemption "does not specify a particular type of judicial proceeding or any particular phase within a judicial proceeding." 41 Misc. 3d 471, 477 (N.Y. Sup. Ct. N.Y. Cnty. 2013). For its holding, that case quoted from the earlier *Campbell v. NYCPD*, No. 401938/2011, 2012 WL 255023 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 20, 2012).[6] In neither case, however, did the trial court engage in the analysis that this Court feels is necessary under the Court of Appeals's directives concerning interpretation of FOIL exemptions.

---

[6] While the trial court's decision in *Asian American Legal Defense & Education Fund* was subsequently affirmed by the First Department (and the Court of Appeals thereafter denied leave to appeal), the First Department's decision did not address the POL § 87(2)(e)(i) exemption. 125 A.D.3d 531 (1st Dep't 2015), *lv. denied* 26 N.Y.3d 919 (2016). The scope of the "judicial proceedings" implicated by POL § 87(2)(e)(i) has, therefore, yet to be directly addressed by an appellate court.

160558/2023 The Diocese of Buffalo v. Office of the New York State Attorney General et al.                    Page 22 of 29
Mot. Seq. No. 001

Case 1-20-10322-CLB,    Doc 4178-1,    Filed 09/16/25,    Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 23 of 30
22 of 29

The Diocese argues that, even if a judicial proceeding must be related to a law-enforce-ment investigation or litigation to qualify under POL § 87(2)(e)(i), the Bankruptcy Proceeding is, in fact, related to the OAG's civil lawsuit against the Diocese stemming from the OAG's investi-gation of all Catholic dioceses in New York. (Reply 9-10) According to the Diocese, the OAG's complaint in the civil action "expressly alleged that the Diocese sought bankruptcy protection due to claims arising out of" the conduct upon which the OAG's complaint was founded—*i.e.*, "allegations that the Diocese did not properly investigate and address allegations of abuse." (*Id.* at 9) The Diocese also argues that *it* subsequently removed the civil action to federal court on the basis that it was related to the Bankruptcy Proceeding, that the OAG did not contest the assertion that the actions were related and later abandoned its attempt to remand the case to state court, and that the federal court entered a Stipulated Final Order under which it retains ongoing juris-diction to enforce the order. (*Id.* 9-10)

The Court is unconvinced by the Diocese's arguments. The Diocese expressly alleges that it commenced the Bankruptcy Proceeding because it was "[f]aced with hundreds of civil actions filed by claimants pursuant to the [Child Victims Act]." (Pet. ¶ 17) Simply because some of the underlying facts involved in two actions—here, the Bankruptcy Proceeding and the OAG's civil action—may overlap does not necessarily mean that the actions are "related" within the meaning of the POL § 87(2)(e)(i). Nor is the meaning of "related" for purposes of federal bankruptcy juris-diction necessarily equivalent to the relationship necessary for the litigations to be "related" for purposes of POL § 87(2)(e)(i). "A proceeding is 'related to' a bankruptcy case when: (1) the out-come of the litigation might have any conceivable effect on the bankrupt estate; or (2) the litigation has a significant connection with [the] bankruptcy case." *Rahl v. Bande*, 316 B.R. 127, 132 (S.D.N.Y. 2004) (alteration in original) (internal quotation marks and citations omitted). This is a broad standard, under which "any conceivable effect on the bankrupt estate" will serve to confer juris-diction on the federal court. By contrast, as repeatedly stated herein, FOIL exemptions are to be read narrowly to effect FOIL's purpose of maximum public access to government records. Read-ing POL § 87(2)(e)(i) narrowly, as it must, the Court rejects the notion that the Bankruptcy Pro-ceeding is related to either the OAG's investigation of all Catholic dioceses in New York or to its civil lawsuit against the Diocese in such a manner as to trigger the exemption's protections from disclosure.

