# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| THE DIOCESE OF BUFFALO, N.Y., | Case No. 20-10322 (CLB) |
| Debtor. | |

## RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO CERTAIN CLAIMS OBJECTIONS FILED BY CERTAIN INSURERS

The Official Committee of Unsecured Creditors (the "**Committee**") of The Diocese of Buffalo, N.Y. (the "**Diocese**" or the "**Debtor**"), the above-captioned debtor and debtor in possession, hereby submits this response (the "**Response**") to certain objections (the "**Claims Objections**")[1] filed by U.S. Fire Insurance Company and Pacific Employers Insurance Company (the "**Excess Insurers**") to the claims of certain survivors (the "**Survivor Claimants**").  The Committee understands that each of the Survivor Claimants has filed or will file a response to the Claims Objections, and hereby joins in such responses and incorporates them herein by reference for all purposes as though set forth fully herein.

## PRELIMINARY STATEMENT

1.      The Excess Insurers filed the Claims Objections to pursue their own self-interest, in violation of applicable state law governing rights of excess carriers, and in contravention of the interests of their insured.  The Claims Objections were filed **after** the Diocese and the Committee reached agreement on the terms of a settlement with the Diocese, its parishes and certain other affiliated non-debtor entities (the "**DOB Entities**") as well as certain insurance

---

[1] The Claims Objections are filed at Docket Nos. 4223 through 4230.

4910-2667-0448.7 18502.002

carries regarding the treatment of survivors of childhood sexual abuse. These proposed settlements are embodied in the terms of a joint plan of reorganization recently filed with the Bankruptcy Court [Docket No. 4221] (the "**Joint Plan**").[2] Under the Joint Plan at least $248,900,000 will be contributed to a trust to compensate survivors of childhood sexual abuse ("**Survivors**").

2.     The Excess Insurers are not settling insurers under the Joint Plan, although the door remains open for them to settle and mediations with non-settling insurers are ongoing. Fatally to the their Claims Objections, the Excess Insurers have not agreed to fund defense of the claims. The Excess Insurers issued excess policies and, as such, are generally only required to pay on a claim after the underlying insurance is exhausted. Typically, excess carriers do not participate in, let alone direct, defense of claims.

3.     Under the Joint Plan, survivors' claims will be reviewed by an independent claims reviewer to determine whether each survivor has a claim entitled to recovery and the proportionate share of settlement funds each survivor will recover based on certain factors, including the severity and impact of the abuse. Moreover, the Joint Plan provides a means to allow claims covered by non-settling insurers to be litigated to judgment in state court. Given the Joint Plan's provisions to resolve claims, the efforts of the Excess Insurers to object to claims at this time brings no potential benefit to the Estate while wasting Estate resources. Even if the Claims Objections were to result in the exclusion of certain claims from recovery, the amount of the agreed settlement from the DOB Entities would not be changed. Indeed, avoiding the litigation of individual claims is one of the key advantages to the Diocese and other DOB Entities.

---

[2] Capitalized terms used and not otherwise defined herein have the meaning ascribed thereto in the Joint Plan.

4. Under the Joint Plan and pursuant to separate motion to be filed prior to confirmation, Settling Insurers will (a) buy back insurance policies that such Settling Insurers issued to the Diocese, and (b) have no further liability exposure from those purchased policies. To the extent an insurer does not reach agreement with the Diocese and the Committee (a "**Non-Settling Insurer**") on the terms of a resolution, all of such Non-Settling Insurer's rights and defenses relating to any insurance policies that such Non-Settling Insurer issued to the Diocese are preserved. *See generally* Joint Plan § 6.

5. This Court should not permit these Claims Objections to proceed for the following reasons:

a. First, the Excess Insurers have declined to defend the Diocese and have not committed to paying any of the Diocese's defense costs. Thus, under New York law, the Excess Insurers may not control the Diocese's defense of Abuse Claims and cannot prosecute the Claims Objections in the place of the Diocese.

b. Second, permitting the Excess Insurers to pursue the Claims Objections in the Bankruptcy Court will needlessly add to the administrative expenses by forcing the Diocese to bear the cost of defending the claims through discovery and potentially requiring the Diocese to address the merits of claims. This waste could hamper the Debtor's ability to fulfill its obligations to Survivors on the agreed terms and frustrate the largely consensual resolution of this long-running bankruptcy case. The Claims Objections involve significant factual and evidentiary issues requiring discovery on the relationship of the Diocese and the Franciscan Friars and so cannot be simply or summarily resolved. Indeed, in connection with the Diocese's efforts to object to these same claims, before withdrawing those objections, the Diocese was facing deadlines for responding to multiple discovery requests and arranging the depositions of Diocese personnel, including the Bishop. Thus, permitting the Excess Insurers to pursue the Claims Objections will involve substantial time and estate resources to resolve.

c. Finally, pursuit of the Claims Objection provides no benefit to the Estate from the use of its resources because the Diocese and the Committee have agreed on a Joint Plan that provides an agreed mechanism for litigation of claims covered by Non-Settling Insurers. The settlement embodied in the Joint Plan will not change even if the Claims Objections are granted and finally determined, it will simply mean that it is pre-determined that the Survivor Claimants are not entitled to recovery from the Settlement Trust. However, pursuing that determination through the Bankruptcy Case needlessly wastes Estate assets at a time its assets should be marshalled to confirm the Joint Plan.

