**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 20-10322 (CLB) |
| THE DIOCESE OF BUFFALO, NY, | ) | |
| Debtor. | ) | Chapter 11 |

## NOTICE OF OBJECTION TO ALLOWANCE OF
## SEXUAL ABUSE PROOF OF CLAIM NO. 791

**PLEASE TAKE NOTICE**, that for U.S. Fire Insurance Company and Pacific

Employers Insurance Company (collectively, the "Insurers"), by and through their counsel, filed

the *Objection to Proof of Claim No. 791*, seeking an Order, pursuant to 11 U.S.C. § 502(a) and

(b) and Rule 3007 of the Federal Rules of Bankruptcy Procedure: (i) disallowing and expunging

Sexual Abuse Proof of Claim No. 791 in its entirety; and (ii) granting such other and further

relief as this Court may deem just and proper.

**PLEASE TAKE FURTHER NOTICE**, that the hearing to consider the Objection and

any responses thereto will be held on October 30, 2025, at 10:00 a.m. (prevailing Eastern time),

or as soon thereafter as counsel may appear and be heard, before the Honorable Carl L. Bucki,

Chief United States Bankruptcy Judge for the Western District of New York, or such other judge

as may be sitting in his stead, in the Robert H. Jackson U.S. Courthouse, 2 Niagara Square,

Buffalo, New York 14202.

**PLEASE TAKE FURTHER NOTICE**, that parties can choose to appear either (i) in

person at the Robert H. Jackson U.S. Courthouse, 2 Niagara Square, Buffalo, New York or

(ii) telephonically (call in 1-517-353-2301, Courtroom ID 483077448#, and security pin 9999#).

**PLEASE TAKE FURTHER NOTICE**, that any responses to the Objection must

conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the

Western District of New York and be filed with the Court and served in accordance with Local Rule 9013-1 upon the following parties: (i) counsel to the Insurers, O'Melveny & Myers LLP, 1301 Avenue of the Americas, Suite 1700, New York, NY 10019, Attn: Tancred Schiavoni, Esq. and Adam Haberkorn, Esq.; (ii) counsel to the Diocese, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attn: Stephen A. Donato, Esq., and Grayson T. Walter, Esq., (iii) the Office of the United States Trustee for the Western District of New York, 300 Pearl Street, Suite 401, Buffalo, NY 14202, Attn: Joseph W. Allen, Esq., (iv) counsel to the Official Committee of Unsecured Creditors, Pachulski, Stang, Ziehl & Jones, LLP, 780 Third Avenue, 34th Floor, New York, New York, 10017-2024, Attn. Ilan Scharf, Esq. and James Stang, and (v) those persons who have formally appeared and requested service in this case pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

   **PLEASE TAKE FURTHER NOTICE**, that copies of the Objection and all other documents filed in the Diocese's chapter 11 case may be obtained free of charge via the case management website maintained by the Diocese's notice agent at https://case.stretto.com/dioceseofbuffalo or by contacting the undersigned counsel for the Insurers.

Dated:  September 30, 2025

Respectfully submitted,

By: _/s/ Adam Haberkorn_____

**O'MELVENY & MYERS LLP**
TANCRED V. SCHIAVONI
ADAM P. HABERKORN
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone:      (212) 326-2000
Email: tschiavoni@omm.com
            ahaberkorn@omm.com

*-and-*

**CLYDE & CO US LLP**
MARIANNE G. MAY
340 Mt. Kemble Ave., Suite 300
Morristown, NJ 07340
Telephone:      (973) 210-6700
Email:  marianne.may@clydeco.us

*Attorneys for U.S. Fire Insurance Company and*
*Pacific Employers Insurance Company*

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

|                                          |     |                          |
| ---------------------------------------- | --- | ------------------------ |
| In re:                                   | )   |                          |
|                                          | )   | Case No. 20-10322 (CLB)  |
| THE DIOCESE OF BUFFALO, NY,              | )   |                          |
|                                          | )   | Chapter 11               |
|                          Debtor.         | )   |                          |
|                                          | )   |                          |
|                                          | )   |                          |

### INSURERS' OBJECTION TO PROOF OF CLAIM NO. 791
### AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

**O'MELVENY & MYERS LLP**
TANCRED V. SCHIAVONI
ADAM P. HABERKORN
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone:     (212) 326-2000
Email: tschiavoni@omm.com
            ahaberkorn@omm.com

*-and-*

**CLYDE & CO US LLP**
MARIANNE G. MAY
340 Mt. Kemble Ave., Suite 300
Morristown, NJ 07340
Telephone:     (973) 210-6700
Email: marianne.may@clydeco.us

*Attorneys for U.S. Fire Insurance Company*
*and Pacific Employers Insurance Company*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 3

    The allegations of the POC .................................................................................... 3

    Claimant names the Franciscan Friars and St. Francis High School as
        responsible in his separate state court complaint ...................................... 4

    The Diocese objected to this claim on the exact same basis (Dkt. No. 3578) ....... 5

    St. Francis High School was founded, incorporated, owned, and managed
        entirely by the Franciscan Friars, a religious order wholly separate
        from the Diocese ........................................................................................ 6

    The New York Department of State and Erie County corroborate the Suchan
        Declaration ................................................................................................. 7

    Clearing out proofs of claim not properly asserted against the Diocese............... 8

    It will further inflame the objecting parishes if they are charged with paying
        claims that are not legally viable .............................................................. 9

RELIEF REQUESTED........................................................................................................ 10

JURISDICTION ................................................................................................................. 10

ARGUMENT ...................................................................................................................... 11

    A.    If a single essential allegation in a claim is refuted, the burden of proof
        shifts to the claimant to establishing the validity of the claim............................ 11

    B.    The Diocese did not owe Claimant a legal duty of care and because there
        is no such duty, it cannot be held liable for the alleged abuse............................ 16

    C.    Claimant is not entitled to discovery before the Court determines whether
        they have adequately stated a claim against the Diocese................................... 24

    D.    POC 791 must be dismissed under the doctrine of Judicial Estoppel................. 24

    E.    Insurers have standing to object under Section 502(a) ...................................... 25

    Insurers are "Parties in Interest" to this Bankruptcy Case................................... 26

    Denial of Standing on an Issue on Which the Court has an  Independent Duty
        to Act will Needlessly Force an Appeal ................................................. 28

    Motion for Stay Pending Appeal if Standing is Denied ...................................... 30

NOTICE AND PROCEDURE ............................................................................................. 31

# TABLE OF AUTHORITIES

**Cases**

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc.*,
96 N.Y.2d 280 (2001) ........................................................................................ 16

*Arista Records LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) ............................................................................. 13

*Ark263 Doe v. Archdiocese of N.Y.*,
2022 N.Y. Misc. LEXIS 3510 (July 18, 2022) ................................................. 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................... 4, 13

*Bautista v. Archdiocese of New York*,
164 A.D.3d 450 (1st Dep't 2018) ...................................................................... 18

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 554 (2007) ........................................................................................... 13

*Coyle v. United States*,
954 F.3d 146 (2d Cir. 2020) ............................................................................. 16

*D'Amico v. Christie*,
71 N.Y.2d 76 (1987) .......................................................................................... 17

*De Angelis v. Lutheran Medical Ctr.*,
58 N.Y.2d 1053 (1983) ..................................................................................... 17

*Doe v. Roman Cath. Diocese of Rockville Ctr. (In re Roman Cath. Diocese of
Rockville Ctr.)*,
2024 U.S. Dist. LEXIS 124499 (S.D.N.Y. July 15, 2024) ........................ 12, 14

*Espinal v. Melville Snow Contractors*,
98 N.Y.2d 136 (2002) ........................................................................................ 17

*Farrulla v. Happy Care Ambulette Inc.*,
125 A.D.3d 529 (1st Dep't 2015) ...................................................................... 18

*In re Actos Antitrust Litig.*,
2020 WL 8996696 (S.D.N.Y. Mar. 9, 2020) .................................................... 30

*In re Black, Davis & Shue Agency, Inc.*,
460 B.R. 407 (Bankr. M.D. Pa. 2011) ................................................... 11, 26, 27

*In re Country Squire Assocs. of Carle Place, L.P.*,
203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) .......................................................... 31

*In re Heating Oil Partners*,
2009 U.S. Dist. LEXIS 117871 (D. Conn. Dec. 17, 2009) ................................ 26

*In re Johnsbury Trucking Co., Inc.*,
206 B.R. 318 (Bankr. S.D.N.Y. 1997) .............................................................. 12

*In re Megan-Racine Assocs., Inc.*,
  1996 WL 167681 (N.D.N.Y. Apr. 1, 1996) ................................................... 30, 31

*In re Prime Capital Ventures, LLC*,
  2025 WL 73066 (Bankr. N.D.N.Y. Jan. 10, 2025) ............................................ 29

*In re Prime Capital Ventures, LLC*,
  2025 WL 73066 (Bankr. N.D.N.Y. Jan. 10, 2025) ............................................ 31

*In re Reilly*,
  245 B.R. 768 (B.A.P. 2d Cir. 2000) ................................................................ 12

*In re Residential Cap. LLC*,
  531 B.R. 1 (S.D.N.Y. 2015) ............................................................................ 12

*In re Revel AC, Inc.*,
  802 F.3d 558 (3d Cir. 2015) ........................................................................... 31

*In re Rockefeller Ctr. Props.*,
  272 B.R. 524 (Bankr. S.D.N.Y.2000) ............................................................. 12

*In re Roman Cath. Diocese of Rockville Ctr.*
  2023 WL 6284596 (Bankr. S.D.N.Y. Sep. 26, 2023) .................................... 3, 24

*In re Roman Cath. Diocese of Rockville Ctr., N.Y.*
  651 B.R. 399 (Bankr. S.D.N.Y. 2023) ..................................................... passim

*In re Roman Catholic Diocese of Syracuse*,
  665 B.R. 866 (Bankr. N.D.N.Y. 2024) ........................................................... 29

*In re Standard Insulations, Inc.*,
  138 B.R. 947 (Bankr. W.D. Mo. 1992) ........................................................... 26

*In re World Trade Ctr. Disaster Site Litig.*,
  503 F.3d 167 (2d Cir. 2007) ........................................................................... 30

*K.I. v. New York Cty. Bd. of Educ.*,
  256 A.D.2d 189 (1st Dep't 1998) ................................................................... 21

*Negron v. Weiss*,
  2006 WL 2792769 (E.D.N.Y. Sept. 27, 2006) ............................................... 25

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ....................................................................................... 25

*Nken v. Holder*,
  556 U.S. 418 (2009) ....................................................................................... 30

*Palka v. Servicemaster Mgt. Servs. Corp.*,
  83 N.Y.2d 589 (1994) ..................................................................................... 17

*Pratt v. Robinson*,
  39 N.Y.2d 554 (1976) ..................................................................................... 21

*Primavera Familienstifung v. Askin*,
    130 F. Supp.2d 450 (S.D.N.Y. 2001) ................................................................. 12

*Pulka v. Edelman*,
    40 N.Y.2d 781 (1976) ...................................................................... 16, 17, 21

*Purdy v. Public Adm'r of County of Westchester*,
    72 N.Y.2d 1 (1988) .............................................................................. 17, 18

*R.D. v. Archdiocese of New York et al.*,
    2021 WL 4307231 (Sup. Ct. Kings Cty. Sep. 22, 2021) ..................................... 19

*SCVAWCR-Doe v. Archdiocese of New York*,
    2024 N.Y. Misc. LEXIS 1549 (Sup. Ct. Westchester County Mar. 27, 2024) .................... 20

*Sheila C. v. Povich*,
    11 A.D.3d 120 (1st Dep't 2004) ................................................................... 21

*Solomon ex rel. Solomon v. City of New York*,
    46 N.Y.2d 401 (1978) .............................................................................. 16

*Springer v. Archdiocese of New York*,
    2021 WL 1054553 (Sup. Ct. New York Cty. Mar. 18, 2021) ............................... 19

*Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*,
    602 U.S. 268 (2024) .................................................................... 26, 27, 28, 29

*Walker v. Archdiocese of New York*,
    270 A.D.2d 127 (1st Dep't 2000) ................................................................. 19

**Statutes**

11 U.S.C. § 101, *et seq.* ................................................................................. 10

11 U.S.C. § 1109(b) ........................................................................................ 34

11 U.S.C. § 502 .............................................................................................. 17

11 U.S.C. § 502(a) .......................................................................................... 10

11 U.S.C. § 502(b)(1) ................................................................................ 10, 12

11 U.S.C. § 502(b)(1) ...................................................................................... 12

U.S. Fire Insurance Company and Pacific Employers Insurance Company (the "Insurers"), by and through their counsel, hereby object to Sexual Abuse Proof of Claim No. 791 ("POC 791") filed in this chapter 11 case (the "Chapter 11 Case"), and respectfully request the entry of an order disallowing and expunging, in its entirety, POC 791.  In support of this Objection, the Insurers set forth as follows:

## PRELIMINARY STATEMENT

1.      POC 791, signed only by a lawyer, alleges abuse by a lay employee, Mr. James Warren, at St. Francis High School of Athol Springs, N.Y. ("St. Francis High School"), where it is alleged the claimant was a student from 1982 to 1983 ("Claimant").  It is alleged Mr. Warren was a religion instructor at St. Francis High School.

2.      The proof of claim was filed in this bankruptcy case.  However, the Claimant separately filed a state court complaint that was not attached to POC 791.  The Claimant names as defendants in his complaint the Franciscan Friars and St. Francis High School, and represents that the Franciscan Friars and St. Francis High School employed and were responsible for Mr. Warren.

3.      Mr. Warren was not a cleric or employee of the Diocese; rather, he is alleged by the Claimant in POC 791 and in his complaint to have been a lay individual who was employed by St. Francis High School, a school that was owned, operated and controlled by the Conventual Franciscans d/b/a Our Lady of Angels Province, Inc. a/k/a St. Anthony of Padua Province, Franciscan Fathers Minor Conventual, U.S.A., Inc. a/k/a Franciscan Fathers Minor Conventuals of Buffalo, NY, Inc. ("Franciscan Friars"), a religious order separate and apart from the Diocese, and to have been employed by the Franciscan Friars at this Franciscan Friars' school, St. Franscis High School.

4.      New York law requires a direct relationship between the Diocese and Mr. Warren, specifically an employment or agency relationship, in order to demonstrate the Diocese had a duty to control Mr. Warren.  Such a relationship must be pled with accompanying factual allegations bearing on the plausible existence of such a relationship.  Merely filing a proof of claim in the Diocese's bankruptcy case without any factual allegations plausibly establishing that the Diocese could control or employ Mr. Warren, is wholly insufficient under federal pleading standards.  There are no such facts pled in POC 791 about or against the Diocese.  Nor could there be.  The declaration filed by the Diocese eight months ago attesting that Mr. Warren was not employed by the Diocese, and that St. Francis High School was not owned by the Diocese, is uncontroverted.

