**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-10322 (CLB) |
| THE DIOCESE OF BUFFALO, NY, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| | ) | |

## NOTICE OF OBJECTION TO ALLOWANCE OF
## SEXUAL ABUSE PROOF OF CLAIM NO. 807

**PLEASE TAKE NOTICE**, that for U.S. Fire Insurance Company and Pacific Employers Insurance Company (collectively, the "Insurers"), by and through their counsel, filed the *Objection to Proof of Claim No. 807*, seeking an Order, pursuant to 11 U.S.C. § 502(a) and (b) and Rule 3007 of the Federal Rules of Bankruptcy Procedure: (i) disallowing and expunging Sexual Abuse Proof of Claim No. 807 in its entirety; and (ii) granting such other and further relief as this Court may deem just and proper.

**PLEASE TAKE FURTHER NOTICE**, that the hearing to consider the Objection and any responses thereto will be held on October 30, 2025, at 10:00 a.m. (prevailing Eastern time), or as soon thereafter as counsel may appear and be heard, before the Honorable Carl L. Bucki, Chief United States Bankruptcy Judge for the Western District of New York, or such other judge as may be sitting in his stead, in the Robert H. Jackson U.S. Courthouse, 2 Niagara Square, Buffalo, New York 14202.

**PLEASE TAKE FURTHER NOTICE**, that parties can choose to appear either (i) in person at the Robert H. Jackson U.S. Courthouse, 2 Niagara Square, Buffalo, New York or (ii) telephonically (call in 1-517-353-2301, Courtroom ID 483077448#, and security pin 9999#).

**PLEASE TAKE FURTHER NOTICE**, that any responses to the Objection must conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the

Western District of New York and be filed with the Court and served in accordance with Local

Rule 9013-1 upon the following parties: (i) counsel to the Insurers, O'Melveny & Myers LLP,

1301 Avenue of the Americas, Suite 1700, New York, NY 10019, Attn: Tancred Schiavoni, Esq.

and Adam Haberkorn, Esq.; (ii) counsel to the Diocese, Bond, Schoeneck & King, PLLC, One

Lincoln Center, Syracuse, New York 13202, Attn: Stephen A. Donato, Esq., and Grayson T.

Walter, Esq., (iii) the Office of the United States Trustee for the Western District of New York,

300 Pearl Street, Suite 401, Buffalo, NY 14202, Attn: Joseph W. Allen, Esq., (iv) counsel to the

Official Committee of Unsecured Creditors, Pachulski, Stang, Ziehl & Jones, LLP, 780 Third

Avenue, 34th Floor, New York, New York, 10017-2024, Attn. Ilan Scharf, Esq. and James

Stang, and (v) those persons who have formally appeared and requested service in this case

pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

      **PLEASE TAKE FURTHER NOTICE**, that copies of the Objection and all other

documents filed in the Diocese's chapter 11 case may be obtained free of charge via the case

management website maintained by the Diocese's notice agent at

https://case.stretto.com/dioceseofbuffalo or by contacting the undersigned counsel for the

Insurers.

Dated:  September 30, 2025

Respectfully submitted,

By:  */s/ Adam Haberkorn*

**O'MELVENY & MYERS LLP**
TANCRED V. SCHIAVONI
ADAM P. HABERKORN
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone:      (212) 326-2000
Email: tschiavoni@omm.com
          ahaberkorn@omm.com

*-and-*

**CLYDE & CO US LLP**
MARIANNE G. MAY
340 Mt. Kemble Ave., Suite 300
Morristown, NJ 07340
Telephone:      (973) 210-6700
Email:  marianne.may@clydeco.us

*Attorneys for U.S. Fire Insurance Company and*
*Pacific Employers Insurance Company*

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| THE DIOCESE OF BUFFALO, NY, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |

Case No. 20-10322 (CLB)

Chapter 11

### INSURERS' OBJECTION TO PROOF OF CLAIM NO. 807
### AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

**O'MELVENY & MYERS LLP**
TANCRED V. SCHIAVONI
ADAM P. HABERKORN
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone:    (212) 326-2000
Email: tschiavoni@omm.com
         ahaberkorn@omm.com

*-and-*

**CLYDE & CO US LLP**
MARIANNE G. MAY
340 Mt. Kemble Ave., Suite 300
Morristown, NJ 07340
Telephone:    (973) 210-6700
Email: marianne.may@clydeco.us

*Attorneys for U.S. Fire Insurance Company
and Pacific Employers Insurance Company*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

      The allegations of the POC ...................................................................................... 3

      Claimant names the Franciscan Friars and St. Francis High School as
          responsible in his separate state court complaint ....................................... 4

      The Diocese objected to this claim on the exact same basis (Dkt. No. 3578) ....... 5

      St. Francis High School was founded, incorporated, owned, and managed
          entirely by the Franciscan Friars, a religious order wholly separate
          from the Diocese ......................................................................................... 6

      The New York Department of State and Erie County corroborate the Suchan
          Declaration ................................................................................................. 7

      Clearing out proofs of claim not properly asserted against the Diocese ............... 9

      It will further inflame the objecting parishes if they are charged with paying
          claims that are not legally viable ................................................................ 9

RELIEF REQUESTED .......................................................................................................... 10

JURISDICTION ................................................................................................................... 10

ARGUMENT ....................................................................................................................... 12

    A.     If a single essential allegation in a claim is refuted, the burden of proof
          shifts to the claimant to establishing the validity of the claim ................... 12

    B.     The Diocese did not owe Claimant a legal duty of care and because there
          is no such duty, it cannot be held liable for the alleged abuse ................... 16

    C.     Claimant is not entitled to discovery before the Court determines whether
          they have adequately stated a claim against the Diocese ........................... 24

    D.     POC 807 must be dismissed under the doctrine of Judicial Estoppel ................. 25

    E.     Insurers have standing to object under Section 502(a) ...................................... 26

      Insurers are "Parties in Interest" to this Bankruptcy Case ................................. 27

      Denial of Standing on an Issue on Which the Court has an Independent Duty
          to Act will Needlessly Force an Appeal ................................................... 29

      Motion for Stay Pending Appeal if Standing is Denied ...................................... 30

NOTICE AND PROCEDURE .................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc.*,
   96 N.Y.2d 280 (2001) ............................................................................................ 18

*Arista Records LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010) .................................................................................. 14

*Ark263 Doe v. Archdiocese of N.Y.*,
   2022 N.Y. Misc. LEXIS 3510 (July 18, 2022) ..................................................... 20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................... 4, 14, 15

*Bautista v. Archdiocese of New York*,
   164 A.D.3d 450 (1st Dep't 2018) ......................................................................... 19

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 554 (2007) ......................................................................................... 14, 15

*Coyle v. United States*,
   954 F.3d 146 (2d Cir. 2020) .................................................................................. 17

*D'Amico v. Christie*,
   71 N.Y.2d 76 (1987) .............................................................................................. 19

*De Angelis v. Lutheran Medical Ctr.*,
   58 N.Y.2d 1053 (1983) .................................................................................... 18, 19

*Doe v. Roman Cath. Diocese of Rockville Ctr. (In re Roman Cath. Diocese of
   Rockville Ctr.)*,
   2024 U.S. Dist. LEXIS 124499 (S.D.N.Y. July 15, 2024) ............................. 13, 16

*Espinal v. Melville Snow Contractors*,
   98 N.Y.2d 136 (2002) ............................................................................................ 18

*Farrulla v. Happy Care Ambulette Inc.*,
   125 A.D.3d 529 (1st Dep't 2015) ......................................................................... 19

*In re Actos Antitrust Litig.*,
   2020 WL 8996696 (S.D.N.Y. Mar. 9, 2020) ........................................................ 32

*In re Black, Davis & Shue Agency, Inc.*,
   460 B.R. 407 (Bankr. M.D. Pa. 2011) ...................................................... 12, 28, 30

*In re Country Squire Assocs. of Carle Place, L.P.*,
   203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) .............................................................. 33

*In re Heating Oil Partners*,
   2009 U.S. Dist. LEXIS 117871 (D. Conn. Dec. 17, 2009) ................................... 28

*In re Johnsbury Trucking Co., Inc.*,
   206 B.R. 318 (Bankr. S.D.N.Y. 1997) .................................................................. 12

*In re Megan-Racine Assocs., Inc.*,
1996 WL 167681 (N.D.N.Y. Apr. 1, 1996) ....................................................... 33

*In re Prime Capital Ventures, LLC*,
2025 WL 73066 (Bankr. N.D.N.Y. Jan. 10, 2025) ........................................... 31

*In re Prime Capital Ventures, LLC*,
2025 WL 73066 (Bankr. N.D.N.Y. Jan. 10, 2025) ........................................... 33

*In re Reilly*,
245 B.R. 768 (B.A.P. 2d Cir. 2000) .................................................................. 12

*In re Residential Cap. LLC*,
531 B.R. 1 (S.D.N.Y. 2015) .............................................................................. 13

*In re Revel AC, Inc.*,
802 F.3d 558 (3d Cir. 2015) ............................................................................. 33

*In re Rockefeller Ctr. Props.*,
272 B.R. 524 (Bankr. S.D.N.Y.2000) ............................................................... 12

*In re Roman Cath. Diocese of Rockville Ctr.*
2023 WL 6284596 (Bankr. S.D.N.Y. Sep. 26, 2023) ................................... 3, 26

*In re Roman Cath. Diocese of Rockville Ctr., N.Y.*
651 B.R. 399 (Bankr. S.D.N.Y. 2023) ........................................................ passim

*In re Roman Catholic Diocese of Syracuse*,
665 B.R. 866 (Bankr. N.D.N.Y. 2024) ............................................................. 31

*In re Standard Insulations, Inc.*,
138 B.R. 947 (Bankr. W.D. Mo. 1992) ............................................................. 28

*In re World Trade Ctr. Disaster Site Litig.*,
503 F.3d 167 (2d Cir. 2007) ............................................................................. 32

*K.I. v. New York Cty. Bd. of Educ.*,
256 A.D.2d 189 (1st Dep't 1998) ..................................................................... 23

*Negron v. Weiss*,
2006 WL 2792769 (E.D.N.Y. Sept. 27, 2006) ................................................. 26

*New Hampshire v. Maine*,
532 U.S. 742 (2001) .......................................................................................... 26

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................................................... 32

*Palka v. Servicemaster Mgt. Servs. Corp.*,
83 N.Y.2d 589 (1994) ....................................................................................... 18

*Pratt v. Robinson*,
39 N.Y.2d 554 (1976) ....................................................................................... 23

*Primavera Familienstifung v. Askin,*
    130 F. Supp.2d 450 (S.D.N.Y. 2001)................................................................. 13

*Pulka v. Edelman,*
    40 N.Y.2d 781 (1976) ............................................................................. 18, 19, 23

*Purdy v. Public Adm'r of County of Westchester,*
    72 N.Y.2d 1 (1988) ...................................................................................... 18, 19

*R.D. v. Archdiocese of New York et al.,*
    2021 WL 4307231 (Sup. Ct. Kings Cty. Sep. 22, 2021) ..................................... 20

*SCVAWCR-Doe v. Archdiocese of New York,*
    2024 N.Y. Misc. LEXIS 1549 (Sup. Ct. Westchester County Mar. 27, 2024)...................... 21

*Sheila C. v. Povich,*
    11 A.D.3d 120 (1st Dep't 2004) ....................................................................... 23

*Solomon ex rel. Solomon v. City of New York,*
    46 N.Y.2d 401 (1978) ...................................................................................... 17

*Springer v. Archdiocese of New York,*
    2021 WL 1054553 (Sup. Ct. New York Cty. Mar. 18, 2021) ............................... 21

*Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.,*
    602 U.S. 268 (2024)................................................................................ passim

*Walker v. Archdiocese of New York,*
    270 A.D.2d 127 (1st Dep't 2000) ..................................................................... 20

**Statutes**

11 U.S.C. § 101, *et seq.*............................................................................................. 11

11 U.S.C. § 1109(b) .................................................................................................. 35

11 U.S.C. § 502........................................................................................................ 17

11 U.S.C. § 502(a) .................................................................................................... 11

11 U.S.C. § 502(b)(1) .......................................................................................... 10, 12

11 U.S.C. § 502(b)(1) ............................................................................................... 12

U.S. Fire Insurance Company and Pacific Employers Insurance Company (the "Insurers"), by and through their counsel, hereby object to Sexual Abuse Proof of Claim No. 807 ("POC 807") filed in this chapter 11 case (the "Chapter 11 Case"), and respectfully request the entry of an order disallowing and expunging, in its entirety, POC 807. In support of this Objection, the Insurers set forth as follows:

## PRELIMINARY STATEMENT

1.     POC 807, signed only by a lawyer, alleges abuse by a Franciscan Friar, Luke Rutter, O.F.M. Conv., at St. Francis High School of Athol Springs, N.Y. ("St. Francis High School"), where it is alleged the claimant was a student from 1978 to 1980 ("Claimant"). It is alleged Friar Rutter was a vocabulary and theology teacher at St. Francis High School.

2.     The proof of claim was filed in this bankruptcy case. However, the Claimant separately filed a state court complaint that was not attached to POC 807. The Claimant names as defendants in his complaint the Franciscan Friars and St. Francis High School, and represents that the Franciscan Friars and St. Francis High School employed and were responsible for Friar Rutter.

3.     Friar Rutter was not a cleric or employee of the Diocese; rather, he is alleged by the Claimant in his complaint to have been a member of the Conventual Franciscans d/b/a Our Lady of Angels Province, Inc. a/k/a St. Anthony of Padua Province, Franciscan Fathers Minor Conventual, U.S.A., Inc. a/k/a Franciscan Fathers Minor Conventuals of Buffalo, NY, Inc. ("Franciscan Friars"), a religious order separate and apart from the Diocese, and to have been employed by the Franciscan Friars at a Franciscan Friars' school, St. Franscis High School.

4.     New York law requires a direct relationship between the Diocese and Friar Rutter, specifically an employment or agency relationship, in order to demonstrate the Diocese had a

duty to control Friar Rutter. Such a relationship must be pled with accompanying factual allegations bearing on the plausible existence of such a relationship. Merely filing a proof of claim in the Diocese's bankruptcy case without any factual allegations plausibly establishing that the Diocese could control or employ Friar Rutter, is wholly insufficient under federal pleading standards. There are no such facts pled in POC 807 about or against the Diocese. Nor could there be. The declaration filed by the Diocese eight months ago attesting that Friar Rutter was not employed by the Diocese, and that St. Francis High School was not owned by the Diocese, is uncontroverted.

5. In *Diocese of Rockville Centre*, Judge Glenn disallowed 39 proofs of claim—including 22 that did not file a state court complaint—involving religious order priests and schools pled almost identical to those here, emphasizing the need for supporting factual allegations that go beyond the type of conclusory allegation that the diocese had an agency or employment relationship with the alleged perpetrator or separate religious order which are not even made here. *See In re Roman Cath. Diocese of Rockville Ctr., N.Y.*, 651 B.R. 399 (Bankr. S.D.N.Y. 2023) (dismissing 39 claims against alleged abusers employed by separate religious orders / institutions on the basis that the claims failed to allege facts sufficient to establish an employment or agency relationship with the diocese), *aff'd In re Roman Cath. Diocese of Rockville Ctr.*, 2024 U.S. Dist. LEXIS 124499. Because there were no non-conclusory allegations to support either an employment or agency relationship, the claims had to be dismissed as a matter of law and the District Court affirmed that decision. *Id*. Further, Judge Glenn found that the plaintiffs' Canon Law assertions could not support the claims without sufficient allegations of secular facts. *Id.* at 420-28.

6. POC 807 further fails to allege that the Diocese had any knowledge of Friar

Rutter's propensity to commit abuse prior to the alleged abuse suffered by Claimant. Claimant does not plead any facts that would put the Diocese on notice of any duty owed where the alleged perpetrators were employed by the Franciscan Friars, a separate religious order from the Diocese, and the Claimant failed to plead how the Diocese knew or should have known of the alleged perpetrators' propensities for child sexual abuse, a necessary element of a claim.

7.      Just like Judge Glenn found in *Rockville Centre*, this Court need not consider the factual support offered in Diocese's declaration as the Claimant has not pled specific facts sufficient to support a claim, nor could they, and therefore POC 807 must be disallowed as a matter of law. While the Diocese's declaration establishes that facts cannot be pled to support a claim against the Diocese, as Judge Glenn states "[t]he Proofs of Claim here fail not because the Debtor has refuted any facts, but because the Claimants have failed to allege sufficient facts in the first instance." *In re Roman Cath. Diocese of Rockville Ctr.*, 2023 WL 6284596, at *7 (Bankr. S.D.N.Y. Sep. 26, 2023). POC 807 fails for the same reason.

