# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------------------x
In Re:                              1-20-10322(CLB)
                                    Chapter 11

The Diocese of Buffalo, N.Y.,
            Debtor.
--------------------------------------------------x
**HEARING          October 30, 2025   Buffalo, New York**


                 TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE CARL L. BUCKI
              UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

DEBTOR:                 BOND, SCHOENECK & KING, PLLC
(Via telephone)           BY:  ***ANDREW RIVERA, ESQ.
                        One Lincoln Center
                        Syracuse, New York 13202

CREDITORS               PACHULSKI, STANG, ZIEHL & JONES LLP
COMMITTEE:              BY:  ILAN SCHARF, ESQ.
(Via telephone)        BY:  KAREN B. DINE, ESQ.
                        780 Third Avenue
                        34th Floor
                        New York, New York 10017-2024




TRANSCRIBER:            Diane S. Martens
                        dmartensreporter@gmail.com

(Proceedings recorded by electronic audio recording,
 transcript produced by computer.)

APPEARANCES


U.S. FIRE and          O'MELVENY & MYERS LLP
PACIFIC:                  BY:  ADAM HABERKORN, ESQ.
(Via telephone)        1301 Avenue of the Americas
                       New York, New York 10019

SURVIVORS:             THE LAW OFFICES OF STEVE BOYD PC
(Via telephone)          BY:  STEPHEN BOYD, ESQ.
                       510 Clinton Square
                       Rochester, New York 14604

SURVIVORS:             JEFF ANDERSON & ASSOCIATES, PA
(Via telephone)          BY:  STACEY BENSON, ESQ.
                       366 Jackson Street
                       Suite 100
                       St. Paul, Minnesota 55101

In Re: Diocese of Buffalo - BK 20-10322

**P R O C E E D I N G S**

\*           \*           \*

1
2
3
4
5     **THE COURT:**  Good morning, everyone.  This is Judge Bucki
6     here for a motion in the case of the Diocese of Buffalo,
7     New York.  Of course I welcome all those who are present in
8     the courtroom and we also welcome those who are hearing on
9     line.
10          For those who are online, I remind you that local
11    bankruptcy rules prohibit the recording or rebroadcasting of
12    any portion of today's proceeding and I also ask everyone to
13    identify yourselves when you speak.  We need that to
14    facilitate the preparation of a transcript should one be
15    necessary or requested.
16          I apologize to the lateness of our start but there were
17    papers that were filed I believe at 2 this morning and I did
18    read them and I'm familiar with them.  So that's the reason
19    for our few moments of delay.
20          With that, let me start by asking for appearances in the
21    court.
22          Let's start with debtor's counsel.
23          **MR. DONATO:**  Good morning, your Honor, Steve Donato,
24    Bond Schoeneck & King for the Diocese of Buffalo.
25          Also in the courtroom is the Diocese Chief Operating

In Re: Diocese of Buffalo - BK 20-10322

1  Officer ***Rick Suchan.

2      **THE COURT:** All right.

3      **MR. SCHIAVONI:** Good morning, your Honor, Tancred

4  Schiavoni for U.S. Fire and PIC.

5      **THE COURT:** All right, thank you.

6      A    Owe PHEL in this and PHAOEURZ.

7      **MR. DURST:** Good morning, your Honor.  Adam Durst,

8  Goldberg Segalla on behalf of Wausau.

9      **THE COURT:** All right.  Thank you.

10     **MR. SCHARF:** Good morning, your Honor.  Ilan Scharf,

11  Pachulski, Stang, Ziehl & Jones on behalf of the Committee.

12     And I believe on the phone is my colleague Karen Dine.

13     **THE COURT:** All right.  We welcome everyone.

14     **MS. BENSON:** Good morning, your Honor, Stacey Benson

15  with Jeff Anderson & Associates representing numerous

16  claimants including three of the claimants whose objections

17  were brought.

18     **THE COURT:** All right.  Thank you.

19     A    Good morning, your Honor, my she will allay KWRAPB

20  from her man law representing CV A claimants.

21     **THE COURT:** All right.  Thank you.

22     A    Good morning, your Honor PHEL in this wolf from

23  tremendous vet Cristo representing claimants.

24     **THE COURT:** All right.  Mr. Boyd.

25     **MR. BOYD:** Good morning, your Honor, Steven Boyd,

1    cocounsel with Ms. Benson.

2        **THE COURT:**  All right.  Thank you.

3        I think that's the totality of people in the courtroom.

4        Who do I have that wants to note an appearance who may

5    be online?

6        A    STEF in this PWRAUS of slater slate letter SHUL

7    man, counsel for certain CVA plaintiffs.

8        **THE COURT:**  All right.  Thank you.

9        Anyone else on line?

10       **MR. GIBBONS:**  Good morning, your Honor, Robert Malone,

11   Gibbons, PC for Selective.

12       With me are William KOR bet of Coughlin ***Midlige and

13   TKPWAR left hand and Judith Shelton of ***Kenney Shelton.

14       **THE COURT:**  All right.  Anyone else?

15       **MS. TURNER:**  Good morning, your Honor, this is Miranda

16   Turner, Plevin and Turner on behalf of Continental Insurance

17   Company.

18       **THE COURT:**  All right.  Thank you for joining us.

19       Anyone else?

20       **MS. ALLEN:**  Joseph Allen for the you U.S. Trustee.

21       **THE COURT:**  All right.  Thank you.  Thank you for

22   joining us, particularly in this time of budgetary

23   uncertainty.

24       Who else do I have?

25       A    Good morning, your Honor, this is SKWRES I bare

In Re: Diocese of Buffalo - BK 20-10322

1   from Burns bare, special insurance counsel for the Committee.

2        **THE COURT:**  All right.  Thank you.

3        Anyone else?

4        (No response.)

5        **THE COURT:**  All right.  We have our appearances.

6        There are two preliminary matters that I want to

7   mention.  One was that I have read all the papers.  I already

8   stated that including the ones that were filed in the wee

9   hours of the morning.  And -- well, that's the primary point

10  I wanted to raise.

11       With that, let me begin with argument from the movant.

12       **THE COURT:**  And for those who are in the courtroom,

13  please speak directly into the microphone because that's how

14  our recording system operates.

15       **MR. SCHIAVONI:**  Your Honor, Tancred Schiavoni for U.S.

16  Fire and ***PIC.

17       I apologize for the letter I sent you yesterday.  Papers

18  were still coming in and I was concerned about my ability to

19  get through them.

20       **THE COURT:**  Well, let me just comment on that.  I did

21  receive your letter.  The question of -- and you had asked

22  for an adjournment.  I may be willing to go and allow

23  post-hearing submissions and I'll address that later on but I

24  felt that with all that had been done, we were ready to go at

25  least with arguments on a preliminary basis today.

1      **MR. SCHIAVONI:** Yes, your Honor.

2      And I was able to get through the papers and I was

3  concerned you might not be able to read our brief but you are

4  legendary for your ability to get through papers.

5      **THE COURT:** Well I don't know if I'm legendary but we

6  try our best.

7      **MR. SCHIAVONI:** Okay. So, your Honor, first if I could

8  just deal with sort of why we're here and our ability to be

9  heard. We are defendants in the adversary, the insurance

10  coverage adversary proceeding, U.S. Fire and ***PEIC.

11      It's asserted, represented, averred in those complaints

12  that we're financially responsible for various claims that if

13  they allege abuse in our period, we've been sued, we've

14  incurred costs in connection with that lawsuit and the

15  positions of the debtor are quite clearly set out there.

16  We're also in connection with the lift stay hearings that

17  your Honor had several of them, the Committee and the debtor

18  at separate points in time went forward and represented in

19  connection with those lift stay hearings that the cases that

20  would be let go would be in fact covered, that these -- that

21  the insurers in those periods would be financially

22  responsible for those claims. They put in affidavits on

23  this. I think they actually at one point called coverage

24  counsel from Blank Rome to the stand to make that point that

25  we were financially responsible and would be held financially

1  responsible. We're parties to the mediation. I'm not -- I

2  don't want to get into anything there but we're incurring

3  costs in connection with that.

4      One can imagine, your Honor, that demands have been made

5  and offers made back. I cannot -- and then in the actual

6  cases that your Honor has lifted the stay for, my clients are

7  excess carriers but we've incurred, and we are incurring,

8  costs for associated defense counsel. We've given the

9  Diocese notice and we've received no objection to putting in

10  associated counsel in the defense of the claims that

11  implicate our periods. We are not -- we have not disclaimed

12  defense costs here. We're an excess carrier. The solvent

13  primary below us, the solvent primary is handling the primary

14  defense.

15      We are doing just what an excess carrier is supposed to

16  be doing. We're funding associated counsel who is

17  participating in an active case and charging us money for

18  that. And in all those ways -- I mean, I will add that I'm

19  also here and, you know, my client's incurred significant

20  costs in connection with having us here. We have a direct,

21  concrete, immediate interest in these claims as asserted by,

22  represented by the claimants, lift stay claimants, the debtor

23  and the Committee. And on that basis, we believe we have

24  standing under *Truck Kaiser*, the *Truck Kaiser* case.

25      In that case, your Honor, the Court talked about how

In Re: Diocese of Buffalo - BK 20-10322

1    insurers can stay, you know, ends up oftentimes in these

2    cases as standing alone carrying the financial burden.  And

3    there's another quote that comes out of the *Kaiser* decision

4    where the Court talks about how neither the debtor nor the

5    claimants have an incentive to limit the post-Confirmation

6    costs associated with paying claims and defending claims.

7         And the Court goes on in this unanimous decision and

8    talks about that issue and how that manifests itself, how the

9    different interests of the parties manifest themselves.  And

10   that one in particular how in these kinds of cases the debtor

11   can enter into a plan.  At that point it doesn't really care

12   or doesn't have an interest, a financial interest in the

13   handling of the claims.  The Committee, the claimants, they

14   have an interest but it's to maximize the outcome.  Nobody's

15   really concerned about among those constituents the interest

16   of the claims.  That's why the Court talks about how insurers

17   can stand alone.

18        There was extensive -- I was at the oral argument.  It

19   was really fascinating but it was like there was extensive

20   back and forth among the justices with the parties there

21   about this very issue about what happens to carriers and how

22   they cited the *In Re ***Global* case in the Third Circuit and

23   they actually sort of adopted their quote there about when

24   one puts -- it's sort of a rare moment for the Court sort of

25   stepping down from the Ivory Tower and being very

1    practical -- when one puts the hands in the pocket of another

2    party, that party has the ability to have -- I'm misquoting

3    it but I'm getting the sense of it -- should have an interest

4    to be heard.

5        And I would say those concerns -- that concern that was

6    back and forth among the justices at that hearing is really

7    manifest here in a very obvious way.  The debtor had an

8    interest in the claims and defending the claims when it was

9    being asked to pay them.  And there came a point here in the

10   continuum -- and with that interest and motivated by that

11   interest, the debtor came forward, looked at these claims and

12   filed objections.  And they put one of their senior officers

13   up to put basic information before the Court about those

14   claims.

15       And they did that, I think, on, as I will get to, on

16   very strong grounds, grounds very similar to what Judge Glenn

17   looked at to defend themselves, to defend the claims, and in

18   some respects defend the integrity of the whole process to

19   make sure claims that perhaps shouldn't be paid here were not

20   presumptively allowed.

21       **THE COURT:**  They filed an objection.

22       **MR. SCHIAVONI:**  And, your Honor, if I could just close

23   off on the point before your question, all right.

24       It's when they entered into a plan and that's what the

25   Supreme Court was talking about, I think -- when they did a

In Re: Diocese of Buffalo - BK 20-10322

1  plan, that's when the Diocese sort of stood back and said,

2  okay, we don't need to go forward now.  That's a

3  manifestation in my mind at least of exactly what the Court

4  was talking about:  How neither the debtor nor the claimants

5  have an incentive post-Confirmation to insure the defense of

6  the claims.  We're here with that interest because it impacts

7  us directly and materially.

8      **THE COURT:**  Although Judge Glenn's decision -- he goes

9  through the whole rationale of it but at the very end he

10  essentially gives license to them to amend the complaint in

11  order to -- or to amend their claims.  It's without prejudice

12  in those instances except for the one party that chose not to

13  respond.

14      **MR. SCHIAVONI:**  Well, your Honor, I was trying to get

15  first through why you should hear me and then address the

16  merits.  So, if, if we're --

17      **THE COURT:**  Well, okay, we'll get back to that then.

18      **MR. SCHIAVONI:**  Well --

19      **THE COURT:**  And I recognize the *Truck Insurance v.*

20  *Kaiser* decision.  But both Judge Littlefield and Judge

21  Kinsella in Syracuse, respectively in Albany and Syracuse

22  distinguished it.

23      **MR. SCHIAVONI:**  Yes, your Honor, to -- I would agree

24  that Judge Littlefield reached a very different conclusion.

25  And with all due respect -- I have tremendous respect for

1   Judge Littlefield but I think he was wrong and appeals are
2   going up to the Circuit on that now.  He basically adopted
3   exactly what the claimants had to say there.  If you take his
4   conclusions to their logical end, he's basically saying that
5   an insurer would have to have -- agree to pay the indemnity
6   even before the indemnity's incurred in a case.  The insurer
7   in *Kaiser Truck*, it was defending under a reservation of
8   rights because one never really knows exactly what the claim
9   is until it fully develops.  So it's commonplace to develop
10  under reservation.
11       For Judge Littlefield, with all due respect to him, to
12  sort of suggest that one has to agree in advance to pay in
13  full the indemnity even before the case has sort of gone
14  forward to trial and one knows anything about it, it's
15  utterly inconsistent with how insurance law works.  It's --
16  in New York the courts permit and bless an insurer defending
17  under reservation of rights and seeing how things are going.
18  We have not disclaimed on paying any defense obligation.  We
19  just don't have one right now.  We have stepped in and
20  associated the defense and the Committee has offered you some
21  case law saying that, well, that doesn't mean we get to
22  control the defense.
23       Well that's not the issue here.  That's not the issue at
24  all.  We've incurred those costs.  We've -- we're in, we're
25  in the defense of the claim and we face financial

1   responsibility but there's no indemnity obligation right now.

2   That doesn't mean I don't have standing to talk about the

3   claim just like I -- it doesn't mean that I don't have

4   standing to retain for the debtor associated counsel to

5   insure that I end up not having indemnity costs.  We would

6   like to see the claims, if that's the proper resolution of

7   them, to be defended successfully.  That doesn't mean an

8   insurer doesn't have liability.  And I think, I think Judge

9   Littlefield just missed that.  He didn't really understand

10  that -- he didn't address that distinction in where he went.

11      Now, with Judge Kinsella, she did grant the insurer

12  standing to be heard in connection with the Confirmation

13  hearing on a number of issues.  So, you know, she did reach

14  the conclusion -- she did in her decision say, well, you have

15  to satisfy the three prong, you know, the three prongs of

16  standing.  And I would agree with her.  She's right.  Those

17  are the three prongs of standing.  Just what I think was

18  missed there -- and I don't think her decision necessarily is

19  inconsistent with anything, any position we're taking -- is

20  that what the Supreme Court said is, yeah, there are three

21  prongs but in a mass, in a tort driven bankruptcy where an

22  insurer given how these plans work and there's a whole

23  section of the decision that deal with this -- the insurers

24  have both, essentially Article III and prudential standing

25  collapse into each other because of how the insurers are

1   impacted by these plans.

2       The debtor -- the claimants do not have an interest in

3   defending the claims post-Confirmation.  That collapses both

4   prudential and Article III standing because in every one of

5   these cases we're then going to really have an interest in

6   sort of dealing with these things.

7       So, again, I don't think Judge Kinsella -- I mean, I

8   would have written that decision differently if I was a judge

9   but it's not inconsistent with the jurisprudence that, yes,

10  there are three prongs.  It's just the Supreme Court when

11  they looked at it, they said these two prongs collapse into

12  each other based on the nature of the fact pattern in these

13  cases.

14      And, your Honor, if you look at, if you were to look at

15  Judge Goldblatt's decision recently out of Delaware, he

16  addresses this very specifically.  He talks about those very

17  issues and he in his decision talks about how *Kaiser*

18  aggregated the concept of prudential standing as a separate

19  notion in a tort-driven bankruptcy.  This was in the *Avon*

20  bankruptcy.  It's a 100-page decision.  It's quite a bear to

21  get through but it's quite scholarly and it goes through

22  those very issues.

23      And, again, Judge Kinsella granted the insurer standing

24  to be heard in connection with a whole host of issues in that

25  case so I don't think her decision was really inconsistent.

1  I concede Judge Littlefield's decision is.  But I would ask

2  you grant us standing to be heard here.

3      I mean, we're -- we're impacted.  I mean, if my client

4  didn't think I was impacted, I wouldn't be in Buffalo today.

5  I don't know in the most practical way here but we're very

6  much impacted by these issues.

7      And I would say the claimants have teed this issue up.

8  They've -- they asked you as a threshold matter to address it

9  when this was filed in the first place, when the motions were

10  filed.  They also make arguments in their papers that are

11  essentially prudential standing arguments and other arguments

12  about how, I don't know, somehow they're preserving their

13  rights on standing to say later we don't have standing, I

14  guess, if we were to prevail here.  It doesn't really make

15  any sense.  We should have standing to be heard here and any

16  sort of partial or misunderstanding on standing I think is a

17  real problem for us.

18      **THE COURT:**  I'm not going to rule today on whether you

19  have standing or not.  I'm just hearing the arguments but

20  certainly proceed forward.

21      **MR. SCHIAVONI:**  Sure.  Thank you, your Honor.  That's --

22  I just wanted to not overstep.

23      **THE COURT:**  Yeah.

24      **MR. SCHIAVONI:**  So, your Honor, with respect to the

25  merits of the objection itself, if we could, there are a lot

1 of papers.  You were given a lot of papers.  There's a lot of

2 sort of duplication among the papers -- maybe we're even

3 guilty of that a little bit.  We did file, I think, eight

4 different briefs.  I think we get that was somehow required

5 but the briefs are largely the same because these claims are

6 the same.  And that's what I would like to zero in first on

7 the commonality of what we have before us today.

8      So what we have here in these eight claims, these eight

9 claims all involve claims where a proof of claim was filed

10 against the Diocese but a separate lawsuit was filed against

11 the Franciscan Friars and the --

12      **THE COURT:**  And the high school.

13      **MR. SCHIAVONI:**  And their high school, St. Francis high

14 school which has a long, storied history here in Buffalo.  If

15 I understand this right, a famous Polish Franciscan came over

16 from Poland and started the school I think before the war.

17      **THE COURT:**  Father Justin Figas.

18      **MR. SCHIAVONI:**  Your Honor, it's an interesting story by

19 itself.  We are guilty of citing Wikipedia but it was for

20 informational reasons and nothing else.  We weren't offering

21 it as a fact.

22      But it was founded as a Franciscan school, run as a

23 Franciscan school, administered as a Franciscan school, and

24 it is owned as a Franciscan school.

25      But what do these claims all have in common?  They all

In Re: Diocese of Buffalo - BK 20-10322

1   have -- each one of these eight claimants filed a separate

2   lawsuit against the Franciscans.  They didn't name the

3   Diocese.  Now they'll say, well, geez, the automatic stay's

4   in place.  But these firms all filed complaints against

5   others before the stay.  But in any event, these were filed

6   after the bankruptcy.  But why that was done one could, one

7   could come up with different ideas about how it impacts

8   contribution and whether it's a sharing or not sharing here.

9       But putting that aside for the pleading before the

10  Court, the proofs of claim and the complaints all allege that

11  the abuser, the alleged abuser was a member of the Franciscan

12  Friars.  The Franciscan Friars are named as a defendant

13  specifically because the alleged abuser was alleged to be a

14  Franciscan Friar.  The Friars in each one of these eight

15  cases are alleged to have had positions at St. Francis high

16  school.  I think one was a vice-principal, others were

17  teachers but they were sort of on staff at that high school.

18  The abuse is alleged to have occurred to these individuals as

19  students of the high school.  The high school is sued.  The

20  Franciscan order is sued.  Both of them are sued as

21  independent separate corporation.  The corporate entities for

22  both of those are named.  Those are both corporate entities

23  that are separate and apart -- they're separately

24  incorporated from the Diocese.  In fact, they're incorporated

25  in other states, the Franciscan Friars.  The abuse, the

1    actual Friars themselves are not employees of the Diocese.

2    They're not paid by the Diocese.  They're on staff at the

3    school itself.

4         **THE COURT:**  Let me just ask a question because I'm not

5    sure it has any relevance to this argument.  It may have more

6    relevance to the motions for stay relief that are scheduled

7    for November.

8         But you attached to your last filing some docket sheets.

9    And docket sheets are not exactly written in perfect English

10   but they are what they are.  And there's a suggestion in

11   there that some of the complaints or one of the complaints

12   may have been dismissed or summary judgment may have been

13   granted.  Does that relate to anything that is the subject of

14   this motion?

15        **MR. SCHIAVONI:**  Your Honor, I'm not -- I don't know, I

16   don't know what you're referring to.  So I may have had

17   problems reading the dockets.  It's not my belief that

18   summary judgment -- I don't know one way or the other, bottom

19   line.

20        **THE COURT:**  Mm-mm.

21        **MR. SCHIAVONI:**  I did not see that entry if one of these

22   cases had been dismissed.  I'd go back and look at it for

23   your Honor and get back to you on that.

24        **THE COURT:**  I mean, this all happened within the last

25   hour that I glanced at that and I didn't fo -- didn't study

In Re: Diocese of Buffalo - BK 20-10322

1    it.  But I'm just wondering whether any of these state law

2    claims against the Franciscans and the high school may have

3    already been dismissed.

4         **MR. SCHIAVONI:**  The claimants, the plaintiffs' lawyers

5    are here.  I think they'll tell when you they speak.

6         Your Honor, we proffered the docket sheets for the

7    proposition that none of those cases we believed -- there's

8    no order -- there's no bankruptcy notice or stay notice or

9    order staying them.  All those cases seem to have been --

10   they're open cases to go forward.  There's different levels

11   of activity in the various cases.  There's one that's been

12   quite active where there's, it appears there's, on the

13   docket, entries for deposition notices and interrogatories,

14   et cetera.  The others is not as apparent what the activity

15   is but it is apparent that there's nothing there indicating

16   that they've been stayed.  The Anderson firm in their

17   submissions have said that they've exchanged at least written

18   discovery there and exchanged documents.  We made a request

19   for these documents so we have a record of that.  We don't

20   have it.  We did get what they submitted.  And presumably if

21   they had material from what they obtained in depositions and

22   other discovery, they would have put that forward if it

23   supported, you know, their case.

24        But in the first instance, your Honor, it's our view

25   that you don't have to reach any of that discovery.  We're

1    here on what the, what the pleading itself says.  And the

2    pleadings here that are before the courts say that these are

3    Friars, members of the Franciscan Order that are alleged to

4    have abused someone at a Franciscan school.  There's -- under

5    New York law -- and we cite this in our briefs -- requires a

6    direct relationship between the Diocese and the abuser,

7    specifically an employment or agency relationship.

