***Exhibit A***

Bidding Procedures Order

22232346.v8

Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 1 of 95

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**ORDER (I)(A) APPROVING BIDDING PROCEDURES FOR THE
SALE AND PARTIAL LEASEBACK OF CERTAIN REAL PROPERTY
LOCATED AT 785, 814, 815, 819, AND 821 MAIN STREET, BUFFALO, NEW
YORK; (B) AUTHORIZING AND APPROVING THE FORM OF PURCHASE
AGREEMENT AND ACCOMPANYING LEASE; (C) SCHEDULING AN AUCTION
AND HEARING TO CONSIDER THE SALE; AND (D) APPROVING THE FORM AND
MANNER OF SERVICE OF NOTICE OF AUCTION AND SALE HEARING; (II)
APPROVING THE SALE FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS; AND
(III) GRANTING RELATED RELIEF**

Upon consideration of the motion [Docket No. _____] (the "Motion")[1] filed by The

Diocese of Buffalo, N.Y. (the "Diocese") for entry of an order pursuant to sections 105 and 363

of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules"): (I)(a) approving bidding procedures in

connection with the sale of certain real property located at (i) 785 Main Street, Buffalo, New York

14203, (ii) 814 Main Street, Buffalo, New York 14203, (iii) 815 Main Street, Buffalo, New York

14203, (iv) 819 Main Street, Buffalo, New York 14203, and (v) 821 Main Street, Buffalo, New

York 14203 (each a "Parcel" and collectively, (i) – (v), together with all improvements and fixtures

located thereon, the "Real Property"); (b) authorizing and approving the form of the proposed

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

22232345.v6

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 2 of 95

purchase agreement, as amended (the "Purchase Agreement") between the Diocese and BFC Buffalo Main LLC, ("BFC″ or the "Stalking Horse Bidder"); (c) authorizing and approving the form of the proposed lease agreement, (the "Lease Agreement") between the Diocese and BFC; (d) scheduling an auction (the "Auction") and the date and time of the hearing to approve the sale of the Real Property (the "Sale Hearing"); and (e) approving the form and manner of service of notice of auction and sale hearing (the "Notice of Auction and Sale Hearing"); (II) approving and authorizing the sale of the Real Property and a leaseback of a portion thereof (together the "Sale Transaction") free and clear of any liens, claims, encumbrances and other interests (collectively, "Encumbrances") pursuant to the terms of the Successful Bid (as defined herein); and (III) granting related relief; and it appearing that the relief requested in the Motion is in the best interests of the Diocese, its estate, creditors, and other parties in interest; and good and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**[2]

A.      This Court has jurisdiction over the Motion and the transactions contemplated therein pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, and no other or further notice is required except as set forth herein. A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties-in-interest.

---

[2]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when applicable.  *See* Bankruptcy Rule 7052.

22232345.v6

C.     The Diocese has articulated good and sufficient business reasons for this Court to approve the bidding procedures attached hereto as *Exhibit 1* (the "Bidding Procedures").

D.     The Bidding Procedures are reasonably designed to maximize the consideration to be received for the Real Property.

E.     The Stalking Horse Bidder is not an "insider" or "affiliate" of the Diocese, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between the Stalking Horse Bidder and the Diocese. The Stalking Horse Bidder and the Diocese, together with their respective counsel and advisors, have acted in "good faith" and at "arm's length" within the meaning of section 363(m) of the Bankruptcy Code in connection with the negotiation of the agreement for the sale of the Real Property attached hereto as *Exhibit 2* (the "Purchase Agreement") and the leaseback of a portion thereof attached hereto as *Exhibit 3* (the "Lease Agreement").

F.     The Diocese has demonstrated and proved to the satisfaction of this Court that a sale of the Real Property, pursuant to the terms of the Purchase Agreement, subject to higher or better offers, is in the best interests of the Diocese, its creditors, and its estate, and the Diocese's decision to enter into the Purchase Agreement with the Stalking Horse Bidder represents a prudent exercise of the Diocese's sound business judgment.

G.     The publication and service of the Notice of Auction and Sale Hearing attached hereto as *Exhibit 4*, as described in the Motion, is reasonably calculated to provide all interested parties with adequate and proper notice of the proposed Sale Transaction, the Bidding Procedures, the Auction, and the Sale Hearing.

H.     The Diocese has articulated good and sufficient reasons for this Court to grant the relief set forth herein.  The entry of this Bidding Procedures Order is in the best interests of the Diocese, its estate, creditors, and other parties in interest.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     The Motion is granted as set forth herein.

2.     All objections to the Motion relating to the relief provided herein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3.     The Bidding Procedures attached hereto as *Exhibit 1* are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all bids to purchase the Real Property.  Any party desiring to submit a bid for the Real Property shall comply with the Bidding Procedures and this Order.

4.     The form of the Purchase Agreement attached hereto as *Exhibit 2* and the Lease Agreement attached hereto as *Exhibit 3* are hereby approved.  The offer by the Stalking Horse Bidder to purchase the Real Property pursuant to the terms of the Purchase Agreement, subject to and conditioned upon the Lease Agreement, is a Qualified Bid and the Stalking Horse Bidder is a Qualified Bidder for all purposes under the Bidding Procedures.

5.     In accordance with the terms of the Purchase Agreement, the Diocese shall return to the Stalking Horse Bidder its $450,000.00 deposit, payable in the event the Diocese, at no fault of the Stalking Horse Bidder, consummates the Sale Transaction with a Successful Bidder other than the Stalking Horse Bidder.

6.     The transfer of title and possession of the Real Property to the Stalking Horse Bidder or to a Successful Bidder other than the Stalking Horse Bidder shall be subject to terms, conditions, and obligations of the Lease Agreement.

22232345.v6

7.      The deadline for submitting bids for the Real Property (the "Bid Deadline") is **12:00 noon (prevailing Eastern Time) on _____ __, 2026.**  No bid shall be deemed to be a Qualified Bid (as defined in the Bidding Procedures) or otherwise considered for any purposes unless such bid is received by the Diocese prior to the Bid Deadline and otherwise satisfies all requirements set forth in the Bidding Procedures.

8.      If more than one Qualified Bid for the Real Property is timely received by the Diocese in accordance with the Bidding Procedures, the Diocese shall hold an Auction for the Real Property.  The Auction shall take place at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107, on _____ __, **2026 at 12:00 noon (prevailing Eastern Time)**, or on such other date and time as the Diocese shall notify all Qualified Bidders and other invitees.

9.      Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed Sale Transaction. The Stalking Horse Bidder will be permitted, but not obligated, to submit overbids at the Auction.

10.     The Notice of Auction and Sale Hearing, in substantially the form attached hereto as *Exhibit 4*, is hereby approved.

11.     The Diocese shall cause (a) a copy of the Notice of Auction and Sale Hearing, and (b) a copy of the Bidding Procedures Order, with exhibits, to be sent by first-class mail postage prepaid, to: (i) the Office of the United States Trustee for the Western District of New York; (ii) counsel to the Official Committee of Unsecured Creditors (the "Committee"); (iii) all parties filing Notices of Appearance and requests for papers in this Chapter 11 Case; (iv) all required governmental agencies; (v) all known parties who have expressed a bona fide interest in acquiring the Real Property during the pendency of this Chapter 11 Case; (vi) all creditors in the Chapter 11

22232345.v6

Case; and (vii) all persons known or reasonably believed to have asserted any lien, claim, encumbrance, or other interest in or upon any of the Real Property not later than three (3) business days following entry of this Bidding Procedures Order.

12.     The Diocese shall arrange for publication of a copy of the Notice of Auction and Sale Hearing in the *Buffalo News* not later than five (5) business days following entry of this Bidding Procedures Order (subject to applicable submissions deadlines).

13.     If the Diocese does not receive any Qualified Bids (other than the Purchase Agreement) prior to the Bid Deadline: (a) the Diocese may cancel the Auction; (b) the Stalking Horse Bidder will be deemed the Successful Bidder for the Real Property; and (c) the Diocese shall be authorized to seek approval of the Purchase Agreement and the Sale Transaction to the Stalking Horse Bidder at the Sale Hearing.

14.     The Sale Hearing shall be held before this Court on _____ __, **2026 at 10:00 a.m.**/ **p.m. (prevailing Eastern time)**, or as soon thereafter as counsel and interested parties may be heard.

15.     The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest other than as reflected on the Bankruptcy Court's docket or announcement of said adjournment in open Court or on this Court's calendar on the date scheduled for the Sale Hearing.

16.     Except as otherwise provided in this Bidding Procedures Order, the Diocese reserves the right as it may reasonably determine to be in the best interests of its estate, in the Diocese's business judgment, in consultation with the Committee, and subject to conformity with the Bidding Procedures to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the highest or best proposal and

22232345.v6

which is the next highest or best proposal; (d) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) not in the best interests of the Diocese and its estate; (e) waive terms and conditions set forth herein with respect to all potential bidders or impose additional terms and conditions with respect to all bidders; (f) extend the deadlines set forth herein; (g) adjourn or cancel the Auction or Sale Hearing without further notice, except that written notice shall be provided to the Stalking Horse Bidder; and (h) modify the Bidding Procedures as the Diocese, in its business judgment, may determine to be in the best interest of its estate, or to withdraw the Motion at any time with or without prejudice.

17.    The Diocese is hereby authorized to take all actions necessary as appropriate to effectuate the terms of this Bidding Procedures Order.

18.    Notwithstanding anything to the contrary in Bankruptcy Rule 6004(h), or otherwise, this Bidding Procedures Order shall be effective immediately upon its entry.

19.    This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order.


Dated: _____, 2026
      Buffalo, New York                    _____
                                     Hon. Carl L. Bucki
                                     Chief United States Bankruptcy Judge

22232345.v6

***Exhibit 1***

(to Bidding Procedures Order)

Bidding Procedures

22232345.v6

Case 1-20-10322-CLB,   Doc 4581-1,   Filed 02/09/26,   Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 9 of 95

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

## BIDDING PROCEDURES FOR THE SALE AND PARTIAL LEASEBACK
## OF 785, 814, 815, 819, AND 821 MAIN STREET, BUFFALO, NEW YORK

Set forth below are the bidding procedures (the "<u>Bidding Procedures</u>") to be employed with respect to the proposed sale and partial leaseback (the "<u>Sale Transaction</u>") of certain real property located at (I) 785 Main Street, Buffalo, New York 14203, (II) 814 Main Street, Buffalo, New York 14203, (III) 815 Main Street, Buffalo, New York 14203, (IV) 819 Main Street, Buffalo, New York 14203, and (V) 821 Main Street, Buffalo, New York 14203 (each a "<u>Parcel</u>" and collectively, (I) – (V), together with all improvements and fixtures located thereon, the "<u>Real Property</u>") by The Diocese of Buffalo, N.Y. (the "<u>Diocese</u>"). The Sale Transaction is subject to competitive bidding as set forth herein and approval by the United States Bankruptcy Court for the Western District of New York (the "<u>Bankruptcy Court</u>") pursuant to Section 363 of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

On February __, 2026, the Diocese filed the *Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale and Partial Leaseback of Certain Real Property Located at 785, 814, 815, 819 and 821 Main Street, Buffalo, New York; (B) Authorizing and Approving the Form of Purchase Agreement and Accompanying Lease; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief* [Docket No. _____] (the "<u>Sale Motion</u>").

On _____ __, 2026, the Bankruptcy Court entered an order [Docket No. _____] (the "<u>Bidding Procedures Order</u>")[1] which, among other things, approved (i) these Bidding Procedures, (ii) the form of purchase agreement with BFC Buffalo Main LLC, ("<u>BFC</u>" or the "<u>Stalking Horse Bidder</u>") attached as *Exhibit 2* to the Bidding Procedures Order (the "<u>Purchase Agreement</u>"), and (iii) the form of lease agreement with the Stalking Horse Bidder attached as *Exhibit 3* to the Bidding Procedures Order (the "<u>Lease Agreement</u>").

These Bidding Procedures describe, among other things, the Real Property available for sale, the form of bids and the manner in which bidders and bids become qualified, the coordination of diligence efforts, the conduct of the Auction (as defined herein), the ultimate selection of the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion and the Bidding Procedures Order, as applicable.

22232343.v7

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 10 of 95

Successful Bidder (as defined herein) and the Court's approval thereof (the "Bidding Process"). In the event of any disagreement as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court shall have jurisdiction to hear and resolve such dispute.

Copies of the Sale Motion and all exhibits thereto may be obtained by contacting the Diocese's counsel: Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attn: Stephen A. Donato, Charles J. Sullivan, Grayston T. Walter, and Justin S. Krell (Telephone (315) 218-8000; email: sdonato@bsk.com, csullivan@bsk.com, gwalter@bsk.com, , and jkrell@bsk.com), or they may be downloaded by visiting the Bankruptcy Court's electronic case management website at https://ecf.nywb.uscourts.gov/ or for free at https://case.stretto.com/dioceseofbuffalo.

## Property to be Sold

The Real Property to be sold consists of five (5) parcels of land owned by the Diocese and located at 785 Main Street, Buffalo, New York 14203, 814 Main Street, Buffalo, New York 14203, 815 Main Street, Buffalo, New York 14203, 819 Main Street, Buffalo, New York 14203, and 821 Main Street, Buffalo, New York 14203. The sale is expressly subject to and contingent upon a Lease Agreement, substantially in the form attached as ***Exhibit 3*** to the Bidding Procedures Order, between the Diocese and the Successful Bidder.

The Sale Transaction will be conducted on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Diocese, its agents or the Diocese's bankruptcy estate, except to the extent set forth in the Purchase Agreement. Except as otherwise provided in the Purchase Agreement or in the Bankruptcy Court's order approving the Sale Transaction, the Real Property shall be sold to the Successful Bidder free and clear of all liens, claims, encumbrances, and other interests ("Encumbrances"), with such Encumbrances to attach solely to the net proceeds of the sale.

## Participation Requirements

In order to participate in the Bidding Process, a bidder for the Real Property (a "Potential Bidder") must be a "Qualified Bidder." A Qualified Bidder is a person or group of persons who has provided the Diocese with current audited financial statements, evidence of committed financing, or such other financial and credit-quality disclosures as may be reasonably requested by, and satisfactory to the Diocese, in consultation with the Official Committee of Unsecured Creditors (the "Committee"), evidencing the Potential Bidder's financial wherewithal to consummate the Sale Transaction and pay the purchase price for the Real Property to the Diocese in cash.

The Diocese, in its discretion, shall determine whether a bid qualifies as a "Qualified Bid." To constitute a Qualified Bid, a bid must be an offer from a Qualified Bidder received by the Diocese before the Bid Deadline (defined below) and:

(i)     be submitted in writing;

2

22232343.v7

Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 11 of 95

(ii)     provide for a purchase price, payable in full, in cash, upon the Sale Transaction closing date, which exceeds the cash consideration set forth in the Purchase Agreement by at least $100,000.00 (the "Initial Minimum Overbid").

(iii)    be on terms that are not more burdensome or conditional in any material respect than the terms of the Purchase Agreement;

(iv)    agree to lease terms that are substantially similar, in all material respects, to the terms of the Lease Agreement;

(v)     not be conditioned on obtaining financing, the outcome of any due diligence investigation, or on the receipt of any third-party approvals or consents (excluding required Bankruptcy Court approval and any third-party approvals or consents contemplated in the Purchase Agreement);

(vi)    not request or entitle the bidder to any break-up fee, expense reimbursement, or similar type of payment;

(vii)   include a binding and definitive purchase agreement for the Real Property, in substantially the same form as the Purchase Agreement and executed by the Qualified Bidder (a "Qualified Bidder Contract"), together with a marked copy showing any changes from the Purchase Agreement, and a clean electronic copy in Microsoft Word readable format;

(viii)  include a lease agreement for the Real Property, in substantially the same form as the Lease Agreement and executed by the Qualified Bidder (a "Qualified Bidder Lease"), together with a marked copy showing any changes from the Lease Agreement, and a clean electronic copy in Microsoft Word readable format;

(ix)    be accompanied by a cash, certified bank check, or wire transfer deposit equal to at least 10% of the purchase price set forth in the Qualified Bidder Contract;

(x)     fully disclose the identity of each entity that will be bidding for the Real Property or otherwise participating in connection with such bid, the complete terms of any such participation, and identify no more than three (3) representatives authorized to appear and act on behalf of such Qualified Bidder at the Auction ("Authorized Bidder Representatives");

(xi)    include an acknowledgment and representation that the Qualified Bidder has had an opportunity to consider all due diligence regarding the Real Property prior to submitting its bid and that it has relied solely upon its own independent review, investigation and inspection of any documents or the Real Property in making its bid;

(xii)   confirm that, if selected as the Successful Bidder or the Back-Up Bidder, such bidder will complete the Sale Transaction within five (5) business days following the later date for which (A) the Bankruptcy Court's order approving the sale shall have become a final and non-appealable order, or (B) the Diocese shall have

3

22232343.v7

Case 1-20-10322-CLB,   Doc 4581-1,   Filed 02/09/26,   Entered 02/09/26 18:09:51,   Description: Exhibit A-Proposed Bidding Procedures Order, Page 12 of 95

provided written notice of its readiness to consummate the Sale Transaction, which notice shall be provided no later than thirty (30) days of such order becoming final and non-appealable;

(xiii)     certify that the bidder has not, and is not, engaged in any collusion with respect to its bid or the Sale Transaction; and

(xiv)     provide that such bid shall remain open and irrevocable until:

        (A)     if such bid is not the Successful Bid or Back-Up Bid (as each term is defined below), the entry by the Bankruptcy Court of an order approving the sale of the Real Property to another Qualified Bidder;

        (B)     if such bid is the Successful Bid, the closing of the Sale Transaction to such Successful Bidder; or

        (C)     if such bid is chosen by the Diocese to be the Back-Up Bid, the date which is the earlier to occur of: (i) the closing of the Sale Transaction to the Successful Bidder or (ii) the closing of the Sale Transaction to such Back-Up Bidder.

As promptly as practicable after receiving a bid from a Potential Bidder, the Diocese shall determine, in consultation with the Committee, and shall notify the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder and whether the bid is a Qualified Bid. Notwithstanding anything to the contrary herein, the Stalking Horse Bidder is a Qualified Bidder, and the Purchase Agreement is a Qualified Bid, for all purposes of these Bidding Procedures.

## Bid Deadline

All Qualified Bids must be actually received at or before **12:00 noon (prevailing Eastern Time) on _____ __, 2026** (the "Bid Deadline"), by counsel to the Diocese, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202 (Attn: Stephen A. Donato, Charles J. Sullivan, Grayson T. Walter, and Justin S. Krell (Telephone (315) 218-8000; email: sdonato@bsk.com, csullivan@bsk.com, gwalter@bsk.com, and jkrell@bsk.com). The Diocese may extend the Bid Deadline in its discretion, for an aggregate period of not more than thirty (30) days, but is not obligated to do so.

As soon as practicable following the Bid Deadline, the Diocese will review all timely-received bids and will provide copies of all bids deemed to be Qualified Bids to counsel to the Committee, and the Office of the United States Trustee for the Western District of New York (the "UST").

## "As-Is" Sale / Diligence

The sale of the Real Property shall be on an "as-is" basis, without any representations or warranties provided by the Diocese, except those set forth in the Purchase Agreement. The sale is

22232343.v7

Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 13 of 95

expressly subject to and contingent upon the Lease Agreement between the Diocese and the Stalking Horse Bidder, or such other Qualified Bidder who makes a higher and better offer.

Each Potential Bidder shall comply with all reasonable requests for information by the Diocese or its advisors regarding such Potential Bidder's financial wherewithal and ability to consummate the Sale Transaction. Failure by any Potential Bidder to comply with requests for additional information from the Diocese may be a basis for the Diocese, in its discretion, to determine that a Potential Bidder is not a Qualified Bidder, or that any bid is not a Qualified Bid.

Prior to the Bid Deadline, the Diocese shall provide any Potential Bidder deemed to be a Qualified Bidder with reasonable site access and due diligence information upon request. In no instance shall the Diocese have any obligation to produce or furnish any information not already within the Diocese's possession and control.

Potential Bidders are advised to exercise their own discretion before relying on any information regarding the Real Property provided by anyone other than the Diocese or its representatives.

By submitting their bid, each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to inspect and examine the Real Property and that it has relied solely upon its own independent review, investigation and/or inspection of any documents in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Real Property, or the completeness of any information provided in connection with the Bidding Process except as expressly stated in the Qualified Bidder Contract submitted with its Qualified Bid.

## Auction

If no Qualified Bids (other than the Purchase Agreement submitted by the Stalking Horse Bidder, which shall be deemed as a Qualified Bid) are received on or prior to the Bid Deadline, the Stalking Horse Bidder shall be the Successful Bidder (as defined below) and the Diocese shall seek authorization to sell the Real Property to the Stalking Horse Bidder without further competitive bidding.

If the Diocese receives more than one Qualified Bid prior to the Bid Deadline, the Diocese shall conduct an auction (the "Auction") for the Sale of the Real Property. The Auction shall take place on _____ __, **2026 at 12:00 noon (prevailing Eastern Time)** at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107, or at such other time and place as the Diocese may notify all Qualified Bidders. Only the Stalking Horse Bidder and those Qualified Bidders who timely submitted a Qualified Bid will be eligible to participate in the Auction.

At the commencement of the Auction, the Diocese shall announce the Qualified Bid that it has determined represents the highest or otherwise best bid for the Real Property (the "Starting Qualified Bid") and the overall consideration value ascribed to such bid (the "Bid Value").

Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 14 of 95

Each Qualified Bidder present at the Auction will be permitted to increase its Qualified Bid in turns (each such increased Qualified Bid, a "<u>Qualified Overbid</u>"), provided that each Qualified Overbid thereafter must exceed the Bid Value of the then-highest or otherwise best Qualified Overbid, by at least fifty thousand dollars ($50,000.00) (the "<u>Minimum Bid Increment</u>"). During the course of the Auction, the Diocese will inform the participants which Qualified Overbid reflects the then-highest or otherwise best offer for the Real Property and the Bid Value ascribed thereto. The Diocese in consultation with the Committee, reserves the right to adjust the amount of the Minimum Bid Increment during the Auction if it has been determined that such adjustment may induce more competitive bidding.

The Auction may be adjourned from time to time by the Diocese, but it shall not be concluded until each Qualified Bidder present at the Auction has been given an opportunity to submit a Qualified Overbid with knowledge of the Bid Value ascribed to the Starting Qualified Bid or then-highest Qualified Overbid, as applicable.

At the conclusion of the Auction the Diocese will announce (i) the Qualified Bid which the Diocese, in consultation with the Committee, deems to represent the highest or otherwise best bid for the Real Property (such bid being the "<u>Successful Bid</u>" and the Qualified Bidder submitting such bid, the "<u>Successful Bidder</u>") and (ii) the next highest or otherwise best bid (the "<u>Back-Up Bid</u>" and the party submitting such bid, the "<u>Back-Up Bidder</u>"). As a condition precedent to the Diocese declaring any bid the Successful Bid or the Back-Up Bid, the Diocese may require the Successful Bidder or Back-Up Bidder to deposit additional cash or immediately available funds such that their total deposit shall be not less than ten percent (10%) of the purchase price of their respective Successful Bid or Back-Up Bid. For the avoidance of doubt, the Stalking Horse Bidder shall be given full credit for the $450,000 deposit it has previously tendered pursuant to the Purchase Agreement. Any deposits not applied in satisfaction of the obligations of the Successful Bidder or Back-Up Bidder shall be returned not later than five (5) business days following the consummation of the Sale Transaction.

The Diocese shall not consider any bids submitted after the conclusion of the Auction.

