UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S OBJECTION AND MEMORANDUM OF LAW IN OPPOSITION TO
MOTION OF SAVE OUR BUFFALO CHURCHES, INC. TO APPEAR AND BE
HEARD PURSUANT TO 11 U.S.C. § 1109(b) AND RULE 2018(a)
OF THE FEDERAL RULES OF BANKRUPTCY**

Debtor The Diocese of Buffalo, N.Y. ("Diocese"), by and through its attorneys, Bond,
Schoeneck & King PLLC, respectfully submits this Objection and Memorandum of Law (this
"Objection") to the *Motion of Save Our Buffalo Churches, Inc. to Appear and be Heard Pursuant
to 11 U.S.C. § 1109(b) and Rule 2018(a) of the Federal Rules of Bankruptcy* (the "Motion to
Appear") [Doc. 4843]. In support of this Objection, the Diocese respectfully represents to the
Court as follows:

**PRELIMINARY STATEMENT**

Purporting to have an interest in this bankruptcy proceeding (the "Proceeding") by virtue
of its members' collateral pursuit of unrelated faith-based appeals to the Catholic Church under
Canon Law relating to Diocesan parish entities, Save Our Buffalo Churches, Inc. ("SOBC") filed
the instant Motion to Appear seeking entry of an order to intervene in the Proceeding "so as to
appear and be heard." [Doc. 4843, ¶ 10]. However, apart from its conclusory contention that it is

an "interested entity" - based on unsubstantiated and vague assertions concerning the "financial ruin" of parish entities that it does not represent during the pendency of its canonical appeals - SOBC has failed to demonstrate that it is a "party in interest" under 11 U.S.C. § 1109(b) because it has not demonstrated, nor can it demonstrate, that it holds a direct financial stake in the outcome of this Proceeding or otherwise possesses standing. In fact, notwithstanding its attempt to intervene in this Proceeding to raise concerns on behalf of the Diocese's parishes, all of the parishes are, and have been, actively involved and represented by counsel throughout this Proceeding. As such, SOBC lacks standing and fails to qualify as a "party in interest" to permit it to intervene in the Proceeding.

SOBC's application should be further denied because its claimed right to intervene in the Proceeding is based solely on alleged violations of Canon Law, which has no application to secular courts, and this Court is barred from interpreting or considering under the First Amendment's Free Exercise and Establishment Clauses. Indeed, these very same arguments were previously advanced by individuals affiliated with SOBC in two prior New York State Court actions last year wherein they were soundly rejected by that court and the cases dismissed in late September of 2025. Thus, SOBC's application appears to be nothing more than an attempt to re-litigate these same issues by way of a "do over" in Bankruptcy Court.

The Motion to Appear should alternatively be denied due to the delay and prejudice it will cause to the parties to this Proceeding, and its failure to comply with Rule 2019. As this Court is certainly aware, the Proceeding has now been pending for *over six years*, and a global plan of resolution (in a total amount of over $326 million) has been reached after extensive negotiations and mediation by all of the actual interested parties in the Proceeding – i.e., the Diocese, the Committee, the hundreds of victims of sexual abuse, the parishes and the Diocese's insurers –

which, if approved, would finally bring this case to a conclusion. That being the case, there is nothing for SOBC – an entity *which did not even exist until a little over a year and a half ago[1]* – to add to that plan of resolution at this late juncture and its intervention in the case would only serve to further delay an already extremely lengthy bankruptcy process, and prejudice the timely administration of the bankruptcy estate as well as the Diocese's creditors (including, most notably, the hundreds of victims of sexual abuse who have a vested interest in the prompt disposition of the Proceeding). Furthermore, although SOBC professes to represent "thousands of Catholics," it has failed to comply with Rule 2019 of the Federal Rules of Bankruptcy Procedure.

