# Exhibit E

His Excellency Bishop Michael W. Fisher
Catholic Diocese of Buffalo
795 Main Street
Buffalo, NY 14203

**Date:** September 15, 2024

**Re:** Diocese of Buffalo Road to Renewal Alternate Proposal

Your Excellency,

Attached is an alternative proposal for your consideration.

We look forward to having constructive dialogue with the diocese relative to this proposal.

We continue to keep you and our entire diocese in prayer.

Respectfully,


Patrick Gorman
Save Our Buffalo Churches - SaveOurBuffaloChurches@gmail.com
716-541-7234

CC: Presbyteral Council of the Diocese of Buffalo, Philip C. L. Gray, JCL (via Email)

Case 1-20-10322-CLB, Doc 4976-5, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit E, Page 2 of 31

**Diocese of Buffalo Road to Renewal Alternate Proposal**
**From:** Save Our Buffalo Churches

**Introduction:**

Started in 2021, the Road to Renewal (RTR) objectives on web-pages, in interviews and official correspondence state that closing parishes was not the initiative's goal. Final announcements for pastoral assignments for parish families were made in August, 2023. In May, 2024, the RTR office released its "Plan to Reshape the Number of Parishes". A month later, on June 21, 2024, the Diocese released a "full list of mergers".

St. Joseph Canon Law (SJCL) has been engaged to assist our diocese in understanding the proper Canon Law processes, rights and roles of laity, priests and the bishop in addressing the concerns of the faithful with regard to parish modifications. While our parishes are individually incorporated non-profits, each parish's main goal is in saving souls and bringing others to witness Christ through His Church. We are not merely buildings, a franchise nor any other business-type model. In our parishes, we count as 'juridic persons' with subsequent collective rights that must be honored. We are concerned with the faithful souls who worship God in sacred, consecrated spaces that were built on the backbone of the immigrant families, missionaries and saints that helped establish them. The Pastoral guide provided by Pope Francis clearly states that churches should not be closed. We anxiously wait to embrace the original stated goal of RTR which was to strengthen parishes without merging/closing them..

**Summary:**

Canon law does not recognize top-down closures, and therefore the "Rightsize and Reshape" phase to the RTR is in violation to juridic persons. Most parishes had no time to implement, nor experience the benefits from the new family structure. Of the 36 parish families, 86% challenged RTR recommendations. RTR proposed closing 6 of our top 21 parishes. Inconsistent reasoning was provided, from having 'too many stop signs,' to disagreement with the RTR, or because the parish is surrounded by a commercial developer willing to purchase their property. Those reasons do not constitute the Canon Law requirement of a "grave" reason for closure. In fact, 7 of the bottom 26 parishes will remain open, including St. Joseph Cathedral, which has the 26th lowest participation number in our diocese and continues to receive a substantial annual subsidy.

There is a substantial, negative ripple effect to the community as a result of the proposed closures: Half of the food distribution sites and 3 pantries, at least one infant/mother ministry, 12-step program meeting locations, displacement of two Catholic homeschooling co-ops, and shut-down of numerous church ministerial programs. Of the 17 parishes providing Masses in foreign languages, 11 will be closed/merged. These impacts were not factored into analysis as required by Canon Law.

RTR has decreased the number of masses available for the faithful to attend. The majority of the diocese saw reassignments of priests and pastors due to RTR, which does not lend to stability. The current lack of vocations within the diocese can be addressed in other ways. We have 8 men in priestly formation, where comparable dioceses of Cleveland and Minneapolis/St. Paul have 46 and 59, respectively. Since 2019, our diocese has lost 14 religious orders and gained only 2. Youth and family evangelization should be of primary importance, yet, the budgets for these areas were eliminated as distinct line items in recent years, prompting questions. Additionally, 8 parishes with schools are scheduled to close/merge, further impacting opportunities to foster growth in the faith.

In 2007-2009, 131 churches were closed/merged. We are seeing the rotten fruits of those decisions now. One church was sold despite a Vatican ruling reversing the closure. Several sites were not relegated properly, have fallen into utter decay, altars sold on the open marketplace, and some sites have become worship centers for Islam. While RTR claims to be

Case 1-20-10322-CLB, Doc 4976-5, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit E, Page 3 of 31

aimed at revitalization and expansion, the evidence of Journey and Faith and Grace's aftermath has us asking why we should blindly trust that this approach will provide different results? Our church should be looking for opportunities to grow, not close.

Swift settlement of the bankruptcy and lawsuits will bring monetary justice to the victims, avoid additional legal costs and provide all parishes the opportunity to rebuild their congregations and support. With the sale of Fidelis, the Archdiocese of NY has funding necessary to settle any remaining lawsuits. The sale of any parish property is stipulated to remain *with that parish community* and cannot be used for settlement of lawsuits they are not party to. Instead, the sale of entities identified as 'non-essential,' Upon This Rock and other liquid asset reserves could be used to satisfy this settlement.

A survey of 150 laity showed on a scale of 1 to 5, 1 being 'strongly dislike' and 5 being 'strongly support', 84% rank RTR a 2 or less. Words like 'misinformation,' 'discord,' 'dissent,' 'awful,' 'heavy-handed,' 'horrible' are used to elaborate on the ranking given. Regarding the impact of RTR on respondents' Catholic lifestyle on a scale of 1 to 5, with 1 being 'very negatively' to 5 'very positively', 65% of respondents claim a 2 or less. Over 68% of those responding suggested more time to work within families as the proper path forward.

SJCL's Philip Gray states his research findings: historically 20-60% of laity of closed/merged parishes will stop attending Mass or leave the Church. Based on RTR data, that is 6,733-16,832 lost households or 26,930-67,326 lost souls. The financial impact to parish contributions could range from $1.8million to $4.4million. What has become the main 'solution' of RTR will contribute significantly to the defeat of its own claimed purpose.

### Recommendations:

The Road to Renewal program should be ended and personnel should be re-assigned to support the family structure instead of driving closure recommendation data. No parish that does not meet the 'grave cause' bar for closure should be closed. All outside consultants should be released. Base restructuring on the letter and spirit of Canon Law and Vatican instructional document "The pastoral conversion of the Parish community in the service of the evangelising mission of the Church", of the Congregation for the Clergy, 20.07.2020. The parish family structure should be given time to work for several years with no threat of change in the interim.

Remove the number of Mass restrictions per priest; better leverage our deacons; encourage retired priests to continue their ministry; bring in supportive orders and missionaries to help us overcome our current hurdle; strengthen vocations by investing in youth ministries and the parishes contributing the most to vocations (The Latin Mass community); and end the suppression of those priestly ministries that trigger increases in parish participation.

Resolving the diocesan financial issues should be expedited. Those legitimately wronged by the actions of any diocese employee/priest should have their grievances resolved quickly and fairly. Funding for settlements should be obtained from other sources including the archdiocese and diocesan funds. Diocese fiscal management should be reviewed for better stewardship of funds, including cutting high salary officials the diocese cannot afford.

### Next Steps:

To date, we have over 2,400 signatures challenging RTR. We plan to bring to the attention of the appropriate authorities the violations of the canonical process that have been documented to date. A procurator has been named to facilitate this process through SJCL. Additionally, we plan to support the canonical process for parish level challenges.

Contact: SaveOurBuffaloChurches@gmail.com                                                    9/15/2024 AD

25 January 2025

His Eminence
The Most Reverend Pietro Cardinal Parolin
Secretary, Secretariat of State
Palazzo Apostolico
Vaticano, Citta del Vaticano 00120

His Excellency
The Most Reverend Robert Francis Prevost, O.S.A.
Prefect, Dicastery for Bishops
Piazza Pio XII, 10
Palazzo delle Congregazioni
Roma 00193

His Eminence
The Most Reverend Lazzaro Cardinal You Heung-sik
Prefect, Dicastery for Clergy
Piazza Pio XII, 3
Palazzo delle Congregazioni
Roma 00193

Your Eminences,

By way of introduction, I serve as Procurator for about 3,200 members of the Catholic Faithful in the Diocese of Buffalo. As Procurator having domicile in the Diocese, I am writing on their behalf as well as on my own behalf. The matter for which I am writing involves elements of competence for both the Dicastery for Bishops and the Dicastery for Clergy. The significance of the matter and the involvement of multiple dicasteries encourages the involvement of the Secretary of State. For these reasons, this Appeal against the rejection of a petition made to The Most Reverend Michael Fisher, Bishop of Buffalo, is being sent to each of you. Because of the large volume of paper involved, a hard copy of all mandates is being provided to the Dicastery for Bishops only, as it seems to have primary competence in this matter. If I am wrong on this point, I ask the matter to be referred to the appropriate dicastery for address. As proof of my standing, I am enclosing copies of ten of my

mandates for the Dicastery for Clergy and the Secretary of State (Attachment 1—Mandates).

