# Exhibit G

Case 1-20-10322-CLB,   Doc 4976-7,   Filed 07/22/26,   Entered 07/22/26 17:16:01,
Description: Exhibit G, Page 1 of 22

2 July 2025

Patrick Gorman
102 Oakbrook Drive
West Seneca, New York 14224

His Excellency
The Most Rev. Michal W. Fisher
Bishop, Diocese of Buffalo
795 Main Street
Buffalo, New York 14203

Your Excellency,

Thank you for your letter of 23 June 2025 responding to my 14 June 2025 letter. I received your letter on June 26. I had raised issue with the methodology used to assess parishes in the Diocese of Buffalo. My letter recognized that all material published on the matter was obtained from diocesan press releases and lacked your specific intervention or recognition as the Diocesan Bishop of Buffalo. In response, you rejected my requests claiming there was no cause for a decree and nothing to promulgate. You based your decision on the claim that the allocation methodology utilizes the norms of Canons 1291-1295 and originate from the individual parishes. In specific response to your letter, please consider.

Your letter constitutes an administrative act in the form of a published decision. It constitutes the first expression of intention published with your signature regarding the methodology used to assess each parish's contribution to the purported Chapter 11 settlement. As such, please accept this letter as a *remonstratio* against your stated intention to assess the parishes as expressed in your letter.

**Canon 1263**

Regarding the 9 June 2025 Press Release of the Office of Communications, you are correct. I did interpret the means by which *you* intend to settle the diocesan bankruptcy to be in the form of an extraordinary tax as in Canon 1263. Although the Press Release does not use the word "tax" or refer to said canon, it is in fact what is described therein:

> *Each Parish will receive a detailed statement of their expected contribution to the settlement fund. The contribution is based upon a progressive percentage applied to the parishes' self-reported and unrestricted assets held as of August 31, 2024, the end of the Diocesan fiscal year ...*

> *All payments are required to be received by the Diocese by July 15, 2025, and will be held in reserve until the settlement is confirmed by the federal bankruptcy court. Parish contributions from this process total $80 million of the $150 million settlement proposed by the Diocese to the Creditors' Committee and accepted in principle.*

According to this Press Release, this is the means that:

- *You*, as the diocesan bishop and juridic administrator of the Diocese of Buffalo, have chosen to pursue $80 million in funds from all parishes in a case of grave necessity, i.e. to settle the diocesan bankruptcy.

- *You* will be giving each public juridic person or parish subject to your governance a financial statement identifying an amount that each parish is to contribute to the diocese.

Case 1-20-10322-CLB, Doc 4976-7, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit G, Page 2 of 22

- *You* are expecting each parish to contribute. In other words, you are exacting an amount from each parish in order to total $80 million.

- *You* intend to exact an amount from each parish that is proportionate to the self-reported and unrestricted assets of each parish.

- *You* expect the amount by 15 July 2025.

- *You* expect the contributions from all parishes in the Diocese of Buffalo to total $80 million.

- The terms "*assessed*" and "*assessment*" are used in the press release. Both are synonymous to the use of the word "*tax*" as demonstrated in your annual appeal in which you "*assess*" parishes an ordinary tax.

- The 16 June 2025 Press Release also used the term "*assessment*" to describe the contributions made by the parishes to the settlement.

## Canon 1285

Subsequent to my mailing the June 14 letter, diocesan authorities gave interviews to the press in which they described the contributions by the parishes as being "voluntary." If voluntary and not a tax, the contribution would be a donation. This is governed under Canon 1285, which only allows a pastor to make a donation out of moveable goods up to the amount of ordinary administration. In the Diocese of Buffalo, I understand this to be $15,000.00. This amount is substantially less than that assessed to the parishes.

## Canons 1291-1295

Regarding your June 23 letter, it is not canonically proper to describe the methodology of acquiring $80 million from parishes as individual acts of alienation according to the norms found in cc. 1291-1295. Consequently, the procedural formalities of cc. 1292 *et al* are irrelevant and invalid.

As you state in your letter, "These canons cover how a public juridic person [e.g. a parish in the Diocese of Buffalo] may freely give a substantial amount of its assets to another public juridic person [e.g. the Diocese of Buffalo]." Therefore the competent authority in c. 1291 is the *parochus* who is the juridic administrator of the parish—the entity that owns the funds that you expect to acquire. The diocesan bishop is not the competent authority to make this decision. As you have stated publicly and in your June 23 letter, this is your intention to settle the diocesan bankruptcy. It is not the expressed intentions of the *parochi*. Moreover the contribution of c. 1291 is to be freely given meaning the initiative must come from the parishes. It is not to be exacted by a statement or calculated based on unrestricted cash. To pursue these amounts from each of the parish if not by extraordinary tax per c. 1263 would require Your Excellency to interfere with the canonical role of each parish's juridic administrator and usurp parochial goods.

The testimony of many trustees indicate that you are attempting to usurp the role of pastors and parish assets through the institutes available to you in the secular forum and claiming effects in the canonical forum. While this may be civilly valid, it is canonically invalid.

Further, there are institutes available in the civil forum that would allow a proper settlement of the lawsuits and bankruptcy claims without harming the parishes and usurping parish patrimony. Regrettably, you have chosen a path that allows you to justify closing parishes and selling consecrated churches without observing the formalities of canon law. This scandalous approach significantly harms the trust held by the Faithful in ecclesiastical authorities and only encourages the loss of Faith among so many in the Diocese of Buffalo.

Lastly, because the June 9 Press Release introduces a methodology that affects all parishes in the Diocese of Buffalo, it would require a general decree.

Case 1-20-10322-CLB,  Doc 4976-7,  Filed 07/22/26,  Entered 07/22/26 17:16:01,
Description: Exhibit G, Page 3 of 22

With that said, I make *remonstratio* against the decisions and intentions found in your 23 June 2025 letter and I ask Your Excellency:

1. To reconsider and revoke your application of cc. 1291-1295 as expressed in your letter;

2. Acknowledge that there is a general practice that has been introduced to the Diocese that demands a decree in application of cc. 124ff and 1263 and issue that decree that the Faithful may defend their parochial and acquired rights in the matter.

I look forward to hearing from you.

