# Exhibit J

Case 1-20-10322-CLB, Doc 4976-10, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-1, Page 1 of 15



**DICASTERIUM PRO CLERICIS**

Prot. N. 2026 0812

Mr. Daniel A. Hinz, Procurator
2262 Haskell Road
Olean, New York 14760
**UNITED STATES OF AMERICA**

Dear Mr. Hinz,

This Dicastery for the Clergy writes further regarding your request for hierarchical recourse against the decree dated 5 March 2025, issued by the Most Reverend Michael W. Fisher, Bishop of Buffalo, which merged **Saint John the Evangelist Parish in Olean** with that of St. Mary of the Angels Parish in Olean in an extinctive union (cf. *CIC*, canons 121 and 515 §2).

Please find enclosed the Decree whereby the recourse has been decided. By way of explanation, every hierarchical recourse exists as a reality in its own right, even if it is linked to other events and circumstances. This curial Institution determined in this particular extinctive union that there was no violation of the law, either substantively or procedurally.

Thanking you for your correspondence, and with assurances of prayers and best wishes, I remain,

Sincerely yours in Christ,

*Siree Ree*

Monsignor Simone Renna
*Undersecretary*

Case 1-20-10322-CLB, Doc 4976-10, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-1, Page 2 of 15



# DICASTERIUM PRO CLERICIS

# DECREE

Prot. N. 2026 0812

## *SPECIES FACTI*

1. WHEREAS, on 5 March 2025, the Bishop of Buffalo, the Most Reverend Michael W. FISHER (hereinafter, 'the Ordinary'), decreed the extinctive union of the Parish of St. John the Evangelist in Olean (hereinafter, 'the Parish') with the Parish St. Mary of the Angels, also in Olean (cf. *CIC* cann. 121; 515 §2), and;

2. WHEREAS, on 14 March 2025, Mr. Daniel A. HINZ, Procurator for various members of the faithful (hereinafter, 'the Procurator'), brought *remonstratio* against the aforementioned decree to the Ordinary (cf. can. 1734 §1), who made no response, and;

3. WHEREAS, on 23 April 2025, the Procurator submitted a request for hierarchical recourse (cf. can. 1737 §1) to the Dicastery for the Clergy (hereinafter, 'the Dicastery'), which accepted that request for study by its decretal letter of 1 July 2025 (cf. Art. 137 §1 *General Regulations of the Roman Curia* 1999), recognizing as the object the decree the aforementioned extinctive union, and granting the requested suspension of the Ordinary's act, and;

4. WHEREAS, supplemental acts from the Procurator dated 26 September 2025, 20 November 2025, 6 December 2025, 8 December 2025, 6 January 2026, and 14 January 2026, and;

5. WHEREAS, the *votum* dated 19 September 2025 and the Acts of the Ordinary's decision arrived in the Dicastery, and;

6. WHEREAS, by its decretal letter of 16 December 2025, in order to provide adequate time to study the matter, the Dicastery extended the time limits of the recourse by an additional three months, and;

7. WHEREAS, the supplemental *votum* dated 12 February 2026 and additional Acts concerning the Ordinary's decision arrived in the Dicastery, and;

8. WHEREAS, having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted by both the Ordinary and the Recurrent, the Dicastery judges as complete the documentation in its possession and proceeds, therefore, to its decision.

Case 1-20-10322-CLB, Doc 4976-10, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-1, Page 3 of 15

9. The motivating factors for the singular administrative act being impugned are delineated in the Ordinary's decree: (1) the benefit for the Parish to be united with Saint Mary of the Angels Parish; (2) the reduction in strain on the limited number of priests; (3) the negative trend in its finances.

10. Citing this curial Institution's Instruction of 2020, the Procurator argues that the motivations for the impugned decree are based upon a general principle and not directly and organically connected to the Parish in question.

11. Concerning cause (1), the Parish *ad quam*, although it has also experienced a decline in its Mass attendance and sacramental participation, has larger overall numbers (cf. Supplemental *Acta* 34). Financially, it is weaker than the Parish, with negative net operating balances in 6 of 10 years (cf. Supplemental *Acta* 35).

