

**DICASTERIUM**
**PRO CLERICIS**

From the Vatican, 9 September 2025

Prot. N. 2025 2315

Mr. John ROZAK, Procurator
426 University Avenue
Buffalo, NY 14223
**UNITED STATES OF AMERICA**

Dear Mr. Rozak,

This Dicastery for the Clergy writes further regarding your hierarchical recourse against the decree dated 25 November 2024, issued by the Most Reverend Michael W. FISHER, Bishop of Buffalo, which merged **Blessed Sacrament Parish in Tonawanda** with that of St. John the Baptist Parish in Kenmore in an extinctive union (cf. *CIC*, canons 121 and 515 §2).

Please find enclosed the Decree whereby the recourse has been decided. By way of explanation, every hierarchical recourse exists as a reality in its own right, even if it is linked to other events and circumstances. This curial Institution determined in this particular extinctive union that there was no violation of the law, either substantively or procedurally.

Thanking you for your correspondence, and with assurances of prayers and best wishes, I remain,

Sincerely yours in Christ,

✠ Andrés Gabriel Ferrada Moreira
*Titular Archbishop of Tiburnia*
*Secretary*

Case 1-20-10322-CLB, Doc 4976-11, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-2, Page 1 of 19



# DICASTERIUM PRO CLERICIS

# DECREE

Prot. N. 2025 2315

## *SPECIES FACTI*

1. WHEREAS, on 25 November 2024, the Bishop of Buffalo, His Excellency Michael W. FISHER (hereinafter, 'the Ordinary'), decreed the extinctive union of the Parish of Blessed Sacrament in Tonawanda, New York (hereinafter, 'the Parish') with the Parish of Saint John the Baptist in Kenmore, New York (cf. *CIC* cann. 121; 515 §2), and;

2. WHEREAS, on 2 December 2024, Mr. John ROZAK, Procurator for 300 members of the faithful (hereinafter, 'the Procurator') brought *remonstratio* against the aforementioned decree to the Ordinary (cf. can. 1734 §1), who made no response (cf. can. 1735), and;

3. WHEREAS, on 13 January 2025, the Procurator submitted a request for hierarchical recourse (cf. can. 1737 §1) to the Dicastery for the Clergy (hereinafter, 'the Dicastery'), which accepted that request for study by its decretal letter of 20 March 2025 (cf. Art. 137 §1 *General Regulations of the Roman Curia*), recognizing as the object the decree the aforementioned extinctive union, and granting the requested suspension of the Ordinary's act, and;

4. WHEREAS, on 1 July 2025, the *votum* and the Acts of the Ordinary's decision arrived in the Dicastery, and;

5. WHEREAS, having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted by both the Ordinary and the Recurrent, the Dicastery judges as complete the documentation in its possession and proceeds, therefore, to its decision.

## *IN IURE ET IN FACTO*

6. The motivating factors for the singular administrative act being impugned are delineated in the Ordinary's decree: (1) the benefit for the Parish to be united with Saint John the Baptist Parish; (2) the "need to amass a substantial sum of money to settle numerous civil claims in Federal Bankruptcy Court"; (3) the possibility of alienating the property of the Parish; (4) the reduction in strain on the limited number of priests; (5) the consistent decline in sacramental life and parish involvement.

7. Citing this curial Institution's Instruction of 2020, the Procurator argues that the motivations for the impugned decree are based upon a general principle and not directly and organically connected to the Parish in question.

273

Case 1-20-10322-CLB, Doc 4976-11, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-2, Page 2 of 19

8. The information provided by the Ordinary shows that the Parish has experienced a decline in the average Sunday Mass attendance, 550 persons in 2014, and continuing to fall (except for 2016, when 562 persons attended Sunday Mass on average) to 226 in 2023 (*Acta,* 3). In 2014, there were 719 registered households, of which 573 were practicing. By 2023, the registered households had fallen to 577, with 346 of those practicing (*Acta,* 3). A similar decline is reflected in the reception of the sacraments: In 2014, there were 14 baptisms, 14 confirmations and 2 marriages, while in 2023, there were three baptisms, one confirmation and one marriage (*Acta,* 3). Participation in religious education also fell: in 2014, there were 141 students, while in 2023, there were only 7 (*Acta,* 3). The Ordinary's overall assessment of sacramental participation for this Parish was "the numbers are low for the space and are not projected to improve (*Votum,* 9)."

9. These numbers (cf. n. 8) support the Ordinary's assertion that the decline of the parochial community and the reduced number of priests available to serve the faithful would be ameliorated through the extinctive union of the Parish. Inasmuch as the extinction of a parish is an act with permanent consequences, the cause should not be based on "conditions within the community that are presumably reversible or of brief duration" (Congregation for the Clergy, instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelizing mission of the Church,* n. 48), given the already proven decline of the Parish, this demonstrates that the decrease in average Mass attendance and participation in other sacraments is not a passing phenomenon.

10. Financially, the Parish has increased its assets from $280,724 in 2014, versus liabilities of $719,232 that same year, to $606,209 in assets versus $24,489 in liabilities (*Acta,* 3). However, its regular income has fallen, from a high of $540,754 in 2014 to $298,505 in 2023 (*Acta,* 3). This has been overcome with additional income, such that in the majority of the years from 2014 to 2023, the Parish has enjoyed a significant net operating balance (*Acta,* 4).

11. The Dicastery has affirmed that "the suppression of parishes by extinctive union is legitimate for causes directly related to a specific Parish." Furthermore, "As a condition for the legitimacy of this type of provision, the requisite motivations must be directly and organically connected to the interested parish community, and not on general considerations or theories, or based solely on principle" (Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church,* 20 June 2020, n. 48). In addition, the Dicastery has affirmed that the motivating cause for the suppression or merger of a parish must be at least a just cause, which, in the determination of the diocesan Bishop, serves the good of souls (cf. Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches,* 30 April 2013, Prot. N. 2013 1348).

