# Exhibit K

Case 1-20-10322-CLB,  Doc 4976-12,  Filed 07/22/26,  Entered 07/22/26 17:16:01, Description: Exhibit K-1, Page 1 of 28



**HIS EXCELLENCY**
**MOST REVEREND MICHAEL W. FISHER**
*By the Grace of God and the Authority of the Apostolic See*
**BISHOP OF BUFFALO**

## DECREE OF THE MERGER OF ST. BERNADETTE PARISH, ORCHARD PARK AND ITS TERRITORY INTO SS. PETER AND PAUL PARISH, HAMBURG

### *THE FACTS*

In 1958 the parish community of St. Bernadette was canonically recognized. Their first order of business, under the direction of their founding Pastor, the Rev. Msgr. Harry W. Osborne, was to build a space for divine worship. Land was graciously donated by the Edward J. Benz family in accord with canon 1513 *CIC/17*. A groundbreaking ceremony was held on 22 July 1958 and the initial school-auditorium structure was completed on 1 February 1959. The first Mass was also celebrated on this date in the newly finished building. September 1959 saw the opening of the school which welcomed 230 children that year for all grade levels offered.

A new church was next on the list. In 1968, during the pastorate of Rev. Thomas P. Carey, ground was broken for the new edifice. Completed on 28 March 1970, the new sacred building held the Easter Vigil as its first eucharistic celebration.

On 19 March 1974, St. Bernadette Parish received its third Pastor, the Rev. Msgr. Richard T. Nugent. Known for his writing and pastoral style, Rev. Msgr. Nugent led St. Bernadette Parish until 2007. During these years, a parish center would be built, the school would receive a cafeteria, a convent would be constructed, and more land would be acquired. All of this was made possible through the generous donations of the faithful who wished to contribute to the mission of St. Bernadette Parish.

In 2014, St. Bernadette Parish lost its parochial school after the matter was adjudicated by the Roman Curia. Despite this loss, St. Bernadette continued to minister to the faithful of Orchard Park and the surrounding areas. Contemporarily, St. Bernadette is one of the few parishes which hosts perpetual adoration. Their desire to remain faithful to what they have inherited remains one of the defining features of St. Bernadette Parish. In September of 2022, St. Bernadette Parish was included in Family #28 as part of the Road to Renewal program.

1

Case 1-20-10322-CLB, Doc 4976-12, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-1, Page 2 of 28

The Road to Renewal has allowed the diocese to gain a more realistic picture of the financial and sacramental situations in its parishes. St. Bernadette Parish has been identified as a community that could benefit by being joined with its sister community in Hamburg. Additionally, due to our need to amass a substantial sum of money to settle numerous civil claims in Federal Bankruptcy Court, the possibility of alienating this property has also been suggested. This was discussed with members of the Chancery and especially with the Reverend Bryan Zielenieski, Vicar for the Renewal. As a result of these conversations, I hereby issue the following decree.

## *THE LAW*

Because a parish is a public juridic person (cc. 116, 515 §3) and therefore established perpetually (c. 120), it can only be extinguished by legitimate authority according to the norm of law. Canon 515 §2 states, "It is only for the diocesan bishop to erect, suppress, or alter parishes. He is neither to erect, suppress, nor alter notably parishes, unless he has heard the presbyteral council."

Unstated in this norm is the requirement for at least a just cause in augmenting the structure of a parish. As a parish is defined in law as "a certain community of the Christian faithful stably constituted in a particular church, whose pastoral care is entrusted to a pastor (*parochus*) as its proper pastor (*pastor*) under the authority of the diocesan bishop" (c. 515 §1), the focus of such augmentation is primarily concerned with the pastoral care of a group of people and only secondarily interested in specific worship sites. Thus, a merger of parishes falls under the governing authority of the diocesan bishop in accord with canon 374 §1.

Following the norm of canon 121, when two public juridic persons "are so amalgamated that one aggregate, itself with a juridic personality, is formed, this new juridic person obtains the goods and patrimonial rights proper to the prior ones and assumes the obligations with which they were burdened." The eminent canonist Reverend Robert Kennedy notes, "Canon 121…focuses on what, in the United States, is called a consolidation, in which two or more juridic persons are so joined that each of them loses its own juridic identity and in their stead a new juridic person is constituted. A consolidation involves both the suppression and creation of juridic persons" ("Chapter II: Juridic Persons" in *New Commentary on the Code of Canon Law* (New York: Paulist Press, 2000) 168). Since the norm of canon 121 assumes a consolidation in which two juridic persons go out of existence to form a new juridic person from the amalgamation of the former entities, it does not strictly apply to the situation of a parochial merger in which one entity absorbs another.

When the principle of law contained in canon 121 is applied to the canonical merger of one parish into another, the receiving parish must assume all net assets and debts of the merging parish. Here the term "net assets" is used to indicate that the merging parish is responsible for paying off its debts before an accurate assessment of what constitutes the temporal goods of the merging parish can be determined. "Commutative justice," the *Catechism of the Catholic Church*

2

Case 1-20-10322-CLB,   Doc 4976-12,   Filed 07/22/26   Entered 07/22/26 17:16:01,
Description: Exhibit K-1, Page 3 of 28

reminds us, "obliges strictly; it requires…paying debts" (n. 2411). This amount, once established, will be transferred to the receiving parish. What would be a clear *a iure* transfer of assets and liabilities to a newly constituted juridic person described in canon 121, is only partially applicable to the situation of a merging parish and can thus be addressed in terms of "net assets" to be identified at a future date.

## *THE ARGUMENT*

The reshaping of the diocese to prepare it for more effective ministry in the future requires a certain consolidation of resources. The goal of the Road to Renewal is to reduce the strain on our already limited number of priests while at the same time uniting communities to foster a greater drive to "go out to all the world and preach the Gospel to all creation" (Mk 16:15). Part of this process requires the merging of parishes and the overall reduction of physical worship sites throughout the diocese. Looking at St. Bernadette Parish in particular, the research and consultation done by the Office for Renewal and Development has revealed that this community would be better served by joining its resources to SS. Peter and Paul Parish in an extinctive merger.

On 27 August 2024, the presbyteral council met at the Catholic Center of the Diocese of Buffalo. At this meeting, I consulted the council about the possibility of merging St. Bernadette Parish into SS. Peter and Paul Parish, Hamburg. Rev. Zielenieski pointed out that there would likely only be two available priests serving in Family #28 by 2030. SS. Peter and Paul Parish is also being considered to absorb the territory of other nearby parishes so as to centralize pastoral ministry and increase efforts for evangelization. This proposal received majority support from the members of the Presbyteral Council present on 27 August.

Having heard the Presbyteral Council on this issue, I have chosen to merge St. Bernadette Parish into SS. Peter and Paul Parish in accord with canon 515 §2.

Thus, having done the requisite consultations and having gained the required consents, I, the undersigned Most Reverend Michael W. Fisher, Bishop of Buffalo, exercising my ordinary power in virtue of canon 515 §2, do hereby decree that St. Bernadette Parish, Orchard Park be merged into SS. Peter and Paul Parish, Hamburg and St. Bernadette to be extinct thereby.

SS. Peter and Paul Parish will be the recipient of the net assets and liabilities of St. Bernadette Parish. The territorial boundaries of SS. Peter and Paul Parish will henceforth include:

1. the territory south of Camp Rd. from Southwesters Blvd. to Mae Lou Dr.; Mae Lou Dr. and Quinby Dr. to McKinley Pkwy. north to the Northern Town Line of Orchard Park as far east as California Rd.;
2. the territory west of California Rd. and Murphy Rd. to Rte. 219 as far as Boston State Rd. (Rte. 391);

3

Case 1-20-10322-CLB, Doc 4976-12, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-1, Page 4 of 28

3. the territory east of Southwestern Blvd. from Camp Rd. to Schultz Rd. to Lake View Rd. to North Creek to Eden Town Line;

4. the territory north of Eden Town Line to East Eden Rd. to Eckhard Rd. to Boston State Rd.

The intentions of the founders and donors regarding the temporal goods and patrimonial rights proper to the extinct St. Bernadette Parish, insofar as they exist, must be respected. In addition, the temporal goods and patrimonial rights, and obligations of the extinct St. Bernadette Parish must be defined and allocated according to the norm of law (cf. cc. 121-122) as interpreted by this document.

All the parish and sacramental records of the extinct St. Bernadette Parish are to be properly preserved and safeguarded in the parish archives of SS. Peter and Paul Parish, Hamburg, in accord with the norm of law.

This decree is to be effective on Monday 1 May 2025.

This decree is to be communicated to the Rev. James D. Ciupek, the Pastor of both parishes (c. 532) and the two parishes affected by this extinctive merger (cf. cc. 7, 54 §1). Anyone who feels his or her rights have been legitimately harmed by this decree may present a challenge by requesting its revocation or emendation to its author within ten (10) useful days from its legitimate notification. Further recourse will follow the norms of canons 1734-1739.

Given at the Chancery of the Diocese of Buffalo on this 12th day of November 2024.

