

## HIS EXCELLENCY
## MOST REVEREND MICHAEL W. FISHER
*By the Grace of God and the Authority of the Apostolic See*
## BISHOP OF BUFFALO

## DECREE OF THE MERGER OF SACRED HEART PARISH, BOWMANSVILLE AND ITS TERRITORY INTO NATIVITY OF THE BLESSED VIRGIN MARY PARISH, HARRIS HILL

### *THE FACTS*

In the first year of the War of 1812, Mr. Benjamin Bowman purchased land surrounding a waterfall on Ellicott Creek. This area came to be known as "Bowman's Mills" due to the saw and grist mills that Mr. Bowman put on his tract. The area that is now known as Bowmansville grew a substantial Catholic population by the dawn of the twentieth century. Some of these faithful petitioned Bishop Dennis J. Daughtery for a new parish to be erected. In June of 1917, Bishop Daughtery agreed. He appointed the Rev. Francis X. Scherer, the Pastor of Our Lady Help of Christians, to this task in addition to his other responsibilities.

Land was finally purchased in 1919, and the construction of the church soon ensued. The completed church was dedicated by Bishop William Turner on 25 June 1920. This would be the first church he dedicated as Ordinary of the Diocese of Buffalo. In 1923, the Rev. Edward Ott was appointed the first resident pastor of Sacred Heart Parish.

1924 saw another building project. That year the parish constructed a combination school/hall edifice and expanded the rectory to allow space for a convent. With the arrival of the Sisters of St. Francis from Williamsville, Sacred Heart school opened its doors in the Fall of 1924. After a period f closure, the school was reopened in 1950. A new school building was completed in 1965. This building, however, would only see use for another eighteen years. When the Sisters of St. Francis removed themselves form the school in 1983, all the students were routed to SS. Peter and Paul in Williamsville for their education.

1

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 1 of 26

The need for a new church was discerned in the mid-1950s. Thus, under the guidance of the Rev. Francis Hall, ground was broken in 1958. The church was completed the next year and dedicated on 27 September 1959. Sacred Heart Parish is known for its expansive outdoor shrine to the Immaculate Conception and the Sacred Heart of Jesus. The designation of Sacred Heart Diocesan Shrine was bestowed upon it by Bishop Edward Head on 7 June 1991. The parish school building is also the current location of the Chesterton Academy of Buffalo.

In May of 2023, the parish was grouped into Family #9 and ministered to by several priests *in solidum*. Since then, it has been reassigned to Family #15 and placed under the care of a single Pastor.

The Road to Renewal has allowed the diocese to gain a more realistic picture of the financial and sacramental situations in its parishes. Sacred Heart Parish has been identified as a community that could benefit by being joined with its sister community in Harris Hill. This was discussed with members of the Chancery and especially with the Reverend Bryan Zielenieski, Vicar for the Renewal. As a result of these conversations, I hereby issue the following decree.

### THE LAW

Because a parish is a public juridic person (cc. 116, 515 §3) and therefore established perpetually (c. 120), it can only be extinguished by legitimate authority according to the norm of law. Canon 515 §2 states, "It is only for the diocesan bishop to erect, suppress, or alter parishes. He is neither to erect, suppress, nor alter notably parishes, unless he has heard the presbyteral council."

Unstated in this norm is the requirement for at least a just cause in augmenting the structure of a parish. As a parish is defined in law as "a certain community of the Christian faithful stably constituted in a particular church, whose pastoral care is entrusted to a pastor (*parochus*) as its proper pastor (*pastor*) under the authority of the diocesan bishop" (c. 515 §1), the focus of such augmentation is primarily concerned with the pastoral care of a group of people and only secondarily interested in specific worship sites. Thus, a merger of parishes falls under the governing authority of the diocesan bishop in accord with canon 374 §1.

Following the norm of canon 121, when two public juridic persons "are so amalgamated that one aggregate, itself with a juridic personality, is formed, this new juridic person obtains the goods and patrimonial rights proper to the prior ones and assumes the obligations with which they were burdened." The eminent canonist Reverend Robert Kennedy notes, "Canon 121…focuses on what, in the United States, is called a consolidation, in which two or more juridic persons are so joined that each of them loses its own juridic identity and in their stead a new juridic person is constituted. A consolidation involves both the suppression and creation of juridic persons" ("Chapter II: Juridic Persons" in *New Commentary on the Code of Canon Law* (New York: Paulist Press, 2000) 168). Since the norm of canon 121 assumes a consolidation in which two juridic persons go out of existence to form a new juridic person from the

2

amalgamation of the former entities, it does not strictly apply to the situation of a parochial merger in which one entity absorbs another.

When the principle of law contained in canon 121 is applied to the canonical merger of one parish into another, the receiving parish must assume all net assets and debts of the merging parish. Here the term "net assets" is used to indicate that the merging parish is responsible for paying off its debts before an accurate assessment of what constitutes the temporal goods of the merging parish can be determined. "Commutative justice," the *Catechism of the Catholic Church* reminds us, "obliges strictly; it requires…paying debts" (n. 2411). This amount, once established, will be transferred to the receiving parish. What would be a clear *a iure* transfer of assets and liabilities to a newly constituted juridic person described in canon 121, is only partially applicable to the situation of a merging parish and can thus be addressed in terms of "net assets" to be identified at a future date.

## THE ARGUMENT

The reshaping of the diocese to prepare it for more effective ministry in the future requires a certain consolidation of resources. The goal of the Road to Renewal is to reduce the strain on our already limited number of priests while at the same time uniting communities to foster a greater drive to "go out to all the world and preach the Gospel to all creation" (Mk 16:15). Part of this process requires the merging of parishes and the overall reduction of physical worship sites throughout the diocese. Looking at Sacred Heart Parish in particular, the research and consultation done by the Office for Renewal and Development has revealed that this community would be better served by joining its resources to Nativity of the Blessed Virgin Mary Parish in an extinctive merger.

On 27 August 2024, the presbyteral council met at the Catholic Center of the Diocese of Buffalo. At this meeting, I consulted the council about the possibility of merging Sacred Heart Parish into Nativity of the Blessed Virgin Mary Parish, Harris Hill. Rev. Zielenieski pointed out that there would likely only be two available priests serving in Family #15 by 2030. Nativity of the Blessed Virgin Mary Parish is already set to absorb the territory of other nearby parishes so as to centralize pastoral ministry and increase efforts for evangelization. The discussion noted that Sacred Heart Parish did not have any pastoral programs running and that it had recently been on the verge of closing. The counter proposal submitted by Sacred Heart Parish was also addressed. This included the desire to merge Sacred Heart into St. Teresa of Avila, Akron. After a vote, the Council unanimously supported the original proposal to merge Sacred Heart Parish into Nativity of the Blessed Virgin Mary Parish.

Having heard the Presbyteral Council on this issue, I have chosen to merge Sacred Heart Parish into Nativity of the Blessed Virgin Mary Parish in accord with canon 515 §2.

3

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 3 of 26

Thus, having done the requisite consultations and having gained the required consents, I, the undersigned Most Reverend Michael W. Fisher, Bishop of Buffalo, exercising my ordinary power in virtue of canon 515 §2, do hereby decree that Sacred Heart Parish, Bowmansville be merged into Nativity of the Blessed Virgin Mary Parish, Harris Hill and Sacred Heart to be extinct thereby.

Nativity of the Blessed Virgin Mary Parish will be the recipient of the net assets and liabilities of Sacred Heart Parish. The territorial boundaries of Nativity of the Blessed Virgin Mary Parish will henceforth include:

1. the territory south of Greiner Rd. at Rte. 78 east to Harris Hill Rd., north on Harris Hill Rd. to Roll Rd. and east on Roll to Goodrich Rd.; north on Goodrich Rd. to Keller Rd.; east on Keller Rd. to Davidson Rd.; south on Davidson Rd. to Bowmansville Town Line and south to Clarence Center Rd.; Clarence Center Rd. east to Barnum Rd.;
2. the territory west of Salt Rd. from Keller Rd. to Clarence Center Rd.; east on Clarence Center Rd. to Barnum Rd.; south on Barnum and Millgrove Rds. to Genessee Rd. (Rte. 33), west on Rte. 33 to Ransom Rd., south on Ransom Rd. to Walden Ave.;
3. the territory east of Transit Rd. (Rte. 78) from Greiner Rd. to Wehrle Dr., west on Wehrle Dr. to Garrison Rd., Garrison Rd. south to Aero Dr. to Holtz to Genessee Rd.;
4. the territory north of Genessee Rd. from Holtz to Transit (Rte. 78), south on Rte. 78 to northern border of Town of Depew, from northern border of the Town of Depew at Transit Rd. extended east to Seitz Ave.; Line east to Ransom Rd., Ransom Rd. to Genessee St., east on Genessee as far as Millgrove Rd.

