

PACHULSKI STANG ZIEHL & JONES

Ilan D. Scharf     August 3, 2026     212.561.7721
ischarf@pszjlaw.com

**LOS ANGELES**

10100 SANTA MONICA BLVD. 13TH FL.

LOS ANGELES, CALIFORNIA 90067-4003

310.277.6910

**NEW YORK**

1700 BROADWAY, 36TH FL.

NEW YORK, NEW YORK 10019

212.561.7700

**WILMINGTON**

919 NORTH MARKET STREET, 17TH FLOOR,

P.O. BOX 8705

WILMINGTON, DELAWARE 19899-8705

302.652.4100

**HOUSTON**

700 LOUISIANA STREET, STE. 4500

HOUSTON, TEXAS 77002

713.691.9385

**SAN FRANCISCO**

ONE SANSOME STREET, 34TH FL. STE. 3430

SAN FRANCISCO, CALIFORNIA 94104

415.263.7000

<u>**FILED VIA ECF**</u>

Hon. Carl L. Bucki
United States Bankruptcy Judge
United Stated Bankruptcy Court
Robert H. Jackson United States Courthouse
2 Niagara Square
Buffalo, NY 14202

> Re:     **The Diocese of Buffalo, N.Y., Case No. 1-20-10322-CLB**

Your Honor:

We represent the Official Committee of Unsecured Creditors (the "Committee") of the Diocese of Buffalo, N.Y. (the "Debtor").

We write in connection with (i) the Court's statements at the hearing on July 23, 2026 that any interested person, including any parishioner, has standing to appear and be heard at the Disclosure Statement Hearing scheduled for August 26, 2026, (ii) apparent misrepresentations to the Court by Save Our Buffalo Churches, Inc. at the July 23 hearing, and (iii) the request made by SOBC in its Reply[1] to be permitted to act in the capacity as an *amicus curiae* in this matter to provide "the Vatican Dicastery Decrees, and relative documents, regarding the parish assessment program and merger profits to the Court's attention and to the attention of all parishioners of the DOB and the public at large." Reply ¶ 6.

---

[1] *Reply of Save Our Buffalo Churches, Inc. to Objections Filed by the Diocese of Buffalo, N.Y., Parishes within the Diocese of Buffalo, N.Y. and Official Committee of Unsecured Creditors to Its Motion for Entry of an Order Authorizing Intervention to Appear and Be Heard Pursuant to 11 U.S.C. § 1109(B) and Rule 2018(A) of The Federal Rules of Bankruptcy Procedure* [Dkt. No. 4976].

4934-3226-0288.4 18502.002



### *Parishioner Standing*

The Committee understands the Court's position that people who believe they are being impacted by the Plan, whether or not they technically have legal standing, should have an opportunity to have their voices heard in this case. The Court already provided an opportunity for parishioners to make non-testimonial statements to this Court. The Committee did not oppose the Court's *sua sponte* determination to afford that opportunity to parishioners.

However, the Committee objects to the Court granting legal standing to be heard at the Disclosure Statement hearing to any person who wishes to be heard on this matter, unless such person can demonstrate Constitutional or prudential standing, or standing pursuant to Section 1109 of the Bankruptcy Code or Bankruptcy Rule 2018(a). As a matter of fairness and good order, the Committee (and the Diocese and the Additional Debtors) should have the opportunity to respond to any such request for standing (or any assertion of standing presented in an objection to the Plan or Disclosure Statement. It is fundamentally unfair to the Committee, the Diocese, and the Additional Debtors to be placed in the position of responding to substantive objections to the Disclosure Statement or the Joint Plan from parties who may not have the right to do so and who have not provided any advance notice of the actual objections.

At the very least, any party (other than the Diocese, Committee or Additional Debtors) that wishes to be heard should file on the docket either (a) a written objection to the Disclosure Statement or (b) a written statement of intent to appear, the relationship the person has to this case, the person's financial/economic interest in the case (if any) and the issue on which the person wishes to speak.

### *SOBC Intervention and Misrepresentations*

The SOBC filed the Intervention Motion[2] seeking leave to intervene and be heard pursuant to 11 U.S.C. § 1109(B) and Rule

---

[2] *Motion of Save Our Buffalo Churches, Inc. For Entry of An Order Authorizing Intervention to Appear and be Heard Pursuant to* 11 U.S.C. § 1109(b) *and Rule*



2018(A). Objections from the Diocese, the Additional Debtors and the Committee to the Intervention Motion made it clear that SOBC had no legitimate legal basis for standing or intervention. As such, on the eve of the hearing, SOBC filed the Reply wherein SOBC changed its requested relief and now seeks status as an *amicus curiae*, purportedly not to object to the Joint Plan but to put certain documents before the Court so that the Court could consider them and decide if they had any relevance. Rather than waiting for any determination on this request, the SOBC improperly attached the documents to its Reply. The documents at issue pertain solely to Canon Law. It is undisputed that the Court cannot consider them, enforce them, interpret them or otherwise rely on them. In other words, SOBC is asking for *amicus curiae* status to submit documents that the Court cannot rely upon. Thus, the request makes no sense and should be denied. Further, the documents should be struck from the record of this case to avoid even the appearance that they form part of the record of the case to be relied upon by the Court for any matter.

At the hearing, SOBC's counsel stated very clearly that "[SOBC] does not object to the plan that is filed. It does not object to the plan. I know that there has been some suggestion that it wants to blow up or sabotage the Plan and the settlement fund. That is not true." Hrg. Tr. 5:4-8.[3] Yet, days after the hearing, SOBC issued its *Statement on 7-23-26 Bankruptcy Court Hearing* (the "Statement").[4] SOBC stated that "[w]e object to the source of the settlement being any parishes' lifeblood. SOBC objects to any part of the settlement funding being 'ill-gotten' according to Church authority." (Statement at Response to Objection 2.). The Joint Plan includes funding from parishes that SOBC opposes. As such, SOBC clearly opposes the settlement funding from parishes as embodied in the Joint Plan.[5] The Court should not countenance SOBC's efforts to

---

*2018(a) of the Federal Rules of Bankruptcy Procedure* [Doc. No. 4843] (the "Intervention Motion").

[3] The transcript from the July 23, 2026 hearing on the Intervention Motion ("Hrg. Tr.") is attached hereto.

[4] https://www.facebook.com/groups/1071073770607283/permalink/1540477973666858 (last visited July 31, 2026). A copy is attached hereto.

[5] SOBC's post-hearing Statement is consistent with testimony from SOBC's witness, as presented in the Committee's objection to the Intervention Motion (Dkt. No. 4970, ¶ 10). Thus, SOBC's position before and after the hearing was



survive the objections to the Intervention Motion by changing positions and, thereby, deceiving the Court as to its intentions.

Further, SOBC continues to be under the very misguided and dangerous impression that the liability for childhood sexual abuse rests with the Diocese alone by stating that it is the Diocese's "own mess" and that the "settlement is the Diocese's, and only the Diocese's responsibility to fulfill." (Statement at Response to Objection 2.) That public statement is highly misleading and disingenuous. The record of this case and the law of the State of New York is clear. The Diocese and Parishes each have direct liability for abuse claims. Notably, more than 600 lawsuits have been filed directly against parishes. That current and future direct Parish liability, along with current and future liability of the Diocese and other parties, is being resolved by the settlement. The SOBC's misguided effort to undermine the Joint Plan by intimating there are alternative sources of funding and trying to wedge itself into a process it has no standing to participate in, is dangerous and could cause the Diocese and the Parishes, that SOBC purports to cherish, to deplete their assets if the Joint Plan is not confirmed.

At the hearing, SOBC, for the first time, asserted that the reason for SOBC's intervention "is for the limited purpose of providing certain information that we believe should be included in the Disclosure Statement." (Hrg. Tr. 5:11-14.)[6]

While the Court has broad discretion to permit *amicus curiae*, such permission should only be granted consistent with Bankruptcy Rule 8017. *See, e.g., In re Edison Mission Energy,* 610 B.R. 871, 878 (Bankr. N.D. Ill. 2020). That Rule requires that the movant must provide a draft brief and explain (i) its interest and (ii) the reason why an *amicus* brief is desirable and why the matters

---

opposition to the Joint Plan. SOBC's position apparently changed temporarily only in between those times when it had counsel state in the Reply and at the hearing that it does not oppose the Joint Plan.

[6] The transcript from the July 23, 2026 hearing on the Intervention Motion ("Hrg. Tr.") is attached hereto.



asserted are relevant to the disposition of the matter. Bankruptcy Rule 8017(a)(3).[7]

Here, the SOBC admits in its papers that it is not offering any actual guidance to the Court, but rather wishes to put purely ecclesiastical documents before the Court to consider as it will. SOBC offers no reasoning that would be helpful in disposing of any matter before the Court, and, in fact, states in its pleadings that it does not object to any relief being requested by the Diocese, the Additional Debtors or the Committee. After the hearing, SOBC acknowledged that "the Establishment Clause of the First Amendment prohibits civil courts from interpretation and application of Canon Law." (Statement at Response to Objection 1.)

SOBC offered no legal analysis or reasoning to the Court because SOBC knows (as this Court recognized at the hearing) that the Court cannot consider or interpret the religious and ecclesiastical Canon Law documents that the SOBC wishes to put before the Court for its consideration.

As the Second Circuit has affirmed, "[t]he primary role of the *amicus* is to assist the Court in reaching the right decision in a case affected with the interest of the general public." *Russell v. Bd. of Plumbing Examiners of Cnty. of Westchester*, 74 F. Supp. 2d 349, 351 (S.D.N.Y. 1999), *aff'd,* 1 F. App'x 38 (2d Cir. 2001). "The usual rationale for amicus curiae submissions is that they are of aid to the court and offer insights not available from the parties." *Auto. Club of N. Y., Inc. v. The Port Auth. of N.Y. and N. J.*, No. 11 Civ. 6746(RJH), 2011 WL 5865296, at *2 (S.D.N.Y. Nov. 22, 2011). An *amicus* need not be totally disinterested, but "the partiality of an *amicus* is a factor to consider in deciding whether to allow

---

[7] The standard generally applied by courts for permitting an *amicus* brief is whether (i) a party is not represented competently, (ii) the *amicus* has an interest in some other case that may be affected by the decision in the present case, or (iii) when the *amicus* has unique information or perspective that can assist the court in making its decision. *See, e.g., Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997); *Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*, 471 F. Supp. 2d 295, 311 (W.D.N.Y. 2007), *amended on reconsideration in part,* No. 06-CV-0001S, 2007 WL 1200473 (W.D.N.Y. Apr. 20, 2007).



participation." *Picard v. Greiff,* 797 F.Supp.2d 451, 452 (S.D.N.Y.2011).

In this case, the SOBC has put forward nothing that can aid the Court in the determination of any issue before it, as it is asking the Court to determine issues relating to Canon Law which the Court is barred from considering. Moreover, the interests of the Parishes are more than adequately represented by the counsel retained by the Parishes, and there is nothing in the record to suggest that the SOBC represents the Parishes in any way. Finally, the SOBC's sole stated objective is to put forward documents that the Court cannot rely upon. Since there is nothing for the Court to rely on in the SOBC's proposed filing, there is no basis to place the documents before the Court or to grant SOBC amicus (or any other) standing to do so.

The Committee, Diocese and Additional Debtors agreed at the hearing to disclose a risk factor noting the existence of the Dicastery decrees, and that theoretically such decrees could impact whether the Effective Date of the Joint Plan will occur. However, this should not be taken as an admission by the any party that the Dicastery Decrees in fact pose any such risk, or that the disclosure of any such attenuated risk is necessary for the Abuse Claimants to determine whether to vote to accept or reject the Plan. The Committee believes that the inclusion of such a risk factor should resolve any issue that relates to the existence of the Dicastery decrees and so effectively moots the Intervention Motion, or the belated recasting of SOBC's relief into serving as an *amicus curiae* to bring the Dicastery decrees to the Court's attention. In fact, SOBC's counsel expressly stated that he was "limiting [SOBC's role] on the record today to trying to get some information in the Disclosure Statement, and that's last you'll hear of us." (Hrg. Tr. 78:7-9.)

If the SOBC's role is so limited, then any suggestion of their need to be an amicus is moot, and the documents that SOBC filed with its Reply should be stricken from the record so that there is no risk that the Court is improperly considering Canon Law in its legal determinations with respect to the Disclosure Statement or the Joint Plan. If SOBC wants to again change its position and seek more of a role than it has represented to this Court, then it should be required



to make a motion explaining its interest and how it proposes to aid the Court in its legal considerations of any matter in this case.

      We are available to address any questions or concerns the Court may have regarding this matter.

Respectfully Submitted,

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Ilan D. Scharf*

*Counsel to the Official Committee of Unsecured Creditors*

# HEARING TRANSCRIPT – JULY 23, 2026

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In Re:                                  1-20-10322(CLB)
                                        Chapter 11

The Diocese of Buffalo, NY,
                                        July 23, 2026
            Debtor.                     Buffalo, New York
-------------------------------------------------------x
**HEARING**


                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE CARL L. BUCKI
                 UNITED STATES BANKRUPTCY JUDGE

   INTERVENOR:            BAUMEISTER DENZ LLP
                            BY:  ARTHUR G. BAUMEISTER, JR., ESQ.
                          174 Franklin Street, Suite 2
                          Buffalo, New York 14202


   DEBTOR:                BOND, SCHOENECK & KING, PLLC
                            BY:  STEPHAN A. DONATO, ESQ.
                            BY:  STEPHEN A. SHARKEY, ESQ.
   (Via telephone)          BY:  CHARLES J. SULLIVAN, ESQ.
                          One Lincoln Center
                          Syracuse, New York 13202


   CREDITORS             PACHULSKI, STANG, ZIEHL & JONES LLP
   COMMITTEE:              BY:  ILAN SCHARF, ESQ.
                            BY:  KAREN DINE, ESQ.
   (Via telephone)          BY:  JEFFREY DINE, ESQ.
                          780 Third Avenue
                          34th Floor
                          New York, New York 10017-2024


   TRANSCRIBER:          Diane S. Martens
                         dmartensreporter@gmail.com

   (Proceedings recorded by electronic audio recording,
    transcript produced by computer.)

APPEARANCES - CONTINUED

TRUSTEE:                    OFFICE OF THE U.S. TRUSTEE
                              BY:  JILL ZUBLER, ESQ.
(Via telephone)              BY:  JOSEPH W. ALLEN, ESQ.
                           Olympic Towers
                           300 Pearl Street, Suite 401
                           Buffalo, New York 14202


PARISHES:                  WESTERMAN BALL EDURER MILLER
                              ZUCKER & SHARFSTEIN, LLP
                              BY:  WILLAM HEUER, ESQ.
                           RXT Plaza
                           Uniondale, New York 15553
                                     -and-
(Via telephone)            ELSAESSER ANDERSON, CHTD
                              BY:  J. FORD ELSAESSER, ESQ.
                           320 East Neider Avenue
                           Suite 102
                           Coeur d'Alene, Idaho 83815


SURVIVORS:                 THE LAW OFFICES OF STEVE BOYD PC
                              BY:  STEPHEN BOYD, ESQ.
                           510 Clinton Square
                           Rochester, New York 14604


SURVIVORS:                 JEFF ANDERSON & ASSOCIATES, PA
                              BY:  STACEY BENSON, ESQ.
(Via telephone)              BY:  MICHAEL FINNEGAN, ESQ.
                           366 Jackson Street
                           Suite 100
                           St. Paul, Minnesota 55101

APPEARANCES - CONTINUED

SURVIVORS:              CHIACCHIA & FLEMING LLP
                          BY:  DANIEL J. CHIACCHIA, ESQ.
                        5113 South Park Avenue
                        Buffalo, New York 14075

SURVIVORS:              LAW OFFICES OF MITCHELL GARABEDIAN
(Via telephone)         100 State Street
                        6th Floor
                        Boston, Massachusetts 02109

ALSO PRESENT:           SURVIVORS

**P R O C E E D I N G S**

\*          \*          \*

**THE COURT:** This, of course, is a hearing on a motion, what's called a Motion to Intervene, in the case of the Diocese of Buffalo New York.

