**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

---

In re:

THE DIOCESE OF BUFFALO, N.Y., — Case No. 20-10322

Debtor. — Chapter 11 Case

---

# DISCLOSURE STATEMENT IN SUPPORT OF FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE DIOCESE OF BUFFALO, N.Y. AND ADDITIONAL DEBTORS

**DATED: AUGUST 21, 2026**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF NEW YORK FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF REORGANIZATION DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.**


**BOND, SCHOENECK & KING, PLLC**
Stephen A. Donato, Esq.
Charles J. Sullivan, Esq.
Grayson T. Walter, Esq.
Sara C. Temes, Esq.
Office and Post Office Address:
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: (315) 218-8000
Email: donatos@bsk.com
sullivc@bsk.com
walterg@bsk.com
temess@bsk.com

*Counsel to The Diocese of Buffalo, N.Y.*

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[1]

THE DIOCESE OF BUFFALO, N.Y., THE DEBTOR AND DEBTOR IN POSSESSION IN THE ABOVE-CAPTIONED CHAPTER 11 CASE (THE "DIOCESE"), THE ADDITIONAL DEBTORS (AS DEFINED IN THE PLAN), AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (TOGETHER WITH THE DIOCESE AND THE ADDITIONAL DEBTORS, THE "PLAN PROPONENTS") JOINTLY SEEK CONFIRMATION OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE DIOCESE OF BUFFALO, N.Y. AND THE ADDITIONAL DEBTORS (THE "PLAN"). A COPY OF THE PLAN IS ATTACHED AS **EXHIBIT A**.

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT"), THE PLAN, THE PLAN SUPPLEMENT, THE ACCOMPANYING BALLOTS, AND RELATED MATERIALS ARE BEING FURNISHED BY THE PLAN PROPONENTS, PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE IN CONNECTION WITH THE SOLICITATION BY THE PLAN PROPONENTS OF VOTES TO ACCEPT THE PLAN AS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THE PLAN PROVIDES FOR THE REORGANIZATION OF THE FINANCIAL AFFAIRS OF THE DIOCESE AND THE ADDITIONAL DEBTORS AND FOR DISTRIBUTIONS TO CREDITORS HOLDING ALLOWED CLAIMS FROM THE ASSETS OF THE DIOCESE AND ADDITIONAL DEBTORS, THE ASSETS OF CONTRIBUTING NON-DEBTOR ENTITIES, THE CONTRIBUTIONS OF SETTLING INSURERS, AND FOR THE CLAIMS AGAINST NON-SETTLING INSURERS TO BE ASSIGNED TO THE TRUST. THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST THE DIOCESE ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, INCLUDING UNDER "*RISK FACTORS TO BE CONSIDERED*" IN ARTICLE 19.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DIOCESE, THE ADDITIONAL DEBTORS AND THE CONTRIBUTING NON-DEBTOR ENTITIES (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED IN THE PLAN.

NO PERSON MAY GIVE ANY INFORMATION ON BEHALF OF THE PLAN PROPONENTS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings and definitions assigned to such terms in the Plan.

OF THE PLAN, OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, EXCEPT FOR THE COMMITTEE CONSISTENT WITH ITS OBLIGATIONS ARISING UNDER 11 U.S.C. § 1103(c)(3). ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREIN, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF IMPAIRED CLAIMS AGAINST THE DIOCESE AND THE ADDITIONAL DEBTORS TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN FILED CONTEMPORANEOUSLY HEREWITH, OTHER ANNEXED EXHIBITS, AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO THE END OF THE SOLICITATION PERIOD FOR THE PLAN. NO MATERIALS OTHER THAN THE ACCOMPANYING MATERIALS ATTACHED TO THIS DISCLOSURE STATEMENT OR REFERENCED HEREIN HAVE BEEN APPROVED BY THE BANKRUPTCY COURT OR THE PLAN PROPONENTS FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (I) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN REMAIN MATERIALLY ACCURATE, OR (II) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT, EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE PLAN PROPONENTS FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE PLAN PROPONENTS' KNOWLEDGE, INFORMATION, AND BELIEFS. THE PLAN PROPONENTS' RESPECTIVE PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND ARE NOT RESPONSIBLE FOR ANY INACCURACIES THAT MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN.

THE HISTORICAL FINANCIAL INFORMATION CONCERNING THE CENTRAL ADMINISTRATIVE OFFICES OF THE DIOCESE OF BUFFALO IS BASED PRINCIPALLY ON AUDITED FINANCIAL STATEMENTS AS OF AND FOR THE FISCAL YEAR ENDED AUGUST 31, 2025. THE LIQUIDATION ANALYSIS ATTACHED AS **EXHIBIT B** AND THE FINANCIAL PROJECTIONS ATTACHED AS **EXHIBIT C** WERE PREPARED BY MANAGEMENT BASED ON SUCH HISTORICAL FINANCIAL INFORMATION AND RELATED ASSUMPTIONS AND HAVE NOT BEEN INDEPENDENTLY AUDITED OR REVIEWED.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME SUBSEQUENT TO THIS DATE, AND THE PLAN PROPONENTS UNDERTAKE NO DUTY TO UPDATE THE INFORMATION.

PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DIOCESE AND THE ADDITIONAL DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED, AND SHOULD BE AWARE THAT ACTUAL DISTRIBUTIONS MAY VARY FROM THE ESTIMATES CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DIOCESE OR THE ADDITIONAL DEBTORS, THEIR BUSINESS OPERATIONS, THE VALUE OF THEIR ASSETS, OR THE VALUES OF ANY BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN, OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN THE PLAN AND OTHER PLAN DOCUMENTS. ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DIOCESE, ANY ADDITIONAL DEBTOR OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE

EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DIOCESE, THE ADDITIONAL DEBTORS, ANY OTHER PROTECTED PARTY, OR HOLDERS OF CLAIMS.

THIS DISCLOSURE STATEMENT IS FORWARD-LOOKING. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLANS, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE OF THE DIOCESE, THE ADDITIONAL DEBTORS, AND A TRUST TO BE CREATED FOR THE BENEFIT OF HOLDERS OF ABUSE CLAIMS, AS WELL AS ANTICIPATED FUTURE DETERMINATIONS OF CLAIMS AND DISTRIBUTIONS ON CLAIMS. THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, LEGAL, AND ECONOMIC RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE PLAN PROPONENTS UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL FACTORS, NOR CAN THE IMPACT OF ALL FACTORS BE ASSESSED.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH THEIR OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

**[THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT WITH RESPECT TO VOTING TO ACCEPT OR REJECT THE PLAN.]** HOWEVER, THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION OR DETERMINATION BY THE BANKRUPTCY COURT AS TO THE MERITS OF THE PLAN. EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING ALL EXHIBITS AND SCHEDULES TO THE PLAN AND DISCLOSURE STATEMENT) IN THEIR ENTIRETY BEFORE VOTING.

**TABLE OF CONTENTS**

**Page**


**ARTICLE 1 INTRODUCTION ........ 1**

A. Summary of the Plan ........ 3
B. Summary of Voting Procedures ........ 6
C. Overview of Chapter 11 ........ 7
D. Summary of Classification of Claims ........ 9
E. Disclosure Statement Enclosures ........ 10

**ARTICLE 2 THE DIOCESE AND ITS OPERATIONS ........ 11**

A. Prepetition Operations ........ 11
B. Need for Reorganization ........ 14
C. The Additional Debtors ........ 15

**ARTICLE 3 THE DIOCESE'S CHAPTER 11 CASE ........ 16**

A. The Chapter 11 Filing ........ 16
B. Administration of the Case ........ 18
C. Appointment of the Committee ........ 18
D. Retention of Professionals ........ 18
E. Schedules and Statement of Financial Affairs ........ 22
F. Post-Petition Operations and Select Financial Information ........ 22
G. Post-Petition Consolidation and Financial Restructuring ........ 25
H. Bar Date, Abuse Claims, and Boy Scouts of America Claims ........ 31
I. Insurance Coverage Adversary Proceedings ........ 34
J. Stay of Litigation Against Parishes, Schools, and Other Catholic Organizations ........ 36
K. Appointment of Additional Mediators ........ 37
L. The DOB Claim Objections ........ 38
M. Supreme Court's Decision in Purdue Pharma ........ 38
N. The Consent Decision and Direct Appeal ........ 39
O. The Case Management Order ........ 39

**ARTICLE 4 SUMMARY OF THE PLAN ........ 39**

A. Classification of Claims Generally ........ 40
B. Creditor Recovery Under the Plan ........ 40
C. Classification of Claims and Treatments ........ 40

**ARTICLE 5 ABUSE CLAIMS ........ 51**

A. Assessment of Abuse Claims ........ 51
B. Legal Effect of Estimation of Claims and Distributions Under the Allocation Protocol ........ 51
C. Insurance Settlements ........ 52

D. Release and Discharge of Abuse Claims. ............ 52
E. Dismissal of Pending Litigation............ 53
F. Claim Withdrawal............ 53
G. Medicare Procedures............ 54

**ARTICLE 6 SETTLING INSURERS ............ 55**

A. Insurance Settlement Agreements............ 55
B. Sale of Settling Insurer Policies Free and Clear ............ 55
C. Resolution of Claims Involving Settling Insurers............ 56
D. The Settling Insurer's Payments ............ 56
E. Further Assurances; Non-Material Modifications ............ 56
F. Waiver/Consent............ 56
G. Timing............ 57

**ARTICLE 7 MATTERS RELATING TO NON-SETTLING INSURERS ............ 57**

A. Preservation of Rights and Obligations ............ 57
B. Estimations/Assessments of Abuse Claims Are Not Binding ............ 57
C. Trust Powers With Respect to Abuse Claims and Non-Settling Insurers............ 58
D. Insurance Coverage Adversary Proceedings. ............ 58

**ARTICLE 8 MEANS FOR IMPLEMENTATION OF THE PLAN............ 59**

A. Plan Implementation ............ 59
B. Corporate Action............ 59
C. Payments Effective Upon Tender ............ 59
D. Agreements, Instruments, and Documents ............ 59
E. Continuation of Insurance Policies ............ 60
F. Bar Date for Professional Fee Claims............ 60
G. Bar Date for Other Administrative Claims ............ 60
H. Exit Financing............ 61

**ARTICLE 9 THE TRUST ............ 61**

A. Establishment of the Trust ............ 61
B. Funding the Trust............ 61
C. Vesting of Trust Assets............ 64
D. Non-Monetary Commitments ............ 64
E. Appointment of the Trustee ............ 65
F. Rights and Responsibilities of the Trustee............ 65
G. Trust Advisory Committee ............ 65
H. Trust Pursuit of Insurance Claims............ 66
I. Investment Powers; Permitted Cash Expenditures ............ 69
J. Tax Matters ............ 70
K. No Recourse Against Trustee ............ 70
L. Indemnification by Trust............ 70
M. Trust Assumption of Liability............ 72

N. Termination ........ 72

**ARTICLE 10 GENERAL CLAIMS ADMINISTRATION ........ 72**

A. Objections to Non-Abuse Claims ........ 72
B. Determination of Claims ........ 72
C. No Distributions Pending Allowance ........ 73
D. Claim Estimation ........ 73
E. Treatment of Contingent Claims ........ 73
F. Controversy Concerning Impairment ........ 73
G. Treatment of Executory Contracts and Unexpired Leases ........ 74

**ARTICLE 11 PROVISIONS GOVERNING DISTRIBUTIONS ........ 74**

A. Disbursing Agents ........ 74
B. Manner of Payment ........ 74
C. Distribution Only to Holders of Allowed Claims ........ 74
D. Disputed Claim Reserve ........ 75
E. Transmittal of Distributions ........ 75
F. Timing of Distributions ........ 75
G. Time Bar to Check Payments ........ 76
H. No Professional Fees or Expenses ........ 76
I. No Interest on Claims ........ 76
J. Saturday, Sunday, or Holiday ........ 76
K. Withholding Taxes ........ 76
L. Setoffs and Recoupment ........ 77
M. No *De Minimis* Distributions ........ 77
N. Prepayment ........ 77

**ARTICLE 12 EFFECTIVE DATE ........ 77**

A. Conditions Precedent to Effective Date ........ 77
B. Waiver of Conditions ........ 79
C. Occurrence of Effective Date ........ 79
D. Notice of Effective Date ........ 79
E. Effect of Non-Occurrence of Conditions ........ 79

**ARTICLE 13 EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE ........ 80**

A. General Injunction and Discharge ........ 80
B. Injunction and Discharge of Abuse Claims and Inbound Contribution Claims ........ 81
C. Channeling Injunction Preventing Prosecution of Channeled C laims Against Protected Parties ........ 83
D. Additional Debtors Payment ........ 85
E. Settling Insurer Injunction ........ 85
F. Litigation/Settlement of Certain Claims ........ 85
G. Additional Debtors Abuse Claim Bar Date ........ 87

H. Certain Litigation Matters .......... 90
I. Injunction Against Interference with Plan .......... 90
J. Release by Holders of Channeled Claims .......... 90
K. Mutual Releases .......... 91
L. Releases in Insurance Settlement Agreements .......... 91
M. Exculpation; Limitation of Liability .......... 91
N. Gatekeeper Injunction .......... 92
O. Injunctions in Full Force and Effect .......... 92
P. Release of Estate Causes of Action .......... 92
Q. Injunctions and Releases Integral .......... 93
R. Timing .......... 93
S. Excluded Parties and Non-Settling Insurers .......... 93
T. Title to and Vesting of Assets .......... 94
U. Identity of Trustees and Officers of the Diocese .......... 94
V. Authority to Effectuate Plan .......... 94
W. Binding Effect .......... 95
X. Dissolution of Committee .......... 95

**ARTICLE 14 RESERVED .......... 95**

**ARTICLE 15 RETENTION OF JURISDICTION .......... 95**

A. By the Bankruptcy Court .......... 95
B. By the District Court .......... 97
C. Actions to Enforce the Plan .......... 97
D. Case Closure .......... 97

**ARTICLE 16 TAX CONSEQUENCES OF THE PLAN .......... 98**

A. Federal Income Tax Consequences to Holders of Unsecured Claims .......... 98
B. Federal Income Tax Consequences to the Diocese .......... 99
C. Tax Consequences to the Trust .......... 99

**ARTICLE 17 ALTERNATIVES TO THE PLAN .......... 100**

A. Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code .......... 100
B. Dismissal of the Chapter 11 Case .......... 100
C. Chapter 7 Liquidation is Not a Viable Alternative .......... 100
D. Appointment of a Chapter 11 Trustee is Not a Viable Alternative .......... 101

**ARTICLE 18 ACCEPTANCE AND CONFIRMATION OF THE PLAN .......... 101**

A. General Confirmation Requirements .......... 101
B. Confirmation Hearing .......... 102
C. Confirmation .......... 102
D. Acceptance of Plan .......... 103
E. Confirmation Without Acceptance of All Impaired Classes .......... 103
F. Best Interests Test .......... 104

G. Feasibility ... 105
H. Compliance with the Applicable Provisions of the Bankruptcy Code ... 105

**ARTICLE 19 RISK FACTORS TO BE CONSIDERED ... 106**

A. Objection to Classifications of Claims ... 106
B. Failure to Satisfy Voting Requirements ... 106
C. The Plan May Not Be Accepted or Confirmed ... 106
D. The Plan Proponents' Assumptions and Estimates May Prove Incorrect ... 107
E. Contributing Non-Debtor Entity Contributions May Not Be Received ... 108
F. Conditions Precedent to Funding ... 108
G. Non-Confirmation or Delay in Confirmation of the Plan ... 108
H. Non-Consensual Confirmation ... 108
I. Risk of Non-Occurrence of the Effective Date ... 109
J. Non-Settling Insurers May Raise Objections to Confirmation ... 109
K. Post-Confirmation Litigation May Not Result in Additional Recovery ... 109
L. United States Trustee fees may be imposed on certain payments under the Plan ... 110
M. State Court Counsel contingency fees ... 111

**ARTICLE 20 MISCELLANEOUS PROVISIONS ... 111**

A. Amendment or Modification of the Plan ... 111
B. Headings ... 112
C. Severability of Plan Provisions ... 112
D. Validity and Enforceability ... 112
E. Revocation or Withdrawal of the Plan ... 112
F. Controlling Documents ... 112
G. Filing of Additional Documents ... 113
H. Direction to a Party ... 113
I. Certain Actions ... 113
J. Plan as Settlement Communication ... 113
K. Reports ... 113
L. Governing Law ... 114
M. No Admissions. ... 114

**ARTICLE 21 BANKRUPTCY RULE 9019 REQUEST ... 114**

**ARTICLE 22 RECOMMENDATION AND CONCLUSION ... 114**

Exhibit A Chapter 11 Plan of Reorganization
Exhibit B Liquidation Analysis
Exhibit C Financial Projections
Exhibit D Additional Debtor Financial Information

## ARTICLE 1

## INTRODUCTION

On February 28, 2020 (the "Petition Date"), the Diocese filed a voluntary Chapter 11 petition with the United States Bankruptcy Court for the Western District of New York (Buffalo Division) (the "Bankruptcy Court"). Since the Petition Date, the Diocese has remained in possession of its assets and has continued to own, operate, and manage its affairs pending the approval of a plan of reorganization in accordance with the provisions of title 11 of the United States Code (as amended, the "Bankruptcy Code").

On March 12, 2020, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in the Diocese's Chapter 11 Case. The Committee is comprised of six individuals who assert Abuse Claims against the Diocese. The Committee supports approval and confirmation of the Plan and is a Plan Proponent and a signatory to the Plan.[2]

The Plan's treatment of Abuse Claims represents the culmination of over six (6) years of negotiation among the Diocese, the Additional Debtors, and the Committee in its capacity as an advocate on behalf of all Abuse Claimants and has been approved by the Committee in consultation with attorneys ("State Court Counsel") who collectively represent an overwhelming majority of Abuse Claimants who have asserted Abuse Claims against the Diocese. During this time, the Diocese, the Additional Debtors, the Settling Insurers, the Committee and State Court Counsel in Abuse Actions have been active participants in mediation concerning Abuse Claims asserted against the Diocese and the Additional Debtors, and the available Insurance Policies that would cover such Abuse Claims.

The Additional Debtors include 206 parishes and other Catholic entities within the Diocese of Buffalo listed on **Exhibit A** to the Plan. As of the date of the filing of this Disclosure Statement, the Additional Debtors have not yet filed for bankruptcy but contemplate filing for bankruptcy shortly before the Confirmation Hearing. Immediately after filing, the Additional Debtors will request approval of this Disclosure Statement as containing "adequate information" with respect to the Additional Debtors. This Disclosure Statement is intended to apply to the Additional Debtors who have not yet filed their chapter 11 petitions.

The Plan sets forth, among other things, the proposed treatment of Claims and other interests in accordance with the Bankruptcy Code. This Disclosure Statement is intended to explain the Plan and provide such information to all Creditors as may be deemed material, important, and necessary so that they may make reasonably informed decisions in exercising their right to vote for acceptance of the Plan. A copy of the Plan is included with this Disclosure Statement. If the Plan and this Disclosure Statement are not consistent, the terms of the Plan

---

[2] The Committee is not a signatory to this Disclosure Statement and makes no representations or warranties with respect to information set forth herein regarding the Diocese's history and financial projections. The Committee has reviewed and approved the description of the Plan and the statements contained herein pertaining to the Committee, its activities in this Chapter 11 Case, and the Committee's evaluation and recommendations as a Plan Proponent with respect to the Plan and alternatives to the Plan.

control. Capitalized terms used in this Disclosure Statement but not otherwise defined shall have the meanings ascribed to them in the Plan.

The Plan provides for the financial restructuring of the Diocese and Additional Debtors and the settlement of all, or substantially all, Claims against the Diocese and the Additional Debtors, including, without limitation, the settlement of all Abuse Claims against the Diocese, the Additional Debtors and the Contributing Non-Debtor Entities.[3] Claims against the Additional Debtors that are not Abuse Claims will not be treated under the Plan, and will be paid by the Additional Debtors as they come due.

As set forth in more detail below, the Plan provides for payment in full of all Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, Professional Fee Claims, and U.S. Trustee Fee Claims, leaves unimpaired any Allowed Secured Claims or Pass-Through Claims, provides that Non-Abuse Claims against the Additional Debtors ride through unaffected and are paid in the ordinary course of business, provides for deferred payments equal to the full Allowed amount of any General Unsecured Claims against the Diocese, and establishes the Abuse Claims Settlement Fund to be held by the Trust to compensate holders of Abuse Claims. Inbound Contribution Claims against the Diocese and Additional Debtors are disallowed and extinguished pursuant to the Plan.

The Plan provides that funding for the Trust and the Abuse Claims Settlement Fund in the total amount of $326,452,500 will be provided from, among other potential sources of recovery, a monetary payment by the Diocese, the Additional Debtors and the Contributing Non-Debtor Entities in the aggregate amount of $150,000,000, which may include up to $25,000,000 to be evidenced by the DOB Trust Note, and payments from Settling Insurers in the amount of $176,452,500. The audited financial statements of the Diocese for the fiscal year ended August 31, 2025 recognize a $30,000,000 provision for misconduct claims, which represents the Diocese's minimum publicly stated obligation in relation to the settlement. The Financial Projections attached as **Exhibit C** assume an Effective Date cash payment to the Settlement Trust of $40,000,000 by or through the Diocese. The $150,000,000 DOB Entities' Cash Contribution described in the Plan reflects the aggregate contribution by the Diocese, the Additional Debtors, and other contributing Catholic entities, and may include the DOB Trust Note as provided in the Plan. The Plan also provides for other potential sources of funding for the Abuse Claims Settlement Fund. As of the date of the Plan, the Diocese, the Additional Debtors and the Committee have agreed to accept the following Settling Insurer payments: (i) $37.5 million from Wausau, (ii) $85 million from CNA, (iii) $1.4 million from AIG Insurers, (iv) $1.5 million from TNCRRG, (v) $35.5 million from SICNY, (vi) $9 million from Catholic Mutual, (vii) $2.0875 million from Travelers Indemnity, (viii) $1.5 million from Hartford, (ix) $1.5 million from Century, and (x) an additional $1.465 million in the aggregate from a number of additional Settling Insurers. If the conditions set forth in the Plan are met and the Plan Proponents reach an Insurance Settlement Agreement or other terms of settlement with respect to

[3] The Plan establishes a Trust for the settlement of all Abuse Claims against the Diocese that arose prior to February 28, 2020 which is when the Diocese filed this Chapter 11 Case. Any Claims arising on or after February 28, 2020 but prior to confirmation of the Plan will be treated as either Administrative Claims, or Pass-Through Claims, in accordance with Plan Sections 2.1.1 and 2.3.3 respectively. With respect to the Additional Debtors, the Plan provides a settlement of all Abuse Claims, which will be administered and implemented via the Trust, for all Abuse Claims that arose before the Additional Debtors Petition Date.

Insurance Claims against Non-Settling Insurers prior to commencement of the confirmation hearing for the Plan, the Plan provides that such Non-Settling Insurers may become Settling Insurers and for settlement proceeds resulting therefrom to be used to further supplement the Abuse Claims Settlement Fund. To the extent no such settlement is achieved, the Plan provides for the assignment of Insurance Claims held by the Diocese Settling Parties against the Non-Settling Insurers to the Trust.

The Committee, in consultation with State Court Counsel representing an overwhelming majority of Abuse Claimants, has acknowledged and accepted the risk inherent in pursuing post-confirmation recovery from the Non-Settling Insurers in the absence of a settlement.

## A. Summary of the Plan

Survivors of Abuse are the focal point of the Plan. The tragedy of the Abuse that was inflicted in the past by individuals purporting to do the missionary work of the Roman Catholic Church is impossible to overstate. Instead of fulfilling this mission, such perpetrators inflicted harm and suffering. The Abuse is inexcusable. It not only deeply impacted the survivors, but it also affected the faithful and the community that the Diocese and the Additional Debtors serves.

Prior to the enactment of the New York Child Victims Act (A.2683/S.2440) (the "CVA") and the Adult Survivors Act (A.648/S.66) (the "ASA"), the Diocese devoted substantial resources and effort to provide support and compensation to survivors of Abuse, including providing counselling, therapy, and other support to those survivors. The Diocese also provided monetary compensation to a number of known survivors, including the payment of amounts awarded through its Independent Reconciliation and Compensation Program.

Following the enactment of the CVA, individuals alleging Abuse Claims began to file lawsuits against the Diocese and the Additional Debtors. The Diocese and the Additional Debtors have limited insurance and other resources available to compensate Abuse Claimants. A filing for bankruptcy relief was the only viable means to preserve and fairly distribute the Diocese's limited resources among the numerous Abuse Claimants. As is more fully described below, bankruptcy filings by the Additional Debtors are necessary in order to obtain comprehensive relief.

The Plan establishes a Trust funded by (i) the DOB Entities' Cash Contribution in the aggregate amount of $150,000,000; (ii) monetary contributions made by Settling Insurers; and (iii) the assignment to the Trust of certain Insurance Claims against Non-Settling Insurers (the foregoing are, collectively, the "Trust Assets"). The Trustee will liquidate the Trust Assets and distribute the proceeds to the Abuse Claimants pursuant to the procedures contained in the Allocation Protocol.

Distributions to Abuse Claimants may be subject to fee agreements between an Abuse Claimant and their legal counsel. Abuse Claimants' legal counsel are obligated to comply with Rule 1.5 of the New York Rules of Professional Conduct and 22 CRR-NY 1015.15 in connection with any fees charged to Abuse Claimants.

The Plan Proponents believe that the Plan provides the best possible means to compensate Abuse Claimants for their Abuse Claims. The Trust will be funded in an initial

amount of $326,452,500, including contributions by Settling Insurers in the amount of $176,452,500.

If settlements with the Non-Settling Insurers cannot be reached prior to the approval of the Plan, then under the Plan, the Trust would retain the right to pursue causes of action of the Diocese Settling Parties against, or settle with, Non-Settling Insurers. The Plan Proponents believe that the tools provided by the Plan to Abuse Claimants and the Trust will allow the Trust to pursue a favorable settlement with the Non-Settling Insurers that fairly values each such Insurer's exposure for Abuse Claims asserted in this Chapter 11 Case.

The contribution by the Diocese and each of the Additional Debtors and Contributing Non-Debtor Entities was reached as the result of extensive negotiations regarding, among other things, the extent of liability faced by each entity, the ability of each entity to pay, and insurance coverage available for the types of Claims being satisfied by the Trust. In exchange for their contributions to the Trust, (a) the Diocese, (b) the Additional Debtors, (c) the Contributing Non-Debtor Entities (solely with respect to any Contributing Non-Debtor Entity Abuse Actions); and (d) the Settling Insurers (collectively, the "Protected Parties") shall receive certain releases, exculpation, and injunctions, all as more specifically set forth in this Disclosure Statement and the Plan. The Diocese and Additional Debtors will also receive a bankruptcy discharge.

***Exculpation.*** *The Plan provides certain exculpation provisions which are typical and customary in Chapter 11 plans. The provisions provide that the Diocese, the Diocese's Professionals, the Additional Debtors, the Additional Debtors' Professionals, the Contributing Non-Debtor Entities, the Contributing Non-Debtor Entities' Professionals, the Committee, the Committee's Professionals, the Mediators, the Settling Insurers, and Related Persons of the foregoing Persons and entities will be released from certain of their acts and omissions that occurred from the Petition Date though the Effective Date. None of these parties will be exculpated from claims arising from gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty.*

***Releases.*** *The Plan Provides that the Diocese Settling Parties will be granted a channeling injunction for Abuse Claims under the Plan. The Diocese and the Additional Debtors will be granted releases regarding all Abuse Claims. The Contributing Non-Debtor Entities will be granted releases under the Plan for Abuse Claims to the extent the Class 6 Claimants who have commenced Contributing Non-Debtor Abuse Actions elect to consent to such releases. If the Plan is confirmed, Abuse Claimants will not be able to recover directly from or pursue further litigation against the Diocese Settling Parties, and Abuse Claimants' recoveries on account of their Abuse Claims will be limited by the terms of the Plan.*

> ***Injunctions.*** *The Plan provides for certain injunctions, including a channeling injunction which will channel certain Claims, including all Abuse Claims against the Diocese or any of the Protected Parties, into the Trust. This means that any holder of a Claim that is channeled will no longer be permitted to pursue their Claim except as set forth in the Plan.*
>
> *The exculpation, releases, and injunctions contained in the Plan are an integral part of the overall restructuring efforts of the Diocese and the Additional Debtors and were an essential element of the negotiations among the parties and in obtaining the Protected Parties' support for the Plan.*

**Class 6 Claimants under the Plan are deemed to have released the Diocese Settling Parties pursuant to Section 12.10 of the Plan, and Class 6 Claims are subject to a channeling injunction pursuant to Section 12.3 of the Plan and the discharge in bankruptcy that the Diocese and Additional Debtors will receive.**

**If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of claims and interests against the Diocese and the Additional Debtors, including all Abuse Claimants, will be bound by the terms of the Plan, including the release and discharge provisions.**

The Plan further provides that (i) the holders of Allowed Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, Professional Fee Claims, Secured Claims, Pass-Through Claims, and General Unsecured Claims will be paid in full as set forth herein, (ii) that Non-Abuse Claims against Additional Debtors ride through unaffected by the Additional Debtors' Chapter 11 Cases, (iii) that all Abuse Claims against the Diocese and Additional Debtors will be channeled to the Trust, (iv) that the Diocese will be able to restructure its financial affairs, and (v) that the Diocese and Additional Debtors will continue the mission and ministry of the Church, which is critical to so many in Western New York – especially the elderly, poor, incarcerated, and vulnerable – after confirmation of the Plan. The Diocese will also continue to address the spiritual needs of those who were harmed and the Catholic community as a whole.

In the opinion of the Plan Proponents, the treatment of Claims under the Plan provides an opportunity for greater recovery for Creditors than that which is likely to be achieved under other alternatives. **Accordingly, the Plan Proponents believe that confirmation of the Plan is in the best interests of, and provides the highest and most expeditious recovery to, holders of all Claims against the Diocese and Abuse Claims against the Additional Debtors. All Creditors entitled to vote, therefore, are urged to vote to accept the Plan.**

## B. Summary of Voting Procedures

1. ***Vote Solicitation and Deadline***.

To be counted, your Ballot must be received, pursuant to the following instructions, by Bankruptcy Management Solutions, Inc. d/b/a Stretto ("Stretto"), on or before **5:00 p.m. (Eastern Time) on _________, 2026** (the "Voting Deadline"):

**If by first class mail, overnight courier or hand delivery:**

The Diocese of Buffalo – Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, California 92602

**If by electronic, online submission:**

Please visit **https://case.stretto.com/Buffalodiocese/docket**. Click on the "***E-Ballot***" section of the Diocese's website and follow the directions on your Ballot to submit your E-Ballot. If you choose to submit your Ballot through Stretto's E-Ballot system, you should not also return a hard (paper) copy of your Ballot.

**IMPORTANT NOTE: You will need a unique E-Ballot ID Number that will be provided with your Ballot.**

**IF YOU HOLD A CLAIM ENTITLED TO VOTE:**

Please (i) complete the information requested on the Ballot; (ii) sign, date, and indicate your vote to accept or reject the Plan; and (iii) return the completed Ballot in the enclosed pre-addressed, postage-paid envelope, or by one of the other methods described above, so that it is actually received by Stretto on or before the Voting Deadline.

**DO NOT RETURN ANY INVOICES, DEBT INSTRUMENTS, NOTES, OR CERTIFICATES THAT YOU MAY HAVE WITH YOUR BALLOT.**

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY TELECOPY OR EMAIL BE ACCEPTED.**

**IF YOU HAVE QUESTIONS REGARDING THE BALLOT, DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, DID NOT RECEIVE AN ELECTRONIC COPY OF THE DISCLOSURE STATEMENT AND THE PLAN, OR NEED PHYSICAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE DIOCESE'S SOLICITATION AND CLAIMS AGENT, STRETTO, BY EMAIL AT TEAMBUFFALODIOCESE@STRETTO.COM OR BY**

**CALLING 855.347.3773 AND REQUESTING TO SPEAK WITH A MEMBER OF THE DIOCESE'S SOLICITATION TEAM.**

2. ***Importance of Your Vote***.

Your vote is important. The Bankruptcy Code defines acceptance by a Class of Claims as acceptance of at least two-thirds in amount and a majority in number of Allowed Claims in the Class that voted. Only the Ballots of those Creditors who actually vote are counted for purposes of determining whether a Class voted to accept the Plan. Your failure to vote will leave to others the decision of whether to accept or reject the Plan.

## C. Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its creditors. In addition to permitting rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and interest holders with respect to any distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." Upon filing a petition for chapter 11 relief and during the pendency of a case, the Bankruptcy Code imposes an automatic stay against creditors' attempts to collect or enforce, through litigation or otherwise, claims against the debtor. The automatic stay provisions of section 362 of the Bankruptcy Code, unless modified by court order, will generally prohibit or restrict attempts by creditors to collect or enforce any claims that arose prior to the commencement of the chapter 11 case against the debtor.

The Bankruptcy Code provides for the formation of an official committee of unsecured creditors in a Chapter 11 case to represent the interests of creditors in the case.

The principal objective of a chapter 11 reorganization is the confirmation of a plan of reorganization. The plan sets forth the means for satisfying the claims of creditors and other stakeholders. The plan and a disclosure statement that contains information necessary to allow creditors, shareholders, and members to evaluate the plan are sent to creditors, shareholders and members whose claims or interests are impaired, who then vote to accept or reject the plan.

A class of claims is entitled to vote to accept or reject a plan if the class is "impaired" by the plan. Section 1124 of the Bankruptcy Code provides generally that a claim is impaired if the legal, equitable, or contractual rights of the claim are altered.

A plan may be confirmed under section 1129(a) of the Bankruptcy Code (i) if each class of claims or interests is not impaired by the plan or (ii) if each class has noted to accept the plan. Votes will be counted only with respect to claims: (a) that are listed on the debtor's schedules other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before the claim filing deadline set by the Bankruptcy Court for the filing of proofs of claim. However, any vote by a holder of a claim will not be counted if the claim has been disallowed or

is the subject of an unresolved objection, absent an order from the Bankruptcy Court allowing the claim for voting purposes. A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the allowed voting claims in the class have voted to accept the plan. Pursuant to Bankruptcy Rule 3018(a), Class 6 Abuse Claims shall be estimated at $1.00 for voting purposes only. The actual amount payable on account of Class 6 Abuse Claims will be determined pursuant to the Allocation Protocol.