Even if POL § 87(2)(e)(i) applies to the Bankruptcy Proceeding, however, that is not the end of the inquiry. According to the Diocese, the OAG concedes that release of the documents would interfere with the Bankruptcy Proceeding. But the Appeals Officer also rejected the Diocese's attempt to invoke POL § 87(2)(e)(i) on the alternative ground that it had not provided a copy of any relevant Bankruptcy Court order, thereby preventing the OAG from assessing any potential interference with the Bankruptcy Proceeding. (Potzler Affirm., Ex. G at 3) And the OAG, in its Verified Answer, opposes the Verified Petition on the broad grounds that "the records are not properly subject to the law enforcement exemption of POL § 87(2)(e)(i)" and that "[t]he Petition, on its face and as a matter of law, does not demonstrate sufficient grounds warranting the relief sought herein." (Answer ¶¶ 50-51) But most important, notwithstanding anything else, it is *the Diocese* that bears the initial burden to demonstrate that the exemption applies, not only legally but also factually.

As previously stated, a party seeking to rely on a FOIL exemption must typically demonstrate "that the requested material falls squarely within a FOIL exemption by articulating a particularized and specific justification for denying access." *Burns*, 67 N.Y.2d at 566; *Fink*, 47 N.Y.2d at 571; *Bradbury*, 40 A.D.3d at 1114. When there is a pending criminal investigation or prosecution, however, and an agency seeks to withhold documents compiled for law-enforcement purposes pursuant to POL § 87(2)(e)(i) on the ground that their release would interfere with the investigation or prosecution, the Court of Appeals has held that "the agency may fulfill its burden to articulate a factual basis for the exemption under FOIL by 'identify[ing] the generic kinds of documents for which the exemption is claimed, and the generic risks posed by disclosure of [those] categories of documents.'" *Abdur-Rashid*, 31 N.Y.3d at 227 (alternation in original) (quoting *Lesher*, 19 N.Y.3d at 67). There is no pending criminal investigation or prosecution here with which release of the disputed documents could interfere. And the OAG has already determined and stated that release of the documents would not interfere with any investigation or judicial proceeding in which it is involved.

But as with so many things in this case, its unique circumstances pose a challenge to the application of precedent. Assuming, *arguendo*, that POL § 87(2)(e)(i) applies to the Bankruptcy Proceeding, the question that the Court still faces is whether the reasons underlying an agency's modified burden when there is a pending criminal investigation or prosecution also call for the

modified burden to apply when there is a pending *civil* proceeding with which a nonagency individual or entity claims the release of records would interfere. The Court of Appeals articulated those reasons in *Lesher*, and the Court now concludes that they would apply with equal force to noncriminal judicial proceedings.

In *Lesher*, the Court of Appeals adopted, with respect to POL § 87(2)(e)(i), the U.S. Supreme Court's analysis of FOIA Exemption 7A in *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978). The Supreme Court in *Robbins* noted "that Exemption 7A '[spoke] in the plural voice' about 'enforcement proceedings' and therefore Congress 'appear[ed] to contemplate that certain generic determinations might be made." *Lesher*, 19 N.Y.3d at 66 (alterations in original) (quoting *Robbins*, 437 U.S. at 223-224). It further explained that "Congress did not intend to prevent the federal courts from determining that, with respect to particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory records while a case is pending would generally interfere with enforcement proceedings." *Id.* at 66-67 (quoting *Robbins*, 437 U.S. at 236). Because POL § 87(2)(e)(i) also speaks in the plural voice with its use of the phrase "judicial proceedings," in the event that that phrase means any kind of judicial proceeding, the Court concludes that the Legislature intended that state courts could determine, with respect to any kind of judicial proceeding, that disclosure of particular kinds of investigatory records while a case is pending would generally interfere with the proceedings. Thus, the modified burden would apply if POL § 87(2)(e)(i) applies to the Bankruptcy Proceeding.

Even under the modified burden, however, the party seeking to rely on the law-enforcement exemption must still "articulate a factual basis for the exemption." *Id.*; *Dioso Faustino Freedom of Info. Law Request v. City of N.Y.*, 191 A.D.3d 504, 505 (1st Dep't 2021); *N.Y. Times Co. v. N.Y. State Exec. Chamber*, 57 Misc. 3d 405, 420 (N.Y. Sup. Ct. Albany Cnty. 2017) ("Despite the lessened, 'generic' standard of particularity, an 'agency must still fulfill its burden under [POL] § 89(4)(b) to articulate a factual basis for the exemption.' Vague allegations and/or attorney affirmations alone, will not suffice since, evidentiary support is needed." (quoting *Lesher*, 19 N.Y.3d at 67)). The Diocese fails to do so. Initially, as the Appeals Officer found, the Diocese fails to demonstrate that release of the disputed documents would violate any order of the Bankruptcy Court. (*See* Potzler Affirm., Ex. G at 3) In the Verified Petition, the Diocese alleges that mediation is "currently taking place to attempt to obtain a consensual resolution for all of the Diocese's stakeholders."