4910-2667-0448.7 18502.002

6. Pursuing the Claims Objections only potentially serves to address the liability of the Excess Insurers for those claims. Importantly, however, the Joint Plan already provides a mechanism for that litigation to occur, if necessary, after confirmation of the Joint Plan. The Bankruptcy Court is not the forum for this litigation.

7. The rights of the Non-Settling Insurers, including any valid objection to any Abuse Claims of the Survivor Claimants, are preserved and can be resolved through litigation after confirmation of the Joint Plan. To the extent there is coverage litigation with respect to those claims, the Survivor Claimants and the Settlement Trustee can assess the appropriate use of resources to pursue and resolve the coverage issues.

8. If the Excess Insurers are permitted to pursue these Claims Objections, the Excess Insurers should be required to pay all costs associated with pursuit of the Claims Objections by the Diocese and no insurer that has agreed to a resolution with the Diocese should be obligated to pay any of the expenses related to the Excess Insurers' unilateral decision to litigate the Claims Objections now.

9. If the Court allows the Claims Objections to proceed notwithstanding the Excess Insurers' lack of state law rights to direct defense of the claims, Survivor Claimants should be granted relief from the automatic stay to adjudicate their claims in state court.[3] If the Excess Insurers' purpose is to reveal weaknesses in some Survivor Claims that may be pursued against the Excess Insurers,[4] allowing cases to move forward in state court would be the more cost effective option. State court litigation would also inform the Excess Insurers of the magnitude of

---

[3] Several of the Survivor Claimants have filed motions for relief from the automatic stay. *See* Docket Nos. 4255, 42258, and 4261.

[4] Under the Joint Plan, filed Abuse Claims will be reviewed pursuant to the Trust and Trust Allocation Protocol. Any determination of an Abuse Claim through that process is not determinative of the allowance of that Abuse Claim with respect to any Non-Settling Insurer. Joint Plan § 6.

4

their liability, building an empirical grounding for all parties to set rational expectations regarding the value of the claims, and motivating all parties to resolve the claims through the bankruptcy case. The Court should set a reasonable schedule for the hearing on such objections providing adequate time for the Survivor Claimants to take appropriate discovery to enable them to defend against the Claims Objections.

10. It has been the experience in other diocesan cases that the vast majority of abuse claims have been dealt with post-confirmation through a structured claims resolution process, agreed to by the survivors, that incurs substantially less administrative expense and consequently much less drain on the ultimate resources available to satisfy survivors (rather than using estate money to fund bankruptcy case professionals or litigation counsel). That should be the course pursued here.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. The Bankruptcy

11. On February 28, 2020 (the "**Petition Date**"), the Diocese filed a voluntary petition for relief under chapter 11 in the wake of hundreds of lawsuits filed by Survivors of sexual abuse under the New York Child Victims Act ("**CVA**") and in anticipation of the assertion of more sexual abuse claims. The CVA temporarily undid the statute of limitations on claims of sexual abuse against children and created a "window" beginning August 14, 2019, during which victims of child sexual abuse whose claims may have been time-barred could bring a timely civil action. The window closed on August 14, 2021.

12. The Court established a deadline to assert claims against the Diocese that was co-terminus with the expiration of the window. The perpetrators were priests, teachers, youth leaders and others employed by various parishes, schools, and other Related Entities.

4910-2667-0448.7 18502.002

**B. The State Court Actions**

13.     There are almost 800 pending actions in state court pursuant to the CVA (the "**State Court Actions**").  In the vast majority of the State Court Actions, the Survivors assert direct claims (in contrast to derivative claims) against the Diocese and other non-debtors, including, without limitation, claims for: negligence, gross negligence, negligent hiring, retention, supervision, and failure to warn, breach of duty, and premises liability.

14.     The State Court Actions have been subject to a stay, including an agreed stay with respect to actions against non-debtors, since the beginning of the case.  This Court previously granted relief from the stay for 17 of the State Court Actions[5] to proceed noting that "[b]y pushing litigants closer to a trial of tort claims, we hope that the parties may better appreciate their risks and the benefits of a consensual plan."[6]

**C. Settlement Among the Diocese, the Contributing Related Entities and the Settling Insurers**

15.     On February 3, 2022, the Court entered an order appointing the Honorable Michael J. Kaplan as mediator and ordering the parties to mediate.[7]  On January 19, 2023, the Court appointed Patrick H. NeMoyer as an additional mediator for the bankruptcy case.[8]

16.     On January 13, 2025, the Court entered a Decision and Order [Docket No. 3501] (the "**Mediation Order**"), appointing the Hon. (Ret) Melanie Cyganowski as an additional mediator in this case.  In the Mediation Order, the Court urged the parties to "renew their commitment to seek a fair and realistic settlement."