5.      In *Diocese of Rockville Centre*, Judge Glenn disallowed 39 proofs of claim— including 22 that did not file a state court complaint—involving religious order priests and schools pled almost identical to those here, emphasizing the need for supporting factual allegations that go beyond the type of conclusory allegation that the diocese had an agency or employment relationship with the alleged perpetrator or separate religious order which are not even made here.  *See In re Roman Cath. Diocese of Rockville Ctr., N.Y.*, 651 B.R. 399 (Bankr. S.D.N.Y. 2023) (dismissing 39 claims against alleged abusers employed by separate religious orders / institutions on the basis that the claims failed to allege facts sufficient to establish an employment or agency relationship with the diocese), *aff'd In re Roman Cath. Diocese of Rockville Ctr.*, 2024 U.S. Dist. LEXIS 124499.  Because there were no non-conclusory allegations to support either an employment or agency relationship, the claims had to be dismissed as a matter of law and the District Court affirmed that decision.  *Id*.  Further, Judge Glenn found that the plaintiffs' Canon Law assertions could not support the claims without

Case 1-20-10322-CLB,    Doc 4311,    Filed 10/29/25,    Entered 10/29/25 12:57:26,
Description: Main Document  , Page 10 of 84

sufficient allegations of secular facts.  *Id.* at 420-28.

6.     POC 791 further fails to allege that the Diocese had any knowledge of Mr.
Warren's propensity to commit abuse prior to the alleged abuse suffered by Claimant.  Claimant
does not plead any facts that would put the Diocese on notice of any duty owed where the
alleged perpetrators were employed by the Franciscan Friars, a separate religious order from the
Diocese, and the Claimant failed to plead how the Diocese knew or should have known of the
alleged perpetrators' propensities for child sexual abuse, a necessary element of a claim.

7.     Just like Judge Glenn found in *Rockville Centre*, this Court need not consider the
factual support offered in Diocese's declaration as the Claimant has not pled specific facts
sufficient to support a claim, nor could they, and therefore POC 791 must be disallowed as a
matter of law.  While the Diocese's declaration establishes that facts cannot be pled to support a
claim against the Diocese, as Judge Glenn states "[t]he Proofs of Claim here fail not because the
Debtor has refuted any facts, but because the Claimants have failed to allege sufficient facts in
the first instance."  *In re Roman Cath. Diocese of Rockville Ctr.*, 2023 WL 6284596, at *7
(Bankr. S.D.N.Y. Sep. 26, 2023).  POC 791 fails for the same reason.

8.     As set forth herein, accepting Claimant's allegations against Mr. Warren as true
for purposes of this Objection does not mean that the Diocese is responsible for Mr. Warren's
criminal conduct.  The POC fails to adequately plead a cause of action under federal pleading
standards and therefore must be dismissed.

## STATEMENT OF FACTS

### *The allegations of the POC*

9.     POC 791 is devoid of any allegation that the Diocese had control over the hiring,
retention and/or supervision of anyone employed at St. Franscis High School, including Mr.
Warren.  Nor is there any allegation that the Diocese knew or should have known of the risks

posed by Mr. Warren. The only factual allegations in POC 791 regarding an employee-employer relationship state that Mr. Warren was a "Religion instructor at St. Francis High School." POC 791, Attachment, Part 3.b. No facts are alleged that any information about Mr. Warren reached anyone at the Diocese.

10. These allegations fail to state any facts or allegations of a claim against the Diocese and are even less than "[t]hreadbare recitals of the elements of a cause of action" that still would not suffice. *Iqbal*, 556 U.S. at 678.

### Claimant names the Franciscan Friars and St. Francis High School as responsible in his separate state court complaint

11. Claimant separately filed a state court complaint that was not attached to POC 791 that names only the Franciscan Friars and St. Francis High School, in which it is represented that the Franciscan Friars and St. Francis High School employed and were responsible for Mr. Warren, not the Diocese. *See* Complaint, *Jon C. Gross v. St. Francis High School, et al.*, Index No. 811111/2021, Doc. No. 2 (Sup. Ct. Erie Cty. Aug. 12, 2021) ("Complaint"), attached hereto as **Appendix 1**.[1]

12. Mr. Warren was not a cleric or employee of the Diocese; rather, he is alleged by the Claimant in his separately filed complaint to have been employed by the Franciscan Friars, a religious order separate and apart from the Diocese, and by a Franciscan Friars' school, St. Franscis High School. *Id.*, at ¶¶ 16, 18, 65, 122, 142, 199.

13. The Franciscan Friars and St. Francis High School do not deny the allegations that Mr. Warren was employed by St. Francis High School and the Franciscan Friars in their Answer to the Complaint. *See* Answer to Complaint, *Jon C. Gross v. St. Francis High School, et al.*,

---

[1] The Complaint is signed solely by the Claimant's lawyer, Melanie S. Wolk of Trevett Cristo, and not by the Claimant. *See* Complaint.

Index No. 811111/2021, Doc. No. 3, ¶ 3 (Sup. Ct. Erie Cty. Sept. 17, 2021), attached hereto as **Appendix 2** (denying knowledge or information sufficient to respond to the allegations contained in paragraphs 16, 18, 65, 122, 142, and 199 of the Complaint, which allege Mr. Warren's employment relationship to the Franciscan Friars and St. Francis High School, respectively).

### *The Diocese objected to this claim on the exact same basis (Dkt. No. 3578)*

14.     The Diocese objected to POC 791 on January 15, 2025. *Objection to Allowance of Sexual Abuse Proof of Claim No. 791* at docket entry number 3578 (the "Diocese Objection"). The Diocese walked through in its Objection how POC 791 failed to plead an employment or agency relationship, in order to demonstrate the Diocese had a duty to control Mr. Warren, with accompanying factual allegations bearing on the plausible existence of such a relationship. *See* Diocese Objection, at ¶ 17-20, 29.

15.     In demonstrating that such facts could not be pled, the Diocese Objection to POC 791 is supported by the Declaration of Richard C. Suchan dated January 8, 2025 (Dkt. No. 3587) (the "Suchan Declaration"). Mr. Suchan is the Chief Operating Officer for the Diocese, a position he has served in since July 2021.[2] He affirms that the statements in the declarations are based on his personal knowledge, and specifically that he makes "this Declaration based upon: (a) [his] personal knowledge of certain facts stated [therein], (b) information supplied to [him] by others associated with the Diocese, (c) [his] review of relevant documents, (d) consultation with professionals engaged by the Diocese, and (e) [his] experience and knowledge of Diocesan operations."[3]

---

[2] *See* Suchan Declaration, ¶ 1.
[3] *Id.*, ¶ 2.

16.     In the eight months since the filing of the Diocese Objection, the claimant who filed POC 791 has not offered anything to controvert the facts offered in the Diocese Objection and Suchan Declaration.

### *St. Francis High School was founded, incorporated, owned, and managed entirely by the Franciscan Friars, a religious order wholly separate from the Diocese*

17.     As set forth in the Suchan Declaration, St. Francis High School of Athol Springs, N.Y. "is an all-boys secondary school located in Hamburg, New York that was founded, supervised and controlled by the [Franciscan Friars], an independent, separately incorporated religious order that was, and is, separate from and not affiliated with the Diocese."[4] "St. Francis High School is a separately incorporated entity."[5] The charter for St. Francis High School, attached at Exhibit 10 to the Suchan Declaration, was granted on September 25, 1959, and contains no reference to the Diocese.[6]

18.     Mr. Suchan further affirms that: "The Diocese does not own the property where the school is located"[7] and that "[s]ince its founding by the Franciscan Friars, the Diocese has not managed, supervised, controlled, directed, or operated St. Francis High School."[8] Mr. Suchan further verifies as the CFO of the Diocese that: "The Diocese did not hire, employ, supervise, control, or train the faculty, staff, or other employees in their work at St. Francis High School."[9]

19.     Mr. Suchan verifies that "the Diocese did not hire, supervise, train or pay the lay

---

[4] *Id.*, ¶ 46.

[5] *Id.*

[6] Suchan Declaration, ¶ 46 ("Attached hereto as Exhibit 10 is the charter for St. Francis High School granted on September 25, 1959, which contains no reference to the Diocese.").

[7] *Id.*

[8] *Id.*, ¶ 47.

[9] *Id.*

Case 1-20-10322-CLB,   Doc 4311,   Filed 10/29/25,   Entered 10/29/25 12:57:26,
Description: Main Document , Page 14 of 84

employees of St. Francis High School, including James Warren."[10]  Mr. Suchan further attests

that "[t]he Diocese does not maintain records for the clerics, staff or employees of St. Francis

High School."[11]

### The New York Department of State and Erie County
### corroborate the Suchan Declaration

20.    The government records maintained by the New York Department of State

independently confirm that St. Anthony of Padua Province, Franciscan Fathers Minor

Conventual, U.S.A., Inc. and Franciscan Fathers Minor Conventuals of Buffalo, NY, Inc. were

and are separately incorporated entities.[12]  Additionally, the government records maintained by

the Maryland Secretary of State independently confirm that Our Lady of Angels Province, Inc. is

also a separately incorporated entity.[13]  The Franciscan Friars hold themselves out on their

official website as a separate and independent religious order.[14]  The Franciscan Friars also hold

themselves out on their official website as being "responsible for administration of its own high

school in Hamburg, NY (St. Francis High School)."[15]

21.    Government records maintained by the New York Department of State confirm

that St. Francis High School is and was a separately incorporated entity.[16]  St. Francis High

---

[10]  *Id.*, ¶ 49

[11]  *Id.*

[12]  *See* Haberkorn Declaration, Exhs. 1, 2 (New York Department of State records for (1) St. Anthony of
Padua Province, Franciscan Fathers Minor Conventual, U.S.A., Inc. founded in 1901 and (2) Franciscan
Fathers Minor Conventuals of Buffalo, NY, Inc. formed in 1960, both of which remain active not for
profit entities in New York).

[13]  *See id.*, Exhs. 3, 4 (Maryland Secretary of State records for Franciscan Friars-Our Lady of Angels
Province, Inc. along with the Articles of Incorporation, showing this is a separately incorporated entity).

[14]  *See id.*, Exh. 5 (The "Who We Are" page of the Franciscan Friar's website describes the friars as
originating in Europe in the 13th and 14th centuries and "today are divided into three main groups or
branches:  the Friars Minor (Brown Franciscans – OFM), the Friars Minor Capuchin (Capuchins – OFM
Cap.), and the Friars Minor Conventual (Conventuals – OFM Conv.)")

[15]  *See id.*, Exh. 6 (the "Education" page of the Franciscan Friars' webpage states that they are responsible
for the administration of St. Francis High School and even includes a hyperlink leading directly to the
school's webpage).

[16]  *See id.*, Exh. 7 (the Erie County property records list the ownership history of the parcel of land upon

School maintains on its official website that it was founded and has been run by the Franciscan Friars since its inception.[17]

22.     The Erie County property records reflect that the owner of the school premises is St. Francis High School (not the Diocese).[18]  The history of the school reflects that the Franciscan Order purchased the property on which St. Francis High School was built and with the help of Polish American businessmen and professionals raised money for the Franciscan Order to construct the school.[19]

### Clearing out proofs of claim not properly
### asserted against the Diocese

23.     At the June 4 hearing, the Court noted the benefit of clearing out proofs of claim not properly asserted against the Diocese.

> "[I]f these 28 or so claimants have absolutely no claim against the Diocese and yet you allow them to go and recover through the plan, are you not diluting the recovery for the other 800 and some claimants and reducing what they will ultimately get by way of this settlement because you're adding on additional

---

which the high school is built, which currently lists the owner of the land as "ST FRANCIS HIGH SCHOOL" as an independent business entity).

[17] *See id.*, Exh. 8 (The "History" page on the St. Francis High School website, which is directly linked from the "Education" page on the Franciscan Friars' website (*see* FN 15 *supra*), provides that the school was founded in the mid-1920's by "the Very Rev. Justin Figas, OFM Conv." on the shores of Lake Erie "on a thirty-two acre site that had been purchased for the Conventual Franciscans of St. Anthony of Padua Province in 1916 by the Very Rev. Hyacinth Fudzinski, OFM Conv.").

[18] *See id.*, Exhs. 9, 7 (the property records for Erie County, New York show that St. Francis High School is the owner of the parcel of land upon which the high school is built, and the ownership history for that property goes back to 1916 with the only property owners listed being the "FRANCISCAN FATHERS ASSN" and "ST FRANCIS HIGH SCHOOL").

[19] *See id.*, Exh. 10 (Wikipedia, https://en.wikipedia.org/wiki/Saint_Francis_High_School_(Athol_Springs,_New_York) (as of Aug. 25, 2025, 9:35pm EST), "The Conventual Franciscans of the Saint Anthony of Padua Province already owned a 32-acre (130,000 m$^2$) parcel of land on the shore of Lake Erie in Athol Springs just outside Buffalo. The site was purchased in 1916 by Father Hyacinth Fudzinski who was a member of the Franciscan Order. The land had previously been the estate of one "Dr. Pierce," who developed pharmaceuticals around the start of the 20th century. In December 1924 Father Justin assembled a group of Polish American businessmen and professionals from Buffalo, New York to help raise funds and support for the construction of the school. This group became known as the "Father Justin Drivers," or the "Justin Drivers." The group was successful and in 1925 ground was broken for the new school in a ceremony held on 12 July 1925.").

claims."[20]

24.     In granting the Diocese's request to adjourn the hearing on the Diocese Objection and later allowing the Diocese to withdraw its objection at the insistence of the Committee the Court expressly preserved the rights of other parties—including the Insurers—to separately advance objections to the same proofs of claim that were the subject of the Diocese's claims objections.[21] *See* Haberkorn Decl., Exh. 11 (June 4, 2025, Hearing Transcript at 17:21-25 ("If any party with standing wishes to raise their own objection, perhaps even on the identical grounds that are raised by the Diocese in these motions, we'll give you a hearing time and we'll give it consideration.  And so we're open to that being raised by anyone.")).

25.     This Objection is being filed on that basis.

### *It will further inflame the objecting parishes if they are charged with paying claims that are not legally viable*

26.     Leadership from certain parishes filed a lawsuit in the beginning of July 2025 against the Diocese and certain parishes to enjoin their respective parish's assets from being allocated to pay for the Diocese's settlement with the claimants, including this Claimant.[22]

27.     Neither this Claim nor any of the others that are the subject of the Insurers' motions to disallow assert a claim against any parish.  The Diocese acknowledged that it believes this Proof of Claim is not legally viable against it.

---

[20] *Id.*, Exh. 11 (June 4, 2025, Hearing Transcript at 10:19-24).
[21] The Insurers wrote the Court and conveyed the benefits to the estate, claimants and the mediation of going forward with the Claims Objections and clearing out of the claims that are not properly asserted against the Diocese. *See* Letter in Response to Letter Adjourning Matter [Dkt. No. 3757].  In April 2025, the Diocese conveyed that it reached an agreement in principle with the Committee on the amount it would contribute to a plan of reorganization in exchange for the Committee's agreement to support the Diocese being granted a discharge of any liability it may have for all abuse claims.  No longer having an economic interest in what claims are allowed, the Diocese asked that the Diocese Objection be taken off calendar pursuant to a letter notice filed at docket entry number 4059.
[22] *See* Verified Complaint, *John Rozak, et al. v. Diocese of Buffalo, et al.*, Index No. 811414/2025, Doc. No. 2 (Sup. Ct. Erie Cty. July 8, 2025).

28.     It will only further inflame the situation to permit obviously deficient claims to be allowed and allocated to the parishes.

## RELIEF REQUESTED

29.     U.S. Fire and PEIC respectfully request that the Court issue an order disallowing and expunging POC 791 in its entirety.  In response to an objection, if a claim is determined to be unenforceable against the debtor it should be disallowed.  *See* 11 U.S.C. § 502(b)(1).  The claimant has not plausibly asserted that he has a "right to payment" from the Diocese of Ogdensburg, and his claim should be disallowed.  *See* 11 U.S.C. § 101; 11 U.S.C. § 502(b)(1).