8.      As set forth herein, accepting Claimant's allegations against Friar Rutter as true for purposes of this Objection does not mean that the Diocese is responsible for Friar Rutter's criminal conduct. The POC fails to adequately plead a cause of action under federal pleading standards and therefore must be dismissed.

## STATEMENT OF FACTS

### *The allegations of the POC*

9.      POC 807 is devoid of any allegation that the Diocese had control over the hiring, retention and/or supervision of anyone employed at St. Franscis High School, including Friar Rutter. Nor is there any allegation that the Diocese knew or should have known of the risks posed by Friar Rutter. The only factual allegations in POC 807 regarding an employee-employer relationship state that "[Friar] Rutter was a teacher as St. Francis High School." POC 807,

Attachment, Part 3.d. No facts are alleged that any information about Friar Rutter reached anyone at the Diocese.

10. These allegations fail to state any facts or allegations of a claim against the Diocese and are even less than "[t]hreadbare recitals of the elements of a cause of action" that still would not suffice. *Iqbal*, 556 U.S. at 678.

### Claimant names the Franciscan Friars and St. Francis High School as responsible in his separate state court complaint

11. Claimant separately filed a state court complaint that was not attached to POC 807 that names only the Franciscan Friars and St. Francis High School, in which it is represented that the Franciscan Friars and St. Francis High School employed and were responsible for Mr. Warren, not the Diocese. *See* Complaint, *Anonymous O.G. v. St. Francis High School, et al.*, Index No. 806334/2021, Doc. No. 2 (Sup. Ct. Erie Cty. May 13, 2021) ("Complaint"), attached hereto as **Appendix 1**.[1]

12. Friar Rutter was not a cleric or employee of the Diocese; rather, he is alleged by the Claimant in POC 807 and in his separately filed Complaint to have been a member of the Franciscan Friars, a religious order separate and apart from the Diocese, and to have been employed by the Franciscan Friars at a Franciscan Friars' school, St. Franscis High School. *Id.*, at ¶¶ 21, 22. Claimant also alleges that St. Francis High School was founded and administered by the Franciscan Friars. *Id.* at ¶ 10.

13. The Franciscan Friars and St. Francis High School admit that Friar Rutter was a religious order priest of the Franciscan Friars and do not deny the allegations that Friar Rutter was employed by St. Francis High School and the Franciscan Friars in their Answer to the

---

[1] The Complaint is signed solely by the Claimant's lawyer, Melanie S. Wolk of Trevett Cristo, and not by the Claimant. *See* Complaint.

Complaint. *See* Answer to Complaint, *Anonymous O.G. v. St. Francis High School, et al.*, Index No. 806334/2021, Doc. No. 10, ¶¶ 1, 3 (Sup. Ct. Erie Cty. June 15, 2021), attached hereto as **Appendix 2** (admitting to the allegations contained in paragraph 21 of the Complaint, which alleges Friar Rutter was a religious order priest of the Franciscan Friars and denying knowledge or information sufficient to respond to the allegations contained in paragraph 22 of the Complaint, which allege the Friar Rutter's employment relationship to St. Francis High School run by the Franciscan Friars). Similarly, the Franciscan Friars and St. Francis High School admit that St. Francis High School was founded and administered by the Franciscan Friars. *Id.* at ¶ 3 (admitting to the allegations contained in paragraph 10 of the Complaint, which alleges the Franciscan Friars founded and administered St. Francis High School).

### *The Diocese objected to this claim on the exact same basis (Dkt. No. 3578)*

14.     The Diocese objected to POC 807 on January 15, 2025. *Objection to Allowance of Sexual Abuse Proof of Claim No. 807* at docket entry number 3578 (the "Diocese Objection"). The Diocese walked through in its Objection how POC 807 failed to plead an employment or agency relationship, in order to demonstrate the Diocese had a duty to control Friar Rutter, with accompanying factual allegations bearing on the plausible existence of such a relationship. *See* Diocese Objection, at ¶ 17-20, 29.

15.     In demonstrating that such facts could not be pled, the Diocese Objection to POC 807 is supported by the Declaration of Richard C. Suchan dated January 8, 2025 (Dkt. No. 3587) (the "Suchan Declaration"). Mr. Suchan is the Chief Operating Officer for the Diocese, a position he has served in since July 2021.[2] He affirms that the statements in the declarations are based on his personal knowledge, and specifically that he makes "this Declaration based upon:

---

[2] *See* Suchan Declaration, ¶ 1.

(a) [his] personal knowledge of certain facts stated [therein], (b) information supplied to [him] by others associated with the Diocese, (c) [his] review of relevant documents, (d) consultation with professionals engaged by the Diocese, and (e) [his] experience and knowledge of Diocesan operations."[3]

16.      In the eight months since the filing of the Diocese Objection, the claimant who filed POC 807 has not offered anything to controvert the facts offered in the Diocese Objection and Suchan Declaration.

### *St. Francis High School was founded, incorporated, owned, and managed entirely by the Franciscan Friars, a religious order wholly separate from the Diocese*

17.      As set forth in the Suchan Declaration, St. Francis High School of Athol Springs, N.Y. "is an all-boys secondary school located in Hamburg, New York that was founded, supervised and controlled by the [Franciscan Friars], an independent, separately incorporated religious order that was, and is, separate from and not affiliated with the Diocese."[4]  "St. Francis High School is a separately incorporated entity."[5]  The charter for St. Francis High School, attached at Exhibit 10 to the Suchan Declaration, was granted on September 25, 1959, and contains no reference to the Diocese.[6]

18.      Mr. Suchan further affirms that:  "The Diocese does not own the property where the school is located"[7] and that "[s]ince its founding by the Franciscan Friars, the Diocese has not managed, supervised, controlled, directed, or operated St. Francis High School."[8]  Mr.

---

[3]  *Id.*, ¶ 2.
[4]  *Id.*, ¶ 46.
[5]  *Id.*
[6]  Suchan Declaration, ¶ 46 ("Attached hereto as Exhibit 10 is the charter for St. Francis High School granted on September 25, 1959, which contains no reference to the Diocese.").
[7]  *Id.*
[8]  *Id.*, ¶ 47.

6
Case 1-20-10322-CLB,    Doc 4312,    Filed 10/29/25,    Entered 10/29/25 13:07:34,
Description: Main Document  , Page 14 of 89

Suchan further verifies as the CFO of the Diocese that: "The Diocese did not hire, employ, supervise, control, or train the faculty, staff, or other employees in their work at St. Francis High School."[9]

19.     Mr. Suchan verifies that "[t]he Diocese did not assign [Friar Rutter] to St. Francis High School, did not supervise [Friar Rutter] or any Franciscan Friars there, and did not pay their salaries and benefits."[10]  Mr. Suchan further attests that "[t]he Diocese does not maintain records for the clerics, staff or employees of St. Francis High School."[11]

### The New York Department of State and Erie County corroborate the Suchan Declaration

20.     The government records maintained by the New York Department of State independently confirm that St. Anthony of Padua Province, Franciscan Fathers Minor Conventual, U.S.A., Inc. and Franciscan Fathers Minor Conventuals of Buffalo, NY, Inc. were and are separately incorporated entities.[12]  Additionally, the government records maintained by the Maryland Secretary of State independently confirm that Our Lady of Angels Province, Inc. is also a separately incorporated entity.[13]  The Franciscan Friars hold themselves out on their official website as a separate and independent religious order.[14]  The Franciscan Friars also hold themselves out on their official website as being "responsible for administration of its own high

---

[9] *Id.*

[10] *Id.*, ¶ 49.

[11] *Id.*

[12] *See* Haberkorn Declaration, Exhs. 1, 2 (New York Department of State records for (1) St. Anthony of Padua Province, Franciscan Fathers Minor Conventual, U.S.A., Inc. founded in 1901 and (2) Franciscan Fathers Minor Conventuals of Buffalo, NY, Inc. formed in 1960, both of which remain active not for profit entities in New York).

[13] *See id.*, Exhs. 3, 4 (Maryland Secretary of State records for Franciscan Friars-Our Lady of Angels Province, Inc. along with the Articles of Incorporation, showing this is a separately incorporated entity).

[14] *See id.*, Exh. 5 (The "Who We Are" page of the Franciscan Friar's website describes the friars as originating in Europe in the 13th and 14th centuries and "today are divided into three main groups or branches:  the Friars Minor (Brown Franciscans – OFM), the Friars Minor Capuchin (Capuchins – OFM Cap.), and the Friars Minor Conventual (Conventuals – OFM Conv.)")

school in Hamburg, NY (St. Francis High School)."[15]

21. Government records maintained by the New York Department of State confirm that St. Francis High School is and was a separately incorporated entity.[16] St. Francis High School maintains on its official website that it was founded and has been run by the Franciscan Friars since its inception.[17]

22. The Erie County property records reflect that the owner of the school premises is St. Francis High School (not the Diocese).[18] The history of the school reflects that the Franciscan Order purchased the property on which St. Francis High School was built and with the help of Polish American businessmen and professionals raised money for the Franciscan Order to construct the school.[19]

---

[15] *See id.*, Exh. 6 (the "Education" page of the Franciscan Friars' webpage states that they are responsible for the administration of St. Francis High School and even includes a hyperlink leading directly to the school's webpage).

[16] *See id.*, Exh. 7 (the Erie County property records list the ownership history of the parcel of land upon which the high school is built, which currently lists the owner of the land as "ST FRANCIS HIGH SCHOOL" as an independent business entity).

[17] *See id.*, Exh. 8 (The "History" page on the St. Francis High School website, which is directly linked from the "Education" page on the Franciscan Friars' website (*see* FN 15 *supra*), provides that the school was founded in the mid-1920's by "the Very Rev. Justin Figas, OFM Conv." on the shores of Lake Erie "on a thirty-two acre site that had been purchased for the Conventual Franciscans of St. Anthony of Padua Province in 1916 by the Very Rev. Hyacinth Fudzinski, OFM Conv.").

[18] *See id.*, Exhs. 9, 7 (the property records for Erie County, New York show that St. Francis High School is the owner of the parcel of land upon which the high school is built, and the ownership history for that property goes back to 1916 with the only property owners listed being the "FRANCISCAN FATHERS ASSN" and "ST FRANCIS HIGH SCHOOL").

[19] *See id.*, Exh. 10 (Wikipedia, https://en.wikipedia.org/wiki/Saint_Francis_High_School_(Athol_Springs,_New_York) (as of Aug. 25, 2025, 9:35pm EST), "The Conventual Franciscans of the Saint Anthony of Padua Province already owned a 32-acre (130,000 m$^2$) parcel of land on the shore of Lake Erie in Athol Springs just outside Buffalo. The site was purchased in 1916 by Father Hyacinth Fudzinski who was a member of the Franciscan Order. The land had previously been the estate of one "Dr. Pierce," who developed pharmaceuticals around the start of the 20th century. In December 1924 Father Justin assembled a group of Polish American businessmen and professionals from Buffalo, New York to help raise funds and support for the construction of the school. This group became known as the "Father Justin Drivers," or the "Justin Drivers." The group was successful and in 1925 ground was broken for the new school in a ceremony held on 12 July 1925.").

***Clearing out proofs of claim not properly
asserted against the Diocese***

23.     At the June 4 hearing, the Court noted the benefit of clearing out proofs of claim

not properly asserted against the Diocese.

> "[I]f these 28 or so claimants have absolutely no claim against the Diocese and
> yet you allow them to go and recover through the plan, are you not diluting the
> recovery for the other 800 and some claimants and reducing what they will
> ultimately get by way of this settlement because you're adding on additional
> claims."[20]

24.     In granting the Diocese's request to adjourn the hearing on the Diocese Objection

and later allowing the Diocese to withdraw its objection at the insistence of the Committee the

Court expressly preserved the rights of other parties—including the Insurers—to separately

advance objections to the same proofs of claim that were the subject of the Diocese's claims

objections.[21]  *See* Haberkorn Decl., Exh. 11 (June 4, 2025, Hearing Transcript at 17:21-25 ("If

any party with standing wishes to raise their own objection, perhaps even on the identical

grounds that are raised by the Diocese in these motions, we'll give you a hearing time and we'll

give it consideration.  And so we're open to that being raised by anyone.")).

25.     This Objection is being filed on that basis.

***It will further inflame the objecting parishes if they are
charged with paying claims that are not legally viable***

26.     Leadership from certain parishes filed a lawsuit in the beginning of July 2025

---

[20]  *Id.*, Exh. 11 (June 4, 2025, Hearing Transcript at 10:19-24).
[21]  The Insurers wrote the Court and conveyed the benefits to the estate, claimants and the mediation of
going forward with the Claims Objections and clearing out of the claims that are not properly asserted
against the Diocese. *See* Letter in Response to Letter Adjourning Matter [Dkt. No. 3757].  In April 2025,
the Diocese conveyed that it reached an agreement in principle with the Committee on the amount it
would contribute to a plan of reorganization in exchange for the Committee's agreement to support the
Diocese being granted a discharge of any liability it may have for all abuse claims.  No longer having an
economic interest in what claims are allowed, the Diocese asked that the Diocese Objection be taken off
calendar pursuant to a letter notice filed at docket entry number 4059.

against the Diocese and certain parishes to enjoin their respective parish's assets from being allocated to pay for the Diocese's settlement with the claimants, including this Claimant.[22]

27.     Neither this Claim nor any of the others that are the subject of the Insurers' motions to disallow assert a claim against any parish.  The Diocese acknowledged that it believes this Proof of Claim is not legally viable against it.

28.     It will only further inflame the situation to permit obviously deficient claims to be allowed and allocated to the parishes.

## RELIEF REQUESTED

29.     U.S. Fire and PEIC respectfully request that the Court issue an order disallowing and expunging POC 807 in its entirety.  In response to an objection, if a claim is determined to be unenforceable against the debtor it should be disallowed.  *See* 11 U.S.C. § 502(b)(1).  The claimant has not plausibly asserted that he has a "right to payment" from the Diocese of Ogdensburg, and his claim should be disallowed.  *See* 11 U.S.C. § 101; 11 U.S.C. § 502(b)(1).

## JURISDICTION

30.     The Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

31.     The relief requested is available pursuant to sections 502(a) and (b) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* and Rule 3007 of the Federal Rules of Bankruptcy Procedure.  "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless ***a party in interest*** . . . ***objects***."  11 U.S.C. § 502(a) (emphasis added).

---

[22] *See* Verified Complaint, *John Rozak, et al. v. Diocese of Buffalo, et al.*, Index No. 811414/2025, Doc. No. 2 (Sup. Ct. Erie Cty. July 8, 2025).

32.     "The language of section 502(a) is clear and unambiguous.  ***It plainly authorizes***

***a party in interest to object to any claim or interest***, proof of which is filed under section 501 of

the Code.  Nowhere is this right made subject to any other provision of the Code or to the

Trustee's refusal to pursue possible objections to certain claims."  4 Collier on Bankruptcy

¶ 502.02 (16th 2025) (quoting *Whitely v. Slobodian (In re Mechanicsburg Fitness, Inc.)*, 592

B.R. 798, 807 (Bankr. M.D. Pa. 2018)) (emphasis added).

33.     U.S. Fire and PEIC have associated into the defense of the underlying claims, are

paying the cost of associated defense counsel,[23] are parties to the adversary proceeding filed

against them by the Diocese and the monetary made against them[24] and are parties to the

Mediation Order and the monetary demands for this claim.[25]  As insurers with a "***potential***

financial stake in the outcome" of the claim U.S. Fire and PEIC are parties in interest with

standing to object to proofs of claim.  *In re Black, Davis & Shue Agency, Inc.*,460 B.R. 407, 414-

15 (Bankr. M.D. Pa. 2011) (quoting *Adair v. Sherman*, 230 F.3d 890, 894 n. 3 (7th Cir. 2000))

(emphasis added).

34.     In response to an objection, if a claim is determined to be unenforceable against the

debtor it should be disallowed.  *See* 11 U.S.C. § 502(b)(1).  The claimant has not plausibly asserted

---

[23] Haberkorn Decl., ¶ 3 (describing the letter the Insurers sent on August 18, 2025, to Mr. Obis as the authorized representative of the Diocese notifying the Diocese that the Insurers "exercise their right to associate in the defense of the Lawsuits" for which the stay was lifted and implicate the Insurers' excess policy periods).