8          There's also a requirement that there be notice of the

9    propensity of the person to have -- to abuse or some notice

10   that they had abused.  The federal pleading standards we

11   submit apply here.  The Supreme Court's decision in

12   ****Towney which requires that the relationship be pled with

13   some accompanying factual allegations bearing on the

14   plausible existence of such a relationship.  In other words,

15   you can't under the federal standard just make a sort of

16   generalized -- you can't just make a conclusory statement

17   that the Diocese is responsible.  You have to have something

18   to say, well, the Diocese actually was paying these guys or

19   employing them directly or they knew about this or they had

20   notice.  The complaints are devoid -- the proofs of claim are

21   devoid of any assertion that the Diocese, in fact, had notice

22   that these particular individuals had a propensity to commit

23   abuse.  It's also devoid of anything suggesting that the

24   Diocese, in fact, employed them.

25         The only thing that is sort of asserted generally now

1    through declarations that sort of Canon Law gives the Bishop

2    response -- sort of an ability to sort of have oversight over

3    Catholics within the Diocese.  And while that may be true or

4    not true under Canon Law, it's like that is not in any way

5    specific factual allegation that they in fact exercised, you

6    know, some sort of direct agency or employment role here with

7    respect to these folks.

8         We think, your Honor, on that basis, these claims, for

9    the same reasoning that Judge Glenn applied, these eight

10   claims failed.  They don't plead a claim.  He, the judge,

11   Judge Glenn dismissed almost identical claims in his case.  I

12   think the difference is what he didn't have in his case is

13   the affirmative representations by the claimants that we have

14   here that the Friars are in fact responsible like we have

15   through these complaints.

16        **THE COURT:**  So now Judge Glenn -- and I already

17   mentioned this -- at the conclusion of his opinion ruled that

18   the dismissal of the claims was without prejudice to the

19   possibility of filing a new proof of claim that might assert

20   some better basis for liability.  Do you see that as -- if I

21   was to grant your motion, would you see it to be more

22   appropriate as a dismissal of these -- or denial of these

23   claims with prejudice as opposed to without prejudice by

24   reason of the character of the state court proceedings?

25        **MR. SCHIAVONI:**  Your Honor, it's within your discretion

In Re: Diocese of Buffalo - BK 20-10322

1   to go either of those two routes.  But when you weigh that
2   issue, I think we're in -- we are in a different position to
3   some extent than where Judge Glenn was.  Here, the stay has
4   been lifted and these cases against the Franciscans have gone
5   forward for two years, okay.  So they've taken discovery,
6   they have discovery.  You know, a significant amount of time
7   has gone forward.  Not only have they obtained discovery and
8   I, you know, some of the individual claimants will say, oh,
9   you know, in this particular case we're going to take
10  discovery.  But the course of sort of dealings in these
11  things is not to take ten depositions of the principal of the
12  St. Francis high school.  Plaintiffs' firms will pick one
13  case, go active in that case, and take depositions of the
14  particular people that are important there and take documents
15  and then use them in the other cases.
16       So I just keep that in the back of your mind when you
17  hear a response to this that, oh, this particular case didn't
18  get a lot of discovery.  It's like they've had two years to
19  take discovery.  They've taken discovery from the
20  Franciscans.  They've also, your Honor, there's a very
21  significant amount of production here by the Diocese.
22  There's in fact some of the claimants -- one of the claimants
23  citing in the -- that was, you know, produced by the Diocese
24  that they don't maintain a personnel file on Friars.  So they
25  noted that, they looked for that material and they have that

1   also.

2       But more than that, the fact that plenty of time has

3   passed here, there's something else.  The Diocese -- and we

4   would be, the Diocese proffered a declaration.  We proffered

5   a declaration of government records and we're not asking you

6   to rely on those and make a decision to dismiss.

7       I would submit, your Honor, you can take those into

8   consideration in your evaluation of whether the dismissal

9   should be with or without prejudice because the thing we know

10  from those is that -- and they're essentially uncontroverted

11  after eight months, the Diocese submission and ours.  And

12  nowhere in the hundred pages of pleadings that the claimants

13  filed did any of them come back and say, no, the declarant is

14  wrong, these Friars were in fact employed by the Diocese.

15  None of them came forward and said that, oh, no, the school

16  is really owned by the Diocese or has a financial interest.

17  Nobody really said, oh, well, the Diocese in the Articles of

18  Incorporation.  They didn't say all that because that's

19  not -- those are all things they can't plead.  We know they

20  can't plead these things because these declarations and

21  exhibits are before you and they're not contested.

22      They're not saying we think those are wrong and that we

23  want to plead that in fact the school is owned by -- the

24  Diocese has some secret ownership interest.  They're not

25  saying that.  It's like so the core facts that they need here

1  are not there.  And they've also come forward, I think, your

2  Honor, with their best evidence that they've developed in

3  these other cases and it doesn't -- none of it has anything

4  to do with any of this.  We -- one of the reasons I did want

5  to get in -- I mean, I'm sorry I was working on something at

6  2 o'clock.  Actually my wife was quite upset about it, but,

7  you know, I'm sorry I filed it that late.

8      But we wanted to look at those exhibits quite closely

9  because they sort of spun in the papers it's like, well,

10 there's an agreement with the Franciscans about how to run

11 these Diocese and whatnot.  But when you -- we walked through

12 those in our reply submission individually, and to the extent

13 your Honor has time after the argument to look at those more

14 closely, we welcome that because I think four or five of the

15 six exhibits submitted by the Anderson firm are about

16 Diocesan schools.  They're agreements with the Franciscans

17 about how to put their staff in a Diocese high school.

18     There's one -- the very first exhibit in there is a

19 letter with a form agreement attached and admittedly I had to

20 literally use a magnifying glass to look text because it was

21 copied in a way that you can't really see it but it's there

22 in light language that this is for staff of Diocesan schools.

23 That's what we believe those agreements were about.  They

24 sort of spun in the papers that, oh, no, you know, there are

25 agreements here with the Friars but I don't think that's what

In Re: Diocese of Buffalo - BK 20-10322

1  they're about at all.  And there were depositions taken, we

2  don't see trans-- you know, those transcripts weren't

3  submitted to us.

4       So, your Honor, again, it's within your discretion on

5  how you balance fairness and whatnot about whether or not to

6  allow them to replead.  But I don't think they can plead

7  those facts based on -- I think you can make a dismissal here

8  with prejudice based on the length of time that's passed, the

9  fact that they've had discovery in these cases, and they've

10  had discovery here.

11       I would like to just make a brief comment about I think

12  your Honor's questions went right to what I wanted to present

13  so you may have drawn out from me some of my best material,

14  your Honor.

15       But just briefly this declaration that was submitted by

16  a former priest of the Diocese.  It's quite lengthy.  It goes

17  on and on and on.  He's a priest that was ordained in 2009, I

18  think it is.  He's not, he's not held out as a percipient

19  witness, someone with personal knowledge about anything

20  having to do with the school.  He does offer an opinion about

21  the section of the Canon Law that deals with the Bishop's

22  ability to have oversight of Catholics within his, the

23  geographical range of his Diocese.  You know, recently that

24  Canon provision was invoked in New Orleans by a Bishop

25  against some people brought over from Africa who were

1  engaging in exorcisms or something that was viewed to be

2  hieratical, okay. I mean, this is stuff out of the middle

3  ages when those are invoked.

4      In the day-to-day real world, the religious orders like

5  the Jesuits and the Dominicans and the Friars, they run their

6  places on their own. They run their own finances. They can

7  be quite zealous about their own jurisdiction. Now, if one

8  of their people starts preaching something that's off the

9  reservation, for lack of a better word, yes, the Bishop has

10 authority to step in. But that's -- there's no suggestion in

11 that declaration that -- it's not just a suggestion. It's a

12 generic opinion. He doesn't talk in there about anything

13 about exercising direct oversight over who to hire, when to

14 hire, where to hire, and they don't even maintain personnel

15 files on the Jesuits or priests that are brought in.

16     In fact, there's one letter that was submitted -- it's

17 the one letter, the only letter that actually deals with

18 St. Francis high school, that kind of make the point. It's a

19 letter from the Franciscan provincial telling the Bishop,

20 hey, so you know, we put two more people into St. Francis.

21 He's not asking the Bishop's permission. He's not asking to

22 incarnate those people, those Friars in the Diocese. He's

23 just sort of introducing that, hey, we put two people, we put

24 two folks in there. He's not asking the Bishop to do

25 anything if you read the letter.

1       But I don't think that -- I don't think you need to

2   reach the declaration.  The issue here is the pleadings and

3   what the pleadings are about.  None of them make allegations

4   that the Diocese was directly involved in running this

5   school, that they had any knowledge of the propensity of

6   these individuals to commit abuse, that they had committed

7   abuse associated with these folks, that they, in fact,

8   employed these people or even if they maintained a personnel

9   file.  It's just -- it's devoid of any of that, your Honor.

10  And for those reasons we ask that you disallow the proofs of

11  claim.

12      If you choose to do that on a -- without prejudice

13  basis, you know, we'll be back if we have to when we see the

14  repled claims.  We think it would be futile and you should

15  not do at that because of the length of time here on

16  discovery, your Honor.

17      And with that I'll submit on my papers.

18      Thank you very much, your Honor.

19      **THE COURT:**  Thank you, as well.

20      We have a number of responses.  Unless the parties have

21  a preference, I'd hear from the parties most affected which

22  are the counsel for the creditors but we also have a

23  Committee response and a response also from the Diocese.

24      Have you discussed among yourselves which one should go

25  first?

In Re: Diocese of Buffalo - BK 20-10322

1    **MR. SCHARF:**  We have, your Honor.  We thought it would

2    make sense for counsel for the claimants to go first and

3    address some of the issues really pertaining to the facts of

4    the claims and what's been done in the underlying cases with

5    discovery, what needs to be done to the extent you have to

6    reach this -- to the extent that the pleading standard under

7    Iqbal/Twombly is appropriate to show that there is a

8    plausible path to a claim here.  That in fact needs more

9    discovery which is one of the central arguments.  And then

10   the Committee through myself would talk about some of the

11   bankruptcy issues raised by PEIC and U.S.F. and then the

12   Diocese would follow, as well, and then we all reserve time

13   to reply to whatever rebuttal there is.

14       **THE COURT:**  All right.  By nods, I can perceive that

15   everyone's agreeable with that.

16       **MR. DONATO:**  That's fine.

17       **MR. SCHIAVONI:**  Your Honor, I have an answer to your

18   question.  That case was, my colleague here, he just told me

19   the case was dismissed on summary judgment on lack of notice,

20   one of the very issues that we're bringing up here.  It was

21   dismissed on lack of notice.  It's on appeal.  Do you have a

22   record cite for the judge?  Is it an exhibit to our papers?

23       **UNIDENTIFIED SPEAKER:**  Yes, your Honor.  It's appendix

24   three to our objection to proof of claim number 807.  I will

25   quote the docket for you to get you to the unredacted

1  version.

2      **THE COURT:**  All right.  Well, thank you for that update.

3  But whichever counsel among those representing the creditors

4  wants to speak first, we'll be happy to hear you.  I

5  recognize that they're somewhat, the arguments -- I've looked

6  at all the briefs.  I recognize they're somewhat repetitive,

7  particularly those of parties that have filed multiple

8  responses because there were independent objections rather

9  than group objections.  But I'll let counsel appear and note

10  her appearance and present her argument.

11     **MS. BENSON:**  Thank you, your Honor.  My name is

12  ***Stacey Benson.  I'm with Jeff Anderson & Associates and

13  I'm here today representing numerous survivors in this

14  bankruptcy case but specifically claimant 125, claimant 428,

15  and claimant 203 who are the subject of three of the eight

16  claim objections today.

17     **THE COURT:**  And those are all from the same three that

18  you're looking for stay relief in November?

19     **MS. BENSON:**  That is correct.

20     **THE COURT:**  Okay.

21     **MS. BENSON:**  So this Court should deny the excess

22  insurer's claims objections or alternatively these matters

23  should be continued until after the stay relief motions are

24  heard.  So I'm glad you brought that up.  If those stay

25  relief motions are denied, then at least we request an

In Re: Diocese of Buffalo - BK 20-10322

1   opportunity to conduct further discovery including on the

2   debtor and both non-debtor defendants.  We want to provide

3   all the information and facts to you, Judge, so you can make

4   a decision if that's how you want to proceed with this.

5       But I think, as Mr. Schiavoni was speaking, most of his

6   arguments actually don't really equate to the pleading stage.

7   More so, it's a motion for summary judgment.  He's bringing

8   up facts, he's bringing up all of these different situations

9   where these aren't at the pleading stage.  He's making

10  argument on fact and that's a motion for summary judgment.

11  But I'm not going to get into those standards today.

12      But we respectfully disagree with Judge Glenn's decision

13  in the Southern District.  It's unfair to survivors in this

14  case.  When this case was originally filed in February of

15  2020 and the proof of claim form was approved, this Court

16  said it was only required a Form 410 and the questionnaire

17  was voluntary.

18      And all these survivors came forward, hundreds of them,

19  and they filed their claims and they went ahead and shared

20  their stories.  They filled out these questionnaires because

21  they wanted their stories and they wanted their truths heard.

22  This Court didn't require it and if we're going to change

23  direction and all the sudden require all of these survivors

24  to plead their case in their proof of claim, then at least we

25  should have an opportunity to conduct discovery and provide

In Re: Diocese of Buffalo - BK 20-10322

1    all of the information that this Court wants.

2        **THE COURT:**  Let me ask a preliminary question.

3        **MS. BENSON:**  Sure.

4        **THE COURT:**  You have three clients.  It's -- I'm under

5    the impression that you also commenced separate actions

6    against the Franciscans and against St. Francis high school.

7        **MS. BENSON:**  That's correct, your Honor.

8        **THE COURT:**  Those would have had a statute of

9    limitations date of some date in I believe 2021.

10       **MS. BENSON:**  It was coterminous with the bar date here.

11       **THE COURT:**  That's right.

12       **MS. BENSON:**  Yep.

13       **THE COURT:**  And I did that deliberately with some

14   opposition but that's what I did.  So those have been

15   outstanding at least for 4 years.

16       Those plaintiffs, if they recover, are only going to

17   recover once.  They only, their damages are defined by --

18   you're not going to recover your damages twice.  Where do you

19   stand on those separate litigations that have been pending

20   for 4 years?

21       **MS. BENSON:**  Sure, good question, your Honor.

22       So when the Parish stay was at issue, too, and that was

23   released, we had an agreement with the Franciscans, as well,

24   to hold discovery from moving forward on all Catholic

25   entities.  And also to your point about the claims -- or

1   excuse me, the complaints outstanding, Mr. Schiavoni wants

2   you to believe that our complaints don't meet standards,

3   federal or state -- they do.  And we did claim that all of

4   these perpetrators were under the employment, supervision and

5   control of both St. Francis, the religious order, the

6   Franciscans and the Diocese of Buffalo.  That's in our

7   complaints that we submitted as well.

8        But also the excess insurers here have known about these

9   claims for 4 years and they chose on the eave of the Diocese

10  filing their plan of reorganization to bring these claim

11  objections and now we're here today, you know, with -- we

12  have a resolution with the Diocese and the Committee and now

13  they want to engage in protracted and expensive litigation as

14  we're trying to get a plan confirmed for over 900 survivors.

15       **THE COURT:**  All right, well --

16       **MS. BENSON:**  And we do -- and we have started discovery.

17  We are engaged with the Franciscans, we've had meet and

18  confers, we served discovery, we've had extensive discussions

19  with them and it is proceeding so it has not been stagnant.

20       **THE COURT:**  All right.  But we don't know -- no prospect

21  of imminent resolution?

22       **MS. BENSON:**  Not at this point, your Honor.  We're in

23  continuing conversations with them.

24       **THE COURT:**  All right.

25       Mr. Boyd.

1    **MR. BOYD:**  Your Honor, Steven Boyd.  I'm cocounsel with

2   Ms. Benson and I just want to say since you brought up the

3   discovery issue, Mr. Schiavoni has just told you all kinds of

4   presumptions of what he believes has happened during

5   discovery.

6        I can tell the Court that we have not yet deposed one

7   member of the Franciscan Order.  We are in the phase of paper

8   discovery and none of the discovery that has been demanded

9   has anything to do with the insurance or with the

10   relationships between the Diocese and the very question

11  before this court.  So, we are proceeding as a case against a

12  Franciscan high school and the Franciscan order just as we

13  have some against a Jesuit high school and a Jesuit order.

14  Your Honor --

15       **THE COURT:**  And also against the I don't know, someone

16  has a claim against the Oblates (phonetic) and somebody has a

17  claim against --

18       **MR. BOYD:**  Oblates, and --

19       **THE COURT:**  There's multiple orders.

20       **MR. BOYD:**  Rochester, the Basilians and the Vincentians,

21  many Orders.

22       But, your Honor, we need to take a step back.  Catholic

23  life is not corporate life.  Catholic life is Catholic life.

24  If you went to Canisius and I could have afforded to go to

25  St. Francis, we'd both say we went to Catholic high schools.

In Re: Diocese of Buffalo - BK 20-10322

1  We would both have gone to mass regularly in our Catholic

2  high schools and recited the creed hundreds of times.  We

3  believe in one holy Catholic and Apostolic church.  And at

4  the mass in the most critical part of the mass, the holiest

5  part of the mass, the Eucharistic prayer.  We would have

6  prayed -- in your day and my day -- for Paul our Pope and

7  Edward our Bishop and all the clergy every day at mass or

8  ever week at mass at Canisius high school, at St. Francis

9  high school, at St. Joe's high school.  People who go to

10 these high schools, our clients, they thought they went to a

11 Catholic high school.  Bishop Head said mass.  It appears in

12 their yearbooks, they were Catholics, they didn't go there to

13 become Franciscans.  They worship in Catholic Parishes today.

14 And so to draw a line between what has happened corporately

15 in the last 20 years during this crisis and what people

16 believed when they were there, what the priests believed when

17 they were there was that this was one holy Catholic and

18 Apostolic church.

19     Our expert says that all of these priests answer to two

20 earthly matters -- masters:  The provincial of the Friars and

21 the local Bishop.  That's what Canon Law says.  And we can't

22 skirt Canon Law, Judge, because I think if we do, we get into

23 First Amendment issues.  The church has a right to operate in

24 the manner that it wishes.

25     And so it's our position and it's our expert's position

1   that under Canon Law, these Friars operated within the

2   geography of the local Bishop and therefore -- and under his

3   authority and, therefore, these cases are so intertwined.

4       Now why did we not sue the Diocese?  Well we couldn't

5   sue the Diocese.  The New York the New York State legislature

6   gave our clients the right to bring old claims from when they

7   were abused as children and they did that because many people

8   couldn't talk about it until they were much older, among

9   other reasons.  For reasons well discussed here, that right

10  was taken away as against the Diocese because of the

11  bankruptcy filing by the debtor.  And the only choice left

12  was to sue Parishes and schools and religious Orders who were

13  also involved.  But that does not mean that the local Bishop

14  didn't have authority over anyone.  It just means that there

15  was a limitation as to what they could do to exercise the

16  right that the New York State legislature gave them.

17      Mr. Schiavoni is asking you to take away that right.

18  They still have a right of claim against the debtor because

19  the debtor was involved in the authority over every single

20  Friar, every single Jesuit and Vincentian.

21      **THE COURT:**  Well I don't want to -- I know both of you

22  are representing the same parties --

23      **MR. BOYD:**  Sure.

24      **THE COURT:**  -- and I don't want to be -- I don't know if

25  I should ask both of you the question and then let you decide

In Re: Diocese of Buffalo - BK 20-10322

1  whoever you want to respond.

2      **MR. BOYD:**  Ask her, your Honor, she's smarter.

3      **THE COURT:**  Judge Glenn at the end of his opinion

4  decided that for most of the claims, with one exception, that

5  the dismissal of the claim, the denial of the claim was

6  without prejudice.  Your request for discovery may suggest

7  that your claim in its present form is not adequate and needs

8  some supplementation that can only be acquired after some

9  discovery.  Am I misreading your argument?

10     **MR. BOYD:**  I think so, your Honor.  I think this Court

11 approved the proof of claim form and said that many of the

12 questions were optional.  The claimants met that standard.

13 The state court is a notice pleading state.  These claimants

14 filed complaints in New York State court and met that

15 standard.  Now if we hold them to a federal pleading standard

16 now, we've played a shell game and you're an accomplice in

17 that game because they were told here's the standard and they

18 met it.  Here's the other standard and they met it, and now

19 you want to move the goalposts -- not you -- but now they

20 want to move the goalposts.

21     And so by asking -- and by the way, your Honor, these

22 insurance issues, these authority issues of who was

23 supervising who is not in the proof of claim.  And so why

24 would you hold people to a standard for not answering a

25 question that was never asked?

1      **THE COURT:**  Well, my concerns about the disclosure

2   statement and Plan are really not your problem.  They're a

3   problem I'm going to perhaps give Mr. Donato a hard time on.

4   And in particular, the disclosure statement includes an

5   exhibit which lists the parties who are beneficiaries of a

6   channeling injunction if such were ever to be granted and

7   that exhibit says "to be provided".  So I have no idea

8   whether it's intent of the plan proponents -- and it's a

9   joint plan between the Committee and the debtor -- as to

10  whether or not St. Francis high school and the Franciscans

11  are intended beneficiaries of a channeling order.  Does that

12  make a difference?

13     **MR. SCHARF:**  Your Honor, they're not so we can --

14     **THE COURT:**  Okay, they're not.

15     **MR. SCHARF:**  They're not.

16     **THE COURT:**  So whatever we do here, they're not the

17  beneficiaries of a channeling order.  Whatever comes out of

18  this plan -- assuming we get there -- you still have the

19  right to sue the Franciscans and St. Francis high school for

20  any unsatisfied injuries.

21     **MR. BOYD:**  And I think the way you worded that is

22  important, your Honor, because I think as a practical matter

23  at the end of these cases when someone will evaluate the

24  cases, I think that evaluator will take into account that

25  there is an ongoing and concurring lawsuit, and it has

1    happened in I don't know how many of these bankruptcies have

2    been resolved but those people receive a reduced amount.  And

3    we have had meet and confers with the Franciscans and I think

4    everyone is kind of in agreement that no one is trying to

5    double collect and that as part of the discovery we fully

6    expect Judge Chimes or Judge Savita (phonetic) or whoever is

7    in charge of the particular case to let the jury know exactly

8    what, if any, other settlements have been paid to the

9    plaintiff at the end of the case.  But it's not an issue

10   that's been decided yet.  But as a practical matter that's

11   the way things have gone.

12       But nobody here is trying to double collect.  It is for

13   lack of a better phrase -- this is kind of hamhanded -- it is

14   a single injury case.  I mean, there are multiple incidents

15   but it is a single case.  But there are multiple defendants.

16   So, because of the way things have laid out procedurally, it

17   is not a joint and several case.

18       **THE COURT:**  But the level of damages is identical no

19   matter --

20       **MR. BOYD:**  The level of damages does not go up because

21   you have more defendants.

22       **THE COURT:**  That's right.

23       **MR. BOYD:**  Yeah, we agree with that.

24       **THE COURT:**  I mean, why should it be -- I mean, this is

25   more of a practical question than something that's raised in

1   any of the papers.  But would it not be in the Diocese's best

2   interest to go and have the Franciscans pay the bill rather

3   than the Diocese and for you it doesn't make any difference.

4       **MR. BOYD:**  Well and it would be in the Franciscan's

5   interest to have the Diocese pay the whole thing.

6       **THE COURT:**  Well that's also true.

7       **MR. BOYD:**  But under the law we sued multiple

8   defendants.  We could not sue the Diocese in some of the

9   claims so there are multiple responsible parties and I don't

10   think it's anything new in the world of torts that multiple

11   parties who could be responsible could pay percentages of a

12   claim.