All Qualified Bids and Qualified Overbids submitted by Qualified Bidders prior to or at the Auction shall remain open and irrevocable as follows:

> (a)      if such bid is not the Successful Bid or Back-Up Bid, until the entry by the Bankruptcy Court of an order approving the Sale to another Qualified Bidder;

> (b)      if such bid is the Successful Bid, until the closing of the Sale to such Successful Bidder; or

> (c)      if such bid is the Back-Up Bid, until the date which is the earlier to occur of: (i) the closing of the Sale to the Successful Bidder or (ii) the closing of the Sale to such Back-Up Bidder.

22232343.v7

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 15 of 95

## The Sale Hearing

A hearing to approve the Sale Transaction (the "Sale Hearing") is scheduled to take place on _____ __, **2026 at 10:00 a.m. (prevailing Eastern time)** before the Honorable Carl L. Bucki, Chief Judge of the United States Bankruptcy Court for the Western District of New York, at the Robert H. Jackson United States Courthouse, 2 Niagara Square, Buffalo, NY 14202. Objections to the Sale Transaction must be in writing, comply with the Local Bankruptcy Rules for the Western District of New York, and be filed with the Bankruptcy Court as soon as practicable in advance of the Sale Hearing. At the Sale Hearing, the Diocese will seek entry of an order (the "Sale Order"), among other things, (i) authorizing and approving the sale of the Real Property to the Successful Bidder (or in the alternative, the Back-Up Bidder), as determined by the Diocese in the Diocese's business judgment and in accordance with the Bidding Procedures, pursuant to the terms and conditions set forth in the Purchase Agreement or Qualified Bidder Contract, as applicable, and as the same may be modified by any Qualified Overbid submitted at the Auction, and (ii) authorizing and approving the Lease Agreement or the Qualified Bidder Lease. The Sale Hearing may be adjourned or rescheduled without notice other than as reflected on the Bankruptcy Court's docket or by an announcement of the adjourned date in open court at the Sale Hearing.

The Diocese shall be deemed to have accepted a Qualified Bid only when (i) such Bid is declared the Successful Bid (or the Back-Up Bid) in accordance with these Bidding Procedures, (ii) definitive documentation has been executed in respect thereof, and (iii) the Bankruptcy Court has entered the Sale Order.

Following the entry of the Sale Order, if the Successful Bidder fails to consummate the approved Sale Transaction in accordance with the terms of its Successful Bid because of a breach or failure to perform on the part of such Successful Bidder, the Diocese may terminate its agreement to sell the Real Property to the Successful Bidder, retain the Successful Bidder's deposit, and maintain the right to pursue all available remedies whether legal or equitable against such Successful Bidder. In the event the Diocese elects to so terminate, the Backup Bid, shall automatically be deemed to be the Successful Bid with respect to the Real Property, and the Diocese shall be authorized to effectuate the sale of the Real Property to the Backup Bidder without further order of the Bankruptcy Court, and for all such purposes the Backup Bidder shall be deemed the Successful Bidder.

The Diocese shall return any deposits to all Qualified Bidders, other than the Successful Bidder and the Back-Up Bidder, within five (5) business days following the date on which the Sale Order becomes a final and non-appealable order. The deposit of the Successful Bidder shall be applied to, and deducted from, the Successful Bidder's obligations under the Successful Bid at the closing of the Sale Transaction. The deposit of the Back-Up Bidder shall be returned to the Back-Up Bidder within five (5) business days following the date its bid is no longer required to remain open and irrevocable as set forth herein.

Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 16 of 95

**<u>Reservation of Rights</u>**

The Diocese reserves all rights to terminate the Bidding Process at any time if the Diocese determines, in consultation with the Committee, that the Bidding Process is not in the best interests of the Diocese's bankruptcy estate. In addition, the Diocese reserves the right not to submit for approval to the Bankruptcy Court any bid (regardless of whether it may be a Qualified Bid under these Bidding Procedures) if the Diocese has reason to believe that such bid was not submitted in good faith or other similar reason, with written notice to the Stalking Horse Bidder of any such determination. Without limiting the generality of the foregoing, the Diocese may reject at any time before entry of the Sale Order, any bid that it determines, in consultation with the Committee, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) not in the best interests of the Diocese, its estate and creditors. The Diocese shall further have the right to amend the rules set forth herein for the Bidding Process or impose such other or additional terms and conditions for the Bidding Process which the Diocese determines, in consultation with the Committee, are in the best interests of the chapter 11 estate, provided that such modifications are not inconsistent with these Bidding Procedures or the Bidding Procedures Order.

<p align="center">*    *    *</p>

***Exhibit 2***

(to Bidding Procedures Order)

Purchase Agreement

22232345.v6

Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 18 of 95

# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of the 8th day of September 2025 (the "Effective Date"), is entered into between **THE DIOCESE OF BUFFALO, N.Y.**, a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, having an address at 795 Main Street, Buffalo, NY 14203 ("Seller"), and **BFC BUFFALO MAIN LLC**, a New York limited liability company having an address at 150 Myrtle Avenue, Suite 2, Brooklyn, New York 11201, or an affiliated entity ("Purchaser"; Seller and Purchaser are each referred to herein as a "Party", and collectively as the "Parties").

## RECITALS

WHEREAS, Seller is the owner of real properties located in the City of Buffalo, County of Erie, and State of New York, commonly known as (i) **785 Main Street, Tax Map Parcel No. 111.23-10-3.1[1]**, (ii) **814 Main Street, Tax Map Parcel No. 111.22-8-18**, (iii) **815 Main Street, Tax Map Parcel No. 111.23-10-2**, (iv) **819 Main Street, Tax Map Parcel No. 111.23-10-1**, and (v) **821 Main Street, Tax Map Parcel No. 111.23-9-1.1**, which are shown outlined on the property sketches attached hereto as **Exhibit A-1**, and is more particularly described on **Exhibit A-2** attached hereto (each, a "Parcel" and collectively, (i) – (v), together with all improvements and fixtures located thereon, the "Real Property").

WHEREAS, on February 28, 2020 (the "Petition Date") Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 et seq., the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court"), commencing Seller's chapter 11 case (this "Bankruptcy Case");

WHEREAS, Seller continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, by Order Authorizing the Retention and Employment of Hanna Commercial Real Estate as Real Estate Broker to the Diocese (Docket No. 2784) and entered January 31, 2024, Seller retained Hanna Commercial Real Estate ("Hanna CRE") as the real estate broker for Seller (the "Broker Order");

WHEREAS, Seller listed the Real Property for sale with Hanna CRE beginning on or about March 11, 2024;

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Purchaser, and Purchaser desires to purchase the Property (as hereinafter defined) from Seller;

WHEREAS, Seller has not provided Purchaser with a copy of the Bid Procedures and Order, as defined below at 1.4 and 1.5, Purchaser reserves the right to review those prior to

---

[1] For the avoidance of doubt, this property address is 785 Main Street, Buffalo, New York and the mailing address is 795 Main Street, Buffalo, New York.

21419372.v19
Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 19 of 95

consenting to submission of this Offer to the Bankruptcy Court for Sale Approval, as defined below at 1.24[2];

WHEREAS, the transaction contemplated by this Agreement is subject to the approval of the Bankruptcy Court, which approval will include, among other things, issuance by the Bankruptcy Court of a Bidding Procedures Order directing the manner in which a bidding procedure will be conducted for solicitation of competing offers from third parties for the purchase of the Property; and

WHEREAS, depending upon the outcome of the bidding pursuant to the Bidding Procedures Order, this Agreement and the transactions contemplated herein will be consummated pursuant to a sale order to be entered in the Bankruptcy Case or, in the alternative, this Agreement may be terminated by Seller or Purchaser, as hereinafter provided.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings ascribed to them below, unless the context clearly requires otherwise:

1.1     "**Bankruptcy Case**" shall have the meaning given to it in the Recitals to this Agreement.

1.2     "**Bankruptcy Code**" shall have the meaning given to it in the Recitals to this Agreement.

1.3     "**Bankruptcy Court**" shall have the meaning given to it in the Recitals to this Agreement.

1.4     "**Bidding Procedures**" shall mean the bidding procedures governing the process by which the sale of the Property shall occur, which are attached to the Bidding Procedures Order as Exhibit 1.

1.5     "**Bidding Procedures Order**" shall mean an order of the Bankruptcy Court: (i) approving the terms of this Agreement, subject to higher and better bids; (ii) establishing procedures for Seller's solicitation of competing offers to purchase the Property from third parties; (iii) establishing procedures for an auction to determine the highest or otherwise best offer for the Property; and (iv) scheduling a hearing to consider entry of the Sale Order.

---

[2] For the avoidance of doubt, Purchaser retains the right to review, not the right to request substantive changes, to the Bid Procedures and Order.

**Purchase and Sale Agreement for Various Properties on Main Street in Buffalo, New York**

1.6 "**Business Day(s)**" shall mean calendar days, exclusive of Saturdays, Sundays and holidays on which banking institutions in New York are authorized by Law to close.

1.7 "**Claim**" shall mean any claim within the meaning of section 101(5) of the Bankruptcy Code.

1.8 "**Closing**" shall mean the closing of the transaction as set forth in Section 7.1 of this Agreement.

1.9 "**Closing Date**" shall mean the date of Closing.

1.10 "**Encumbrance**" shall mean any Lien, Claim, Interest, or defect in title, whether imposed by Law, agreement, understanding or otherwise. For the avoidance of doubt, rights of way and easements of record shall not be considered an Encumbrance under this Agreement.

1.11 "**Escrow Agent**" shall mean the Seller's attorneys, Bond, Schoeneck & King, PLLC.

1.12 "**Interest**" shall mean any interest in, or related to, the Property within the meaning of section 363(f) of the Bankruptcy Code, and all mortgages, Leases, or other interests, pledges, security interests, rights of setoff, successor liabilities, conditions, obligations to allow participation, agreements or rights, rights asserted in litigation matters, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of Sellers (and all created expenses and charges) of any type under, among other things, any document, instrument, agreement, affidavit, matter filed of record, cause, or state or federal law, whether known or unknown, legal or equitable, and all Liens, rights of offset, replacement liens, adequate protection liens, charges, obligations.

1.13 "**IMG_INK Lease**" shall mean that certain lease agreement dated July 21, 1998, The Diocese of Buffalo, NY and IMG_INK f/k/a Keystone Film Productions, Inc., as amended by the Lease Addendum and Modification Agreement dated January 25, 1999, as further amended by the Second Lease Addendum and Modification Agreement dated February 14, 2003, as further amended by the Third Addendum and Modification Agreement dated April 21, 2009, as further amended by the Fourth Lease Addendum and Modification Agreement dated July 13, 2009, as further amended by the Fifth Lease Addendum and Modification Agreement dated July 22, 2010, as further amended by the Sixth Lease Addendum and Modification Agreement dated August 1, 2011, as further amended by the Seventh Lease Addendum and Modification Agreement dated August 11, 2014, as further amended by the Eighth Lease Addendum and Modification Agreement dated August 20, 2014, as further amended by the Ninth Lease Addendum and Modification Agreement dated August 13, 2015, as further amended by the Tenth Lease Addendum and Modification Agreement dated August 17, 2016, as further amended by the Eleventh Lease Addendum and Modification Agreement dated July 24, 2017, as further amended by the Twelfth Lease Addendum and Modification Agreement dated August 20, 2018, as further amended by the Thirteenth Lease Addendum and Modification Agreement dated February 11, 2019, as further amended by the Fourteenth Lease Addendum and Modification Agreement dated September 24, 2019, as further amended by the Fifteen Lease Addendum and Modification Agreement dated February 12, 2020, as further amended by the Sixteenth Lease Addendum and Modification

Agreement dated October 1, 2020, as further amended by the Seventeenth Lease Addendum and Modification Agreement dated May 26, 20121, as further amended by the Eighteenth Lease Addendum and Modification Agreement dated December 9, 2021, as further amended by the Nineteenth Lease Addendum and Modification Agreement dated December 20, 2022, as further amended by the Twentieth Lease Addendum and Modification Agreement dated December 11, 2023, as further amended by the Twenty-First Lease Addendum & Modification dated December 3, 2024, and as further amended by the Twenty-Second Lease Addendum & Modification dated July 1, 2025 (collectively, the "IMG_INK Lease") IMG_INK leased (x) a portion of the mezzanine and (y) a portion of the first floor of 825 Main Street, Buffalo, New York (a/k/a 821 Main Street, Buffalo, New York) and (z) ten (10) parking spots. The IMG_INK Lease is set to expire on its terms on December 31, 2025.

1.14    "**Law**" shall mean all federal, state and local laws, ordinances, rules, regulations, standards, and Orders.

1.15    "**Leases**" shall mean all leases, including the IMG_INK Lease, Oxford Pennant Lease (as hereinafter defined) and Walsh Duffield Lease (as hereinafter defined), subleases, licenses, concessions, options, extension letters, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements, whether written or oral, and any amendments or supplements to any of the foregoing.

1.16    "**Liability**" shall mean any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due).

1.17    "**Lien**" shall mean any charge against or Interest in the Property to secure payment of a debt or performance of an obligation (statutory or otherwise), deed of trust, mortgage, pledge, security interest, security agreement, hypothecation, preference, priority, or right of recovery.

1.18    "**Order**" shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, or administrative agency.

1.19    "**Oxford Pennant Lease**" shall mean that certain lease dated April 1, 2025, between The Diocese of Buffalo, NY and Oxford Pennant LLC (the "Oxford Pennant Lease"). Oxford Pennant LLC leased twenty eight (28) parking spots at 821 Main Street, Buffalo, New York, between the hours of 8:00am and 12:00am, Monday thru Friday. The Oxford Pennant Lease is set to expire on September 30, 2025, however, there is the option to convert the lease to a month-to-month lease, which can be terminated upon thirty (30) days written notice to the other party.

1.20    "**Permitted Exceptions**" shall have the meaning given to such term in Section 9.4.

1.21    "**Person**" shall mean any individual, corporation, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

1.22    "**Proceeding**" shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 22 of 95

notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Person.

1.23 "**Property**" shall mean the Real Property together with all of Seller's right, title, and interest, if any, in and to:

    a. Strips and gores of land adjoining or abutting the Real Property, if any;

    b. Any land lying in the bed of any street, road, avenue or alley, opened or proposed, in front of, running through or adjoining the Real Property;

    c. Any easement, privilege or right-of-way over, contiguous or adjoining the Real Property, and all the other easements, if any, inuring to the benefit of the Real Property or the fee owner thereof;

    d. All minerals, oil, gas and other hydrocarbons located in, on or under the Real Property, together with all rights to surface or subsurface entry;

    e. The appurtenances and hereditaments belonging or in any way appertaining to the Real Property;

    f. All right, title and interest, if any, in and to the fixtures attached or appurtenant to the improvements located on the Real Property;

    g. All transferable warranties and guaranties pertinent to the Real Property; and

    h. To the extent they may be transferred under applicable law, all licenses, permits, approvals and authorizations required for the use and operation of all or any portion of the Property and any improvements thereon, including, without limitation, all of Seller's right, title and interest, if any, in and to all consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality relating to the Property, to the extent transferrable and/or assignable.

1.24 "**Quitclaim Deed**" shall mean the deed to be delivered at Closing by Seller to Purchaser in the form attached hereto as **Exhibit B**.

1.25 "**Remaining Personal Property**" shall mean any items of equipment and personal property remaining on the Property as of the date of the Closing. For the avoidance of doubt, except for the Building Systems and Fixtures (as hereinafter defined) and as otherwise required hereunder, Seller, in its sole discretion, shall determine what equipment and personal property, if any, shall remain on the Property as of the date of the Closing.

1.26 "**Sale Order**" shall mean an Order of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller authorizing the sale of the Property to Purchaser in

21419372.v19

accordance with the terms and conditions set forth herein, free and clear of any Encumbrances pursuant to section 363(f) of the Bankruptcy Code.

1.27  "**Tax**" and "**Taxes**" shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

1.28  **"Title Company"** shall mean a reputable title company to be selected by Purchaser.

1.29  **"Transaction"** shall mean the purchase and sale of the Property contemplated by this Agreement.

1.30  **"Walsh Duffield Lease"** shall mean that certain lease agreement dated January 1, 2013 between The Diocese of Buffalo, N.Y. and Walsh Duffield Companies, Inc., as amended by the Lease Extension and Modification Agreement dated June 28, 2018, and further amended by the Second Lease Extension and Modification Agreement dated October 25, 2023 and further amended by the Third Lease Modification Agreement dated March 8, 2024 (collectively, the "Walsh Duffield Lease") Walsh Duffield Companies, Inc. leases 801 Main Street, Buffalo, New York (the "Walsh Building") and sixty-one (61) designated parking spaces in the parking lots. The Walsh Duffield Lease shall terminate on December 31, 2025.

## ARTICLE II
## AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

2.1.  **Agreement to Sell and Purchase the Property**.  On the Closing Date, subject to the performance of the parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, Seller shall sell, convey, assign, transfer, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, the Property, free and clear of all Encumbrances, except as otherwise expressly provided in this Agreement.

2.2.  **Condition of Property**.  Seller is selling and Purchaser is acquiring the Property "AS-IS" "WHERE-IS", and with all faults, as provided in **ARTICLE XII** below.

2.3.  **Personal Property.**  Seller shall have the right at any time prior to Closing to remove from the Property any religious items and other equipment and personal property which Seller elects to remove and retain. For the avoidance of doubt, any pews shall be considered religious items under this Agreement. Purchaser agrees to accept possession of the Property at Closing with any Remaining Personal Property included in the sale (at no additional cost to Purchaser) on an "AS IS" "WHERE IS" basis.  If requested by Purchaser prior to Closing, Seller shall deliver to Purchaser at Closing a quitclaim bill of sale conveying Seller's interest in any such Remaining Personal Property. Seller and Purchaser acknowledge that, to the extent any such Remaining Personal Property is on the Property as of the Closing, such Remaining Personal Property is of little or no value.

2.4.  **Building Systems and Fixtures.**  Notwithstanding the foregoing, Seller agrees not to remove from the Property any of the following to the extent they are in place on the Property as of the Effective Date of this Agreement, and that all such items shall be included in the sale to

21419372.v19

Purchaser, as fixtures to the Property: any natural gas and electric fixtures, facilities, appliances and wiring, fixtures and related equipment, all emergency generators, engines, boilers, elevators, incinerators, motors, heating, ventilation, and air conditioning equipment, affixed cabinetry, sinks, basins, water closets, lavatory fixtures, faucets, and pipes, all electrical and telephone systems, components, wiring, transformers, electrical boxes, switches, lighting fixtures, and bulbs, any sprinkler systems, fire prevention and extinguishing apparatus, any central music and public address systems, any burglar alarms, security systems and equipment, remote control devices for overhead doors, any window shades, awnings, screens, blinds, installed carpeting, drapes, and curtains (collectively and as appear on the Property at the Effective Date of this Agreement, the "Building Systems and Fixtures"). Seller makes no representation or warranty that any of the foregoing items are in place on the Property. The Building Systems and Fixtures are transferred "AS-IS" "WHERE-AS", with all faults, and SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE III
## PURCHASE PRICE

3.1.    **Purchase Price**.  The Purchase Price for the Property shall be FOUR MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($4,500,000.00) (the "Purchase Price"), payable as follows:

    3.1.1.    **Deposit**.  Within five (5) business days after the Effective Date, Purchaser shall deposit in escrow with Escrow Agent, an earnest money deposit of FOUR HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($450,000.00) (the "Earnest Money Deposit") in a non-interest bearing account, which Earnest Money Deposit is to become part of the Purchase Price, or be returned, if required under the terms of this Agreement.

    3.1.2.    **Balance**.  The balance of the Purchase Price shall be paid, plus or minus Closing adjustments, as the case may be, in wire transferred funds of United States currency to Seller in accordance with the terms of the Sale Order.

3.2.    **Cash Transaction**. Purchaser acknowledges that Purchaser's representation below that the transaction contemplated herein is a "Cash Transaction" was a determinative factor in Seller's acceptance of Purchaser's offer. To that end, Seller acknowledges that Purchaser has provided Seller with evidence reasonably satisfactory to Seller confirming Purchaser's ability to purchase the Property pursuant to this Agreement without obtaining financing or funding from outside funding sources ("Proof of Funds").

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller makes no representations or warranties, express or implied, except those expressly contained or incorporated in this Agreement. All of the representations and warranties of Seller contained in this Agreement are to the best of Seller's knowledge, made as of the Effective Date, and except as otherwise set forth herein, shall merge with the Quitclaim Deed and shall not survive

21419372.v19

the Closing. Subject to the foregoing, Seller represents and warrants unto Purchaser as of the date hereof, as follows:

4.1.    **Organization**.  Seller is a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, duly organized, validly existing, and in good standing under the laws of the State of New York, and subject to the Bankruptcy Court's entry of the Sale Order, Seller has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate the transaction contemplated herein.

4.2.    **Power and Authority**.  All requisite corporate action has been taken by Seller in connection with entering into this Agreement, the documents and instruments referenced herein, and the consummation of the transaction contemplated hereby.  Subject to the Bankruptcy Court's entry of the Sale Order, no consent, authority, licensing, or approval of any partner, shareholder, trustee, trustor, beneficiary, creditor, investor, or other party is required for Seller to execute and deliver this Agreement and the instruments and documents referenced herein or consummate the transaction contemplated by this Agreement. The individual(s) executing this Agreement and the instruments referenced herein on behalf of Seller have the legal power, right, and actual authority to bind Seller to the terms and conditions hereof and thereof.

4.3.    **Consents**.  Subject to the Bankruptcy Court's entry of the Sale Order, no consent, approval, waiver, license, permit, or certificate of authority any other third Person is required in connection with the execution, delivery or performance by Seller of this Agreement or the consummation by Seller of the transactions contemplated hereby.

4.4.    **Foreign Person**. Seller is not a "foreign person" as defined in §1445(f)(3) of the Internal Revenue Code and regulations promulgated thereunder, which Seller shall so certify at Closing (via a "<u>Non-Foreign Person Affidavit</u>").

4.5.    **Title**. Seller is the sole fee owner of the Property, and has good, insurable and marketable fee title to the Property, and shall convey same to Purchaser at Closing. Except for the rights granted in the IMG_INK Lease, Oxford Pennant Lease, and Walsh Duffield Lease, there are no other Leases affecting the Property and no other party has any rights or claims of ownership, possession or other interest in the Property and but for the right of first refusal in the IMG_INK Lease and the right of first offer in the Walsh Duffield Lease, no party has any rights of first refusal, rights of first offer, or any other rights to purchase, rent, or otherwise possess the Property.

4.6.    **Leases**.  Within five (5) days of the Effective Date, Seller shall provide Purchaser with true, accurate, complete copies of the latest iteration of the Leases, specifically the IMG_INK Lease and the Walsh Duffield Lease, which annex the prior amendments.  The IMG_INK Lease, the Oxford Pennant Lease, and the Walsh Duffield Lease are the only Leases for any portion of the Property.

a.    **IMG_INK Lease**. IMG_INK Lease is in full force and effect, will expire on its terms on December 31, 2025, there are no further options to extend the term of the IMG_INK Lease, the tenant of the IMG_INK Lease has waived its right of first refusal in writing (to be provided to Purchaser prior to Closing), no rent or other

**Page 8 of 28**                    **Purchase and Sale Agreement**
**for Various Properties on Main Street**
**in Buffalo, New York**
21419372.v19

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 26 of 95

amounts have been collected from the tenant of the IMG_INK Lease more than one month in advance, no party to the IMG_INK Lease is in default of any terms thereof, there are no material liabilities of Seller as landlord of the IMG_INK Lease, and Seller currently holds a security deposit in the amount of $1,000.00 and provided the IMG_INK Lease is amended or extended to a month-to-month basis, the security deposit will be a credit against the Purchase Price at Closing.

b. **Oxford Pennant Lease**. The Oxford Pennant Lease is in full force and effect, will expire on its terms on September 30, 2025, and absent written notice from the Seller or Oxford Pennant, the Oxford Pennant Lease will convert into a month-to-month lease. No rent or other amounts have been collected from the tenant of the Oxford Pennant Lease more than one month in advance, no party to the Oxford Pennant Lease is in default of any terms thereof, there are no material liabilities of Seller as landlord of the Oxford Pennant Lease, and the Oxford Pennant Lease did not require a security deposit.

c. **Walsh Duffield Lease**.  The Walsh Duffield Lease is in full force and effect, will expire on its terms on December 31, 2025, there are no further options to extend the term of the Walsh Duffield Lease, the tenant of the Walsh Duffield Lease has waived its right of first offer in writing (to be provided to Purchaser prior to Closing), no rent or other amounts have been collected from the tenant of the Walsh Duffield Lease more than one month in advance, no party to the Walsh Duffield Lease is in default of any terms thereof, there are no material liabilities of Seller as landlord of the Walsh Duffield Lease, and the Walsh Duffield Lease did not require a security deposit.