Finally, insofar as SOBC premises its application and objections on this Court's Decision and Order relating to the proceeds from the sale of the Christ the King Seminary property, its position is baseless inasmuch as that decision was recently reversed on appeal by the Decision and Order of the Hon. Meredith A. Vacca, U.S.D.J. granted on June 10, 2026.

## OBJECTION

A.      **SOBC Is Neither A Party In Interest Nor Possesses The Necessary Standing To Intervene In The Proceeding.**

11 U.S.C. § 1109(b) provides that "[a] party in interest…may raise and may appear and be heard on any issue in a case under this chapter." The text of § 1109(b) specifically delineates a number of parties that are deemed parties in interest, "including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee," but that list is not exhaustive. The Supreme Court has noted that "[c]ourts must determine on a case-by-case basis whether a prospective party has a sufficient

---

[1] SOBC acknowledges that it was not formed until November 14, 2024, and did not obtain federal tax-exempt status until June 5, 2025. [Doc. 4843, ¶ 3].

stake in reorganization proceedings to be a 'party in interest.' " *Truck Insurance Exchange v. Kaiser Gypsum Co.*, 602 U.S. 268, 277 (2024). "The general theory behind [§ 1109(b)] is that anyone holding a direct financial stake in the outcome of the case should have an opportunity (either directly or through an appropriate representative) to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest." *Id.* at 278 (citing *7 Collier on Bankruptcy* ¶ 1109.01 (16th ed. 2023)). Courts in the Second Circuit have "limited 'party in interest' standing where a party's interest in the proceeding is not a direct one." *In re Innkeepers USA Tr.*, 448 B.R. 131, 141, 143 (Bankr. S.D.N.Y. 2011) (finding an "investor in a creditor" did not have standing); *see also In re Tour Train Partnership*, 15 B.R. 401, 402 (Bankr. D. Vt. 1981) (finding a creditor of a debtor's creditor did not have standing); *see also S. Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57, 61-62 (S.D.N.Y. 1997).

Moreover, "section 1109(b) does not abrogate constitutional standing requirements— a party in interest must still demonstrate that it meets the general requirements of the standing doctrine, including whether it has alleged a personal stake in the outcome of the proceedings and whether it is asserting its own legal rights and remedies." *In re Heating Oil Partners, LP*, 422 Fed. Appx. 15, 17 (2d Cir. 2011) (citing *Etuk v. Slattery*, 936 F.2d 1433, 1440 (2d Cir. 1991); *see also Warth v. Seldin*, 422 U.S. 490, 498-499 (1975) ("This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."); *In re Roman Catholic Diocese of Syracuse*, 665 B.R. 866, 877 (Bankr. N.D.N.Y. 2024) ("In bankruptcy court, a party must satisfy (1) Article III Constitutional standing; (2) federal court prudential standing: and (3) the party in interest standing under § 1109(b)").

"A party seeking [Article III] constitutional standing must demonstrate an 'injury in fact' that is 'concrete,' 'distinct and palpable,' and 'actual or imminent,' . . . [and that such] injury 'fairly

can be traced to the challenged action and is likely to be redressed by a favorable decision.'" *In re Roman Catholic Diocese of Syracuse*, 665 B.R. at 879 (quoting *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011)). Furthermore, the "[t]he prudential standing rule…normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves" and a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014). "Courts in the Second Circuit recognize that "[p]rudential limitations on standing are especially important in bankruptcy proceedings which often involve numerous parties who may seek to assert the rights of third parties for their own benefit." *Roman Catholic Diocese of Syracuse*, 665 B.R. at 879 (citations omitted). Here, when examining SOBC's application under any of these required standing principles, it is clear that its interest in the Proceeding is not direct, and is in fact, extremely attenuated; therefore, its motion to intervene must be denied.