We oppose the implementation of the Road to Renewal initiative in the Diocese of Buffalo. It violates the legitimate structures of parishes, the rights and obligations of pastors, the rights of the lay faithful, and offends the unity of the Church by encouraging parishes to compete for survival and foments mistrust of ecclesiastical authority. The overall result causes significant disadvantage to the Church, especially by driving people from the practice of the Catholic Faith in contradiction to her Divine Mission. Therefore, we beg the Holy See to suspend the implementation of Road to Renewal at this time so as to encourage a proper collaborative dialogue to take place within the Diocese of Buffalo; a dialogue that will actually address legitimate pastoral planning concerns without forcing a "one-size-fits-all" plan on all parishes.

*Summary*

As reported on the diocesan 'Road to Renewal' (RTR) website ([www.roadtorenewal.org](www.roadtorenewal.org)) in 2023, the Bishop of Buffalo, Michael W. Fisher, began a pastoral planning process upon his ordination Dec. 1, 2020 (at that time named "Diocesan Renewal Task Force"). The mass-closure portion of the plan did not become public until a May 28, 2024 press conference. This press conference made public the sharp and sudden change of direction RTR was about to undertake, contrasting with its official statements posted through Spring 2024, assuring RTR was not about closures, and not about pooling of assets (Attachment 2 – 'Fr.BryanNotAboutClosures' and Attachment 3 – 'RTRFamiliesNoClosures'). The Diocese's designated media outlet, the *Western New York Catholic,* noted about the conference: "Following a meeting with more than 180 diocesan priests, the diocese shared the next step in the Renewal process publicly." It also quotes Bishop Fisher:

*"When the Renewal process began, Father Zielenieski said that it was not about closing parishes. He apologized for those remarks. "We need to acknowledge that circumstances have changed," he told reporters. "We shouldn't have said that the way we did when we started the process, because we have to be realistic about our changing climate, culture, changing demographics, changing populations. So, this process that we're embarking upon right now is going to address some of those situations."*

The conference announcement was that the 'changed circumstances' now justified the extinctive merging/closing of approximately 50% of the diocese.

The Bishop consulted with a private lay apostolate known as the Catholic Leadership Institute (CLI). We know this to be true because the Diocese of Buffalo is listed on CLI's website as a 'partner' and because the RTR website includes CLI's The Disciple Maker

Index Parishioner Survey information and results from Fall of 2022 (Attachment 4 – 'CLI Discipleship Survey'). Also, the email communications involving the diocesan planning program are sent through CLI. It seems that the intent of the consultation was to develop a pastoral plan that would consolidate resources for better efficiency in the Diocese. In practical application, that meant extinctively merging parishes, closing and selling churches, and extinctively merging parochial schools. As inadvertently admitted on the website, these consultation and planning sessions remained hidden from the pastors and the affected members of the Christian Faithful for more than a year. An anonymous employee of the Catholic Center (World Missions Diocesan Office) claims the closures have been planned for at least 5 years. Note: The contents of the RTR website: language, postings and videos, have been revised since Summer 2024. The current 'Playbook' asserts the strength of the bishop's consultations with stakeholders:

*"Bishop Mike immediately endorsed the work of the Diocesan Renewal Task Force and also deemed it necessary to have a listening ear to the Diocese before moving forward with the Road to Renewal. Bishop Mike consulted with priests, deacons, religious and the lay faithful through listening sessions. Priests had an opportunity to participate in 16 listening sessions that included each vicariate. They gathered based on years of ordination, as well as a general session for all priests held at St. Gregory the Great. Our Deacons had an opportunity to attend 15 listening sessions that included each vicariate, and a listening session for all deacons and their wives also held at St. Gregory the Great. Lay leaders have been invited to numerous sessions in their vicariates and at the Catholic Center as well. After the listening sessions and discernment, Bishop Mike believed it was time to move the Renewal forward."*

This language creates the impression in retrospect that there was a high degree of consultation. ("Bishop Fisher said the decisions were made with "extensive consultation and prayer.") However, whatever consultation occurred prior to May 28, 2024, it wasn't with the laity's awareness of planned closure of at least 50% of the diocese.

The Bishop's 'Diocesan Renewal Task Force,' of 2020 morphed into a phased roll-out of parish 'family' clusters, with the Phase 1 pilot family starting November 2022, continuing with Phase 2 in May 2023, and completed during the Summer of 2023. As said above, during this time, the diocese's publicly stated mission was explicit, repeated assurance that RTR was not about closures. On May 28, 2024, after years of clandestine planning, and after having suddenly closed St. Andrew Church and school and St. Lawrence, Buffalo, late Winter 2024, the Bishop publicly announced the closure phase of the Road to Renewal initiative. The closure of All Saints, Buffalo was to follow, also without warning, July, 2024. The expressed intent of the program was to reduce the number of parishes from 160 to 106

(originally 30%) yet ultimately resulted in the recommended reduction of 196 parishes and worship sites to 118, or approximately 60% reduction. Extinctive merger decrees were to be issued after closing dates were selected- per diocesan directive- by each affected parish (beginning October 2024). From the moment of its announced implementation, the initiative and activities of implementation have violated the rights of the Christian Faithful, including the rights of the lay members of parishes and the pastors of the parishes. It seems the Bishop understands the offense caused by implementation of his program, as both he, his Vicar for Renewal, and the Vicar General have all admitted the harm done to souls, though without acknowledging this to be anything other than difficulty adjusting to a new normal. As one such example, in a September 10, 2024 interview, Bishop Fisher stated (about final decisions), "I can tell you we had a very robust conversation with all of our pastors. Those were even more agonizing, I think, than with some of the families." Vicar General Fr. Peter Karalus has also admitted harm with the following statement taken from his letter attached later in this document: "The recent announcements of the mergers and closings of parishes have been difficult and upsetting for some. Our parish communities have been spiritual homes and the Road to Renewal initiatives to "right-size" our diocese can produce uncertainty, anger, and frustration among your parishioners."

The diocese has been explicit, publicly, that the intended extinctive merger of parishes is not based on causes arising from any specific parish targeted, but on an ideological preference of administrative governance for the Diocese. For example, the Renewal Vicar (Fr. Bryan Zielenieski) commented that the diocese has been in a "maintenance model," spending resources on the maintenance of buildings instead of evangelizing to create new growth. Yet, the RTR initiative provides no evangelical outreach that could hope to overcome the damage currently being inflicted. In contrast, it alienates the Faithful and encourages survival rivalry between parishes.

Bishop Fisher has stated:

*"The Diocese of Buffalo, like dioceses across our nation and around the world, has had to deal with some harsh realities - a decline in Church attendance, the decline of those pursuing a life in ordained ministry, the rise of secularism and shift away from the parish as the defining center of Catholic identity and the horrendous toll that the sexual abuse scandal by clergy and others has inflicted on parish life and the personal faith of so many; most especially on those who have been forever harmed in body, mind and spirit."*

Under this rationale, none of the intended mergers would be valid as there would not be sufficient cause *ad rem* for them to occur. Further, it would constitute a significant alteration of the Diocese of Buffalo—the sudden reduction of parishes by more than sixty percent (60%)—and would presumably require the permission of the Holy See given the

very large loss of fixed assets and the worsening of the patrimony condition of the Diocese (Canons 1292, 1295).

Over the past six months, many people have reached out to the Bishop and his appointees in an attempt to address concerns with the diocesan initiative. I am one of those who did so. To my knowledge, none of us who wrote received responses to our inquiries and concerns. Therefore, a group of us obtained our own canonical counsel in July 2024 and organized discussions with concerned groups from the parishes.

Organization was far from easy. The sudden reversal of the RTR initiative threw the laity into a state of shock and confusion. An extremely short window of response time was imposed on the laity by the diocese: There would be vicariate meetings beginning June 3 and ending June 13, ostensibly to determine closures (Attachment 5 – 'Vicariate Meetings'). Family listening sessions would follow, late June. From there, we would have until July 15 to create and submit 'counter proposals' (deadline ultimately extended to Aug. 5). At this time, impacted parishes, yet uninformed of canonical recourse, still trusting the diocesan program, were left scrambling, with all assets and resources tied up in preparing counter proposals. This scenario made it very difficult to organize, but we were able to reach concerned parishioners representing 12 parishes who immediately responded to the invitation to gather information about recourse. A result of these meetings was my appointment as Procurator and the intention of our diocesan-wide group to oppose the initiative because it is corrupt at its root.