Sincerely in Christ,

Patrick Gorman
Procurator

Copy: The Most Rev. Lazzaro Cardinal You Heung-sik
Prefect, Dicastery for the Clergy

Recurrents

Case 1-20-10322-CLB, Doc 4976-7, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit G, Page 4 of 22

His Excellency Bishop Michael W. Fisher
Catholic Diocese of Buffalo
795 Main Street
Buffalo, NY 14203

**Date:** September 15, 2024

**Re:** Diocese of Buffalo Road to Renewal Alternate Proposal

Your Excellency,

Attached is an alternative proposal for your consideration.

We look forward to having constructive dialogue with the diocese relative to this proposal.

We continue to keep you and our entire diocese in prayer.

Respectfully,


Patrick Gorman
Save Our Buffalo Churches - SaveOurBuffaloChurches@gmail.com
716-541-7234

**CC:** Presbyteral Council of the Diocese of Buffalo, Philip C. L. Gray, JCL (via Email)

Case 1-20-10322-CLB,   Doc 4976-7,   Filed 07/22/26,   Entered 07/22/26 17:16:01,
Description: Exhibit G, Page 5 of 22

**Diocese of Buffalo Road to Renewal Alternate Proposal**
**From:** Save Our Buffalo Churches

**Introduction**:

Started in 2021, the Road to Renewal (RTR) objectives on web-pages, in interviews and official correspondence state that closing parishes was not the initiative's goal. Final announcements for pastoral assignments for parish families were made in August, 2023. In May, 2024, the RTR office released its "Plan to Reshape the Number of Parishes". A month later, on June 21, 2024, the Diocese released a "full list of mergers".

St. Joseph Canon Law (SJCL) has been engaged to assist our diocese in understanding the proper Canon Law processes, rights and roles of laity, priests and the bishop in addressing the concerns of the faithful with regard to parish modifications. While our parishes are individually incorporated non-profits, each parish's main goal is in saving souls and bringing others to witness Christ through His Church. We are not merely buildings, a franchise nor any other business-type model. In our parishes, we count as 'juridic persons' with subsequent collective rights that must be honored. We are concerned with the faithful souls who worship God in sacred, consecrated spaces that were built on the backbone of the immigrant families, missionaries and saints that helped establish them. The Pastoral guide provided by Pope Francis clearly states that churches should not be closed. We anxiously wait to embrace the original stated goal of RTR which was to strengthen parishes without merging/closing them..

**Summary:**

Canon law does not recognize top-down closures, and therefore the "Rightsize and Reshape" phase to the RTR is in violation to juridic persons. Most parishes had no time to implement, nor experience the benefits from the new family structure. Of the 36 parish families, 86% challenged RTR recommendations. RTR proposed closing 6 of our top 21 parishes. Inconsistent reasoning was provided, from having 'too many stop signs,' to disagreement with the RTR, or because the parish is surrounded by a commercial developer willing to purchase their property. Those reasons do not constitute the Canon Law requirement of a "grave" reason for closure. In fact, 7 of the bottom 26 parishes will remain open, including St. Joseph Cathedral, which has the 26th lowest participation number in our diocese and continues to receive a substantial annual subsidy.

There is a substantial, negative ripple effect to the community as a result of the proposed closures: Half of the food distribution sites and 3 pantries, at least one infant/mother ministry, 12-step program meeting locations, displacement of two Catholic homeschooling co-ops, and shut-down of numerous church ministerial programs. Of the 17 parishes providing Masses in foreign languages, 11 will be closed/merged. These impacts were not factored into analysis as required by Canon Law.

RTR has decreased the number of masses available for the faithful to attend. The majority of the diocese saw reassignments of priests and pastors due to RTR, which does not lend to stability. The current lack of vocations within the diocese can be addressed in other ways. We have 8 men in priestly formation, where comparable dioceses of Cleveland and Minneapolis/St. Paul have 46 and 59, respectively. Since 2019, our diocese has lost 14 religious orders and gained only 2. Youth and family evangelization should be of primary importance, yet, the budgets for these areas were eliminated as distinct line items in recent years, prompting questions. Additionally, 8 parishes with schools are scheduled to close/merge, further impacting opportunities to foster growth in the faith.

In 2007-2009, 131 churches were closed/merged. We are seeing the rotten fruits of those decisions now. One church was sold despite a Vatican ruling reversing the closure. Several sites were not relegated properly, have fallen into utter decay, altars sold on the open marketplace, and some sites have become worship centers for Islam. While RTR claims to be

aimed at revitalization and expansion, the evidence of Journey and Faith and Grace's aftermath has us asking why we should blindly trust that this approach will provide different results? Our church should be looking for opportunities to grow, not close.

Swift settlement of the bankruptcy and lawsuits will bring monetary justice to the victims, avoid additional legal costs and provide all parishes the opportunity to rebuild their congregations and support. With the sale of Fidelis, the Archdiocese of NY has funding necessary to settle any remaining lawsuits. The sale of any parish property is stipulated to remain *with that parish community* and cannot be used for settlement of lawsuits they are not party to. Instead, the sale of entities identified as 'non-essential,' Upon This Rock and other liquid asset reserves could be used to satisfy this settlement.

A survey of 150 laity showed on a scale of 1 to 5, 1 being 'strongly dislike' and 5 being 'strongly support', 84% rank RTR a 2 or less. Words like 'misinformation,' 'discord,' 'dissent,' 'awful,' 'heavy-handed,' 'horrible' are used to elaborate on the ranking given. Regarding the impact of RTR on respondents' Catholic lifestyle on a scale of 1 to 5, with 1 being 'very negatively' to 5 'very positively', 65% of respondents claim a 2 or less. Over 68% of those responding suggested more time to work within families as the proper path forward.

SJCL's Philip Gray states his research findings: historically 20-60% of laity of closed/merged parishes will stop attending Mass or leave the Church. Based on RTR data, that is 6,733-16,832 lost households or 26,930-67,326 lost souls. The financial impact to parish contributions could range from $1.8million to $4.4million. What has become the main 'solution' of RTR will contribute significantly to the defeat of its own claimed purpose.