12. In regard to the information presented by the Ordinary in his votum and the accompanying acts, he asserts that the Parish has seen a significant sacramental decline as well as a decline in Mass attendance. This appears to be supported by the figures he provided. Specifically, in 2014, an average of 341 persons attended Sunday Mass, whereas in 2023 this had fallen to 80 (*Acta* 6). Similarly, baptisms in 2014 numbered 4 but fell to 0 in 2023. The highest number of baptisms registered during 2014-2023 was 7 (2015, 2016, and 2018). Confirmations in 2014 were 11, and in 2023 they were 7, with a high of 16 in 2015. Marriages have been consistently low, with 2 in 2014 (the highest in a single year) and 1 in 2023. No marriages took place in 2020, 2021, and 2022. Religious education enrollment figures are incomplete; in 2014, there were 119 students, which fell to 41 in 2023. The highest number of students reported was 165 in 2017. Information provided by the Procurator indirectly confirms the sacramental decline, as evidenced by the reduction in enrollment at Archbishop Walsh Academy and the small number of sacraments received there (cf. Attachment 5). The Procurator also points out that, due to conflicts between the common catechetical formation class for children and the Sunday Mass at the Parish, attendance has been affected (cf. Letter of 20 November 2025).

13. Based on the numbers provided by the Ordinary, particularly regarding Mass attendance, it is evident that the Parish has significantly declined in terms of sacramental life. The Ordinary's original votum states, "The COVID-19 pandemic did have something to do with [the decline in Mass attendance] but, since a full-scale return to regular offering of worship services in 2021, the numbers grew back to pre-pandemic levels but are still low for the space and are not projected to improve" (*votum* 5). This statement is at odds with the figures, which show that Mass attendance in 2022 and 2023 was 80 persons each year, down from 225 in 2021; thus, the figures do not demonstrate a return to pre-pandemic levels. The Ordinary, in his supplemental votum of 12 February 2026, confirmed that Mass attendance had indeed fallen to an average of 80 persons per week during the years of 2022 and 2023 (Supplemental *votum* 4). He indicates that average Lord's Day Mass attendance may have risen in 2024 and 2026, due to the suppression of the Saturday evening anticipated Mass in June 2024 at the Parish *ad quam*, which resulted in "[m]any of the St. Mary of the Angels parishioners began to worship at St. John the Evangelist church because it offered the Mass time that best fit their schedule. This, to me, indicates a high level of fluidity between the parishes

and serves as evidence to support my statements above about the parishes already enjoying [an] easy cooperation" (cf. Supplemental *votum* 4).

14. Concerning cause (2), the decree itself states that there will be only two priests available to serve Family #24 by 2030 (down from 3 at present). However, the Ordinary in his votum projects this as a future condition by stating "by 2030" and "If this is the landscape the priests of 2030 will have to deal with [...]" (cf. *votum* 6). This does not appear sufficient in itself to justify the extinctive merger. The Ordinary notes that parishioners are pleased with their current pastor and believe he is "the animating force needed to revitalize the area." The Ordinary expresses hope that this is true, but at the same time states. "I do not believe, however, that [the Parish] is capable of sustaining itself financially and sacramentally much longer.""

15. Concerning the assertion by the Ordinary in the impugned decree and his votum that the Parish is in financial decline, the recurrents have provided additional data for 2024 and 2025, which shows that the Parish continues to generate a surplus in income. The recurrents explain that the significant deficit in 2023 (-$111,999.11) was due to capital improvements. Looking at the supplemental financial information provided by the Ordinary, there were capital expenditures totaling $61,954.52 (Supplemental *Acta* 20). This still leaves a deficit of $50,044.59; however, given the Parish's savings, this was not disastrous to the juridic person, and the additional information provided by the recurrents shows that the Parish has continued to reduce its expenses. In contrast, although its income has declined, it continues to exceed costs by tens of thousands of dollars. This is supported by the supplemental financial information provided by the Ordinary (cf. Supplemental *Acta* 22-33). Given the information provided by both parties, this motivation is insufficient.

16. The Dicastery has affirmed that "the suppression of parishes by extinctive union is legitimate for causes directly related to a specific Parish." Furthermore, "As a condition for the legitimacy of this type of provision, the requisite motivations must be directly and organically connected to the interested parish community, and not on general considerations or theories, or based solely on principle" (Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, 20 June 2020, n. 48). This does not mean that the cause must be unique to a specific Parish. An overall decline in sacramental participation and Mass attendance within a region does not mean that the cause is not specific to the Parish, since while the reasons for the decline may be common to a people or geographic area, they still affect the particular juridic person.