12. While there are significant challenges facing the Diocese of Buffalo, the value of the Parish's property or the need to pay civil settlements from the sale of Parish property, are not just causes for its extinctive union. Concerning the specific interpretation of can. 121 offered by the Ordinary (*Votum,* 1-4) and the corresponding dispositions of the temporal goods of the Parish in the impugned decree, this Dicastery, recalling n. 1. l) of the *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches,* observes that "*In casu unionis paroeciarum bona paroeciae su personae iuridicae suppressae non obveniunt personae iuridicae immediate superiori (cf. can. 123), sed, ad normam can. 121 paroeciae seu personae iuridicae* ad quam *aut paroeciis seu personis iuridicis* ad quas (STAS, Definitive Decree *coram* Echevarría Rodríguez, Prot. N. 38161/06 CA, 7 May 2010, n. 6). Therefore, the law requires that the assets and liabilities of the Parish belong

Case 1-20-10322-CLB, Doc 4976-11, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-2, Page 3 of 19

immediately to the Parish *ad quem* (cf. Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, 20 June 2020, n. 50).

13. Regarding the procedure, the required consultation with the Presbyteral Council (cf. can. 515 §2) occurred on 27 August 2024. Twenty-two members voted in favor of the extinctive merger (*Acta*, 29; 31). Procedurally, the Dicastery finds that the Ordinary acted according to the law.

14. Notwithstanding the arguments of the Procurator, given the decline in the average Sunday Mass participation of the faithful, the reduced number of priests available in the Diocese of Buffalo available to staff the Parish, and the benefit to the Parish *ad quem* through the extinctive union of the Parish with it, and in consideration of the jurisprudence of the Supreme Tribunal of the Apostolic Signature, namely, *sufficit proinde iusta causa; qua in ratione perpendenda, non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, ut totius dioecesis saluti animarum et quidam etiam in futuro, meliore quo fieri potest modo provideatur* (cf. STSA Decree Prot. N. 45082/11 CA, 27 April 2011), the Dicastery finds that the Ordinary has provided at least one just cause for the extinctive union of this Parish (cf. can. 515, §2).

THEREFORE

**In accord with CIC can. 1739, this Dicastery hereby MODIFIES the decree of the Bishop of Buffalo, which joined the Parish of Blessed Sacrament in Tonawanda to that of Saint John the Baptist in Kenmore in an extinctive union, CONFIRMING the extinctive union, for which sufficient just cause has been shown, while directing that the temporal goods of the suppressed Parish accrue immediately to the Parish *ad quem*.**

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
9 September 2025

*Lazzaro You*
Lazzaro Cardinal You Heung sik
*Prefect*

✠ Andrés G. Ferrada Moreira
*Titular Archbishop of Tiburnia*
*Secretary*

*Page 3 of 3*



## HIS EXCELLENCY
## MOST REVEREND MICHAEL W. FISHER
*By the Grace of God and the Authority of the Apostolic See*
## BISHOP OF BUFFALO

## DECREE OF THE MERGER OF ST. ALOYSIUS GONZAGA PARISH, CHEEKTOWAGA AND ITS TERRITORY INTO CHRIST THE KING PARISH, SNYDER

### *THE FACTS*

The desire of Bishop John A. Duffy to establish a new parish at the intersection of Buffalo, Cheektowaga, and Amherst was realized by the Rev. Walter Gonter in 1940. Rev. Gonter celebrated the first two Masses of the parish on Mother's Day, 12 May 1940, in a temporary structure. The church which now serves as the parish church of St. Aloysius Gonzaga Parish was finished in time for *Laetare* Sunday, 3 March 1941, when it was dedicated by Bishop Duffy in a solemn ceremony.

Due to the growing size of the parish and its desire to offer an educational alternative for its children, a school was built in 1947 with the first class graduating in 1951. The school was staffed by the Sisters of St. Joseph in these years. As the area continued to experience growth, the school was enlarged and expanded through many construction projects over the years. In 1977, the Felician Sisters were called upon to reinforce the religious presence at the school. From this year, the school would encounter declining enrollment and eventually close in 2007.

As part of the Journey in Faith and Grace initiative, St. Aloysius Gonzaga Parish took over the territory and personality of Immaculate Heart of Mary Parish in an extinctive merger. This took place on 1 November 2009. In July of 2023, St. Aloysius Gonzaga Parish was included in Family #16 as part of the Road to Renewal program.

The Road to Renewal has allowed the diocese to gain a more realistic picture of the financial and sacramental situations in its parishes. St. Aloysius Gonzaga Parish has been identified as a community that could benefit by being joined with its sister community in Snyder. Additionally, due to our need to amass a substantial sum of money to settle numerous civil claims in Federal Bankruptcy Court, the possibility of alienating this property has also been suggested. This was discussed with members of the Chancery and especially with the Reverend

1

Bryan Zielenieski, Vicar for the Renewal. As a result of these conversations, I hereby issue the following decree.

## *THE LAW*

Because a parish is a public juridic person (cc. 116, 515 §3) and therefore established perpetually (c. 120), it can only be extinguished by legitimate authority according to the norm of law. Canon 515 §2 states, "It is only for the diocesan bishop to erect, suppress, or alter parishes. He is neither to erect, suppress, nor alter notably parishes, unless he has heard the presbyteral council."

Unstated in this norm is the requirement for at least a just cause in augmenting the structure of a parish. As a parish is defined in law as "a certain community of the Christian faithful stably constituted in a particular church, whose pastoral care is entrusted to a pastor (*parochus*) as its proper pastor (*pastor*) under the authority of the diocesan bishop" (c. 515 §1). The focus of such augmentation is primarily concerned with the pastoral care of a group of people and only secondarily interested in specific worship sites. Thus, a merger of parishes falls under the governing authority of the diocesan bishop in accord with canon 374 §1.