_+ Michael W. Fisher_
Most Reverend Michael W. Fisher
Bishop of Buffalo

Ms. Melissa Potzler
Chancellor

4



**DICASTERIUM
PRO CLERICIS**

Vatican City, 17 October 2025

Prot. N. 2025 2997

Mr. Eugene HANITZ, Procurator
121 Old Orchard Lane
Orchard Park, NY 14127
**UNITED STATES OF AMERICA**

Dear Mr. Hanitz,

The Dicastery writes regarding your hierarchical recourse against the decree which merged *Saint Bernadette Parish* in **Orchard Lake** with that of *Saints Peter and Paul* in Hamburg, in the Diocese of Buffalo (cf. *Code of Canon Law*, canons 121 and 515 §2).

Please find enclosed the Decree whereby the recourse has been decided. Thanking you for your correspondence, and with assurances of prayers and best wishes, I remain,

Sincerely yours in Christ,

Lazzaro You

Lazzaro Cardinal You Heung sik
*Prefect*

*(Enclosure)*



## DICASTERIUM PRO CLERICIS

## DECREE

**Prot. N. 2025 2997**

*SPECIES FACTI*

1. WHEREAS, on 12 November 2024, His Excellency, the Most Reverend Michael W. Fisher, Bishop of Buffalo (hereinafter, 'the Ordinary') issued a decree joining Saint Bernadette Parish in Orchard Park (hereinafter, 'the Parish') to the Parish of Saints Peter and Paul in Hamburg, in an extinctive union (cf. *CIC* cann. 121; 515 §2), to take effect on 1 May 2025, and;

2. WHEREAS, after the aforesaid Decree was published to the faithful on 20 November 2024, Mr. Eugene Hanitz, acting *pro se* and as procurator of numerous members of the Parish (hereinafter, 'the Procurator') made *remonstratio* on 20 November 2024 against the same to the Ordinary (cf. can. 1734), and;

3. WHEREAS, with thirty days having passed with no response from the Ordinary (cf. can. 1735), on 23 December 2024, the Procurator sought hierarchical recourse before the Dicastery for the Clergy (hereinafter, 'the Dicastery'), which was received on 22 January 2025 and was accepted for examination on 20 March 2025, and;

4. WHEREAS on 11 September 2025 the acts and the *votum* of the Ordinary arrived in the Dicastery, and;

5. WHEREAS a hierarchical recourse is, by its nature, a documentary process that proceeds on the basis of examination of authentic documents provided by interested parties at the request of the Dicastery; thus having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted by both the Ordinary and the Procurator, the Dicastery judges as complete the documentation in its possession and proceeds, therefore, to its decision *per cartas*.

*IN IURE*

1. The Apostolic Constitution, *Praedicate Evangelium*, art. 118, 1° establishes the competence of the Dicastery for the Clergy over "general discipline governing… parishes" and thus its authority to decide the matter as the appropriate Entity of the Holy See.

2. Concerning the specific object of this recourse, the extinctive union of a parish, canon 50 requires that, before issuing a decree, the Ordinary must seek the necessary information and proofs, and consult those whose rights can be harmed. Canon 515 §2 requires that the

Case 1-20-10322-CLB,   Doc 4976-12,   Filed 07/22/26,   Entered 07/22/26 17:16:01,
Description: Exhibit K-1, Page 7 of 28

diocesan Bishop consult the Presbyteral Council before establishing, suppressing or notably altering a parish. Further, a decree is to be issued in writing and, when it contains a decision, the reasons for that decision must be given, at least in summary form (cf. can. 51). Canon 515 §2 makes no provision as to the gravity of the cause required. Hence it is sufficient that a just cause be present (cf. Decrees of the Supreme Tribunal of the Apostolic Signatura, Prot. N. 24048/93 CA, 6 December 1993 and Prot. N. 38159/06 CA, 18 April 2008).

3. However, the just cause must primarily be the betterment of the pastoral provision for the salvation of souls (cf. Second Vatican Ecumenical Council, Decree on the Pastoral Office of Bishops in the Church, *Christus Dominus*, 28 October 1965, n. 32) and the good of the faithful (cf. Congregation for Bishops, Directory for the Pastoral Ministry of Bishops, *Apostolorum Successores*, 22 February 2004, n. 214).

4. The Dicastery has affirmed that "the suppression of parishes by extinctive union is legitimate for causes directly related to a specific Parish," and further, "As a condition for the legitimacy of this type of provision, the requisite motivations must be directly and organically connected to the interested parish community, and not on general considerations or theories, or based solely on principle" (Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, 20 June 2020, n. 48).

5. However, although a diocesan Bishop is required to consider the situation *ad rem* of a particular parish in the deliberation of a just cause, the law does allow him to take into account the condition of the entire Diocese. The Apostolic Signatura has stated: *Decretum suppressionis feratur, denique, saltem summarie expressis motivis (cf. can. 51). Qua in re, "Episcopus diocesanus...iuxta suam prudentem discretionem procedure potest, excluso vero arbitrarietate" (decreta Congressus diei 3 maii 2002, prot. Nn. 33219/01 CA; 32220/01 CA; 32238/01 CA). Hac in ratione perpendenda,* non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, *ut totius dioecesis saluti animarum meliore quo fieri potest modo, provideatur. Nullum tandem "ius christifedelium agnoscitur ad determinatam paroeciam, cum illis sufficiat paroecia quaedam, quae eorumdem curam pastoralem expleat" (cf. v.g. decreta Congressus dierum 12 octobris 1995, prot. N. 25323/94 CA; 18 ianuarii 1996 prot. N. 25465/94 CA; 12 octobris 1995, prot. N. 25530/95 CA* (cf. Decree Prot. N. 37280/05 CA, 22 May 2009). This was also reiterated in a subsequent decision, *sufficit proinde iusta causa; qua in ratione perpendenda, non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, ut totius dioecesis saluti animarum* et quidam etiam in futuro, *meliore quo fieri potest modo provideatur* (cf. Decree Prot. N. 45082/11 CA, 27 April 2011). Because the faithful have a right to pastoral care in some parish, rather than a right to a specific parish, and since the diocesan Bishop can consider the condition of an area or the Diocese as a whole, even a parish whose community and finances are in good condition may be united to another. The Apostolic Signatura succinctly expressed this jurisprudence as follows: *"etiam in paroecia in bona condicione legitime uniri potest cum aliis paroeciis, nam consideranda est non tantum condicio singulae paroeciae sed etiam totius loci, immo totius dioecesis (cfr. SSAT decretum diei 12 iunii 2012, Prot. N. 46039/11 CA)"* (Decree, 4 December 2020, Prot. N. 55183/20 CA). Taken together, the Instruction of the Dicastery cited above and the jurisprudence of the Apostolic Signatura must be understood to require that the conditions generally affecting an area or the entire Diocese must affect the interested Parish in some way.

6. The nature of a parish in the Church is found in canon 515 §1: *Paroecia est certa communitas christifidelium in Ecclesia particulari stabiliter constituta, cuius cura*

*pastoralis, sub auctoritate Episcopi dioecesani, committitur parocho, qua proprio eiusdem pastori.* A parish, from the moment of its legitimate establishment by the competent authority, is a public juridic person, as clearly stated in canon 515 §3: *Paroecia legitime erecta personalitate iuridica ipso iure gaudet.* As a juridic person, a parish is perpetual by nature however, it is possible to suppress (cf. can. 120 §1) juridic persons, such as parishes, or to merge them with another parish (cf. can. 121). The suppression or merger of the juridic person of the Parish requires a singular decree of the diocesan Bishop after the necessary consultation with the Presbyteral Council of his Diocese, as found in canon 515 §2: *Paroecias erigere, supprimere aut eas innovare unius est Episcopi dioecesani, qui paroecias ne erigat aut supprimat, neve eas notabiliter innovet, nisi audito consilio presbyterali.* The motivating cause for the suppression or merger of a parish must be at least a just cause, which, in the determination of the diocesan Bishop, serves the good of souls (cf. Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, 30 April 2013, Prot. N. 2013 1348). A paucity of clergy, a declining participation in parish life, or financial difficulties can be among the reasons that meet the standard of a just cause for the extinctive union of a parish, as these concerns affect the ability of the juridic person in question to continue its mission for the good of souls.

7. As noted above, these causes may affect not only the Parish in question but also the parishes in a given area or even the entire Diocese. In the first place, the Ordinary may group parishes together in a federated form, "whereby assembled Parishes would retain their own identity (Congregation for the Clergy, instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelizing mission of the Church*, n. 47)." Nevertheless, inasmuch as the extinction of a parish is an act with permanent consequences, the cause should not be based on "conditions within the community that are presumably reversible or of brief duration" (Ibid., n. 48). Along this same line, jurisprudence indicates that "an extinctive union or suppression should be the last choice when dealing with various problems affecting parochial life, insofar as other possible remedies should have been at least considered beforehand and ruled out (Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, 30 April 2013, Prot. N. 2013 1348, n. 1g)."