The intentions of the founders and donors regarding the temporal goods and patrimonial rights proper to the extinct Sacred Heart Parish, insofar as they exist, must be respected. In addition, the temporal goods and patrimonial rights, and obligations of the extinct Sacred Heart Parish must be defined and allocated according to the norm of law (cf. cc. 121-122) as interpreted by this document.

All the parish and sacramental records of the extinct Sacred Heart Parish are to be properly preserved and safeguarded in the parish archives of Nativity of the Blessed Virgin Mary Parish, Harris Hill, in accord with the norm of law.

This decree is to be effective on Monday 31 March 2025.

4

This decree is to be communicated to the Rev. Thomas M. Mahoney, the Pastor of both parishes (c. 532) and the two parishes affected by this extinctive merger (cf. cc. 7, 54 §1). Anyone who feels his or her rights have been legitimately harmed by this decree may present a challenge by requesting its revocation or emendation to its author within ten (10) useful days from its legitimate notification. Further recourse will follow the norms of canons 1734-1739.

Given at the Chancery of the Diocese of Buffalo on this 21st day of January 2025.

Most Reverend Michael W. Fisher
Bishop of Buffalo

Ms. Melissa Potzler
Chancellor

5

Case 1-20-10322-CLB,   Doc 4976-13,   Filed 07/22/26,   Entered 07/22/26 17:16:01,
Description: Exhibit K-2, Page 5 of 26



# DICASTERIUM PRO CLERICIS

## DECREE

Prot. N. 2025 3075

### SPECIES FACTI.

1. WHEREAS, on 21 January 2025, His Excellency, the Most Reverend Michael W. Fisher, Bishop of Buffalo (hereinafter, 'the Ordinary') issued a decree joining Sacred Heart Parish in Bowmansville (hereinafter, 'the Parish') to the Parish of the Nativity of the Blessed Virgin Mary in Harris Hill, in an extinctive union (cf. *CIC* cann. 121; 515 §2), to take effect on 31 March 2025, and;

2. WHEREAS, after the aforesaid Decree was published to the faithful on 26 January 2025, Ms. Julianna Monheim, acting *pro se* and as procurator of numerous members of the Parish (hereinafter, 'the Procurator') made *remonstratio* on 5 February 2025 against the same to the Ordinary (cf. can. 1734), and;

3. WHEREAS, with thirty days having passed with no response from the Ordinary (cf. can. 1735), on 12 March 2025, the Procurator sought hierarchical recourse before the Dicastery for the Clergy (hereinafter, 'the Dicastery'), which was received on 20 March 2025 and was accepted for examination on 1 April 2025, and;

4. WHEREAS on 23 September 2025 the acts and the *votum* of the Ordinary arrived in the Dicastery, and;

5. WHEREAS a hierarchical recourse is, by its nature, a documentary process that proceeds on the basis of examination of authentic documents provided by interested parties at the request of the Dicastery; thus having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted by both the Ordinary and the Procurator, the Dicastery judges as complete the documentation in its possession and proceeds, therefore, to its decision *per cartas*.

### IN IURE

1. The Apostolic Constitution, *Praedicate Evangelium*, art. 118, 1° establishes the competence of the Dicastery for the Clergy over "general discipline governing... parishes" and thus its authority to decide the matter as the appropriate Entity of the Holy See.

2. Concerning the specific object of this recourse, the extinctive union of a parish, canon 50 requires that, before issuing a decree, the Ordinary must seek the necessary information

1 of 7

and proofs, and consult those whose rights can be harmed. Canon 515 §2 requires that the diocesan Bishop consult the Presbyteral Council before establishing, suppressing or notably altering a parish. Further, a decree is to be issued in writing and, when it contains a decision, the reasons for that decision must be given, at least in summary form (cf. can. 51). Canon 515 §2 makes no provision as to the gravity of the cause required. Hence it is sufficient that a just cause be present (cf. Decrees of the Supreme Tribunal of the Apostolic Signatura, Prot. N. 24048/93 CA, 6 December 1993 and Prot. N. 38159/06 CA, 18 April 2008).

However, the just cause must primarily be the betterment of the pastoral provision for the salvation of souls (cf. Second Vatican Ecumenical Council, Decree on the Pastoral Office of Bishops in the Church, *Christus Dominus*, 28 October 1965, n. 32) and the good of the faithful (cf. Congregation for Bishops, Directory for the Pastoral Ministry of Bishops, *Apostolorum Successores*, 22 February 2004, n. 214).

The Dicastery has affirmed that "the suppression of parishes by extinctive union is legitimate for causes directly related to a specific Parish," and further, "As a condition for the legitimacy of this type of provision, the requisite motivations must be directly and organically connected to the interested parish community, and not on general considerations or theories, or based solely on principle" (Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, 20 June 2020, n. 48).

However, although a diocesan Bishop is required to consider the situation *ad rem* of a particular parish in the deliberation of a just cause, the law does allow him to take into account the condition of the entire Diocese. The Apostolic Signatura has stated: *Decretum suppressionis feratur, denique, saltem summarie expressis motivis (cf. can. 51). Qua in re, "Episcopus diocesanus...iuxta suam prudentem discretionem procedure potest, excluso vero arbitrarietate" (decreta Congressus diei 3 maii 2002, prot. Nn. 33219/01 CA; 32220/01 CA; 32238/01 CA). Hac in ratione perpendenda,* non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, *ut totius dioecesis saluti animarum meliore quo fieri potest modo, provideatur. Nullum tandem "ius christifedelium agnoscitur ad determinatam paroeciam, cum illis sufficiat paroecia quaedam, quae eorumdem curam pastoralem expleat" (cf. v.g. decreta Congressus dierum 12 octobris 1995, prot. N. 25323/94 CA; 18 ianuarii 1996 prot. N. 25465/94 CA; 12 octobris 1995, prot. N. 25530/95 CA* (cf. Decree Prot. N. 37280/05 CA, 22 May 2009). This was also reiterated in a subsequent decision, *sufficit proinde iusta causa; qua in ratione perpendenda, non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, ut totius dioecesis saluti animarum* et quidam etiam in futuro, *meliore quo fieri potest modo provideatur* (cf. Decree Prot. N. 45082/11 CA, 27 April 2011). Because the faithful have a right to pastoral care in some parish, rather than a right to a specific parish, and since the diocesan Bishop can consider the condition of an area or the Diocese as a whole, even a parish whose community and finances are in good condition may be united to another. The Apostolic Signatura succinctly expressed this jurisprudence as follows: "*etiam in paroecia in bona condicione legitime uniri potest cum aliis paroeciis, nam consideranda est non tantum condicio singulae paroeciae sed etiam totius loci, immo totius dioecesis (cfr. SSAT decretum diei 12 iunii 2012, Prot. N. 46039/11 CA)*" (Decree, 4 December 2020, Prot. N. 55183/20 CA). Taken together, the Instruction of the Dicastery cited above and the jurisprudence of the Apostolic Signatura must be understood to require that the conditions generally affecting an area or the entire Diocese must affect the interested Parish in some way.

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 7 of 26

juridic person in question also accrue to the receiving Parish, with due regard for the intentions of donors (cf. can. 121), rather than the superior juridic person, such as the Diocese (cf. can. 123). A territorial parish may not be truly suppressed, inasmuch as the entire territory of a diocese must be divided into these basic units of pastoral governance (cf. can. 374 §1).