For those who are on line I remind you that local Bankruptcy Rules prohibit the recording or rebroadcasting of any portion of this afternoon's proceeding.

And I also ask everyone to please identify yourself each time that you speak. We need that to facilitate the preparation of a transcript should one be necessary or requested.

With that, let me begin by asking for appearances of those who are in the courtroom.

Let's start with debtor's counsel.

**MR. DONATO:** Good afternoon, your Honor, Steve Donato, Steve Sharkey in the courtroom. And Charles Sullivan on the phone for the Diocese of Buffalo.

**THE COURT:** All right. Thank you.

**MR. HEUER:** Good afternoon, your Honor, Bill Heuer of wester medicine law on behalf of all Parishes.

On the phone should be my cocounsel Ford Elsaesser.

**THE COURT:** All right. We welcome both of you.

And for the Committee.

**MR. SCHARF:** Good afternoon, your Honor, Ilan Scharf and Karen Dine of Pachulski, Stang, Ziehl & Jones on behalf of the Committee and I think our colleague Jeffrey Dine is on the phone.

**THE COURT:** All right. And I should have started perhaps with the movant.

Mr. Baumeister.

**MR. BAUMEISTER:** Yes, Arthur Baumeister, Baumeister Denz on behalf of the proposed intervenor Save our Buffalo Churches, Inc.

**THE COURT:** Thank you.

**MS. ZUBLER:** Good afternoon, your Honor, Jill Zubler for the U.S. Trustee. I believe AUS Trustee Joseph Allen is also on the phone.

**THE COURT:** All right. We welcome both of you.

**MS. ZUBLER:** Thank you.

**MR. BOYD:** Good afternoon, your Honor, Stephen Boyd representing two members of the Unsecured Creditors Committee, a number of other creditor survivors. Along with me in the courtroom today is Stacey Benson from my partner Jeff Anderson Associates. And on the telephone Michael Finnegan also from Jeff Anderson Associates.

**THE COURT:** All right. Thank you. Anyone else want to in the courtroom that wants to note their appearance?

(WHEREUPON, survivors note their appearances.)

**MR. CHIACCHIA:** Dan Chiacchia for several survivors.

**THE COURT:** All right. Thank you.

Anyone on the line wanting to note their appearance?

**MR. GARABEDIAN:** Attorney Mitchell Garabedian.

**MR. STARK:** Peter Stark, Committee member.

**THE COURT:** I heard Mr. Garabedian on behalf of various survivors and then there was a second voice.

Who do I have?

**MR. STARK:** Peter Stark, Committee member.

**THE COURT:** Thank you.

Anyone else?

**MR. KOSCIELNIAK:** Kevin Koscielniak, survivor and claimant.

**THE COURT:** All right. Thank you.

Anyone else?

**MR. ELSAESSER:** Your Honor, just confirming what Mr. Heuer already said, Ford Elsaesser, his cocounsel for Parishes.

**THE COURT:** All right. Thank you very much for noting your appearance again.

Anyone else?

(No response.)

**THE COURT:** All right. The motion was filed by Mr. Baumeister. So I'll let you speak first.

**MR. BAUMEISTER:** Thank you, your Honor.

First of all, I'd like to make a couple of things perfectly clear as far as the Save our Buffalo Churches' position here. Save our Buffalo Churches does not object to the plan that is filed. It does not object to the plan. I know there has been some suggestion that it wants to blow up or sabotage the Plan and the settlement fund. That is not true.

Second, we're not asking the Court to enforce Canon Law although I will be referring to Canon Law during my presentation. The reason that Save our Buffalo Churches wants to intervene is for the limited purpose of providing certain information that we believe should be included in the Disclosure Statement.

So, what I'd like to do is provide some background and provide context and then I'll go into exactly what it is that we would like the Court to do, okay.

Save our Buffalo Churches was organized in 2024 in response to the Diocese of Buffalo's Road to Renewal Program. The program started in 2001 stating that its purpose was not the closing of Parishes. However, in May of 2024, a plan to reshape the number of Parishes was released and a month later in June of 2024, the Diocese released a full list of mergers. Parishioners are not only extremely disturbed by this aspect of the program but question whether the plan was in violation

of Canon Law.

As the Court, I think, well knows, Canon Law is the law that governs the Ecclesiastical hierarchy within the Catholic Church. Ground swell opposition of the plan led to the organization of Save our Buffalo Churches. Save our Buffalo Churches engaged the St. Joseph Canon Law Foundation to provide advice and counsel as to the proper Canon Law processes, right, and roles of the lady, priests and the Bishop in addressing concerns of these faithful parishioners.

**THE COURT:** Let me just ask a question. You say this Save our Buffalo Churches was formed in 2024. When was it incorporated?

**MR. BAUMEISTER:** It was incorporated November 14th of 2024. So we're looking at just a couple of months. At first it was an association. Ultimately became incorporated November 14th of 2024. It operated as an association for a couple of months before incorporation. Save our Buffalo Churches acted as a conduit between the Canon Foundation and parishioners to facilitate the appointment of procreators -- I'm sorry, I have a hard time with that word -- procurators for Parishes that sought to challenge the merger plan and they were instrumental in obtaining more than 4,000 signed mandates by affected parishioners to appoint procurators.

In September of 2024, this was two months before formal incorporation, the Bishop was presented with an alternative

proposal for the Road to Renewal Program through the workings of Save our Buffalo Churches, an association at the time advising the Bishop that challenges were being made by (extraneous noise) certain Parishes.

**THE COURT:** All right. Go ahead.

**MR. BAUMEISTER:** No action was taken by the Bishop.

In the meantime, parishioners were continuing to appoint procurators for Parishes for purposes of taking petitions and appeals to the Vatican and approximately 30 Parishes appointed procurators.

November 14th of 2024, the Save our Buffalo Churches was incorporated as a New York Not For Profit Charitable Corporation and its express purposes were to provide assistance to and advocate for the rights of the faithful in challenging decisions of the Diocese of Buffalo under Canon Law, provided information relative to the Diocese activity or Diocese activity (extraneous noise) in (indiscernible) appeal processes appeal the Road to Renewal program for the entire Diocese and advance the Catholic faith with the goal to save souls.

And officers at that time continue to be the officers of Save our Buffalo Churches and they are Elizabeth Zilbauer, President; Patrick Gorman, vice president; and Mary Pruski secretary treasurer.

On January 25th, 2025, again under the Road to Renewal

program under the signature of procurator Patrick Gorman, the appeal of the Road to Renewal program was taken to the Holy See in Rome and together with the appeal copies of the 4,000 and individual parishioner mandates were submitted.

Then on June 5th of 2025, the Internal Revenue Service did render its determination that Save our Buffalo Churches Inc. qualified as a tax exempt Section 501(c)(3) corporation.

The next challenge to present itself for the Save our Buffalo Churches was the Diocese/Parishes' program. In or about April 2025, it was announced that a settlement of $150 million had been reached in the bankruptcy case and at that time, the case had been pending for over 5 years.

On or about June 9th, 2025, the Bishop announced a week long series of meetings with Parishes advising the Parishes as to the required contributions that the Parishes would be required to make at the behest of the Diocese toward the settlement fund. These contributions or assessments, the word used by the Dicastery in Rome were assessments ranged from 10 percent to 80 percent of unrestricted cash and investment assets of each of the Parishes. Parishes appealing their closure were assessed 80 percent.

Right after on June 14th, 2025, procurator Patrick Gorman wrote the Bishop asking for a copy of the decree issued in connection with the Parish assessment program and to revoke same or if there was no decree, to reconsider and

revoke the intention. The June 23rd, 2025, response from the Bishop advised that there was no decree and as a result, there was nothing to revoke.

Further correspondence was exchanged, the result being that the Bishop refused to revoke the allocation methodology. Numerous Parishes through their procurators with the assistance of Save our Buffalo Churches filed petitions with the Vatican seeking revocation of the decree of the Bishop determining the assessment amounts (extraneous noise). The Dicastery for the clergy in Rome has ruled on a number of appeals, each and every one of them in favor of the Parishes. Thus far, the Dicastery has issued eight decision decrees revoking the Bishop's Parish assessment program decree (extraneous noise) --

**THE COURT:** All right, go ahead.

**MR. BAUMEISTER:** And ordering return of funds if those funds were already paid for those subject Parishes.

Thus far the Dicastery has issued eight decrees suspending the Bishop's Parish Assessment Program decree for the duration of the recourse for those subject Parishes (extraneous noise.)

**THE COURT:** Mr. Baumeister, why don't you come to the podium. Perhaps you can be more effective. Apparently some people who are on line are having trouble hearing. And speak really directly into the microphone.

**MR. BAUMEISTER:** Okay. Is that better?

**THE COURT:** Well I can hear you but the question is the people on line.

**MR. BAUMEISTER:** Okay.

**UNIDENTIFIED SPEAKER:** Yes, that's much better.

**MR. BAUMEISTER:** So thus far the Dicastery has issued eight decrees suspending the program with regard to those Parishes. Thus far the Dicastery has issued four decrees with regard to closed merged Parishes modifying the decree and ordering that the moneys from those Parishes accrued at the sustaining Parish rather than be paid over. Thus far the Dicastery has issued eight decrees revoking the merger decrees of the Bishop with regard to those subject Parishes. One of those Parishes was St. Bernadette's in Orchard Park which was slated for closure and merger. St. Bernadette's is one of the Diocese's largest and richest Parishes and I'd like to note that it owns a very valuable real estate holding including acres of developable land.

**THE COURT:** Is that land not presently used for church purposes?

**MR. BAUMEISTER:** I think it is. It is in conjunction with a parcel, with a school building and a sanctuary building and then surrounding acreage.

**THE COURT:** Okay.

**MR. BAUMEISTER:** There are a number of appeals that the

In Re: Diocese of Buffalo - BK 20-10322

Dicastery has yet to address.

As far as Save our Buffalo Churches knows, the Diocese has taken no action to seek recourse against or challenge the after for mentioned decrees of the Vatican Dicastery. Actually it appears that the Diocese has simply ignored these directives and orders from its higher authority. It is these decisions that the -- from the Dicastery together with the background associated therewith, that Save our Buffalo Churches seeks to make known in this bankruptcy proceeding. And it is on that limited basis (extraneous noise) upon which Save our Buffalo Churches seeks to intervene.

It is argued by the objectant that the Canon Law determinations are wholly irrelevant to this bankruptcy proceeding since the Court does not have independent authority to enforce Canon Law. We do not disagree with that. It is argued with -- well, I do disagree with them being wholly irrelevant but we don't disagree -- disagree with the Court not having authority to enforce Canon Law. I mentioned that from the outset.

It's also argued by the objectants that the sole purpose of Save our Buffalo Churches is to sabotage the joint plan of reorganization and, in particular, the $150 million settlement fund.

As I stated at the outset, that is absolutely not true. That is not the position of Save our Buffalo Churches. It is

up to creditors, abuse victims, any interested parties to vote any way they want on the plan. I take no position on the plan.

While it is true that Save our Buffalo Churches does not represent the Parishes, that the Parishes appear to have agreed to provide the assessments directed by the Diocese and that the Parishes have their own legal counsel, the information sought to be brought to this proceeding is necessary for there to be adequate information in connection with the plan. While those so-called voluntary contributions likely violate Canon Law for the same reasons that the Dicastery has set forth in its decrees, Save our Buffalo Churches agrees that the Court does not have authority to enforce Canon Law with regard to those contributions. (Extraneous noise.) Instead, the issue is disclosure and the Disclosure Statement relative to a number of items.

Save our Buffalo Churches does not object to the plan and certainly recognizes the substantial benefits associated with the plan including payment to -- prompt payment to abuse victims after this case has been pending for six and a half years, release from liability of the Parishes and Diocese.

Nonetheless, creditors interest of parties, parishioners and the general public given the high profile of this case (distorted audio) should be made aware of the circumstances surrounding the source of the Parish contributions.

Certainly the source of funds for a Chapter 11 plan are, indeed, relevant. If funds to support a plan are disclosable, that certainly would be relevant. Here, funds to support a plan are being obtained illegally under Canon Law. That needs to be disclosed. It may be unlikely that that disclosure in practice will influence voting by those entitled to vote under the plan. However, that does not make the information any less relevant and necessary to provide adequate information for purposes of the Disclosure Statement.

Disclosure of this information is also relevant under Section 1129(a)(3) of the Bankruptcy Code. The bankruptcy case was filed in February of 2020. The Diocese and Parishes have known since that time that substantial monetary contributions would be necessary in order to achieve a confirmed plan yet over 5 years passed before the Parish assessment plan was announced. What was done during that period and thereafter to locate other sources of funds to support the plan?

The motion papers, our motion papers refer to the Cabrini fund. Cabrini Fund. Which arose from the sale of Fidelis Catholic -- the Fidelis Catholic Health Network. Given that the Parish assessment program is now only one year after its implementation, Save our Buffalo Churches didn't have much time to lobby for legislation that has been

proposed by a coalition of downstate abuse victims and unpaid Fidelis pensioners named Justice For All. That fund would provide for the release of funds held in that -- or that legislation would provide for the release of funds held in that foundation to compensate abuse victims.

Save our Buffalo Churches did try to lobby the, lobby the introduction of bills into the New York State Assembly and the New York Senate and contacted each and every Assembly person and Senator in Western New York as well as individuals in the Governor's office seeking a sponsor for bills that had already been drafted for the New York Assembly and Senate which would have provided substantial funds to pay victims.

And there was significant interest expressed by a number of them. We questioned what efforts, if any, were made by the Diocese to support this proposed legislation which would alleviate the financial burdens placed on the Parishes by the Diocese. The disclosures that we want to include in the bankruptcy case go to the statutory issue of good faith under 1129(a)(3). That its efforts to obtain financing other than through the Parish assessment plan which is illegal under Canon Law and the fact that its efforts under the Road to Renewal and the Parish assessment plans were not only in violation of Canon Law but appear to have been wholly ignored by the Diocese.

It is for these reasons that Save our Buffalo Churches

submits that as an interested entity for purposes of intervening on a limited basis as a Friend of the Court to supplement the Disclosure Statement with the information it submits is relevant and necessary to provide adequate information for purposes of Plan Confirmation.

Thank you, your Honor.