A holder of a Disputed Claim is not entitled to vote on the Plan unless such Claim is temporarily Allowed by the Diocese, or by an order of the Bankruptcy Court, in an estimated amount that it deems proper for the purpose of voting to accept or reject the Plan. In other words, only holders of Allowed Claims that are in Class 6 (Abuse Claims) may vote to accept or reject the Plan. A Claim to which an objection has been Filed by the Diocese, the Additional Debtors, or any other party in interest that is pending at the time of the Confirmation Hearing or a Claim (i) that is listed on the Diocese's Schedules as disputed, unliquidated, or contingent, and (ii) with respect to which a superseding proof of claim has not been Filed, is not an Allowed Claim for voting purposes, unless the Claim is settled by agreement or the Bankruptcy Court Allows the Claim (in whole or in part) by Final Order. Upon request of a party in interest, the Bankruptcy Court may temporarily Allow or estimate a Disputed Claim for the purpose of voting on the Plan. Ballots cast in respect of Claims other than Allowed Abuse Claims will not be counted. In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the Claimant is not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If an impaired class votes to reject the plan, the proponent of the plan may seek to "cram down" the plan by confirming it under section 1129(b) of the Bankruptcy Code. A plan proponent may cram down a plan upon a rejecting class only if (i) at least one impaired class has voted to accept the plan, (ii) the plan does not discriminate unfairly, and (iii) the plan is fair and equitable with respect to each impaired class that has not voted to accept the plan. **The Plan Proponents believe that the Plan will satisfy the foregoing requirements as to any rejecting Class of Claims, and can therefore be confirmed despite any such rejection by any Class.**

Voting on the plan by each holder of a claim in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of a claim should vote on the enclosed ballot either to accept or reject the Plan. Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted. A ballot that is not received by the deadline will not be counted. If a ballot is lost, damaged, or missing, a replacement ballot may be obtained by contacting the Diocese's solicitation and claims agent, Stretto, by email at TeamBuffaloDiocese@stretto.com or by calling 855.347.3773 and requesting to speak with a member of the solicitation team.

**Class 6 Abuse Claims are Impaired under the Plan and are entitled to vote on the Plan.**

**The Class 1 Secured Claim of The Bank of America, Class 2 Secured Claim of M&T Bank, Class 3 Secured Claim of National Fuel, Class 4 Pass-Through Claims (against the Diocese), Class 5 General Unsecured Claims (against the Diocese), and Class 8 Ride Through Claims (against the Additional Debtors) are Unimpaired under the Plan and are**

**deemed to accept the Plan. Class 7 Inbound Contribution Claims are Impaired under the Plan and are deemed to reject the Plan.**

Section 1129(a) of the Bankruptcy Code establishes several conditions for the confirmation of a plan. These conditions are too numerous to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the chapter 11 process. Among the conditions for plan confirmation is that either each holder of a claim must accept the plan, or the plan must provide at least as much value as would be received upon liquidation of a debtor's estate under Chapter 7 of the Bankruptcy Code. **The Plan Proponents believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.**

The Bankruptcy Court has scheduled a Confirmation Hearing to consider approving the Plan commencing on **__________ at ___ _.m. (prevailing Eastern Time)** at the United States Bankruptcy Court for the Western District of New York in Buffalo, New York. The Confirmation Hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled hearing date or upon the Diocese filing a notice of adjournment.

## D. Summary of Classification of Claims

Detailed elsewhere in this Disclosure Statement are descriptions of the technical aspects of the classification of Claims, the relative allocations of assets to holders of such Claims, the methodology as to how such assets are to be distributed, the risks inherent in the proposed Plan, and the applicable bankruptcy and tax consequences of the Plan. However, the Plan Proponents believe that a broad overview of what, in their opinion, Creditors are likely to receive under the Plan, will be helpful for your consideration of whether you wish to accept or reject the Plan.

The following is a summary of the classification of all Claims under the Plan. This summary is qualified in its entirety by reference to the Plan:

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| N/A | Administrative Claims | No | Deemed to Accept |
| N/A | Priority Tax Claims | No | Deemed to Accept |
| N/A | Non-Tax Priority Claims | No | Deemed to Accept |
| N/A | Professional Fee Claims | No | Deemed to Accept |
| N/A | U.S. Trustee Fee Claims | No | Does Not Vote |
| 1 | Secured Claim of The Bank of America | No | Deemed to Accept |
| 2 | Secured Claim of M&T Bank | No | Deemed to Accept |
| 3 | Secured Claim of National Fuel | No | Deemed to Accept |
| 4 | Pass-Through Claims (against the Diocese) | No | Deemed to Accept |
| 5 | General Unsecured Claims (against the Diocese) | No | Deemed to Accept |
| 6 | Abuse Claims (against the Diocese and Additional Debtors) | Yes | Entitled to Vote |
| 7 | Inbound Contribution Claims | Yes | Deemed to Reject |
| 8 | Ride Through Claims (against the Additional Debtors) | No | Deemed to Accept |

As discussed in the Liquidation Analysis attached hereto as **Exhibit B**, the Plan Proponents estimate that recoveries for holders of Abuse Claims in Class 6 under the Plan will be greater than they would be in liquidation under Chapter 7 of the Bankruptcy Code because the total amount of assets available for Distribution is greater under the Plan than in liquidation of the Diocese and the Additional Debtors under Chapter 7. The assignment of Insurance Claims made by the Diocese and the Additional Debtors would not be available to the Estates under Chapter 7. The Plan Proponents also believe that theoretical Distributions under a Chapter 7 case would likely be delayed due to the time it would take a Chapter 7 trustee to assess the assets of the Diocese and Additional Debtors, review and analyze Claims, and evaluate and litigate claims against third parties. Holders of Allowed Claims entitled to vote to accept or reject the Plan should review the Liquidation Analysis (including all footnotes thereto and documents referenced therein) in assessing whether to vote to accept or reject the Plan.

## E. Disclosure Statement Enclosures

Accompanying this Disclosure Statement are the following enclosures:

### 1. *Order Approving Disclosure Statement*.

A copy of the Order of the Bankruptcy Court dated _______________, approving this Disclosure Statement and, among other things, establishing procedures for voting on the Plan, scheduling the Confirmation Hearing, and setting the deadline for objecting to confirmation of the Plan (the "Order Approving Disclosure Statement").

### 2. *Notice of Confirmation Hearing*.

A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Confirmation Hearing, and the deadline for filing objections to confirmation of the Plan (the "Notice of Confirmation Hearing").

3. ***Ballot***.

A Ballot (and return envelope) for voting to accept or reject the Plan. *See* Article 18.A.1 below for an explanation of which Creditors are entitled to vote.

## ARTICLE 2

## THE DIOCESE AND ITS OPERATIONS

### A. Prepetition Operations

The Catholic Church is a worldwide community with more than 1.2 billion members who hold a common creed. The supreme authority of the Church is vested in the Pope, who, by virtue of his office, possesses supreme, full, immediate, and universal ordinary power in the Church. The Pope exercises such power in concert with the College of Bishops of which he is the head. The organizational structure of the Church is intended to serve the mission to teach, to sanctify, and to serve which is realized in a variety of instruments and organizations. A "diocese" is a portion of the Roman Catholic faithful which is entrusted to a bishop for him to shepherd with the cooperation of ordained clergy. As a general rule, a diocese is territorial and encompasses all the Roman Catholic faithful within its geographical bounds. The bishop of a diocese is appointed by the Pope. The Bishop of the Diocese is the Most Reverend Michael W. Fisher (the "Bishop"). Bishop Fisher was installed as the Bishop of Buffalo on January 15, 2021. A diocese is divided into "parishes," which are communities of the Roman Catholic faithful stably constituted in a particular church, whose pastoral care is entrusted to a priest as its proper pastor under the authority of the diocesan bishop. As a general rule, each parish is territorial and encompasses all the Roman Catholic faithful within its geographical bounds.

Canon Law is a generic term applied to several sources of church law that together establish the internal organizational structure and procedures to be followed within the Catholic Church. Canon Law also identifies property rights and agency relationships among the variety of structures with the community of the Catholic Church. The Diocese is a Latin Catholic Diocese and subject to the *Code of Canon Law* promulgated by Pope John Paul II on January 25, 1983.[4] As used herein, "Church" means the universal Catholic Church. Under Canon Law, dioceses and parishes are public juridic persons having separate and distinct canonical legal existence from each other and from the Church.

Under New York Law, the Diocese is an incorporated legal entity, separate from the Parishes and Other Catholic Organizations within its territory, with its own corporate structure and governance. The Diocese was canonically established on April 23, 1847, subsequently incorporated in New York State on October 30, 1897, and later reincorporated on May 19, 1951 by a special act of the New York State Legislature. The Diocese is governed by a Board of Trustees made up of the Bishop, the Vicar General and the Chancellor of the Diocese, as required under Canon law.

---

[4] 1983 Code c.1-1752 (1983) (as amended, "1983 Code"). Within the Roman Catholic Church there are 24 *sui juris* churches. The Latin Church is the largest, it is subject to *Codex Iuris Canonici auctoritate Ionnisa Paulii PP. II promulgatus* (Vatican City: Libreria Editrice Vaticana, 1983) (hereinafter, the "1983 Code"). Throughout this Disclosure Statement, the English translation used will be *Code of Canon Law, Latin-English Edition,* CLSA 1998.

The territory over which the Diocese exercises canonical jurisdiction is co-extensive/contiguous with the counties of Erie, Niagara, Genesee, Orleans, Chautauqua, Wyoming, Cattaraugus and Allegany in New York State. Within the territory of a diocese are separately constituted parishes. Like a diocese, a parish is usually defined territorially, and each Parish is its own, separate, incorporated legal entity. There are currently 159 separately incorporated Parishes and approximately 515,000 Catholic individuals in the territory of the Diocese. These individuals are served by 68 non-retired Diocesan priests, 15 Religious order priests who reside in the Diocese, 13 extern priests[5] and 82 non-retired permanent deacons. Deacons are men ordained for the ministry of the word (catechetics and preaching), service to the poor, and liturgical assistance. The Diocese also currently employs approximately 130 individuals, both clergy and laity in its central offices and direct ministries. The majority of diocesan priests are self-employed. Numerous Parish corporations own, maintain, and operate cemeteries.

Within the Diocese, there are twenty-two (22) Parish corporation owned and operated parochial schools. There are also twenty-four (24) Catholic Independent/Regional schools (12 elementary schools and 12 high schools) in the territory of the Diocese that are separately operated and governed as not-for-profit organizations and are not under the fiscal or operating control of the Diocese or any Parish corporation. These schools (parochial, independent and regional) collectively service 9,895 students. Five of the independent/regional schools currently operate pursuant to a lease with respect to the real property they occupy but which is owned by the Diocese.

There are several separate not-for-profit corporations that assist the Diocese and Parishes in their ministries (the "Catholic Ministry Entities"). All of the Catholic Ministry Entities were incorporated under the New York Not-for-Profit Corporation law or other New York not-for-profit organizational statutes to carry out a variety of works of the apostolate. The primary Catholic Ministry Entities include Catholic Charities of the Diocese of Buffalo, Inc., Catholic Cemeteries of the Roman Catholic Diocese of Buffalo, New York, Inc., Christ the King Seminary Corporation (which, due to fiscal belt tightening, has ceased operations and the corporation is winding down its affairs), and The Foundation of the Roman Catholic Diocese of Buffalo, among others.

The Parish corporations, schools and Catholic Ministry Entities located within the Diocese are not under the fiscal or operating control of the Diocese and did not seek bankruptcy relief on the Diocese's Petition Date. The list of Additional Debtors, which will be filing voluntary petitions under chapter 11 of the Bankruptcy Code, is attached to the Plan as **Exhibit A** and includes Parish corporations, schools and certain Catholic Ministry Entities.

The Diocese, through its administrative offices (a) provides operational support to the Catholic parishes, schools and certain other Catholic entities that operate within the territory of the Diocese in support of their shared charitable, humanitarian and religious missions; (b) provides parish schools with financial, operational and educational support; and (c) provides

[5] An extern priest is priest incardinated in another diocese or institute of consecrated life who comes with the permission of the diocesan bishop to exercise ministry in the territory of the Diocese of Buffalo. Incardination is the bond that exists between a cleric and a diocese or institute of consecrated life.

comprehensive risk management services to the Parishes and Schools through the Diocese's insurance program.

The Diocese is a not-for-profit corporation under New York law. Gross revenue for the Diocese of Buffalo Central Administrative Office (the "CAO") for the fiscal years ending on August 31, 2021, August 31, 2022, August 31, 2023, August 31, 2024, and August 31, 2025 were $29,863,694, $30,484,876, $28,931,056, $31,534,593, and $31,099,886, respectively. There are four (4) primary sources of income used by the Diocese to support its operations: (i) the Fund for the Faith; (ii) contributions and bequests; (iii) Diocesan assessments; and (iv) assets released from restriction. In addition, the Diocese may, from time to time, take up special appeals and "capital campaigns" for specific purposes. The Fund for the Faith is a Diocesan-wide, unified appeal, occurring in the spring of each year, in which all Parishes and parishioners are asked to provide critical financial support for the Diocese. The unified appeal is marketed and administered by Catholic Charities who also benefits from the majority of the appeal's annual results. The Diocese also applies for grants, receives gifts and bequests, conducts capital campaigns, and generates investment income to fund its operations. Diocesan assessments are invoiced and collected from active Parishes in the Diocese based on each Parish's previous year's offertory results. Finally, the Diocese receives various donations and bequests with specific designations on how those funds may be used and on how the amount of the underlying principal may be used.

The Diocese's CAO (a) provides operational and pastoral support to the Parishes and certain Other Catholic Organizations; (b) provides Schools with financial and educational support; (c) provides central support of ministry including funding of religious personnel; (d) provides comprehensive risk management services to the foregoing entities; and (e) administers a lay pension trust and a priest pension trust for the benefit of most of the foregoing entities' employees and priests. The CAO provides operational and functional support to the Parishes and Other Catholic Organizations in the areas of finance, building and properties, legal, human resources, stewardship and communications, canonical tribunal, schools, evangelization and catechesis, pastoral services, and clergy services. Information technology is also provided by contract to all Parishes and Other Catholic Organizations.

St. Joseph Investment Fund, Inc. ("SJIF") was incorporated on August 30, 2006 as a New York not-for-profit corporation. The members of SJIF, all of whom serve ex officio, are the Bishop of the Diocese, Vicar General/Moderator of the Curia of the Diocese, Chancellor of the Diocese, the President of Catholic Charities and the Rector/President of the Seminary.

The purpose of SJIF is to receive funds from the Diocese, Parish corporations, schools and other Catholic Entities within the Diocese to invest in harmony with the teachings and beliefs of the Church and to provide a fund for the pooling of investments. Each participant enters into a separate written participation agreement with SJIF with respect to the delivery of funds for investment, the investment strategies for the funds as part of collectively invested pools of funds, fees of SJIF for administration and management of the collective investment funds, and procedure for return of any proceeds of the invested funds including any investment return after payment of fees.

The SJIF Board of Directors is responsible for investment, reinvestment and custody of all investment assets of SJIF. The SJIF Board of Directors either directly or as delegated to the Board's Investment Committee monitors performance, and periodically reports to investors and at least annually reports to the members. SJIF's financial statements are audited annually.

The Foundation of the Roman Catholic Diocese of Buffalo, N.Y., Inc. (the "Foundation") was incorporated as a New York not-for-profit corporation on December 27, 1996. The members of the Foundation, all of whom serve ex officio, include the Bishop of the Diocese, Vicar General/Moderator of the Curia of the Diocese, the Chancellor of the Diocese, the Chief Executive Officer of Catholic Charities and the President/Rector of the Seminary. The purpose of the Foundation is to financially support the ministries of the Diocese and the Other Catholic Entities. The Foundation's financial statements are audited annually.

## B. Need for Reorganization

Over the last several decades, certain clergy members and employees of the Church have violated the sacred trust placed in them by children and their families and the Church by committing acts of Abuse. This conduct runs contrary to the teachings and traditions of the Church. The Diocese has worked for decades to meet the needs of Abuse survivors without filing for Chapter 11 reorganization. During the two years prior to the Petition Date, the Diocese implemented its Independent Reconciliation and Compensation Program pursuant to which 111 Abuse survivors agreed to monetary settlements totaling $17,940,000. The Diocese has publicly disclosed proven or acknowledged perpetrators of abuse. The Diocese makes referrals to law enforcement for all allegations of Abuse. Bishop Fisher has apologized for the past misconduct of the personnel of the Diocese and meets with victims at every opportunity in an attempt to bring comfort to such individuals, as did his predecessor. The Diocese has established standards for the training and background assessment of all employees, clerics and volunteers who will likely interact with children and young people.

While the Diocese carried insurance during many periods in which Abuse is alleged to have occurred, and while the Diocese believes such insurance provides coverage for the Abuse Claims as they were asserted or likely would be asserted against the Diocese, prior to filing its Chapter 11 Case, the Diocese had been largely unsuccessful in obtaining any coverage for Abuse Claims asserted against the Diocese and Parishes.

On January 28, 2019, the New York State Legislature passed the CVA. New York's Governor signed the legislation on February 14, 2019. The CVA modified New York's statute of limitations and created a one-year "window" during which victims of child sexual abuse whose claim may have been time-barred were permitted to commence a timely civil action. In addition, the CVA extended the statute of limitations for claims that were not time-barred on its date of passage, permitting such child victims to commence timely civil actions until they reach 55 years of age. The window for commencing previously time-barred actions under the CVA was subsequently extended to, and closed on, August 13, 2021. Since the Petition Date, survivors of alleged clergy Abuse have Filed 891 proofs of claims against the Diocese's Estate in the Chapter 11 Case. In addition, most such claims are the subject matter of separate Abuse Actions that have been commenced in other courts against an Additional Debtor that is alleged to

be jointly and severally liable with the Diocese on account of such claims. Some Abuse Actions assert liability against Additional Debtors alone, without asserting claims against the Diocese.

On May 24, 2022, New York's Governor signed into law the ASA. The ASA created a one-year window during which survivors whose claims would otherwise have been subject to New York's statute of limitations may commence lawsuits based upon sexual offenses committed against them when they were eighteen (18) years of age or older at the time the Abuse occurred. The ASA window to sue on an Adult Abuse Claim opened on November 24, 2022.

As a result, the Diocese faced the prospect of addressing Abuse Claims asserted in amounts exceeding the Diocese's ability to pay, in which circumstance (a) survivors of Abuse could have been left with no compensation or other support, and (b) those within the Diocese (including non-Catholics) who depend on the services of the Church delivered through the Diocese could have been left without the material, monetary, and spiritual support the Diocese provides.

On November 23, 2020, the Attorney General of the State of New York commenced an action against the Diocese in the Supreme Court of the State of New York, County of New York [Index No. 452354/2020] (the "AG Lawsuit"). The AG Lawsuit sought, among other things, injunctive relief for alleged violations of the New York Religious Corporations Law, Not-for-Profit Corporation Law and Estates, Powers and Trusts Law. The AG Lawsuit was settled in October 2022, and the Diocese is in compliance with the child protection protocols established by the settlement pursuant to all subsequent audit reports.

The Diocese is a not-for-profit religious corporation with limited resources, including limited insurance coverage which may be applicable to claims of persons seeking remedies for Abuse Claims. The Diocese acknowledges its moral obligation to compensate all victims of Abuse by Church personnel fairly and equitably. Consistent with this moral obligation, it cannot allow any single plaintiff to recover a disproportionate share of the limited funds available from the Diocese simply because that plaintiff's case goes to trial first. Similarly, the Diocese cannot ignore the valid claims of other Creditors who stand on equal footing with Abuse Claimants as general unsecured Creditors of the Diocese. Beyond the Diocese's obligation to all of its Creditors, the Diocese has a fundamental and moral obligation to the Catholic faithful it serves, and to the donors who have entrusted the Diocese with the material fruits of their life's labor, to continue the ministries of the Church through the Diocese. The Diocese's goals in seeking Chapter 11 relief were two-fold. First, to protect and preserve its assets that are properly available for Distribution to satisfy the claims of the Diocese's unsecured Creditors, along with whatever additional assets can be marshaled, so that those assets are distributed equitably to all Creditors. Second, to continue the work of the Church in Western New York to the fullest extent possible, using the resources dedicated to that purpose.

## C. The Additional Debtors

The Additional Debtors include 206 Parishes and Catholic Ministry Entities within the Diocese of Buffalo, as listed on Exhibit A to the Plan. The Additional Debtors did not file bankruptcy petitions on the Diocese's Petition Date, but now contemplate filing Chapter 11 petitions shortly before the Confirmation Hearing. The Plan discussed in this Disclosure

Statement is a "prepackaged" plan as it pertains to the Additional Debtors, meaning that the voting process for the Plan, as it relates to the Additional Debtors, was commenced and will conclude prior to, and in anticipation of, the Additional Debtors filing Chapter 11 petitions. Here, the "prepackaged" Plan is intended to implement the consensual resolution that was reached between the Diocese, the Additional Debtors, the Committee, and the Settling Insurers.

The Additional Debtors consist of parishes and other Catholic entities which are central to the lives of the Catholic community within the Diocese, and oversee central life events of Catholic individuals and families within the Diocese, including: baptism, religious education, communion, mass, confirmation, marriage, and bereavement, including last rites, funeral services and grief support. The Additional Debtors are crucial to continuing the mission of the Diocese and connecting the Diocese with its community.

The Additional Debtors are separate religious corporations, formed under Article 5 of New York's Religious Corporations Law. As such, the trustees of each parish corporation are the Bishop, the Vicar General, the pastor of the parish, and two laypersons. Parishes bring in revenue primarily through offertory collections, diocesan collections, and additional fundraising, programming and other sources of income. Parishes expenditures include programming expenses such as salaries, religious education, ministries, music and other ministry programming, and capital expenditures. The Additional Debtors are also additional insureds under the Insurance Policies.

Financial information for the Additional Debtors is attached hereto as **Exhibit D**.

## ARTICLE 3

## THE DIOCESE'S CHAPTER 11 CASE

### A. The Chapter 11 Filing

The Diocese commenced the Chapter 11 Case on the Petition Date by filing a voluntary petition for Chapter 11 relief under the Bankruptcy Code [Docket No. 1]. The Diocese's case was assigned to the Honorable Carl L. Bucki, United States Bankruptcy Judge for the Western District of New York. The Diocese has continued in possession of its assets and the management of its business as a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On February 28, 2020, the Bankruptcy Court held an initial hearing to consider certain "first day" matters and entered several orders in the Chapter 11 Case, each of which is available from the Clerk of the Bankruptcy Court or may be viewed, free of charge, at the case management website maintained by the Diocese's notice agent at https://case.stretto.com/Buffalodiocese. The Bankruptcy Court entered the following orders granting "first day" relief:

1. ***Employee Wages and Benefits.***

The Diocese Filed a motion seeking approval to pay certain prepetition employee wage and benefit obligations (the "Wage Motion"). Interim Orders granting the relief requested in the

Wage Motion were entered on March 4, 2020 [Docket No. 55], April 6, 2020 [Docket No. 184], and a Final Order was entered on April 21, 2020 [Docket No. 250].

2. ***Pre-petition Self-Insurance Program.***

The Diocese Filed a motion seeking authority to continue its prepetition self-insurance program (the "PSIP Motion"). Interim Orders granting the relief requested in the PSIP Motion were entered on March 4, 2020 [Docket No. 56] and April 6, 2020 [Docket No. 190] and a Final Order was entered on April 21, 2020 [Docket No. 253].

3. ***Insurance Premium Financing.***

The Diocese Filed a motion seeking authority to honor its insurance premium financing agreements and enter into new such agreements in the ordinary course of business (the "Premium Financing Motion"). Interim Orders granting the relief requested in the Premium Financing Motion were entered on March 4, 2020 [Docket No. 60] and April 6, 2020 [Docket No. 188] and a Final Order was entered on April 21, 2020 [Docket No. 251].

4. ***Prepetition Taxes and Regulatory Fees.***

The Diocese Filed a motion seeking authority to pay prepetition taxes and regulatory fees in the ordinary course of business (the "Tax Motion"). Interim Orders granting the relief requested in the Tax Motion were entered on March 4, 2020 [Docket No. 58] and April 6, 2020 [Docket No. 189] and a Final Order was entered on April 21, 2020 [Docket No. 252].

5. ***Utilities.***

The Diocese Filed a motion seeking to prohibit utility companies from altering, refusing, or discontinuing service and determining adequate assurance of future performance (the "Utilities Motion"). Interim Orders granting the relief requested in the Utilities Motion were entered on March 4, 2020 [Docket No. 59] and April 6, 2020 [Docket No. 193] and a Final Order was entered on April 21, 2020 [Docket No. 257].

6. ***Maintain Bank Accounts and Forms.***

The Diocese Filed a motion seeking approval to maintain its existing investment and bank accounts and its existing business forms (the "Cash Management Motion"). Interim Orders approving the Cash Management Motion were entered on March 4, 2020 [Docket No. 57], April 6, 2020 [Docket No. 192], April 21, 2020 [Docket No. 255], May 29, 2020 [Docket No. 342], July 21, 2020 [Docket No. 465], and September 1, 2020 [Docket No. 534] and a Final Order was entered on October 20, 2020 [Docket No. 616].

7. ***File Chapter 11 Matrix and Schedules Under Seal.***

The Diocese Filed a motion seeking approval to File all documents containing the names of alleged child Abuse victims in a redacted form (the "Motion to File Under Seal") on the Petition Date and an Order approving the Motion to File Under Seal was entered on March 4, 2020 [Docket No. 53]. The Diocese filed a subsequent supplement to the Motion to File Under

Seal on March 19, 2020 [Docket No. 103]. An Interim Order approving the supplemental relief requested was entered on April 6, 2020 [Docket No. 187], and a Final Order was entered on April 21, 2020 [Docket No. 256].

## B. Administration of the Case

After the Petition Date, and in accordance with sections 1107(a) and 1108 of the Bankruptcy Code, the Diocese continued its operations and managed its assets as a debtor in possession. As of the date of this Disclosure Statement, no trustee or examiner has been appointed in the Chapter 11 Case, nor has any motion for a trustee or examiner been made.

## C. Appointment of the Committee

On March 12, 2020, the Office of the United States Trustee appointed the Committee pursuant to sections 1102(a) and 1102(b) of the Bankruptcy Code to serve in the Chapter 11 Case. The Committee is composed of six individuals who hold Abuse Claims against the Diocese.

The Committee retained the law firm of Pachulski, Stang, Ziehl & Jones, LLP ("PSZJ") to represent it in the Chapter 11 Case. Since its appointment, the Committee has taken an active role in the Chapter 11 Case and has been involved in virtually every major event that transpired during the Chapter 11 process, including participating in mediation and drafting the Plan.

The Committee also performed its investigatory function by reviewing financial and operating information supplied by the Diocese and third parties, and by conducting an investigation to determine whether any other assets could be made available to pay Abuse Claims.

## D. Retention of Professionals

During the Chapter 11 Case, the Bankruptcy Court approved the retention and employment of the following professionals to assist in the administration of the Chapter 11 Case:

### 1. ***Claims and Noticing Agent***.

On February 28, 2020, the Diocese filed an application to retain Stretto as its claims and noticing agent. Interim Orders approving the retention of Stretto were entered on March 24, 2020 [Docket No. 112] and April 6, 2020 [Docket No. 186], and a Final Order approving the retention of Stretto was entered on April 21, 2020 [Docket No. 254].

### 2. ***Bankruptcy Counsel to Diocese***.

On April 6, 2020, the Diocese Filed an application to retain Bond, Schoeneck & King, PLLC ("Bond") as its bankruptcy counsel. An Order approving the retention of Bond was entered on June 15, 2020 [Docket No. 397].

3. ***Financial Advisor to the Diocese***.

On April 6, 2020, the Diocese Filed an application to retain Phoenix Management Services, LLC ("Phoenix") as its financial advisor. An Order approving the retention of Phoenix was entered on June 26, 2020 [Docket No. 413].

4. ***Special Insurance Counsel to Diocese***.

On April 22, 2020, the Diocese Filed an application to retain Blank Rome LLP ("Blank Rome") as its special counsel with respect to the Diocese's various insurance policies and insurance coverage litigation. An Order approving the retention of Blank Rome was entered on June 30, 2020 [Docket No. 423].

5. ***Communications Consultant to the Diocese***.

On May 28, 2020, the Diocese Filed an application to retain The Tucker Group, LLC ("Tucker") as its communications consultant. An Order approving the retention of Tucker was entered on June 29, 2020 [Docket No. 420].

6. ***Special Litigation Counsel to Diocese***.

On June 1, 2020, the Diocese Filed an application to retain Connors LLP ("Connors") as its special counsel with respect to (i) the Abuse Claims; (ii) a certain subpoena dated September 6, 2018 issued to the Diocese by the New York State Office of the Attorney General; (iii) a certain subpoena dated November 15, 2018 issued to the Diocese by the U.S. Attorney for the Western District of New York; and (iv) to continue to provide legal assistance to the Diocese with respect to potential litigation matters. An Order approving the retention of Connors was entered on July 9, 2020 [Docket No. 442].

7. ***Special Counsel to the Diocese***.

On June 30, 2020, the Diocese Filed an application to retain Gibson, McAskill & Crosby, LLP ("Gibson") to act as special counsel to the Diocese with respect to certain non-bankruptcy litigation matters. An Order approving the retention of Gibson was entered on July 15, 2020 [Docket No. 453].

8. ***Special Counsel to the Diocese***.

On July 1, 2020, the Diocese Filed an application to retain Chelus, Herdzik, Speyer & Monte, P.C. ("Chelus") to act as special counsel to the Diocese with respect to certain non-bankruptcy litigation matters. An Order approving the retention of Chelus was entered on July 15, 2020 [Docket No. 454].

9. ***Accountants***.

On December 1, 2020, the Diocese Filed an application to retain Bonadio & Co, LLP ("Bonadio") as the accountants to the Diocese. An Order approving the retention of Bonadio was entered on December 15, 2020 [Docket No. 738].

10. ***Special Counsel to the Diocese*.**

On December 22, 2020, the Diocese Filed an application to retain Jones Day to act as special counsel to the Diocese with respect to the lawsuit commenced by the New York State Attorney General. A Decision and Order approving the retention of Jones Day was entered on February 23, 2021 [Docket No. 905].

11. ***Special Counsel to the Diocese***.

On August 23, 2021, the Diocese Filed an application to retain Gellert, Scali, Busenkell & Brown, LLC ("Gellert") to act as special counsel to the Diocese and represent its interests in the chapter 11 case filed by the Boy Scouts of America in the United States Bankruptcy Court for the District of Delaware (Case No. 20-10343). An Order approving the retention of Gellert was entered on October 1, 2021 [Docket No. 1292].

12. ***Real Estate Appraiser and Valuation Expert to the Diocese***.

On May 10, 2023, the Diocese Filed an application to retain KWL Appraisal Group, Inc. ("KWL") as real estate appraiser and valuation expert to the Diocese. An Order approving the retention of KLW was entered on June 5, 2023 [Docket No. 2356].

13. ***Real Estate Broker to the Diocese***.

On May 10, 2023, the Diocese Filed an application to retain Howard Hanna Professionals ("HHP") as real estate broker to the Diocese. An Order approving the retention of HHP was entered on July 18, 2022 [Docket No. 1882]. On August 24, 2023, the Diocese Filed an application to retain Hanna Commercial Real Estate ("Hanna") as real estate broker to the Diocese. An Order approving the retention of Hanna was entered on September 27, 2023 [Docket No. 2523].

14. ***Insurance Specialist Retained by the Diocese.***

Beginning on or about July 1, 1973, and at all times thereafter, the Diocese has maintained a joint insurance program (the "Insurance Program") which provides comprehensive risk management services and insurance coverage for the Diocese and also for Parishes, Schools and other Catholic ministry entities and institutions within the geographical territory of the Diocese (collectively, the "Program Participants").

On March 8, 2024, the Diocese Filed an application to retain Aldrich & Cox, a Subsidiary of Crain, Langer & Co. ("A&C") to act as its insurance and risk management consultant to provide consulting services to review and report on the effectiveness of current policies and program structure, and to present meaningful strategies to improve the going forward implementation of the Insurance Program (the "Initial Review"). An Order approving the retention of A&C was entered on March 28, 2024 [Docket No. 2856].

A&C's performance of the Initial Review revealed that there were certain areas where the Diocese could improve the Insurance Program to both realize cost savings for the Diocese and the Program Participants and implement a more appropriate and targeted risk protection strategy that would be in line with the particular needs of the Diocese and the Program Participants.

On August 2, 2024, the Diocese Filed a second application seeking to retain A&C to facilitate the implementation of the recommended changes to the Insurance Program and to administer the Insurance Program on an outsourced basis, providing services, including among other things, data collection for the various programs, reporting to senior management, monitoring key risk indicators, adjusting strategies based on changing risk landscapes, negotiating and administering related third-party service agreements, identifying and procuring appropriate commercial insurance coverage to protect against various risks, implementing procedures for filing insurance claims, developing and maintaining comprehensive written risk management policies and procedures, and supplying, training, and assigning staff to execute all services under the agreement (collectively, the "Insurance Program Administrative Services"). An Order approving the retention of A&C to perform the Insurance Program Administrative Services was entered on August 27, 2024 [Docket No. 3104].

15. ***Counsel Retained by the Committee***.

On April 6, 2020, the Committee Filed an application to retain PSZJ as its legal advisor. An Order approving the retention of PSZJ was entered on June 3, 2020 [Docket No. 359].

16. ***Local Counsel Retained by the Committee.***

On May 5, 2020, the Committee Filed an application to retain Gleichenhaus, Marchese & Weishaar, PC ("GMW") as co-counsel to the Committee. An Order approving the retention of GMW was entered on June 17. 2020 [Docket No. 402].

17. ***Special Insurance Counsel Retained by the Committee***.

On October 30, 2023, the Committee Filed an application to retain Burns Bowen Bair LLP as special insurance counsel to the Committee. An Order approving the retention of Burns Bowen Bair LLP was entered on November 13, 2023 [Docket No. 2606].

18. ***Claim Valuation Expert Retained by the Committee***.

On January 5, 2023, the Committee Filed an application to retain Stout Risius Ross, LLC ("Stout") as claim valuation expert to the Committee. An Order approving the retention of Stout was entered on March 2, 2023 [Docket No. 2250].

## E. Schedules and Statement of Financial Affairs

The Diocese Filed its Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules") on April 11, 2020 [Docket No. 228]. The Schedules were amended on March 1, 2024 [Docket No. 2820], April 8, 2024 [Docket No. 2863] and April 3, 2026 [Docket No. 4695].

## F. Post-Petition Operations and Select Financial Information

Since the Petition Date, the Diocese has continued to operate its ecclesiastical business. During a typical month, the Diocese's expenses total approximately $1,500,000.

Set forth below is a summary of the Diocese's assets and select financial information as of August 31, 2025, based on the audited financial statements of the CAO:

As of August 31, 2025, the Diocese reported total assets for the CAO of approximately $50.1 million, including cash and cash equivalents of approximately $9.5 million, investments of approximately $32.4 million, property held for sale of approximately $1.5 million, property, buildings and equipment, net, of approximately $4.5 million, and other assets of approximately $0.4 million. As of the same date, the Diocese reported total liabilities for the CAO of approximately $44.5 million, including a $30.0 million provision for misconduct claims, an $8.75 million provision for potential uninsured losses, and approximately $3.6 million of accounts payable and accrued expenses.