(Pet. ¶ 18; Potzler Affirm. ¶ 7) In connection with the mediation, all of the disputed documents "have been produced to a Bankruptcy Court-appointed committee representing approximately 850 alleged victims of abuse, the Official Committee of Unsecured Creditors . . . , and also the Diocese's insurers." (Pet. ¶ 18; Potzler Affirm. ¶ 7) The mediation, according to the Diocese, is "confidential, pursuant to Bankruptcy Court orders," and there is "no provision in the Bankruptcy Court's mediation orders or the confidentiality protocols in the Bankruptcy Proceeding that provides for disclosure of the Diocese's confidential information concerning victim allegations to the news media or otherwise to the public at large." (Pet. ¶¶ 18-19; Potzler Affirm. ¶¶ 7-8) But the Diocese failed to provide a copy of any Bankruptcy Court order to the OAG, as the Appeals Officer observed, and the Diocese similarly fails to provide the Court with any Bankruptcy Court order here.[7] There is no evidence, therefore, beyond the self-serving allegations in the Verified Petition and the duplicative Potzler Affirmation, that release of the disputed documents would violate any order of the Bankruptcy Court. The Court notes, further, that the Diocese's allegation that there is "no provision in the Bankruptcy Court's mediation orders . . . that allows for disclosure of the Diocese's confidential information" does not necessarily mean that such orders—if they exist and whatever they may say if they do—*prohibit* the release of the Diocese's information outside of mediation.

The Diocese also relies heavily on the allegation that release of the documents would interfere with the Bankruptcy Proceeding because the disputed documents are subject to certain confidentiality agreements. (*See* Pet. ¶¶ 18-19; Potzler Affirm. ¶¶ 7-8) Unlike the alleged Bankruptcy Court orders, the Diocese provides the Court with copies of at least some of these confidentiality agreements. (Potzler Affirm., Exs. A & B) The first provided agreement, dated July 23, 2020, is between the Diocese, the Official Committee of Unsecured Creditors (the "Committee"), and the Committee's counsel. (*Id.*, Ex. A) The second provided agreement, dated November 18, 2020, is between the Diocese and a number of insurance companies that may be responsible for covering claims against the Diocese or related entities. (*Id.*, Ex. B)[8] Neither agreement is so-ordered by the Bankruptcy Court, however. Both agreements, therefore, appear to be entirely

---

[7] Nor does the Diocese request that the Court take judicial notice of any order entered by the Bankruptcy Court.

[8] If the Committee is separate from the alleged Bankruptcy Court–appointed committee representing the approximately 850 alleged victims of abuse, the Diocese has not provided a copy of any confidentiality agreement between it and that other committee.

private agreements, the violation of which would not constitute, on their face, a violation of a Bankruptcy Court order.

Accordingly, the Diocese fails to demonstrate that the alleged mediation is anything other than a private matter—an effort made by stakeholders in the Diocese's bankruptcy to resolve it without the necessity of rulings from the Bankruptcy Court. This, in turn, raises a critical question: whether "judicial proceedings," as used in POL § 87(2)(e)(i), extends to a mediation, governed by private confidentiality agreements, related to a pending civil proceeding. Because exemptions to FOIL disclosure must be interpreted narrowly, *Disability Rights N.Y.*, 194 A.D.3d at 1232, the Court concludes that it does not.