---

[5] *Decision and Order* dated November 22, 2024 [Docket No.3345] (the "**Stay Relief Order**").

[6] *Id*. at 9.

[7] *Order*, No. 20-10322-CLB, Doc. No. 1568.

[8] *Order Appointing Patrick H. NeMoyer as Additional Mediator*, No. 20-10322-CLB, Doc. No. 2215.

6

17.     Through the mediation process, the Diocese and the DOB Entities reached an agreement with the Committee on the terms of a plan of reorganization, including a cash contribution from the DOB Entities in the aggregate amount of $150,000,000.

18.     Additionally, the Diocese, and the Committee have agreed to accept the following Settling Insurer payments: (i) $37.5 million as a settlement payment from Wausau; (ii) $85 million as a settlement payment from CNA; and (iii) $1.4 million as a settlement payment from AIG.

19.     To date, the Diocese and the Committee have not been able to reach agreement with certain other insurers, including the Excess Insurers. The Joint Plan provides a mechanism for such Non-Settling Insurers to become Settling Insurers. If settlements with the Non-Settling Insurers cannot be reached, then, under the Plan, Abuse Claimants with claims within the Non-Settling Insurers' coverage period may pursue claims insured by a Non-Settling Insurer as a Litigation Claimant as authorized by the Trustee in accordance with the Trust Documents. The Trust retains the right to pursue causes of action of the Diocese against, or settle with, Non-Settling Insurers.

20.     The Joint Plan provides that determinations made regarding Abuse Claims pursuant to the Trust Documents, including the Allocation Protocol do not prejudice the Non-Settling Insurers.

> The rights and obligations (if any) of the Protected Parties and every Non-Settling Insurer under the terms of the Non-Settling Insurer Policies and at law shall not be affected by the Allocation Protocol and shall be treated as if the determination by the Abuse Claims Reviewer had never occurred. Each Non-Settling Insurer shall be entitled to all rights and defenses as are provided under the terms of its Non-Settling Insurer Policies as if the determination by the Abuse Claims Reviewer had never occurred.

Joint Plan § 6.1.

4910-2667-0448.7 18502.002

### D.    The Excess Insurers' Policies

21.    U.S. Fire issued an excess policy to the Diocese for the period from July 1,

1978 through July 1, 1979 for the coverage amount of $5 million per occurrence in excess of

$500,000 covered by the underlying primary policy.  PEIC issued an excess policy for the

period from July 1, 1981 through July 1, 1982 for the coverage amount of $25 million per

occurrence in excess of $1 million covered by the underlying primary policy.  *See*

*Declaration of Attorney James R. Murray in Support of the Diocese's Motion for Entry of an*

*Order §§ 105(a) and 362(a) Enjoining the Prosecution of Certain State Court Lawsuits*

[Docket No. 290], ¶¶ 8 & 10, Ex. A, *The Diocese of Buffalo, N.Y. v. JMH 100 Doe*, Adv.No.

20-01016 (CLB) (Bankr. W.D.N.Y. Oct. 23, 2023).

### E.    The Claims Objections

22.    The Claim Objections each assert that the Diocese is not responsible for the

abuse alleged in the Survivor Claim because (i) the perpetrator was not a cleric or employee

of the Diocese, (ii) the perpetrator is alleged to have been a member of a religious order

separate and apart from the Diocese, (iii) the perpetrator was employed by a school or other

institution that was not owned, operated or controlled by the Diocese, and/or (iv) the Diocese

did not own, operate or control the school or other institution where the alleged abuse

occurred.

23.    The Claims Objections involve abuse by perpetrators associated with

Conventual Franciscans d/b/a Our Lady of Angels Province, Inc. a/k/a St. Anthony of Padua

Province, Franciscan Fathers Minor Conventual, U.S.A., Inc. a/k/a Franciscan Fathers Minor

Conventuals of Buffalo, NY, Inc. (the "**Franciscan Friars**") and St. Francis High School,

allegedly owned by the Franciscan Friars.

24.     On October 24, 2025, the Excess Insurers served discovery on the Committee.  A true and correct copy of the request for production of documents is attached as Exhibit B to the Dine Declaration.  Notably, the discovery is returnable on November 24, 2025.  Upon information and belief, the Excess Insurers also served discovery on the Diocese and certain of the Survivor Claimants, which are returnable after the initial October 30 hearing on the Claims Objections.

## ARGUMENT

### A.     The Committee Has a Right to be Heard

25.     The Excess Insurers have questioned the Committee's right to be heard on this matter under a mistaken assumption that the Committee should be interested in whittling down the number of claims.  However, this is not a commercial case.  This case was filed to resolve claims of sexual abuse against children.  As such, one of the Committee's objectives is to assure that survivors are compensated fairly under the circumstances.  The Committee seeks to assure a fair and appropriate process for all survivors, especially where their claims have been stayed because of the Diocese's chapter 11 case.  Section 1109 of the Bankruptcy Code specifically authorizes the Committee to appear and be heard on this matter.  The Court should ignore the Excess Insurers' efforts to opine on the Committee's actions and select which party may oppose its efforts to circumvent state law and limit survivors' rights.