## JURISDICTION

30.     The Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

31.     The relief requested is available pursuant to sections 502(a) and (b) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* and Rule 3007 of the Federal Rules of Bankruptcy Procedure.  "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless ***a party in interest . . . objects***."  11 U.S.C. § 502(a) (emphasis added).

32.     "The language of section 502(a) is clear and unambiguous.  ***It plainly authorizes a party in interest to object to any claim or interest***, proof of which is filed under section 501 of the Code.  Nowhere is this right made subject to any other provision of the Code or to the Trustee's refusal to pursue possible objections to certain claims."  4 Collier on Bankruptcy ¶ 502.02 (16th 2025) (quoting *Whitely v. Slobodian (In re Mechanicsburg Fitness, Inc.)*, 592 B.R. 798, 807 (Bankr. M.D. Pa. 2018)) (emphasis added).

33.     U.S. Fire and PEIC have associated into the defense of the underlying claims, are

paying the cost of associated defense counsel,[23] are parties to the adversary proceeding filed

against them by the Diocese and the monetary made against them[24] and are parties to the

Mediation Order and the monetary demands for this claim.[25]  As insurers with a "***potential***

**financial stake in the outcome**" of the claim U.S. Fire and PEIC are parties in interest with

standing to object to proofs of claim.  *In re Black, Davis & Shue Agency, Inc.*,460 B.R. 407, 414-

15 (Bankr. M.D. Pa. 2011) (quoting *Adair v. Sherman*, 230 F.3d 890, 894 n. 3 (7th Cir. 2000))

(emphasis added).

34.     In response to an objection, if a claim is determined to be unenforceable against the

debtor it should be disallowed.  *See* 11 U.S.C. § 502(b)(1).  The claimant has not plausibly asserted

that he has a "right to payment" from the Diocese of Ogdensburg, and his claim should be

disallowed.  *See* 11 U.S.C. § 101; 11 U.S.C. § 502(b)(1).

## <u>ARGUMENT</u>

**A.      If a single essential allegation in a claim is refuted, the burden of proof shifts to the
          claimant to establishing the validity of the claim**

35.     Where, as here, a claim is unenforceable under applicable state law, it should be

disallowed.  11 U.S.C. § 502(b)(1).  If an objection is asserted refuting at least one essential

---

[23] Haberkorn Decl., ¶ 3 (describing the letter the Insurers sent on August 18, 2025, to Mr. Obis as the authorized representative of the Diocese notifying the Diocese that the Insurers "exercise their right to associate in the defense of the Lawsuits" for which the stay was lifted and implicate the Insurers' excess policy periods).

[24] *See* Complaint, *All Saints Roman Catholic Church Society of Buffalo, et al. v. 21st Century Premier Insurance Company, et al.*, Adv. Proc. No. 20-10322 CLB, Doc. No. 1, at ¶¶ 358, 398, 404 (Bankr. W.D.N.Y. Jan. 19, 2021) (naming U.S. Fire Insurance Company in the coverage adversary proceeding seeking both a declaratory judgment that the Insurers are obligated to indemnify the Parishes and/or the Diocese for all sums the Parishes and/or Diocese become obligated to pay through judgment, settlement, or otherwise as well as damages for costs to pay settlements and/or judgments in the Underlying Actions and Claims).

[25] *See* Order, at 3 [Dkt. No. 1568] (mandating participation in the mediation for all insurer defendants listed on Exhibit A attached thereto, including but not limited to U.S. Fire); see also Decision & Order, at 7 [Dkt. No. 3501] (mandating participation by all parties in all mediation sessions for the latest round of mediation efforts).

allegation in a claim, the claimant then has the burden to demonstrate the validity of such claim. *See, e.g., In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y.2000). Importantly, a claimant "must prove the claim, not sit back while the objector attempts to disprove it." *In re Johnsbury Trucking Co., Inc*., 206 B.R. 318, 323 (Bankr. S.D.N.Y. 1997) (citing *In re Bennett*, 83 B.R. 248, 252 (Bankr. S.D.N.Y. 1988)); *see also Primavera Familienstifung v. Askin*, 130 F. Supp.2d 450, 541 (S.D.N.Y. 2001) ("The ultimate burden or persuasion to prove the loss claimed . . . remains with the claimant.").

36. The proof of claim subject to this Objection alleges sexual abuse that occurred at, and by individuals associated with and controlled by, a separately incorporated entity unaffiliated with and distinct from the Diocese. In the Complaint, the Claimant represents that the Franciscan Friars entity defendants employed the abusers.

37. Federal pleading rules apply in assessing the validity of a proof of claim. *See In re Residential Cap. LLC*, 531 B.R. 1, 12 (Bankr. S.D.N.Y. 2015), *on reconsideration in part*, 537 B.R. 161 (Bankr. S.D.N.Y. 2015); *Doe v. Roman Cath. Diocese of Rockville Ctr. (In re Roman Cath. Diocese of Rockville Ctr.)*, 2024 U.S. Dist. LEXIS 124499, *3 (S.D.N.Y. July 15, 2024) ("The legal standard of review of the disallowance of claims at a sufficiency hearing is equivalent to the standard applied to a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure."). Judge Glenn found that this standard also applies to proofs of claim where the claimant's "arguments regarding the Debtor's liability are founded on the same allegations regarding control as" those that also filed complaints in state court and also depend on a control theory to succeed. *In re Roman Cath. Diocese of Rockville Ctr., N.Y.*, 651 B.R. 399, 434 (Bankr. S.D.N.Y. 2023), *aff'd In re Roman Cath. Diocese of Rockville Ctr.*, 2024 U.S. Dist. LEXIS 124499.

38.     A claimant, thus, must assert allegations of plausible fact that make their claims rise above a speculative level. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that "[f]actual allegations must be enough to raise a right to relief above the speculative level."). In order to be plausible, "the complaint's '[factual] allegations must be enough to raise a right to relief above the speculative level.'" *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Similarly, a complaint is properly dismissed when, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

39.     Here, it is alleged in POC 791 § 3.b. that Mr. Warren was a "Religion instructor at St. Francis High School." Claimant makes no allegation that the Diocese had control over the hiring, retention and supervision of the alleged abusers. There are no references to the Diocese anywhere in POC 791 other than the fact that the proof of claim was filed against the Diocese in this Case.

40.     These allegations do not even set out "[t]hreadbare recitals of the elements of a cause of action" that still would not be sufficient to state a claim. *Iqbal*, 556 U.S. at 678. Because Claimant has not asserted allegations of plausible fact that "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, the claim should be disallowed as against the Diocese.

41.     In *Rockville Centre*, 39 very similarly pled proofs of claim—including 22 that did not file a state court complaint—were objected to and dismissed on the basis that the claimants did not adequately allege that the diocese had an employment relationship or an agency relationship with the respective alleged abusers when the claimants merely made simple "conclusory recitals of the legal relationships that the claimants seek to establish." *In re Roman Cath. Diocese of Rockville Ctr., N.Y.*, 651 B.R. 399, 418 (Bankr. S.D.N.Y. 2023), *aff'd In re Roman Cath. Diocese of Rockville Ctr.*, 2024 U.S. Dist. LEXIS 124499. As described more fully below, one of these two relationships is necessary under New York law to establish the requisite degree of control exercised by the diocese over the alleged abusers and threadbare allegations of the possibility of control fails as a matter of law. *Id.* at 417-19.

42.     Judge Glenn carefully considered and applied the federal dismissal standard and based on an analysis of the conclusory facts alleged in the complaints, granted the objections. *Id.* at 409, 417-19. Importantly, Judge Glenn noted that an allegation of "'control' itself is not actually an independent theory that allows a plaintiff to hold a defendant liable in tort for the actions of a third party" and thus is wholly insufficient to plead a claim arising out of an employment or agency relationship under New York state law. *Id.* at 410; *see also In re Roman Cath. Diocese of Rockville Ctr.*, 2024 U.S. Dist. LEXIS 124499 at *5 (affirming bankruptcy court's dismissal of claims where claimants "offer[ed] no non-conclusory allegations to support a theory of liability based on the Debtor's relationships with either the alleged abusers or the religious institutions where the abuse occurred.").

43.     The claims against the Diocese of Rockville Centre were dismissed by Judge Glenn because there were no factual allegations to support the claimant's alleged legal labels of employment or agency and therefore no allegations of factual circumstances to support the

diocese's alleged employment or agency relationships with the abusers or separate religious order. *Id.* at 416, 418-19. Here, the proof of claim alleges no facts that bear upon any employment or agency relationship between the Diocese and Mr. Warren.

44. Conversely, the Suchan Declaration delineates the legal distinctions among the Diocese, the Franciscan Friars and St. Francis High School, and establishes that the Diocese did not own, operate or control that private school, nor did it hire, direct, manage, supervise or control the clerics or employees of St. Francis High School.[26] Government records submitted in support of this objection further confirm the Suchan Declaration.

45. As set forth in Section B below, the Claimant does not have viable causes of action under New York law for an abuse claim against the Diocese. Here, the Claimant does not plead plausible facts of a custodial or "control" relationship—neither employment nor agency— between the Diocese and Claimant or between the Diocese and Claimant's alleged abuser. Because POC 791 is unenforceable under appliable law, it should be disallowed pursuant to 11 U.S.C. § 502.

46. POC 791 is also devoid of any allegation the Diocese had any knowledge of Mr. Warren's propensity to commit abuse prior to the alleged abuse suffered by Claimant.

47. In *C.S. v. Archdiocese of N.Y.*, plaintiff's abuse claims against the Archdiocese were dismissed because the "Plaintiff has not submitted any evidence that would put Archdiocese on notice of any duty owed" where the alleged perpetrators were employed by the Franciscan Friars of the Atonement, a separate religious order from the Archdiocese, and the plaintiff failed to establish how the Archdiocese knew or should have known of the alleged perpetrators' propensities for child sexual abuse. Index No. 951299/2021, 2022 N.Y. Misc.

---

[26] *See* Suchan Declaration at ¶¶ 46-49.

LEXIS 6640, at *2-4 (Sup. Ct. New York Cty. Nov. 2, 2022). This Court is faced with the precise same situation here.

**B.      The Diocese did not owe Claimant a legal duty of care and because there is no such duty, it cannot be held liable for the alleged abuse**

48.      To establish a prima facie case of negligence under New York law, "a plaintiff must prove (1) that the defendant owed her a duty; (2) that the defendant breached that duty; and (3) that she suffered injuries proximately resulting from that breach." *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020) (quoting *Solomon ex rel. Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (2016)); *Becker v. Schwartz*, 46 N.Y.2d 401, 410 (1978) ("As in any cause of action founded upon negligence, a successful plaintiff must demonstrate the existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by the injured party.").

49.      Under New York law, for the Diocese to be liable for the torts of alleged abusers, the Diocese must have a duty to control them. The duty to control arises only when "the relationship between the defendant and the person who threatens the harm to the third person . . . require[s] the defendant to attempt to control the other's conduct." *Pulka v. Edelman*, 40 N.Y.2d 781, 783-84 (1976). For instance, in an employment relationship or when the "relationship between the defendant and the person exposed to harm . . . requires the defendant to afford protection from certain dangers including the conduct of others." *Id.* (citations omitted).

50.      It is well-established law that "[i]n the absence of duty, there is no breach and without a breach there is no liability." *Pulka*, 40 N.Y.2d at 782 (citation omitted); *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 96 N.Y.2d 280, 289 (2001) ("Absent a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm. This restriction is necessary to avoid exposing defendants to

unlimited liability to an indeterminate class of persons conceivably injured by any negligence in a defendant's act."). "Duty is essentially a legal term by which we express our conclusion that there can be liability. It tells us whether the risk to which one person exposes another is within the protection of the law. In fixing the bounds of that duty, not only logic and science, but policy plays an important role." *De Angelis v. Lutheran Medical Ctr.*, 58 N.Y.2d 1053, 1055 (1983) (citation omitted).

51.     A "threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party." *Espinal v. Melville Snow Contractors*, 98 N.Y.2d 136, 138 (2002) (citations omitted). Whether someone owes a duty of care to reasonably avoid injury to another is a question of law. *See Purdy v. Public Adm'r of County of Westchester*, 72 N.Y.2d 1, 8 (1988); *Palka v. Servicemaster Mgt. Servs. Corp.*, 83 N.Y.2d 589, 585 (1994) (holding that "the definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration.") (citations omitted). "The question of duty is best expressed as 'whether the plaintiff's interests are entitled to legal protection against the defendant's conduct.'" *Pulka*, 40 N.Y.2d at 784 (citations omitted). However, "a line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit." *De Angelis*, 58 N.Y.2d at 1055.

52.     It is well-settled in New York law that "[a] defendant generally has no duty to control the conduct of a third person so as to prevent them from harming others, even where as a practical matter defendant can exercise such control." *D'Amico v. Christie*, 71 N.Y.2d 76, 88 (1987) (citing *Pulka v. Edelman*, 40 N.Y.2d 781, 783 (1976)). New York courts have identified a duty to control the conduct of another person when "there exist special circumstances in which

there is sufficient authority and ability to control the conduct of third persons." *Purdy*, 72

N.Y.2d at 8.  The New York Court of Appeals has "imposed a duty to control the conduct of

others where there is a special relationship:  a relationship between defendant and a third person

whose actions expose plaintiff to harm such as would require the defendant to attempt to control

the third person's conduct; or a relationship between the defendant and plaintiff requiring

defendant to protect the plaintiff from the conduct of others." *Id.* (citations omitted).

53.     A party, like the Diocese here, cannot be held liable for tortious conduct by

individuals outside of its control.  *See Bautista v. Archdiocese of New York*, 164 A.D.3d 450, 451

(1st Dep't 2018) (no legal liability because defendant did not have "the authority to supervise or

control" the individual); *Farrulla v. Happy Care Ambulette Inc.*, 125 A.D.3d 529, 530 (1st Dep't

2015) (defendant "did not cause plaintiff's alleged injuries and was not legally responsible for

the person who did").

54.     In *Ark263 Doe v. Archdiocese of N.Y.*, the court dismissed a complaint that

alleged abuse by an employee of a high school that was owned and operated by the Congregation

of Christian Brothers—a religious organization separate and independent from the Archdiocese,

similar to the Franciscan Friars.  2022 N.Y. Misc. LEXIS 3510, at *3-6 (July 18, 2022).  The

Archdiocese did not own the school property where the alleged abuser worked, nor did the

Archdiocese "hire, retain, employ, oversee, or control the staff or employees" of the high school,

including the alleged abusers.  *Id.* at *3-4.  Based on the lack of ownership over the property, any

direct relationship between the Archdiocese and the Congregation of Christian Brothers, and

testimony evidencing the lack of operational control, including hiring and supervision, by the

Archdiocese, the court dismissed the complaint.  *Id.* at *5-6.