[24] *See* Complaint, *All Saints Roman Catholic Church Society of Buffalo, et al. v. 21st Century Premier Insurance Company, et al.*, Adv. Proc. No. 20-10322 CLB, Doc. No. 1, at ¶¶ 358, 398, 404 (Bankr. W.D.N.Y. Jan. 19, 2021) (naming U.S. Fire Insurance Company in the coverage adversary proceeding seeking both a declaratory judgment that the Insurers are obligated to indemnify the Parishes and/or the Diocese for all sums the Parishes and/or Diocese become obligated to pay through judgment, settlement, or otherwise as well as damages for costs to pay settlements and/or judgments in the Underlying Actions and Claims).

[25] *See* Order, at 3 [Dkt. No. 1568] (mandating participation in the mediation for all insurer defendants listed on Exhibit A attached thereto, including but not limited to U.S. Fire); see also Decision & Order, at 7 [Dkt. No. 3501] (mandating participation by all parties in all mediation sessions for the latest round of mediation efforts).

that he has a "right to payment" from the Diocese of Ogdensburg, and his claim should be disallowed. *See* 11 U.S.C. § 101; 11 U.S.C. § 502(b)(1).

<u>**ARGUMENT**</u>

**A.      If a single essential allegation in a claim is refuted, the burden of proof shifts to the claimant to establishing the validity of the claim**

35.      Where, as here, a claim is unenforceable under applicable state law, it should be disallowed. 11 U.S.C. § 502(b)(1). If an objection is asserted refuting at least one essential allegation in a claim, the claimant then has the burden to demonstrate the validity of such claim. *See, e.g., In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y.2000). Importantly, a claimant "must prove the claim, not sit back while the objector attempts to disprove it." *In re Johnsbury Trucking Co., Inc*., 206 B.R. 318, 323 (Bankr. S.D.N.Y. 1997) (citing *In re Bennett*, 83 B.R. 248, 252 (Bankr. S.D.N.Y. 1988)); *see also Primavera Familienstifung v. Askin*, 130 F. Supp.2d 450, 541 (S.D.N.Y. 2001) ("The ultimate burden or persuasion to prove the loss claimed . . . remains with the claimant.").

36.      The proof of claim subject to this Objection alleges sexual abuse that occurred at, and by individuals associated with and controlled by, a separately incorporated entity unaffiliated with and distinct from the Diocese. In the Complaint, the Claimant represents that the Franciscan Friars entity defendants employed the abusers.

37.      Federal pleading rules apply in assessing the validity of a proof of claim. *See In re Residential Cap. LLC*, 531 B.R. 1, 12 (Bankr. S.D.N.Y. 2015), *on reconsideration in part*, 537 B.R. 161 (Bankr. S.D.N.Y. 2015); *Doe v. Roman Cath. Diocese of Rockville Ctr. (In re Roman Cath. Diocese of Rockville Ctr.)*, 2024 U.S. Dist. LEXIS 124499, *3 (S.D.N.Y. July 15, 2024) ("The legal standard of review of the disallowance of claims at a sufficiency hearing is equivalent to the standard applied to a motion to dismiss for failure to state a claim under Rule

12(b)(6) of the Federal Rules of Civil Procedure.").  Judge Glenn found that this standard also applies to proofs of claim where the claimant's "arguments regarding the Debtor's liability are founded on the same allegations regarding control as" those that also filed complaints in state court and also depend on a control theory to succeed.  *In re Roman Cath. Diocese of Rockville Ctr., N.Y.*, 651 B.R. 399, 434 (Bankr. S.D.N.Y. 2023), *aff'd In re Roman Cath. Diocese of Rockville Ctr.*, 2024 U.S. Dist. LEXIS 124499.

38.     A claimant, thus, must assert allegations of plausible fact that make their claims rise above a speculative level.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that "[f]actual allegations must be enough to raise a right to relief above the speculative level.").  In order to be plausible, "the complaint's '[factual] allegations must be enough to raise a right to relief above the speculative level.'"  *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)  (quoting *Twombly*, 550 U.S. at 555, 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Similarly, a complaint is properly dismissed when, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.

39.     Here, it is alleged in POC 807 § 3.b., d. that "[Friar] Rutter was [Claimant's] freshman vocabulary teacher and sophomore theology teacher at St. Francis High School," and more generally that "[Friar] Rutter was a teacher at St. Francis High School."  Claimant makes no allegation that the Diocese had control over the hiring, retention and supervision of the

alleged abusers. There are no references to the Diocese anywhere in POC 807 other than the fact that the proof of claim was filed against the Diocese in this Case.

40. These allegations do not even set out "[t]hreadbare recitals of the elements of a cause of action" that still would not be sufficient to state a claim. *Iqbal*, 556 U.S. at 678. Because Claimant has not asserted allegations of plausible fact that "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, the claim should be disallowed as against the Diocese.

41. In *Rockville Centre*, 39 very similarly pled proofs of claim—including 22 that did not file a state court complaint—were objected to and dismissed on the basis that the claimants did not adequately allege that the diocese had an employment relationship or an agency relationship with the respective alleged abusers when the claimants merely made simple "conclusory recitals of the legal relationships that the claimants seek to establish." *In re Roman Cath. Diocese of Rockville Ctr., N.Y.*, 651 B.R. 399, 418 (Bankr. S.D.N.Y. 2023), *aff'd In re Roman Cath. Diocese of Rockville Ctr.*, 2024 U.S. Dist. LEXIS 124499. As described more fully below, one of these two relationships is necessary under New York law to establish the requisite degree of control exercised by the diocese over the alleged abusers and threadbare allegations of the possibility of control fails as a matter of law. *Id.* at 417-19.

42. Judge Glenn carefully considered and applied the federal dismissal standard and based on an analysis of the conclusory facts alleged in the complaints, granted the objections. *Id.* at 409, 417-19. Importantly, Judge Glenn noted that an allegation of "'control' itself is not actually an independent theory that allows a plaintiff to hold a defendant liable in tort for the actions of a third party" and thus is wholly insufficient to plead a claim arising out of an employment or agency relationship under New York state law. *Id.* at 410; *see also In re Roman*

*Cath. Diocese of Rockville Ctr.*, 2024 U.S. Dist. LEXIS 124499 at *5 (affirming bankruptcy court's dismissal of claims where claimants "offer[ed] no non-conclusory allegations to support a theory of liability based on the Debtor's relationships with either the alleged abusers or the religious institutions where the abuse occurred.").

43.     The claims against the Diocese of Rockville Centre were dismissed by Judge Glenn because there were no factual allegations to support the claimant's alleged legal labels of employment or agency and therefore no allegations of factual circumstances to support the diocese's alleged employment or agency relationships with the abusers or separate religious order. *Id.* at 416, 418-19.  Here, the proof of claim alleges no facts that bear upon any employment or agency relationship between the Diocese and Friar Rutter.

44.     Conversely, the Suchan Declaration delineates the legal distinctions among the Diocese, the Franciscan Friars and St. Francis High School, and establishes that the Diocese did not own, operate or control that private school, nor did it hire, direct, manage, supervise or control the clerics or employees of St. Francis High School.[26]  Government records submitted in support of this objection further confirm the Suchan Declaration.

45.     As set forth in Section B below, the Claimant does not have viable causes of action under New York law for an abuse claim against the Diocese.  Here, the Claimant does not plead plausible facts of a custodial or "control" relationship—neither employment nor agency— between the Diocese and Claimant or between the Diocese and Claimant's alleged abuser. Because POC 807 is unenforceable under appliable law, it should be disallowed pursuant to 11 U.S.C. § 502.

46.     POC 807 is also devoid of any allegation the Diocese had any knowledge of Friar

---

[26] *See* Suchan Declaration at ¶¶ 46-49.

Rutter's propensity to commit abuse prior to the alleged abuse suffered by Claimant.

47.     In *C.S. v. Archdiocese of N.Y.*, plaintiff's abuse claims against the Archdiocese were dismissed because the "Plaintiff has not submitted any evidence that would put Archdiocese on notice of any duty owed" where the alleged perpetrators were employed by the Franciscan Friars of the Atonement, a separate religious order from the Archdiocese, and the plaintiff failed to establish how the Archdiocese knew or should have known of the alleged perpetrators' propensities for child sexual abuse.  Index No. 951299/2021, 2022 N.Y. Misc. LEXIS 6640, at *2-4 (Sup. Ct. New York Cty. Nov. 2, 2022).  This Court is faced with the precise same situation here.

## B.     The Diocese did not owe Claimant a legal duty of care and because there is no such duty, it cannot be held liable for the alleged abuse

48.     To establish a prima facie case of negligence under New York law, "a plaintiff must prove (1) that the defendant owed her a duty; (2) that the defendant breached that duty; and (3) that she suffered injuries proximately resulting from that breach."  *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020) (quoting *Solomon ex rel. Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (2016)); *Becker v. Schwartz*, 46 N.Y.2d 401, 410 (1978) ("As in any cause of action founded upon negligence, a successful plaintiff must demonstrate the existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by the injured party.").

49.     Under New York law, for the Diocese to be liable for the torts of alleged abusers, the Diocese must have a duty to control them.  The duty to control arises only when "the relationship between the defendant and the person who threatens the harm to the third person . . . require[s] the defendant to attempt to control the other's conduct."  *Pulka v. Edelman*, 40 N.Y.2d 781, 783-84 (1976).  For instance, in an employment relationship or when the "relationship

between the defendant and the person exposed to harm . . . requires the defendant to afford protection from certain dangers including the conduct of others." *Id.* (citations omitted).

50.     It is well-established law that "[i]n the absence of duty, there is no breach and without a breach there is no liability." *Pulka*, 40 N.Y.2d at 782 (citation omitted); *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 96 N.Y.2d 280, 289 (2001) ("Absent a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm.  This restriction is necessary to avoid exposing defendants to unlimited liability to an indeterminate class of persons conceivably injured by any negligence in a defendant's act.").  "Duty is essentially a legal term by which we express our conclusion that there can be liability.  It tells us whether the risk to which one person exposes another is within the protection of the law.  In fixing the bounds of that duty, not only logic and science, but policy plays an important role." *De Angelis v. Lutheran Medical Ctr.*, 58 N.Y.2d 1053, 1055 (1983) (citation omitted).

51.     A "threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party." *Espinal v. Melville Snow Contractors*, 98 N.Y.2d 136, 138 (2002) (citations omitted).  Whether someone owes a duty of care to reasonably avoid injury to another is a question of law. *See Purdy v. Public Adm'r of County of Westchester*, 72 N.Y.2d 1, 8 (1988); *Palka v. Servicemaster Mgt. Servs. Corp.*, 83 N.Y.2d 589, 585 (1994) (holding that "the definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration.") (citations omitted).  "The question of duty is best expressed as 'whether the plaintiff's interests are entitled to legal protection against the defendant's conduct.'" *Pulka*, 40 N.Y.2d at 784 (citations omitted).  However, "a line must be drawn between the competing

Case 1-20-10322-CLB,    Doc 4312,    Filed 10/29/25,    Entered 10/29/25 13:07:34,
Description: Main Document  , Page 25 of 89

policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit." *De Angelis*, 58 N.Y.2d at 1055.

52.     It is well-settled in New York law that "[a] defendant generally has no duty to control the conduct of a third person so as to prevent them from harming others, even where as a practical matter defendant can exercise such control." *D'Amico v. Christie*, 71 N.Y.2d 76, 88 (1987) (citing *Pulka v. Edelman*, 40 N.Y.2d 781, 783 (1976)).  New York courts have identified a duty to control the conduct of another person when "there exist special circumstances in which there is sufficient authority and ability to control the conduct of third persons." *Purdy*, 72 N.Y.2d at 8.  The New York Court of Appeals has "imposed a duty to control the conduct of others where there is a special relationship:  a relationship between defendant and a third person whose actions expose plaintiff to harm such as would require the defendant to attempt to control the third person's conduct; or a relationship between the defendant and plaintiff requiring defendant to protect the plaintiff from the conduct of others." *Id.* (citations omitted).

53.     A party, like the Diocese here, cannot be held liable for tortious conduct by individuals outside of its control. *See Bautista v. Archdiocese of New York*, 164 A.D.3d 450, 451 (1st Dep't 2018) (no legal liability because defendant did not have "the authority to supervise or control" the individual); *Farrulla v. Happy Care Ambulette Inc.*, 125 A.D.3d 529, 530 (1st Dep't 2015) (defendant "did not cause plaintiff's alleged injuries and was not legally responsible for the person who did").

54.     In *Ark263 Doe v. Archdiocese of N.Y.*, the court dismissed a complaint that alleged abuse by an employee of a high school that was owned and operated by the Congregation of Christian Brothers—a religious organization separate and independent from the Archdiocese, similar to the Franciscan Friars.  2022 N.Y. Misc. LEXIS 3510, at *3-6 (July 18, 2022).  The

Archdiocese did not own the school property where the alleged abuser worked, nor did the Archdiocese "hire, retain, employ, oversee, or control the staff or employees" of the high school, including the alleged abusers. *Id.* at \*3-4. Based on the lack of ownership over the property, any direct relationship between the Archdiocese and the Congregation of Christian Brothers, and testimony evidencing the lack of operational control, including hiring and supervision, by the Archdiocese, the court dismissed the complaint. *Id.* at \*5-6.

55. Courts have repeatedly held, including in the context of claims asserted under the CVA, that where a diocese does not control the entity with which the alleged abuser is associated, the diocese is not responsible for that individual's alleged misconduct as a matter of law. *See, e.g.*, *Walker v. Archdiocese of New York*, 270 A.D.2d 127, 128 (1st Dep't 2000) (affirming the summary judgment dismissal of a personal injury action against the Archdiocese where affidavits established "the Archdiocese does not own, operate or exercise control over the school," nor did it own the "premises on which the defendant school is located" which was separately owned by the defendant church); *R.D. v. Archdiocese of New York et al.*, No. 519339/2020, 2021 WL 4307231 (Sup. Ct. Kings Cty. Sep. 22, 2021) (granting motion to dismiss the abuse claims against the Archdiocese where documentary evidence established (1) that "contrary to plaintiff's claims, [Archdiocese] did not oversee St. Agnes and St. Francis[, the two locations where the abuse alleged[ly] occurred], and had no custody, control, or supervision over either entity's residents or employees," (2) the premises of St. Agnes "has been owned by the Dominican Convent, not the Archdiocese," and (3) St. Francis was located in Brooklyn outside of the Archdiocese's geographic territory); *Springer v. Archdiocese of New York*, No. 950137/2019, 2021 WL 1054553, at \*1 (Sup. Ct. New York Cty. Mar. 18, 2021) (dismissing defendant Notre Dame School of Manhattan where school charters and "affidavits

demonstrate that the Notre Dame School and defendant Notre Dame School of Manhattan are completely separate entities" and thus the defendant did "not own, operate or exercise control over the Notre Dame Convent School/Notre Dame School").

56.     An essential element of a negligent hiring, retention, or supervision claim is there must be an employer-employee relationship, and no such relationship has been established in POC 807. In *SCVAWCR-Doe v. Archdiocese of New York*, a plaintiff alleged negligent hiring, retention and supervision of an alleged abuser who was employed by a third-party employer, not the Archdiocese, which proved fatal to the claim leading to its dismissal on summary judgment. 2024 N.Y. Misc. LEXIS 1549, at *24-25 (Sup. Ct. Westchester County Mar. 27, 2024) (granting summary judgment dismissing negligent supervision claim because an "essential element of an employer-employee relationship is lacking in this case;" the plaintiff "has not established how either the Archdiocese or St. Joseph's was liable for the alleged negligent supervision of [abuser] when he was employed by non-party [].")

57.     In *In re Roman Catholic Diocese of Rockville Center*, Judge Glenn found that under New York law it is critical that facts that are alleged go "to the degree of control exercised by the purported employer," with the predominant factor being "the extent of the employer's power to order and control the employee's performance at work." 651 B.R. 399, 410, *aff'd In re Roman Cath. Diocese of Rockville Ctr.*, 2024 U.S. Dist. LEXIS 124499 (quoting *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003); *Sokola v. Weinstein*, 187 N.Y.S.3d 493, 500 (Sup. Ct. N.Y. Cty. Feb. 7, 2023)) (internal quotations omitted). The claims against the diocese were dismissed because there were no "accompanying factual allegations that would support [the] legal labels of employment or agency," and therefore no "allegations that actually bear on the factual circumstances of the Debtor's alleged employment or agency relationships with the

abusers or Religious Institutions/Orders" that are "necessary to [] plead the causes of action asserted." *Id.* at 416, 418-19.