13       **MS. BENSON:**  Your Honor, may I just point out --

14       **THE COURT:**  Yeah

15       **MS. BENSON:**  -- one section of the Diocese response, as

16   well, where I quote "while the Diocese believes that it

17   should have little, if any, liability under such

18   circumstances, certain claimants have articulated legal

19   theories which, if successful, might possibly provide a path

20   to finding of liability against the Diocese.

21       And so, that in and of itself is saying if we have facts

22   that are sufficient -- and the filing of the proof of claim

23   itself in this courtroom for these claimants said our

24   position is that the Diocese does have some liability in

25   these cases.

In Re: Diocese of Buffalo - BK 20-10322

1          **THE COURT:**  Liability or exposure?

2          **MS. BENSON:**  I would say both.

3          **THE COURT:**  All right.  Of course liability hasn't been

4     proven.  Exposure is -- exposure even without liability at

5     this point.

6          **MR. BOYD:**  Well our ability to prove liability against

7     the debtor has been taken away from us.

8          **THE COURT:**  Let me focus on your expert.  And this gets

9     more to the philosophy of tort law.

10         If any of us was driving down the road and sees a party

11    injured on the side of the road in some sort of distress, we

12    have no obligation -- a moral obligation perhaps -- but no

13    legal obligation to stop and provide assistance.  There's no

14    duty.  And I read the Zilliox's expert opinion which suggests

15    that -- or may suggest that the Bishop, the Diocese has

16    opportunities to control the activities of the, of the

17    Franciscans, has opportunities to control what happens in the

18    high schools, but is that not like a driver who sees an

19    injured party and has an opportunity to do something but no

20    obligation to do something?

21         And is there -- I looked through the Zilliox's expert

22    opinion and the question I have is:  Is he really identifying

23    an opportunity of the Diocese to do something or is he

24    creating an actual duty?  Is he identifying a duty as opposed

25    to an opportunity?

1    **MR. BOYD:**  We've outlined the duty in our complaints in

2   state court.  And your question to our expert is a question I

3   think that could better be answered after discovery.  Because

4   we've given you our expert's opinion but we're, we're doing

5   this prediscovery on these particular issues.

6        But, your Honor, this is not a car accident case.  This

7   is a case where we -- I want to be careful how we say this.

8   We believe reports of abuse for all religions could have been

9   and may have been reported to the local Bishop.  We know from

10  our own experience cooperating with investigators from the

11  Diocesan independent review board, that they have on many

12  occasions, and in the last one that I cooperated with, they

13  were investigating a Jesuit priest.

14       And on many occasions they were investigate -- and they

15  don't do these investigations on the priests that are

16  deceased but in many occasions, the Bishop's review board,

17  the Diocesan review board investigates these clerics to see

18  if they are credibly accused.  And so very often the

19  Bishop -- and I think the Bishop would step in if he knew and

20  we can't, of course we can't ask Bishop Fisher to speak for

21  what Bishop Head did.

22       But we believe under Canon Law that there is an

23  authority and we believe that perhaps once the evidence is

24  gathered, that you should conduct a hearing on this and we

25  can bring the expert in and ask questions.

In Re: Diocese of Buffalo - BK 20-10322

1    But to rule as a matter of law today or whenever you

2 issue a decision that these claim objections should be

3 dismissed is to do so without an ability by the claimants to

4 gather evidence and to put their case in front of you.  And

5 we think that's patently unfair.

6    **THE COURT:**  Your expert suggests that the -- there's

7 ultimate authority in the church.  The ultimate authority

8 rests with the Pope.  Presumably the Pope can -- has the

9 authority to remove the Bishop if he doesn't think something

10 is proper.  Presumably he has the authority to go and take

11 control over the Franciscans if he thinks something is

12 improper or to exercise some control.

13    No one is suggesting here that -- and no one has

14 attempted to bring an action against either the Pope or the,

15 let's say the Pope because he fails to exercise that

16 opportunity to control or the opportunity to go and exercise

17 some control over what has happened in this Diocese.

18    But isn't the authority of the Bishop comparable to that

19 in terms of not so much a duty but more an opportunity?  And

20 isn't this more an act of omission rather than an act of

21 comission and does that make a difference?

22    **MS. BENSON:**  Your Honor, part of this also goes back to

23 when a religious order priest does come into the Diocese,

24 they have to have faculties from the Bishop and that's

25 outlined in our expert report and in our papers as well.  But

1   in order for that priest to even function in the geographical

2   territory of the Diocese, he has to be granted faculties by

3   the Bishop.  And that, in and of itself, definitely would

4   rise to the level of duty.  And it's been my experience and

5   my firm's experience and mine in the last 15 years that

6   religious order priests do have -- they do have a

7   responsibility within the Diocese and the Bishop has a

8   responsibility and a duty to protect all of his flock within

9   the Diocese, and that includes children who are exposed and

10  work with religious priests whom that Bishop has granted

11  faculties to work in his Diocese.  He also has the power to

12  remove them.  And if -- like I said earlier, your Honor, I

13  think all of our complaints were sufficiently pled.  I think

14  there is a duty here and I don't think it is an opportunity

15  for the Bishop.

16       And I just want to add to what Mr. Boyd said, too, about

17  Mr. Zilliox and if we do get to the level of an evidentiary

18  hearing on this matter, I mean all these questions can go to

19  him.  I'm not a Canon Law expert but I have enough at least

20  knowledge in litigating these cases for the last 15 years

21  that that has been my experience.

22       **THE COURT:**  All right.  Go ahead.

23       **MS. BENSON:**  I just wanted to -- just a couple other

24  points, your Honor.

25       If this does move forward and this Court does decide on

1    whether it's going to dismiss these claims, it is our request

2    that the excess insurers objections are denied.  But in the

3    event that they aren't denied, there has been other cases --

4    the Southern District with Judge Glenn is a unique situation.

5    No other bankruptcy court, at least to my knowledge, has held

6    proofs of claim for survivors to that standard.  Additionally

7    in Milwaukee when there was issue as a matter of law

8    pertaining to the statute of limitations.  Judge Susan Kelly

9    allowed survivors to conduct discovery and move forward.

10         **THE COURT:**  Well does it really make a difference?  I

11   mean, Judge Glenn issued his order without prejudice which

12   means that presumably the claimants could have amended their

13   claims to assert some better foundation for duty.

14         Was that ever done, do you know, with your clients in

15   Rockville Center?

16         **MS. BENSON:**  I would -- I don't know offhand, your

17   Honor, I'm sorry.

18         **MR. SCHARF:**  I can address that, your Honor.  I

19   apologize for stepping in.  Some of them were amended.  There

20   were also appeals taken of Judge Glenn's order, and, frankly,

21   the case settled before that issue was like fully, fully

22   ironed out.

23         **MR. SCHIAVONI:**  The District Court affirmed, your Honor.

24         **MR. SCHARF:**  But it could have gone up -- I think it was

25   going to go up to the Second.  I mean, there was an appeal

In Re: Diocese of Buffalo - BK 20-10322

1    process under -- I'll address the details of this --

2       **THE COURT:**  Okay.

3       **MR. SCHARF:**  -- the issues with the decision.  But just

4    from a procedural standpoint there was never final resolution

5    of the appellate process because the case settled and there

6    was no need to further appeal.  And by the way, those people

7    came back into the bankruptcy to receive a distribution at

8    the end of the day.

9       **MR. SCHIAVONI:**  The District Court affirmed.

10      **MR. SCHARF:**  But the Second Circuit never got, never

11   got, never got to decide it.  And, and, and, those people

12   came back into the bankruptcy case because the insurance

13   companies who settled said I want a release from those guys

14   whose claims you bounced out of the bankruptcy and so

15   ultimately it's, it was, it was dismissals without real life

16   effect at the end of the day.

17      **THE COURT:**  Okay.  Well it's an odd question.

18      So go ahead, Ms. Benson.

19      **MS. BENSON:**  Thank you, your Honor.

20      I think the bottom line is here is if you go back to

21   2020, U.S. Fire, Pacific Employers, they didn't even object

22   to the proof of claim in this process.  The form 410 was what

23   this court said is the standard for survivors to submit their

24   proofs of claim in.  Questionnaire was voluntary.  These

25   three claimants have met that standard and their claims

1  should continue.

2      Respectfully, your Honor, this Court should deny the

3  excess insurers claim objections or in the alternative just

4  defer your decision until after the stay relief motions and

5  proper discovery has been completed so that you as a

6  factfinder in this situation can make a more fully informed

7  decision.

8      **THE COURT:**  Okay.  Of course we have the foundation for

9  the objection really is Mr. Suchan's affidavit.  I gather you

10  disagree with Mr. Suchan's affidavit?

11      **MS. BENSON:**  Yes, your Honor, we do.  And Mr. Suchan is

12  hardly the witness that should be able to speak to employment

13  supervision and control of these perpetrators.  And it has

14  been found in state courts in the *J.D. v. the Archdiocese of*

15  *New York* case that basically an identical declaration was

16  submitted by the Archdiocese's general counsel and the court

17  determined that that was insufficient and it was just

18  basically mainly legal conclusions and denials and that was

19  insufficient to dismiss that survivor's lawsuit.

20      **THE COURT:**  All right.  Let me ask -- there's no

21  argument that I -- no significant argument, maybe you read

22  your own papers differently -- there was no real argument

23  that as to the jurisdiction of this court under 28 U.S.C.

24  Section 157 in terms of -- which has limitations on our

25  ability to decide personal injury claims.  You don't see this

1    objection as being limited in any way by Section 157, do you?

2        **MR. BOYD:**  Your Honor, I barely speak Canon Law and I

3    don't speak bankruptcy law so I don't even know how to answer

4    that question.

5        **MR. SCHARF:**  I'll address that issue in my presentation,

6    your Honor.

7        **THE COURT:**  Okay.

8        **MS. BENSON:**  I will, I will just add that your Honor --

9    and we will address this in the stay relief motions as

10   well -- but the appropriate forum for these cases from our

11   perspective is the state court especially on -- just as you

12   said in deciding a survivor's personal injury claim and the

13   state courts are equipped to hear these and they've been

14   hearing them for five years.  And I'm not saying that you

15   aren't equipped to do it, Judge, but I do think the New York

16   legislature, as Mr. Boyd pointed out, afforded these

17   survivors their opportunity to file in state court and if

18   this is going to be a fact issue, as it has been brought to

19   this Court, then that is the proper forum for it to be

20   adjudicated.

21       **THE COURT:**  All right.  Let me ask one other question.

22   I already alluded to it which is a rather difficult issue in

23   bankruptcy law and that's the issue of Marshaling.

24       Here we have prospective liability of the Franciscan

25   order.  It would certainly benefit the Diocese if these

1  claims were settled and resolved and full compensation

2  provided from another source.  That other source may be the

3  Franciscans or perhaps the St. Francis high school or perhaps

4  their insurance carriers.  Why shouldn't we let them take the

5  first hit on liability rather than the Diocese?

6      **MR. BOYD:**  I'm sorry why should you take?

7      **THE COURT:**  Why shouldn't we let the Franciscans and

8  their insurance carrier take the first hit on satisfying

9  these claims rather than the Diocese of Buffalo?  And I know

10  Marshaling is a very -- is an equitable doctrine, very

11  difficult, but why not let them take the first hit rather

12  than the Diocese of Buffalo?

13      **MR. BOYD:**  Well those claims are still in litigation

14  and, you know, a long time ago Mr. Donato and I went back and

15  forth about the speed at which a state court case could take

16  place and I estimated two years and he thought closer to four

17  years.  And we were both estimating.

18      **THE COURT:**  And he turned out to be more accurate.

19      **MR. BOYD:**  Well we're one year into it, into the stay

20  relief cases.

21      **THE COURT:**  Well in the St. Francis and Franciscan

22  cases, those are -- the Diocese at this moment, until I grant

23  stay relief, is not even a party to those actions.

24      **MR. BOYD:**  Correct.  Correct but --

25      **THE COURT:**  And they've been ongoing for four years.

In Re: Diocese of Buffalo - BK 20-10322

1    **MR. BOYD:** But my point, your Honor, you know, we have

2    opened estate after estate for our claimants that have died.

3    And for St. Francis to take the hit first, we would need

4    St. Francis cases to get to a jury and I don't think that's

5    happening before the end of 2026.  I think it's more likely

6    to happen around the spring of 2027 if things proceed as

7    they've been proceeding.  And more people will die.

8         And so to wait for St. Francis to pay their share before

9    the Diocese pays their share, we were not the ones who chose

10   bankruptcy court.  Our clients frankly didn't choose to be

11   here at all.  They were forced into this position as children

12   then made the decision to come as adults but.

13   **THE COURT:** But they choose to file a separate action

14   against the Franciscans and against St. Francis high school

15   and I'm not suggesting that they're not doing it but they

16   have the ability to pursue those claims, that litigation in

17   state court with some diligence at this point and it's

18   already been outstanding for 4 years -- well more than 4

19   years because the statute of limitations was in August of

20   2021.

21   **MR. BOYD:** And so I'm not understanding what the

22   question is then.

23   **THE COURT:** Well you've had litigation trying to obtain

24   a recovery from the Franciscans.

25   **MR. BOYD:** Right.

1    **THE COURT:** And that's been outstanding for more than 4

2  years.  Why the delay in getting that to the forefront?  If

3  you can recover from the Franciscans, there's no need -- we

4  wouldn't even need to argue the case over here.

5    **MR. BOYD:** Well I can't predict what we would recover

6  from the Franciscans.  I can say, though, that in the order

7  of things it appears that their cases will get to a jury

8  selection I think hopefully before a joint plan is

9  confirmed -- after a joint plan is confirmed and that any

10  recovery would be reduced if the evaluator who could look at

11  all these claims and determine whether or not to make any

12  kind of monetary settlement to each of these people.  But to

13  take the other way and just eliminate their ability and then

14  to put it all on the Franciscans, it's not fair either.  So.

15    **THE COURT:** But I mean if your clients recover in full

16  for the full amount of their damages from the Franciscans,

17  what do they care whether there's any contribution from the

18  Diocese?

19    **MR. BOYD:** Well, our clients provided proofs of claim,

20  you know, presumably before August 14th of -- or August 19th

21  of 2021.  They've been in this process all that time.  And

22  they have been ex -- they knew that the case was separated

23  due to a bankruptcy filing.  And so to now be told almost 6

24  years into it that -- into the bankruptcy and certainly the

25  child victims act that now you don't have a proof of claim in

1    the bankruptcy, you only have the lawsuit against the

2    Franciscans, I mean, I'd hate to have to break the news to

3    them because all the while they thought they had this kind of

4    claim and --

5         **THE COURT:**  Although.

6         **MR. BOYD:**  And why shouldn't they?  I mean, really the

7    point is not how you collect, the point is who's liable and

8    our position is the Bishop is partially liable.

9         **THE COURT:**  But on the other hand, if this matter had

10   been pursued diligently -- and you said your estimate of a

11   personal injury claim was 4 years from start to resolution --

12   if these claims against the Franciscans had been pursued

13   diligently, presumably we would have had a judgment and if

14   that judgment was paid by the Franciscans, I probably have a

15   different motion today.  I'd have a motion saying that was

16   satisfied, that claim was satisfied.

17        **MR. BOYD:**  And not just with these three because I

18   honestly can't recall the captions but if you had a

19   Franciscan case where you also had named St. Martin's parish,

20   then that would have been stayed under the stay relief order,

21   right, when it -- and it was not clear to us.  In other

22   jurisdictions when we received an order staying the cases, we

23   get a list and it was not clear whether some of these cases

24   were stayed or not.  And during that 4 years we had a

25   pandemic.  So it's, I think it's an oversimplification to say

1  you've had 4 years, it should be done.  I think typically

2  these cases are done in 2 to 3 years but we're going to be

3  entering year 6 very soon.  There have been other

4  circumstances outside of this -- outside of our client's

5  control.  We are in discovery now with the Franciscans but we

6  cannot say with any certainty -- I can probably say with most

7  certainty that we will not get to jury selection in those

8  cases before you minimally have the disclosure hearing and

9  possibly depending on how that goes the Confirmation hearing.

10    **THE COURT:**  Well, in light of the current status of

11  Disclosure Statement and Plan, I'm not sure -- I'm not going

12  to predict how soon we get to the disclosure phase.  All

13  right.

14    Any other arguments?

15    **MR. BOYD:**  Thank you, your Honor.

16    **THE COURT:**  All right.  Thank you.

17    **MS. BENSON:**  Thank you, your Honor.

18    **THE COURT:**  We have other parties representing claimants

19  and feel free to address the questions I already posed and

20  new arguments as it fits, as you feel appropriate.

21    **\*\*\*MS.:**  Good morning, your Honor, MY name is my she

22  will lie bay KWREPB.  I'm an attorney at Harmon law and we

23  represent one of the claimants whose objections were opposed

24  by counsel.  It's claim number 697 going forward.

25    Your Honor, this is a first of a few things for me.

1  It's a first appearing before you so I appreciate the

2  opportunity to be here and before your court.  It's also the

3  first for me to know as a Catholic that my Catholic high

4  school from a particular order is not perhaps considered by

5  counsel to be part of a Catholic Diocese as to where I went

6  to Catholic school.  So that's a first for me just in my lay

7  understanding repeating some of the sentiments from Mr. Boyd

8  and Ms. Benson so that was actually a first to me.

9      And also in regards to these objections to claims.  The

10  I guess the uniqueness of coming and finding these proof of

11  claims is, as what's been echoed what was asked in the proof

12  of claim I mean, the form 410 and the proof of claim, it was

13  basic and it provides for the information that our claimants

14  provided and, again, as noted that everything else was

15  voluntary.

16      I can tell you that our client was very distrustful

17  coming forward to have belief in an institution again and we

18  assured them, and I'm sure counsel did as well, if you have

19  to go into the bankruptcy court, you can believe this

20  institution, they will listen to your claim.  They will

21  believe, as you filed under penalty of perjury no less, the

22  proof of claim that your statements -- and our claimant, he

23  wrote the Diocese of Buffalo over and over, St. Francis,

24  Diocese of Buffalo, St. Francis Diocese of Buffalo.  So in

25  his proof of claim he provided the information that was

1    asserted truthfully under penalty of perjury.

2         Opposing counsel makes a statement when asking if the

3    claim should be dismissed with or without pen -- without

4    prejudice, he noted the time, the amount of time that's

5    passed.  And, Judge, you as well, you noted the amount of

6    time that's been passing and I think that is probably the

7    most saddest effect of all of this is that the time that's

8    passed.  My client who was a teenager at the time still is

9    seeking 50 years later, treatment, medical treatment for the

10   sexual assaults that was committed against him.  To this

11   court he filed his proof of claim in 2021, upon the news of

12   appearing in court, listening to motions, even hearing

13   potential settlement and plans being made, he now has to

14   believe that he is not acknowledged for the crime that was

15   committed or -- against him.  The Court does not believe or

16   the insurance carriers don't believe that these abuse is

17   attributed to the Diocese of Buffalo.

18        So the idea that counsel can now speak of time almost

19   feels, um, comical in the sense that part of the delay has

20   been perpetrated to keep a lot of our clients from seeking

21   the justice that they deserve from this court.  I will

22   certainly say, as others have said, we submitted the proof of

23   claim, we believe that all the facts provided in the proof of

24   claim are correct.  We sought discovery the first time when

25   the Diocese had filed objection to the claim and we did not

In Re: Diocese of Buffalo - BK 20-10322

1  receive any discovery.  So, the information that counsel

2  said, well, we have discovery and we could find and we could

3  have pled and we could have amended and we could have

4  supplemented, we weren't provided that discovery.

5      And we now ask this Court, you, your Honor, to at least

6  allow us the opportunity to do some discovery.  We provided

7  the expert before you, Mr. Zilliox.  I know counsel noted,

8  oh, he went on and on and he was a priest.  He was a

9  canonical adviser to the Bishop.  He was on the Diocesan

10  review board.  He's an authority licensed under canonical law

11  appointed to the Bishop Stack and I'm not talking any

12  particular Bishop -- the Bishop of Buffalo.  So the

13  statements that he made, they have to have some more weight

14  and consideration that in his statements if he says there is

15  information that could be found that the Bishop has, we

16  should be able to pursue that.

17      So with that, your Honor, we find that's disingenuine

18  for counsel to speak of the loss of time and how our proof of

19  claim wasn't pled well enough when, one, the standard wasn't

20  even provided to create a pleading to have that type of

21  assertment of documents, and, two, if that is what's

22  required, we respectfully request for the time to get that

23  and we will move with all deliberate speed to both subpoena,

24  depositions, whatever we need to do to supplement this claim.

25  But we certainly ask you to not dismiss these claims and

1   certainly not to dismiss them without prejudice without the

2   opportunity to seek the discovery that we feel is credible

3   under our expert's testimony that's available to us.

4       **THE COURT:**  Well, your papers rely on the Zilliox expert

5   opinion.

6       **\*\*\*MS.:**  It does.

7       **THE COURT:**  And I'm -- and this goes more to -- this is

8   not bankruptcy law.  It's tort law.  What are the essential

9   elements of a proof of -- of a claim in bankruptcy or outside

10  of bankruptcy -- let's say outside of bankruptcy, one of the

11  essential elements of a cause of action under tort law, one

12  of those essential elements is a duty.  And what I struggled

13  with on the Zilliox expert opinion is does he really identify

14  a duty as opposed to an opportunity?  He says that the Bishop

15  has the power to approve the placement of people in the

16  Diocese, the giving them of credentials.  He says that he has

17  the ability to remove someone who he doesn't like or

18  disagrees with.  He has a host of powers but does that create

19  a duty?

20      Now on the other hand, for claims other than involving a

21  Parish, it's somewhat different, the theory is different.

22  You have a -- one can argue that he's -- that the Diocese is

23  maybe an employer.  If not an employer, the Diocese may have

24  negligently made an assignment of somebody who had a history

25  of wrongful conduct and keeps on reassigning them to a

1  Parish.  And so with the majority of our claims in this case

2  involving Parishes, you would either have a duty by way of

3  employer/employee relationship or perhaps negligence in terms

4  of the -- negligence in terms of making an assignment of

5  someone who had known proclivities or problems.  So you have

6  a, you have a different theory of liability.  Now we're

7  dealing with someone who, according to Mr. Suchan's

8  affidavit, is not an employer.  The Diocese is not an

9  employer of these individuals.  And so we're dealing with

10  something different.  Where is the duty?  And I -- the

11  Zilliox expert opinion, I'm not -- I'm certainly open to

12  argument on it but it's not obvious to me as to whether he

13  identifies a duty as opposed to an opportunity to exercise

14  control which the Diocese chose not to do just like, you

15  know, a driver --

16      **\*\*\*MS.:**  Yes.

17      **THE COURT:**  -- passes somebody that's injured and say,

18  well, I don't have any duty it's not my problem he just

19  drives along.  Is that right?  Maybe not morally right but

20  does it create a legal obligation?