4.7 **Diocese Lease**. Notwithstanding anything to the contrary contained in this Agreement, Seller shall have the right to occupy the Walsh Building for a period not to exceed three (3) years after the Closing Date, and Purchaser shall have the obligation to permit Seller to occupy the Walsh Building for a period not to exceed three (3) years after the Closing Date, subject to the terms of a written lease agreement by and between Seller, as tenant, and Purchaser, as landlord (the "Diocese Lease"). Seller and Purchaser shall work in good faith to agree to the terms of the Diocese Lease prior to the Closing Date which such lease shall include, but not limited to, the following material terms:

a. Seller, as tenant, shall have the right to terminate the Diocese Lease upon thirty (30) days prior written notice to Purchaser, as landlord, at any time during the term of the Diocese Lease;

b. Seller, as tenant, shall pay Purchaser's, as landlord, Carrying Costs (as hereinafter defined) for the Walsh Building.  The term "Carrying Costs" shall include the following costs:

i. All utilities consumed at the Walsh Building;

ii. All maintenance, repair, and upkeep of the parking lot located adjacent to the Walsh Building (the "Walsh Parking Lot"), which shall include, but not be limited to all snow and ice

**Purchase and Sale Agreement for Various Properties on Main Street in Buffalo, New York**

21419372.v19

Case 1-20-10322-CLB,   Doc 4581-1,   Filed 02/09/26,   Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 27 of 95

removal and plowing services;

   iii.   All real property taxes and assessments levied against the Walsh Building and the Walsh Parking Lot;

   iv.   All cost to obtain insurance coverage for the Walsh Building, to the extent such insurance limits are commercially reasonable (the Diocese Lease shall include Seller's obligation to carry and pay for liability insurance and property damage insurance or to pay for Purchaser's, as landlord, insurance covering the Walsh Building). Prior to securing an insurance policy, Purchaser shall provide Seller the opportunity to obtain an insurance estimate for the Walsh Building at such commercially reasonable coverage limits specified by Purchaser, as landlord (the "Estimate"). After review of the Estimate, if Purchaser elects to secure a policy from another broker, at a higher premium, Seller's financial obligations shall be limited to a reasonable increase of the Estimate." All costs of the general maintenance and repair of the Walsh Building; and

   v.   Sidewalk maintenance and snow and ice removal to the extent performed by Buyer as landlord and not Seller as tenant.

**c.**  **INTENTIONALLY DELETED**.

**d.**  If during the term of the Diocese Lease, Purchaser elects to separate the Walsh Building from the adjacent building, 795 Main Street (the "Diocese Building"), then Purchaser shall install a new heating, ventilation, and air conditioning ("HVAC") system to service the Walsh Building and take steps to separate the utilities of the Walsh Building and the Diocese Building (the "HVAC and Utility Work"). If the costs of the HVAC and Utility Work exceed Two Hundred and Fifty Thousand Dollars ($250,000.00), Seller shall be liable for up to Two Hundred and Fifty Thousand Dollars ($250,000.00) ("Seller's Contribution") and Purchaser shall pay the difference between the cost of the HVAC and Utility Work cost and Seller's Contribution. Notwithstanding anything to the contrary contained herein, Seller's Contribution under this Subsection and related to the HVAC and Utility Work shall be limited to, and in no instance more than, Two Hundred and Fifty Thousand Dollars ($250,000.00). *For the avoidance of doubt and for illustrative purposes only, if the HVAC and Utility Work costs Four Hundred and Fifty Thousand Dollars ($450,000.00), Purchaser shall pay $250,000.00 and Seller shall pay Two Hundred Thousand Dollars ($200,000.00). For further illustrative purposes only, if the HVAC and Utility Work costs Five Hundred and Sixty Thousand Dollars ($560,000.00), Purchaser shall pay Three Hundred and Ten Thousand Dollars ($310,000.00) and Seller shall pay Two Hundred and Fifty*

21419372.v19

Case 1-20-10322-CLB,   Doc 4581-1,   Filed 02/09/26,   Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 28 of 95

*Thousand Dollars ($250,000.00).*

    e. For the avoidance of doubt, the obligations and responsibilities contained in this Section 4.7 shall survive Closing.

4.8.   **Encumbrances**. Except as otherwise expressly provided in this Agreement, at the Closing, Seller will convey the Property free and clear of all Encumbrances, as provided in the Sale Order, subject to any rights of way or easements of record.

4.9.   **Contracts.**  From and after the Effective Date, Seller shall not enter into or amend any agreement with respect to all or any part of the Property (including, without limitation, any easement) or take any legal action with respect to the Property which will be binding upon Purchaser without obtaining Purchaser's prior written consent (given in Purchaser's sole discretion) and Seller shall deliver title to the Property free of all contracts, leases, and other agreements (including, without limitation, license agreements and other rights of use) which are not terminable on thirty (30) days' notice. Seller shall continue to operate the Property in substantially the same manner as Seller has prior to the Effective Date and shall maintain the Property in its condition as of the Effective Date and deliver the Property at Closing in substantially the condition it is in on the Effective Date, reasonable wear and tear excepted. Notwithstanding anything to the contrary herein, Purchaser authorizes, to the extent necessary, Seller to amend or extend the IMG_INK Lease to a month-to-month tenancy after the expiration of that lease term provided that the IMG_INK Lease is terminable on no more than thirty (30) days prior notice.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

5.1.   **Power and Authority**. All requisite action (corporate, trust, partnership or otherwise) has been taken by Purchaser in connection with entering into this Agreement, the documents and instruments referenced herein, and the consummation of the transaction contemplated hereby. No consent, authority, licensing or approval of any partner, shareholder, trustee, trustor, beneficiary, creditor, investor, regulatory authority or other party is required for Purchaser to execute and deliver this Agreement and the instruments and documents referenced herein or consummate the transaction contemplated by this Agreement. The individual(s) executing this Agreement and the instruments referenced herein on behalf of Purchaser have the legal power, right, and actual authority to bind Purchaser to the terms and conditions hereof and thereof.

5.2.   **Sufficient Funds**. The transaction contemplated by this Agreement is a "Cash Transaction", and Purchaser has as of the date hereof, and will have as of the Closing, sufficient funds in cash in its possession to pay the Purchase Price as the same become due and payable under this Agreement, without obtaining financing or funding from outside funding sources.

5.3.   **Certain Relationships**. Purchaser represents and warrants to Seller (i) that neither Purchaser nor any Person or entity that directly or indirectly owns any interest in Purchaser nor any of its officers, directors or members is a Person or entity with whom U.S. Persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control

Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 29 of 95

("OFAC") of the U.S. Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including, but not limited to, Executive Order 13224 ("Executive Order") signed on September 24, 2001 and titled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action, (ii) that Purchaser's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that so long as this Agreement is in full force and effect, Purchaser shall comply with the Executive Order and with the Money Laundering Act.

5.4. **Foreign Person**. Purchaser is not a "foreign person" as defined in §1445(f)(3) of the Internal Revenue Code and the regulations promulgated thereunder.

## ARTICLE VI
## CONDITIONS TO CLOSING

6.1. **Conditions to Obligations of Each Party**. The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of the following conditions:

6.1.1. **Sale Order**. The Bankruptcy Court shall have entered the Sale Order.

6.2. **Additional Conditions to Obligations of Purchaser**. The obligations of the Purchaser to consummate the transactions contemplated hereby are subject to satisfaction or waiver by the following additional conditions:

6.2.1. **Representations and Warranties**. The representations and warranties of Seller set forth in this Agreement shall be materially true and correct as of the Effective Date and as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date).

6.2.2. **Agreements and Covenants**. Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

6.2.3. **Documents**. All of the documents, instruments and agreements required to be executed and/or delivered by Seller on or prior to Closing pursuant to **Section 7.1.1** of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

6.2.4. **Property**. There shall have been no material change to or material Violations (as hereinafter defined) issued against the Property after the Effective Date, ordinary wear and tear excepted.

**Purchase and Sale Agreement
for Various Properties on Main Street
in Buffalo, New York**

Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 30 of 95

6.3. **Additional Conditions to Obligations of Seller**. The obligations of Seller to consummate the transactions contemplated hereby are subject to satisfaction or waiver by Seller of the following additional conditions:

6.3.1. **Representations and Warranties**. The representations and warranties of the Purchaser set forth in this Agreement shall be materially true and correct as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date).

6.3.2. **Agreements and Covenants**. Purchaser shall have paid the full Purchase Price performed and complied with all of its other covenants hereunder in all material respects through the Closing.

6.3.3. **Documents**. All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to **Section 7.1.2** of this Agreement shall have been executed by the parties thereto other than Seller and delivered to Seller.

## ARTICLE VII
## CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING

7.1. **Closing Date**. The Closing of the purchase and sale of the Property and any other transactions contemplated in this Agreement shall occur no later than the date that is five (5) Business Days after the date of the entry of the Sale Order or such other later date as the parties may mutually agree. The parties agree that TIME IS OF THE ESSENCE with respect to the occurrence of the Closing Date subject to any notice and cure rights contained in this Agreement. The Closing shall be held via escrow and wire transfer through the offices of Seller's attorney.

7.1.1. **Deliveries by Seller at the Closing**. At the Closing, Seller shall cause to be executed and delivered to Purchaser the following documents with respect to the Property being conveyed:

7.1.1.1. a duly executed and acknowledged Quitclaim Deed;

7.1.1.2. duly executed TP-584 and RP-5217 documents for each Parcel;

7.1.1.3. a Quitclaim Bill of Sale conveying title to the Remaining Personal Property:

7.1.1.4. a bringdown certificate duly acknowledged by Seller certifying that all representations and warranties of Seller contained in this Agreement are true and accurate as of the date of Closing;

21419372.v19

7.1.1.5. two (2) counterparts of a duly executed Closing Statement setting forth all closing adjustments and prorations for the Property (the "Closing Statement");

7.1.1.6. a Non-Foreign Person Affidavit signed by Seller;

7.1.1.7. Seller executed assignment of leases for the IMG_INK Lease, Oxford Pennant Lease, and Walsh Duffield Lease, as applicable;

7.1.1.8. tenants estoppel certificates for the IMG_INK Lease, Oxford Pennant Lease, and Walsh Duffield Lease, as applicable, confirming such Leases are in full force and effect, the term of such Lease, amounts paid to landlord (including, but not limited to rent called for pursuant to such Lease), that no payments have been made to Seller more than one (1) month in advance, and that no party to the Lease is in default of such Lease;

7.1.1.9. landlord estoppel certificate, as applicable, from Seller confirming the Leases are in full force and effect, the term of such Lease, amounts paid to landlord (including, but not limited to rent called for pursuant to such Lease), that no payments have been collected from the tenants of the Leases more than one (1) month in advance and that no party to the Lease is in default of such Lease;

7.1.1.10. executed Diocese Lease;

7.1.1.11. a copy of the Sale Order; and

7.1.1.12. such other agreements, instruments, and documents of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be reasonably necessary or desirable to convey the Property to Purchaser free and clear of all Encumbrances, except as otherwise expressly provided in this Agreement.

7.1.2. **Deliveries by the Purchaser at the Closing**. At the Closing, Purchaser shall cause to be delivered to Seller the following:

7.1.2.1. the Purchase Price, by wire transfer of immediately available funds (subject to prorations and adjustments, including, but not limited to, a credit for the Earnest Money Deposit) by no later than 2:00 p.m. (eastern time);

7.1.2.2. Purchaser executed assignment of leases for the IMG_INK Lease, Oxford Pennant Lease, and Walsh Duffield Lease, as applicable;

7.1.2.3. executed Diocese Lease;

21419372.v19

7.1.2.4. two (2) counterparts of a Closing Statement setting forth all closing adjustments and prorations for the Property; and

7.1.2.5. such other agreements, instruments, and documents as Seller may reasonably request to consummate the purchase and sale transaction contemplated hereby.

7.1.3. For the avoidance of doubt, any documents or related materials provided by Seller to Purchaser in connection with the transfer contemplated herein shall be held in escrow until Seller's acknowledgement of receipt of the Purchase Price.

7.1.3.1. Seller may, but shall in no instances be required to, release one or more documents or related materials from the restriction in Section 7.1.3.

7.1.3.2. A release of Section 7.1.3. for one or more documents or related materials shall not be construed as a waiver of the restriction for other documents or related materials.

## ARTICLE VIII
## TERMINATION

8.1. **Termination.** This Agreement may be terminated at any time prior to Closing:

8.1.1. by mutual written agreement of Purchaser and Seller;

8.1.2. by Seller, by written notice to Purchaser, if the Closing shall not have occurred on or before the date that is the later of (a) fifteen (15) Business Days after the date of entry of the Sale Order (as may be extended by written agreement of Purchaser and Seller), or (b) the expiration of the twenty-one (21) calendar day cure period provided in this Agreement, as the case may be; provided, however, that Seller is not in material breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder;

8.1.3. by Purchaser, by written notice to Seller, if there shall have been a material breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in this Agreement, and such material breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within twenty-one (21) calendar days after written notice thereof shall have been received by Seller; provided, that Purchaser is not in material breach of this Agreement as of such date;

21419372.v19

Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 33 of 95

8.1.4.    by Seller, if there shall have been a material breach by Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in this Agreement, and such material breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within twenty-one (21) calendar days after written notice thereof shall have been received by Purchaser; provided, that Seller is not in material breach of this Agreement as of such date;

8.1.5.    by Purchaser in the event the Sale Order is not issued by September 1, 2025; or

8.1.6.    by Purchaser on or after the date the Sale Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction.

If this Agreement is terminated for any reason other than those contained in 8.1.2 and 8.1.4 above, the Earnest Money Deposit shall be returned to Purchaser immediately.

# ARTICLE IX
# EVIDENCE OF TITLE

9.1.    **Abstract of Title.** On or about thirty (30) days following the Effective Date, Seller shall, deliver to Purchaser (or its attorneys) 60-year title abstracts and tax searches of the Property (the "Title Search"). Purchaser shall be responsible for obtaining a commitment for title insurance prepared by the Title Company covering the Property (the "Title Commitment"), committing the Title Company to issue to Purchaser, upon the recording of the Quitclaim Deed, an ALTA fee title insurance policy in the full amount of the Purchase Price, together with legible copies of all documents referenced in Schedules B-1 or B-2 to the Title Commitment. Purchaser shall be responsible for paying the cost of the Title Search at the Closing, and Purchaser shall be solely responsible for the cost of the procurement and issuance of the Title Commitment and the premium for the title insurance policy, such responsibility shall survive the Closing or cancellation of this Agreement. Within ten (10) business days after receipt of the Title Commitment, Purchaser shall provide to Seller any objections to the exceptions contained of the Title Commitment (the "Title Objections"). Seller may, but shall not be obligated to, attempt to cure the Title Objections; provided, however Purchaser shall not be required to object to, and Purchaser shall not be required to take title to the Property subject to any Monetary Objections (as hereinafter defined) or to any Mandatory Cure Items (as hereinafter defined). Seller shall then have ten (10) days from its receipt of such Title Objections to (i) remove the exceptions; (ii) notify Purchaser of its election to cure such title defects and undertake such reasonable efforts to cure such title defects; or (iii) provide Purchaser with assurances satisfactory to Purchaser in its sole discretion that the exceptions will be removed or such Title Objections otherwise cured before or at the Closing. If Seller does neither of (i), (ii), or (iii) within such ten (10) day period, but Purchaser's Title Objections can be insured over by the Title Company, Purchaser will have the option to (x) obtain a title insurance commitment issued by the Title Company insuring over such exceptions. If, within such ten (10)

day period, Seller does neither of (i), (ii), or (iii) and Purchaser is thereafter unable or unwilling to obtain a commitment for the title insurance policy referenced in (x), then Purchaser may terminate this Agreement by written notice to Seller given at any time after the end of such ten (10) day period and the Earnest Money Deposit shall be immediately returned to Purchaser.

9.2.    **Additional Objections**. Notwithstanding anything herein to the contrary, in the event any additional title objections (each an "<u>Additional Objection</u>") are reported or discovered by the Purchaser after the date of the Title Commitment (whether by updates to the Title Commitment, subsequently delivered title documents, or otherwise), Purchaser shall give Seller written notice of Purchaser's objection, if any, to such Additional Objection on or prior to ten (10) business days after receipt of written notice of any such Additional Objection, and such Additional Objection shall be subject to the same procedure provided in the immediately preceding paragraph (and the Closing shall be extended commensurately (but in no event shall such extension exceed sixty (60) days) if the Closing would have occurred but for those procedures being implemented for Additional Objection.

9.3.    **Monetary Objections and Mandatory Cure Items**. Except for real estate taxes and assessments not yet due and payable as of the Closing, Seller shall pay or cause to be paid by Seller (or other appropriate party) at or prior to Closing, and shall cause to be removed from record by the Title Company: (i) any mortgage, deed to secure debt, deed of trust or similar security instrument encumbering all or any part of the Property, (ii) any mechanic's, materialman's or similar lien (unless resulting from any act or omission of Purchaser or any of its agents, contractors, representatives or employees), (iii) the lien of ad valorem real or personal property taxes, assessments and governmental charges affecting all or any portion of the Property that are delinquent, and (iv) any certified judgment of record against Seller in the county in which the Property is located (collectively, the "<u>Monetary Objections</u>"). Notwithstanding anything in this Agreement to the contrary, on or prior to Closing, Seller shall satisfy all Monetary Objections affecting the Property (collectively, the "<u>Mandatory Cure Items</u>").

9.4.    **Condition to Title**. The Property shall be sold and conveyed, and Purchaser shall purchase the Property, (i) free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens to attach to the consideration to be received by Seller in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and (ii) subject to: (a) the terms and conditions of the Sale Order, (b) the designation of the property address 785 Main Street, Buffalo, New York (mailing address of 795 Main Street, Buffalo, New York) as a local landmark under Part II, Chapter 337, and Article III of the City of Buffalo Local Laws, (c) such title exceptions affecting the Property which Purchaser has not objected to or as the Title Company (or any other reputable title insurance company licensed to do business in the State of New York) shall, at regular rates, be willing to omit as exceptions to coverage and (d) the IMG_INK Lease, Oxford Pennant Lease, and the Walsh Duffield Lease, as applicable (collectively, the "<u>Permitted Exceptions</u>").

9.5.    **Survey**. Purchaser shall have the right, but not the obligation, to order a new survey of the Property (a "<u>Survey</u>"), at Purchaser's sole cost and expense and, if Purchaser elects to obtain a Survey, Purchaser shall deliver a copy of the Survey to Seller upon receipt. Notwithstanding the

21419372.v19

Case 1-20-10322-CLB    Doc 4581-1    Filed 02/09/26    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 35 of 95

foregoing, Closing shall not be subject to or conditioned upon Purchaser's or Seller's receipt of or Title Company's review of a Survey.

<div align="center">

**ARTICLE X**
**CLOSING ADJUSTMENTS**

</div>

10.1.    **Apportionment**. The following shall be apportioned on the Closing Statement against sums due Seller at Closing:

     10.1.1.    Seller shall pay for the New York real property transfer tax due, if any, in connection with this transaction.

     10.1.2.    Purchaser shall pay all recording fees and other charges and fees payable in connection with the recording of the Quitclaim Deed.

     10.1.3.    Purchaser shall also pay for (1) the examination and search fees incurred by the Title Company to acquire the Title Search, (2) the examination and all premiums by the Title Company to acquire the Title Commitment (3) all premiums charged on the owner's policy of title insurance issued to Purchaser pursuant to the Title Commitment, including, without limitation, the costs of any endorsements or extended title insurance coverage requested by Purchaser, and (4) the charges for preparing the Survey, if applicable.

     10.1.4.    Each party shall bear its own attorneys' fees in connection with its negotiation, due diligence investigation and conduct of the transaction.

10.2.    **Real Estate Taxes and Other Charges**. Real estate taxes, utilities, including but not limited to water charges, sewer, rents and fuel, and all other customary items shall be adjusted, apportioned and allowed as of the Closing Date, if necessary by an estimated tax calculation, with the Closing Date being a day of income and expense to the Purchaser.  If at any time up to the Closing Date, the Property or any part thereof shall be or shall have been affected by an assessment or assessments for municipal improvements whether or not confirmed or completed and whether or not payable in installments, then for purpose of this Agreement, the proportional share of all of the unpaid installments of any such assessment(s), which are to become due and payable after the delivery of the Quitclaim Deed contemplated hereunder, shall be paid by the Purchaser. Installments allocable to period prior to the Closing and unpaid as of the Closing Date shall be paid by Seller or allowed as a reduction in the Purchase Price.

<div align="center">

**ARTICLE XI**
**POSSESSION**

</div>

11.1.    **Right to Possession**.  Subject to the IMG_INK Lease, Oxford Pennant Lease, and the Walsh Duffield Lease, the right to possession of, and control over, the Property shall transfer to Purchaser on the Closing Date.  On the Closing Date, Seller shall, subject to the rights conveyed in the IMG_INK Lease, Oxford Pennant Lease, the Walsh Duffield Lease, and the Diocese Lease:

<div align="right">

**Purchase and Sale Agreement**
**for Various Properties on Main Street**
**in Buffalo, New York**

</div>

21419372.v19

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 36 of 95

11.1.1.	Transfer possession to Purchaser of the Property in AS-IS, WHERE IS condition.

11.1.2.	Transfer and deliver to Purchaser all keys, pass keys, pass codes, security codes, locks and safe combinations and all other similar items in Seller's possession as Purchaser may require to obtain occupation and control of the Property.

11.1.3.	Make available to Purchaser originals of all documents, instruments and agreements in Seller's possession that are required to be transferred to Purchaser by this Agreement.