In the Motion to Appear, SOBC asserts that it is "a domestic not-for-profit corporation, organized and existing under the laws of the State of New York…on November 14, 2024" and "was formed for the purpose of defending parish life and preserving the Catholic Church's presence through faith-based appeals using Canon Law." [Doc. 4843, ¶ 3-4]. It further asserts that it "has been integral in accomplishing, *inter alia*, the following: the collection of over 4,000 diocese-wide mandates protesting the Road to Renewal; organizing and assisting 30 parish group in the canonical recourse process to oppose parish modification (i.e., extinctive merger, relegation, alienation: and assessment allocation decrees before the Vatican Dicastery for the Clergy. *Id.* at ¶ 5. SOBC maintains that several of these recourses resulted in Dicastery findings revoking or modifying Diocesan decrees, and claims that "every merger Dicastery Decree has stated that the

Diocese may not assess the parishes to fund any portion of the settlement of the CVA claims."
(hereinafter referred to as the "Settlement") *Id.* at ¶ 16-17.

According to SOBC, the Diocese's actions supposedly violate Canon Law and that "intervention is necessary, because SOBC and Catholics throughout the Diocese cannot rely on the Diocese or the plaintiffs that have been victimized by the Diocese to protect the interests of the parishes." *Id.* at ¶ 27. Hence, SOBC purports to assert standing in this case based on the fact that it consists of a group of parishioners who are concerned that the parishes with whom they are spiritually affiliated may be contributing funds toward the Settlement supposedly in violation of Canon Law. Nonetheless, SOBC lacks standing to intervene in this Proceeding for several reasons.

First, the interests raised by SOBC herein relate solely to the property of the Diocese's *parishes* and not its own. Despite its assertions that it has an interest in whether the *parishes* contribute toward the Settlement, neither SOBC nor its members represent or control the parishes. Instead, pursuant to Article 5 of the New York Religious Corporations Law ("NYRCL"), each of the Diocese's parishes is by law governed and controlled by a board of trustees comprised of the Bishop, the Vicar General of the Diocese, the Pastor of the Parish (referred to in the statute as a "rector"), and two lay members of the Parish's faith community. NYRCL § 91. Pursuant to NYRCL § 5 and 91, the trustees of the parishes have custody and control of all parish property and assets, and are responsible for administering same, subject to approval from the Bishop of the Diocese. Moreover, all of the parishes on whose behalf SOBC purports to raise these issues *are already, and have been, represented throughout this Proceeding by highly competent and capable counsel, including attorneys Ford Elsaesser, Esq., Timothy Lyster, Esq., and the recently retained William Heuer, Esq.* Hence, SOBC possesses no standing to speak on behalf of the parishes or to assert an interest in the use or allocation of the parishes' assets and, to the extent that it objects to

6

how the parishes utilize their assets, its objections should appropriately be raised not with this Court but with the affected parishes' board of trustees.

Second, SOBC has plainly failed to assert a direct financial stake in this Proceeding. SOBC has not alleged that it or its members are being asked in their personal capacity to pay any money or that it or its members will sustain any pecuniary injury as a result of the Settlement[2]. Instead, it takes issue with the fact that *certain of the Diocese's parishes* have been requested to contribute toward the Settlement to obtain a release from CVA liability and that *those parishes* will supposedly be harmed by these acts. *See* Doc. 4843, ¶ 12 ("The Assessments are overly excessive and would financially ruin many of the parishes."). Because SOBC has not demonstrated that it will be directly injured by these actions – a necessity to establish standing in this Proceeding – its Motion to Appear should be denied.

Lastly, in advancing its arguments, the SOBC displays a complete misunderstanding of both the existential threat posed by the CVA lawsuits to the parishes and the Diocese as a whole, and whether it is in the best interests of the parishes to make a payment toward the Settlement in order to obtain a release of all claims against them and avoid the potential total financial collapse of the Diocese[3]. In fact, as will undoubtedly be addressed by counsel for the parishes, it would be completely *antithetical* to the parishes' best interests not to participate in the Settlement because they will be left to defend against a multitude of CVA lawsuits filed against them, leaving them

---

[2] Indeed, SOBC's representative, Mary Pruski, readily conceded during her recent deposition that the SOBC is not a creditor of the Diocese or any of its parishes, and that the SOBC has not filed a claim against the Diocese in this Proceeding. *See* pp. 20-21 of the transcript of the deposition of Ms. Pruski conducted on July 16, 2026, relevant excerpts of which are attached hereto as **Exhibit A**.