We made no secret of our activities. We encouraged individuals within the parishes to engage their pastors and the diocesan process for their parishes as actively as possible. I attempted to engage the Bishop directly as Procurator of so many concerned members of the Christian Faithful. Most recently, as Procurator, I petitioned the Bishop to suspend implementation of the initiative (Attachment 6 – 'Alternate Proposal') Oct. 14, 2024. Because closure decrees are already being promulgated, it seems prudent to seek the intervention of the Holy See to suspend the process so as to avoid dozens of canonical appeals from pastors and laity.

*In iure*

Violations of Financial Administration

Canon 532: *In all juridic affairs the pastor represents the parish according to the norm of law. He is to take care that the goods of the parish are administered according to the norm of cann. 1281-1288.*

The Parish is a public juridic person by the law itself (Canon 515§3). While a diocesan bishop can and should issue norms to regulate the administration of parish patrimony, those norms cannot usurp the discretionary rights and obligations of a pastor to act as the administrator of the parish, particularly in the discharge of duties identified in Canon 1284.

Canon 1292 §1. Without prejudice to the prescript of can. 638, §3, when the value of the goods whose alienation is proposed falls within the minimum and maximum amounts to be defined by the conference of bishops for its own region, the competent authority is determined by the statutes of juridic persons if they are not subject to the diocesan bishop; otherwise, the competent authority is the diocesan bishop with the consent of the finance council, the college of consultors, and those concerned. The diocesan bishop himself also needs their consent to alienate the goods of the diocese.

§2. The permission of the Holy See is also required for the valid alienation of goods whose value exceeds the maximum amount, goods given to the Church by vow, or goods precious for artistic or historical reasons.

Canon 1293 §1. The alienation of goods whose value exceeds the defined minimum amount also requires the following:

1° a just cause, such as urgent necessity, evident advantage, piety, charity, or some other grave pastoral reason;

2° a written appraisal by experts of the asset to be alienated.

§2. Other precautions prescribed by legitimate authority are also to be observed to avoid harm to the Church.

Canon 1295: The requirements of cann. 1291-1294, to which the statutes of juridic persons must also conform, must be observed not only in alienation but also in any transaction which can worsen the patrimonial condition of a juridic person.

The United States Conference of Catholic Bishops (USCCB) issued the following particular law relative to Canons 1292, 1293 and 1295 (https://www.usccb.org/committees/canonical-affairs-church-governance/complementary-norms#tab--canon-1421-%C2%A72-lay-persons-as-judges):

By means of a Decree, dated March 31, 2010 (Prot. N. 778/2005), signed by His Eminence Giovanni Battista Cardinal Re, Prefect, and His Excellency Most Reverend Manuel Monteiro de Castro, Secretary, the Congregation for Bishops granted definitive recognition to the following defined sums. A subsequent Decree, dated May 10, 2011, with the same aforementioned Protocol Number, signed by His Excellency Most Reverend Manuel Monteiro de Castro, Secretary, and His Excellency Most Reverend Giovanni Maria Rossi,

*Subsecretary, granted definitive recognition to the sums defined in norm 3 of the complementary legislation.*

*Wherefore, and in accord with the prescripts of canon 1292, §1, the United States Conference of Catholic Bishops decrees that:*

*(1) The maximum limit for alienation and any transaction which, according to the norm of law, can worsen the patrimonial condition is $7,500,000 for Dioceses with Catholic populations of half a million persons or more. For other Dioceses the maximum limit is $3,500,000 (cf. can. 1295).*

*(2) The minimum limit for alienation and any transaction which, according to the norm of law, can worsen the patrimonial condition is $750,000 for Dioceses with Catholic populations of half a million persons or more. For other Dioceses the minimum limit is $250,000.*

*(3) For the alienation of property of other public juridic persons subject to the Diocesan Bishop, the maximum limit is $3,500,000 and the minimum limit is $25,000 or 10% of the prior year's ordinary annual income, whichever is higher.*

*As President of the United States Conference of Catholic Bishops, I hereby decree that these norms are effective immediately for all dioceses of the United States Conference of Catholic Bishops.*

*Given at the offices of the United States Conference of Catholic Bishops, in the city of Washington, the District of Columbia, on the 1st of December, in the year of our Lord 2011.*

*Most Reverend Timothy M. Dolan*
*Archbishop of New York*
*President, USCCB*

*Reverend Monsignor Ronny E. Jenkins*
*General Secretary, USCCB*

According to the website catholic-hierarchy.org, the Diocese of Buffalo enjoyed a Catholic population of 741,000 in 2022. This means that the "*maximum limit for alienation and any transaction which, according to the norm of law, can worsen the patrimonial condition is $7,500,000*" for the Diocese itself. A key phrase in the Universal Law and in the Particular Law is, "*can worsen the patrimonial condition.*" This phrase is significant in this case.

Parish Mergers and Alterations

Before extinctively merging or notably altering a parish or parishes, the diocesan bishop must hear the presbyteral council as well as those who could be harmed (Canons 50,

515§2). Notable alterations of a parish include the forced closure of its parochial school. The norms of Canons 1292 and 1293 also apply if the action could worsen the patrimonial condition of the diocese.

Transfer of Pastors

As commonly recognized in jurisprudence, a canonical transfer requires a lateral move, not a demotion. That is, the transfer must occur from one ecclesiastical office into another that possesses the same stability in law or greater stability in law. This raises an interesting question in law. Can a pastor appointed for an indefinite term be transferred into a pastor position with a term limit of six years? Or, can a pastor be transferred into a situation in which he participates in the pastoral care of a parish or parishes *in solidum*, in which the priest does not personally possess the office of pastor? It would seem the answer to both questions is no, simply because the stability of an office with a term limit is less than that of an office given with an indeterminate term. And, not to personally possess the office of pastor—only sharing in the responsibilities—is not reasonably the same as possessing the office of pastor.

Before transferring a pastor, the diocesan bishop must have a grave cause and the proposed transfer must improve the care of souls or increase the advantage of the Church (Canons 190§2, 1748). The ad rem situation of the departing parish must be considered in regards to the care of souls and whether advantage of the Church is increased. Put another way, the stability of the parish from which the pastor would be transferred from must be protected or the care of souls is harmed.

Evangelization

In its recent instruction, *"The pastoral conversion of the Parish community in the service of the evangelising mission of the Church"*, the Dicastery for Clergy provides clear guidelines and expectations on any process intending to reconfigure a diocese by re-structuring its parishes. The Mission of the Church to Evangelize is the foundation of this document. Put another way, the Holy See expects that all decisions affecting a change in juridic status or a significant alteration of a parish or group of parishes will provide more effectively for the evangelization of peoples. That is how the advantage of the Church is increased; by forming structures that facilitate its Mission of Evangelization in concrete and practical ways within the affected communities.

This is not just a fancy idea or academic undertaking. Rather, to foster proper evangelization, practical considerations must occur at a local level. As clearly articulated in the Instruction, it is not merely a question of demographics, number of priests, or amount of money available. Rather, the principle question to address is whether the

ecclesiastical structures used would be effective in increasing the advantage of the Church in her evangelizing mission?

The entire Instruction applies an important spiritual principle enumerated by such great saints as Francis de Sales and Philip Neri: *"Discerning the need to move from a situation of evil to a situation of good is easy; discerning a move from a moral good to a perceived "better" is a dangerous and often ill-advised venture."* Because of this truth, the Instruction—together with the laws and jurisprudence it explains—demands numerous levels of authentic dialogue and collaboration as well as a gradualism in implementation. Without the first, any decisions to restructure a parish or diocese will result in alienation of current members. Such effect causes disadvantage to the Church and cannot be said to exemplify authentic evangelization. The latter expectation, use of gradualism, implements restructuring with small steps that allow self-reflection and correction so as not to offend the Faithful or cause harm in the community. In truth, gradualism cannot occur without authentic dialogue. Otherwise, the steps taken, no matter how far apart they are in time, are merely a means to a predetermined end and lose all opportunity for self-reflection by a diocese and its parishes. The end results offend the unity of the Church by disenfranchising the Faithful and providing an example of pastoral manipulation to the larger community. It's the complete opposite of evangelization.

For true dialogue to occur, all parties must be welcome to the table before any preconceived outcomes are developed. Not doing so violates the praxis of synodality that has guided the Church for centuries.

*In facto*

There are four areas of harm that will occur with the implementation of the diocesan initiative: harm to financial administration of parishes and the Diocese, violations of rights in parish mergers and parish alterations, violation of priests' rights (especially those of pastors), and harm to the unity of the Church with disadvantage to her Mission of Evangelization. I will address each of these separately below. Before doing so, it seems prudent to provide some context taken from a survey of priests that was taken (Attachment 7 — 'Survey for Priests').