**Recommendations**:
The Road to Renewal program should be ended and personnel should be re-assigned to support the family structure instead of driving closure recommendation data. No parish that does not meet the 'grave cause' bar for closure should be closed. All outside consultants should be released. Base restructuring on the letter and spirit of Canon Law and Vatican instructional document "The pastoral conversion of the Parish community in the service of the evangelising mission of the Church", of the Congregation for the Clergy, 20.07.2020. The parish family structure should be given time to work for several years with no threat of change in the interim.

Remove the number of Mass restrictions per priest; better leverage our deacons; encourage retired priests to continue their ministry; bring in supportive orders and missionaries to help us overcome our current hurdle; strengthen vocations by investing in youth ministries and the parishes contributing the most to vocations (The Latin Mass community); and end the suppression of those priestly ministries that trigger increases in parish participation.

Resolving the diocesan financial issues should be expedited. Those legitimately wronged by the actions of any diocese employee/priest should have their grievances resolved quickly and fairly. Funding for settlements should be obtained from other sources including the archdiocese and diocesan funds. Diocese fiscal management should be reviewed for better stewardship of funds, including cutting high salary officials the diocese cannot afford.

**Next Steps:**
To date, we have over 2,400 signatures challenging RTR. We plan to bring to the attention of the appropriate authorities the violations of the canonical process that have been documented to date. A procurator has been named to facilitate this process through SJCL. Additionally, we plan to support the canonical process for parish level challenges.

*Contact*: *SaveOurBuffaloChurches@gmail.com*                                    9/15/2024 AD



Mr. Patrick GORMAN
102 Oakbrook Drive
West Seneca, New York 14224

8 July 2025

Dear Mr. Gorman,

I am in receipt of your letter dated 2 July 2025 in which you present specific concerns with the method by which the Diocese of Buffalo is settling its Chapter 11 Federal Bankruptcy. Allow me to respond to the points you raise by offering a longer view into the history of our bankruptcy proceedings.

In 2020, the Most Reverend Edward SCHARFFENBURGER, Apostolic Administrator of the Diocese of Buffalo, saw fit to enter into Chapter 11 Federal Bankruptcy because of the number of claims brought against the Diocese of Buffalo and its parishes due to the "look back" window opened by the Child Victims Act. Even at this early date, the hope was to reach a global settlement (i.e. channeling injunction) so that the parishes of the diocese would be able to share in the benefits of Chapter 11 Bankruptcy relief going forward.

An essential part of these proceedings was the parishes' ability to retain appropriate legal counsel to represent their interests. In 2021, Mr. Ford ELSAESSLER and Mr. Timothy LYSTER were put forward as candidates to represent all the parishes in the diocese. At that time, every parish in the diocese decided to retain them as counsel and paid $1000 toward their services. The decision of those Pastors at that time served as an explicit intention to join their parishes to the Chapter 11 Bankruptcy of the Diocese of Buffalo in hopes of securing a channeling injunction. Implicit in this retainer payment was the request to pay into the final settlement in such a way that the benefits of bankruptcy would be applied to the parishes. The parishes have been billed for these services on several other occasions, thus renewing their implicit request to be included in the global settlement. This fact also indicates that various Pastors over time have been involved in this request, not only those men who made the first installment.

In 2021, no settlement had yet been reached, and no exact number figure could be applied to the parishes seeking this relief. Only now, in 2025, am I able to provide the Pastors of the parishes of the diocese with the suggested contribution that will allow them to be included in the

Case 1-20-10322-CLB, Doc 4976-7, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit G, Page 8 of 22

benefits of Chapter 11 Bankruptcy coverage. My communication of these figures through members of my staff is an answer to a question posed by Pastors in 2021. Thus, the norms of canons 1291-1295 apply to this situation.

The only reason I was able to agree to the $150 million settlement was because I already knew that parishes were willing to contribute to secure the channeling injunction. I understand that some will contest the amount of funds applied to each parish, but the initial request for inclusion in the channeling injunction came from the Pastors of these parishes in 2021, not the most recent press releases from the diocese. I reiterate that no decree has been issued, or will be issued, because no decree is necessary for the current assignment of contributions amounts to the parishes who requested to be a part of the channeling injunction back in 2021.

I sincerely hope you will respect the integrity of the Pastor's right to be the sole representative of the public juridic person of the parish (cc. 118, 532) and my responsibility as Ordinary to grant permission for restrictive alienations according to the norm of law (c. 1291). To answer your specific questions:

1. I will not revoke the permission I have given to Pastors for the alienation of funds according to the norms of canons 1291-1295.
2. There is no general practice in the diocese that requires the implementation of canon 1263. Additionally, the formalities required for a juridic act contained in the general norm of canons 124ff are being strictly observed.

Sincerely in Christ,

Most Reverend Michael W. FISHER
Bishop of Buffalo

31 July 2025

Patrick Gorman
102 Oakbrook Drive
West Seneca, New York 14224
Prot. N. 2025 0508

His Eminence
The Most Reverend Lazzaro Cardinal You Heung-sik
Prefect, Dicastery for Clergy
Piazza Pio XII, 3
Palazzo delle Congregazioni
Roma 00193

RE: Recourse Against Diocese of Buffalo Assessment of Parishes

Your Eminence,

As you know, I serve as Procurator for thousands of Catholics domiciled in the Diocese of Buffalo (hereafter, the Recurrents). In previous correspondence, I have attached a copied set of my mandates. To avoid unnecessary duplication, I do not attach them here; but I would be happy to provide another copied set upon request. I have also sent updates to the Dicastery for the Clergy in the form of denunciation letters in anticipation of this recourse (cf. 21 May, 17 June, and 15 July 2025 letters).

By this letter, I pursue recourse against an act placed by the Bishop of Buffalo which lacks the formalities and requirements imposed by canon law for its validity (cf. c. 124). By this act, he has effectively usurped the authority of the Pastors in order to obtain a large amount of stable patrimony from each parish.