17. While there are significant challenges facing the Diocese of Buffalo, the value of the Parish's property or the need to pay civil settlements from the sale of Parish property are not just causes for its extinctive union. Concerning the specific interpretation of can. 121 offered by the Ordinary (*Votum*, 1-4) and the corresponding dispositions of the temporal goods of the Parish in the impugned decree, this Dicastery, recalling n. 1. l) of its *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, further observes that "*In casu unionis paroeciarum bona paroeciae su personae iuridicae suppressae non obveniunt personae iuridicae immediate superiori (cf. can. 123), sed, ad normam can. 121 paroeciae seu personae iuridicae* ad quam *aut paroeciis seu personis iuridicis* ad quas (STAS, Definitive Decree *coram* Echevarría Rodríguez, Prot. N. 38161/06 CA, 7 May 2010, n.

Case 1-20-10322-CLB, Doc 4976-10, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-1, Page 5 of 15

6). The Dicastery for Legislative Texts has confirmed that such an interpretation is "legally unfounded," stating, "In particular, canon 121 provides for the immediate and unconditional transfer of the temporal goods of suppressed parishes which are juridic persons to the parish *ad quem*, ensuring stable and transparent management of ecclesiastical resources. The absence of provisions for deferred terms or suspensive conditions confirms that the transfer must take place without delay. The expression '*obtinet*' implies an immediate acquisition of the temporal goods and property rights of the new juridic person" (Letter to the Dicastery for the Clergy, 9 September 2025, Prot. N. 18715/2025). Therefore, insofar as the impugned act vitiates can. 121, the decree fails to respect the aforementioned norm. Consequently, the law requires that the assets and liabilities of the Parish belong immediately to the Parish *ad quem* (cf. Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, 20 June 2020, n. 50).

18. Regarding the procedure, the required consultation with the Presbyteral Council (cf. can. 515 §2) occurred on 30 August 2024. Sixteen members voted in favor of the extinctive merger, with no abstentions (*Acta*, 14). While the Procurator has provided what is evidently a draft copy of the minutes from that consultation (cf. Appendix 8, p. 12) and argues that the text indicates that "none of those who voted knew the actual status of churches and oratories in our Family", the provided draft does not regard the impugned act, but the reduction of a church to profane but not sordid use. Nor does the lack of correct references in the draft text indicate that the Presbyteral Council was not sufficiently informed, given that both texts note that the proposals were shared with the Council. Procedurally, the Dicastery finds that the Ordinary acted according to the law.

19. Thus, the benefit asserted in cause (1), and therefore the sustainability of the recourse, depends not only upon the verification of a true sacramental decline, which, in this case, has been demonstrated, but also the benefit to the resulting community formed through the extinctive merger. The resulting Parish *ad quam*, being financially weaker on its own, benefits from the resources provided by the Parish through the extinctive merger. Inasmuch as the extinction of a parish is an act with permanent consequences, the cause should not be based on "conditions within the community that are presumably reversible or of brief duration" (Congregation for the Clergy, instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, n. 48), given the already proven decline of the Parish, not ameliorated by the long-standing sharing of a Pastor, this demonstrates that the decrease in average Mass attendance and participation in other sacraments is not a passing phenomenon.

20. Notwithstanding the arguments of the Procurator, given the the motivations expressed above, and in consideration of the jurisprudence of the Supreme Tribunal of the Apostolic Signature, namely, *sufficit proinde iusta causa; qua in ratione perpendenda, non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, ut totius dioecesis saluti animarum et quidam etiam in futuro, meliore quo fieri potest modo provideatur* (cf. STSA Decree Prot. N. 45082/11 CA, 27 April 2011), the Dicastery finds that the Ordinary has provided at least one just cause for the extinctive union of this Parish (cf. can. 515, §2).

Case 1-20-10322-CLB, Doc 4976-10, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-1, Page 6 of 15

THEREFORE

In accord with CIC can. 1739, this Dicastery hereby MODIFIES the decree of the Bishop of Buffalo, which joined the Parish of St. John the Evangelish in Olean to that of St. Mary of the Angels, aslo in Olean, in an extinctive union, CONFIRMING the extinctive union, for which sufficient just cause has been shown, while directing that the temporal goods of the suppressed Parish accrue immediately to the Parish *ad quam*.