Following the norm of canon 121, when two public juridic persons "are so amalgamated that one aggregate, itself with a juridic personality, is formed, this new juridic person obtains the goods and patrimonial rights proper to the prior ones and assumes the obligations with which they were burdened." The eminent canonist Reverend Robert Kennedy notes, "Canon 121…focuses on what, in the United States, is called a consolidation, in which two or more juridic persons are so joined that each of them loses its own juridic identity and in their stead a new juridic person is constituted. A consolidation involves both the suppression and creation of juridic persons" ("Chapter II: Juridic Persons" in *New Commentary on the Code of Canon Law* (New York: Paulist Press, 2000) 168). Since the norm of canon 121 assumes a consolidation in which two juridic persons go out of existence to form a new juridic person from the amalgamation of the former entities, it does not strictly apply to the situation of a parochial merger in which one entity absorbs another.

When the principle of law contained in canon 121 is applied to the canonical merger of one parish into another, the receiving parish must assume all net assets and debts of the merging parish. Here the term "net assets" is used to indicate that the merging parish is responsible for paying off its debts before an accurate assessment of what constitutes the temporal goods of the merging parish can be determined. "Commutative justice," the *Catechism of the Catholic Church* reminds us, "obliges strictly; it requires…paying debts" (n. 2411). This amount, once established, will be transferred to the receiving parish. What would be a clear *a iure* transfer of assets and liabilities to a newly constituted juridic person described in canon 121, is only partially applicable to the situation of a merging parish and can thus be addressed in terms of "net assets" to be identified at a future date.

2

Case 1-20-10322-CLB, Doc 4976-11, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-2, Page 6 of 19

## THE ARGUMENT

The reshaping of the diocese to prepare it for more effective ministry in the future requires a certain consolidation of resources. The goal of the Road to Renewal is to reduce the strain on our already limited number of priests while at the same time uniting communities to foster a greater drive to "go out to all the world and preach the Gospel to all creation" (Mk 16:15). Part of this process requires the merging of parishes and the overall reduction of physical worship sites throughout the diocese. Looking at St. Aloysius Gonzaga Parish in particular, the research and consultation done by the Office for Renewal and Development has revealed that this community would be better served by joining its resources to Christ the King Parish in an extinctive merger.

On 27 August 2024, the presbyteral council met at the Catholic Center of the Diocese of Buffalo. At this meeting, I consulted the council about the possibility of merging St. Aloysius Gonzaga Parish into Christ the King Parish, Snyder. Rev. Zielenieski pointed out that there would likely only be two available priests serving in Family #16 by 2030. Christ the King Parish is also being considered to absorb the territory of other nearby parishes so as to centralize pastoral ministry and increase efforts for evangelization. This proposal received nearly unanimous support from the members of the Presbyteral Council present on 27 August.

Having heard the Presbyteral Council on this issue, I have chosen to merge St. Aloysius Gonzaga Parish into Christ the King Parish in accord with canon 515 §2.

Thus, having done the requisite consultations and having gained the required consents, I, the undersigned Most Reverend Michael W. Fisher, Bishop of Buffalo, exercising my ordinary power in virtue of canon 515 §2, do hereby decree that St. Aloysius Gonzaga Parish, Cheektowaga be merged into Christ the King Parish, Snyder and St. Aloysius Gonzaga to be extinct thereby.

Christ the King Parish will be the recipient of the net assets and liabilities of St. Aloysius Gonzaga Parish. The territorial boundaries of Christ the King Parish will henceforth include:

1. the territory south of Wehrle Dr. from Orleans Rd. to Washington Hwy.; south of Sheridan Dr. from Harlem Rd. (Rte. 240) to N. Forest Rd.;
2. the territory west of N. Forest Rd. from Sheridan to Park Club Ln., Park Club Ln. to Main St., west on Main St. to Royal Pkwy W., Royal Pkwy W. to Queen Pl. to S. Forest Rd. to Wehrle Dr., west on Wehrle Dr. to Roycroft, south along an imaginary line to Huth Rd. Huth Rd. to Woodbridge Ave., south on Woodbridge Ave. to the Kensington Expressway (Rte. 33), west on Rte. 33 to Harlem and south on Harlem to Sugar Rd.;
3. the territory east of Suffolk St. from Langfield Dr. to Rte. 33, east on Rte. 33 to Kay St., north on Kay St. to Division to Leonard St. north on Leonard to Kensington Ave., west on Kensington to Orleans St., north on Orleans St. to Cheektowaga Town Line; east along Cheektowaga Town Line to Washington Hwy., north on Washington Hwy. to Kings Hwy., east on Kings Hwy. to Harlem Rd. and north on Harlem to Sheridan Dr.;

3

Case 1-20-10322-CLB, Doc 4976-11, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-2, Page 7 of 19

4. the territory north of Langfield Dr. and Sugar Rd. from Suffolk to Harlem (Rte. 240) and north of Wehrle Dr. from Roycroft S. Forest Rd.

The intentions of the founders and donors regarding the temporal goods and patrimonial rights proper to the extinct St. Aloysius Gonzaga Parish, insofar as they exist, must be respected. In addition, the temporal goods and patrimonial rights, and obligations of the extinct St. Aloysius Gonzaga Parish must be defined and allocated according to the norm of law (cf. cc. 121-122) as interpreted by this document.

All the parish and sacramental records of the extinct St. Aloysius Gonzaga and Immaculate Heart of Mary Parishes are to be properly preserved and safeguarded in the parish archives of Christ the King Parish, Snyder, in accord with the norm of law.

This decree is to be effective on Friday 30 May 2025.