8. Regarding which juridic act, suppression or merger, is most apt, there are four types of modification to parishes available in the law: an Extinctive Union whereby two or more parishes unite to form a new juridic person (cf. can. 121); an Extinctive Union whereby one Parish absorbs another, so that only the receiving Parish remains (cf. can. 121); a Division, whereby one Parish is divided so that one or more additional parishes are erected (cf. can. 122) and a true Suppression, where the juridic person of a parish is extinguished entirely (cf. can. 123). The Dicastery further clarified that "territorial parishes, as a general rule, may only be united or divided. Although sometimes personal parishes are truly suppressed, they are ordinarily united or divided, either in connection to another personal parish or even to a territorial parish" (Congregation for the Clergy, *Procedural Guidelines* [Prot. N. 2013 1348] n. 1d). If the parish church and other properties of a personal parish have been given over to another parish, and the faithful are directed to that same Parish for their pastoral care, this can only be considered an extinctive union of the two, rather than a true suppression. In such cases, the financial assets and liabilities of the juridic person in question also accrue to the receiving Parish, with due regard for the intentions of donors (cf. can. 121), rather than the superior juridic person, such as the Diocese (cf. can. 123). A territorial parish may not be truly suppressed, inasmuch as the

entire territory of a diocese must be divided into these basic units of pastoral governance (cf. can. 374 §1).

9. With regard to the temporal goods of the extinguished Parish, the Apostolic Signatura has stated, "*In casu unionis paroeciarum bona paroeciae seu personae iuridicae suppressae non obveniunt personae iuridicae immediate superiori (cf. can. 123), sed, ad normam can. 121 paroeciae seu personae iuridicae ad quam aut paroeciis seu personis iuridicis ad quas.*" (Definitive Sentence, *coram* Echevarría Rodríguez, 7 May 2010, *Prot. N. 38161/06 CA).*

10. Whichever of the aforementioned juridic acts is taken, the extinctive union of one or more parishes must always be carefully distinguished from the decision to reduce a church to profane but not sordid use (cf. can. 1222 §2), since the cause required for the former is merely just, while the latter requires a grave cause (cf. Congregation for the Clergy, *Procedural Guidelines*, Prot. N. 2013 1348). This distinction is not limited to the issuance of the singular administrative act itself, but also to the consultations and preparations for the same, which must maintain the "*necessaria distincio inter 'processum reordinationis paroeciarum et determinationem quoad statutum canonicum edificii sacrii'* (*Sententia defintiva diei 21 maii 2011, coram* Caffara, prot. n. 41719/08 CA" (Definitive sentence, *coram* Mamberti, 25 April 2018, Prot. N. 51993/16 CA).

## In Facto

1. The Parish was erected in 1958, and the new church was built in 1968 (*Decree*, 1). The Parish school closed in 2014. Since 2022, the Parish has been part of a collaborative unit, Family #28 ("The Eternal Flame Catholic Community"), a "family of parishes," with four other parishes, served by three priests (a pastor and two senior priests, *Family Parish Bulletin*, 13 Oct. 2025).

2. According to data supplied by the Ordinary, the Parish had 2,839 registered households as of 2023, with an average weekend Mass attendance of 1000 (*Acta*, 3). In the decade spanning 2014 to 2023, the number of registered households has increased by 51.8% (from 1,869 to 2,839), the number of "practicing" households (the term is undefined) has increased by 74% (from 1,246 to 2,167), while Mass attendance has remained fairly steady, with a relatively modest decline of 13.6% (from 1,157 to 1,000) (*Acta*, 3-4). Though the number of "contributing households" has decreased by 32.4% (1,470 to 995), the parish has maintained a strong and stable financial profile, with a positive operating balance in 5 of the 8 years reported in the summary of the financial data provided, and an increase in "total receipts," with a net operating balance of $182,739 in 2021 (*Acta*, 4). Over the period, assets have increased from $250,460 to $457,794, while liabilities have decreased from $222,128 to $58,648 (*Acta*, 6).

3. With regard to the celebration of other Sacraments, the number of baptisms has fluctuated between 19 and 29 over the decade, with a high of 44 in 2018, and 43 in 2022, with a similar fluctuating trend with respect to marriages and confirmations (*Acta*, 3, 5). The number of children in religious education has halved from 572 to 279, signaling an aging demographic in the parish (*Acta*, 6).

4. The Ordinary also states that data collected from surveys conducted in the Parish show that the 60% of the parishioners are close to the age of 70 or order (*Votum*, 8-9). However, this data is based on a response rate of 22% (*ibid.* 8), which is lower than similar surveys

done in other parishes in the diocese, which limits the conclusions that can be drawn regarding the demographic makeup of the Parish.

5. In his Decree, the Ordinary gives the following three reasons for the extinction of the parish: 1) the diocesan reorganization plan, "The Road to Renewal," has provided a "more realistic" picture of the financial and sacramental situations in its parishes, which, 2) along with the need to reduce the strain on the "already limited number of priests," requires the merging of parishes and the overall reduction of physical worship sites, and thus the Parish was identified as a site that would "benefit" from being united with its neighboring parish, Saints Peter and Paul, in order to consolidate resources. Furthermore, 3) the diocese has a need to procure an undisclosed sum for the settlement of bankruptcy proceedings arising from historical sexual abuse claims, and the property of the Parish has been identified as one that could be alienated for this purpose. The Decree meets the requirements of presenting the motivating causes "at least in summary form" (can. 51). None of the causes listed, however, is *ad rem,* connected to the concrete reality of the Parish.

6. In the recourse, the Procurator challenges the Ordinary's presentation of just causes in the impugned Decree, stating that the Decree gives no reasons for the above mentioned causes, that the number of priests estimated to be available in 2030 is speculative and reversible, that according to this Dicastery's 2020 Instruction (cited above), this cannot be the only reason to merge a parish, that the consultation and research mentioned in the Decree do not reflect the reality of the Parish, that the need to generate funds for the diocesan bankruptcy settlement is not a just cause for the extinctive merger of parishes, and that the Ordinary has not demonstrated how pastoral provision would be improved by the merger (*Recourse,* 4-6). The Procurator also presented several other reasons against the opportuneness of the merger (summarized at *Acta,* 18).

7. The Procurator further challenges the data submitted by the Ordinary, for instance, asserting that the net operating balance of the parish between 2021 to 2023 was $157,918, rather than $1,697 as claimed by the Ordinary (*Acta,* 35), and that the average weekend Mass attendance was higher than what the diocesan data showed, at 1,225 (*Acta,* 37). The Dicastery notes some discrepancy within the data presented by the Ordinary, where average attendance in 2022 is listed in one place as 750 (*Acta,* 1), and in another as 1300 for the same year (*Acta,* 3), while noting, moreover, that detailed financial statements were not included in the acts.

8. In his *votum* the Ordinary summarizes the conclusions of the Office of Renewal and Development, that the Parish faces "significant challenges: declining regular receipts, lower sacramental participation (especially among youth), and a shrinking religious education enrollment" (*Votum,* 9), adding that the "Red Flags" in the report, based on the data mentioned above, suggest that it is "time to merge St. Bernadette in hopes of inspiriting a zeal for evangelization and further unite the administration of the buildings and communities" in the area, stating that the church and campus will remain open for worship and other activities (*ibid.*). Furthermore, given that the area is projected to have only 2 priests to cover the family of parishes in 2030 would make for a more "reasonable weekend Mass schedule (*ibid.,* 10).

9. The Dicastery finds that the Road to Renewal process engaged in consultation with the clergy and lay faithful of the parishes making up Family #28, including soliciting counterproposals to the diocesan proposal, and thus the requirements of can. 51 were met.

10. The Dicastery finds that the data supplied by the Ordinary himself, as well as that submitted by the Procurator do not support his assertion of a parish facing "significant challenges" or a "picture that is far more dire," in that the Parish is attracting new members, and is in a financially strong position. The number of sacraments celebrated has

fluctuated somewhat, but the data do not support a case for a strong decline. The decline of young people enrolled in religious education classes is not a sufficient reason for the suppression of the Parish. There is no information present, moreover, as to the manner in which the projected number of priests available to serve the area in 5 years' time, was determined. Nor does the Ordinary provide any information as to how the merger will "benefit" the Parish (*Decree*, 3). Therefore, the Dicastery finds that the Ordinary has not shown a just cause for the extinctive union.

11. The Presbyteral Council discussed the Parish in question on Wednesday, 27 April 2024, the first of its two day-long meetings to discuss the diocesan reorganization plan. The minutes record that there was concern that closing a viable and vibrant parish would alienate the faithful. The proposal passed with 15 voting in favor, 10 against, with 2 abstentions (*Acta*, 60).