With regard to the temporal goods of the extinguished Parish, the Apostolic Signatura has stated, "*In casu unionis paroeciarum bona paroeciae seu personae iuridicae suppressae non obveniunt personae iuridicae immediate superiori (cf. can. 123), sed, ad normam can. 121 paroeciae seu personae iuridicae ad quam aut paroeciis seu personis iuridicis ad quas.*" *(Definitive Sentence, coram* Echevarría Rodríguez, 7 May 2010. *Prot. N. 38161/06 CA).*

0. Whichever of the aforementioned juridic acts is taken, the extinctive union of one or more parishes must always be carefully distinguished from the decision to reduce a church to profane but not sordid use (cf. can. 1222 §2), since the cause required for the former is merely just, while the latter requires a grave cause (cf. Congregation for the Clergy, *Procedural Guidelines*, Prot. N. 2013 1348). This distinction is not limited to the issuance of the singular administrative act itself, but also to the consultations and preparations for the same, which must maintain the "*necessaria distincio inter 'processum reordinationis paroeciarum et determinationem quoad statutum canonicum edificii sacrii* (*Sententia defintiva diei 21 maii 2011, coram* Caffara, prot. n. 41719/08 CA" (Definitive sentence, *coram* Mamberti, 25 April 2018, Prot. N. 51993/16 CA).

## IN FACTO

1. The Parish dates back to the early 20th century, with the first church being dedicated in 1920, and the first pastor being appointed in 1923. A new Parish church was built in 1959. On 7 June 1991, the Parish was also designated the diocesan shrine for devotion to the Sacred Heart. In February 2023, the Parish was included in a collaborative arrangement with neighboring parishes, as part of Family #9, served by several priests *in solidum*, and later under a single Pastor, assisted by a parochial vicar and two senior priests, after being moved to Family #15 ("Together in Christ Family").

2. According to data supplied by the Ordinary, the Parish had 671 registered households as of 2023, with an average weekend Mass attendance of 300 (*Acta*, 3). In the decade spanning 2014 to 2023, the number of registered households has remained steady, from 670 in 2014, to a high of 697 in the years 2020 and 2021, before coming down to 671 in 2022 and 2023. The number of "practicing" households (the term is undefined) decreased from 400 to a low of 340 in 2023, with a high of 499 being recorded in 2017. Average weekend Mass attendance has decreased from 580 to 300 over the same period (*ibid*). The number of "contributing households," which term is also not defined, has also decreased from 400 to 340. While "total receipts," decreased from $406,809 in 2014 to $332,371 in 2023, assets increased from $147,027 to $319,939, and though liabilities also increased at the same time (none were recorded from 2014 to 2019; in 2020, liabilities were $23,246, with a sudden jump to $106,642 in 2023), the Parish has maintained a strong and stable financial profile, with a positive operating balance in 7 of the most recent 10 years.

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 8 of 26

The nature of a parish in the Church is found in canon 515 §1: *Paroecia est certa communitas christifidelium in Ecclesia particulari stabiliter constituta, cuius cura pastoralis, sub auctoritate Episcopi dioecesani, committitur parocho, qua proprio eiusdem pastori.* A parish, from the moment of its legitimate establishment by the competent authority, is a public juridic person, as clearly stated in canon 515 §3: *Paroecia legitime erecta personalitate iuridica ipso iure gaudet.* As a juridic person, a parish is perpetual by nature however, it is possible to suppress (cf. can. 120 §1) juridic persons, such as parishes, or to merge them with another parish (cf. can. 121). The suppression or merger of the juridic person of the Parish requires a singular decree of the diocesan Bishop after the necessary consultation with the Presbyteral Council of his Diocese, as found in canon 515 §2: *Paroecias erigere, supprimere aut eas innovare unius est Episcopi dioecesani, qui paroecias ne erigat aut supprimat, neve eas notabiliter innovet, nisi audito consilio presbyterali.* The motivating cause for the suppression or merger of a parish must be at least a just cause, which, in the determination of the diocesan Bishop, serves the good of souls (cf. Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, 30 April 2013, Prot. N. 2013 1348). A paucity of clergy, a declining participation in parish life, or financial difficulties can be among the reasons that meet the standard of a just cause for the extinctive union of a parish, as these concerns affect the ability of the juridic person in question to continue its mission for the good of souls.

As noted above, these causes may affect not only the Parish in question but also the parishes in a given area or even the entire Diocese. In the first place, the Ordinary may group parishes together in a federated form, "whereby assembled Parishes would retain their own identity (Congregation for the Clergy, instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelizing mission of the Church*, n. 47)." Nevertheless, inasmuch as the extinction of a parish is an act with permanent consequences, the cause should not be based on "conditions within the community that are presumably reversible or of brief duration" (*Ibid.*, n. 48). Along this same line, jurisprudence indicates that "an extinctive union or suppression should be the last choice when dealing with various problems affecting parochial life, insofar as other possible remedies should have been at least considered beforehand and ruled out (Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, 30 April 2013, Prot. N. 2013 1348, n. 1g)."

Regarding which juridic act, suppression or merger, is most apt, there are four types of modification to parishes available in the law: an Extinctive Union whereby two or more parishes unite to form a new juridic person (cf. can. 121); an Extinctive Union whereby one Parish absorbs another, so that only the receiving Parish remains (cf. can. 121); a Division, whereby one Parish is divided so that one or more additional parishes are erected (cf. can. 122) and a true Suppression, where the juridic person of a parish is extinguished entirely (cf. can. 123). The Dicastery further clarified that "territorial parishes, as a general rule, may only be united or divided. Although sometimes personal parishes are truly suppressed, they are ordinarily united or divided, either in connection to another personal parish or even to a territorial parish" (Congregation for the Clergy, *Procedural Guidelines* [Prot. N. 2013 1348] n. 1d). If the parish church and other properties of a personal parish have been given over to another parish, and the faithful are directed to that same Parish for their pastoral care, this can only be considered an extinctive union of the two, rather than a true suppression. In such cases, the financial assets and liabilities of the

Case 1-20-10322-CLB,   Doc 4976-13,   Filed 07/22/26,   Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 9 of 26

With regard to the celebration of other Sacraments, the number of baptisms has remained steady, around 17, from 2014, to 2023. The number of confirmations has also dropped, remaining steady, around 15-17 from 2014 to 2021, with none recorded in 2022 and 2023. The number of marriages has remained in the single digits. The number of children in religious education has decreased significantly from 140 in 2014 to 25 in 2022, with none recorded in 2023, all which points to an aging demographic in the parish (*Acta*, 3).

The Ordinary also states that data collected from surveys conducted in the Parish show that the 60% of the parishioners are close to the age of 70 or order (*Votum*, 9), based on a response rate of 38%.

In his Decree, the Ordinary gives the following reasons for the extinction of the parish: 1) the diocesan reorganization plan, "The Road to Renewal," has provided a "more realistic" picture of the financial and sacramental situations in its parishes, which, 2) along with the need to reduce the strain on the "already limited number of priests," requires the merging of parishes and the overall reduction of physical worship sites, and thus the Parish was identified as a site that would "benefit" from being united with its neighboring parish, Nativity of the Blessed Virgin Mary, in order to consolidate resources. Furthermore, 3) the Parish does not have "any pastoral programs running" and was "recently on the verge of closing." The Decree meets the requirements of presenting the motivating causes "at least in summary form" (can. 51). The first two of the causes listed, however, are not *ad rem*, i.e. connected to the concrete reality of the Parish.

In the recourse, the Procurator challenges the Ordinary's presentation of just causes in the impugned Decree, stating that Ordinary has not provided a just cause, because the causes listed in the Decree, as identified by the Procurator, are not *ad rem* to the Parish, having to do with a priori decisions about "the number of 'necessary' closures and mergers," and the consolidation of resources of other parishes with the parish *ad quem* which does not relate to the Parish as such (*Recourse*, 3, 4, 6). Furthermore, the Procurator asserts that the consultations were hastily done, insufficiently in-depth (*Recourse*, 3, 9, 11), and manipulative, pitting parishes within a family against each other (*Recourse*, 4). With respect to the projected number of priests available to serve the area, the Procurator states that this is a future projection, and therefore an illicit cause for the merger; moreover, in canonical jurisprudence, a priest shortage is not seen as an irreversible factor (*Recourse*, 7-8). Furthermore, it is unjust for the diocese to insist that parishes could not use future projections in their counterproposals to the merger, while using a similar argument itself for the merger of the Parish (*Recourse*, 8). The Procurator challenges the assertion that there are "no programs" in the Parish, citing several that do exist. She also asserts that the lack of children registered in religious education classes is due to the fact that the Parish agreed in 2022 to be a "pilot parish" for a centralized faith formation program, shared between different parishes in the parish family unit, and it is unjust for this fact to now be used as a sign of a the Parish's decline (*Recourse*, 8). She adds that the Decree mistakenly states that the Parish's counterproposal accepted the reality of a merger, proposing one with St. Theresa in Akron, stating that the counterproposal mentioned that parish only with respect to its distance from other parishes in the area, and did not accept a merger, or propose that the Parish merge with any other parish in the family or the area (*Recourse*, 5). Finally, the Recurrent states that a March 2025 inquiry of the Parish database showed 653 families and 1,392 members (*Recourse*, 9), adding that the four parishes in the Lancaster-Depew geographic areas that are slated for merger have nearly 3,000 practicing families, or 81% of the total Catholic population in the area. A closure of such a magnitude will bring "unreasonable harm and disadvantage" to the Parish, as well the faithful in other

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 10 of 26

of "an administrative preference and not a just cause" (*Recourse*, 10).