**THE COURT:** All right. Let me ask some questions.

**MR. BAUMEISTER:** Sure.

**THE COURT:** When you filed your initial papers I was somewhat confused but then you did file supplemental papers either yesterday or this morning. I read them this morning. The initial motion was to intervene.

Your supplemental papers now speak in terms of looking only to serve as an Amicus, an Amicus Curiae to the Court. Do I read that correctly? That's the only purpose that you're seeking to participate?

**MR. BAUMEISTER:** Whether you want to characterize it as Amicus or a limited interested entity intervention, I think it's one in the same. I just want to make clear that it's limited to providing information in the Disclosure Statement relative to the decisions that have been made by the Dicastery and the associated relevant information.

**THE COURT:** All right. Why -- I assume many of your members are parishioners and Catholics within the Diocese. As individuals, I would assume -- let us assume that they

have standing to go and -- just as any stockholder would, this is not a profit making business there's no stockholders in terms of a financial investment but there are parishioners.  Let's assume for the moment that they as parishioners would have standing to raise arguments or to make positions in this Court.  Why do we need to allow standing not to them individually but to a corporation?

**MR. BAUMEISTER:**  Well I don't think we're asking for a standing per se.  We're looking to -- and I guess I'm not sure that any parishioner would necessarily have standing.  Our group represents a whole host of parishioners that is upset with the approach taken by the Diocese in this case and simply want it made known that they are violating Canon Law.  It's okay I guess, all right, if they're not violating civil law but that's the long and the short of it.  And we've done a lot to work with Canon Law and Parishes and many parishioners.

**THE COURT:**  And the papers you filed either yesterday or this morning have various exhibits which are really conclusory statements in the letters addressed to particular individuals.  Did the Vatican in considering the objections that were raised, were those objections raised by the corporation or were though raised just by individuals?

**MR. BAUMEISTER:**  They were raised by the procurators who were appointed by the parishioners for a particular Parish.

**THE COURT:** All right. So the entity that you represent, Save our Buffalo Churches, Incorporated, was not itself a presenter or an objector to the Vatican.

**MR. BAUMEISTER:** That is correct but one of its officers is a procreator --

**THE COURT:** All right.

**MR. BAUMEISTER:** Or procurator.

**THE COURT:** All right. Mr. Donato, you represent the Diocese.

**MR. DONATO:** Yes, your Honor. We're going to do this, if it's okay, is the Committee would like to go first in response and then the Diocese would go and then Parish counsel would go.

**THE COURT:** All right, that's fine. However you wish to present.

**MR. DONATO:** Thank you, your Honor.

**MR. SCHARF:** Thank you, your Honor.

Your Honor, I've been representing Committees in abuse cases for over 15 years now and I've never had the ability to quote a Bible verse in one of these cases but I do today. I think we have to ask your Honor to "render therefore to Caesar the things which are Caesar's, and to God the things which are God's."

This issue of Canon Law does not belong in this Court and, frankly, we think that the filing yesterday that

included all of those decrees should be stricken from the record. We don't understand what we're doing here today, frankly, after reading yesterday's pleading. SOBC doesn't seem to have a purpose in intervening. It simply wants to put documents before the Court and ask the Court to figure out what to do with them. More fundamentally, your Honor, SOBC does not have any basis to intervene under the Bankruptcy Code, Bankruptcy Rules or case law.

Further, the apparent stated reason to intervene -- which is simply to present these Vatican Dicastery decrees to the Court -- makes no sense. The only thing the Court can do with those decrees, as I said, is strike them from the record and ignore them. I'm going to address the following elements of our objection: That intervention is sought for improper purpose, SOBC lacks statutory standing, SOBC lacks Constitutional or Prudential standing, SOBC lacks standing under state law, and even if your Honor were to look at the now shifting sand to an Amicus brief, they don't meet the standard for filing an Amicus brief either.

I'll start with the intervention sought for improper purpose. The Court cannot consider the Vatican Dicastery decrees. The Court cannot consider Canon Law. SOBC has not articulated any argument in support of its stated objective to present these decrees for the Court to do as it pleases. What does that even mean? Is the Court to consider them?

State that they are correct?  State that they are incorrect? Act as an appeal court to the Vatican?  Enforce them? Interpret them?  The Court cannot do this under any reading of applicable law and I think the *Rozak* decision from the state court is an -- extremely instructive.  And I won't get into the citations in the brief but I think that the Court there was very clear that the issues dealing with Canon Law and disputes over Canon Law and interpretation of Canon Law belong in Canon Law and the civil law -- and do not have any place in civil law or this courtroom.

We cited a plethora of bankruptcy court cases and other federal cases.  And again without repeating the string cite in Paragraph 62 of our objection, we want to highlight Judge Glenn's decision and in the Diocese of Rockville Centre case where he very clearly held the Court may not consider arguments or corresponding evidence that rely on different interpretations of Catholic Canon Law.  And I think that there is some conclusory statements about these decrees that have been presented but I would expect that the Diocese and the Parishes may have other interpretations or other views on where those stand procedurally in that world.

And if we need a higher authority than Judge Glenn, we can look at the *Kedroff* case, the *Jones* case by the Supreme Court and especially the *Presbyterian Church* case that we cited that very clearly said that under the First Amendment,

the First Amendment doesn't prohibit, it commands -- this is a quote from the case -- commands civil courts not to decide church proper disputes without resolving underlying controversies over religious doctrine, and Ecclesiastical Canon Law is clearly a controversy over religious doctrine.

**THE COURT:** Well let me ask. I'm not going to -- I think you're probably correct. This Court's not going to decide any Canon Law question but I do have to decide questions of feasibility. There's a lot of money that has to come from some place and I raised this issue at least three years ago in both oral argument and I think in some of my written decisions that when one looks at the schedules, there is no money here, that this debtor is either insolvent or very close to insolvent. There's no money there and I've looked at the current draft of the Disclosure Statement. It doesn't tell me where the money's coming from.

**MR. SCHARF:** Sure.

**THE COURT:** Dollar by dollar. It's this dollar is coming from here, this dollar is coming from there. I know there's $3 million available from the seminary property the District Court told us that but that's $147 million short and the schedules don't tell me where the money's coming from.

**MR. SCHARF:** Sure.

**THE COURT:** Now if it's coming from Parishes and the Parishes can't give it because of rulings from the Vatican,

I'm not going to question that but how I'm going to be able to determine feasibility?

**MR. SCHARF:** So I think, your Honor -- we talked about this a little bit at the last hearing -- and I'll tell you when we went through our five-year mediation process to get to the settlement, yes, we had the schedules for the debtor entity. That's just the Diocese. But at the same time there are at least I believe 6 -- over 600 direct claims against Parishes including over 500 claims that are pre-1973 when the global -- or the Diocese wide insurance program kicked in, so largely uninsured or underinsured claims so we've got 500 of those.

And when we approached the beginning of this case, the Committee, as you may recall, entered into a stipulation so ordered by your Honor with the Diocese staying the Parish lawsuits. And one of the agreements we had as part of that stay was we got financial information from all of the Parishes and other entities as well within the Diocese.

**THE COURT:** Yeah, but that was by stipulation. That's not something --

**MR. SCHARF:** Sure.

**THE COURT:** -- that this Court ordered.

**MR. SCHARF:** But what my point is it's not that it's been presented to the Court, it's that it's the negotiation included an analysis of restricted assets of the Parishes, a

lot of discussion about all these issues that you would imagine surrounded without breaching the mediation privilege but the analysis included a global resolution and a global discussion looking at assets of all of these related entities. And when we do get to the disclosure hearing at the end of next month, the Parishes, represented by Mr. Heuer, have on the record committed to presenting Parish by Parish what the assets are, I believe non-real estate assets of the cash investment assets on a Parish by Parish --

**THE COURT:** But that's not in the current iteration --

**MR. SCHARF:** But --

**THE COURT:** -- of the Disclosure Statement.

**MR. SCHARF:** But it will be when we do ask you to approve feasibility. So it's not in the current iteration but it's been committed to be provided as part of the overall procedural process --

**THE COURT:** But at least --

**MR. SCHARF:** We've chosen.

**THE COURT:** -- at this point the current form of the Disclosure Statement does not give me the information I need to make a finding of feasibility.

**MR. SCHARF:** Correct but we're not asking you to make a finding of feasibility.

**THE COURT:** Well, I have -- when I approve a Disclosure Statement it better tell me how this is feasible.

**MR. SCHARF:** And it will. But that's --

**THE COURT:** But right now it doesn't.

**MR. SCHARF:** Right now it doesn't. But right now we're not here to discuss feasibility. We're here to talk about intervention for a nebulous purpose. So, you know, it's, it's, again, you're being asked to look at documents that I think are in dispute in the Canon Law world and under appeal in that process but you can't look at those. They're not part of the record of this case. And again --

**THE COURT:** So let me --

**MR. SCHARF:** Sure.

**THE COURT:** Let me ask you. $150 million is coming from the debtor.

**MR. SCHARF:** No, no, $150 million is coming from the debtor and the related --

**THE COURT:** All right.

**MR. SCHARF:** -- additional debtor.

**THE COURT:** But right now the Disclosure Statement doesn't give me any basis, doesn't tell me where that money's coming from.

**MR. SCHARF:** Correct.

**THE COURT:** And yet -- so I have no idea where that money's coming from and you're trying to fund a plan without any assurance that the plan is -- at least I haven't seen anything that tells me where the money's coming from.

**MR. SCHARF:** Right. But that's part of the record that we have to make for confirmation.

**THE COURT:** All right. And so let's take Parish X, whatever it may be.

**MR. SCHARF:** Mm-hmm.

**THE COURT:** And there happens to be a decision from the Vatican saying you cannot use the resources of that Parish to fund the plan.

**MR. SCHARF:** Mm-hmm.

**THE COURT:** I'm not going to look behind that. You're telling me I have no ability to go and look behind Canon Law, and I agree with you.

**MR. SCHARF:** Mm-hmm.

**THE COURT:** So where's the money coming from if the Vatican says it can't be used?

**MR. SCHARF:** So I think that there are interpretations of some of these decrees that the Diocese will go through its own process. The Diocese will have to deal with the Canon Law issues. And there is money in other pockets that can be reached if a limited portion of the settlement is not available at a particular time --

**THE COURT:** But again --

**MR. SCHARF:** -- because of whatever's going on behind the scenes.

**THE COURT:** -- that hasn't been shown to the Court.

**MR. SCHARF:** It's not being -- it doesn't have to be shown to the Court. We have to tell you where the money is coming from, not whether the Vatican has said that the money is allowed to come from there. And, frankly, I think that -- there's another very serious issue here which is what happens -- there's a civil entity for the Parishes -- and we'll talk about this in a little bit -- there's a civil entity for the Parishes under New York law, under the New York Not For Profit Corporation Law statutorily prescribed and there's a -- then there's the juridic person and the Canon Law issues and they're separate.

What happens if somebody goes -- five survivors sue a Parish and get judgments for double the value of the -- a hundred times the value of the Parish and the Vatican says no, no, no, under Canon Law you're not allowed to use your Parish money to settle that. I don't think a single court in the U.S. would look at that prohibition and say, well, we're going to enforce that.

**THE COURT:** Every Disclosure statement that we approve includes risk factors.

**MR. SCHARF:** Right.

**THE COURT:** There are risks.

**MR. SCHARF:** Mm-hmm.

**THE COURT:** And without the Court deciding whether the Canon Law applies or doesn't apply -- and I'm not deciding

anything under Canon Law.

**MR. SCHARF:** Mm-hmm.

**THE COURT:** That's beyond my jurisdiction. But if there is a risk --

**MR. SCHARF:** Mm-hmm.

**THE COURT:** -- that those funds are not available --

**MR. SCHARF:** Mm-hmm.

**THE COURT:** -- should that risk not be identified?

**MR. SCHARF:** The risk will be identified. That's a disclosure issue. And the reality is that if we, the creditors don't get the full benefit of the bargain, the Plan already says we won't go effective. And so if there is an inability to raise the money that has been committed, the Plan won't go effective and we'll have to deal with a backup Plan.

**THE COURT:** And we better tell the creditors that before they vote.

**MR. SCHARF:** Okay. And that's a disclosure issue that will be very clear in the Disclosure Statement.

**THE COURT:** But right now it's not.

**MR. SCHARF:** Okay. I -- okay, we'll make it -- we'll make sure -- we'll highlight it.

One thing just, your Honor, to preview the Disclosure Statement we started working on a plain English sort of like care sheet to put on top. We'll make sure that that's even

on that portion of it. Just a little, you know, a summary, a five-page or ten-page summary of the Disclosure Statement for people. So -- but, again, I think we're dealing with disclosure issues not a question of whether SOBC should have a right to intervene to put these documents in front of you. And so, again, I think I've exhausted the discussion on the purpose of the intervention and what you can even look at.

But let's not -- before we even get to that discussion, the question is whether there's a statutory authority to intervene. SOBC from an economic perspective -- from any perspective -- I think is a stranger to this bankruptcy case. It's not a creditor, it's not a member of a Parish, not a creditor of a Parish, not a creditor of the Diocese, not a claimant in the bankruptcy case, not a counter-party to a contract. It's a trade organization or a consumer organization of some sort which is why we think that *Ionosphere* case is extremely instructive. I'm not quite clear when it was incorporated because their Articles -- I mean, I think we heard today from counsel that they were incorporated in November of 2024 but I think the Articles of incorporation were signed in March of 2025. I don't think that makes a difference. I just think that it's a -- under any analysis it's a latecomer to the game.

Frankly, your Honor, the Parish and procurator appeals are irrelevant to this proceeding to this Court. Those

disputes, decisions, remedies, whatever they're going to have, belong somewhere else.

No one is asking this Court to order a Parish to close. No one is asking this Court to order a Parish to put aside a Vatican decree or enforce a Vatican Committee. In this court for standing we have to look at Section 1109(b) of the Bankruptcy Code.

A party in interest may raise and appear and be heard on any issue in a Chapter 11 case but we don't have a definition of the term "party in interest". We've had some recent case law in the *Truck* decision that says somebody asserting purely derivative rights or interests that are too remote from the bankruptcy case will not qualify.

I think that's precisely what we have here. We've also got about 40 years of -- over 40 years of Second Circuit precedent. The cases we cite go back to the '80s that state that the term -- even though the term "party in interest" is broadly interpretive, it's not, according to what the Second Circuit said, infinitely expansive.

In the *Archdiocese of New Orleans*, an instructive case because it follows *Truck* which is a more recent Supreme Court case, said that abuse survivors don't have standing under 1109(b) to challenge professional fees even though they're clearly creditors in the case. But after the case was over, the case was done and they had a sum certain set aside, they

In Re: Diocese of Buffalo - BK 20-10322

didn't have any more pecuniary interest in that aspect of the case and were not granted standing to be heard.

And that issue -- that analysis -- is directly applicable here. The SOBC does not have a pecuniary interest. Has no standing. It also lacks Constitutional or Prudential standing to intervene. So even if there's an analysis that somehow holds that they are a party in interest, in order to be heard, they would have to have Constitutional Prudential standing. They don't.