1. ***Operating Cash***.

As of August 31, 2025, the CAO had approximately $9.5 million in cash and cash equivalents. Included in cash and cash equivalents was approximately $4.16 million related to proceeds from the sale of the Christ the King Seminary campus, which amount is required to be set aside for use in the CAO's bankruptcy settlement. In addition, the Diocese has identified approximately $1.6 million of funds designated for Catholic education. The availability of cash and investments for Plan funding, operations, or liquidation is therefore subject to applicable restrictions, designations, reserves, and court-approved uses.

2. ***Real Estate***.

Certain real property owned by the Diocese has been or is expected to be sold in connection with the Plan and the funding of the Diocese's contribution. For purposes of the Liquidation Analysis, management estimated gross fair value for real estate not recorded on the books of approximately $17.512 million, reduced by estimated closing costs and other adjustments of approximately $1.592 million, resulting in estimated net realizable value of approximately $15.920 million. The Financial Projections assume receipt of approximately $15.920 million from property sales in connection with the Effective Date transaction.

The Diocese owns, either in whole or in part, the following parcels of real property:

a. the Catholic Center located at Main Street, Buffalo, New York;

b. Bishop Head Residence, 10 Rosary Avenue, Lackawanna, New York;

c. Bishop Timon High School, 601 McKinley Parkway, Buffalo, New York;

d. 821 Main Street, Buffalo, New York;

e. Cardinal O'Hara High School, located in Tonawanda, New York and O'Hara Residence, 69 O'Hara Road, Tonawanda, New York;

f. Desales Catholic School, 6914 Chestnut Street, Lockport, New York;

g. Mother Teresa Home, 212 Stanislaus Road, Buffalo, New York;

h. Newman Center Building located at Lower College Drive, Alfred, New York 14802;

i. Notre Dame High School, 73 Union Street, Batavia, New York;

j. O'Hara Residence, 69 O'Hara Road, Tonawanda, New York;

k. Our Lady of Victory parking lots, McKinley Parkway, Lackawanna, New York;

l. OLV Baker Complex, Ridge Road, Lackawanna, New York 14218;

m. Property located at 55 Melroy Ave., Lackawanna, New York 14218;

n. St. Gianna Molls Pregnancy Center, 76 Church Street, Buffalo, New York;

o. St. Joseph Cathedral, 60 Franklin Street, Buffalo, New York;

p. St. Jude Center, 760 Ellicott Street, Buffalo, New York;

q. St. Jude Parking Lots and Garages;

r. St. Mary's High School, Hawley Street, Lancaster, New York, and Msgr. Conniff Residence, 68 Corning Street, Depew, New York;

s. University of Buffalo Newman Center, 495 Skinnerville Road, Amherst, New York;

t. Vacant land located at Dewey Street, Jamestown, New York;

u. Vacant land located at Route 62, Dayton, New York;

v. Walsh Duffield, 785 Main Street, Buffalo, New York;

w. 119 Miller Street, Sherman, New York 14781;

x. 5875 Ellicott Street Road, East Bethany, New York 14054;

y. 306 Ingham Avenue, Lackawanna, New York 14218; and

z. 36 East Main Street, Panama, New York 14767.

3. ***Personal Property***.

The Diocese currently owns personal property (accounts receivable, prepaid expenses, furniture, property and fixtures), with a scheduled book value of approximately $7.8 million as of August 31, 2025.

4. ***Investment Accounts***.

a. *St. Joseph Investment Fund, Inc.* The Diocese's non-cash investments are held primarily in an account with SJIF. As set forth above, SJIF is a not-for-profit corporation formed in 2006 to maintain pooled investments on behalf of the Diocese and various separately incorporated Catholic entities in conformity with Canon Law and the New York State Prudent Management of Institutional Funds Act. SJIF's affairs are governed by its Certificate of Incorporation and By-laws. As SJIF is a separate and distinct legal entity, the debts and liabilities of SJIF lie solely with SJIF and are not guaranteed or payable by the Roman Catholic Church, the Diocese or any other person or entity. Similarly, the debts and liabilities of the Roman Catholic Church and the Diocese are solely their own and are not guaranteed or payable by SJIF.

SJIF's purpose is to maximize investment returns through economies of scale and to provide participants with the opportunity to invest in harmony with the teaching and beliefs of the Roman Catholic Church. SJIF provides for administration and protection of temporal goods, as required by Canon Law. SJIF is exempted from certain federal and state securities laws pursuant to the Philanthropy Protection Act of 1995. *See, e.g.*, 15 U.S.C. §§ 77c(a)(4), 78c(a)(12)(A)(v), 80a-3(c)(10), 80a-3a.

The participants in SJIF include: the Diocese, parishes, cemeteries, and other Catholic entities. As of August 31, 2025, SJIF had approximately $201 million in total assets under management, the majority of which constitute investments by entities other than the Diocese. Of

the approximately $25.0 million in Diocesan funds under management, approximately $4.3 million is specifically designated to support the Diocese's obligations under its self-insurance program, with approximately $17.4 million reserved toward the Diocese Cash Payment with the remainder considered as unrestricted and available for use at the discretion of the Diocese.

b. *The CGA Investment Account.* The Diocese maintains a charitable gift annuity program pursuant to N.Y. Insurance Law § 1110, which allows the Diocese to make annuity agreements with donors under which the Diocese receives gifts for the benefit of itself and other Catholic entities in exchange for its agreement to make annuity payments calculated based upon the actuarial projected lifespan of the annuitant. Gifts received through this program are invested in an account (the "CGA Investment Account") maintained by the Diocese with Christian Brothers Investment Services, Inc. ("CBIS") and are used to fund quarterly payments to the annuitants during their lifetimes. As of August 31, 2025, the value of the CGA Investment Account was $28,030, administering only one (1) individual annuitant, with amount $670 in annual annuity payments.

c. *DOB Brokerage Account.* The Diocese maintains a brokerage account at M&T Bank (the "DOB Brokerage Account"). The DOB Brokerage Account does not typically maintain a balance but is used to receive and liquidate securities that may be gifted or bequeathed to the Diocese and other Catholic entities in the Buffalo area.

## G. Post-Petition Consolidation and Financial Restructuring

### 1. *Road to Renewal*

The Road to Renewal began in 2020 under the Apostolic Administration of Bishop Edward B. Scharfenberger. Recognizing the trends of falling numbers of clergy, reduced lay participation at Masses, and a general worsening financial situation of the diocese and its parishes, he decided to consult with the Leadership Roundtable, a national consulting firm, which proposed a restructuring plan similar to what other dioceses had done. When Bishop Michael Fisher took over stewardship of the Diocese in January of 2021, the plan was already underway. To this end, Rev. Bryan Zielenieski was appointed as Episcopal Vicar for Renewal and Development.

The studies conducted during the initial stages of the Road to Renewal resulted in projections for the future that helped the Diocese understand the changing demographics of the Diocese of Buffalo. Part of these studies was a close look at the viability of parishes. Being able to open their books and see the reality of their sacramental life, ministerial offerings, financial well-being, condition of buildings, and typical Mass attendance permitted the Diocese to have an accurate picture of each individual parish while also allowing it to see how all of these parishes fit into the larger whole of the Diocese.

Major trends of concern included the aging doner base, declining engagement among the young, and the looming financial impact this Chapter 11 Case and the funding required for the DOB Entities' Cash Contributions. Particular areas of concern include:

a. In the Diocese of Buffalo, 60% of donors are aged 66 and over. This leads to a projected 70% loss within 15 years.

b. Less than 10% of active donors are between the ages of 26-46.

c. Since 2011, the weekend attendance rates have dropped from nearly 160,000 to around 90,000.

d. Since 2010, more people are dying in the territory of the Diocese of Buffalo than are being born.

e. 2019, before the COVID-19 pandemic, marked the first year that parish expenditures outpaced parish revenue.

f. The diocese has 68 active Diocesan priests incardinated in Buffalo, 13 extern priests, and 15 religious order priests. In total, there are less than 100 non-retired priests available for ministry in the Diocese.

The initial phase of the Road to Renewal was only focused on increasing coordination among independent parishes in a particular territory. It soon became obvious that, given the results of certain studies, some parishes would need to begin a process of merger. To this end, the Vicar for Renewal and Development engaged the Diocese in an extensive process of consultation and deliberation. This office produced a well-researched list of parishes that would be suited for merger. With an equitable plan for the whole Diocese being assembled, the Rev. Zielenieski traveled to each of the vicariates of the Diocese to meet with the leadership of the individual parishes and explain to them the rationale behind the proposal between June 3 and June 14, 2024.

The next stage was to allow the Families of Parishes to submit a counter proposal that would be considered by the Office for Renewal and Development. The required consultation of the Presbyteral Council took place. Each member of the Council had an opportunity to review the proposal, the counter proposal (if there was one), and the reasoning for the proposed merger in each case. After this, a final list of the mergers and closures was published in September. The process of issuing individual decrees took place after that.

The reality is that the Church will be poorer, smaller, and less financially influential in the near future because of the change in demographics and the cost associated with Chapter 11. In preparation for this certain eventuality, communities need to be united and strengthened that they might not scatter.

The Road to Renewal is a program that looks toward the future and attempts to put the diocese in the best possible position to respond to the pastoral needs of this portion of the People of God.

### 2. *General Cost Savings and Revenue Enhancing Measures*

Soon after the Petition Date, the Diocese made initial large cuts in employee costs by terminating about 40% of its workspace during 2021, yielding annual savings of about $4 million. However, as the Diocese continued in its Chapter 11 Case, it recognized and acted on the following additional issues:

The Diocese faced significant financial risk due to the following programs that the Diocese is/was administering:

(i) Master Diocesan Wide High Retention Insurance Program, which resulted in deficits of over $1 million per year over the last 5 years, and is now breaking even; and

(ii) Catholic Partnership Lay Health Plan, which was facing deficits of over $500,000 per year for the last two years, and has now been eliminated, with a move towards traditional health premiums for Diocesan employees.

Excessive cost overruns in the three Diocese-managed priest retirement homes led to costs overrunning budget by $250,000 per year over the past three years. To correct this, the Diocese has closed one retirement home and implemented cost control on the expenses in two retirement homes. This has resulted in a net cost of $500,000 per year, a significant decrease from the approximate $1 million incurred in fiscal periods ending in 2023 and 2024.

In connection with a review of positions and workforce, an additional 17 employees were terminated during August 2025, resulting in a savings of at least $1.6 million in net payroll annually.

In the past, the Diocese also failed to allocate proper reasonable costs towards affiliated corporations and funds utilizing Diocesan employees to manage and administer their services. Corrective action on this issue resulted in an additional allocation of $200,000 of Diocesan overhead to these affiliates.

The Diocese also failed, in the past, to use simple techniques such as the use of overnight cash sweeps to maximize interest on cash sitting in operating accounts. Implementing these techniques has added about $200,000 annually in expense reimbursement for the Diocese.

In summary, over the past two years, the Diocese has reduced about $4.0 million in annual operating expenditure and losses in certain health and insurance programs, including the three cost-cutting initiatives described below:

a. <u>Diocesan Master Insurance Program</u>

The Diocese administers a broad master high retention insurance program, aimed to attract cost synergies and improved coverage by providing insurance to all parish corporations, including their associated schools, independent regional schools, and several affiliates such as Catholic Charities, Catholic Cemeteries and the Foundation of the Roman Catholic Diocese. This program is consistent, in application and design, with most Catholic dioceses throughout the

United States. The program incurred $5.5 million in losses during the period 2019 through 2024. The Diocese, as a first step, hired an insurance consulting team to review the program. The process led in a short term towards replacing the prior in-house insurance team with newly contracted external program administrators. In one year, the new management model resulted in administrative savings of over $150,000 annually, reduced financial exposure of millions of dollars (primarily in worker compensation exposure) and moved towards the purchase of additional third-party premiums reducing the overall risk exposure of the program and total cost of the program without sacrificing coverage levels. The business is on a sustainable path of breaking even at a minimum, which was achieved at the fiscal period ending August 2025 and expected to be achieved again for the fiscal period ending in August 2026. In addition, the overall program cost (which is billed to entities being covered) will be reduced by more than $700,000 (8% decrease) for the upcoming fiscal period ending in 2026. There is a continuing opportunity to reduce overall program costs going forward as other coverage areas (such as priest auto insurance) move to a model of reimbursing premium costs instead of undertaking direct financial exposure for potential accidents and poor driving performance. Further, the opportunity to sell off historical exposure to unresolved worker compensation claims could result in reducing restricted cash held by the Diocese to provide gap coverage towards open claims as required by New York State.

b. Catholic Partnership Lay Health Plan

This voluntary high-retention health insurance program was designed for Diocesan lay employees and certain lay employees of about five affiliated entities. The program historically covered more than 500 personnel but dwindled to approximately 200 participants by the end of 2022 as a result of reductions in the Diocesan workforce and employees electing coverage from other sources. Due to the shrinking premium pool and adverse claim history, the program resulted in losses of approximately $550,000 in 2024 and 2023 and loss of approximately $200,000 in 2025. Diocesan management decided to terminate the program at the end of calendar 2024 and move to a traditional program of buying health insurance with no high retentions.

c. Priest Retirement Homes

The Diocese of Buffalo offers retiring priests, if space is available, the ability to live in an "independent living" retired home managed by the Diocese. At the onset of the Chapter 11 filing, the Diocese provided suites to retired priests in three different locations. In exchange, each retired priest provided to the Diocese his monthly room and board afforded to him from the Priest Pension Fund (a fund dedicated specifically to provide retired priests with a monthly salary and room and board payment). However, over the years, this amount became a smaller percentage of the actual monthly cost incurred by the Diocese to house each retired priest, such that the Diocese was effectively subsidizing the cost of housing by approximately $1 million at the end of each of the 2023 and 2024 fiscal periods. The Diocese conducted a review the eligibility of certain priests, based on their current income levels and needs, to receive assistance from Medicaid, which allowed many to move to alternative living arrangements, including skilled nursing homes where appropriate, providing better care for them, and allowing the Diocese to close one location during the fiscal period ending August 31, 2025, resulting in ongoing savings of $500,000 per year.

### 3. *Parish Requests for Injunctive Relief*

On July 8, 2025, a group of parishioners and lay trustees for five Diocesan parishes that had been slated for closure by the Diocese commenced a lawsuit in NYS Supreme Court, Erie County, in the matter entitled *John Rozak, et al. v. Diocese of Buffalo, et al.* (Index No. 811414/2025) seeking preliminary injunctive relief enjoining and restraining the Diocese from collecting from the five affected parishes an 80% allocation of proceeds from merged and closed parishes toward the settlement reached with the Committee of Unsecured Creditors in the Diocese's bankruptcy proceeding during the pendency of the parishioners' canonical appeal of the closure of the affected parishes. The settlement would resolve all Abuse Claims against parishes. On July 22, 2025, a second lawsuit was filed in NYS Supreme Court by another group of parishioners and a lay trustee of four additional parishes that had also been slated for closure by the Diocese – seeking identical relief – in the matter entitled *Paul D. Reid, et al. v. Diocese of Buffalo, et al.* (Index No. 812422/2025). The Diocese opposed both applications for preliminary injunctive relief, and cross-moved to dismiss the complaints on the grounds that the court lacked subject matter jurisdiction over plaintiffs' claims and the relief they sought since they impermissibly sought review of internal church affairs in violation of the First Amendment's Free Exercise and Establishment Clauses. The Diocese also sought dismissal of the actions on the grounds that the plaintiffs lacked both capacity and standing to assert their purported claims on behalf of the affected parishes involved in the lawsuits. A hearing was held on the motions before the Hon. John J. DelMonte on August 12, 2025. On September 26, 2025, the NYS Supreme Court entered a Decision and Order denying the motions, granting the Diocese's cross-motion on the lack of civil jurisdiction premised under the First and Fourteenth Amendments of the Constitution, and dismissing the complaints.

### 4. *Real Estate Sales*

The Diocese estimates a minimum of $15 million in net, Diocese-owned real estate sales proceeds to be utilized towards the $150 million settlement. The Diocese-owned sites (land, land leases and buildings) sold or proposed to be sold include:

| | Site/Parcel: | Estimated Net Proceeds |
|---|---|---|
| a. | Oakland Place/Bishop's Home: | $1.2 million (sold) |
| b. | Christ the King Seminary: | $4.0 million (sold)[6] |
| c. | Catholic Center: | $5.0 million (sold) |
| d. | St. Jude Pastoral Ctr.: | $ .60 million |
| e. | Buffalo State Newman Ctr.: | $ .60 million (sold) |
| f. | Condo at UB North Newman Ctr.: | $ .120 million (sold) |
| g. | 4 Catholic high schools:[7] | $6.0 million |

[6] *See* Article 3.G.5.

| | | |
|---|---|---|
| h. | OLV Land Lease lots: | $3.7 million |
| i. | 3 empty parcels: | $ .160 million |
| | Potential Net Sales Proceeds: | $20.7 million |

The Western New York commercial real estate market is depressed due to a post-COVID glut of vacant commercial office space, an absence of a commercial lending appetite by most banking institutions, higher rates of interest on commercial loans, and escalated material and construction related costs.

Parish contributions towards settlement sourced from Parish-owned real estate sales are expected to result in approximately $30 million with nearly $16 million realized to date but with approximately 30% closed as of the date of this filing. Approximately forty sites, with an estimated value of $50 million, are slated to permanently close, along with an estimated $6 million in non-essential parish properties were identified for sale, with approximately 40% of such properties sold to date. In addition to the market challenges mentioned above, the sale of parish properties may require additional sale processes pursuant to New York or canonical law.

5. ***Seminary Proceeds Motion and Appeal***

On July 18, 2024, the Diocese filed its Motion for Entry of an Order (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief [Docket No. 3031] (the "Sale Motion"), pursuant to which the Diocese sought approval of the sale of the property located at 711 Knox Road, East Aurora, NY (the "Seminary Property"). The Diocese marketed the Seminary Property in accordance with the bidding procedures approved by the Bankruptcy Court [Docket No. 3090] (the "Bidding Procedures Order").

On November 20, 2024, the Bankruptcy Court entered an order [Docket No. 3340] (the "Sale Order") approving the sale of Seminary Property to World Mission Society, Church of God for a purchase price of $4,200,000.00 (the "Sale Proceeds"), but due to potential *cy-près* doctrine concerns, directed that the Sale Proceeds be segregated and held pending further order of the Bankruptcy Court.

On March 19, 2025, the Diocese filed a Motion for entry of an order authorizing, but not directing, the Diocese to access the Sale Proceeds (the "Seminary Proceeds Motion"), so that the Diocese could, in part, use the Sale Proceeds to fund a chapter 11 plan. The Seminary Proceeds Motion was supported by the Committee and was not opposed by any party in interest in the Chapter 11 Case.

[7] The four high schools are subject to favorable, long-term leases, the terms of which prevail upon the purchaser, and are hampering marketability.

On June 6, 2025, the Bankruptcy Court issued a decision granting in part and denying in part the Diocese's unopposed Seminary Proceeds Motion, holding that 64.68% of the Sale Proceeds were restricted funds subject to Cy-près relief (the "Seminary Proceeds Decision") [Docket No. 3929].

On June 20, 2025, both the Diocese and Committee filed separate Notices of Appeal commencing separate appeals of the Seminary Proceeds Decision. [W.D.N.Y. Case Nos. 25-cv-535-MAV and 25-cv-538-MAV]. These cases were consolidated by the District Court for the Western District of New York on September 2, 2025 [W.D.N.Y. Case No. 25-cv-535-MAV, Docket No. 8] (the "Seminary Proceeds Appeal").

The District Court heard oral argument on the Seminary Proceeds Appeal on December 16, 2025. On June 10, 2026, the District Court reversed the Seminary Proceeds Decision, holding that the Sale Proceeds were available for payment of creditor claims pursuant to the Joint Plan, and remanded to the Bankruptcy Court for further proceedings in line with its decision.

## H. Bar Date, Abuse Claims, and Boy Scouts of America Claims

### 1. *Diocese Bar Date*.

By an Order dated December 11, 2020 (the "Bar Date Order"), the Bankruptcy Court fixed August 14, 2021 (the "Bar Date") as the deadline for filing proofs of claim for all prepetition Claims, including Abuse Claims, against the Diocese. The Bar Date Order also established August 14, 2021 as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to File proofs of claim in the Chapter 11 Case. The Notice of Deadline for Filing Proofs of Claim (the "Bar Date Notice") approved by the Bankruptcy Court defines "Sexual Abuse Claim" as any claim arising from "contacts, or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult."

The Bar Date Notice was sent to all known Creditors of the Diocese. In addition, the Bar Date Notice was published, as required in the Bar Date Order, through Diocese press releases, through parish bulletins, in national and regional newspapers, on television and radio stations, on the Diocese's web page and social media accounts, through postings at Parishes and at other Catholic agencies, and through postings at governmental agencies, including the State of New York Office of the Attorney General, and at the district attorney's office, sheriff's office, county government center, and public health and substance abuse agencies in Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans and Wyoming Counties.

Under the Bar Date Order and the Plan, unless otherwise ordered by the Bankruptcy Court or as provided in the Allocation Protocol, any Person who was required to File a timely proof of claim and failed to do so on or before the Bar Date will not be entitled, with respect to such Claim, to receive any payment or Distribution of property from the Diocese, its successors or assigns, and will be forever barred from asserting such Claim against the Diocese or its Estate.

The Diocese, its Professionals, and the Committee's Professionals have reviewed all the Claims Filed by Creditors. More than 891 proofs of claim were Filed by Abuse Claimants in the

Chapter 11 Case. The Diocese believes that 121 of these proofs of claim are either duplicate claims or do not allege a claim arising from or relating to Abuse. At least 32 Abuse Claims were filed after the Bar Date. Among the Abuse Claims Filed prior to the Bar Date, the Diocese believes at least 127 assert Claims based upon the actions or omissions of individuals or entities that are not affiliated with the Diocese and for which the Diocese believes neither it nor the Additional Debtors have any legal liability, including 26 proofs of claim that have been channeled to the BSA Settlement Trust. Notwithstanding the Diocese's position on liability, or whether Abuse Claims may be duplicative or filed after the Bar Date, the Abuse Claim Reviewer and/or the Trustee may determine that holders of such Abuse Claims may be entitled to a Distribution in accordance with the Allocation Protocol. Nothing herein shall be deemed an admission regarding any Person's liability for Abuse Claims. In addition, various Parishes, Schools, and Other Catholic Organizations also Filed contingent claims for indemnification or contribution in the Chapter 11 Case, as they were sued in various Abuse Actions either as co-defendants along with the Diocese prior to the Petition Date or, following the Petition Date, in Abuse Actions relating to the same actions or occurrences of Abuse alleged in proofs of claim Filed in the Chapter 11 Case.

2. ***Claims Involving the Boy Scouts of America***.[8]

On February 18, 2020, the Boy Scouts of America and Delaware BSA, LLC (collectively, "BSA") Filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court") commencing a jointly administered Chapter 11 bankruptcy case bearing the case number 20-10343 (the "BSA Bankruptcy Case"). The BSA Bankruptcy Case was Filed primarily to address thousands of unique abuse-related claims asserted against the BSA (the "BSA Abuse Claims"). In addition to alleging direct liability against BSA for abuse, many BSA Abuse Claims also implicate certain other organizations (known as "Chartered Organizations")[9] that facilitate the scouting programs of the BSA on a local level. The Diocese and several of the Additional Debtors may have been Chartered Organizations and are potentially implicated by certain BSA Abuse Claims.

There are ninety-four (94) Abuse Claims asserted against the Diocese and other Additional Debtors (either through proofs of claim filed in the Chapter 11 Case or Abuse Actions filed in state court) that reference the BSA and allege scouting-related Abuse (the "DOB-BSA Abuse Claims"). On or around June 22, 2021, the Roman Catholic Ad Hoc Committee (the "RCAHC")[10] was formed to represent the interests of all Roman Catholic entities ("Roman

---

[8] Capitalized terms that are used in this section but not defined in the Diocese's Plan or elsewhere in this Disclosure Statement shall have the meanings ascribed to them in the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [BSA Docket No. 10296] (the "BSA Plan"). References to the BSA Bankruptcy Case docket will be cited in the following manner: "[BSA Docket No. ___]".

[9] There are over 40,000 Chartered Organizations nationwide within the BSA organization, and they operate within one of the 253 non-debtor Local Councils that are responsible for administering the BSA's programs across the United States and its territories. Each Local Council covers a specific geographic area. The counties served by the Diocese are variously located within the Greater Niagara Frontier Council (including the Iroquois Trail Council by merger dated May 1, 2023) and the Allegheny Highlands Council.

[10] The RCAHC is composed of the following entities: Catholic Mutual Relief Society of America, Roman Catholic Diocese of Sioux City, Roman Catholic Diocese of Joliet, Roman Catholic Diocese of Omaha, Roman Catholic

Catholic Entities") nationwide that are Chartered Organizations, or are otherwise implicated by, the BSA Case. The Diocese is a member of the RCAHC.

On March 17, 2022, the RCAHC entered into a Settlement Agreement with BSA and its key constituents (the "RCAHC Settlement") which provides that all non-debtor Roman Catholic Entities would be treated as Participating Chartered Organizations under the BSA Plan. Roman Catholic Entities, such as the Diocese, that are currently debtors in their respective Chapter 11 cases are required to obtain orders from their respective bankruptcy courts authorizing them to participate in the RCAHC Settlement. On November 8, 2022, the Bankruptcy Court entered an Order [Docket No. 2053] authorizing, but not directing, the Diocese to opt-in to treatment as a Participating Chartered Organization.

On September 8, 2022, the Delaware Court entered an order [BSA Docket No. 10316] (the "BSA Confirmation Order") confirming the BSA Plan. On December 20, 2022, the Diocese gave BSA notice of its election to opt-in to treatment as a Participating Chartered Organization under the BSA Plan.

The legal effect of certain provisions contained within the BSA Plan and the BSA Confirmation Order is a matter of dispute among various parties in interest in the BSA Bankruptcy Case. Further, the BSA Confirmation Order has been appealed by multiple parties. While there is a possibility that the BSA Confirmation Order will be modified or vacated on appeal, in the event it is upheld, the Diocese believes that, as a Participating Chartered Organization, it will receive the following treatment under the BSA Plan:[11]

a. *Protection from Direct BSA Abuse Claims.* All BSA Abuse Claims that arose on or after January 1, 1976 ("Post-1975 BSA Abuse Claims"), as well as all BSA Abuse Claims that arose prior to January 1, 1976 ("Pre-1976 BSA Abuse Claims") for which there is insurance issued by a Settling Insurance Company (as defined in the BSA Plan, a "BSA Settling Insurance Company"), will be channeled into a Settlement Trust established under the BSA Plan (the "BSA Settlement Trust"), and the Abuse survivors will release the Participating Chartered Organizations from such BSA Abuse Claims. Claims unrelated to scouting are not impacted by the BSA Plan. The BSA Plan also provides that all Participating Chartered Organizations will receive the protection of a twelve-month injunction from prosecution of BSA Abuse Claims beginning on the Effective Date of the BSA Plan (subject to further extension) to afford Participating Chartered Organizations an opportunity to negotiate an appropriate contribution with the Settlement Trust in order to become, and receive the enhanced treatment afforded to, Contributing Chartered Organizations under the BSA Plan. Contributing Chartered Organizations receive complete releases from all BSA Abuse Claims asserted against them, regardless of when the BSA Abuse Claim arose.

---

Diocese of Winona-Rochester, Roman Catholic Archdiocese of Washington, D.C, Roman Catholic Archdiocese of Atlanta, Roman Catholic Archdiocese of New York, Roman Catholic Archdiocese of Chicago, Roman Catholic Diocese of Syracuse, Roman Catholic Diocese of Buffalo, and the Diocese of Rochester.

[11] Notwithstanding the Diocese's description of its understanding of the legal effect of the BSA Plan, nothing herein shall bind the Abuse Claims Reviewer, the Trustee or the Trust in the application of the Allocation Protocol to Abuse Claims.

b. *BSA and Local Council Insurance*. Participating Chartered Organizations will assign, to the BSA Settlement Trust, their rights as additional insureds under liability insurance policies covering BSA Abuse Claims issued to the BSA or Local Councils by BSA settling insurance companies (the "Participating Chartered Organization Insurance Assignments") and will voluntarily release their rights to any such insurance policies. All BSA Abuse Claims will be channeled into the BSA Settlement Trust. Participating Chartered Organizations must also assign to the BSA Settlement Trust, among other things, all causes of action against non-settling insurance companies related to Post-1975 BSA Abuse Claims; however, they will retain whatever rights they previously had (if any) in all pre-1976 insurance policies issued to the BSA and Local Councils.

c. *Chartered Organization Insurance*. BSA Abuse Claims against Participating Chartered Organizations will be released and channeled to the BSA Settlement Trust if a BSA Settling Insurance Company issued a liability policy (other than an automobile policy or director's and officer's policy) that does not specifically exclude Abuse or molestation to a Participating Chartered Organization, and a claimant alleges Abuse during the period of that policy. Although the Participating Chartered Organization will release the BSA settling insurance company for these BSA Abuse Claims, the Participating Chartered Organization will retain all rights for Abuse claims unrelated to scouting under policies issued by BSA settling insurance companies. They will also retain all rights for any claims (both related and unrelated to scouting) under independent insurance policies issued by non-settling insurance companies.

d. *Indirect Abuse Claims.* The Participating Chartered Organizations must voluntarily waive all claims against the BSA for contribution, indemnity, reimbursement, or subrogation, and any other claims which are derivative of abuse claims against BSA.

The Diocese believes that thirty-five (35) DOB-BSA Abuse Claims allege Post-1975 BSA Abuse Claims, and the remaining fifty-nine (59) allege Pre-1976 BSA Abuse Claims that are not covered under insurance policies issued by BSA Settling Insurance Companies.

Under the Plan, holders of DOB-BSA Abuse Claims may be compensated by the Trust without regard to treatment of such claims under the BSA Plan.

## I. Insurance Coverage Adversary Proceedings

The Diocese determined that Insurance Policies issued by seven of its Insurers may be implicated by the Abuse Claims. The Abuse Claims have also been Filed, in many cases, against Parishes, Schools, and Other Catholic Organizations, including Non-Debtor Catholic Entities.

The Insurers asserted various defenses to coverage of the Abuse Claims. In response, on February 28, 2020, the Diocese commenced Adversary Proceeding No. 20-01009 (the "Diocese Insurance Adversary Proceeding") by filing a complaint against CNA, Wausau, Selective Insurance Company of America (formerly known as Exchange Mutual Insurance Company) ("Selective"), National Union Fire Insurance Company Of Pittsburgh, PA ("National Union"), Fireman's Fund Insurance Company ("Fireman's Fund"), Catholic Mutual Group ("Catholic Mutual"), and The National Catholic Risk Retention Group ("National Catholic") (collectively, the "Insurers") for breach of contract and declaratory judgment, seeking a declaration of the

rights, duties, and liabilities of the parties pursuant to the terms of their respective insurance policies and damages. By commencing the Diocese Insurance Adversary Proceeding, the Diocese sought to determine the extent of coverage as to the Abuse claims asserted against the Diocese.

On January 15, 2021, the Diocese commenced a further Adversary Proceeding No. 21-01001 in connection with defenses raised by Insurers to coverage of Abuse Claims asserted against Parishes, captioned as *All Saints Roman Catholic Church Society of Buffalo et al. v. 21st Century Premier Insurance Company et al*. (the "Parish Insurance Coverage Adversary Proceeding" and together with the Diocese Insurance Adversary Proceeding. The "Insurance Coverage Adversary Proceedings").

On June 5, 2020, the Diocese moved for an order referring the issues raised in the Insurance Adversary Proceeding to mediation and for the appointment of a mediator to mediate all issues among the Diocese, the Committee, and the Insurers. On December 27, 2021, the Bankruptcy Court entered an order conditionally granting the Diocese's motion to refer the Insurance Adversary Proceeding and two related adversary proceedings to mediation and deferring commencement of mediation until two related matters were resolved [Docket No. 260]. On February 3, 2022, the Bankruptcy Court entered an Order (the "Mediation Order") [Docket No. 1568] which (i) referred the claims asserted in the Insurance Adversary Proceeding to mediation; (ii) appointed the Honorable United States Bankruptcy Judge Michael J. Kaplan as mediator; and (iii) directed the Diocese, the Insurers, the Committee, the *ad hoc* committee of Parishes and other Protected Parties to participate in the mediation process.

Under the Plan, the Trust will succeed to the Diocese as plaintiff under the Insurance Adversary Proceeding.

1. ***The Claimant Lift Stay Motions***.

On September 10 and 11, 2024, seventeen (17) alleged abuse survivors Filed motions for relief from the automatic stay under section 362(d) of the Bankruptcy Code to pursue their Abuse Claims against the Diocese and other parties in state court (the "Claimant Lift Stay Motions").[12] The Committee Filed a joinder in support of the Claimant Lift Stay Motions.

The Diocese filed a *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 362(a) Further Enjoining the Prosecution of Certain Lawsuits* [Adv. Pro. 20-01016, Docket No. 389] (the "Further Injunction Motion") and the Committee filed opposition to the Further Injunction Motion. The Bankruptcy Court entered its Order and Decision on September 30, 2024 [Adv. Pro. 20-01016, Docket No. 417] granting, among other things, the plaintiffs' request to prosecute their claims against parishes and other affiliated entities.

In response to the Claimant Lift Stay Motions, Bond filed an *Omnibus Objection* on behalf of the Diocese [Docket No. 3187] arguing against the requested relief, or in the alternative, adjourning the stay relief hearing for to a later date. On November 22, 2024, in *its*

[12] The Claimant Lift Stay Motions are filed at Docket Nos. 3117, 3119, 3121, 3123, 3125, 3127, 3129, 3131, 3133, 3135, 3137, 3139, 3141, 3147, 3148, 3149, and 3153. The Committee filed a Joinder to the Claimant Lift Stay Motions at Docket No. 1079.

*Decision and Order*, the Bankruptcy Court granted the motion for relief [Docket No. 3345] making clear that litigation in state court should be resumed only for purposes of determining liability and damages, and not for enforcement of any judgment against the Diocese.

## J. Stay of Litigation Against Parishes, Schools, and Other Catholic Organizations

On May 2, 2020, the Diocese filed the *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Enjoining the Continued Prosecution of Certain Laws*uits [Adv. Pro. 20-02016, Docket No. 4] (the "Initial Injunction Motion") seeking, among other things, entry of one or more orders (i) confirming that the automatic stay provided by section 362 of the Bankruptcy Code enjoins the prosecution of the Abuse Claims, to the extent they seek to recover against, collect, or to obtain possession or control of, any property of the Diocese's bankruptcy estate (including, without limitation, any rights to insurance coverage), and further (ii) enjoining the prosecution of Abuse Claims against the Additional Debtors pursuant to section 105(a) of the Bankruptcy Code, to the extent such prosecution is not already stayed by operation of the automatic stay.