Aside from failing to demonstrate that release of the disputed documents would interfere with the Bankruptcy Proceeding by violating an express order of the Bankruptcy Court, the Diocese also fails to establish the "generic risks" that disclosure would have for the mediation. All the Diocese alleges is that disclosure of the dispute documents to parties outside of those participating in the mediation would "derail" and "inflame efforts" to resolve the Bankruptcy Proceeding and "provide for prompt and equitable compensation to the claimants." (Pet. ¶ 20; Potzler Affirm. ¶ 9) But these allegations are little more than a rewording of the law-enforcement exemption itself: instead of using the statutory term "interfere," the Diocese merely uses terms loaded with more dire connotations. The Diocese must go further, however, and explain *how*—even if in a generic manner—release of the disputed documents would "derail" or "inflame" the mediation efforts. In *Lesher*, for example, the District Attorney satisfied its burden by explaining the records sought were "replete with information about the crimes committed" and that their release would pose a risk of interfering with a potential criminal prosecution by "prematurely tipping the District Attorney's hand." 19 N.Y.3d at 67-68; *N.Y. Times Co.*, 57 Misc. 3d at 420 ("In *Lesher*, the Court of Appeals sustained the investigation exemption, but only because the District Attorney was able to articulate a series of concrete factual statements relating to specific document categories and then describe the relevant harm disclosure might create."); *see also Disability Rights N.Y.*, 194 A.D.3d at 1233-34 (finding explanation that release of M-187 forms prior to completion of investigations "would frustrate respondent's investigations by tipping its hand with respect to the subject and nature of its investigations and allow 'the subjects to construct excuses or defenses'"). By contrast, the First Department recently denied the New York City Police Department's attempt to

160558/2023 The Diocese of Buffalo v. Office of the New York State Attorney General et al.      Page 27 of 29
Mot. Seq. No. 001

Case 1-20-10322-CLB,   Doc 4178-1,   Filed 09/16/25,   Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 28 of 30
27 of 29

withhold records based on the law-enforcement exemption because the "NYPD's assertion in response to the FOIL request that disclosure would interfere with an ongoing internal investigation . . . was conclusory in the absence of any factual showing as to *how* disclosure would have interfered with that investigation." *Dioso Faustino Freedom of Info. Law Request*, 191 A.D.3d at 506 (emphasis added).

Here, the Diocese's allegations of the risks posed by disclosure of the dispute documents are similarly conclusory. The implication of the Diocese's "derail" and "inflame" allegations seems to be that if the disputed documents are released to the public, one or more of the participants in the mediation will be unwilling to continue negotiating. As the Diocese itself concedes, however, all participants, including the committee representing the alleged victims of clergy abuse, already have the disputed documents. The participants—all of the relevant stakeholders— are thus already aware of the details of the alleged abuse contained in the documents. It would appear, then, that the Diocese is suggesting that public exposure of those details would nonetheless change at least one of the participant's willingness to engage in negotiations to a degree that would threaten the viability of the mediation. The Diocese fails to allege how or why that would be.

Accordingly, it is hereby

**ORDERED and ADJUDGED** that the Diocese's Verified Petition and Notice of Petition (Seq. No. 1) are **DENIED**; it is further

**ORDERED** that Respondents shall serve a copy of this Decision and Order upon the Diocese and upon the Clerk of the General Clerk's Office with notice of entry within twenty (20) days thereof; and it is further

**ORDERED** that service upon the Clerk shall be made in accordance with the procedures set forth in the Protocol on Courthouse and County Clerk Procedures for Electronically Filed Cases (Revised August 15, 2019);[9] and it is further

**ORDERED** that any requested relief not expressly addressed herein has been considered and is denied; and it is further

---

[9] The protocols are available at https://www.nycourts.gov/LegacyPDFS/courts/1jd/supctmanh/Efil-protocol.pdf.

**ORDERED** that the Clerk shall mark Motion Sequence No. 1 decided in all court records;

and it is further

**ORDERED** that the Clerk shall mark this proceeding disposed in all court records.

This constitutes the decision, order, and judgment of the Court.

| June 25, 2025 | | | | | SHAHABUDDEEN A. ALLY, A.J.S.C. | |
|---|---|---|---|---|---|---|
| **DATE** | | | | | | |
| CHECK ONE: | X | CASE DISPOSED | | | NON-FINAL DISPOSITION | |
| APPLICATION: | | GRANTED | X | DENIED | GRANTED IN PART | OTHER |
| CHECK IF APPROPRIATE: | | SETTLE ORDER | | | SUBMIT ORDER | STAY CASE |
| | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

160558/2023 The Diocese of Buffalo v. Office of the New York State Attorney General et al.            Page 29 of 29
Mot. Seq. No. 001

Case 1-20-10322-CLB,    Doc 4178-1,    Filed 09/16/25,    Entered 09/16/25 14:54:39,
Description: Exhibit A, Page 30 of 30
29 of 29