26.     As this Court recognized in connection with the stay relief motions, what may move this case forward is "pushing litigants closer to a trial of tort claims" in the hopes "that the parties may better appreciate their risks and the benefits of a consensual plan."[9]  The Court was

---

[9] Stay Relief Order at 9.

4910-2667-0448.7 18502.002

correct, and, shortly after granting relief from the stay, many of the key constituents reached resolution. Most importantly, the Debtor and the Committee are now pursuing the Joint Plan.

27.     In an effort to disrupt confirmation of the Joint Plan or to put their own economic interests ahead of the interests of their insured, the Excess Insurers bring Claims Objections that will not only fail to further the process or goal of resolution of the case, but rather, waste estate resources and delay the bankruptcy.  Moreover, the pursuit of Claims Objections could undermine the settlements already achieved, particularly given that the Bankruptcy Court cannot fully resolve the Survivors' tort claims.[10]

## B.     The Excess Insurers, as Non-defending Excess Carriers, Cannot Control or Interfere with the Diocese's Defense

28.     The Excess Insurers' attempt to object to claims should be denied for the independent reason that the Excess Insurers, to date, are *not* defending the Diocese and have *not* committed to paying the Diocese's defense costs.

29.     The Excess Insurers made this clear in their August 18, 2025 letter to the Diocese,[11] where the Excess Insurers reiterated their view that they have no obligation to respond to the state court lawsuits until *after* all of the underlying limits have been exhausted—a condition the Excess Insurers believe has not occurred:

> As U.S. Fire and PEIC have also previously advised, *neither the U.S. Fire Excess Policy, nor the PEIC Excess Policy, as excess policies, can be called upon to respond to the Lawsuits unless and until the limits of all applicable underlying coverage has been fully and properly exhausted*. Underlying insurers and/or the Diocese and/or defendant parishes are required to satisfy the underlying limits for any and all underlying policies that are triggered for the Lawsuits before any Excess Policy can be required to respond.

---

[10] *See* 28 U.S.C. § 157(b)(5); 28 U.S.C. § 157(b)(2)(B) (core proceedings do not include the "liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11"); *see also*, *infra* ¶¶ 40-43.

[11] The August 18, 2025 letter to the Diocese from the Excess Insurers is attached as Exhibit A to the Declaration of Karen B. Dine (the "**Dine Dec.**") filed concurrently herewith.

4910-2667-0448.7 18502.002

Dine Dec. Ex. A (emphasis added).

30.     Further, while the Excess Insurers could have elected to drop down and pay the Diocese's defense costs, the Excess Insurers did not do so.  Instead, they merely chose to "exercise [their] right to *associate* in the defense of the Lawsuits" by hiring their own separate lawyer to monitor the proceedings.  *See id.* (emphasis added).  That is not the same thing as assuming the Diocese's defense.

31.     Under New York law, an insurer may only control its policyholder's defense if the insurer assumes the duty to defend and pays its policyholder's defense costs.  *See, e.g.*, *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1219 (2d Cir. 1995) ("[T]he [excess] insurer has no duty to defend or pay costs, but only has the right to do so at its own election.  The [excess] insurer can permit the insured's defense to proceed and take the chance that the insured might exceed the limits of other liability coverage, *or participate in the defense and agree to pay all or part of the defense costs incurred.*") (emphasis added); *Narragansett Elec. Co. v. Am. Home Assur. Co.*, 999 F. Supp. 2d 511, 524 (S.D.N.Y. 2014) ("[A]n insurer that exercises its right, *and honors its duty to assume the defense* can control both the extent and duration of defense costs.") (emphasis added); *Scottsdale Ins. Co. v. McGrath*, 549 F. Supp. 3d 334, 347 (S.D.N.Y. 2021) ("However, an insurer only 'has exclusive control over a claim against its insured once it assumes defense of the suit.'").  Put simply, control requires payment.

32.     The Excess Insurers, however, have not paid the Diocese's defense costs.  Even so, the Excess Insurers are attempting to take control of the defense from the Diocese by filing their own claim objections.  Not only do the Excess Insurers have no right to do so, but their unsolicited claim objections also prejudice their policyholder—the Diocese—who has negotiated for years with the Committee in an attempt to reach a consensual resolution of this case, which

11

culminated in the filing of the Joint Plan, under which the Claims Objections (among others) will be deemed withdrawn with prejudice as of the Effective Date of the Plan. Adjudicating the Claim Objections now risks delaying Plan confirmation and depleting estate resources. For example, in response to the Claim Objections, certain Survivor Claimants have already moved to lift the stay to permit pre-trial discovery and trial in those actions. *See* ECF Nos. 4255, 4258, and 4261. The Diocese—as a result of years of negotiations and in an attempt to consensually resolve this bankruptcy case—has chosen to withdraw its prior claim objections. The Excess Insurers, as non-defending excess carriers, have no right under New York law or the policies to change or undermine that decision.