55.     Courts have repeatedly held, including in the context of claims asserted under the

CVA, that where a diocese does not control the entity with which the alleged abuser is associated, the diocese is not responsible for that individual's alleged misconduct as a matter of law. *See*, *e.g.*, *Walker v. Archdiocese of New York*, 270 A.D.2d 127, 128 (1st Dep't 2000) (affirming the summary judgment dismissal of a personal injury action against the Archdiocese where affidavits established "the Archdiocese does not own, operate or exercise control over the school," nor did it own the "premises on which the defendant school is located" which was separately owned by the defendant church); *R.D. v. Archdiocese of New York et al.*, No. 519339/2020, 2021 WL 4307231 (Sup. Ct. Kings Cty. Sep. 22, 2021) (granting motion to dismiss the abuse claims against the Archdiocese where documentary evidence established (1) that "contrary to plaintiff's claims, [Archdiocese] did not oversee St. Agnes and St. Francis[, the two locations where the abuse alleged[ly] occurred], and had no custody, control, or supervision over either entity's residents or employees," (2) the premises of St. Agnes "has been owned by the Dominican Convent, not the Archdiocese," and (3) St. Francis was located in Brooklyn outside of the Archdiocese's geographic territory); *Springer v. Archdiocese of New York*, No. 950137/2019, 2021 WL 1054553, at *1 (Sup. Ct. New York Cty. Mar. 18, 2021) (dismissing defendant Notre Dame School of Manhattan where school charters and "affidavits demonstrate that the Notre Dame School and defendant Notre Dame School of Manhattan are completely separate entities" and thus the defendant did "not own, operate or exercise control over the Notre Dame Convent School/Notre Dame School").

56.     An essential element of a negligent hiring, retention, or supervision claim is there must be an employer-employee relationship, and no such relationship has been established in POC 791.  In *SCVAWCR-Doe v. Archdiocese of New York*, a plaintiff alleged negligent hiring, retention and supervision of an alleged abuser who was employed by a third-party employer, not

the Archdiocese, which proved fatal to the claim leading to its dismissal on summary judgment. 2024 N.Y. Misc. LEXIS 1549, at *24-25 (Sup. Ct. Westchester County Mar. 27, 2024) (granting summary judgment dismissing negligent supervision claim because an "essential element of an employer-employee relationship is lacking in this case;" the plaintiff "has not established how either the Archdiocese or St. Joseph's was liable for the alleged negligent supervision of [abuser] when he was employed by non-party [].")

57.     In *In re Roman Catholic Diocese of Rockville Center*, Judge Glenn found that under New York law it is critical that facts that are alleged go "to the degree of control exercised by the purported employer," with the predominant factor being "the extent of the employer's power to order and control the employee's performance at work." 651 B.R. 399, 410, *aff'd In re Roman Cath. Diocese of Rockville Ctr.*, 2024 U.S. Dist. LEXIS 124499 (quoting *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003); *Sokola v. Weinstein*, 187 N.Y.S.3d 493, 500 (Sup. Ct. N.Y. Cty. Feb. 7, 2023)) (internal quotations omitted). The claims against the diocese were dismissed because there were no "accompanying factual allegations that would support [the] legal labels of employment or agency," and therefore no "allegations that actually bear on the factual circumstances of the Debtor's alleged employment or agency relationships with the abusers or Religious Institutions/Orders" that are "necessary to [] plead the causes of action asserted." *Id.* at 416, 418-19.

58.     Judge Glenn held the 22 claims that were only proofs of claim, and no state court complaint was filed must meet the same legal pleading standard as the complaints. *Id.* at 433-36. This decision was made because the definition of "Sexual Abuse Claim" on the proof of claim form defined "such claims as abuse 'under any theory of liability, including vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory based on any acts or

failures to act by the Diocese or any other persons or entity for whose acts or failures to act the Diocese is or was allegedly responsible.'" *Id.* at 433. Therefore, the court concluded that asserted claims consisted of a similar range of tort claims as those asserted by the complaint claimants, the arguments regarding the diocese's liability are "founded on the same allegations regarding control as the Complaint Claimants," and so "they will be subject to the same legal standards and caselaw discussed for the Complaint Claims." *Id.* at 434.

59. Here, Mr. Warren is alleged by the Claimant to have been employed by St. Francis High School, a wholly separate and independent entity from the Diocese, resulting in no employer-employee relationship with the Diocese. The mere conclusory assertions of a legal employment relationship without accompanying factual allegations to support such legal label does not meet the federal pleading standards for the negligence claims. Here, there is not even a conclusory allegation.

60. An organization **may, accordingly, be held liable** for a person's sexual misconduct **only when** the alleged perpetrator's conduct is connected to the organization. *See Sheila C. v. Povich*, 11 A.D.3d 120, 129 (1st Dep't 2004) (defendant could not be held liable for sexual assault that occurred after she "had left defendants' physical custody and control"); *K.I. v. New York Cty. Bd. of Educ.*, 256 A.D.2d 189, 192 (1st Dep't 1998) (the school was not responsible for sexual assault which "was severed by time, distance and [the perpetrator's] intervening independent actions").

61. Similarly, under New York law, custody or control over a student is required to establish a duty of the Diocese to supervise or "afford [Claimant] protection from certain dangers including conduct of others." *Pulka*, 40 N.Y.2d at 783; *see also Pratt v. Robinson*, 39 N.Y.2d 554, 560 (1976) ("The school's duty is thus coextensive with and concomitant to its physical

custody and control over the child.  When the custody ceases because the child has passed out of the orbit of its authority . . . the school's custodial duty also ceases.") (citations omitted).  The Diocese never controlled, owned or operated St. Francis High School, that was the responsibility of the Franciscan Friars and the administration of the school employed by and members of the Franciscan Friars;[27] at no time did the Diocese maintain any custody or control over Claimant while they were a student at St. Francis High School.

62.     Judge Glenn also considered arguments by the claimants that Canon Law gave the diocese control over the respective alleged abusers with the most specific assertion being that: "Everyone who works in a diocese including pastors, assistant pastors, and anyone holding any other position, is appointed by the bishop.  This includes members of religious institutions who hold positions in the government of the diocese."  *In re Roman Catholic Diocese of Rockville Ctr.*, 654 B.R. at 422-23, *aff'd In re Roman Cath. Diocese of Rockville Ctr.*, 2024 U.S. Dist. LEXIS 124499.  The court also considered "the more generalized allegations of the Debtor's control over personnel within its territory" and the argument that the diocese has control over the separate religious institutions or orders that perform works of ministry within the diocese's territory.  *Id.* at 423, 428.  First, Judge Glenn found that Canon Law may be considered "to assess the allegations in the complaint," but "if claimants cannot prove the existence of [an employment or agency relationship] based on underlying secular facts pertaining to employment and agency, the Court considers that ***they will not be able to rely exclusively on Canon Law*** to prove their claims."  *Id.* at 422-23, 426 (emphasis added).

63.     The allegations relating to Canon Law led the court to conclude that "inherent in the allegations that the Debtor ***may*** hire and appoint ***some*** personnel to other Catholic entities

---

[27] *See* Suchan Declaration, ¶¶ 46-49.

within the diocesan territory, is the recognition that the Debtor does not hire and appoint *all personnel* at every entity within diocesan territory." *Id.* at 423 (emphasis in original). The court found it "plausible that the Debtor has the general authority to staff certain of its own employees at Religious Institutions or even appoint clergy members to work for the Religious Institutions/Orders," but was "troubled by the lack of non-conclusory allegations stating that is actually what occurred for the abusers at issue." *Id.* at 425. Similarly, the allegations could not establish that "the Religious Institutions and Orders were acting on behalf of the Debtor, or subject to their control, when they hire or supervise their own employees. *Id.* at 427.

64. Under straightforward principles of New York law, POC 791 is not properly asserted against the Diocese and should be disallowed. Claimant has not alleged any facts, conclusory or otherwise, giving rise to a legal duty of the Diocese. *See* POC 791. In addition, as detailed in the Suchan Declaration, the evidence demonstrates that the Diocese had no authority to control the actions of Mr. Warren who was an employee of St. Francis High School.[28]

65. Mr. Warren was not a cleric or employee of the Diocese.[29] The Franciscan Friars is an independent religious order that was and is separate from the Diocese.[30] The Diocese did not have supervisory authority over the employees at St. Francis High School, nor did it pay their salaries or benefits.[31] St. Francis High School is a separately incorporated entity.[32] At all relevant times, St. Francis High School was owned, controlled and operated by the Franciscan Friars, not by the Diocese.[33] The Diocese did not play any role in assigning or appointing Mr.

---

[28] *See* Suchan Declaration, ¶¶ 47, 49.
[29] *Id.*, ¶ 49.
[30] *Id.*, ¶ 46.
[31] *Id.*, ¶ 49.
[32] *Id.*, ¶ 46.
[33] *Id.*, ¶ 47.

Warren at St. Francis High School.[34] The Diocese did not, and does not, own property where St. Francis High School was located and at no time has it employed, supervised or trained the faculty, staff or any other employees of St. Francis High School, including Mr. Warren.[35]

66.     Based upon the foregoing, the Diocese did not owe Claimant a legal duty of care and because there is no such duty, it cannot be held liable for the alleged abuse. Accordingly, the Insurers respectfully request that the Court enter an order disallowing and expunging POC 791.

**C.     Claimant is not entitled to discovery before the Court determines whether they have adequately stated a claim against the Diocese**

67.     As explained by Judge Glenn when deciding this precise issue, the U.S. Supreme Court ruled that 'Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'" *In re Roman Cath. Diocese of Rockville Ctr.*, 2023 WL 6284596, at *8 (Bankr. S.D.N.Y. Sep. 26, 2023) (citing *Iqbal*, 556 U.S. 662, 678). The Claimant must be able to allege sufficient facts such that their claims move from conceivable to plausible, otherwise they must be dismissed as a matter of law. *See id.* (citing *Twombly*, 550 U.S. 544, 570). Only after this Court determines whether the POC 791 has adequately stated a claim against the Diocese is discovery appropriate.

**D.     POC 791 must be dismissed under the doctrine of Judicial Estoppel**

68.     The Claimant must be judicially estopped from advancing claims against the Diocese in POC 791 because they have made inconsistent and contradictory statements in the Complaint which does not make any allegations against the Diocese whatsoever. Judicial

---

[34] *Id.*, ¶ 49.
[35] *Id.*, ¶¶ 46-49.

estoppel is an equitable doctrine that generally "prevents a party from 'asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding.'" *Negron v. Weiss*, 2006 WL 2792769, at *3 (E.D.N.Y. Sept. 27, 2006) (quoting *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir. 1993)). This rule is designed to protect the "integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001).

69.     In this case, the Claimant expressly alleges in the Complaint that Mr. Warren was employed by, and an agent of, the Franciscan Friars and St. Francis High School where he perpetrated the abuse alleged in the Complaint. Complaint at ¶ 16. There is no factual allegation of any employment or agency relationship between Mr. Warren and the Diocese anywhere in the Complaint. Then the Claimant files POC 791 against the Diocese, which, if the Claimant is alleging the Diocese employed Mr. Warren where the abuse was perpetrated, directly contradicts the factual allegations in the Complaint. Such contradictory facts would only serve to manipulate the tools of the judicial system and must be judicially estopped.

### E.     Insurers have standing to object under Section 502(a)

70.     The alleged abuse asserted in POC 791 implicates or may implicate the time period from July 1, 1981, through July 1, 1982, addressed by Pacific Employers Insurance Company Policy No. XMO007350.[36] Thus, U.S. Fire and PEIC have associated into the defense of the underlying claims, are paying the cost of associated defense counsel,[37] are parties to the

---

[36] *See* Declaration of Attorney James R. Murray, *The Diocese of Buffalo, N.Y. v. JMH 100 Doe, et al.*, Adv. Proc. 20-01016-CLB, Doc. No. 290 (Bankr. W.D.N.Y. Oct. 23, 2023), ¶ 10, Exh. A (stating that "[f]rom July 1, 1981 to July 1, 1982, the Diocese purchased an excess policy from Pacific Employers Insurance Company" and listed policy number XMO007350 on the coverage chart attached as Exhibit A for that time period).

[37] Haberkorn Decl., ¶ 3 (describing the letter the Insurers sent on August 18, 2025, to Mr. Obis as the

adversary proceeding filed against them by the Diocese and the monetary demands associated with it[38] and are parties to the Mediation Order.[39]

### *Insurers are "Parties in Interest" to this Bankruptcy Case*

71.     As insurers with a "***potential*** financial stake in the outcome of the claim, the Insurers are parties in interest withstanding to object to proofs of claim. *In re Black, Davis & Shue Agency, Inc.*,460 B.R. 407, 414-15 (Bankr. M.D. Pa. 2011) (quoting *Adair v. Sherman*, 230 F.3d 890, 894 n. 3 (7th Cir. 2000)) (emphasis added); *see also Truck Ins. Exch. v. Kaiser Gypsum Co., Inc*., 602 U.S. 268, 282 (2024) (an insurer is a party in interest when they have a risk of "***potential*** financial harm—attributable to [their] status as an insurer with financial responsibility for bankruptcy claims") (emphasis added); *In re Standard Insulations, Inc.*, 138 B.R. 947, 950 (Bankr. W.D. Mo. 1992) ("The insurers are parties in interest under 11 U.S.C. §§ 1109(b) and 502(a), and have standing to object to claims against the estate."); *see also In re Heating Oil Partners*, 2009 U.S. Dist. LEXIS 117871, at *17 (D. Conn. Dec. 17, 2009) ("Where the debtor's insurance was . . . the true asset sought by personal injury claimants against the debtor, the insurers were parties in interest with standing to object to claims against the estate.").

72.     As entities that have already incurred costs associated with POC 791 and may be

---

authorized representative of the Diocese notifying the Diocese that the Insurers "exercise their right to associate in the defense of the Lawsuits" for which the stay was lifted and implicate the Insurers' excess policy periods).

[38] *See* Complaint, *All Saints Roman Catholic Church Society of Buffalo, et al. v. 21st Century Premier Insurance Company, et al.*, Adv. Proc. No. 20-10322 CLB, Doc. No. 1, at ¶¶ 358, 398, 404 (Bankr. W.D.N.Y. Jan. 19, 2021) (naming U.S. Fire Insurance Company in the coverage adversary proceeding seeking both a declaratory judgment that the Insurers are obligated to indemnify the Parishes and/or the Diocese for all sums the Parishes and/or Diocese become obligated to pay through judgment, settlement, or otherwise as well as damages for costs to pay settlements and/or judgments in the Underlying Actions and Claims).

[39]  *See* Order, at 3 [Dkt. No. 1568] (mandating participation in the mediation for all insurer defendants listed on Exhibit A attached thereto, including but not limited to U.S. Fire); see also Decision & Order, at 7 [Dkt. No. 3501] (mandating participation by all parties in all mediation sessions for the latest round of mediation efforts).

asked to pay the claim alleged in POC 791, U.S. Fire and PEIC are parties in interest with a right to object. *See Truck Ins. Exch.*, 602 U.S. 268.

73. U.S. Fire and PEIC face financial harm even when maintaining coverage defenses, as reorganization efforts can affect insurers in "myriad ways." "For example, a plan that purports to maintain an insurer's coverage defenses could nonetheless allow claims at amounts far above their actual value," expose insurers to the payment of fraudulent claims or impair insurers' rights to control settlement and defense. *Id.* at 281 ("A reorganization plan can impair an insurer's contractual right to control settlement or defend claims. A plan can abrogate an insurer's rights to contribute from other insurance carriers. Or, as alleged here, a plan may be collusive, in violation of the debtor's duty to cooperate, assist, and impair the insurer's financial interests by inviting fraudulent claims. The list goes on.").

74. The term "party in interest" is not defined more narrowly for purposes of a claim objection than in the context of a plan objection, because potential financial exposure is sufficient to have a legally protected interest in the resolution of a claim. In *In re Black, Davis & Shue Agency, Inc.*, the court held that an insurer with even just a "potential financial stake in the outcome" of the claim is a party in interest withstanding to object to proofs of claim. The Court reasoned that:

> There is no reason to define 'party in interest' standing more narrowly in the context of an objection to a claim than in the context of a plan objection. Parties in interest for the purpose of claims objections 'include not only the debtor, but anyone who has a legally protected interest that could be affected by the bankruptcy proceeding.'