58.    Judge Glenn held the 22 claims that were only proofs of claim, and no state court complaint was filed must meet the same legal pleading standard as the complaints. *Id.* at 433-36. This decision was made because the definition of "Sexual Abuse Claim" on the proof of claim form defined "such claims as abuse 'under any theory of liability, including vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory based on any acts or failures to act by the Diocese or any other persons or entity for whose acts or failures to act the Diocese is or was allegedly responsible.'" *Id.* at 433.  Therefore, the court concluded that asserted claims consisted of a similar range of tort claims as those asserted by the complaint claimants, the arguments regarding the diocese's liability are "founded on the same allegations regarding control as the Complaint Claimants," and so "they will be subject to the same legal standards and caselaw discussed for the Complaint Claims." *Id.* at 434.

59.    Here, Friar Rutter is alleged by the Claimant to have been employed by St. Francis High School, a wholly separate and independent entity from the Diocese, resulting in no employer-employee relationship with the Diocese.  The mere conclusory assertions of a legal employment relationship without accompanying factual allegations to support such legal label does not meet the federal pleading standards for the negligence claims.  Here, there is not even a conclusory allegation.

60.    An organization ***may, accordingly, be held liable*** for a person's sexual misconduct ***only when*** the alleged perpetrator's conduct is connected to the organization.  *See Sheila C. v. Povich*, 11 A.D.3d 120, 129 (1st Dep't 2004) (defendant could not be held liable for sexual assault that occurred after she "had left defendants' physical custody and control"); *K.I. v.*

*New York Cty. Bd. of Educ.*, 256 A.D.2d 189, 192 (1st Dep't 1998) (the school was not responsible for sexual assault which "was severed by time, distance and [the perpetrator's] intervening independent actions").

61.     Similarly, under New York law, custody or control over a student is required to establish a duty of the Diocese to supervise or "afford [Claimant] protection from certain dangers including conduct of others." *Pulka*, 40 N.Y.2d at 783; *see also Pratt v. Robinson*, 39 N.Y.2d 554, 560 (1976) ("The school's duty is thus coextensive with and concomitant to its physical custody and control over the child.  When the custody ceases because the child has passed out of the orbit of its authority . . . the school's custodial duty also ceases.") (citations omitted).  The Diocese never controlled, owned or operated St. Francis High School, that was the responsibility of the Franciscan Friars and the administration of the school employed by and members of the Franciscan Friars;[27] at no time did the Diocese maintain any custody or control over Claimant while they were a student at St. Francis High School.

62.     Judge Glenn also considered arguments by the claimants that Canon Law gave the diocese control over the respective alleged abusers with the most specific assertion being that: "Everyone who works in a diocese including pastors, assistant pastors, and anyone holding any other position, is appointed by the bishop.  This includes members of religious institutions who hold positions in the government of the diocese." *In re Roman Catholic Diocese of Rockville Ctr.*, 654 B.R. at 422-23, *aff'd In re Roman Cath. Diocese of Rockville Ctr.*, 2024 U.S. Dist. LEXIS 124499.  The court also considered "the more generalized allegations of the Debtor's control over personnel within its territory" and the argument that the diocese has control over the separate religious institutions or orders that perform works of ministry within the diocese's

---

[27] *See* Suchan Declaration, ¶¶ 46-49.

territory. *Id.* at 423, 428. First, Judge Glenn found that Canon Law may be considered "to assess the allegations in the complaint," but "if claimants cannot prove the existence of [an employment or agency relationship] based on underlying secular facts pertaining to employment and agency, the Court considers that ***they will not be able to rely exclusively on Canon Law*** to prove their claims." *Id.* at 422-23, 426 (emphasis added).

63. The allegations relating to Canon Law led the court to conclude that "inherent in the allegations that the Debtor ***may*** hire and appoint ***some*** personnel to other Catholic entities within the diocesan territory, is the recognition that the Debtor does not hire and appoint ***all personnel*** at every entity within diocesan territory." *Id.* at 423 (emphasis in original). The court found it "plausible that the Debtor has the general authority to staff certain of its own employees at Religious Institutions or even appoint clergy members to work for the Religious Institutions/Orders," but was "troubled by the lack of non-conclusory allegations stating that is actually what occurred for the abusers at issue." *Id.* at 425. Similarly, the allegations could not establish that "the Religious Institutions and Orders were acting on behalf of the Debtor, or subject to their control, when they hire or supervise their own employees. *Id.* at 427.

64. Under straightforward principles of New York law, POC 807 is not properly asserted against the Diocese and should be disallowed. Claimant has not alleged any facts, conclusory or otherwise, giving rise to a legal duty of the Diocese. *See* POC 807. In addition, as detailed in the Suchan Declaration, the evidence demonstrates that the Diocese had no authority to control the actions of Friar Rutter, a member of the Franciscan Friars who was an employee of St. Francis High School.[28]

65. Friar Rutter was a cleric or employee of the Diocese.[29] The Franciscan Friars is

---

[28] *See* Suchan Declaration, ¶¶ 47, 49.

[29] *Id.*, ¶ 49.

an independent religious order that was and is separate from the Diocese.[30]  The Diocese did not

have supervisory authority over the Franciscan Friars at St. Francis High School, nor did it pay

their salaries or benefits.[31]  St. Francis High School is a separately incorporated entity.[32]  At all

relevant times, St. Francis High School was owned, controlled and operated by the Franciscan

Friars, not by the Diocese.[33]  The Diocese did not play any role in assigning or appointing Friar

Rutter at St. Francis High School.[34]  The Diocese did not, and does not, own property where St.

Francis High School was located and at no time has it employed, supervised or trained the

faculty, staff or any other employees of St. Francis High School, including Friar Rutter.[35]

66.     Based upon the foregoing, the Diocese did not owe Claimant a legal duty of care

and because there is no such duty, it cannot be held liable for the alleged abuse.  Accordingly,

the Insurers respectfully request that the Court enter an order disallowing and expunging POC

807.

## C.     Claimant is not entitled to discovery before the Court determines whether they have adequately stated a claim against the Diocese

67.     As explained by Judge Glenn when deciding this precise issue, the U.S. Supreme

Court ruled that 'Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with

nothing more than conclusions.'"  *In re Roman Cath. Diocese of Rockville Ctr.*, 2023 WL

6284596, at *8 (Bankr. S.D.N.Y. Sep. 26, 2023) (citing *Iqbal*, 556 U.S. 662, 678).  The Claimant

must be able to allege sufficient facts such that their claims move from conceivable to plausible,

---

[30] *Id.*, ¶ 46.
[31] *Id.*, ¶ 49.
[32] *Id.*, ¶ 46.
[33] *Id.*, ¶ 47.
[34] *Id.*, ¶ 49.
[35] *Id.*, ¶¶ 46-49.

otherwise they must be dismissed as a matter of law. *See id.* (citing *Twombly*, 550 U.S. 544, 570). Only after this Court determines whether the POC 807 has adequately stated a claim against the Diocese is discovery appropriate.

**D.     POC 807 must be dismissed under the doctrine of Judicial Estoppel**

68.     The Claimant must be judicially estopped from advancing claims against the Diocese in POC 807 because they have made inconsistent and contradictory statements in the Complaint which does not make any allegations against the Diocese whatsoever. Judicial estoppel is an equitable doctrine that generally "prevents a party from 'asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding.'" *Negron v. Weiss*, 2006 WL 2792769, at *3 (E.D.N.Y. Sept. 27, 2006) (quoting *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir. 1993)). This rule is designed to protect the "integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001).

69.     In this case, the Claimant expressly alleges in the Complaint that Friar Rutter was employed as a priest and/or teacher at St. Francis High School which was operated, controlled, and/or supervised by the Franciscan Friars at all material times. Complaint at ¶¶ 12, 22. There is no factual allegation of any employment or agency relationship between Friar Rutter and the Diocese anywhere in the Complaint. Then the Claimant files POC 807 against the Diocese, which, if the Claimant is alleging the Diocese employed Friar Rutter at St. Francis High School, directly contradicts the factual allegations in the Complaint. POC 807 currently reiterates the statements made in the Complaint, that Friar Rutter was employed as a teacher at St. Francis High School and the school was operated by the Franciscan Friars. POC 807, Attachment, Part 3.d. To make new allegations against the Diocese would allege directly contradictory facts that

only serve to manipulate the tools of the judicial system and must be judicially estopped.

70.     Judge Grisanti, presiding over the Claimant's state court CVA action, entered and order granting the Franciscan Friars' and St. Francis High School's motion from summary judgment and dismissing the CVA action in its entirety on June 4, 2024.  *See* Summary Judgment Order, *Anonymous O.G. v. St. Francis High School, et al.*, Index No. 806334/2021, Doc. No. 54 (Sup. Ct. Erie Cty. June 4, 2024) ("Summary Judgment Order"), attached hereto as **Appendix 3**.  In doing so, the judge acknowledged and accepted as fact the employee-employer relationship between Friar Rutter and St. Francis High School and the Franciscan Friars. However, he found that there is no evidence that St. Francis High School or the Franciscan Friars had any notice of Friar Rutter's propensity for sexual abuse prior to the alleged abuse; finding that the evidence shows they were only first made aware of such propensity in 1998, nearly 20 years after the abuse took place.  *See* Summary Judgment Order, at 14, 17-20.  The Claimant cannot now abuse the legal system by seeking a second opportunity to litigate these issues through the Diocese's bankruptcy with POC 807.

**E.     Insurers have standing to object under Section 502(a)**

71.     The alleged abuse asserted in POC 807 implicates or may implicate the time period from July 1, 1978, through July 1, 1979, addressed by U.S. Fire Insurance Company Policy No. 523 017914 4.[36]  Thus, U.S. Fire and PEIC have associated into the defense of the underlying claims, are paying the cost of associated defense counsel,[37] are parties to the

---

[36] *See* Declaration of Attorney James R. Murray, *The Diocese of Buffalo, N.Y. v. JMH 100 Doe, et al.*, Adv. Proc. 20-01016-CLB, Doc. No. 290 (Bankr. W.D.N.Y. Oct. 23, 2023), ¶ 10, Exh. A (stating that "from July 1, 1978 to July 1, 1979, the Diocese purchased excess coverage from U.S. Fire Insurance Company" and listed policy number 523 017914 4 on the coverage chart attached as Exhibit A for that time period).

[37] Haberkorn Decl., ¶ 3 (describing the letter the Insurers sent on August 18, 2025, to Mr. Obis as the authorized representative of the Diocese notifying the Diocese that the Insurers "exercise their right to associate in the defense of the Lawsuits" for which the stay was lifted and implicate the Insurers' excess

adversary proceeding filed against them by the Diocese and the monetary demands associated with it[38] and are parties to the Mediation Order.[39]

### *Insurers are "Parties in Interest" to this Bankruptcy Case*

72.     As insurers with a "***potential*** financial stake in the outcome of the claim, the Insurers are parties in interest withstanding to object to proofs of claim. *In re Black, Davis & Shue Agency, Inc.,*460 B.R. 407, 414-15 (Bankr. M.D. Pa. 2011) (quoting *Adair v. Sherman*, 230 F.3d 890, 894 n. 3 (7th Cir. 2000)) (emphasis added); *see also Truck Ins. Exch. v. Kaiser Gypsum Co., Inc*., 602 U.S. 268, 282 (2024) (an insurer is a party in interest when they have a risk of "***potential*** financial harm—attributable to [their] status as an insurer with financial responsibility for bankruptcy claims") (emphasis added); *In re Standard Insulations, Inc.*, 138 B.R. 947, 950 (Bankr. W.D. Mo. 1992) ("The insurers are parties in interest under 11 U.S.C. §§ 1109(b) and 502(a), and have standing to object to claims against the estate."); *see also In re Heating Oil Partners*, 2009 U.S. Dist. LEXIS 117871, at *17 (D. Conn. Dec. 17, 2009) ("Where the debtor's insurance was . . . the true asset sought by personal injury claimants against the debtor, the insurers were parties in interest with standing to object to claims against the estate.").

73.     As entities that have already incurred costs associated with POC 807 and may be asked to pay the claim alleged in POC 807, U.S. Fire and PEIC are parties in interest with a right

---

policy periods).

[38] *See* Complaint, *All Saints Roman Catholic Church Society of Buffalo, et al. v. 21st Century Premier Insurance Company, et al.*, Adv. Proc. No. 20-10322 CLB, Doc. No. 1, at ¶¶ 358, 398, 404 (Bankr. W.D.N.Y. Jan. 19, 2021) (naming U.S. Fire Insurance Company in the coverage adversary proceeding seeking both a declaratory judgment that the Insurers are obligated to indemnify the Parishes and/or the Diocese for all sums the Parishes and/or Diocese become obligated to pay through judgment, settlement, or otherwise as well as damages for costs to pay settlements and/or judgments in the Underlying Actions and Claims).

[39]  *See* Order, at 3 [Dkt. No. 1568] (mandating participation in the mediation for all insurer defendants listed on Exhibit A attached thereto, including but not limited to U.S. Fire); see also Decision & Order, at 7 [Dkt. No. 3501] (mandating participation by all parties in all mediation sessions for the latest round of mediation efforts).

to object.  *See Truck Ins. Exch.*, 602 U.S. 268.

74.    U.S. Fire and PEIC face financial harm even when maintaining coverage defenses, as reorganization efforts can affect insurers in "myriad ways."  "For example, a plan that purports to maintain an insurer's coverage defenses could nonetheless allow claims at amounts far above their actual value," expose insurers to the payment of fraudulent claims or impair insurers' rights to control settlement and defense.  *Id.* at 281 ("A reorganization plan can impair an insurer's contractual right to control settlement or defend claims.  A plan can abrogate an insurer's rights to contribute from other insurance carriers.  Or, as alleged here, a plan may be collusive, in violation of the debtor's duty to cooperate, assist, and impair the insurer's financial interests by inviting fraudulent claims.  The list goes on.").

75.    The term "party in interest" is not defined more narrowly for purposes of a claim objection than in the context of a plan objection, because potential financial exposure is sufficient to have a legally protected interest in the resolution of a claim.  In *In re Black, Davis & Shue Agency, Inc.*, the court held that an insurer with even just a "potential financial stake in the outcome" of the claim is a party in interest withstanding to object to proofs of claim.  The Court reasoned that:

> There is no reason to define 'party in interest' standing more narrowly in the context of an objection to a claim than in the context of a plan objection.  Parties in interest for the purpose of claims objections 'include not only the debtor, but anyone who has a legally protected interest that could be affected by the bankruptcy proceeding.'

*In re Black, Davis & Shue Agency, Inc.*,460 B.R. 407, 414-15 (Bankr. M.D. Pa. 2011) (quoting *Adair v. Sherman*, 230 F.3d 890, 894 n. 3 (7th Cir. 2000)) (holding that an insurer with a "potential financial stake in the outcome" of the claim is a party in interest withstanding to object to proofs of claim).

Case 1-20-10322-CLB,   Doc 4312,   Filed 10/29/25,   Entered 10/29/25 13:07:34,
Description: Main Document  , Page 36 of 89

76.     Because of the settlement between the Diocese and the Committee, neither the

Diocese nor the Committee have any incentive to oppose this Claim, leaving the Insurers as the

*only* entities with an incentive to object to this Claim.[40]  *See Truck Ins. Exch.*, 602 U.S. at 282

(the court found that "neither the Debtors nor the Claimants have an incentive to limit the post

confirmation cost of defending or paying claims," "the Plan eliminates all of [the Debtors']

ongoing liability," and "Claimants similarly have little incentive to propose barriers to their

ability to recover from Truck," leaving the insurer as "*the only entity* with an incentive to

identify problems with the Plan") (emphasis added).