21      **\*\*\*MS.:**  Of course, and I understand this question.  And

22  I thought about this question, as well, as you were asking

23  Mr. Boyd.  And from just the questions that you provided

24  right now, I actually hear three questions in the one.  One,

25  is there a duty?  And as Mr. Boyd mentioned, I would say also

1  this Court has the ability to call in the expert, have a

2  hearing, an evidentiary hearing and ask him.  But how I

3  read -- it's just my opinion -- as I read it, I found, yes,

4  there is a duty.  Canonical law was written up and down

5  through his papers saying there is not just only control and

6  authorization but in my opinion, yes, I think there is a

7  responsibility and a duty that he writes in his papers but,

8  again, I would have the Court a better --

9      **THE COURT:**  Is that a question of --

10     **\*\*\*MS.:**  -- response would be to have him actually come

11  in and refer to that.

12     **THE COURT:**  Is that a question of law or a question of

13  fact?

14     **\*\*\*MS.:**  I believe that it is a question of fact that

15  would allow the Court to come in -- I mean, if it's a

16  question of fact, it has to have the opportunity to be

17  fleshed out, your Honor.  And in your other questions you

18  asked about the duty as provided through torts.  In our

19  complaint we had noted in our complaint the duty to

20  supervise, negligent retention, so we had provided that

21  information in our complaint.  And, three, you had mentioned

22  about the affidavit -- oh, for the insurers.  I don't think

23  that affidavit in and of itself can be relied on just because

24  so many of the statements are conclusory, your Honor, and

25  self-serving, if I may say.

In Re: Diocese of Buffalo - BK 20-10322

1  And, again, I think the best way to handle with regards
2  to the proof of claim just to have an evidentiary hearing and
3  have all the experts in and to confirm, yes, there is a duty
4  or as you say, maybe it's just a, you know, a opportunity,
5  let's say.  But I think the reading of the duty would create
6  the opportunity for us to get the evidence to provide to you
7  in a better format, your Honor.

8  **THE COURT:**  Your response looks for an opportunity for
9  discovery.  Is that acknowledging, is that not an
10  acknowledgment that perhaps your proof of claim needs -- on
11  its face it may be subject to challenge but you want to give
12  better grounds for the existence of a duty?

13  **\*\*\*MS.:**  No, I think our proof of claim as provided by
14  this Court is sufficient.  It's what the Court has asked, we
15  provided.  And we provided under penalty of perjury.  But at
16  this point where we are, if this Court is demanding for us to
17  support with evidentiary, we would be able to get that if we
18  have discovery, your Honor.  And I know counsel stated, well,
19  they didn't object to A, B or C, in their response we don't
20  have the evidence to be able to object because we were denied
21  discovery.  So if we have the opportunity, yeah, I'm sure we
22  would put in our pleading how we would object to things that
23  they put in their papers.

24  **THE COURT:**  How far are your clients along in terms of
25  getting a judgment against -- or a trial against the -- I

In Re: Diocese of Buffalo - BK 20-10322

1   make no suggestion that there's --

2       **\*\*\*MS.:**  Yes.

3       **THE COURT:**  -- any liability on anybody.

4       **\*\*\*MS.:**  Of course.

5       **THE COURT:**  That's not for me to decide at this point.

6   And 28 U.S.C. Section 157 says that's an obligation of a

7   state court to decide.  But is there any -- I'm not saying

8   there's liability or not liability but how close are you to

9   getting that decision in the state court proceedings?

10      **\*\*\*MS.:**  I would first have to say that I'm not the

11  litigating attorney on state court for that case but from

12  what I see, I'd suggest also that we're about probably

13  spring, maybe end of '26, spring of '27 possibly if, again,

14  we get all the information.  We're still going through

15  discovery on that.

16      **THE COURT:**  One of your clients -- and this is suggested

17  in the papers and I know they were filed only at 2 in the

18  morning so if you're not ready for them, I understand that.

19  But one of the papers suggest that one of your clients had a

20  stipulation of discontinuance in the state court proceeding.

21  Does that --

22      **\*\*\*MS.:**  I --

23      **THE COURT:**  Can you fill me in on why?

24      **\*\*\*MS.:**  I can say that I did not have the opportunity

25  to read those papers that were filed last night and I'm not

1  aware of any discontinuation at this point but I would

2  certainly like the opportunity to look into it.  But at this

3  point I don't have that information for you, your Honor.

4      **THE COURT:**  All right.  Okay.

5      **\*\*\*MS.:**  And that's where I would just, with our papers

6  submitted, thank you again for the opportunity and for giving

7  me and both my client to have a voice for you to hear our

8  concern.  Thank you.

9      **THE COURT:**  All right.  We try to give everyone a voice

10  but the penalty of that, of course is you get to stay here

11  longer.

12      **\*\*\*MS.:**  Thank you, your Honor.

13      **THE COURT:**  I think we have another creditor that may

14  want to speak.

15      **UNIDENTIFIED SPEAKER:**  Good morning, your Honor.  We're

16  still in the morning.

17      So there's been a lot of conversation about the

18  individuals that had their case dismissed.  That's my client.

19  That's 807.

20      **THE COURT:**  Okay, I'm sorry if I suggested it was the

21  other one.  I may have been wrong but go ahead.

22      **UNIDENTIFIED SPEAKER:**  My client was abused by Luke

23  Rutter.  He is probably, this client is probably what we

24  would consider ground zero anywhere.  He is probably the

25  first human that was abused by Luke Rutter as a teacher.  He

1    came into the school, St. Francis, in 1978 and that is when

2    my client was a freshman at 14 years old.  And as he sat in

3    vocabulary class, he was groomed with exceptional attention

4    to him, names like, you know, you're the funny professor, the

5    professor, and then it moved to touching, back, hips, waist

6    and then to the genitals.

7         One of my other clients three years later was also

8    abused by Father Rutter.

9         Claimant 807's case was dismissed.  It's now up on

10   appeal.  We did not have a deposition of anybody from the

11   school, any of the Franciscans.  Additionally, they refused

12   to provide any discovery in regards to any relationship or

13   one piece of document related to the Diocese because they

14   weren't a party to that litigation.

15        And why are they not a party to that litigation?

16   Because they filed bankruptcy and were here.  I'm boots on

17   the ground in the state court actions, as Mr. Boyd is.  We

18   literally talk with these clients every day and we know what

19   happens.  I've never seen any of those individuals in a

20   conference.  They don't know what happened in the state

21   litigation actions.  We aren't sharing documents.  Often

22   we're not permitted to.

23        **THE COURT:**  But that dismissal is under appeal you're

24   saying?

25        **UNIDENTIFIED SPEAKER:**  It is.  We don't get to share

1  deposition witnesses because guess what?  Different people

2  did different types of abuse.  There's different age ranges,

3  there's different time periods.  We don't all get to sit in a

4  room, as what's been perceived that the state counsel does,

5  and gather all of our documents and figure out who we want to

6  depose.  That isn't the reality of what's happening.  They

7  have three cases.  One has been dismissed and the other two

8  are not anywhere close to a trial date and most of that

9  happened because of the COVID delay of two years.  We had at

10  least a two-year delay there.

11      And then I have a case who's moving faster than the

12  other two where I have a school -- the very school that

13  they're like get these documents from refusing to provide

14  them because they're not a party to the litigation.  And it

15  has nothing to do with the Friars' negligence or inability to

16  train or hire or anything else.  So he kind of wants to walk

17  away this two-way street where you guys over here in state

18  court haven't done enough to push your cases because you're

19  waiting for the Diocese money.  And then those people that

20  got dismissed for notice because I have the ground zero guy,

21  well, you couldn't prove a case against the Diocese anyway.

22  You can't let them do that.  These are individuals that have

23  come forward in two different realms, in two different places

24  to try to get some satisfaction out of what happened to them.

25  Fortunately, 807 wasn't raped.  I can't say the same for my

1     other two clients.  By the same Father and Priest.

2         So, I'm standing up here and I hear what's happening.

3     I'm not a bankruptcy attorney.  I leave that to Ilan.  I'm

4     here, I talk to these people every month, sometimes weekly.

5     They filled out the proof of claim.  We did it painstakingly

6     with every one of our clients and we gave it to you guys and

7     everything was good until we get to the eave of settlement

8     and it's all of a sudden not okay.  And now they're talking

9     about we're just going to object and kick these out.

10        And you try to legally or logically explain that to

11    someone that's not an attorney and I try to get Ilan to

12    explain it to someone that is an attorney and I had a really

13    hard time following it.  If this Court finds that the proof

14    of claim didn't cover what needed to be covered, give us the

15    opportunity to resolve that issue.  Simply moving these,

16    these nine, ten, eight, whatever, just off to the side

17    doesn't really solve the problem.

18        **THE COURT:**  All right.

19        **\*\*\*MS.:**  Thank you.

20        **THE COURT:**  All right.  Thank you for your comments.

21        Do we have anyone else that's representing a claimant

22    that wants to speak?  We have people who are in the courtroom

23    who have had that opportunity.  Is anyone else on line wants

24    that opportunity?

25        **MS. \*\*\*VOSS:**  Yes, your Honor.  This is STEF in this

In Re: Diocese of Buffalo - BK 20-10322

1   TPWROS slater slater SHAUL man.  My office represents

2   claimant 111.  I don't want to repeat what has been

3   previously argued by my state court colleagues.  But I do

4   want to say that I share in the frustration I've heard

5   expressed as we are defending the sufficiency of our client's

6   proofs of claim which were submitted in accordance with the

7   Court's directions, using a form that the debtor agreed to

8   and are now being judged by a federal court pleading

9   standard.  The proof of claim was not meant to be a

10  complaint.  It doesn't -- that wasn't the intention.  We

11  filed a complaint in state court against the Franciscans,

12  against the school and against the Parish that our clients

13  attended.  And our state court complaint was pled in

14  accordance with state court pleading standards.

15      So, I believe what has been done in the proof of claim

16  was sufficient but if the Court is to find otherwise.  I

17  would ask for the opportunity to conduct discovery, to

18  attempt the proof of claim and to, you know, achieve a fair

19  result for my client.

20      **THE COURT:**  All right.  Thank you.

21      Anyone else on line that wants to speak on behalf of any

22  of the claimants?

23      (No response.)

24      **THE COURT:**  All right.  I think as indicated earlier,

25  now I believe the Committee wants to argue its position.

1    **MR. SCHARF:**  Thank you, your Honor.  Ilan Scharf,

2  Pachulski, Stang Ziehl & Jones for the Committee.  I'll go

3  through this.  I will address some of the bankruptcy adjacent

4  questions that you had asked and some of the other questions

5  you had asked to state court counsel in my presentation and

6  of course whatever questions your Honor may have for me.

7       And so I think, your Honor, I want to just kind of frame

8  this a little bit before I launch into the discussion and

9  just make a couple of points.  We are not contesting standing

10  under the *Truck* decision so we're not arguing about standing

11  under *Truck*.  We have a separate issue as to whether or not

12  under state law the insurance company can, these excess

13  insurance companies can drop down and really direct defense

14  of the claim or take over defense of the claim in the

15  bankruptcy process.  We have a couple of points that we think

16  that first -- and they think that's a basis to deny the

17  claims objections outright.

18       But to the extent that your Honor disagrees and does not

19  deny them outright or the insurance company actually funds

20  the defense of the claim like they're supposed to under state

21  law in order to have the right to direct the defense, we

22  think that discovery would be needed.  We think that

23  discovery would be needed to address these issues.  And I'll

24  expand on all of that later.

25       And, finally, we think that, frankly, state court is the

1    proper forum here and I'll address that question that your

2    Honor had asked about Section 157.  So we're dealing here,

3    your Honor, with an interesting situation where the Diocese

4    has settled in principle and we have the Plan -- we

5    understand that Plan is going to be revised and amended as we

6    move through this process.

7        **THE COURT:**  Well I mean, the serious question is whether

8    I can even consider what was filed as a Plan because of so

9    many elements are missing.

10       **MR. SCHARF:**  Mm-mm.

11       **THE COURT:**  I already questioned one of them.  Who are

12   the parties that are beneficiaries of the channeling order

13   and that's not indicated -- well the Plan, what was filed

14   says to be provided.

15       **MR. SCHARF:**  Sure.  And I'll address that.  I mean, part

16   of the way these cases -- this is an interesting case, right.

17   And it's a little bit of an unusual case even in the unusual

18   world of Diocesan bankruptcy cases, right.  We are still

19   working through the settlement process with the insurance

20   companies.  So we have a settlement in principle with the

21   Diocese.  We have a settlement in principle with Wausau.  We

22   have a settlement in principle with some other carriers as

23   well at this point.  They haven't made it into the Plan yet.

24       **THE COURT:**  One thing it's not clear to me from what was

25   filed.  Is the United States Fire is excess liability?

1    **MR. SCHARF:** Right.

2    **THE COURT:** Does your settlement encompass the primary

3    in his case?

4    **MR. SCHARF:** In one instance yes and in one instance no

5    because he's got -- his, there's U.S -- sorry. There's U.S.,

6    there's U.S. Fire, there's U.S. Fire -- there's U.S.

7    Fire/PEIC they're both part of the same company now but

8    they're still -- I guess they're maintaining them separate

9    entities within that structure. And I apologize. I just

10   don't remember off the top of my head but I can look it up.

11   One of the years is '78, '79, is that Wausau.

12       (No audible response.)

13   **MR. SCHARF:** That's Wausau. So we have a settlement as

14   to that one.

15       The other year is '81, 82. That's -- the primary there

16   is Selective or Exchange. We do not have a settlement with

17   Selective or Exchange yet. We do, however, have a mediation

18   scheduled for Monday morning where we're going to try to wrap

19   that up and I can represent I don't think we're like miles

20   and miles apart with Selective. So we're working to get that

21   resolution of that other underlying.

22       So, one primary carrier: No settlement. The other

23   primary carrier: There is a settlement. And I think we did

24   put -- when we talk about -- when we talk about this in our

25   pleading -- and I can get the exact cite -- but when we talk

1   about it in our pleading, we do cite to one of Mr. Murry's

2   declarations where he had the exhibit in one of the adversary

3   proceedings showing where they are and I think we do say that

4   they are -- which one is excess to the other, to which

5   primary carrier in the pleading.  So it is in there if your

6   Honor --

7        **THE COURT:**  As far as --

8       **MR. SCHARF:**  -- is going back to look at it.

9        **THE COURT:**  As far as the movants are concerned, some of

10   them have a primary that has settled and some of them have a

11   primary that has not yet settled.

12      **MR. SCHARF:**  That has not -- correct.  And on top of

13   that, a defendant in the Diocese -- or an insured rather that

14   the Diocese that's settled as to its liability.  And so there

15   is that complexity here where you do have a -- and we address

16   this, I think, in our papers, and I think Mr. Donato will

17   address this a little bit more fulsomely just because we're

18   divvying up the labor of the arguments.

19      But I think that there is this huge issue of if a

20   primary is not paying the cost of defense and the Diocese,

21   you know, has settled, really if the excess carrier wants to

22   direct the defense and wants the Diocese to have to go

23   through the process, they need to actually pay the Diocese's

24   counsel.  And I'm going to address that as part of my

25   discussion, as well, in more detail.

In Re: Diocese of Buffalo - BK 20-10322

1    So, your Honor, so that's the -- that's where we are

2  with these excess carriers.  The Committee, the carrier has

3  made a big deal about whether or not the Committee has a

4  right to be heard or should be opining on this issue and I

5  think that it's coming from a perspective -- again these are

6  not normal bankruptcies but in a tip -- in a commercial

7  bankruptcy case, Committees are typically interested in

8  making sure that there are as few creditors as possible and

9  as much money to distribute as possible so that the average

10 recovery per dollar of claims is higher.

11    This is a different kind of case and, your Honor, the

12 Committee is comprised of abuse survivors and the Committee's

13 constituency is abuse survivors.  And what their -- their

14 objective is not solely economic in this case.  They are

15 never going to get compensated fully through the bankruptcy

16 process and it's unlikely they'll ever be fully compensated

17 for their damages in the tort system.  But they want to make

18 sure that the overall survivor community obtains fair and

19 equitable results across the board and so they want to make

20 sure that everybody's rights are fully vetted, everybody's

21 rights are fully protected.  And so that's why the Committee

22 has made the decision to oppose this type of claim objection

23 and we're not even saying, we're not even saying that the

24 issue shouldn't be litigated.  If it has to go forward, we're

25 saying it has to be litigated in the right way.

1       So, again, funding the defense costs if you're going to

2  drop down and direct the -- as an excess carrier you're going

3  to drop down and direct the defense as well as allowing an

4  appropriate discovery process if a claim does go forward and

5  going forward -- and allow the claim to go forward in the

6  correct forum.  That issue about forum is really an issue for

7  three claims November 17 and I anticipate four (phonetic)

8  other claims shortly thereafter when the stay relief motions

9  are scheduled -- or will be filed for some of the other

10  claims.

11      So this goes back to this, you know, the U.S. Fire and

12  PIC's speculation about the motives of the Committee and the

13  desires of the Committee are just not appropriate.  I mean,

14  we're not going to -- we're not opining on the ultimate

15  merits of the case.  We're just trying to advocate for a fair

16  process.

17      And let's talk now about the state law issue where

18  excess carriers do not have the right to control or interfere

19  with defense of a claim.  And we cited case law, New York

20  State case law in our brief -- in our, not brief but our

21  opposition pleading.  It's not an issue of standing.  It's

22  not an issue of prudential standing, it's really a question

23  of insurance law.  You know, it's, typically speaking, the

24  excess carriers sits above the primary and just waits for the

25  judgment to come in and then pays it.  And if they believe

In Re: Diocese of Buffalo - BK 20-10322

1  they need to participate in the defense, they have to pay for

2  the defense costs.

3      What U.S. Fire and PIC have done here is actually very

4  interesting.  They've paid for -- they say they're funding an

5  associated -- associate counsel.  I honestly don't even know

6  what the heck that means.  To me it sounds like they are

7  funding -- and it may be Mr. Schiavoni can explain this in

8  his rebuttal.

9      **MR. SCHIAVONI:**  It's in the policy what associated

10  counsel is.

11      **MR. SCHARF:**  Okay.  But are you --

12      **MR. SCHIAVONI:**  It's in the contract.

13      **MR. SCHARF:**  But they're not funding somebody to

14  represent the Diocese.  They're funding someone who's

15  answering to them.

16      **MR. SCHIAVONI:**  Incorrect.

17      **THE COURT:**  First of all, when someone asks for a

18  transcript they're not going to be able to figure out who's

19  talking.  That was Mr. Schiavoni making a commentary.  We'll

20  give you that chance later on.

21      **MR. SCHIAVONI:**  I'm sorry.

22      **THE COURT:**  Because our court reporter's not going to be

23  able to figure out --

24      **MR. SCHARF:**  And, and --

25      **THE COURT:**  -- who's saying what.

In Re: Diocese of Buffalo - BK 20-10322

1    **MR. SCHARF:**  And this may be one of those issues we just

2    need some further briefing on after we hear their response

3    but it sounds like it's not, they're not funding the defense

4    costs for anybody who's going to be responding to discovery

5    on behalf of the Diocese.  I mean, they're really taking --

6    they're stepping into the shoes of the Diocese to pursue this

7    claims objection as an insurer and they're not funding the

8    fees of anybody responding to discovery, they're not funding

9    the Diocese defense counsel so they're essentially leaving

10   the Diocese and maybe the primary insurer out to dry while

11   they're forcing these costs on them.

12       **THE COURT:**  Let me try to get to what I think are some

13   fundamental --

14       **MR. SCHARF:**  Sure.

15       **THE COURT:**  -- confusion.

16       **MR. SCHARF:**  Sure.

17       **THE COURT:**  And I read the Disclosure Statement and

18   Plan.

19       **MR. SCHARF:**  Mm-mm.

20       **THE COURT:**  I'm sure you read it and I know you

21   recognize its deficiencies.

22       **MR. SCHARF:**  Mm-mm.

23       **THE COURT:**  But there's some questions that I have about

24   it because -- and I read your brief.  You're arguing that

25   among other things, that we should give the Plan Confirmation

1   process an opportunity --

2       **MR. SCHARF:**  Mm-mm.

3       **THE COURT:**  -- to go and resolve these issues before we

4   get into addressing the merits, and I understand that.  But

5   I'm somewhat confused based on what has been filed.

6       **MR. SCHARF:**  Sure.

7       **THE COURT:**  Let me ask, start with asking a

8   hypothetical.  Let's assume that we have somebody, a claimant

9   who accepts the Plan.

10      **MR. SCHARF:**  Mm-mm.

11      **THE COURT:**  But also has a claim against the Franciscans

12  and St. Francis high school.

13      **MR. SCHARF:**  Mm-mm.

14      **THE COURT:**  By accepting the Plan, are they satisfying

15  their claim against the Franciscans and the --

16      **MR. SCHARF:**  Absolutely not.

17      **THE COURT:**  I mean, I know that's what you want.

18      **MR. SCHARF:**  I --

19      **THE COURT:**  Is that clear?

20      **MR. SCHARF:**  I --

21      **THE COURT:**  Do I have the authority to direct that?

22      **MR. SCHARF:**  So you do and this has been very -- I don't

23  have the exact citation to the, to the section of the Plan

24  off the top of my head.  But the Plans in these cases provide

25  that, at least the ones I've worked on, that there's no

1  resolution of any claim against a non-settling party or

2  non-released party or non-channelled party and specifically

3  religious -- I believe this is in the Plan, specifically

4  religious orders are not -- or the Holy See, for example,

5  don't get a release and so if somebody wants to sue their

6  claim against the Holy See, they're allowed to do so.  If

7  somebody wants to pursue a claim against a religious order,

8  they are allowed to do so.  And there's also an

9  acknowledgment in the Plan that the amount of the

10 distribution is not full and complete satisfaction of the

11 abuse here because --

12      **THE COURT:**  Well, I know that's what you may --

13      **MR. SCHARF:**  Mm-mm.

14      **THE COURT:**  -- propose but then when the separate

15 lawsuit against the Franciscans eventually comes to trial --

16      **MR. SCHARF:**  Mm-mm.

17      **THE COURT:**  -- I presume the Franciscan counsel will say

18 well this was settled --

19      **MR. SCHARF:**  Right.

20      **THE COURT:**  -- over in the bankruptcy court, don't come

21 here for a second bite --

22      **MR. SCHARF:**  So --

23      **THE COURT:**  -- at the apple.

24      **MR. SCHARF:**  You're right.  And I think that, I think

25 that goes not to the merits of the actual underlying

In Re: Diocese of Buffalo - BK 20-10322

1  litigation.  I think that goes to a, a setoff, for example,

2  of the amount of the liability.

3       So, for example, let's just say that if a case proceeds

4  to a jury against the Franciscans and there's an $8 million

5  judgment and that stands up and passes all the appeals and

6  there's a final, final judgment of $8 million and let's say

7  that person gets $250,000 of the bankruptcy, I think it's

8  perfectly fair for the Franciscans to say, well, I'm really

9  only liable for 7.75 million because you got $250,000.

10      **THE COURT:**  Well, that would be --

11      **MR. SCHARF:**  You can't get more than --

12      **THE COURT:**  That would be --

13      **MR. SCHARF:**  -- $8 million.

14      **THE COURT:**  That would be the plaintiff's position.

15      **MR. SCHARF:**  No, that would be the Franciscan position,

16  defendant position.