## ARTICLE XII
## AS-IS, WAIVER AND RELEASE

12.1.	**Condition of Property**. As a material inducement to the execution and delivery of this Agreement by Seller and the performance by Seller of its duties and obligations hereunder, Purchaser does hereby acknowledge, represent, warrant and agree, to and with Seller, that (i) Purchaser is purchasing the Property in an "AS-IS" condition as of the Closing Date with respect to any facts, circumstances, conditions and defects, latent or patent; (ii) Seller has no obligation to repair or correct any such facts, circumstances, conditions or defects or compensate Purchaser for same; (iii) Purchaser has undertaken all such physical inspections and examinations of the Property as Purchaser deems necessary or appropriate under the circumstances, and that based upon same, Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its agents and officers, and Purchaser is and will be fully satisfied that the Purchase Price is fair and adequate consideration for the Property; (iv) Seller is not making and has not made any warranty, representation, information, data, statement, written or oral, as to the physical condition, the presence or absence thereon of environmental contamination, pollution, asbestos, petroleum, hazardous substances or hazardous materials thereon, whether the Property is in compliance with Environmental Laws (as hereinafter defined), the state of repair, present or former use, cost of operation, or any other matter related to the Property or any of the improvements or other items included in the sale with respect to all or any part of the Property (including, but not limited to, any matters contained in documents made available or delivered to Purchaser in connection with this Agreement as an inducement to Purchaser to enter into this Agreement and thereafter to purchase the Property or for any other purpose); and (v) by reason of all of the foregoing, Purchaser shall assume the full risk of any loss or damage occasioned by any fact, circumstance, condition or defect pertaining to the physical condition of the Property, including without limitation the presence of any asbestos containing material, hazardous, toxic or radioactive waste, substance or materials in, on, under or about the Property, and Purchaser hereby expressly and unconditionally waives and releases Seller and all of its parents, subsidiaries, Affiliates and partnerships, and its and their respective officers, directors, shareholders, partners, agents and employees, and their respective successors, heirs and assigns and each of them (individually and collectively, the "Released Parties") from any and all rights and claims against Seller and/or the Released Parties with respect to the condition of the Property, including without limitation, whether the Property is in compliance with all federal, state or local statues, regulations, ordinances, and judicial or administrative orders, decrees and decisions pertaining to pollution,

hazardous materials, hazardous substances, petroleum products, asbestos, drinking water, groundwater, wetlands, landfills, storage tanks (whether above ground or below ground), solid waste, waste water, storm water runoff, waste emissions, and/or other environmental concerns, as amended from time to time, or similar laws (collectively, "<u>Environmental Laws</u>"). Purchaser acknowledges and agrees that the foregoing waiver and release includes all rights and claims of Purchaser against Seller pertaining to the condition of the Property, whether heretofore or now existing or hereafter arising, or which could, might, or may be claimed to exist, of whatever kind or nature, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, which in any way arise out of, or are connected with, or relate to, the condition of the Property. The foregoing provisions shall survive the Closing Date and the consummation of the transaction contemplated by this Agreement.

<div align="center">

**ARTICLE XIII**
**DEFAULT**

</div>

13.1. **Seller Default**. In the event that Seller shall be in material default hereunder for any reason other than Purchaser's default, Purchaser may deliver a written notice to Seller stating with particularity the alleged default of Seller, the action required by Seller to cure such default, and Purchaser's intent to exercise its remedies provided below if the default is not cured. Seller shall have twenty-one (21) days after receipt of such notice to cure the alleged default to Purchaser's reasonable satisfaction (and the Closing Date shall be delayed, if necessary, until the end of such twenty-one (21) day period). In the event such default is not cured within such twenty-one (21) day period, then Purchaser may elect, as its sole and exclusive remedy, to seek to enforce specific performance only for failure to cause the Property to be conveyed in accordance with the terms and provisions hereof (without any reduction in the Purchase Price) or to terminate this Agreement by written notice to Seller and the Title Company, whereupon Purchaser shall be entitled to a full refund of the Earnest Money Deposit. It is expressly understood and agreed that the remedy of specific performance shall not be available to enforce any other obligation of Seller hereunder other than a failure to cause the Property to be conveyed in accordance with the terms and provisions of this Agreement. Purchaser shall be deemed to have elected to terminate this Agreement if Purchaser fails to file suit for specific performance against Seller in Bankruptcy Court, or, with the permission of Bankruptcy Court, in a court having jurisdiction in the county and state in which the Property is located, on or before thirty (30) days following the date upon which the Closing was to have occurred pursuant to this Agreement. Notwithstanding anything to the contrary contained herein, Purchaser shall have no right to specific performance of this Agreement, nor shall Seller have any authority or obligation to transfer the Property to Purchaser pursuant to this **Article XIII** absent the entry of a Sale Order by the Bankruptcy Court authorizing and directing such conveyance of the Property by Seller to Purchaser.

13.2. **Purchaser Default**. In the event that Purchaser shall be in default hereunder for any reason other than Seller's default, Seller may deliver a written notice to Purchaser stating with particularity the alleged default of Purchaser, the action required by Purchaser to cure such default and Seller's intent to terminate this Agreement if the default is not cured. Purchaser shall have twenty-one (21) days after receipt of such notice to cure the alleged default to Seller's reasonable satisfaction (and the Closing Date shall be delayed, if necessary, until the end of such twenty-one (21) day period). In the event such default is not cured within such twenty-one (21) day period,

21419372.v19

then Seller may, as Seller's sole and exclusive remedy for such default, terminate this Agreement by written notice to Purchaser and the Title Company, whereupon Seller shall be entitled to retain the Earnest Money Deposit as full liquidated damages for such default of Purchaser. It is hereby agreed that Seller's damages in the event of a default by Purchaser hereunder are uncertain and difficult to ascertain, and that the Earnest Money Deposit constitutes a reasonable liquidation of such damages and is intended not as a penalty, but as full liquidated damages. Purchaser covenants not to bring any action or suit challenging the amount of liquidated damages provided hereunder in the event of such default. Notwithstanding anything to the contrary contained herein, this provision shall in no way affect or impair Seller's right of recovery under any indemnity given by Purchaser in favor of Seller under this Agreement.

## ARTICLE XIV
## WAIVER OF INSPECTION, VIOLATIONS, AND LOCAL REQUIREMENTS

14.1.    Purchaser expressly waives any and all right to terminate this Agreement based on the results of any inspection of the Property by a licensed inspector, licensed contractor or licensed engineer prior to the Closing Date.

14.2.    Notwithstanding the foregoing and in addition to the Right of Entry, Seller grants Purchaser and any Representative of Purchaser, after reasonable notice to Seller, reasonable access to conduct a final walk through of the Property with all utilities in service within forty-eight (48) hours prior to the Closing to ensure that all conditions of this Agreement have been met by Seller.

14.3.    Purchaser shall accept the Property subject to any and all violations of law, rules, regulations, ordinances, orders or requirements issued by any Federal, state, county, municipal or other department or governmental agency having jurisdiction against or affecting the Property existing as of the Effective Date (collectively, "Violations").  Seller shall have no obligation to cure or remove any Violations existing as of the Effective Date.

14.4.    To the extent the City of Buffalo, County of Erie, State of New York, or any other governmental agency or authority having jurisdiction (collectively, "Governmental Authorities") imposes requirements for issuance certificates of occupancy, certificates of compliance, certificates of inspection of sanitary sewer and/or storm sewer fixtures or facilities, or any other inspection and/or certification requirements in connection with and as a condition to the sale of the Property (collectively, "Local Requirements"), Purchaser shall be deemed to have waived all such Local Requirements to the extent the same are waivable.  To the extent any such Local Requirement or Local Requirements are not waivable by Purchaser, Purchaser shall comply with the Local Requirement(s) in question at Purchaser's sole cost. Purchaser's waiver and assumption of obligations contained in **Section 14.4** shall survive the Closing of the transaction contemplated herein.

## ARTICLE XV
## BROKER

15.1.    **Broker Commission**.  In accordance with the Broker Order and in connection with the consummation of the sale contemplated by this Agreement, Seller shall be solely responsible for paying a broker's commission to Hanna CRE from the proceeds of the Purchase Price and

21419372.v19

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 39 of 95

pursuant to the terms of a separate agreement in an amount not to exceed six percent (6%) of the Purchase Price. No commissions shall be due or payable to Hanna CRE unless and until the Closing contemplated hereby occurs. Seller represents and warrants that Purchaser's broker, Pyramid Brokerage Company ("Purchaser's Broker"), will be paid by Hanna CRE pursuant to a separate written agreement. Purchaser and Seller each represent and warrant to the other that, except for the Hanna CRE and Purchaser's Broker, they have not employed, retained or consulted with any other broker, agent or finder in connection with the solicitation of Purchaser, the negotiations in connection with this Agreement, or the purchase and sale referenced herein. Each Party shall indemnify, defend and hold harmless the other Party against and from any and all claims, liabilities and expenses (including reasonable attorney's fees and disbursements) incurred by the other Party as a result of any commission or compensation claimed by or due to any broker.

## ARTICLE XVI
## BIDDING PROCEDURES AND ALTERNATIVE TRANSACTION

16.1.  **Sale Motion**.  The Parties acknowledge that this Agreement has been submitted without review of the Bid Procedures Motion or Proposed Bid Procedure Order and is subject to approval of the Bankruptcy Court, which approval will include, among other things, issuance by the Bankruptcy Court of a Bidding Procedures Order directing the manner in which a bidding procedure will be conducted for solicitation of competing offers from third parties for the purchase of the Property. Depending upon the outcome of the Bid Procedure Motion, this Agreement may be subject to termination by Purchaser or Seller, as hereinafter provided. Seller shall file a motion to approve this Agreement (the "Sale Motion") and to establish reasonable bidding procedures (the "Bidding Procedures") within twenty-one (21) days of the Effective Date of this Agreement.

16.2.  **Higher Bids**.  This Agreement is subject to higher and better offers pursuant to the Bidding Procedures to be established by the Bankruptcy Court, and is subject to termination pursuant to **Article VIII**.

16.3.  **Alternative Transaction**.  If the Bankruptcy Court shall enter a final Sale Order approving a purchase of the Property by an Alternative Bidder (as hereinafter defined), then Seller shall terminate this Agreement, by written notice to Purchaser, Purchaser shall be entitled to receive a refund of the Earnest Money Deposit, and Seller shall be free to consummate a sale of the Property to the Alternative Bidder (an "Alternative Transaction").

16.4.  **The Bidding Procedures**.  Subject to the approval by the Bankruptcy Court, Bidding Procedures shall include the following:

16.4.1.  the procedures for solicitation of competing offers from third parties for the purchase of the Property (each, an "Alternative Bidder");

16.4.2.  any bid submitted by an Alternative Bidder shall include proof of funds and a signed Purchase and Sale Agreement along with a marked copy showing any changes from this Agreement;

21419372.v19

16.4.3.    any bid submitted by an Alternative Bidder must exceed the Purchase Price set forth in this Agreement by One Hundred Thousand Dollars ($100,000.00) (the "Initial Overbid");

16.4.4.    any subsequent bidding after the Initial Overbid shall be in minimum increments of One Hundred Thousand Dollars ($100,000.00), with minimum subject to modification in the Seller's sole and absolute discretion;

16.4.5.    the procedures for an auction to determine the highest and best offer for the Property (the "Successful Bidder");

16.4.6.    such further terms as are determined to be necessary by Seller in order to obtain Bankruptcy Court approval of the Bidding Procedures; and

16.4.7.    Purchaser shall be allowed to participate in the bidding process along with Alternative Bidders.

16.5.    **Backup Bidder**.  In the event that the Purchaser is not the Successful Bidder in the bidding process, the Purchaser's bid (as reflected in this Agreement or in any higher bid placed by Purchaser during the bidding process) shall remain irrevocable as the backup bidder (the "Backup Bidder") until the earliest of: (i) a period of thirty (30) days from the Sale Order, or (ii) the closing of a sale with the Successful Bidder.

## ARTICLE XII
## MISCELLANEOUS

17.1.    **Amendment**. This Agreement shall not be amended, modified, supplemented, or revoked, except by a writing signed by Seller and Purchaser.

17.2.    **Governing Law**.  This Agreement shall be governed by and construed, interpreted and enforced in accordance with the Laws of the State of New York without regard to conflicts of Laws or choice of Laws principles thereof that would cause the application of the Laws of any jurisdiction other than the State of New York.

17.3.    **Binding Effect**.  This Agreement shall bind the parties hereto, their respective heirs, successors and assigns.  Except as set forth in **Section 17.6** hereof, neither Purchaser nor Seller may assign its interest hereunder without the prior written approval of the other party.

17.4.    **Notices**.  All notices required under this Agreement shall be in writing and shall be: (i) personally delivered; (ii) sent by certified mail, return receipt requested, postage pre-paid; (iii) sent by nationally recognized overnight air courier service at the expense of sender, or (iv) by email ,addressed to the parties hereto at their respective addresses set forth below.  Such notice or other communication shall be deemed given upon delivery, or if delivery is refused, upon refusal to accept delivery. Notice hereunder may be given at the following addresses:

If to Seller:                    The Diocese of Buffalo, N.Y.

**Page 23 of 28**                    **Purchase and Sale Agreement for Various Properties on Main Street in Buffalo, New York**

21419372.v19
Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 41 of 95

795 Main Street
Buffalo, New York 14203
Attn: Richard Suchan

With a copies to:          Bond Schoeneck & King PLLC
110 W. Fayette Street
One Lincoln Center
Syracuse, New York 13202
Attn: Charles Sullivan, Esq.
Email: csullivan@bsk.com

Bond, Schoeneck & King PLLC
225 Old Country Road
Melville, New York 11747
Attn: Edward J. LoBello, Esq.
Email: elobello@bsk.com

Bond, Schoeneck & King PLLC
200 Delaware Avenue
Suite 900
Buffalo, New York 14202
Attn: Sarah B. Wheeler, Esq.
Email: swheeler@bsk.com

If to Purchaser:          BFC Buffalo Main LLC
150 Myrtle Avenue, Suite 2
Brooklyn, New York 11201
Attn:

With a copy to:          BFC Buffalo Main LLC
150 Myrtle Avenue, 2nd Floor
Brooklyn, New York 11201
Attn: Kevin E. Fullington, Esq.
Email: Kfullington@bfcnyc.com

Lippes Mathias LLP
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
Attn: Richard R. Capote, Esq.
Email: rcapote@lippes.com

The above notwithstanding, notice may be given by email from one party's attorney to the other party's attorney, with a copy by first class mail, addressed to the respective attorney above. Notice upon brokers, realtors, or other third parties shall be deemed courtesy copies only.

**Page 24 of 28**          **Purchase and Sale Agreement
for Various Properties on Main Street
in Buffalo, New York**

21419372.v19
Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 42 of 95

17.5.  **Time for Performance**.  Time shall be of the essence for purposes of this Agreement.

17.6.  **Assignability**.  Purchaser shall not have the right to assign this Agreement and its rights hereunder without Seller's prior written consent, unless such assignment is to a single asset entity in which Purchaser owns a controlling interest, in which case, Seller's consent shall not be required, provided, however, that upon such assignment, Purchaser shall in no way be released or relieved of any of its obligations under this Agreement.

17.7.  **Number and Gender**.  Whenever required by the context or use in this Agreement, the singular word shall include the plural word and the masculine gender shall include the feminine and/or neuter gender, and vice versa.

17.8.  **Captions**.  The paragraph titles, headings and/or captions contained herein have been inserted solely as a means of reference and convenience.  Such captions shall not affect the interpretation or construction of this Agreement and shall not define, limit, extend or otherwise describe the scope of this Agreement or the intent of any provision hereof.

17.9.  **Counterparts and Electronic Delivery**.  This Agreement may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original, all of which shall be deemed to be one and the same instrument.  This Agreement may be delivered by Facsimile or email transmission, and facsimile, email, or photocopies of the fully executed Agreement shall have the same force and effect as originals.

17.10.  **Legal Counsel**.  Purchaser and Seller acknowledge that they have been, or have had the opportunity to be, represented by legal counsel in connection with this Agreement and that this Agreement is the product of extensive negotiations between the parties.  Purchaser and Seller agree that the fact that this Agreement or one or more provisions hereof were drafted by one party or the other shall not affect the meaning or interpretation of this Agreement.

17.11.  **Waiver**.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by any party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

17.12.  **Third Party Beneficiaries**. Nothing in this Agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than the parties hereto and their permitted successors and assigns.  There are no third party beneficiaries to this Agreement.

17.13.  **Cooperation and Further Assurances**.  The Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to

**Purchase and Sale Agreement
for Various Properties on Main Street
in Buffalo, New York**

be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth herein and to consummate the transactions contemplated hereby as promptly as practicable and evidence the consummation of the transactions contemplated hereby, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing.

17.14. **No Merger**. Except for (a) Seller's covenants with respect to the title to the Property, and (b) as otherwise expressly provided herein, the provisions of this Agreement containing agreements between the parties relating to actions occurring after Closing shall not be merged into the instruments of Closing but shall expressly survive and be enforceable according to their terms.

17.15. **Notification of Certain Matters**.  From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "Required Notification"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

17.16. **Entire Agreement**. This Agreement, including the exhibits and schedules, contains the entire agreement between Seller and Purchaser pertaining to the transaction contemplated hereby and fully supersedes all prior agreements and understandings between Seller and Purchaser pertaining to such transaction. If any provision hereof is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect. This Agreement may be amended, modified, or supplemented only by an instrument in writing signed by the parties.

17.17. **Escrow Agent and Earnest Money Deposit.** The Earnest Money Deposit made by Purchaser under the terms of this Agreement shall be held by Escrow Agent in a non-interest-bearing attorney's trust account, in accordance with and subject to the following provisions:

(a)     Escrow Agent, without risk to Escrow Agent, except for willful misconduct or fraud, shall place the Earnest Money Deposit in a non-interest bearing bank attorney trust account maintained at a commercial bank, savings bank or savings and loan association.

(b)     At the Closing, if any, Escrow Agent shall disburse the Earnest Money Deposit to Seller, and said Earnest Deposit shall be credited to the Purchase Price.

(c)     Upon receipt of written demand therefor signed by Seller, stating that Purchaser have defaulted in the performance of Purchaser's obligations under this Agreement and that Seller has terminated this Agreement on account of said default of Purchaser, Escrow Agent shall, only disburse the Earnest Money Deposit to Seller; after Escrow Agent shall have given notice to Purchaser (in the manner specified in this Agreement for notices to be given) and Purchaser shall have given written notice authorizing such disbursement.

**Page 26 of 28**                          **Purchase and Sale Agreement**
**for Various Properties on Main Street**
**in Buffalo, New York**

21419372.v19
Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 44 of 95

(d)      Upon receipt of written demand therefor signed by Purchaser, stating that this Agreement has been terminated and that Purchaser is entitled under the terms of this Agreement to the return of the Earnest Money Deposit, Escrow Agent shall, only disburse the Earnest Money Deposit to Purchaser; after Escrow Agent shall have given notice to Seller (in the manner specified in this Agreement for notices to be given) and Seller shall have given written notice authorizing such disbursement.

(e)      If an action or proceeding is commenced by either party to determine the rights of the parties to the Earnest Money Deposit, all attorneys' fees and court costs of the prevailing party shall be borne by whoever shall not prevail in such action or proceeding.

(f)      It is agreed that the duties of Escrow Agent are only as herein specifically provided, are purely ministerial in nature and that Escrow Agent shall incur no liability whatsoever except for willful misconduct or fraud. Seller and Purchaser hereby release Escrow Agent from any act done or omitted to be done by Escrow Agent in good faith in the performance of Escrow Agent's duties hereunder. If requested at Closing, Seller and/or Purchaser shall execute and deliver general releases in the usual form to Escrow Agent.

(g)      Escrow Agent is acting only as a stakeholder with respect to the Earnest Money Deposit. If any dispute shall arise as to whom the Earnest Money Deposit is to be disbursed, Escrow Agent shall not disburse the Earnest Money Deposit to either party but in such event shall hold the same until receipt by Escrow Agent of a written authorization signed by Seller and Purchaser directing the disposition of same, or in the absence of such authorization, Escrow Agent may hold the Earnest Money Deposit until the final determination of the rights of the parties in an appropriate action or proceeding. Notwithstanding anything to the contrary contained herein, if such written authorization is not given, or an action or proceeding for such determination is not begun and diligently continued, Escrow Agent may, but is not required to, bring any appropriate action or proceeding for interpleader or other leave to place the Earnest Money Deposit in court pending such determination. All costs of such action or proceeding, including, without limitation, attorneys' fees of Escrow Agent are to be borne by the party who shall not prevail in such action or proceeding. Upon delivery of the Earnest Money Deposit in the manner herein provided, Escrow Agent shall have no further liability hereunder or otherwise. Escrow Agent shall have the right to represent Seller in any dispute between Purchaser and Seller with respect to the Earnest Money Deposit.

(h)      Escrow Agent has executed this Agreement solely to acknowledge Escrow Agent's receipt of the Earnest Money Deposit by check subject to collection, and to evidence Escrow Agent's agreement to act as escrow agent in accordance with the provisions of this **Section 17.17.**

(i)      Seller and Purchaser agree that, notwithstanding the role of Bond, Schoeneck & King, PLLC under this Agreement as Escrow Agent, Bond, Schoeneck & King, PLLC currently represents Seller in connection with the transaction contemplated by this Agreement, and will continue to act as legal counsel to Seller in connection with matters related to this Agreement, including, without limitation, any disputes concerning the entitlement of either party to the Deposit. Purchaser hereby waives the right to assert an objection to such continued representation of Seller by Bond, Schoeneck & King, PLLC based on an alleged

**Purchase and Sale Agreement for Various Properties on Main Street in Buffalo, New York**

conflict of interest. The provisions of this **Section 17.17(i)** shall survive Closing or earlier termination of this Agreement.

**[Remainder of Page Intentionally Blank; Signature Page Follows]**

21419372.v19

**In Witness Whereof** the parties have executed this Agreement as of the day and year first written above.

SELLER:

**THE DIOCESE OF BUFFALO, N.Y.**

By: _Michael W Fisher_
Name:
Title:

PURCHASER:

**BFC BUFFALO MAIN LLC**

By: _____
Name:
Title:

ESCROW AGENT:

**BOND, SCHOENECK & KING, PLLC**

By: _____
Name: Sarah B. Wheeler
Title: Associate Attorney

Purchase and Sale Agreement
for Various Properties on Main Street
in Buffalo, New York

21419372

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 47 of 95

**In Witness Whereof** the parties have executed this Agreement as of the day and year first written above.

SELLER:

**THE DIOCESE OF BUFFALO, N.Y.**

By: _____
Name:
Title:

PURCHASER:

**BFC BUFFALO MAIN LLC**

By: _____
Name: DONALD CAPOCCIA
Title: MANAGER

ESCROW AGENT:

**BOND, SCHOENECK & KING, PLLC**

By: _____
Name:
Title:

Purchase and Sale Agreement
for Various Properties on Main Street
in Buffalo, New York

21419372

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 48 of 95

Exhibit A-1 (to Purchase and Sale Agreement)

Property Sketches



**Purchase and Sale Agreement**
**for Various Properties on Main Street**
**in Buffalo, New York**

Exhibit A-2 (to Purchase and Sale Agreement)

## 785 Main Street, Buffalo, New York

ALL THAT TRACT OR PARCEL OF LAND situate in the City of Buffalo, County of Erie and State of New York, being part of Outer Lots Nos. 146 and 147, in said City, bounded and described as follows:

BEGINNING at the point of intersection of the easterly line of Main Street with the northerly line of Goodell Street; thence northerly along the easterly line of Main Street 278 feet to the southwesterly corner of lands conveyed to R. Thomas Flynn, Jr. by deed recorded in the Erie County Clerk's Office in Liber 8686 of Deeds at page 129; thence easterly along the southerly line of said lands of Flynn 198 feet to the westerly line of Washington Street (66 feet wide); thence southerly along the westerly line of Washington Street 278 feet to the northerly line of Goodell Street; thence westerly along the northerly line of Goodell Street 198 feet more or less to the point or place of beginning.