[3] During her deposition, Ms. Pruski testified that she had never seen a CVA lawsuit against the Diocese's parishes, was unaware of how many CVA lawsuits had been filed against the parishes and that the SOBC had never undertaken an analysis of the legal exposure faced by the parishes in these lawsuits (*see* Ex. A, pp. 123-125). She also testified that she believed – erroneously – that the parish contributions were being used to fund the resolution of claims against the Diocese only. *Id.* at pp. 97-98. Nevertheless, she stated that the SOBC opposes confirmation of the Amended Plan based on parish contributions toward the Settlement. *Id.* at pp. 14-15.

exposed to extensive legal defense costs incurred in defending against these lawsuits, as well as potential legal judgments obtained against them by the plaintiffs in those cases.

By way of illustration, the attached chart (**Exhibit B**) lists known CVA lawsuits filed against the Diocese's parishes in Erie County alone. This chart demonstrates that the vast majority of the parishes have CVA lawsuits filed against them individually, with some parishes having as many as 20 or more suits filed against them. Ex. B. To highlight the financial risks associated with these claims, another chart (attached hereto as **Exhibit C**) lists some recent verdicts, judgments and settlements that have been reached in CVA cases in New York State. This chart demonstrates that a number of these cases have resulted in verdicts or judgments *in the milli*ons (and, in some cases, *tens of millions*) *of dollars*. Ex. C.

Accordingly, if even one claimant were to prevail in a CVA case and secure a judgment against a parish, it could (and likely would) bring about the financial ruin of that parish and a cessation of operations. This also does not take into account the legal fees that will be required to defend against these claims, which would be extensive. In fact, the only reason the parishes have not incurred such fees to date is because the Diocese secured a stay on behalf of the parishes in this Proceeding prohibiting the prosecution of CVA claims against them during the pendency of the Proceeding. It is precisely because of the dire threat that these CVA cases pose that representatives and counsel representing the Diocese's parishes in this Proceeding have fully approved and recommended the Settlement on behalf of the parishes.

**B.**     **SOBC's Papers Demonstrate That This Court Lacks Jurisdiction To Address Or Resolve Their Objections.**

SOBC's papers also readily demonstrate that this court lacks jurisdiction to resolve its objections because they revolve entirely around Canon Law. As noted, SOBC urges that intervention in this Proceeding is necessary because the Diocese and the Bishop are supposedly

engaging in, or threatening to engage in, actions that it claims are illegal under Canon Law. *See* Doc. 4843, ¶ 20-24. In other words, SOBC seeks to intervene in this case so that it can object to actions taken, or proposed to be taken, by the Diocese with respect to the Settlement because SOBC maintains the Diocese's actions – or the actions of the Bishop – violate Canon Law. Nonetheless, to permit SOBC to do so would plainly violate the Constitution.

The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." U.S. Const., Amend. I. This clause "forbids excessive government entanglement with religion." *Rweyemamu v. Cote*, 520 F.3d 198, 208 (2d Cir. 2008) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 613, 91 S. Ct. 2105 (1971)). Another right emanating from the Free Exercise and Establishment Clauses is the church autonomy doctrine. "The church autonomy doctrine provides that religious associations have 'independence in matters of faith and doctrine and in closely linked matters of internal government.'" *Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022) (quoting *Our Lady of Guadalupe School*, 591 U.S. 733, 747 (2020)). "To allow anyone 'aggrieved by [a religious association's] decisions' to 'appeal to the secular courts and have [those decisions] reversed' subverts the rights of religious associations to retain independence in matters of faith, doctrine, and internal government." *Id.* (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 114-15, 73 S. Ct. 143 (1952)).