The survey questions regarding the diocesan initiative are found on pages three and four of the survey. The questions were posed because the Bishop has expressly stated his intention to transfer a very large number of pastors just before announcing the parishes he intends to extinctively merge. Of course, this raises significant questions about the validity of causes *ad rem* for the extinctive mergers and whether proper consultations would occur before such decisions are made. Nonetheless, it seemed prudent to ask the priests about

their perceptions of the program. Here are the preliminary results we have at the time of this Petition.

1. **Only 12% of priests** believe program reflects a proper catechesis of the people, flexibility of parish styles and identity, and gradualism as demanded by the Holy See's Instruction (#10 in the Instruction).

2. **Only 18% of priests** believe the obligations of the Instruction, #48 are properly respected by ATN.

3. **67% of priests** believe a different model for parish restructuring should be used. Put another way, only 33% of the priests believe that the diocesan initiative is a viable model for restructuring the parishes in the Diocese of Buffalo.

4. **Only 7% of priests** believe the program will increase vocations.

5. **90% or more of priests believe the program will cause a decrease in parish donations, a decrease in participation of the Faithful, and will harm missionary outreach to non-Catholics, the elderly and homebound.**

6. **89% of the priests believe the Bishop is out of touch with the unique situations of parishes in the Diocese of Buffalo.** They do not believe he understands the situation he is trying to fix.

7. **27% of pastors would use the appeal process in law if the Bishop tries to transfer them.**

8. **Fewer than 15% of priests** believe the initiative would prove beneficial if implemented as explained by the Bishop.

These numbers are alarming. They demonstrate that a super-majority of the presbyterate of the Diocese of Buffalo are opposed to the implementation of the program as intended. They do not believe the Bishop understands the evolving situation in Buffalo, and they believe that the massive number of parish mergers will cause significant harm to the Church. That all being said, a majority of priests (and lay Faithful) are not opposed to pastoral planning provided it authentically reflects the elements identified in the Instruction (proper collaborative dialogue, no preconceived arrangements, and a respect for the rights and obligations of parishes, parish churches, schools, pastors, priests, and the lay Faithful).

Within that context, please consider our four general areas of concern.

*Violations of Financial Administration*

While the diocese has publicly stated the laity's right to canonical recourse, parish organizations are suffering persecutions from pastors and RTR authorities for participating in said recourse.

Pastors are not allowed to administer their parish patrimony. As such, the parish itself does not possess its own operational funds. Not only is this a significant violation of the rights and obligations of a parish and its pastor, the arrangement has three immediate effects. First, the very large patrimonial account handled by diocesan officials without any transparency to pastors or the parishes encourages financial scandal. It is unnecessary to explain this point further, as such scandals are still being addressed both in the United States and at the Vatican. Second, the arrangement does not allow a pastor or his finance council a proper understanding of the parish's financial holdings. Finally, it discourages the necessary collaboration of the parish finance council in the administration of parish assets. With the current financial scandals occurring in the Church, this contributes to a lack of trust by the Faithful.

There is also reason to believe there is manipulation of parish funds, through a variety of methods. Though the diocese made a statement that all parishes and churches would remain 'as is' during recourse (Attachment 12 – 'Parish Appeal Guidelines'), and no closures or mergers would occur until final decisions from Rome, premature movements toward the merging of finances have been occurring in parishes involved in recourse. The first example of this is illustrated by the case of St. Pius X (Attachment 13 – 'St. PiusX Freeze Accounts'), wherein the diocese placed a moratorium on St. Pius X's spending, requested the turning in of checkbooks, and the redepositing of any funds, in anticipation of a merger with St. Gregory the Great Parish. The date of the correspondence announcing such a directive was July 10, 2024, which was prior to the revised deadline for counterproposals of impacted parishes, Aug. 5. We have reason to suspect this is not an isolated situation.

Another example of what seems to be the abuse of a regular, licit process is the example of St. Rose of Lima, Forestville. (Attachment 14 – 'St. Rose Checks' and 'Checks Situation Email'). The parishioners were told to stop making checks out to 'St. Rose of Lima,' but instead only to 'Our Lady of Mt. Carmel.' This instruction came mid-October 2024, prior even to a decree of merger being promulgated publicly. It suggests a violation of the diocese' promise to leave all 'as is' during recourse.

A similar method to the above involves the transferring of an endowment intended to secure a parish and parish church. (Attachment 15 – 'St. Mary's E. Arcade SOF') St. Mary's, East Arcade, received a nearly $500,000 endowment from its pastor in 1989. This amount was given for the express purpose of sustaining the parish and its church in perpetuity. The stipulation further directed that, in the event it should ever be sold, that money go to a

The first and foremost concern regarding financial administration in the Diocese of Buffalo is an emerging pattern of incomplete trustee boards, and trustee boards operating under seeming undue influence. During the organizational stage of the Diocesan Core Group (Save Our Buffalo Churches), we have encountered at least 3 parishes (Ascension, Batavia; St. Aloyisius; Holy Apostles, etc.) declaring 1 or no lay trustees during the period in which boards should have been complete and therefore had means of a proper vote on closure recommendations. Trustees had resigned in protest of RTR (Attachment 8 – 'Trustee Violations Holy Apostles'), or unwillingness to submit to irregular practices, and positions were left vacant. One trustee who became procurator for his parish group (Ascension) was fired mid-term under seeming false motivations. (Attachment 9 –'Ascension Trustee Letter Nowak', 'Ascension Trustee Situation,' 'OLP Trustee Removal,' 'OLPParishCouncilLtr'). The trustee was told verbally, based on diocesan directives (Attachment 10 – 'Trustee Info' and 'Trustee Procurator DOB') that he could not serve as both trustee and procurator. In writing, he was dismissed for having exceeded his term limit. The position as of this correspondence remains vacant, with the trustee awaiting a requested letter from the Bishop. Another trustee/procurator was threatened with the diocesan prohibition (Attachment 11a – 'Osmanski Trustee Email'). Yet another, who is not acting as procurator for the parish group, was dismissed as Trustee from Our Lady of Peace (Attachment 9). It is a violation of fiduciary responsibility of the parish corporation to be without a complete board. The diocese, as seen in Attachment 9, also claims pastor and lay trustees' unilateral obedience to the bishop on any matter, which is also a violation of the function of trustee boards. What's more, in the case of St. Michael's, Buffalo, this kind of pastoral disorganization resulting in a lack of fully-formed councils is used by the Diocese as justification to extinguish the parish. In Bishop Michael Fisher's Remonstratio reply letter to the parish Procurator, dated November. 8, 2024, the Bishop cites a lack of finance and pastoral councils as 'evidence' that St. Michael's has not 'functioned as an actual parish for some time.' (Attachment 11b - 'St. MichaelBpRemReply' and 'SpeersReactiontoRemReply') The guidance and instructional documents of the Church suggest the proper remedy would be to form these councils, instead of extinguishing a parish. We question the legitimacy of any closure decree when the proper body established to exercise a right to refuse such a decree, or be fully, transparently involved in discussions regarding parish modification, is either not intact, or is being ordered to operate as a bishop's rubber stamp.

The above-outlined situations would be bad enough, and yet they are not the extent of these types of violations. Also included in Attachment 9 is the letter received by a member of Our Lady of Peace's Parish Council. This member was removed from the parish council for having signed a parish mandate- as was every other member of this council except one.

The diocese not only did not heed the message and spirit of these protests, but instead used the protests to justify closures. We are concerned they will use similarly distorted data in their defense during administrative recourse. For example, though the Diocese has stated "During recourse, the parish will remain 'as is' and will not merge or close until a decision is received from the Dicastery for Clergy and/or Apostolic Signatura in Rome' (Attachment 21 – 'Guidelines for Recourse'), the distrust RTR has fomented among the laity has produced concern that parishes will, in fact, be merged both administratively and financially during recourse, effectively destroying evidence of continued support for the pre-merged parish, which the diocese may use as 'evidence' of lack of financial support.

Another form of this seeming 'diocesan-managed attrition' is the secondary worship site watchlist scenario. In cases such as St. Michael's, Mass schedule and sacramental/devotional reductions have been imposed (by diocesan directive) that have already minimized participation. Similar to that is the parish reduced to 'secondary worship site' and also given 'watchlist' targets, such as the one imposed on Sacred Heart of Jesus Parish and Shrine, Bowmasville. Please find attached the 'One-Year Watchlist Targets for Sacred Heart of Jesus' (Attachment 19b - 'SHB Watchlist P1-3'). Under the RTR watchlist, targets are given for items such as weekly collections and Mass attendance. Failing to meet these goals will result in closure. One parishioner has reported to our core group that the watchlist targets are higher even than their current metrics (Attachment 19d - 'Statement of Fact' and 'Designated as Diocesan Shrine').