Please consider the facts of the matter:

On 9 June 2025, the diocesan Office of Communications published a Press Release titled, *Diocese of Buffalo Begins Vicariate Meetings to Present Parish Contribution Plan to Fulfill Chapter 11 Settlement Terms* (Attachment 1: 9 June 2025 Press Release). This Press Release introduced a Chapter 11 allocation methodology to address a $150 Million proposed settlement by which the Bishop intends to exact $80 Million from each parish's unrestricted assets: "*The expected contribution [from each parish] is based upon a progressive percentage applied to the parishes' self-reported and unrestricted assets…Contribution percentage range from 10 percent to 80 percent of each parish's unrestricted cash with the highest percentage being applied to parishes scheduled to be closed or merged as part of Road to Renewal*" (emphasis added). He intends to acquire an additional $40 Million from the liquidation of the parishes' real property: "*Additional sources of contribution to the settlement are expected from the Diocese affiliate Catholic organizations, as well as proceeds of real estate sales*" (emphasis added. Under New York State Common Law, parish corporations are "affiliates" of the Diocese). Reportedly, the Diocese has entered non-binding sale agreements for churches that are not yet relegated. There is a history of the Diocese of Buffalo selling churches to groups hostile to the Catholic Church or whose use of such a church for their religious practices would cause scandal to Christians in general and former parishioners and donors specifically (e.g. several churches have been sold to various Muslim groups for conversion to use as a mosque).

Although the Press Release expressed a common prescript binding all parishes of the Diocese, His Excellency did not issue a decree. Instead, he executed his decision through the Office of Communications. The Press Release was then followed by additional statements from other curial staff, e.g. the lay diocesan Chief Operating Officer (COO) - who gave in-person interviews to the press; and the lay diocesan Chief Executive Officer (CEO) - who gave instructions to the Board of Trustees (of the parish corporations) within closed-door meetings.

Case 1-20-10322-CLB, Doc 4976-7, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit G, Page 10 of 22

To date, no secular authority (viz. the judge of a federal bankruptcy court) has ordered His Excellency to pursue either this amount ($150 Million) or this allocation methodology as it has been described in the Press Release and other official statements. Nonetheless, based on the content of these communications, it appears that the Bishop is obfuscating the norms of canon law and both his role and those of the pastors of the parishes in the canonical forum. Instead, he is acting by means of his roles in the secular forum in relation to the Diocese, as its representative, and in relation to the parishes, as the President Trustee of each parish corporation, so as to obtain the needed parish patrimony for the settlement without, at the same time, being subject to oversight or recourse in the canonical forum.

Due to the lack of clarity and formality by which the Bishop has expressed his intention through the agency of others, all of whom lack executive power of governance, to exact parish patrimony, I submitted an 14 June 2025 Petition to the Bishop (Attachment 2: 14 June 2025 Letter to Bishop). And, I asked him to provide the following:

1. *Please provide a copy of the decree that I presume you have issued in accord with c. 124 et al.*

2. *If the June 9 Announcement indicates that Your Excellency has acted to implement an allocation methodology that would bind all diocesan parishes, then by this letter I ask you to reconsider and revoke your intention as it was expressed by the June 9 Announcement.*

3. *If the announcement indicates that you have decreed the allocation methodology, this decree is not known to me; and by this letter, I ask you to reconsider and revoke the decree.*

On 26 June 2025, I received a letter, dated 23 June 2025 letter, from the Bishop (Attachment 3: 23 June 2025 Letter from Bishop Fisher). He responded in the negative. In his letter, he stated the allocation methodology is not an extraordinary tax per c. 1263. Instead, he claims, "*The proper understanding of the transfer of these funds is the norms found in canons 1291-1295.*"

On 2 July 2025, I placed *remonstratio* against the Bishop's negative decision to my petition (Attachment 4: 2 July 2025 Letter to Bishop Fisher). I pointed out the violations of law; and the contradictions between the words used in official, diocesan statements and the norms of cc. 1291-1295.

On 16 July 2025, I received a letter, dated 8 July 2025, from the Bishop (Attachment 5: 8 July 2025 Letter from Bishop Fisher with postmark of 15 July). He confirmed his negative to my requests. In this letter, the Bishop stated, "*The Diocese has entered Chapter 11 Federal Bankruptcy proceedings with the intent of securing a global settlement/channeling injunction which would both generate a larger sum for the victims and provide all parishes with future immunity from civil litigation based on similar claims.*"

Within the peremptory time limit, I now approach the Dicastery for Clergy to pursue hierarchical recourse against the Bishop's confirmation of his act as expressed in his 23 June 2025 letter. If the Dicastery for Clergy is not competent to review this matter, I kindly ask Your Eminence to forward this recourse to the appropriate office.

Please consider:

1. *Corporations.* Under New York State law, the Diocese of Buffalo and each parish is separately incorporated. Subsequently, each parish corporation is legally autonomous and the subject of rights and obligations in a way similar to how canon law recognizes the juridic person of a parish. Each parish corporation is considered a corporation that is "affiliated" to the corporation of the Diocese.

2. *Look-Back Laws.* In 2019, the State of New York changes its law to relax the statute of limitations for victims of sexual abuse, thereby enabling a victim to file a claim even if time-barred. As a result, hundreds of claimants came forward alleging abuse by priests and seeking monetary compensation. In such

lawsuits, the Defendants are the accused priest, the bishop accused of negligence, the Diocese, and the Parish where the priest was assigned at the time of the alleged abuse.

3. *Channeling Injunction*. Under federal law in the United States, an 'affiliated corporation,' e.g. a parish corporation, can obtain the benefit of Chapter 11 protection if it enters the settlement or channeling injunction together with the primary corporation, i.e. the Diocese of Buffalo, that filed for bankruptcy. In this way, affiliated parish corporations receive protection from the dissolution that could have occurred if it was a parish implicated in lawsuit.

   After a settlement is entered into by the Plaintiff and Defendant(s), it is then submitted to the judge of the bankruptcy court for confirmation. Note: The settlement between the parties is not binding until it is reviewed by an identified committee used for this purpose and later confirmed by the judge. Accordingly, in a confirmation hearing, any aggrieved parties (e.g. victims or parishes) may contest the settlement (*or channeling injunction*) in whole or in part, but the judge must address concerns raised in law before the settlement can be confirmed. Once confirmed, the judge issues an order that legally binds the parties to the settlement.