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
8 April 2026

Lazzaro Cardinal You Heung sik
*Prefect*

Monsignor Simone Renna
*Undersecretary*

Case 1-20-10322-CLB, Doc 4976-10, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-1, Page 7 of 15



## HIS EXCELLENCY
## MOST REVEREND MICHAEL W. FISHER
*By the Grace of God and the Authority of the Apostolic See*
## BISHOP OF BUFFALO

## DECREE OF THE MERGER OF ASCENSION PARISH, BATAVIA AND ITS TERRITORY INTO RESURRECTION PARISH, BATAVIA

### *THE FACTS*

Ascension Parish, Batavia is one of the parishes born of the Journey of Faith and Grace initiative in the early part of the twenty-first century. On 1 April 2008, Ascension Parish was formed as a combination of St. Anthony Parish, Batavia and Sacred Heart Parish, Batavia. Although not specified in the decree of merger, the *de facto* parish church at the time of this merger was Sacred Heart church.

On 29 November 2012, the Most Reverend Richard J. Malone issued a decree reducing the church of St. Anthony to profane but not sordid use in accord with canon 1222 §2. This was executed on 31 December 2012.

With the parish now utilizing only one church building, there was a need for renovations to the site. These being completed, the pontifical ceremony of blessing and dedicating an altar was celebrated by the Most Reverend Michael W. Fisher on 11 December 2021. Ascension Parish has faithfully served the people of its territory since its foundation in 2008. In September of 2022, Ascension Parish was included in Family #12 as part of the Road to Renewal program.

The Road to Renewal has allowed the diocese to gain a more realistic picture of the financial and sacramental situations in its parishes. Ascension Parish has been identified as a community that could benefit by being joined with its sister community in Batavia. Additionally, due to our need to amass a substantial sum of money to settle numerous civil claims in Federal Bankruptcy Court, the possibility of alienating this property has also been suggested. This was discussed with members of the Chancery and especially with the Reverend Bryan Zielenieski, Vicar for the Renewal. As a result of these conversations, I hereby issue the following decree.

1

Case 1-20-10322-CLB, Doc 4976-10, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-1, Page 8 of 15

## THE LAW

Because a parish is a public juridic person (cc. 116, 515 §3) and therefore established perpetually (c. 120), it can only be extinguished by legitimate authority according to the norm of law. Canon 515 §2 states, "It is only for the diocesan bishop to erect, suppress, or alter parishes. He is neither to erect, suppress, nor alter notably parishes, unless he has heard the presbyteral council."

Unstated in this norm is the requirement for at least a just cause in augmenting the structure of a parish. As a parish is defined in law as "a certain community of the Christian faithful stably constituted in a particular church, whose pastoral care is entrusted to a pastor (*parochus*) as its proper pastor (*pastor*) under the authority of the diocesan bishop" (c. 515 §1), the focus of such augmentation is primarily concerned with the pastoral care of a group of people and only secondarily interested in specific worship sites. Thus, a merger of parishes falls under the governing authority of the diocesan bishop in accord with canon 374 §1.

Following the norm of canon 121, when two public juridic persons "are so amalgamated that one aggregate, itself with a juridic personality, is formed, this new juridic person obtains the goods and patrimonial rights proper to the prior ones and assumes the obligations with which they were burdened." The eminent canonist Reverend Robert Kennedy notes, "Canon 121…focuses on what, in the United States, is called a consolidation, in which two or more juridic persons are so joined that each of them loses its own juridic identity and in their stead a new juridic person is constituted. A consolidation involves both the suppression and creation of juridic persons" ("Chapter II: Juridic Persons" in *New Commentary on the Code of Canon Law* (New York: Paulist Press, 2000) 168). Since the norm of canon 121 assumes a consolidation in which two juridic persons go out of existence to form a new juridic person from the amalgamation of the former entities, it does not strictly apply to the situation of a parochial merger in which one entity absorbs another.