This decree is to be communicated to the Rev. David A. Bellittiere, the Pastor of both parishes (c. 532) and the two parishes affected by this extinctive merger (cf. cc. 7, 54 §1). Anyone who feels his or her rights have been legitimately harmed by this decree, may present a challenge by requesting its revocation or emendation to its author within ten (10) useful days from its legitimate notification. Further recourse will follow the norms of canons 1734-1739.

Given at the Chancery of the Diocese of Buffalo on this 17th day of December 2024.

Most Reverend Michael W. Fisher
Bishop of Buffalo

Ms. Melissa Potzler
Chancellor

4

Case 1-20-10322-CLB, Doc 4976-11, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-2, Page 8 of 19



**DICASTERIUM
PRO CLERICIS**

From the Vatican, 19 September 2025

Prot. N. 2025 2763

Ms. Ellen MISSERT, Procurator
233 Kenview Boulevard
Cheektowaga, NY 14215
**UNITED STATES OF AMERICA**

Dear Ms. Missert,

This Dicastery for the Clergy writes further regarding your hierarchical recourse against the decree dated 17 December 2024, issued by the Most Reverend Michael W. FISHER, Bishop of Buffalo, which merged **St. Aloysius Gonzaga Parish in Cheektowaga** with that of Christ the King Parish in Snyder in an extinctive union (cf. *CIC*, canons 121 and 515 §2).

Please find enclosed the Decree whereby the recourse has been decided. By way of explanation, every hierarchical recourse exists as a reality in its own right, even if it is linked to other events and circumstances. This curial Institution determined in this particular extinctive union that there was no violation of the law, either substantively or procedurally.

Thanking you for your correspondence, and with assurances of prayers and best wishes, I remain,

Sincerely yours in Christ,

✠ Andrés Gabriel Ferrada Moreira
*Titular Archbishop of Tiburnia*
*Secretary*



## DICASTERIUM PRO CLERICIS

# DECREE

Prot. N. 2025 2763

### SPECIES FACTI

1. WHEREAS, on 17 November 2024, the Bishop of Buffalo, His Excellency Michael W. FISHER (hereinafter, 'the Ordinary'), decreed the extinctive union of the Parish of St. Aloysius Gonzaga in Cheektowaga, New York (hereinafter, 'the Parish') with the Parish of Christ the King in Snyder, New York (cf. *CIC* cann. 121; 515 §2), and;

2. WHEREAS, on 28 December 2024, Ms. Ellen MISSERT, Procurator for 349 members of the faithful (hereinafter, 'the Procurator'), brought *remonstratio* against the aforementioned decree to the Ordinary (cf. can. 1734 §1), who responded in a letter dated 27 January 2025, rejecting the aforementioned request for revocation, and;

3. WHEREAS, on 11 February 2025, the Procurator submitted a request for hierarchical recourse (cf. can. 1737 §1) to the Dicastery for the Clergy (hereinafter, 'the Dicastery'), which accepted that request for study by its decretal letter of 20 March 2025 (cf. Art. 137 §1 *General Regulations of the Roman Curia*), recognizing as the object the decree the aforementioned extinctive union, and granting the requested suspension of the Ordinary's act, and;

4. WHEREAS, on 4 August 2025, the *votum* and the Acts of the Ordinary's decision arrived in the Dicastery, and;

5. WHEREAS, having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted by both the Ordinary and the Recurrent, the Dicastery judges as complete the documentation in its possession and proceeds, therefore, to its decision.

### IN IURE ET IN FACTO

6. The motivating factors for the singular administrative act being impugned are delineated in the Ordinary's decree: (1) the benefit for the Parish to be united with Christ the King Parish; (2) the "need to amass a substantial sum of money to settle numerous civil claims in Federal Bankruptcy Court"; (3) the possibility of alienating the property of the Parish; (4) the reduction in strain on the limited number of priests;

7. Citing this curial Institution's Instruction of 2020, the Procurator argues that the motivations for the impugned decree are based upon a general principle and not directly and organically connected to the Parish in question.

8. The information provided by the Ordinary shows that the Parish has experienced a decline in the average Sunday Mass attendance during the period of 2014-2023: 435 persons in 2014 (the highest number in the time period) to 207 in 2023 (*Acta,* 3). Similarly, the number of registered households in the Parish decreased. In 2014, there were 825 registered households, of which 425 were practicing. By 2023, the number of registered households had decreased to 390, with 220 of those households practicing (*Acta,* 3). A similar decline is reflected in the reception of the sacraments: In 2014, there were 12 baptisms, 17 confirmations, and 3 marriages, while in 2023, there were no baptisms, 4 confirmations, and 2 marriages (*Acta,* 3). The decline becomes clearer when one examines the highest numbers of these sacraments compared to 2023: baptism—12 in 2014; confirmation—17 in 2014; and marriage—4 in 2020 (*Acta,* 3). Participation in religious education also declined during that same period of 2014-2023: in 2014, there were 55 students, while in 2023, the number had dropped to 16 (*Acta,* 3).

9. These numbers (cf. n. 8) support the Ordinary's assertion that the decline of the parochial community and the reduced number of priests available to serve the faithful would be ameliorated through the extinctive union of the Parish (cf. *Votum,* 10). Inasmuch as the extinction of a parish is an act with permanent consequences, the cause should not be based on "conditions within the community that are presumably reversible or of brief duration" (Congregation for the Clergy, instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelizing mission of the Church,* n. 48), given the already proven decline of the Parish, this demonstrates that the decrease in average Mass attendance and participation in other sacraments is not a passing phenomenon.

10. Financially, the Parish has seen a negative net operating balance in six out of nine years. The years of positive balances are not significant enough to show that the overall trend is financially positive. These is further supported by the decline in total receipts and a decline in assets, which may indicate that the Parish is using its savings to make up for these deficits (*Acta,* 3-4) these negative balance increase in its assets versus liabilities, going from $642,137 in 2014, versus liabilities of $43,605 that same year, to $357,3087 in assets versus $71,807 in liabilities in 2022 (*Acta,* 3). The Parish's regular income has fallen, from a high of $328,360 in 2014 to $218,573 in 2022 (*Acta,* 3). This has not been overcome by additional income in recent years, such that, according to available data for the period from 2014 to 2022, the parish has had a negative net operating balance in three out of nine years. (*Acta,* 4).