THEREFORE,

**In accord with CIC can. 1739, this Dicastery hereby REVOKES the decree of 12 November 2024 of the Bishop of Buffalo, which joined Saint Bernadette Parish in Orchard Park to that of Saints Peter and Paul in Hamburg in an extinctive union, since the petition for hierarchical recourse as presented has merit *in decernendo*.**

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
17 October 2025

*Lazzaro You*
Lazzaro Cardinal You Heung sik
*Prefect*

+ *Andrés Ferrada*
✠ Andrés Gabriel Ferrada Moreira
*Titular Archbishop of Tiburnia*
*Secretary*



# DICASTERIUM PRO CLERICIS

## DECREE

**Prot. N. 2025 3053**

### *SPECIES FACTI*

1. WHEREAS, on 19 November 2024, His Excellency, the Most Reverend Michael W. Fisher, Bishop of Buffalo (hereinafter, 'the Ordinary') issued a decree joining Our Lady of Peace Parish in Clarence (hereinafter, 'the Parish') to the Parish of the Nativity of the Blessed Virgin Mary in Harris Hill, in an extinctive union (cf. *CIC* cann. 121; 515 §2), to take effect on 8 June 2025, and;

2. WHEREAS, after the aforesaid Decree was published to the faithful on 22 November 2024, Mr. Timothy Creenan, acting *pro se* and as procurator of numerous members of the Parish (hereinafter, 'the Procurator') made *remonstratio* on 29 November 2024 against the same to the Ordinary (cf. can. 1734), and;

3. WHEREAS, with thirty days having passed with no response from the Ordinary (cf. can. 1735) a petition for hierarchical recourse before the Dicastery for the Clergy (hereinafter, 'the Dicastery') submitted by the Procurator was received on 29 January 2025, and was accepted for examination, with the Dicastery acting as hierarchical superior, on 2 May 2025, and;

4. WHEREAS on 12 August 2025 the acts and the *votum* of the Ordinary arrived in the Dicastery, and;

5. WHEREAS a hierarchical recourse is, by its nature, a documentary process that proceeds on the basis of examination of authentic documents provided by interested parties at the request of the Dicastery; thus having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted by both the Ordinary and the Procurator, the Dicastery judges as complete the documentation in its possession and proceeds, therefore, to its decision *per cartas*.

### *IN IURE*

1. The Apostolic Constitution, *Praedicate Evangelium*, art. 118, 1° establishes the competence of the Dicastery for the Clergy over "general discipline governing... parishes" and thus its authority to decide the matter as the appropriate Entity of the Holy See.

2. Concerning the specific object of this recourse, the extinctive union of a parish, canon 50 requires that, before issuing a decree, the Ordinary must seek the necessary information and proofs, and consult those whose rights can be harmed. Canon 515 §2 requires that the diocesan Bishop consult the Presbyteral Council before establishing, suppressing or notably altering a parish. Further, a decree is to be issued in writing and, when it contains a decision, the reasons for that decision must be given, at least in summary form (cf. can. 51). Canon 515 §2 makes no provision as to the gravity of the cause required. Hence it is sufficient that a just cause be

Case 1-20-10322-CLB,   Doc 4976-12,   Filed 07/22/26,   Entered 07/22/26 17:16:01,
Description: Exhibit K-1, Page 13 of 28

present (cf. Decrees of the Supreme Tribunal of the Apostolic Signatura, Prot. N. 24048/93 CA, 6 December 1993 and Prot. N. 38159/06 CA, 18 April 2008).

3. However, the just cause must primarily be the betterment of the pastoral provision for the salvation of souls (cf. Second Vatican Ecumenical Council, Decree on the Pastoral Office of Bishops in the Church, *Christus Dominus*, 28 October 1965, n. 32) and the good of the faithful (cf. Congregation for Bishops, Directory for the Pastoral Ministry of Bishops, *Apostolorum Successores*, 22 February 2004, n. 214).

4. The Dicastery has affirmed that "the suppression of parishes by extinctive union is legitimate for causes directly related to a specific Parish," and further, "As a condition for the legitimacy of this type of provision, the requisite motivations must be directly and organically connected to the interested parish community, and not on general considerations or theories, or based solely on principle" (Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, 20 June 2020, n. 48).

5. However, although a diocesan Bishop is required to consider the situation *ad rem* of a particular parish in the deliberation of a just cause, the law does allow him to take into account the condition of the entire Diocese. The Apostolic Signatura has stated: *Decretum suppressionis feratur, denique, saltem summarie expressis motivis (cf. can. 51). Qua in re, "Episcopus diocesanus…iuxta suam prudentem discretionem procedure potest, excluso vero arbitrarietate" (decreta Congressus diei 3 maii 2002, prot. Nn. 33219/01 CA; 32220/01 CA; 32238/01 CA). Hac in ratione perpendenda,* non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, *ut totius dioecesis saluti animarum meliore quo fieri potest modo, providesatur. Nullum tandem "ius christifedelium agnoscitur ad determinatam paroeciam, cum illis sufficiat paroecia quaedam, quae eorumdem curam pastoralem expleat" (cf. v.g. decreta Congressus dierum 12 octobris 1995, prot. N. 25323/94 CA; 18 ianuarii 1996 prot. N. 25465/94 CA; 12 octobris 1995, prot. N. 25530/95 CA* (cf. Decree Prot. N. 37280/05 CA, 22 May 2009). This was also reiterated in a subsequent decision, *sufficit proinde iusta causa; qua in ratione perpendenda, non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, ut totius dioecesis saluti animarum* et quidam etiam in futuro, *meliore quo fieri potest modo providesatur* (cf. Decree Prot. N. 45082/11 CA, 27 April 2011). Because the faithful have a right to pastoral care in some parish, rather than a right to a specific parish, and since the diocesan Bishop can consider the condition of an area or the Diocese as a whole, even a parish whose community and finances are in good condition may be united to another. The Apostolic Signatura succinctly expressed this jurisprudence as follows: *"etiam in paroecia in bona condicione legitime uniri potest cum aliis paroeciis, nam consideranda est non tantum condicio singulae paroeciae sed etiam totius loci, immo totius dioecesis (cfr. SSAT decretum diei 12 iunii 2012, Prot. N. 46039/11 CA)"* (Decree, 4 December 2020, Prot. N. 55183/20 CA). Taken together, the Instruction of the Dicastery cited above and the jurisprudence of the Apostolic Signatura must be understood to require that the conditions generally affecting an area or the entire Diocese must affect the interested Parish in some way.

6. The nature of a parish in the Church is found in canon 515 §1: *Paroecia est certa communitas christifidelium in Ecclesia particulari stabiliter constituta, cuius cura pastoralis, sub auctoritate Episcopi dioecesani, committitur parocho, qua proprio eiusdem pastori.* A parish, from the moment of its legitimate establishment by the competent authority, is a public juridic person, as clearly stated in canon 515 §3: *Paroecia legitime erecta personalitate iuridica ipso iure gaudet.* As a juridic person, a parish is perpetual by nature however, it is possible to suppress (cf. can. 120 §1) juridic persons, such as parishes, or to merge them with another parish (cf. can. 121). The suppression or merger of the juridic person of the Parish requires a singular decree of the diocesan Bishop after the necessary consultation with the Presbyteral Council of his Diocese, as found in canon 515 §2: *Paroecias erigere, supprimere aut eas innovare unius est Episcopi dioecesani, qui paroecias ne erigat aut supprimat, neve eas notabiliter innovet, nisi audito consilio presbyterali.* The motivating cause for the suppression or merger of a parish must be at least a just cause, which, in the determination of the diocesan

1. The Parish was erected in 1930, with the church first having been built in 1922 (*Decree*, 1). Since 2022, the Parish has been part of a collaborative unit, Family #15 ("The Akron-Clarence Roman Catholic Community"), a "family of parishes," with four other parishes, served by four priests (a pastor, parochial vicar, and two senior priests, *Family Parish Bulletin*, 20 Oct. 2025).

2. According to data supplied by the Ordinary, the Parish had 885 registered households as of 2023, with an average weekend Mass attendance of 485 (*Acta*, 5). In the decade spanning 2014 to 2023, the number of registered households has decreased by 11.9% (from 1005 to 885), though there has been an annual increase since the pandemic, to 860 in 2021, 876 in 2022 and 885 in 2023. The number of "practicing" households (the term is undefined) has decreased by 12.2% (from 887 to 779), while Mass attendance, which had remained steady at 1000 from 2014 to 2021 (including the pandemic year of 2020), shows a steep drop off to 500 in 2022 and 485 in 2023 (*Acta*, 5). The number of "contributing households" which had decreased from 887 in 2014 to 611 in 2022, shows a sign of recovery with 865 being recorded in 2023 (*ibid.*). The summary financial data shared in the acts show a strong increase in assets over the decade, from $322,826 to $1,112,061, though a slight decline from the post-pandemic high of $1,232,083 is noted (*Acta*, 6), with relatively modest liabilities, of $31,258 in 2021, $53,014 in 2022 and $23,760 in 2023. Total receipts over the period have decreased somewhat from $641,040 to $587,440 (*ibid.*), and after maintaining a positive net operating balance until 2021, the last two years (2022, 2023) have shown negative balances of $61,216 and $59,072 respectively (*ibid*).

3. With regard to the celebration of other Sacraments, the number of baptisms has remained fairly steady over the decade, of around 20 per year (with a low of 8 during the pandemic year of 2020), with a similar trend shown in the number of marriages, in the single digits. The number of confirmations have decreased, however, from a high of 48 in 2014 to 19 in 2023 (*Acta*, 5). The number of children in religious education has decreased by 58.7% from 363 to 279, signaling an aging demographic in the parish (*Acta*, 9).

4. The Ordinary states that data collected from surveys conducted in the Parish show that the 60% of the parishioners are close to the age of 70 or order (*Votum*, 9). However, this data is based on a response rate of 20% (*ibid.*), which is lower than similar surveys done in other parishes in the diocese, which limits the conclusions that can be drawn regarding the demographic makeup of the Parish.