7. In his *votum* the Ordinary points to "the collapse of youth formation, weakening engagement and growing deficits" as a sign of a "parish in peril," stating that the "sharp decline in religious education and sacrament reception" are also signs of the need to merge the Parish (*Votum*, 9). He adds that Recurrents seem to think that a merger would imply a closure of the Parish church, which is not the case, since the Parish church and campus are expected to continue as a secondary worship site of the parish *ad quem* (*Votum*, 10), pointing to the presence of an independent Catholic school that expects to continue to rent space on the Parish campus (*ibid.*). The Ordinary also adds that the priest shortage "cannot be ignored," with the area expected to have two active priests in 2030, who would have the the charge of administering five parishes. The Ordinary's plan is to have only three parishes in the area, which would allow a "more reasonable weekend Mass schedule." Finally, the reduction of the number of juridic persons "carries the benefit of real community cohesion in a spirit of anti-parochialism" (*Votum*, 10).

8. The Dicastery finds that the Road to Renewal process engaged in consultation with the clergy and lay faithful of the parishes in the family of parishes, including soliciting counterproposals to the diocesan proposal, and thus the requirements of can. 50 were met. The Dicastery, however, highlights the concern expressed by the Procurator, that the counterproposal process appeared to be oriented to a predetermined outcome, in that parishes were required to submit a counterproposal that had to suggest at least one parish from the parish family unit for merger.

9. The Dicastery finds that the data supplied by the Ordinary himself, as well as that submitted by the Procurator do not support his assertion of a "parish in peril." The Procurator has provided an explanation for the lack of any Confirmands or children being enrolled in the Parish religious education program in 2022 and 2023, given the Parish' participation in a pilot project for centralized faith formation in the family of parishes, and the fact that young people are prepared for the Sacrament in the Parish, which is then celebrated at a different parish church in the family of parishes. The Recurrent further provides evidence of the presence of several parish programs, contrary to the assertion that the parish has no running programs. The Procurator asserts that there is a spirit of active participation and volunteerism in the Parish (Counterproposal, Appendix C, 10). With respect to marriages, the analysis provided by the Ordinary's delegate takes the fact that 1 marriage was celebrated in 2023 as a sign of serious decline. However, the Procurator states that 7 marriages have since taken place in 2023-2024, with more scheduled, pointing to the attractiveness of the diocesan shrine for the celebration of the Sacrament, especially its outdoor altar and chapel area (*Recourse*, 8; *Acta*, 14). This number is in line with those reported from 2014 in the Ordinary's data. Though there has been a decline in the number of the faithful attending Mass, and in the numbers of "practicing" and "contributing" households, the number of registered households in the Parish remains steady, and the financial position of the Parish is largely stable, with an increase in assets seen in recent years. The most recent annual deficit is explained by unexpected capital expenditures related to the school roof, which, according to the Procurator, which was paid by the Parish, and should have been recorded as a capital expense, and not an operating expense (*Acta*, 13). There is no evidence of any Parish debt. The data do not support a case for an irreversible decline therefore. Moreover, no evidence has been presented that at some point the parish "was on the verge of closure." The counterproposal included in the acts does not indicate, further, that the Parish agreed to a

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 11 of 26

merger, much less with St. Theresa in Akron, contrary to what is stated in the Ordinary's *votum* and in the Decree. There is no information present, moreover, as to the manner in which the projected number of priests available to serve the area in 5 years' time was determined, nor does the Ordinary provide any information as to how the merger will "benefit" the Parish (*Decree*, 3), other than a suggestion that the reduction in the number of juridic persons in the parish family will increase "community cohesion in a spirit of anti-parochialism," which is hardly a just cause for the extinction of a juridic person.

10. The Presbyteral Council discussed the Parish in question on 27 August 2024, the first of its two day-long meetings to discuss the diocesan reorganization plan. The proposal passed with 21 voting in favor, none against, and no abstentions. The minutes record that the Parish was described as having been "on the verge of closing" and as "having "no programs running within the parish" (*Acta*, 29). The Dicastery points to the concern expressed by the Procurator regarding the thoroughness of these consultations.

THEREFORE,

In accord with CIC can. 1739, this Dicastery hereby REVOKES the decree of 21 January 2025 decree of the Bishop of Buffalo, which joined Sacred Heart Parish in Harris Hill to that of the Nativity of the Blessed Virgin in Harris Hill in an extinctive union, since the petition for hierarchical recourse as presented has merit *in decernendo*.

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
24 February 2026

✠ Carlo Roberto Maria Redaelli
*Archbishop-emeritus of Gorizia*
*Secretary*

Rev. Enrico Massignani
*Adjunct Undersecretary*

7 of 7



## DICASTERIUM PRO CLERICIS

From the Vatican, 8 April 2026

Prot. N. 2026 0370

Ms. Cheryl BAUER, Procurator
52 Royal Coach Road
West Seneca, NY 14224
**UNITED STATES OF AMERICA**

Dear Ms. Bauer,

This Dicastery for the Clergy writes further regarding your hierarchical recourse against the decree dated 12 November 2024, issued by the Most Reverend Michael W. FISHER, Bishop of Buffalo, which merged **St. John XXIII in West Seneca** with that of Queen of Heaven Parish in West Seneca in an extinctive union (cf. *CIC*, canons 121 and 515 §2).

Please find enclosed the decision of this curial Institution, deciding the matter (cf. *Enclosure*).

Thanking you for your patience, and with assurances of prayers and best wishes, I remain,

Sincerely yours in Christ,

Monsignor Simone Renna
*Undersecretary*

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 13 of 26



# DICASTERIUM PRO CLERICIS

## DECREE

Prot. N. 2026 0370

### SPECIES FACTI

1. WHEREAS, on 12 November 2024, the Bishop of Buffalo, His Excellency Michael W. FISHER (hereinafter, 'the Ordinary'), decreed the extinctive union of the Parish of Saint John XXIII in West Seneca (hereinafter, 'the Parish') with the Parish of Queen of Heaven, also in West Seneca (cf. *CIC* cann. 121; 515 §2), and;

2. WHEREAS, on 22 November 2024, Ms. Cheryl BAUER, Procurator for 400 members of the faithful (hereinafter, 'the Procurator'), brought *remonstratio* against the aforementioned decree to the Ordinary (cf. can. 1734 §1), who made no response (cf. can. 1735), and;

3. WHEREAS, on 5 January 2025, the Procurator submitted a request for hierarchical recourse (cf. can. 1737 §1) to the Dicastery for the Clergy (hereinafter, 'the Dicastery'), which accepted that request for study by its decretal letter of 20 March 2025 (cf. Art. 137 §1 *General Regulations of the Roman Curia,* 1999), recognizing as the object the decree of the aforementioned extinctive union, and granting the requested suspension of the Ordinary's act, and;

4. WHEREAS, the *votum* and the Acts of the Ordinary's decision, dated 7 July 2025, arrived in the Dicastery, and;

5. WHEREAS, in order to provide further time to study the matter, the time limits were extended by three months on 5 September 2025, and;

6. WHEREAS, supplemental information from the Procurator, dated 8 October 2025, arrived in the Dicastery, and;

7. WHEREAS, a supplemental *votum* and Acts from the Ordinary, dated 14 January 2026, arrived in the Dicastery, and;

8. WHEREAS, having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted by both the Ordinary and the Recurrent, the Dicastery judges as complete the documentation in its possession and proceeds, therefore, to its decision.