**THE COURT:** But they're representing to me that they're not going to object to the Plan.

**MR. SCHARF:** Then what are they doing? They're filing an Amicus brief. Let's talk about the Amicus standards for a second.

They have to have something that adds value. They have to have a unique perspective, unaddressed legal arguments, technical or scientific expertise.

All they want to do is put in front of you -- without any argument -- documents that you can't consider. What are we doing here?

And so in terms of just the analysis -- you know, they don't have a -- there's a: And again we don't have a Bankruptcy Rule for Amicus briefs but we do have a Federal Rule of Appellate Procedure that, that governs this. And somebody has to have a direct interest in the case. They,

they don't have an interest in the case other than wanting to present their grievances under Canon Law with the Diocese, with the Parishes in a process that's going on in the Vatican. And if they want the world to know what's going on, they have a website they can put all -- they may have put all these documents on their website. They can put all these documents on their website. Not on this Court's docket, not in front of the pile of documents your Honor should be considering in a record for confirmation in this case.

In addition, your Honor --

**THE COURT:** But isn't, I mean --

**MR. SCHARF:** Sure.

**THE COURT:** -- I can see your point that there are many documents that are of no relevance to the Court. But is that a matter for the debtor and the Committee to decide relevance or is that a matter for the Court to decide relevance after it has an opportunity to see them?

**MR. SCHARF:** Your Honor, you've been told that these are issues and decisions under Canon Law by the Vatican. They've given them to you. They've snuck them on to the record. Frankly, we think those should be stricken. We'd actually ask that those be stricken.

**THE COURT:** I may very well agree with you. I may say these documents, I see them, they're of no relevance to me. But is that for me to decide after I see them or is that for

you to decide and not even let me see them?

**MR. SCHARF:** Your Honor, I know you had a hearing in this courtroom before us. I didn't listen to this one. I was standing outside. But let's take a hypothetical. Let me put my -- I'm not a law professor but I'll put my law professor hat on for a second and take a hypothetical.

Let's say I was in the gallery listening to an oral argument and I thought one side just was not stating it correctly and I jumped up and said, your Honor, I'd like to help you out and just tell you what I think the case law is. You'd tell me to sit down, I don't represent anybody in this case. I don't have an interest in this case.

And so I think that's what's going on here. A party that has a direct -- has standing in a case, has a right to be heard in the case, can make all the arguments about relevance it wants. But a party that has no standing to begin with, no intent, it says, of upending or objecting to the Chapter 11 Plan, has no right to put documents in for the Court to consider on the record.

**THE COURT:** It was only a few weeks ago --

**MR. SCHARF:** Mm-hmm.

**THE COURT:** -- that this Court had a hearing, you were present with it and it was a question of giving notice of the disclosure hearing.

**MR. SCHARF:** Mm-hmm.

**THE COURT:** And I directed that that notice had to go out in all Parish bulletins so that anyone affiliated in any fashion with the Diocese could go and participate if they wished, in the Disclosure Hearing.

**MR. SCHARF:** Mm-hmm.

**THE COURT:** Notice went out. I presume it went out. I'm not monitoring it but I'm sure that the Diocese followed the order of the Court and instructed its various Parishes to include this in their Parish bulletins so that any parishioner could come here. And now we have some parishioners that are coming here and ask just to -- as I see it, they want an opportunity just to confirm they can go and speak on the question.

Are you saying, well, it's fine to send out notice that you have an opportunity to appear but if you do appear, we don't want to hear you?

**MR. SCHARF:** Your Honor, I think that sending out notice for people to appear, if they have standing, is perfectly appropriate. There are circumstances or certain particular issues where a parishioner may have standing, I don't know, depends on what they raise. Depends what issue they bring up.

But respectfully, your Honor, this is not a parishioner. It's a corporation and it's trying to act as the focal point for certain groups of parishioners, certain parishioners, I

guess. But it's not representing all the parishioners in those Parishes. It doesn't speak for all those parishioners. I, frankly, don't really know how many parishioners they actually speak for. I don't know that. And I think that with respect to anybody appearing to be heard at a Disclosure Statement, or more critically confirmation, our rights about standing are absolutely reserved and we may object.

But let me, if your Honor -- and, your Honor, I will get into a discussion in just about who may have standing in these cases. I think part of the issue here, your Honor, is that -- and maybe this was just a PR issue, there was a problem with the Diocese, maybe it was a communication that could have been handled better. It's not our communication. But these are settled -- the settlement and the Parish portion of the settlement is, again, it's not a funding of the Diocese's liability.

Parishes have their own liability. And, frankly, even Parishes without claims against them have potential future exposure, and this will be part of the discussion at confirmation. And as your Honor may recall from the beginning of the case, the way that the Diocese has funded its insurance program, at least a current funding of it which would apply to all the uninsured or underinsured claims is essentially pool assets by assessing each Diocese for a share of the cost. They may be changing the way they do this but

they would assess the Parishes for a cost and then by excess insurance and be sort of self-insured as a group for the beginning of Court.

So even if a Parish doesn't have claims against it, if there are defense costs that are going to be expended because we don't have a settlement -- and as your Honor may recall, we technically don't have a Parish stay right now. Everybody's been holding off because we do have a settlement. But if that were to become -- go south and litigation proceeds, I fully expect that even Parishes with no claims are going to start getting assessments for defense costs because Parishes can't survive without the Diocese and the Diocese as a whole.

But, again, these are kind of confirmation issues and what your Honor --

**THE COURT:** Well, let's not get to Confirmation. Lets just focus on Disclosure.

**MR. SCHARF:** Okay.

**THE COURT:** I gave a directive to the Diocese to file a Disclosure Statement because I want this case over.

**MR. SCHARF:** Mm-hmm.

**THE COURT:** All right.

**MR. SCHARF:** So do we.

**THE COURT:** And so -- I hope so.

**MR. SCHARF:** Yes.

**THE COURT:** But I certainly want it over. And I gave direction in 2025 --

**MR. SCHARF:** Mm-hmm.

**THE COURT:** -- that they had to file a Disclosure Statement. They filed a Disclosure Statement. It is obviously inadequate.

**MR. SCHARF:** Sure.

**THE COURT:** I wouldn't even allow that to be noticed for Disclosure Hearing it was so deficient and I don't see anyone disagreeing with that.

So then I gave a second directive that we had to have a Disclosure Statement and I understand the pressures on counsel to get a document of this size and magnitude and significance completed, I understand that. I used to do that work at one time in my prior professional life. And I know it's time-consuming. So when debtor asks for an extension -- with your cooperation and support -- I granted a further extension.

So then I was told we're going to finally get a good Disclosure Statement and one was filed. And I look at that Disclosure Statement. It doesn't tell me where the money is coming from, and that's a vital issue.

Now I have someone who's coming in here and saying, Judge, I'm going to want to present information that addresses in part the deficiencies on that Disclosure and

you're saying I shouldn't listen to them?

**MR. SCHARF:** Yeah, because they're not a creditor. They're not voting on the Plan and they're bringing in an issue that is some -- and they're bringing in a issue that you cannot look at --

**THE COURT:** No, I can.

**MR. SCHARF:** -- or rule --

**THE COURT:** I can.

**MR. SCHARF:** -- or rule.

**THE COURT:** No. Whoa, whoa, whoa. There's a difference here. I've told you before: I'm not going to decide anything on Canon Law.

**MR. SCHARF:** Right.

**THE COURT:** But if there is a dispute on Canon Law, should that not be identified in the Disclosure Statement?

**MR. SCHARF:** We can -- you know, your Honor, without bringing them in here and allowing these documents into the record, we can disclose it. There is a dispute under Canon Law and that's a risk factor in the Disclosure Statement.

**THE COURT:** All right. But you didn't -- no one put that in the Disclosure Statement that was vetted by -- with you before it was filed with the Court.

**MR. SCHARF:** You're right, you're right. But Disclosure Statements in my experience -- so couple of things.

In my experience disclosure statements get revised

before the Disclosure Statement hearing, after the Disclosure Statement hearing, and then go out.  And, frankly -- including, frankly, in many of the cases I've worked on, *Diocese of Rochester*, for example, other cases where -- I think the *Diocese of Rockville Centre* as well -- where there was particular disclosure about what was going on with Parish payments.  I don't like using the word "contributions".  I know people use that but I prefer to use the word "Parish payments" because a payment of a settlement sum are disclosed in more detail as a Plan supplement, frankly, filed before the Confirmation Hearing.

And if your Honor -- and we heard your Honor that your Honor wants to see further disclosure.  That's what Mr. Heuer and Mr. Elsaesser, along with the Diocese, are working to accomplish, and I have every confidence that they will accomplish that before we get to the Disclosure Statement hearing and you'll get a revised Disclosure Statement filed I assume before the Disclosure Statement because all these issues can percolate.

And if we can deal with this intervention motion by making a disclosure that there is some issue under Canon Law and disputes as a risk factor, I'm perfectly happy to do that.

But that's not what they are asking.  They are asking to present the documents for you to do what you will with them,

and I don't know what that means. And I think that, you know, the position today has been we don't object to the Plan but the testimony at the deposition -- and we attached that to our pleading -- was that the organization, SOBC, opposes the Parish portion of the payments. And if the Parish portion of the payments does not come through, there is no Plan and we are back to square one.

**THE COURT:** That -- I share that concern. I want to see this effective. I want a Plan to be successful. But if there's no money there, how is it going to be successful?

**MR. SCHARF:** It's a risk factor, your Honor. But having these documents in the record doesn't mitigate that risk, doesn't address that risk, doesn't assess that risk.

**THE COURT:** And the Disclosure Statement in its present form doesn't discuss it either.

**MR. SCHARF:** Right, but that's an easy thing to discuss as a disclosure issue without having the documents considered as part of the record by the Court which is what they're asking.

And, again, your Honor, I feel that's a good segue into what I think is the last sort of point I want to make that they lack standing under state law to intervene because, again, property issues are determined under state law. We have the whole *Rozak* decision that says there's no standing -- sorry, that these issues can't be considered by a

Court. There is some discussion in their brief that argues they need to be heard to insure compliance with Charitable Donation Law. But that ignores that New York's law for charitable donations is very clear: That SOBC doesn't have standing to enforce that issue. That's an issue for the Attorney General or the actual donor to enforce.

And, again, your Honor, my thought would be if a parishioner appears and says my donation is restricted, we can assess that. Frankly, there's going to be disclosure by the Parishes over the amount of their restricted assets and if somebody comes in and says, well, my restricted money can't be used, I guess we can assess whether there's a writing, what the magnitude of that is or whether, frankly, it's already restricted because there is a portion of the Parish funds that are restricted.

**THE COURT:** Although I don't want that issue coming up at the point where the Prepackaged Plan and Disclosure Statement are filed.

**MR. SCHARF:** Right.

**THE COURT:** I want those resolved long in advance.

**MR. SCHARF:** We do, too. We do, too. So I think that -- the discussion we had last time was that there's going to be objections to the Plan. Your Honor's normal practice has been to allow people to come in up to the hearing but those issues will have a deadline to be followed

before Confirmation and we'll address it.

But, again, that's somebody who actually has a stated pecuniary interest and maybe they're correct, maybe they're not. But it's not a question of putting this type of document in front of the Court.

So, again, what I was thinking about a parishioner may have standing, that's an issue that we'd have to address on the facts of that particular parishioner's basis for coming in to be heard.

I mean, I know that one thing that the Disclosure Statement should not hearing -- or confirmation hearing should not turn into is like a referendum among the parish -- the 500,000 parishioners about who thinks it's appropriate to have this Plan or not. That's really not going to help get this done.

And, again, your Honor, New York Legislature made it very clear who governs the Parishes in a civil law: It's the Trustees. They're the only one -- the only issue this Court might have to consider is whether the Trustees were exercising their business judgment or whether the settlement is appropriate under Rule 9019, that standard of above the lowest point of reasonableness.

Very fundamentally what came out at the deposition was SOBC has not assessed the Parish's, any Parish's actual CVA exposure, available insurance, defense costs, financial

information, all of the factors that would go into a business judgment being made by the Trustees. And Mr. Heuer has committed that the Trustees will all -- the Parishes will all have resolutions signed by the Trustees. Further, the SOBC understands that certain Parishes could have all of their assets depleted due to CVA litigation but I think, frankly, by attempting to -- again, the purpose has to be to derail the Plan or upending the Plan in some way, shape or form. They're doing this in a way, I think, that runs counter to what -- their ultimate objective which I think is probably to have a Diocese that survives.

And while we understand that certain parishioners may oppose the Diocese out-of-court restructuring of the Parishes, I'm very -- I totally sympathize with that. I understand that people grew up in Parishes. Parishes close. They've spent time volunteering, devoted to it. I get it, I do. But I think, frankly, parishes are -- the Diocese will address this. I think the Parishes are closing because there's an excess capacity at this point of Diocese and it's happening all over the country. I think when I looked at it, there was like one Diocese in the country that's getting like an expanded enrollment. Although that seems to be changing among the Millennials.

But, your Honor, they're asking this Court to look at these documents and, again, they've talked about certain

measures that they've explored. The Mother Cabrini Fund, for example, your Honor. Believe me, we looked at the Mother Cabrini Fund. We looked at the documents that gave rise to that Fund, to the sale documents for the Fidelis Care that funded Mother Cabrini, what the Attorney General for New York insisted goes to the state from that sale.

We don't see a viable avenue to a forced recovery there. I would love the Board of the Mother Cabrini Fund to do the right thing and step up across New York State to fund settlements. They have been asked and they have refused to do so. Not only that, they've changed their own rules to prohibit Dioceses in bankruptcy from asking for money. So that's the Mother Cabrini fund's decision. I don't have the ability to influence it.

And, frankly, I think also the Legislative action, again, interesting. I appreciate the effort but it wasn't going to go anywhere. Nobody sponsored the Bill and the language of the Bill was essentially we are going to direct the Attorney General to force the Mother Cabrini Fund to give up a billion dollars. I don't see how that stands up in any court, especially after the Attorney General have already taken over a billion, I think a billion dollars from the initial sale of the Fidelis Care.

Just in case your Honor isn't aware, the Fidelis Care was this entity that was founded by all the Dioceses of

In Re: Diocese of Buffalo - BK 20-10322

New York and --

**THE COURT:** You may recall that when we had victim statements --

**MR. SCHARF:** Yes.

**THE COURT:** And when I heard victim statements, I said anybody can come here.

**MR. SCHARF:** Yes.

**THE COURT:** Anybody.

**MR. SCHARF:** Yes.

**THE COURT:** And I will hear them. And some of the victims, I think at least one, raised the issue of the Cabrini Fund and why wasn't it available.

**MR. SCHARF:** Yes.

**THE COURT:** I'm not making a statement here because I'm not deciding the question but I hear your point. Your point is it's not available to fund a settlement. But at least the person had the right to tell me their position.

**MR. SCHARF:** Sure.

**THE COURT:** I'm not ruling one way or the other on the relevance of this document. I'm not going to rule one way or the other on whether there's any basis to impact on the Plan or the Disclosure Statement.

The question is should I give people an opportunity, no matter how weak their argument may be --

**MR. SCHARF:** Mm-hmm.

**THE COURT:** -- should I at least give them an opportunity to know that if they want to say something, someone will listen? I may rule them out for lack of relevance. I may rule them out for lack of merit. But should I at least hear what they have to say?