On July 2, 2020, the Bankruptcy Court entered a decision and order in this Adversary Proceeding granting the Diocese's request for a preliminary injunction and enjoining the prosecution of the then-pending Abuse Actions through September 15, 2020 (the "Preliminary Injunction Decision") [Adv. Pro. 20-02016, Docket No. 70]. On October 9, 2020, the Diocese filed a further motion seeking Bankruptcy Court approval of a stipulation staying the prosecution of Abuse Actions against certain additional parties (the "Stipulation Motion").

On December 7, 2020, the Bankruptcy Court entered the *Stay Stipulation Order*, approving the stipulation, with respect to approximately 468 Abuse Claimants that received notice and did not object to the Stipulation Motion (the "Stay Stipulation Order"). After the closing of the CVA window, on March 30, 2022, the Diocese filed a Second *Motion for Entry of an Order Approving Stipulation Staying Prosecution of Certain Lawsuits Against Additional Stay Parties* [Adv. Pro. 20-01016, Docket No. 211].

Pursuant to the Stay Stipulation Order, the Stay Stipulation did not apply to certain objecting Abuse Claimants (the "Lipsitz Claimants") represented by Lipsitz Green Scime Cambria LLP ("Lipsitz"). On February 22, 2021, the Diocese filed a motion seeking to enjoin the Lipsitz Claimants from prosecuting their Abuse Actions against certain non-debtor parties (the "Lipsitz Injunction Motion") [Adv. Pro. 20-01016, Docket No. 112]. On March 31, 2021, the Bankruptcy Court entered its *Decision and Order* granting the Lipsitz Injunction Motion in part and enjoining the Lipsitz Claimants through September 15, 2021 [Adv. Pro. 20-01016, Docket No. 155], which was extended by further orders through September 30, 2023. At the request of the Diocese, and with the support of the Committee, the Bankruptcy Court issued several orders enjoining the Lipsitz Claimants, from prosecuting their respective Abuse Actions [Adv. Pro. 20-01016, Docket Nos. 155, 182, 261, and 282] during the same time period. On April 24, 2024, the Bankruptcy Court issued a further Order enjoining the Lipsitz Claimants through "the earlier of May 31, 2024 or twenty days after the Supreme Court issued its decision in *Purdue Pharma*" [Adv. Pro. 20-01015, Docket No. 354].

Between the filing of the Initial Injunction Motion and the Diocese's final request for injunctive relief, the Bankruptcy Court issued a number of published decisions. *See In re Diocese of Buffalo, N.Y.*, 618 B.R. 400 (Bankr. W.D.N.Y. 2020); *In re Diocese of Buffalo, N.Y.*, 623 B.R. 354 (Bankr. W.D.N.Y. 2020); *In re Diocese of Buffalo, N.Y.*, 626 B.R. 866 (Bankr. W.D.N.Y. 2021); *In re Diocese of Buffalo, N.Y.*, 633 B.R. 185 (Bankr. W.D.N.Y. 2021); *In re Diocese of Buffalo, N.Y.*, 642 B.R. 350 (Bankr. W.D.N.Y. 2022); *In re Diocese of Buffalo, N.Y.*, 652 B.R. 574 (Bankr. W.D.N.Y. 2023); and *In re Diocese of Buffalo, N.Y.*, 656 B.R. 323 (Bankr. W.D.N.Y. 2024).

On July 31, 2024, the Diocese filed a further motion (the "Final Injunction Motion") seeking a temporary stay [Adv. Pro. 20-01016, Docket No. 389]. The Committee and various Abuse Claimants opposed the Final Injunction Motion. On September 30, 2024, the Bankruptcy Court issued a *Decision and Order* denying the Final Injunction Motion and providing that "[e]xcept in those instances where 11 U.S.C. § 362(a) applies, plaintiffs seeking to recover damages for sexual abuse may prosecute their claims against parishes and other affiliated entities." [Adv. Pro. 20-01016, Docket. No. 422] (the "Injunction Decision").

## K. Appointment of Additional Mediators

After the entry of the original Mediation Order, appointing Honorable United States Bankruptcy Judge Michael J. Kaplan as mediator, the Diocese Filed a *Motion for Entry of an Order Authorizing the Appointment of an Additional Mediator* [Docket No. 1990] and the Bankruptcy Court granted the relief requested in an *Order Appointing Patrick H. NeMoyer as Additional Mediator*, entered on January 19, 2023 [Docket No. 2215]

During a status conference held on October 10, 2024, the Diocese advocated for the Bankruptcy Court to direct the parties to continue their efforts to work in good faith towards settlement through the mediation process. The Bankruptcy Court later issued its *Decision and Order* filed on January 13, 2025, appointing Judge Melainie Cyganowski, a retired bankruptcy judge from the Eastern District of New York, to serve as a co-mediator with Judge NeMoyer. [Docket No. 3501].

Since entry of the original Mediation Order, the Diocese, the Committee, and the Insurers have engaged in more than four years of mediation with dozens of virtual and in-person mediation meetings, interspersed with ongoing negotiations and communications among the mediation parties. Additional mediation sessions with Insurers resulted in settlements with nearly all of the Insurers, now categorized as Settling Insurers. A few remaining Insurers, including Arrowood Indemnity Company ("Arrowood"), which is in liquidation under the supervision of the Insurance Commissioner of Delaware as the appointed receiver[13], remain Non-Settling Insurers, and will be treated as such under the Plan.

[13] Subject to the indemnity and reimbursement provisions contained in the Plan, the Diocese and the Additional Debtors, as applicable, shall provide the Trust with documentation or other information requested by the Trust to pursue recoveries in connection with the Trust's claims against Arrowood as a Non-Settling Insurer. For the avoidance of doubt, the Trust will be responsible for any reasonable attorneys' fees incurred by the Diocese and the Additional Debtors, as applicable, in responding to any such requests.

## L. The DOB Claim Objections

On January 15, 2025, the Diocese Filed objections to 37 Abuse Claims Filed in the Chapter 11 Case (collectively, the "DOB Claim Objections").[14] The basis for the DOB Claim Objections is the Diocese's assertion that the subject Abuse Claims do not allege facts sufficient to support a claim upon which relief can be granted under applicable New York Law because they concern allegations against either (i) entities not located within the Diocese; (ii) entities not controlled by the Diocese; or (iii) individuals who were never employed by the Diocese.

On July 25, 2025, the DOB Claim Objections were withdrawn by the Diocese pursuant to a letter filed on the docket [Docket No. 4052].

## M. Supreme Court's Decision in Purdue Pharma

On June 27, 2024, the Supreme Court issued its decision in *Harrington v. Purdue Pharma L.P.*, No. 23-124 (the "Purdue Decision"). In the Purdue Decision, the Supreme Court ruled that a bankruptcy court does not have the authority to issue nonconsensual releases discharging creditors' claims against non-debtor entities.

As a result of the Purdue Decision, the Diocese filed a proposed Plan and Disclosure Statement on October 1, 2025, including opt-out provisions to address consent of Abuse Claimants to third-party releases for parishes and other non-debtor parties, including the Additional Debtors.

[14] The DOB Claim Objections are filed at Docket Nos. 3559, 3577, 3558, 3567, 3582, 3560, 3553, 3576, 3564, 3554, 3583, 3556, 3565, 3579, 3570, 3571, 3561, 3639, 3563, 3551, 3562, 3566, 3573, 3584, 3557, 3555, 3572, 3585, 3574, 3550, 3586, 3581, 3578, 3568, 3575, 3580, and 3552 in the Chapter 11 Case.

## N. The Consent Decision and Direct Appeal

On January 9, 2026, the Bankruptcy Court held oral argument on the issue of whether Abuse Claimants could express their consent to the third-party releases contemplated in the Joint Plan by declining to opt-out of such releases, or whether Abuse Claimants must affirmatively opt-in to such releases.

On February 27, 2026, the Bankruptcy Court issued a Decision and Order holding that, in accordance with the Purdue Decision, Abuse Claimants must opt in to grant the third-party releases contemplated in the Joint Plan (the "Consent Decision") [Docket No. 4616]. In response, the Diocese [Docket No. 4654] and the Committee [Docket No. 4651] each filed a motion requesting that the Court reconsider its Consent Decision.

On April 3, 2026, the Bankruptcy Court issued a Decision and Order denying both motions to reconsider its Consent Decision [Docket No. 4694] and certified the issue for direct appeal to the Second Circuit [Docket No. 4784]. Accordingly, on April 17, 2026, the Diocese [Docket No. 4723] and the Committee [Docket No. 4722] each filed a Notice of Appeal of the Consent Decision (Case No. 26-cv-00808-MAV and Case No. 26-cv-00807-MAV, respectively).

The Diocese and the Committee requested authorization for a direct appeal to the Second Circuit, but the request was denied. For the Joint Plan to be successful as formulated herein, a positive result on the appeal is not necessary.

## O. The Case Management Order

On June 17, 2026 [Docket No. 4903], the Diocese filed a motion seeking entry of a Case Management Order that would provide a framework in which the Additional Debtors' Chapter 11 Cases could be commenced and administered with the Diocese's Chapter 11 Case to the extent of seeking confirmation of the Joint Plan. On July 2, 2026 [Docket No. 4926], parishes filed a statement in support of the request for entry of the Case Management Order, and the United States Trustee filed a response to the Diocese's motion on July 10, 2026 [Docket No. 4942], and a revised proposed Case Management Order was filed on July 14, 2026 [Docket No. 4955] to address the United States Trustee's concerns.

After a hearing held on July 15, 2026, the Court approved the relief sought and entered the Case Management Order [Docket No. 4957].

# ARTICLE 4

# SUMMARY OF THE PLAN

The Plan Proponents submit that the treatment of Creditors under the Plan is more favorable than the treatment Creditors would receive if the Chapter 11 Cases were converted to cases under Chapter 7 of the Bankruptcy Code. Therefore, the Plan Proponents submit that the Plan is in the best interests of all Creditors and the Plan Proponents recommend acceptance of the Plan by holders of Class 6 Abuse Claims.

**The summary of significant elements of the Plan below is provided for the convenience of all parties. The summary does not describe every element of the Plan and is not intended as a substitute for a thorough and complete review of the Plan. This summary is subject to, and is qualified in its entirety by reference to, the full text of the Plan. All Creditors are encouraged to review the Plan and this Disclosure Statement, including Exhibits, in their entirety for a more complete understanding of the Plan's provisions and impact upon Creditors. To the extent any term or provision in this Disclosure Statement is inconsistent with a term or provision of the Plan, the term or provision of the Plan shall control.**

## A. Classification of Claims Generally

Section 101(5) of the Bankruptcy Code defines a claim as: (a) a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"; or (b) a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall designate classes of claims against a debtor. Section 1122 of the Bankruptcy Code further requires that each class of claims contain only claims that are "substantially similar" to each other. The Diocese believes that it has classified all Claims in compliance with the requirements of Sections 1122 and 1123. However, it is possible that the holder of a Claim may challenge such classification and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Diocese would, to the extent permitted by the Bankruptcy Court, modify the classifications in the Plan as required and use the acceptances received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class of which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of Claims may necessitate a re-solicitation.

## B. Creditor Recovery Under the Plan

All classified Claims have been placed into one of ten separate Classes. The Plan affirmatively states whether each Class of Claims is Impaired or Unimpaired and whether such Class is entitled to vote.

## C. Classification of Claims and Treatments

As required by the Bankruptcy Code, all Claims are classified into several separate categories. While the vast majority of Claims have been placed into one of the ten separate Classes, some Claims are left unclassified. The separate Classes are described in detail within this Disclosure Statement and in the Plan.

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| N/A | Administrative Claims | No | Deemed to Accept |
| N/A | Priority Tax Claims | No | Deemed to Accept |
| N/A | Non-Tax Priority Claims | No | Deemed to Accept |
| N/A | Professional Fee Claims | No | Deemed to Accept |
| N/A | U.S. Trustee Fee Claims | No | Does Not Vote |
| 1 | Secured Claim of Bank of America | No | Deemed to Accept |
| 2 | Secured Claim of M&T Bank | No | Deemed to Accept |
| 3 | Secured Claim of National Fuel | No | Deemed to Accept |
| 4 | Pass-Through Claims (against the Diocese) | No | Deemed to Accept |
| 5 | General Unsecured Claims (against the Diocese) | No | Deemed to Accept |
| 6 | Abuse Claims (against the Diocese and Additional Debtors) | Yes | Entitled to Vote |
| 7 | Inbound Contribution Claims | Yes | Deemed to Reject |
| 8 | Ride Through Claims (against the Additional Debtors) | No | Deemed to Accept |

1. ***Unclassified Claims***.

a. *Administrative Claims.* Administrative Claims are Claims for costs or expenses incurred in the administration of the Chapter 11 Cases of the Diocese and Additional Debtors, which are Allowed pursuant to section 503(b) of the Bankruptcy Code. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims have not been classified and are treated as described in this Section 2.1 of the Plan. Except as otherwise provided in the Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different and less favorable treatment than provided under the Plan, or by order of the Bankruptcy Court, a Person holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim as soon as practicable after the later of: (i) the Effective Date; or (ii) the date on which such Claim becomes an Allowed Administrative Claim. Notwithstanding anything in the Plan to the contrary, the holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon by the holder of an Allowed Administrative Claim and the Diocese.

With respect to any trade Claims arising after the applicable Petition Date representing obligations incurred by the Diocese or the Additional Debtors in the ordinary course of its business consistent with past practice, such trade Claims shall be paid in the ordinary course of business. As to other Allowed Administrative Claims, except as otherwise provided in the Plan, each holder of an Allowed Administrative Claim: (i) shall be paid by the Diocese or the Additional Debtors as soon as reasonably practicable after the Effective Date or on the date the Order allowing such Administrative Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Claim, Cash equal to the amount thereof, unless the holder agrees to less favorable treatment of such Allowed Administrative Claim.

Administrative Claims representing obligations incurred by the Diocese or the Additional Debtors after the date and time of the entry of the Confirmation Order shall not be subject to application to the Bankruptcy Court and may be paid by the Diocese or the Additional Debtors in the ordinary course of business and without Bankruptcy Court approval.

b. *Priority Tax Claims*. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Diocese, Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; *provided*, *however*, that the Diocese reserves the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium. The holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising from, or in connection with any Priority Tax Claim and any demand for such penalty will be deemed Disallowed by the confirmation of the Plan.

The Diocese does not anticipate that any Priority Tax Claims will exist as of the Effective Date.

c. *Non-Tax Priority Claims.* Unless the holder of an Allowed Non-Tax Priority Claim and the Diocese agree to a different treatment, on, or as soon as reasonably practicable after, the later of: (i) the Effective Date; or (ii) the date on which such Non-Tax Priority Claim becomes an Allowed Claim, each holder of such an Allowed Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, (a) Cash equal to the unpaid portion of such Allowed Claim or (b) such other less favorable treatment as to which the Diocese and the holder of such Allowed Claim shall have agreed upon in writing. The Trust shall not be responsible for payment of Non-Tax Priority Claims. Notwithstanding anything in the Plan to the contrary, the holder of an Allowed Non-Tax Priority Claim may be paid on such other date and upon such other terms as may be agreed upon by the holder of an Allowed Administrative Claim and the Diocese.

The Diocese does not anticipate that any unpaid Non-Tax Priority Claims will exist as of the Effective Date.

d. *Professional Fee Claims.* In accordance with section 1123(a)(1) of the Bankruptcy Code, Professional Fee Claims have not been classified and are treated as described herein. All Professionals or other Persons requesting an award by the Bankruptcy Court of Professional Fee Claims shall: (i) File their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is 60 days after the Effective Date; and (ii) be paid in full, in Cash, by the Diocese or the Additional Debtors, as applicable (a) as soon as practicable after the Effective Date or the date the order allowing such Administrative Claim becomes a Final Order, or (b) upon such terms as may exist pursuant to order of the Bankruptcy Court or as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Diocese or the Additional Debtors, as applicable. The Diocese and the Additional Debtors are authorized to pay their Professionals for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

Professional Fee Claims of Professionals employed by the Committee, which are incurred prior to the Effective Date of the Plan in connection with the implementation and consummation of the Plan, may be paid by the Diocese, after notice and a hearing, or by the Trust from contributions by the Diocese in addition to the amounts payable to Abuse Claimants under the Plan. Professional Fee Claims of Professionals employed by the Diocese for services rendered prior to the Effective Date shall not be paid by the Trust.

e. *U.S. Trustee Fees*. U.S. Trustee Fees include all fees and charges assessed against the Diocese under 28 U.S.C. § 1930, together with interest, if any, under 31 U.S.C. § 3717. All U.S. Trustee Fees due and owing but not paid prior to the Effective Date shall be paid by the Diocese on the Effective Date. In no event shall the payments made to the Trust pursuant to Sections 2, 5, 7 or 8 of the Plan by any Person other than the Diocese be considered "disbursements" under 28 U.S.C. § 1930, nor shall any payment made by the Trust to any Person be considered a disbursement under 28 U.S.C. § 1930. The Additional Debtors must comply with requirements set forth in the *Case Management Order Establishing Procedures for the Filing and Administration of Prepackaged Chapter 11 Cases by Parishes and Affiliated Entities of the Diocese of Buffalo* [Docket No. ___].

As of June 2025, the Diocese has paid U.S. Trustee Fees totaling approximately $1.3 million to the Office of the United States Trustee in connection with its Chapter 11 Case. The requirement to pay U.S. Trustee Fees is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed chapter 11 cases. The Diocese shall have the exclusive right to pursue any cause of action, right to reimbursement for overpayment, or similar interest of the Diocese in amounts paid pursuant to 28 U.S.C. § 1930.

2. ***Classified Claims***.

a. ***Class 1 – Secured Claim of The Bank of America***

**Classification:** Class 1 is composed of the Secured Claim held by Bank of America in connection with the BOA Secured Debt Documents.

**Treatment:** The Diocese is current with respect to all obligations due under the BOA Secured Debt Documents and will continue to pay those obligations in accordance with the terms of the BOA Secured Debt Documents. The Trust shall not be responsible for the payment of the Class 1 Claim. The BOA Lien shall attach to the Residual Assets held by the Diocese, to the same extent, validity, and priority as it attached to the assets of the Diocese prior to the DOB Petition Date, and the Diocese shall assume all obligations under the BOA Secured Debt Documents.

**Voting:** The Class 1 Claim is Unimpaired, and therefore, the holder of the Class 1 Claim is deemed to have accepted the Plan and is not entitled to vote.

b. ***Class 2 – Secured Claim of M&T Bank***

**Classification:** Class 2 is composed of the Secured Claim held by M&T Bank in connection with the M&T Secured Debt Documents.

**Treatment:** The Diocese is current with respect to all obligations due under the M&T Secured Debt Documents and will continue to pay those obligations in accordance with the terms of the M&T Secured Debt Documents. The Trust shall not be responsible for the payment of the Class 2 Claim. The M&T Lien shall attach to the Residual Assets held by the Diocese, to the same extent, validity, and priority as it attached to the assets of the Diocese prior to the DOB Petition Date, and the Diocese shall assume all obligations under the M&T Secured Debt Documents.

**Voting:** The Class 2 Claim is Unimpaired, and therefore, the holder of the Class 2 Claim is deemed to have accepted the Plan and is not entitled to vote.

c. ***Class 3 – Secured Claim of National Fuel***

**Classification:** Class 3 is composed of the Secured Claim held by National Fuel in connection with the National Fuel Secured Debt Documents.

**Treatment:** The Diocese is current with respect to all obligations due under the National Fuel Secured Debt Documents and will continue to pay those obligations in accordance with the terms of the National Fuel Secured Debt Documents. The Trust shall not be responsible for the payment of the Class 3 Claim. The National Fuel Lien shall attach to the Residual Assets held by the Diocese, to the same extent, validity, and priority as it attached to the assets of the Diocese prior to the DOB Petition Date, and the Diocese shall assume all obligations under the National Fuel Secured Debt Documents.

**Voting:** The Class 3 Claim is Unimpaired, and therefore, the holder of the Class 3 Claim is deemed to have accepted the Plan and is not entitled to vote.

d. ***Class 4 – Pass-Through Claims (against the Diocese).***

**Classification:** Class 4 includes all Pass-Through Claims.

**Treatment:** Upon the later to occur of the Effective Date and the date on which the Diocese designates a Claim as a Pass-Through Claim, the holder of such Pass-Through Claim shall be deemed to have granted relief from the automatic stay with respect to its Pass-Through Claim, such Pass-Through Claim shall not be subject to the Diocese Discharge, and the parties shall retain their respective rights, remedies, claims, and defenses as they existed on the applicable Petition Date. The Diocese shall designate all Pass-Through Claims no later than sixty (60) days after the Effective Date. The Trust shall not be responsible for the payment of any Pass-Through Claims.

**Voting:** Class 4 Pass-Through Claims are Unimpaired, and therefore, holders of Class 4 Claims are deemed to have accepted the Plan and are not entitled to vote.

e. ***Class 5 – General Unsecured Claims (against the Diocese).***

**Classification:** Class 5 Claims include all General Unsecured Claims that are Non-Abuse Claims against the Diocese.

**Treatment:** Except to the extent the holder of an Allowed General Unsecured Claim agrees in writing to accept less favorable treatment as proposed by the Diocese, the Diocese shall pay each holder of an Allowed General Unsecured Claim, Cash in the Allowed amount of such General Unsecured Claim on the later of (a) the Effective Date, and (b) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim. The foregoing payment shall be in full satisfaction, settlement, and release of, and in exchange for, such Allowed General Unsecured Claim. Notwithstanding anything to the contrary set forth above, no payments shall be made to any Protected Party on account of any General Unsecured Claim and all Protected Parties shall be deemed to have withdrawn any General Unsecured Claim with prejudice as of the Effective Date in consideration of the Channeling Injunction and Release provisions provided in Section 12 of the Plan.

The Trust shall not be responsible for payment of General Unsecured Claims.

**Voting:** Class 5 General Unsecured Claims are Unimpaired, and therefore, holders of Class 5 Claims are deemed to have accepted the Plan and are not entitled to vote.

f. ***Class 6 – Abuse Claims.***

**Classification:** Class 6 Claims include all asserted and unasserted Abuse Claims.

**Treatment:**

a. On the Effective Date and subject to the Plan provisions, the Trust shall assume liability for all Abuse Claims against the Diocese and all Additional Debtors, including Post-Statute Filed Abuse Claims, Adult Abuse Claims, and Unknown Abuse Claims, in accordance with and under the Plan and Trust Documents. To the extent a Contributing Non-Debtor Entity makes its contribution, the Trust shall assume liability for all Abuse Claims against that Contributing Non-Debtor Entity. Distributions shall be made to holders of Abuse Claims on a fair and equitable basis, pursuant to and in accordance with the terms of the Plan and the Trust Documents. The Trust will make an initial distribution to holders of Filed Abuse Claims after reserving funds sufficient to fund (i) operational expenses, (ii) costs of litigation with Non-Settling Insurers, (iii) any other reserves required under the Plan or Trust Documents, and (iv) any other reserves as determined necessary by the Trustee, but not to include any reserves established to provide indemnification to Settling Insurers. Thereafter, the Trust will make additional distributions in accordance with the Trust Documents.

b. Class 6 Claimants shall have their Claims treated in accordance with the Allocation Protocol which shall provide as follows:

(i) Initial Evaluation. The Abuse Claims Reviewer shall consider whether the Abuse Claimant has proven by credible evidence that the Abuse alleged by each Abuse Claimant was perpetrated by a Perpetrator of the Diocese. The Abuse Claims Reviewer shall give notice to the Abuse Claimant and the Trustee if he determines that the Abuse Claimant has not met the burden of proof and will provide the Abuse Claimant a reasonable opportunity to provide facts and/or legal basis to establish that the burden of proof has been met. The Diocese and any Protected Party (other than a Settling Insurer) must cooperate with any reasonable information or discovery request by an Abuse Claimant that is necessary to respond to the Abuse Claims Reviewer's determination that the Abuse Claimant has not met the burden of proof.

For Post-Statute Filed Abuse Claims and Unknown Abuse Claims, the Abuse Claims Reviewer will additionally determine whether a valid legal excuse for not timely filing an Abuse Claim or Abuse Action pursuant to N.Y. C.P.L.R. § 214 or any other statutes of limitation or repose under applicable law exists. The Abuse Claims Reviewer shall give notice to the Abuse Claimant and the Trustee if he determines that the Abuse Claimant has not met the burden of proof (or, where applicable, has failed to establish the required valid legal excuse), and will provide the Abuse Claimant a reasonable opportunity to provide facts and/or legal basis to establish that the burden of proof or requirement for a valid legal excuse, as the case may be, has been satisfied. With respect to any Post-Statute Filed Abuse Claims, the Abuse Claims Reviewer may, in his sole

discretion, reduce the award to any such Claimant as set forth in the Trust Documents.

(ii) Unknown Abuse Claimants may receive compensation only from the Unknown Abuse Claim Fund.

(iii) Each Claim that has met the burden of proof as set forth in the Initial Evaluation will be evaluated by the Abuse Claims Reviewer. Each Claim will be scored on a scale of up to 200 based on the Evaluation Factors.

The Abuse Claims Reviewer shall not consider the mere fact that a Claimant has been or is incarcerated in the review of the claim unless an element of the crime for which the Claimant was convicted includes fraud or misrepresentation.

The Abuse Claims Reviewer may grant an additional award of up to 20 points based on the holder of the Filed Abuse Claim's level of participation in public events related to the Abuse Claims, including but not limited to:

a. leadership role in organizations dedicated to helping sexual abuse survivors;
b. active participation in the chapter 11 process;
c. active participation in litigation against the Diocese and/or an Additional Debtor regarding any Abuse Claim; and/or
d. participation in criminal proceedings against a Perpetrator of the Diocese.

The Trustee shall apply a multiple of 1.25 to the award determined by the Abuse Claims Reviewer to any holder of any Abuse Claim that also filed a complaint against the Diocese, any Additional Debtor, and/or any other Roman Catholic entity on or prior to August 13, 2022.

The Trustee shall apply any further enhancements to the claims awards in accordance with the Trust Documents.

Zero (0) points shall be allocated for any Claim that is not a Filed Abuse Claim. Further, zero (0) points shall be allocated for any Claim that is on account of non-sexual assault, non-sexual battery, non-sexual corporal punishment and any other non-sexual act of physical, psychological, mental, or emotional abuse, humiliation, or intimidation or fraud, fraud in the inducement, misrepresentation, concealment, unfair practice, loss of consortium or any other non-Abuse tort.

There will be no consideration of an Abuse Claimant's claims against any entity other than the Diocese or Additional Debtors that may be liable to the Abuse Claimant. Any Claims for punitive or exemplary damages will be treated as penalty Claims and will be Disallowed and receive no Distribution under the Plan.

The right of any Class 6 Claimant to a trial by jury or otherwise against the Diocese and/or any Protected Parties is waived and released upon the occurrence of the Effective Date, and any Class 6 Claim they may hold will be solely determined by the Abuse Claims Reviewer in accordance with the Allocation Protocol.

c. The Allocation Protocol was developed by the Committee, in consultation with State Court Counsel and was not developed by, or submitted for the approval of, any of the Protected Parties, nor are the Protected Parties deemed to have accepted or acquiesced in the adoption of the Allocation Protocol. For the avoidance of doubt, the Insurance Settlement Agreements do not indicate the Settling Insurers' support for the Allocation Protocol, and no party shall argue that the Settling Insurers agreed to or acquiesced in the terms or use of the Allocation Protocol in any proceeding; the Settling Insurers take no position on the Allocation Protocol. If a Class 6 Claim is denied payment, in whole or in part, pursuant to the Allocation Protocol, the holder of such Class 6 Claim will have no rights against any of the Protected Parties relating to such Class 6 Claim.

d. None of the Trust, the Diocese or the Additional Debtors shall have any obligation to take any action to enforce an Insurance Policy of a Non-Settling Insurer, including any obligation to commence/prosecute any action against any Non-Settling Insurer or to defend an action commenced by a Non-Settling Insurer, though the Trust (the Diocese), may do so in their sole and absolute discretion.

e. Nothing in the Plan affects, diminishes, or impairs any Class 6 Claimant's rights against any Joint Tortfeasor, including that Joint Tortfeasor's comparative fault or joint and several liability for Abuse, if any. In any litigation against a Joint Tortfeasor, nothing in the Plan or the Plan Documents shall be deemed an adjudication of a Class 6 Claim for any purpose or a limitation on the recovery against such Joint Tortfeasor; *provided*, *however*, that the Channeling Injunction and Settling Insurer Injunction respectively bar any recovery of a Channeled Claim or Barred Claim from any Settling Insurer Releasees, any Settling Insurer's Related Persons, or the property or assets of either (including the Purchased Property).

f. The Diocese and the Additional Debtors are not obligated to take any action pursuant to this Section, but may cooperate with the Abuse Claims Reviewer and/or the Trustee if reasonably requested by the Abuse Claims Reviewer and/or the Trustee in connection with the administration of the

Allocation Protocol. If the Trustee or the Abuse Claims Reviewer requests information or seeks participation of any kind from the Diocese and/or any Additional Debtor(s) in connection with Section 2.3.6(f) of the Plan, the parties will confer and negotiate to determine whether such request can be accommodated, subject to an agreement that reasonable fees and expenses of the Diocese and/or the Additional Debtor(s), as applicable, will be reimbursed by the Trust.

g. The Non-Settling Insurers remain fully liable for their obligations related in any way to the Abuse Claims, and their obligations are not reduced by the Diocese being in bankruptcy or by the Trust Distributions Class 6 Claimants receive, or are entitled to receive, based on the Plan, Trust Agreement, or Allocation Protocol. For the avoidance of doubt, (i) determinations by the Abuse Claims Reviewer and/or any distributions entitled to be received from the Trust shall not constitute a determination of the Diocese's or any Additional Debtor's liability or damages for Class 6 Claims; and (ii) under no circumstances shall the Abuse Claims Reviewer's review of a Class 6 Claim affect, or be construed to affect, the rights of a Non-Settling Insurer. The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Class 6 Claims. Any such recoveries by the Trust from Non-Settling Insurers will become Trust Assets to be distributed pursuant to Section 4.5 of the Plan and the Allocation Protocol.

h. As of the Effective Date of the Plan, and without any further order from the Bankruptcy Court or further action from any party, the Trustee shall fully assume (a) the liability of the Protected Parties for all Channeled Claims, in each case pursuant to the Channeling Injunction set forth in Section 12.3 of the Plan and (b) the liability (if any) of the Settling Insurers for any and all Barred Claims. All Class 6 Claims shall be satisfied solely from the Trust as set forth in the Plan, the Trust Agreement, and the Allocation Protocol.

i. No Person, other than the Committee or, following the Effective Date, the Trustee, may: (i) object to any Class 6 Claim; or (ii) challenge the merit, validity, or amount of any Class 6 Claim, except that nothing in the Plan shall prevent the Diocese or any Additional Debtor, or with respect to any Class 6 Claim implicating a Non-Settling Insurer Policy, a Non-Settling Insurer, from asserting any legal or factual defenses that the Diocese, an Additional Debtor, and/or Non-Settling Insurer may have in response to any Litigation Claim. Any objection or challenge to a Class 6 Claim pending as of the Effective Date is deemed withdrawn and shall not be refiled. With the exception of the Trustee's objections or challenges to a Class 6 Claim, or the adjudication or settlement of a Litigation Claim, Class 6 Claims shall be treated in accordance with the Allocation Protocol and shall not be subject to any other review or judicial consideration. Nothing in the Plan or the Plan Documents shall constitute an admission by any Protected Party as to the validity or amount of any Class 6 Claim, nor shall anything herein or therein (i) restrict the Diocese or the Additional Debtors from satisfying any Post-Effective Date Preconditions to

Coverage; or (ii) modify the terms of any Non-Settling Insurer Policy with respect to any failure of the Diocese or the Covered Party to satisfy any Post-Effective Date Preconditions to Coverage.

m. No Class 6 Claimant shall receive a Distribution from the Trust until such Class 6 Claimant has executed and delivered to the Trust an Abuse Claim Release Agreement attached to the Plan Supplement as **Exhibit 2**. Each Class 6 Claimant must release all Claims against the Protected Parties. The Trust must provide copies of all executed Abuse Claim Release Agreements (a) to the Protected Parties, and (b) upon request, to any Joint Tortfeasor that has executed a non-disclosure or confidentiality agreement.

n. Subject to and conditioned upon entry of the Confirmation Order as contemplated in Section 11.1.1 of the Plan, Class 6 Claimants shall automatically and without further action be deemed to irrevocably appoint the Committee as their attorney in fact and to grant to the Committee the authority to negotiate and agree to modifications of the treatment accorded to Class 6 claims, and the Plan generally on their behalf, between the Confirmation Date and the Effective Date, to the extent such modifications are necessary to satisfy or obtain the waiver of any of the conditions precedent to the Plan's Effective Date set forth in Sections 11.1.2 through 11.1.10, subject to the Committee's fiduciary duties to act on behalf of all Creditors.

o. The Allocation Protocol and the terms of the Plan concerning financial treatment of Abuse Claims were developed by the Committee; it was not developed by the Diocese, the Additional Debtors or any Settling Insurer, and the Settling Insurers have not (and shall not be deemed to have) accepted or acquiesced in the adoption of the Allocation Protocol. For the avoidance of doubt, the Insurance Settlement Agreements do not indicate the Settling Insurers' support for the Allocation Protocol, and no party shall argue that the Settling Insurers agreed to or acquiesced in the terms or use of the Allocation Protocol in any proceeding; the Settling Insurers take no position on the Allocation Protocol.

**Voting:** Class 6 Claims are Impaired, and each holder of a Class 6 Claim is entitled to vote to accept or reject the Plan. Only for purposes of voting, each Class 6 Claim is deemed to be Allowed in the amount of $1.00. Those Class 6 Claimants who hold a Contributing Non-Debtor Entity Abuse Claim shall be assigned a ballot providing for the election to opt in to the release for the applicable Contributing Non-Debtor Entity.

g. ***Class 7 – Inbound Contribution Claims.***

**Classification:** Class 7 Inbound Contribution Claims include any Claim asserted against the Diocese for indemnity, contribution, or reimbursement arising out of, or related to, the Claimant's liability to pay or defend any Abuse Claim.

**Treatment:** Class 7 Claims shall be Disallowed and extinguished and there will be no Distributions to the holders of Class 7 Claims on account of such Class 7 Claims.