### C. Resolution of the Claims Objections Will Be Costly and Will Not Benefit the Estate

33. The Claims Objections now at issue are essential "Not Us" objections asserting that the Diocese does not have the requisite relationship with the Franciscan Friars or the St. Francis High School to be subject to liability on the claims of the Survivor Claimants. Despite the Excess Insurers' assertions in the Claims Objections that "the evidence demonstrates that there was no custodial or control relationship between the Diocese and Claimant or between the Diocese and Claimant's alleged abuser," the reality is much more complicated.

34. In the Committee's professionals' and the individual state court counsels' extensive experience, such arguments are highly fact-specific. Where the Excess Insurers object to claims because the Franciscan Friars (and not the Diocese) supervised the perpetrators, the Court cannot adjudicate the objection without extensive discovery by the Survivor Claimants and an evidentiary hearing.[12]

---

[12] *See supra* footnote 11.

4910-2667-0448.7 18502.002

35.    While the Excess Insurers suggest that the evidentiary record should effectively begin and end with the Suchan Declaration and information found on the internet, there are, as demonstrated by the Zilliox Declaration,[13] substantial factual issues concerning the Diocese's control of and responsibility for the Franciscan Friars.

36.    In its Stay Relief Order, this Court recognized that even if a non-diocesan party was truly and wholly independent, there is "no good reason to restrain litigation against religious orders" noting that "considerations for judicial economy suggest that lawsuits against a religious order should be tried with related claims against the Diocese."[14]

### D.    <u>State Court is the Appropriate Venue to Litigate Abuse Claims</u>

37.    If the Court permits the Excess Insurers to litigate liability issues on behalf of the Diocese, state court is the proper venue for such litigation.  State court judges are more appropriate arbiters of state law questions of liability.  Also, the designated state court judges in each district overseeing Child Victim Act cases have specialized training and have experience ruling on liability issues in similar cases on their dockets.

38.    New York state court is the appropriate forum for the resolution of the CVA Claims, given its specialization in state law generally and CVA claims.  Certain state court judges have developed specialized knowledge for addressing cases under the CVA.  Prior to the legislation's effective date, New York state courts implemented new procedures for the efficient and expedient handling of claims revived under the CVA, including: the assignment of all CVA cases to "dedicated part(s) of Supreme Court in each Judicial District"; mandated training in "subjects related to sexual assault and the sexual abuse of minors" for these justices, judicial

---

[13] The Declaration of Robert W. Zilliox, M.Div., J.C.L.(the "**<u>Zilliox Declaration</u>**") is being filed by certain Survivor Claimants in response to the Claim Objections.

[14] Stay Relief Order at 9.

4910-2667-0448.7 18502.002

hearing officers, referees, and ADR neutrals overseeing CVA cases; and a recommended pre-trial schedule for each CVA case.[15]  The schedule proposes an accelerated timetable at every phase of the cases: one year to complete discovery, ninety days to file dispositive motions after the completion of discovery, and trial within sixty days of note of issue or decision on dispositive motions.[16]  Thus, the judges assigned to the State Court Actions have received training related to the actions and have been designated as specialized parts of the Supreme Court for handling such cases.  Given the significant number of lawsuits filed under the CVA over the past few years, those designated state court judges are also now highly familiar with the various legal issues likely to arise in the State Court Actions.  State courts also have a particularized interest in determining disputes and issues within their jurisdiction.[17]

39.     Additionally, "[a] clear congressional policy exists to give state law claimants a right to have claims heard in state court."[18]  A grant of relief from stay in favor of a state court action is proper here because "only state law is involved," the state court is "the more appropriate forum" and "the result reached [by the state court] will more likely be consistent with other state law decisions."[19]

---

[15] 22 N.Y.C.R.R. § 202.72 (1)–(3).

[16] *Id.*

[17] *See Walsh v. Brush (In re Walsh)*, 79 B.R. 28, 29 (D. Nev. 1987) ("This case includes only state law claims. Therefore, the state court is particularly well suited to handle the issues raised."); *Allen Cty Bank & Tr. Co. v. Valvmatic Int'l Corp.*, 51 B.R. 578, 582 (N.D. Ind. 1985) ("The state court has expertise in the resolution of this type of case, presenting state law questions and is better able to adjudicate this action.")

[18] *In re Castlerock Props.*, 781 F.2d 159, 163 (9th Cir. 1986); *see also Project Orange*, 432 B.R. at 103; *Murray Indus., Inc. v. Aristech Chem. Corp. (In re Murray Indus., Inc.)*, 121 B.R. 635 (Bankr. M.D. Fla. 1990); S. Rep. No. 989, 95th Cong., 2d Sess. 50, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5780, 5836 ("[I]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from any duties that may be handled elsewhere.").

[19]  *O'Rourke v. Cairns*, 129 B.R. 87, 91 (E.D. La. 1991) (citing, as examples, *Gorse v. Long Neck, Ltd.*, 107 B.R. 479, 483 (D. Del. 1989); *Cook v. Griffin*, 102 B.R. 875, 877 (N.D. Ga. 1989)).