*In re Black, Davis & Shue Agency, Inc.*,460 B.R. 407, 414-15 (Bankr. M.D. Pa. 2011) (quoting *Adair v. Sherman*, 230 F.3d 890, 894 n. 3 (7th Cir. 2000)) (holding that an insurer with a

"potential financial stake in the outcome" of the claim is a party in interest withstanding to object to proofs of claim).

75.     Because of the settlement between the Diocese and the Committee, neither the Diocese nor the Committee have any incentive to oppose this Claim, leaving the Insurers as the *only* entities with an incentive to object to this Claim.[40]  *See Truck Ins. Exch.*, 602 U.S. at 282 (the court found that "neither the Debtors nor the Claimants have an incentive to limit the post confirmation cost of defending or paying claims," "the Plan eliminates all of [the Debtors'] ongoing liability," and "Claimants similarly have little incentive to propose barriers to their ability to recover from Truck," leaving the insurer as "***the only entity*** with an incentive to identify problems with the Plan") (emphasis added).

### Denial of Standing on an Issue on Which the Court has an Independent Duty to Act will Needlessly Force an Appeal

76.     Judge Littlefield's recent decision in *In re The Diocese of Albany, New York*, Case No. 23-10244, Dkt. No. 2168 (Bankr. N.D.N.Y. Sept. 3, 2025) is based on different facts.  Here, the Diocese has abandoned the prosecution of proofs of claims it has admitted are legally meritless leaving U.S. Fire and PEIC as the only parties in interest with any economic interest in objecting.  Judge Littlefield's holding "that [an] obligation is not real until either the Insurers concede liability or are otherwise adjudicated to be responsible" is also wrong as it is at odds with the Supreme Court's holding that it is enough for purposes of standing that an insurer merely could be at risk of "potential financial harm."  *Truck Ins. Exch.*, 602 U.S. at 282.

---

[40]  *See* Co-Mediators First Report [Dkt. No. 3814], at ¶ 7 ("The settlement in principle also provides, among other terms, the withdrawal of pending claim objections . . . ."); Haberkorn Decl., Exh. 11 (June 4 Hearing Transcript at 5:3-20 (in responding to the Court's question about why the Diocese is seeking to withdraw motions to disallow claims by persons who possibly should not be treated as creditors in the case, counsel for the Diocese stated the purpose of withdrawing their objections is because of the announced settlement and the parties are focused on mediation and resolving a Plan and don't want to spend money pursuing these claim objections)).

77.     As Judge Kinsella found in the *Diocese of Syracuse* bankruptcy, "liability does not need to be acknowledged or adjudicated before the teachings of *Truck* apply," particularly when the diocese is "attempting to assign its interest in insurance claims and recoveries against the Certain Insurers to the Trust." *In re Roman Catholic Diocese of Syracuse*, 665 B.R. 866, 866 and 875 (Bankr. N.D.N.Y. 2024).  The Diocese and Committee will propose a plan that assigns the insurance rights to a trust, which will threaten to impact the Insurers' rights, just as was proposed in *In re Roman Catholic Diocese of Syracuse*.

78.     In *Prime Capital Ventures*, the Court found, on similar facts as here, that an officer of a company had standing as a party in interest pursuant to Section 1109(b) ***based on potential, contingent liability as a codebtor who had not admitted liability***, and no final determination of his personal responsibility had been made. *In re Prime Capital Ventures, LLC*, 2025 WL 73066 (Bankr. N.D.N.Y. Jan. 10, 2025) (emphasis added).  The Court found that the mere possibility that creditor payments "may reduce a future liability of [the officer] in his individual capacity" was sufficient. *Id.* at *5.  The Insurers face potential contractual liability for covered claims under certain insurance policies that they subscribed, hence, applying the analysis of *Prime Capital Ventures*, the Insurers have standing to object to abuse claims.

79.     An insurer's legally protected interest may be in the defense of a claim or in "a potential financial stake in the outcome" of the claim. *Id.*  This is exactly the case here.  Insurers have a legally protectable interest in not being sued to pay legally insufficient claims.  Because U.S. Fire and PEIC are "parties in interest" under 11 U.S.C. § 1109(b), they have the right to "raise and . . . appear and be heard on any issue" in this proceeding including a right to object to any claims implicating such interest.  11 U.S.C. § 1109(b); *see also Truck Ins. Exch.*, 602 U.S. at 269 (observing that the rights of a party in interest are broadly construed).

## *Motion for Stay Pending Appeal if Standing is Denied*

80.     If the Court concludes that the Insurers are not parties in interest, Insurers hereby request a stay of such order pending appeal to the district court pursuant to Bankruptcy Rule 8007.

81.     Bankruptcy Rule 8007 provides that "[o]rdinarily, a party must move first in the bankruptcy court for . . . a stay of a judgment, order, or decree of the bankruptcy court pending appeal." Fed. R. Bankr. P. 8007(a)(1)(A). But the motion also "may be made in the court where the appeal is pending," as long as it is accompanied by a statement that a similar motion was made in the bankruptcy court and "either state[s] that the court has not yet ruled on the motion, or state[s] that the court has ruled and set out any reasons given for the ruling." Fed. R. Bankr. P. 8007(b).

82.     The four factors to be considered for whether to issue a stay pending appeal are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007). All of these factors favor the issuance of a stay to resolve the question of whether Insurers are parties in interest in this Case. It is well-established that the first two factors "are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

83.     *First*, a likelihood of success on the merits does not requires a party to show that there is "more than a mere possibility" it will prevail. *In re Actos Antitrust Litig.*, 2020 WL 8996696, at *2 (S.D.N.Y. Mar. 9, 2020). The Insurers easily satisfy this standard because it is, at a minimum, plausible that as an insurer with a potential financial obligation to the debtor each Insurer is a party in interest. *See, e.g., In re Megan-Racine Assocs., Inc.*, 1996 WL 167681, at *11 (N.D.N.Y. Apr. 1, 1996) (granting motion to stay pending appeal to resolve "very difficult

question of statutory interpretation"). This ruling would be consistent with the recent decision in *In re Prime Capital Ventures, LLC*. *See* 2025 WL 73066 at \*4-5 (Bankr. N.D.N.Y. Jan. 10, 2025).

84. *Second*, a party will suffer irreparable harm if a stay is denied where, as here, it will result in the loss of appellate rights. *See In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) (the loss of appellate rights is the "quintessential form of prejudice"). Not only is a stay necessary to allow Century to validify its rights on appeal, but if this bankruptcy proceeding moves forward without a review of whether Century is a party in interest its due process rights will be violated because it will be denied the chance to challenge the validity of proof of claim CC048—a claim that may result in Century owing a financial obligation to the debtor.

85. *Third*, although other parties may assert the "possibility of irreparable harm" if a stay is entered the "near certainty of irreparable harm" to Century if a stay is not entered clearly outweighs this concern. *See In re Megan-Racine Assocs., Inc*., 1996 WL 167681 at \*6.

86. *Finally*, the public interest also weighs strongly in favor of a stay because it "strongly favors the correct application of the Bankruptcy Code, especially where property rights are at stake." *In re Revel AC, Inc*., 802 F.3d 558, 573 (3d Cir. 2015) (reversing district court's denial of stay). Neither the Second Circuit nor any district court in this Circuit has ruled on the question of whether under *Truck Insurance* an insurer that has a potential financial obligation under an insurance policy is a party in interest. There is a strong public interest in resolving this question which has arisen in the *Diocese of Albany, Diocese of Syracuse,* and *Diocese of Buffalo* cases (among others), and will continue to arise again in the future.

## NOTICE AND PROCEDURE

87. U.S. Fire and PEIC reserve the right to supplement this Objection and to object to

POC 791 on any other grounds not stated herein. In addition, the Insurers reserve their rights to object to any and all other claims filed in this Chapter 11 Case.

88. U.S. Fire and PEIC will provide notice to: (i) the Claimant who submitted Proof of Claim No. 791; (ii) the Office of the United States Trustee; (iii) counsel for the Official Committee of Unsecured Creditors; (iv) counsel for the Diocese, and (v) any other parties requesting notice in this proceeding.

89. No prior request for the relief sought herein has been made to this Court or any other court.[41][42]

**WHEREFORE,** based upon the foregoing, the Insurers respectfully request that the Court issue an Order, substantially in the form attached hereto as **Exhibit A**: (i) disallowing and expunging Proof of Claim No. 791 in its entirety; and (ii) awarding such other and further relief as the Court deems just and proper.

---

[41] U.S. Fire and PEIC reserve the right to supplement this Objection and to object to POC 791 on any other grounds not stated herein. In addition, the Insurers reserve their rights to object to any and all other claims filed in this Chapter 11 Case.

[42] This filing does not constitute a waiver of the Moving Insurers right to have any and all final orders in any and all non-core matters entered only after *de novo* review by a Federal district court (or, as applicable, appellate court) and/or the Moving Insurers' right to trial by jury in any proceeding as to any and all matters so triable, whether or not the same be designated legal or private rights, or in any case or controversy or proceeding related thereto, and whether such jury trial is pursuant to statute or the United States Constitution.

Case 1-20-10322-CLB, Doc 4311, Filed 10/29/25, Entered 10/29/25 12:57:26, Description: Main Document , Page 40 of 84

Dated: September 30, 2025

Respectfully submitted,

By: */s/ Adam Haberkorn*

**O'MELVENY & MYERS LLP**
TANCRED V. SCHIAVONI
ADAM P. HABERKORN
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone: (212) 326-2000
Email: tschiavoni@omm.com
        ahaberkorn@omm.com

*-and-*

**CLYDE & CO US LLP**
MARIANNE G. MAY
340 Mt. Kemble Ave., Suite 300
Morristown, NJ 07340
Telephone: (973) 210-6700
Email: marianne.may@clydeco.us

*Attorneys for U.S. Fire Insurance Company and Pacific Employers Insurance Company*

**EXHIBIT A**

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| THE DIOCESE OF BUFFALO, NY, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |

Case No. 20-10322 (CLB)

Chapter 11

## [PROPOSED] ORDER DISALLOWING AND EXPUNGING
## SEXUAL ABUSE PROOF OF CLAIM NO. 791

Upon the objection (the "<u>Objection</u>") filed by for U.S. Fire Insurance Company and

Pacific Employers Insurance Company (collectively "<u>Insurers</u>") seeking entry of an order (this

"<u>Order</u>") disallowing and expunging Sexual Abuse Proof of Claim No. 791 in its entirety; and

the Court having found that: (i) it has jurisdiction over the matters raised in the Objection

pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2); and (iii) the relief requested in the Objection is in the best interest of the estate of

the Diocese of Buffalo, its creditors and other parties in interest; and the Court having found that

the Insurers provided appropriate notice of the Objection and the opportunity for a hearing on the

Objection under the circumstances; and upon the record and after due deliberation,

**IT IS HEREBY ORDERED THAT**:

1.      The Objection is GRANTED, as set forth herein.

2.      Sexual Abuse Proof of Claim No. 791 is hereby disallowed and expunged in its

entirety.

3.      Nothing in this Order shall be deemed a waiver or release of the Insurers' right to

otherwise object to Sexual Abuse Proof of Claim No. 791 on any other grounds not set forth in

the Objection.

4.      Nothing in this Order shall be deemed to in any way impair or limit the Insurers'

right to object to any other claim in this Chapter 11 Case.

       5.      This Order is immediately effective and enforceable.

       6.      This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.


Dated: _____
         Buffalo, New York


                            _____
                            Hon. Carl L. Bucki
                            United States Bankruptcy Judge

# APPENDIX 1

**SUPREME COURT STATE OF NEW YORK**
**COUNTY OF ERIE**
------------------------------------------------------------------------X
**JON C. GROSS,**

**Index No.:**

**Plaintiff,**

**-against-**                                                    **VERIFIED COMPLAINT**

**ST. FRANCIS HIGH SCHOOL, ORDER OF**
**FRIARS MINOR CONVENTUAL, ST. ANTHONY**
**OF PADUA PROVINCE, U.S.A., INC. a/k/a ST.**
**ANTHONY OF PADUA PROVINCE, FRANCISCAN**
**FATHERS MINOR a/k/a FRANCISCAN FATHERS**
**MINOR CONVENTUALS OF BUFFALO, N.Y.**
**a/k/a FRANCISCAN FRIARS — OUR LADY OF**
**THE ANGELS PROVINCE, INC.,**

**Defendants.**
------------------------------------------------------------------------X

Plaintiff, JON C. GROSS ("Plaintiff" or "Gross"), by and through undersigned counsel,

hereby sues the Defendants, ST. FRANCIS HIGH SCHOOL ("Defendant" or "St. Francis") and

ORDER OF FRIARS MINOR CONVENTUAL, ST. ANTHONY OF PADUA PROVINCE,

U.S.A., INC. a/k/a ST. ANTHONY OF PADUA PROVINCE, FRANCISCAN FATHERS

MINOR, a/k/a FRANCISCAN FATHERS MINOR CONVENTUALS OF BUFFALO, N.Y., a/k/a

FRANCISCAN FRIARS — OUR LADY OF THE ANGELS PROVINCE, INC. ("Defendant" or

"Franciscan Friars") (collectively the "Defendants"), complaining of the Defendants, upon

information and belief, as follows:

This Complaint arises from negligence on the part of Defendants' negligence and

the sexual battery of Plaintiff Gross by Mr. James B. Warren ("Mr. Warren"), a Religion teacher

at St. Francis, in or about the 1982-83 school year while Plaintiff was a student at St. Francis.

Specifically, Mr. Warren directed Plaintiff during class to follow him to small, dimly lit, and

secluded laundry room to undergo a governmental health screening. Upon entering the laundry

room, Mr. Warren asked Plaintiff a series of questions about his sexual history and directed

Plaintiff to remove his pants and underwear. After Plaintiff did so, Mr. Warren fondled Plaintiff's

bare genitals and buttocks, spreading Plaintiff's buttocks and running his hand through the crack

of Plaintiff's buttocks to his genitals and back to his anus. When Mr. Warren attempted to probe

Plaintiff's anus, Plaintiff pulled his pants up and asked to return to class, at which time Mr. Warren

said Plaintiff passed his governmental health exam.

## I.      JURISDICTION AND VENUE

2.       Venue is proper in this Court because Defendant St. Francis has its principal place

of business in Erie County and the acts and omissions giving rise to this Complaint occurred in Erie

County.

3.       The provisions of Section 1602 of the CPLR do not apply to the within action

including nondelegable duty and/or the doctrine of *respondeat superior*.

4.       Plaintiff brings this suit within the extended time period as provided for in

Sections 208 and 214-G of the Civil Practice Law.

5.       Jurisdiction is proper because this Complaint seeks monetary damages in excess of

$25,000.00, exclusive of interest, costs, and attorney's fees.

## II.      PARTIES

6.       Plaintiff, Gross, is an adult resident of the State of North Carolina and is

otherwise *sui juris*.

7.       Defendant St. Francis is a Roman Catholic college-preparatory school founded and

administered by Defendant Franciscan Friars, and it is located at 4129 Lake Shore Road, Hamburg,

New York, 14075.

2

8. Defendant Franciscan Friars is a Catholic religious order and a corporation conducting business in the State of New York with its principal place of business at 12300 Folly Quarter Road, Ellicott City, Maryland 21042. Defendant Franciscan Friars' resident agent is Michael Kolodziej at 12300 Folly Quarter Road, Ellicott City, Maryland 21042.