### *Denial of Standing on an Issue on Which the Court has an Independent Duty to Act will Needlessly Force an Appeal*

77.     Judge Littlefield's recent decision in *In re The Diocese of Albany, New York*, Case

No. 23-10244, Dkt. No. 2168 (Bankr. N.D.N.Y. Sept. 3, 2025) is based on different facts.  Here,

the Diocese has abandoned the prosecution of proofs of claims it has admitted are legally

meritless leaving U.S. Fire and PEIC as the only parties in interest with any economic interest in

objecting.  Judge Littlefield's holding "that [an] obligation is not real until either the Insurers

concede liability or are otherwise adjudicated to be responsible" is also wrong as it is at odds

with the Supreme Court's holding that it is enough for purposes of standing that an insurer

merely could be at risk of "potential financial harm."  *Truck Ins. Exch.*, 602 U.S. at 282.

78.     As Judge Kinsella found in the *Diocese of Syracuse* bankruptcy, "liability does

not need to be acknowledged or adjudicated before the teachings of *Truck* apply," particularly

---

[40]  *See* Co-Mediators First Report [Dkt. No. 3814], at ¶ 7 ("The settlement in principle also provides, among other terms, the withdrawal of pending claim objections . . . ."); Haberkorn Decl., Exh. 11 (June 4 Hearing Transcript at 5:3-20 (in responding to the Court's question about why the Diocese is seeking to withdraw motions to disallow claims by persons who possibly should not be treated as creditors in the case, counsel for the Diocese stated the purpose of withdrawing their objections is because of the announced settlement and the parties are focused on mediation and resolving a Plan and don't want to spend money pursuing these claim objections)).

when the diocese is "attempting to assign its interest in insurance claims and recoveries against the Certain Insurers to the Trust." *In re Roman Catholic Diocese of Syracuse*, 665 B.R. 866, 866 and 875 (Bankr. N.D.N.Y. 2024). The Diocese and Committee will propose a plan that assigns the insurance rights to a trust, which will threaten to impact the Insurers' rights, just as was proposed in *In re Roman Catholic Diocese of Syracuse*.

79.      In *Prime Capital Ventures*, the Court found, on similar facts as here, that an officer of a company had standing as a party in interest pursuant to Section 1109(b) ***based on potential, contingent liability as a codebtor who had not admitted liability***, and no final determination of his personal responsibility had been made. *In re Prime Capital Ventures, LLC*, 2025 WL 73066 (Bankr. N.D.N.Y. Jan. 10, 2025) (emphasis added). The Court found that the mere possibility that creditor payments "may reduce a future liability of [the officer] in his individual capacity" was sufficient. *Id.* at *5. The Insurers face potential contractual liability for covered claims under certain insurance policies that they subscribed, hence, applying the analysis of *Prime Capital Ventures*, the Insurers have standing to object to abuse claims.

80.      An insurer's legally protected interest may be in the defense of a claim or in "a potential financial stake in the outcome" of the claim. *Id.* This is exactly the case here. Insurers have a legally protectable interest in not being sued to pay legally insufficient claims. Because U.S. Fire and PEIC are "parties in interest" under 11 U.S.C. § 1109(b), they have the right to "raise and . . . appear and be heard on any issue" in this proceeding including a right to object to any claims implicating such interest. 11 U.S.C. § 1109(b); *see also Truck Ins. Exch.*, 602 U.S. at 269 (observing that the rights of a party in interest are broadly construed).

### *Motion for Stay Pending Appeal if Standing is Denied*

81.      If the Court concludes that the Insurers are not parties in interest, Insurers hereby request a stay of such order pending appeal to the district court pursuant to Bankruptcy Rule

8007.

82.     Bankruptcy Rule 8007 provides that "[o]rdinarily, a party must move first in the bankruptcy court for . . . a stay of a judgment, order, or decree of the bankruptcy court pending appeal." Fed. R. Bankr. P. 8007(a)(1)(A).  But the motion also "may be made in the court where the appeal is pending," as long as it is accompanied by a statement that a similar motion was made in the bankruptcy court and "either state[s] that the court has not yet ruled on the motion, or state[s] that the court has ruled and set out any reasons given for the ruling." Fed. R. Bankr. P. 8007(b).

83.     The four factors to be considered for whether to issue a stay pending appeal are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007).  All of these factors favor the issuance of a stay to resolve the question of whether Insurers are parties in interest in this Case.  It is well-established that the first two factors "are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

84.     *First*, a likelihood of success on the merits does not requires a party to show that there is "more than a mere possibility" it will prevail.  *In re Actos Antitrust Litig.*, 2020 WL 8996696, at *2 (S.D.N.Y. Mar. 9, 2020).  The Insurers easily satisfy this standard because it is, at a minimum, plausible that as an insurer with a potential financial obligation to the debtor each Insurer is a party in interest.  *See, e.g., In re Megan-Racine Assocs., Inc.*, 1996 WL 167681, at *11 (N.D.N.Y. Apr. 1, 1996) (granting motion to stay pending appeal to resolve "very difficult question of statutory interpretation").  This ruling would be consistent with the recent decision in *In re Prime Capital Ventures, LLC.  See* 2025 WL 73066 at *4-5 (Bankr. N.D.N.Y. Jan. 10,

2025).

85.     *Second*, a party will suffer irreparable harm if a stay is denied where, as here, it will result in the loss of appellate rights.  *See In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) (the loss of appellate rights is the "quintessential form of prejudice").  Not only is a stay necessary to allow Century to validify its rights on appeal, but if this bankruptcy proceeding moves forward without a review of whether Century is a party in interest its due process rights will be violated because it will be denied the chance to challenge the validity of proof of claim CC048—a claim that may result in Century owing a financial obligation to the debtor.

86.     *Third*, although other parties may assert the "possibility of irreparable harm" if a stay is entered the "near certainty of irreparable harm" to Century if a stay is not entered clearly outweighs this concern.  *See In re Megan-Racine Assocs., Inc.*, 1996 WL 167681 at *6.

87.     *Finally*, the public interest also weighs strongly in favor of a stay because it "strongly favors the correct application of the Bankruptcy Code, especially where property rights are at stake."  *In re Revel AC, Inc.*, 802 F.3d 558, 573 (3d Cir. 2015) (reversing district court's denial of stay).  Neither the Second Circuit nor any district court in this Circuit has ruled on the question of whether under *Truck Insurance* an insurer that has a potential financial obligation under an insurance policy is a party in interest.  There is a strong public interest in resolving this question which has arisen in the *Diocese of Albany, Diocese of Syracuse,* and *Diocese of Buffalo* cases (among others), and will continue to arise again in the future.

## NOTICE AND PROCEDURE

88.     U.S. Fire and PEIC will provide notice to: (i) the Claimant who submitted Proof of Claim No. 807; (ii) the Office of the United States Trustee; (iii) counsel for the Official Committee of Unsecured Creditors; (iv) counsel for the Diocese, and (v) any other parties

requesting notice in this proceeding.

89.     No prior request for the relief sought herein has been made to this Court or any

other court.[41][42]

**WHEREFORE,** based upon the foregoing, the Insurers respectfully request that the

Court issue an Order, substantially in the form attached hereto as **Exhibit A**: (i) disallowing and

expunging Proof of Claim No. 807 in its entirety; and (ii) awarding such other and further relief

as the Court deems just and proper.

---

[41]  U.S. Fire and PEIC reserve the right to supplement this Objection and to object to POC 807 on any other grounds not stated herein.  In addition, the Insurers reserve their rights to object to any and all other claims filed in this Chapter 11 Case.

[42]  This filing does not constitute a waiver of the Moving Insurers right to have any and all final orders in any and all non-core matters entered only after *de novo* review by a Federal district court (or, as applicable, appellate court) and/or the Moving Insurers' right to trial by jury in any proceeding as to any and all matters so triable, whether or not the same be designated legal or private rights, or in any case or controversy or proceeding related thereto, and whether such jury trial is pursuant to statute or the United States Constitution.

Dated:  September 30, 2025          Respectfully submitted,

By: */s/ Adam Haberkorn*       

**O'MELVENY & MYERS LLP**
TANCRED V. SCHIAVONI
ADAM P. HABERKORN
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone:    (212) 326-2000
Email: tschiavoni@omm.com
      ahaberkorn@omm.com

*-and-*

**CLYDE & CO US LLP**
MARIANNE G. MAY
340 Mt. Kemble Ave., Suite 300
Morristown, NJ 07340
Telephone:    (973) 210-6700
Email:  marianne.may@clydeco.us

*Attorneys for U.S. Fire Insurance Company and Pacific Employers Insurance Company*

# **EXHIBIT A**

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| THE DIOCESE OF BUFFALO, NY, | ) |
|  | ) |
| Debtor. | ) |
|  | ) |
|  | ) |

Case No. 20-10322 (CLB)

Chapter 11

## [PROPOSED] ORDER DISALLOWING AND EXPUNGING
## SEXUAL ABUSE PROOF OF CLAIM NO. 807

Upon the objection (the "Objection") filed by for U.S. Fire Insurance Company and

Pacific Employers Insurance Company (collectively "Insurers") seeking entry of an order (this

"Order") disallowing and expunging Sexual Abuse Proof of Claim No. 807 in its entirety; and

the Court having found that: (i) it has jurisdiction over the matters raised in the Objection

pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2); and (iii) the relief requested in the Objection is in the best interest of the estate of

the Diocese of Buffalo, its creditors and other parties in interest; and the Court having found that

the Insurers provided appropriate notice of the Objection and the opportunity for a hearing on the

Objection under the circumstances; and upon the record and after due deliberation,

**IT IS HEREBY ORDERED THAT**:

1.      The Objection is GRANTED, as set forth herein.

2.      Sexual Abuse Proof of Claim No. 807 is hereby disallowed and expunged in its

entirety.

3.      Nothing in this Order shall be deemed a waiver or release of the Insurers' right to

otherwise object to Sexual Abuse Proof of Claim No. 807 on any other grounds not set forth in

the Objection.

4.      Nothing in this Order shall be deemed to in any way impair or limit the Insurers'

Case 1-20-10322-CLB,    Doc 4312,    Filed 10/29/25,    Entered 10/29/25 13:07:34,
Description: Main Document  , Page 44 of 89

right to object to any other claim in this Chapter 11 Case.

      5.     This Order is immediately effective and enforceable.

      6.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.


Dated: _____
      Buffalo, New York


                                       _____
                                       Hon. Carl L. Bucki
                                       United States Bankruptcy Judge

# APPENDIX 1

STATE OF NEW YORK

SUPREME COURT     COUNTY OF ERIE

----------------------------------------------------------X

ANONYMOUS O.G.,

                       *Plaintiff,*         Index No. _____

    v.

                                     **VERIFIED COMPLAINT**

ST. FRANCIS HIGH SCHOOL andORDER OF
FRIARS MINOR CONVENTUAL, ST.
ANTHONY OF PADUA PROVINCE, U.S.A.,
INC., a Maryland corporation,

                       *Defendants.*

----------------------------------------------------------X

Plaintiff, O.G., by and through undersigned counsel, brings this action against Defendants

St. Francis High School and Order of Friars Minor Conventual, St. Anthony of Padua Province,

U.S.A., Inc. (hereinafter "Franciscan Friars"), and alleges, upon information and belief, as follows:

## JURISDICTION AND VENUE

1.      This Complaint arises from the grooming and sexual assaults of Plaintiff by Father

Luke Rutter (hereinafter "Fr. Rutter") when he was a child beginning in the fall of approximately

1978 through the spring of approximately 1980.

2.      This Court has personal jurisdiction over Defendant St. Francis High School

pursuant to CPLR §§ 301 and 302 because Defendant resides in the State of New York and

committed tortious acts within the State.

3.      This Court has personal jurisdiction over Defendant Franciscan Friars pursuant to

CPLR §§ 301 and 302 because Defendant regularly conducts business in the State of New York

and committed tortious acts within the State.

4.      Jurisdiction is proper because this Complaint seeks monetary damages in excess of

1

$25,000.00, exclusive of interest, costs, and attorney's fees.

5.      Venue is proper in this Court pursuant to CPLR § 503 because the events and omissions giving rise to this Complaint occurred in Erie County, and Defendant St. Francis High School has its principal place of business in Erie County.

6.      The provisions of CPLR § 1602 do not apply to the within action including nondelegable duty and/or the doctrine of *respondeat superior*.

7.      Plaintiff brings this suit within the extended time period as provided for in CPLR §§ 208 and 214-g.

## PARTIES

8.      Plaintiff realleges and incorporates all previous paragraphs as if set forth fully herein.

9.      Plaintiff is an adult resident of the State of New York, residing in Hamburg, New York, and is otherwise *sui juris*. Given the nature of the allegations, Plaintiff has elected to proceed using the pseudonym Anonymous O.G. in this matter. Anonymous O.G.'s identity has been or soon will be made know to Defendants under separate cover.

10.     Defendant St. Francis High School is a Roman Catholic college-preparatory school founded and administered by Defendant Franciscan Friars, and it is located at 4129 Lake Shore Road, Hamburg, New York, 14075.

11.     Defendant Franciscan Friars is a Catholic religious order and a corporation conducting business in the State of New York with its principal place of business at 12300 Folly Quarter Road, Ellicott City, Maryland 21042-1419. Defendant Franciscan Friars' resident agent is Michael Kolodziej at 12300 Folly Quarter Road, Ellicott City, Maryland 21042-1419.

12.     At all times material, Defendant St. Francis High School was operated, controlled,

2

Case 1-20-10322-CLB,  Doc 4312,  Filed 10/29/25,  Entered 10/29/25 13:07:34,
Description: Main Document , Page 48 of 89
2 of 16

and/or supervised by Defendant Franciscan Friars.

## STATEMENT OF FACTS

13.     Plaintiff realleges and incorporates the previous paragraphs as if set forth fully herein.

14.     In the fall of approximately 1978, Plaintiff was a ninth grade student at Defendant St. Francis High School.

15.     Fr. Rutter was Plaintiff's vocabulary teacher during his ninth grade year, which Plaintiff attended about twice a week.

16.     Fr. Rutter groomed Plaintiff very early on in the school year of 1978 by paying close attention to Plaintiff and calling Plaintiff "professor" and "fun loving professor."

17.     As the school year went on, Fr. Rutter's grooming escalated, and he began to frequently rub Plaintiff's back and shoulders.

18.     Toward the end of Plaintiff's ninth grade year in approximately April or May of 1979, Fr. Rutter regularly rubbed his back and moved his hand toward Plaintiff's waist.

19.     On several occasions in approximately April or May of 1979, Fr. Rutter reached around to the front side of Plaintiff's body and fondled and groped Plaintiff's genitals.

20.     Plaintiff recalls the fondling of the genitals occurring in what he refers to as the "main building" of the choool as well as in "Justin Hall".

21.     Fr. Rutter was a religious order priest of Defendant Franciscan Friars.

22.     At all times material, Fr. Rutter was employed as a priest and/or teacher at Defendant St. Francis High School.

23.     Fr. Rutter died in approximately 2000.

24.     The problem of clergy sexual abuse of minors is well documented throughout the

history of the Roman Catholic Church. As far back as 1051, St. Peter Damian wrote in the *Book of Gomorrah* that clergy who defiled boys should be dismissed from holy orders. (*Book of Gomorrah*, Ch. 6) Later, St. Peter Damian wrote in his *Rule of the Monastery of Compludo* about the punishment for "A cleric or monk who seduces youths or young boys" being public flogging, loss of tonsure and six months in jail, among other punishment. In 1143 or 1144, a professor at the University of Bologna named Gratian, known the "Father of the Science of Canon Law," in his work the *Decretum,* identified the sexual sin by a priest that he called *stuprum pueri*, which is the sexual use of boys by an adult male.

25.     In 1961, the Vatican issued an instruction on the training of candidates for the priesthood, based upon the 1917 Code of Canon Law, stating:

> Advancement to religious vows and ordination should be barred to those who are afflicted with evil tendencies to homosexuality or pederasty, since for them the common life and priestly ministry would constitute serious dangers.

26.     The Catholic Church's knowledge that Catholic clergy were sexually abusing minors continued through the Middle Ages and into recent history. In 1962, Pope John XXIII approved the publication *De Modo Procedendi in Causis Solicitationis*, a special procedural law addressing solicitations of sex in the confessional. This document contained instructions prohibiting clergy from having sex with minors under the age of sixteen. This document was distributed to every bishop and major religious superior in the world. It was to be kept by them with the deepest secrecy. This document reflected the Catholic Church's insistence on maintaining the highest degree of secrecy regarding the worst sexual crimes perpetrated by clergy.