17      **THE COURT:**  Well the Franciscans will say you've settled

18  this --

19      **MR. SCHARF:**  I believe --

20      **THE COURT:**  -- don't come back and ask for me --

21      **MR. SCHARF:**  I believe that -- I don't think that -- but

22  they haven't settled it because they haven't settled with the

23  Franciscans.  They haven't settled the Franciscans liability.

24  And you can have settlements with individual defendants and

25  it's really just a question of a setoff, right, or a setoff

1    amount as opposed to a, as opposed to wiping out the claim

2    entirely against the Franciscans.  If, if -- there are

3    settlement agreements that Dioceses have typically entered

4    into before bankruptcy that will say this is a release of

5    everybody because we never want to hear about this claim

6    again and so it releases the religious order, it releases the

7    Diocese and then they can work out internally who pays what.

8         But in the context of a bankruptcy it's never been the

9    case that a non-settling religious order gets -- or has

10   argued successfully that the claim is wiped out because there

11   was a bankruptcy distribution.  I'm sure they'll argue it but

12   it's never been a successful argument.

13        **THE COURT:**  All right.  Go ahead.

14        **MR. SCHARF:**  But again that brings us back to where we

15   are today --

16        **THE COURT:**  Mm-mm.

17        **MR. SCHARF:**  -- with respect to these particular claims

18   objections.  And so, your Honor, the -- again we have this

19   argument under New York law that if they're really going to

20   be directing defense of a claim and this thing goes to

21   discovery, et cetera, the Diocese is going to incur costs.

22   Mr. Suchan will be deposed.  There will be a challenge to his

23   declaration.  I presume others within the Diocese would be

24   deposed such as the Bishop or other people who may have been

25   witnesses or here at the time, maybe the Vicar.  I mean,

In Re: Diocese of Buffalo - BK 20-10322

1  there are going to be a number of depositions of Diocesan

2  individuals.  There will also be further document discovery

3  from the Diocese.  The document discovery -- yes, your Honor.

4      **THE COURT:**  Yeah but on the other hand, your Plan is I

5  thought was -- well, at least your argument was clear that

6  the, that the Plan would still preserve the opportunity for a

7  trial later on.

8      **MR. SCHARF:**  It does.

9      **THE COURT:**  And so either the Bishop's going to be

10  deposed in that future trial --

11      **MR. SCHARF:**  Right.

12      **THE COURT:**  -- or they're going to be deposed now.

13      **MR. SCHARF:**  But it becomes a question of who pays the

14  costs.  So under the Plan if a claim is not insured or the

15  insurer's not funding the defense costs and the claim

16  proceeds to trial -- let's say, can I just use a hypothetical

17  to explain it?

18      **THE COURT:**  Mm-mm.

19      **MR. SCHARF:**  Let's say we have no settlement with

20  Selective.  They're a primary carrier, it's an easier

21  example.  We have no settlement with Selective and Mr. Boyd

22  and Ms. Benson are representing a claimant who has a claim

23  wholly covered by Selective and they are pursuing that

24  litigation.  It goes forward and let's say Selective says I'm

25  not paying defense costs because I'm just denying coverage

In Re: Diocese of Buffalo - BK 20-10322

1    outright.  The trust has a reserve set up, will have a

2    reserve set up to reimburse the Diocese for its costs.

3        **MR. SCHIAVONI:**  Your Honor, objection (phonetic).

4        **MR. SCHARF:**  So that's what the Plan says.

5        **THE COURT:**  I'll give you time.

6        **MR. SCHIAVONI:**  Okay.

7        **MR. SCHARF:**  That's just what the Plan says.  So the

8    Plan -- the Plan has a mechanism for funding the litigation

9    as part of a settlement with the Diocese where the Diocese

10   doesn't bear the costs.

11       **THE COURT:**  Let me focus on where I'm confused.  United

12   States Fire is an excess liability carrier.

13       **MR. SCHARF:**  Correct.

14       **THE COURT:**  Let's suppose that they were an excess

15   liability carrier in a simple slip and fall case.

16       **MR. SCHARF:**  Yep.

17       **THE COURT:**  And you have a primary obligor and they're

18   the excess carrier.

19       **MR. SCHARF:**  Mm-mm.

20       **THE COURT:**  And the primary obligor negotiates a

21   settlement that is above the primary -- above the policy

22   limits.

23       **MR. SCHARF:**  Mm-mm.

24       **THE COURT:**  And says we want this to, we want to settle

25   this for a judgment of let's suppose the policy limits are a

1  half million dollars --

2      **MR. SCHARF:**  Mm-mm.

3      **THE COURT:**  -- on the primary.  And United States Fire

4  or anybody else is an excess liability carrier.  And so they

5  negotiate hard and they say the primary carrier and the

6  injured party agree to a $1 million settlement.  Well fine

7  and dandy as far as the primary carrier is concerned but

8  that's not going to bind the excess carrier.  You have to get

9  the excess carrier in here as a participant in that

10  settlement.

11     **MR. SCHARF:**  Mm-mm.

12     **THE COURT:**  Why is it any different here?  If they're

13  not a party to the settlement, how can their exposure

14  continue with the primary is no longer, is not -- when

15  they're not a party to a settlement with the primary carrier?

16     **MR. SCHARF:**  Sure.  So I think, let's assume things go

17  the litigation route, they don't settle and we go the

18  litigation route.  And by the way, we will be working to

19  settle as we kind of move forward.

20     **THE COURT:**  We all hope for a settlement.

21     **MR. SCHARF:**  But let's say we go through litigation.

22  Let's take a very simple, it's one occurrence, right, so.

23     **THE COURT:**  Yeah.

24     **MR. SCHARF:**  We don't have to worry about how many

25  occurrences there were.  So it's one occurrence.  Let's say

1  it's a million dollars for the primary and $25 million for

2  the excess and there's a judgment for $13 million or

3  $10 million.  So, I would then say that the excess carrier --

4  so the primary carrier settled so just deduct a million

5  dollars, you're not recovering that million dollars and if

6  you have the excess up to 25, that next $9 million is fully

7  insured and you go and try to collect it from the excess

8  carrier and that's a litigation against the excess carrier.

9      **THE COURT:**  Well, I mean, would you not -- if you want a

10  global settlement on the claim, don't you need to get a

11  settlement that includes both the primary carrier and the

12  excess carrier?  And if you don't have the excess carrier in

13  here, how do you have a feasible Plan?

14      **MR. SCHARF:**  If we don't have the excess carrier in --

15  well, two things.  One, there will be claims that just don't

16  hit the excess policies, right.

17      **THE COURT:**  Well you're going to have this review

18  Committee or whatever, you're going to have a trust and

19  there's going to be --

20      **MR. SCHARF:**  Right.

21      **THE COURT:**  They're going to be evaluating the claims.

22      **MR. SCHARF:**  Right.

23      **THE COURT:**  They're determining what their worth for

24  distribution.

25      **MR. SCHARF:**  Yes and no.  The claims reviewer doesn't

1    determine the value amount of the claim.  The claims reviewer

2    will score the claim essentially.  So he'll say I'm going to

3    look at the severity.  We are never compensating people

4    fully.  We're going to end up with an average in the hundreds

5    of thousands of dollars, not the millions of dollars per

6    claim.

7         And so what that means is, you know, if, what the claims

8    reviewer will do is look at the acts of abuse:  What kind of

9    act was it?  Was it penetration?  Was it a groping claim?

10   Was it over-the-clothes?  Was it skin on skin.  What's the

11   frequency?  Was it -- was there a special circumstance like

12   was the child in the woods in a cabin with the abuser?  Was

13   it in a school?  And then the -- and first they're going to

14   determine by a preponderance -- this is not in the Plan right

15   now but it will be in the allocation protocol and it's been

16   in every confirmed Plan I've ever been a part of.

17        The first question the claims reviewer assesses is

18   whether there's a based on a preponderance of the evidence

19   the Diocese is liable, would be liable for this claim or the

20   participating parties are liable for the claims.  Then assess

21   the severity based on the actual abuse and then the effects

22   of the abuse, so for example, the impact of the abuse.

23        So, for example, in a different case there was a one

24   occurrence abuse while a child was in school at confession

25   and was abused as part -- right after confession by a priest

In Re: Diocese of Buffalo - BK 20-10322

1   and the kid dropped out of school the very next day and lost

2   all their educational opportunities and never got back on

3   track.  And then other people have different types of impacts

4   of the abuse.  I mean, there are some people who are very

5   high-functioning who have been very successful monetarily or

6   otherwise but still have an impact on the abuse.  The abuse

7   reviewer assesses those things and essentially scores them

8   generally on a scale of 1 to 100.  And so it's really

9   comparative liability within the claims pool and then the

10  payment is calculated based on that score.  And so it's not

11  that the claims reviewer will say, well, this claim's worth

12  $750,000 and that claim is worth $12 million.  They're

13  assessing the comparative liability and then we're dividing

14  up the fund.

15      **THE COURT:**  But let's look at it from the perspective of

16  the excess carrier.

17      **MR. SCHARF:**  Mm-mm.

18      **THE COURT:**  And I don't have the policies in front of me

19  so I'm somewhat at a loss here.  They have certain rights --

20      **MR. SCHARF:**  Mm-mm.

21      **THE COURT:**  -- and expectations.  I assume that one of

22  their expectations is that the primary carrier will

23  diligently defend against the claim.

24      **MR. SCHARF:**  Right.

25      **THE COURT:**  And that their liability as excess carrier

In Re: Diocese of Buffalo - BK 20-10322

1    only comes after a judgment is rendered that -- and that

2    judgment exceeds the amount of the primary obligation.

3        **MR. SCHARF:**  Mm-mm.

4        **THE COURT:**  Here we're having the primary obligor saying

5    we're not going to defend the whole thing.

6        **MR. SCHARF:**  Mm-mm.

7        **THE COURT:**  And so is there a contractual problem here

8    in terms of holding the excess liability carrier liable for

9    anything when there's not a full -- without their consent.

10   Obviously if they join the settlement, they're in for it.

11       But let's suppose they don't join in the settlement and

12   they say our contractual rights are for the primary obligor

13   on this claim --

14       **MR. SCHARF:**  Mm-mm.

15       **THE COURT:**  -- to go and provide a full defense --

16       **MR. SCHARF:**  Mm-mm.

17       **THE COURT:**  -- and to go and pay the limits of their

18   coverage before we have any exposure.

19       **MR. SCHARF:**  Sure.  So --

20       **THE COURT:**  And how do you -- without them being a party

21   to this Plan, how is it feasible to have the primary obligor,

22   the primary carrier participate in the Plan whether they're

23   not going to get the release that they're looking for.

24       **MR. SCHARF:**  Sure.  So, your Honor, I think that, first

25   I think this is, this is -- we're probably a little premature

In Re: Diocese of Buffalo - BK 20-10322

1  for this argument because I think this is, this is.

2      **THE COURT:**  It's probably a Plan Confirmation or at

3  least a disclosure issue.

4      **MR. SCHARF:**  Yes, I just want to caveat that with my

5  response that I may -- we may buttress this response based on

6  further research and analysis with a little more thought --

7      **THE COURT:**  As I read your papers --

8      **MR. SCHARF:**  -- before the hearing.

9      **THE COURT:**  As I read your papers --

10      **MR. SCHARF:**  But --

11      **THE COURT:**  -- part of the argument that you made --

12      **MR. SCHARF:**  Yes.

13      **THE COURT:**  -- is don't interfere with the process of

14  getting this Plan confirmed but if feasibility of the Plan is

15  really contingent --

16      **MR. SCHARF:**  Sure.

17      **THE COURT:**  -- on United States Fire to be a participant

18  in this settlement.

19      **MR. SCHARF:**  Sure.  I hear you.  But I think that just,

20  just off the top of my head in order to address this

21  feasibility issue, I think the Plan is still feasible even if

22  U.S. Fire is not a settling insurer and the primary carrier

23  is because under the terms of the agreement with the primary

24  carrier, that insurance will be bought back and the trust

25  will be indemnifying the carrier for costs and at the same

1    time the trust will have to fund the defense of the claims.

2    So the defense of the claim will be funded.  It's just going

3    to be funded by the trust rather than the primary carrier.

4        The debtor's obligations to cooperate continue even

5    under the assignment of rights of the insurance policies in

6    the Plan to the trust.  Those assignments, that duty to

7    defend continues, just like duty to defend and duty to

8    cooperate, very important -- continue.  It's just a question

9    of who is paying for that duty.  And the trust doesn't have

10   an oversight right on the litigation.  It does have the right

11   to question whether the expenses are appropriate or not when

12   it's reimbursing them but the duty to defend stays.  The

13   defense is funded and if there is a liability, the liability

14   would only hit the excess carrier to the extent -- and to the

15   extent it exceeds the primary coverage levels and at the same

16   time the excess carrier, if it's concerned about its rights,

17   always has the ability to fund the defense of the claim --

18        **THE COURT:**  Well --

19        **MR. SCHARF:**  -- itself.

20        **THE COURT:**  Well let's take this trial.

21        **MR. SCHARF:**  Sure.

22        **THE COURT:**  And so you have United States Fire that's

23   let's say is not going to participate by way of settlement.

24        **MR. SCHARF:**  We hope they will.

25        **THE COURT:**  As I already said five minutes ago, we hope

In Re: Diocese of Buffalo - BK 20-10322

1  for a settlement, a global settlement, that's what we're

2  hoping for.  Whether we get it is another question.

3      **MR. SCHARF:**  Mm-mm.

4      **THE COURT:**  But let's suppose that you have one of these

5  victims being willing to settle and they say we have a claim

6  here that we think is worth -- let's suppose the primary is

7  liable for half a million dollars per incident.  And I think

8  it was, I'm thinking in Mr. Schiavoni's brief that he said

9  that their exposure was $5 million an incident.  I could be

10  wrong on that.

11      **MR. SCHARF:**  One of the policy it is.  It's 5 million

12  excess, 500.

13      **THE COURT:**  Yeah.  So let's say it's 500,000 on the

14  primary liability and then 5 million on the excess carrier.

15  And the excess carrier says I'm not paying a dime until you

16  try this in good faith as you're obligated to do and pay your

17  half million dollars.

18      **MR. SCHARF:**  Mm-mm.

19      **THE COURT:**  And then you have a, you have everybody --

20  and so let's assume those responsibilities are assumed by the

21  Trust but then you have the poor victim who's going to say,

22  well, I want -- and gets a judgment for $5 million.

23      **MR. SCHARF:**  Right.

24      **THE COURT:**  And they say, well, I want to get 500,000

25  from the Trust but the Trust is set up that they're not going

In Re: Diocese of Buffalo - BK 20-10322

1    to get $500,000 --

2        **MR. SCHARF:**  Right.

3        **THE COURT:**  -- from the trust.

4        **MR. SCHARF:**  So, so --

5        **THE COURT:**  What are you going to look for from the

6    excess carrier?

7        **MR. SCHARF:**  Sure.

8        **THE COURT:**  And how does that affect feasibility?

9        **MR. SCHARF:**  So, again, in that circumstance, if the

10   claimant litigates it, claimant doesn't get that $500,000

11   primary portion from the trust.  The claimant has agreed

12   ahead of time that whatever they're getting from the trust is

13   baked into the Plan and that's why they get the ability to go

14   litigate the claim.  There's also a split, they also get,

15   depending on what stage of litigation they're in, they

16   essentially get bonuses or bumps in their, in their points so

17   that they do get an enhanced recovery for having gone through

18   this and then when they get that judgment, the judgment is

19   then assigned to the trust and the trust will go and pursue

20   the insurance claim and insurance and try to enforce it

21   against the insurance company.  So the claimant has agreed

22   ahead of time not to collect that half million dollars on the

23   primary level from the trust.

24       Going back, your Honor.

25       **THE COURT:**  None of which is really explained in the

1    Disclosure Statement.

2        **MR. SCHARF:**  We can, we can further explain that.  I

3    mean, these are kind of hard -- we think it's in the Plan

4    itself and so this is all laid out.  But we can always

5    enhance disclosure statements and provide more and more

6    disclosure.  The reality is that in these cases, especially

7    this case, most of the claimants are represented by very

8    sophisticated counsel.  And then what the Plan says, they

9    read the Plan because they look at the operative document and

10   the Disclosure Statement so there is that layer of what we're

11   assuming the target audience will be.

12       But I hear you and we can always, always, always, always

13   give more disclosure.  That's never an issue for you.

14       Again I want to go back just one other thought, your

15   Honor, in terms of this relationship between the primary and

16   the excess carrier.  Imagine, if you will -- and there have

17   been circumstances like this in cases -- where the primary

18   carrier may be insolvent or may have liquidated years ago.

19       So in that situation under New York law, the primary

20   carrier doesn't drop down, it stays at that primary -- unless

21   there's special language in the insurance agreement, it stays

22   at that level and the insured would be responsible for

23   funding the defense costs up until the -- and then, and then

24   the ultimate liability would then, if it's determined to

25   exceed the primary level, would be -- the excess carrier is

1    still only responsible for their excess portion not the

2    primary portion.

3        So there is an analogy outside of bankruptcy where this

4    happens that, yeah, if they have an insolvent insurer on the

5    primary level, the Diocese is on the hook for the defense

6    costs up until the excess level.  Let me go back to just

7    my -- I'm going to talk a little bit about discovery.  I

8    think I've made my point and I think our briefing is pretty

9    clear on whether or not there's this right to drop down and,

10   frankly, it sounds like we might just have to have some

11   post-hearing briefing on that as well, your Honor.

12       But let's say we go forward.  There's a real question

13   here on, first, your Honor, resolution -- sorry, the state

14   court is the appropriate forum here.  We think under Section

15   157 -- and we've cited case law in our brief -- that your

16   Honor doesn't have the jurisdiction under 157 to liquidate a

17   personal injury claim.  We think that disallowance of a

18   personal injury claim is a liquidation because you're

19   essentially saying it's worth nothing and therefore that

20   should really go back to state court.  And we've got motions

21   for stay relief on file as to that effect.

22       And that's -- and that brings us, I think, your Honor,

23   to this question of what is the pleading standard.  I think

24   it's actually a very interesting question, it's an

25   intellectually challenging question.  We do have Judge

In Re: Diocese of Buffalo - BK 20-10322

1  Glenn's decision in Rockville Center.  That jurisprudence

2  over the federal pleading standard for a complaint seems to,

3  you know, the Iqbal-Twombly standard where the Iqbal-Twombly

4  standards applies to a proof of claim really seems to be a

5  creature of the Southern District of New York.  It's based on

6  the res cap, residential capital mortgage case that I think

7  ***Judge Drain originally decided and went out to the

8  district court.  And then MS Global which cites to that res

9  cap case and then Rockville Center where Judge Glenn cites to

10 those cases.  I haven't been able to find that kind of

11 jurisprudence outside of the Southern District.

12    **THE COURT:**  Well, I made a list of issues that I have

13 here and the number one issue I had was Section 157.

14    **MR. SCHARF:**  Right.

15    **THE COURT:**  28 U.S.C. 157.  Assuming that the

16 Iqbal-Twombly standard applies --

17    **MR. SCHARF:**  Right.

18    **THE COURT:**  -- in a nonpersonal injury context.

19    **MR. SCHARF:**  Right.

20    **THE COURT:**  Does it apply in a personal injury context?

21    **MR. SCHARF:**  Right.  So let me address whether Iqbal

22 Twombly or that standard should apply in a personal injury

23 context.  So I think it's actually a very important question.

24 So let's look at the res cap and ***MS, I think it's MS

25 Global case.  I have it written down.  ***It's in our brief.

In Re: Diocese of Buffalo - BK 20-10322

1   I apologize if I'm getting the name wrong.  But those are,
2   those were claims and they were based on injuries but those
3   injuries stemmed -- res cap, right, the injury stemmed from
4   some alleged breach of the, you know, breach of the insurance
5   agreement, right -- sorry not the insurance agreement, I
6   apologize.
7       A breach of the mortgage documents, right, the loan
8   documents, you know, essentially predatory lending cases.
9   And those are based on -- and if you look at the standard for
10  filing a proof of claim when you file a personal injury proof
11  of claim, Form 410, again let's just use the example of a
12  ordinary slip and fall case.  All you have to say is I was
13  injured at the debtor's property, period.  Or I was injured
14  when I fell, period.  You don't even have to give a date.
15  You don't have to say what your injuries are and I'm owed
16  money and it can be a liquidated or an unliquidated claim on
17  that form.
18      And so we do have the questionnaire in this case.  It's
19  supplemental to help the parties get through mediation.  It's
20  not designed to substitute for a complaint.  And so that's
21  why the bankruptcy law or bankruptcy jurisprudence says that
22  when you file an objection to -- the proof of claim is prima
23  fascia validity of the claim.  If there's an objection and
24  the objecting party brings forth sufficient evidence to
25  question the claim, the burden would shift back to the

1   claimant to prove by a preponderance of the evidence that

2   they have a valid claim.  And how do they get that evidence?

3   How do they get to a preponderance?  You go through a

4   discovery process.  So every proof of claim process involves

5   objection involves -- generally involves a discovery process

6   of some sort, assuming even whether it's appropriate for this

7   Court to hear.  And again, we think that under Section 157,

8   your Honor doesn't have the jurisdiction to determine the

9   validity or not of the proof of claim form.

10      And so going back to that Iqbal Twombly standard,

11  they're applying it -- it was being applied in the underlying

12  cases to a document whether, you know, based on some sort of

13  breach of this agreement, you have a legal claim against that

14  debtor.  And it's not a question -- here there's no document.

15  The injury here is based on an act, an act of abuse.

16  Evidence about that duty, about that act can be obtained from

17  documents, can be obtained from depositions but it's not

18  something where you can go and say, well, here's my agreement

19  with the debtor between the debtor and the claimant or

20  between somebody and the claimant that says there's some

21  duty.

22      And, again going back to your questions about duty here,

23  you know, yes, these are separate entities, they're separate

24  religious entities and there's a body of Canon Law that

25  governs their relationship but they're not strangers to one

1   another.  The Diocese and the religious orders operating

2   within the Diocese are part of the Catholic faith for the

3   members of this Diocese and, in fact, just this morning right

4   now we've gone on -- I went on the website for the Diocese of

5   Buffalo and they have a section about Catholic education in

6   the Diocese of Buffalo and they list the Catholic schools in

7   the Diocese of Buffalo.  And one of them is St. Francis and

8   other religious orders schools as well.  Canisius or, or

9   others.  There's a relationship here and it's important to

10  explore that relationship beyond just some initial discovery.

11  It's important to test Mr. Suchan's testimony and his

12  declaration.  It's important to test what was received from

13  the Franciscans.  So there's more out there that can be

14  obtained about what this duty is.

15      And so I, again, I don't think that you have to meet the

16  Iqbal Twombly standard but I think that with the Zilliox

17  affidavit, they do meet the Iqbal Twombly standards.  It's a

18  question of -- if you were in state court, right, and just

19  had to, you were pleading on -- prior to Iqbal Twombly in

20  federal court, all you had to do was say I was injured,

21  defendant had a duty, and I was damaged, therefore

22  negligence.  So you just had to say there was a duty.

23      Now under Iqbal Twombly, you have to say what that duty

24  was and connect the dots a little more to show plausibility.

25  But I think that with the Zilliox affidavit or declaration,

In Re: Diocese of Buffalo - BK 20-10322

1    it does show that there is a means of connecting those dots,

2    yes, it is plausible that there is a duty, it is plausible

3    that there is -- and there's a path to that duty but it

4    requires more evidence, frankly, and it would be, frankly,

5    irresponsible for Mr. Zilliox as an expert to opine on the

6    record here to clearly show X, Y and Z based on this

7    document, based on that testimony.  And so he's showing based

8    on Canon Law that there is this connection.