## 814 Main Street, Buffalo, New York

ALL THAT TRACT OR PARCEL OF LAND situate in the City of Buffalo, County of Erie and State of New York, being part of Outer Lot No. 26, bounded and described as follows:

BEGINNING at a point in the westerly line of Main Street (99 feet wide), distant 98 feet southerly from the intersection of the westerly line of Main Street with the southerly line of Virginia Street (66 feet wide), said distance being measured along said westerly line of Main Street; thence westerly at right angles 100 feet; thence southerly parallel with Main Street 34 feet more or less to an easterly corner of lands conveyed to Victoria B. Alt by deed recorded in Liber 2585 of Deeds at page 235; thence southwesterly along the southeasterly line of lands so conveyed to Victoria B. Alt 41.40 feet to the southeasterly corner thereof; thence westerly on a line at right angles to St. Louis Place (66 feet wide, formerly Pearl Place) and along the southerly line of lands so conveyed to Victoria B. Alt as aforesaid 75 feet to the easterly line of St. Louis Place (9.36 feet) to the northwesterly corner of lands conveyed to Frank X. Hamlin and Frances Hamlin, his wife, by deed recorded in Liber 2115 of Deeds at page 90; thence easterly along the northerly line of lands so conveyed to Franklin X. Hamlin and wife as aforesaid 70 feet; thence southeasterly along Hamlin's east line 23.64 feet; thence easterly on a line drawn at right angles to the easterly line of St. Louis Place 30 feet more or less to a point 100 feet west of Main Street; thence southerly parallel with Main Street 32 feet more or less to the northerly line of lands conveyed to Charles R. Turner and Frances Turner by deed recorded in Liber 3653 of Deeds at page 439; thence easterly along the northerly line of lands conveyed to Charles R. Turner and Frances Turner as aforesaid 100 feet to the westerly line of Main Street; thence northerly along the westerly line of Main Street 132 feet to the point of beginning.

## 815 Main Street, Buffalo, New York

ALL THAT TRACT OR PARCEL OF LAND situate in the City of Buffalo, County of Erie and State of New York, being part of Outer Lot No. 146, in said City, bounded and described as follows:

BEGINNING on the easterly line of Main Street, a distance of 278 feet north of the corner of Main and Goodell Streets; thence easterly, at right angles with Main Street, a distance of 99 feet to the center of the block; thence northerly, parallel with Main Street, a distance of 25 feet; thence westerly, parallel with the first mentioned line, a distance of 99 feet to Main Street; thence southerly, on the easterly line of Main Street, a distance of 25 feet to the place of beginning.

ALSO ALL THAT TRACT OR PARCEL OF LAND situate in the City of Buffalo, County of Erie and State of New York, being part of Outer Lot No. 146, in said City, bounded and described as follows:

BEGINNING at a point on the westerly line of Washington Street, a distance of 30 feet southerly from the point of intersection of the westerly line of Washington Street with the southerly line of Burton Alley; running thence westerly, on a line at right angles with Washington Street, a distance of 99 feet to the center of the block; thence southerly, on a line parallel with Washington Street, a distance of 25 feet; thence easterly, on a line at right angles with Washington Street, a distance of 99 feet to the westerly line of Washington Street; thence northerly, along the westerly line of Washington Street, a distance of 25 feet to the place of beginning.

### 819 Main Street, Buffalo, New York

ALL THAT TRACT OR PARCEL OF LAND situate in the City of Buffalo, County of Erie and State of New York, being part of Outer Lot No. 147, in said City, bounded and described as follows:

BEGINNING on the easterly line of Main Street at its intersection with the southerly line of Burton Alley; running thence easterly along the southerly line of Burton Alley 200 feet to Washington Street; thence southerly along the westerly line of Washington Street 30 feet; thence westerly parallel with Burton Alley 200 feet to Main Street; thence northerly along said line of Main Street 30 feet to the place of beginning.

### 821 Main Street, Buffalo, New York

Parcel A

ALL THAT TRACT OR PARCEL OF LAND situate in the City of Buffalo, County of Erie and State of New York, being part of Outer Lot No. 147, in said City, bounded and described as follows:

BEGINNING at the point of intersection of the easterly line of Main Street with the northerly line of Burton Street; thence northerly along said easterly line of Main Street, 70 feet; thence easterly at right angles 200 feet to the westerly line of Washington Street; thence southerly along the said westerly line of Washington Street 70 feet to the northerly line of Burton Street; thence westerly along said northerly line of Burton Street, 200 feet to Main Street to the place of beginning.

Exhibit A-2

**Purchase and Sale Agreement for Various Properties on Main Street in Buffalo, New York**

21419372.v19

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 51 of 95

Parcel B

ALL THAT TRACT OR PARCEL OF LAND situate in the City of Buffalo, County of Erie and State of New York, being part of Outer Lot No. 147, in said City, bounded and described as follows:

BEGINNING at a point in the easterly line of Main Street, 70 feet north of the point of intersection of the easterly line of Main Street with the northerly line of Burton Alley; running thence easterly at right angles to Main Street 200 feet to the westerly line of Washington Street; running thence northerly along the westerly line of Washington Street, about 160 feet to the south line of Virginia Street (as now laid out); running thence westerly along the south line of Virginia Street (as now laid out) to the easterly line of Main Street; running thence southerly along the easterly line of Main Street about 117 feet to the place of beginning.

Exhibit B (to Purchase and Sale Agreement)

Quit Claim Deed

**THIS INDENTURE**, made the _____ day of _____ 2025,

BETWEEN

**THE DIOCESE OF BUFFALO, N.Y.**, a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, having an office at 795 Main Street, Buffalo, New York 14203, Grantor,

and,

_____, a _____, having an address at _____, Grantee,

**WITNESSETH** that the said Grantor, in consideration of _____ Dollar ($____), lawful money of the United States, paid by the Grantee, do hereby remise, release and forever Quit-Claim unto the Grantee, and their heirs and assigns forever:

ALL THAT TRACT OR PARCEL OF LAND, _____

Pursuant to Sections _____ of the _____, the Bankruptcy Court of _____ approved the sale contemplated herein by an Order dated _____ and located at Index No. _____ (the "Order"), attached hereto as **Schedule A** shall be incorporated herein and shall be understood to be a part hereof.

**TOGETHER** with the appurtenances and all the estate and rights of the Grantors in and to the said premises.

**TO HAVE AND TO HOLD**, the above granted premises unto the said Grantee, their heirs and assigns forever.

**IN WITNESS WHEREOF**, the said Grantors have hereunto set their hands and seals on the day and year first above written.

In Presence of          THE DIOCESE OF BUFFALO, N.Y.

By: _____ L.S.

Exhibit B                    **Purchase and Sale Agreement
for Various Properties on Main Street
in Buffalo, New York**

21419372.v19
Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 53 of 95

STATE OF NEW YORK        )
                                       )SS.:
COUNTY OF ERIE              )

On the _____ of _____ in the year 2025, before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

Exhibit B                                     **Purchase and Sale Agreement**
**for Various Properties on Main Street**
**in Buffalo, New York**

21419372.v19
Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 54 of 95

# FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

This FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "<u>Amendment</u>"), dated as of the 12th day of January 2026 (the "<u>Effective Date</u>"), is entered into between **THE DIOCESE OF BUFFALO, N.Y.**, a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, having an address at 795 Main Street, Buffalo, NY 14203 ("<u>Seller</u>"), and **BFC BUFFALO MAIN LLC**, a New York limited liability company having an address at 150 Myrtle Avenue, Suite 2, Brooklyn, New York 11201, or an affiliated entity ("<u>Purchaser</u>"; Seller and Purchaser are each referred to herein as a "<u>Party</u>", and collectively as the "<u>Parties</u>").

## RECITALS

WHEREAS, Seller is the owner of real properties located in the City of Buffalo, County of Erie, and State of New York, commonly known as (i) **785 Main Street, Tax Map Parcel No. 111.23-10-3.1**[1], (ii) **814 Main Street, Tax Map Parcel No. 111.22-8-18**, (iii) **815 Main Street, Tax Map Parcel No. 111.23-10-2**, (iv) **819 Main Street, Tax Map Parcel No. 111.23-10-1**, and (v) **821 Main Street, Tax Map Parcel No. 111.23-9-1.1**, which are shown outlined in the Agreement (as hereinafter defined) (the "Real Property");

WHEREAS, on February 28, 2020 (the "<u>Petition Date</u>") Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 et seq., the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Western District of New York (the "<u>Bankruptcy Court</u>"), commencing Seller's chapter 11 case (this "<u>Bankruptcy Case</u>");

WHEREAS, Seller continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Purchaser and Seller entered into that Purchase and Sale Agreement dated September 8, 2025 (the "<u>Agreement</u>"), which provided for Seller to sell the Property (as defined in the Agreement) to Purchaser, subject to Bankruptcy Court (as defined in the Agreement) procedures and approvals;

WHEREAS, Purchaser and Seller wish to amend the Agreement, as hereinafter provided.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, Seller and Purchaser agree as follows:

---

[1] For the avoidance of doubt, this property address is 785 Main Street, Buffalo, New York and the mailing address is 795 Main Street, Buffalo, New York.

**Page 1 of 4    Amendment to Purchase and Sale Agreement
for Various Properties on Main Street
in Buffalo, New York**

22816611.v1

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 55 of 95

1.    Diocese Lease. Section 4.7 is hereby deleted in its entirety and replaced with the following language:

4.7 Diocese Lease. Notwithstanding anything to the contrary contained in this Agreement, Seller shall have the right to occupy the Walsh Building for a period not to exceed three (3) years after the Closing Date, and Purchaser shall have the obligation to permit Seller to occupy the Walsh Building for a period not to exceed three (3) years after the Closing Date, subject to the terms of a written lease agreement by and between Seller, as tenant, and Purchaser, as landlord (the "Diocese Lease"). The form Diocese Lease is attached hereto, and incorporated herein, as Exhibit 1. For the avoidance of doubt, the following terms shall be considered material terms of the Diocese Lease:

a.  Seller, as tenant, shall have the right to terminate the Diocese Lease upon thirty (30) days prior written notice to Purchaser, as landlord, at any time during the term of the Diocese Lease;

b.  Seller, as tenant, shall pay Purchaser's, as landlord, Carrying Costs (as hereinafter defined) for the Walsh Building.  The term "Carrying Costs" shall include the following costs:

i.   All utilities consumed at the Walsh Building;

ii.  All maintenance, repair, and upkeep of the parking lot located adjacent to the Walsh Building (the "Walsh Parking Lot"), which shall include, but not be limited to all snow and ice removal and plowing services;

iii. All real property taxes and assessments levied against the Walsh Building and the Walsh Parking Lot;

iv.  All cost to obtain insurance coverage for the Walsh Building, to the extent such insurance limits are commercially reasonable (the Diocese Lease shall include Seller's obligation to carry and pay for liability insurance and property damage insurance or to pay for Purchaser's, as landlord, insurance covering the Walsh Building). Prior to securing an insurance policy, Purchaser shall provide Seller the opportunity to obtain an insurance estimate for the Walsh Building at such commercially reasonable coverage limits specified by Purchaser, as landlord (the "Estimate"). After review of the Estimate, if Purchaser elects to secure a policy from another broker, at a higher premium, Seller's financial obligations shall be limited to a reasonable increase of the Estimate." All costs of the general maintenance and repair of the Walsh Building; and

Page 2 of 4      Amendment to Purchase and Sale Agreement
for Various Properties on Main Street
in Buffalo, New York

22816611.v1
Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 56 of 95

> v. Sidewalk maintenance and snow and ice removal to the extent performed by Purchaser as landlord and not Seller as tenant.

c. If during the term of the Diocese Lease, Purchaser elects to separate the Walsh Building from the adjacent building, 795 Main Street (the "<u>Diocese Building</u>"), then Purchaser shall install a new heating, ventilation, and air conditioning ("<u>HVAC</u>") system to service the Walsh Building and take steps to separate the utilities of the Walsh Building and the Diocese Building (the "<u>HVAC and Utility Work</u>"). If the costs of the HVAC and Utility Work exceed Two Hundred and Fifty Thousand Dollars ($250,000.00), Seller shall be liable for up to Two Hundred and Fifty Thousand Dollars ($250,000.00) ("<u>Seller's Contribution</u>") and Purchaser shall pay the difference between the cost of the HVAC and Utility Work cost and Seller's Contribution. Notwithstanding anything to the contrary contained herein, Seller's Contribution under this Subsection and related to the HVAC and Utility Work shall be limited to, and in no instance more than, Two Hundred and Fifty Thousand Dollars ($250,000.00). *For the avoidance of doubt and for illustrative purposes only, if the HVAC and Utility Work costs Four Hundred and Fifty Thousand Dollars ($450,000.00), Purchaser shall pay $250,000.00 and Seller shall pay Two Hundred Thousand Dollars ($200,000.00). For further illustrative purposes only, if the HVAC and Utility Work costs Five Hundred and Sixty Thousand Dollars ($560,000.00), Purchaser shall pay Three Hundred and Ten Thousand Dollars ($310,000.00) and Seller shall pay Two Hundred and Fifty Thousand Dollars ($250,000.00).*

d. For the avoidance of doubt, the obligations and responsibilities contained in this Section 4.7 shall survive Closing.

2. The recitals set forth in the preamble of this Amendment are incorporated into and shall constitute a part of this Amendment.

3. Except as otherwise specifically set forth in this Amendment, all terms and conditions of the Agreement shall remain in full force and effect, shall not be considered amended or modified, and are hereby ratified and confirmed in all respects.

4. This Amendment may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.

[Remainder of Page Intentionally Blank; Signature Page to Follow]

**Page 3 of 4**     Amendment to Purchase and Sale Agreement
for Various Properties on Main Street
in Buffalo, New York

**In Witness Whereof** the parties have executed this Amendment as of the day and year first written above.

SELLER:

**THE DIOCESE OF BUFFALO, N.Y.**

By: _Michael W Fisher_

Name:

Title:

PURCHASER:

**BFC BUFFALO MAIN LLC**

By: _____

Name:

Title:

22816611.v1

**In Witness Whereof** the parties have executed this Amendment as of the day and year first written above.

<div align="right">

SELLER:

**THE DIOCESE OF BUFFALO, N.Y.**


By: _____
Name:
Title:

PURCHASER:

**BFC BUFFALO MAIN LLC**

By: _____
Name: DONALD CARUCCIA
Title: MANAGER

</div>

Page 4 of 4     Amendment to Purchase and Sale Agreement
for Various Properties on Main Street
in Buffalo, New York

22816611.v1

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 59 of 95

Exhibit 1
(to First Amendment to Purchase and Sale Agreement)

LEASE AGREEMENT

THIS LEASE AGREEMENT (this "**Lease**"), dated as of the \_\_\_\_\_ day of _____, 2026 (the "**Effective Date**"), is by and between _____, _____ ("**Landlord**"), and **THE DIOCESE OF BUFFALO, N.Y.**, a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, having an address at 795 Main Street, Buffalo, NY 14203 ("**Tenant**"; Landlord and Tenant are each referred to herein as a "Party"; and collectively, as the "**Parties**").

## ARTICLE 1 -- PROPERTY

1.1     Property.  Landlord, in consideration of the rents to be paid and the covenants and agreements to be performed and observed by Tenant, does hereby lease unto Tenant, and Tenant does hereby lease and take from Landlord, the building comprising approximately 31,500 square feet located at 801 Main Street in the City of Buffalo, New York 14203[2] (the "**Building**"), including the garage at street level and adjacent to the Building (the "**Bishop's Garage**"), and exclusive use of all parking spaces located in Lot 1, which Parking Lot 1 is connected to the Building (the "**Parking Lot**"; collectively, the "**Property**").

## ARTICLE 2 -- TERM

2.1     Term.  The term of this Lease shall commence on _____ ("**Commencement Date**") and shall terminate three (3) years thereafter, unless terminated earlier in accordance with this Lease (the "**Termination Date**") (collectively, the "**Term**").

2.2     Option to Renew.  Landlord hereby grants an option to renew this lease for one (1) year after the expiration of the Term, as set forth in Article 2.1 above, on the same terms as this Lease provided that Tenant is not actively in an Event of Default, as hereinafter defined.  Tenant shall give Landlord written notice of its intention to renew at least sixty (60) days prior to the expiration of the Term.  If properly exercised, the definition of "Term" set forth herein shall include this renewal term.

2.3     Early Termination.  Notwithstanding anything to the contrary herein, Tenant may terminate this Lease prior to the expiration of the Term by providing Landlord with no less than THIRTY (30) days' prior written notice. In such circumstances, the Lease shall expire with the same force and effect as if the term were, pursuant to the provisions of the Lease, fixed to expire at such time on the Termination Date.

---

[2] The Parties acknowledge that 801 Main Street, Buffalo, New York is the mailing address for a portion of the real property, which is commonly known by the City of Buffalo, as "785 Main Street, Buffalo, New York."

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1

Case 1-20-10322-CLB,   Doc 4581-1,   Filed 02/09/26,   Entered 02/09/26 18:09:51,   Description: Exhibit A-Proposed Bidding Procedures Order, Page 60 of 95

## ARTICLE 3 -- RENT

3.1    Rent.    Within fifteen (15) days of Tenant's receipt of an invoice or bill from Landlord, Tenant agrees to pay Landlord, at the address set forth above or such place as Landlord shall from time to time direct by written notice to Tenant, the following:

(a)    All maintenance, repair, and upkeep of the Parking Lot, which shall include, but not be limited to all snow and ice removal and plowing services;

(b)    All real property taxes and assessments levied against the Property;

(c)    All cost to obtain and maintain insurance coverage for the Property, to the extent such insurance limits are commercially reasonable, and further subject to the requirements and limitations identified in Section 11.3 below;

(d)    Sidewalk maintenance and snow and ice removal to the extent performed by Landlord, and not Tenant and

(e)    Any costs, expenses, charges, or other payments, which Tenant is obligated by the terms of this Lease to pay to or for the benefit of Landlord.

(collectively (a) – (e), the "**Rent**").

## ARTICLE 4 -- DELIVERY OF PROPERTY

4.1    Property Condition.    Tenant accepts the Property in "as-is" condition.

## ARTICLE 5 -- REPAIRS

5.1    Landlord's Repairs and Maintenance.    Landlord shall be responsible, at its sole cost and expense, for maintaining the structural components of the Property in good condition and making all structural repairs and replacements as are necessary or desirable, in Landlord's reasonable discretion, including to: all structural components of the Property, roof, foundation, and exterior walls. Landlord shall be responsible, its sole cost and expense, for maintaining any common areas.

5.2    Tenant's Repairs and Maintenance.    Tenant agrees that it shall, throughout the Lease, take good care of the Property and that, except for those repairs and replacements identified in Section 5.1, it will, at its sole cost and expense, be responsible for maintaining the Property

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1
Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 61 of 95

(including Bishop's Garage), and shall make all necessary repairs and replacements to the Building (both internal and external), and take such action as may be necessary to preserve the same in good order, condition and state of repair, without limitation, all interior and exterior maintenance, repairs, and replacements in connection with the Property(inclusive of the Building) , the windows, doors, and other interior and exterior features of the Building, the plumbing, electrical, exterior lighting, the Parking Lot (including removal of snow and ice, sanding, and salting), building systems (excluding the HVAC system except as otherwise provided herein), and all landscaping. Notwithstanding anything to the contrary contained herein, except for any repairs required due Tenant's negligence, willful misconduct, or failure to reasonably maintain the HVAC system located within the Building (which shall be Tenant's obligation), Landlord shall make any required repairs, including, replacement, if necessary, to the main components HVAC system servicing the Property. Notwithstanding the foregoing, Tenant shall be responsible for maintaining and repairing any infrastructure of the HVAC system (including, but not limited to, ductwork, filters, vents, and etc.) located within the Building.

5.3     Tenant's Alterations.

(a)  Subject to the Alteration Conditions (as hereinafter defined), Tenant shall have the right, at its sole expense, from time to time, to make such interior cosmetic alterations, redecorations and changes (collectively "**Alterations**") in such parts of the Property thereof as Tenant shall reasonably deem necessary for its business purposes; provided that Tenant shall first obtain Landlord's prior written consent.

(b)  All Alteration(s) (i) shall be completed in accordance with all applicable laws, rules, regulations, and orders, including applicable building codes, and (ii) shall not affect (x) structural components of the Property, (y) the Bishop's Garage or Parking Lot, or  (z) the certificate of occupancy for the Building.

(c)  No Alterations shall be commenced until the following conditions are satisfied ((i)-(iii), each, an "**Alteration Condition**"; collectively, the "**Alteration Conditions**"):

(i)  Tenant shall obtain, at Tenant's sole cost and expense, all certificates, licenses, permits, authorizations, consents and approvals necessary for such Alterations, from all governmental authorities having jurisdiction with respect to the Property or Alterations. With respect to Alterations that have been approved by Landlord, Landlord shall reasonably cooperate with Tenant, at Tenant's cost, in obtaining any such certificate, license, permit, authorization, consent or approval. Notwithstanding anything to the contrary herein, any certificates, licenses, permits, authorizations, consents and/or approvals from all government authorities, which have jurisdiction with respect to the Property or Alterations, that must be obtained upon completion of an Alteration is expressly excluded from Alteration Conditions.

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1
Case 1-20-10322-CLB,     Doc 4581-1,     Filed 02/09/26,     Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 62 of 95

(ii) Tenant shall furnish approval plans and specifications for each proposed Alteration, reasonably detailed based upon the scope of the proposed Alteration, to Landlord for prior written approval (which approval shall not to be unreasonably withheld, conditioned or delayed, provided the Alteration Conditions are met);

(iii) Tenant shall obtain Landlord's prior approval of any contractor or subcontractor (and, Tenant shall furnish Landlord with the names, addresses and all information of any contractor or subcontractor, which may be reasonably requested by Landlord); and

(iv) Tenant shall furnish to duplicate policies, or certificates of worker's compensation (covering all persons to be employed by Tenant, and Tenant's contractors and subcontractors in connection with such Alteration) and commercial general liability (including property damage coverage) insurance in such form, with such companies, for such periods and in such amounts as Landlord may reasonably approve, naming Landlord and its agents, and any mortgagee, as additional insured. For the avoidance of doubt, Tenant's insurance obligations may be satisfied by self-insurance as identified in Article 11 provided such self-insurance complies with all requirements of Tenant's insurance contained in this Lease specifically including, but not limited to, naming Landlord as additional insured, waiver of subrogation, and providing Landlord with ACCORD certificates of insurance.

(d) Tenant shall cause all Alterations to be made and completed in accordance with the approved plans and specifications, in a good and workmanlike manner, in compliance with all Laws. All Alterations shall be diligently prosecuted to completion. All materials and equipment to be incorporated in the Property as a result of any Alteration shall be of good quality, and no such materials or equipment shall be subject to any lien, encumbrance, chattel mortgage or title retention or security agreement. Tenant, at Tenant's expense, shall obtain certificates of final approval of such Alteration, which may be required by any governmental authority. Tenant shall furnish Landlord with copies of such approvals. To the extent an Alteration alters the structure of the Building, upon Landlord's reasonable written request, Tenant shall provide Landlord with as-built plans and specifications.

(e) Tenant shall promptly pay all costs and expenses incurred for any Alterations, and Tenant shall at all times maintain the Property free and clear of all liens for services or labor performed or rendered, or for materials delivered, supplied or furnished, to or in connection with any Alteration(s).

5.3    <u>HVAC and Utility Work</u>. The parties acknowledge the heating, ventilation, and air conditioning system ("**HVAC**") and utilities that service the Property are interconnected to the

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1
Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 63 of 95

HVAC and utilities serviced to the adjacent property, 795 Main Street, Buffalo, New York (the "**Adjacent Property**"). If during the Term, Landlord elects to separate the Property from the Adjacent Property, Landlord shall (i) provide notice to Tenant the earlier of (a) at least sixty (60) days prior to the beginning of separation work or (b) receipt of necessary approvals from any and all applicable municipal agencies; (ii) timely install a new HVAC to service the Property; and (iii) timely take steps to separate the utilities of the Building and the Adjacent Property ((ii) and (iii), the "**HVAC and Utility Work**"). If the costs of the HVAC and Utility Work is Two Hundred and Fifty Thousand Dollars ($250,000.00) or less, Tenant shall be liable for up to Two Hundred and Fifty Thousand Dollars ($250,000.00) ("**Tenant's Contribution**"). If the costs of the HVAC and Utility work exceed Two Hundred and Fifty Thousand Dollars ($250,000.00), Landlord shall pay the difference between the cost of the HVAC and Utility Work and Tenant's Contribution. Notwithstanding anything to the contrary herein, Tenant's Contribution under this Section 5.3 shall limited to, and in no instance exceed, Two Hundred and Fifty Thousand Dollars ($250,000.00).[3] For the avoidance of doubt, notwithstanding the fee splitting procedure identified above for the HVAC and Utility Work, Landlord shall, at its sole cost and expense, maintain, repair, and replace the HVAC and the HVAC shall be the sole property of Landlord.