The First Amendment, binding on the States through the Fourteenth Amendment, prohibits the making of "laws respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const, 1st Amend., 14th Amend. Consistent with these amendments, civil courts are forbidden from interfering in or determining religious disputes. To do so violates the First Amendment because it simultaneously establishes one religious belief as correct for the organization while interfering with the free exercise of the opposing faction's

beliefs. *See Maryland & Va. Eldership of Churches v Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 369 (1970). The Constitution dictates that religious institutions are to be left free to decide church matters for themselves, uninhibited by State interference. *See Serbian E. Orthodox Diocese v Milivojevich*, 426 U.S. 696, 709 (1976) ("where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them."); *Kedroff v St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952) (noting that religious organizations have a "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine").

This prohibition extends to any matter where the court is required to review or interpret Canon Law. *See, e.g., Doe v. Roman Catholic Diocese of Rockville Center*, 2024 U.S. Dist. LEXIS 124499, *9 (S.D.N.Y. 2024) quoting *In re Roman Catholic Diocese of Rockville Center*, 651 B.R. 399, 421 (Bankr. S.D.N.Y. 2023) ("the bankruptcy court correctly observed that "the Free Exercise Clause and Establishment Clause of the United States Constitution bar courts from interpreting issues of religious Canon Law to resolve disputes."); *In re Roman Catholic Diocese of Rockville Center,* 650 B.R. 765, 780 (Bankr. S.D.N.Y. 2023) (court concluding "that it may not consider arguments or corresponding evidence that rely on differing interpretations of Catholic Canon Law"); *Kraft v. Rector, Churchwardens & Vestry of Grace Church*, 2004 U.S. Dist. LEXIS 4234, * 21 (S.D.N.Y. 2004) (citing *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.,* 196 F.3d 409, 431 (2d Cir. 1999)) (holding "the Establishment Clause bars courts from exercising jurisdiction in cases where resolution of the dispute would result in the 'entanglement' of

10

government with religion" and that "[e]ntanglement occurs when a court is called upon to resolve disputed issues of 'religious doctrine and practice'.").

Here, that is precisely what SOBC is asking this Court to do – it seeks to intervene in this Proceeding so that it can somehow sway the Court to take certain action in the case based on its review, interpretation and consideration of Canon Law. Because that is expressly prohibited by the First Amendment, SOBC's motion should clearly be denied.

**1. Indeed, These Very Same Arguments Were Previously Litigated – And Rejected – In Two Prior Recent New York State Court Actions**.

In fact, these very same arguments – advanced by individuals affiliated with SOBC[4] in two prior lawsuits filed in New York State Supreme Court – were expressly rejected and the lawsuits dismissed in late September of 2025. In *Rozak v. Diocese of Buffalo, et al.* and *Reid v. Diocese of Buffalo, et al.*, groups of similarly disgruntled parishioners purporting to represent the Diocese's parishes filed suit for injunctive relief seeking to stay enforcement of certain decrees issued by the Bishop of the Diocese with respect to the merger and/or closure of those parishes and to stay financial contributions by the parishes toward the Settlement pending resolution of the canonical appeals being pursued by the plaintiffs because they claimed that the contributions would "fatally destroy the parishes." The Diocesan defendants moved to dismiss both actions, arguing, *inter alia*, that the court lacked subject matter jurisdiction over plaintiffs' claims since they impermissibly sought court intervention in ecclesiastical matters.