This situation at Sacred Heart of Jesus Parish and Shrine is particularly noteworthy and in significant need of attention. This is a parish renowned as a beautiful and edifying diocesan shrine. This is also a parish that has suffered great instability in recent history, due in part to terminal illness of pastors (Attachment 19c - SHB History Page). The line of pastors from 1990 to present is as follows: #9 - Fr. Walter Kern (1990-2002), #10 - Fr. Mark Illig (2002-2011), #11 - Msgr. Joseph Sicari (2011) #12 - Fr. Frederick Leising (2011-2013), #13 - Fr. Joseph Klos (2013-2016), #14 - Fr. Bob Zilliox (2016-2018), #15 - Fr. Dominik Jezierski (2018-2021- He was not reinstated after Covid restrictions prevented him from reentering the U.S. after a family visit in March, 2019); #16 (listed as #15) - Fr. Lukasz Kopola (2021-2024) - (in solidum priest - moved to another parish family). Unfortunately, this instability is what parishioners believe has led to an overall weakening in parish life and ministries (Attachment 19d), leaving them vulnerable prey to the RTR. Parishioners have become so demoralized over the past 15 years, leaders struggle even now to put together a parish canonical recourse group, though they ardently desire to remain independent. The same parishioner who gave us the above statement of fact said, "We don't want to be merged into Nativity [of the Blessed Virgin Mary]. We don't want to be merged at all, but definitely not into Nativity." They feel they are being set up for failure in the form of full closure. They

charity named in his will. During Journey of Faith and Grace (~2008), the diocese reduced St. Mary's to a worship site of St. Peter and Paul, and renamed St. Peter and Paul 'St. Mary.' 'St. Mary' was subsequently renamed 'St. Mary of East Arcade.' The trustees of the new St. Mary invested the bequeath in mutual funds.

The attached letter (Attachment 16 – 'Fr. Bryan No Use') from the Diocese also makes clear that priests have been directed not to permit any parish fundraising or appeal organization on parish grounds. Multiple parish groups have sought the advice of the core group (Save Our Buffalo Churches) after being restricted according to this directive. While they stated we have the right to recourse (Attachment 17 – 'Press Conference Sept. 10'), their directives are effectively squeezing the laity out of any means of funding or organizing recourse or using and funding our parishes (Attachment 18 – 'Holy Apostles Complaint' and 'Changing Locks Jamestown' and 'Fr. Parker Threat' and 'BSC Violations').

Prior to recourse, there existed much evidence that the Diocese had either manipulated records or circumstances to bring about data to justify closure recommendations according to an 'in the red' argument. The main counterproposal argument of most parishes joining the Diocesan Core Group (Save Our Buffalo Churches) became a refutation of incorrect financial and operational data as claimed by the Road to Renewal Office. For example, the diocese, in some cases, counted capital improvement project spending as average spending of a parish in determining debt. In another specific case, St. Michael Roman Catholic Church, Buffalo, was reported by more than two sources (Attachment 19 – 'Buffalo Rising Article' and 19a 'Hager Statements of Fact 1&2') as having been reduced solely by the will of the Vicar for Renewal, and against the wishes of the resident Jesuits, from 22 Masses per week to 6, radically and inorganically reducing the participation rates and income to the parish. This occurred in the Summer of 2023, when the Jesuits in residence at the church offered to stay and continue hearing confessions and celebrating Mass, but were ordered out by the diocese because "the laity need to get used to a [coming] priest shortage." Of course this move resulted in a reduction in contributions that will likely be used to justify the St. Michael closure decree. In the attachments provided, the progression of fiscal opacity under RTR-placed pastor, Fr. Raymond Corbin, is evident. (Attachment 20 – 'StMichaelFinancialBlurb1-5 and 'StMichaelBulletin1-3' and see Attachment 11b also).

More examples exist than not, according to anecdotal evidence, that parish contributions greatly dropped not only in response to the sex abuse settlement issue- where laity refused to fund the diocese's settlement by offering tithe- but also in response to closure recommendations. St. Pius X's bulletin from late September 2024 is one of many examples illustrating this trend. (Attachment 12). See also St. Michael's evidence (Attachment 19).

worry what will happen to the shrine, as well as their cemetery. For the shrine and cemetery alone, the diocese should be applying all resources to its preservation 'as is,' occupied by a parish. The parishioners are feeling hope now that they are in contact with our core group, and with a 'path forward,' this parish desires to remain independent.

These trends and arrangements were made possible by Bishop Fisher, which allow him unnecessary and manipulative control over patrimonial rights of a parish and its donors. This point has come up time and time again in our many meetings. Whether it is true or not, the perception by a large number of the lay Faithful is that the Diocese has 'stolen' or misappropriated parish money. This perception is not caused by priests, but simply by the fact that parishes do not control their finances; the Diocese does. Because of this perception, many believe that if a parish is extinctively merged, the financial patrimony will be lost to the Diocese and the overall condition of the new parish will be worse than the collective position of the previous two parishes. Right or wrong, it is necessary to recognize that the financial scandals of the Church have bred widespread mistrust that is encouraged by archdiocesan finance policies. Given that the Bishop has expressed a direct connection between merger parishes and paying off a diocesan lawsuit that does not involve all the parishes, it is clear that he intends to take parish assets illegitimately and use them for his own diocesan purposes.

If more than half of parishes are extinctively merged as intended by the Bishop, and parochial schools are (closed) the Diocese will lose half the juridic persons it now taxes on an annual basis. Donations to the new parish structures will be significantly decreased (the Diocese is expecting a loss of 20% of Catholics, but estimates range as high as 60% depending on whether the Faithful experience transparency, compassion, and pastoral care improves with the changes) in comparison to current donation amounts. These intended mergers with the expected loss of faithful Catholics will cause a significant worsening of the patrimonial condition of the Diocese of Buffalo, ranging from an estimated $1.7 million to $4.3 million, with a 20% to 50% loss, respectively (Attachment 22a – 'Fiscal Impact on Diocese').

As a matter of record, in 2018, the Diocese of Buffalo only received $262,000.00 in donations and bequests. In 2019, that number was down 50% (Attachment 22b -'Diocesan financial report published in 2020'). It is remarkably tragic that a Catholic Diocese the size of Buffalo only received $262,000.00 in donations and bequests during a fiscal year. Most parishes in the United States with more than 100 families or more receive at least that amount of income from donations each year. The low figure of donations in 2018, and that it was halved in 2019, coincide with the implementation of the first diocesan reconfiguration plan, during which the Faithful experienced a large number of parish

mergers and church closures. The figures demonstrate that the Faithful are unwilling to support an administrative model that decreases parishes and churches at the expense of pastoral care.

In contrast, the parishes are not suffering the same magnitude of financial loss as seen at the diocesan level. In fact, many of the parishes targeted for closure are financially and morally vibrant. The lack of funding and support of the faithful to the diocese does not reflect a lack of support to the parishes. It does reflect a failed management at the diocesan level. The model being imposed, as illustrated so many times in the evidence presented in this petition, is one that usurps the legitimate authority of the pastor and proper parish administration. This has resulted in a distortion of authentic parish identity that is now being used to justify closures.

Has the Bishop asked Rome for permission to enact his plan in accord with the norm of law? Based on the statements made by the Bishop and his Vicar for Pastoral Planning, we do not believe such a request has been made.

*Violation of Rights in Parish Mergers and Alterations*

This section cannot begin without referencing the Diocese of Buffalo's last church closure program, 2007's Journey of Faith & Grace (JFG), and key examples of its deleterious effects. While the program claimed to be for the purpose of 'spiritual revitalization' and creating vibrant parish communities (Attachment 23 – 'DOB- Journey of Faith & Grace Strategic Plan') the need for the subsequent Road to Renewal program- if we were to believe there is a need- is the strongest argument against such programs for the strengthening of dioceses. It has had lasting consequences of scandalous proportions. Two churches, St. Ann's, Buffalo, and St. Mary's Lockport, are two specific examples that need to be brought to the Vatican's attention.