4. *Essential Assets vs Non-essential Assets*. The purpose of Chapter 11 bankruptcy protection is to protect a corporation from dissolution and allow it the opportunity to re-organize so that it may emerge from a settlement with its essential assets (which includes real estate and other types of property) in place. The loss of anything that would prejudice a corporation's ability to continue to exist would be considered essential assets. Therefore, when a Diocese files for Chapter 11 bankruptcy protection, one of the first steps taken by the court is to obtain a list of essential and non-essential assets of the Diocese and of the affiliated parish corporation that joined the action via channeling injunction. Essential assets cannot be used to settle the claims against the Diocese and affiliated parishes.

5. *Board of Trustees of the Parish Corporations*. Only about half of the parishes in the Diocese were implicated in the lawsuits resulting from the 2019 look-back law. Yet the Bishop entered every parish corporation in channeling injunction (Attachment 6: Diocese of Buffalo Vicariate Meetings, Unanimous Written Consent of the Trustees). Again, as mentioned above, he did so by means of the Board of Trustees of each parish corporation. Parish corporation trustees are: the Bishop as the President Trustee; the Vicar General as the Vice President Trustee; the Pastor as the Pastor Trustee and two lay members, who represent the interests of the Parishioners. The Diocese appointed two civil lawyers to represent the Trustees of each parish corporation. Since the start of the bankruptcy proceedings, these lawyers have provided no direct communication to the lay trustees. As a result, it enabled diocesan authorities to make all decisions for the parish corporation under secular law and disallowed sufficient disclosure to those who could be harmed by the action. The Bishop has proceeded to the benefit of the Diocese at the expense of the parishes. Among each affiliated parish corporation, he held the majority vote among the cleric trustees; he excluded the lay trustees by the appointment of the lawyers; and he did not reconcile the canonical institutions with his actions in the secular forum. This significantly violates the autonomous nature of the parishes, both in the canonical and secular fora. His actions usurped the fiduciary obligations that both canon and secular law imposes on the Trustees (both clerical and lay).

   Groups from nine parishes have filed lawsuit against the Diocese for imposing the allocation methodology and the specific contribution percentage – according to an unconfirmed settlement - in violation of law. The cases are pending, and additional groups are investigating whether to join this action.

6. *Invalid Acquisition of Parish Patrimony*. As corporate president of the Diocese and each affiliate parish corporation, the Bishop used his secular position to negotiate the current, non-binding agreement made between diocesan authorities and the creditors. He also used this process to determine how much money each parish would contribute to the settlement. His methodology was not obligated by the secular process but imposed by him within that process.

Case 1-20-10322-CLB, Doc 4976-7, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit G, Page 12 of 22

The Bishop can acquire parish patrimony in one of the following ways, as:

- An extraordinary tax (cf. c. 1263, *et al*);
- A donation within the limits of ordinary administration (cf. c. 1285, *et al*); or,
- An alienation of goods, which requires the permission of competent authority, i.e. the juridic administrators of the parishes and is above the maximum sum of ordinary administration which has been set by the particular law of the Diocese, i.e. $15,0000 (cf. cc. 1291-1295, *et al*).

The Bishop rejects that the allocation methodology is an extraordinary tax. It is also not a voluntary contribution or donation. Rather, the Bishop expressly identifies the transfer of money as occurring in accord with cc. 1291-1295 without providing any further details of intention, process, or the role of parish administrators in the process. If the Bishop is acquiring the "expected contribution" according to the norms of cc. 1291-1295, then this is a type of alienation that can only be accomplished through the institutes of secular law (cf. nn. 1-5 above). In fact, as his letters testify, until we began this action, he was not initiating any of the institutes of canon law within this process.

His actions are invalid canonically.

In the secular forum, the settlement has not been confirmed by a reviewing committee or federal judge. In other words, its terms are not binding on the Diocese or the Parishes and can be retracted, revoked, or re-negotiated.

In the canonical forum, the competent authority in c. 1291 is the Pastor. It is not the Bishop. Yet, the Bishop has usurped the office of Pastor by way of his role as the President Trustee of the parish corporations to transfer funds from an affiliated parish corporation to the benefit of the primary corporation--the Diocese.

7. *Additional concern.* As noted above, nine parishes have sued the Diocese and the Diocesan Bishop over the methodology used to reach a non-binding agreement with the creditors. In a preliminary hearing, the secular judge in this case ordered the parishes involved not to make the assessed payment to the Diocese. A final hearing has yet to occur. In a public statement regarding the lawsuit and the judge's order, diocesan authorities stated that the parishes involved would be assessed interest on the payments that the court suspended. The payments were due on July 15th past. The Diocese's claim to assess interest on a payment demanded by the Bishop for a matter in the secular forum that has not been determined conclusive raises significant questions about his intentions toward the parishes and the validity of his actions.

8. *Extinctive mergers by way of secular dissolution.* We note that if the full $80 million dollars were paid to the Diocese by 15 July 2025 as demanded by the Bishop, and if the Bishop liquidates the intended properties he has expressed intent to liquidate, the Diocese would gain an estimated $600,000.00 from the investment of this money that would occur before the Bankruptcy Court would hold a hearing on the proposed settlement. Put another way, the Diocese is obtaining a large benefit by closing and selling parish properties and emptying parish bank accounts while claiming that the channeling injunction is intended to protect the parishes from dissolution due to hostile lawsuits.

This reality raises a legitimate question: If the Bishop required every parish—even those not implicated in a lawsuit—to enter Chapter 11 proceedings in order to protect them from potential dissolution due to excessive lawsuits, why does his methodology of assessing payments force excessive payments that will result in the closure of more than half the parishes? Some of the parishes that will close are not implicated in lawsuits. The solution contradicts the purpose of the Chapter 11 proceedings.

9. Contra *Canon 37*. In deference to the Bishop of Buffalo, my 14 June 2025 Petition that initiated this thread of recourse attempted to interpret the Bishop's actions within the prescripts of canon law. I presumed good faith on his part and requested a copy of the decree that would have been issued for any

Case 1-20-10322-CLB,   Doc 4976-7,   Filed 07/22/26,   Entered 07/22/26 17:16:01,
Description: Exhibit G, Page 13 of 22

executive act that would have force in the external forum. I gave him the benefit of doubt and attempted to interpret his actions by considering them as potential applications of various canons. I made use of the words and context found in various diocesan statements on this matter. His response made clear that he has not initiated a canonical process; he has not issued a decree. Yet, he makes vague appeal to cc. 1291-1295 to support his methodology for assessing parish contributions to the Chapter 11 settlement. He repeated that position in his rejection of my *remonstratio*. As such, the Bishop's 23June2025 Rejection Letter constitutes an expressed decision that amounts to a decree in accord with Canon 1732.