When the principle of law contained in canon 121 is applied to the canonical merger of one parish into another, the receiving parish must assume all net assets and debts of the merging parish. Here the term "net assets" is used to indicate that the merging parish is responsible for paying off its debts before an accurate assessment of what constitutes the temporal goods of the merging parish can be determined. "Commutative justice," the *Catechism of the Catholic Church* reminds us, "obliges strictly; it requires…paying debts" (n. 2411). This amount, once established, will be transferred to the receiving parish. What would be a clear *a iure* transfer of assets and liabilities to a newly constituted juridic person described in canon 121, is only partially applicable to the situation of a merging parish and can thus be addressed in terms of "net assets" to be identified at a future date.

2

Case 1-20-10322-CLB,   Doc 4976-10,   Filed 07/22/26,   Entered 07/22/26 17:16:01, Description: Exhibit J-1, Page 9 of 15

## THE ARGUMENT

The reshaping of the diocese to prepare it for more effective ministry in the future requires a certain consolidation of resources. The goal of the Road to Renewal is to reduce the strain on our already limited number of priests while at the same time uniting communities to foster a greater drive to "go out to all the world and preach the Gospel to all creation" (Mk 16:15). Part of this process requires the merging of parishes and the overall reduction of physical worship sites throughout the diocese. Looking at Ascension Parish in particular, the research and consultation done by the Office for Renewal and Development has revealed that this community would be better served by joining its resources to Resurrection Parish in an extinctive merger.

On 27 August 2024, the presbyteral council met at the Catholic Center of the Diocese of Buffalo. At this meeting, I consulted the council about the possibility of merging Ascension Parish into Resurrection Parish, Batavia. Rev. Zielenieski pointed out that there would likely only be three available priests (1 Diocesan and 2 Mercedarians) serving in Family #12 by 2030. Resurrection Parish was also considered to absorb the territory of other nearby parishes so as to centralize pastoral ministry and increase efforts for evangelization. This proposal received nearly unanimous support from the members of the Presbyteral Council present on 27 August.

Having heard the Presbyteral Council on this issue, I have chosen to merge Ascension Parish into Resurrection Parish in accord with canon 515 §2.

Thus, having done the requisite consultations and having gained the required consents, I, the undersigned Most Reverend Michael W. Fisher, Bishop of Buffalo, exercising my ordinary power in virtue of canon 515 §2, do hereby decree that Ascension Parish, Batavia be merged into Resurrection Parish, Batavia and Ascension to be extinct thereby.

Resurrection Parish will be the recipient of the net assets and liabilities of Ascension Parish. The territorial boundaries of Resurrection Parish will henceforth include:

The entire City and Town of Batavia east of Kelsey Rd. and Wortendyke Rd. and that part of the Township of Stafford that is north of Rte. 5 and west of Byron-Stafford Rd.

The intentions of the founders and donors regarding the temporal goods and patrimonial rights proper to the extinct Ascension Parish, insofar as they exist, must be respected. In addition, the temporal goods and patrimonial rights, and obligations of the extinct Resurrection Parish must be defined and allocated according to the norm of law (cf. cc. 121-122) as interpreted by this document.

3

All the parish and sacramental records of the extinct Ascension Parish, St. Anthony Parish, and Sacred Heart Parish are to be properly preserved and safeguarded in the parish archives of Resurrection Parish, Batavia, in accord with the norm of law.

This decree is to be effective on Friday 22 November 2024.

This decree is to be communicated to the Rev. Scottston F. Brentwood, O. de M., J.C.L., the Moderator of the priests *in solidum* assigned to care for both parishes (c. 520 §1) and the two parishes affected by this extinctive merger (cf. cc. 7, 54 §1). Anyone who feels his or her rights have been legitimately harmed by this decree, may present a challenge by requesting its revocation or emendation to its author within ten (10) useful days from its legitimate notification. Further recourse will follow the norms of canons 1734-1739.

Given at the Chancery of the Diocese of Buffalo on this 16th day of October 2024.

Most Reverend Michael W. Fisher
Bishop of Buffalo

Ms. Melissa Potzler
Chancellor

4



**DICASTERIUM PRO CLERICIS**

Prot. N. 2025 2316

Mr. William H. BRACH, Procurator
5168 Ellicott St. Rd.
Batavia, NY 14020
**UNITED STATES OF AMERICA**

Dear Mr. Brach,

This Dicastery for the Clergy writes regarding your hierarchical recourse against the decree dated 16 October 2024, issued by the Most Reverend Michael W. FISHER, Bishop of Buffalo, which merged **Ascension Parish in Batavia** with that of Resurrection Parish in Batavia in an extinctive union (cf. *CIC*, canons 121 and 515 §2).