11. The Dicastery has affirmed that "the suppression of parishes by extinctive union is legitimate for causes directly related to a specific Parish." Furthermore, "As a condition for the legitimacy of this type of provision, the requisite motivations must be directly and organically connected to the interested parish community, and not on general considerations or theories, or based solely on principle" (Congregation for the

Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, 20 June 2020, n. 48). In addition, the Dicastery has affirmed that the motivating cause for the suppression or merger of a parish must be at least a just cause, which, in the determination of the diocesan Bishop, serves the good of souls (cf. Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, 30 April 2013, Prot. N. 2013 1348).

12. While there are significant challenges facing the Diocese of Buffalo, the value of the Parish's property or the need to pay civil settlements from the sale of Parish property, are not just causes for its extinctive union. Concerning the specific interpretation of can. 121 offered by the Ordinary (*Votum*, 1-4) and the corresponding dispositions of the temporal goods of the Parish in the impugned decree, this Dicastery, recalling n. 1. l) of its *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, further observes that "*In casu unionis paroeciarum bona paroeciae su personae iuridicae suppressae non obveniunt personae iuridicae immediate superiori (cf. can. 123), sed, ad normam can. 121 paroeciae seu personae iuridicae* ad quam *aut paroeciis seu personis iuridicis* ad quas (STAS, Definitive Decree *coram* Echevarría Rodríguez, Prot. N. 38161/06 CA, 7 May 2010, n. 6). The Dicastery for Legislative Texts has confirmed that such an interpretation is "legally unfounded," stating, "In particular, canon 121 provides for the immediate and unconditional transfer of the temporal goods of suppressed parishes which are juridic persons to the parish *ad quem*, ensuring stable and transparent management of ecclesiastical resources. The absence of provisions for deferred terms or suspensive conditions confirms that the transfer must take place without delay. The expression '*obtinet*' implies an immediate acquisition of the temporal goods and property rights of the new juridic person" (Letter to the Dicastery for the Clergy, 9 September 2025, Prot. N. 18715/2025). Therefore, insofar as the impugned act vitiates can. 121, the decree fails to respect the aforementioned norm. Consequently, the law requires that the assets and liabilities of the Parish belong immediately to the Parish *ad quem* (cf. Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, 20 June 2020, n. 50).

13. Regarding the procedure, the required consultation with the Presbyteral Council (cf. can. 515 §2) occurred on 27 August 2024. Nineteen members voted in favor of the extinctive merger, with two abstentions (*Acta*, 19). Procedurally, the Dicastery finds that the Ordinary acted according to the law.

14. Notwithstanding the arguments of the Procurator, given the decline in the average Sunday Mass participation of the faithful and the reduced number of priests available in the Diocese of Buffalo available to staff the Parish, and in consideration of the jurisprudence of the Supreme Tribunal of the Apostolic Signature, namely, *sufficit proinde iusta causa; qua in ratione perpendenda, non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, ut totius dioecesis saluti animarum et quidam etiam in futuro, meliore quo fieri potest modo provideatur* (cf. STSA Decree

Prot. N. 45082/11 CA, 27 April 2011), the Dicastery finds that the Ordinary has provided at least one just cause for the extinctive union of this Parish (cf. can. 515, §2).

THEREFORE

**In accord with CIC can. 1739, this Dicastery hereby MODIFIES the decree of the Bishop of Buffalo, which joined the Parish of St. Aloysius Gonzaga in Cheektowaga to that of Christ the King in Snyder in an extinctive union, CONFIRMING the extinctive union, for which sufficient just cause has been shown, while directing that the temporal goods of the suppressed Parish accrue immediately to the Parish *ad quem*.**

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
19 September 2025

✠ Andrés G. Ferrada Moreira
*Titular Archbishop of Tiburnia*
*Secretary*

Reverend Enrico Massignani
*Adjunct Undersecretary*



# DICASTERIUM PRO CLERICIS

## DECREE

Prot. N. 2025 2309

### *SPECIES FACTI*

1. WHEREAS, on 15 January 2025, His Excellency, the Most Reverend Michael Fisher, Bishop of Buffalo (hereinafter, 'the Ordinary') issued a decree joining the parish of Holy Spirit, Buffalo, New York (hereinafter, 'the Parish') to St. Mark parish also in Buffalo, New York, in an extinctive union (cf. *CIC* cann. 121; 515 §2), to take effect 12 February 2025, and;

2. WHEREAS, after the aforesaid Decree was published to the faithful on 19 January 2025, Mr. Thomas BURGER, acting with a legitimate mandate on behalf of 342 parishioners of the Parish (hereinafter, 'the Procurator') made *remonstratio* on 25 January 2025 against the same to the Ordinary (cf. can. 1734), and;

3. WHEREAS, with thirty days having passed with no response from the Ordinary (cf. can. 1735), on 1 March 2025, the Procurator sought hierarchical recourse before the Dicastery for the Clergy (hereinafter, 'the Dicastery'), which was received on 12 March 2025 and was accepted for examination on 26 March 2025, and;

4. WHEREAS, on 12 May 2025, the Acts and the *votum* of the Ordinary arrived in the Dicastery, and;

5. WHEREAS a hierarchical recourse is, by its nature, a documentary process that proceeds on the basis of examination of authentic documents provided by interested parties at the request of the Dicastery; thus having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted by both the Ordinary and the Recurrent, the Dicastery judges as complete the documentation in its possession and proceeds, therefore, to its decision *per cartas*.