5. In his Decree, the Ordinary gives the following three reasons for the extinction of the parish: 1) the diocesan reorganization plan, "The Road to Renewal," has provided a "more realistic" picture of the financial and sacramental situations in its parishes, which, 2) along with the need to reduce the strain on the "already limited number of priests," requires the merging of parishes and the overall reduction of physical worship sites, and thus the Parish was identified as a site that would "benefit" from being united with its neighboring parish, Nativity of the Blessed Virgin Mary, in order to consolidate resources. Furthermore, 3) the diocese has a need to procure an undisclosed sum for the settlement of bankruptcy proceedings arising from historical sexual abuse claims, and the property of the Parish has been identified as one that could be alienated for this purpose. The Decree meets the requirements of presenting the motivating causes "at least in summary form" (can. 51). None of the causes listed, however, is *ad rem*, connected to the concrete reality of the Parish.

6. In the recourse, the Procurator challenges the Ordinary's presentation of just causes in the impugned Decree, stating that the Ordinary has not presented a just cause; that the causes mentioned in the Decree are not specific to the Parish (*Acta*, 45), that the Decree provides no explanation or justification for the purported benefit to the Parish from the extinctive union (*Acta*, 46), that the need to amass funds for the diocese's liabilities, including the alienation

Bishop, serves the good of souls (cf. Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, 30 April 2013, Prot. N. 2013 1348). A paucity of clergy, a declining participation in parish life, or financial difficulties can be among the reasons that meet the standard of a just cause for the extinctive union of a parish, as these concerns affect the ability of the juridic person in question to continue its mission for the good of souls.

7. As noted above, these causes may affect not only the Parish in question but also the parishes in a given area or even the entire Diocese. In the first place, the Ordinary may group parishes together in a federated form, "whereby assembled Parishes would retain their own identity (Congregation for the Clergy, instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelizing mission of the Church*, n. 47)." Nevertheless, inasmuch as the extinction of a parish is an act with permanent consequences, the cause should not be based on "conditions within the community that are presumably reversible or of brief duration" (Ibid., n. 48). Along this same line, jurisprudence indicates that "an extinctive union or suppression should be the last choice when dealing with various problems affecting parochial life, insofar as other possible remedies should have been at least considered beforehand and ruled out (Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, 30 April 2013, Prot. N. 2013 1348, n. 1g)."

8. Regarding which juridic act, suppression or merger, is most apt, there are four types of modification to parishes available in the law: an Extinctive Union whereby two or more parishes unite to form a new juridic person (cf. can. 121); an Extinctive Union whereby one Parish absorbs another, so that only the receiving Parish remains (cf. can. 121); a Division, whereby one Parish is divided so that one or more additional parishes are erected (cf. can. 122) and a true Suppression, where the juridic person of a parish is extinguished entirely (cf. can. 123). The Dicastery further clarified that "territorial parishes, as a general rule, may only be united or divided. Although sometimes personal parishes are truly suppressed, they are ordinarily united or divided, either in connection to another personal parish or even to a territorial parish" (Congregation for the Clergy, *Procedural Guidelines* [Prot. N. 2013 1348] n. 1d). If the parish church and other properties of a personal parish have been given over to another parish, and the faithful are directed to that same Parish for their pastoral care, this can only be considered an extinctive union of the two, rather than a true suppression. In such cases, the financial assets and liabilities of the juridic person in question also accrue to the receiving Parish, with due regard for the intentions of donors (cf. can. 121), rather than the superior juridic person, such as the Diocese (cf. can. 123). A territorial parish may not be truly suppressed, inasmuch as the entire territory of a diocese must be divided into these basic units of pastoral governance (cf. can. 374 §1).

9. With regard to the temporal goods of the extinguished Parish, the Apostolic Signatura has stated, "*In casu unionis paroeciarum bona paroeciae seu personae iuridicae suppressae non obveniunt personae iuridicae immediate superiori (cf. can. 123), sed, ad normam can. 121 paroeciae seu personae iuridicae ad quam aut paroeciis seu personis iuridicis ad quas.*" (Definitive Sentence, *coram* Echevarría Rodríguez, 7 May 2010, *Prot. N. 38161/06 CA*).

10. Whichever of the aforementioned juridic acts is taken, the extinctive union of one or more parishes must always be carefully distinguished from the decision to reduce a church to profane but not sordid use (cf. can. 1222 §2), since the cause required for the former is merely just, while the latter requires a grave cause (cf. Congregation for the Clergy, *Procedural Guidelines*, Prot. N. 2013 1348). This distinction is not limited to the issuance of the singular administrative act itself, but also to the consultations and preparations for the same, which must maintain the "*necessaria distincio inter 'processum reordinationis paroeciarum et determinationem quoad statutum canonicum edificii sacrii'* (*Sententia defintiva diei 21 maii 2011, coram* Caffara, prot. n. 41719/08 CA" (Definitive sentence, *coram* Mamberti, 25 April 2018, Prot. N. 51993/16 CA).

of property, is not a just cause according to the 2020 Instruction issued by this Dicastery (cited above), nor is the scarcity of priests a sufficient reason according to the same Instruction (*ibid.*). The Procurator also asserts that in a Parish Council Meeting, the Vicar for Renewal stated that the "Diocese is expecting to lose parishioners … 10 to 30 percent loss of parishioners is being planned on," therefore the merger is opposed to the salvation of souls (*Acta*, 47). The Procurator also presented several other reasons against the opportuneness of the merger (summarized at *Acta*, 46-47).

7. The Procurator further challenges the data submitted by the Ordinary, asserting that the Parish is growing, and that registration and sacraments are increasing (*Acta*, 14); that though the Parish serves a number of "retirement communities," this is not a disadvantage, because newer retirees keep moving to the area; that there is a mix of ages in the parish, including young families, with 16 baptisms celebrated in the first half of 2024 alone (*Acta*, 17); that the Parish is planning for a diminished number of priests, utilizing the presence of a planned home for retired priests in the area (*Acta*, 19); that the Parish has a high percentage (85%) of registered households that contribute financially to the parish, that the deficits in the last two years in financial statements are because of capital improvements conducted under the guidance of the Diocesan Buildings and Properties Department being recorded on the balance sheets, and which were eventually reimbursed from the parish's capital expenditure account, and that no actual deficit has been recorded for any year, contrary to the diocesan report (*Acta*, 20). The Dicastery notes some discrepancies within the data presented by the Ordinary, for instance, the average attendance in 2022 being listed in one place as 450 (*Acta*, 1), and in another as 500 for the same year (*Acta*, 5), while noting, moreover, that detailed financial statements were not included in the acts.

8. In his *votum* the Ordinary states that the Parish is "not attracting new parishioners" (*Votum*, 9), while summarizing the conclusions of the Office of Renewal and Development, regarding the challenges facing the Parish as follows: "Although the parish has shown strong fiscal commitment from its core base … the sharp drop in weekend attendance and religious education signals a pastoral challenge" (*ibid.*), adding that the "Red Flags" in the report, based on the data mentioned above, "paint a picture that is more dire," which, along with the sharp drop in religious education and sacrament reception," suggest that it is "time to merge Our Lady of Peace in hopes of inspiriting a zeal for evangelization and further unite the administration of the buildings and communities" in the area, stating that the church and campus will not "necessarily" be closed, and the church will remain a "secondary worship site" (*Votum*, 10), while excess property would be sold (*Acta*, 35). Furthermore, given that the area is projected to have only 2 priests to cover the family of parishes in 2030, a reduced number of parishes would make for a more "reasonable weekend Mass schedule (*Votum*, 10).

9. The Dicastery finds that the data supplied by the Ordinary himself, as well as those submitted by the Procurator do not support his assertion of a parish facing "significant challenges" or a "picture that is far more dire," in that the Parish is attracting new members, has shown a growth in numbers in recent years, both in terms of registered and contributing households, and is in a financially strong position. The number of sacraments celebrated has fluctuated somewhat, but the data do not support the case for a strong decline. There is no explanation provided for the sharp decline in Mass attendance seen in the two most recent years of the past decade (2022 and 2023), after 7 years of steady and stable attendance, nor why this relatively recent decline is "not projected to improve" (*Votum*, 9). Consequently, this decline cannot be taken as an irreversible trend. The decline of young people enrolled in religious education classes is not, in of itself, a sufficient reason for the suppression of the Parish. There is no information present, moreover, as to the manner in which the projected number of priests available to serve the area in 5 years' time, was determined, nor any response to the Procurator's claim of the availability of retired priests from a planned retirement home for priests in the area. Nor does the Ordinary provide any concrete information as to how the merger will "benefit" the Parish (*Decree*, 3). Therefore, the Dicastery finds that the Ordinary has not shown a just cause for the extinctive union.

10. The Presbyteral Council discussed the Parish in question on Wednesday, 27 August 2024; however, the vote was postponed after a discussion suggested more consultation was needed (*Acta*, 34). The Presbyteral Council met again on 8 October 2024 to discuss the matter, and the discussion focused on the desire of parishioners of the Parish to stay independent or merge with a different parish. The proposal did not pass, with 6 members in favor, 11 opposing, and 4 abstentions (*Acta*, 40).