### IN IURE ET IN FACTO

9. The motivating factors for the singular administrative act being impugned are delineated in the Ordinary's decree: (1) the benefit for the Parish to be united with Queen of Mary Parish;

*Page 1 of 4*

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 14 of 26

(2) the "need to amass a substantial sum of money to settle numerous civil claims in Federal Bankruptcy Court"; (3) the possibility of alienating the property of the Parish; (4) the reduction in strain on the limited number of priests; (5) the consistent decline in sacramental life and parish involvement.

10. Citing this curial Institution's Instruction of 2020, the Procurator argues that the motivations for the impugned decree are based upon a general principle and not directly and organically connected to the Parish in question.

11. Financially, the Parish has increased its assets from $284,873 in 2014, versus liabilities of $117,836 that same year, to $457,794 in assets versus $58,648 in liabilities (*Acta*, 3). However, its regular receipts have fallen, from a high of $419,692 in 2014 to $372,939 in 2023 (*Acta*, 3). This has been overcome with additional income, such that in the majority of the years from 2014 to 2023, the Parish has enjoyed a significant net operating balance (*Acta*, 4). Two Parish Trustees, in their counter-proposal to the extinctive union, note that the Parish has made a number of improvements to the Parish Church and connected property, while growing its balance from $550,000 in 2015 to $866,802.69 as of July 12, 2024 (*Acta*, 20). Similarly, the Parish *ad quam*, according to the Ordinary is "much more financially stable than St. John XXIII" (*Supplemental Votum*, 2). Given the financial health of the Parish and the asserted financial health of the Parish *ad quam*, a benefit to the Parish *ad quam* that justifies the extinctive union of the Parish for financial motives is not demonstrated.

12. The information provided by the Ordinary shows that the average Sunday Mass attendance in the Parish has fluctuated between a high of 485 persons in 2014 (as well as in 2017, 2018, and 2019) and a low of 300 in 2020 (the first year of the COVID-19 pandemic). Both 2022 and 2023 (the last year of data provided by the Ordinary), the average Sunday Mass attendance was 400 (*Acta*, 3). The average Sunday Mass attendance over the past ten years is 410 persons. Similarly, the other sacraments have held steady, excluding a drop in raw numbers of Confirmations year to year, due to what appears to be an unusually high number of Confirmations for the Parish in 2014 (25), followed by no confirmations in the successive two years. It appears that specific pastoral decisions may be behind the irregular Confirmation numbers, as the number of baptisms has increased year over year over the past five years, except in 2021, during the COVID-19 pandemic. Similarly, marriages have increased slightly, although it should be noted that there have been relatively few marriages in the Parish over the past ten years (in total, 13). Given the negligible difference, the Dicastery does not consider this to be, in itself, a just cause for the extinctive union of the Parish.

13. As the Ordinary notes in his supplemental *votum* of 14 January 2026: the Parish "has shown increases in Registered Households, Practicing Households, and Contributing Households. People are taking advantage of the existence of this church […]". While the Ordinary goes on to qualify these increases by noting that the Parish is not "a location that provides much more than Sunday and weekly Eucharistic celebrations", the Procurator has provided information showing the Parish's outreach to the poor through the *Response to Love Center* and other charitable organizations. The Procurator has also highlighted other well attended community events that are not mentioned by the Ordinary or in the documentation provided by him supporting the impugned act.

14. The Parish *ad quam* had a significantly higher average Sunday Mass attendance for the only reported date (2022). In that year, an average of 730 persons attended Holy Mass each week, compared to 350 at the Saint John XXIII Parish (*Acta*, 1). Concerning the benefit to the Parish that the extinctive union will bring, the information provided to the Presbyteral Council as a

Case 1-20-10322-CLB,  Doc 4976-13,  Filed 07/22/26,  Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 15 of 26

justification notes, "St. John XXIII – geography to the family, with its location in West Seneca on the edge of Cheektowaga gives families other options to attend very easily" (*Acta,* 41). However, the ease with which this Parish community could participate in the life of another parochial community is not a sufficient justification for this extinctive merger. The Ordinary clarified further in his supplementary *votum* that the Parish will benefit from the extinctive union through the parochial school of the Parish *ad quam*. However, there is no evidence that the parishioners of the Parish are prohibited from already seeking the benefits of that school, and given the Ordinary's assertion that it is a "successful elementary school", it does not seem evident that the Parish *ad quam* would further benefit from the extinctive union.

15. Concerning the number of priests available to serve the Parish, both the Parish and the Parish *ad quam* are served by the same Pastor, who has maintained relative stability in both communities. While the Ordinary projects that by 2030 there will be only three available priests to serve the five parishes presently comprising the pastoral grouping, the minutes of the consultation with the Presbyteral Council note its recommendation to suppress three of those parishes, including the Parish subject to the presently impugned decree. At present, there are five priests serving Family #7. Thus, the Ordinary's motive concerning an insufficient number of priests is not demonstrated at the present time.

16. While there are significant challenges facing the Diocese of Buffalo, the value of the Parish's property or the need to pay civil settlements from the sale of Parish property, are not just causes for its extinctive union. Concerning the specific interpretation of can. 121 offered by the Ordinary (*Votum,* 1-4) and the corresponding dispositions of the temporal goods of the Parish in the impugned decree, this Dicastery, recalling n. 1. l) of its *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches,* further observes that "*In casu unionis paroeciarum bona paroeciae su personae iuridicae suppressae non obveniunt personae iuridicae immediate superiori (cf. can. 123), sed, ad normam can. 121 paroeciae seu personae iuridicae ad quam aut paroeciis seu personis iuridicis ad quas* (STAS, Definitive Decree *coram* Echevarría Rodríguez, Prot. N. 38161/06 CA, 7 May 2010, n. 6). The Dicastery for Legislative Texts has confirmed that such an interpretation is "legally unfounded," stating, "In particular, canon 121 provides for the immediate and unconditional transfer of the temporal goods of suppressed parishes which are juridic persons to the parish *ad quem,* ensuring stable and transparent management of ecclesiastical resources. The absence of provisions for deferred terms or suspensive conditions confirms that the transfer must take place without delay. The expression '*obtinet*' implies an immediate acquisition of the temporal goods and property rights of the new juridic person" (Letter to the Dicastery for the Clergy, 9 September 2025, Prot. N. 18715/2025). Therefore, insofar as the impugned act vitiates can. 121, the decree fails to respect the aforementioned norm. Consequently, the law requires that the assets and liabilities of the Parish belong immediately to the Parish *ad quam* (cf. Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church,* 20 June 2020, n. 50).

17. The Dicastery has affirmed that "the suppression of parishes by extinctive union is legitimate for causes directly related to a specific Parish." Furthermore, "As a condition for the legitimacy of this type of provision, the requisite motivations must be directly and organically connected to the interested parish community, and not on general considerations or theories, or based solely on principle" (Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church,* 20 June 2020, n. 48). In addition, the Dicastery has affirmed that the motivating cause for the suppression or merger of a parish must be at least a just cause, which, in the determination of

Case 1-20-10322-CLB,   Doc 4976-13,   Filed 07/22/26,   Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 16 of 26

the diocesan Bishop, serves the good of souls (cf. Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches*, 30 April 2013, Prot. N. 2013 1348).

18. Inasmuch as the extinction of a parish is an act with permanent consequences, the cause should not be based on "conditions within the community that are presumably reversible or of brief duration" (Congregation for the Clergy, instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelising mission of the Church*, n. 48), and in consideration that the community dimension cannot be reduced to a mere formality; rather, it must truly exist as such from both a structural and a dynamic perspective, embodying a genuine Christian life in accordance with the three dimensions of the Word, the Sacraments, and Charity, and reflecting an adequate presence of the faithful who take on the various responsibilities of the community, given the long-standing financial health of the Parish, the stability in average Mass attendance and sacramental participation, the presence of an active communal and cultural life, and in consideration that the benefit to the Parish *ad quam* has not been demonstrated, the Dicastery finds that the Ordinary has not presented any just cause for the extinctive union of this Parish.

19. Regarding the procedure, the required consultation with the Presbyteral Council (cf. can. 515 §2) occurred on 27 August 2024. Twenty-two members voted in favor of the extinctive merger (*Acta*, 29; 31). Procedurally, the Dicastery finds that the Ordinary acted according to the law.