**MR. SCHARF:** I think you have to address that on a case-by-case basis, see what people are saying. And I think that, frankly, giving parishioners that -- parishioners and survivors the opportunity to do that in a -- I want to follow a non-adversarial setting because I think that those statements that your Honor listened to -- and I respect your Honor for sitting through I think it was about six days of statements.

**THE COURT:** If there were more people, I would have stayed more days.

**MR. SCHARF:** Your Honor, and I appreciate that but that's a different process of somebody -- knowing that you heard them than coming in with a right to state a legal or factual argument in opposition or in support of the Plan of reorganization. You know, it's -- and, again, if people come in and want to be a heard on the Disclosure Statement or confirmation, we can address that on a case-by-case basis.

But I think that if people, even individuals come in and want to present your Honor with the Dicastery decree for their particular Parish, we're going to oppose that. That

doesn't belong on the record.

**THE COURT:** Would you oppose my ruling that it's not relevant?

**MR. SCHARF:** I don't even think we have to get to a ruling that it's not relevant and give them an appeal issue on that. Just no standing if your Honor -- I don't understand how opening the record to documents that are not relevant is going to help us here in this case with SOBC.

**THE COURT:** All right.

**MR. SCHARF:** Again with their stated aim of being -- now being an Amicus to the Court. It's just a -- it's -- I don't think it's even a question of relevance. It's just a question of -- I'm not your Honor, I'm not allowed to consider this, not relevance, it's just I can't consider this.

In terms -- just to address one or two of the issues raised by counsel. Counsel noted there was a five-year difference between the start of the bankruptcy case and the timing that the assessments were announced. I think that's just prudent on the Diocese's behalf because if we had, you know, we got to $150 million global settlement. Let's say we're at the point in the mediation where we had reached 50 million and they went around and collected commitments for $50 million from the Parishes or other entities and we had not agreed 50 million it's just that's where we were, or

that's where they were in the mediation. Coming back on every increment or, you know, going back to the same funding source time and time again, I think would be probably more traumatic for those funding sources because at a certain point they'll say, you told me this was done for 50 million, why are you now coming to me with 150 million. So I think that's just kind of the way I've experienced Parishes and Dioceses operating. So there's a perfectly reasonable explanation for that.

I know your Honor's asking a lot of questions but I'll stop there and see if your Honor has any further questions for me.

**THE COURT:** No, I'm --

**MR. SCHARF:** Okay.

**THE COURT:** I appreciate your comments.

**MR. SCHARF:** Thank you.

**THE COURT:** Thank you.

**MR. DONATO:** Your Honor, Mr. Sharkey will address Court.

**THE COURT:** All right.

**MR. SHARKEY:** Good afternoon, your Honor.

We have a lot of very similar arguments to Mr. Scharf's position so I'm going to avoid beating a dead horse here. I know you asked him a lot of questions and it was discussed then.

I do think it's important, your Honor, to kind of focus

on why we're here today. And we're here today to resolve the motion that's been filed by this proposed intervenor to intervene in this case pursuant to 1109(b) and Rule 2018(a). And, your Honor, I know you asked a lot of questions about, well, do they get a chance to be heard, well they are being heard right now.

We're hearing what they're saying but there's a difference between that and intervention in a case. And in court and the rules talk about what it takes to be considered a, quote, unquote, "party in interest" under 1109. And your Honor, one of the hallmarks of that as noted by the Court in *Truck* since that that party has a direct financial stake in the outcome of the case.

And we would submit that that's very clear from this, for example, Mr. -- the counsel for the movant spent 25 to 30 minutes talking about it on his motion and I don't believe I heard almost any discussion of the relevant legal issues that pertain to their intervention motion about what it takes to have standing or whether they have standing. We understand that they're unhappy with the approach by the Diocese. That's been made loud and clear but they don't meet the legal standard to intervene in this case.

**THE COURT:** One of the problems I had with the motion in preparing for it up through this morning was that I did not know what they wanted to intervene for, all right. And that

was -- I'll be honest with you -- that was a problem that concerned me. Then there were papers filed either late last night or this morning, I don't know which. I did not see them until this morning. And that changed -- the motion is different than it was.

Without any -- there's no doubt in my mind the motion now essentially asks for an opportunity to be an Amicus Curiae which is entirely different from asking for standing to object. Isn't that somewhat different? I understand the arguments that Mr. Scharf made but it's a different motion now is that all they're asking -- well, it was an uncertain motion it was an amorphous motion before. Now it's more defined as really an opportunity to be involved as an Amicus Curiae.

**MR. SHARKEY:** Well, your Honor, I agree that it provided a little more clarity but it's still a little unclear what exactly their intentions are and why they want to intervene in this case. We understand that they want to bring these Canonical rulings to the Court's attention. For what purpose? And that's the question.

**THE COURT:** I can always say they're not relevant.

**MR. SHARKEY:** You can, your Honor, but I don't know that it's proper to change the relief sought in the motion in your reply.

The motion that's before the Court is for a motion for

In Re: Diocese of Buffalo - BK 20-10322

intervention under 1109 and Rule 2018 and that was not the stated purpose in this case and I don't believe that's appropriate for them to suddenly change tact and have a completely different grounds of relief in a reply filed the night before the hearing.

**THE COURT:** Well it's certainly more limited than what they were asking for -- well, it's more clear, let's leave it at that. I didn't know what he was asking for -- well, I shouldn't say that. I thought it was somewhat unclear. But now with the reply papers that are submitted, it's clear that they're, there's a whole present to act as an Amicus Curiae.

If that is all they are asking for, are you still opposing that?

**MR. SHARKEY:** Your Honor, I think we are for the same reasons mentioned by Mr. Scharf earlier. I think we would like an opportunity to address that if that is, in fact, what they are proposing. We don't think that they necessarily meet the standard for that but I think, your Honor, the bigger issue here is they keep saying they want to be heard. But what it is that they want to tell the Court is something that I think everybody here has acknowledged the court can't review and consider, and that is these Canonical rulings and that's what they want to bring before court. That's their only stated purpose here.

**THE COURT:** Well if someone wants to present something

to me, I can rule it's no relevance but at least I give them the opportunity to present it.

**MR. SHARKEY:** We don't think so, your Honor, not with the stated purpose of that nature. We think it's something that is clearly barred by the First Amendment here. Your Honor, this is something that is classic -- what they've asked you to do is essentially review and interpret Canonical rulings.

**THE COURT:** Well even Mr. Scharf acknowledged that if there are Canon rulings that may suggest a feasibility problem, that that probably should be incorporated into the Disclosure Statement.

**MR. SHARKEY:** Your Honor, that may be an issue for down the road and that's something that -- and, your Honor, by the way, we disagree with their assertions that the Dicastery Decrees say the things that they do and have the impact that they do.

**THE COURT:** Well they may not even be relevant.

**MR. SHARKEY:** Well we don't believe they're relevant at all. The whole purpose of this intervention is to ask this Court to consider Canonical rulings which is forbidden. They acknowledge it, and even your Honor said earlier that you can't consider that. Then what is the purpose of their submission of these papers?

**THE COURT:** I was tempted to ask this to Mr. Scharf but

I reserved it because Mr. Donato may have more familiarity with this particular question.

There's a case I think is somewhat on point. The case of *Megan-Racine Associates v. Niagara Mohawk Power Corporation*, 176-BR-687. Decided by a very respected judge, Judge Stephen Gerling from the Northern District. And I'll just quote from it for you.

He says the factual and legal complexity of the EPC claim will escalate the cost of the debtor's and Niagara Mohawk's proceedings and lead to undue delay. The Court is, however, sympathetic to Hudson's concern that the debtor may feel it more advantageous to preserve its alleged indemnity against Hudson and to prevent defenses to Niagara Mohawk. Thus, the Court will permit Hudson to voice their concerns and monitor the proceedings as Amicus Curiae. Courts have broad discretion to appoint Amici Curiae.

We have "broad discretion" doesn't mean that I'm going to give them standing on anything else other than to present information. And in their latest revision to their motion, that's all their looking for. Doesn't the Court have discretion at least to say you can present your arguments and maybe you're presenting arguments that the Court's going to reject out of hand but should I at least give people an opportunity to speak?

**MR. DONATO:** Your Honor, it's very interesting. I'm

going to approach the Court, and I'm raising because you did allude to me and, of course, as you probably saw in the cites, I was in Megan-Racine. So I have a pretty good memory of the case. So it was about 25 years ago.

The biggest issue with Megan-Racine was that it involved all kinds of specific complex Niagara Mohawk regulations dealing with alternative energy. Now this is 25 years ago so this isn't alternative energy like we're talking about now, okay. And Megan-Racine was up in Canton, New York.

Hudson raised these issues, as I understand it, Hudson, while they acted as an Amicus, they were directly involved in the case. So they were not a stranger to the case as was set forth by my colleagues here, this SOBC: They're strangers to the proceedings.

Now I am concerned about this because as you acknowledge, late last night as I'm reading these papers -- it did come in last night -- all of the sudden what are we doing here? We spent hours and hundreds of pages addressing intervention. I'm just going to cut through it. SOB saw that they were going to lose so then they said, oh, boy, we better do something here, we better throw something in. First we're going to file anything with the judge, who cares if it's improper or not, he'll get to see it any way. So that's the first thing they did.

And then they said, well, let's just make ourselves

Amicus.  First of all, I would say it's completely inappropriate.  We didn't brief Amicus.  I didn't even know about Amicus until it was said in the papers last night when I read them at 11:00.  But if we're going to talk about Amicus even for a minute, the first thing to ask is could there be delays as a result of the Amicus?  Okay.  What is -- is there impartiality?  There's no --

**THE COURT:**  Judge Gerling was --

**MR. DONATO:**  -- impartiality.

**THE COURT:**  -- concerned about delays, as well.

**MR. DONATO:**  Absolutely.

**THE COURT:**  But he allowed them to appear as Amicus.

**MR. DONATO:**  Sure.  But Hudson was impartial.  These people aren't impartial.  The deposition transcript quotes the secretary as saying we object to the Parish funding.  We are going to object to the Plan.  We object to the settlement.  That's what the transcript says, okay.

The fact that Mr. Baumeister comes in and announces, well, okay, maybe we were confused and we're not going to do any of that, great concern about that.  I also heard they're not going to object to the Plan.  If we're doing anything -- first of all, they shouldn't be involved at all.  They are strangers to this proceeding, okay.

But they've acknowledged that they're not going to object.  But you know what I just heard?  I sat here and I

listened to a 30-minute objection under 11 U.S.C. 1125. So Mr. Baumeister said I'm not going to object to the Disclosure or the Plan and he did during his oral argument.

We are going down a slippery slope. There is no reason to allow any third-party who has no financial -- there's no gray area. They have no financial interest. They have no Prudential standing at all. We're making a mistake if we start slipping sliding down this path. This is literally like somebody outside just showed up in your courtroom and said, hey, I got some good stuff I want to tell but this case. There's really not much difference.

And again, the deposition last week was specifically clear that their goal is to block the Parish funding. And if it's to block the Parish funding, then that means that they're trying to get in the way of a 6-and-a-half year nonstop negotiation where we finally got to a number to move forward.

Now you brought up feasibility. Of course, we understand that. What did we do in *Syracuse*? What did we do in *Rochester*. At Confirmation, my CFO sat on the stand and produced a bank statement and showed the Court that every dollar under that Plan is in a bank account -- and we proved it and both cases were deemed to be feasible. We didn't have to do that at 1125 time. We didn't have a Disclosure Statement.

Risk factors. We have no issue with risk factors. You want to put a risk factor in there about Canon Law dispute, no problem. But we're going down a slippery slope if you start listening to these strangers in any law. And as I said, I object to the fact that now all the sudden I'm scrambling around trying to remember what are the factors for Amicus when that wasn't even before you until 10:00 o'clock last night.

**THE COURT:** If this was a for profit corporation, would a stockholder -- and let's say it's fully under water, would a stockholder have standing?

**MR. DONATO:** I don't think so. (indiscernible) the corporation has standing, directly of the officers have standing, you know, the CFO, the employees but a minority shareholder like a single whatever small shareholder in an insolvent situation, they're out of their money. They don't even have standing.

**THE COURT:** All right.

**MR. DONATO:** But of course, as you know, we're dealing with not for profits.

The reason I got up here is, one, I am totally comfortable we expected that you would have concerns about feasibility. You have signaled that for a while, and you should. It's a lot of money. But I wouldn't be standing here right now if I wasn't darn sure that when it's time and

we have our Confirmation Hearing on December 15th and we can all celebrate Christmas together, and I will show you every dollar's in the bank. There's going to be no games. There is nothing like that. But we don't have to do that at Disclosure Statement time. We need to do that at Plan Confirmation time. At disclosure if your Honor has concerns, we have no problem. Judge Kinsella asked me to add risk factors. I did it in a second. Judge Warren asked the same thing. Go ahead, I'm sorry.

**THE COURT:** Well the difference, though, is that we have this Prepackaged Plans. I don't want any Parish filing a Prepackaged Plan unless they know that they're going to get out of it.

**MR. DONATO:** Fine. Absolutely. We can set something up. You want me to demonstrate that we have the money two weeks before the filing, three weeks before the filing, I can do that. I see what you're saying and there's no question. Mr. Heuer's been very clear and the Case Management Order, as you know, has an escape hatch that if those Parishes aren't out in a certain amount of time, the case is dismissed. So we're fully aware of that. We want no filings unless this is a done deal.

And for me to say that, I got to show you they got the money, okay. But I don't have to show you I have the money today. I have to show you as we get closer to Plan

Confirmation. And I'm going to. We've already done it in two and we're going to do it in our other two as well, and that's the way it's going. But that's why I wanted it to address that.

Risk factor, fine. Strangers putting stuff in which I think was completely inappropriate. They wanted to get this before you so they say, what the heck, we'll just file it and maybe we'll get some good publicity for SOB while we do it because people can just go to the Stretto document and read their stuff. They should have put it on their website. It was inappropriate for them to file what they filed last night.

I'm going to step down but I raised because of the Megan-Racine but also the feasibility piece. We know what needs to be done. I wouldn't be here after 6 and a half years living with Mr. Scharf on a daily basis if I didn't think we got a deal and we're going to get it done. We need to keep strangers out of the courtroom, set a date, let's go. We'll get it done.

**THE COURT:** We have a date set.

**MR. DONATO:** Good.

**THE COURT:** For August.

**MR. DONATO:** Perfect. And as you observed, we're filing additional information. We purposely didn't put the Parish information in until you had a chance to see the categories

that we propose in the Disclosure Statement. Right. If we put all this information in there and you weren't comfortable with it, it's a totally different situation. We know what we need to do. Those are all being populated and those will all be filed before the Disclosure Statement hearing.

**THE COURT:** All right.

**MR. DONATO:** Thank you.

**THE COURT:** Go ahead.

**MR. SHARKEY:** Yes, your Honor, I think Mr. Donato covered it.

Just one final point I wanted to add, your Honor. I know you asked about whether or not they should be permitted to make these arguments or we should hear them. I would just add, your Honor, I know we mentioned this in our papers is that the (indiscernible) acknowledges -- I know we quoted some deposition testimony -- that they do have recourse available. To the extent that they allege that the Diocese supposedly violated these Canonical decrees, they do have recourse available to them through the church which they have pursued. So there's nothing to add by them trying to raise the same issue with the secular court, getting them to do something as well.