**Voting:** Class 7 Inbound Contribution Claimants will not receive or retain any property under the Plan and therefore are deemed to have rejected the Plan. Class 7 will not vote on the Plan.

h. ***Class 8 – Ride Through Claims (against the Additional Debtors).***

**Classification:** Class 8 Ride Through Claims (against the Additional Debtors) includes Post-Confirmation Claims filed against the Additional Debtors that are not Abuse Claims.

**Treatment:** The Additional Debtors will continue to meet their obligations on account of Claims that are not Abuse Claims, in the ordinary course of business and as they become due. All rights, claims, and defenses relating to Claims in Class 8 are fully preserved for each Additional Debtor and each Class 8 Claimant. All rights, claims, and defenses relating to Claims in Class 8 are fully preserved for each Additional Debtor and each Class 8 Claimant.

**Voting:** Class 8 Ride Through Claims (against the Additional Debtors) are unimpaired, and each holder of a Claim against an Additional Debtor that is not an Abuse Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 8 Claims against the Additional Debtors are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Claims, other than Abuse Claims, against the Additional Debtors.

## ARTICLE 5

## ABUSE CLAIMS

### A. Assessment of Abuse Claims

Class 6 Abuse Claims will be assessed and paid in accordance with the Allocation Protocol, which is designed to provide an expeditious, efficient, and inexpensive method for determining whether an Abuse Claimant is entitled to a Distribution from the Trust. Under no circumstance shall the Abuse Claims Reviewer's review of an Abuse Claim or a Distribution to an Abuse Claimant have any effect on the rights, defenses, or obligations of any Non-Settling Insurer.

### B. Legal Effect of Estimation of Claims and Distributions Under the Allocation Protocol

The Abuse Claims Reviewer's determinations are for estimation and Distribution purposes only and shall not constitute findings as to, or the fixing of, facts or liability concerning the Abuse Claims with any binding legal effect. The determination of Abuse Claimants' qualifications, the estimation of Abuse Claims, and the payment of Trust Distributions shall not be construed as an admission of liability by the Diocese, any Additional Debtor, any defendant in an Abuse Action or alleged Joint Tortfeasor, or the Trust with respect to any Abuse Claim and

shall have no *res judicata* or collateral estoppel effect on the Diocese, any Additional Debtor, the Trust, or any Non-Settling Insurer. Notwithstanding the discharge of the Diocese and the Additional Debtors, Trust Distributions do not release the liability of Joint Tortfeasors for liability on account of the Abuse Claims; *provided, however*, that all of the Settling Insurers' respective liabilities with respect to any Channeled Claims are subject to the Channeling Injunction and Settling Insurer Injunction respectively prohibit any Person (including all Abuse Claimants) from asserting, enforcing, or attempting to assert or enforce any Channeled Claim or Barred Claim against any Protected Party, any Settling Insurer Releasees, any Settling Insurer's Related Person, or the assets or property of either of the foregoing (including Purchased Property).

The Trust's act of making a Distribution to an Abuse Claimant is immaterial to, and shall not be construed as, a determination or admission of the Diocese's, any Additional Debtor's, or any Non-Settling Insurers' liability for, or damages with respect to, any Abuse Claim. Neither the Abuse Claims Reviewer's review of an Abuse Claim and determination of qualification, nor the Trust's estimation of an Abuse Claim or the payment of Distributions shall: (i) constitute a trial, an adjudication on the merits, or evidence of liability or damages in any litigation with the Diocese or the Additional Debtors, Non-Settling Insurers, or any other Person, or (ii) constitute, or be deemed, a determination of the reasonableness of the amount in any coverage litigation with any Non-Settling Insurers. The Trust's estimation of Abuse Claims and payment of Trust Distributions does not create an admission of the fact of liability, or the extent of damages, on behalf of the Diocese and/or any Additional Debtors.

## C. <u>Insurance Settlements</u>

The Trust shall use reasonable efforts, consistent with the terms of the Trust Agreement and its fiduciary duties to the Trust's beneficiaries, to enter into an Insurance Settlement Agreement with any Non-Settling Insurer.

## D. <u>Release and Discharge of Abuse Claims.</u>

Notwithstanding anything to the contrary in the Plan, each Abuse Claimant must, prior to receiving a Distribution from the Trust, execute and deliver to the Trustee an Abuse Claim Release Agreement in the form attached to the Plan Supplement as **<u>Exhibit 2</u>**, but recourse on such Abuse Claims prior to their release is limited to any Trust Distributions as set forth in the Plan, the Trust Agreement, and the Allocation Protocol, and the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable by the Trust from any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim, and any such judgments or awards will be handled in accordance with the Plan.

Class 6 Claims will be released or enjoined as against the Diocese and Additional Debtors for any Abuse that may be covered under Non-Settling Insurer Policies upon the occurrence of the Abuse Claim Discharge Date. Class 6 Claimants will expressly reserve their rights against all Persons, including Joint Tortfeasors, which are not Protected Parties; Joint Tortfeasors will remain severally liable with respect to any Class 6 Claims. For the avoidance of

doubt, neither the Channeling Injunction nor the Settling Insurer Injunction, nor any release of a Class 6 Claim, shall be subject to any delayed effectiveness with respect to the Settling Insurers.

Any Person that is, or was alleged to be, a Joint Tortfeasor with any of the Diocese Settling Parties in connection with the Abuse that forms the basis of any Class 6 Claim, including a Post-Confirmation Claim, shall not be liable for any Protected Party's share of causal liability or fault and no Protected Party shall be liable for the share of causal liability or fault of any other Protected Party or Joint Tortfeasor.

For the avoidance of doubt, with respect to all Non-Abuse Claims, except as otherwise provided in the Plan, the Diocese's liability on account of such Claims shall be discharged pursuant to the provisions of 1141(d).

1. ***Distributions to Abuse Claimants***.

a. *Distributions Generally.* Abuse Claimants' recoveries under the Plan shall be limited to their Trust Distributions, if any, under the Allocation Protocol and Trust Documents. Abuse Claimants shall not be entitled to collect personally, or otherwise, any additional amounts whatsoever from the Diocese, any Additional Debtor, or their respective assets, for any Abuse Claims that are Channeled Claims, even if Abuse Claimants are denied a Trust Distribution. Abuse Claimants shall not be entitled to collect any portion of a Channeled Claim or Barred Claim (including, for the avoidance of doubt, an Abuse Claim) from any Settling Insurer Releasee, any Settling Insurer's Related Persons, or the property or assets of either (including Purchased Property) under any circumstance. Distributions may commence only after the earlier of (a) sixty (60) days after the Effective Date or (b) the entry of a final decree in these Chapter 11 Cases, unless the Plan Proponents agree otherwise in writing.

b. *Distributions to Class 6 Claimants.* A Class 6 Claimant whom the Abuse Claims Reviewer determines to be entitled to a Distribution, will receive a Distribution from the Trust in the amount(s) and at the time(s) provided for in the Allocation Protocol and Trust Documents; *provided, however*, no Class 6 Claimant shall receive a Distribution from the Trust until such Class 6 Claimant has executed and delivered to the Trust an Abuse Claim Release Agreement. Any payment on a Class 6 Claim constitutes a payment for damages on account of a personal physical injury or sickness arising from an occurrence, within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

## E. Dismissal of Pending Litigation

Upon the occurrence of the Abuse Claim Discharge Date, the subject Abuse Claim asserted in any lawsuit against any Protected Party pending in state or federal court shall be dismissed, with prejudice, and without fees and costs being recoverable against any Protected Party and the Diocese or any Protected Party is authorized to file a copy of this Plan, the Confirmation Order, or such other documentation as necessary to effectuate such dismissal.

## F. Claim Withdrawal

An Abuse Claimant may withdraw his or her Abuse Claim at any time on written notice to the Trustee. If withdrawn, the Abuse Claim will be withdrawn with prejudice and may not be

reasserted, and such Abuse Claimant shall still be bound by the Diocese Discharge, the Additional Debtors Discharge and all injunctive provisions of the Plan, including the Channeling Injunction to the same extent that such provisions applied to such Abuse Claimant's Abuse Claim prior to its withdrawal.

## G. Medicare Procedures

None of the Protected Parties will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other Claim liquidations by the Trust, under the reporting provisions of MSPA or MMSEA. To that end, the following shall apply (and the Confirmation Order shall so provide):

a. The Trust shall register as a "Responsible Reporting Entity" under the reporting provisions of MMSEA.

b. With respect to all Abuse Claims, the Trust shall maintain sufficient funds to pay any Medicare Claims.

c. The Trust shall confirm whether the holder of any Abuse Claims that occurred after December 5, 1980 is enrolled in Medicare Parts A and B (fee-for-service), Part C (Medicare Advantage), or Medicare Part D (drug coverage). This includes implementing an appropriate process to gather the necessary information for querying the Centers for Medicare and Medicaid on such determination, including, but not limited to, the claimant's first and last name, date of birth, gender, address, and social security number or health insurance claim number.

d. The Trust shall timely submit all reports required under MMSEA because of any Abuse Claims that occurred after December 5, 1980 settled, resolved, paid, or otherwise liquidated by the Trust. The Trust, as a Responsible Reporting Entity, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agency or successor entity charged with responsibility for tracking, assessing, or receiving reports made under MMSEA to determine whether, and, if so, how, to report to such agency or agencies under MMSEA.

e. For Abuse Claims that occurred after December 5, 1980, before remitting funds to any person on account of an Abuse Claim, the Trustee shall obtain (i) a certification that said person (or such person's authorized representative) has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under the MSP Provisions, or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim, and (ii) an agreement that such person indemnify the Trust for any such obligations. The failure by one or more holders of Abuse Claims to follow these provisions shall not delay or impair the payment by the Trust to any other holder of an Abuse Claim following these provisions.

f. Upon written request, the Trust shall provide to a Settling Insurer or the Diocese information sufficient to perform their own queries to CMS, to the extent they wish to do so, including a report setting forth (I) each Abuse Claimant whom the Trustee has determined

to be a Medicare Beneficiary; (II) the amount of (a) all Conditional Payments to each such Medicare Beneficiary, (b) the amount of the reserve maintained by the Trust for each Medicare Claim based upon such Conditional Payments.

g. The Trust shall submit reimbursement to the Centers for Medicare and Medicaid for Medicare Claims relating to Abuse Claims.

h. With respect to all Abuse Claims, the Trust shall maintain sufficient funds to pay any potential reimbursements to the Centers for Medicare and Medicaid in full and consider the potential future interests of the Centers for Medicare and Medicaid.

i. Nothing in the Plan shall imply, or constitute an admission, that the Diocese, the Protected Parties, or any Settling Insurer are "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any actions undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

## ARTICLE 6

## SETTLING INSURERS

### A. Insurance Settlement Agreements

Each Insurance Settlement Agreement is effective and binding upon all Persons who have notice (including constructive notice, to the extent applicable), and any of the foregoing Persons' successors and assigns (including, for the avoidance of doubt, the Trust and the Trustee), upon the entry of the Sale Order approving such Insurance Settlement Agreement and satisfaction of all conditions precedent, including, without limitation, the Sale Order and the Confirmation Order having become Final Orders. Payment to the Trust of a Settling Insurer's Insurance Settlement Amount, and the releases by the Diocese and Additional Debtors of that Settling Insurer, shall occur and/or be effective according to the terms of such Settling Insurer's Insurance Settlement Agreement. The Insurance Settlement Agreements shall survive the confirmation, effectiveness, and consummation of the Plan. The rights of the parties under any Insurance Settlement Agreement shall be determined exclusively under the applicable Insurance Settlement Agreement and those provisions of the Sale Order approving such Insurance Settlement Agreement, the Plan, and the Confirmation Order. In the event of a conflict between (a) any Insurance Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the applicable Insurance Settlement Agreement shall control; and/or in the event of a conflict between (y) the Sale Order(s), on the one hand, and (z) the Confirmation Order, on the other, the terms of the Sale Order(s) shall control. For the avoidance of doubt, but without limiting the generality of the foregoing, nothing in the Plan, any Plan Documents, or the Confirmation Order shall limit the parties' respective rights and obligations under the Insurance Settlement Agreements.

### B. Sale of Settling Insurer Policies Free and Clear

Each Settling Insurer shall purchase its Settling Insurer Policy(ies) and Claims related thereto free and clear of all Claims, Interests, and other rights of any nature, whether at law or in

equity, pursuant to sections 105 and 363 of the Bankruptcy Code and the terms of such Settling Insurer's Insurance Settlement Agreement.

**C. <u>Resolution of Claims Involving Settling Insurers</u>**

The Confirmation Order shall provide that the Diocese or the Trust, as the case may be, shall dismiss with prejudice their Claims in the Insurance Coverage Adversary Proceedings, against each Settling Insurer, and each Settling Insurer shall dismiss with prejudice their respective Claims in the Insurance Coverage Adversary Proceedings against the Diocese and Additional Debtors (or, if applicable, the Trust), in accordance with the terms and timeline(s) set forth in each Settling Insurer's respective Insurance Settlement Agreement. Each side will bear its own fees and costs.

**D. <u>The Settling Insurer's Payments</u>**

Each Settling Insurer will pay to the Trust the Insurance Settlement Amount set forth in such Settling Insurer's Insurance Settlement Agreement, on the terms and within the time detailed therein.

**E. <u>Further Assurances; Non-Material Modifications</u>**

From and after the Effective Date, the Diocese, the Additional Debtors, and the Settling Insurers shall be authorized to enter into, execute, adopt, deliver, or implement all notes, contracts, security agreements, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the Insurance Settlement Agreements without further order of the Bankruptcy Court. The Diocese, the Additional Debtors, and a Settling Insurer may make technical or immaterial alterations, amendments, modifications, waiver, or supplements to the terms of such Settling Insurer's Insurance Settlement Agreement, subject to the requirement thereof. The Diocese, the Additional Debtors, and the Settling Insurers, with the consent of the Committee, may also make technical or immaterial alterations, amendments, modifications, waiver, or supplements to the terms of the Plan, subject to the requirements of the respective Insurance Settlement Agreements. A Class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or supplemented under Section 15.1 of the Plan, if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such Class. An order of the Bankruptcy Court approving any amendment or modification made pursuant to Section 15.1 of the Plan shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

**F. <u>Waiver/Consent</u>**

In consideration of the releases and Channeling Injunction and other covenants herein, subject to the occurrence of the Effective Date and the satisfaction of the other conditions precedent to the effectiveness of the Insurance Settlement Agreements, each of the Protected Parties: (a) ratifies the releases set forth in the Insurance Settlement Agreements and (b) ratifies and further consents to the sale of the Purchased Property in accordance with the Insurance Settlement Agreements and to the contribution of the proceeds from such sale and settlement to the Trust, as provided in the Plan.

## G. Timing

The injunctions, releases, and discharges to which a Settling Insurer is entitled pursuant to its Insurance Settlement Agreement, the Plan, the Confirmation Order, the Sale Order, and the Bankruptcy Code shall become effective pursuant to the terms of such Settling Insurer's Insurance Settlement Agreement, which shall not occur prior to the Effective Date.

# ARTICLE 7

# MATTERS RELATING TO NON-SETTLING INSURERS

## A. Preservation of Rights and Obligations

If an Abuse Claim is liquidated through the Allocation Protocol, or in any state or federal court as may be permitted by the Plan, the Allocation Protocol, or the Trust Agreement, then the Protected Parties, the Trust, and each Non-Settling Insurer shall retain the right to assert any and all rights and defenses of the Protected Parties with respect to such Abuse Claim and all coverage defenses. The rights, duties, and obligations of each Non-Settling Insurer under the Non-Settling Insurer Policies with respect to Abuse Claims are not affected in any way by the Diocese Discharge or the Additional Debtor Discharge.

The rights and obligations (if any) of the Protected Parties and every Non-Settling Insurer under the terms of the Non-Settling Insurer Policies and at law shall not be affected by the Allocation Protocol and shall be treated as if the determination by the Abuse Claims Reviewer had never occurred. Each Non-Settling Insurer shall be entitled to all rights and defenses as are provided under the terms of its Non-Settling Insurer Policies, as if the determination by the Abuse Claims Reviewer had never occurred.

Nothing in the Plan, the Confirmation Order, or any Plan Document shall impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Abuse Claim, or grant to any Person any right to sue any Non-Settling Insurer directly, relating to an Abuse Claim. All such obligations with respect to Non-Settling Insurers shall be determined by and in accordance with the terms of the Non-Settling Insurer Policies and with applicable non-bankruptcy law.

## B. Estimations/Assessments of Abuse Claims Are Not Binding

Estimations of Abuse Claims for purposes of determination, qualification, assignment of points pursuant to the Allocation Protocol, and payment of Trust Distributions:

a. shall not (i) constitute an admission of liability by any Person with respect to such Abuse Claims; (ii) have any *res judicata* or collateral estoppel effect on any Person; (iii) constitute a settlement, release, accord, satisfaction, or novation of such Abuse Claims; or (iv) otherwise prejudice any rights of the Trust, the Diocese, the Additional Debtors, the Settling Insurers, the Non-Settling Insurers, or the Class 6 Claimants in any other contexts or forums;

b. shall be without prejudice to any and all rights of the Trust, the Non-Settling Insurers, and the Class 6 Claimants in any other contexts and forums; and

c. shall not be deemed to be a determination of liability of the Diocese or any Additional Debtor or a determination of whether, or the extent to which, such Abuse Claim is covered under any Non-Settling Insurer Policy.

**C. <u>Trust Powers With Respect to Abuse Claims and Non-Settling Insurers</u>**

Solely as set forth in the Plan, Allocation Protocol, or the Trust Agreement, any Abuse Claimant or the Trust with consent of an individual Abuse Claimant, may enter into a settlement of an individual Abuse Claimant allowed by applicable non-bankruptcy law, and may enter into an arrangement with the Abuse Claimant's counsel, provided such counsel will receive reasonable compensation from any recovery from a Non-Settling Insurer. Notwithstanding the foregoing, the foregoing sentence shall not apply to the Trust's negotiation and entry into a Trust Insurance Settlement.

The Diocese and the Additional Debtors are not obligated to participate in any way in the resolution of any Covered Claims against Non-Settling Insurers. Nothing contained in the Plan requires any of the Diocese Settling Parties to satisfy any of the Non-Settling Insurers' Post-Effective Date Preconditions to Coverage. If any party requests information or seeks participation of any kind from the Diocese and/or any Additional Debtor(s) in connection with the resolution of Covered Claims against the Non-Settling Insurers, including, but not limited to, participating in litigation or settlement of claims, the parties will confer and negotiate to determine whether such request can be accommodated, subject to an agreement that reasonable fees and expenses of the Diocese and/or the Additional Debtor(s), as applicable, will be reimbursed by the Trust or the requesting party.

If the Trust successfully resolves a Covered Claim or otherwise receives a recovery of insurance proceeds relating to any Abuse Claim from a Non-Settling Insurer, such proceeds shall become Trust Assets available to pay, and shall increase the amount available to pay, Class 6 Claims, pursuant to the Allocation Protocol.

Upon the due execution and delivery of an Insurance Settlement Agreement, the entry of an order approving an Insurance Settlement Agreement, and the payment to the Trust of the settlement amount due thereunder, a Non-Settling Insurer shall become a Settling Insurer protected by the Channeling Injunction and the Settling Insurer Injunction and become entitled to benefit from all releases executed by Claimants and the other rights and protections of a Settling Insurer under the Plan, the Trust Documents, and the orders approving Insurance Settlement Agreements.

**D. <u>Insurance Coverage Adversary Proceedings.</u>**

As of the Effective Date, the Insurance Coverage Adversary Proceedings shall be dismissed without prejudice. For the avoidance of doubt, the Trust and the Abuse Claimants shall have no right to pursue recoveries against any Settling Insurer Releasee or any Settling Insurer's Related Persons.

## ARTICLE 8

## MEANS FOR IMPLEMENTATION OF THE PLAN

### A. Plan Implementation

All Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, Secured Claims, General Unsecured Claims, and Pass-Through Claims will be paid by the Diocese. All Distributions to be made under the Plan on account of Abuse Claims will be paid solely from the Trust to be established for the purpose of receiving, liquidating, and distributing Trust Assets in accordance with the Plan, the Allocation Protocol, and the Trust Agreement. All Class 8 Ride Through Claims against the Additional Debtors will be paid in the ordinary course of business. The Allocation Protocol is attached to the Plan Supplement as **Exhibit 1** and is incorporated into the Trust Agreement. The proposed Trust Agreement is attached to the Plan Supplement as **Exhibit 3**.

### B. Corporate Action

All matters provided under the Plan involving the corporate structure of the Diocese or the Additional Debtors or corporate action to be taken by or required of the Diocese or any Additional Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement or further approval by the Bankruptcy Court or any other governmental entity. For avoidance of doubt, to the extent any corporate action or other transaction contemplated under the Plan would otherwise require approval under section 511 or 511-a of the New York State Not-For-Profit Corporation Law, the entry of the Confirmation Order shall constitute such approval.

### C. Payments Effective Upon Tender

Whenever the Plan requires payment to be made to a Creditor, such payment will be deemed made and effective upon tender thereof by the Trustee, the Diocese or the Additional Debtor to the Creditor to whom payment is due. If any Creditor refuses a tender, the amount tendered and refused will be held by the Trust or the Diocese for the benefit of that Creditor pending final adjudication of the dispute. However, when and if the dispute is finally adjudicated and the Creditor receives the funds previously tendered and refused, the Creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the Creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the Creditor if the Trust, the Diocese or the Additional Debtor failed to pay the tendered payment.

### D. Agreements, Instruments, and Documents

All organizational agreements, charter documents, instruments, and documents required under the Plan to be executed or implemented, together with such others as may be necessary, useful, or appropriate in order to effectuate the Plan, shall be executed on or before the Effective Date or as soon thereafter as is practicable.

## E. Continuation of Insurance Policies

All Insurance Policies that are ***not*** Settling Insurer Policies shall, as applicable, either (i) be deemed to be assumed by the Diocese or the Additional Debtors, as applicable, pursuant to sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code to the extent such Insurance Policy is or was an executory contract of the Diocese or any Additional Debtor, or (ii) continued in accordance with its terms pursuant to section 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Insurance Policy is not an executory contract of the Diocese or any Additional Debtor, such that each of the parties' contractual, legal, and equitable rights under each such Insurance Policy shall remain unaltered. To the extent that any or all such Insurance Policies that are not Settling Insurer Policies are considered to be executory contracts, then the Plan shall constitute a motion to assume such Insurance Policies in connection with the Plan. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to sections 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of the Diocese, the Additional Debtors, their Estates, and all parties in interest in these Chapter 11 Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Diocese existing as of the Effective Date with respect to any Insurance Policy. Subject to the terms of the Insurance Settlement Agreements, the Diocese and the Additional Debtors reserve the right to seek rejection of any Insurance Policy or other available relief prior to the Effective Date.

## F. Bar Date for Professional Fee Claims

Each Professional retained or requesting compensation in the Chapter 11 Cases, pursuant to sections 330, 331, or 503(b) of the Bankruptcy Code, must File with the Bankruptcy Court a final application requesting the allowance of a Professional Fee Claim no later than 60 days after the Effective Date. All applications for the allowance of Professional Fee Claims that are not timely Filed shall be forever barred. Objections to such applications may be Filed in accordance with the Bankruptcy Rules. The Bankruptcy Court shall determine all such Professional Fee Claims.

## G. Bar Date for Other Administrative Claims

Except as provided for herein or in an order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of Administrative Claims must File and serve on the Diocese or the Additional Debtors, as applicable, requests for the payment of such Administrative Claims not previously Allowed by a Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Claims Bar Date, or such Administrative Claims shall be automatically considered Disallowed Claims, forever barred from assertion, and unenforceable against the Diocese, the Additional Debtors, their Estates, or their property without the need for any objection by the Diocese or the Additional Debtors or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Administrative Claims shall be deemed fully satisfied, released, and discharged.

## H. Exit Financing

The Diocese may, at its discretion, obtain financing to assist the Diocese in making Diocese Cash Payment, which includes any loan or other financing arrangement entered into by the Diocese (i) prior to the Effective Date to fund any portion of the DOB Entities' Cash Payment through the DOB Trust Note or (ii) at any time after the Effective Date, without the need to seek Bankruptcy Court approval, to fund any portion of the Diocese's payment obligations under the DOB Trust Note (if any). Any security interest or Lien in collateral granted to a lender in connection with such financing shall, on and after the Effective Date, be enforceable against any interest the Diocese may have in such collateral, to the same extent it may have been enforceable against the Diocese prior to the Effective Date.

# ARTICLE 9

# THE TRUST

## A. Establishment of the Trust

On the Confirmation Date, or as soon as practicable thereafter, the Trust shall be established in accordance with the Trust Documents for the exclusive benefit of the holders of Abuse Claims. The Trust will assume all liability for and rights concerning all Channeled Claims, including the rights to settle the Channeled Claims. The Trust will control the allocation and Distribution of the Abuse Claims Settlement Funds to Abuse Claimants pursuant to the terms of the Allocation Protocol, the Trust Agreement, the Plan, and the Confirmation Order. The Trustee shall establish and maintain a reserve for Trust Expenses, which shall be paid pursuant to the terms of the Trust Agreement.

## B. Funding the Trust

### 1. *Diocese Cash Payment*.

On or before the Effective Date, the Diocese shall cause the Diocese Cash Payment to be paid to the Trust to establish the Trust Reserve, with any balance to be included in the Abuse Claims Settlement Fund. The Abuse Claims Settlement Fund may be supplemented from time to time from: (i) any payment by a Settling Insurer pursuant to an Insurance Settlement Agreement; (ii) any Insurance Claim Proceeds; (iii) proceeds of proceeds of Outbound Contribution Claims; and (iv) any other proceeds which the Trust may obtain pursuant to the terms of the Plan.

### 2. *Additional Debtors' Cash Payment*

On or before the Effective Date, the Additional Debtors shall cause the Additional Debtors' Cash Payment to be paid to the Trust, as part of the DOB Entities' Cash Payment, for inclusion in the Abuse Claims Settlement Fund.

3. ***Contributing Non-Debtor Entity Contribution.*** On or before the Effective Date, and in consideration for the releases set forth in the Plan, including the release of the Estate Causes of Action, each Contributing Non-Debtor Entity shall cause its portion of the Contributing Non-Debtor Entity Contribution to either (a) be paid to the Trust, as part of the DOB Entities' Cash Payment, for inclusion in the Abuse Claims Settlement Fund if all Contributing Non-Debtor Entity Claimants who have filed an Abuse Action against a particular Non-Debtor Entity have either (i) returned a ballot that elects to opt-in to the release for the applicable Contributing Non-Debtor Entity or (ii) the underlying Abuse Action is dismissed with prejudice, or (b) paid to the IOLTA account of Bond Schoeneck & King PLLC and, thereafter paid to the Trust after all Contributing Non-Debtor Entity Claimants who have filed an Abuse Action against a particular Contributing Non-Debtor Entity have either (i) all returned an executed Abuse Claim Release Agreement providing for the release of such Contributing Non-Debtor Entity or (ii) the underlying Abuse Action with respect to the Contributing Non-Debtor Entity Claimant is dismissed with prejudice.

4. ***Settling Insurers' Cash Contribution***.

Each Settling Insurer will pay to the Trust the Insurance Settlement Amount set forth in such Settling Insurer's Insurance Settlement Agreement, in accordance with the terms thereof.

5. ***Insurance Claims Assignment***.

Insurance Claims against the Non-Settling Insurers shall be transferred to the Trust as follows:

a. On the Effective Date, and without further action by any party, the Diocese and the Class 6 Claimants will be deemed to have assigned to the Trust their respective rights, if any, to all Insurance Claims against the Non-Settling Insurers and recoveries on account of such Insurance Claims. Additionally, on the Effective Date, and without further action by any party, each of the Additional Debtors will assign to the Trust the Additional Debtors' rights, if any, to all Insurance Claims against the Non-Settling Insurers and recoveries on account of such Insurance Claims. The foregoing transfer shall be effective to the maximum extent permissible under applicable law and shall not be construed: (i) as an assignment of the Non-Settling Insurer Policies; or (ii) to entitle any Person to Insurance Coverage other than those Persons entitled to coverage under the terms of the Non-Settling Insurer Policies. For the avoidance of doubt, the Trust shall be solely responsible for satisfying, to the extent required under applicable law, any self-insured retention obligations on account of any Class 6 Claim or arising out of any Non-Settling Insurer Policy. To the extent that the Trust pays any self-insured retention in connection with any Class 6 Claim, such amount shall be paid by the Trust. To the extent the Diocese or any of the Additional Debtors pay any self-insured retention, the Trust shall reimburse the Diocese or Additional Debtor for any amounts actually paid by the Diocese or the Additional Debtor prior to making any Trust Distribution for the Abuse Claim for which the Diocese or Additional Debtor paid the self-insured retention. Nothing herein shall obligate any Non-Settling Insurers to advance any self-insured retention, unless otherwise required by applicable law. Likewise, nothing herein shall obligate the Trust, the Diocese or any Additional Debtor to pay any self-insured retention that is not otherwise required by applicable law.

b. For the avoidance of doubt, the Diocese and the Additional Debtors make no representations or warranties, and shall have no duty or obligations whatsoever, to the Trust with respect to the Insurance Claims against Non-Settling Insurers. The Trust shall assume all risks with respect to the litigation, liquidation, and collection of the Insurance Claims against Non-Settling Insurers.

c. For the avoidance of doubt, and notwithstanding anything to the contrary herein, Related Insurance Claims shall not be transferred to the Trust and shall be sold to the Settling Insurers and/or settled and released, in each case as set forth in the Insurance Settlement Agreements.

6. ***Outbound Contribution Claims***.

Outbound Contribution Claims shall be automatically, and without further act or deed, assigned to the Trust on the Effective Date.

7. ***Cabrini Foundation.***

a. If, prior to the termination of the Trust, the Cabrini Foundation enters into a settlement agreement or other arrangement whereby the Diocese and/or Additional Debtors receive any Cabrini Qualifying Proceeds, the Diocese and/or Additional Debtors shall transfer such Cabrini Qualifying Proceeds to the Trust as set forth in such settlement agreement or arrangement.

b. If prior to the termination of the Trust, the Diocese and/or Additional Debtors (as applicable) receive any Cabrini Qualifying Proceeds that are not transferred subject to a settlement agreement or other arrangement as contemplated by subsection (a) above, the recipient thereof shall hold such Cabrini Qualifying Proceeds in a separate segregated account (which may be an investment account) pending either (i) agreement among the Trustee, the Diocese, and, if applicable, any recipient Additional Debtors, as to the ultimate disposition of such Cabrini Qualifying Proceeds; or (ii) entry of an order by the Court directing such disposition, provided, however, that no party shall apply to the Court for judicial intervention until the parties have attempted to negotiate in good faith for at least six months, and provided further, that in the event of judicial intervention is needed with respect to any issue related to the Cabrini Foundation, its assets, proceeds thereof, or the disposition thereof, all parties shall retain all rights and arguments (if any) they may have related to the Cabrini Foundation its assets, proceeds thereof, or the disposition thereof.

c. Any Cabrini Qualifying Proceeds that are transferred to the Trust pursuant to this Article IX.B.7 shall be included in the Abuse Claims Settlement Fund.

d. For avoidance of doubt, nothing in the Plan shall limit or direct in any way the manner in which the Diocese or any Additional Debtors may receive and utilize any Cabrini Exempt Transfer.

## C. Vesting of Trust Assets

On the Effective Date, all Trust Assets shall vest in the Trust, and the Protected Parties shall be deemed for all purposes to have transferred all of their respective right, title, and interest in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Protected Parties, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of the Trust Assets in accordance with this paragraph, and subject to the Insurance Settlement Agreements, the Protected Parties shall have no further interest in or with respect to the Trust Assets.

## D. Non-Monetary Commitments

In order to further promote healing and reconciliation, and in order to continue efforts to prevent Abuse from occurring in the future, the Diocese and the Additional Debtors agree that, beginning within thirty (30) days after the Effective Date (unless a different date is provided in the Confirmation Order), they will use reasonable efforts to undertake and observe certain non-monetary commitments as agreed upon with the Committee and set forth as **Exhibit 4** to the Plan Supplement.

## E. Appointment of the Trustee

The initial Trustee will be identified no fewer than ten (10) Business Days before the Confirmation Hearing. The Trustee shall commence serving as the Trustee on the Effective Date; *provided, however*, that the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Bankruptcy Court, and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

## F. Rights and Responsibilities of the Trustee

The Trustee shall be deemed to be a fiduciary of the Trust under the terms of the Trust Agreement and shall have all rights, powers, authority, responsibilities, and benefits under New York law specified in the Plan and as reflected in the Trust Agreement, including commencing, prosecuting, or settling causes of action, enforcing contracts, and asserting Claims, defenses, offsets and privileges. If there is any inconsistency or ambiguity between the Confirmation Order and the Trust Agreement with respect to the Trustee's authority to act, the provisions of the Trust Agreement shall control, but shall not take precedence over any contrary provision in any Insurance Settlement Agreement(s) or the Sale Order(s) approving the Insurance Settlement Agreement(s) (in which case, such Sale Order(s) and the applicable Insurance Settlement Agreement(s) shall control and govern in that order). Among other things, the Trustee: (1) shall liquidate and convert to Cash the Trust Assets, make timely Distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other Agents on behalf of the Trust, and at the Trust's sole expense, as reasonably necessary and to carry out the obligations of the Trustee hereunder and under the Trust Agreement.

The Trust shall make Trust Distributions to the Abuse Claimants. The Trust may pursue Insurance Claims against any Non-Settling Insurers. The Trust shall neither pursue Related Insurance Claims against Settling Insurer Releasees nor any Settling Insurer's Related Persons or take any other action contrary to, or in violation of, the Insurance Settlement Agreements.

The Confirmation Order shall state that, absent permission of the Bankruptcy Court, no cause of action shall be commenced in any forum, other than the Bankruptcy Court, against the Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Trustee, *provided, however*, that this limitation shall not apply with respect to any Claim or cause of action brought by a Settling Insurer for any actual or alleged breach by the Trustee of such Settling Insurer's Insurance Settlement Agreement or violation by the Trustee of any provision of the Sale Order(s).

## G. Trust Advisory Committee

The Plan and Trust Agreement provide for the creation of a Trust Advisory Committee, which shall initially consist of those members of the Committee who agree to serve on the Trust Advisory Committee. The members of the Trust Advisory Committee shall have only such

limited rights, duties and powers as set forth in the Plan and Trust Agreement. The process for appointing replacement members of the Trust Advisory Committee shall be provided in the Trust Agreement. Upon termination of the Trust, or as otherwise provided in the Trust Agreement, the Trust Advisory Committee shall be deemed dissolved and discharged of and from all further authority, duties, responsibilities, and obligations with respect to or in connection with the Trust and the Chapter 11 Cases.

Except for the reimbursement of reasonable actual costs and expenses incurred in connection with their duties as members of the Trust Advisory Committee, the members of the Trust Advisory Committee shall serve without compensation. Reasonable expenses incurred by members of the Trust Advisory Committee may be solely paid by the Trust without need for approval of the Bankruptcy Court. For the avoidance of doubt, none of the Protected Parties shall be responsible for any fees, costs, or expenses associated with the Trust Advisory Committee.