4910-2667-0448.7 18502.002

40.     28 U.S.C. §§ 157(b)(2)(B) and 157(b)(5) state, *inter alia*, (i) that "liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11" are not within this Court's "core" jurisdiction, and (ii) "the district court shall order that personal injury and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in which the claim arose, as determined by the district court in which the bankruptcy case is pending."[20]  In that case, this Court has no jurisdiction to finally adjudicate the Claim Objections.

41.     Any disallowance of a personal injury claim is a "liquidation" under  section 157(b)(2)(B).[21]  For example, in *In re Schepps Food Stores, Inc.*,[22] the Bankruptcy Court for the Southern District of Texas held the section 157(b)(2)(B) personal injury exclusion prevented the court from disallowing a claim based on a state statute of limitations defense "because to do so would effectively liquidate the claim for purposes of distribution."  Moreover, in *In re UNR Industries, Inc.*,[23] the United States District Court for the Northern District of Illinois held that the bankruptcy court could not decide a summary judgment motion with respect to a creditor's claim against the bankruptcy estate because a resolution against the creditor could serve to finally adjudicate the creditor's claim on the merits for purposes of distribution in violation of section 157(b)(2)(B) of title 28 of the United States Code.[24]

---

[20]    28 U.S.C. §§ 157(b)(2)(B), (b)(5).

[21]    *See In re UAL Corp.*, 310 B.R. 373, 379 (Bankr. N.D. Ill. 2004).

[22]    169 B.R. 374, 377 (Bankr. S.D. Tex. 1994).

[23]    74 B.R. 146, 148 (D.N.D. Ill. 1987).

[24]    In *In re G-I Holdings, Inc.*, 323 B.R. 583, 612–14 (Bankr. D.N.J. 2005), the court stated that, under section 157(b)(2)(B), allowing or disallowing claims is distinct from liquidating or estimating a claim, and therefore, held that the court had jurisdiction to resolve disputes over the legal validity of personal injury claims but not their valuation in the context of claims estimation. The *G-I Holdings* court specifically found such a reading was the "most appropriate to adopt in this matter," *Id.* at 613 (emphasis added), suggesting that the facts and circumstances of a particular case should be considered in interpreting the breadth of the section 157(b)(2)(B) exception.

4910-2667-0448.7 18502.002

42.     Finally, personal injury claimants are statutorily and constitutionally entitled to a jury to liquidate their claim, and title 11 does "not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to personal injury or wrongful death tort claims."[25]

43.     Thus, the Bankruptcy Court lacks the jurisdiction to fully adjudicate the claims of the Survivor Claimants.  It is only the adjudication of the substantive claims that will determine the true exposure and liability of the Diocese, insurers, and other related entities—providing critical data for the parties to reach a consensual resolution.  The disallowance of some claims without determining the amounts of others is an ineffectual, expensive and inefficient approach and a waste of time and resources.  If administrative resources are to be spent in litigation, they should be spent where litigation could actually move matters to resolution.

**E.     Resolution of the Claims Objections Will Not Advance The Case**

44.     Because the Diocese has proposed a plan that would provide for payment of a fixed amount to resolve any Abuse Claims against the Diocese, resolution of any individual Abuse Claims outside of the process provided in the Joint Plan will not benefit the Debtor.  To the contrary, as noted above, the Diocese will instead be required to expend time and money— which could be substantial—responding to discovery regarding the claims at issue.

45.     To the extent that there is ultimately litigation against the Excess Insurers with respect to coverage relating to these Abuse Claims, then the settlement trust created by the Joint Plan (the "**Survivor Trust**") and the Diocese will each evaluate the risks and benefits associated with the costs of discovery and the risks of litigation.  Forcing the Diocese to bear this burden

---

[25]  28 U.S.C. § 1411(a); *see G-I Holdings*, 323 B.R. at 607 (observing that personal injury claimants in the cases possessed jury trial rights under the Seventh Amendment to the United States Constitution for purposes of liquidating their respective claims against the estate); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 318 (5th Cir. 1998) (observing that personal injury damage suits are the prototypical Seventh Amendment case).

now outside of the context of actual coverage litigation involving the Excess Carriers is premature and not in the best interests of the Estate.

46.     As discussed above, the Excess Insurers are not entitled to and should not be permitted to disrupt the Diocese's process for resolution of the Abuse Claims.  The Joint Plan provides a mechanism for litigation of these Abuse Claims that preserves the rights of the Excess Insurers to defend against the Abuse Claims in state court after confirmation of the Joint Plan. The Excess Insurers should not be permitted effectively to litigate these claims now to the prejudice of the Survivor Claimants and the Diocese.

**F.      Survivor Claimants are Entitled to Discovery**

47.     Before the Court determines the Diocese's liability for religious order claims, Survivor Claimants are entitled to discovery to determine, among other topics: (a) what role the Diocese played (or had the power to play) in supervising religious order clerics and personnel, (b) what Diocesan policies apply to religious order clerics and personnel and religious order-run schools, and (c) the conditions that the Bishop imposed (or could have imposed) on the religious orders and their priests and personnel when he granted them permission to operate in the Diocese.