9. At all times material, Defendant St. Francis was operated, controlled, and/or supervised by Defendant Franciscan Friars.

### III. STATEMENT OF FACTS

10. Born on April 11, 1967, Plaintiff was raised in a Catholic family.

11. In or about the fall of 1981, when Plaintiff was approximately 14 years old, Plaintiff's parents enrolled him at St. Francis, located at 4129 Lake Shore Road, Hamburg, New York, 14075.

12. At all relevant times, St. Francis was the legal owner of the real property located at 4129 Lake Shore Road, Hamburg, New York, 14075.

13. At all relevant times, the St. Francis was the tenant of the real property located at 4129 Lake Shore Road, Hamburg, New York, 14075.

14. At all relevant times, the St. Francis was the occupier of the real property located at 4129 Lake Shore Road, Hamburg, New York, 14075.

15. In or about the fall semester of 1982, Plaintiff was sexually abused by Mr. Warren on at least one occasion.

16. At all relevant times, Mr. Warren was employed by, and an agent of, Defendants St. Francis and Franciscan Friars where he perpetrated the sexual abuse alleged herein. Plaintiff is not aware of Mr. Warren's other employment history.

17.      In or about the 1982-83 school year, Mr. Warren sexually abused Plaintiff in the laundry room of St. Francis.

18.      Mr. Warren was Plaintiff's sophomore Religion teacher, however, Mr. Warren was teaching Plaintiff's sophomore English class at the time the sexual abuse occurred.

19.      Shortly after lunch, Plaintiff arrived at his English class.

20.      At the beginning of the class, Mr. Warren indicated to the entire class the period would be used as a study hall because he was helping the nurse conduct governmental health screening.

21.      Shortly thereafter, Mr. Warren tapped Plaintiff on the shoulder and told him he was selected for the health screening.  Plaintiff was subsequently directed by Mr. Warren to follow him out of the classroom.

22.      Complying with Mr. Warren's demand, Plaintiff followed Mr. Warren down the hallway to the athletic locker room.

23.      Connected to the athletic locker room was a small, windowless laundry room with interior masonry walls and lit by a single dim light bulb.  The laundry room was approximately 6 feet by 6 feet in dimension and only had enough room for a washer and dryer.

24.      Standing outside the laundry room, Mr. Warren said, "we'll do the screening in here," and ordered Plaintiff to enter the laundry room.

25.      Plaintiff complied and entered the locker room.   Mr. Warren followed behind Plaintiff.

26.      After entering the laundry room, Mr. Warren shut and bolted the door behind them.

27.      Turning and facing Plaintiff, Mr. Warren told him to relax and that the screening was going to be over quickly and easily.

4

28.     Mr. Warren proceeded to ask Plaintiff several preliminary health questions regarding prior visits to his primary physician, dentist, and orthodontist.

29.     Mr. Warren then asked if Plaintiff was sexually active and, if so, to detail the specifics of his sexual history.

30.     Plaintiff responded by telling Mr. Warren he was sexually active.

31.     In response, Mr. Warren indicated Plaintiff would need to undergo a governmental AIDS test because he answered he was sexually active.  Mr. Warren specifically said, "I'm your Religion teacher, trust me, and I'm acting on behalf of St. Francis High School and they need to make sure they keep everyone safe."

32.     Mr. Warren then directed Plaintiff to pull down his pants and underwear below his knees.

33.     Immediately after Plaintiff pulled down his pants and underwear below his knees, Mr. Warren began touching Plaintiff's penis.  Specifically, Mr. Warren grabbed, lifted, groped, and pulled on Plaintiff's bare genitals.

34.     As Mr. Warren continued to fondle Plaintiff's bare genitals, he moved his face within inches of Plaintiff's genitals.

35.     Mr. Warren moved his face so close to Plaintiff's bare genitals that Plaintiff felt and smelled Mr. Warren's cigarette-laced breath on his skin.

36.     Horrified, Plaintiff felt nauseated by the sight of Mr. Warren fondling his bare genitals and the pungent aroma of Mr. Warren's cigarette breath.

37.     After several minutes, Mr. Warren directed Plaintiff to turn around so he could complete the governmental AIDS test.

5

38.     As Plaintiff hesitated, Mr. Warren put his hands on Plaintiff's hips and spun Plaintiff around abruptly.

39.     Mr. Warren then put his hand on the middle of Plaintiff's back and tilted Plaintiff forward slightly as Plaintiff braced himself against the washer and dryer.

40.     Mr. Warren directed Plaintiff to maintain that position so he could continue with the governmental AIDS test.

41.     Unable to see Mr. Warren or what Mr. Warren was doing, Plaintiff became even more petrified at the thought of what awaited him next.

42.     After several moments, Mr. Warren parted Plaintiff's buttocks.

43.     Remaining in the position as directed, Plaintiff could feel Mr. Warren's nose and beard stubble on his buttocks as Mr. Warren continued to part his buttocks and inspect his anus.

44.     In an unsettlingly similar sensation as Mr. Warren fondling his bare genitals, Plaintiff felt and smelled Mr. Warren's cigarette-laced breath on his skin.

45.     After several minutes, Mr. Warren slid his hand through the crack of Plaintiff's parted buttocks, all the way along his underside, and up to Plaintiff's scrotum.

46.     Mr. Warren then reversed his hand and along the same line slid his finger back through Plaintiff's underside and up along the crack of Plaintiff's parted buttocks.

47.     As Mr. Warren attempted to penetrate Plaintiff's anus, Plaintiff abruptly stepped away, pulled his pants up, and told Mr. Warren he wanted to go back to class.

48.     Mr. Warren responded by apologizing, telling Plaintiff the exam was over and that he "did a great job."

49.     Mr. Warren then thanked Plaintiff for being so cooperative and that he passed the governmental AIDS test.

6

50.     Mr. Warren unlocked the door and walked back to class with Plaintiff.

51.     As Mr. Warren walked back to class with Plaintiff, Mr. Warren began to whistle as though he was strolling through the park and appeared to be pleased with the sexual abuse that had just unfolded.

52.     At all relevant times, Mr. Warren's sexual abuse of Plaintiff was foreseeable.

53.     By holding Mr. Warren out as safe to work with children, and by undertaking the custody, supervision of, and/or care of the minor Plaintiff, Defendant entered into a special relationship with the minor Plaintiff. As a result of Plaintiff being a minor, and by Defendant's undertaking the care and guidance of the then vulnerable Plaintiff, who was uniquely vulnerable, without his parents and incapable of self-protection the Defendant entered into a special relationship.

54.     Furthermore, Defendant, by holding itself out as being able to provide a safe environment for children, solicited and/or accepted this position of empowerment. This empowerment prevented the Plaintiff from effectively protecting himself, and Defendant thus entered into a special relationship with Plaintiff. By holding themselves out as a safe, moral, and trusted institution to Plaintiff's parents, Defendant induced Plaintiff's parents to entrust their child to Defendant and thereby deprived Plaintiff of the protection of his family.

55.     The problem of clergy sexual abuse of minors is well-documented throughout the history of the Roman Catholic Church. As far back as 1051, St. Peter Damian wrote in the *Book of Gomorrah* that clergy who defiled boys should be dismissed from holy orders. (*Book of Gomorrah*, Ch. 6). Later, St. Peter Damian wrote in his *Rule of the Monastery of Compludo*, about the punishment for "A cleric or monk who seduces youths or young boys" being public flogging, loss of tonsure and six months in jail, among other punishment.  In 1143 or 1144, a professor at

7

the University of Bologna named Gratian, known as the "Brother of the Science of Canon Law," identified in his work the *Decretum*, the sexual sin by a priest that he called *stuprum pueri*, which is the sexual use of boys by an adult male.

56.     In 1961, the Vatican issued an instruction on the training of candidates for the priesthood, which was based upon the 1917 Code of Canon Law which stated:

> Advancement to religious vows and ordination should be barred to those who are afflicted with evil tendencies to homosexuality or pederasty, since for them the common life and priestly ministry would constitute serious dangers.

57.     This knowledge that Catholic clergy were sexually abusing minors continued through the middle ages and into recent history. In 1962, Pope John XXIII approved the publication *De Modo Procedendi in Causis Solicitationis*, a special procedural law for solicitation of sex in the confessional. This document contained prohibitions prohibiting clergy from having sex with minors under the age of sixteen. This document was distributed to every bishop and major religious superior in the world and was to be kept by them with the deepest secrecy. In addition, this document reflected the Catholic Church's insistence on maintaining the highest degree of secrecy regarding the worst sexual crimes perpetrated by clergy.

58.     In 1947, a priest named Fr. Gerald Fitzgerald founded a religious order of priests called the Servants of the Paracletes. This religious order was founded in order to assist and treat Catholic clergy who experienced mental health problems. By 1952, Fr. Fitzgerald wrote that he had already treated a handful of priests who had sexually abused minors. By 1963, the Paracletes were treating so many sexually abusive clergy that they developed a shorthand code, "code 3," to describe the offense. By 1966, the Paracletes began specializing in treatment of pedophile and ephebophile Catholic clergy.

8

59.     As early as 1971, the issue of sexual misconduct by clergy was being discussed in the Commonwealth of Massachusetts. Bishop Bernard Flanagan, Bishop of Worchester (Massachusetts) testified that as early as February 1971, there had been discussions about sexual misconduct among priests.  According to Bishop Flanagan, "I think by 1971 I had heard of other cases of this type [sic] sexual misconduct and I knew that they were taking place in other dioceses too."

60.     That same year, Dr. Conrad Baars and Dr. Anna Terruwe presented a scholarly paper titled The Role of the Church in the Causation, Treatment and Prevention of the Crisis in the Priesthood" to the 1971 Synod of Bishops at the Vatican and to the U.S. Conference of Catholic Bishops about psychiatric problems in Catholic clergy and how psychosexual immaturity manifested itself in heterosexual and homosexual activity.

61.     In 1985, the public prosecution of a priest in Lafayette, Louisiana led to the creation of the 100-page document titled "*The Problem of Sexual Molestation by Roman Catholic Clergy: Meeting the Problem in a Comprehensive and Responsible Manner*" by Fr. Thomas Doyle, F. Ray Mouton and Fr./Dr. Michael Peterson.  This document was distributed to every Catholic Bishop and religious order ordinary in the United States.  A significant portion of this document describes how significant that the sexual abuse of children by Catholic clergy had become.

62.     In 1990, psychologist and priest, A.W. Richard Sipe, published a study involving 1,500 priests that concluded that six (6) percent of priests were sexually involved with minors.

63.     Defendant St. Francis allowed Mr. Warren to have unsupervised and unlimited access to minor children at St. Francis in Buffalo, New York, located at the time within the Diocese of Buffalo.

**AS FOR A FIRST CAUSE OF ACTION**
**FOR NEGLIGENCE AGAINST THE DEFENDANT ST. FRANCIS**

9

64.     Plaintiff realleges, incorporates, and restates all paragraphs of this complaint as if set forth fully herein.

65.     At all relevant times, Mr. Warren was employed by, or an agent of, Defendant St. Francis.

66.     At all relevant times, Mr. Warren remained under the direct employment, supervision, and control of the Defendant St. Francis.

67.     At all relevant times, Defendant had the right to control the means and manner of Mr. Warren's job performance.

68.     At all relevant times, the Defendant compensated Mr. Warren for his services.

69.     At all relevant times, Defendant had the power to terminate the employment of Mr. Warren.

70.     Upon information and belief, before Plaintiff was sexually abused by Mr. Warren, Defendant had actual or constructive knowledge of material facts regarding their sexual misconduct, impulses, and behavior.

71.     Despite clear indications of danger, Defendant St. Francis took no steps to discover the specific nature of Mr. Warren's problems or to determine whether he was fit to work with children or to protect children from them, thereby increasing the likelihood that Plaintiff would be harmed.

72.     Plaintiff was raised in a Catholic family and regularly participated in church-related activities. Plaintiff and his parents, therefore, developed great admiration, trust, reverence, and respect for the Roman Catholic faith and its agents, including Defendant.

73.     Defendant held Mr. Warren out as qualified teacher at St. Francis, and undertook the education, religious instruction, and spiritual and emotional guidance of Plaintiff.

10

Defendant exercised a direct role over Plaintiff. Accordingly, Plaintiff placed trust in Defendant so that Defendant and its agents gained superiority and influence over Plaintiff. Defendant entered into a special relationship with the Plaintiff and his family.

74.     Defendant owed Plaintiff a duty of reasonable care because it assumed duties owed to Plaintiff and had superior knowledge about the risk that Mr. Warren posed to Plaintiff, the risk of abuse in general in its programs, and/or the risks that its facilities posed to minor children. Defendant had the duty to protect the moral purity of Plaintiff and other children within the Defendant's community.

75.     Defendant owed Plaintiff a duty of reasonable care because it assumed that duty and because they solicited youth and parents for enrollment at St. Francis.

76.     Defendant owed Plaintiff a duty of reasonable care because it undertook custody of minor children, including Plaintiff.

77.     Defendant owed Plaintiff a duty of reasonable care because it promoted its facilities and programs as being a safe and moral place for children.

78.     Defendant owed Plaintiff a duty of reasonable care because it held out its agents, including Mr. Warren, as safe to work with children.

79.     Defendant owed Plaintiff a duty of reasonable care because it encouraged parents and children to spend time with its agents, and/or encouraged its agents, including Mr. Warren, to spend time with, interact with, and discipline children.

80.     Defendant had a duty to protect Plaintiff from harm because Defendant's actions created a foreseeable risk of harm to Plaintiff.

81.     Defendant breached its duty by failing to use reasonable care in supervising Plaintiff when he was with Mr. Warren.

11

82.     Defendant    breached its duty by exposing    Plaintiff    to    pedophiles    and/or ephebophiles.

83.     Defendant breached its duty by recruiting, hiring, and maintaining Mr. Warren in positions of authority over children.

84.     Defendant breached its duty by exposing Mr. Warren to children.

85.     Defendant    breached its    duty    by exposing    Plaintiff    to    a    teacher Defendant knew or should have known was a pedophile and ephebophile.

86.     Defendant    breached    its    duty    by holding    out its employees    and    agents, including Mr. Warren, as safe and wholesome for children to be with.

87.     Defendant breached its duty by leaving or encouraging parents to leave Mr. Warren alone with children unsupervised.

88.     Defendant    breached its    duty    by inducing    Plaintiff    and his parents    to    entrust Plaintiff to Mr. Warren.

89.     Defendant breached its duty by failing to follow policies and procedures designed to prevent child sex abuse and/or failing to implement sufficient policies and procedures to prevent child sex abuse.

90.     Defendant breached its duty by failing to take reasonable measures to make sure that policies and procedures were implemented to prevent child sex abuse were working.

91.     Defendant breached its duty by failing to investigate risks of child molestation at its facilities and/or by its agents.

92.     Defendant breached its duty by failing to properly train the workers at institutions and programs within Defendant's geographical confines.

12

93.     Defendant breached its duty by failing to properly train its employees to identify signs of child molestation by fellow employees.

94.     Defendant breached its duty by failing to have any outside agency test its safety procedures.

95.     Defendant breached its duty by failing to protect the children in its programs from child sex abuse and failing to adhere to the applicable standard of care for child safety.

96.     Defendant breached its duty by failing to investigate the amount and type of information necessary to represent the institutions, programs, leaders, and people as safe.