27.     In 1947, a priest named Fr. Gerald Fitzgerald founded a religious order for priests called the Servants of the Paracletes. This religious order was founded to assist and treat Catholic clergy who experienced mental health problems. By 1952, Fr. Fitzgerald wrote that he had already treated handful of priests who had sexually abused minors. By 1963, the Paracletes were treating

4

Case 1-20-10322-CLB,   Doc 4312,   Filed 10/29/25,   Entered 10/29/25 13:07:34,
Description: Main Document , Page 50 of 89
4 of 16

so many sexually abusive clergy that they developed a shorthand code, "Code 3," to describe the offense. By 1966, the Paracletes began specializing in treatment of pedophile Catholic clergy.

28.     As early as 1971, the issue of sexual misconduct by clergy was being discussed in the Commonwealth of Massachusetts. Bishop Bernard Flanagan, Bishop of Worchester (Massachusetts) testified that, as early as February of 1971, there had been discussions about sexual misconduct among priests. According to Bishop Flanagan, "I think by 1971 I had heard of other cases of this type [sic] sexual misconduct and I knew that they were taking place in other dioceses too."

29.     That same year, Dr. Conrad Baars and Dr. Anna Terruwe presented a scholarly paper titled "The Role of the Church in the Causation, Treatment and Prevention of the Crisis in the Priesthood" to the 1971 Synod of Bishops at the Vatican and to the U.S. Conference of Catholic Bishops about psychiatric problems in Catholic clergy and how psychosexual immaturity manifested itself in heterosexual and homosexual activity.

30.     In 1985, the public prosecution of a priest in Lafayette, Louisiana led to the creation of the 100-page document titled "The Problem of Sexual Molestation by Roman Catholic Clergy: Meeting the Problem in a Comprehensive and Responsible Manner" by Fr. Thomas Doyle, F. Ray Mouton and Fr./Dr. Michael Peterson. This document was distributed to every Catholic Bishop and religious order ordinary in the United States. A substantial portion of this document describes how significant the sexual abuse of children by Catholic clergy had become.

31.     In 1990, psychologist and priest A.W. Richard Sipe published a study involving 1,500 priests that concluded that six (6) percent of priests were sexually involved with minors.

32.     As a direct result of Fr. Rutter's sexual abuse of Plaintiff, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress,

5

Case 1-20-10322-CLB,  Doc 4312,  Filed 10/29/25,  Entered 10/29/25 13:07:34,
Description: Main Document , Page 51 of 89
5 of 16

physical manifestations of emotional distress, embarrassment, depression, anxiety, Post Traumatic

Stress Disorder (PTSD), trust issues, self-blaming, isolation, relationship and intimacy issues, sex

addiction, problems with sexual identity, unfulfilled life, feelings of anger, feelings of weakness,

feelings of being powerless, problems with authority, drug abuse, alcohol abuse, faith and religious

problems, humiliation and psychological injuries, was prevented and will continue to be prevented

from performing his normal daily activities and obtaining the full enjoyment of life, has incurred

and will continue to incur expenses for medical and psychological treatment, therapy, and

counseling, all to Plaintiff's damage in excess of the jurisdiction of all lower courts.

## FIRST CAUSE OF ACTION
### NEGLIGENCE

33.     Plaintiff realleges and incorporates all previous paragraphs as if set forth fully

herein.

34.     Plaintiff had great admiration, trust, reverence, and respect for Defendants and their

agents.

35.     Defendants held Fr. Rutter out as a qualified Roman Catholic priest and/or teacher

and undertook the spiritual and emotional guidance and education of Plaintiff during a very

vulnerable time in Plaintiff's life.

36.     Defendants and their agents exercised a direct role over Plaintiff. Accordingly,

Plaintiff placed trust in Defendants so that Defendants and their agents gained superiority and

influence over Plaintiff. Defendants entered into a special relationship with Plaintiff and his family

37.     By holding Fr. Rutter out as safe to work with children, and by undertaking the

custody, supervision of and/or care of the minor Plaintiff, Defendants entered into a special

relationship with the minor Plaintiff. Because Plaintiff was a minor, and because Defendants

undertook the care and guidance of the then vulnerable Plaintiff, Defendants held a position of

6

Case 1-20-10322-CLB,   Doc 4312,   Filed 10/29/25,   Entered 10/29/25 13:07:34,
Description: Main Document , Page 52 of 89
6 of 16

empowerment over Plaintiff.

38.    Defendants, by holding themselves out as able to provide a safe environment for children, solicited and/or accepted this position of empowerment. This empowerment prevented Plaintiff from effectively protecting himself. Defendants thus entered into a special relationship with Plaintiff.

39.    By holding themselves out as safe, moral, and trusted institutions to Plaintiff's parents, Defendants induced Plaintiff's parents to entrust their child to Defendants and thereby deprived Plaintiff of the protection of his family.

40.    At all times material, Fr. Rutter's sexual abuse of Plaintiff was foreseeable given the Catholic Church's lengthy history of and struggles with sexual abuse.

41.    At all times material, Fr. Rutter remained under the direct supervision, employ, and control of Defendants.

42.    Defendants allowed Fr. Rutter to have unsupervised and unlimited access to minor children at their premises, located within the Diocese of Buffalo in Buffalo, New York.

43.    Upon information and belief, before Plaintiff was sexually abused by Fr. Rutter, Defendants had actual or constructive knowledge of material facts regarding Fr. Rutter's sexual misconduct, impulses, and behavior.

44.    Despite clear indications of danger, Defendants took no steps to discover the specific nature of Fr. Rutter's problems or to determine whether he was fit to work with children or to protect children from him, thereby increasing the likelihood that Plaintiff would be harmed.

45.    Defendants owed Plaintiff a duty of reasonable care because they assumed duties owed to Plaintiff and had superior knowledge about the risk that Fr. Rutter posed to Plaintiff, the risk of abuse in general in their programs, and/or the risks that their facilities posed to minor

7

Case 1-20-10322-CLB,   Doc 4312,   Filed 10/29/25,   Entered 10/29/25 13:07:34,
Description: Main Document  , Page 53 of 89
7 of 16

children. Defendants had the duty to protect the moral purity of Plaintiff and other children within the Diocese of Buffalo.

46.     Defendants owed Plaintiff a duty of reasonable care because they assumed that duty and because they solicited youth and parents for participation in their youth and educational programs.

47.     Defendants owed Plaintiff a duty of reasonable care because they undertook custody of minor children, including Plaintiff.

48.     Defendants owed Plaintiff a duty of reasonable care because they promoted their facilities and programs as being safe for children.

49.     Defendants owed Plaintiff a duty of reasonable care because they held out their agents, including Fr. Rutter, as safe to work with children.

50.     Defendants owed Plaintiff a duty of reasonable care because they encouraged parents and children to spend time with their agents and/or encouraged their agents, including Fr. Rutter, to spend time with, interact with, and recruit children.

51.     Defendants had a duty to Plaintiff to protect him from harm because Defendants' actions created a foreseeable risk of harm to Plaintiff.

52.     Defendants breached their duties by exposing Plaintiff to a known pedophile.

53.     Defendants breached their duties by exposing Plaintiff to a priest whom Defendants knew or should have known was a pedophile.

54.     Defendants breached their duties by recruiting, hiring, and maintaining Fr. Rutter in a position of authority over children.

55.     Defendants breached their duties by exposing Fr. Rutter to children.

56.     Defendants breached their duties by leaving Fr. Rutter alone with children

8

Case 1-20-10322-CLB,   Doc 4312,   Filed 10/29/25,   Entered 10/29/25 13:07:34,
Description: Main Document , Page 54 of 89
8 of 16

unsupervised.

57.     Defendants breached their duties by inducing Plaintiff and his parents to entrust Plaintiffs to Fr. Rutter.

58.     Defendants breached their duties by failing to follow policies and procedures designed to prevent child sex abuse and/or failing to implement sufficient policies and procedures to prevent child sex abuse.

59.     Defendants breached their duties by failing to take reasonable measures to make sure that policies and procedures to prevent child sex abuse were working.

60.     Defendants breached their duties by failing to adequately inform families and children of the known risks of child sex abuse.

61.     Defendants breached their duties by holding out their employees and agents, including Fr. Rutter, as safe and wholesome for children to be with.

62.     Defendants breached their duties by failing to investigate risks of child molestation.

63.     Defendants breached their duties by failing to have any outside agency test their safety procedures.

64.     Defendants breached their duties by failing to protect the children in their programs from child sex abuse; failing to adhere to the applicable standard of care for child safety.

65.     Defendants breached their duties by failing to investigate the amount and type of information necessary to represent the institutions, programs, and leaders and people as safe.

66.     Defendants breached their duties by failing to respond to and/or investigate information of improper conduct of employees or agents with children, including Fr. Rutter.

67.     Defendants breached their duties by failing to properly train their employees to identify signs of child molestation by fellow employees.

9

68.    Defendants breached their duty to use ordinary care in determining whether their facilities were safe and/or to determine whether they had sufficient information to represent its facilities as safe.

69.    Defendants breached their duty of care by maintaining Fr. Rutter at their facilities.

70.    Defendants breached their duty of care by maintaining a dangerous condition on the premises of their facilities (i.e., a priest Defendants knew or should have known posed a risk of pedophilic harm to children).

71.    Defendants breached their duty of care by holding out their facilities as a safe and moral place for children, which they were not.

72.    Defendants breached their duty of care by failing to have sufficient policies and procedures prevent abuse at their facilities.

73.    Defendants breached their duty of care by failing to investigate risks at their facilities.

74.    Defendants breached their duty of care by failing to properly train the workers at their facilities and failing to have any outside agency test their safety procedures.

75.    Defendants breached their duties to Plaintiff by holding out clergy members, including Fr. Rutter, as safe, moral, and trustworthy people and by failing to warn Plaintiff and his family of the risk that Fr. Rutter posed and the known risks of child sexual abuse by clerics in general.

76.    Defendants also failed to warn Plaintiff about any of the knowledge that Defendants had about child sex abuse perpetrated by clergy or Fr. Rutter.

77.    Defendants breached their duties to Plaintiff by failing to report Fr. Rutter's abuse of children to the police and law enforcement.

10

Case 1-20-10322-CLB,    Doc 4312,    Filed 10/29/25,    Entered 10/29/25 13:07:34,
Description: Main Document  , Page 56 of 89
10 of 16

78.     Defendants further breached their duties by hiding a pedophile and engaging in a cover-up of abuse perpetrated by Fr. Rutter.

79.     Defendants knew or should have known that some of the leaders and people working at Catholic institutions were not safe for children.

80.     Defendants knew or should have known that they did not have sufficient information about whether or not their leaders and people working at Catholic institutions within the Diocese of Buffalo were safe to be around children.

81.     Defendants knew or should have known that there was a risk of child sex abuse for children participating in Catholic programs and activities.

82.     Defendants knew or should have known that they did not have sufficient information about whether or not there was a risk of child sex abuse for children participating in Catholic programs and activities.

83.     Defendants knew or should have known that they had other agents who had sexually molested children.

84.     Defendants knew or should have known that child molesters have high rate of recidivism.

85.     Defendants knew or should have known that there was a specific danger of child sex abuse for children participating in Defendant's youth and education programs.

86.     Defendants held their leaders and agents out as people of high morals, as possessing immense power, teaching families to obey these leaders and agents, teaching families and children to respect and revere these leaders and agents, soliciting youth and families to their programs, schools, marketing to youth and families, recruiting youth and families, and holding out the people that worked in the programs as safe for children/youth.

11

Case 1-20-10322-CLB,   Doc 4312,   Filed 10/29/25,   Entered 10/29/25 13:07:34,
Description: Main Document  , Page 57 of 89
11 of 16

87.     Defendants made negligent representations to Plaintiff and his family during his minority. Plaintiff and/or his family relied upon these representations, which resulted in Plaintiff being put in a vulnerable situation with Fr. Rutter who harmed him.

88.     At all times material, Defendants controlled the premises where Fr. Rutter performed as a priest and/or teacher.

89.     At all times material, Defendants had the power to terminate the employment of Fr. Rutter.

90.     Upon information and belief, before Plaintiff was sexually abused by Fr. Rutter, Defendants had actual or constructive knowledge of material facts regarding Fr. Rutter's sexual misconduct, impulses, and behavior, but failed to act on that knowledge and exposed Plaintiff, a child, to Fr. Rutter, thereby increasing the likelihood that Plaintiff would be harmed.

91.     As a direct result of Defendants' negligence, breached duties, sexual abuse, sexual exploitation, and Defendants' conduct, Plaintiff has suffered and will continue to suffer the severe injuries and damages described herein.

92.     By reason of the foregoing, Defendants are liable to Plaintiff for compensatory damages, and for punitive damages, together with interest and costs.

### SECOND CAUSE OF ACTION
#### NEGLIGENT HIRING/RETENTION/SUPERVISION/DIRECTION

93.     Plaintiff realleges and incorporates all previous paragraphs as if set forth fully herein.

94.     At all times material, Defendants, by and through their agents, managers, employees, and directors, owed a duty to Plaintiff to use reasonable care to protect his safety, care, well-being and health while he was under the custody or in the presence of Defendants. These duties encompassed the use of reasonable care in the retention and supervision of Fr. Rutter and

12

Case 1-20-10322-CLB,   Doc 4312,   Filed 10/29/25,   Entered 10/29/25 13:07:34,
Description: Main Document , Page 58 of 89
12 of 16

otherwise providing a safe environment for children.

95.     Prior to the sexual misconduct perpetrated by Fr. Rutter upon Plaintiff, Defendants knew, or in the exercise of reasonable care, should have known, of the general problem of Catholic clergy engaging in sexual misconduct with children.

96.     Prior to sexual misconduct perpetrated by Fr. Rutter upon Plaintiff, Defendants knew, or in the exercise of reasonable care, should have known, that Fr. Rutter was unfit for the duties assigned to him, that he did not exhibit appropriate behavior with children, and otherwise posed a risk of perpetrating unwanted sexual contact upon children.

97.     Given actual or constructive knowledge of Fr. Rutter's dangerous propensities specifically, Defendants had a duty to act reasonably in all decisions relating to his supervision and retention as an employee.

98.     Defendants failed to exercise reasonable care in one or more of their decisions to supervise and retain Fr. Rutter and therefore exposed Plaintiff to an unreasonable risk of harm.

99.     Defendants affirmed and ratified Fr. Rutter's misconduct with Plaintiff. Given the actual and constructive knowledge of the likelihood that Fr. Rutter and/or other clergy would engage children in unwanted sexual contact, the unwanted sexual contact of Plaintiff was reasonably foreseeable to Defendants.

100.     Defendants and their agents had superior knowledge of the likelihood that Fr. Rutter would engage in unwanted sexual conduct with clients that he encountered in his position as priest and had a duty to take precautions to lessen the risk that Plaintiff would be the victim of unwanted sexual contact.

101.     At all relevant times, Defendants' acts and omissions created an environment which fostered unwanted sexual contact and exploitation against the people they had a duty to protect,

13

Case 1-20-10322-CLB,   Doc 4312,   Filed 10/29/25,   Entered 10/29/25 13:07:34,
Description: Main Document , Page 59 of 89
13 of 16

including Plaintiff.

102.    At all relevant times, Defendants had inadequate policies and procedures to protect children entrusted to their care and protection, including Plaintiff, which substantially contributed to the creation of a dangerous environment.

103.    As direct and proximate result of the negligence of Defendants, Plaintiff has suffered and will continue to suffer the severe injuries and damages described herein.

104.    By reason of the foregoing, Defendants are liable to Plaintiff for compensatory damages, and for punitive damages, together with interest and costs.

WHEREFORE Plaintiff demands judgment against Defendants on each cause of action as follows:

A.    Awarding compensatory damages in an amount to be proved at trial but in any event in an amount that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction;

B.    Awarding punitive damages to the extent permitted by law;

C.    Awarding prejudgment interest to the extent permitted by law;

D.    Awarding costs and fees of this action, including attorneys' fees to the extent permitted by law; and

E.    Awarding such other and further relief as to this Court may seem just and proper.

*Attorney signature on following page*

Dated: May 12, 2021

Respectfully Submitted


_____/s/ Melanie S. Wolk_____

Melanie S. Wolk
TREVETT CRISTO
2 State Street, Suite 1000
Rochester, NY 14614
Telephone: (585) 454-2181
mwolk@trevettcristo.com

And

Craig K. Vernon
JAMES, VERNON AND WEEKS, P.A.
1626 Lincoln Way
Coeur d'Alene, ID 83815
Telephone: (208) 667-0683
craig@jvwlaw.net

And

Patrick Noaker
NOAKER LAW FIRM, LLC
1600 Utica Avenue S., 9th Floor
St. Louis Park, MN 55416
Telephone: (952) 491-6798
patrick@noakerlaw.com

*Attorneys for Plaintiff*

15

Case 1-20-10322-CLB, Doc 4312, Filed 10/29/25, Entered 10/29/25 13:07:34,
Description: Main Document , Page 61 of 89
15 of 16

## ATTORNEY VERIFICATION

MELANIE S. WOLK, an attorney duly admitted to practice in the State of New York, affirms under penalty of perjury that she has read the foregoing VERIFIED COMPLAINT and knows the contents thereof; that the same is true to the affirmant's own knowledge, except as to those matters therein stated to be on information and belief and as to these matters affirmant believes them to be true.