9        Now that connection, that path has to be filled in, has

10   to be demarcated, has to get -- the path is basically just a

11   path, now it has to get some pavement, get, get, get some

12   more of a construction to actually be useful in an ultimate

13   decision on this case.  And so it's very important that the

14   burden that has shifted to the claimant -- or may have

15   shifted to claimant -- be given an opportunity to, the

16   claimant who now has this burden be given an opportunity to

17   explore it and get the facts necessary to prove it.

18       And, again, it's highly distinguishable and we can,

19   again, if your Honor post-petition briefing, we can address

20   this in more detail.  But in Rockville Center, first of all,

21   Judge Glenn was relying on an order he had entered, a

22   procedures order that laid out how objections to proof of

23   claim would be handled, and one of the procedures was doing

24   it on the pleading standards initially.  The claimants

25   disagreed.  I don't think the Committee weighed in on that.

1   May have, may have weighed in.  I don't remember exactly if

2   the Committee weighed in but, you know, I think that is very

3   important to address what is the standard here and so we

4   disagree and we're happy to provide more briefing on this.

5       Very importantly, Judge Glenn also -- and as you have

6   noted and we note in our papers -- Judge Glenn allowed --

7   said that after discovery you might be able to amend the

8   claims.  Why should we go through a process of disallowing

9   the claim, then getting discovery and then going through this

10  process all over again?  It just doesn't make sense.  Let's

11  get discovery and, again, if your Honor can even decide the

12  case or go to an appropriate, a court of appropriate

13  jurisdiction, let's get the discovery and then see if it

14  applies and whether or not there is a connection or liability

15  for the Diocese for these particular claims.

16      State courts incidentally have also grappled with this

17  and we cited some of the cases in our brief where there were,

18  there was jurisdiction.  At the beginning of the CVA process

19  as cases were moving forward, there were cases that were

20  dismissed on the basis that, well, the religious order can't

21  be liable -- sorry, the Diocese can't be liable for the acts

22  of the religious order priests.  And I think those have been

23  reversed, especially in the Fourth Circuit.  The Fourth

24  Circuit -- I'm sorry, the Fourth Department.  I'm not a state

25  court lawyer but Fourth Department.  I believe we cited a

1  case in there that shows that there's a right to conduct

2  discovery on this issue for -- in state courts.

3      And so if Judge Glenn is giving them right to -- even

4  after dismissing a case, is giving people the ability to do

5  discovery and amend, we should just avoid that kind of

6  confusing, that kind of confusing process and just, okay,

7  let's go do your discovery.

8      And we think that again if your Honor's inclined to keep

9  the cases, you know, the parties should negotiate a

10 scheduling order of about 120 days to allow a discovery

11 process and, you know, conduct it under supervision, under

12 guidance, you know, what does it mean to just obtain

13 discovery after the claims are dismissed.  Are we now in Rule

14 2004 land?  Well maybe because you've got, you know, it's the

15 debtor's pre-petition financial condition.  On the other

16 hand, we've got a case in controversy or you got a live, you

17 know, there may be objections to the, to using Rule 2004 for

18 this process.

19     And so rather than tread into this bizarre unknown world

20 of what is post-dismissal discovery, let's do discovery

21 before the case is decided and dismissed -- or before the

22 claim is dismissed on a summary base --

23     **THE COURT:**  Well, let me ask you --

24     **MR. SCHARF:**  Sure.

25     **THE COURT:**  -- I think a difficult question.

In Re: Diocese of Buffalo - BK 20-10322

1      **MR. SCHARF:**  Oh, the others were easy.

2      **THE COURT:**  What's that?

3      **MR. SCHARF:**  The others were easy.

4      **THE COURT:**  They're all interesting, let's leave it at

5  that.  But let me ask you what I think is a difficult

6  question.

7      Let's assume that I accept your notion that I lack

8  jurisdiction under 157 to decide this.  And when that

9  happens, it means that I have to send this over to state

10  court to decide.  And so let's assume that I also accept Mr.

11  Schiavoni's argument that under the *Truck Insurance v. Kaiser*

12  matter, that this does have jurisdiction generally in terms

13  of the ability to go and raise the issue.

14      **MR. SCHARF:**  Mm-mm.

15      **THE COURT:**  But I might not have jurisdiction under

16  section 157.  And let's suppose for the moment -- and he's

17  right, hypothetically --

18      **MR. SCHARF:**  Mm-mm.

19      **THE COURT:**  -- these are claims against the -- that are

20  properly recovered from the resources of the Franciscans,

21  properly recovered from the the resources of St. Francis high

22  school, and not recovered from the Diocese.  Let's assume all

23  that.  Where do I -- where does that leave us?  I say, well,

24  you got to go over to state court to make this argument on

25  the merits of non-liability for the Diocese.

1      **MR. SCHARF:**  Mm-mm.

2      **THE COURT:**  But then the primary carrier says I'm not

3   raising that argument because I've settled.  And then Mr.

4   Schiavoni's saying you're making us go through the whole

5   process when we really should get a decision from some place

6   on whether or not the Diocese has a respons -- has a duty and

7   aren't we left -- aren't we just pushing everything into a

8   limbo --

9      **MR. SCHARF:**  Sure.

10     **THE COURT:**  -- where nobody is going to decide the

11  matter and we're going to have to incur enormous litigation

12  expenses?

13     **MR. SCHARF:**  I don't think we're going into a limbo

14  where nobody decides the matter.  I think we're going into a

15  different system where a judge I guess down the street would

16  be making the decision.

17     **THE COURT:**  But it's not going to be argued by the

18  primary carrier.

19     **MR. SCHARF:**  It's not going to be argued by the primary

20  but to the extent the excess carrier wants -- but it's going

21  to be argued by the Diocese, they still have that duty to

22  cooperate.  Sorry, the primary carrier's not going to argue

23  the case.  It's just the primary carrier may fund the case

24  and so, yes.

25     **THE COURT:**  But they think they've settled.

In Re: Diocese of Buffalo - BK 20-10322

1    **MR. SCHARF:**  They think they've settled.  So -- and they
2    may not be called upon to fund the case.  I mean, I think
3    that's a question that we have to work out down the road.  To
4    the extent that the Diocese has to litigate this or that the
5    excess carriers directing defense of the -- that's really
6    what they're doing.  They're saying I need you to press this
7    case now and WAOEFPBG in bankruptcy court they have to fund
8    Mr. Donato's costs -- or, sorry, the Diocese's defense costs
9    for the fees incurred in doing that.  So I think it leaves
10   everybody kind of in the same position, it's just a question
11   of what forum you're going to be in.
12       **THE COURT:**  It's in United States Fire's interest to go
13   and get this issue resolved now --
14       **MR. SCHARF:**  Right.
15       **THE COURT:**  -- so that they know whether they have
16   exposure on excess liability?
17       **MR. SCHARF:**  But that, that --
18       **THE COURT:**  How are you going -- and so they're coming
19   to me --
20       **MR. SCHARF:**  Right.
21       **THE COURT:**  -- to say please make a decision whether
22   there's exposure of any sort either to the primary or to the
23   excess carrier.
24       **MR. SCHARF:**  Right.
25       **THE COURT:**  And then the primary carrier says we don't

In Re: Diocese of Buffalo - BK 20-10322

1  want to bring that issue.

2      **MR. SCHARF:**  Mm-mm.

3      **THE COURT:**  And so we're never going to get a decision

4  on the merits, at least in any prompt fashion.

5      **MR. SCHARF:**  Sure.  One thing, one thing nobody has

6  done, your Honor, and I think that this might be another one

7  of these post-hearing issues we should be actually looking

8  at.  One thing nobody -- look, we have asserted that U.S.

9  Fire is responsible for certain claims and these religious

10 order claims are unique.  One of the issues that we encounter

11 in these cases is let's say a claim is worth $5 million.

12 New York law says, well, if the claim is worth $5 million and

13 you apply -- you have to apply each occurrence, each active

14 abuse as an occurrence.  So if there's 100 acts of abuse or

15 50 acts of abuse, you have to apply 50 times 500 for one of

16 the primary policies and say, well, that's $258 million of

17 coverage you have to eat up before you get to the primary

18 level -- the excess level.

19      I think we should actually take a look and see whether

20 or not we're actually seeking for U.S. Fire to pay on these

21 claims.  It may be -- U.S. Fire's liability on some of these

22 claims is highly, highly, highly, highly (indiscernible)

23 because the way New York law applies.

24      **MR. SCHIAVONI:**  Your Honor, I didn't hear the last

25 phrase.

1     **THE COURT:**  Could you repeat that?

2       **MR. SCHARF:**  I thought -- oh.  U.S. Fire's liability on

3   some of these cases, some of them, we've, we've had this

4   discussion.  We're not hiding.  It is contingent on, A, a

5   judgment of a certain high amount and so they're going -- and

6   I understand why Mr. Schiavoni's wants me to repeat this --

7   but there is a speculative level of some of these claims

8   being paid by an excess carrier.  And that's just, so they

9   may not even be on the hook at the end of the day.  We should

10  really take a hard look at that and, you know, going through

11  this process to preserve a hypothetical right seems, you

12  know, seems to me to be a waste of resources.

13      **THE COURT:**  All right.  I hear your argument.

14      **MR. SCHARF:**  I mean, I think, you know, the question

15  really becomes like what is, what is U.S. --

16      **THE COURT:**  Well, I mean U.S. Fire is saying it's a

17  waste of resources for them to be involved on these claims

18  when they really should -- I'm not saying that they should be

19  dismissed but their argument is it's a waste of their

20  resources not to have this decided at an earliest stage.

21      **MR. SCHARF:**  We hear that.  We hear you, we hear you on

22  that.  I think that part of what U.S. Fire -- you --

23      **THE COURT:**  I'm not saying I accept it.  But that's I

24  think their argument.

25      **MR. SCHARF:**  I hear that and I understand the argument.

In Re: Diocese of Buffalo - BK 20-10322

1  I think, though, part of what we have to think about here is
2  what is their motivation really.  I mean, their, their, the
3  Diocese's exposure isn't going to change, the amount of money
4  the Diocese has to pay to survivors is not going to increase
5  or decrease by these claims being disallowed.  And, frankly,
6  in the grand scheme of things, 8 claims out of the 30 odd
7  claims that U.S. Fire -- that hit their policy periods and,
8  again, I may be wrong on that number.  It's just what I think
9  at the top of my head.  So whatever number, it's not going to
10  move the needle on what the ultimate settlement with U.S.
11  Fire is going to be.  And so -- I mean, because frankly when
12  we have discussions with carriers, you know, there are cases
13  that they're just not going to be liable on contractually or
14  just by the value of the math of the case.  And so this is
15  not going to move the needle.
16      I think what they're really trying to do is get a
17  decision that expands their liability under *Truck*, I'm sorry,
18  expands their right under Truck and for that reason
19  specifically we are not opposing, we're not contesting
20  standing in this case.  I mean, if there's a finding that
21  they have standing under *Truck* even though we're not
22  contesting it, we may take issue with that.  But this is not
23  a discussion about *Truck*, your Honor.  This is a discussion
24  about their rights under state law and, frankly, your
25  jurisdiction under Section 157 and, frankly, I don't see how

1    *Truck* in an 1109 grant of standing can keep -- can trump

2    Section 157 which clearly says your Honor doesn't have

3    jurisdiction.  Standing means a right to be heard.  It

4    doesn't mean a right to supersede some other statutory

5    jurisdictional grant, which again, is also following, is also

6    following I think -- you implicate Article III if you try to

7    keep a personal injury claim in this court versus, you know,

8    a grant of standing under *Truck*.  And so I think that, you

9    know, again we don't think they have a right under state law

10   to drop down and direct the defense which is essentially what

11   they're doing, not a question of *Truck* and then to the extent

12   your Honor -- and then we don't think they have the right to

13   have this adjudicated in this court just because of 28 U.S.C.

14   Section 157.

15       But if your Honor decides to keep it here, we think that

16   there needs to be a discovery process and maybe, maybe

17   ultimate -- I think your Honor's going to have post-petition

18   briefing on this but maybe the ultimate decision on that

19   really should wait for the stay relief motions to be heard

20   because if the stay relief is granted, it goes to state court

21   and we can have an argument over who's paying or directing

22   defense costs in state court.

23       **THE COURT:**  All right.

24       **MR. SCHARF:**  Thank you, your Honor.  And I'll reserve

25   some time just in case I need to respond.

In Re: Diocese of Buffalo - BK 20-10322

1      **THE COURT:**  Thank you.

2      Mr. Donato, I think you're next.

3      We'll talk a ten-minute break.  For those who are on

4      line, please stay on line we'll resume at 12:45

5      (WHEREUPON, recess taken.

6      (Open court:)

7      **THE COURT:**  We welcome everyone once again.  I assume we

8      have the same appearances.  Is there anybody who did not

9      appear when we called the matter at 10:00 who wants to note

10     an appearance at this time?

11     (No response.)

12     **THE COURT:**  All right.  We'll assume that everybody has

13     noted their appearance.

14     Mr. Donato, it's your turn.

15     **MR. DONATO:**  Thank you very much, your Honor.

16     At the outset I would just make an observation.  You had

17     a lot of questions about insurance law, the effect of a

18     primary settling and an excess, et cetera, most everybody in

19     this courtroom is a bankruptcy lawyer.  During this case I've

20     been communicating with special insurance company who have

21     been listening on the phone.  What I'm hearing is you have a

22     lot of good insurance questions, we're trying to answer them

23     but I think it very well may make sense to insure that

24     special counsel for the Diocese and for the Committee weigh

25     in on some of these issues.  So I just want to make that

1 general observation.

2    I guess my first comment is there is a threshold legal

3 issue.  And the threshold legal issue that's been alluded to

4 by my colleagues here for the Committee is what role does an

5 excess carrier have if the excess carrier is not paying

6 defense costs?  Now, Mr. Schiavoni said to you that they're

7 paying associated counsel costs.  When I deal with let's just

8 say zealous litigants, once in a while they fail to actually

9 set forth the facts.  And I have a list of misstatements that

10 were made and I'll clarify those at the end but there is one

11 that has to be set forth now.

12    The comment from Mr. Schiavoni that he has incurred

13 costs for associate rights for associate costs is misleading

14 the Court.  The associate costs means he hired his own lawyer

15 to take a look at what's going on with the primary, okay, how

16 is the primary doing in regard to the defense.  We think he

17 knows this.  That is not what provides an excess a

18 possibility to control or impact the underlying litigation.

19 I am not an expert in this area but I am asking you to at

20 least consider this and also to accept -- if you're going to

21 move forward.  My main thrust is what are we doing?  We're

22 wasting our time here and I'll get to that in a minute.  If

23 you're inclined to consider moving forward with these, with

24 these objections, there is this threshold issues and if the

25 Chubb companies do not pay defense costs, they don't have a

1   right to be heard.  So I am just making that observation to

2   you.

3       I have received some spirited communications from my

4   special insurance counsel to make sure that I clarify to you

5   they are not paying defense costs, they're paying their own

6   lawyers to take a look at what's going on in the case and

7   that is not defense costs so I just observe to you that just

8   as an initial threshold issue frankly before you get into

9   anything else, if you're considering allowing these eight

10  objections to move forward, I respectfully submit that's an

11  immediate threshold issue that you should address as a matter

12  of law because that is a misrepresentation to the Court.

13      The general, the bigger concern that I have is why now?

14  Right.  I'm listening to this.  We're almost in our third,

15  fourth hour, whatever it is, of discussions, et cetera, we

16  got an excess carrier here made a proof of claim objection

17  for eight claims, right.  Now, first of all, I'm concerned

18  because the Diocese is going to be the one that's going to

19  have to incur costs and expenses.  You already heard state

20  court counsel say, well, we want the stay lifted.  You don't

21  have jurisdiction, okay.  So now we're going to go to state

22  court.  Now the Diocese who's focused on getting this case

23  done, I listened to your questions about the Disclosure

24  Statement and Plan and I'm looking forward to them because I

25  want to get the case moving.

1        In Syracuse you asked my adversary about Judge Kinsella,

2    okay.  He couldn't skirt your question with Judge Littlefield

3    because you can't misread that decision.  But he didn't

4    answer your question.  Judge Kinsella when faced with the

5    exact same facts today, Plan and Disclosure Statement filed,

6    some settlements, not all settlements, was faced with the

7    exact question.  LMI in that case the insurer, they're not in

8    this case, filed motions for proof of claim objections

9    frankly, I think they copied it because it was the same

10   sealing motion all of the stuff.  And I went into court and

11   said why would we do this at this stage of the case because

12   we want to move forward with Plan and Disclosure.  We also

13   want to keep moving with mediation.  We got mediation

14   scheduled on Monday so we're going to continue to hopefully

15   chip away and get some of these carriers settled.

16       But the bottom line is Judge Kinsella said no, you're

17   not moving ahead with proof of claim objections at this

18   stage.  It is distracting, it is time consuming, it is a

19   negative impact on the Diocese.  It is expensive.  By the

20   way, we settled with that carrier as well.

21       The fact that an excess could come in here, file claim

22   objections and have 15, you know, 10 lawyers in this case

23   incurring all kinds of administrative expenses is just

24   unbelievable to me.  We should be focusing on mediation,

25   which we are.

In Re: Diocese of Buffalo - BK 20-10322

1    As you know, Judge ***Cyganowski got in this case.  She

2 settled the Catholic Family deal.  She settled CNA, our

3 largest carrier.  I know you followed the other cases.  I

4 dealt with CNA for six years in Rochester.  They wouldn't

5 settle.  And I got them to settle on the courthouse steps at

6 Confirmation.  Once that happened -- and that was 120, it's

7 all public.  Once that happened, we started negotiating

8 (indiscernible) they settled at 85.  That's our largest

9 carrier.  We have moved the bawl scream, very much.  Wausau

10 in the courtroom today, 37,5, done.  AIG, done, 1 million

11 five.  National Catholic Risk while not officially done is

12 going to be done.  I received Confirmation and it's going to

13 be -- it's a good number.

14    My point is this case is moving.  Judge Cyganowski got

15 people off their duff and we are now into substantive

16 resolution of the case.  Why would we create a diversion at

17 this point when the focus should be answering your questions

18 concerning Disclosure Statement and Plan?  I reported to you

19 in a few weeks that we would be filing a solicitation motion.

20 We are going to do that in the next couple of days.  That

21 will deal with one of the immediate issues, whether we can

22 pursue solicitation and how do you do it.  And we need

23 guidance from your Honor in that regard and we're going to be

24 filing a pleading on that.  What I'm saying is we should be

25 focusing on those issues.  We've been in the ***chapter long

1  enough.  We got Syracuse done.  We got Rochester done.  It's

2  now time to move Buffalo and get Buffalo done.

3      If we're in a position where, oh, my goodness, there's

4  litigation, they're questioning your jurisdiction, maybe you

5  make a determination you don't have the jurisdiction.  Now

6  we're in state court.  I got Diocese officials being deposed,

7  document product -- what are we doing?  For eight claims?  So

8  my adversary is very skilled --

9      **THE COURT:**  They may be 8 claims but the allegations are

10  rather serious.

11     **MR. DONATO:**  I understand that.  I'm not belittling

12  them.  I'm just sharing with you that, frankly, when you got

13  800, 900 claims in the case, you knock 8 claims out, it

14  doesn't really matter.  The Diocese has a settlement, okay.

15  So, the settlement whether these claims are expunged or not

16  does not change the amount of the Catholic Family settlement,

17  okay.

18     **THE COURT:**  Except the Franciscans are not part of the

19  Catholic Family by way of any channeling injunction.

20     **MR. DONATO:**  Agreed.  But it doesn't matter.  It frankly

21  doesn't matter.  The Diocese needs to move forward with its

22  reorganization Plan.  If the plaintiffs want to pursue

23  third-parties, they take a position it's not a double

24  recovery, it may be a double recovery.  That's not relevant

25  here.  What's relevant here is getting this Diocese moving on

1  a Plan of disclosure.  We met the deadline.  I know that

2  there are deficiencies.  We haven't filed the Plan supps yet,

3  I know that.  I had a long conversation with co-plan

4  proponent, the creditors Committee, about Plan supps, moving

5  things up.  Some of them are pretty straightforward, form of

6  the ballot, different things like that.  But the bottom line

7  is what I'm suggesting is that Judge Kinsella hit the nail on

8  the head and my adversary didn't answer your question because

9  he knows the answer which is why would we waste our time in

10 this part of the case?  If it was a different stage, that

11 would be different.  All focus should be on moving the case

12 to Confirmation.  Does that hurt the excess?  Absolutely not.

13 Why?  Every right that every carrier has that are

14 non-settling is 100 percent preserved.  So that if there's a

15 non-settling insurer like Mr. Schiavoni's clients, if they

16 continue to be nonsettling -- by the way, we settled all

17 insurance claims in Syracuse, all insurance claims in

18 Rochester even though we went right to the last second,

19 everyone fell in line.  If, however, it turns out that the

20 ***O'Melveny carriers are the ones that don't settle, okay.

21 And obviously you should look around the country as to what's

22 going on with this particular company.  But if they don't

23 settle, every right is preserved.

24      So, for example, you asked the question what happens if

25 the primary settles and how does that hurt the excess, et

1  cetera?  The answer is the excess has every defense that's

2  available in the post-Confirmation litigation.  So if the

3  excess thinks that something was amiss in regard to a

4  resolution with the primary, the excess has that defense.

5  100 percent.  There's all kinds of protective language in the

6  Plan.  They've been vetted by both Judges Warren and Judge

7  Kinsella.  Maybe we need more but it can't be any clearer,

8  everything says this Plan has no impact on any rights of any

9  non-settling insurer.

10      So this is all a ruse, frankly.  I can't believe we're

11  spending hours on this thing, hundreds -- thousands of

12  dollars, if not hundreds of thousands of dollars by the time

13  this thing is done and what are we doing?  Since all rights

14  are preserved, since all rights are protected, there's

15  absolutely no reason that your Honor should allow these claim

16  objections to move forward.

17      I'm also concerned that if you take the bait and allow

18  it to go forward, we could have copycats.  We could have

19  other motions made.  I've seen this happen before.  Somebody

20  comes in, cracks the door, you brought us just a few claims,

21  okay, boom, okay bang, now we've got the remaining claims

22  before you, same kind of a situation.

23      I am very concerned that if you crack this door open at

24  this stage of the case, we're going to be diverted.  Your

25  Honor, we've been in this Chapter 11 long enough.  We've got

In Re: Diocese of Buffalo - BK 20-10322

1  a long way to go but we met your deadline with the Plan and

2  Disclosure.  I understand you have questions and I am happy

3  to answer them, address them, modify, whatever it is.  But we

4  should keep our eye on two things:  Plan and Disclosure

5  Statement and mediation.

6       And I assure you mediation is being focused on because

7  Judge Cyganowski's keeping everybody in line.  And, as

8  Mr. Scharf indicated, we are going to be -- we have mediation

9  with a couple of carriers.  By the way, we're close on these

10 carriers, okay.  I'm going to ask -- counsel giggling in the

11 courtroom, I don't understand that piece.  It's really not

12 professional protocol.

13      **MR. SCHIAVONI:**  Let me just object on the mediation

14 privilege grounds then and let's move on --

15      **MR. DONATO:**  Stop your giggling, Counsel, okay.

16      **THE COURT:**  Let's move on.

17      **MR. DONATO:**  Sorry, your Honor, all right.  So, as I

18 indicated, I'm concerned about copycats, floodgates, things

19 like that but I'm really concerned that we focus on where we

20 are.  We've got over a quarter of a billion dollars already.