## ARTICLE 6 -- UTILITIES

6.1     _Utilities_. As of the Commencement Date, gas and water serviced to the Property are not separately metered from the Adjacent Property. Unless and until the completion of the HVAC and Utility Work, the Parties agree Tenant shall pay for its percentage share, by square footage of gas and water services to the Property. For clarity, as of the Commencement Date, the total square footage of the Building is approximately 31,500 square feet and the total square footage of the Building and Adjacent Property is approximately 126,320 square feet, for a gas and water percentage of 25% (provided the entire Adjacent Property is on the same meter, otherwise the "square footage of the Adjacent Property" shall be limited to the actual square footage connected to the same meter as the Building). Landlord shall invoice Tenant for Tenant's percentage share. Tenant shall be responsible for all other utilities used upon or furnished to the Building as of the Commencement Date or thereafter.

## ARTICLE 7 -- USE

7.1     _Use of Property_. Tenant shall have the right to use and occupy the Property for any lawful purpose related to a Roman Catholic Diocese and related administrative functions and agrees to not use the Property or permit the Property to be used for any other purposes without the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned, or

---

[3] For the avoidance of doubt and for illustrative purposes only, if the HVAC and Utility Work costs Four Hundred and Fifty Thousand Dollars ($450,000.00), Landlord shall pay Two Hundred and Fifty Thousand Dollars ($250,000.00) and Tenant shall pay Two Hundred Thousand Dollars ($200,000.00). For further illustrative purposes only, if the HVAC and Utility Work costs Five Hundred and Sixty Thousand Dollars ($560,000.00), Landlord shall pay Three Hundred and Ten Thousand Dollars ($310,000.00) and Tenant shall pay Two Hundred and Fifty Thousand Dollars ($250,000.00)

delayed.  Tenant shall not use the Property or permit the Property to be used for any unlawful purposes or in violation of appliable laws, ordinances, or regulations.

## ARTICLE 8 -- ASSIGNMENT

8.1　<u>Assignment and Subletting</u>.  Tenant shall have no right to assign this Lease and/or to sublet all or any portion of the Property without Landlord's prior written consent, which shall not be unreasonably withheld.

## ARTICLE 9 -- SURRENDER

9.1　<u>Surrender of Property</u>.  Upon the expiration or termination of this Lease, Tenant shall surrender the Property to Landlord in good condition and repair, reasonable wear and tear, casualty, and condemnation, excepted.

## ARTICLE 10 -- SIGNS

10.1　<u>Exterior Signs</u>.  Tenant shall have the right, at its sole expense and in conformity with applicable laws and ordinances (including variances), and subject to Landlord's prior written consent, not to be unreasonably withheld, conditioned, or delayed, to erect and thereafter, to maintain and/or replace, if it shall so elect, signs on the Property.  Upon the expiration of this Lease, Tenant shall remove all such signs, and Tenant shall repair any damage to the Property caused by such the installation or removal of such signage.

## ARTICLE 11 -- INSURANCE

11.1　<u>Indemnity</u>.  Tenant shall indemnify and hold Landlord harmless from any claims, damages, liabilities and expenses (including attorneys' fees and costs) for damage or injury to any person or any property occurring on the Property caused by Tenant's use or occupancy of the Property, except to the extent caused by Landlord's negligent acts or omission or willful misconduct or breach of this Lease.

11.2　<u>Tenant's Insurance</u>.  Tenant agrees to provide:

(a) Commercial general liability insurance, written on ISO form CG 00 01 01 96 or its equivalent, including contractual liability for Tenant's obligations pursuant to this Lease as an "**Insured Contract**", including all obligations of indemnity hereunder (including, but not limited to, defense costs and attorney's fees assumed under this Lease, which may be payable in addition to the limit of the liability) and liability for both bodily injury and property damage, against claims for loss of life, bodily injury and property damage occurring in, on or about the Premises or with respect to the operations of Tenant in the Premises, in which the limit of such commercial general liability coverage shall be not less than Three Million Dollars ($3,000,000) per occurrence and Five Million Dollars ($5,000,000) in the aggregate (the "**CGL Policy**"). The CGL Policy

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1

Case 1-20-10322-CLB,　Doc 4581-1,　Filed 02/09/26,　Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 65 of 95

shall cover liability arising from premises and operations, independent contractors, and liability assumed under an insured contract (including tort liability of another assumed in a business contract). The CGL Policy shall name Landlord and any mortgagee as additional insured such coverage to be provided through an ISO CG 20 11 04 13 form of endorsement or its equivalent. If the CGL Policy contains a general aggregate limit, such general aggregate limit shall apply separately to each location. The CGL Policy shall be written on an occurrence bases, not a claims made basis and shall be primary and non-contributory to any insurance carried by Landlord. If in the reasonable opinion of the insurance broker retained by Landlord the amount of CGL Policy coverage maintained by Tenant is not adequate, Tenant shall from time to time (but no more frequently than once every five (5) years) increase the insurance coverage as recommended by Landlord's insurance broker;

(b) Fire, casualty, and extended risk property damage insurance on a causes of loss-special form basis covering, on a replacement cost value, all leasehold improvements, fixtures, inventory, personal property and equipment located within the Premises which includes business interruption/business income loss insurance and names Landlord and any Landlord mortgagee as loss payee;

(c) Worker's compensation and employer's liability coverage providing statutorily required benefits or a limit of no less than One Million and No/100 Dollars, whichever is greater, which such policies will contain an endorsements waiving the underwriter's rights of subrogation against Landlord;

(d) Commercial automobile insurance, to be written with a liability limit of no less than One Million and No/100 Dollars ($1,000,000.00) and which shall include owned, hired, and non-owned coverage; and

(e) An umbrella and/or excess policy with limits of no less than Ten Million and No/100 Dollars ($10,000,000.00) per occurrence or in the aggregate.

Insurance policies shall name Landlord and each of Landlord's mortgagees as additional insured and as certificate holders, to the extent available for such policy. Coverages for the Landlord and each other additional insured under any policy required hereunder, specifically including, but not limited to the CGL Policy, shall be as broad as the coverage for Tenant and shall apply as primary insurance on a non-contributory basis before any other insurance or self-insurance, including any deductible, maintained by or provided to Landlord or such other additional insured. Each such policy of insurance shall be written by one or more insurance companies licensed to do business in the State of New York with an AM Best rating of A-VIII or better, with express waivers of subrogation against Landlord and each mortgagee, and shall provide that if the insurers cancel such insurance for any reason whatsoever, or the same is allowed to lapse or expire, or there be any reduction in amount, or any material change is made in the coverage, such cancellation lapse, expiration, reduction or change shall not be effective as to Landlord or any mortgagee until thirty (30) days after receipt by the Landlord or such Mortgagee, as the case may be, of written notice

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1

Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 66 of 95

thereof.

With respect to each type of insurance specified herein, Landlord's insurance shall be excess to Tenant's insurance. A copy of each policy and endorsement shall be delivered to Landlord and each mortgagee on or before the Effective Date, and copies of all policies and endorsements with respect to all renewals, extensions or replacements thereof shall thereafter be furnished to Landlord and each mortgagee at least ten (10) days prior to the expiration or cancellation of any policies and endorsements which they replace. Tenant shall promptly (and in any event at least five (5) business days prior to the date on which notice is required to be given to the insurer under such policies) notify both Landlord and the insurer in writing of any occurrence which might give rise to a claim under any of the policies required to be maintained by Tenant under this Lease. Tenant further agrees to comply in timely fashion with all of the obligations of the insured under each such policy and shall defend, indemnify and hold Landlord and each mortgagee harmless from any liability, loss, cost and/or expense suffered or incurred by Landlord or such mortgagee as a result of Tenant's failure to comply with the provisions of this Section

  11.3 <u>Landlord's Insurance</u>. Landlord shall maintain comprehensive insurance on the Property and any personal property therein appropriate for Landlord's respective interests, in a commercially reasonable amount. Prior to securing an insurance policy, Landlord shall provide Tenant the opportunity to obtain an insurance estimate, through Tenant's self-insurance or an insurance broker, for the Property at such commercially reasonable coverage limits specified by Landlord (the "**Estimate**"). After review of the Estimate, if Landlord elects to secure a policy from another broker, at a higher premium, Tenant's financial obligations shall be limited to a reasonable increase of the Estimate.

## <u>ARTICLE 12 -- CASUALTY</u>

  12.1 <u>No Abatement or Adjustment of Rent</u>. If the whole of the Property shall be damaged or destroyed, or if a substantial portion thereof shall be damaged or destroyed to the extent that Tenant, in its reasonable judgment, determines that it cannot conduct business in the Property, then Rent and any other charges payable hereunder shall not be abated, unless otherwise indicated in this Lease.

  12.2 <u>Repairs and Restoration of Property</u>. In the event of the destruction of the Building, the Property, or any portion thereof, by fire, explosion, the elements or otherwise, during the Term, or such partial destruction thereof as to a material portion of the Property, as reasonably determined by Landlord, then Landlord shall have a period of forty-five (45) days from the date of such destruction or partial destruction of the Property to determine, at its election, whether the Property should be rebuilt. If Landlord elects to rebuild, Landlord thereafter shall have a period of one hundred fifty (150) days from the date of commencement of substantial repairs or reconstruction of the Property, which shall not be more than forty-five (45) days from the event of destruction, to rebuild the Property to substantially the same condition as upon initial delivery thereof to Tenant. For the avoidance of doubt, if the necessitated repairs exceed an insurance award for the damage,

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1

Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 67 of 95

the Term hereby created, at the option of Landlord, shall cease and become null and void from the date of such damage or destruction; and if such option is exercised Tenant shall immediately surrender the Property and all Tenant's interest therein to Landlord and shall pay Rent only to the time of such surrender. However, should the Property be rendered wholly or partially untenantable and unfit for occupancy but yet be repairable, at Landlord's election, Landlord shall repair the same within the timeline identified above. If the Property is rendered wholly or partially untenable and unfit for occupancy but repairable, Tenant shall continue to pay all Rent as herein provided. Tenant shall immediately notify Landlord in case of fire or other damage to the Property. No claim shall be made by Tenant in any case for compensation or damages by reason of interruption of its business through any such destruction and damage to the Property or arising from the necessity of repairing any portion of the Property. Landlord shall not be liable for any loss of or damage to property of Tenant or the interruption of Tenant's business. Tenant waives the right to make repairs at Landlord's expense If this Lease is terminated under this Article 12, the parties shall be released hereunder, each to the other, from all liability and obligations hereunder thereafter arising.

12.3 <u>Delivery of Property</u>. If this Lease has not been canceled hereunder as a result of any damage or destruction of the Property, Tenant shall not be required to accept delivery or possession of the Property and recommence paying Rent and other charges (or such abated portion thereof) until all of the following shall have occurred:

    (a)    The damaged or destroyed portion of the Property shall have been restored as nearly as practicable to the condition existing immediately prior to such destruction or damage and in compliance with all laws, ordinances, regulations, and requirements of governmental authorities having jurisdiction thereof;

    (b)    If required, a certificate of occupancy or an equivalent use permit, and all other requisite permits, if any, shall have been issued by the appropriate legal authorities issuing same, and Landlord shall have delivered to Tenant such certificate(s) or photostatic copies thereof; and

    (c)    If Landlord has elected to rebuild Landlord shall have delivered written notice to Tenant of the date of completion of the Property as required herein, and Tenant shall have a period of SIXTY (60) days from and after such date of completion to install all trade fixtures, merchandise, equipment, and other personal property damaged or destroyed in connection with such damage or destruction of the Property.

## ARTICLE 13 -- CONDEMNATION

13.1 <u>Total Taking</u>. If the whole of the Property shall be taken under power of eminent domain by any public or private authority or conveyed by Landlord to said authority in lieu of such taking, then this Lease shall terminate as of the date of such taking.

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1

Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51, Description: Exhibit A-Proposed Bidding Procedures Order, Page 68 of 95

13.2  <u>Partial Taking</u>.

(a) Landlord or Tenant may, at its election, terminate this Lease upon the occurrence of any condemnation, or conveyance in lieu of condemnation, which affects:

(i)  Twenty percent (20%) or more of the floor area of the Property;

(ii)  Any portion of the access areas or parking areas whose condemnation would materially affect ingress to and egress from the Property or the ability of Tenant to park its vehicles.

The terminating party shall give the other party notice of such party's election to terminate this Lease within thirty (30) days after the parties have received notice of such pending condemnation.  If Landlord or Tenant fails to give such written notice to the other party within such thirty (30) day period, the parties shall be conclusively deemed to have elected not to terminate this Lease.

(b) If there is a condemnation, conveyance in lieu of condemnation, or other taking of a material portion of the Property (as reasonably determined by Landlord) or any portion of the Property or Adjacent Property that would make satisfying Landlord's obligations hereunder impossible, Landlord shall have the right to terminate this Lease upon written notice to Tenant within thirty (30) days after notice of such condemnation.

(c) Notwithstanding anything to the contrary set forth herein, if any portion of the Property is condemned or conveyed in lieu of such condemnation during the last two (2) years of the term hereof then Landlord or Tenant may terminate this Lease upon thirty (30) days written notice to the other party.

13.3  <u>Restoration</u>.  If Landlord elects not to terminate this Lease, Landlord, at Landlord's sole cost and expense, shall promptly restore the remaining portions of the Property, as the case may be, to a condition comparable to its condition at the time of such condemnation less the portion lost in the taking and exclusive of any trade fixtures or improvements installed by Tenant, and provided that Landlord shall not be required to expend more on such restoration than the award amount.  If Landlord does not either (i) obtain a building permit for any repairs or restoration required hereunder within three (3) months of the date of taking, or (ii) complete such repairs or restoration in accordance with this Section 13.3 within nine (9) months of such taking, then, in either event, Landlord or Tenant may at any time thereafter terminate this Lease upon thirty (30) days written notice thereof to Landlord.  Rent and any other charges payable by Tenant hereunder shall not be suspended or abated

13.4  <u>The Award</u>.  All compensation awarded for any taking, whether for the whole or a

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1

Case 1-20-10322-CLB,   Doc 4581-1,   Filed 02/09/26,   Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 69 of 95

portion of the Property, shall be the sole property of Landlord whether such compensation shall be awarded for diminution in the value of, or loss of the leasehold or for diminution in the value of or loss of the fee, or otherwise, and Tenant hereby assigns to Landlord all of Tenant's right and title to and interest in any and all such compensation; provided, however, Landlord shall not be entitled to and Tenant shall have the sole right to recover for itself any award made by the appropriating authority for (a) the unamortized portion of any leasehold improvements installed by Tenant in the Property, (b) the cost of removal of leasehold improvements, fixtures, and other improvements installed in the Property by, or at the expense of Tenant, (c) relocation expenses, and (d) any separate award made by the appropriating authority directly to Tenant, provided that Landlord's award is not reduced by any such awards to Tenant. Tenant acknowledges and agrees that Landlord is not liable for any such damages claimed by Tenant.

13.5    Release.  In the event of any termination of this Lease as the result of the provisions of Article 13, Rent and any other charges, if any, paid in advance by Tenant shall be refunded to Tenant, and the parties, effective as of such termination, shall be released from all liability and obligations thereafter arising under this Lease.

## ARTICLE 14 -- DEFAULT

14.1    Landlord's Right Upon Tenant's Default.

(a)    Tenant agrees, and it is hereby made a condition of this Lease, that if at any time prior to or during the term of this Lease any one or more of the following events occurs, each such event shall constitute an "**Event of Default**":

(i)    If any of the Rent herein reserved shall not be paid as and when the same shall become due and payable and shall remain unpaid in whole or in part for TEN (10) days after the applicable due date and written notice of the default from Landlord, or

(ii)    If the Tenant shall default in the performance of any of the other agreements, covenants, or terms herein contained on its part to be performed or kept, and remain in default for ten (10) days after written notice of the default from Landlord, provided, however, that if the nature of the default is such that the same cannot reasonably be cured within such period, Tenant shall commence such cure and thereafter diligently prosecute the same to completion; or

(iii)    If the Tenant abandons the Property and the Property do not revest in the Tenant and remains abandoned after a period of ten (10) days.

(b)    Should an Event of Default occur and be continuing beyond the period within which to cure, Landlord, in addition to the other rights and remedies it may have,

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 70 of 95

shall have the right to immediately declare this Lease terminated and the term ended, in which event all of the right, title and interest of Tenant hereunder shall wholly cease and expire upon receipt by Tenant of a notice of termination from Landlord. Tenant shall then quit and surrender the Property to Landlord in the manner and under the conditions as provided for under this Lease. Furthermore Landlord shall be entitled to all Rent due through the date of termination and shall have all rights and remedies available to Landlord at law and in equity.

## ARTICLE 15 -- TITLE

15.1    <u>Subordination</u>.  Tenant hereby subordinates this Lease to the lien of any deed of trust, mortgage or mortgages now or hereafter placed upon Landlord's interest in the Property. The foregoing subordination shall be self-operative and require no act of Tenant to effectuate intent of the provision, however, Tenant agrees that it shall, on demand, execute such further instrument(s) as may be requested by Landlord or Landlord's mortgagee(s) to re-affirm and further evidence such subordination and the rights of the mortgagee with respect to this Lease and the Property.

15.2    <u>Quiet Enjoyment</u>.  Landlord covenants and agrees with Tenant that, Tenant may peaceably and quietly have, hold, occupy and enjoy the Property without hindrance or molestation from Landlord or any persons.

## ARTICLE 16 -- MISCELLANEOUS

16.1    <u>Holding Over</u>.  In the event that Tenant or anyone claiming under Tenant shall continue in occupancy of the Property after the expiration of the original term of this Lease without any agreement in writing between Landlord and Tenant with respect thereto, such occupancy shall not be deemed to extend or renew the term of this Lease, but such occupancy shall continue as a tenancy from month to month upon the covenants, provisions and conditions herein contained provided, however, the Rent owed by Tenant to Landlord shall increase by 200% for each month Tenant remains in possession of the Property after expiration of the original term of the Lease.

16.2    <u>Notice</u>.  All notices, requests, demands, approvals and other communications relating to this Lease shall be in writing and sent by certified mail return receipt requested, nationally recognized overnight courier, or by personal delivery, and shall conclusively be deemed to have been received on the date such notice is personally given, or, in the case of certified mail or overnight courier, on the date on which it is received or rejected:

Tenant:            The Diocese of Buffalo, N.Y.
                   Attn: Richard Suchan
                   801 Main Street
                   Buffalo, New York 14203

Landlord:

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1

Case 1-20-10322-CLB,   Doc 4581-1,   Filed 02/09/26   Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 71 of 95

ATTN: _____

     16.3    <u>Headings</u>. Headings in this Lease are for convenience of reference only and in no way define, limit or describe the scope of this Lease and shall not be used to interpret or construe this Lease or any of its provisions.

     16.4    <u>Governing Law; Venue</u>. This Lease shall be interpreted, construed and enforced in accordance with and governed by the internal laws of the State of New York without reference to the principles of conflicts of laws. Any litigation or dispute resolution shall be brought in the state or federal courts located in Erie County, New York.

     16.5    <u>Entire Agreement / Amendments</u>. This Lease comprises the entire agreement between the parties. This Lease may not be modified, amended or terminated nor may any of its provisions be waived except by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, termination or waiver is sought, and then such modification, amendment, termination or waiver shall be effective only in the specific instance and for the specific purpose for which given.

     16.6    <u>Successors and Assigns</u>. Subject to the terms and conditions hereof, the covenants, agreements, terms, provisions and conditions contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective distributees, legal representatives, successors and assigns.

     16.7    <u>Severability</u>. If any term, covenant or condition of this Lease shall, to any extent, be invalid or unenforceable, the remainder of this Lease shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the extent permitted by the law.

     16.8    <u>Counterparts</u>. This Lease may be executed in one or more counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument and shall be binding upon each of the undersigned as fully and completely as if all had signed the same instrument. Moreover, signatures transmitted by electronic means including but not limited to email or PDF shall be binding as if originals.

     16.9    <u>Law Compliance</u>. Tenant agrees to observe and comply with all laws, ordinances, rules and regulations of the Federal, State, County, and Municipal authorities applicable to the Property, including the Americans with Disabilities Act (as amended and/or supplemented from time to time, the "**ADA**"). Tenant shall not use or permit the use of the Property for any purpose which is illegal, dangerous to persons or property or which, in Landlord's reasonable opinion, unreasonably disturbs any tenants or occupants or operations of the Adjacent Property. Tenant shall obtain and maintain throughout the term any licenses or permits required by any governmental body for (a) the conduct of its business within the Property, (b) any Alteration(s)

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1

Case 1-20-10322-CLB,   Doc 4581-1,   Filed 02/09/26,   Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 72 of 95

Tenant makes to the Property, and/or (c) any and all applicable zoning approval, special use permits and/or construction permits from the applicable government authorities as necessary for or required by Tenant's use. Tenant acknowledges that the Property is a place of "public accommodation". Tenant, at is sole cost and expense, shall make the same accessible, and shall make any modification or alterations, at Tenant's sole cost and expense, as required by the ADA or other accessibility laws. Provided, however, that if any such modifications or alterations are required, Tenant may terminate this Lease within thirty (30) days after receipt of such modification notice and, if properly exercised, Tenant shall not be obligated to make such modifications or alterations. Tenant, shall provide Landlord with copies of any notices it receives regarding a violation or alleged violation of any laws, ordinances, rules and regulations of the Federal, State, County, and Municipal authorities applicable to the Property, within ten (10) days after receipt of the same. If Tenant terminates the Lease under Section 16.9, the Lease shall expire with the same force and effect as if the term were, pursuant to the provisions of the Lease, fixed to expire at such time on the Termination Date. Except as identified herein, Tenant shall reimburse and compensate Landlord for all expenditures made by, or damages or fines sustained or incurred by, Landlord due to any violations of such laws, ordinances, rules or regulations by Tenant, its agents, contractors, subcontractors, employees, guests, invitees, customers, licensees and subtenants with respect to the Property.

16.10 <u>Mechanic's Lien</u>. Tenant has no authority or power to cause or permit any lien or encumbrance of any kind whatsoever, whether created by act of Tenant, operation of law, or otherwise, to attach to or be placed upon Landlord's title or interest in the Property or Adjacent Property, and any and all liens and encumbrances created by Tenant shall attach to Tenant's interest only. In the event that any mechanic's lien is filed against the Property or Adjacent Property as a result of Alterations, additions or improvements made by or on behalf of Tenant, Landlord, at its option, after ten (10) days' notice to Tenant, may terminate this Lease and/or may bond, discharge, defend or pay the said lien without inquiring into the validity thereof, and Tenant shall forthwith reimburse Landlord the reasonable expense incurred by Landlord in discharging or bonding, paying or defending against the said lien, as additional rent hereunder.

16.11 <u>Hazardous Substances</u>. Tenant shall not conduct any activities with respect to the Property which result in the generation, storage or release of any toxic, hazardous or similar substances (as those terms may be defined from time to time in any federal, state or local law, rule or regulation). Tenant shall bear all liability for any claim, injury, loss or damage to any person or the environment as a result of any such toxic, hazardous or similar substances and Tenant will save Landlord harmless and indemnify Landlord against any such loss, claim, injury or damage which arises from, or is directly related to, Tenant's use or activities during the Term.