The court granted the motion, and dismissed the actions based on a lack of civil jurisdiction premised under the First and Fourteenth Amendments, noting:

> Though avidly and forthrightly argued by plaintiffs that the disposition rendered by

---

[4] SOBC acknowledges that it "connected 9 parish groups into a consortium that filed a civil suit against the Diocese for the assessment allocations." [Doc. 4843, ¶ 5].

the Dicastery in the Dicasterium Decree is supportive of their position for the Court to grant the relief sought in these actions, it is plain and obvious from the averments made in their supplemental papers that the plaintiffs acknowledge, accept and completely reconcile themselves to the decisional authority of the Canon Law and ecclesiastical governance of the Roman Catholic Church to be solely and ultimately responsible for the lawful disposition of all the issues raised in these actions. (See Dkt. No. 96, particularly ¶ 10 ["Plaintiffs are not requesting that the Court make any substantive determination as to the merits of the Dicastery Decree. It is respectfully submitted that it is for the Dicastery for the Clergy and the Supreme Tribunal to make the final decision in accordance with Canon Law."] and ¶ 13 ["*It is for the Dicastery and/or the Supreme Tribunal to make the final decisions.*"] and ¶¶ 14-18 [italics added]). The Court agrees.

*See* p. 10 of the Decision and Order of the Hon. John J. DelMonte, J.S.C., a copy of which is attached hereto as **Exhibit D[5]**.

Here, likewise, it would be entirely improper to permit SOBC to intervene in this Proceeding to raise the very same issues previously raised unsuccessfully in the prior New York State Supreme Court lawsuits – i.e., alleged violations of Canon Law and the supposed "financial ruin" of parishes that it does not represent[6]. Because this Court also lacks jurisdiction to review or consider such issues, SOBC's motion plainly should be denied.

---

[5] In his Decision and Order, Judge DelMonte also cited to the case of *Filetto v. St. Mary of Assumption Church of Binghamton*, 61 Misc.2d 278 (Sup. Ct., Broome Co., 1969) wherein the court held "in the hierarchy of Roman Catholic church organizations the powers, and concomitant control, descend from each respective higher church authority down ultimately to the corporate body of the individual church corporation, over the conduct of which the parishioners of that individual church have no ultimate control." Ex. D, pp. 8-9.

[6] SOBC's representative, Mary Pruski, acknowledged during her recent deposition that this application involves substantially the same canonical, constitutional and statutory rights as those raised in the prior unsuccessful *Rozak* and *Reid* actions. *See* Ex. A, pp. 115-116. Ms. Pruski further conceded that the SOBC has recourse available to it with the Catholic Church to challenge these very same issues, and has pursued that recourse. *Id.* at pp. 116-117.

**C.** **The Delay And Prejudice SOBC's Intervention Will Cause To The Adjudication Of This Proceeding, And Its Failure To Comply With Rule 2019, Warrant Denial Of The Motion.**

Alternatively, the Motion to Appear should be denied due to the delay and prejudice SOBC's intervention will cause to the parties to – and the adjudication of - this Proceeding, and SOBC's failure to comply with Rule 2019.

**1. SOBC's Intervention Would Prejudice The Parties And Further Delay An Already Lengthy Bankruptcy Process.**

Initially, SOBC's intervention at this late stage of the Proceeding would prejudice the parties to this Proceeding and only serve to further delay an already extremely lengthy Chapter 11 process. For, even if a proposed intervenor is somehow affected by the reorganization, courts "must also determine whether [its] intervention causes undue delay or prejudices the adjudication of the rights of the original parties." *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 850-851 (Bankr. S.D.N.Y. 1989); *see also Metro North State Bank v. Barrick Group, Inc. (In re Barrick Group, Inc.), 98 Bankr. 133, 135 (Bankr. D. Conn. 1989)* ("Rule 2018 gives courts the discretion to balance the needs of a potential intervenor against any delay or prejudice which would result from intervention."). Intervention should not be allowed where intervention would cause undue delay or prejudice to the original parties. *In re Ionosphere Clubs*, at 853.