It is our understanding that both were sold by the Diocese of Buffalo pending completion of all appeals. The case of St. Ann's is uniquely scandalous. Parishioners won their appeal at the Congregation for Clergy (Prot. N. 20133806). Prior to that decision being reached, the Bishop of Buffalo invalidly seized the Church and Shrine from the administration of the Pastor. The doors were bolted and entrance to St. Ann Church and Shrine was prohibited by the Bishop. Following the decision by the Congregation for Clergy, the Bishop refused to restore the administration of the Church and Shrine to the Pastor. He kept it under lock and key, allowing it to fall into disrepair while his own appeal to the Supreme Tribunal of the Apostolic Signatura occurred. That process lasted more than three years. During the hearing of that appeal, the Bishop did not implement the Decree of the Congregation for Clergy as required in law. In fact, he implemented his revoked Decree of Relegation and its

appeal had reached the Apostolic Signatura. During this time, a purchaser presented with a plan to restore St. Ann's as a Catholic Church. Carol Robinson, co-chair of Save St. Ann's group, succeeded in obtaining a contract to purchase the Church on the condition that it would not be sold until all appeals were exhausted. The Diocese initially accepted those terms. However, St. Ann's was sold prior to the exhaustion of all appeals, changing hands from ST ANN S R C CH OF BFLO to Buffalo Cresent Holdings, Inc., a Muslim development entity (Attachment 24a- 'StAnnsPropertyInfo'). They reportedly plan to turn the Church into a mosque. There is reason to believe a little less than half of the total sale proceeds went directly to the Diocese instead of to Sts. Columba-Bridgid, the Parish that owned St. Ann's Church and Shrine. The diocese posted $117,234 in their 2023 financial statements, so that amount went to the diocese and not the parish. We do not know how much of the $250,000 (after expenses) went to the parish. St. Ann's has since fallen into utter disrepair. The Catholic Faithful from all over the Diocese who were parishioners of the Parish or visitors to the historic Shrine remember a regal structure that inspired Faith and drew thousands of visitors to pray. They now see a crumbling façade, broken and boarded up windows, and a failing roof. Canon Law and ecclesial guidelines (Congregation for Clergy, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, April 30, 2013, *cit.* No. 3.g; and, 2018 Vatican document *Decommissioning and Ecclesial Reuse of Churches Guidelines*) forbid churches from being sold to groups whose use would give scandal and offend the sensibilities of the parishioners. Yet, the Diocese sold St. Ann's, against contract, to a Muslim group who has permitted profound debilitation of the former Church and Shrine. Speaking for thousands of members of the Faithful, we are deeply scandalized by the events leading to the loss of St. Ann's Church and Shrine. -

St. Mary's, Lockport is another case in which a church was also sold prior to the conclusion of appeal, to a non-denominational evangelical church, 'The Chapel.' It is our understanding that an appeal against the extinctive merger of the St. Mary Parish was pending at the Apostolic Signatura (Prot. N. 44426/10 CA) at the time the Church was closed and sold.

In addition, we've identified 8 total churches that have been sold by the Diocese to Protestant, Muslim or Buddhist entities since 1993 (Attachment 24b – 'Sales to Non-Catholic Entities').

In yet further seeming violation, the Diocese sold Holy Name of Jesus Roman Catholic Church, 1965 Bailey Ave., Buffalo to New Life Harvest Church of God in Christ, in 2009. The altar from Holy Name has subsequently been found to be for sale on Facebook Marketplace in 2024 (Attachment 25 – 'Holy Name Altar FB' & '). Alarmed, Diocesan Core

Group member, Elizabeth Zilbauer, wrote to Fr. Sean Paul Fleming, Dir. of the Office of Worship for the Diocese of Buffalo, on Aug. 26, 2024 (Attachment 26 – 'Altars Sold on FB Marketplace email') regarding this sale, with no response. The selling of this altar was made possible by a failure of the Diocese to comply with Canon Law on altars, as well as the guidance documents '*Decommissioning and Ecclesial Reuse of Churches Guidelines*,' and Congregation for Clergy's *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, April 30, 2013, *cit.* No. 3.g. In light of these documents, it is particularly confusing to find that Bishop Fisher's decree to St. Jude, Sardinia, wherein he reduces St. Jude to profane but not sordid use, includes the following language: "that all altars within the church lose their consecration, dedication, or blessing by this same decree (c. 1238)."

The diocese has also renamed multiple churches (Attachment 27 – 'Renamed Churches'), and we understand only the Vatican has the authority to rename a church, out of respect for its consecrated status and the living, spiritual creature it is, with rights in and of itself.

If we are to believe the statements made by the Bishop and his Vicar for Renewal, decisions about which parish would be extinctively merged were made before the program became public (Attachment 28 - 'Closed'). The initial announcements of the diocesan initiative included two statements that have been repeated over and over again: They need to reduce the footprint of the diocese, as it is unsustainable due to bankruptcy and priest shortage, and they need to satisfy a $100 million sex abuse settlement. (Attachment 29 – 'Suchan Confident' and '160 Location Too Big to Maintain'). Due to irregularities that have become obvious in their closure recommendations, laity in general feel the closures are about a 'money grab' (Attachment 30 – 'Laity Survey Road to Renewal Responses'). Irregularities in procedure and rationale include the initial recommended closure of 5 of 21 of the most vibrant parishes (St. Bernadette, St. Jude, OL Pompeii, Holy Family, St. Andrew) in the diocese, by diocesan data standards (participation, contributions, sacraments, etc.) (Attachment 31 – '5 of 21 Top Vibrant Parishes'); closure of vibrant parishes that have high property value; merging parishes with updated, spacious, and ADA-compliant grounds and buildings into church grounds lacking these features or amenities. A factor that would make some sense of the nonsensical would be the partnership of the Diocese with CLI.

Within the diocesan process, CLI distributed a survey intended to determine the health of each parish. (Attachment 32 – 'CLI Discipleship Survey DOB 2022'). In 2022, parishioners were totally unaware of plans for a 50% closure of parishes by 2024, and submitted responses believing they were for the purpose of assisting the diocese in strengthening its ministry and the vibrancy of parishes, oblivious to any closure plans. In fact, immediately following the Diocese's 'Upon this Rock' campaign (2015), parishioners were under the

impression parishes had been shored up considerably for the long-term (Attachment 33 – 'UTR Explanation'). The survey was, in both its promotion and its temporal distance from the May 2024 press conference, wholly disconnected from any canonical process required to validly or reliably obtain lay feedback on parish modifications. Please consider:

1. The Diocese first opened commentary to laity in June 2024, after clandestinely planned and coerced closures (Attachment 34 – 'Coerced to Close') had ostensibly been imposed on pastors around March of 2024 per the statement of a Catholic Center employee. This was the scenario, despite Diocesan claims of listening sessions: "Bishop Mike consulted with priests, deacons, religious and the lay faithful through listening sessions. Priests had an opportunity to participate in 16 listening sessions that included each vicariate. They gathered based on years of ordination, as well as a general session for all priests held at St. Gregory the Great. Our Deacons had an opportunity to attend 15 listening sessions that included each vicariate, and a listening session for all deacons and their wives also held at St. Gregory the Great. Lay leaders have been invited to numerous sessions in their vicariates and at the Catholic Center as well." These listening sessions occurred at a time when RTR as a mass-closure plan had not yet been revealed.

2. The listening sessions that occurred regarding extinctive mergers and closures happened after closure recommendations were published (announced May 28, 2024 and listening sessions held late June 2024). While these sessions were promoted as opportunities to hear from the faithful, the meetings were largely confusing, with laity leaving sessions without critical answers to questions about RTR data and the proposed counterproposal process. The sessions were also reported to be sessions where parishioners from different parishes within a family often began arguing for their parish over others. In the sessions I attended, discussion and answers to questions were almost non-existent. We were told what would happen, not asked what could be done to address specific concerns.

3. The survey conducted by CLI was conducted online. There were no controls put on the survey to keep the same person from completing it more than once. In addition to the open and clear opportunity for a person to complete the survey multiple times, because of the electronic means used, it would have been very simple to write a program that would complete the survey with specific answers to specific questions, and run the program as much as one wanted. I believe it's reasonable to question whether the claimed responses genuinely represent individuals. I have not been able to find the number of survey responses received.

4. It's disturbing to view the published results of the survey now, in 2024, and realize that certain responses could justify the Diocese's stated plan to go from 'maintenance' to 'ministry' (i.e. questions nos. 5 and 10).

5. It's also disturbing to see that responses reflect majority 'great' to 'good' physical shape of churches and properties/grounds, financial stability, and the importance of relationship with 1 pastor per parish as moral shepherd. These responses seem to have been disregarded by the diocese in its planning and decision-making.

6. The survey was developed by CLI as a tool to help individual parishes, not to compare parish viability. The survey does not allow for comparison modules or data, only self-reporting information about a person's perceptions of their parish. While this can be helpful in providing information for the development of parish programs, it is not helpful in determining the *ad rem* causes for parish extinctive mergers. Put another way, the CLI survey is invalid for the purpose it is being used for by the Diocese. It's like using a screw-driver to cut a piece of wood. It can be done, but it's ugly.