In this case, the Bishop has used his authority: 1. To require all parishes, even those that are not implicated in a lawsuit, to be part of the Chapter 11 process. This amounts to a common prescript binding all parishes; 2. To determine the amount of money each parish must pay toward the Chapter 11 non-binding settlement. This amounts to a specific prescript; 3. To threaten an imposition of interest on non-payments or partial payments of the determined amount (some parishes do not have the cash on hand to make the assessed payment), and 4. To identify parish properties that include churches for sale in the secular forum, the proceeds of which will contribute to the settlement. These actions regard the external forum. They usurp the authority of the *parochus* and prejudice the parishes and the right of the Faithful to receive proper pastoral care. Furthermore, the actions prejudice the Diocese and the Church herself because of the significant loss of trust his actions have caused, as well as the public scandal that has ensued. This has been done without promulgation of a decree or the appearance of any process identifiable in canon law. The Bishop admits this himself.

10. Finally, I would like to say that the Bishop did not have to do this in this way. Chapter 11 protection would only extends to those parishes named as a Defendant for alleged abuse that occurred up to the conclusion of the bankruptcy proceedings. The Bishop could have used the channeling injunction to protect only the parishes that were implicated. He could also have identified the essential assets of the affiliated parish corporations—like churches that may be sold without a canonical process of relegation (Attachment 7: St. Jude Bulletin Rectory Sale, Father Bellittiere emails.) He chose not to take care that parochial goods were protected by civilly and canonically valid methods. It is not difficult to see the connection between the channeling injunction and the reconfiguration plan, "Road to Renewal," which was announced the same year but some months after the Chapter 11 process and channeling injunction began. Put another way, AFTER the Bishop filed for bankruptcy protection, he announced plans to close half the parishes and churches. It is invalid, gravely illicit, and deeply scandalous to the People of the Diocese of Buffalo.

> **Therefore, as Procurator on behalf of the Recurrents and on my own behalf, I beg the Dicastery for Clergy to revoke the allocation methodology as expressed in the Bishop's 23 June 2025 Decree, by which he actively albeit invalidly acquiring $120M of parish property ($80M from unrestricted cash and $40M from the proceeds of real estate) to the benefit of the Diocese and the immediate and direct harm of the parishes and the Faithful of the Diocese of Buffalo.**

Respectfully in Christ,

Patrick Gorman
Procurator

Copy:  The Most Rev. Ilson de Jesus Montanari, Secretary, Dicastery for the Bishops

Recurrents

Case 1-20-10322-CLB,  Doc 4976-7,  Filed 07/22/26,  Entered 07/22/26 17:16:01, Description: Exhibit G, Page 14 of 22

# Timothy J. Greenan

100 Schultz Road, West Seneca, New York 14224
716-553-6111 • timothy.greenan@gmail.com

---

**HAND DELIVERED**

**PERSONAL AND CONFIDENTIAL**

**FOR THE BISHOP'S EYES ONLY**

Most Reverend Michael W. Fisher
Bishop of Buffalo
Diocese of Buffalo

Divine Mercy Sunday, April 12, 2026

**Re:     Request for confidential meeting with SOBC and Non-Bankruptcy Counsel.**

Your Excellency,

At the last bankruptcy proceeding, Judge Bucki invited and welcomed a formal submission by Mary Pruski and Save Our Buffalo Churches (SOBC) to the Bankruptcy Court to provide information as to the sources of the funds being used to fund the potential Chapter 11 Plan and other matters to which SOBC could testify.

To make a formal submission of evidence, SOBC will need to make a motion to intervene in the proceeding. That motion would be based upon a Sworn Declaration stating the basis upon which they have standing to make such a request. Attached is the Declaration in Support of the Motion to Intervene.  Neither the Declaration nor the Motion have been filed in Bankruptcy Court.

I no longer actively practice, but I am an attorney with 36 years of experience and SOBC requested my assistance in preparing the Declaration and Motion in response to Judge Bucki's invitation.

I am assisting them *pro bono fidelium et Ecclesiae*. If necessary, I may appear in the Bankruptcy proceeding if the issues raised by SOBC are not addressed by you utilizing your good pastoral judgment and sole Episcopal authority.

In keeping with the dictates of Matthew Chapter 5 – especially 5:25, the documents will not be filed until you have had the opportunity, as a pastor and as the one who holds sole episcopal authority over the affairs of this Diocese, to discern the most prudent path forward with full knowledge.

I understand to discern the most prudent path forward, you will need good counsel.  I asked that Your Excellency do not share these documents or their contents with the attorneys who are representing the Diocese in the bankruptcy proceeding. They are financially motivated to continue the current course of action, and their interests in that regard may not be fully aligned with yours as pastor and Bishop.

In reviewing the Bankruptcy Docket, I see Lawlor Quinlan, Terry Connor and Randy White of Connors LLP are Special Counsel to the Diocese. I know Lawlor the best and worked with him early in his career. I respect Terry and Randy. I called Lawlor informally and confidentially last week to tell him my concerns related to further scandal, dissipation of the Church's Patrimony, victim impact and impact on your Episcopal office based upon what I expect will happen in the Bankruptcy court with or without the filing.

I have copied Lawlor on this letter without his foreknowledge of me doing so, as I trust him and his firm to represent the Diocese's interests in addressing these issues informally. I don't know if this is something they are able or willing to undertake.

Also, I ask that you not share the contents of this letter with your Vicar General, your Judicial Vicar, or other chancery advisors until we meet with you and non-bankruptcy counsel. I have personally witnessed your Vicar General and Judicial Vicar commit canonical crimes in your name.

Last, there are some concerns regarding the Cathedral Rector, not because of any canonical crimes, but because he actively works to separate you from the faithful that have concerns. I recognize this is an unusual ask. I make it because I believe you deserve to hear the full account without preemption, and to exercise your own pastoral judgment before others may have the opportunity to shape your response.