Please find enclosed the Decree whereby the recourse has been decided. By way of explanation, every hierarchical recourse exists as a reality in its own right, even if it is linked to other events and circumstances. This curial Institution determined in this particular extinctive union that there was no violation of the law, either substantively or procedurally.

Thanking you for your correspondence, and with assurances of prayers and best wishes, I remain,

Sincerely yours in Christ,

✠ Andrés Gabriel Ferrada Moreira
*Titular Archbishop of Tiburnia*
*Secretary*

Case 1-20-10322-CLB, Doc 4976-10, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-1, Page 12 of 15



# DICASTERIUM PRO CLERICIS

# DECREE

Prot. N. 2025 2316

## SPECIES FACTI

1. WHEREAS, on 16 October 2024, the Bishop of Buffalo, His Excellency Michael W. FISHER (hereinafter, 'the Ordinary'), decreed the extinctive union of the Parish of the Ascension in Batavia, New York (hereinafter, 'the Parish') with the Parish of the Resurrection, also in Batavia, New York (cf. *CIC* cann. 121; 515 §2), and;

2. WHEREAS, on 28 October 2024, Mr. William H. BRACH, Procurator for 302 members of the faithful (hereinafter, 'the Procurator') brought *remonstratio* against the aforementioned decree to the Ordinary (cf. can. 1734 §1), who made no response (cf. can. 1735), and;

3. WHEREAS, on 11 December 2024, the Procurator submitted a request for hierarchical recourse (cf. can. 1737 §1) to the Dicastery for the Clergy (hereinafter, 'the Dicastery'), which accepted that request for study by its decretal letter of 20 March 2025 (cf. Art. 137 §1 *General Regulations of the Roman Curia*), recognizing as the object the decree the aforementioned extinctive union, and granting the requested suspension of the Ordinary's act, and;

4. WHEREAS, on 1 July 2025, the *votum* and the Acts of the Ordinary's decision arrived in the Dicastery, and;

5. WHEREAS, having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted by both the Ordinary and the Recurrent, the Dicastery judges as complete the documentation in its possession and proceeds, therefore, to its decision.

## IN IURE ET IN FACTO

6. The motivating factors for the singular administrative act being impugned are delineated in the Ordinary's decree: (1) the benefit for the Parish to be united with Saint John the Baptist Parish; (2) the "need to amass a substantial sum of money to settle numerous civil claims in Federal Bankruptcy Court"; (3) the possibility of alienating the property of the Parish; (4) the reduction in strain on the limited number of priests;

7. Citing this curial Institution's Instruction of 2020, the Procurator argues that the motivations for the impugned decree are based upon a general principle and not directly and organically connected to the Parish in question.

*Page 1 of 3*

Case 1-20-10322-CLB,    Doc 4976-10,    Filed 07/22/26,    Entered 07/22/26 17:16:01, Description: Exhibit J-1, Page 13 of 15

8. The information provided by the Ordinary shows that the Parish has experienced a consistent decline in the average Sunday Mass attendance: 350 persons in 2014 to 171 in 2023 (*Acta,* 3). In 2014, there were 523 registered households, of which 523 were practicing. By 2023, the number of registered households had decreased to 457, with 341 of those households practicing (*Acta,* 3). A similar decline is reflected in the reception of the sacraments: In 2014, there were nine baptisms, six confirmations, and three marriages, while in 2023, there was was one baptism, six confirmations, and no marriage (*Acta,* 3). During those years, from 2014-2023, there were singular years in which there were high numbers of both baptisms and confirmations; however, these years do not reflect the average numbers in the Parish. Participation in religious education also declined, although this decrease may be related to the sharing of religious education with the Resurrection Parish. Nevertheless, there was a decline from 81 in 2019 to 27 in 2023 (*Acta,* 3).