### *IN IURE*

1. The Apostolic Constitution, *Praedicate Evangelium*, art. 118, 1° establishes the competence of the Dicastery for the Clergy over "general discipline governing... parishes" and thus its authority to decide the matter as the appropriate Entity of the Holy See.

2. Concerning the specific object of this recourse, the extinctive union of a parish, canon 50 requires that, before issuing a decree, the Ordinary must seek the necessary information and proofs, and consult those whose rights can be harmed. Canon 515 §2 requires that the diocesan Bishop consult the Presbyteral Council before establishing, suppressing or notably altering a parish. Further, a decree is to be issued in writing and, when it contains a decision, the reasons for that decision must be given, at least in summary form (cf. can. 51). Canon 515 §2 makes no provision as to the gravity of the cause required. Hence it is sufficient that a just cause be present (cf. Decrees of the Supreme Tribunal of the Apostolic Signatura, Prot. N. 24048/93 CA, 6 December 1993 and Prot. N. 38159/06 CA, 18 April 2008).

3. However, the just cause must primarily be the betterment of the pastoral provision for the salvation of souls (cf. Second Vatican Ecumenical Council, Decree on the Pastoral Office of

Case 1-20-10322-CLB, Doc 4976-11, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit J-2, Page 14 of 19

Bishops in the Church, *Christus Dominus*, 28 October 1965, n. 32) and the good of the faithful (cf. Congregation for Bishops, Directory for the Pastoral Ministry of Bishops, *Apostolorum Successores*, 22 February 2004, n. 214).

4.  The Dicastery has affirmed that "the suppression of parishes by extinctive union is legitimate for causes directly related to a specific Parish," and further, "As a condition for the legitimacy of this type of provision, the requisite motivations must be directly and organically connected to the interested parish community, and not on general considerations or theories, or based solely on principle" (Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the Service of the Evangelising Mission of the Church*, 20 June 2020, n. 48).

5.  However, although a diocesan Bishop is required to consider the situation *ad rem* of a particular parish in the deliberation of a just cause, the law does allow him to take into account the condition of the entire Diocese. The Apostolic Signatura has stated: *Decretum suppressionis feratur, denique, saltem summarie expressis motivis (cf. can. 51). Qua in re, "Episcopus diocesanus...iuxta suam prudentem discretionem procedure potest, excluso vero arbitrarietate" (decreta Congressus diei 3 maii 2002, prot. Nn. 33219/01 CA; 32220/01 CA; 32238/01 CA). Hac in ratione perpendenda,* non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, *ut totius dioecesis saluti animarum meliore quo fieri potest modo, provideatur. Nullum tandem "ius christifedelium agnoscitur ad determinatam paroeciam, cum illis sufficiat paroecia quaedam, quae eorumdem curam pastoralem expleat" (cf. v.g. decreta Congressus dierum 12 octobris 1995, prot. N. 25323/94 CA; 18 ianuarii 1996 prot. N. 25465/94 CA; 12 octobris 1995, prot. N. 25530/95 CA* (cf. Decree Prot. N. 37280/05 CA, 22 May 2009). This was also reiterated in a subsequent decision, *sufficit proinde iusta causa; qua in ratione perpendenda, non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, ut totius dioecesis saluti animarum* et quidam etiam in futuro, *meliore quo fieri potest modo provideatur* (cf. Decree Prot. N. 45082/11 CA, 27 April 2011). Because the faithful have a right to pastoral care in some parish, rather than a right to a specific parish, and since the diocesan Bishop can consider the condition of an area or the Diocese as a whole, even a parish whose community and finances are in good condition may be united to another. The Apostolic Signatura succinctly expressed this jurisprudence as follows: *"etiam in paroecia in bona condicione legitime uniri potest cum aliis paroeciis, nam consideranda est non tantum condicio singulae paroeciae sed etiam totius loci, immo totius dioecesis (cf. SSAT decretum diei 12 iunii 2012, Prot. N. 46039/11 CA)"* (Decree, 4 December 2020, Prot. N. 55183/20 CA). Taken together, the Instruction of the Dicastery cited above and the jurisprudence of the Apostolic Signatura must be understood to require that the conditions generally affecting an area or the entire Diocese must affect the interested Parish in some way.

6.  The nature of a parish in the Church is found in canon 515 §1: *Paroecia est certa communitas christifidelium in Ecclesia particulari stabiliter constituta, cuius cura pastoralis, sub auctoritate Episcopi dioecesani, committitur parocho, qua proprio eiusdem pastori.* A parish, from the moment of its legitimate establishment by the competent authority, is a public juridic person, as clearly stated in canon 515 §3: *Paroecia legitime erecta personalitate iuridica ipso iure gaudet.* As a juridic person, a parish is perpetual by nature however, it is possible to suppress (cf. can. 120 §1) juridic persons, such as parishes, or to merge them with another parish (cf. can. 121). The suppression or merger of the juridic person of the Parish requires a singular decree of the diocesan Bishop after the necessary consultation with the Presbyteral Council of his Diocese, as found in canon 515 §2: *Paroecias erigere, supprimere aut eas innovare unius est Episcopi dioecesani, qui paroecias ne erigat aut supprimat, neve eas notabiliter innovet, nisi audito consilio presbyterali.* The motivating cause for the suppression or merger of a parish must be at least a just cause, which, in the determination of the diocesan Bishop, serves the good of souls (cf. Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of*

unit (Family #20, "Catholic Community of North Buffalo), originally consisting of six other parishes in the Buffalo city area, served by one pastor and a parochial vicar (*Acta*, 14, Parish Bulletin, 22 September 2025).