THEREFORE,

**In accord with CIC can. 1739, this Dicastery hereby REVOKES the decree of 19 November 2024 of the Bishop of Buffalo, which joined Our Lady of Peace Parish in Clarence to Nativity of the Blessed Virgin Mary Parish in Harris Hill in an extinctive union, since the petition for hierarchical recourse as presented has merit *in decernendo*.**

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
10 November 2025

Lazzaro Cardinal You Heung sik
*Prefect*

Rev. Msgr. Simone Renna
*Undersecretary*



# DICASTERIUM PRO CLERICIS

## DECREE

Prot. N. 2025 3076-1

### SPECIES FACTI

1. WHEREAS, on 6 January 2025, His Excellency, the Most Reverend Michael W. Fisher, Bishop of Buffalo (hereinafter, 'the Ordinary') issued a decree joining Holy Apostles Parish in Jamestown (hereinafter, 'the Parish') to the Parish of Saint James also in Jamestown, in an extinctive union (cf. *CIC* cann. 121; 515 §2), to take effect on 28 February 2025, and;

2. WHEREAS, after the aforesaid Decree was published to the faithful on 9 January 2025, Ms. Samantha Scalise, acting *pro se* and as procurator of numerous members of the Parish (hereinafter, 'the Procurator') made *remonstratio* on 17 January 2025 against the same to the Ordinary (cf. can. 1734), which was received on 23 January 2025 and;

3. WHEREAS, with thirty days having passed with no response from the Ordinary (cf. can. 1735), on 8 March 2025, the Procurator sought hierarchical recourse before the Dicastery for the Clergy (hereinafter, 'the Dicastery'), which was received on 17 March 2025 and was accepted for examination on 1 April 2025, and;

4. WHEREAS on 23 September 2025 the *acta* and the *votum* of the Ordinary arrived in the Dicastery, and;

5. WHEREAS a hierarchical recourse is, by its nature, a documentary process that proceeds on the basis of examination of authentic documents provided by interested parties at the request of the Dicastery; thus having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted by both the Ordinary and the Procurator, the Dicastery judges as complete the documentation in its possession and proceeds, therefore, to its decision *per cartas*.

### IN IURE

1. The Apostolic Constitution, *Praedicate Evangelium*, art. 118, 1° establishes the competence of the Dicastery for the Clergy over "general discipline governing... parishes" and thus its authority to decide the matter as the appropriate Entity of the Holy See.

2. Concerning the specific object of this recourse, the extinctive union of a parish, canon 50 requires that, before issuing a decree, the Ordinary must seek the necessary information and proofs, and consult those whose rights can be harmed. Canon 515 §2 requires that the diocesan Bishop consult the Presbyteral Council before establishing, suppressing or notably altering a parish. Further, a decree is to be issued in writing and, when it contains a decision, the reasons for that decision must be given, at least in summary form (cf. can. 51). Canon 515 §2 makes

1 of 6

Case 1-20-10322-CLB, Doc 4976-12, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-1, Page 19 of 28

no provision as to the gravity of the cause required. Hence it is sufficient that a just cause be present (cf. Decrees of the Supreme Tribunal of the Apostolic Signatura, Prot. N. 24048/93 CA, 6 December 1993 and Prot. N. 38159/06 CA, 18 April 2008).

3. However, the just cause must primarily be the betterment of the pastoral provision for the salvation of souls (cf. Second Vatican Ecumenical Council, Decree on the Pastoral Office of Bishops in the Church, *Christus Dominus*, 28 October 1965, n. 32) and the good of the faithful (cf. Congregation for Bishops, Directory for the Pastoral Ministry of Bishops, *Apostolorum Successores*, 22 February 2004, n. 214).

4. The Dicastery has affirmed that "the suppression of parishes by extinctive union is legitimate for causes directly related to a specific Parish," and further, "As a condition for the legitimacy of this type of provision, the requisite motivations must be directly and organically connected to the interested parish community, and not on general considerations or theories, or based solely on principle" (Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, 20 June 2020, n. 48).

5. However, although a diocesan Bishop is required to consider the situation *ad rem* of a particular parish in the deliberation of a just cause, the law does allow him to take into account the condition of the entire Diocese. The Apostolic Signatura has stated: *Decretum suppressionis feratur, denique, saltem summarie expressis motivis (cf. can. 51). Qua in re, "Episcopus diocesanus...iuxta suam prudentem discretionem procedure potest, excluso vero arbitrarietate" (decreta Congressus diei 3 maii 2002, prot. Nn. 33219/01 CA; 32220/01 CA; 32238/01 CA). Hac in ratione perpendenda,* non solum condicio paroeciae consideranda est, *verum etiam totius dioecesis, ut totius dioecesis saluti animarum meliore quo fieri potest modo, provideatur. Nullum tandem "ius christifedelium agnoscitur ad determinatam paroeciam, cum illis sufficiat paroecia quaedam, quae eorumdem curam pastoralem expleat" (cf. v.g. decreta Congressus dierum 12 octobris 1995, prot. N. 25323/94 CA; 18 ianuarii 1996 prot. N. 25465/94 CA; 12 octobris 1995, prot. N. 25530/95 CA* (cf. Decree Prot. N. 37280/05 CA, 22 May 2009). This was also reiterated in a subsequent decision, *sufficit proinde iusta causa: qua in ratione perpendenda, non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, ut totius dioecesis saluti animarum* et quidam etiam in futuro, *meliore quo fieri potest modo provideatur* (cf. Decree Prot. N. 45082/11 CA, 27 April 2011). Because the faithful have a right to pastoral care in some parish, rather than a right to a specific parish, and since the diocesan Bishop can consider the condition of an area or the Diocese as a whole, even a parish whose community and finances are in good condition may be united to another. The Apostolic Signatura succinctly expressed this jurisprudence as follows: "*etiam in paroecia in bona condicione legitime uniri potest cum aliis paroeciis, nam consideranda est non tantum condicio singulae paroeciae sed etiam totius loci, immo totius dioecesis (cfr. SSAT decretum diei 12 iunii 2012, Prot. N. 46039/11 CA)*" (Decree, 4 December 2020, Prot. N. 55183/20 CA). Taken together, the Instruction of the Dicastery cited above and the jurisprudence of the Apostolic Signatura must be understood to require that the conditions generally affecting an area or the entire Diocese must affect the interested Parish in some way.

6. The nature of a parish in the Church is found in canon 515 §1: *Paroecia est certa communitas christifidelium in Ecclesia particulari stabiliter constituta, cuius cura pastoralis, sub auctoritate Episcopi dioecesani, committitur parocho, qua proprio eiusdem pastori.* A parish, from the moment of its legitimate establishment by the competent authority, is a public juridic person, as clearly stated in canon 515 §3: *Paroecia legitime erecta personalitate iuridica ipso iure gaudet.* As a juridic person, a parish is perpetual by nature however, it is possible to suppress (cf. can. 120 §1) juridic persons, such as parishes, or to merge them with another parish (cf. can. 121). The suppression or merger of the juridic person of the Parish requires a singular decree of the diocesan Bishop after the necessary consultation with the Presbyteral Council of his Diocese, as found in canon 515 §2: *Paroecias erigere, supprimere aut eas*

Case 1-20-10322-CLB, Doc 4976-12, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-1, Page 20 of 28

must maintain the *"necessaria distincio inter processum reordinationis paroeciarum et determinationem quoad statutum canonicum edificii sacrii"* (*Sententia defintiva diei 21 maii 2011, coram* Caffara, prot. n. 41719/08 CA" (Definitive sentence, *coram* Mamberti, 25 April 2018, Prot. N. 51993/16 CA).

## IN FACTO

1. The Parish was formed from the extinctive union of the parishes of St. John (founded in 1927) and SS. Peter and Paul (with roots stretching back to the 1850s), on 1 June 2008, to form the new parish of the Holy Apostles, as part of the "Journey in Faith and Grace" initiative, with both churches remaining open. In February 2023, the Parish was included in a collaborative arrangement with neighboring families, as part of Family #4 ("Catholic Neighbors in Faith community"), served by 3 priests, a Parish Administrator and two parochial vicars (*Parish Bulletin*, 19 October 2025).

2. According to data supplied by the Ordinary, the Parish had 891 registered households as of 2023, with an average weekend Mass attendance of 675 (*Acta*, 6). In the decade spanning 2014 to 2023, the number of registered households decreased from 1024 to a low of 882 in 2021, but then has shown an increase, to 891 in 2023. The number of "practicing" households (the term is undefined) decreased from 720 to a low of 570 in 2022, with a rebound to 850 in 2023. Mass attendance has increased slightly over the decade from 650 in 2014, to 675 through 2023 (*ibid.*). Though the number of "contributing households" has decreased by 47% 675 to 361), the parish has maintained a strong and stable financial profile, with a healthy positive operating balance in the most recent 5 years. "Total receipts," increased from $707,942 in 2014 to $901,232 in 2023, assets increased dramatically from $259,662 to $1,394,888, while liabilities, while increasing, have left the Parish with a healthy net operating balance of $112,115 in 2023, and though liabilities also increased at the same time, the Parish had a net operating balance of $112,115 in 2023 (*Acta*, 6-7).