THEREFORE

In accord with CIC can. 1739, this Dicastery hereby REVOKES the decree of the Bishop of Buffalo, which joined the Parish of Saint John XXIII in West Seneca to that of Queen of Heaven in West Seneca in an extinctive union.

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
8 April 2026

*Lazzaro You*
Lazzaro Cardinal You Heung sik
*Prefect*

*Simone Renna*
Monsignor Simone Renna
*Undersecretary*

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 17 of 26



# DICASTERIUM PRO CLERICIS

## DECREE

Prot. N. 2026 0424-1

### SPECIES FACTI

1. WHEREAS, on 21 January 2025, the Bishop of Buffalo, the Most Reverend Michael W. FISHER (hereinafter, 'the Ordinary'), issued a decree (hereinafter, 'the Decree') joining the parish of St. Jude the Apostle in North Tonawanda, New York, with that of Saint Christopher parish, in Tonawanda, New York, to take effect on 5 May 2025 (cf. *CIC* cann. 121 and 515 §2), and;

2. WHEREAS, on 23 April 2025, Ms. Victoria Vanill, Procurator, with legitimate mandates from members of the Parish, placed a petition before the Ordinary requesting the "reinstatement and erection of St. Jude the Apostle Parish" in "accord with Canon 57," and;

3. Whereas, on 28 April 2025, the Ordinary rejected the petition, and;

4. WHEREAS, on 3 May 2025, the Procurator sought hierarchical recourse before the Dicastery for the Clergy (hereinafter, 'the Dicastery'), which, despite the procedural defects in its placement, was accepted for study on 2 July 2025 by the Dicastery, acting as hierarchical superior (cf. cann. 1734, 1736 §2, 1737 §1, and *Regolamento Generale della Curia Romana*, 1999, Art. 137 §1), and taking as its object the abovementioned Decree, and;

5. WHEREAS, on 16 July 2025, the Ordinary requested a *beneficium novae audientiae* asking for a reconsideration of the decree of acceptance of the Procurator's petition for recourse (cf. *Regolamento Generale della Curia Romana*, 1999, Art. 135), and;

6. WHEREAS, on 4 August 2025, the Dicastery rejected the Ordinary's request for a *beneficium novae audientiae*, and requested the transmission of his *votum* and the acts of the decision, which have not, to date, arrived, and;

7. WHEREAS, on 5 January 2026, the Procurator sent further documents to be joined to the petition, and;

8. WHEREAS a hierarchical recourse is, by its nature, a documentary process that proceeds on the basis of examination of authentic documents provided by interested parties at the request of the Dicastery; thus having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted, the Dicastery judges as complete the documentation in its possession and proceeds, therefore, to its decision *per cartas*.

### IN IURE

1 of 5

1. The Apostolic Constitution, *Praedicate Evangelium*, art. 118, 1° establishes the competence of the Dicastery for the Clergy over "general discipline governing… parishes" and thus its authority to decide the matter as the appropriate Entity of the Holy See.

2. Concerning the specific object of this recourse, the extinctive union of a parish, canon 50 requires that, before issuing a decree, the Ordinary must seek the necessary information and proofs, and consult those whose rights can be harmed. Canon 515 §2 requires that the diocesan Bishop consult the Presbyteral Council before establishing, suppressing or notably altering a parish. Further, a decree is to be issued in writing and, when it contains a decision, the reasons for that decision must be given, at least in summary form (cf. can. 51). Canon 515 §2 makes no provision as to the gravity of the cause required. Hence it is sufficient that a just cause be present (cf. Decrees of the Supreme Tribunal of the Apostolic Signatura, Prot. N. 24048/93 CA, 6 December 1993 and Prot. N. 38159/06 CA, 18 April 2008).

3. However, the just cause must primarily be the betterment of the pastoral provision for the salvation of souls (cf. Second Vatican Ecumenical Council, Decree on the Pastoral Office of Bishops in the Church, *Christus Dominus*, 28 October 1965, n. 32) and the good of the faithful (cf. Congregation for Bishops, Directory for the Pastoral Ministry of Bishops, *Apostolorum Successores*, 22 February 2004, n. 214).

4. The Dicastery has affirmed that "the suppression of parishes by extinctive union is legitimate for causes directly related to a specific Parish," and further, "As a condition for the legitimacy of this type of provision, the requisite motivations must be directly and organically connected to the interested parish community, and not on general considerations or theories, or based solely on principle" (Congregation for the Clergy, Instruction, *The Pastoral Conversion of the Parish Community in the Service of the Evangelising Mission of the Church*, 20 June 2020, n. 48).

5. However, although a diocesan Bishop is required to consider the situation *ad rem* of a particular parish in the deliberation of a just cause, the law does allow him to take into account the condition of the entire Diocese. The Apostolic Signatura has stated: *Decretum suppressionis feratur, denique, saltem summarie expressis motivis (cf. can. 51). Qua in re, "Episcopus diocesanus…iuxta suam prudentem discretionem procedure potest, excluso vero arbitrarietate" (decreta Congressus diei 3 maii 2002, prot. Nn. 33219/01 CA; 32220/01 CA; 32238/01 CA). Hac in ratione perpendenda, non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, ut totius dioecesis saluti animarum meliore quo fieri potest modo, provideatur. Nullum tandem "ius christifedelium agnoscitur ad determinatam paroeciam, cum illis sufficiat paroecia quaedam, quae eorumdem curam pastoralem expleat"* (cf. v.g. decreta Congressus dierum 12 octobris 1995, prot. N. 25323/94 CA; 18 ianuarii 1996 prot. N. 25465/94 CA; 12 octobris 1995, prot. N. 25530/95 CA (cf. Decree Prot. N. 37280/05 CA, 22 May 2009). This was also reiterated in a subsequent decision, *sufficit proinde iusta causa; qua in ratione perpendenda, non solum condicio paroeciae consideranda est, verum etiam totius dioecesis, ut totius dioecesis saluti animarum* et quidam etiam in futuro, *meliore quo fieri potest modo provideatur* (cf. Decree Prot. N. 45082/11 CA, 27 April 2011). Because the faithful have a right to pastoral care in some parish, rather than a right to a specific parish, and since the diocesan Bishop can consider the condition of an area or the Diocese as a whole, even a parish whose community and finances are in good condition may be united to another. The Apostolic Signatura succinctly expressed this jurisprudence as follows: *"etiam in paroecia in bona condicione legitime uniri potest cum aliis paroeciis, nam consideranda est non tantum condicio singulae paroeciae sed etiam totius loci, immo totius dioecesis (cf. SSAT decretum diei 12 iunii 2012, Prot. N. 46039/11 CA)"* (Decree, 4 December 2020, Prot. N. 55183/20 CA). Taken together, the Instruction of the Dicastery cited above and the

jurisprudence of the Apostolic Signatura must be understood to require that the conditions generally affecting an area or the entire Diocese must affect the interested Parish in some way.

6. The nature of a parish in the Church is found in canon 515 §1: *Paroecia est certa communitas christifidelium in Ecclesia particulari stabiliter constituta, cuius cura pastoralis, sub auctoritate Episcopi dioecesani, committitur parocho, qua proprio eiusdem pastori.* A parish, from the moment of its legitimate establishment by the competent authority, is a public juridic person, as clearly stated in canon 515 §3: *Paroecia legitime erecta personalitate iuridica ipso iure gaudet.* As a juridic person, a parish is perpetual by nature; however, it is possible to suppress (cf. can. 120 §1) juridic persons, such as parishes, or to merge them with another parish (cf. can. 121). The suppression or merger of the juridic person of the Parish requires a singular decree of the diocesan Bishop after the necessary consultation with the Presbyteral Council of his Diocese, as found in canon 515 §2: *Paroecias erigere, supprimere aut eas innovare unius est Episcopi dioecesani, qui paroecias ne erigat aut supprimat, neve eas notabiliter innovet, nisi audito consilio presbyterali.* The motivating cause for the suppression or merger of a parish must be at least a just cause, which, in the determination of the diocesan Bishop, serves the good of souls (cf. Congregation for the Clergy, Circular Letter, *Procedural Guidelines for the Modification of Parishes and the Closure, Relegation and Alienation of Churches,* 30 April 2013, Prot. N. 2013 1348). A paucity of clergy, a declining participation in parish life, or financial difficulties can be among the reasons that meet the standard of a just cause for the extinctive union of a parish, as these concerns affect the ability of the juridic person in question to continue its mission for the good of souls.