So, again, we just submit these are excessively entangling the Court with religious matters, should not be heard and, therefore, the motion should be denied, your

Honor.

**THE COURT:** Well, clearly I have no -- I'm not an appellate court through any Canon Law decision. That's beyond my jurisdiction. Let alone do what Rome wants to do. But if there is a dispute that has to be put into the risk factors --

**MR. SHARKEY:** I believe it will be addressed, your Honor.

**THE COURT:** All right. Let me hear from Parish counsel.

**MR. HEUER:** Good afternoon, your Honor.

First, I'd like to very directly and very clearly respond to a couple questions your Honor had and then I had some other things I'd like to speak about on behalf of Parishes.

First with respect to feasibility. Mr. Donato stole some of my thunder because before we get to Confirmation, I am going to be at this podium and I will either be able to tell your Honor we have the money in an account ready to go or I will not. I am going to make the commitment I will have the money in an account ready to go. This isn't going to be a situation where I say, Judge, please confirm the Plan and in the next month or two or three, I'll get the money. I'm going to be here at Confirmation with the money in an account and I'll be able to show it to you. So we know that when it's time for feasibility, we will prove feasibility for your

Honor. It won't be a question. It won't be an analysis. It will be: Here's the money in a bank account, your Honor.

With respect to Disclosure, we've talked today about adding some clarifications and risk factors to the Plan. I'm happy to do that. I'm not doing that because of the objections raised by movant. I'm not doing it because they've raised valid points. I'm doing it because your Honor has concern and you want us to be clear. So in response to your Honor's concerns, I'll make sure we get disclosures in there talking about this, okay. With respect to Amicus status, I have to --

**THE COURT:** Well let me focus right there.

There are risk factors, and how do I even know that those risk factors exist if nobody tells me about these -- that the Vatican has issued rulings? I'm not going to rely on what the newspapers say. I have no personal knowledge what the Vatican is doing.

Shouldn't I give someone an opportunity to go and present it and say you better disclose it?

**MR. HEUER:** So, your Honor, my read on that is the case law says you put things like Canon Law rulings and decisions inside a hierarchal church's structure, put them in a box and you don't take them out. They're not for consideration.

And what they are asking of your Honor isn't simply saying, look, here it is, here's what it says. It's not that

easy. There's an interpretation to be had of what's on the paper.

**THE COURT:** That's why we list risk factors on matters that I'm not deciding.

**MR. HEUER:** I understand. But even for them to -- I don't mind saying there's a risk that under -- there are Canon Law appeals and that might cause problems to one degree or another with funding. I'm also committing that I'll have the money here that day and I'll be able to show you.

But disclosing it as a risk factor, that's okay but they're not needed for that. We've said we'll do it, we'll put in a discussion of risk factors. But those decisions themselves they got to stay in a box. They can't come out of the box. That's what the law says. The Ecclesiastical Abstention Doctrine, that's what it says. Because the problem with it is once you open the box, once somebody puts it in front of you, all right, let me read it. Well it talks about these different pieces of Canon Law. Let me interpret that. What does it mean? Well, wait a minute there are things in Canon Law that aren't talked about here, why not? Well wait a minute what was argued in the briefs that were submitted?

It's the kind of thing where once you open the box, it's the equivalent of peeling back a layer of the onion and then there's another and then there's another. It's wholly

inappropriate and the law sets a very clear safeguard. It protects the parties. It protects the Court and it protects the church. So the rulings themselves, they're not relevant. They can't be put in front of the Court. They can't be reviewed or considered by the Court and putting them on the docket last night, in my view, inappropriate.

But the reality of the matter is if your Honor is concerned that whatever that process that's in the box, whatever that process might be that poses a risk to this Plan, I'm happy to say -- it's a fair question, it's a fair comment, and we'll address it.

**THE COURT:** Let's suppose that you're right. Assume that you're right. I'm not saying that you are. I'm going to take this under advisement but let's say that you're absolutely right on all these things that what they want to present to me is of no relevance, that their disputes, their issues should be put in a box and sealed, that even if I looked at it, it makes no difference, let's assume that you're right on everything. But we're going to leave the Court -- the Court is going to close up the proceeding with some people saying he wouldn't even listen to me. And is that right?

**MR. HEUER:** That's why we have guidance from the Supreme Court and every other court on this that says, no, there's an Abstention Doctrine, we stay out of it. And it isn't just

stay out of ruling on it, it's the Court to stay out of interpretation of. That's entirely why.

**THE COURT:** I can rule on that and I can say I'm not interpreting this at all but I'll let you speak. Shouldn't I at least accord -- I mean, there's a lot of people throughout that have interest in this case. Shouldn't I at least let them say what they want to say and rule against them? I don't mind ruling against them but shouldn't I at least give them a chance to speak?

**MR. HEUER:** So let's talk about what movant has asked to talk about. Movant says that they're here to put the Canon Law rulings in front of the Court on the record in the public docket. That's what they want to talk about. And they say we don't want to object to the Plan but Mr. Donato is completely correct in saying that the deposition testimony made very clear: While I don't want to object to the Plan but the way that Plan is being funded is not okay, Judge. The way that Plan is being funded is not okay. Parishes should do it differently. Maybe it should be over time. Maybe it should be a little bits. Maybe it should be smaller increments. Maybe it should be a loan, maybe it should be legislation, maybe somebody else should pay it. They're here to tank that settlement.

And then even so today saying we just want to put these rulings in front of the Court because we think your Honor

should look at this under 1129(a)(3). They're here for a purpose. It's not just, Judge, look, there's a sign on the wall, please look at it. It's look at it, read it, review it. They put 15 different points of Canon Law in their brief -- 15. I went through them in my document, outlined each and every one. They don't just ask your Honor to look at Canon Law sections. They ask your Honor to review Canon Law policy and procedure. It's in their brief. How can that be? Within the bounds of what's acceptable under the Ecclesiastical Abstention Doctrine, it simply cannot be. Otherwise that doctrine would not exist. The doctrine is here to put those things in a box. We can't look at them. They can't be opened.

Relevance isn't even the question. The question -- relevance would only be, okay, I opened the box and I look at them, what are they? Do they matter? The Ecclesiastical Abstention Doctrine says you leave them in the box they don't come out because the church has a structure. It has a appeal process. They tout their success in the appeal process. Yet they want to put these rulings in front of your Honor for one purpose and that is to get in the way of the Plan.

Now I have to say we had our deposition last week. I met movant's witness last week. I will tell you it was a very good conversation. Very good witness. Witness is a, in my view, kind person who strongly believes in what that

organization is doing and is deeply devoted to the church. But that doesn't mean that they're advocating on behalf of Parishes or even all parishioners. We spent time even after the deposition talking for a while. And it was a very nice conversation. That was a week ago. I said if there's anything you need me as counsel of the Parishes to look at, send it to me. If you need to talk to me, spoke with counsel, call me. No email, no phone call, no document, nothing to look at. Didn't ask me for any information or documents, nothing.

And I'll tell you although it was a good conversation, I was, I was very disappointed early on in the conversation when after the witness recognized and conceded that Mr. Elsaesser and I were retained to represent all Parishes and that there was no dispute about that, I was challenged as to whether I was meeting my obligations to the Court and to my client -- clients by not raising these Canon Law issues that are in the box with the Court. Now I can't argue those issues. I can't deal with those issues. The law says I can't. But that's, that's okay.

I'm going to talk a little bit about the conversations I had with my clients. I'm going to be at a high level because I want to be protective of my discussions with my clients but I can tell your Honor clearly that I spoke about the Canon Law rulings with my clients, pastors and Trustees in the

meetings I had with them. I gave them my view on what was being said about those rulings, the way they were being characterized by movants. I told my clients I disagreed. And I did not get a single request from a single Trustee or pastor to do anything differently. No one reached out to me and said: I think you're wrong, I need you to do this. Bill, I think you're wrong I want you to go say this. Bill, you're wrong, please argue this to the judge.

Not one, your Honor. Not once. And then when you think about what happened at that deposition, it became incredibly clear that the real strength, if any of this organization, is for them to be dealing with Canon Law issues. Because when we started talking about what's happening here, when we started talking about the Plan, it became very clear that the witness did not understand the joint Plan. And, your Honor, it's not like this is a joint Plan in a small case that hits the docket and nobody sees it. This is a joint Plan that was hit after years and years. There was discussion about it. There's been media reporting about it, press, movant itself, the organization has been in the press talking about the joint Plan.

I first met your Honor at a status conference. We talked about the joint Plan on the record. I came back. We drafted a Case Management Order with very specific procedures talking about the unique nature of how we're going to confirm

this Plan. I put a further statement in support of that order, laid it all out in very clear detail trying to be responsive to your Honor's point that we need to make things clear so that lay people, everyone can understand what this Plan was all about, how it works, worked very hard to try to make that point. And my hope is that your Honor agrees that we were successful in that. The way that we put our statement in support of the case management together and in front of the Court, I think was very helpful to everyone.

Despite all of that, when it came time for questions at the deposition about, well, don't Parishes get a release and discharge, the witness wasn't aware of it. We're here arguing about the terms of this joint Plan and disclosures. The witness for the organization that wants to inject itself into these proceedings and ask your Honor to look at things that should stay in the box didn't know that the Plan gives Parishes a discharge.

And the testimony is quoted at Page 10 of my brief. This is the very heart of the Plan and the testimony said exactly this.

Question: "There are claims against the Diocese saying the Diocese is liable for abuse."

Answer: "Okay."

Question: "There are separate claims against Parishes. So I'm trying to understand whether if the amount of the

assessment" -- I'm going to get back to the word assessment later -- "but if the amount of the assessment included resolution of all the claims against the Parishes, would that change your mind?"

The answer: "I understand what you're asking. It temper it's a bit. But I would have to contemplate that a bit. But it does temper it."

It was an honest answer. It was an honest answer. The problem was getting to that point. We were in the middle of getting ready to deal with this motion and the movant doesn't even know that the Plan had a (indiscernible) discharge for Parishes? That's, that's the entity that's coming to you and saying: Your Honor, open the box.

The Supreme Court in (indiscernible) says, no, that box stays closed but, Judge, please open the box. We don't know that there's a release in the Plan?

And I took it a step further, right. I said: Would it change your mind, right. And the answer was, well, it tempers it a bit. Okay. The reality of the matter was the answer was, yes, it would change my mind, I think. I think everyone in the room understood that. I think that's a fair reading of the transcript. I understand the witness not wanting to say that. It would be pretty fatal but that was the testimony, your Honor. They didn't even know that we were talking about a discharge for Parishes.

And that illustrates the real issue here for me. Without taking time to understand what the Plan says or what we were trying to do, they want to try to shut down funding of that Plan. Now it's easy to gripe about things. It's easy to gripe about the need to fund the Plan. Nobody wants to pay $120 million for anything, I get it. I don't want the Parishes to have to pay the $120 million. But that's the deal and that deal was struck with competent, capable, good advocates on both sides after years and years of work. That is the deal and we're working to fund it.

Trustees don't just get a chance to gripe. It's easy to gripe. Trustees have to make the decisions. Our Trustees met. They talked about this. I discussed the Canon Law rulings with them. No one asked me to follow up. All of my Trustees had an understanding of what the exposures were. The witness did not. All of my Trustees have an understanding of what the costs to defend were. The witness did not. My Trustees had plenty of questions. And I told your Honor in the past I gave out my cell phone number to everyone. If back in the day when you had to pay for cell phone coverage by the minutes, the way it used to be, my cell phone bill would be through the roof because I speak with Trustees about these things all the time.

**THE COURT:** You're talking about Parish Trustees?

**MR. HEUER:** Correct, correct. I spoke with one

yesterday -- Tuesday afternoon. I spent over an hour with one this past weekend on the phone. I get emails from them. I was emailing with someone this morning in the airport. I have an active, engaged group of Trustees, your Honor. They're doing the hard work. They're the ones that have to make the decisions. They shouldn't be secondguessed. It's not appropriate.

**THE COURT:** Let me ask in that regard. The responding papers state the law of New York that each Parish has a Board of Directors that consist of five people: Two lay Trustees, the pastor, the Bishop, and the Bishop's assistant.

I directed and this was followed -- at least I'm told it was followed -- when we set the date for the Disclosure Hearing -- and I'm expecting a similar process when we set the Confirmation hearing -- I said I want notice to go out in all the church bulletins so anybody who has an interest in this thing can come and participate if they so wish. We did that at the -- in connection with the statements that were made. The vast majority were by victims but there were some non-victims who also chose to appear.

And that was opposed, that decision was opposed by the Committee and by the debtor. They said, oh, we only want victims coming here. And I said, no, I'm going to hear anybody. Let's suppose we just have a random parishioner -- not a Trustee, clearly not the pastor, clearly not the Bishop

and clearly not the Bishop's assistant -- who wants to come in and make an argument. Should I say get out of here or should I listen to them?

**MR. HEUER:** So I'm going to draw -- I'll answer your Honor's question and then I'm going to draw a very big distinction between today and the maybe.

So, your Honor, if an individual parishioner comes and wants to talk to you, I understand that your Honor wants to hear them.

**THE COURT:** As long as it's in court with everybody available to listen.

**MR. HEUER:** I understand that. I'm here as counsel of the Parishes. How could I say otherwise? I understand that. But that's very different than an organization that has three people making decisions standing up and telling your Honor we represent thousands. At first their papers said they represent all Parishes. I said that's -- I scratched my head to that because I represent all Parishes and they represent? What does that even mean for someone who's not an attorney or an adviser? I don't get what it means for them to represent anyone.

So we drilled down on it and instead of being everyone, I got a list of 34 Parishes. I said quite honestly 34 Parishes, how can that be? My Trustees haven't said anything to me about this. Not a single pastor has said anything to

me about this. How can they have 34 Parishes that have approved them? Like what's -- so we explored that. It's not Parishes that they represent. They say Parishes. That adds credibility, adds gravitas to the situation. What they mean is someone at a Parish said, hey, please, you know, voice your concerns for us, please deal with Canon Law for us. They talk about 4,000 signatures on papers. They put a form letter in front of people and say, hey, you want a Canon Law appeal, sign it, boom, boom, boom. That's not members, that's not membership. That's, hey, here's a form letter, sign it. I drop a complaint card in a restaurant on my way out the door, it's effectively the same thing.

So the question of should an individual parishioner be able to come and speak to your Honor, I understand that as counsel of the Parishes, that's okay. I get it. That isn't a parishioner coming in and saying I represent the views of thousands. I have three people making decisions but I represent the view of all parish -- that's not acceptable. They're trying to grab the mantel of authority and gravitas. We have thousands behind us. It's not accurate. The deposition transcript makes it clear that is not accurate.

So there's a very big distinction between one parishioner coming in to voice their views and an organization saying they don't have to worry about it, I got it. This is very different.

**THE COURT:** If we have parties coming here, even the members of this group, and they clearly are wrong on the laws, they may be wrong on the facts, maybe, I'm not ruling one way or the other. But should I at least give them the opportunity to speak?