## H. Trust Pursuit of Insurance Claims

### 1. *Trust's Rights to Pursue Insurance Claims Against Non-Settling Insurers*.

Effective as of the Effective Date, and in accordance with Section 8.2.5 of the Plan, the Insurance Claims against Non-Settling Insurers are assigned and transferred to the Trust.

a. The Trust shall be entitled to (i) all recoveries on account of Insurance Claims against Non-Settling Insurers assigned to the Trust as set forth in the Plan, the Allocation Protocol, and the Confirmation Order, and (ii) to assert and/or assign to any Class 6 Claimant or combination of Class 6 Claimants, to the extent permitted by the Non-Settling Insurer Policies and applicable law, any and all Insurance Claims that currently exist or may arise in the future.

b. The Trust shall also have the exclusive right to pursue Insurance Claims against Non-Settling Insurers related to the Diocese's and/or the Additional Debtors' liability for Channeled Claims or the Non-Settling Insurers' obligations in respect of such Channeled Claims. The foregoing transfer shall not be construed to entitle any Person to insurance coverage other than those Persons entitled to such coverage from Non-Settling Insurers. For the avoidance of doubt, the Trust cannot present Non-Settling Insurers with a demand for Coverage or indemnification based upon Distributions made by the Trust to Abuse Claimants.

c. The Trust may act in its own name, or in the name of any Class 6 Claimant, the Diocese and/or a Additional Debtor to enforce any right, title, or interest of any such party in the Insurance Claims against Non-Settling Insurers assigned to the Trust.

d. No limitations on recovery from Non-Settling Insurers shall be imposed by virtue of the fact the Diocese or Additional Debtor is in bankruptcy or by any Distribution from the Trust to an Abuse Claimant.

e. The Insurance Claims Assignment shall not affect any Non-Settling Insurer's duty to defend, but to the extent that the failure to defend or a separate agreement between the Diocese and/or an Additional Debtor and any Non-Settling Insurer gives rise to a monetary obligation to reimburse defense costs in lieu of a duty to defend, the Trust shall be

entitled to the benefit of such monetary obligation or policy proceeds to the extent of any costs actually paid by the Trust.

f. Any recovery by the Trust on Insurance Claims against Non-Settling Insurers relating to the Diocese's and/or Additional Debtors' liability for Abuse Claims shall become a Trust Asset and shall be distributed as provided in the Plan, the Trust Agreement, and the Allocation Protocol.

g. The Trust's pursuit of the Additional Debtors shall be limited to enforcing specific performance of the Insurance Claims Assignment and any other rights or interests expressly granted to the Trust under the Plan. Neither the Trust nor the Trustee may pursue any Settling Insurer for any Claim released, waived, sold, or relinquished under such Settling Insurer's Insurance Settlement Agreement (including, for the avoidance of doubt, Related Insurance Claims); *provided*, the Trust may enforce its rights (if any) and/or each Settling Insurer's obligations under the applicable Insurance Settlement Agreement(s).

h. The Trust shall have full access to coverage under the Non-Settling Insurer Policies as permitted by applicable non-bankruptcy law, and the Non-Settling Insurers shall retain any and all rights and defenses to coverage under the Non-Settling Insurer Policies and applicable non-bankruptcy law.

i. The Insurance Claims Assignment does not affect any right of the Diocese, any Additional Debtor, or any Non-Settling Insurer to contest any liability or the amount of damages in respect of any Abuse Claims.

2. ***No Impact on Non-Settling Insurers***.

Nothing in the Plan, the Allocation Protocol, the Trust Documents, the Plan Documents, any Confirmation Order (including any provision in the Confirmation Order), or any judgment, order, finding of fact, conclusion of law, determination or statement (written or verbal, on or off the record) made by the Bankruptcy Court, the District Court, or entered by any other court exercising jurisdiction over the Bankruptcy Case, including in any judgment, order, writ or opinion entered on appeal from any of the foregoing, shall in any Action brought by or against a Non-Settling Insurer, including the Insurance Coverage Adversary Proceedings:

a. constitute an adjudication, judgment, trial, determination on the merits, finding, or conclusion of law establishing:

(i) the liquidated liability (in the aggregate or otherwise) of (a) the Diocese, the Additional Debtors, or the Trust, with respect to any Abuse Claims; or (b) any Non-Settling Insurer with respect to any Insurance Claim;

(ii) the liability or obligation of the Diocese, Additional Debtors, or Trust with respect to any Abuse Claim;

(iii) that the aggregate value of the Abuse Claims is equal to the amount to be paid by the Diocese and/or the Additional Debtors into the Trust;

(iv) that it is reasonable, in good faith, or consistent with the terms and conditions of any Non-Settling Insurer Policy for any of the Diocese, the Additional Debtors, or the Trust, to settle, allow, assign any value to, liquidate, and/or pay (or present to any Non-Settling Insurer for payment) any Abuse Claim on any terms or conditions contemplated by the Plan, the Allocation Protocol (including any procedures, matrices or criteria used or considered in valuing, estimating or allowing Abuse Claims thereunder), any other Plan Documents, or any other document or agreement;

(v) that the Plan, any other Plan Document, or any other document or agreement (including any procedures, matrices or criteria used or considered in valuing, estimating or allowing Abuse Claims thereunder) are reasonable or consistent with any procedures that were used to evaluate, settle, or pay Abuse Claims against the Diocese and the Additional Debtors before the Petition Date or under the terms and conditions of any Non-Settling Insurer Policy or applicable non-bankruptcy law;

(vi) that the conduct of the Diocese, the Additional Debtors, the Committee, or the Abuse Claimants, in connection with the negotiation, development, settlement and/or implementation of the Plan (including the aggregate value or amount of the DOB Entities' Cash Payments), the other Plan Documents, or any related documents or agreements was, is, or will be consistent with the terms and conditions of any Non-Settling Insurer Policy or applicable non-bankruptcy law;

(vii) that any Non-Settling Insurer was invited to participate in or participated in, consulted on, negotiated, and/or consented to the Allocation Protocol, the Trust Documents, and other Plan Documents; and

b. have any res judicata, collateral estoppel or other preclusive effect with respect to any matter set forth in Section 8.8.2(a) of the Plan, or otherwise prejudice, diminish, impair, or affect (under principles of waiver, estoppel, or otherwise) any defense, Claim or right any Non-Settling Insurer may have under any Non-Settling Insurer Policy or applicable non-bankruptcy law with respect thereto. Without limiting the foregoing, but subject to Section 8.8.4 of the Plan, it is expressly agreed by all Neutrality Parties that the Neutrality Parties are not litigating any issue set forth in Section 8.8.1(a) of the Plan or any other Non-Settling Insurer coverage defenses, rights, obligations, or other coverage issue of any kind in these Chapter 11 Cases;

c. constitute a decision on any matter at issue or which may be raised as an issue in any Action by or against a Non-Settling Insurer, including the Insurance Coverage Adversary Proceedings. Thus, any judgment, order, finding of fact, conclusion of law, determination or other statement of the Bankruptcy Court or issued or affirmed by the District Court in these Chapter 11 Cases, or entered by any other court exercising jurisdiction over the bankruptcy case, including any Confirmation Order or the Allocation Protocol and/or other Plan Documents and any finding, conclusion or determination entered in connection therewith, is not intended – and shall not be construed – to constitute a finding, conclusion or determination regarding any matter set forth in Section 8.8.2(a) of the Plan or any other issue for any insurance coverage purpose whatsoever, and the Neutrality Parties shall not contend otherwise in any Action against a Non-Settling Insurer;

d. subject to Sections 8.8.4 of the Plan, impair any Non-Settling Insurer's legal, equitable, or contractual rights under any Non-Settling Insurer Policy or with respect to Insurance Claims, or any policyholder's legal, equitable or contractual rights under any Non-Settling Insurer Policy or with respect to Insurance Claims. The Neutrality Parties shall retain, and be permitted to assert, in any Action against any Non-Settling Insurer, all Claims and/or defenses, including any coverage defenses related to the Abuse Claims, the Insurance Claims and/or the Non-Settling Insurer Policies, notwithstanding any provision of the Plan, Allocation Protocol, the Trust Documents, the other Plan Documents, the Confirmation Order, any findings of fact and/or conclusions of law with respect to the confirmation of the Plan, or any Final Order or opinion entered on appeal from the Confirmation Order; or

e. subject to Section 8.8.4 of the Plan, impair any Non-Settling Insurer's Insurer Contribution Claims, which may be asserted as a defense or counterclaim against the Diocese, the Diocese Settling Parties or the Trust (as applicable) in any Action against any Non-Settling Insurer, including the Insurance Coverage Adversary Proceedings. To the extent the Insurer Contribution Claims of a Non-Settling Insurer are determined to be valid, the liability (if any) of such Non-Settling Insurer to the Trust shall be reduced by the amount of such Insurer Contribution Claims. For avoidance of doubt, and notwithstanding anything to the contrary in Section 8.8.2 of the Plan, all Insurer Contribution Claims shall be channeled to the Trust in accordance with Section 12.3 of the Plan and no Insurer Contribution Claim shall be the basis for any affirmative recovery against any Protected Party.

3. ***Non-Settling Insurers' Remedies.***

Notwithstanding anything to the contrary in Section 8.8.2 of the Plan, the Non-Settling Insurers' remedies are limited to those available under applicable law and nothing in these Chapter 11 Cases shall enhance or impair any right(s) a Non-Settling Insurer may have under applicable law.

4. ***Preservation of Plan Provisions.***

For the avoidance of doubt, the provisions of Section 8.8.2 of the Plan are intended solely to ensure that the Plan leaves intact and does not alter or affect any rights or interests of the Non-Settling Insurers with respect to the Non-Settling Insurer Policies. Nothing set forth in Section 8.8.2 of the Plan is intended to, nor shall it, impair the effectiveness of any provision of the Plan, including, without limitation, the Diocese Discharge, the Additional Debtor Discharge, the Channeling Injunction, the Settling Insurer Injunction, or any other release or injunctive provisions set forth in the Plan, as such Plan provisions relate to any rights, Claims, actions, defenses, interests, transactions or other dealings between or among (i) one or more Neutrality Parties who are not Non-Settling Insurers or (ii) any Neutrality Party who is not a Non-Settling Insurer and any Person who is not a Neutrality Party.

## I. Investment Powers; Permitted Cash Expenditures

All funds held by the Trust shall be held in Cash or invested in short-term highly-liquid investments that are readily convertible to known amounts of Cash as more particularly

described in the Trust Agreement. The Trustee may expend such Cash in a manner consistent with the terms of the Trust Agreement and the Allocation Protocol.

**J. Tax Matters**

The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Diocese is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference. The Trust shall not be deemed to be the same legal entity as the Diocese or the Additional Debtors, but only the assignee of certain assets of the Diocese and the Additional Debtors and a representative of the Estates for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Trustee shall File such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et seq.*, as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 *et seq.*, and New York law and the regulations promulgated thereunder, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any. The Trustee, may in its discretion, establish a disputed claims reserve for the Trust, which shall be administered in accordance with applicable law.

**K. No Recourse Against Trustee**

No recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any Agent retained in accordance with the terms of the Trust Agreement or the Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Trustee in implementation of the Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Trustee under the Plan for any purpose authorized by the Trust Agreement or the Plan, it being expressly understood and agreed that all such liabilities, covenants, and Trust Agreements of the Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets or such part thereof as shall under the term of any such Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Trust Assets. Notwithstanding the foregoing, the Trustee may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, breach of the fiduciary duty of loyalty, or fraud, and if liability on such grounds is established, recourse may be had directly against the Trustee. The Trust shall not be covered by a bond.

None of the Additional Debtors shall be liable for any acts or omissions by the Trust, the Trustee, or their respective Agents or Related Persons.

**L. Indemnification by Trust**

The Trust shall defend, indemnify, and hold harmless the Trustee and its Agents to the fullest extent permitted under the laws of New York in the performance of their duties under the

Plan and the Trust Agreement. For the avoidance of doubt, the Diocese, Additional Debtors, and their respective Agents shall not be deemed to be Agents of the Trust unless specifically authorized as such in writing by the Trustee.

The Trust shall defend, indemnify, and hold harmless the Protected Parties from any Medicare Claims arising out of or related to an Abuse Claim, and any Claims related to the Trust's obligations under the Plan.

The Trust shall defend, indemnify, and hold harmless any Settling Insurer, as set forth in such Settling Insurer's Insurance Settlement Agreement from each and every one of the following "Indemnified Claims:" any and all Channeled Claims, Barred Claims, and Claims otherwise enjoined by or subject to the Settling Insurer Injunction and/or such Settling Insurer's Insurance Settlement Agreement, including all such Claims made by (i) any Person claiming to be an insured (as a named insured, additional insured, or otherwise) under any of the Settling Insurer Policies; (ii) any Person who has made, will make, or can make (a) a Related Insurance Claim or (b) an Abuse Claim; and (iii) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Settling Insurer Policies. For the avoidance of doubt, to the extent set forth in Section 8.12.3 of the Plan (also set forth in the subsections immediately below) conflicts or is inconsistent with the provisions of any Insurance Settlement Agreement that relate to Indemnified Claims, the provisions of the applicable Insurance Settlement Agreement(s) will control and govern.

i. Each Settling Insurer shall have the right (but not the obligation) to defend any Indemnified Claims brought or made against such Settling Insurer and shall do so in good faith. Each Settling Insurer (i) may, upon receipt of an Indemnified Claim brought or made against such Settling Insurer, undertake the defense of the Indemnified Claim but is not required to do so and (ii) agrees to notify the Trust as soon as practicable of such Indemnified Claim(s) and of the Settling Insurer's choice of counsel. If a Settling Insurer declines to defend an Indemnified Claim brought or made against it, the Trust shall undertake the defense thereof.

ii. The Trust shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by each Settling Insurer defending an Indemnified Claim. Such Settling Insurer may settle or otherwise resolve the Indemnified Claim only with the prior consent of the Trust, which consent shall not be unreasonably withheld. The Trust may settle or otherwise resolve an Indemnified Claim only with the prior consent of the applicable Settling Insurer, which consent shall not be unreasonably withheld. A Settling Insurer's defense, settlement, or other resolution of any Indemnified Claim brought or made against such Settling Insurer shall not diminish the obligations of the Trust to indemnify the Settling Insurer for the Indemnified Claim, as set forth in Section 8.12.3 of the Plan.

iii. The indemnification and hold harmless undertaking set forth in Section 8.12.3 of the Plan also extends to and for the benefit of the other Settling Insurer Releasees, all of which are third-party beneficiaries of the terms hereof.

## M. Trust Assumption of Liability

Upon the occurrence of the Effective Date, the Trust shall automatically and without further act or deed assume all responsibility for preserving, managing, and distributing Trust Assets.

Subject to and upon the occurrence of each applicable Abuse Claim Discharge Date, the Trust shall automatically and without further act or deed assume all liability, if any, of the Diocese, Additional Debtors and Settling Insurers in respect of all Abuse Claims, which shall become Channeled Claims in accordance with the terms of the Plan. On the Effective Date, the Trust shall automatically and without further act or deed assume all liability, if any, of the Settling Insurers in respect of all Barred Claims and Channeled Claims.

## N. Termination

The Trust shall terminate after its liquidation, administration, and Distribution of the Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth in the Trust Agreement.

# ARTICLE 10

# GENERAL CLAIMS ADMINISTRATION

## A. Objections to Non-Abuse Claims

Prior to the Effective Date, the Diocese and the Additional Debtors shall have the authority to pursue any objection to the allowance of any Non-Abuse Claim. From and after the Effective Date, the Diocese and the Additional Debtors will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making any Distributions with respect to Non-Abuse Claims; *provided*, *however*, that nothing in this Section shall affect the right of any party in interest (including the Diocese, the Additional Debtors and the Trustee) to object to any Non-Abuse Claim to the extent such objection is otherwise permitted by the Bankruptcy Code, the Bankruptcy Rules, and this Plan. Unless otherwise provided in this Plan or by order of the Bankruptcy Court, objections to Non-Abuse Claims will be Filed and served not later than the Claims Objection Deadline. The Claims Objection Deadline or any Bankruptcy Court-approved extension thereof, may be extended upon request by the Diocese by filing a motion without any requirement to provide notice to any Person, based upon a reasonable exercise of the Diocese's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

## B. Determination of Claims

From and after the Effective Date, any Non-Abuse Claim as to which a proof of claim or motion or request for payment was timely Filed in these Chapter 11 Cases, or deemed timely Filed by order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed, or amended, as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired, (and as to which no appeal or petition for review or rehearing was Filed or, if Filed, remains

pending)), liquidated pursuant to: (i) an order of the Bankruptcy Court; (ii) applicable bankruptcy law; (iii) agreement of the parties without the need for Bankruptcy Court approval; (iv) applicable non-bankruptcy law; or (v) the lack of (a) an objection to such Non-Abuse Claim, (b) an application to equitably subordinate such Non-Abuse Claim, and (c) an application to otherwise limit recovery with respect to such Non-Abuse Claim, Filed by the Diocese or any other party in interest on or prior to any applicable deadline for filing such objection or application with respect to such Non-Abuse Claim. Any such Non-Abuse Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with this Plan. Nothing contained in this Section shall constitute or be deemed a waiver of any Claims, rights, or causes of action that the Diocese may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U.S.C. § 157; *provided, however*, that any Claims against the Settling Insurers that the Diocese had, has, may have had, or may in the future have shall be waived and released in accordance with the terms of, and to the extent set forth in, the Settling Insurers' respective Insurance Settlement Agreement.

**C. No Distributions Pending Allowance**

Except in the case of Abuse Claims paid pursuant to the Allocation Protocol, no Distribution will be made with respect to a Disputed Claim, or any portion thereof, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

**D. Claim Estimation**

To effectuate Distributions pursuant to the Plan and avoid undue delay in the administration of these Chapter 11 Cases, with respect to Disputed Claims (except Class 6 Claims), the Diocese, after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an order of the Bankruptcy Court or the District Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the amount of: (i) property that must be withheld from or reserved for Distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; *provided*, *however*, that the Bankruptcy Court or the District Court, as applicable, shall determine: (y) whether such Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code, and (z) the timing and procedures for such estimation proceedings.

**E. Treatment of Contingent Claims**

Except with respect to Abuse Claims, until such time as a contingent Claim or a contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to Distributions under the Plan.

**F. Controversy Concerning Impairment**

If a controversy arises as to whether any Claim or any Class of Claims is Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy prior to confirmation of the Plan.

## G. Treatment of Executory Contracts and Unexpired Leases

Subject to the requirements of section 365 of the Bankruptcy Code, all executory contracts and unexpired leases of the Diocese and the Additional Debtors except (i) Insurance Policies that have not been assumed and retained by the Diocese or any Additional Debtors pursuant to Section 7.5 of the Plan, or (ii) executory contracts and unexpired leases that have been rejected by order of the Bankruptcy Court or are the subject of a motion to reject pending on the Confirmation Date, will be deemed to be assumed and assigned to the Diocese and the Additional Debtors, as applicable, on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed and assigned to the Diocese or Additional Debtors objects to such assumption and assignment, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure defaults that may be required under section 365(b)(1) of the Bankruptcy Code will be made by the Diocese and the Additional Debtors, except that the Trust shall pay any cure costs under any Insurance Policy assumed and retained by the Diocese or the Additional Debtors pursuant to Section 7.5 of the Plan. In the event of a dispute regarding the amount of any cure payments, or the ability of the Diocese or the Additional Debtors (as applicable) to provide adequate assurance of future performance with respect to any executory contracts to be assumed by the Diocese or the Additional Debtors, or assumed and assigned to the Diocese or the Additional Debtors, the Trust, the Diocese or the Additional Debtors (as applicable) will make any payments required by section 365(b)(1) of the Bankruptcy Code after the entry of a Final Order resolving such dispute. The contracts and leases which will be assumed and assigned to the Diocese and the Additional Debtors, and their respective cure costs, are identified in **Exhibit 5** to the Plan Supplement. For the avoidance of doubt, none of the Settling Insurer Policies will be assumed or assigned to the Diocese or the Additional Debtors.

# ARTICLE 11

# PROVISIONS GOVERNING DISTRIBUTIONS

## A. Disbursing Agents

The Diocese shall be the disbursing agent for all aspects of the Plan except for Distributions made from the Trust. With respect to the Trust, the Trustee shall be the disbursing agent and be responsible for all Distributions made under the Trust.

## B. Manner of Payment

Unless otherwise agreed by the Diocese, Additional Debtors, or the Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, all Distributions of Cash under the Plan may be made either by check via first class mail, postage prepaid, or by wire transfer from a domestic bank, at the option of the respective disbursing agent.

## C. Distribution Only to Holders of Allowed Claims

Except as otherwise provided in the Plan for Abuse Claims which shall be neither Allowed nor Disallowed under the Plan, Distributions under the Plan and the Plan Documents

will be made only to the holders of Allowed Claims. Until a Disputed Non-Abuse Claim becomes an Allowed Claim, the holder of that Disputed Non-Abuse Claim will not receive any Distribution otherwise provided to Non-Abuse Claimants under the Plan or the Plan Documents. If necessary, in determining the amount of a *pro rata* Distribution due to the holders of Allowed Claims in any Class, the Diocese will make the *pro rata* calculation as if all Disputed Non-Abuse Claims were Allowed Claims in the full amount claimed or in the estimated amount. When a Disputed Non-Abuse Claim in any Class becomes an Allowed Claim, the Diocese will make a full or partial Distribution, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the order, if any, allowing such Claim and any required withholding of applicable federal and state taxes.

**D. <u>Disputed Claim Reserve</u>**

Except with respect to Trust Distributions made to Abuse Claimants pursuant to the Allocation Protocol, to the extent that a disbursing agent makes a Distribution hereunder to a Class prior to the resolution of all Disputed Claims of such Class, the respective disbursing agent shall reserve an amount for any Disputed Claims in such Class equal to the amount that such holders of Disputed Claims in such Class would be entitled to receive under the Plan if such Disputed Claims were Allowed in the asserted amount of the Claim.

**E. <u>Transmittal of Distributions</u>**

Except as otherwise provided in the Plan, in the Plan Documents, or in an order of the Bankruptcy Court, Distributions to be made under the Plan, Confirmation Order, or Trust Documents to Class 6 Claimants will be made by the Trust, and Distributions to all other Claimants will be made by the Diocese or the Additional Debtors. Distributions to Class 6 Claimants will be made: (i) to the client trust account for the Claimant's attorney of record, as agent for the Abuse Claimant; or (ii) if the Class 6 Claimant does not have an attorney of record, to the mailing address set forth in the Release submitted to the Trust, or to such other address as may be provided to the Trustee by such Claimant in writing. The Trustee shall have no liability to a Class 6 Claimant on account of Distributions made to the client trust account of a Class 6 Claimant's attorney.

**F. <u>Timing of Distributions</u>**

Unless otherwise agreed by the Diocese, Additional Debtors, or the Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, whenever any payment to be made is due on a day other than a Business Day, such payment will instead be made on the next Business Day. Any Claimant that is otherwise entitled to an undeliverable Distribution and that does not, within thirty (30) days after a Distribution is returned to the Diocese, Additional Debtor, or to the Trustee, as applicable, as undeliverable or is deemed to be an undeliverable Distribution, provide the Diocese, Additional Debtor, or the Trustee, as applicable, with a written notice asserting its Claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed to waive any Claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Diocese, Additional Debtor, the Trust, the Trustee, or its property. Any undeliverable Distributions to be made by the Trust that are not claimed under

this Section will become available for the Trust to distribute to other Abuse Claimants. Any other undeliverable Distributions shall be retained by the Diocese or Additional Debtor, as applicable, in accordance with the Plan. Nothing in the Plan requires the Diocese, Additional Debtor, the Trust, or the Trustee to attempt to locate any Claimant whose Distribution is undeliverable.

**G. Time Bar to Check Payments**

If an instrument delivered as a Distribution to a Claimant by the Diocese, Additional Debtor, or the Trust is not negotiated within one hundred eighty (180) days after such instrument is sent to the Claimant, then the instrument shall be null and void, the Claimant shall be deemed to have waived such Distribution, and all Claims in respect of such voided check shall be discharged and forever barred. Any request for re-issuance of a check must be made on or before within one hundred eighty (180) days after issuance of a non-negotiated check. Except as otherwise provided herein, any Distribution under the Plan which is not negotiated after within one hundred eighty (180) days following issuance shall be forfeited, and such Distribution, together with any interest earned thereon, and shall return to and revest in the Diocese or to the Trust, as applicable.

**H. No Professional Fees or Expenses**

No professional fees or expenses incurred by a Claimant will be paid by the Diocese, the Additional Debtors, or the Trust with respect to any Claim except as specified in the Plan or the Trust Documents.

**I. No Interest on Claims**

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between the Diocese or any Additional Debtor and the holder of a Claim approved by an order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on any Claim, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, the Confirmation Order, or the Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**J. Saturday, Sunday, or Holiday**

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the following Business Day but shall be deemed to have been completed as of the required date.

**K. Withholding Taxes**

The Diocese and Additional Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. As

a condition to making any Distribution under the Plan, the Diocese and the Additional Debtors will require that the holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

**L. Setoffs and Recoupment**

Subject to the terms of the Plan and pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Diocese and the Additional Debtors may but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan, any Claims of any nature whatsoever the Diocese may have against the holder of such Claim.

**M. No *De Minimis* Distributions**

Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash (rounded to the nearest whole cent when and as necessary) will be issued to Claimants entitled to receive Distributions of Cash. Any Distribution of less than $25.00 will be considered *de minimis*, and holders of Allowed Claims that are entitled to Distributions of less than $25.00 will not receive any Distribution. Such funds will remain with, and revest in, the Diocese or the Additional Debtor, as applicable. For avoidance of doubt, this Section 11.M shall not apply to any Distributions to be made by the Trust, which shall be governed solely by the Trust Documents.

**N. Prepayment**

Except as otherwise provided in the Plan or the Confirmation Order, the Diocese and the Additional Debtors shall have the right to prepay, without penalty, all, or any portion of an Allowed Claim.

## ARTICLE 12

## EFFECTIVE DATE

**A. Conditions Precedent to Effective Date**

The Effective Date shall not occur, and the Plan shall not be consummated, unless each of the following conditions are satisfied or waived as set forth in Section 11 of the Plan:

1. ***Confirmation Order.*** The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Plan Proponents and the Settling Insurers; provided, however, that the findings and determinations set forth in the following clauses a. and b. of this Section A.1 (or in any corresponding section or paragraph of the Plan or Confirmation Order) shall not be binding on the Settling Insurers. Neither the Insurance Settlement Agreements nor any of the Settling Insurers' actions or inactions in these Chapter 11 Cases shall be deemed as support for such findings and determinations, the Insurance Claims Assignment and/or the Allocation Protocol, and no party shall argue that the Settling Insurers agreed to or acquiesced in such findings and determinations, the Insurance Claims Assignment and/or

Allocation Protocol in any proceeding. Rather, the Settling Insurers are designated as Protected Parties under the Plan, and as a result, the Settling Insurers take no position on such findings and determinations, the Insurance Claims Assignment, or the Allocation Protocol. Without limiting the generality of the foregoing, the Confirmation Order shall, at a minimum, contain findings by the Bankruptcy Court that:

a. the assignment of Insurance Claims, or alternatively, the retention and prosecution of such Claims following confirmation by the Diocese and the Additional Debtors as contemplated in the Plan is authorized by, and does not conflict with, any provision of the Bankruptcy Code, and is therefore approved;

b. to the extent approval for any transfer contemplated in the Joint Plan may be required under section 511 or 511-a of the New York State Not-For-Profit Corporation Law, the Bankruptcy Court has jurisdiction to approve, and does hereby approve such transfers, and no further approval of, or authorization from, the New York State Attorney General or the Supreme Court of the State of New York is required; and

c. all of the requirements for confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code have been met and that the Plan should be confirmed.

2. ***Channeling and Insurer Injunctions.*** The Confirmation Order shall approve and implement the Channeling Injunction set forth in Section 12 of the Plan and shall ratify the Settling Insurer Injunction set forth in the Sale Order(s) approving the respective Insurance Settlement Agreements.

3. ***Plan Documents.*** Except for the Allocation Protocol, the Plan Documents shall be in form and substance acceptable to the Plan Proponents and the Settling Insurers. The Allocation Protocol shall be in form and substance acceptable to the Plan Proponents.

4. ***Trust Formation.*** The Trust shall have been formed, the Bankruptcy Court shall have entered an order appointing the Trustee, and the Trustee, the Diocese and the Additional Debtors shall have executed the Trust Agreement.

5. ***The DOB Entities' Cash Payment to the Trust.*** The DOB Entities' Cash Payment, including the DOB Trust Note, as applicable, shall have been contributed to the Trust.

6. ***Insurance Settlement Agreements.*** Each Insurance Settlement Agreement agreed to prior to the Confirmation Date shall have been duly executed by all parties thereto and approved by the Bankruptcy Court, in each case in form and substance satisfactory to the Plan Proponents and applicable Settling Insurers.

7. ***The Settling Insurers' Contribution.*** Each Settling Insurer shall have paid to the Trust the Insurance Settlement Amount due under such Settling Insurer's Insurance Settlement Agreement, unless the terms of such Insurance Settlement Agreement expressly provide that the applicable Insurance Settlement Amount will be paid at a later date.

8. ***Final Orders.*** The Confirmation Order, the order appointing the Trustee, and the Sale Order(s) shall be Final Orders and no stay of any such orders shall then be in effect.

9. ***Additional Debtors Petition Date and Additional Debtors Bar Date.*** The Additional Debtors shall have filed their chapter 11 petitions prior to the Confirmation Hearing, and the Additional Debtors Bar Date shall have occurred and no more than ten (10) Post-Confirmation Claims shall have been filed.

10. ***No Material Amendments.*** The Plan shall not have been materially amended, altered, or modified as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made with consent of the Plan Proponents, and any affected Settling Insurers, Additional Debtors and Abuse Claimants, *provided*, *however*, that the Committee shall have authority to negotiate and agree to modifications to the treatment accorded to Class 6 Claims on behalf of all Class 6 Claimants in accordance with Section 2.3.6(n) of the Plan.

## B. Waiver of Conditions

Any condition to the occurrence of the Effective Date set forth in Section 11.1 of the Plan may be waived only by the mutual written consent of the Diocese and the Committee; *provided, however*, that each Settling Insurer must consent to a waiver of any conditions affecting such Settling Insurer's rights or obligations, and each of the Additional Debtors must consent to a waiver of any condition affecting such Additional Debtor's obligations. For avoidance of doubt, none of the Diocese, the Committee, the Settling Insurers, or the Additional Debtors shall have any obligation to waive any of the conditions set forth in Section 11.1, and each may withhold such consent in their sole and absolute discretion.

## C. Occurrence of Effective Date

If the Effective Date has not occurred within ninety (90) days of the date on which the Confirmation Order becomes a Final Order, the Diocese or the Committee may elect to withdraw the Plan in their respective sole and absolute discretion.

## D. Notice of Effective Date

The Diocese and Additional Debtors shall jointly File a notice of Effective Date with the Bankruptcy Court and serve it on all Creditors and parties in interest, within five (5) Business Days after the occurrence of the Effective Date. Such notice shall include all relevant deadlines put into effect by the occurrence of the Effective Date.

## E. Effect of Non-Occurrence of Conditions

If substantial consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (i) constitute a waiver or release of any Claims by or against the Additional Debtors; (ii) prejudice in any manner the rights of the Protected Parties, or the Trust; (iii) constitute an admission, acknowledgment, offer, or undertaking by the Protected Parties in any respect, including but not limited to, in any proceeding or case against the Diocese or any Additional Debtor; or (iv) be admissible in any action, proceeding or case against the Protected Parties or Settling Insurers in any court or other forum. Notwithstanding the foregoing, each Insurance Settlement Agreement

(including any release or waiver of Claims in accordance with the terms thereof) shall continue and survive, in accordance with its terms and to the extent set forth therein.

## ARTICLE 13

## EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE

### A. General Injunction and Discharge

1. ***General Injunction*. EXCEPT WITH RESPECT TO ABUSE CLAIMS AND INBOUND CONTRIBUTION CLAIMS ADDRESSED IN SECTION 12.2.3 OF THE PLAN, OR AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, OR AS OTHERWISE PROVIDED IN ANY INSURANCE SETTLEMENT AGREEMENT OR SALE ORDER, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OF ANY KIND OR NATURE AGAINST THE DIOCESE OR THE ADDITIONAL DEBTORS, WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, OR ITS AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASES, AS APPLICABLE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF NON-ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i) OF THE BANKRUPTCY CODE, WHETHER OR NOT (I) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (II) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (III) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN, ARE PERMANENTLY ENJOINED, ON AND AFTER THE CONFIRMATION DATE, FROM (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM OR TAKING ANY ACT TO RECOVER SUCH CLAIM OUTSIDE OF THE CLAIMS ALLOWANCE PROCEDURE PROVIDED FOR IN THE PLAN AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (B) THE ENFORCEMENT, ATTACHMENT, COLLECTION, OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DIOCESE ON ACCOUNT OF ANY SUCH CLAIM, (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE OR ADDITIONAL DEBTOR ON ACCOUNT OF ANY SUCH CLAIM AND (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DIOCESE OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE ON ACCOUNT OF ANY SUCH CLAIM.**



23535292.v7-8/21/26
Case 1-20-10322-CLB, Doc 5057, Filed 08/21/26, Entered 08/21/26 17:37:11, Description: Main Document , Page 90 of 125

2. ***Discharge of the Diocese for Non-Abuse Claims.*** Except as otherwise expressly provided in (i) the Plan, (ii) the Confirmation Order, or (iii) any Insurance Settlement Agreement or Sale Order, on the Effective Date, pursuant to section 1141(d) of the Bankruptcy Code, the Diocese and its Estate will be discharged from all liability for any and all Non-Abuse Claims. For the avoidance of doubt and notwithstanding anything to the contrary herein, neither the Diocese nor its Estate will be discharged from its or their respective responsibilities (and corresponding liabilities) under or with respect to any Insurance Settlement Agreement.

3. ***Treatment of Non-Abuse Claims against the Additional Debtors.*** The Additional Debtors will continue to be obligated to pay Non-Abuse Claims in the ordinary course of business, as set forth in Section 2.3.8 of the Plan. For the avoidance of doubt and notwithstanding anything to the contrary herein, neither the Additional Debtors, nor their Estates will be discharged from its or their respective responsibilities (and corresponding liabilities) under or with respect to any Insurance Settlement Agreement.