48.     State Courts in New York have repeatedly addressed survivors' rights to discovery regarding the issue of whether a diocese is liable for abuse by a member of a religious order within the diocese's territory.  *See Harmon v. Diocese of Albany*, 204 A.D.3d 1270 (3d Dep't 2022) (holding that plaintiff may seek discovery regarding Diocese's potential liability for abuse by member of religious order); *Borrino v. Diocese of Brooklyn*, No. 50296/2020 (Kings Sup. Ct. Aug. 2, 2024) (ordering disclosure of documents regarding relationship between defendants, including diocese and non-diocesan entities); and *S.E. v. Diocese of Brooklyn*, No. 506289/2020 (Kings Sup. Ct. Sept. 30, 2024) (same).

17

49.     The filing of a proof of claim constitutes "prima facie evidence of the validity and amount of a claim." Fed. R. Bankr. P. 3001(f).  Generally, "[a]n objecting party 'bears the initial burden of production and must provide evidence showing the claim is legally insufficient' under 11 U.S.C. § 502." *In re Lehman Bros. Holdings, Inc*., 519 B.R. 47, 53-54 (Bankr. S.D.N.Y. 2014) (quoting *In re Arcapita Bank B.S.C.(c)*, 508 B.R. 814, 817 (S.D.N.Y. 2014)).  A party objecting to the proof of claim must only provide evidence sufficient to negate the prima facie validity of the claim by refuting one or more of the facts in the filed claim. *See In re Waterman S.S. Corp*., 200 B.R. 770, 774-75, 777 (Bankr. S.D.N.Y. 1996) (reopening discovery into asbestos claims due to insufficient information upon which to determine validity of claims); *see also In re Allegheny Int'l, Inc*., 954 F.2d 167, 173-74 (3d Cir. 1992); *In re Oneida, Ltd*., 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 Civ. 2229 (DC), 2010 WL 234827 (S.D.N.Y. Jan. 22, 2010) (same); *In re Adelphia Commc'ns Corp*., No. 02-41729 (REG), 2007 WL 601452, at *5 (Bankr. S.D.N.Y. Feb. 20, 2007).

50.     Once the objector meets its initial burden, "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *In re WorldCom, Inc*., No. 02-13533 (AJG), 2005 WL 3832065, at *4, *9 (Bankr. S.D.N.Y. Dec. 29, 2005) (citing Bankruptcy Rule 3001(f) and holding that claimant did not meet its burden to prove validity of anticipatory breach and unjust enrichment claims, but that further evidence was needed to assess the merits of lack of good faith claim) (quoting *Allegheny*, 954 F.2d at 173-74); *see also In re St. Johnsbury Trucking Co*., 206 B.R. 318, 323, 328 (Bankr. S.D.N.Y. 1997) (citing Bankruptcy Rule 3001(f) and allowing claim where debtor failed to refute any of the material facts in proof of claim). Generally, the claimant must prove the claim and not sit back while the objector attempts to disprove it. *See In re Bennett*, 83 B.R. 248, 252 (Bankr. S.D.N.Y. 1988) (holding

4910-2667-0448.7 18502.002

that debtor presented sufficient evidence to rebut the prima facie validity of claimant's claim and that claimant failed to prove claim by a preponderance of credible evidence).  Even when dismissing claims, one court noted that discovery was appropriate to allow survivors to supplement a proof of claim to try to amend their claims.  *See In re Roman Cath. Diocese of Rockville Ctr., N.Y.*, 651 B.R. 146, 153 (Bankr. S.D.N.Y. 2023).

51.     Notably, in objecting to the motion of an insurer in the Syracuse Diocese Bankruptcy to object to claims, the Diocese's counsel argued that such claims objections would burden the Diocese with extensive discovery.

> The claims objection process that [insurer] seeks to embark upon will create enormous expense for the Diocese and the chapter 11 estate, being dragged into litigation over dozens or potentially even hundreds of claims and responding to extensive discovery demands that will be propounded to the Diocese, and will likely delay the process of confirmation as the Chapter 11 Case becomes bogged down with omnibus claims objections.[26]

52.     Discovery on these topics is likely to include requests for:

- agreements, policies, or understandings regarding the presence or operation of the entity in the territory of the Diocese;

- authorizations or permissions which initiated the creation of the entity;

- the basis for listing the entity in Diocese of Buffalo section of the Official Catholic Directory;

- correspondence and other documents pertaining to the perpetrator's service within the Diocese's territory;

- the persons and entities involved in response to allegations of abuse at the entity;

- requests for authorization or permission to the Bishop or his designees relating to personnel or activities at the entity; and

- the Bishop's issuance of faculties or other authorizations to clergy relating to the entity.

---

[26] BSK Syracuse Objection ¶ 9.

4910-2667-0448.7 18502.002

53.     The scope of discovery required here is illustrated by the discovery that was already underway with respect to the Diocese's earlier objections to these same claims.  Much of the discovery that was being sought by the Survivor Claimants in connection with the Diocese's objections to the Claims of the Survivor Claimants remains outstanding.