97.     Defendant breached its duty by failing to respond to and/or investigate information of improper conduct of employee or agent with children, including Mr. Warren.

98.     Defendant breached its duty to use ordinary care in determining whether its facilities and/or agents were safe and/or to determine whether they had sufficient information to represent its facilities and/or agents as safe.

99.     Defendant breached its duty by failing to adequately inform families and children of the known risks of child sex abuse within the Defendant's community.

100.    Defendant breached its duty to Plaintiff by failing to warn its members about any of the knowledge that Defendant had about child sex abuse perpetrated by clergy.

101.    Defendant knew or should have known that some of the leaders and people working in the Defendant's community were not safe for children.

102.    Defendant knew or should have known that it did not have sufficient information about whether or not its leaders and people working at its facilities were safe around children.

103.    Defendant held its leaders and agents out as people of high morals, as possessing immense power, teaching families and children to obey these leaders and agents, teaching families

13

and children to respect and revere these leaders and agents, soliciting youth and families to its programs, schools, marketing to youth and families, recruiting youth and families, and holding out the people that worked at St. Francis as safe for children/youth.

104.     Defendant made negligent representations to Plaintiff and his family during each and every year of his minority. Plaintiff and/or his family relied upon these representations, which resulted in Plaintiff being put in a vulnerable and dangerous situation with Mr. Warren who harmed him.

105.     Defendant knew or should have known that there was a risk of child sex abuse for children participating in Defendant's programs and activities and/or under the supervision of Mr. Warren.

106.     Defendant knew or should have known that it had agents who had sexually molested children. Defendant knew or should have known that child molesters have a high rate of recidivism. Defendant knew or should have known that there was a specific danger of child sex abuse for children participating in Defendant's academic and youth programs.

107.     Defendant encouraged Mr. Warren to have unsupervised and unlimited access to young children through a variety of capacities.

108.     Upon information and belief, upon receiving actual notice of child sexual abuse by Mr. Warren, Defendant made a concerted effort to cover up the incident and reassigned him to another location where children would continue to be placed under his care, thereby increasing the likelihood that children would be harmed.

109.     Defendant further breached its duties by hiding a pedophile and ephebophile and engaging in a cover-up of abuse perpetrated by Mr. Warren.

14

110.    As a direct and proximate result of Defendant's acts, omissions, negligence, breached duties, the sexual abuse, and sexual exploitation, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation and psychological injuries, was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life, has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling all to this Plaintiff's damage in excess of the jurisdiction of all lower courts.

## AS FOR A SECOND CAUSE OF ACTION
## FOR NEGLIGENT HIRING, RETENTION AND SUPERVISION
## AGAINST THE DEFENDANT ST. FRANCIS

111.    Plaintiff realleges, incorporates, and restates all paragraphs of this complaint as if set forth fully herein.

112.    At all relevant times, Defendant St. Francis, by and through its agents, managers, employees, and directors owed a duty to Plaintiff to use reasonable care to protect his safety, care, well-being, and health while he was under the care, custody or in the presence of said Defendant. These duties encompassed the use of reasonable care in the hiring, retention, and supervision of Mr. Warren and otherwise providing a safe environment for children.

113.    Prior to the sexual misconduct perpetrated by Mr. Warren upon Plaintiff, Defendant knew, or in the exercise of reasonable care, should have known, that Mr. Warren was unfit for the duties assigned to him, that he did not exhibit appropriate behavior with children, and otherwise posed a risk of perpetrating unwanted sexual contact upon children.

15

114.    Given actual or constructive knowledge of Mr. Warren's dangerous propensities specifically, Defendant had a duty to act reasonably in all decisions relating to their hiring, supervision, and retention as employees.

115.    Defendant failed to exercise reasonable care in one or more of its decisions to hire, supervise, and retain Mr. Warren and therefore exposed Plaintiff to an unreasonable risk of harm.

116.    Defendant affirmed and Mr. Warren's misconduct with Plaintiff. Given the actual and constructive knowledge of the likelihood that Mr. Warren would engage children in unwanted sexual contact, the unwanted sexual contact of Plaintiff was reasonably foreseeable to the Defendant.

117.    Defendant and its agents had superior knowledge of the likelihood that Mr. Warren would engage in unwanted sexual contact with students that they encountered in their position as priest and/or teachers and had a duty to take precautions to lessen the risk that Plaintiff would be the victim of unwanted sexual contact.

118.    At all relevant times, Defendant's acts and omissions created an environment which fostered unwanted sexual contact and exploitation against the people it had a duty to protect, including Plaintiff.

119.    At all relevant times, Defendant had inadequate policies and procedures to protect children entrusted to its care and protection, including Plaintiff, which substantially contributed to the creation of a dangerous environment.

120.    As    a    direct    and    proximate    result    of    Defendant's    acts, omissions, negligence, breached duties, the sexual abuse, and sexual exploitation, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional

16

distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation and psychological injuries, was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life, has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling all to this Plaintiff's damage in excess of the jurisdiction of all lower courts.

### AS FOR A THIRD CAUSE OF ACTION
### FOR RESPONDEAT SUPERIOR/VICARIOUS LIABILITY
### AGAINST THE DEFENDANT ST. FRANCIS

121.    Plaintiff realleges, incorporates, and restates all paragraphs of this complaint as if set forth fully herein.

122.    Among other duties, Defendant employed Mr. Warren as a teacher at St. Francis.

123.    Defendant created a master-servant relationship with Mr. Warren, employing him to interact with and supervise children at St. Francis.

124.    The unwanted contact by Mr. Warren upon Plaintiff occurred as a direct result of the entrustment of them with Plaintiff during their regular working hours and at the place of their employment with Defendant while performing duties of priest and/or teacher.

125.    The sexual contact by Mr. Warren occurred in the course and scope of his employment with Defendant during school hours on school property.

126.    The sexual contact by Mr. Warren was generally foreseeable to Defendant.

127.    The sexual contact by Mr. Warren was closely connected to what he was employed to do as a childcare provider at St. Francis, and/or was otherwise naturally incidental to his job duties.

17

128.     Mr. Warren's conduct was motivated, at least in part, by a desire to serve his employer's business interests or otherwise meet the objectives of his employment, however misguided.

129.     Alternatively, Mr. Warren's conduct constituted an authorized, minor deviation from his employment that was authorized and/or ratified by Defendant.

130.     As a direct and proximate result of Defendant's acts, omissions, negligence, breached duties, the sexual abuse, and sexual exploitation, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation and psychological injuries, was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life, has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling all to this Plaintiff's damage in excess of the jurisdiction of all lower courts.

### AS FOR A FOURTH CAUSE OF ACTION
### FOR FAILURE TO REPORT AS A MANDATED REPORTER AGAINST
### THE DEFENDANT ST. FRANCIS

131.     Plaintiff realleges, incorporates, and restates all paragraphs of this complaint as if set forth fully herein.

132.     As described above, Defendant, St. Francis had actual and/or constructive notice of the abuse.

133.     As described above, Defendant failed to report the abuse to a designated agency to prevent interference with Defendant's internal investigation.

134.     Upon information and belief, Defendant and its agents are mandated reporter pursuant to New York Social Services Law § 413 and has a statutory duty to report if there is

18

reasonable cause to suspect that a child coming before it in their professional or official capacity is an abused or maltreated child.

135.    As such, Defendant failed to comply with its statutory duty to report the abuse to a designated agency.

136.    As a direct and proximate result of Defendant's failure to report, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation and psychological injuries, was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life, has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling all to this Plaintiff's damage in excess of the jurisdiction of all lower courts.

## AS FOR A FIFTH CAUSE OF ACTION
## FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## AGAINST THE DEFENDANT ST. FRANCIS

137.    Plaintiff realleges, incorporates, and restates all paragraphs of this complaint as if set forth fully herein.

138.    As described above, the actions of Defendant and its agents were conducted in a negligent manner.

139.    Defendant and its agent's actions endangered Plaintiff's safety and caused him to fear for his own safety.

140.    As a direct and proximate result of Defendant's acts, omissions, negligence, breached duties, the sexual abuse, and sexual exploitation,  Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation and

19

psychological injuries, was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life, has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling all to this Plaintiff's damage in excess of the jurisdiction of all lower courts.

## AS FOR A SIXTH CAUSE OF ACTION
## FOR NEGLIGENCE AGAINST THE DEFENDANT FRANCISCAN FRIARS

141.    Plaintiff realleges, incorporates, and restates all paragraphs of this complaint as if set forth fully herein.

142.    At all relevant times, Mr. Warren was employed by, or an agent of, Defendant.

143.    At all relevant times, Mr. Warren remained under the direct employment, supervision, and control of the Defendant.

144.    At all relevant times, had the right to control the means and manner of Mr. Warren's job performance.

145.    At all relevant times, the Defendant compensated Mr. Warren for his services.

146.    At all relevant times, Defendant had the power to terminate the employment of Mr. Warren.

147.    Upon information and belief, before Plaintiff was sexually abused by Mr. Warren, Defendant had actual or constructive knowledge of material facts regarding Mr. Warren's sexual misconduct, impulses, and behavior.

148.    Despite clear indications of danger, Defendant took no steps to discover the specific nature of Mr. Warren's problems or to determine whether they were fit to work with children or to protect children from them, thereby increasing the likelihood that Plaintiff would be harmed.

20

149.    Plaintiff was raised in a Catholic family and participated in church-related activities. Plaintiff and his parents, therefore, developed great admiration, trust, reverence, and respect for the Roman Catholic faith and its agents, including Defendant.

150.    Defendant held Mr. Warren out as qualified teacher at St. Francis, and undertook the education, religious instruction, and spiritual and emotional guidance of Plaintiff. Defendant exercised a direct role over Plaintiff. Accordingly, Plaintiff placed trust in Defendant so that Defendant and their agents gained superiority and influence over Plaintiff. Defendant entered into a special relationship with the Plaintiff and his family.

151.    Defendants owed Plaintiff a duty of reasonable care because it assumed duties owed to Plaintiff and had superior knowledge about the risk that Mr. Warren posed to Plaintiff, the risk of abuse in general in its programs, and/or the risks that its facilities posed to minor children. Defendant had the duty to protect the moral purity of Plaintiff and other children within the Defendant's community.

152.    Defendant owed Plaintiff a duty of reasonable care because it assumed that duty and because it solicited youth and parents for enrollment at St. Francis.

153.    Defendant owed Plaintiff a duty of reasonable care because it undertook custody of minor children, including Plaintiff.

154.    Defendant owed Plaintiff a duty of reasonable care because it promoted its facilities and programs as being a safe and moral place for children.

155.    Defendant owed Plaintiff a duty of reasonable care because it held out its agents, including Mr. Warren, as safe to work with children.

156.     Defendant owed Plaintiff a duty of reasonable care because it encouraged parents and children to spend time with its agents; and/or encouraged its agents, including Mr. Warren, to spend time with, interact with, and discipline children.

157.     Defendant had a duty to protect Plaintiff from harm because Defendant's actions created a foreseeable risk of harm to Plaintiff.

158.     Defendant breached its duty by failing to use reasonable care in supervising Plaintiff when he was with Mr. Warren.

159.     Defendant  breached its duty by exposing  Plaintiff  to  pedophiles  and/or ephebophiles.

160.     Defendant breached its duty by recruiting, hiring, and maintaining Mr. Warren in positions of authority over children.

161.     Defendant breached its duty by exposing Mr. Warren to children.

162.     Defendant breached its duty by exposing Plaintiff to priests and/or teachers Defendant knew or should have known was a pedophile and ephebophile.

163.     Defendant breached its duty by holding out its employees and agents, including Mr. Warren, as safe and wholesome for children to be with.

164.     Defendant breached its duty by leaving or encouraging parents to leave Mr. Warren alone with children unsupervised.

165.     Defendant breached its duty by inducing Plaintiff and his parents to entrust Plaintiff to Mr. Warren.

166.     Defendant breached its duty by failing to follow policies and procedures designed to prevent child sex abuse and/or failing to implement sufficient policies and procedures to prevent child sex abuse.

22

167. Defendant breached its duty by failing to take reasonable measures to make sure that policies and procedures were implemented to prevent child sex abuse were working.

168. Defendant breached its duty by failing to investigate risks of child molestation at its facilities and/or by its agents.

169. Defendant breached its duty by failing to properly train the workers at institutions and programs within Defendant's geographical confines.

170. Defendant breached its duty by failing to properly train its employees to identify signs of child molestation by fellow employees.

171. Defendant breached its duty by failing to have any outside agency test its safety procedures.

172. Defendant breached its duty by failing to protect the children in its programs from child sex abuse and failing to adhere to the applicable standard of care for child safety.

173. Defendant breached its duty by failing to investigate the amount and type of information necessary to represent the institutions, programs, leaders, and people as safe.

174. Defendant breached its duty by failing to respond to and/or investigate information of improper conduct of employee or agent with children, including Mr. Warren.

175. Defendant breached its duty to use ordinary care in determining whether its facilities and/or agents were safe and/or to determine whether it had sufficient information to represent its facilities and/or agents as safe.

176. Defendant breached its duty by failing to adequately inform families and children of the known risks of child sex abuse within the Defendant's community.

177. Defendant breached its duty to Plaintiff by failing to warn its members about any of the knowledge that Defendant had about child sex abuse perpetrated by clergy.

23

178.    Defendant knew or should have known that some of the leaders and people working in the Defendant's community were not safe for children.

179.    Defendant knew or should have known that it did not have sufficient information about whether or not its leaders and people working at its facilities were safe around children.

180.    Defendant held its leaders and agents out as people of high morals, as possessing immense power, teaching families and children to obey these leaders and agents, teaching families and children to respect and revere these leaders and agents, soliciting youth and families to its programs, schools, marketing to youth and families, recruiting youth and families, and holding out the people that worked at St. Francis as safe for children/youth.

181.    Defendant made negligent representations to Plaintiff and his family during each and every year of his minority. Plaintiff and/or his family relied upon these representations, which resulted in Plaintiff being put in a vulnerable and dangerous situation with Mr. Warren who harmed him.

182.    Defendant knew or should have known that there was a risk of child sex abuse for children participating in Defendant's programs and activities and/or under the supervision of Mr. Warren.

183.    Defendant knew or should have known that it had agents who had sexually molested children. Defendant knew or should have known that child molesters have a high rate of recidivism. Defendant knew or should have known that there was a specific danger of child sex abuse for children participating in Defendant's academic and youth programs.

184.    Defendant encouraged Mr. Warren to have unsupervised and unlimited access to young children through a variety of capacities.

185. Upon information and belief, upon receiving actual notice of child sexual abuse by Mr. Warren, Defendant made a concerted effort to cover up the incident and reassigned them to locations where children would continue to be placed under their care, thereby increasing the likelihood that children would be harmed.

186. Defendant further breached its duties by hiding a pedophile and ephebophile and engaging in a cover-up of abuse perpetrated by Mr. Warren.

187. As a direct and proximate result of Defendant's acts, omissions, negligence, breached duties, the sexual abuse, and sexual exploitation, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation and psychological injuries, was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life, has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling all to this Plaintiff's damage in excess of the jurisdiction of all lower courts.

## AS FOR A SEVENTH CAUSE OF ACTION
## FOR NEGLIGENT HIRING, RETENTION AND SUPERVISION
## AGAINST THE DEFENDANT FRANCISCAN FRIARS

188. Plaintiff realleges, incorporates, and restates all paragraphs of this complaint as if set forth fully herein.

189. At all relevant times, Defendant, by and through its agents, managers, employees, and directors owed a duty to Plaintiff to use reasonable care to protect his safety, care, well-being, and health while he was under the care, custody or in the presence of said Defendant. These duties encompassed the use of reasonable care in the hiring, retention, and supervision of Mr. Warren and otherwise providing a safe environment for children.