The undersigned further states that the reason this affirmation is made by the affirmant and not by the Plaintiff is to protect the identity of Plaintiff under the New York Civil Rights Law.

The grounds of affirmant's belief as to all matters not stated to be on affirmant's knowledge are as follows: Discussions with the client following the client's review and approval of the Verififed Complaint, as well as investigations and records in the file.

Dated: May 12, 2021
Rochester, NY

*Melanie S. Wolk*
MELANIE S. WOLK, ESQ.

# APPENDIX 2

STATE OF NEW YORK
SUPREME COURT: COUNTY OF ERIE

ANONYMOUS O.G.,

               Plaintiff,

v.

ST. FRANCIS HIGH SCHOOL and ORDER OF
FRIARS MINOR CONVENTUAL, ST.
ANTHONY OF PADUA PROVINCE, U.S.A.,
INC., a Maryland corporation,

               Defendants.

**VERIFIED ANSWER**

Index No. 806334/2021

Defendants ST. FRANCIS HIGH SCHOOL and ORDER OF FRIARS MINOR
CONVENTUAL, ST. ANTHONY OF PADUA PROVINCE, U.S.A, INC. (hereinafter
"Defendants"), by their attorneys, Lippes Mathias Wexler Friedman LLP, as and for their Answer
to the Complaint, respond as follows:

    1.    Deny knowledge or information sufficient to respond to the allegations contained
in paragraphs 1, 9, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 34, 35 and
86 of the Complaint, and therefore deny same.

    2.    The allegations contained in paragraphs 2, 3, 4, 5, 6, 7, 12, 36, 37, 38, 39, 45, 46,
47, 48, 49, 50, 51, 88, 89, 92, 94, 97, 100 and 104 call for a legal conclusion requiring neither an
admission or denial. To the extent that a response is necessary, Defendants deny same.

    3.    Admit to the allegations contained in paragraph 10 and 21 of the Complaint.

    4.    Deny the allegations contained in paragraphs 11, 40, 41, 42, 43, 44, 52, 53, 54, 55,
56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81,
82, 83, 84, 85, 87, 90, 91, 95, 96, 98, 99, 101, 102 and 103 of the Complaint.

5.      Plaintiff repeats and realleges all of the allegations above and below paragraphs 8, 13, 33, and 93 of the Complaint.

6.      Defendant further denies each and every allegation of the Complaint not hereinbefore specifically admitted, controverted, or denied.

## AFFIRMATIVE AND OTHER DEFENSES

7.      For a first affirmative defense, Defendants assert that the Complaint and each Cause of Action therein fails to state a claim upon which relief can be granted.

8.      For a second affirmative defense, Defendants assert that this Court lacks jurisdiction over some or all of the claims made in the Complaint.

9.      For a third affirmative defense, Defendants assert that Plaintiff's claims are barred, in whole or in part, by the doctrine of laches and the applicable statues of limitations.

10.      For a fourth affirmative defense, Defendants assert that the Childs Victim Act is unconstitutional.

11.      For a fifth affirmative defense, Defendants assert that Defendants did not breach any lawful duty owed to Plaintiff.

12.      For a sixth affirmative defense, Defendants assert that all or some of the claims in the Complaint are barred because the alleged violations and damages sustained by Plaintiff, if any, were caused by the acts of a third party over whom Defendants had no control.

13.      For a seventh affirmative defense, Defendants assert that Plaintiff's claims are barred, in whole or in part, because the acts of others constitute responsible and/or intervening and/or superseding causes of Plaintiff's alleged damages.

14.     For an eighth affirmative defense, Defendants assert that all or some of the claims in the Complaint are barred because the alleged violations and damages sustained by Plaintiff, if any, were not caused by Defendants.

15.     For a ninth affirmative defense, the Child Victims Act violates Defendants' Due Process rights under the New York State Constitution (Const. Art I, §6).

16.     For a tenth affirmative defense, in the event that the Plaintiff recovers damages which have been paid or are payable by a collateral source, Defendants will seek an offset to such damages pursuant to Article 45 of the CPLR.

17.     For an eleventh affirmative defense, if Defendants are found liable as alleged in the complaint, Defendants allege that the provisions of CPLR 1601 will apply.

18.     For a twelfth affirmative defense, any proof adduced or presented during any trial of this matter on the issue of punitive damages and any such resulting award must conform to the procedural and substantive constitutional limitations set forth in the due process clauses of the 14th Amendment to the United States Constitution and the applicable sections of the New York State Constitution.

19.     Defendants reserve the right to assert any additional affirmative defenses as may be appropriate based upon the facts or issues disclosed during the course of additional investigation and discovery.

WHEREFORE, Defendants respectfully demand judgment dismissing Plaintiff's Complaint in its entirety and for such other and further relief as to this Court may seem just, proper and equitable, together with the costs and disbursements of this action.

Dated:      Buffalo, New York
             June 15, 2021

                          LIPPES MATHIAS WEXLER FRIEDMAN LLP

                          */s/Dennis C. Vacco*
                          Dennis C. Vacco, Esq.
                          Scott S. Allen Jr., Esq.
                          *Attorneys for Defendants*
                          50 Fountain Plaza, Suite 1700
                          Buffalo, New York 14202
                          T: (716) 853-5100
                          dvacco@lippes.com
                          sallen@lippes.com

TO:     Melanie S. Wolk
       TREVETT CRISTO
       2 State Street, Suite 1000
       Rochester, NY 14614
       (585) 454-2181

       Craig K. Vernon
       JAMES, VERNON AND WEEKS, P.A.
       1626 Lincoln Way
       Coeur d'Alene, ID 83815
       (208) 667-0683

       Patrick Noaker
       NOAKER LAW FIRM, LLC
       1600 Utica Avenue S., 9th Floor
       St. Louis Park, MN 55416
       (952) 491-6798

       *Attorneys for Plaintiff*

## VERIFICATION BY ATTORNEY

DENNIS C. VACCO, an attorney being duly admitted before the courts of the State of New York, hereby affirms the following under penalties of perjury:

The he is an attorney for Defendants ST. FRANCIS HIGH SCHOOL and ORDER OF FRIARS MINOR CONVENTUAL, ST. ANTHONY OF PADUA PROVINCE, U.S.A, INC a Maryland corporation in the above-entitled action with offices located at 50 Fountain Plaza, Suite 1700, Buffalo, New York; that he has read the foregoing VERIFIED ANSWER and knows the contents thereof; that the same is true to his knowledge, except as to the matters stated to be alleged upon information and belief, and that as to those matters, he believes them to be true.

That this verification is made by deponent instead of Defendants because one Defendant is not within Erie County where deponent has his office.

Dated: Buffalo, New York
June 15, 2021

Dennis C. Vacco
LIPPES MATHIAS WEXLER FRIEDMAN LLP
*Attorneys for Defendants*
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
T: (716) 853-5100
dvacco@lippes.com

# APPENDIX 3

At a term of the Supreme Court of
the State of New York held in and
for the County of Erie at the Erie
County Court House on the 21st
day of May, 2024.

Present: Hon. Mark J. Grisanti

STATE OF NEW YORK
SUPREME COURT : COUNTY OF ERIE

_____

ANONYMOUS O.G.,

        Plaintiff,

    v.

ST. FRANCIS HIGH SCHOOL and ORDER OF
FRIARS MINOR CONVENTUAL, ST.
ANTHONY OF PADUA PROVINCE, U.S.A.,
INC., a Maryland corporation,

        Defendants.

_____

Index No.: 806334/2021

      Defendants St. Francis High School and Order of Friars Minor Conventual, St. Anthony

of Padua Province, USA, Inc., having moved this court through a notice of motion for summary

judgment dated August 14, 2023, for an order pursuant to CPLR § 3212 granting summary

judgment in favor of Defendants and dismissing Plaintiff Anonymous O.G.'s complaint, and the

Court having received and read the following: notice of motion for summary judgment,

affirmation in support thereof and memorandum of law, all dated August 14, 2023, by Scott S.

Allen Jr., Esq., with supporting exhibits A through E; Plaintiff's affirmation and memorandum of

law in opposition to Defendants' motion for summary judgment, dated April 9, 2024, by Craig

K. Vernon, Esq., with exhibits A through G; and Defendants' memorandum of law in reply dated

April 12, 2024, by Scott S. Allen Jr., Esq., and

Oral argument having been heard on May 21, 2024, on Defendants' motion for summary judgement, with appearances by Scott S. Allen Jr., Esq. for moving Defendants and Craig K. Vernon, Esq. for Plaintiff,

A decision having been issued by the Honorable Mark J. Grisanti, from the bench and following oral argument, a true and accurate copy of the transcript of said oral argument and decision being attached hereto and incorporated herein; it is hereby

**ORDERED** that Defendants' motion for summary judgement is granted, and it is further

**ORDERED** that the above titled action is dismissed in its entirety upon the merits, without costs or disbursements awarded to either party.

Dated: ___6·3___, 2024
         Buffalo, New York

**E N T E R :** _____
                        **Hon. Mark J. Grisanti, J.S.C.**

STATE OF NEW YORK : SUPREME COURT
COUNTY OF ERIE : PART 15

_____

ANONYMOUS O.G.,

                    Plaintiff,

        vs.                              INDEX NO. 806334/2021

ST. FRANCIS HIGH SCHOOL and ORDER OF
FRIARS MINOR CONVENTUAL, ST. ANTHONY
OF PADUA PROVINCE, USA, INC.,
a Maryland corporation,

                                      Motion and Decision

              Defendants.


_____

                         25 Delaware Avenue
                         Buffalo, New York
                         May 21, 2024

        ***Proceedings held via Teams***



B E F O R E:

        HONORABLE MARK J. GRISANTI,
             Acting Supreme Court Justice.



A P P E A R A N C E S:

        CRAIG VERNON, ESQ.,
             Appearing for the Plaintiff.

        SCOTT S. ALLEN, JR., ESQ.,
             Appearing for the Defendant.

*Anonymous O.G. v. St. Francis High School, et al.*

2

```
 1           THE COURT:  This is the matter of Anonymous
 2    O.G. versus St. Francis High School, et al., index number
 3    806334/2021.  Counsel, state your name for the record.
 4           MR. VERNON:  Craig Vernon for plaintiff,
 5    Anonymous O.G.
 6           MR. ALLEN:  Good morning, Your Honor.  Scott
 7    Allen of Lippes Mathias on behalf of defendants.
 8           THE COURT:  All right.  This is defendant's
 9    motion for summary judgment dismissing plaintiff's
10    complaint against it, correct?
11           MR. ALLEN:  Yes, Your Honor.
12           THE COURT:  All right.  Do you want to put
13    something on the record, Craig?
14           MR. VERNON:  No, Your Honor.
15           THE COURT:  Scott?
16           MR. ALLEN:  Your Honor, I just think -- I don't
17    want to go over my papers as a whole, Your Honor, but I do
18    think it's important to establish a timeline in arguing
19    this motion here today.  So obviously plaintiff alleges
20    that he was abused between 1978 and 1980.  It is
21    undisputed that plaintiff did not inform anybody of his
22    alleged abuse until he told his attorneys in 2020 or 2021,
23    so forty-four years after the alleged abuse.
24           And in 2000, so several years later, twenty
25    years later, is the first time that OLA was put on notice
```

*Anonymous O.G. v. St. Francis High School, et al.*

3

1   of Father Rutter's alleged propensities here.  And then

2   the letter that plaintiff's counsel relies upon in trying

3   to challenge the motion for summary judgment here was

4   written in 1998.

5        It is defense position that there is no factual

6   issue here, Judge.  That the evidence is indisputable that

7   the defendants neither knew nor should have known of

8   Father Rutter's propensities until 2000.  That any alleged

9   propensities he did have were simply unforeseeable, and

10  that this Court should grant summary judgment in favor of

11  the defendants based on the facts in this case,

12  Your Honor.  Thank you.

13        THE COURT:  All right.

14        MR. VERNON:  Your Honor, I would like to

15  respond if I could?

16        THE COURT:  Yes.  For sure.  Go ahead.

17        MR. VERNON:  Okay.  Thank you, Your Honor.  So

18  here, Your Honor, you know, there's no doubt that

19  defendants had an in loco parentis duty to supervise

20  plaintiff and other students.  Also, they had a duty to,

21  you know, properly hire, supervise, and retain priests and

22  teachers that were safe and not tortious or didn't have a

23  propensity to abuse kids.

24        So it really comes down to did defendants back

25  in 1978, when we allege Father Rutter was abusing

JILL R. DRASZKIEWICZ
Official Court Reporter

Case 1-20-10322-CLB,   Doc 4312,   Filed 10/29/25,   Entered 10/29/25 13:07:34,
Description: Main Document , Page 74 of 89
5 of 20

*Anonymous O.G. v. St. Francis High School, et al.*

4

```
 1      Anonymous O.G., did they have notice of propensities that

 2      he would abuse kids, was he at an increased risk of

 3      abusing kids, was it foreseeable.  And I think there's

 4      three things that would indicate that there was notice of

 5      that.

 6              First, there's a historical, I guess, general

 7      notice theory that this was happening so much in the

 8      Catholic church all across the nation, all across the

 9      world, that there had to be, you know, some, you know, I

10      guess, red flags there.  Secondly, in the seminary there's

11      indication that Father Rutter had engaged or was coerced

12      into some sexual activity with another seminarian.

13              And that's important, Your Honor, because

14      there's a policy that the Catholic church had.  Gary

15      Johnson and Father Twele both talked about this, a policy,

16      and it states that there should be no pederast or

17      homosexual priests.  It's not and.  It's or.  Either one

18      of those, according to both Father Twele and Father

19      Johnson, would forbid somebody from becoming a priest and,

20      if they were already a priest, would cause that priest to

21      need to be dismissed and essentially fired.

22              So that was a policy.  That's not our policy.

23      That's the Catholic church's policy, and this order

24      followed that policy in 1978.  So when we get to

25      St. Francis in 1978, when my client alleges that he was
```

*Anonymous O.G. v. St. Francis High School, et al.*

5

1        abused, what we do know is that Father Rutter writes in

2        his letter that he was engaging in homosexual activity

3        with Father Nowacki.  Whether that homosexual activity was

4        completely consensual, they were both adult men, or

5        whether that homosexual activity was coerced by Father

6        Nowacki, we don't know, but there was homosexual activity.

7        Father Nowacki, according to Gary Johnson, was a known

8        homosexual.  Of course that's later on, but we can use

9        that as context.

10              So the question is did the Order and the school

11       have notice of propensities that Father Rutter would be an

12       increased risk of violating children, of abusing children.

13       Another way to know it, to look at it, is did they have

14       notice that Father Rutter was violating its own policy, a

15       policy that, you know, we can't have pederast or

16       homosexual priests.  And, yes, they had notice.  Of course

17       the school is just brick and mortar.  The Order is just a

18       fictional, you know, corporate entity.

19              How did they have notice?  Father Nowacki.

20       Father Nowacki was Father Rutter's superior at

21       St. Francis.  Father Nowacki was Father Rutter's principal

22       at the school and, therefore, his supervisor and his boss

23       at St. Francis.  So Father Nowacki, who was engaging in

24       homosexual activity had actual notice that Father Rutter

25       was engaged in homosexual activity because he was doing

JILL R. DRASZKIEWICZ
Official Court Reporter

Case 1-20-10322-CLB,   Doc 4312,  Filed 10/29/25,  Entered 10/29/25 13:07:34,
Description: Main Document , Page 76 of 89
7 of 20

*Anonymous O.G. v. St. Francis High School, et al.*

6

1    with he.

2           So, Your Honor, certainly there was notice that

3    there were propensities that Father Rutter was at

4    increased risk of abusing children.  There was actual

5    notice that he was violating the church's own policy.