21 We shouldn't jeopardize our ability to move forward, augment

22 it through the additional mediation settlements.  If it turns

23 out there's one or two carriers that are not settling

24 insurers, the Plan as drafted, we believe, reservess all

25 rights.  The Trust then would take over the litigation

In Re: Diocese of Buffalo - BK 20-10322

1  post-Confirmation, Mr. Scharf is right, our defense costs are

2  paid by the Trust because we've settled, right.  We've done

3  this before.  I'm not telling you it's foolproof.  And,

4  again, I'm happy to answer any questions.  We'll modify and

5  things like that but we have to keep our eye on the ball.  We

6  should not take this bait and get diverted.

7       Look what happens.  Counsel files 8 proof of claim

8  objections.  Immediately I've got motions to lift the stay.

9  I've already got 17 cases moving along -- you're right not on

10 that expedited schedule as I argued the last time but it

11 doesn't matter.  17 cases.  The last thing this Diocese needs

12 to have to -- not while they're not defendants surely they're

13 going to be sucked into this thing.

14       So it is extremely important that you not take the bait,

15 you don't allow this to become the tail wagging the dog.

16 This is a diversion because nobody's getting hurt.  All

17 rights, all defenses are preserved.

18       So I'm submitting to you that there's no benefit in

19 doing this at this stage and it is definitely not necessary

20 to protect the excess carriers and the other carriers, since

21 as I've already explained, all rights are reserved.

22       You have question about the claims reviewer and I

23 understand that.  And Mr. Scharf's right, you know, it's a

24 point basis kind of a thing but the claims reviewer

25 guidelines which are in the allocation protocol which you

1  haven't seen because we haven't filed but if you, if anyone

2  wanted to see an allocation protocol, the general forms are

3  in the Syracuse and Rochester case.  I don't have to file

4  them here.  I'm working with my joint plan proponent to get

5  those done but that allocation protocol has requirements for

6  the claim reviewer.  For example, the claim reviewer must

7  find by a preponderance of the evidence that a claim is valid

8  meaning the claims reviewer very well can bounce claims and

9  it's happened in other cases.  Literally find there's no

10  merit in a claim.  That claims reviewer has that ability.

11      So what I'm sharing is whether you're a settling

12  insurer, claims are going to be properly allowed with a

13  standard that we're not letting bad claims in but if you're

14  not a settling insurer, of course, as I've already indicated,

15  you can have your day in court.  Mr. Schiavoni can go to

16  court every day.  He can raise every defense he wants in

17  post-Confirmation litigation.  There's no need to do it now.

18  The need to focus now is on the Plan and Disclosure

19  Statement.

20      So when you're having the discussions with my colleagues

21  about, you know, excess carriers having rights, things like

22  that, we agree with that but as I just indicated, all those

23  rights are being preserved and protected just not today.  I

24  listened to a lot of zealous counsel today -- and I probably

25  fall into that trap as well -- but I just want to make a

In Re: Diocese of Buffalo - BK 20-10322

1    couple observations.  One, as I already indicated, the

2    comment that the carriers have incurred costs, that's a

3    misguided approach.  ***They have done us rights to associate

4    which simply means they hired their own lawyer to look at it.

5    They're not paying defense costs.  They don't even have the

6    right to be here without that basic threshold issue.

7        I already covered the fact that Mr. Schiavoni did not

8    answer your question about Judge Kinsella because she hit the

9    nail right on the head, and, of course, didn't want to tell

10   you that.  Mr. Schiavoni said that the stay was not lifted --

11   excuse me, yeah, that the stay was lifted in the Friar suits.

12   That doesn't even make any sense.  The Diocese is never a

13   defendant so there's never been a stay in regard to the Friar

14   suits.

15       All I'm doing is just ensuring that the record is clear

16   about the mistakes that were made.  I am not sure that

17   Zilliox or whatever his name is actually an expert,

18   everybody's calling him an expert.  That's got to be set

19   forth at some point.  And I am very concerned about this.

20   One of the state court counsel says that the Diocese review

21   board reviewed issues with order clergy.  Absolutely 100

22   percent wrong.  Any -- a situation that did not involve a

23   direct Diocesan clergy is not reviewed by the Diocesan review

24   board.  So if there was any particular situation where an

25   Order had an issue, that's not being reviewed by the Diocesan

In Re: Diocese of Buffalo - BK 20-10322

1    review board.  I think I heard the exact opposite statement

2    here.  So I just want to make sure that that's clear.  I

3    don't know if that's directly relevant but when I hear

4    misstatements, I feel an obligation to clarify.

5       At this stage -- oh, one other point, one other comment.

6    You had a discussion about feasibility and while we have a

7    burden to show feasibility, with the utmost respect, it

8    doesn't matter about the trust.  ***Feasibility asks STK-L

9    the Chapter 11 debtor if we confirm this case will the

10   Chapter 11 debtor need more RA*EUGS post-Confirmation, will

11   it avoid litigation?  And as you know, feasibility is not a

12   guarantee but there must be a good basis for it.  But the

13   focus on that is the debtor and what the impact of making

14   payments under a Plan and things like that do to the debtor's

15   post-Confirmation operations.  Of course those issues are not

16   before you today.  We'll deal with feasibility, et cetera,

17   but I just want to make that comment because that's, I think,

18   the focus, the feasibility requirement under 1129(a).

19      I respectfully submit that at this stage there is

20   absolutely no reason and it would be a detriment to this case

21   to spend any more than the four hours that we've already

22   spent on this seeking to deal with eight claims when the

23   insurer's rights are 100 percent protected.  We need to focus

24   on Plan, Disclosure Statement and keep the mediation going.

25   Thank you, your Honor.

1      **THE COURT:** Let me ask you.  This case is almost six

2  years old.  Long time.  And we have an interesting issue.

3  Does the Diocese have responsibility for the activities of a

4  religious order.  You took that position, a position on that

5  earlier this year.  You filed a motion and you withdrew it.

6  Mr. Suchan is present in the courtroom.  He prepared an

7  affidavit that outlined his position, his view, that the

8  Diocese did not have liability or responsibility for the

9  actions of a religious order.  Somehow or other, that

10  decision is going to -- that question is going to have to be

11  resolved.

12      There are three ways to resolve it.  Mr. Schiavoni

13  thinks that I should resolve it and he's brought the motion

14  for me to make that decision.  The Anderson firm thinks that

15  I should grant stay relief to let state court resolve it and

16  that motion is scheduled for a hearing I think on

17  November 17th, and we'll give that due consideration.  The

18  only other possibility of how to resolve it is to have it

19  settled and the court in January authorized the appointment

20  or directed the appointment of Judge Cyganowski to act as

21  mediator, retired Judge Cyganowski and she's been doing so

22  for the better part of this year.

23      And so the third option, the way to settle this question

24  is to go and have it settled.  And settlement of course is

25  highly desirable.  The problem with my evaluating or

In Re: Diocese of Buffalo - BK 20-10322

1    comparing these three options -- and there's all sorts of

2    legal questions -- do I have jurisdiction, is there standing?

3    And for those parties who are affected, that's not the

4    question they want to discuss but it is a question that I

5    have to decide.

6         When I appoint a mediator, as you know, there's a wall

7    created.  I have no ability to speak to that mediator -- nor

8    should I.  Mediator is acting and conversing with the

9    parties, is being provided with information from the parties.

10   If the mediation falls apart, I may have to have a trial on

11   some of these issues and I shouldn't be prejudiced one way or

12   the other to say, well, this party to the mediation is being

13   difficult, this party is being reasonable, I shouldn't have

14   any knowledge one way or the other.

15        But as I read your brief, you're really arguing to me

16   that I need to give the mediation process some further time.

17   Now I don't want to know anything about what's happening in

18   the mediation until it's over with -- nor should I, as I

19   already said.  But without that knowledge, it's hard for me

20   to decide whether I should just put this on hold while the

21   mediation continues or whether I should say the mediation has

22   taken long enough and I should either go one of the other

23   routes, either decide it myself --

24        **MR. DONATO:**  Sure.

25        **THE COURT:**  -- or direct it over, as the Anderson firm

1   is asking in their three motions, that I send it over to

2   state court.  So I don't want violation of the mediation

3   privilege but I have a sense that you believe that this

4   should be subject to further mediation without deciding on

5   the other options.

6       **MR. DONATO:**  Absolutely.  But I do -- it's interesting

7   so I wrote down the three options.  You decide -- essentially

8   you started off by saying the question of course is Diocesan

9   liability for order actions, right?  So we're just sort of on

10  the same page.  And you said look a couple of options.  You

11  could decide proof of claim objections and you could maybe

12  let it go to state court, right.  You could settle, right.

13  And then all I put down was at this stage there's no need to

14  do this.  Why?  If we don't settle, Mr. Schiavoni can raise

15  this issue in the post-Confirmation litigation.

16      I don't think there's ever going to be a need for you to

17  have to make this decision.  Let's just look at the facts.

18  We've already got two of our major carriers settled.  Right.

19  The fact that we have CNA is mind boggling to me when you

20  think about how difficult another case was with them.  We are

21  done, okay.  Judge Cyganowski gets a lot of credit but it's

22  done.  So I think there's going to be a situation where

23  you're never going to be -- you never have to do this.  And

24  the reason why you never have to do this is if Mr. Schiavoni

25  is not a settling insurer -- and I have to acknowledge they

In Re: Diocese of Buffalo - BK 20-10322

1    did settle in one Catholic case so it could happen -- but if

2    he's not a settling insurer, that issue can be decided

3    post-Confirmation.  Mr. Schiavoni knows how to assert every

4    defense in the world.  He'll raise them.  It will be in state

5    court if he's a non-settling.  The state court judge then at

6    that time can make a determination as to -- on some specific

7    issue.

8         I respectfully submit you never have to make this

9    decision.  You don't have to make this decision because you

10   have a Plan in front of you that says that upon Confirmation

11   if there are non-settling insurers, those claims are going

12   back into the tort system, full rights of all carrier

13   defenses, and the trust obviously will stand in the shoes of

14   the Diocese in regard to litigation.  The Diocese duty of

15   cooperation does continue, no question about it.  So I agree

16   with that.

17        So when I wrote down the three options, I think it

18   started off you said something like -- and I don't want to

19   misstate what you said but something like this question has

20   to be decided.  And I agree with you it has to be decided but

21   I respectfully submit it doesn't have to be decided by you

22   and it doesn't have to be decided now.

23        Syracuse.  We have all the same kinds of aggressive

24   carriers that don't want to settle.  We settled every one of

25   them.  Rochester, I gave you that story.  Ba ba ba ba.  We

In Re: Diocese of Buffalo - BK 20-10322

1  settled.

2      So to me, there's actually no need to expend your time

3  and energy on this issue.  Send it back to mediation, put

4  everything on hold.  If you're not necessarily to just

5  dismiss the claim objections, put them out six, eight months

6  and we can come back and revisit them.  But I submit to you I

7  see a path where you never actually have to ever make that

8  decision.  It will be made in state court.  You won't have

9  people criticizing you because they might suggest you don't

10  have the authority to do so, you know, the personal injury

11  jurisdiction limitation.  I see a path where we never have to

12  impose on your Honor to make that decision.

13      **THE COURT:**  All right.  Thank you.

14      **MR. DONATO:**  Thank you for your time, your Honor.

15      **THE COURT:**  Thank you.  We'll hear rebuttal arguments

16  from anyone that wishes to make them.

17      **MR. SCHIAVONI:**  I'll be brief, your Honor.

18      Your Honor, the Diocese has challenged our legal

19  standing to appear.  It's in the Committee's papers.  It's in

20  the objector's papers.  I do think that's an issue you need

21  to reach.  I think in some ways Mr. Donato's argument, he

22  both in one sentence explains his challenge to our standing

23  and then in the very next sentence I think he proved up

24  exactly why we fit squarely within *Truck*.  Why are we here

25  today?  All sorts of questions about my motives and I'm a bad

In Re: Diocese of Buffalo - BK 20-10322

1  person and such and such.  But we counted on our policyholder

2  to defend these claims.  That was their duty under the

3  policies.  Mr. Donato's client came in with claims objections

4  eight months ago.  We offered our support at that time to

5  them if they needed it.  They didn't ask us to appear.  We

6  were willing to appear alongside them.  Once he -- exactly

7  like Justice KAEU began and Thomas talked about in the oral

8  argument at the *Kaiser* hearing -- exactly when the Diocese

9  reached agreement to resolve its capping its exposure, it

10  abandoned the defense, and then as part of that acquiesced to

11  demands by the Committee to withdraw these proofs of claim --

12  to withdraw its objections to these proofs of claim.

13      We came forward at that time exactly because that was

14  the -- after our policyholder had abandoned it, we felt it

15  was important for us to step forward.  Those claims are

16  important to us.  I got it, they're not 800 claims but

17  they're important to us.  They're important, frankly, to us,

18  among other things -- not that I want to get into it -- but

19  in aid of mediation.  Judge Cyganowski, last time she spoke

20  to us was the only time really and it was in July, okay.

21      So all this stuff about mediation -- I don't want to

22  talk about what's happening but I can just say nothing has

23  happened.  Okay, Mr. Donato hasn't met with me this year.

24  That's just a reality.  We're not important, okay, and maybe

25  you sort of got some hint of that from the Committee

1  suggestion that, oh, maybe we're not even really exposed on

2  these, okay.  But those claims are important to us, they're

3  important to the estate as a general matter in how they're

4  dealt with and it also goes to voting and other things.  I

5  don't think it's a matter that can just sort of be put off.

6      So we do think we fit within *Truck* exactly for these

7  reasons that they articulate about how the Committee or the

8  debtor and the claimants post-Confirmation don't have an

9  interest in how these things, how these issues are resolved.

10  You heard -- and the last thing on that, you heard a lot --

11  and I'm at fault for getting up and objecting during the

12  presentation by the Committee on this -- but you heard a lot

13  about how this is, how this Plan works from the Committee

14  lawyer.  You also heard some from Mr. Donato.  It's not

15  there.  It's not there.

16      All the sections that deal with how claims are to be

17  allowed and how claims are to be valued are not in there.

18  They're in this allocation protocol, otherwise known in many

19  of the case law as a trust distribution procedure.  Those are

20  things that impact all of our rights, the terms that impact

21  all of the claimants's rights.  In a tort driven bankruptcy,

22  it's the guts of a plan how the claims are going to be

23  valued, how rights are to be dealt with, what our rights are

24  to defend, how all that would execute itself.  All the

25  details are in the devil there -- or the devil's in those

1  details.  That's not here.  It's just not in front of you.

2  You heard what they are suggesting it means.  You heard

3  Mr. Donato's suggestions that are conclusory about, oh, well,

4  it's totally neutral.  The bottom line is none of it's before

5  you.

6       I will tell you, you will see this.  They will ask for a

7  Disclosure Statement hearing to be scheduled without that

8  document in hand and without the 30-day clock running,

9  they'll ask for that.  That's a problem.  But none of those

10 things can you really actually understand without those Plan

11 terms.

12      Now I just have two or three other points.

13 Jurisdiction, important and purely rebuttal.  Your Honor, you

14 have jurisdiction under both 157(b) and (a) and under 502.

15 Congress sets forth a statutory scheme for dealing with

16 proofs of claim where it envisions that, you know, anyone can

17 file a proof of claim, that's fine.  But all parties in

18 interest are then able to review them.  It's sort of a kind

19 of self-auditing process, not just the Court looks at them

20 but other claimants.  And if there's a problem, claimants can

21 step, other claimants, other parties in interest can step

22 forward with objections.  That's where we are.

23      We're here on a 502(a) objection.  When an objection

24 like that is made -- and by the way the claimants are sort of

25 right, 410 is a sort of basic form.  It does require one of

1  the basic elements is that you're supposed to attach the

2  instrument that sets out what your claim is.  Here it's the

3  complaint, all right.  So, that should like those basic

4  elements of the tort are supposed to be presented to the

5  court in that means.  I don't think they've been bamboozled

6  or something about not being able to present their claim.

7  But whatever the Court concludes about my argument on that

8  point, it's the statutory scheme envisions that a party in

9  interest would then come forward and object.  Once an

10 objection's made, the burden shifts and the claimant has to

11 come forward and present, has to plead the elements of their

12 claim if they haven't done it.

13     And that's where we are.  We've advanced an objection

14 based upon the proof of claim that's been filed.  They in

15 their response did not come forward with pleading the basic

16 elements of a claim.  The Court sits as a gatekeeper under

17 502(a) as to claims coming before it.  157(b)(5) talks about

18 whether your Honor can sit as essentially, you know, on a

19 jury trial, can you run a jury trial for a personal injury

20 claim.  We're not at that stage.  That's not what this is

21 about.  This is the threshold issue of whether or not they've

22 presented a viable claim that meets the elements for a claim

23 in New York.  And I won't go through those points again.

24     **THE COURT:**  Mm-mm.

25     **MR. SCHIAVONI:**  One of them is that there was, you know,

1   term of the trade notice, that there was some element or

2   propensity, did they have that?  One of these claims has been

3   dismissed and is on appeal because they weren't even able to

4   plead that as against the Friars.  We contend there's nothing

5   in that proof of claim that establishes notice to the

6   Diocese.  There's nothing in any of these eight proofs of

7   claim that establish that.

8       The other element we talked about obviously is the one

9   about employment and agency.  Do they actually have a duty

10  here?  And they don't plead that or that is our contention.

11  Both of those elements, they have under the federal pleading

12  standard, they have to come forward and provide some basic

13  elements of plausible facts that support it.  They can't just

14  plead it in a conclusory way.  One might get away with that

15  in state court but your Honor sits as gatekeeper on this.  If

16  your Honor, if Congress didn't envision that bankruptcy

17  judges would have the jurisdiction as gatekeepers to evaluate

18  whether or not the basic elements of the claim have been

19  pled, it would open the door to bankruptcy, like basically

20  anyone asserting a tort claim being excused from any

21  review -- which is clearly not what they intended.  And

22  there's lots of cases where tort claims are reviewed on that

23  initial threshold basis.

24      So, your Honor, I think that's how you have to approach

25  it.  It's like we made the objection that it wasn't pled.

1    They haven't come forward with a pleading.  They haven't

2    amended or otherwise provided a pleading that meets the basic

3    elements.  And your Honor sits as gatekeeper on that.  You're

4    not being asked to decide disputed issues of fact.  You're

5    not being asked to hold a jury trial.  You have been sort of

6    kind of invited to have some sort of proceeding where we

7    bring in, you know, experts and go off on.  I sort of agree

8    with Mr. Donato.  I don't think that's really what's called

9    for and that's not really necessary on this.  They have to

10   basically present their pleading first.

11        Now, I think, your Honor, the more they push back and

12   say gosh we need this discovery, it's because they, it's the

13   very reason -- it's an acknowledgment that they can't plead

14   that claim.  They just can't do it right now and they can't

15   do it, they are not able to do it.  I heard the stuff about,

16   oh, not having discovery and whatnot.  I'm not going to read

17   it but in our brief on Page -- in our reply brief in

18   Paragraph 9 we cite individual entries from the docket for

19   POC 807.

20        That's Exhibit 7 to Mr. Haberkorn's declaration on state

21   court docket number 16, notice to take deposition.

22        20, plaintiff's response to defendant's requests to

23   answer interrogatories.

24        31, transcript of plaintiff's examination before trial.

25        And I could go on.  So things were done.  But let's

1    assume maybe, who knows, like whatever I'm totally wrong on

2    this, they did have the two years or three years to do this

3    and they haven't -- or whatever it is, the bottom line is

4    they haven't come forward to meet that standard, to plead a

5    case and until they do, under the -- and we cite this in the

6    reply brief -- under the Supreme Court precedent under

7    ***Towney, filing a proof of claim is not a key to open up

8    and get discovery otherwise people would file proofs of claim

9    and just it would be a fishing -- it would be sort of entry

10   to a fishing expedition.  That's not how 502 was intended to

11   work.  That's not how it's supposed to work.

12        So I think the process here for the Court to follow and

13   just in the steps you look at to address this are relatively

14   simple and straightforward in how you assess it.

15        Now just one minute on this common law issue.  I mean, I

16   spent my eight years at Georgetown.  I have to admit I'm sort

17   of fascinated by it and, like, I could spend the rest of the

18   afternoon talking about this.  I mean, I do say to myself,

19   geez, in my eight years at Georgetown I never saw a Bishop on

20   the campus.  It's like -- and the notion that the Diocesan

21   Bishop in Washington was responsible for and overseeing the

22   selection of 900 professors and clerical staff at that

23   university, it's just utterly beyond my comprehension that

24   anyone could think that this is how Catholicism works.  But

25   we're not arguing really the fact here.  I want to get to

1   what this is about.

2        On the Canon Law issue, is it a duty or is it an

3   opportunity?  We could have Dominicans here and Jesuits there

4   and maybe it would go on for a day arguing that and it would

5   all be quite entertaining to us.  But this is, this Court is

6   governed by secular rules and Judge Glenn, he struggled with

7   that same issue and he was not -- I knew him in private

8   practice.  He's not a debotay (phonetic) of Catholic like

9   theology but I think he looked at that and what he came away

10  with in his ruling on Page 399, 422 -- on pin cite 422

11  through 23.  That he says that, look, I cannot rely upon

12  Canon Law to make this determination of duty.  I need secular

13  facts to make this determination.  So I do read the Canon Law

14  saying this is an opportunity.  In fact, the code itself, the

15  Canon Law talks about the Bishop may inspect.  It doesn't say

16  he has to inspect every facility.  It says he may.  And when

17  you see this invoked, very rarely, it's invoked.  It's

18  typically like again somebody acting, you know, pursuing some

19  heretical kind of sort of doctrine somewhere.  But it's a --

20  whether it's a "may" or "should" they needed to plead secular

21  facts that they did.  And when I looked at Mr. ***Zillioux's

22  declaration, he, he was -- first of all, he wasn't, he's not

23  a percipient witness.  He doesn't have personal knowledge.

24  He didn't work for the Bishop until well after the Dallas

25  charter was adopted and decades after these claims occurred.

1    But more importantly his opinion -- he refers in several

2    places and when you read it on first pass you would think

3    he's sort of talking about direct knowledge but he's

4    referring to those exhibits that were submitted, those six

5    exhibits that we said were about Diocesan schools and he's

6    saying that there could be.  There may be documents.  In

7    other words, he's saying "maybe", "could be", "possibly",

8    they might have intervened.

9    But the bottom line is they haven't come forward with

10   any facts that they did, that the Bishop came to Georgetown,

11   interviewed the professor and made -- created a file on him

12   and did something about him.  It's just -- none of it is

13   there.  It's not there for Georgetown but it's not there for

14   St. Francis.  They haven't pled the basic Plan.  And I don't

15   think the course here is to say when a claimant doesn't meet

16   their obligation under 502 in the pleading standard to say,

17   well, why don't we open it up to a general inquiry.  What

18   would govern that if that's really what they're saying they

19   want?  That's Rule 2004.  Let them bring a 2004 application

20   before your Honor and we can make an assessment of whether

21   they meet the elements and standards applicable there for,

22   you know, seeking generalized discovery to determine whether

23   a claim consists.  I submit they don't but if they haven't

24   pled a claim, you don't skip over and say, well, why don't

25   you go find if there is a claim.  And the Court doesn't give

1   up its duty as gatekeeper and say, well, let's have a state

2   court decide this when it's an important gatekeeper duty for

3   the court on 502.