16.12 <u>Estoppel Certificates</u>. Tenant shall, at any time and from time to time upon request of Landlord, within ten (10) days following notice of such request from Landlord, execute, acknowledge and deliver to Landlord (in recordable form, if so requested), a certificate (each, an "**Estoppel Certificate**") in such reasonable form as Landlord or any of its lenders, prospective purchasers, lienholders or assignees may deem appropriate. Failure by Tenant to deliver an

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1

Case 1-20-10322-CLB,   Doc 4581-1,   Filed 02/09/26,   Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 73 of 95

Estoppel Certificate within such ten (10) day period shall be deemed to establish conclusively that (i) this Lease is in full force and effect and has not been assigned, modified, supplemented or amended; (ii) all covenants, conditions and agreements on the part of Landlord hereunder have been performed; and that (iii) there are no defenses or offsets to the enforcement of this Lease by Landlord, or stating those claimed by Tenant, except as each of the foregoing may be represented by Landlord. Tenant irrevocably constitutes and appoints Landlord as Tenant's attorney-in-fact to execute and deliver any Estoppel Certificate so requested and not returned to Landlord within such ten (10) day period; provided, however, such appointment and subsequent execution and delivery by Landlord shall not be deemed to have cured any default by Tenant under this Section or the Lease.

16.13 <u>Right of Entry</u>. Landlord shall, at all reasonable times, have access to the Property for the purposes of examining the same, making repairs required to be made by Landlord, in furtherance of Landlord's management of the Property, or for the purpose of showing the Leased Premises to prospective purchasers or tenants.

16.14 <u>Definition and Liability of Landlord</u>. The term "Landlord" as used in this Lease means only the owner for the time being of the Property or the owner of a leasehold interest in the building and/or the land. Provided Landlord receives an assignment and assumption agreement from its successor, Landlord shall be and hereby is entirely freed and relieved of all of its obligations of Landlord hereunder. It is specifically understood and agreed that there shall be no personal liability of Landlord in respect to any of the covenants, conditions or provisions of this Lease. In the event of a breach or default by Landlord of any of its obligations under this Lease, Tenant shall look solely to the equity of Landlord in the Property for the satisfaction of Tenant's remedies.

16.15 <u>No Representation</u>. Tenant expressly acknowledges that neither Landlord nor Landlord's agents have made or are making, and Tenant, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this Lease, and no rights, easements or licenses are or shall be acquired by Tenant by implication or otherwise unless expressly set forth in this Lease.

16.16 <u>Authority</u>. Landlord and Tenant, respectively, hereby represent and warrant to the other party that the individuals executing this Lease on behalf of Landlord or Tenant, respectively, is duly authorized to so execute this Lease on behalf such party, as the case may be, and that the execution and delivery of this Lease has been authorized by all necessary company, corporate or partnership action. Landlord and Tenant agree to provide the other upon request reasonable evidence confirming the existence of such authority.

16.17 <u>Waiver of Covenant or Condition</u>. The failure of Landlord to insist upon strict performance of any of the covenants or conditions of this Lease or to exercise any option herein conferred in any one or more instances shall not be construed as a waiver or relinquishment for the future of any such covenants, conditions or options, but the same be and remain in full force

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 74 of 95

and effect.

16.18 <u>Waiver of Subrogation</u>. The parties hereto shall procure an appropriate clause in, or endorsement for, any fire or extended coverage insurance covering the Property and personal property, fixtures and equipment located therein, pursuant to which the insurance companies waive subrogation or consent to a waiver of right of recovery, and, having obtained such clauses or endorsements or consent, waive any and all rights of recovery, claim, action or cause of action against each other, their respective agents, officers and employees, for any loss or damage that may occur to the Property, or to any other property, whether real, personal or mixed, located in the Property, by reason of fire, the elements, or any other cause insured against, under the terms of policies of insurance maintained, for the Property or such other property, by Landlord or Tenant (as the case may be) under the terms of this Lease, regardless of cause or origin, including negligence of the parties hereto, their respective agents and employees, provided, the waiver contained herein shall be limited by, and coextensive with, the terms and provisions of the waiver of subrogation clause or endorsement or clauses or endorsements consenting to a waiver of right of recovery.

[Remainder of Page Intentionally Blank; Signature Page Follows]

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 75 of 95

IN WITNESS WHEREOF, the parties hereto have executed this Lease Agreement as of the Effective Date.

LANDLORD:

By:_____
Name:
Title:

TENANT:                                The Diocese of Buffalo, N.Y.


By:_____
                                       Michael W. Fisher, Bishop

Exhibit 1: Lease Agreement – 801 Main Street
Buffalo, New York

22816611.v1
Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 76 of 95

***Exhibit 3***

(to Bidding Procedures Order)

Lease Agreement

22232345.v6

Case 1-20-10322-CLB,   Doc 4581-1,   Filed 02/09/26,   Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 77 of 95

# LEASE AGREEMENT

THIS LEASE AGREEMENT (this "**Lease**"), dated as of the _____ day of _____, 2025 (the "**Effective Date**"), is by and between _____, _____ ("**Landlord**"), and **THE DIOCESE OF BUFFALO, N.Y.**, a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, having an address at 795 Main Street, Buffalo, NY 14203 ("**Tenant**"; Landlord and Tenant are each referred to herein as a "Party"; and collectively, as the "**Parties**").

## ARTICLE 1 -- PROPERTY

1.1     <u>Property</u>. Landlord, in consideration of the rents to be paid and the covenants and agreements to be performed and observed by Tenant, does hereby lease unto Tenant, and Tenant does hereby lease and take from Landlord, the building comprising approximately 31,500 square feet located at 801 Main Street in the City of Buffalo, New York 14203[1] (the "**Building**"), including the garage at street level and adjacent to the Building (the "**Bishop's Garage**"), and exclusive use of all parking spaces located in Lot 1, which Parking Lot 1 is connected to the Building (the "**Parking Lot**"; collectively, the "**Property**").

## ARTICLE 2 -- TERM

2.1     <u>Term</u>. The term of this Lease shall commence on _____ ("**Commencement Date**") and shall terminate three (3) years thereafter, unless terminated earlier in accordance with this Lease (the "**Termination Date**") (collectively, the "**Term**").

2.2     <u>Option to Renew</u>. Landlord hereby grants an option to renew this lease for one (1) year after the expiration of the Term, as set forth in Article 2.1 above, on the same terms as this Lease provided that Tenant is not actively in an Event of Default, as hereinafter defined. Tenant shall give Landlord written notice of its intention to renew at least sixty (60) days prior to the expiration of the Term. If properly exercised, the definition of "Term" set forth herein shall include this renewal term.

2.3     <u>Early Termination</u>. Notwithstanding anything to the contrary herein, Tenant may terminate this Lease prior to the expiration of the Term by providing Landlord with no less than THIRTY (30) days' prior written notice. In such circumstances, the Lease shall expire with the same force and effect as if the term were, pursuant to the provisions of the Lease, fixed to expire at such time on the Termination Date.

## ARTICLE 3 -- RENT

3.1     <u>Rent</u>. Within fifteen (15) days of Tenant's receipt of an invoice or bill from Landlord, Tenant agrees to pay Landlord, at the address set forth above or such place as Landlord shall from time to time direct by written notice to Tenant, the following:

(a)     All maintenance, repair, and upkeep of the Parking Lot, which shall include, but not be limited to all snow and ice removal and plowing services;

(b)     All real property taxes and assessments levied against the Property;

---

[1] The Parties acknowledge that 801 Main Street, Buffalo, New York is the mailing address for a portion of the real property, which is commonly known by the City of Buffalo, as "785 Main Street, Buffalo, New York."

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 78 of 95

(c)     All cost to obtain and maintain insurance coverage for the Property, to the extent such insurance limits are commercially reasonable, and further subject to the requirements and limitations identified in Section 11.3 below;

(d)     Sidewalk maintenance and snow and ice removal to the extent performed by Landlord, and not Tenant and

(e)     Any costs, expenses, charges, or other payments, which Tenant is obligated by the terms of this Lease to pay to or for the benefit of Landlord.

(collectively (a) – (e), the "**Rent**").

## ARTICLE 4 -- DELIVERY OF PROPERTY

4.1     <u>Property Condition</u>.  Tenant accepts the Property in "as-is" condition.

## ARTICLE 5 -- REPAIRS

5.1     <u>Landlord's Repairs and Maintenance</u>.  Landlord shall be responsible, at its sole cost and expense, for maintaining the structural components of the Property in good condition and making all structural repairs and replacements as are necessary or desirable, in Landlord's reasonable discretion, including to: all structural components of the Property, roof, foundation, and exterior walls. Landlord shall be responsible, its sole cost and expense, for maintaining any common areas.

5.2     <u>Tenant's Repairs and Maintenance</u>. Tenant agrees that it shall, throughout the Lease, take good care of the Property and that, except for those repairs and replacements identified in Section 5.1, it will, at its sole cost and expense, be responsible for maintaining the Property (including Bishop's Garage), and shall make all necessary repairs and replacements to the Building (both internal and external), and take such action as may be necessary to preserve the same in good order, condition and state of repair, without limitation, all interior and exterior maintenance, repairs, and replacements in connection with the Property(inclusive of the Building) , the windows, doors, and other interior and exterior features of the Building, the plumbing, electrical, exterior lighting, the Parking Lot (including removal of snow and ice, sanding, and salting), building systems (excluding the HVAC system except as otherwise provided herein), and all landscaping. Notwithstanding anything to the contrary contained herein, except for any repairs required due Tenant's negligence, willful misconduct, or failure to reasonably maintain the HVAC system located within the Building (which shall be Tenant's obligation), Landlord shall make any required repairs, including, replacement, if necessary, to the main components HVAC system servicing the Property. Notwithstanding the foregoing, Tenant shall be responsible for maintaining and repairing any infrastructure of the HVAC system (including, but not limited to, ductwork, filters, vents, and etc.) located within the Building.

5.3     <u>Tenant's Alterations</u>.

(a)    Subject to the Alteration Conditions (as hereinafter defined), Tenant shall have the right, at its sole expense, from time to time, to make such interior cosmetic alterations, redecorations and changes (collectively "**Alterations**") in such parts of the Property thereof as Tenant shall reasonably deem necessary for its business purposes; provided that Tenant shall first obtain Landlord's prior written consent.

Lease Agreement – 801 Main Street
Buffalo, New York

(b) All Alteration(s) (i) shall be completed in accordance with all applicable laws, rules, regulations, and orders, including applicable building codes, and (ii) shall not affect (x) structural components of the Property, (y) the Bishop's Garage or Parking Lot, or (z) the certificate of occupancy for the Building.

(c) No Alterations shall be commenced until the following conditions are satisfied ((i)-(iii), each, an "**Alteration Condition**"; collectively, the "**Alteration Conditions**"):

    (i) Tenant shall obtain, at Tenant's sole cost and expense, all certificates, licenses, permits, authorizations, consents and approvals necessary for such Alterations, from all governmental authorities having jurisdiction with respect to the Property or Alterations. With respect to Alterations that have been approved by Landlord, Landlord shall reasonably cooperate with Tenant, at Tenant's cost, in obtaining any such certificate, license, permit, authorization, consent or approval. Notwithstanding anything to the contrary herein, any certificates, licenses, permits, authorizations, consents and/or approvals from all government authorities, which have jurisdiction with respect to the Property or Alterations, that must be obtained upon completion of an Alteration is expressly excluded from Alteration Conditions.

    (ii) Tenant shall furnish approval plans and specifications for each proposed Alteration, reasonably detailed based upon the scope of the proposed Alteration, to Landlord for prior written approval (which approval shall not to be unreasonably withheld, conditioned or delayed, provided the Alteration Conditions are met);

    (iii) Tenant shall obtain Landlord's prior approval of any contractor or subcontractor (and, Tenant shall furnish Landlord with the names, addresses and all information of any contractor or subcontractor, which may be reasonably requested by Landlord); and

    (iv) Tenant shall furnish to duplicate policies, or certificates of worker's compensation (covering all persons to be employed by Tenant, and Tenant's contractors and subcontractors in connection with such Alteration) and commercial general liability (including property damage coverage) insurance in such form, with such companies, for such periods and in such amounts as Landlord may reasonably approve, naming Landlord and its agents, and any mortgagee, as additional insured. For the avoidance of doubt, Tenant's insurance obligations may be satisfied by self-insurance as identified in Article 11 provided such self-insurance complies with all requirements of Tenant's insurance contained in this Lease specifically including, but not limited to, naming Landlord as additional insured, waiver of subrogation, and providing Landlord with ACCORD certificates of insurance.

(d) Tenant shall cause all Alterations to be made and completed in accordance with the approved plans and specifications, in a good and workmanlike manner, in compliance with all Laws. All Alterations shall be diligently prosecuted to completion. All materials and equipment to be incorporated in the Property as a result of any Alteration shall be of good quality, and no such materials or equipment shall be subject to any lien, encumbrance, chattel mortgage or title retention or security agreement. Tenant, at Tenant's expense, shall obtain certificates of final approval of such Alteration, which may be required by any

Page 3 of 14

Lease Agreement – 801 Main Street
Buffalo, New York
Case 1-20-10322-CLB, Doc 4581-1, Filed 02/09/26, Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 80 of 95

governmental authority. Tenant shall furnish Landlord with copies of such approvals. To the extent an Alteration alters the structure of the Building, upon Landlord's reasonable written request, Tenant shall provide Landlord with as-built plans and specifications.

(e) Tenant shall promptly pay all costs and expenses incurred for any Alterations, and Tenant shall at all times maintain the Property free and clear of all liens for services or labor performed or rendered, or for materials delivered, supplied or furnished, to or in connection with any Alteration(s).

5.3     HVAC and Utility Work. The parties acknowledge the heating, ventilation, and air conditioning system ("**HVAC**") and utilities that service the Property are interconnected to the HVAC and utilities serviced to the adjacent property, 795 Main Street, Buffalo, New York (the "**Adjacent Property**"). If during the Term, Landlord elects to separate the Property from the Adjacent Property, Landlord shall (i) provide notice to Tenant the earlier of (a) at least sixty (60) days prior to the beginning of separation work or (b) receipt of necessary approvals from any and all applicable municipal agencies; (ii) timely install a new HVAC to service the Property; and (iii) timely take steps to separate the utilities of the Building and the Adjacent Property ((ii) and (iii), the "**HVAC and Utility Work**"). If the costs of the HVAC and Utility Work is Two Hundred and Fifty Thousand Dollars ($250,000.00) or less, Tenant shall be liable for up to Two Hundred and Fifty Thousand Dollars ($250,000.00) ("**Tenant's Contribution**"). If the costs of the HVAC and Utility work exceed Two Hundred and Fifty Thousand Dollars ($250,000.00), Landlord shall pay the difference between the cost of the HVAC and Utility Work and Tenant's Contribution. Notwithstanding anything to the contrary herein, Tenant's Contribution under this Section 5.3 shall limited to, and in no instance exceed, Two Hundred and Fifty Thousand Dollars ($250,000.00).[2] For the avoidance of doubt, notwithstanding the fee splitting procedure identified above for the HVAC and Utility Work, Landlord shall, at its sole cost and expense, maintain, repair, and replace the HVAC and the HVAC shall be the sole property of Landlord.

ARTICLE 6 -- UTILITIES

6.1     Utilities. As of the Commencement Date, gas and water serviced to the Property are not separately metered from the Adjacent Property. Unless and until the completion of the HVAC and Utility Work, the Parties agree Tenant shall pay for its percentage share, by square footage of gas and water services to the Property. For clarity, as of the Commencement Date, the total square footage of the Building is approximately 31,500 square feet and the total square footage of the Building and Adjacent Property is approximately 126,320 square feet, for a gas and water percentage of 25% (provided the entire Adjacent Property is on the same meter, otherwise the "square footage of the Adjacent Property" shall be limited to the actual square footage connected to the same meter as the Building). Landlord shall invoice Tenant for Tenant's percentage share. Tenant shall be responsible for all other utilities used upon or furnished to the Building as of the Commencement Date or thereafter.

ARTICLE 7 -- USE

7.1     Use of Property.  Tenant shall have the right to use and occupy the Property for any lawful purpose related to a Roman Catholic Diocese and related administrative functions and agrees to not use the Property or permit the Property to be used for any other purposes without the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned, or delayed.  Tenant shall not use the Property or permit the Property to be used for any unlawful purposes or in violation of appliable laws, ordinances, or regulations.

---

[2] For the avoidance of doubt and for illustrative purposes only, if the HVAC and Utility Work costs Four Hundred and Fifty Thousand Dollars ($450,000.00), Landlord shall pay Two Hundred and Fifty Thousand Dollars ($250,000.00) and Tenant shall pay Two Hundred Thousand Dollars ($200,000.00). For further illustrative purposes only, if the HVAC and Utility Work costs Five Hundred and Sixty Thousand Dollars ($560,000.00), Landlord shall pay Three Hundred and Ten Thousand Dollars ($310,000.00) and Tenant shall pay Two Hundred and Fifty Thousand Dollars ($250,000.00)

## ARTICLE 8 -- ASSIGNMENT

8.1 <u>Assignment and Subletting</u>. Tenant shall have no right to assign this Lease and/or to sublet all or any portion of the Property without Landlord's prior written consent, which shall not be unreasonably withheld.

## ARTICLE 9 -- SURRENDER

9.1 <u>Surrender of Property</u>. Upon the expiration or termination of this Lease, Tenant shall surrender the Property to Landlord in good condition and repair, reasonable wear and tear, casualty, and condemnation, excepted.

## ARTICLE 10 -- SIGNS

10.1 <u>Exterior Signs</u>. Tenant shall have the right, at its sole expense and in conformity with applicable laws and ordinances (including variances), and subject to Landlord's prior written consent, not to be unreasonably withheld, conditioned, or delayed, to erect and thereafter, to maintain and/or replace, if it shall so elect, signs on the Property. Upon the expiration of this Lease, Tenant shall remove all such signs, and Tenant shall repair any damage to the Property caused by such the installation or removal of such signage.

## ARTICLE 11 -- INSURANCE

11.1 <u>Indemnity</u>. Tenant shall indemnify and hold Landlord harmless from any claims, damages, liabilities and expenses (including attorneys' fees and costs) for damage or injury to any person or any property occurring on the Property caused by Tenant's use or occupancy of the Property, except to the extent caused by Landlord's negligent acts or omission or willful misconduct or breach of this Lease.

11.2 <u>Tenant's Insurance</u>. Tenant agrees to provide:

(a) Commercial general liability insurance, written on ISO form CG 00 01 01 96 or its equivalent, including contractual liability for Tenant's obligations pursuant to this Lease as an "**Insured Contract**", including all obligations of indemnity hereunder (including, but not limited to, defense costs and attorney's fees assumed under this Lease, which may be payable in addition to the limit of the liability) and liability for both bodily injury and property damage, against claims for loss of life, bodily injury and property damage occurring in, on or about the Premises or with respect to the operations of Tenant in the Premises, in which the limit of such commercial general liability coverage shall be not less than Three Million Dollars ($3,000,000) per occurrence and Five Million Dollars ($5,000,000) in the aggregate (the "**CGL Policy**"). The CGL Policy shall cover liability arising from premises and operations, independent contractors, and liability assumed under an insured contract (including tort liability of another assumed in a business contract). The CGL Policy shall name Landlord and any mortgagee as additional insured such coverage to be provided through an ISO CG 20 11 04 13 form of endorsement or its equivalent. If the CGL Policy contains a general aggregate limit, such general aggregate limit shall apply separately to each location. The CGL Policy shall be written on an occurrence bases, not a claims made basis and shall be primary and non-contributory to any insurance carried by Landlord. If in the reasonable opinion of the insurance broker retained by Landlord the amount of CGL Policy coverage maintained by Tenant is not adequate, Tenant shall from time to time (but no more frequently than once every five (5) years) increase the insurance coverage as recommended by Landlord's insurance broker;

Lease Agreement – 801 Main Street
Buffalo, New York

(b) Fire, casualty, and extended risk property damage insurance on a causes of loss-special form basis covering, on a replacement cost value, all leasehold improvements, fixtures, inventory, personal property and equipment located within the Premises which includes business interruption/business income loss insurance and names Landlord and any Landlord mortgagee as loss payee;

(c) Worker's compensation and employer's liability coverage providing statutorily required benefits or a limit of no less than One Million and No/100 Dollars, whichever is greater, which such policies will contain an endorsements waiving the underwriter's rights of subrogation against Landlord;

(d) Commercial automobile insurance, to be written with a liability limit of no less than One Million and No/100 Dollars ($1,000,000.00) and which shall include owned, hired, and non-owned coverage; and

(e) An umbrella and/or excess policy with limits of no less than Ten Million and No/100 Dollars ($10,000,000.00) per occurrence or in the aggregate.

Insurance policies shall name Landlord and each of Landlord's mortgagees as additional insured and as certificate holders, to the extent available for such policy. Coverages for the Landlord and each other additional insured under any policy required hereunder, specifically including, but not limited to the CGL Policy, shall be as broad as the coverage for Tenant and shall apply as primary insurance on a non-contributory basis before any other insurance or self-insurance, including any deductible, maintained by or provided to Landlord or such other additional insured. Each such policy of insurance shall be written by one or more insurance companies licensed to do business in the State of New York with an AM Best rating of A-VIII or better, with express waivers of subrogation against Landlord and each mortgagee, and shall provide that if the insurers cancel such insurance for any reason whatsoever, or the same is allowed to lapse or expire, or there be any reduction in amount, or any material change is made in the coverage, such cancellation lapse, expiration, reduction or change shall not be effective as to Landlord or any mortgagee until thirty (30) days after receipt by the Landlord or such Mortgagee, as the case may be, of written notice thereof.

With respect to each type of insurance specified herein, Landlord's insurance shall be excess to Tenant's insurance. A copy of each policy and endorsement shall be delivered to Landlord and each mortgagee on or before the Effective Date, and copies of all policies and endorsements with respect to all renewals, extensions or replacements thereof shall thereafter be furnished to Landlord and each mortgagee at least ten (10) days prior to the expiration or cancellation of any policies and endorsements which they replace. Tenant shall promptly (and in any event at least five (5) business days prior to the date on which notice is required to be given to the insurer under such policies) notify both Landlord and the insurer in writing of any occurrence which might give rise to a claim under any of the policies required to be maintained by Tenant under this Lease. Tenant further agrees to comply in timely fashion with all of the obligations of the insured under each such policy and shall defend, indemnify and hold Landlord and each mortgagee harmless from any liability, loss, cost and/or expense suffered or incurred by Landlord or such mortgagee as a result of Tenant's failure to comply with the provisions of this Section

11.3 <u>Landlord's Insurance</u>. Landlord shall maintain comprehensive insurance on the Property and any personal property therein appropriate for Landlord's respective interests, in a commercially reasonable amount. Prior to securing an insurance policy, Landlord shall provide Tenant the opportunity to obtain an insurance estimate, through Tenant's self-insurance or an insurance broker, for the Property at such commercially reasonable coverage limits specified by Landlord (the "**Estimate**"). After review of the Estimate,

if Landlord elects to secure a policy from another broker, at a higher premium, Tenant's financial obligations shall be limited to a reasonable increase of the Estimate.

<u>ARTICLE 12 -- CASUALTY</u>

12.1    <u>No Abatement or Adjustment of Rent</u>.  If the whole of the Property shall be damaged or destroyed, or if a substantial portion thereof shall be damaged or destroyed to the extent that Tenant, in its reasonable judgment, determines that it cannot conduct business in the Property, then Rent and any other charges payable hereunder shall not be abated, unless otherwise indicated in this Lease.