This Proceeding has now been pending for over six years, and the Diocese has recently filed its Amended Plan of Confirmation (the "Amended Plan") setting forth a viable path for the conclusion of this Proceeding based on a settlement agreement reached (after extensive negotiations and mediation) between all interested parties of record – i.e., the Diocese, the Committee, the victims of sexual abuse, the parishes and the insurers for the Diocese – that would resolve all outstanding sexual abuse claims against the Diocese and its affiliates (including the parishes) for a total sum of over $326 million. [Doc. 4901]. By contrast, SOBC, which did not

13

Case 1-20-10322-CLB, Doc 4967, Filed 07/20/26, Entered 07/20/26 15:59:16, Description: Main Document , Page 13 of 16

even come into existence until November 14, 2024 (nearly four years after this Proceeding was initiated) [Doc. 4843, ¶ 3], filed the Motion to Appear literally one business day before the original deadline for the Diocese to file the Amended Plan. Moreover, one of the grounds for SOBC's proposed intervention is its pursuit of a purported "alternative source" of Settlement funding that would require legislative action on the part of the State of New York, which action it concedes "is at an impasse." [Doc. 4843, ¶ 26]. Accordingly, to permit SOBC to intervene at this late date in order to raise these additional issues and prolong its pipe dream of securing alternative Settlement funding based on New York State legislative action that may (and likely will) never come to fruition will only serve to cause the parties to this Proceeding to incur additional cost, and even further delay resolution of the Amended Plan and the adjudication of this Proceeding (which, in turn, will delay compensating the victims of sexual abuse from the Settlement).

**2. <u>SOBC Failed To Comply With Rule 2019 Of The Federal Rules Of Bankruptcy</u>.**

SOBC's motion should also be denied because it failed to comply Rule 2019. Rule 2019(b)(1) of the Federal Rules of Bankruptcy Procedure provides "[i]n a Chapter 9 or 11 case, a verified statement containing the information listed in (c) must be filed by every group or committee consisting of or representing—and every entity representing—multiple creditors or equity security holders that are:

> (A) acting in concert to advance their common interests; and

> (B) not composed entirely of affiliates or insiders of one another.

Pursuant to Rule § 2019(e), if there is a failure to provide the information required by § 2019(c), the court may, among other things, "refuse to permit the group, committee, or entity to be heard or to intervene in the case." Here, although SOBC purports to act on behalf of "thousands

of Catholics" in the Diocese and seeks to weigh in on the Amended Plan, it failed to file a verified statement containing the information required by Rule 2019 with respect to the membership it purports to represent. Thus, for this reason, too, its application should be denied.

**D.**     **SOBC's Arguments Supporting Intervention Based On This Court's Prior Decision And Order Granted On June 6, 2025 Are Groundless.**

Finally, insofar as SOBC premises its Motion to Appear and right to be heard [Doc. 4839, ¶¶ 17-18] on this Court's prior Decision and Order granted in this Proceeding on June 2025 [Doc. 3929] pertaining to the proceeds from the sale of the Christ the King Seminary property (the "Seminary Order"), its position is baseless because the Seminary Order was recently reversed on appeal by the Decision and Order of the Hon. Meredith A. Vacca, U.S.D.J. granted on June 10, 2026 (a copy of which is attached hereto as **Exhibit E)**. Judge Vacca's Decision and Order determined, among other things, "that the proceeds of the sale of the Seminary Property…are not restricted." Ex. E, p. 12.

## **CONCLUSION**

For the foregoing reasons, the Diocese respectfully submits that SOBC's Motion to Appear should be denied in its entirety.

Dated: July 20, 2026

Respectfully submitted,

BOND, SCHOENECK & KING, PLLC

By: /s/ Stephen A. Sharkey

Stephen A. Sharkey, Esq.
Avant Building
200 Delaware Avenue, Suite 900
Buffalo, NY 14202
Telephone: (716) 416-4000
Facsimile: (716) 416-7053
ssharkey@bsk.com

Stephen A. Donato, Esq.
Charles J. Sullivan, Esq.
One Lincoln Center
Syracuse, NY 13202
Telephone: (315) 218-8336
Facsimile: (315) 218-8100
sdonato@bsk.com
csullivan@bsk.com

23641065.v2