7. Based on the information given in the listening sessions and on the diocesan website, in addition to the Renewal Vicar's own 'Counterproposal Instructions' to pastors that Save Our Buffalo Churches obtained (Attachment 35 – 'Fr. Bryan Counterproposal Instructions'), the planning initiative did not begin with an identification of potential concerns followed by discussion about flexible ways those concerns could be addressed in each parish. Rather, it began with a preconceived intent to implement an "urban model" of pastoral planning and reduce the number of parishes by 50% or more, and then rationalize the decision with information from the CLI survey. There was a predetermined number of closures, any divergence away from which in counterproposals would render them unacceptable. This forces all parishes into one model of structure rather than utilizing the Principles of Subsidiarity and Synodality to identify true concerns at the parish level, the Principle of Flexibility to address those concerns, and the goal of authentic evangelization to increase vocations and the participation of the Faithful. Simply put, the plan forces all parishes into a "one-size-fits-all" model that does not respect the unique spiritualities and structures of each parish community. It does so by inducing illicit and harmful competition between family parishes to fight for their right to exist in perpetuity. Some have named this process 'hunger games,' but one member of our core group calls it 'hostage negotiations.'

Examples abound of other rights violations in the RTR process. This includes the case of St. Mary's, Batavia, which had been reduced to a worship site during Journey of Faith and

Grace (~2007). The Vicar Forane attempted to prematurely close the church on July 28, 2024, more than 1 month prior to final closure decisions being published, and without a decree. A letter was read at the 7:30 a.m. Mass (Attachment 36 – 'St. Mary's Letter'), announcing the closure, with final Mass scheduled for Aug. 14. The letter also informed the parishioners that the pastor was being placed on sabbatical, making the closure necessary. The Bishop was to celebrate the final Mass, but when the time came, a local news reporter discovered the Bishop was not present for the Mass, and a follow-up call to the Diocese informed her that it was not the 'final Mass' after all. According to a parishioner, two days later, doors were locked, and employees were not permitted to retrieve personal items (Attachment 37 – 'Locked Out'; 'Buckley Article'; 'St. Mary's Doors Locked Staff Intimidated'; 'St. Mary's Closing').

St. Jude, Sardinia, reduced to 'profane but not sordid use,' and also sold within one single decree, was listed on the reality market 147 days as of Oct. 9, 2024, with the bishop's decree dated Sept. 24, 2024. This means, 131 days prior to the dating and promulgation of St. Jude's decree, it was listed for sale. (Attachment 38 – 'St. Jude's Listing'; 'St. Jude, Sardinia decree').

St. Andrew Roman Catholic Church and Country Day School, Tonawanda, were closed in June, 2024. Though the announcement was made in February, 2024, the announcement came as a clear surprise to parishioners and school families alike. School administration was in ongoing talks with the Diocese, planning the future of the school. When the sudden closure announcement came last February, they felt deceived and betrayed. (Attachment 38a - 'St. Andrew's WBEN' and 'St. Andrew's Closure Post' and 'Heartbroken'). Even more significant than this, one lay trustee of St. Andrew claims they never saw a merger decree or a closure (relegation/alienation) decree for the parish and parochial church. The diocesan core group attempted to obtain a statement of fact from a parish trustee on this matter, who claimed she never saw one decree, let alone two. However, this trustee was unable to provide a statement prior to our appeal deadline. There are no closure decrees listed on the Diocese of Buffalo website. Important to note, seemingly without a single decree, the diocese moved very rapidly to liquidate St. Andrew's, holding a 'final sale' of church and school furniture and items the first week of August, 2024. The final Mass was held June 30, 2024. (Attachment 38b -'St. Andrew's Final Sale').

St. Lawrence Catholic Church, Buffalo, closed under RTR, had its final Mass August 10, 2024. It was listed for sale ($500,000) as early as July 12, 2024. There appears to be no merger or closure decrees for this parish either. (Attachment 38c - 'Diocese Lists St. Lawrence for Sale')

Once again, directives coming from the Road to Renewal Office and the diocesan leadership have repeatedly prohibited members of parish juridic persons to use their own churches to raise money, organize appeals, promote recourse, or in any way prove they are willing to fund, repair or use their church. (Attachment 39 – 'Fr.BryanProhibitsFundraisingUse' and 'Trustee Info').

Aside from a laity survey compiling reactions and feelings of laity diocese-wide, we have testimony submitted in the form of screen-shot Facebook private group membership requests. The 'lay testimony' we've collected was mainly given in response to membership questions individuals had to answer to join FB group 'Buffalo Catholic Beacon,' which was formed in response to increasingly manifest diocesan corruption, and upon learning from a Catholic Center employee that there were clandestine plans afoot to close churches and schools. We have 60+ such examples of lay testimony reflecting the concerns, frustrations and distrust of a variety of laypersons whose common thread is objection to RTR (Attachment 40 – 'LayTestimony' #s 1-61).

In addition, based on evidence obtained both by published closure decrees and the anonymous testimony of a member of the presbyteral council, we have reason to believe the Bishop's consultation with the presbyteral council over the closure of 78 worship sites was abysmally inadequate, and seemingly illicit. First, published decrees are so far all stating the council met and determined a final decision on the same two days. (Attachment 41 – 'Ascension Closure Decree' and 'St. Brigid Decree'). The relaying of an anonymous presbyteral council member's opinion of the meetings with the Bishop also suggests 'rubber stamping' predetermined decisions and priests intimidated and unwilling to dissent from the Bishop's plan. (Attachment 42 – 'Presbyteral Council Testimony' and 'Presbyteral Council Inadequate').

While the diocese justifies closures by asserting a 'future prediction of a lack of priests,' such that the number of Buffalo Catholics cannot be adequately served, data compiled from Catholic Hierarchy (catholic-hierarchy.org/diocese/dbuff.html), in comparison with Diocese of Buffalo Directory data, indicates several items of note. The DOB Directory reports approximately 165,000 fewer Catholics in 2022 than what was reported to the Vatican, and a 183,000 person difference between the Vatican-reported total number of Catholics in 2022 and the Diocesan Directory-reported data available to us for 2023 and 2024 continues this trend. We question this. The percentage of Buffalo Diocese Catholics seems higher than compared dioceses due to this. Overall, this information does not align with RTR data. Our diaconate is strong. We could have 1.3 priests per parish as it currently stands, without leveraging deacons. This is comparable to the other dioceses. (Attachment 43 – 'DOB Trends-Priest' and 'DOB Directors Stats 24').

Lastly, for reasons unbeknownst to the Core Group, human resources making alternate ministerial arrangements possible in our situation have diminished greatly in the Diocese since 2019. According to research done by the Core Group via Diocesan directories, we have lost 12 religious orders (Attachment 44 – 'Loss of Religious'). There is a serious crisis going on in this diocese, the roots of which need to be identified and addressed. Instead, the diocese is stripping away roots and fruits and 'bidding the geldings be fruitful.'

If a diocesan reconfiguration plan is intended to begin with collaborative dialogue aimed at advancing the evangelizing Mission of the Church, why would a decision be made to close 50% of the parishes before any dialogue occurs? How is planning to lose 20% of active Catholics an act of evangelization? Legitimate cause for extinctive mergers of parishes require a cause *ad rem* unique to the parish affected. How can a preconceived plan to close so many parishes be considered legitimate?

*Violation of Rights in the Transfer of Pastors*

During the pastoral planning process, the Diocese has made numerous statements about the lack of priests in the Diocese. Presently, there are 160 parishes and 202 diocesan priests. As of the Summer of 2024, there were 104 Religious Priests and Brothers, and 127 Permanent Deacons. 135 priests were listed as 'retired,' 'sick,' or 'absent.' There is no clergy shortage at this time in the Diocese of Buffalo. In fact, there is mounting evidence that the Diocese is acting in a way antagonistic to the remediation of a priest shortage issue. For example, Bishop Fisher has recently (December 2024) refused the incardination request of Fr. Justus Ndyamukame, who has stated his priestly faculties within the Diocese will end Jan. 31, 2025. There is no evidence that Fr. Justus is guilty of any grave cause that would justify an incardination refusal, but instead is a much-beloved priest, whose former parishioners are shocked and saddened at this incongruous decision. Save Our Buffalo Churches has encouraged Fr. Justus to exercise his canonical rights. There are also two (2) current Diocesan seminarians who are being permitted by the Diocesan Vocations Director, Fr. David Baker, to serve in states outside of New York after ordination. This permission doesn't align with a supposed magnitude of crisis that justifies closing and selling half of parochial properties due to 'priest shortage.'

From a practical perspective, it seems unreasonable to spend millions of dollars in consultation fees to CLI with a preconceived intent to close half the parishes, only to neglect developing a stronger vocations plan while there are still enough priests to staff the parishes.