So, my respectful request is for a confidential meeting with you and Lawlor or another counsel of your choosing on behalf of the Diocese, and me and Mary Pruski on behalf of SOBC, this Friday, April 17, 2026 at 1:00 p.m., at a private location of your choosing. If the Connors firm is representing you in this matter, it could be their office. I am also willing to host. The location is entirely at your and your counsel's discretion — I am willing to come to you, or to host if you prefer. We could also meet on April 20, 21, or 22 in the afternoon. I raise the following not to pressure you, but because you deserve to know the full timeline as you discern your response — the deadline is not mine to extend. If the matter is not resolved before April 23, 2026, SOBC's Canonical Counsel has advised that the motion must be filed based upon the interests they are obligated to protect.

Also know there are legitimate paths forward to what should be our mutual goal to provide hope and healing to the Diocese of Buffalo, your Episcopal authority, the parishes, the lay faithful and the victims of clergy sex abuse.

I remain, as always, faithful to the Catholic Church and to the authority of the episcopal office.

In Christ,


Timothy J. Greenan

cc: Lawlor Quinlan, Esq – Connors LLP - via email - lfq@connorsllp.com

Docusign Envelope ID: 6E2C5C18-E9ED-8DA5-81ED-6EE40B3760A8

UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF NEW YORK

---

In re:                       )

*The Diocese of Buffalo, N.Y.,*   )   Case No. 1-20-10322-CLB

      *Debtor.*           )   Chapter 11

---

## DECLARATION OF OFFICERS AND DIRECTORS OF SAVE OUR BUFFALO CHURCHES IN SUPPORT OF
## MOTION OF SAVE OUR BUFFALO CHURCHES FOR ENTRY OF
## AN ORDER AUTHORIZING INTERVENTION PURSUANT TO
## RULE 2018(a) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

We, the undersigned officers and directors of Save Our Buffalo Churches, each declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following, as to matters within our respective personal knowledge, is true and correct:

### I. IDENTITY AND AUTHORITY TO MAKE THIS DECLARATION

1. Save Our Buffalo Churches ("SOBC") is a not-for-profit organization formed on November 14, 2024 and exempt from federal income taxation under § 501(c)(3) of the Internal Revenue Code, with its principal address at 736 Baseline Road, Grand Island, New York 14072. Elizabeth Zilbauer serves as President of SOBC; the other undersigned serve as officers and directors. We make this Declaration in support of SOBC's Motion to Intervene in the above-captioned Chapter 11 proceeding pursuant to Rule 2018(a) of the Federal Rules of Bankruptcy Procedure. Each of us has personal knowledge of the matters set forth herein as

they relate to our respective roles, except where stated upon information and belief, and each of us could testify competently thereto if called as a witness.

2. SOBC was founded by lay Catholics of the Diocese of Buffalo who are empowered and obliged, by virtue of their knowledge, competence, and standing in the Church, to manifest their opinion on matters pertaining to the good of the Church. This obligation finds its expression in the Dogmatic Constitution on the Church adopted by the Second Vatican Council on November 21, 1964 — *Lumen Gentium* — which declared:

> "[The faithful] are permitted and sometimes obliged to express their opinion on those things which pertain to the good of the Church. If the occasion should arise, this should be done through the institutions established by the Church for that purpose, and always with truth, courage, and prudence, and with reverence and charity toward those who, by reason of their office, represent the person of Christ."
>
> *Vatican Council II, Dogmatic Constitution on the Church (Lumen Gentium), No. 37 (Nov. 21, 1964).*

3. SOBC's officers and directors have pursued their concerns through the institutions established by the Church for that purpose — with truth, courage, and prudence, and with reverence and charity toward those who, by reason of their office, represent the person of Christ. We remain faithful to the Catholic Church and loyal to the authority of the episcopal office. It is because of that fidelity, and not in spite of it, that we are obliged to act. We recognize the authority of the office of the Bishop, and we pray that he will exercise that authority in a manner consistent with his canonical obligations and the good of the faithful entrusted to his care.

4. SOBC pursues this intervention in the same spirit — exercising the individual and collective rights of its members and the parishes they serve under the First, Fifth, and Fourteenth Amendments to the United States Constitution; Article I, §§ 3 and 6 of the New York State Constitution; the New York Not-for-Profit Corporation Law, including §§ 513, 514, and 515 thereof; and the New York Religious Corporations Law. SOBC and certain of its member parishes were additionally parties to civil proceedings before the Supreme Court of the State of New York, Erie County (Rozak v. Diocese of Buffalo, Index No. 811414/2025; Reid v.

Diocese of Buffalo, Index No. 812422/2025), dismissed without prejudice on September 26, 2025, in which substantially the same canonical, constitutional, and statutory rights were placed in issue; any refiling of those claims against the Diocese as debtor requires relief from the automatic stay of 11 U.S.C. § 362. This intervention is sought to ensure that the actions of the Diocese and its hierarchy violate neither the ecclesiastical law by which they are bound nor the federal and state constitutional and statutory rights of the faithful.

## II. SOBC'S ACTIVITIES AND STANDING AS AN INTERESTED ENTITY

5. SOBC was formed in direct response to the Diocese of Buffalo's "Road to Renewal" restructuring program, which announced plans to close or merge 81 parishes and designate additional parishes as secondary worship sites, while simultaneously imposing Assessments on those same parishes to fund a settlement of clergy sexual abuse claims (the "CVA Claims") filed under the New York Child Victims Act.

6. Since its formation, SOBC has: organized and assisted 30 parish groups in filing petitions for canonical recourse (hierarchical appeal) before the Vatican Dicastery of the Clergy; obtained Dicastery decrees suspending 23 parish modification decrees and 13 Assessment allocation decrees pending case examination, and secured outright revocation of 5 merger or relegation decrees, permitting those parishes to continue as independent canonical and civil entities. Eight additional parishes received Dicastery decrees modifying the Bishop's merger decrees to exclude the appropriation of parish assets. In each of these successful cases, the Dicastery found merit in the parishes' canonical claims.