9. These numbers (cf. n. 8) support the Ordinary's assertion that the decline of the parochial community and the reduced number of priests available to serve the faithful would be ameliorated through the extinctive union of the Parish (cf. *Votum,* 9). Inasmuch as the extinction of a parish is an act with permanent consequences, the cause should not be based on "conditions within the community that are presumably reversible or of brief duration" (Congregation for the Clergy, instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelizing mission of the Church*, n. 48), given the already demonstrated decline of the Parish and the current sharing of a pastor within Family #12 which has not ameliorated the decline, this shows that the decrease in average Mass attendance and participation in other sacraments is not a passing phenomenon.

10. Financially, the Parish has seen an increase in its assets versus liabilities, going from $1,123,543 in 2014, versus liabilities of $21,147 that same year, to $1,509,066 in assets versus $16,226 in liabilities in 2023 (*Acta,* 3). However, its regular income has seen only a relatively small decrease, from a high of $238,854 in 2014 to $211,114 in 2023 (*Acta,* 3). This reduction in regular income has not been offset by additional income in recent years, such that, according to available data for the past decade, the parish has had a negative net operating balance every year from 2014 to 2023. (*Acta,* 4).

11. The Dicastery has affirmed that "the suppression of parishes by extinctive union is legitimate for causes directly related to a specific Parish." Furthermore, "As a condition for the legitimacy of this type of provision, the requisite motivations must be directly and organically connected to the interested parish community, and not on general considerations or theories, or based solely on principle" (Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, 20 June 2020, n. 48). In addition, the Dicastery has affirmed that the motivating cause for the suppression or merger of a parish must be at least a just cause, which, in the determination of the diocesan Bishop, serves the good of souls (cf. Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, 30 April 2013, Prot. N. 2013 1348).

12. While there are significant challenges facing the Diocese of Buffalo, the value of the Parish's property or the need to pay civil settlements from the sale of Parish property, are not just causes for its extinctive union. Concerning the specific interpretation of can. 121 offered by the Ordinary (*Votum,* 1-4) and the corresponding dispositions of the temporal goods of the Parish in the impugned decree, this Dicastery, recalling n. 1. 1) of the *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, observes that "*In casu unionis paroeciarum bona paroeciae su personae iuridicae suppressae*

*Page 2 of 3*

*non obveniunt personae iuridicae immediate superiori (cf. can. 123), sed, ad normam can. 121 paroeciae seu personae iuridicae* ad quam *aut paroeciis seu personis iuridicis* ad quas (STAS, Definitive Decree *coram* Echevarría Rodríguez, Prot. N. 38161/06 CA, 7 May 2010, n. 6). Therefore, the law requires that the assets and liabilities of the Parish belong immediately to the Parish *ad quem* (cf. Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, 20 June 2020, n. 50).

13. Regarding the procedure, the required consultation with the Presbyteral Council (cf. can. 515 §2) occurred on 27 August 2024. Twenty-four members voted in favor of the extinctive merger, with three abstentions (*Acta*, 13; 41). Procedurally, the Dicastery finds that the Ordinary acted according to the law.

14. Notwithstanding the arguments of the Procurator, given the decline in the average Sunday Mass participation of the faithful and the reduced number of priests available in the Diocese of Buffalo available to staff the Parish, the present sharing of a pastor between the Parishes, and in consideration of the jurisprudence of the Supreme Tribunal of the Apostolic Signature, namely, *sufficit proinde iusta causa; qua in ratione perpendenda, non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, ut totius dioecesis saluti animarum et quidam etiam in futuro, meliore quo fieri potest modo provideatur* (cf. STSA Decree Prot. N. 45082/11 CA, 27 April 2011), the Dicastery finds that the Ordinary has provided at least one just cause for the extinctive union of this Parish (cf. can. 515, §2).

THEREFORE

In accord with CIC can. 1739, this Dicastery hereby MODIFIES the decree of the Bishop of Buffalo, which joined the Parish of the Ascension in Batavia to that of Resurrection in Batavia in an extinctive union, CONFIRMING the extinctive union, for which sufficient just cause has been shown, while directing that the temporal goods of the suppressed Parish accrue immediately to the Parish *ad quem.*

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
8 September 2025

*Lazzaro You*
Lazzaro Cardinal You Heung sik
*Prefect*

Reverend Enrico Massignani
*Adjunct Undersecretary*

*Page 3 of 3*