3. The Parish had 740 registered households as of 2023, with an average weekend Mass attendance of 150 (*Acta*, 7). From 2014 to 2023, according to data presented by the Ordinary, there has been a small decline in the number of registered households, from 777 to 740 (a 4.8% decrease), with a greater decline in the number of "practicing households," from 564 to 430 (a decrease of 23.8%, *Acta*, 7-8), and the number of households that contribute to the parish, from 622 to 300, a decrease of 51.8%, even as the average weekly attendance at Holy Mass has declined sharply from 640 to 150, a decrease of 76.6% (*Acta*, 7-8). There is a small discrepancy in the data, in that one table states that the "Ave. Sunday Attendance" in 2022 was 250 (*Acta*, 3), whereas a few pages later, the "Avg. WE Att." is listed as 150 for both 2022 and 2023 (*Acta*, 7). This discrepancy does not change the observable trend of the decline, however. No definition of "registered," "practicing," or "contributing" household is provided.

4. Over the same period, the number of sacraments celebrated the Parish, though small, has stayed more or less stable, with 11 baptisms, 7 confirmations and 2 marriages in 2023 (*Acta*, 7); however there has been a 56% drop in enrollment in religious education, from 75 to 33, which suggests an aging community, with few young families (*Acta*, 7-9).

5. Financially, the Parish is stable, with "receipts" increasing from $410,360 to $481,542, annually between 2014 and 2023 (the figures are not adjusted for inflation, however), and a positive operating balance in all but one of the most recent ten years (*Acta*, 8), the substantial deficit in 2022 being caused by unexpected one-time capital expenditures, where the reimbursement from insurance was not reflected until the following year (*Acta*, 16). Furthermore, the Parish has ~1.9 million in savings (*Acta*, 7).

6. A survey conducted by the Ordinary in 2022, with 183 respondents from the Parish (73% of the 250 average weekend Mass attendance), shows that nearly 56% were above the age of 66. With deaths projected to outnumber births and baptisms, the Parish is projected to continue to lose members (*Acta*, 4, 5, 7, 8). The Ordinary also contends that in 2030, there will be only 1 priest available to minister in this part of the diocese (*Votum*, 10; *Acta*, 4).

7. In his Decree, the Ordinary gives the following reasons for the extinction of the parish: 1) the diocesan reorganization plan, "The Road to Renewal," has provided a "more realistic" picture of the financial and sacramental situations in its parishes, which, 2) along with the need to reduce the strain on the "already limited number of priests," requires "the merging of parishes and the overall reduction of physical worship sites," and thus the Parish was identified as a site that would "benefit" from being united with its neighboring parish, St. Mark, in order to consolidate resources. The Decree meets the requirements of presenting the motivating causes "at least in summary form" (can. 51). None of the causes listed, however, is *ad rem*, connected to the concrete reality of the Parish.

8. In his *votum* the Ordinary states that the data collected by the Catholic Leadership Institute as part of the Road to Renewal plan show that over half of the Parish consists of parishioners 70 years or older. Along with a steep decline in Mass attendance over the past decade, numbers of contributing households as well as decreasing participation in religious education programs, the picture is of a community that is aging, and not replacing itself with younger members. This will continue to affect the deteriorating financial condition of the parish (*Votum*, 8-9). The Ordinary hopes that the merger will help "inspire a zeal for evangelization, especially because the area is home to many young people," something that Parish has not been able to accomplish on its own. (*Votum*, 9). Finally, the Ordinary states that the area is expected to have only 1 priest serving it by 2030, which would be difficult for a single Pastor to shepherd adequately without a reduction in the number of parishes (*Votum*, 10). No explanation is provided, however, for the assertion regarding the projected number of priests available to serve the area.

*Churches*, 30 April 2013, Prot. N. 2013 1348). A paucity of clergy, a declining participation in parish life, or financial difficulties can be among the reasons that meet the standard of a just cause for the extinctive union of a parish, as these concerns affect the ability of the juridic person in question to continue its mission for the good of souls.

7. As noted above, these causes may affect not only the Parish in question but also the parishes in a given area or even the entire Diocese. Nevertheless, inasmuch as the extinction of a parish is an act with permanent consequences, the cause should not be based on "conditions within the community that are presumably reversible or of brief duration" (Congregation for the Clergy, instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelizing mission of the Church*, n. 48).

8. Regarding which juridic act, suppression or merger, is most apt, there are four types of modification to parishes available in the law: an Extinctive Union whereby two or more parishes unite to form a new juridic person (cf. can. 121); an Extinctive Union whereby one Parish absorbs another, so that only the receiving Parish remains (cf. can. 121); a Division, whereby one Parish is divided so that one or more additional parishes are erected (cf. can. 122) and a true Suppression, where the juridic person of a parish is extinguished entirely (cf. can. 123). The Dicastery further clarified that "territorial parishes, as a general rule, may only be united or divided. Although sometimes personal parishes are truly suppressed, they are ordinarily united or divided, either in connection to another personal parish or even to a territorial parish" (Congregation for the Clergy, *Procedural Guidelines* [Prot. N. 2013 1348] n. 1d). If the parish church and other properties of a personal parish have been given over to another parish, and the faithful are directed to that same Parish for their pastoral care, this can only be considered an extinctive union of the two, rather than a true suppression. In such cases, the financial assets and liabilities of the juridic person in question also accrue to the receiving Parish, with due regard for the intentions of donors (cf. can. 121), rather than the superior juridic person, such as the Diocese (cf. can. 123). A territorial parish may not be truly suppressed, inasmuch as the entire territory of a diocese must be divided into these basic units of pastoral governance (cf. can. 374 §1).

9. With regard to the temporal goods of the extinguished Parish, the Apostolic Signatura has stated, "*In casu unionis paroeciarum bona paroeciae seu personae iuridicae suppressae non obveniunt personae iuridicae immediate superiori (cf. can. 123), sed, ad normam can. 121 paroeciae seu personae iuridicae ad quam, aut paroeciis seu personis iuridicis ad quas.*" (Definitive Sentence, *coram* Echevarría Rodríguez, 7 May 2010, *Prot. N. 38161/06 CA*).