3. With regard to the celebration of other Sacraments, the number of baptisms has fluctuated, steadily between 10 to 18 from 2014-2021 (with a drop to 2 in 2020), and then fell to 8 in 2022 and then 3 in 2023. The number of confirmations has also dropped, from 15 to 8, while the number of marriages has remained in the single digits. The number of children in religious education has decreased significantly from 143 to 48, all which points to an aging demographic in the parish (*Acta*, 6).

4. The Ordinary also states that data collected from surveys conducted in the Parish show that the 65% of the parishioners are close to the age of 70 or order (*Votum*, 9), based on a response rate of 21%.

5. In his Decree, the Ordinary gives the following three reasons for the extinction of the parish: 1) the diocesan reorganization plan, "The Road to Renewal," has provided a "more realistic" picture of the financial and sacramental situations in its parishes, which, 2) along with the need to reduce the strain on the "already limited number of priests," requires the merging of parishes and the overall reduction of physical worship sites, and thus the Parish was identified as a site that would "benefit" from being united with its neighboring parish, Saint James, in order to consolidate resources. Furthermore, 3) the diocese has a need to procure an undisclosed sum for the settlement of bankruptcy proceedings arising from historical sexual abuse claims, and the property of the Parish has been identified as one that could be alienated for this purpose. The Decree meets the requirements of presenting the motivating causes "at least in summary form" (can. 51). None of the causes listed, however, is *ad rem*, connected to the concrete reality of the Parish.

Case 1-20-10322-CLB, Doc 4976-12, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-1, Page 21 of 28

*innovare unius est Episcopi dioecesani, qui paroecias ne erigat aut supprimat, neve eas notabiliter innovet, nisi audito consilio presbyterali.* The motivating cause for the suppression or merger of a parish must be at least a just cause, which, in the determination of the diocesan Bishop, serves the good of souls (cf. Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, 30 April 2013, Prot. N. 2013 1348). A paucity of clergy, a declining participation in parish life, or financial difficulties can be among the reasons that meet the standard of a just cause for the extinctive union of a parish, as these concerns affect the ability of the juridic person in question to continue its mission for the good of souls.

7. As noted above, these causes may affect not only the Parish in question but also the parishes in a given area or even the entire Diocese. In the first place, the Ordinary may group parishes together in a federated form, "whereby assembled Parishes would retain their own identity (Congregation for the Clergy, instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelizing mission of the Church*, n. 47)." Nevertheless, inasmuch as the extinction of a parish is an act with permanent consequences, the cause should not be based on "conditions within the community that are presumably reversible or of brief duration" (*Ibid.*, n. 48). Along this same line, jurisprudence indicates that "an extinctive union or suppression should be the last choice when dealing with various problems affecting parochial life, insofar as other possible remedies should have been at least considered beforehand and ruled out (Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, 30 April 2013, Prot. N. 2013 1348, n. 1g)."

8. Regarding which juridic act, suppression or merger, is most apt, there are four types of modification to parishes available in the law: an Extinctive Union whereby two or more parishes unite to form a new juridic person (cf. can. 121); an Extinctive Union whereby one Parish absorbs another, so that only the receiving Parish remains (cf. can. 121); a Division, whereby one Parish is divided so that one or more additional parishes are erected (cf. can. 122) and a true Suppression, where the juridic person of a parish is extinguished entirely (cf. can. 123). The Dicastery further clarified that "territorial parishes, as a general rule, may only be united or divided. Although sometimes personal parishes are truly suppressed, they are ordinarily united or divided, either in connection to another personal parish or even to a territorial parish" (Congregation for the Clergy, *Procedural Guidelines* [Prot. N. 2013 1348] n. 1d). If the parish church and other properties of a personal parish have been given over to another parish, and the faithful are directed to that same Parish for their pastoral care, this can only be considered an extinctive union of the two, rather than a true suppression. In such cases, the financial assets and liabilities of the juridic person in question also accrue to the receiving Parish, with due regard for the intentions of donors (cf. can. 121), rather than the superior juridic person, such as the Diocese (cf. can. 123). A territorial parish may not be truly suppressed, inasmuch as the entire territory of a diocese must be divided into these basic units of pastoral governance (cf. can. 374 §1).

9. With regard to the temporal goods of the extinguished Parish, the Apostolic Signatura has stated, "*In casu unionis paroeciarum bona paroeciae seu personae iuridicae suppressae non obveniunt personae iuridicae immediate superiori (cf. can. 123), sed, ad normam can. 121 paroeciae seu personae iuridicae ad quam aut paroeciis seu personis iuridicis ad quas.*" (Definitive Sentence, *coram* Echevarría Rodríguez, 7 May 2010, *Prot. N. 38161/06 CA*).

10. Whichever of the aforementioned juridic acts is taken, the extinctive union of one or more parishes must always be carefully distinguished from the decision to reduce a church to profane but not sordid use (cf. can. 1222 §2), since the cause required for the former is merely just, while the latter requires a grave cause (cf. Congregation for the Clergy, *Procedural Guidelines*, Prot. N. 2013 1348). This distinction is not limited to the issuance of the singular administrative act itself, but also to the consultations and preparations for the same, which

Case 1-20-10322-CLB, Doc 4976-12, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-1, Page 22 of 28

6. In the recourse, the Procurator challenges the Ordinary's presentation of just causes in the impugned Decree, stating that Ordinary has not provided a just cause, because of the causes listed in the Decree, as identified by the Procurator, are not *ad rem* to the Parish, having to do with a priori decisions about "the number of 'necessary' closures and mergers," and the consolidation of resources of other parishes with the parish *ad quem* which does not relate to the Parish as such (*Recourse*, 5, 6). The Procurator adds that the Ordinary has stated in accompanying letters, that the sale of property of merged parishes will be used for the diocesan bankruptcy settlement fund (*Recourse*, 6). With respect to the projected number of priests available to serve the area, the Procurator holds that the Parish has had experience of working with neighboring parishes to adjust the Mass schedule after the death of their former pastor, and could do so in the future (*Recourse*, 5). The Procurator asserts the fact that the two lay trustees of the civil corporation of the Parish have not been replaced after their resignation, because it has been difficult to find parishioners willing to take these positions, is another motivation for the Ordinary to merge the Parish (*Recourse*, 6). She adds that there has been explanation as to how pastoral care would be improved by this decree (*Recourse*, 7), that the Parish is financially stable, so much so that after the family of parishes was created, the Parish was selected as the central "hub" for the financial and administrative operations of the family (*ibid.*), and finally, that the other causes listed in the diocesan report, such as the smaller numbers of sacraments being celebrated are not necessarily irreversible (*ibid.* 9).

7. The Procurator further challenges the nature of the consultation conducted prior to the issuing of the Decree, stating that it was insufficient, showed sign of lack of care and haste (such as getting the name of the Parish incorrect; *Recourse*, 15) and therefore illicit (*Recourse*, 3, 10-16)

8. In his *votum* the Ordinary points to that the fall in the number of contributing households, even though Mass attendance is stable, along with the drop in religious education enrollment and the celebration of the number of sacraments (*Votum*, 9). He summarizes the conclusions of the Office of Renewal and Development, that the Parish "risks long-term decline despite its short-term operational surpluses," unless it addresses "debt and revitalizing sacramental life among families and children (*Votum*, 10) adding that the "Red Flags" in the report, based on the data mentioned above paint a more "dire" picture, specifically the "sharp decline in religious education and sacrament reception" which suggest that it is "time to merge Holy Apostles in hopes of inspiriting a zeal for evangelization and further unite the administration of the buildings and communities" in the area (*ibid.*). Furthermore, given that the area is projected to have only two priests to cover the family of parishes in 2030, the merger would make for a more "reasonable weekend Mass schedule adding that one of the churches of the Parish, St. John's, would remain open (*ibid.*; *Acta*, 21).

9. The Dicastery finds that the Road to Renewal process engaged in consultation with the clergy and lay faithful of the parishes making up Family #28, including soliciting counterproposals to the diocesan proposal, and thus the requirements of can. 50 were met.

10. The Dicastery finds that the data supplied by the Ordinary himself, as well as that submitted by the Procurator do not support his assertion of a parish facing "significant challenges" or a "picture that is far more dire," in that the Parish is attracting new members, has a steady number of the faithful attending Mass, and is in a financially strong position. There is no evidence of the Parish being in debt; furthermore, according to the financial data supplied by the Procurator, the financial position of the Parish in 2024 (the year after the data supplied by the Ordinary) has improved (*Recourse*, Attachment 16), suggesting that the decline in the number of contributing households is not necessarily dire for the Parish. The number of sacraments celebrated has fluctuated somewhat, but the data do not support a case for an irreversible decline. The decline of young people enrolled in religious education classes is not, by itself, a sufficient reason for the suppression of the Parish. There is no information present, moreover, as to the manner in which the projected number of priests available to serve

Case 1-20-10322-CLB, Doc 4976-12, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-1, Page 23 of 28

the area in 5 years' time was determined, nor does the Ordinary provide any information as to how the merger will "benefit" the Parish (*Decree*, 3), or any other parish, such as identifying a weaker parish and joining it to a more stable one (*Votum*, 8). Therefore, the Dicastery finds that the Ordinary has not shown a just cause for the extinctive union.