7. As noted above, these causes may affect not only the Parish in question but also the parishes in a given area or even the entire Diocese. Nevertheless, inasmuch as the extinction of a parish is an act with permanent consequences, the cause should not be based on "conditions within the community that are presumably reversible or of brief duration" (Congregation for the Clergy, instruction, *The Pastoral Conversion of the Parish Community in the service of the evangelizing mission of the Church,* n. 48).

8. Regarding which juridic act, suppression or merger, is most apt, there are four types of modification to parishes available in the law: an Extinctive Union whereby two or more parishes unite to form a new juridic person (cf. can. 121); an Extinctive Union whereby one Parish absorbs another, so that only the receiving Parish remains (cf. can. 121); a Division, whereby one Parish is divided so that one or more additional parishes are erected (cf. can. 122) and a true Suppression, where the juridic person of a parish is extinguished entirely (cf. can. 123). The Dicastery further clarified that "territorial parishes, as a general rule, may only be united or divided. Although sometimes personal parishes are truly suppressed, they are ordinarily united or divided, either in connection to another personal parish or even to a territorial parish" (Congregation for the Clergy, *Procedural Guidelines* [Prot. N. 2013 1348] n. 1d). If the parish church and other properties of a personal parish have been given over to another parish, and the faithful are directed to that same Parish for their pastoral care, this can only be considered an extinctive union of the two, rather than a true suppression. In such cases, the financial assets and liabilities of the juridic person in question also accrue to the receiving Parish, with due regard for the intentions of donors (cf. can. 121), rather than the superior juridic person, such as the Diocese (cf. can. 123). A territorial parish may not be truly suppressed, inasmuch as the entire territory of a diocese must be divided into these basic units of pastoral governance (cf. can. 374 §1).

9. With regard to the temporal goods of the extinguished Parish, the Apostolic Signatura has stated, "*In casu unionis paroeciarum bona paroeciae seu personae iuridicae suppressae non obveniunt personae iuridicae immediate superiori (cf. can. 123), sed, ad normam can. 121 paroeciae seu personae iuridicae ad quam aut paroeciis seu personis iuridicis ad quas.*" (Definitive Sentence, *coram* Echevarría Rodríguez, 7 May 2010, *Prot. N. 38161/06 CA*).

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 20 of 26

10. Whichever of the aforementioned juridic acts is taken, the extinctive union of one or more parishes must always be carefully distinguished from the decision to reduce a church to profane but not sordid use (cf. can. 1222 §2), since the cause required for the former is merely just, while the latter requires a grave cause (cf. Congregation for the Clergy, *Procedural Guidelines*, Prot. N. 2013 T348). This distinction is not limited to the issuance of the singular administrative act itself, but also to the consultations and preparations for the same, which must maintain the "*necessaria distincio inter 'processum reordinationis paroeciarum et determinationem quoad statutum canonicum edificii sacrii*" (*Sententia defintiva diei 21 maii 2011, coram* Caffara, prot. n. 41719/08 CA" (Definitive sentence, *coram* Mamberti, 25 April 2018, Prot. N. 51993/16 CA).

## IN FACTO

1. The Parish was formed from the extinctive merger of the parishes of Saint Albert the Great and Saint Jude the Apostle on 2 November 2007. On 22 May 2008, after consultation with the faithful, the Parish was given its current name, Saint Jude the Apostle, with the Church of Saint Albert the Great being designated the Parish church (Decree, p. 1).

2. The Parish has been part of a collaborative pastoral unit (Family #18, "Roman Catholic Community of Tonawanda") since September 2022 (Letter to the Ordinary from the Procurator, 23 April 2025), consisting of six parishes in the towns of Tonawanda and North Tonawanda, New York.

3. In his Decree, the Ordinary states that in order to prepare the diocese for "more effective ministry in the future," the diocesan reorganization plan "The Road to Renewal," has called for a "certain consolidation of resources," so that communities have a greater drive to spread the Gospel, which requires the "merging of parishes and overall reduction of physical worship sites throughout the diocese." The Decree gives the following reasons for the suppression of the Parish: 1) "to reduce the strain on our already limited number of priests;" 2) that the community would be "better served" by being joined to the parish *ad quem*; 3) that there "would likely be only three available priests serving" Family #18 by 2030, and 4) "due to our need to amass a substantial sum of money to settle numerous civil claims in Federal Bankruptcy Court, the possibility of alienating this property has also been suggested." The Decree meets the requirements of presenting the motivating causes "at least in summary form" (can. 51). The causes listed, however, do not appear to be *ad rem*, i.e. connected to the concrete reality of the Parish.

4. In the present recourse, the Procurator challenges the Ordinary's presentation of just causes in the impugned Decree, arguing that the motivations mentioned in the Decree "do not address any just cause for extinguishing the Parish but instead address general circumstances affecting the Diocese" (*Petition*, 3 May 2025, p. 5).

5. The Ordinary consulted the Presbyteral Council on 27 August 2024, which, according to the minutes of the meeting provided by the Procurator, approved the merger, with 20 voting in favour, and none opposed.

6. As recorded in the minutes of the same Presbyteral Council meeting of 27 August 2024, which discussed this, and numerous other decrees of merger of parishes and relegation of churches, during the discussion of the relegation of the Parish church of St. Albert the Great, which followed immediately upon the discussion of the merger of the Parish with the parish *ad quem*, it was noted that the Parish is "financially viable," that it hosted the faith formation for the family of parishes with 300 children registered, that the area was growing, and that parishioners from the parishes of St. Pius X, St. Andrew and the Niagara Falls area are "gravitating to the site," and that "clergy support" with three priests and the retired priest supply is workable (Minutes accompanying Procurator's letter of 5 January 2026, p. 38 of

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 21 of 26

43). The Dicastery notes that the Presbyteral Council voted against the relegation of the Parish church, with 19 opposed, and 3 in favor.

7. In his request for a *beneficium novae audientiae* placed before the Dicastery on 16 July 2025, the Ordinary mentioned that the Pastor of the Parish had already been approached by several buyers for the purchase of the Parish Church, whose relegation to profane but not sordid use had been decreed on 25 February 2025.

8. The Dicastery finds that, given that the relegation of the Parish Church was decreed, merely a few weeks after the publication of the Decree that merged the Parish with the parish *ad quem*; that despite the fact that the Parish was described in the Presbyteral Council meeting referenced above as being "financially viable," as attracting parishioners from nearby areas, and as having sufficient "clergy support" to meet its needs; and in light of the stated motivation in the Decree for the need to finance the settlement of the diocesan bankruptcy, the Ordinary has not provided a just cause for the extinctive union of the Parish according to the norm of can. 515 §2, with the aim of the good of souls, but rather, the merger appears to have been motivated more by the stated need to alienate the Parish's temporal goods to meet the obligations facing the diocese.

THEREFORE,

**In accord with CIC can. 1739, this Dicastery hereby REVOKES the 21 January 2025 decree of the Bishop of Buffalo, which joined Saint Jude the Apostle Parish in North Tonawanda to that of Saint Christopher in Tonawanda, in an extinctive union, since the Ordinary has erred *in decernendo*.**

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
24 March 2026

Lazzaro Cardinal You Heung sik
*Prefect*

Rev. Enrico Massignani
*Adjunct Under-Secretary*

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 22 of 26



# DICASTERIUM PRO CLERICIS

## DECREE

Prot. N. 2026 0424-2

1. WHEREAS, on 21 January 2025, the Bishop of Buffalo, the Most Reverend Michael W. FISHER (hereinafter, 'the Ordinary'), issued a decree joining the parish of St. Jude the Apostle in North Tonawanda, New York, with that of Saint Christopher parish, in Tonawanda, New York, to take effect on 5 May 2025 (cf. *CIC* cann. 121 and 515 §2), and on 2 July 2025, a recourse against the abovementioned administrative act of the Ordinary was accepted for study by this Dicastery for the Clergy (hereinafter, 'the Dicastery'), which did not, however, suspend the same administrative act, and;

2. WHEREAS, on 2 February 2025, the Ordinary decreed the reduction of the parish church of the former Parish of St. Jude, in Lockport, New York, called "the Church of Saint Albert the Great" (hereinafter, 'the Church'), to profane but not sordid use (cf. can. 1222, §2), to take effect on 30 June 2025 (hereinafter, 'the Decree'), and;