**MR. HEUER:** So I think today's a very good example of that. Movant came in with motion papers, asked your Honor to be heard, told you what they wanted to be heard about. But what they asked your Honor to talk about is something that's in the box. Supreme Court right on down: That stays in the box. You never even get to relevance. That stuff stays in the box.

And if it weren't clear, even just if they were asking to look at something, look at their papers and, please, in my response I talk about, my opposition papers they are asking for a whole lot more than just look at it. What they want is, Judge, look at it and then you look at it and you're left scratching your head a little bit so you have to drill down on this Canon Law and that Canon Law. There's 15 different points they outlined in their brief, your Honor. 15. That's not just look at it, your Honor. That's not look at the piece of paper and you can understand whether it's red light, green light, go. That's please analyze this.

**THE COURT:** But aren't you assuming that I know what these people are going to file or submit as Amicus Curiae?

**MR. HEUER:** So I think we already know what -- if the deposition testimony is accurate and the representations made in their papers are accurate, we know what they're going to do.

**THE COURT:** Well you might know but I don't know.

**MR. HEUER:** Well right now what they've done is they've asked your Honor the opportunity to come in and put Canon Law decisions in front of the Court. They can't do that. That's in the box. Then today they've said, well, we want to have your Honor look at those things on an 1129(a)(3) analysis. Well if it's supposed to be in the box, how can it be that it's relevant on an 1129(a)(3) analysis?

Now your Honor asked legitimate, honest, good questions about Disclosure. We will address them because they're the Court's concerns. But they cannot ask you to review and look at Canon Law rulings. And, your Honor, like I said, I've looked at them. I disagree with the way that they've been characterized. And I know there's a whole separate process. There are other things that can be done. It's not the end of the road but that requires a gigantic, enormous analysis of Canon Law and that's the church's hierarchal structure and they will deal with it within it. Movant represents that they've been very successful in helping people do those appeals and they talk about all the numbers in their briefs and acknowledge there's more relief available, yet they want

your Honor to get in the middle of it. I submit that's not appropriate.

**THE COURT:** All right.

**MR. HEUER:** I could go on, your Honor. I think I've made my point. I'm happy to answer and address any questions that your Honor might have.

**THE COURT:** All right. No, you've answered.

**MR. HEUER:** Thank you.

**THE COURT:** Anyone else want to speak.

**MR. BAUMEISTER:** Your Honor, if I may just briefly.

**THE COURT:** Yes. Please at the podium.

**MR. BAUMEISTER:** Your Honor made an observation that I think is very important and that is if we had not made this motion, if we had not brought these to your attention, would your Honor ever know that there was any risk associated with the rulings that were made by the Dicastery. The rulings that were made and the decrees that were filed? And it doesn't involve interpreting those. They're facts. The fact of the matter is these decisions were made. It creates a risk. Without us appearing, would that ever come to your attention? Hypothetically, maybe it would have, maybe it wouldn't.

The other thing that came up today is the Cabrini Fund, all right. We made -- we suggested to the Court that this fund could be available if there was legislation and we

wondered whether or not the Diocese had taken any steps to try to, you know, get some benefit from that fund or support the legislation. And we heard, I think from Mr. Donato, that, yeah, we did this, this and this. Would that have made it into the Disclosure Statement? That has nothing to do with Canon Law. That has to do with the duty of the debtor to try to fund the Plan. And all we're talking about, despite what the objectants are saying, all we're talking about is giving information that goes into the Disclosure Statement regarding the 1129(a)(3) issue. That's a Confirmation issue.

However, the information that goes into the Disclosure Statement needs to be in there so that if someone does want to raise that issue -- and, as I said, I want to make perfectly clear: We had never intended to object to the Plan. It was about putting this information in front of the Court and hopefully getting some of it into the Plan. There was never any suggestion that copies of these decrees would be a part of the Disclosure Statement but there should be a discussion. There should be a discussion that they exist. And that's all we're asking for. We wanted to bring it will to the Court's attention.

Regarding the initial motion, yeah, it was, it was brought. First of all, the Court has inherent authority to limit the intervention, number one, okay. What I want to

represent to the Court is after I filed this motion, both Mr. Scharf and Mr. Donato were a little bit surprised and, you know, upset -- and I understand that because they've been working for years trying to get something done here and here I come in and it's like, oh, God, what are these people. All right. I told them all we want to do is act as a Friend of the Court. And I told them that from the get-go, the very first time I talked to each of them. All we want to do is get information in front of the Court.

If you look at the deposition transcript, they're pointing to certain answers that were made by Miss Pruski, all right. Her whole, I guess, goal was I guess to let them know that there were these rulings, all right. All right. She commented on the Plan. She gave a statement to the Buffalo news. And that's part of the, that's part of the transcript, as well, where she said the group has no intention of scuttling the settlement or delaying the bankruptcy case. That has always been the point. Only wants to give Bucki the Vatican decision documents regarding the Parish contributions to do as you will.

And what I'm suggesting is that there should be a discussion in the Disclosure Statement about these items. Just give people the information. If the Court determines that it's not relevant to the issues, the civil law issues in the bankruptcy case, that's a decision for the Court. But we

should, we should be heard. And I believe a couple of the -- during the listening sessions I think there were a couple parishioners who did mention these, these items, and I think Mrs. Pruski was one of them in that Court, as I heard it. I wasn't here. Invited her to have the organization bring certain things to the attention of Court and that's what we're doing. The Court has inherent authority to limit our participation. I'm limiting it on the record today to trying to get some information in the Disclosure Statement, and that's last you'll hear of us.

**THE COURT:** All right. Anyone else?

**MR. SCHARF:** Your Honor, if the sole purpose is to get information into the Disclosure Statement about the risk associated with Dicastery appeals, we've already agreed to put that in and I think we've resolved the motion.

**MR. DONATO:** Agreed. Agreed. We'll add a risk factor.

Just so the Court is aware, this is a slippery slope. You already acknowledged you don't have jurisdiction. The Supreme Court's clear about it. They're misstating what the Dicastery actually ruled. But we can't get into it now.

But we'll put it in the Disclosure Statement risk factor one, six, whatever it is. Like I said, Judge Kinsella, Judge Warren asked us to air certain risk factors depending on the case. We'll add one.

There is a dispute because the statements that are being

made by this rogue group are not accurate, okay. The statements in their pleadings are inaccurate but we will acknowledge that we have, we have a dispute because they're misstating what happened. We'll put it as a risk factor. We're not putting all of the stuff that they tried to sneak into the record last night at 11:00. That's grossly inappropriate. We'll add a risk factor.

Your Honor, I've been before you many times. You can be very clear about the language that you want in the risk factor and we can absolutely get it in the Disclosure Statement. We have no issues with that. Mr. Scharf just confirmed it as well.

Big difference between risk factor and then having these documents flood the court, the proceedings when you have no ability to even decipher them. And, again, there's no, no precedence is about the U.S. Supreme Court's directive. So risk factors are fine. It sounds to me like we've got a deal. I don't even know if you have to write a decision, your Honor.

**THE COURT:** Well, I mean, do we really have a dispute here? I mean, I hear Mr. Baumeister say that he is looking for -- that he's identified information, his clients want to present that information and have that incorporated into the Disclosure Statement at least by reference as a risk factor. And I hear Mr. Scharf saying if that's what they want, he's

good for it. I hear Mr. Donato saying the same thing. I'm not sure about the Parishes. But do we really have a dispute here?

**MR. HEUER:** So it depends on the outcome. If the outcome is motion denied because there's no need for further engagement here, that's fine. If the action is, well, we're going to put it in so motion is granted and they can continue to come and talk about all these different things in a way that's not accurate, that's not a deal. But if the answer is motion's in front of the Court, we're going to put disclosures in the Disclosure Statement identifying this as a risk factor, yeah, and the motion's otherwise denied, that's fine by me.

And, your Honor, thank goodness for sticky notes because as we got into our discussion I forgot to say one thing that I think is important for the Court to know.

I can tell your Honor that as of today I have the overwhelming majority of the funding already set aside. That's how I can say to your Honor with such degree of confidence that when we get here to Confirmation, I'm going to be good to go on the dollar and cents. I already have it. Not all of it. Very close.

Thank you, your Honor.

**THE COURT:** Anyone else?

Sure, please.

**MR. CALOCI (PHONETIC):** Good afternoon, your Honor.

**THE COURT:** Good afternoon.

**MR. CALOCI (PHONETIC):** I don't know if you remember me but we knew each other a while in your prior professional life. I'm Darryl Caloci (phonetic) and I am here as a parishioner, and you bet I have a pecuniary interest in this. I've paid tens of thousands of dollars in donations over the course of my life.

And the issue here, Judge -- and this is vitally important to me. I understand that the Diocese is going to -- there will come a day when they will be able to account for every dollar that's going to fund this settlement. That's only part of the issue. The other part, vitally important part, of the issue is where did the money come from? Was the money procured wrongfully?

Before your Honor as part of the submission that Save our Buffalo Churches submitted, there are decrees from the Vatican, from the Dicastery that say crystal clear, you don't have to interpret anything, just the clear words they say. The Diocese may not assess the churches to fund the settlement, period. It's one sentence. It's crystal clear.

And so my point is how could your Honor -- how could any bankruptcy court approve a settlement with funds that were procured wrongfully? In this case in violation of Vatican law? And that is relevant to these proceedings and there's

nothing in the abstention clause or anywhere else that precludes your Honor from drilling down on the source of the funds.

Thank you, your Honor.

**THE COURT:** All right. Thank you.

Anyone else?

**MR. SCHARF:** Your Honor, we just want to reserve any discussion or response to that, too, when it's appropriate. I don't want to respond on the fly.

**THE COURT:** All right.

Anyone else?

**MR. ELSAESSER:** Your Honor.

**THE COURT:** Yes.

**MR. ELSAESSER:** Your Honor, I won't repeat or amplify or add to anything that Mr. Heuer has said but I feel compelled to just raise a couple of issues that have been brought up during this hearing that I believe completely mischaracterized the work that Mr. Lyster and Mr. Heuer and I and the other bankruptcy professionals have worked on in this case for now well over -- well over six years. And I say this coming to you as someone who's, including Buffalo, represented well over 1240 Parishes in the last 23 years, as well as 8 separate Diocese and both cases with the ultimate goal of getting the abuse crisis behind -- not only financially -- but get it behind the church and allow the

mission to go forward. And I carry with me the benefit of having seeing this work over and over again.

But I was very disheartened to hear the moving -- the attorney for the SOBC indicate that his words were to the effect that in the first five years we didn't do anything to try to creatively find money to settle the case without Parishes and schools and the Diocese itself having to fund it out of their own pocket. That is just -- nothing could be further from the truth.

First of all, with regard to Mother Cabrini, I was brought in to talk to the Parishes of Buffalo along with Mr. Lyster at the, at the very outset of this case. We had conference calls with over 600 participants from the Parishes. And we're all forgetting something: That we walked into the most dysfunctional Diocese in the United States.

There were over 1100 news articles critical of the actions of the Ordinary that was the Bishop of this Diocese that were, that were not just Buffalo centric. They were all over the country about it. It was on *60 Minutes*. There was something that I have never seen representing again well over 1200 Parishes. I have never seen before. Which is that Parishes were directly disobeying the Ordinaries and withholding assessments, withholding assessments, regular assessments -- and not for a few hundreds or a few thousand

dollars, but well over millions of dollars were being withheld.

Now if someone in the courtroom can tell me where that has ever happened before in an American Diocese, that would be news to me but certainly it had never happened in any of the other Diocese that have had to experience the difficulty of dealing with this issue.

Now we have separately incorporated Parishes here and I've been on both sides of this. I've represented corporation souls where Parishes have no official quote, legal, unquote, separate standing and can't be sued and I've been in the cooperate Parishes such as New York and Minnesota which is very similar to New York. And in, you know, corporate prayer world as your Honor knows because you lifted the Parish stay, you felt you were compelled to do so and you did. And we had to -- we went out and we made sure that every single Parish that had been sued was represented and had an answer filed and was ready to go, tendered to be, tendered the insurance, if there was any. In many cases there were not or they were on Parish policies that were lost and there was perhaps no coverage available. All of those are still of record and then the stay was lifted in 17 cases where Parishes were all codefendants, and, again, all of our Parish clients had to be represented.

Now, we have to clear those claims against the Parishes.

We have to get rid of them. That's the whole purpose. That's the only thing I do with my life right now is trying to get Parishes completely in the clear because I know what's going to happen when we do that, and when we do that, the Parishes are free to go forward with their mission. In every single case there has been not just talk about healing, there's been actual healing. There's been no more every other night articles in the Buffalo news about a Parish this or a Parish that or a priest this or a priest that. The pastors no longer have to be out in public and be immediately identified by people as, oh, he's one of those, those folks. It changes the entire dynamic.

But in the case of Parishes, Parishes are being sued. There's no, there's no easy summary judgment to get a Parish out of these claims. Anyone who thinks so, I can show them the opinions to the contrary already that we've received in other cases. It's not, this is, this is -- this is not something where a bullying Ordinary is assessing Parishes, saying you pay this or else. That's nonsensical.

What this is is that the Parishes, yes, are they contributing to a settlement, yes, are they buying their release, yes, they are, they are paying money in order to not only -- not only assist the Diocese in reorganizing and not only ending what will -- what are well over 700 plus lawsuits, and eliminating that risk and not only compensating

survivors but they are paying Parish money to get, get released. And for the arguments that, well, our Parish only had one claim and this other Parish had more claims, I just, you know, that gets back into not so much Canon Law but the (indiscernible) creed. And I've always believed that the Parishes, it's all for one and one for all and that is proved to work time and time and time again.

And so when I hear that we didn't do anything for the first five years of this case, where I spent a good portion of my time once COVID travel restrictions were lifted in Buffalo as well as in Syracuse, as well as in Albany, I, I, I just -- the people who think that, who think that we weren't trying to bang on the door of Mother Cabrini, we were. Everyone wanted to bang on the door of Mother Cabrini.

And I don't fault Save our Buffalo Churches Parishes at all from for taking another, for taking another try. I admire them for trying to do that but we've already been there. It's already been turned down. Nobody ignored it. And the idea that Mr. Donato or any of the rest of us kind of ignored the possibility that Mother Cabrini possibility of funding when there never was a possibility of funding is frivolous, it just is. It's not the real deal.

And so I will assure you, along with the assurances that have already been made by Mr. Donato and by Mr. Heuer, that the Disclosures, the final version of the Disclosure

Statement that you see before you for you to, for you to approve, for your approval will contain the Disclosures as necessary in this.

But our current Ordinary stepped in to what he stepped into. And he's the one, he's the one that's got to deal with the controversies and the Dicastery decisions and so forth. That is totally within his Bailiwick. And unless somebody is going to assert that there's something untoward about what the Diocese is doing and putting this Plan together funding it or there is something wrong with the idea there is certainly nothing wrong with Parishes buying their own release, they could do that at state law any day of the week. So they're, they're buying that this, they are essentially purchasing that discharge under the prepackage agreement and there's nothing wrong with that. And, again, it's been proven to work.