## B. Injunction and Discharge of Abuse Claims and Inbound Contribution Claims

1. ***Discharge of the Diocese.*** Except as expressly provided in the Insurance Settlement Agreements, Plan or the Confirmation Order, all consideration distributed under the Plan, and the Diocese's payment to the Trust, shall be in exchange for, and in complete satisfaction, settlement, discharge, termination and release of, all Claims of any nature whatsoever against or in the Diocese or any of its assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, and, as of the Effective Date, the Diocese shall be deemed discharged and released, and each holder of a Claim, and any successor, assign, and affiliate of such holder shall be deemed to have forever waived, discharged and released the Diocese, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of any from any and all Claims, rights and liabilities, and all debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity or any nature that occurred prior to the Effective Date, in each case whether or not (a) a Proof of Claim based upon such debt is Filed or deemed Filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been Disallowed by order of the Bankruptcy Court, or (d) the holder of a Claim based upon such debt is deemed to have accepted the Plan; provided, however, with respect to any Abuse Claim arising after the Diocese Petition Date but prior to the Effective Date, such Abuse Claimant shall be entitled to pursue such Abuse Claim to the extent that such Abuse Claim is covered by an Insurance Policy of the Diocese that remains effective, but may only recover with respect to such Abuse Claim to the extent of the proceeds of any such Insurance Policy covering such Abuse Claim.

2. ***Discharge of Abuse Claims Against the Additional Debtors.*** All consideration distributed under the Plan, and each Additional Debtor's payment to the Trust, shall be in exchange for, and in complete satisfaction, settlement, discharge, termination, and release of, all Abuse Claims against or in the Additional Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, and, as of the Effective Date, the Additional Debtors shall be deemed discharged and released, and each holder of an Abuse Claim and any successor, assign, and

affiliate of such holder shall be deemed to have forever waived, discharged, and released the Additional Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Abuse Claims, rights and liabilities, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, in each case whether or not (a) a Proof of Claim based upon such Abuse Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) an Abuse Claim is Allowed under section 502 of the Bankruptcy Code, (c) an Abuse Claim is or has become an Expunged Abuse Claim, or (d) the holder of an Abuse Claim is deemed to have accepted the Plan.

3. ***Injunction of Abuse Claims and Inbound Contribution Claims*. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN OR IN THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE ALL PERSONS SHALL BE PERMANENTLY STAYED, ENJOINED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE AGAINST THE DIOCESE, THE ADDITOINAL DEBTORS, OR CONTRIBUTING NON-DEBTOR ENTITY (IN CONNECTION WITH A CONTRIBUTING NON-DEBTOR ENTITY ABUSE ACTION), ANY ABUSE CLAIMS OR INBOUND CONTRIBUTION CLAIMS, KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, ANY ADDITIONAL DEBTOR, ANY CONTRIBUTING NON-DEBTOR ENTITY (IN CONNECTION WITH A CONTRIBUTING NON-DEBTOR ENTITY ABUSE ACTION), OR ANY OF THEIR AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i) OF THE BANKRUPTCY CODE, WHETHER OR NOT (I) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (II) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (III) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN.**

**IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.**

**THE DISCHARGE AND INJUNCTIONS CONTAINED IN THE PLAN AND THE RELEASES PROVIDED UNDER THE PLAN DO NOT RELEASE OR IMPAIR AN ABUSE CLAIMANT'S RIGHT TO RECOVER ON ANY ABUSE CLAIM AGAINST**

**ANY PERPETRATOR OF ABUSE FOR ACTS OF ABUSE THAT ARE INDEPENDENT OF THE LIABILITY OF THE DIOCESE OR ANY ADDITIONAL DEBTOR.**

4. ***Discharge of Abuse Claims and Inbound Contribution Claims.*** Except as otherwise expressly provided in the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, the Diocese, the Additional Debtors and their Estates will be discharged from: (i) all liability for any and all Inbound Contribution Claims on the Confirmation Date; and (ii) all liability for any and all Abuse Claims upon the occurrence of the Abuse Claim Discharge Date.

The Abuse Claim Discharge Date shall be the Effective Date with respect to any Filed Abuse Claim held by Abuse Claimants, any Abuse Claim held by an Unknown Abuse Claiamnt, or any Post-Statute Filed Abuse Claim.

5. ***Preservation of Insurance Claims.*** The Non-Settling Insurers remain fully liable for their obligations related in any way to the Abuse Claims, and their obligations are not reduced by the fact that the Diocese and Additional Debtors have filed, or will file, bankruptcy petitions, or by the amount of Distributions Abuse Claimants receive, or may be entitled to receive, based on the Plan. The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Abuse Claims as set forth in the Plan. Any such recoveries by the Trust from Non-Settling Insurers will be added to the Abuse Claims Settlement Fund to be distributed pursuant to the terms of the Plan, the Allocation Protocol, and the Trust Documents. Nothing in the Plan shall be deemed to modify or abridge any rights of the Non-Settling Insurers under their respective Non-Settling Insurer Policies.

6. ***No Injunction Until Payment.*** The Injunction provided in Section 12.2.3 of the Plan shall not apply to any Contributing Non-Debtor Entity until such time that such entity's Contributing Non-Debtor Entity Contribution is paid to the Trust.

## C. Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties

1. **IN CONSIDERATION OF THE UNDERTAKINGS OF THE PROTECTED PARTIES HEREIN, THEIR PAYMENTS TO THE TRUST, AND OTHER CONSIDERATION GIVEN, AND, WHERE APPLICABLE, PURSUANT TO THEIR RESPECTIVE SETTLEMENTS WITH THE DIOCESE AND ADDITIONAL DEBTORS AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS BETWEEN AND AMONG THE PROTECTED PARTIES, AND TO SUPPLEMENT WHERE NECESSARY THE INJUNCTIVE EFFECT OF THE DISCHARGE AS PROVIDED IN SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE, AND PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE:**

a. **ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, AND RESOLVED UNDER THE PROCEDURES AND PROTOCOLS AND IN THE AMOUNTS ESTABLISHED UNDER THE PLAN, THE ALLOCATION PROTOCOL, AND THE TRUST AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL HOLDERS OF CHANNELED CLAIMS.**

b. **ALL PERSONS WHO HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIMS, ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING OR ATTEMPTING TO ASSERT OR ENFORCE ANY CHANNELED CLAIMS AGAINST THE PROTECTED PARTIES, INCLUDING:**

(i) **COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES OR AGAINST THE PROPERTY OF ANY OF THE PROTECTED PARTIES;**

(ii) **ENFORCING, ATTACHING, COLLECTING, OR RECOVERING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, BY ANY MANNER OR MEANS, ANY JUDGMENT, AWARD, DECREE, OR ORDER WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES;**

(iii) **CREATING, PERFECTING, OR ENFORCING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, ANY LIEN OF ANY KIND RELATING TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF THE PROTECTED PARTIES;**

(iv) **ASSERTING, IMPLEMENTING, OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST:**

**(a) ANY OBLIGATION DUE ANY OF THE PROTECTED PARTIES;**

**(b) ANY OF THE PROTECTED PARTIES; OR**

**(c) THE PROPERTY OF ANY OF THE PROTECTED PARTIES.**

(v) **TAKING ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THE PLAN; AND**

(vi) **ASSERTING OR ACCOMPLISHING ANY SETOFF, RIGHT OF INDEMNITY, SUBROGATION, CONTRIBUTION, OR RECOUPMENT OF ANY KIND AGAINST AN OBLIGATION DUE TO ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES.**

2. **THE CHANNELING INJUNCTION IS AN INTEGRAL PART OF THE PLAN AND IS ESSENTIAL TO THE PLAN'S CONSUMMATION AND IMPLEMENTATION. IT IS INTENDED THAT THE CHANNELING OF THE**

**CHANNELED CLAIMS AS PROVIDED IN SECTION 12.3 OF THE PLAN SHALL INURE TO THE BENEFIT OF THE PROTECTED PARTIES. IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING**.

**D. Additional Debtors Payment**

Subject to the terms and conditions of Section 12.4 of the Plan, in exchange for the settlement and release of Abuse Claims as set forth in the Plan, and other provisions of the Plan, including, without limitation, the Trust's assumption of the Channeled Claims and Trust Expenses, the Additional Debtors have agreed, and are directed, to make their payment to the Trust (the "Additional Debtors Payment"). The Diocese, or its designee, may serve as paying agent for the collection and payment of the Additional Debtors Payment to the Trust.

**E. Settling Insurer Injunction**

Pursuant to sections 105(a), 363, and 1123 of the Bankruptcy Code, and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including the Settling Insurers' purchase of the Purchased Property free and clear of all Claims and Interests pursuant to section 363(f) of the Bankruptcy Code, the Plan will incorporate by reference, adopt, and ratify (and the Confirmation Order shall adopt and ratify) the Settling Insurer Injunction set forth in the Sale Order(s) in all respects.

**F. Litigation/Settlement of Certain Claims**

Except as expressly set forth in Section 12.2.5 of the Plan, the Channeling Injunction shall channel all Inbound Contribution Claims and all Insurer Contribution Claims, to the Trust. For the avoidance of doubt, unless otherwise provided in the Plan, the Allocation Protocol, or Trust Documents, the channeling of an Inbound Contribution Claim or Insurance Contribution Claim does not entitle the holder of such Channeled Claim to a Trust Distribution.

If, for any reason any court does not recognize the channeling of the Insurer Contribution Claims of Non-Settling Insurers to the Trust, or such Insurer Contribution Claims are not channeled for any reason, then the following shall apply:

1. Settling Insurers shall retain their Insurer Contribution Claims; *provided*, *however*, that:

a. Settling Insurers shall not pursue any Insurer Contribution Claim against any Non-Settling Insurer, (A) that asserts an Insurer Contribution Claim solely against the Trust; (B) whose Insurer Contribution Claim is satisfied and extinguished entirely by the application of Section 12.5 of the Plan, or (C) that does not assert an Insurer Contribution Claim against them;

b. If a Non-Settling Insurer asserts its Insurer Contribution Claim only against the Trust, then Settling Insurers shall assign any Insurer Contribution Claims they may hold against such Non-Settling Insurer to the Trust, and the Trust shall be free to assert such Insurer Contribution Claims against such Non-Settling Insurer;

c. If a Non-Settling Insurer releases its Insurer Contribution Claims, if any such exist, that it may have against Settling Insurers, then such released Settling Insurers shall release their Insurer Contribution Claims against such releasing Non-Settling Insurer.

2. In any Action, including the Insurance Coverage Adversary Proceedings, involving the Diocese, an Additional Debtor, or the Trust (collectively, the "Alleged Insured") or an Abuse Claimant, as applicable, and one or more Non-Settling Insurers, where a Non-Settling Insurer has asserted, asserts, or could assert an Insurer Contribution Claim against a Settling Insurer (that Settling Insurer, a "Contribution Target"), then any judgment or award obtained by such Alleged Insured or Abuse Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that such Settling Insurer is liable to pay such Non-Settling Insurer as a result of its Insurer Contribution Claim(the "Reduction Amount"), so that the Non-Settling Insurer's Insurer Contribution Claim is thereby satisfied and extinguished entirely. In any Action involving an Alleged Insured or Abuse Claimant against a Non-Settling Insurer, where such a Settling Insurer is not a party, such Alleged Insured or Abuse Claimant shall obtain a finding from that court or arbitrator(s), as applicable, establishing the Reduction Amount before obtaining an entry of judgment against such Non-Settling Insurer. A Contribution Target shall, cooperate in good faith with the Diocese, the Additional Debtors and/or the Trust (as applicable) to take reasonable steps to defend against any Insurer Contribution Claim. In the absence of such good faith cooperation by the Contribution Target, the Reduction Amount shall be zero.

3. If an Alleged Insured or Abuse Claimant and a Non-Settling Insurer enter into an agreement settling one or more Abuse Claims, such agreement shall include a provision whereby such Non-Settling Insurer releases Insurer Contribution Claims against Settling Insurers so long as Settling Insurers release their Insurer Contribution Claims against such Non-Settling Insurer. If such settlement agreement fails to include such a release provision, and the Non-Settling Insurer has asserted, asserts, or could assert an Insurer Contribution Claim against Settling Insurers, then any settlement amount in such settlement agreement shall be deemed automatically reduced by the Reduction Amount. In such event, the settling parties shall obtain a finding from the applicable court or arbitrator(s) of the Reduction Amount. If (a) the settlement agreement was entered into without litigation or arbitration such that no judge or arbitrator can determine the Reduction Amount, or (b) such a reduction is not otherwise made as described above, then the Insurer Contribution Claim by the Non-Settling Insurer against the Contribution Target shall be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Insurer Contribution Claim is Filed. A Contribution Target shall cooperate in good faith with the Diocese, Additional Debtors, and/or the Trust (as applicable) to take reasonable steps to defend against any Insurer Contribution Claim. In the absence of such good faith cooperation by the Contribution Target with respect to any given Insurer Contribution Claim against it, the Reduction Amount shall be zero.

4. If a Non-Settling Insurer asserts an Insurer Contribution Claim against any Settling Insurer, and

a. the Trust fully indemnifies the Settling Insurer, then the Settling Insurer shall assign its Insurer Contribution Claim to the Trust; or

b. the Trust partially, but not fully, indemnifies the Settling Insurer for such Claim, then the Settling Insurer shall retain its Insurer Contribution Claims and may assert those Claims against the Non-Settling Insurer asserting the Insurer Contribution Claim against the Settling Insurer. Any recovery by the Settling Insurer in excess of the amount necessary to satisfy the Trust's full indemnity obligation plus the Settling Insurer's litigation costs shall be turned over to the Trust.

5. Nothing contained in this Section 12.5.2 shall be interpreted to require the Trust to maintain or allocate a specific reserve for the costs set forth in this Section.

6. The above procedures shall bind and inure to the benefit of all Settling Insurers.

7. To ensure that the reduction contemplated in Section 12.5.2 of the Plan is accomplished, the Settling Insurers shall be entitled to: (i) notice, within a reasonable time, of the initiation of any future Action against or future settlement negotiations with any Non-Settling Insurer in which an Insurer Contribution Claim is asserted against any Settling Insurers, and periodic notices thereafter on at least an annual basis of the status of such Action or negotiations; (ii) the opportunity to participate in the Action or settlement negotiations, but only to the extent necessary to accomplish the reduction contemplated in Section 12.5.2 of the Plan; (iii) the reasonable cooperation of the applicable Alleged Insured, at the sole cost and expense of the Trust, so that the Settling Insurers can assert Section 12.5.2 of the Plan as a defense in any Action against any of them for any Insurer Contribution Claim; and (iv) have the court or appropriate tribunal issue such orders as are necessary to effectuate the judgment, award, or settlement reduction in order to protect the Settling Insurers from any Insurer Contribution Claim. The notice required above shall be given by (i) the Alleged Insured that is a party to such Action or settlement negotiations; or (ii) if no Alleged Insured is such a party, the Non-Settling Insurer that is a party to such Action or settlement negotiations; or (iii) if no Alleged Insured or Non-Settling Insurer is a party to such Action or settlement negotiations, the Abuse Claimant bound by the Plan.

8. The Trust shall use reasonable efforts to obtain, from all Settling Insurers, agreements with terms similar to those referenced in Section 12.5 of the Plan.

## G. <u>Additional Debtors Abuse Claim Bar Date</u>

### 1. ***Establishment of Additional Debtors Abuse Claim Bar Date***

Except for a Previously Asserted Abuse Claim (which, for the avoidance of doubt, will be classified and treated in accordance with Section 2.3.6 of the Plan), all Proofs of Claim for Abuse Claims against Additional Debtors, if any, must be filed by the Additional Debtors Abuse Claim Bar Date. Any Abuse Claim (other than a Previously Asserted Abuse Claim) against an Additional Debtor for which a timely Proof of Claim is not filed shall be automatically

disallowed, forever barred from assertion, and unenforceable against the Diocese, the Additional Debtors, their Estates, or their property without the need for any objection by the Additional Debtors or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Abuse Claim against an Additional Debtor shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary. For the avoidance of doubt, if and when Unknown Abuse Claims are filed, such Unknown Abuse Claimants shall receive distributions as and to the extent provided in the Trust Allocation Protocol in the Plan Supplement.

For the avoidance of doubt, the fact that an Abuse Claim is or may be time-barred or subject to a statute of limitations or other defense under applicable non-bankruptcy law does not excuse the holder of such Abuse Claim from compliance with the provisions of the Plan, including Section 12.7 of the Plan and the Additional Debtors Abuse Claim Bar Date, and the Confirmation Order.

2. ***Treatment of Post-Confirmation Claims***

All Previously Asserted Abuse Claims against the Additional Debtors shall be classified as Abuse Claims and treated in accordance with Section 2.3.6 of the Plan. All Abuse Claims (other than Previously Asserted Abuse Claims) against Additional Debtors that are timely filed in accordance with the Additional Debtors Abuse Claim Bar Date and Section 12.7 of the Plan shall be classified as Post-Confirmation Claims and treated in accordance with Section 2.3.6 of the Plan.

As set forth herein, all Abuse Claims (other than Previously Asserted Abuse Claims) against Additional Debtors that are not timely filed in accordance with the Additional Debtors Abuse Claim Bar Date and Section 12.7 of the Plan shall be discharged, disallowed, forever barred from assertion, and unenforceable against the Trust, the Trustee, Additional Debtors, the Estates or their property. To the extent any future court finds the foregoing provision to be unenforceable, such claims shall be treated as Unknown Abuse Claims.

3. ***Additional Debtors Abuse Claim Bar Date Procedures***

The following procedures for the filing of proofs of claim shall apply:

a. Additional Debtors Abuse Proofs of Claim must conform substantially to the Additional Debtors Abuse Proof of Claim Form;

b. All confidentiality provisions of the Diocese Bar Date Order shall apply to the Additional Debtors Abuse Proofs of Claim, provided, however, that to the extent necessary, the Pastor or other trustees of the Additional Debtors may be designated as Authorized Parties (as defined in the Bar Date Order) upon written consent of the Committee or the Trustee.

c. Additional Debtors Abuse Proofs of Claim must be submitted (i) electronically through the Claims Agent website for the lead Chapter 11 Case at https://case.stretto.com/dioceseofbuffalo by following instructions for filing proofs of claim electronically; or (ii) Diocese of Buffalo, N.Y. Claims Processing – Additional Debtors Claims, c/o Stretto, 410 Exchange, Ste. 100, Irvine, CA 92602;

d. Additional Debtors Abuse Proofs of Claim will be deemed filed only when received by the Claims Agent on or before the Additional Debtors Abuse Claim Bar Date;

e. Additional Debtors Abuse Proofs of Claim must (i) be signed, (ii) include supporting documentation (if voluminous, attach a summary) or an explanation as to why documentation is not available; and (iii) be in the English language; and

f. Additional Debtors Abuse Proofs of Claim sent by facsimile, telecopy, or electronic mail transmission will not be accepted.

Pursuant to Bankruptcy Rule 3003(c)(2), all holders of Additional Debtors Abuse Claims that fail to comply with Section 12.7 of the Plan by timely filing a proof of claim in appropriate form shall not be treated as a Creditor with respect to such Claim for the purpose of distributions.

Parties asserting Abuse Claims Against the Additional Debtors that arose before the Additional Debtors Petition Date must use the form substantially in the form of the Additional Debtors Abuse Proof of Claim Form.

Due to the sensitive nature of the information requested in the Additional Debtors Abuse Proof of Claim Form, the Confidentiality Protocol, as stated in the *Order Establishing August 14, 2021 as the Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof [Docket No. 729]*, and as may be further amended from time to time, shall apply to all Additional Debtors Abuse Proof of Claim Forms submitted by holders of Abuse Claims against the Additional Debtors.

The Claims Agent shall assign to each claimant filing an Additional Debtors Abuse Proof of Claim Form against an Additional Debtor a unique identifier code and shall maintain a confidential list of the identities of such claimants, their corresponding identifier code, and their respective Additional Debtors Proof of Claim Forms.

The Diocese will cause the Additional Debtors Bar Date Notice and the Additional Debtors Abuse Proof of Claim Form to be posted on the website established by the Claims Agent for these Chapter 11 Cases.

Pursuant to Bankruptcy Rules 2002(l) and 9008, the Diocese and Additional Debtors may publish notice of the Additional Debtors Abuse Bar Date substantially in the form of the Additional Debtors Bar Date Publication Notice.

The Additional Debtors may (a) post a link on its respective website to the Additional Debtors Bar Date Notice and the Additional Debtors Abuse Proof of Claim Form, (b) provide a notice (or a link to the notice) in any bulletins it sends to its parishioners, or (c) provide additional notice to the extent it considers appropriate.

The Diocese, Additional Debtors and the Claims Agent are authorized and empowered to take such steps and perform such acts as may be necessary to implement and effectuate the terms of Section 12.7 of the Plan.

Nothing in Section 12.7 of the Plan shall (a) prejudice the right of the Trust, the Trustee,

the Diocese, the Additional Debtors or any other Diocese Settling Party or Insurer to dispute or assert offsets or defenses to any Abuse Claim, (b) limit the releases, discharges and injunctions set forth elsewhere in this Plan or the Confirmation Order or (c) be construed to modify, amend or enlarge any Creditor's rights with respect to any Claim.

**H. Certain Litigation Matters**

Upon the occurrence of the Effective Date, the Insurance Coverage Adversary Proceedings shall be deemed withdrawn with prejudice, subject to the Trustee's rights under Section 6.3 of the Plan.

**I. Injunction Against Interference with Plan**

Upon entry of the Confirmation Order, all holders of Claims and all Non-Settling Insurers shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

**J. Release by Holders of Channeled Claims**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, ALL HOLDERS OF CHANNELED CLAIMS, INCLUDING CLASS 6 CLAIMS (THE "RELEASING PARTIES"), SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS RELATING TO THE DIOCESE, THE ADDITIONAL DEBTORS, THE ESTATE, THE CONDUCT OF THE DIOCESE'S AND THE ADDITIONAL DEBTORS' BUSINESSES, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THE PLAN, THE FILING AND PROSECUTION OF THESE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THE PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AMONG THE RELEASING PARTIES AND ANY RELEASED PARTY, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE.**

**THE FOREGOING RELEASE SHALL BE EFFECTIVE UPON THE OCCURRENCE OF THE EFFECTIVE DATE, EXCEPT THAT, SOLELY WITH RESPECT TO ANY ABUSE CLAIM THEY MAY HOLD, EACH CLASS 6 CLAIMANT WILL RELEASE THE DIOCESE AND THE ADDITIONAL DEBTORS UPON THE OCCURRENCE OF THE ABUSE CLAIM DISCHARGE DATE APPLICABLE TO SUCH ABUSE CLAIM.**

## K. Mutual Releases

**EXCEPT FOR OBLIGATIONS ARISING UNDER ANY EXECUTORY CONTRACT ASSUMED BY THE DIOCESE OR THE ADDITIONAL DEBTORS, OR OBLIGATIONS ARISING UNDER THE PLAN, ON THE EFFECTIVE DATE, EACH OF THE DIOCESE, THE ADDITIONAL DEBTORS, THE COMMITTEE, THE TRUST, AND EACH CLASS 6 CLAIMANT, SHALL BE DEEMED TO WAIVE, RELEASE, AND DISCHARGE ANY AND ALL CLAIMS AND CAUSES OF ACTION OF EVERY KIND AND NATURE THAT THEY MAY HAVE AGAINST EACH OTHER, EXCEPT THAT CLASS 6 CLAIMANTS SHALL NOT WAIVE THEIR RIGHTS TO DISTRIBUTIONS UNDER THE TRUST IN ACCORDANCE WITH THE TRUST AGREEMENT AND THE ALLOCATION PROTOCOL, AND SHALL BE DEEMED TO RELEASE THEIR ABUSE CLAIMS AGAINST THE DIOCESE AND THE ADDITIONAL DEBTORS AS OF THE ABUSE CLAIM DISCHARGE DATE; PROVIDED, HOWEVER, THAT PRIOR TO THEIR RELEASE ANY SUCH ABUSE CLAIMS SHALL ONLY BE ENFORCEABLE AND COMPENSABLE PURSUANT TO THE TERMS OF THE PLAN AND PLAN DOCUMENTS. CLASS 6 CLAIMANTS SHALL BE DEEMED TO WAIVE, RELEASE, AND DISCHARGE ANY AND ALL CLAIMS AND CAUSES OF ACTION OF EVERY KIND AND NATURE THAT THEY MAY HAVE AGAINST A SETTLING INSURER, SUCH SETTLING INSURER'S RELATED PERSONS, AND ALL OTHER OF SUCH SETTLING INSURER'S SETTLING INSURER RELEASEES ON THE DATE SUCH SETTLING INSURER REMITS ITS INSURANCE SETTLEMENT AMOUNT TO THE TRUST (BUT NO EARLIER THAN THE EFFECTIVE DATE).**

## L. Releases in Insurance Settlement Agreements

The releases in the Insurance Settlement Agreements are fully incorporated in the Plan by reference and are adopted and ratified in all respects, and the Confirmation Order shall adopt and ratify all such releases. For the avoidance of doubt, but without limiting the generality of the foregoing, the Confirmation Order shall provide that all such releases are binding upon the Diocese and the Additional Debtors.

## M. Exculpation; Limitation of Liability

**FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY FOR ANY CLAIM BY ANY OTHER EXCULPATED PARTY, BY ANY HOLDER OF A CLAIM, OR BY ANY OTHER PARTY IN INTEREST, FOR ANY ACT OR OMISSION (I) THAT OCCURRED FROM THE PETITION DATE THROUGH THE EFFECTIVE DATE IN CONNECTION WITH THESE CHAPTER 11 CASES OR (II) IN CONNECTION WITH THE FORMULATION, NEGOTIATION, OR PURSUIT OF CONFIRMATION OF A PLAN, EXCEPT FOR CLAIMS ARISING FROM THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR BREACH OF THE FIDUCIARY DUTY OF LOYALTY OF ANY EXCULPATED PARTY, IN EACH CASE SUBJECT TO DETERMINATION OF SUCH BY FINAL ORDER OF A COURT OF COMPETENT JURISDICTION AND PROVIDED THAT ANY EXCULPATED PARTY SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO ITS**

**DUTIES AND RESPONSIBILITIES (IF ANY) UNDER THE PLAN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE COMMITTEE, THE DIOCESE, THE ADDITIONAL DEBTORS AND THEIR RESPECTIVE OFFICERS, TRUSTEES, BOARDS, COMMITTEE MEMBERS, EMPLOYEES, ATTORNEYS, FINANCIAL ADVISORS, EXPERTS, EXPERT WITNESSES, AND OTHER PROFESSIONALS SHALL BE ENTITLED TO AND GRANTED BENEFITS OF SECTION 1125(e) OF THE BANKRUPTCY CODE AND THE CHANNELING INJUNCTION.**

**N.** **Gatekeeper Injunction**

To the extent permitted by law, and subject in all respects to Section 12 of the Plan, no Enjoined Party may commence or pursue against any Protected Party (a) an Abuse Claim or (b) any other Claim or cause of action that arose, arises from, or is related to an Abuse Claim, the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind-down or reorganization of the business of the Diocese or the Additional Debtors, the administration of the Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or cause of action represents a colorable Claim against a Protected Party and (ii) subject in all respects to the Channeling Injunction and Settling Insurer Injunction, specifically authorizing such Enjoined Party to bring such Claim or cause of action against any such Protected Party. The Bankruptcy Court will have jurisdiction to determine whether a Claim or cause of action is colorable and, to the extent legally permissible and as provided for in Section 14 of the Plan, have jurisdiction to adjudicate the underlying colorable Claim or cause of action.

For the avoidance of doubt, the Gatekeeper Injunction set forth in Section 12.14 of the Plan does not apply to Claims seeking recovery from Non-Settling Insurers.

**O.** **Injunctions in Full Force and Effect**

All injunctions and/or stays provided for in the Plan, the injunctive provisions of sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting any Settling Insurer that has purchased Settling Insurer Policies, free and clear of all Claims pursuant to sections 105, 363, and 1123 of the Bankruptcy Code, are permanent and will remain in full force and effect following the Effective Date of the Plan and are not subject to being vacated or modified.

**P.** **Release of Estate Causes of Action**

**EXCEPT FOR OBLIGATIONS ARISING UNDER ANY EXECUTORY CONTRACT ASSUMED BY THE DIOCESE OR THE ADDITIONAL DEBTORS AND EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, IN CONSIDERATION FOR THE CONTRIBUTING NON-DEBTOR ENTITY CONTRIBUTION TO THE TRUST, ON THE EFFECTIVE DATE THE DIOCESE AND THE ADDITIONAL DEBTORS EACH, AND COLLECTIVELY, SHALL BE DEEMED TO IRREVOCABLY AND UNCONTITIONALLY FULLY,**

**FINALLY, AND FOREVER WAIVE, RELEASE, ACQUIT, AND DISCHARGE THE CONTRIBUTING NON-DEBTOR ENTITIES, THEIR RESPECTIVE AFFILIATES, AND EACH OF THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES FROM ANY AND ALL CLAIMS, COUNTERCLAIMS, CROSS-CLAIMS, CAUSES OF ACTION, DISPUTES, SUITS, COSTS, DEBTS, LIABILITIES, OBLIGATIONS, RIGHTS, REMEDIES, DEFENSES, DUES, SETOFFS, RECOUPMENTS, SUMS OF MONEY, ACCOUNTS, RECKONINGS, BONDS, BILLS, COVENANTS, CONTRACTS, CONTROVERSIES, AGREEMENTS, PROMISES, DAMAGES, JUDGMENTS, EXECUTIONS AND DEMANDS WHATSOEVER, OF WHATEVER KIND OR NATURE, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, ACCRUED OR UNACCRUED, CURRENTLY EXISTING OR ARISING IN THE FUTURE, BASED IN WHOLE OR IN ANY PART ON THE ESTATE CAUSES OF ACTION.**

### Q. Injunctions and Releases Integral

The foregoing injunctive provisions and releases are an integral part of the Plan and are essential to its implementation. The currently pending Abuse Actions commenced by Class 6 Claimants, the continuation of which would violate Sections 12.1, 12.2, or 12.3 of the Plan, the releases provided for under the Plan, or the Insurance Settlement Agreements shall be dismissed with prejudice following the Trustee's receipt of a Class 6 Claim Release Agreement executed by the applicable Abuse Claimant.

### R. Timing

The injunctions, releases, and discharges (including the Channeling Injunction and the Settling Insurer Injunction) to which a Settling Insurer is entitled pursuant to such Settling Insurer's Insurance Settlement Agreement, the Plan, the Confirmation Order, the Sale Order approving such Insurance Settlement Agreement, and the Bankruptcy Code shall only become effective when (i) the Trust receives payment in full of the Insurance Settlement Amount from the applicable Settling Insurer pursuant to the terms of such Settling Insurer's Insurance Settlement Agreement, and (ii) all other conditions to the effectiveness of such Settling Insurer's Insurance Settlement Agreement are satisfied or waived in accordance with the terms thereof.

### S. Excluded Parties and Non-Settling Insurers

Notwithstanding anything to the contrary herein, the following shall apply to Excluded Parties and Non-Settling Insurers: (a) no Claim by an Abuse Claimant against an Excluded Party or Non-Settling Insurer shall be a Channeled Claim, *provided*, *however*, that any Consenting Class 6 Claims which assert liability against an Excluded Party or Non-Settling Insurer in conjunction with a Protected Party shall be Channeled Claims as to such Protected Party; (b) no Claim by an Abuse Claimant against an Excluded Party or Non-Settling Insurer shall be released by operation of the Plan; (c) the injunctions provided in Section 12.1 and 12.2 of the Plan shall not apply to Claims by any Abuse Claimant against an Excluded Party or Non-Settling Insurer; and (d) all Claims by any Abuse Claimant against an Excluded Party or Non-Settling Insurer are preserved and are not affected by the terms of the Plan.

## T. Title to and Vesting of Assets

All property of the Diocese, the Additional Debtors, and their Estates are dealt with by the Plan. Therefore, on the Effective Date, to the fullest extent allowed by sections 1123(a)(5), 1123(b)(2), 1123(b)(3), 1141(b) and 1141(c) of the Bankruptcy Code, all property of the Diocese, the Additional Debtors, and their Estates, including and any property acquired by the Diocese or the Additional Debtor pursuant to the Plan shall revest in the Diocese or Additional Debtor, as applicable, and such property shall be, except as otherwise expressly provided in the Plan or Confirmation Order, free and clear of all Liens, Claims, charges or other encumbrances whatsoever, except (i) that any charitable assets subject to Donor Restrictions shall remain subject to such Donor Restrictions and (ii) all Purchased Property shall be settled, sold, and/or released (as applicable) pursuant to the terms of the Insurance Settlement Agreements. On and after the Effective Date, except as otherwise provided in the Plan, the Diocese and the Additional Debtors may operate and manage their affairs and may use, acquire, or dispose of such property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by Donor Restrictions, the Plan or the Confirmation Order. The Diocese and the Additional Debtors may pay any charges incurred on or after the Effective Date for Professional Fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

## U. Identity of Trustees and Officers of the Diocese

In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the trustees of the Diocese on and after the Effective Date shall be (i) The Most Reverend Michael W. Fisher, Bishop of Buffalo, President, (ii) Reverend Peter J. Karalus, Vicar General, Vice President, (iii) Richard C. Suchan, Chief Operating Officer; (iv) Melissa Potzler, Chancellor; and (iv) Albert Gress, Chief Financial Officer, all of whom have served in such capacities for the Diocese during this Chapter 11 Case and each of whom is affiliated with the Universal Roman Catholic Church. The trustees of each of the Additional Debtors shall remain unchanged and will include (i) The Most Reverend Michael W. Fisher, Bishop of the Diocese of Buffalo, (ii) Reverend Peter J. Karalus, Vicar General, (iii) the pastor assigned to such Additional Debtor, and (iv) two lay trustees. For the avoidance of doubt, the foregoing individuals shall not be trustees of the Trust.

## V. Authority to Effectuate Plan

Upon the Effective Date, all matters provided under the Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court, the Diocese or the Additional Debtors. The Diocese shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action it may deem necessary or beneficial to achieve consummation and carry out the Plan and to effectuate the transactions provided for thereunder.

**W. Binding Effect**

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan shall bind all holders of Claims. Subject to the terms of the Plan, upon the Effective Date, every holder of a Claim shall be precluded and permanently enjoined from asserting against the Diocese or the Additional Debtors, as applicable, any Claim based on any document, instrument, judgment, award, order, act, omission, transaction or other activity of any kind or nature that occurred before the Petition Date.

**X. Dissolution of Committee**

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals, and Agents shall be released from any further duties and responsibilities in this Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during these Chapter 11 Cases, including any orders regarding confidentiality issued by the Bankruptcy Court Mediators, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Fee Claims.