54.     Even complete discovery may not resolve the Claims Objections, as there is no bright-line legal answer regarding dioceses' control or supervision of religious order priests and religious order-run schools or parishes.  Courts presented with the facts have come to divergent decisions.[27]

55.     As the Court presiding over the Diocese of Syracuse case noted, permitting "a claims objection process to proceed now would be distracting, time consuming, and expensive, and may impair and delay confirmation."[28]

56.     Finally, the Excess Insurers, by serving discovery on certain Claimant Survivors, the Committee and the Diocese, has expressly acknowledged that discovery is necessary to litigate the Claims Objections.  As such, to the extend the Court does not overrule the Claims Objections in their entirety, it should enter a scheduling order allowing for discovery and an evidentiary hearing.

## RESERVATION OF RIGHTS

57.     The Committee is not challenging the standing of the Excess Insurers to bring the Claims Objection so the Court need not address the standing of the Excess Insurers in order to resolve the Claims Objections.  However, the Committee submits that the Excess Insurers lack

---

[27] *Compare* Order Granting and Denying Motions for Summary Judgment, *Doe 30 v. Diocese of New Ulm*, No. 62-CV-14-871 (Minn. Dist. Ct. Aug. 21, 2015) (ruling that the religious order priest was "arguably employed by the Diocese of Duluth.") *with Bernie v. Cath. Diocese of Sioux Falls*, 2012 S.D. 63, ¶ 19, 821 N.W.2d 232, 241. Notably, both these decisions occurred *after* the parties had engaged in extensive discovery, not at a motion to dismiss stage.

[28] *Transcript of November 30, 2023 Hearing*, 60:5-7 [Syracuse Diocese Bankruptcy Docket No. 1572].

4910-2667-0448.7 18502.002

both statutory standing under 11 U.S.C. § 1109(b) and constitutional standing under Article III to pursue the Claims Objections. Under the standard set forth by the Supreme Court in *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 144 S. Ct. 1414 (2024), the Excess Insurers lack the requisite financial responsibility with respect to the Claims Objection to establish standing. *See, e.g., In re Roman Cath. Diocese of Albany*, No. 23-10244, 2025 Bankr. LEXIS 2185, at *21-22 (Bankr. N.D.N.Y. Sept. 3, 2025); *In re Roman Cath. Diocese of Syracuse*, 665 B.R. 866, 880 (Bankr. N.D.N.Y. 2024). The Committee reserves all of its rights to challenge the standing of the Excess Insurers at a later date in this case or in any appeal related thereto.

## CONCLUSION

58. The Committee implores the Court not to permit the Excess Insurers employ the Claims Objection as a tactic to try and force a settlement with the Excess Insurers for less than the fair value that such Excess Insurers should pay. The Committee and the Diocese well understand the risks associated with ultimately pursuing coverage litigation against the Excess Insurers for purposes of valuing the Abuse Claims to reach a fair settlement with the Excess Insurers. If that settlement cannot be reached prior to confirmation of the Joint Plan, then all parties will retain their litigation rights to resolve matters relating to Abuse Claims.

59. Here, the Diocese and the Committee have reached agreement on a fixed sum to be distributed to Abuse Claimants pursuant to a process that the Abuse Claimants will have an opportunity to vote upon. Litigating the Claims Objection only wastes valuable time and Estate resources while providing not benefit to the Estate or its creditor constituents. This Court should not permit them to move forward.

**WHEREFORE**, the Committee respectfully requests this Court: (i) deny the Claims Objections, or, in the alternative, (ii) stay the Claims Objections pending confirmation of the

4910-2667-0448.7 18502.002

Joint Plan, (iii) grant relief from the stay to effectively litigate the Claims Objections in state court, or, to the extent that the Claims Objections are permitted to go forward in Bankruptcy Court, (iv) set an appropriate schedule for hearing on the Claims Objections permitting adequate time for discovery, or, to the extent the Claims Objections are permitted to go forward, (v) require the Excess Insurers to pay all of the costs related to the Claims Objections, and (vi) grant such other and further relief as the Court may deem proper.

Dated: New York, N.Y.
      October 28, 2025

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Ilan D. Scharf*
James I. Stang
Ilan D. Scharf
Iain A.W. Nasatir
Karen B. Dine
1700 Broadway, 36th Floor
New York, New York 10019
Telephone: 212-561-7700
Facsimile: 212-561-7777
Email: jstang@pszjlaw.com
      ischarf@pszjlaw.com
      inasatir@pszjlaw.com
      kdine@pszjlaw.com

*Counsel to Official Committee of Unsecured Creditors*

BURNS BAIR LLP
Timothy W. Burns (admitted *pro hac vice*)
Jesse J. Bair (admitted *pro hac vice*)
10 E. Doty Street, Suite 600
Madison, WI 53703
Telephone: (608) 286-2302
Email:    tburns@burnsbair.com
        jbair@burnsbair.com

*Special Insurance Counsel to the Official Committee of Unsecured Creditors*