190.	Prior to the sexual misconduct perpetrated by Mr. Warren upon Plaintiff, Defendant knew, or in the exercise of reasonable care, should have known, that Mr. Warren was unfit for the duties assigned to them, that they did not exhibit appropriate behavior with children, and otherwise posed a risk of perpetrating unwanted sexual contact upon children.

191.	Given actual or constructive knowledge of Mr. Warren's dangerous propensities specifically, Defendant had a duty to act reasonably in all decisions relating to his hiring, supervision, and retention as an employee.

192.	Defendant failed to exercise reasonable care in one or more of its decisions to hire, supervise, and retain Mr. Warren and therefore exposed Plaintiff to an unreasonable risk of harm.

193.	Defendant affirmed and ratified Mr. Warren's misconduct with Plaintiff. Given the actual and constructive knowledge of the likelihood that Mr. Warren would engage children in unwanted sexual contact, the unwanted sexual contact of Plaintiff was reasonably foreseeable to the Defendant.

194.	Defendant and its agents had superior knowledge of the likelihood that Mr. Warren would engage in unwanted sexual contact with clients that he encountered in his position as a priest and had a duty to take precautions to lessen the risk that Plaintiff would be the victim of unwanted sexual contact.

195.	At all relevant times, Defendant's acts and omissions created an environment which fostered unwanted sexual contact and exploitation against the people they had a duty to protect, including Plaintiff.

26

196.     At all relevant times, Defendant had inadequate policies and procedures to protect children entrusted to their care and protection, including Plaintiff, which substantially contributed to the creation of a dangerous environment.

197.     As a direct and proximate result of Defendant's acts, omissions, negligence, breached duties, the sexual abuse, and sexual exploitation, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation and psychological injuries, was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life, has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling all to this Plaintiff's damage in excess of the jurisdiction of all lower courts.

## AS FOR AN EIGHTH CAUSE OF ACTION
## FOR RESPONDEAT SUPERIOR/VICARIOUS LIABILITY
## AGAINST THE DEFENDANT FRANCISCAN FRIARS

198.     Plaintiff realleges, incorporates, and restates all paragraphs of this complaint as if set forth fully herein.

199.     Among other duties, Defendant employed Mr. Warren as a teacher at St. Francis.

200.     Defendant created a master-servant relationship with Mr. Warren, employing them to interact with and supervise children at St. Francis.

201.     The unwanted contact by Mr. Warren upon Plaintiff occurred as a direct result of the entrustment of them with Plaintiff during their regular working hours and at the place of their employment with Defendant while performing duties of priests and/or teachers.

202.     The sexual contact by Mr. Warren occurred in the course and scope of their employment with Defendant during school hours on school property.

27

203.    The sexual contact by Mr. Warren was generally foreseeable to Defendant.

204.    The sexual contact by Mr. Warren was closely connected to what they were employed to do as priests and/or childcare providers at St. Francis, and/or were otherwise naturally incidental to their job duties.

205.    Mr. Warren conduct was motivated, at least in part, by a desire to serve their employer's business interests or otherwise meet the objectives of their employment, however misguided.

206.    Alternatively, Mr. Warren conduct constituted an authorized, minor deviation from their employment that was authorized and/or ratified by Defendant.

207. As  a  direct  and  proximate  result  of  Defendant's  acts, omissions, negligence, breached duties, the sexual abuse, and sexual exploitation, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation and psychological injuries, was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life, has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling all to this Plaintiff's damage in excess of the jurisdiction of all lower courts.

### AS FOR A NINTH CAUSE OF ACTION
### FOR FAILURE TO REPORT AS A MANDATED REPORTER
### AGAINST THE DEFENDANT FRANCISCAN FRIARS

208.    Plaintiff realleges, incorporates, and restates all paragraphs of this complaint as if set forth fully herein.

209.    As described above, Defendant had actual and/or constructive notice of the abuse.

28

210.     As described above, Defendant failed to report the abuse to a designated agency to prevent interference with Defendant's internal investigation.

211.     Upon information and belief, Defendants and their agents are mandated reporters pursuant to New York Social Services Law § 413 and has a statutory duty to report if there is reasonable cause to suspect that a child coming before it in their professional or official capacity is an abused or maltreated child.

212.     As such, Defendant failed to comply with its statutory duty to report the abuse to a designated agency.

213.     As a direct and proximate result of Defendant's failure to report, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation and psychological injuries, was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life, has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling all to this Plaintiff's damage in excess of the jurisdiction of all lower courts.

## AS FOR A TENTH CAUSE OF ACTION
## FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## AGAINST THE DEFENDANT FRANCISCAN FRIARS

214.     Plaintiff realleges, incorporates, and restates all paragraphs of this complaint as if set forth fully herein.

215.     As described above, the actions of Defendant and its agents were conducted in a negligent manner.

216.     Defendant and its agents' actions endangered Plaintiff's safety and caused him to fear for his own safety.

29

217.     As a direct and proximate result of Defendant's negligence, breached duties, the

sexual abuse, sexual exploitation, and Defendant's conduct, Plaintiff has suffered and will continue

to suffer great pain of mind and body, severe and permanent emotional distress, physical

manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation and

psychological injuries, was prevented and will continue to be prevented from performing his

normal daily activities and obtaining the full enjoyment of life, has incurred and will continue to

incur expenses for medical and psychological treatment, therapy, and counseling all to this

Plaintiff's damage in excess of the jurisdiction of all lower courts.

**WHEREFORE,** Plaintiff demands judgment against the Defendant for a sum in excess of

the jurisdictional limits of all lower courts on each and every Cause of Action stated above,

together with the costs and disbursements and other expenses necessary in this action.

Dated: August 12, 2021
        Rochester, New York

                                            Yours, etc.,

                                            _/s/ Melanie S. Wolk, Esq._
                                            Melanie S. Wolk, Esq.
                                            **TREVETT CRISTO**
                                            2 State St., Suite 1000
                                            Rochester, NY 14614
                                            Telephone: (585) 454-2181
                                            mwolk@trevettcristo.com

                                            and

                                            Craig Vernon
                                            Leander L. James, IV
                                            **JAMES, VERNON & WEEKS P.A.**
                                            1626 Lincoln Way
                                            Coeur d'Alene, ID 83815
                                            Telephone: (208) 667-0683
                                            ljames@jvwlaw.net
                                            cvernon@jvwlaw.net

30

and

Patrick Noaker
**NOAKER LAW FIRM LLC**
1600 Utica Avenue S., 9th Floor
St. Louis Park, MN 55416
Telephone: (952) 491-6798
patrick@noakerlaw.com

31

### ATTORNEY VERIFICATION

**MELANIE S. WOLK**, an attorney duly admitted to practice before the Courts of this State affirms under penalty of perjury that she is counsel for the Plaintiff herein and has read the foregoing **VERIFIED COMPLAINT** and knows the contents thereof; the same is true to my own knowledge, except as to the matters therein to be alleged on information and belief, and as to those matters, I believe it to be true. That the source of my information and knowledge are investigations, communications with the client and co-counsel, and records in the file.

The reason that this verification is made by me and not by Plaintiff is that the Plaintiff resides in another county.

Dated: August 12, 2021
       Monroe County, New York


 _/s/ Melanie S. Wolk, Esq._
Melanie S. Wolk, Esq.
**TREVETT CRISTO**
2 State Street, Suite 1000
Rochester, NY 14614
Telephone: (585) 454-2181
mwolk@trevettcristo.com

32

# APPENDIX 2

STATE OF NEW YORK
SUPREME COURT: COUNTY OF ERIE

_____

Jon C. Gross,

                  Plaintiff,

v.

ST. FRANCIS HIGH SCHOOL, ORDER OF
FRIARS MINOR CONVENTUAL, ST. ANTHONY
OF PADUA PROVINCE, U.S.A., INC. a/k/a ST.
ANTHONY OF PADUA PROVINCE, FRANCISCAN
FATHERS MINOR a/k/a FRANCISCAN FATHERS
MINOR CONVENTUALS OF BUFFALO, N.Y.
a/k/a FRANCISCAN FRIARS - OUR LADY OF
THE ANGELS PROVINCE, INC.,

                  Defendants.

_____

**ANSWER**

Index No. 811111/2021

Defendants ST. FRANCIS HIGH SCHOOL and ORDER OF FRIARS MINOR CONVENTUAL, ST. ANTHONY OF PADUA PROVINCE, U.S.A., INC. a/k/a ST. ANTHONY OF PADUA PROVINCE, FRANCISCAN FATHERS MINOR a/k/a FRANCISCAN FATHERS MINOR CONVENTUALS OF BUFFALO, N.Y. a/k/a FRANCISCAN FRIARS __ OUR LADY OF THE ANGELS PROVINCE, INC. (hereinafter "Defendants"), by their attorneys, Lippes Mathias Wexler Friedman LLP, as and for their Answer to the Complaint, responds as follows:

       1.       Deny that Defendants were negligent and deny knowledge or information sufficient to respond to the remaining allegations within paragraph 1.

       2.       The allegations contained in 2, 3, 4, 5, 9, 13, 76, 77, 78, 79, 112, 123, 134, 153, 154, 155, 156, 189, 200, and 211 call for a legal conclusion requiring neither an admission or denial. To the extent that a response is necessary, Defendants deny same.

3.    Deny knowledge or information sufficient to respond to the allegations contained in paragraphs 6, 10, 11, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 55, 56, 57, 58, 59, 60, 61, 62, 65, 68, 69, 72, 73, 103, 122, 142, 145, 146, 149, 150, 180, and 199 of the Complaint, and therefore deny same.

4.    Defendants admit the allegations in paragraphs 7 and 14 of the Complaint.

5.    Admit the allegations within the first sentence of paragraph 8. The second sentence of paragraph 8 call for a legal conclusion requiring neither an admission or denial. To the extent that a response is necessary, Defendants deny same.

6.    Deny the allegations contained in paragraphs 12, 52, 53, 54, 63, 66, 67, 70, 71, 74, 75, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 104, 105, 106, 107, 108, 109, 110, 113, 114, 115, 116, 117, 118, 119, 120, 124, 125, 126, 127, 128, 129, 130, 132, 133, 135,   136, 138, 139, 140, 141, 142, 143, 144, 145, 147, 148, 151, 152, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 181, 182, 183, 184, 185, 186, 187, 190, 191, 192, 193, 194, 195, 196, 197, 201, 202, 203, 204, 205, 206, 207, 209, 210, 212, 213, 215, 216, and 217 of the Complaint.

7.    Defendants repeat and reallege all of the allegations above and below paragraphs 64, 111, 121, 131, 137, 141, 188, 198, 208, and 214 of the Complaint.

8.    Defendants further deny each and every allegation of the Complaint not hereinbefore specifically admitted, controverted, or denied.

## AFFIRMATIVE AND OTHER DEFENSES

9.    For a first affirmative defense, Defendants assert that the Complaint and each Cause of Action therein fails to state a claim upon which relief can be granted.

10. For a second affirmative defense, Defendants assert that this Court lacks jurisdiction over some or all of the claims made in the Complaint.

11. For a third affirmative defense, Defendants assert that Plaintiff's claims are barred, in whole or in part, by the doctrine of laches and the applicable statues of limitations.

12. For a fourth affirmative defense, Defendants assert that the Childs Victim Act is unconstitutional.

13. For a fifth affirmative defense, Defendants assert that Defendants did not breach any lawful duty owed to Plaintiff.

14. For a sixth affirmative defense, Defendants assert that all or some of the claims in the Complaint are barred because the alleged violations and damages sustained by Plaintiff, if any, were caused by the acts of a third party over whom Defendants had no control.

15. For a seventh affirmative defense, Defendants assert that Plaintiff's claims are barred, in whole or in part, because the acts of others constitute responsible and/or intervening and/or superseding causes of Plaintiff's alleged damages.

16. For an eighth affirmative defense, Defendants assert that all or some of the claims in the Complaint are barred because the alleged violations and damages sustained by Plaintiff, if any, were not caused by Defendants.

17. For a ninth affirmative defense, the Child Victims Act violates Defendants' Due Process rights under the New York State Constitution (Const. Art I, §6).

18. For a tenth affirmative defense, in the event that the Plaintiff recovers damages which have been paid or are payable by a collateral source, Defendants will seek an offset to such damages pursuant to Article 45 of the CPLR.

19.     For an eleventh affirmative defense, if Defendants are found liable as alleged in the complaint, Defendants allege that the provisions of CPLR 1601 will apply.

20.     For a twelfth affirmative defense, any proof adduced or presented during any trial of this matter on the issue of punitive damages and any such resulting award must conform to the procedural and substantive constitutional limitations set forth in the due process clauses of the 14th Amendment to the United States Constitution and the applicable sections of the New York State Constitution.

Dated:          Buffalo, New York
                September 17, 2021

                                LIPPES MATHIAS WEXLER FRIEDMAN LLP

                                _____/s/Dennis C. Vacco_____
                                Dennis C. Vacco, Esq.
                                Scott S. Allen Jr., Esq.
                                *Attorneys for Defendants*
                                50 Fountain Plaza, Suite 1700
                                Buffalo, New York 14202
                                T: (716) 853-5100
                                dvacco@lippes.com
                                sallen@lippes.com

TO:    Melanie S. Wolk, Esq.
TREVETT CRISTO
2 State St., Suite 1000
Rochester, NY 14614
T: (585) 454-2181
mwolk@trevettcristo.com

and

Leander L. James, IV
Craig Vernon
JAMES, VERNON & WEEKS P.A.
1626 Lincoln Way
Coeur d'Alene, ID 83815
T: (208) 667-0683
Ljames@jvwlaw.net
cvernon@jvwlaw.net

and

Patrick Noaker
NOAKER LAW FIRM LLC
1600 Utica Avenue S., 9th Floor
St. Louis Park, MN 55416
T: (952) 491-6798
patrick@noakerlaw.com

## VERIFICATION BY ATTORNEY

DENNIS C. VACCO, an attorney being duly admitted before the courts of the State of New York, hereby affirms the following under penalties of perjury:

That he is an attorney for Defendants ST. FRANCIS HIGH SCHOOL and ORDER OF FRIARS MINOR CONVENTUAL, ST. ANTHONY OF PADUA PROVINCE, U.S.A., INC. a/k/a ST. ANTHONY OF PADUA PROVINCE, FRANCISCAN FATHERS MINOR a/k/a FRANCISCAN FATHERS MINOR CONVENTUALS OF BUFFALO, N.Y. a/k/a FRANCISCAN FRIARS - OUR LADY OF THE ANGELS PROVINCE, INC., (OLA) in the above-entitled action with offices located at 50 Fountain Plaza, Suite 1700, Buffalo, New York; that he has read the foregoing VERIFIED ANSWER and knows the contents thereof; that the same is true to his knowledge, except as to the matters stated to be alleged upon information and belief, and that as to those matters, he believes them to be true.

That this verification is made by deponent instead of Defendants because OLA is not within Erie County where deponent has his office.

Dated: Buffalo, New York
September 17, 2021

/s/ Dennis C. Vacco
Dennis C. Vacco
LIPPES MATHIAS WEXLER FRIEDMAN LLP
*Attorneys for Defendants*
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
T: (716) 853-5100
dvacco@lippes.com