6    And, again, this is not our policy.  This is the Catholic

7    church's policy back in 1961 that was effective in 1978,

8    no pederast or pedophile priests.  Absolutely no wiggle

9    room for that.  That was an absolute violation of that.

10          And we know why Father Nowacki didn't do

11   anything, why he didn't supervise.  He didn't want to be

12   caught because he would have been kicked out of the

13   priesthood as well.  So certainly there was notice.  This

14   is a unique case.  This is not a case where we don't have

15   notice.  We have actual notice both by the Order and by

16   the school.  Thank you, Your Honor.

17          THE COURT:  Thanks, Craig.  Any response?

18          MR. ALLEN:  Yes, Your Honor.  As a threshold

19   matter as it relates to Mr. Vernon's argument concerning a

20   general notice during the historical context of abuse in

21   the Catholic church, there's absolutely no case law

22   offered to support that theory at all in the papers, and

23   that's because I don't think any exist, Your Honor.

24          As it relates to Mr. Vernon's argument as it

25   pertains to negligent hiring and the in locus parentis

1    duties, those duties, Your Honor, are only triggered if

2    there's some reason to know or should know that the

3    alleged abuser has a propensity to abuse children, and we

4    have established time and again in our papers that there

5    is no reason to do that.  Indeed, in his application for

6    the order, Father Rutter established that he had no police

7    record whatsoever and there was absolutely no notice given

8    to the order until 2000 of any propensity to abuse

9    children.

10         In order to defeat the motion for summary

11   judgment, Your Honor, Mr. Vernon in his papers and just

12   now during oral argument relies on the 1998 letter.  And,

13   frankly, it's incredible the argument they are making,

14   Judge, and it's the argument that they are making is that

15   because the superior of --

16         THE COURT:  You broke up.  You jumped out.  You

17   started talking about the relationship.  You have to go

18   back.

19         MR. ALLEN:  Yes, Your Honor.  In order to

20   defeat defendant's arguments in support of motion for

21   summary judgment, Mr. Vernon in his papers and during oral

22   argument just now points to the 1998 letter and the

23   allegations therein that Father Rutter was raped by his

24   superiors, sexually abused by his superior,

25   Father Nowacki.  And their argument is that because

*Anonymous O.G. v. St. Francis High School, et al.*

```
1        Father Nowacki sexually assaulted Father Rutter, therefore

2        Father Nowacki and therefore the Order were on notice of

3        alleged homosexual tendencies at the time of the alleged

4        abuse which, frankly, Your Honor, is a preposterous

5        argument.  It's illogical.  It tries to connect, you know,

6        one sexual assault and homosexuality to an alleged sexual

7        assault of a minor, which there's simply no connection

8        there.  And, frankly, I would just submit to the Court

9        that that's rather desperate, and this Court should grant

10       defendant's judgment for summary judgment in its entirety.

11            THE COURT:  Anything further, Craig?

12            MR. VERNON:  Real quick, Your Honor.  You know,

13       this argument of connecting homosexuality to sexual abuse

14       of a minor, it may seem preposterous now but, again, this

15       was not my policy.  This was the church's policy,

16       Your Honor.  They didn't say, you know, we are only going

17       to exclude pedophile priests.  They said we're excluding

18       pedophile priests and homosexual priests or pedophile

19       priests or homosexual priests.  Excuse me, they used or.

20       That was the policy.

21            And so, again, there was an absolute violation

22       of this policy that the Order knew about in 1978.  We know

23       that because in Father Rutter's letter it talks about his

24       relationship with Father Nowacki beginning in 1978 --

25       well, at least the sexual relationship with Father
```

*Anonymous O.G. v. St. Francis High School, et al.*

9

1    Nowacki.  And, again, these are two adult men.  Whether

2    there was coercion -- it sounds like there was coercion.

3    Whether it was a rape, I don't know.  There's no

4    indication it was a rape.  There was certainly clear

5    indication there was homosexual activity to a superior and

6    the priest that's under him.  So certainly there's a power

7    differential.

8         But in any event, they're both engaging in

9    prohibited activity that should have excluded both of them

10   from the priesthood, and if he was excluded from the

11   priesthood he would not have been abusing our client which

12   he was abusing in 1978 and 1979.  So there's notice to the

13   school, and there's notice to the Order.  Thank you,

14   Your Honor.

15        THE COURT:  All right.  As counsel is aware,

16   the proponent of a summary judgment motion must make a

17   prima facie showing of entitlement to judgment as a matter

18   of law tendering sufficient evidence to eliminate any

19   material issues of fact from the case.  That's under

20   Alvarez, 68 N.Y.2d 320.

21        Failure to make a showing requires denial of

22   the motion, but once such proof has been offered the

23   burden will shift to the opposing party who, in order to

24   defeat the motion, must proffer evidence in admissible

25   form and show facts sufficient to require a trial of any

*Anonymous O.G. v. St. Francis High School, et al.*

1    issue of fact.  That's under Zuckerman, 49 N.Y.2d 557.

2         The Court's function on such a motion is to

3    determine whether issues of fact exist, not to resolve the

4    issues of fact or to determine matters of credibility.

5    The facts alleged by the opposing party and all inferences

6    that may be drawn are to be accepted as true.  That's

7    under Roth, 289 A.D.2d 557.

8         Defendant makes a motion for summary judgment

9    dismissing plaintiff's claims.  The first cause of action

10   alleged is basically negligence and includes an in loco

11   parentis.  There's premises liability and failure to warn.

12   The second cause of action that is alleged is for

13   negligent hiring, retention, supervision slash direction.

14        In support of the motion defendant asserts that

15   they lack notice of any abuse committed by Father Rutter,

16   the alleged perpetrator of the abuse of plaintiff, until

17   1998 when they found out twenty years after plaintiff was

18   abused.  Defendant asserts that without notice of any

19   propensity of Father Rutter to engage in sexual abuse of

20   the students they did not have a duty to the plaintiff.

21        Plaintiff attended the school 1978 to '82.

22   Father Rutter was a vocabulary teacher.  It's alleged that

23   Rutter was grooming plaintiff as his freshman year.  He

24   would touch plaintiff's privates.  Sophomore year Father

25   Rutter was a theology teacher.  He did the same thing as

*Anonymous O.G. v. St. Francis High School, et al.*

11

1    his freshman year and went a little bit further.

2    Approximately twenty to forty times it's claimed in each

3    of the two years.

4              In 1998 Rutter wrote a letter that he was a

5    homosexual.  Mr. Johnson testified that there was evidence

6    of Rutter with another seminarian.  Mr. Johnson said in

7    1978 he believes there was homosexual activity that began

8    with Father Rutter and Father Nowacki.

9              There's a Moore case, M-O-O-R-E, 90 N.Y.3d 150.

10   It's a New York Court of Appeals case.  It talks of notice

11   or actual knowledge but also goes further, and it talks

12   about that you cannot shut your eyes.  Notice is satisfied

13   if you check reasonably and exercise care and are aware of

14   any propensity.  A reasonable inquiry can be done, but

15   there's been no prior specifics to go further with regards

16   to Father Rutter.  There was no prior abuse.  There was no

17   prior complaint.

18             We have Father Nowacki who was a principal at

19   St. Francis.  He was Father Rutter's supervisor who were

20   having alleged homosexual activity, and the claim is that

21   by his superior having this knowledge does that not raise

22   an issue of fact on knowledge under the Moore case in

23   essence for either negligent hiring, retention, or

24   supervision.  And the plaintiff must show that defendant

25   knew or should have known of the employer's propensity --

*Anonymous O.G. v. St. Francis High School, et al.*

12

1    or the employee's propensity, and they claim these are the

2    issues of fact that the supervisor knew of which both were

3    involved in this homosexual activity.  There's a Fuller

4    case, F-U-L-L-E-R, 209 A.D.3d 983.  There's a Sullivan

5    case the Court looked at, 187 N.Y.2d Third 229(sic).

6         And the argument is we have plaintiff says

7    there's issues for failure to warn, failure to supervise.

8    In opposition to the motion, plaintiff asserts again that

9    defendant had notice and constructive notice of abuse by

10   referring to the history of abuse in the Catholic church

11   and by the actual notice of Father Rutter's supervisor

12   Father Nowacki that Rutter was engaged in a homosexual

13   relationship at the time of the plaintiff's abuse.

14        In this matter defendant establishes a prima

15   facie entitlement to summary judgment on all causes of

16   action by establishing that they had no notice of Father

17   Rutter's propensity for sexual abuse prior to 1998.  The

18   burden shifts to the plaintiff to establish any triable

19   issues of fact, and that's what I was talking about with

20   regards to the Moore case and other cases cited.

21        In order to prevail on a negligence claim, the

22   plaintiff must demonstrate, one, a duty owed by the

23   defendant to the plaintiff, two, a breach thereof, and,

24   three, injury proximally resulting.  That's under

25   Pasternack, P-A-S-T-E-R-N-A-C-K, 27 N.Y.3d 817.

*JILL R. DRASZKIEWICZ*

Case 1-20-10322-CLB,  Doc 4312, Filed 10/29/25, Entered 10/29/25 13:07:34,
Description: Main Document , Page 83 of 89
14 of 20

*Anonymous O.G. v. St. Francis High School, et al.*

13

1        So for the plaintiff's general negligence in

2        loco parentis allegation, it's been established that

3        schools have a duty to adequately supervise the students

4        in their care and may be held liable for foreseeable

5        injuries proximally related to the absence of adequate

6        supervision.  That's under the case of Timothy,

7        127 A.D.3d 826.

8        The standard for determining whether the school

9        has breached its duty is to compare the school's

10       supervision and protection to that of a parent of ordinary

11       prudence placed in the same situation and armed with the

12       same information.  That's under the case of David,

13       1 N.Y.3d 525, and the case of Mirand, M-I-R-A-N-D,

14       84 N.Y.2d at 49.

15       Under a theory of premises liability, it is the

16       duty of a property owner to protect plaintiff from

17       foreseeable harm caused by third persons.  That's under a

18       Fourth Department case of Taft, 285 A.D.2d 992.  Such duty

19       is limited to conduct on the premises which the owner had

20       the opportunity to control and of which the owner was

21       reasonably aware.

22       The other theory that's claimed is a theory of

23       failure to warn is a duty to warn about foreseeable

24       dangers and that the failure to warn caused injury.  The

25       person is negligent for failure to warn when they are

*Anonymous O.G. v. St. Francis High School, et al.*

14

```
 1      aware of known dangers and do not warn of them.

 2              Plaintiff's negligence cause of action and the

 3      underlying allegations all depend on the defendant having

 4      notice or at least constructive notice of a foreseeable

 5      danger such as prior knowledge of Father Rutter's

 6      propensity for sexual abuse.  Plaintiff acknowledges that

 7      he never told anyone at the school during the time period

 8      that the abuse took place and never told anyone at all

 9      until roughly 2020.

10              Plaintiff's reference to the history of abuse

11      in the Catholic church in general does not satisfy the

12      notice requirement that Father Rutter had the actual

13      propensity to sexually abuse students in his care.

14      Plaintiff also offers allegations again that Father

15      Rutter's supervisor, Father Nowacki, had actual knowledge

16      that Rutter was involved in a homosexual affair at the

17      time of the abuse of the plaintiff.

18              Plaintiff asserts this knowledge should be

19      imputed from Father Nowacki to the defendant, and without

20      reaching that determination whether Nowacki had knowledge

21      of Rutter's homosexual affair does not equate to notice of

22      Rutter's propensity to sexually abuse children.  It's a

23      leap.  Additionally, defendant asserts that information

24      did not become known to them until 1998.  The knowledge or

25      notice must be prior to the alleged assault.
```

*JILL R. DRASZKIEWICZ*

*Anonymous O.G. v. St. Francis High School, et al.*

15

1        So plaintiff has not established that there are

2    triable issues of fact as to why defendant had notice or

3    should have had notice of Rutter's proclivity to sexually

4    abuse students in his care, and that cause of action will

5    be dismissed.  And, again, that argument does not meet the

6    standard under summary judgment.

7        Some of the arguments are conclusory or

8    speculative, do not link the notice under Zuckerman,

9    previously quoted.  No notice until 2000.  Twenty years

10   later not foreseeable.  Under Sullivan, 214 A.D.3d 751 or

11   Jamal P., 24 A.D.3d 301, and the Mirand case previously

12   cited.

13       We don't have foreseeability here nor notice,

14   although this Court must accept facts as alleged and the

15   complaint as true and give the plaintiff the benefit of

16   every possible favorable inference, and the Court does

17   understand the argument of the plaintiff, and the Court

18   has to determine whether the facts as alleged fit within

19   any cognizable theory.  That's under B.L. Doe,

20   199 A.D.3d at 1419.  But conclusory and speculative

21   allegations to have that nexus as argued by plaintiff that

22   consists of bare legal conclusions with no link of

23   specificity in particular or notice are insufficient to

24   survive a motion to dismiss.

25       We have no prior notice on any level, no

*Anonymous O.G. v. St. Francis High School, et al.*

16

1    complaints made.  The burden is on the plaintiff for prior

2    notice.  That's under the case of -- and I will spell

3    it -- P-A-L-O-P-O-L-I, 166 A.D.3d at 639.

4              Also, for cause of action regarding in loco

5    parentis, there is no separate cause of action in a sense

6    for in loco parentis but it is a standard that is subsumed

7    in a negligence cause of action.

8              As I said, schools can be held liable for

9    foreseeable injuries related to absence of adequate

10   supervision under that Mirand case.  But, again, plaintiff

11   has not countered the defendant's proof with any evidence

12   of Rutter's propensity or that the defendant knew or

13   should have known of such protensity.  Plaintiff failed to

14   raise an issue of fact with respect to actual and

15   constructive notice.

16             Plaintiff's remaining cause of action is then

17   in the hiring, retention, supervision, and direction.  As

18   I said, in order to maintain that cause, the complaint

19   must include allegations that the employer had actual or

20   constructive knowledge of the employee's propensity for

21   that sort of behavior which caused the injured party's

22   harm.  The employer knew or should have known that it had

23   the ability to control the employee and of the necessity

24   and opportunity for exercising such control and that the

25   employee engaged in tortious conduct on the employer's

*Anonymous O.G. v. St. Francis High School, et al.*

17

```
 1          premises or using property or resources available to the

 2          employee only through their status as an employee,

 3          including intellectual property and confidential

 4          information.  The notice element is satisfied if a

 5          reasonably-prudent employer exercising ordinary care under

 6          the circumstances would have been aware of the employee's

 7          propensity to engage in the injury-causing conduct.

 8                  As I said, the plaintiff has not established

 9          that the defendant had the actual constructive notice of

10          Father Rutter's tortious conduct or the protensity for the

11          sort of behavior that caused harm.  So that cause of

12          action, as I said before, is also dismissed due to failure

13          of notice for the defendant.

14                  There's no cause of action for negligent

15          direction.  That's not applicable to the facts here.  The

16          other causes are duplicative of negligence, premises

17          liability.  There's no foreseeable harm shown.  The

18          failure to warn is not applicable to this type of case.

19          There's no superior knowledge, and the plaintiff did not

20          tell anyone.  Social Service Law 413 and 420 do not apply

21          in dealing with failure to respond.

22                  The Court looked at this case really under a

23          microscope.  And I understand the argument that's being

24          made, but the link and the causation to bring it together

25          is just not there.  It's a leap.  It's a jump.  The
```

*Anonymous O.G. v. St. Francis High School, et al.*

18

1       summary judgment motion is granted.  What I would need for

2       you, Scott, is to give Jill your e-mail address so you can

3       get a copy of the transcript, including my decision, and

4       attach it to an order.

5                    MR. ALLEN:  Understood, Your Honor.

6                    THE COURT:  She has your e-mail address.

7                    MR. ALLEN:  Thank you.

8                    THE COURT:  As I said, I understand the

9       argument.  It's not linked there.  So I need a hard copy

10      of an order with the transcript attached to it, and that's

11      the decision of the Court.  Have a good day, gentlemen.

12                   MR. VERNON:  All right.  All right.  Thank you,

13      Judge.

14                   MR. ALLEN:  Thank you, Judge.

15                   (Whereupon the proceedings concluded.)

16                              * * *

17                    C E R T I F I C A T I O N

18

     I certify that the foregoing pages are a correct
19   transcription of the proceedings recorded by me in this matter.

20

21   _____
     JILL R. DRASZKIEWICZ
22        Official Court Reporter

23

24

25