4       Just two more points quickly.  On the issue on how one

5   recovers from codefendants, so to speak, if they were.  These

6   claims have been pursued this state court and I, you know,

7   your Honor, there's a tremendous amount of strategy,

8   gamesmanship, whatever one calls it, it has a long history in

9   the Anderson world about how to pursue a defendant and try to

10  get 100 percent of recovery from that defendant and then

11  bring another claim a year later and get the 100 percent all

12  over again.

13      There is a lot to this.  The notion it was suggested to

14  you that, oh, just look in the Plan.  It says there's a

15  setoff or a reduction if a religious order is -- it's a

16  religious order priest.  It's not there.  There's nowhere,

17  it's not there at all.  I did -- it's like that allocation

18  procedure that they're talking about, it's not in the Plan

19  and you won't find a provision like that.  It will not, I

20  submit to you, ultimately be something that exists here

21  because the effort will be to try to get these defendants for

22  these select defendants money in both places without a

23  settlement.

24      In the state court there's an empty chair defense for a

25  bankrupt debtor and I don't think there's any coincidence

In Re: Diocese of Buffalo - BK 20-10322

1  here that like these complaints were filed without the
2  Diocese on them, they weren't filed before it, they were just
3  filed separately on a standalone basis so they could stand in
4  state court and say we get 100 percent of the damages from
5  you and then separately there would be a damage claim here --
6  and, yes, I would submit that would be a double recovery.
7  But that is not in any way -- that's an issue, it's a
8  problem, it's a Plan objection that we will at the
9  appropriate time address but it's an issue in how these
10 claims are addressed.
11      Just one final point, your Honor.  So this notion of, I
12 mean, I don't even know whether I really should address this
13 but like this notion that everybody thought the Bishop ran
14 everything, I mean, I have kids in Catholic schools.  There
15 are Diocesan schools and there are independent schools.  And
16 I don't know a parent in Rhode Island where I spend my time
17 who doesn't know the difference between the independent
18 schools and the Diocesan schools.  Besides everything else,
19 they have different holidays.  I mean, I could never figure
20 that out because I had a kid at one, another at the other.
21 But they're, they're managed differently, they're dealt with
22 differently.  We all know this.  So I, I think it's all
23 beyond anything that's relevant to what you need to decide
24 here but, you know, it's a sort of suggestion that's just not
25 really on core with what the case is about.

In Re: Diocese of Buffalo - BK 20-10322

1    So, your Honor, with that I would ask for a ruling on

2  standing and a ruling on how to deal with these claims.

3  Thank you very much.

4    **THE COURT:**  Thank you.

5    Any other rebuttal arguments?

6    Mr. Boyd.

7    **MR. BOYD:**  Yes, your Honor.  I'll be very brief.

8    I would point out because you asked me a question about

9  duty.  Our expert disclosure talks about duty on Pages five,

10  7, 10, 12, 23 and 24.  Additionally, our Exhibits 7 and 8, I

11  supply these backwards but I'll call your attention to them.

12    One of them is a letter from Bishop Head to one of the

13  predator priests.  Second full paragraph.

14    "I'm most grateful for your priestly ministry, for your

15  constant willingness to assist in the various Parishes of our

16  Diocese."

17    I served mass as an altar boy with a Franciscan weekly

18  at St. Martin school in South Buffalo and I would point out

19  that St. Martin, like Our Lady of Mary at the Lake,

20  St. Peter, they were all Diocesan schools that if he had

21  St. Francis and so there is an intertwined relationship.

22    Additionally, the other exhibit appoints that same

23  Franciscan to the priest Senate but president of the Senate,

24  Father Maloney.  These are important points for me to

25  mention.

In Re: Diocese of Buffalo - BK 20-10322

1    But the biggest point, your Honor, is that Mr. Donato's

2 right.  This is a case that is being mediated.  I would just

3 supplement one thing he said because after you appointed

4 Judge Cyganowski and she worked with the late Judge NeMoyer

5 in bringing this to fruition, it wasn't just her magic, it

6 was your magic, too.  The September 1st deadline, it got us

7 all to role up our sleeves.  And then because things happened

8 at the end, we asked for another month.

9    So I think Mr. Donato's right.  This needs time to

10 breathe.  This needs time to finish the mediation process, if

11 it can, and nobody's rights are affected if that happens.

12 And we would -- we think that you should let that happen for

13 at least 90 days because the holidays are going to be coming.

14 I would say 60 but the holidays are going to come in and

15 interrupt all of this.  But give it until the end of January,

16 you know, give us a January 15th deadline so that at that

17 point we have to come in and talk about all these issues.

18    We can adjourn the stay relief motion that's on for the

19 17th to give it all time to breathe so that we're not wasting

20 the assets of the estate, we're not wasting a lot of time.

21    As Mr. Donato said -- you know I have not agreed with

22 Mr. Donato very often in last six years -- but we would stay

23 laser focused and I think it gives everyone time, including

24 Judge Cyganowski, to complete her work.

25    Thank you, your Honor.

In Re: Diocese of Buffalo - BK 20-10322

1    **THE COURT:**  Before I hear from Mr. Scharf, Mr. Donato,

2   let me ask you a question because Mr. Boyd does hit an

3   important point and that is this case is so complicated.  You

4   know, I'm not allowed to talk to anybody outside the confines

5   of this courtroom, as you know.  And I don't.  But I know

6   what people are thinking and I know people are thinking:

7   What's taking so long?  And what can I -- if they could ask

8   me -- which they can't -- I'd say it's complicated.  And it's

9   complicated in many ways.

10    As Mr. Boyd pointed out, I gave a deadline of getting a

11   Plan filed of September 1st and a request came in to extend

12   that to October 1st which I did because I wanted to see some

13   movement.  And I understand one of the options for the court

14   is to give some time for mediation to continue and to see

15   where we're going.  But that issue really relates to the

16   question of getting on the table a comprehensive Plan.  And

17   it should be obvious, one of the questions I had to ask this

18   morning is:  Is St. Francis high school and the Franciscans

19   intended to be the beneficiaries of a channeling order?  I

20   don't know if it's in the Plan or Disclosure Statement as an

21   exhibit and says "to be provided".  There's big gaping holes

22   in this thing.  The Disclosure Statement doesn't even mention

23   the $150,000 that's supposedly coming from the Diocese.  It's

24   nowhere in the Disclosure Statement.  I could be corrected on

25   that but the point is not whether it is or isn't.  There's

1    gaping holes in that.

2        And I know you had a deadline.  You met the deadline but

3    that Disclosure Statement and Plan are nowhere close to being

4    in a place where the Court can seriously consider approving

5    the Disclosure Statement or even confirming the case.  And we

6    had a hearing I think within the last several weeks on the

7    question of approval of a sale and it was mentioned at that

8    time that a motion would be forthcoming to look for some

9    guidance in terms of scheduling this.

10       But it would be helpful to the Court to know when do you

11   expect to get a more comprehensive and adequate Disclosure

12   Statement that really doesn't leave these big holes in it and

13   what's realistic in terms of actually getting something here

14   that the Court can invite comment on?

15       **MR. DONATO:**  Well, I think it's as a threshold issue as

16   we talked, right.  We've got -- we have to get guidance from

17   you concerning solicitation.  So I told you that motion's

18   going to be filed here in a few days so that will get this

19   process started.  But we can't send the Disclosure Statement

20   out and I agree with you we have to at least disclose who's

21   going to be a participating party.  So I will work with the

22   joint Plan proponent.  I would think we can get these things

23   filed pretty soon.  But since I'm going to make a motion

24   dealing with the solicitation, I think that has to be

25   addressed before we even actually try to obviously send out

1  the Disclosure Statement for approval.  So I haven't answered

2  your question directly.  Why?  I've got obviously a co-Plan

3  proponent.  We're going to work through these things.  But

4  instinctually -- not instinctually.  First of all, we'll get

5  the motion, the solicitation motion which will approve the

6  form of notice, all those things, we'll get that filed the

7  end of next week.  I think it can be filed tomorrow.

8       (Indiscernible.)

9       **MR. DONATO:**  Yes, okay.  Anyway, so we'll file it, say,

10  let's say by the end of next week that motion will be filed

11  so that will get the process going.  We will obviously have

12  to address you concerning those issues and seek guidance from

13  you.  During that time period we can go ahead and seek to

14  finalize as many Plan supps as we can and then obviously

15  augment the Disclosure statement.  I will obviously check --

16  I know the Plan talks about the $150 million settlement but

17  maybe the Disclosure Statement didn't say that.  I will

18  obviously doublecheck that.

19       **THE COURT:**  I know it's fascinating reading but --

20       **MR. DONATO:**  It sure is.

21       **THE COURT:**  -- maybe I missed it.

22       **MR. DONATO:**  So the thought would be that just us

23  getting the solicitation motion filed gets this process

24  moving.  And then I could report to the Court if you'd like,

25  you know, maybe in a few days.  I could talk with my joint

In Re: Diocese of Buffalo - BK 20-10322

1   Plan proponents to make sure we're on the same page.  It's

2   not just us.  That's why I'm pausing slightly to answer your

3   question.  We have a joint Plan with the creditors Committee

4   which I think is a tremendous result, the fact that I'm in

5   here with the survivors asking you to approve a Plan, I think

6   is a tremendous step in this bankruptcy case.

7       **THE COURT:**  You haven't as of yet had any, you haven't

8   reserved time for this, for a hearing of your motion.

9       **MR. DONATO:**  No.  No, no.  We'll be contacting the Court

10  in regard to setting a hearing on the solicitation motion,

11  yes, but we have not asked yet.

12      **THE COURT:**  All right.  All right.  Mr. Scharf, you

13  wanted something on rebuttal.

14      **MR. DONATO:**  And, your Honor, I would like a short

15  rebuttal as well but I'll be short but I'll let Mr. Scharf.

16      **THE COURT:**  All right, Mr. Scharf.  (indiscernible.)

17      **MR. DONATO:**  I don't want to mess anything up.  My

18  points are pretty straightforward.

19      **THE COURT:**  Just so the record is clear, it's Mr. Donato

20  now speaking.

21      **MR. DONATO:**  Thank you.  One second.

22      So Mr. Schiavoni got up and started telling you he has

23  standing, he has standing, he has standing.  I'm not arguing

24  standing.  I haven't even mentioned *Truck*.  What I said was

25  by law, again I qualified I am a bankruptcy lawyer and that's

In Re: Diocese of Buffalo - BK 20-10322

1  why I think we need some -- if you're going to consider this

2  issue, I think we need some briefing on it.  What I've been

3  advised is if an excess doesn't pay defense costs, they don't

4  have a right to be heard.  So he told you he was paying

5  associate costs which means he hired his own lawyer to watch

6  what's going on.  That's not paying defense costs.

7      He came up immediately and said I've got standing under

8  *Truck*.  I'm not, I'm not -- I'm not talking about *Truck*.

9  What I'm just saying is under insurance law in order for an

10  excess to get in the way, try to direct the defense, they got

11  to pay defense costs, that's all I'm saying on that piece.

12  We have not argued he doesn't have standing under *Truck*.

13      And the only other point because he came up here and he

14  said your Honor you can't put off this decision on the proof

15  of claim objections.  Why not?  I mean I just explained to

16  you that you don't even need to do it.  I think I laid out

17  our path.  There's no reason for you to even spend time and

18  energy on this because if we don't settle, that issue will be

19  addressed but it will be addressed post-Confirmation and Mr.

20  Schiavoni can litigate to his heart's content.

21      Thank you.

22      **THE COURT:**  Mr. Scharf.

23      **MR. SCHARF:**  Briefly, your Honor.

24      I think that Mr. Donato went through a recitation of

25  factual disputes and issues that he had with the proofs of

1    claim and whether or not there's liability for the

2    Franciscans and I think that -- and the claimants also went

3    through their factual analysis.  I think that those factual

4    disputes indicate that there's a real need for discovery here

5    because there are, in fact, factual disputes.

6         Claimants are not required to a -- Mr. Schiavoni said

7    that the claimants are required to attach a complaint or a

8    description of the claim to their proof of claim.  That's not

9    true.  Rule 4 and 410 only requires a writing to be attached

10   if a claim is based on a writing or based on instrument.

11        Mr. SR*EUL OBGZ is not being presented as a fact witness

12   or percipient witness.  He's being presented as an expert

13   witness.  So it's a totally different set of circumstances.

14   It doesn't matter when he worked for the Bishop or didn't

15   work for the Bishop.  It's incidental that he worked for the

16   Bishop.  It's incidental that he happened to have been in

17   this Diocese and he's being presented as an expert witness.

18        We never said that the Plan provides the terms of how we

19   were going to deal with the issues between the Franciscan

20   apportionment of a claim or Diocese apportionment of a claim.

21   It just leaves it out there.  The issue of whether or not a

22   claimant can get more of a recovery than they're entitled to

23   is left for a different day, different court.  It's not an

24   issue in the Plan.

25        Complaints were filed without the Diocese in the caption

In Re: Diocese of Buffalo - BK 20-10322

1  because the Diocese was in bankruptcy and the automatic stay

2  prohibited that from happening.

3      And, your Honor, I think that having heard this, I think

4  that it makes a lot of sense to have some post-hearing

5  briefing on these issues that were raised today after we have

6  time to get the transcript and adjourn this matter for about

7  90 days.  Let's try to get a complete settlement and maybe if

8  this issue is still alive, in 90 days we can reignite it.

9      And, lastly, *Truck* is not at issue here.  We are not

10  contesting standing under *Truck*.  The "*Truck*" is parked,

11  we're not driving it, we're not addressing it.  It's not an

12  issue for today.

13      Thank you.

14      **THE COURT:**  All right.

15      **MR. DONATO:**  Your Honor, just one clarification.  Page 2

16  of the Disclosure Statement sets forth the $150 million

17  settlement.

18      **THE COURT:**  All right.

19      **MR. DONATO:**  Just so you're aware.

20      **MR. SCHIAVONI:**  Your Honor, the news reports are that

21  the Bishop met with the Vatican over the last two days

22  including the court of (indiscernible) which is dealt with

23  the rulings concerning the Parishes.  I think we all would

24  benefit from a status report from debtor's counsel on whether

25  the Vatican is modifying or changing its ruling with regard

In Re: Diocese of Buffalo - BK 20-10322

1    to the Parishes.  That's just one thing because it deals with

2    the Plan issues and the timing.  Typically the solicitation

3    procedures don't come until you have the Disclosure

4    Statement.  They sort of, they're heard at the same hearing

5    so I think they've sort of got that out of order.

6        And then, your Honor, this notion of putting this off

7    for 90 days.  What this is about, you're going to find in the

8    Plan, they're going to include a provision in the Plan

9    prohibiting 502 objections.  So it's a pocket veto basically

10   on the issue being heard ever and then it will just be passed

11   on to the Trustee and then we'll have no control over it.

12       And this is exactly the kind of thing that the Court in

13   *Kaiser* contemplated, they talk about this very sort of thing

14   happening.  We think we have a right under 502 now and it

15   shouldn't be -- this would be a Plan objection for us later

16   but we think this needs to be addressed now.

17       **THE COURT:**  All right.  Anyone else?

18       **MR. CORBETT:**  Your Honor, if I might, William Corbett on

19   behalf of Selective Insurance of New York, a primary insurer

20   of the Diocese and, in fact, a primary insurer that is

21   funding the defense of the Diocese in certain of the lift

22   stay cases.

23       There's been a tremendous -- and significantly for

24   today's proceeding, the primary insurer whose policy directly

25   underlies that underwritten in ***1982 and 1928 by Mr.

1   Schiavoni's client, PEIC and U.S. Fire.  There's been a

2   tremendous number of filings in the case and I've listened

3   intently to the arguments today and my client is wading

4   through those.

5        An issue has been expressed by Mr. Donato on behalf of

6   the Diocese, Mr. Scharf on behalf of the Committee, a

7   threshold issue as to whether or not an excess carrier has

8   the right to raise these sorts of claim objections.  Well my

9   client as a primary carrier would like to seek leave of Court

10  to potentially file a supplemental pleading joining the

11  objections raised by carriers as to certain of the proofs of

12  claims.  I say certain because only 5 of the 8 alleged abuse

13  during period of time that Selective's policy was in place.

14  But I would seek leave of court to file something by way of

15  supplemental pleading to join those objections.

16       **THE COURT:**  All right.  Well certainly you can file

17  something.  Let me ask:  Anyone else want to speak?

18       **MR. SCHARF:**  Your Honor, that request at the end of the

19  hearing -- at the end of briefing is wholly inappropriate.  I

20  mean it -- just to file a joinder after the hearing makes no

21  sense to me.  Mr. Corbett could have contacted us with this

22  issue when the objections were filed.  I'm a little confused

23  by that.

24       **THE COURT:**  All right.  Anyone else have anything to

25  say?

1        (No response.)

2        **THE COURT:** All right. As I said a few moments ago,

3   this is complicated. I enjoyed the arguments today, maybe

4   I'm the only one that enjoyed the arguments but I found it

5   rather fascinating trying to resolve a very difficult matter.

6        I also find that the arguments are somewhat incomplete.

7   They're incomplete because I'm not expecting anyone to have

8   responses but we do have three motions on for November 17th

9   seeking permission for stay relief. And there's a

10  possibility that the outcome of those motions may have

11  relevance to the outcome of this motion. I'm not saying for

12  sure but there's a possibility. If one accepts the argument

13  that the liability of the Diocese to -- for activity of a

14  religious order that the Diocese has liability for a

15  religious order i,f there's a possibility for that, well, if

16  that's the issue, then how is it going to be decided? And as

17  I said probably about an hour ago, I said it's one of three

18  possibilities. It may be the subject of resolution in state

19  court which I believe is the position of Mr. Boyd and the

20  Anderson firm. Ms. Benson, as well.

21       There's the argument of Mr. Schiavoni that that really

22  should be decided by this court at this time now.

23       And then there's the argument that I think is being

24  raised by -- in slightly different ways by the Committee and

25  by the debtor that it's not appropriate for resolution today

1   and that we should give some more time either to get a Plan

2   confirmed that would allow those issues to be decided at a

3   future date or perhaps to allow mediation to continue.

4       Those are really the three options:  Today by this

5   court, in the future by state court or in the context of a

6   confirmed Plan that is not really ready for prime time yet.

7   Hopefully it will be soon.

8       In as much as the Anderson firm, and Mr. Boyd as well,

9   have keyed up the motion for a stay relief, I think I need to

10  hear those arguments -- and those are on November 17th at

11  11:30 -- and I'm going to defer any decision on this matter

12  until that time.  I may defer it beyond that time but I'm

13  certainly going to defer it at least until that time any

14  decision because it's -- I did review those motions.  They

15  raise related issues and I think it would be inappropriate

16  for the Court not to give proper consideration to them.  I'm

17  not saying I'm going to accept them.  I'm not saying I'm

18  going to reject them.  Quite honestly, I've looked at them

19  but I haven't studied them to the same degree as I did with

20  the motion for the claimant objection motion.

21      So I want to study it as well but -- and there was some

22  comment that there may be other creditors that want to join

23  in their own motions for similar relief and of course

24  November 17th is our regular motion day for stay relief

25  applications.

1    For those who may be listening in on that day, you can

2  expect that you will hear first -- I'll put this matter at

3  the end -- you can anticipate that on our stay relief

4  calendar we hear motions dealing with everything.  Motions

5  for permission to foreclose on homes, motions for permission

6  to repossess automobiles.  And any of a variety of those

7  types of matters.  That's why we have a distinct calendar for

8  stay relief motions.  This will be put at the end of that

9  calendar.  Normally the other matters take about 15 or 20

10 minutes, sometimes a little bit longer sometimes less but

11 this will be the final matter on that calendar and you can

12 anticipate that.

13    I'm not deciding this motion until at least

14 November 17th.  There is a request for submissions.  If

15 anyone wants to submit anything, you certainly can do so.

16 You can -- as long as something is properly noticed so it's

17 not an ex parte motion, properly exchanged to the interested

18 parties, I will read it.

19    And so there was the one question a few moments ago as

20 to whether further documentation can be submitted.  Certainly

21 it can.

22    I think I've heard all I need to know on the standing

23 issue relative to a *Truck* insurance exchange.  If someone

24 wants to submit, they can but I think I've heard everything I

25 need to know on that.  And I'm not viewing that as a vital

1   issue.

2       I am somewhat undecided -- or let me put it this way.  I

3   recognize an issue on the jurisdictional questions of 28

4   U.S.C. section 157.  And certainly if anyone wants to submit

5   anything on that, certainly you're invited to.  I did follow

6   the stay relief motions by the Anderson and Boyd firms and

7   they raise that as one of the grounds that they believe would

8   justify stay relief.  So I know that issue is raised and --

9   but certainly I find that somewhat of a important issue.  I'm

10  not saying how I would decide it but the issue is raised and

11  is part of the pleadings for the November 17th motion.  So,

12  you can anticipate that that will be discussed further on

13  that date because that's one of the grounds that as I read

14  it, the movants are asserting as a basis for stay relief.  So

15  I think that's somewhat of a curious issue.

16      I wish I had a more definite date for a scheduling

17  conference for purposes of the Disclosure Statement.  I know

18  a motion is promised and whenever that occurs we'll give it

19  the same hopefully the same attention -- well, I'm assuming

20  that I give it a high level of attention to this motion.

21  That's not for me to either claim or disclaim.  Hopefully

22  you'll find that I gave this my fullest attention but if you

23  disagree, that's fine.

24      But I do want to -- we will be giving that some of these

25  issues will also relate to that schedule.  So for now, I'm

1  reserving decision on this at least until November 17th.  We

2  will hear the arguments of the motions for stay relief at

3  that time.  And I'll give appropriate consideration to those

4  issues.

5       As should be obvious, there are really two levels of

6  argument here.  One is on the merits of the claim without

7  concern for jurisdictional issues and the other are the

8  jurisdictional quandaries.

9       And probably a third is whether the Court should

10  exercise discretion to defer these issues to a meaningful but

11  reasonable date.

12       But at this time I'm not deciding anything until at

13  least November 17th when other related issues are being

14  presented to the Court.  But I want everyone to understand

15  the Court takes very seriously the need for a resolution.

16  Almost six years have passed since this case was filed, not

17  quite but it's getting awfully close, February 28, 2020.

18  It's closer to 6 years than it is to 5 years.

19       And I also realize that this is a burden on everybody,

20  it's a burden on the insurers not to know whether they have

21  exposure or not.  It's a burden on the Diocese that is

22  looking for an opportunity for a fresh start.  It is a burden

23  on all counsel, but most particularly it's a burden on the

24  people that have claims in this case and that one way or the

25  other deserve -- they deserve an answer and the right to go

In Re: Diocese of Buffalo - BK 20-10322

1  home knowing what they're going to get.

2      But the issue before me today I'm going to defer until

3  at least November 17th and my practice has always been that

4  until I decide a matter and someone makes makes a submission,

5  I'll look at it.  And so it's assuming that it's been

6  properly noticed to opposing counsel.

7      Any questions?

8      (No response.)

9      **THE COURT:**  All right.  I thank you all for an

10  interesting argument and I hope I didn't disrupt your

11  schedules by taking so long.  I know that brevity has value

12  but in my view, thoroughness is more important.

13      Thank you, all

14      (Parties say thank you.)

15      (WHEREUPON, proceedings adjourned.)

16

17

18

19

20

21

22

23

24

25