12.2    <u>Repairs and Restoration of Property</u>. In the event of the destruction of the Building, the Property, or any portion thereof, by fire, explosion, the elements or otherwise, during the Term, or such partial destruction thereof as to a material portion of the Property, as reasonably determined by Landlord, then Landlord shall have a period of forty-five (45) days from the date of such destruction or partial destruction of the Property to determine, at its election, whether the Property should be rebuilt. If Landlord elects to rebuild, Landlord thereafter shall have a period of one hundred fifty (150)  days from the date of commencement of substantial repairs or reconstruction of the Property, which shall not be more than forty-five (45) days from the event of destruction, to rebuild the Property to substantially the same condition as upon initial delivery thereof to Tenant. For the avoidance of doubt, if the necessitated repairs exceed an insurance award for the damage,  the Term hereby created, at the option of Landlord, shall cease and become null and void from the date of such damage or destruction; and if such option is exercised Tenant shall immediately surrender the Property and all Tenant's interest therein to Landlord and shall pay Rent only to the time of such surrender. However, should the Property be rendered wholly or partially untenantable and unfit for occupancy but yet be repairable, at Landlord's election, Landlord shall repair the same within the timeline identified above. If the Property is rendered wholly or partially untenable and unfit for occupancy but repairable, Tenant shall continue to pay all Rent as herein provided. Tenant shall immediately notify Landlord in case of fire or other damage to the Property. No claim shall be made by Tenant in any case for compensation or damages by reason of interruption of its business through any such destruction and damage to the Property or arising from the necessity of repairing any portion of the Property. Landlord shall not be liable for any loss of or damage to property of Tenant or the interruption of Tenant's business. Tenant waives the right to make repairs at Landlord's expense If this Lease is terminated  under this Article 12, the parties shall be released hereunder, each to the other, from all liability and obligations hereunder thereafter arising.

12.3    <u>Delivery of Property</u>.  If this Lease has not been canceled hereunder as a result of any damage or destruction of the Property, Tenant shall not be required to accept delivery or possession of the Property and recommence paying Rent and other charges (or such abated portion thereof) until all of the following shall have occurred:

<blockquote>
(a)    The damaged or destroyed portion of the Property shall have been restored as nearly as practicable to the condition existing immediately prior to such destruction or damage and in compliance with all laws, ordinances, regulations, and requirements of governmental authorities having jurisdiction thereof;

(b)    If required, a certificate of occupancy or an equivalent use permit, and all other requisite permits, if any, shall have been issued by the appropriate legal authorities issuing same, and Landlord shall have delivered to Tenant such certificate(s) or photostatic copies thereof; and

(c)    If Landlord has elected to rebuild Landlord shall have delivered written notice to Tenant of the date of completion of the Property as required herein, and Tenant shall have a period of SIXTY (60) days from and after such date of completion to install all
</blockquote>

Lease Agreement – 801 Main Street
Buffalo, New York

trade fixtures, merchandise, equipment, and other personal property damaged or destroyed in connection with such damage or destruction of the Property.

## ARTICLE 13 -- CONDEMNATION

13.1     Total Taking.  If the whole of the Property shall be taken under power of eminent domain by any public or private authority or conveyed by Landlord to said authority in lieu of such taking, then this Lease shall terminate as of the date of such taking.

13.2     Partial Taking.

(a) Landlord or Tenant may, at its election, terminate this Lease upon the occurrence of any condemnation, or conveyance in lieu of condemnation, which affects:

(i)     Twenty percent (20%) or more of the floor area of the Property;

(ii)    Any portion of the access areas or parking areas whose condemnation would materially affect ingress to and egress from the Property or the ability of Tenant to park its vehicles.

The terminating party shall give the other party notice of such party's election to terminate this Lease within thirty (30) days after the parties have received notice of such pending condemnation. If Landlord or Tenant fails to give such written notice to the other party within such thirty (30) day period, the parties shall be conclusively deemed to have elected not to terminate this Lease.

(b)  If there is a condemnation, conveyance in lieu of condemnation, or other taking of a material portion of the Property (as reasonably determined by Landlord) or any portion of the Property or Adjacent Property that would make satisfying Landlord's obligations hereunder impossible, Landlord shall have the right to terminate this Lease upon written notice to Tenant within thirty (30) days after notice of such condemnation.

(c)  Notwithstanding anything to the contrary set forth herein, if any portion of the Property is condemned or conveyed in lieu of such condemnation during the last two (2) years of the term hereof then Landlord or Tenant may terminate this Lease upon thirty (30) days written notice to the other party.

13.3     Restoration.  If Landlord elects not to terminate this Lease, Landlord, at Landlord's sole cost and expense, shall promptly restore the remaining portions of the Property, as the case may be, to a condition comparable to its condition at the time of such condemnation less the portion lost in the taking and exclusive of any trade fixtures or improvements installed by Tenant, and provided that Landlord shall not be required to expend more on such restoration than the award amount.  If Landlord does not either (i) obtain a building permit for any repairs or restoration required hereunder within three (3) months of the date of taking, or (ii) complete such repairs or restoration in accordance with this Section 13.3 within nine (9) months of such taking, then, in either event, Landlord or Tenant may at any time thereafter terminate this Lease upon thirty (30) days written notice thereof to Landlord.  Rent and any other charges payable by Tenant hereunder shall not be suspended or abated

13.4     The Award.  All compensation awarded for any taking, whether for the whole or a portion of the Property, shall be the sole property of Landlord whether such compensation shall be awarded for diminution in the value of, or loss of the leasehold or for diminution in the value of or loss of the fee, or otherwise, and Tenant hereby assigns to Landlord all of Tenant's right and title to and interest in any and all such

compensation; provided, however, Landlord shall not be entitled to and Tenant shall have the sole right to recover for itself any award made by the appropriating authority for (a) the unamortized portion of any leasehold improvements installed by Tenant in the Property, (b) the cost of removal of leasehold improvements, fixtures, and other improvements installed in the Property by, or at the expense of Tenant, (c) relocation expenses, and (d) any separate award made by the appropriating authority directly to Tenant, provided that Landlord's award is not reduced by any such awards to Tenant. Tenant acknowledges and agrees that Landlord is not liable for any such damages claimed by Tenant.

13.5     Release.  In the event of any termination of this Lease as the result of the provisions of Article 13, Rent and any other charges, if any, paid in advance by Tenant shall be refunded to Tenant, and the parties, effective as of such termination, shall be released from all liability and obligations thereafter arising under this Lease.

## ARTICLE 14 -- DEFAULT

14.1     Landlord's Right Upon Tenant's Default.

(a)     Tenant agrees, and it is hereby made a condition of this Lease, that if at any time prior to or during the term of this Lease any one or more of the following events occurs, each such event shall constitute an "**Event of Default**":

(i)     If any of the Rent herein reserved shall not be paid as and when the same shall become due and payable and shall remain unpaid in whole or in part for TEN (10) days after the applicable due date and written notice of the default from Landlord, or

(ii)     If the Tenant shall default in the performance of any of the other agreements, covenants, or terms herein contained on its part to be performed or kept, and remain in default for ten (10) days after written notice of the default from Landlord, provided, however, that if the nature of the default is such that the same cannot reasonably be cured within such period, Tenant shall commence such cure and thereafter diligently prosecute the same to completion; or

(iii)     If the Tenant abandons the Property and the Property do not revest in the Tenant and remains abandoned after a period of ten (10) days.

(b)     Should an Event of Default occur and be continuing beyond the period within which to cure, Landlord, in addition to the other rights and remedies it may have, shall have the right to immediately declare this Lease terminated and the term ended, in which event all of the right, title and interest of Tenant hereunder shall wholly cease and expire upon receipt by Tenant of a notice of termination from Landlord.  Tenant shall then quit and surrender the Property to Landlord in the manner and under the conditions as provided for under this Lease.  Furthermore Landlord shall be entitled to all Rent due through the date of termination and shall have all rights and remedies available to Landlord at law and in equity.

## ARTICLE 15 -- TITLE

15.1     Subordination.  Tenant hereby subordinates this Lease to the lien of any deed of trust, mortgage or mortgages now or hereafter placed upon Landlord's interest in the Property.  The foregoing subordination shall be self-operative and require no act of Tenant to effectuate intent of the provision, however, Tenant agrees that it shall, on demand, execute such further instrument(s) as may be requested by Landlord or

Lease Agreement – 801 Main Street
Buffalo, New York

Landlord's mortgagee(s) to re-affirm and further evidence such subordination and the rights of the mortgagee with respect to this Lease and the Property.

15.2    Quiet Enjoyment.  Landlord covenants and agrees with Tenant that, Tenant may peaceably and quietly have, hold, occupy and enjoy the Property without hindrance or molestation from Landlord or any persons.

## ARTICLE 16 -- MISCELLANEOUS

16.1    Holding Over.  In the event that Tenant or anyone claiming under Tenant shall continue in occupancy of the Property after the expiration of the original term of this Lease without any agreement in writing between Landlord and Tenant with respect thereto, such occupancy shall not be deemed to extend or renew the term of this Lease, but such occupancy shall continue as a tenancy from month to month upon the covenants, provisions and conditions herein contained provided, however, the Rent owed by Tenant to Landlord shall increase by 200% for each month Tenant remains in possession of the Property after expiration of the original term of the Lease.

16.2    Notice.  All notices, requests, demands, approvals and other communications relating to this Lease shall be in writing and sent by certified mail return receipt requested, nationally recognized overnight courier, or by personal delivery, and shall conclusively be deemed to have been received on the date such notice is personally given, or, in the case of certified mail or overnight courier, on the date on which it is received or rejected:

<div style="margin-left: 2em;">

Tenant:        The Diocese of Buffalo, N.Y.
Attn: Richard Suchan
801 Main Street
Buffalo, New York 14203

Landlord:

ATTN: _____

</div>

16.3    Headings.  Headings in this Lease are for convenience of reference only and in no way define, limit or describe the scope of this Lease and shall not be used to interpret or construe this Lease or any of its provisions.

16.4    Governing Law; Venue.  This Lease shall be interpreted, construed and enforced in accordance with and governed by the internal laws of the State of New York without reference to the principles of conflicts of laws.  Any litigation or dispute resolution shall be brought in the state or federal courts located in Erie County, New York.

16.5    Entire Agreement / Amendments.  This Lease comprises the entire agreement between the parties.  This Lease may not be modified, amended or terminated nor may any of its provisions be waived except by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, termination or waiver is sought, and then such modification, amendment, termination or waiver shall be effective only in the specific instance and for the specific purpose for which given.

16.6    Successors and Assigns.  Subject to the terms and conditions hereof, the covenants, agreements, terms, provisions and conditions contained in this Lease shall be binding upon and inure to the

benefit of the parties hereto and their respective distributees, legal representatives, successors and assigns.

16.7    _Severability_.  If any term, covenant or condition of this Lease shall, to any extent, be invalid or unenforceable, the remainder of this Lease shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the extent permitted by the law.

16.8    _Counterparts_.  This Lease may be executed in one or more counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument and shall be binding upon each of the undersigned as fully and completely as if all had signed the same instrument. Moreover, signatures transmitted by electronic means including but not limited to email or PDF shall be binding as if originals.

16.9    _Law Compliance_. Tenant agrees to observe and comply with all laws, ordinances, rules and regulations of the Federal, State, County, and Municipal authorities applicable to the Property, including the Americans with Disabilities Act (as amended and/or supplemented from time to time, the "**ADA**"). Tenant shall not use or permit the use of the Property for any purpose which is illegal, dangerous to persons or property or which, in Landlord's reasonable opinion, unreasonably disturbs any tenants or occupants or operations of the Adjacent Property. Tenant shall obtain and maintain throughout the term any licenses or permits required by any governmental body for (a) the conduct of its business within the Property, (b) any Alteration(s) Tenant makes to the Property, and/or (c) any and all applicable zoning approval, special use permits and/or construction permits from the applicable government authorities as necessary for or required by Tenant's use. Tenant acknowledges that the Property is a place of "public accommodation". Tenant, at is sole cost and expense, shall make the same accessible, and shall make any modification or alterations, at Tenant's sole cost and expense, as required by the ADA or other accessibility laws. Provided, however, that if any such modifications or alterations are required, Tenant may terminate this Lease within thirty (30) days after receipt of such modification notice  and, if properly exercised, Tenant shall not be obligated to make such modifications or alterations. Tenant, shall provide Landlord with copies of any  notices it receives regarding a violation or alleged violation of any laws, ordinances, rules and regulations of the Federal, State, County, and Municipal authorities applicable to the Property, within ten (10) days after receipt of the same. If Tenant terminates the Lease under Section 16.9, the Lease shall expire with the same force and effect as if the term were, pursuant to the provisions of the Lease, fixed to expire at such time on the Termination Date. Except as identified herein, Tenant shall reimburse and compensate Landlord for all expenditures made by, or damages or fines sustained or incurred by, Landlord due to any violations of such laws, ordinances, rules or regulations by Tenant, its agents, contractors, subcontractors, employees, guests, invitees, customers, licensees and subtenants with respect to the Property.

16.10 _Mechanic's Lien_. Tenant has no authority or power to cause or permit any lien or encumbrance of any kind whatsoever, whether created by act of Tenant, operation of law, or otherwise, to attach to or be placed upon Landlord's title or interest in the Property or Adjacent Property, and any and all liens and encumbrances created by Tenant shall attach to Tenant's interest only. In the event that any mechanic's lien is filed against the Property or Adjacent Property as a result of Alterations, additions or improvements made by or on behalf of Tenant, Landlord, at its option, after ten (10) days' notice to Tenant, may terminate this Lease and/or may bond, discharge, defend or pay the said lien without inquiring into the validity thereof, and Tenant shall forthwith reimburse Landlord the reasonable expense incurred by Landlord in discharging or bonding, paying or defending against the said lien, as additional rent hereunder.

16.11 _Hazardous Substances_.  Tenant shall not conduct any activities with respect to the Property which result in the generation, storage or release of any toxic, hazardous or similar substances (as those terms may be defined from time to time in any federal, state or local law, rule or regulation). Tenant shall bear all liability for any claim, injury, loss or damage to any person or the environment as a result of any such toxic, hazardous or similar substances and Tenant will save Landlord harmless and indemnify Landlord against any such loss, claim, injury or damage which arises from, or is directly related to, Tenant's use or activities during

Lease Agreement – 801 Main Street
Buffalo, New York

the Term.

16.12 <u>Estoppel Certificates</u>. Tenant shall, at any time and from time to time upon request of Landlord, within ten (10) days following notice of such request from Landlord, execute, acknowledge and deliver to Landlord (in recordable form, if so requested), a certificate (each, an "**Estoppel Certificate**") in such reasonable form as Landlord or any of its lenders, prospective purchasers, lienholders or assignees may deem appropriate. Failure by Tenant to deliver an Estoppel Certificate within such ten (10) day period shall be deemed to establish conclusively that (i) this Lease is in full force and effect and has not been assigned, modified, supplemented or amended; (ii) all covenants, conditions and agreements on the part of Landlord hereunder have been performed; and that (iii) there are no defenses or offsets to the enforcement of this Lease by Landlord, or stating those claimed by Tenant, except as each of the foregoing may be represented by Landlord. Tenant irrevocably constitutes and appoints Landlord as Tenant's attorney-in-fact to execute and deliver any Estoppel Certificate so requested and not returned to Landlord within such ten (10) day period; provided, however, such appointment and subsequent execution and delivery by Landlord shall not be deemed to have cured any default by Tenant under this Section or the Lease.

16.13 <u>Right of Entry</u>. Landlord shall, at all reasonable times, have access to the Property for the purposes of examining the same, making repairs required to be made by Landlord, in furtherance of Landlord's management of the Property, or for the purpose of showing the Leased Premises to prospective purchasers or tenants.

16.14 <u>Definition and Liability of Landlord</u>. The term "Landlord" as used in this Lease means only the owner for the time being of the Property or the owner of a leasehold interest in the building and/or the land. Provided Landlord receives an assignment and assumption agreement from its successor, Landlord shall be and hereby is entirely freed and relieved of all of its obligations of Landlord hereunder. It is specifically understood and agreed that there shall be no personal liability of Landlord in respect to any of the covenants, conditions or provisions of this Lease. In the event of a breach or default by Landlord of any of its obligations under this Lease, Tenant shall look solely to the equity of Landlord in the Property for the satisfaction of Tenant's remedies.

16.15 <u>No Representation</u>. Tenant expressly acknowledges that neither Landlord nor Landlord's agents have made or are making, and Tenant, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this Lease, and no rights, easements or licenses are or shall be acquired by Tenant by implication or otherwise unless expressly set forth in this Lease.

16.16 <u>Authority</u>. Landlord and Tenant, respectively, hereby represent and warrant to the other party that the individuals executing this Lease on behalf of Landlord or Tenant, respectively, is duly authorized to so execute this Lease on behalf such party, as the case may be, and that the execution and delivery of this Lease has been authorized by all necessary company, corporate or partnership action. Landlord and Tenant agree to provide the other upon request reasonable evidence confirming the existence of such authority.

16.17 <u>Waiver of Covenant or Condition</u>. The failure of Landlord to insist upon strict performance of any of the covenants or conditions of this Lease or to exercise any option herein conferred in any one or more instances shall not be construed as a waiver or relinquishment for the future of any such covenants, conditions or options, but the same be and remain in full force and effect.

16.18 <u>Waiver of Subrogation</u>. The parties hereto shall procure an appropriate clause in, or endorsement for, any fire or extended coverage insurance covering the Property and personal property, fixtures and equipment located therein, pursuant to which the insurance companies waive subrogation or consent to a waiver of right of recovery, and, having obtained such clauses or endorsements or consent, waive any and all rights of recovery, claim, action or cause of action against each other, their respective agents, officers and

Lease Agreement – 801 Main Street
Buffalo, New York

employees, for any loss or damage that may occur to the Property, or to any other property, whether real, personal or mixed, located in the Property, by reason of fire, the elements, or any other cause insured against, under the terms of policies of insurance maintained, for the Property or such other property, by Landlord or Tenant (as the case may be) under the terms of this Lease, regardless of cause or origin, including negligence of the parties hereto, their respective agents and employees, provided, the waiver contained herein shall be limited by, and coextensive with, the terms and provisions of the waiver of subrogation clause or endorsement or clauses or endorsements consenting to a waiver of right of recovery.

IN WITNESS WHEREOF, the parties hereto have executed this Lease Agreement as of the Effective Date.

LANDLORD:

By:_____
Name:
Title:

TENANT:                                                    The Diocese of Buffalo, N.Y.

By:_____
          Michael W. Fisher, Bishop

Page 14 of 14

Lease Agreement – 801 Main Street
Buffalo, New York
Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 91 of 95

***Exhibit 4***

(to Bidding Procedures Order)

Notice of Auction and Sale Hearing

22232345.v6

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 92 of 95

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

## *NOTICE OF AUCTION AND SALE HEARING*

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.　　On _____ __, 2026, the Diocese filed the *Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale and Partial Leaseback of Certain Real Property Located at 785, 814, 815, 819 and 821 Main Street, Buffalo, New York; (B) Authorizing and Approving the Form of Purchase Agreement and Accompanying Lease; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief* [Docket No. ____] (the "Sale Motion").[1]

2.　　The Diocese is seeking to sell certain real property located at (i) 785 Main Street, Buffalo, New York 14203, (ii) 814 Main Street, Buffalo, New York 14203, (iii) 815 Main Street, Buffalo, New York, (iv) 819 Main Street, Buffalo, New York, and (v) 821 Main Street, Buffalo, New York (each a "Parcel" and collectively, (i) – (v), together with all improvements and fixtures located thereon, the "Real Property") to BFC Buffalo Main LLC, ("BFC") or such other purchaser who may submit the highest or otherwise best offer for the Real Property.  The sale is expressly subject to and conditioned upon the Lease Agreement between the Diocese and the Stalking Horse Bidder, or such other Qualified Bidder who makes a higher and better offer.

3.　　On _____ __, 2026, the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court") entered an order [Docket No. ____] (the "Bidding Procedures Order") approving bidding procedures (the "Bidding Procedures") and granting other relief related to the proposed sale of the Real Property.  The Bidding Procedures approved by the Court are attached as Exhibit 1 to the Bidding Procedures Order.  Pursuant to the Bidding Procedures Order, if the Diocese receives more than one Qualified Bid for the Real Property, an Auction for the Real Property shall take place on _____ __, **2026 at 12:00 noon (prevailing Eastern time)** at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107.  Only parties that have submitted Qualified Bids in accordance with the Bidding Procedures by the Bid Deadline may participate at the Auction.  Any party that wishes to take part in this process and submit a bid for the Real

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion.

Case 1-20-10322-CLB,　Doc 4581-1,　Filed 02/09/26,　Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 93 of 95

Property must submit a Qualified Bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

4.      The Sale Hearing to consider approval of the sale of the Real Property to the Successful Bidder or Back-Up Bidder free and clear of all liens, claims, encumbrances and other interests will be held before the Honorable Carl L. Bucki, United States Bankruptcy Court for the Western District of New York, at the United States Courthouse, 2 Niagara Square, Buffalo, NY 14202 on _____ __, **2026 at 10:00 a.m. (prevailing Eastern time)**, or at such other time thereafter as counsel may be heard.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than reflected on the Bankruptcy Court's docket or by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

5.      Parties can choose to appear either (i) in person at the Robert H. Jackson Courthouse, 2 Niagara Square, Buffalo, New York or (ii) telephonically (call-in 1-571-353-2301, Courtroom ID 483077448#, and security pin 9999#).

6.      Objections, if any, to the sale, or the relief requested in the Sale Motion must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Western District of New York (Buffalo Division), as soon as practicable in advance of the Sale Hearing; and (d) be served upon (i) counsel to the Diocese, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attn: Stephen A. Donato, Charles J. Sullivan, Grayson T. Walter, and Justin S. Krell; (ii) the Office of the United States Trustee for the Western District of New York, 300 Pearl Street, Suite 401, Buffalo, NY 14202. Attn:  Joseph W. Allen; (iii) counsel to the Official Committee of Unsecured Creditors, Pachulski, Stang, Ziehl & Jones, LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California, 90067-4003, Attn. James I. Stang, and 1700 Broadway, 36th Floor, New York, New York, 10019-5004, Attn. Ilan Scharf; and (iv) those persons who have formally appeared and requested service in this case pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. UNLESS AN OBJECTION IS SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER HEARING OR NOTICE.

7.      This Notice is subject to the fuller terms and conditions of the Sale Motion, the Bidding Procedures Order, and the Bidding Procedures, which shall control in the event of any conflict and the Diocese encourages parties-in-interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Real Property or obtaining a copy of any of the foregoing documents may make a written request to counsel to the Diocese, Bond Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York, 13202, Attn: Stephen A. Donato, Charles J. Sullivan, Grayson T. Walter, and Justin S. Krell.  In addition, copies of the Sale Motion, the Bidding Procedures Order, the Bidding Procedures and this Notice can be obtained free of charge at https://case.stretto.com/dioceseofbuffalo and are on file with the Clerk of the Bankruptcy Court.

2

22232353.v5

Case 1-20-10322-CLB,    Doc 4581-1,    Filed 02/09/26,    Entered 02/09/26 18:09:51,
Description: Exhibit A-Proposed Bidding Procedures Order, Page 94 of 95

Dated: February __, 2026

BOND, SCHOENECK & KING, PLLC

By: ___/s/ Stephen Donato_____
    Stephen A. Donato
    Charles J. Sullivan
    Grayston T. Walter
    Justin S. Krell
    One Lincoln Center
    Syracuse, NY 13202-1355
    Telephone: (315) 218-8000
    Fax: (315) 218-8100
    Emails:    sdonato@bsk.com
              csullivan@bsk.com
              gwalter@bsk.com
              jkrell@bsk.com

*Attorneys for The Diocese of Buffalo, N.Y.*

3