While the Diocese has not publicly stated that it intends to lower the retirement age of priests from 75 to at least 70 years of age, there is evidence that early retirements have begun to be approved (one notable example is Fr. Joseph Rogliano, who retired at 69 with full benefits and pension, and prior to an accusation of abuse being determined credible (which, by new policy set forth under Bp. Fisher, would've disqualified the priest from benefits and pension). (Attachment 45 – 'Fr. Joe Rogliano' and 'Accused No Pension Policy'). This would have the immediate effect of removing about 25% of the active priests from ministry. In July of 2023 (Attachment 46 – 'Latest Pastoral Assigments DOB' and 'Changes to Pastors DOB'), we find evidence of the Bishop's continued transfer of the majority of pastors (even those with indefinite assignments) to "parochial vicar" status with multiple priests assigned to multiple parishes, as part of RTR. The Bishop did aggregate parishes in clusters of two to six parishes and assign a certain number of priests to the cluster based on the number of parishes clustered. Anecdotal evidence suggests the Bishop placed priests aligned with his closure ideology in pastoral positions, completing the aforementioned argument regarding trustee board violations. Priests who refused to resign their title of 'pastor' (eight in total) were given the title of *in solidum*; three of whom have since been removed, either by forced sabbatical (Fr. Matthew Zirnheld), placed on administrative leave (Fr. Walter Grabowski) (Attachment 47 – 'Fr.Grabowski'), or 'other' (Attachment 48 – 'Family 12 Clergy Update'). He expressly has told the priests that they would have to move out of certain rectories, forcing many to travel to the parish they are assigned to (i.e. Fr. Jozef Dudzik, transferred from St. Josaphat Family, Cheektowaga, to Batavia, but living in Pavilion (a min. 12 mi. distance; vacated by Fr. Zirnheld).

The Bishop's expressed intention to transfer a large number of pastors without first identifying sufficient grave cause and advantage to the Church *ad rem* for each transfer is extremely alarming. It violates the rights of pastors and the Rule of Law. In note of fact, one anonymous priest composed a letter stating his objections to the RTR, based on Canon Law (Attachment 49 – 'Letter from Priest Regarding RTR'). At best, the Bishop's expressed intention to transfer the pastors and form pastorates on such a wide level will cause instability with the Diocese and harm the Mission of the Church. As noted above, 48-65% of pastors are reporting they will appeal such decisions. A super majority (90%) believe the Bishop's plan is harmful.

We have surveyed the Faithful of the Diocese, and results are attached. (Attachment 30 - 'Laity Survey RTR Responses'). Nonetheless, apart from any survey of the lay Faithful, we know that groups of parishioners from more than 30 parishes have either conducted their own discussion sessions or participated in one organized by another parish group. More than 25 parish groups have begun some form of organization in their parish with the intent to oppose the proposed changes identified for their parish. All have organized to the point

that they have engaged in a canonical process to oppose the planned alterations of their parishes. And, more than 3,000 have mandated me to oppose the pastoral planning as a program of the Diocese of Buffalo. The number of mandates continues to grow.

If the Bishop's plan is implemented, I cannot predict how many priests or parish groups will actually take legal action against him, but the indicators right now point to a significant number. At very least, the indicators prove that more than 85% of priests are opposed to the implantation of the plan in its current form, and between 20% and 50% of practicing Catholics will remove their support of the Diocese and cause a worsening of the patrimonial condition both at a moral and financial level.

*Harm to the Unity of the Church and Disadvantage to her Mission of Evangelization*

The closure phase of RTR was imposed on the laity after grouping parishes into families. While the 'pilot' families were started in late 2022, the final families were formed midway through 2023. The diocese was explicit in its purpose of family grouping- to strengthen parishes with no plans to close, and to effectively collaborate and share resources for a 'strong future.' The Diocese gave us only 2 years to undergo this massive overhaul, and apparently prove it unsuccessful, while they oddly extended to all parishes diocese-wide the very program they've now judged by 'data' to be a failure. The laity were still adjusting to the family overhaul when we were hit with draconian closure recommendations that mergers theoretically aim to avoid. Furthermore, data accumulated by family 'pillars' as requested by the Diocese, was then used to justify the closure recommendations. To describe this process as a 'top-down, aggressive approach' would be a charitable understatement in the extreme. This process has been, and continues to be, contempt in action on the part of the diocesan authorities, and its effects have been felt acutely through the Diocese in the form of angst, distrust, disenfranchisement and disgust.

To illustrate the vehemence of opposition to the closure recommendations, 30 out of 36 families of parishes made counterproposals (when permitted by the pastor), testifying clearly to disenfranchisement of diocesan laity. With 83% of impacted families objecting to diocesan recommendations, it is certain the proper process of *ad rem* parish consultation and dialogue had not taken place. Nor would the 'counterproposal' process, which rigidly held laity to a fixed number of pre-determined closures (Attachment 33 and Attachment 50 – 'RTR Rejection Letter'), serve as adequate or genuine consultation or collaboration on alternates to closures.

We have on record the testimony of 60 members of the laity in the form of social media post screenshots, heretofore referenced as attached, expressing angst, distrust, and disenfranchisement. We have the results of a circulated Laity Survey, heretofore referenced

as attached. We also have the acute issue of the Diocese closing most parochial elementary schools, with others rumored to be closing in the next year. When the main stated diocesan plan going forward is 'evangelization' and producing 'vibrant parishes' where resources are no longer used for 'maintenance,' it is odd at best that the diocese should be shuttering what used to be the main source of Catholic evangelization in our culture: the Catholic elementary school.

Bp. Fisher is on record at a September 10, 2024 press conference alluding to a radical reimagining of Catholicism in Western New York. He stated: "...And so, what we propose, is a new way of defining the Catholic Church in WNY. A new way of defining parish boundaries and a new way of considering how best to be that true family of faith..." We believe the mass reduction in the 'footprint' of the diocese and this reimagining are inextricably bound.

Lastly, two notable, recent sales of diocesan entities illustrate concretely the scandal to the Faith produced in direct contradiction of the diocese's stated intent of evangelization. The first example is drawn out in the alienation decree of St. Jude, Sardinia (Attachment 38). The diocese was prepared to sell this property, prior to decree, to Seventh Day Adventists. In the decree, the Bishop reasons that, "In the case of St. Jude church, no scandal is expected based on an appreciation for ecumenism and the changing demographics of the area." We would ask: "Whose duty and obligation has it been to ensure that such ecumenism-based lack of scandal wasn't a reality in the first place?" It has been by the diocese's own failure of mission that they now rationalize and justify the 'selling out' of our churches. Another example of scandal is the sale of the diocese's only seminary, Christ the King, closed in disgrace in February, 2020. On Oct. 29, 2024, the bankruptcy court approved the sale of Christ the King for $4.2 million to World Mission Society of God, considered by popular culture to be a 'cult.'

Evangelization is the Mission of the Church (Mt. 28:19-20; Mk. 16:15). Quite simply, it is difficult to understand how reducing the number of priests by imposing a lower retirement age, implementing a plan that will admittedly decrease the number of active Catholics by at least 20%, and remove Catholic schools and parishes that are currently viable can be called "evangelization." This can only cause disadvantage to the Diocese and the Church as a whole, and directly harm the priests and the Faithful they serve in individual parishes and schools. The entire experience of the planning process has only encouraged mistrust and any decisions made against priests, parishes or schools within the current process will only cause immediate and direct harm to the unity of the Church.

*Votum*

It is our hope that the Holy See will accept this Appeal in an effort to encourage proper collaboration and dialogue between our Bishop and all the Faithful under his care. It is also our hope that acceptance of this Appeal will eliminate the need for the large number of canonical appeals that will come from both priests and the Catholic Faithful when decrees of transfer, extinctive merger, and closure are issued.

**Therefore, 90 days having passed since the Bishop of Buffalo received our Petition, on my own behalf and on behalf of the people for whom I hold mandate, I beg the Holy See to provide the following:**

1. **Suspend the implementation of the Road to Renewal before any further decisions are promulgated;**

2. **Suspend the execution of any decision already made in implementation of the Road to Renewal program, including the suspension of any pastor transfers, establishment of *in solidum* pastorates, closures of schools, mergers of parishes, and any other implementations of the Road to Renewal process;**

3. **Direct the Bishop to open a new collaborative pastoral planning process that implements the principles and elements of authentic dialogue, objective identification of concerns, flexibility in structures, and gradualism, all aimed at respecting the unique identities of parishes and their specific contributions to the evangelizing Mission of the Church.**

With assurances of my prayers, I remain,


Yours in Christ,


Patrick Gorman

Procurator

102 Oakbrook Dr.

West Seneca NY 14224


Copy: Mandaters