7. SOBC has collected over 4,000 mandates from Catholics throughout the Diocese opposing the Road to Renewal program. Patrick Gorman, Vice President of SOBC, serves as the ecclesiastically-appointed Procurator under those mandates, each of which authorizes him to petition the Dicastery of the Clergy for cessation of the Road to Renewal initiative. He signs this Declaration both in his capacity as an officer of SOBC and as the Procurator of record for those 4,000 members of the faithful. SOBC has connected 9 parish groups into a consortium that has filed civil suit against the Diocese for Assessment allocations, and has provided canonical and legal resource connections to pastors and faithful across the Diocese,

including facilitating contact with the St. Joseph Foundation for the vindication of clergy rights under Canon Law.

8. In addition to the canonical proceedings before the Dicastery of the Clergy, a separate petition is currently being circulated by members of the faithful requesting the Holy See to conduct a formal canonical visitation of the Diocese of Buffalo, investigate the conduct of Bishop Fisher, and those to whom he has delegated authority (including allegations of canonical crimes committed in his name) in the governance of the Diocese, and take appropriate corrective action. Attorney Mark J. Byrne serves as Procurator for that petition. The mandate expressly authorizes Byrne to act in the secular forum as necessary, including the initiation of civil proceedings, to advance the interests of the faithful who have executed it. The existence of parallel canonical proceedings at the Holy See — addressing the same pattern of diocesan governance that underlies the concerns raised in this Motion — underscores the gravity and urgency of the matters before this Court, and the breadth of the lay Catholic community that SOBC represents.

9. SOBC has not sought intervention in this proceeding for the purpose of obstructing a resolution of the CVA Claims or diminishing the rights of abuse survivors. SOBC recognizes that the victims of clergy sexual abuse have suffered profound and irreparable harm, and that the Diocese and its leadership bear primary institutional responsibility for that harm through the assignment and supervision of the clergy who committed it. SOBC's purpose in seeking intervention is to ensure that the mechanism chosen to fund victim compensation does not itself become an instrument of further harm — this time to the parishes and faithful who had no part in the abuse and who deserve to have their canonical and civil rights protected in the confirmation of any reorganization plan.

### III. THE CANONICAL BASIS FOR THIS INTERVENTION

10. The Diocese is subject to the authority of Canon Law and the Holy See. Under Canon Law, each parish is a juridic person distinct from the Diocese, and the pastor of each parish — not the Diocesan Bishop — is the juridic administrator responsible for parish finances. The Diocesan Bishop may tax parishes under Canon 1263, but only moderately and proportionate to parish income, without jeopardizing any parish's financial condition. Canon 1285 limits

gifts from parish funds to $15,000 in the Diocese of Buffalo, and requires that such gifts be made only for "pious and charitable" causes — a category that does not include the payment of diocesan lawsuit settlements.

11. The Dicastery of the Clergy has issued decrees in response to appeals by numerous parishes within the Diocese. In every such decree, the Dicastery has stated that the Diocese may not assess the appealing parishes to fund any portion of the CVA settlement. The Dicastery has explicitly found that the Diocese's planned Assessments violate Canon Law. These decrees are binding on the Diocese and have been suspended — not repealed, not replaced — pending further canonical process. To my knowledge, the Diocese has not sought or obtained Holy See authorization to impose Assessments beyond the canonical limits.

12. We are informed and believe that the legal strategy under which the Diocese proposes to fund the CVA settlement through parish Assessments was developed by secular bankruptcy counsel, and that the current Bishop, who assumed his responsibilities after the Chapter 11 Case was already filed and the strategy was already established, has not been presented with an independent canonical assessment of whether that strategy is consistent with his obligations under the Code of Canon Law. SOBC respectfully submits that it is not, for the reasons to be set forth in the Motion to be submitted with this Declaration after we attempt to consult privately with the Bishop in his episcopal capacity.

## IV. THE SIGNIFICANCE OF THIS GOOD FRIDAY FILING

13. This Declaration is executed on Good Friday, April 3, 2026 — the day on which the Church commemorates the Passion and Death of Our Lord Jesus Christ. SOBC chooses this date not as a rhetorical gesture but as a statement of the spiritual foundation from which this intervention proceeds. This Declaration is submitted first to the Bishop of Buffalo, in his capacity as the exclusive holder of episcopal authority over this Diocese and as the shepherd responsible before God for the actions taken in his name, in the hope and prayer that his private exercise of that authority may render the filing of this Motion unnecessary.

14. The parishes whose futures hang in the balance of this proceeding are not abstractions. They are communities of believers who gather in faith, bury their dead, baptize their children, and sustain their neighborhoods. Many of them have stood for generations. They did not cause the abuse that brought this Diocese into bankruptcy. They have already suffered the

dissolution of communities they built, the loss of churches they maintained, and the threat of financial assessments that their pastors are canonically prohibited from paying. They ask this Court, on this day, for the opportunity to be heard.

15. SOBC offers this Declaration in the name of Our Lord Jesus Christ, in fidelity to His Church, and in the hope that the Bishop will pause and privately hear what the *sensus fidelium* of his Diocese is calling him to consider — that the path being pursued in the name of the diocesan corporation, which is controlled exclusively by his episcopal office, carries grave canonical and legal consequences that can yet be averted. SOBC believes that the Bishop's willingness to exercise the fullness of that authority in response to these concerns would itself be a sign of hope: for the faithful of the parishes whose futures hang in the balance, and for the survivors of clerical abuse whose compensation and healing deserve to be maximized, not diminished, by the resolution of this proceeding. We pray for that resolution. We also, as *Lumen Gentium* obliges us to do, act in charity to bring it about.

## V. VERIFICATION

Each of the undersigned declares under penalty of perjury that the foregoing is true and correct to the best of his or her knowledge, information, and belief.

Executed on this Good Friday, the 3rd Day of April, 2026.

Signed by:
*Elizabeth Zilbauer*
—EF0193B5A00C415...
Elizabeth Zilbauer
President
Save Our Buffalo Churches
Diocese of Buffalo, New York

DocuSigned by:
—3F75327AD869485...
Patrick Gorman
Vice President;
Procurator for over
4,000 members of the faithful,
Diocese of Buffalo, New York

Signed by:
*Mary Pruski*
—175ECC2E6C7C406...
Mary Pruski
Treasurer
Save Our Buffalo Churches
Diocese of Buffalo, New York

DocuSigned by:
—2FF194DAFE40432...
Mark Byrne
Procurator for more than 1,500
Lay Christians,
Diocese of Buffalo, New York