10. Whichever of the aforementioned juridic acts is taken, the extinctive union of one or more parishes must always be carefully distinguished from the decision to reduce a church to profane but not sordid use (cf. can. 1222 §2), since the cause required for the former is merely just, while the latter requires a grave cause (cf. Congregation for the Clergy, *Procedural Guidelines*, Prot. N. 2013 1348). This distinction is not limited to the issuance of the singular administrative act itself, but also to the consultations and preparations for the same, which must maintain the "*necessaria distincio inter 'processum reordinationis paroeciarum et determinationem quoad statutum canonicum edificii sacrii' (Sententia defintiva diei 21 maii 2011, coram Caffara, prot. n. 41719/08 CA*" (Definitive sentence, *coram* Mamberti, 25 April 2018, Prot. N. 51993/16 CA).

## In Facto

1. The roots of the Parish go back to the early 20th century, to the arrival of Irish Catholic immigrants in the area. The current Parish church was constructed in 1929 and dedicated on 19 January 1930.

2. Since 2012, the pastor of the Parish has also served as Pastor or Administrator of nearby St. Margaret Parish. Since September 2022, the Parish has been part of a collaborative pastoral

9. In the present recourse, the Procurator challenges the Ordinary's presentation of just causes in the impugned Decree, arguing that the Ordinary has not carried out an "authentic dialogue and collaboration" (*Petition*, 4), and that he has not shown a cause "directly connected to the interested parish community" (*Petition*, 6), using language that is identical to other decrees of extinctive union recently issued, and therefore the Decree "lacks sufficient merit" (*Petition*, 8).

10. The Dicastery finds that the "Road to Renewal" process invited the parishes proposed for merger, including the Parish, to submit a counter-proposal (with some being accepted by the Ordinary, *Votum*, 6), and the Vicar for Renewal met with leaders of the individual parishes to explain the rationale behind the decisions being made (*Votum*, 5-6) and therefore the norm of can. 50 was upheld.

11. The Dicastery finds that with the steep decrease in Mass attendance over the past decade, not only in the Parish, but across the family of parishes, the small number of young people in religious education programs, the aging population of the Parish, along with the projected presence of only 1 priest to serve the area, the Ordinary has presented a sufficiently just cause for the merger of the Parish with the parish *ad quem*.

12. The Procurator argues that rather than combining resources to better evangelize, it is more likely that the resources of the Parish will be "diverted to help satisfy judgments and/or settlements of sexual abuse legal cases," which motive, though not mentioned explicitly in the Decree, has been mentioned as a justifying cause in other decrees issued by the Ordinary, and, furthermore, the Parish sits on valuable urban real estate that could be utilized for this purpose (*Petition*, 7). The Dicastery finds that the Procurator's suspicions are not without merit, in that the diocesan recommendation regarding the temporal goods of the parishes in Family #20 state that the "entire campus of Holy Spirit is to be sold" (*Petition*, Exhibit 6), the Ordinary states that the assets of the parish will be appropriated in order to contribute to the bankruptcy settlement (*Votum*, 9), and the Presbyteral Council has already approved the relegation of the Parish Church (*Acta*, 38). The Dicastery holds that the temporal goods of the Parish belong to the parish *ad quem*, and their disposition outside the norms of law would be illicit.

13. The Procurator's remaining arguments against the merger – that the Parish is in a strong financial position and offers many services to the community, that it is more accessible by public transport, and better and more commodious facilities to accommodate its various apostolates and activities than the parish *ad quem*, that the Food Pantry run by the Parish is closer to those who utilize it than the parish *ad quem*, and that the Parish campus could provide supplementary space, or room for expansion for the school at the parish *ad quem* (*Petition*, 8-12), do not touch on the legitimacy of the Decree, but its opportuneness.

14. The Presbyteral Council examined the proposal of the parish merger on 27 August 2024, the first of its two day-long meetings to discuss the diocesan reorganization plan. According to the extract from minutes of the meeting, the diocesan proposal and the Parish's counterproposal were studied. The vote was as follows: 21 members recommended the proposal, with none opposed, and 3 abstentions (*Acta*, 38).

15. In the impugned Decree, the Ordinary utilizes a unique interpretation of can. 121 and the destination of the goods of the extinguished Parish, contrary to the law and jurisprudence (cf. can. 121 and SSAT, Definitive sentence, *coram* Echevarría Rodríguez, 7 May 2010, Prot. N. 38161/06 CA). Furthermore the Dicastery for Legislative Texts has confirmed that such an interpretation is "legally unfounded," stating, "In particular, canon 121 provides for the immediate and unconditional transfer of the temporal goods of suppressed parishes which are juridic persons to the parish *ad quem*, ensuring stable and transparent management of ecclesiastical resources. The absence of provisions for deferred terms or suspensive conditions confirms that the transfer must take place without delay. The expression '*obtinet*' implies an immediate acquisition of the temporal goods and property rights of the new juridic person"

(Letter to the Dicastery for the Clergy, 9 September 2025, Prot. N. 18715/2025). Therefore, insofar as the impugned act vitiates can. 121, the decree fails to respect the aforementioned norm.

THEREFORE,

**In accord with CIC can. 1739, this Dicastery hereby MODIFIES the 15 January 2025 decree of the Bishop of Buffalo, which joined Holy Spirit Parish in Buffalo to that of Saint Mark also in Buffalo in an extinctive union, confirming the extinctive union, for which sufficient just cause has been shown, while directing that the temporal goods of the suppressed Parish accrue immediately to the Parish *ad quem*.**

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
26 September 2025

✠ Andés Gabriel Ferrada Moreira
*Titular Archbishop of Tiburnia*
*Secrretary*

Rev. Enrico Massignani
*Adjunct Under-Secretary*