11. The Presbyteral Council discussed the Parish in question on Wednesday, 30 August 2024, the second of its two day-long meetings to discuss the diocesan reorganization plan. The proposal passed with 16 voting in favor, none against, and no abstentions. (*Acta*, 20).

THEREFORE,

**In accord with CIC can. 1739, this Dicastery hereby REVOKES the decree of 6 January 2025 decree of the Bishop of Buffalo, which joined Holy Apostles Parish in Jamestown to that of Saint James also in Jamestown in an extinctive union, since the petition for hierarchical recourse as presented has merit *in decernendo*.**

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
11 November 2025

Lazzaro Cardinal Yoŭ Heung sik
*Prefect*

Rev. Enrico Massignani
*Adjunct Undersecretary*



**DICASTERIUM PRO CLERICIS**

Prot. N. 2025 3716

Mr. John M. WICK, Procurator
6617 N. Canal Road
Lockport, NY 14094
**UNITED STATES OF AMERICA**

Dear Mr. Wick,

   The Dicastery writes further regarding your hierarchical recourse against the decree which reduced the Church of Saint Joseph in Lockport, New York to profane but not sordid use (cf. can. 1222 §2).

   Please find enclosed the Decree whereby the recourse has been decided (cf. *Enclosure*). Thanking you for your correspondence, and with assurances of prayers and best wishes, I remain,

Sincerely yours in Christ,

Rev. Enrico Massignani
*Adjunct Undersecretary*

(*Enclosure*)

Dicastero per il Clero - 00120 Città del Vaticano - Tel. 06/69884151 - Fax: 06/69884845



# DICASTERIUM PRO CLERICIS

## DECREE

Prot. N. 2025 3716

1. WHEREAS, on 5 March 2025, the Bishop of Buffalo, the Most Reverend Michael W. FISHER (hereinafter, 'the Ordinary'), decreed the reduction of a subsidiary church of the Parish of All Saints, in Lockport, New York, called "the Church of Saint Joseph" (hereinafter, 'the Church') to profane but not sordid use (cf. can. 1222, §2), and;

2. WHEREAS, on 12 March 2025, Mr. John M. WICK, Procurator for members of the faithful of the Parish (hereinafter, 'the Procurator'), brought *remonstratio* against the aforementioned decree to the Ordinary (cf. can. 1734 §1), and;

3. WHEREAS, thirty days having passed with no reply from the Ordinary, on 16 April 2025, the Procurator submitted a request for hierarchical recourse (cf. can. 1737 §1) to the Dicastery for the Clergy (hereinafter, 'the Dicastery'), which accepted that request for study by its decretal letter of 27 May 2025 (cf. Art. 137 §1 *General Regulations of the Roman Curia*), recognizing as the object the aforementioned decree reducing the Church to profane but not sordid use (can. 1222 §2), and;

4. WHEREAS, on 7 November 2025, the *votum* and the Acts of the Ordinary's decision arrived in the Dicastery, and;

5. WHEREAS a hierarchical recourse is, by its nature, a documentary process which proceeds on the basis of examination of authentic documents provided by interested parties at the request of the Dicastery; thus having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted by both the Ordinary and the Recurrents, the Dicastery judges as complete the documentation in its possession and proceeds, therefore, to its decision *per cartas*.

## IN IURE

6. The Apostolic Constitution, *Praedicate Evangelium*, art. 118, 1° establishes the competence of the Dicastery for the Clergy regarding the "general discipline governing...churches" and thus its authority to decide the matter as the appropriate Entity of the Holy See.

7. A church may be closed to Divine Worship and reduced to profane but not sordid use only for grave reasons, according to a clear disposition in tradition and in law, given the sacred character of the consecrated edifice which becomes "a special sign of the pilgrim Church on earth and reflects the Church dwelling in heaven" (Canon 1222 *CIC; General Instruction for the Dedication of a Church, Ch. 2, §2*).

8. The Code of Canon Law provides for the ability to close a church permanently and reduce it to profane but not sordid use due to grave cause (Canon 1222 §2). Although a single

Case 1-20-10322-CLB,    Doc 4976-12,    Filed 07/22/26,    Entered 07/22/26 17:16:01,
Description: Exhibit K-1, Page 26 of 28

element may constitute grave cause, multiple causes, at least one of which must be grave, may together augment the seriousness of the situation. Such a series of causes may arise from a diligent examination of various factors, including the circumstances of time and place, economic or financial considerations of the juridic person of ownership, and the challenges facing a particular community of the faithful (cf. *Decree of the Supreme Tribunal of the Apostolic Signatura*, N. 41700/08, issued on 18 June 2009, 8; CONGREGATION OF THE CLERGY, *Procedural Guidelines for the Modification of Parishes, the Closure or Relegation of Churches to Profane but not Sordid Use, and the Alienation of the Same*, Prot. N. 2013 1348, 30 April 2013, §2, f).

9. Whenever the economic and financial condition of the juridic person is considered to constitute the grave cause required by canon 1222 §2, the evaluation is made not only on the basis of availability of funds for the repair of a church, but also on the overall mission of the juridic person, particularly its service to the poor. As stated by the jurisprudence of the Apostolic Signatura, "Furthermore, charity and the other assistance to be bestowed on the poor and other things of this kind cannot be neglected in order to preserve a sacred building" (*Definitive Sentence* of the Supreme Tribunal of the Apostolic Signatura N. 24388/93 CA, issued 4 May 1996, published in *Ministerium Iustitiae*, 527, "*Praeterea ut salvetur aedificium sacrum negligi haud queunt eleemosyna ceteraque subsidia pauperibus praesertim elargienda et alia huiusmodi.*")

10. It must be noted, however, that, in this respect, in accordance with the above cited jurisprudence, the evaluation of grave cause, or causes, must be related to actual current conditions, with prudent consideration for the historical, architectural and artistic patrimony of the sacred edifice, the feasibility of fundraising, the prospects for ongoing maintenance as well as the retention of the building for ecclesiastical use for purposes other than sacred worship.

11. In cases where Canon 1222 §2 is applied, the determination is to be made only after hearing the Presbyteral Council and after receiving the consent of those who could lawfully claim rights over the church, chiefly the Pastor or those who could claim patrimonial and other such rights which typically arise at the time of foundation and construction of the church (cf. Canons 1222 §2, 532, 122 *CIC;* Apostolic Signatura N. 17447/85 CA, 21 November 1987, published in *Ministerium Iustitiae*, p. 458, "*Iura de quibus sermo fit in canone (1222 §2) sunt praesertim iura patrimonilia vel eis assimilata, quae magna ex parte e fundatione vel aedificatione ecclesiae exsurgunt.*").

12. Canons 127 and 166 govern the meeting of the Presbyteral Council, which must take place in person to guarantee that all the participants have the necessary information and the opportunity for a complete discussion.

13. Finally, as mentioned in Canon 1222 §2, the Diocesan Bishop must be certain that the good of souls would not be harmed by the closing of the church to Divine Worship and its reduction to profane but not sordid use. The harm referred to in the canon must be a true deprivation of the rights of the faithful to the Word of God and the Sacraments (cf. can. 213), and not merely an inconvenience or difficulty in exercising that right.

### IN FACTO

14. In the impugned decree, the Ordinary asserts that a cumulation of causes has created a grave cause required by can. 1222, §2 for relegating a church to profane but not sordid use. The decree lists them as: the need to reduce financial strain on All Saints Parish, the

Case 1-20-10322-CLB, Doc 4976-12, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-1, Page 27 of 28

shortage of priests available for ministry in the area, the assessment of those in charge of the diocesan restructuring process that the Church was not needed, and the need to generate income to contribute to the the diocesan bankruptcy settlement.

15. On 6 November 2024, the Ordinary had decreed the extinctive union of All Saints Parish in Lockport, which owns the Church, with the parish of Saint John the Baptist, also in Lockport, to take effect on 6 January 2025. Hierarchical recourse against that decree was decided on 28 July 2025, in which the Dicastery confirmed the merger (Prot. N. 2025 1799).

16. Regarding the procedure employed, the Ordinary consulted the Presbyteral Council (cf. cann. 127; 166; 1222, §2) on 30 August 2024. According to the minutes of the meeting, however, the consultation for the above mentioned decree of merger of the parishes of All Saints and Saint John the Baptist (cf. can. 515 §2) also took place in the same meeting, immediately prior to the discussion of the relegation of the Church. It would have been impossible for the the Presbyteral Council to evaluate the presence of the required grave cause for the relegation of the Church with respect to its new owner, the parish *ad quem* in the aforementioned merger, and thefore the Ordinary erred *in procedendo*. The merits of the Ordinary's decision *in decernendo* are not considered.

THEREFORE

**In accord with CIC can. 1739, this Dicastery hereby REVOKES the decree of the Bishop of Buffalo, which reduced the Church of Saint Joseph, Lockport, to profane but not sordid use since the Ordinary erred *in procedendo*.**

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
9 January 2026

Lazzaro Cardinal You Heung sik
*Prefect*

Rev. Enrico Massignani
*Adjunct Undersecretary*