3. WHEREAS, on 12 May 2025, Ms. Victoria VANILL, Procurator, with legitimate mandates from members of the faithful of the former St. Jude Parish (hereinafter the 'Procurator') requested the suspension of the abovementioned Decree, from the Dicastery, and;

4. WHEREAS, on 27 June 2025, the Procurator placed hierchical recourse against the earlier mentioned Decree, and;

5. WHEREAS, on 2 July 2025, the Dicastery, notwithstanding the procedural defects in placing recourse, acting as hierarchical superior, accepted the petition for study and granted the requested suspension of the act (cf. cann. 1734, 1736 §2, 1737 §1, and *Regolamento Generale della Curia Romana*, 1999, Art. 137 §1), having as its object the aforementioned Decree and;

6. WHEREAS, on 16 July 2025, the Ordinary requested a *beneficium novae audientiae* asking for a reconsideration of the decree of acceptance of the Procurator's petition for recourse (cf. *Regolamento Generale della Curia Romana*, 1999, Art. 135), and;

7. WHEREAS, on 4 August 2025, the Dicastery rejected the Ordinary's request for a *beneficium novae audientiae*, and requested the transmission of his *votum* and the acts of the decision, which have not, to date, arrived, and;

8. WHEREAS a hierarchical recourse is, by its nature, a documentary process which proceeds on the basis of examination of authentic documents provided by interested parties at the request of the Dicastery; thus having provided ample opportunity for all interested parties to respond, and having carefully examined the documents submitted, the Dicastery judges

1 of 4

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 23 of 26

as complete the documentation in its possession and proceeds, therefore, to its decision *per cartas*.

## IN IURE

1. The Apostolic Constitution, *Praedicate Evangelium*, art. 118, 1° establishes the competence of the Dicastery for the Clergy regarding the "general discipline governing...churches" and thus its authority to decide the matter as the appropriate Entity of the Holy See.

2. A church may be closed to Divine Worship and reduced to profane but not sordid use only for grave reasons, according to a clear disposition in tradition and in law, given the sacred character of the consecrated edifice which becomes "a special sign of the pilgrim Church on earth and reflects the Church dwelling in heaven" (Canon 1222 *CIC*; *General Instruction for the Dedication of a Church, Ch. 2, §2*).

3. The Code of Canon Law provides for the ability to close a church permanently and reduce it to profane but not sordid use due to grave cause (Canon 1222 §2). Although a single element may constitute grave cause, multiple causes, at least one of which must be grave, may together augment the seriousness of the situation. Such a series of causes may arise from a diligent examination of various factors, including the circumstances of time and place, economic or financial considerations of the juridic person of ownership, and the challenges facing a particular community of the faithful (cf. *Decree of the Supreme Tribunal of the Apostolic Signatura*, N. 41700/08, issued on 18 June 2009, 8; CONGREGATION OF THE CLERGY, *Procedural Guidelines for the Modification of Parishes, the Closure or Relegation of Churches to Profane but not Sordid Use, and the Alienation of the Same*, Prot. N. 2013 1348, 30 April 2013, §2, f).

4. Whenever the economic and financial condition of the juridic person is considered to constitute the grave cause required by canon 1222 §2, the evaluation is made not only on the basis of availability of funds for the repair of a church, but also on the overall mission of the juridic person, particularly its service to the poor. As stated by the jurisprudence of the Apostolic Signatura, "Furthermore, charity and the other assistance to be bestowed on the poor and other things of this kind cannot be neglected in order to preserve a sacred building" (*Definitive Sentence* of the Supreme Tribunal of the Apostolic Signatura N. 24388/93 CA, issued 4 May 1996, published in *Ministerium Iustitiae*, 527, "*Praeterea ut salvetur aedificium sacrum negligi haud queunt eleemosyna ceteraque subsidia pauperibus praesertim elargienda et alia huiusmodi.*")

5. It must be noted, however, that, in this respect, in accordance with the above cited jurisprudence, the evaluation of grave cause, or causes, must be related to actual current conditions, with prudent consideration for the historical, architectural and artistic patrimony of the sacred edifice, the feasibility of fundraising, the prospects for ongoing maintenance as well as the retention of the building for ecclesiastical use for purposes other than sacred worship.

6. In cases where Canon 1222 §2 is applied, the determination is to be made only after hearing the Presbyteral Council and after receiving the consent of those who could lawfully claim rights over the church, chiefly the Pastor or those who could claim patrimonial and other such rights which typically arise at the time of foundation and

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 24 of 26

construction of the church (cf. Canons 1222 §2, 532, 122 CIC, Apostolic Signatura N 17447/85 CA, 21 November 1987, published in *Ministerium Iustitiae*, p. 458, *Iura de quibus sermo fit in canone (1222 §2) sunt praesertim iura patrimonilia vel eis assimilata, quae magna ex parte e fundatione vel aedificatione ecclesiae exsurgunt.*").

7. Canons 127 and 166 govern the meeting of the Presbyteral Council, which must take place in person to guarantee that all the participants have the necessary information and the opportunity for a complete discussion.

8. Finally, as mentioned in Canon 1222 §2, the Diocesan Bishop must be certain that the good of souls would not be harmed by the closing of the church to Divine Worship and its reduction to profane but not sordid use. The harm referred to in the canon must be a true deprivation of the rights of the faithful to the Word of God and the Sacraments (cf. can. 213), and not merely an inconvenience or difficulty in exercising that right.

## IN FACTO

1. The current Church was built in 1965 as the parish church for the eponymous parish, which was merged in an extinctive union with the parish of the Ascension on 2 November 2007; the new parish was given the name of St. Jude the Apostle on 22 May 2008, with the Church being designated the parish church.

2. On 21 January 2025, the Ordinary decreed the extinctive union of Saint Jude parish in North Tonawanda, which owns the Church, with the parish of Saint Christopher in Tonawanda, to take effect on 5 May 2025. Hierarchical recourse against that decree was decided on 24 March 2026, with the Dicastery revoking the merger (Prot. N. 2026 0424-1).

3. In the impugned decree, the Ordinary asserts that a cumulation of causes has created a grave cause required by can. 1222, §2 for relegating a church to profane but not sordid use. The decree lists them as: the need to reduce financial strain on Saint Christopher parish, which has recently (as of 21 January 2025) become the canonical owner of the Church, the lack of need of the Church by Saint Christopher parish, the shortage of priests available for ministry in the area, and the need to generate income to contribute to the the diocesan bankruptcy settlement. Furthermore, the Ordinary's request for a *beneficium novae audientaie* noted that the Pastor of Saint Christopher parish had already secured a potential buyer for the Church.

4. Regarding the procedure employed, the Ordinary consulted the Presbyteral Council (cf. cann. 127, 166 and 1222 §2) on 27 August 2024. According to the minutes of the meeting, however, the consultation for the above mentioned decree of merger of the parishes of Saint Jude the Apostle and Saint Christopher (cf. can. 515 §2) also took place in the same meeting, immediately prior to the discussion of the relegation of the Church. It would have been impossible for the the Presbyteral Council to evaluate the presence of the required grave cause for the relegation of the Church with respect to its new owner, the parish *ad quem* in the aforementioned merger, and thefore the Ordinary erred *in procedendo*. The merits of the Ordinary's decision *in decernendo* are not considered. It is noted, however, that the Presbyteral Council voted against the reduction of the Church, 19 to 3.

Case 1-20-10322-CLB, Doc 4976-13, Filed 07/22/26, Entered 07/22/26 17:16:01, Description: Exhibit K-2, Page 25 of 26

THEREFORE

In accord with CIC can. 1739, this Dicastery hereby REVOKES the decree of the Bishop of Buffalo, which reduced the Church of Saint Albert the Great in North Tonawanda, to profane but not sordid use since the Ordinary erred *in procedendo.*

Recourse against this Decree may be made before the Supreme Tribunal of the Apostolic Signatura within the peremptory time limit established by the Apostolic Letter *Motu Proprio, Antiqua Ordinatione* 34 §1.

Given at the Dicastery for the Clergy
24 March 2026

Lazzaro Cardinal You Heung sik
*Prefect*

Rev. Enrico Massignani
*Adjunct Undersecretary*