So I'm asking the Court that we will address the issues that were raised in this motion. We'll address it in the Disclosure Statement. You'll ultimately be the arbiter of whether that's adequate Disclosure or not and the funding will be disclosed and the funding will be represented to you. We all have track records here of always being able to say that we have the money. We, in fact, have it. And we have and we will continue to do so.

But I ask that the Court not go down a side road here

when we'll deal with this in the Disclosure Statement, as has just been promised by Mr. Donato and Mr. Scharf and Mr. Heuer and myself, we'll get, we'll get that out. But I think it's, it's extremely disruptive to have some sort of Star Chamber inquiry as to how the Plan is funded. We'll disclose how it's funded. It's funded by the people who, the -- I have never met a Plan, a Parish Trustee who doesn't understand the need to not have one lawsuit that could completely wipe out a Parish's assets and that's -- and every case, by the way, that has gone to trial on these stay lift issues as well as trials out in the open indicate that we would be looking at substantial exposure. And so we're going from substantial exposure for a hundred -- well over a hundred Parishes to zero exposure. And that's a significant, significant accomplishment. If we're successful in convincing you on the Disclosure Statement and confirming the Plan, that is a significant accomplishment. It doesn't happen every day.

That's all I have, your Honor. Thank you.

**THE COURT:** All right. Thank you very much.

Anyone else? Mr. Boyd or Mr. Baumeister?

**MR. BOYD:** Steven Boyd representing two members of the Committee and a number of other creditors.

In furtherance of what Mr. Elsaesser said so eloquently just now, these are not assessments, these are settlements. And I would just like to inform the Court that on Friday

afternoon of last week my firm finished a trial in a single Child Victim's Act case. My client was abused from 1985 to 1990. One case. They have 700. An Erie County jury returned a verdict of $75 million: $25 million past pain and suffering, $25 million future pain and suffering, and $25 million punitive damages. In a jury trial in front of judge Deborah Chimes one week ago tomorrow.

Thank you, your Honor.

**THE COURT:** Was that a Diocesan case?

**MR. BOYD:** It was not a Diocesan case.

**THE COURT:** All right.

**MR. BAUMEISTER:** Just very briefly.

I think we've made a lot of progress today with the objective of my client and that is to get information into the Disclosure Statement. We've talked about the risk. Now it's like, okay, we'll get it in there. We talked about the Cabrini Fund. I'm sorry if I put it the wrong way but my query about what happened the first five years was more rhetorical. I don't think any of that is in the Disclosure Statement. What they did with the Cabrini Fund. But now it's going to be in the Disclosure Statement.

So I think we've made a lot of progress about getting the adequate information. I don't think that there's a deal to resolve this motion because we would like to continue to review and participate, if need be, on what the revisions are

to the Disclosure Statement so your Honor can certainly fashion an appropriate order to that effect.

**THE COURT:** All right.

**MR. SCHARF:** Your Honor, that motion was not about putting information into the Disclosure Statement. That's not what this motion stated. I just want to ask and state in open court because I know people are here.

If people want us to put information in a Disclosure Statement, call us and ask us to put information in a Disclosure Statement, don't file a motion for intervention and have people spend thousands of dollars of fees on the estate to get to the point where we finally understand what they want. That's not what this motion asked for. I think we've refined it to that. I think that was an issue that your Honor picked up on that. But if people want information in a Disclosure Statement, Disclosure is Disclosure and we can say somebody takes this position and we disagree.

**MR. BAUMEISTER:** I think, your Honor, we were never asked specifically what we wanted so I just want to --

**THE COURT:** Anyone else?

**MR. SCHARF:** -- I disagree with that characterization.

**THE COURT:** Well, I understand.

Anyone else?

(No response.)

**THE COURT:** All right. The main issue I'm going to take

under advisement but I am going to make a few comments first.

Counsel is well aware that we had victim statements. We had statements by non-victims. And one thing that -- many things stick in my memory about those presentations, many, many things. But among the many things is that many people felt that nobody ever listened to them. And I think that goes for whatever side you are on.

This Court will always listen. Even if there's no grounds, I'll listen to what you have to say. I may deny it. That's why this hearing is taking so long and all of our hearings take long because I open the floor up to listen to what people have to say and what concerns they have. I may limit them at times but not very often. I've already decided that every parishioner has standing to come before this Court at a Disclosure Hearing. That should be obvious from the fact that I directed that notice of the Disclosure Hearing be published in every church bulletin. And I'm not monitoring that but I have to believe that that was done. And there's no reason for me to give notice to people if they don't have an opportunity to come here and speak. And that would extend to every parishioner in the Diocese of Buffalo. That would extend to all the principals of this corporation. I will hear whatever they have to say.

I'm not going to let that delay the proceedings in this case. We are scheduled for an initial Disclosure Hearing on

Wednesday, August 26th. It's been a while but we've had hearings that have gone in this court to as late as 11:45 in the evening. If I need to, I will take all the time to listen to everybody and to get this matter advanced so we can come to a conclusion. But I will hear everybody who has a statement to make, including on the question, or starting with the question of Disclosure Statements.

We have a Disclosure Statement that was filed. I think it's general, everyone, both the debtor and the Committee have acknowledged that there will be revisions to that and I respect that. But we're going forward with a Disclosure Hearing on August 26th. We have to move this matter forward aggressively to get this case over with.

I'm not ascribing any blame to anybody. I heard Mr. Elsaesser said that there are things that have been dysfunctional. I'm not commenting one way or another on that. All I know is that we've been in this case for over six years and we have to go and get it resolved one way or another. And we're going to do that on August 26th. And unless somebody has really good reason, we're going forward on August 26th. That's when it's scheduled for and we're moving forward. I've already decided the question of standing. I want to move forward with this case and we're going to do so. So, I don't think the decision on this motion is going to affect that outcome one way or the other.

I'm pleased to hear that some of Mr. Baumeister's concerns are recognized now by both debtor's counsel and the Committee's counsel. So it may not be necessary to go and decide that question I'm going to take it under advisement. And I may very well decide that it's not ripe for me to decide until after I hear the initial arguments on the 26th of August. But we're going to move forward with this case. And I don't see the decision on this particular motion as preventing that or affecting it.

If appropriate, I may decide the issue that's before me today. But if I do so, I'll issue a written opinion on the question of standing and whether or not somebody can appear as a Friend of the Court which I think is an appropriate question of interest. But I may want to see what happens on the 26th to see what progress we're making at that time.

It's also very important, many of the problems in this case whether it be victims or non-victims have been a reluctance of communication. And so we have a group of people who have gone to the trouble, and I presume the expense, of organizing a corporation. And they're represented by counsel which makes conversation all the more easier. I think there really needs to be -- I think all of us would benefit from this conversation.

We want a Disclosure Statement that adequately identifies the risks of this case and that adequately shows

us the source of funding. Now right now I don't have that in front of me and I'm not saying that has to be present by August 26th. I think August 26th is an opportunity for the Court to discern what the issues are in this case and then we can take it from there. I really think, though, that the issues are going to depend on funding. I hate to say money talks but the question is where is the money coming from. When somebody has to pay, the payor sometimes is objecting to that and I don't know what the response is going to be of people who are impacted by the payment.

There's no question that there's serious damages in this case and there's no question that this is appropriately a matter that's resolved by settlement. And hopefully we can achieve that and we'll try our best on August 26th and everyone should anticipate that.

On the motion before me, I'm going to reserve decision on it. As I deliberate, I may decide that it may be appropriate for me to issue a written decision. But what I have already decided is that every parishioner, including those who are members of this corporation, are entitled to appear before Court. That's why I directed that notice of the Disclosure Hearing be given to them.

Any questions?

(No response.)

**THE COURT:** All right. With that, we stand in recess.

In Re: Diocese of Buffalo - BK 20-10322

(WHEREUPON, proceedings adjourned.)

\* \* \*

**CERTIFICATE OF TRANSCRIBER**

In accordance with 28, U.S.C., 753(b), I certify that this is a true and correct record of proceedings from the official audio recording of the proceedings held in the United States Bankruptcy Court for the Western District of New York before the Honorable Carl L. Bucki on July 23, 2026.

S/ Diane S. Martens

Diane S. Martens
Transcriber

# SAVE OUR BUFFALO CHURCH'S STATEMENT ON 7-23-26 BANKRUPTCY COURT HEARING



# Statement on 7-23-26
# Bankruptcy Court Hearing

**Save Our Buffalo Churches has submitted a request to file an *'amicus curiae'* brief to Judge Bucki's Bankruptcy Court,** and a hearing was held Thursday, July 23. Attorneys for the Creditors Committee, the Diocese and diocesan parishes were present (at least 6) to respond to our attorney's argument in conjunction with the filing request.

*This filing request was initiated on the counsel of our Canon Lawyer, and inspired by Judge Bucki's perennial openness to 'hearing all.'*

**SOBC would like to address the main objections to the filing request (in no particular order).**

**Objection 1: Canonical documents/law have no place in secular courts.**

**Response: SOBC believes it is important that the Dicastery decrees prohibiting parish assessments come before the court.**

We assert that, for this to be an honest process, there is nearly no more significant documentation relevant to the settlement than the Dicastery decrees and associated Canon Law.

~~documentation relevant to the settlement than the Dicastery decrees and associated Canon Law.~~

We acknowledge that the Establishment Clause of the First Amendment prohibits civil courts from interpretation and application of Canon Law. However, with around 70% of the settlement coming from parish assets, documents prohibiting the fund transfers are wholly relevant. These decrees pronounce the ruling of the Bishop's superiors in Rome, prohibiting the method and manner of asset collection, as well as transfer and storage of assets. In ecclesiastical reality, were the Bishop to have abided Church law, a substantial percentage of these funds are non-existent in the settlement. In other words, the monies are 'ill gotten,' and some have referred to them as 'stolen,' canonically speaking. SOBC believes it is critical that the Creditors Committee vote on the settlement fully informed of this reality.

Echoing Judge Bucki's question at the hearing, **how else, besides this *amicus curiae*, would the Dicastery decrees and salient Canon Law come before him?**

The Judge made it clear: Crucial to any considered settlement are the factors of funding **feasibility**, and **risk**. Some of the funding parishes' monies are protected by decree. Technically speaking, they are not assured. It would be unjust to withhold this kind of information from a voting committee.

In addition (per Philip Grey, JCL): If the Court allows the parish assets to be used, especially the parish assets that Rome has explicitly said must be returned to the parishes who appealed, **the Court would be interfering in the internal governance of the Church. That would violate the Establishment Clause.**



## Objection 2- Diocesan lawyers framed our amicus filing as an attempt to undo the settlement.*

**Response: SOBC supports just compensation for survivors, but believes the settlement should not rely on unlawfully-gotten parish funds to accomplish the sum. We seek greater transparency and compliance with Church law.**

**SOBC's action is consistent with our mission.** We object to the source of the settlement being any parish's lifeblood (i.e. 80%). SOBC objects to any part of the settlement funding being 'ill-gotten' according to Church authority. We advocate for parishes' right to exist if provably viable. We advocate for the right of viable parishes to not be cannibalized by the Diocese for the purpose of funding a settlement that is the Diocese's, and only the Diocese's, responsibility to fulfill. Survivors deserve timely, just recompense, but not at the

the Diocese for the purpose of funding a settlement that is the Diocese's, and only the Diocese's, responsibility to fulfill. Survivors deserve timely, just recompense, but not at the cost of a single viable parish, or the loss of 60% of the faithful due to unlawful extinctive mergers.

Additionally, we question the expense of these lawyers objecting to our filing request. If the documents are indisputably irrelevant why are they threatening? Why the need to caustically scrutinize a grassroots group of volunteers?



**Judge Bucki will rule on whether and in what form our amicus curiae will be admitted.** The next hearing (on the disclosure statement) is set for Aug. 26. Parishioners have been offered the opportunity there to be heard.

---

## SOBC urges the Diocese to find another way to fund the settlement that respects both civil law and Church law while protecting parish faith communities and their future.

The Bishop, following Canon Law, had the option of obtaining emergency funding from parishes after genuine consultation determining moderate, proportional, non-impoverishing amounts each parish could give out of its income (not up to 80% out of reserves). Again, had this approach been initiated 7 years ago, we could've foregone all of this, including $20M+ in attorneys' fees and CLI contracting. Regardless, because of the lightning speed with which we have recently seen the Diocese act to wrangle assessment funds and RPP authorizations from custom-populated parish boards, SOBC is confident this recalculation, negotiated in good faith, would not take long. However, SOBC also asserts that it is not our job, nor the job of any parish or layperson, to determine how the Diocese resolve its own mess. We just ask for innocent parties to not be penalized, especially to the point of extinction. At the very least, the parishes receiving a Dicastery decree ordering their money back from the fund to them, should receive their money back.

We live in an age of crowd funding. There has to be another way, outside of impoverishing and extinguishing viable parishes.

*\*By suggesting SOBC is attempting to undo the settlement, the DOB seems to be repeating a tactic used with the RTR counterproposals: pitting groups against one another while they advance their cause with impunity. With the counterproposals, parishes were induced to*

We live in an age of crowd funding. There has to be another way, outside of impoverishing and extinguishing viable parishes.

*By suggesting SOBC is attempting to undo the settlement, the DOB seems to be repeating a tactic used with the RTR counterproposals: pitting groups against one another while they advance their cause with impunity. With the counterproposals, parishes were induced to argue which family parish should close. Of course this resulted in a 'Hunger Games' scenario, pitting parishioners against one another. Here, the DOB's assertion pits SOBC against survivors, creating the impression our intent is so blow up the settlement, depriving them of due recompense. This toxic assertion is patently false. We recognize and support the rights of survivors to just compensation.* **To that end, we grieve the reality that, when all is said and done, it is the lawyers who will likely receive the majority of the settlement funds.** *That is the true deprivation.*

## Remember these important facts:

Essential assets cannot be touched in a Ch. 11. It was the job of the Diocese to classify essential vs. non-essential up front. By assessing parishes in recourse at 80%- in anticipation of a settlement-funding extinctive merger- it seems these parishes were identified upfront as non-essential. (You can't do that.) The Dicastery, by thorough investigation, has found many of these parishes to be perfectly viable- in other words, 'essential.' It would seem that there are essential assets being used in the Ch. 11, which has solely to do with civil law, and that's a problem.

Not all parishes have CVA claims. That distinction has been very muddied as of late. The key question of *which* parishes have claims has been obscured through a conspicuous lack of publicly posted documentation. This information, appropriately redacted, should be readily available to the public. The DOB is acting as though the Ch. 11 global settlement before, and now the RPP, is rescuing all parishes from inevitable, impoverishing CVA litigation. What they're not saying is that not all parishes have CVA claims, and that any parish finding itself with an impoverishing level of litigation could file Ch. 11 at that point- a plan the DOB only acknowledges if it serves the purpose of assisting their diocese-decapitating reorganization plan.

Please remember- we're now looking at RPP because the Diocese determined 2 years into Purdue Pharma that a global settlement isn't likely to work. The RPP is not a sure thing either. SOBC's attempt to inject honesty into the process will have nothing to do with the undoing of this settlement, should it come to that. Don't let the Diocesan narrative distract you away from their sole responsibility in the success or failure of this ever-tenuous plan.