## ARTICLE 14

## RESERVED

## ARTICLE 15

## RETENTION OF JURISDICTION

**A. By the Bankruptcy Court**

Pursuant to sections 105, 1123(a)(5) and 1142(b) of the Bankruptcy Code and 28 U.S.C. §§ 157 and 1334, on and after the Effective Date, the Bankruptcy Court shall retain (i) original and exclusive jurisdiction over the Chapter 11 Case, (ii) original, but not exclusive jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in these Chapter 11 Cases; and (iii) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to these Chapter 11 Cases and the Plan, including matters concerning the interpretation, implementation, consummation, execution or administration of the Plan. Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction:

1. over disputes concerning the ownership of Claims.

2. over disputes concerning the distribution or retention of assets under the Plan.

3. subject to the Plan Documents, over objections to Claims, motions to allow late-filed Claims and motions to estimate Claims.

4. over proceedings to determine the extent, validity, or priority of any Lien asserted against property of the Diocese, the Estate, or the Trust, or property abandoned or transferred by the Diocese, the Estate, or the Trust.

5. over motions to approve Insurance Settlement Agreements entered into after the Effective Date by the Trustee.

6. over matters related to the assets of the Estate or of the Trust, including the terms of the Trust, or the recovery, liquidation, or abandonment of Trust Assets.

7. over matters related to the removal of the Trustee and the appointment of a successor Trustee.

8. over matters relating to the subordination of Claims.

9. to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated.

10. to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including the Confirmation Order.

11. to issue orders in aid of execution, implementation, or consummation of the Plan, including the issuance of orders enforcing any and all releases and injunctions issued under or pursuant to the Plan and any Insurance Settlement Agreement (including, without limitation, the Channeling Injunction, Settling Insurer Injunction, and Gatekeeper Injunction).

12. over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith.

13. over requests for allowance of payment of Claims entitled to priority under sections 507(a)(2) and 503(b) of the Bankruptcy Code and any objections thereto.

14. over all applications for compensation under sections 327, 328, 329, and 330 of the Bankruptcy Code.

15. over matters concerning state, local, or federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

16. over conflicts and disputes among the Trust, the Diocese, the Additional Debtors and holders of Claims.

17. over disputes concerning the existence, nature, or scope of the Diocese Discharge, or the Additional Debtors Discharge including any dispute relating to any liability arising out of

the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date.

18. to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Diocese or its property, any Additional Debtor or its property, the Estates or their property, the Trust or its property, the Trustee, the Professionals, or the Confirmation Order.

19. to enter a final decree closing these Chapter 11 Cases.

20. to enforce all orders previously entered by the Bankruptcy Court (including without limitation the Sale Order(s)).

21. over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to these Chapter 11 Cases or the Plan.

22. to hear and determine any matters related to the indemnification obligations of the Trust under Section 8.12 of the Plan and/or any Insurance Settlement Agreements.

## B. By the District Court

Pursuant to sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. § 1134, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to the Chapter 11 Case.

## C. Actions to Enforce the Plan

The Diocese, the Additional Debtors, and the Trust may, but are not required to, commence an Action to enforce the terms of the Plan or to collect amounts owed pursuant to the Plan and any settlements set forth in the Plan or later approved by the Bankruptcy Court, which are not paid in accordance with the terms of the Plan or such settlement. Any such Action may be commenced by filing a motion with the Bankruptcy Court. On and after the Effective Date, the Trust shall have the sole and exclusive right to enforce the terms of the Plan against the Diocese and/or any Additional Debtor (except that the Diocese or any Additional Debtor may enforce the terms of the plan as against each other and the Trust) and may seek any appropriate remedy in law or equity from the Bankruptcy Court which shall retain exclusive jurisdiction over any such Action.

## D. Case Closure

The existence and continued operation of the Trust shall not prevent the Bankruptcy Court from closing the Chapter 11 Cases upon a motion by the Diocese, Additional Debtors or any other Person. The Trustee shall not take any actions to unreasonably keep the Chapter 11 Cases open. The Trustee, in his sole discretion, may seek to reopen the Chapter 11 Cases to administer assets of the Trust, including with respect to entering into settlement agreements with Non-Settling Insurers. If the Chapter 11 Cases are reopened upon request of the Trustee, the

Trust, Diocese and Additional Debtors shall cooperate to assure that no disbursements are made from the Estate during the period when the Chapter 11 Cases are reopened, and the cases shall be closed at the earliest possibility.

## ARTICLE 16

## TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to certain holders of Claims. This summary is based on the Internal Revenue Code (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Treasury Regulations"), and administrative and judicial interpretations and practice, all as in effect on the date of the Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Diocese and Additional Debtors do not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims that are not U.S. Persons (as such term is defined in the Tax Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to holders of Allowed Claims based upon their circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### A. Federal Income Tax Consequences to Holders of Unsecured Claims

In accordance with the Plan, all holders of General Unsecured Claims and Abuse Claims will receive Distributions on their Allowed Claims. Holders of Abuse Claims will realize a loss, if any, in an amount equal to that Claim, minus any recovery, on an adjusted tax basis.

The tax consequences to holders of Abuse Claims will differ and will depend on factors specific to the holder, including but not limited to: (i) whether the Claim, or a portion of the Claim, constitutes a Claim for interest or principal, (ii) the origin of the Claim, (iii) the type of consideration received in exchange for the Claim, (iv) whether the holder is a United States person or a foreign person for tax purposes, (v) whether the holder reports income on the accrual or cash basis method, and (vi) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

The Plan Proponents anticipate that Distributions to Abuse Claimants will, in all instances, constitute damages, other than punitive damages, on account of personal physical injuries and physical sickness, within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended. The Plan Proponents have not, however, fully analyzed such tax issues and cannot (and do not hereby) make any assurances or representations regarding the anticipated tax treatment of Abuse Claims.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A GENERAL UNSECURED CLAIM OR AN ABUSE CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A GENERAL UNSECURED CLAIM AND ABUSE CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO THE HOLDER OF A GENERAL UNSECURED CLAIM OR ABUSE CLAIM AS A RESULT OF THE PLAN.

## B. Federal Income Tax Consequences to the Diocese

The Diocese and the Additional Debtors are not-for-profit religious corporations having tax-exempt status under 26 U.S.C. § 501(c)(3). Due to the status of the Diocese and the Additional Debtors as not-for-profit corporations, the Plan Proponents anticipate that the confirmation of the Plan will have no material federal income tax consequences on a cash basis for the Diocese or the Additional Debtors.

## C. Tax Consequences to the Trust

The Trust may satisfy the requirements of a designated settlement fund under Section 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Trust as a designated settlement fund or a qualified settlement fund.

THE PLAN PROPONENTS EXPRESS NO OPINION REGARDING WHETHER THE TRUST IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. THE PLAN PROPONENTS HAVE NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE OR AN OPINION OF COUNSEL REGARDING WHETHER THE TRUST IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. ACCORDINGLY, EACH CREDITOR IS URGED TO CONSULT THEIR OWN TAX ADVISOR REGARDING THE CHARACTERIZATION OF THE TRUST AND THE TAX CONSEQUENCES OF SUCH CHARACTERIZATION.

## ARTICLE 17

## ALTERNATIVES TO THE PLAN

The Plan Proponents believe the Plan is in the best interests of Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following two alternatives may be available: (a) an alternative plan of reorganization may be proposed and confirmed, or (b) the Chapter 11 Cases may be dismissed. As discussed below, two other options, liquidation under Chapter 7 and the appointment of a Chapter 11 trustee, are not viable alternatives in these Chapter 11 Cases.

### A. Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code

If the Plan is not confirmed, the Diocese, Additional Debtors, or another party in interest may propose a different plan, which might involve an alternative means for reorganizing the Diocese and the Additional Debtors. The Plan Proponents believe that the terms of the Plan provide for the most favorable outcome for Creditors. The negotiation and drafting required for additional plans would likely add substantially greater administrative expenses with no guarantee of a better result for Creditors. For these reasons, the Plan Proponents do not believe that an alternative plan of reorganization is a preferable alternative to the Plan.

### B. Dismissal of the Chapter 11 Case

If the Plan is not confirmed, the Diocese, Additional Debtors, or another party in interest may seek to dismiss the Chapter 11 Cases. After appropriate notice and a hearing, the Bankruptcy Court may grant the request and dismiss the Chapter 11 Cases. Dismissal of the Chapter 11 Cases would have the effect of restoring, or attempting to restore, all parties to the position they were in immediately prior to the Petition Date.

Upon dismissal of the Chapter 11 Case of the Diocese or the Chapter 11 Cases of the Additional Debtors, the protection of the Bankruptcy Code would be lost, resulting in the expensive and time-consuming process of negotiation and protracted litigation between the Diocese and individual Abuse Claimants and between the Diocese, Additional Debtors, and their Insurers. In addition to the expense and delay, the Plan Proponents believe that these actions would lead to an inequitable recovery for Abuse Claimants, with the first Abuse Claimants to obtain and enforce judgments against the Diocese and the Additional Debtors depleting their assets and resulting in insufficient assets to satisfy later judgments. Therefore, the Plan Proponents believe that dismissal of the Chapter 11 Cases of the Diocese and the Additional Debtors is not a preferable alternative to confirming the Plan.

### C. Chapter 7 Liquidation is Not a Viable Alternative

Pursuant to 11 U.S.C. § 1112(c), if a debtor is “not a moneyed corporation,” a debtor’s Chapter 11 case cannot be converted to a Chapter 7 case without the debtor’s consent. The Diocese, as a not-for-profit entity, is not a moneyed corporation, and may not be forced to convert its Chapter 11 Case to a Chapter 7 case. Similarly, the Additional Debtors are also not-for-profit entities and cannot be forced to convert their Chapter 11 Cases, once filed, to Chapter 7 cases. Thus, conversion to Chapter 7 is not a viable alternative to the Plan.

## D. Appointment of a Chapter 11 Trustee is Not a Viable Alternative

As a result of limitations imposed by the First Amendment to the United States Constitution and the Religious Freedom and Restoration Act, a Chapter 11 trustee cannot be appointed to replace the Bishop's administration of the Diocese.

# ARTICLE 18

# ACCEPTANCE AND CONFIRMATION OF THE PLAN

## A. General Confirmation Requirements

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Plan Proponents, including that (i) the Plan classifies Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan Proponents have complied with applicable provisions of the Bankruptcy Code; (iv) the Plan Proponents propose the Plan in good faith and not by any means forbidden by law; (v) the disclosures required by section 1125 of the Bankruptcy Code have been made; (vi) the Plan has been accepted by the requisite votes of Creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Diocese; (viii) the Plan is in the "best interests" of all holders of Claims in an Impaired Class by providing to such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a Chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan; and (ix) all U.S. Trustee Fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.

### 1. Parties in Interest Entitled to Vote.

Pursuant to the Bankruptcy Code, only Classes of Claims that are "Impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is Impaired if the legal, equitable or contractual rights to which the Claims of that Class entitled the holders of such Claims are modified, other than by curing defaults and reinstating the debt. Classes of Claims that are not Impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes of Claims that receive no Distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

### 2. Classes Impaired Under the Plan.

Class 6 Abuse Claims are the only Claims that are Impaired and entitled to vote under the Plan.

Acceptances of the Plan are being solicited only from those holders of Claims in Impaired Classes that will or may receive a Distribution under the Plan. Accordingly, the Diocese is soliciting acceptances only from holders of Class 6 Abuse Claims.

3. **Voting Procedures and Requirements**.

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT. YOU SHOULD COMPLETE, SIGN, AND RETURN THE BALLOT YOU RECEIVE IN ACCORDANCE WITH THE PROVISIONS SET FORTH IN ARTICLE 1(B) ABOVE.**

4. **Ballots**.

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement. If you are a holder of a Class 6 Abuse Claim and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact the Diocese's counsel, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attention: Stephen A. Donato, or Stretto, the Diocese's Solicitation and Claims Agent, by email at TeamBuffaloDiocese@stretto.com or by calling 855.347.3773 and requesting to speak with a member of the solicitation team.

**PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY, COMPLETE AND SIGN THE BALLOT AND RETURN IT TO STRETTO. TO BE COUNTED, SIGNED BALLOTS MUST BE RECEIVED ON OR BEFORE ________, AT ____ _.M., PREVAILING EASTERN TIME.**

## B. Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing regarding whether the Diocese and the Plan have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for **_________ at _____ __.m. (prevailing Eastern Time)**, before the Honorable Carl L. Bucki, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Western District of New York, United States Courthouse, 2 Niagara Square, Buffalo, New York. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement in open court at the Confirmation Hearing of the date to which the Confirmation Hearing has been adjourned. Remote public access will not be provided by the Court. Judicial Conference policy prohibits audio access to proceedings that may involve testimony.

## C. Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan (i) be accepted by the requisite holders of Claims or, if not so accepted, that it be "fair and equitable" and "not discriminate unfairly" as to each non-accepting Class of Claims, (ii) be in the "best interests" of each holder of a Claim that does not vote to accept the Plan in each Impaired Class under the Plan, (iii) be feasible, and (iv) comply with the applicable provisions of the Bankruptcy Code.

## D. Acceptance of Plan

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims votes to accept the plan, except under certain circumstances. For a plan to be accepted by a voting class, those voting to accept in that class hold at least two-thirds in dollar amount and more than one-half in number of claims of that class that voted in that class. For example, if an impaired claim has 200 claimants holding $200 worth of claims, if 100 claimants in that class vote, then at least 51 of those claimants holding at least $67 worth of claims must vote to accept the plan. Only those holders of claims who actually vote count in these tabulations. Holders of claims who fail to vote, or whose votes are designated pursuant to section 1126(e) of the Bankruptcy Code, are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the bankruptcy court to be in the best interests of each holder of a claim or interest in such class. In addition, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests in section 1129(b) of the Bankruptcy Code discussed below.

## E. Confirmation Without Acceptance of All Impaired Classes

The Bankruptcy Code contains provisions for confirming a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying other requirements of section 1129(a) of the Bankruptcy Code, it (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each class of claims that is impaired under, and has not accepted, the Plan. As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed claims before any junior class receives any distribution. More specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed under that section if: (a) with respect to a secured class (i) the holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each holder of a claim of such class receive deferred cash payments equaling the allowed amount of such claim as of the plan's effective date, or (ii) such holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class may not receive any property under the plan on account of such junior claim or interest; and (c) with respect to a class of interests, either (i) each holder of an interest of such class must receive or retain on account of such interest property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any

fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to the interest of such class may not receive or retain any property on account of such junior interest.

The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal priority.

**IF A CLASS OF CLAIMS VOTING ON THE PLAN VOTES TO REJECT THE PLAN, THE PLAN PROPONENTS RESERVE THE RIGHT TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF THE BANKRUPTCY CODE WITH RESPECT TO SUCH CLASS.**

## F. Best Interests Test

In order to confirm a plan, the Bankruptcy Court must independently determine that the plan is in the best interests of each holder of a claim in any impaired class who has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept the plan, the best interests test requires the Bankruptcy Court to find that the plan provides to each member of such impaired class a recovery on account of the class member's claim that has a value, as of the effective date of the plan, at least equal to the value of the distribution that each such member would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To calculate what holders of Claims would receive if the Diocese alone were liquidated under a hypothetical Chapter 7 case under the Bankruptcy Code, the Bankruptcy Court must first determine the dollar amount that would be realized from such liquidation (the "Liquidation Fund"). The Liquidation Fund would consist of the net proceeds from the disposition of the Diocese's assets (after satisfaction of all valid liens) and the recoveries on causes of action, if any, held by the Estate. The Liquidation Fund would not include (i) the portion of the DOB Entities' Cash Contribution coming from Entities other than the Diocese, (ii) the assignment of Insurance Claims, (iii) any contributions by Setting Insurers, or (iv) restricted funds, which would be subject to a *cy pres* action involving the New York Attorney General. The Liquidation Fund would be reduced by the cost of the liquidation. The costs of a hypothetical liquidation under chapter 7 would include the fees and expenses of the Chapter 7 trustee, as well as those of counsel and other professionals that might be retained by the Chapter 7 trustee, selling expenses and wind-down costs, any unpaid expenses incurred by the Diocese during its Chapter 11 Case (such as fees for attorneys, financial advisors and accountants) which would be Allowed in the Chapter 7 proceedings, interest expense on secured debt and claims incurred by the Diocese during the pendency of the cases. These Claims would be paid in full out of the Liquidation Fund before the balance of the Liquidation Fund, if any, would be made available to holders of General Unsecured Claims and Abuse Claims. In addition, other Claims that would arise upon conversion to a Chapter 7 case would dilute the balance of the Liquidation Fund available to holders of Claims. Moreover, additional Claims against the Estate would arise as a result of the establishment of a new Bar Date for the filing of Claims in the Chapter 7 case. The present value of the Distributions from the Liquidation Fund (after deducting the amounts described above)

must then be compared with the present value of the property offered to each of the Classes of Claims under the Plan, to determine if the Plan is in the best interests of Claim holders.

The inclusion of the Additional Debtors, allowing for the Additional Debtors Contribution and the Settling Insurer Contributions made possible by the inclusion of the Additional Debtors as settling parties is in the best interests of Creditors of both the Diocese and the Additional Debtors. The Diocese and Additional Debtors believe that a Chapter 7 liquidation of their remaining Assets would result in a diminution of the value realized by holders of Claims. That belief is based upon, among other factors: (a) the reduced value of Diocese's and the Additional Debtors' remaining Assets in a Chapter 7 case; (b) the additional administrative expenses involved in the appointment of a Chapter 7 trustee, attorneys, accountants, and other Chapter 7 professionals; (c) the substantial time that would elapse before Creditors would receive any Distribution in respect of their Claims, due to a Chapter 7 trustee's need to become familiar with the books and records of the Diocese and the Additional Debtors and the Chapter 7 trustee's administration of the case; and (d) the additional Claims that may be asserted against the Diocese and the Additional Debtors.

## G. Feasibility

In connection with confirmation of the Plan, the Bankruptcy Court must determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the need for liquidation or further financial reorganization of the Diocese, except as proposed in the Plan.

In this case, the Diocese has prepared cash flow projections demonstrating that the Diocese, together with the Additional Debtors, will be able to fund the DOB Entities' Cash Contribution, that the Diocese will be able to meet their other respective obligations under the Plan, and that the Diocese will have sufficient resources to support ongoing ministries and operations. A copy of the Diocese's financial projections is attached as **Exhibit C**. The cash flow projections demonstrate that the Diocese will be able to fund the Plan on the Effective Date and that the Diocese will be able to make all payments required pursuant to the Plan so that no further financial restructuring will be necessary. Accordingly, the Diocese believes that the Plan satisfies the feasibility test.

Aside from the Additional Debtors Contribution, which will fund a portion of the DOB Entities' Cash Contribution, as set forth above, the Additional Debtors are impacted by the Plan solely in connection with Class 6 Abuse Claims, which will be channeled to the Trust. General Unsecured Claims against the Additional Debtors that are not Abuse Claims will be paid by the Additional Debtors in the ordinary course of business, and the Additional Debtors will continue to meet their obligations.

## H. Compliance with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Plan Proponents have considered each of these provisions in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

## ARTICLE 19

## RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST THE DIOCESE AND ADDITIONAL DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS INFORMATION, HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.**

### A. Objection to Classifications of Claims

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class, only if such claim is substantially similar to the other claims in such class. The Plan Proponents believe that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed and the reclassification adversely affects the treatment of the Claim of any Creditor, the Plan Proponents could be required to re-solicit votes for or against the Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular Class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Plan Proponents believe that the Plan complies with the requirement of equal treatment. To the extent that the Court finds that the Plan does not satisfy the equal treatment requirement, the Court could deny confirmation of the Plan.

Issues or disputes relating to classification or treatment could result in a delay of the confirmation or consummation of the Plan and could increase the risk that the Plan will not be consummated.

### B. Failure to Satisfy Voting Requirements

If the Plan Proponents obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Plan Proponents intend, as promptly as practicable thereafter, to seek confirmation of the Plan. In the event that sufficient votes are not received, the Plan Proponents may be forced to pursue an alternative plan of reorganization, or the Diocese may dismiss the Chapter 11 Case prior to the Additional Debtors Petition Date.

### C. The Plan May Not Be Accepted or Confirmed

The Plan may not be confirmed without the affirmative acceptance of at least one Impaired Class. Even if all voting Classes accept the Plan, the Plan may not be confirmed if the Bankruptcy Court determines that the Plan does not meet the requirements for confirmation set forth in section 1129 of the Bankruptcy Code. The Plan Proponents believe that the Plan satisfies all of the relevant section 1129 requirements. There can be no assurance, however, that

the requisite Creditor consent will be obtained or that the Bankruptcy Court will also conclude that all such requirements have been satisfied.

## D. The Plan Proponents' Assumptions and Estimates May Prove Incorrect

The Plan Proponents have made certain assumptions regarding, and have attempted to estimate in good faith and to the best of their ability, the aggregate number and amount of Claims in each Class, the projected expenses incurred to date or to be incurred in connection with the confirmation and administration of the Plan, and the assets which may be available for liquidation and Distribution under the Plan. There can be no guarantee, however, that the Plan Proponents' assumptions and estimates regarding these amounts will prove to be accurate. In the event the Plan Proponents' assumptions and estimates prove incorrect, Creditor recoveries under the Plan may be materially less than projected.

## E. Contributing Non-Debtor Entity Contributions May Not Be Received

To the extent that Class 6 Claimants who have commenced Contributing Non-Debtor Entity Abuse Actions do not opt in to the release of that Contributing Non-Debtor Entity, one or more Contributing Non-Debtor Entity may not contribute to the Trust, resulting in Creditor recoveries under the Plan that may be materially less than projected.

## F. Conditions Precedent to Funding

There may be certain conditions precedent to the Diocese Settling Parties' funding that must be satisfied prior to the funding of the Trust pursuant to the terms of this Plan. If the Diocese Settling Parties are unable to satisfy any such conditions prior to the Effective Date, then the Plan may not be consummated.

In particular, parishioners of some Parishes, acting through representatives called "Procurators," have appealed decrees relating to the merger or consolidation of their Parish, as well as the amount to be contributed by those Parishes to the Trust. Some Procurators contend that rulings on some of these appeals, made by the Dicastery in Rome, have "reversed" or rendered invalid the contribution amounts of their Parish towards the Trust based on Canon law. The Diocesan and Additional Debtors, on the other hand, contend that Parishes, acting through their Boards of Trustees, have approved the contribution amounts of each Parish and further contend that the required Canonical process has been and is being followed, as has the civil law approval process.

To the extent that a proper Canon law ruling precludes a Parish from making a contribution to the settlement fund, there is risk that the amount needed to fund the Joint Plan would have to be raised by alternative means, or the Plan may not be consummated. The Diocese and Additional Debtors fully expect for all necessary approvals to be obtained, and believe the risk at issue is not significant. To the extent of adverse rulings by the Dicastery, the Diocese and Additional Debtors intend to take additional steps to ensure that the Plan is fully and timely funded. Any dispute over the interpretation of the Dicastery's decision under Canon law is a purely religious matter and outside of the Bankruptcy Court's jurisdiction.

## G. Non-Confirmation or Delay in Confirmation of the Plan

In the event a party objects to the Plan, it is possible that the Bankruptcy Court may not approve confirmation of the Plan.

## H. Non-Consensual Confirmation

In the event the Impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Plan Proponents' request if the cramdown requirements described above are satisfied. The Plan Proponents believe that the Plan satisfies these requirements.

## I. Risk of Non-Occurrence of the Effective Date

Although the Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will in fact occur.

## J. Non-Settling Insurers May Raise Objections to Confirmation

The Plan Proponents anticipate that the Non-Settling Insurers may object to confirmation of the Plan by asserting that the Plan impermissibly alters contractual rights, duties, and obligations under its Insurance Policies. The Plan Proponents do not believe there is any merit to such objections or assertions, and furthermore believe that the number of Insurers remaining as Non-Settling Insurers are few. However, if a Non-Settling Insurer were to prevail on such contentions, the Bankruptcy Court might find that the Plan is not feasible or otherwise not confirmable.

## K. Post-Confirmation Litigation May Not Result in Additional Recovery

The Plan provides for the assignment to the Trust of Insurance Claims against Non-Settling Insurers. The Non-Settling Insurers are likely to assert factual and legal defenses to both their coverage obligations and to the underlying liability of the Diocese and other Additional Debtors for Abuse Claims. Litigation of the Insurance Claims against the Non-Settling Insurers could take years and may require the Trust to expend several million dollars in litigation costs. There is no guarantee that the Trust will prevail in its prosecution of Insurance Claims against a Non-Settling Insurer.

Non-Settling Insurers have asserted defenses that could impair coverage and the Trust's ability to recover anything on account of the Insurance Claims, including the following allegations:

(a) The Diocese and/or Additional Debtor cannot establish that certain of the alleged insurance policies were in fact ever issued;

(b) The Diocese and/or Additional Debtor cannot establish the terms and conditions of certain of the insurance policies, where neither the Diocese nor the Non-Settling Insurer have been able to locate complete copies;

(c) Certain of the Additional Debtors may not be entitled to coverage under certain of the insurance policies issued to the Diocese;

(d) The Diocese and/or Additional Debtors failed to comply with conditions precedent to coverage under the insurance policies, including the requirement that it provide prompt notice of the claim and/or the occurrence, the requirement that the Diocese cooperate with a Non-Settling Insurer in the defense of any claims, and the requirement that the Diocese avoid agreeing to voluntary obligations;

(e) The Diocese knew that the perpetrator had a history of Abuse and, therefore, the injury was not caused by an accident, was not fortuitous, or was expected or intended from the standpoint of the Diocese and/or Additional Debtors;

(f) The injury either does not qualify as "bodily injury" within the meaning of the alleged insurance policies, or any "bodily injury" did not occur during the policy period of a Non-Settling Insurer's Insurance Policy;

(g) Any recovery is limited by the applicable limits of liability in any Non-Settling Insurer's Insurance Policy that are proven; and

(h) All acts of Abuse to which a particular Survivor was subjected constitute a single "occurrence" for purposes of applying policy limits of liability.

Non-Settling Insurers have also asserted the defense of late notice. The Non-Settling Insurers contend that their policies would require that notice of claims be given as soon as practicable. New York courts considering such language routinely hold that even short delays in giving notice are unreasonable, even as short as 40 days. Under New York's strict late-notice rule, the Non-Settling Insurers have alleged that the delays by the Diocese and Additional Debtors in giving notice, of either the claims themselves or lawsuits based on the claims, could bar coverage for many of the claims.

In the event the Non-Settling Insurers successfully defend against the Insurance Claims, the DOB Entities' Cash Contribution and the settlement payments from Settling Insurers would be the sole source of recovery for Abuse Claims.

## L. <u>United States Trustee fees may be imposed on certain payments under the Plan</u>

Section 1930(a) of Title 28 of the United States Code prescribes filing fees that must be paid by "[t]he parties commencing a case under title 11." In cases administered under Chapter 11 of the Bankruptcy Code (other than under subchapter V thereof), section 1930(a)(6) also assesses additional fees, payable to the United States Trustee, which are calculated according to the dollar value of quarterly "disbursements."

In accordance with this statutory requirement, the Diocese paid more than $1.3 million in U.S. Trustee Fees (as of June 2025) during this Chapter 11 Case in which the United States Trustee has not played a particularly active role.

Section 2.1.5 of the Plan makes provision for the payment of unpaid U.S. Trustee Fees in a manner which the Plan Proponents contend is consistent with the language and intent of 28 U.S.C. § 1930(a)(6). The Plan further clarifies that payments made to the Trust by Persons other than the Diocese (*i.e.* contributions by Settling Insurers or Contributing Non-Debtor Entities, made in exchange for the releases and channeling injunctions provided under the Plan, or payments by Settling Insurers to buy back their policies and settle any coverage liabilities they may have) are not "disbursements" to be included in the calculation of U.S. Trustee fees for purposes of 28 U.S.C. § 1930(a)(6).

The United States Trustee has indicated an intent to seek to impose U.S. Trustee Fees not just on distributions made by the Diocese, but also on any Trust contributions made by the Additional Debtors or other Protected Parties, as well as on post-confirmation distributions made by the Trust and the Diocese, even though the Trust is a separate legal entity that is not a debtor in bankruptcy. The Plan Proponents believe the United States Trustee's attempt to impose U.S. Trustee Fees on payments by independent, non-debtor Persons, and to potentially tax assets on their way into, as well as and out of the Trust, has no basis in 28 U.S.C. § 1930(a)(6), and constitutes an impermissible overreach inconsistent with the well-reasoned recent decision of the Delaware bankruptcy court in *Paragon Offshore, PLC*, 629 B.R. 227 (Bankr. D. Del. 2021). Nevertheless, if it is determined at the Confirmation Hearing that the United States Trustee's overly expansive reading of the statute is correct, additional fees may be imposed on certain payments contemplated under the Plan.

### M. State Court Counsel contingency fees

Many Abuse Claimants have retained State Court Counsel to represent them in the prosecution of their Abuse Claims. In many instances, those State Court Counsel have agreed to be compensated on a contingency fee basis, meaning that State Court Counsel are paid only if they succeed in obtaining payment for their clients and, in such case, State Court Counsel's fee is calculated as a percentage of the amount recovered, net of certain expenses. Some State Court Counsel also represent multiple Abuse Claimants in these Chapter 11 Cases and, accordingly, may earn multiple contingency fees on Trust Distributions to their respective clients. Each State Court Counsel is bound, however, to comply with the same Rules of Professional Conduct which regulate the practices all attorneys in New York and which require attorneys to zealously represent the interests of each and every one of their clients, to disclose any conflicts of interest that may arise and, where appropriate, to obtain conflict waivers from any affected client.

## ARTICLE 20

## MISCELLANEOUS PROVISIONS

### A. Amendment or Modification of the Plan

The Plan Proponents may modify the Plan at any time prior to the Confirmation Hearing, in accordance with section 1127(a) of the Bankruptcy Code. After the Confirmation Date and prior to substantial consummation, the Plan Proponents may modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, by filing a motion on notice as required under the applicable Bankruptcy Rules, and the solicitation of all Creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court. Notwithstanding the foregoing, those provisions of the Plan that implement and supplement or relate to the Insurance Settlement Agreements may not be severed, waived, amended, deleted or otherwise modified without the prior written approval of each Settling Insurer affected by such severance, waiver, amendment, deletion or modification.

## B. Headings

The headings used in the Plan and in this Disclosure Statement are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

## C. Severability of Plan Provisions

If, prior to confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.

## D. Validity and Enforceability

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the Confirmation Order, is valid and enforceable pursuant to its terms. Should any provision in the Plan be determined by the Bankruptcy Court or any appellate court to be unenforceable following the Effective Date, such determination shall in no way limit the enforceability and operative effect of any and all other provisions of the Plan.

## E. Revocation or Withdrawal of the Plan

The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. If the Plan Proponents revoke or withdraw the Plan before the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Diocese, Additional Debtors or the Committee or to prejudice in any manner the rights of the Diocese, Additional Debtors or the Committee in any further proceedings.

## F. Controlling Documents

In the event and to the extent that any provision of the Plan or the Trust Documents is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan or the Trust Documents, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Trust Documents (other than provisions relating to the Trustee's authority to act) is inconsistent with any provision of the Plan, the Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan or the Trust Documents, the provisions of the Confirmation Order shall control and take precedence.

## G. Filing of Additional Documents

At any time before substantial consummation of the Plan, the Diocese, the Additional Debtors, or the Trust, as appropriate, may File with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

## H. Direction to a Party

On or after the Effective Date, the Trustee, or the Diocese, or Additional Debtors, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect the transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

## I. Certain Actions

By reason of entry of the Confirmation Order prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers or trustees of the Diocese or the Additional Debtors under the Plan, including (i) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan; and (ii) the adoption, execution and implementation of other matters provided for under the Plan involving the Diocese or the Additional Debtors or the organizational structure of the Diocese or the Additional Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate), pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers or trustees of the Diocese or the Additional Debtors.

## J. Plan as Settlement Communication

The Plan furnishes or offers or promises to furnish (or accepts or offers or promises to accept) valuable consideration in compromising or attempting to compromise Claims and/or causes of action that are disputed as to validity or amount (including Abuse Claims and the Insurance Coverage Adversary Proceedings), except as otherwise provided above. Accordingly, the Plan, the Disclosure Statement, and any communications regarding the Plan or the Disclosure Statement are subject in all respects to Rule 408 of the Federal Rule of Evidence and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity, or invalidity of, any Disputed Claim or cause of action. Except as expressly set forth in the Plan, nothing in the Plan is intended to constitute a compromise of Abuse Claims.

## K. Reports

Until a final decree closing the Chapter 11 Case is entered, the Diocese shall File all post-confirmation quarterly reports as required by the United States Trustee Operating Guidelines (with a copy served on the Office of the United States Trustee). The first report shall be Filed within thirty days after the end of the quarter in which the Effective Date occurs.

The Additional Debtors shall not be required to file monthly operating reports or post-confirmation quarterly reports, pursuant to the *Case Management Order Establishing Procedures for the Filing and Administration of Prepackaged Chapter 11 Cases by Parishes and Affiliated Entities of the Diocese of Buffalo* [Docket No. _____].

## L. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan transactions consummated or to be consummated in connection therewith.

## M. No Admissions.

Notwithstanding anything herein or in the Plan to the contrary, nothing contained in the Plan shall be deemed as an admission by the Diocese, any Additional Debtor, the Committee, or any Settling Insurer with respect to any matter set forth herein.

# ARTICLE 21

# BANKRUPTCY RULE 9019 REQUEST

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Plan Proponents jointly request approval of all compromises and settlements included in the Plan or contemplated.

# ARTICLE 22

# RECOMMENDATION AND CONCLUSION

The Plan Proponents believe that the Plan is in the best interests of all Creditors. The Plan as structured allows Creditors to participate in Distributions believed to be in excess of those which would otherwise be available were these Chapter 11 Cases dismissed and provides an opportunity to maximize insurance recoveries through settlements with the Settling Insurers and post-confirmation litigation of Insurance Claims against Non-Settling Insurers.

FOR ALL OF THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE PLAN PROPONENTS STRONGLY RECOMMEND THAT ALL CREDITORS ENTITLED TO VOTE ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY ARE RECEIVED BY STRETTO NO LATER THAN _________ __.M. PREVAILING EASTERN TIME ON _______________.

*[Signature Page Follows]*

Dated: August 21, 2026
Buffalo, New York

Respectfully submitted,

The Diocese of Buffalo, N.Y.

By: */s/ Richard C. Suchan*
Richard C. Suchan, Chief Operating Officer

**BOND, SCHOENECK & KING, PLLC**

By: */s/ Stephen A. Donato*
Stephen A. Donato, Esq.
Charles J. Sullivan, Esq.
Grayson T. Walter, Esq.
Sara C. Temes, Esq.
Office and Post Office Address:
110 West Fayette Street
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: (315) 218-8000
Facsimile: (315) 218-8100
Email: donatos@bsk.com
sullivc@bsk.com
walterg@bsk.com
temess@bsk.com

*Counsel to The Diocese of Buffalo, N.Y.*