UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>The Diocese of Buffalo, N.Y.,<br><br>Debtor. | Chapter 11<br><br>Case No. 20-10322-CLB |
| The Diocese of Buffalo, N.Y.,<br><br>Plaintiff,<br>v.<br><br>The Continental Insurance Company, *et al*.,<br><br>Defendants. | Adv. Proc. No. 20-01009-CLB |
| All Saints Roman Catholic Church Society of Buffalo, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>21st Century Premier Insurance Company (f/k/a National Ben Franklin Fire Insurance Co. of Pittsburgh, PA, *et al*.,<br><br>Defendants. | Adv. Proc. No. 21-01001-CLB |

**OMNIBUS REPLY TO THE UNITED STATES TRUSTEE'S AND BAKER HALL d/b/a OLV HUMAN SERVICES OBJECTIONS TO, AND MEMORANDUM OF LAW IN FURTHER SUPPORT OF, THE DIOCESE'S MOTION FOR ENTRY OF ORDERS PURSUANT TO SECTIONS 363 AND 105(A) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 APPROVING SETTLEMENT AGREEMENTS AND POLICY BUY-BACKS WITH CERTAIN SETTLING INSURERS AND GRANTING RELATED RELIEF**

The Diocese of Buffalo, N.Y. (the "Diocese"), by and through its undersigned counsel, hereby files this omnibus reply to the *United States Trustee's Objection to Debtor's Motion for Entry of Orders Pursuant to Sections 363 and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement Agreements and Policy Buy-Backs with Certain Settling*

*Insurers and Granting Related Relief* [Docket No. 5144] (the "UST Objection") and the *Baker Hall d/b/a OLV Human Services Objection to the Diocese's Motion For Entry of Orders Approving Settlement Agreements and Policy Buybacks with Certain Settling Insurers and Granting Related Relief* [Docket No. 5151] (the "OLV Objection", collectively with the UST Objection, the "Objections"), and memorandum in further support of the Diocese's *Motion for Entry of Orders Pursuant to Sections 363 and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement Agreements and Policy Buy-Backs with Certain Insurers and Granting Related Relief* [Docket No. 5113] (the "Settlement Motion").[1] As and for its reply to the Objections, and in further support of the Settlement Motion, the Diocese respectfully submits as follows:

## PRELIMINARY STATEMENT

1. The United States Trustee for Region 2 ("UST") continues to take positions and raise objections in this Chapter 11 Case, ostensibly with the purpose of protecting the rights of Abuse Claimants, but which in reality (a) have not been advanced or joined by *any* Abuse Claimants, and (b) are *directly at odds* with the positions advocated by the Official Committee of Unsecured Creditors (the "Committee") which (i) is comprised solely of Abuse Claimants and, (ii) unlike the UST, is in regular communication with other Abuse Claimants and their attorneys.

2. The fact that the Diocese and the Committee are in a position to propose settlements with twenty-two (22) separate insurers, which if approved and consummated would unlock $176,955,500 in additional Joint Plan funding is a remarkable achievement. However, instead of supporting this development, the UST opposes the settlements in a misguided effort to expand the Supreme Court's ruling in *Purdue* well beyond its intended limited scope.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Settlement Motion.

3. The UST has raised similar, if not identical arguments and objections in multiple cases in the wake of *Purdue* and, insofar as the Diocese has been able to ascertain, those arguments and objections have been overruled by each court to have considered them, including by bankruptcy courts in the Southern, Northern, and Western Districts of New York. This Court should likewise reject the UST's contentions and grant the relief requested in the Settlement Motion to facilitate long-overdue compensation and closure for Abuse Claimants.

4. The Settlement Motion seeks entry of orders approving twenty-two (22) separate insurance settlements and granting related relief. The insurance settlements are a major step towards the successful resolution of this complex Chapter 11 Case. After more than six (6) years of conflict and hard-fought negotiations, the insurance settlements will provide over $176 million to be contributed to a settlement trust. Together with the other contributions from the Diocese Settling Parties, the settlement trust will have available funds to pay Abuse Claimants nearly $327 million.

5. Ignoring the overwhelming benefit the settlements stand to provide the Diocese's estate and, most importantly, Abuse Claimants, the UST Objection instead focuses heavily on the third-party release and injunction provisions that are being provided pursuant to section 363 of the Bankruptcy Code. The UST's arguments are misguided, and the Court should overrule the UST Objection in its entirety and grant the Settlement Motion approving the insurer settlement agreements.

6. In the OLV Objection, Baker Hall d/b/a OLV Human Services ("<u>OLV</u>")[2] raises legitimate concerns about drafting ambiguities in the Settlement Agreement, which the Diocese believes can and will be resolved.

---

[2] OLV is identified on Schedule 2 of the Settlement Agreement as Our Lady of Victory Human Services.

## REPLY

### I. The OLV Objection raises legitimate concerns about a drafting ambiguity, and is eminently resolvable

7. The OLV Objection can be distilled down to essentially a concern that the definition of "Subject Insurance Policies" as used in the proposed form of Settlement Agreement, and certain related provisions, could be interpreted more broadly than intended, such that it would include insurance policies that OLV (or other Contributing Non-Debtor Entities) procured independently from the Diocese and/or the Additional Debtors which provide separate and distinct coverage for OLV that is not shared by the Diocese or the Additional Debtors (denominated in the OLV Objection as the "OLV Policies"). As a consequence of this definitional uncertainty, OLV is concerned that it could be compelled to compromise the OLV Policies as part of the settlement, potentially leaving OLV to face liability in the tort system without insurance.

8. The Diocese acknowledges OLV's legitimate concerns and respectfully submits that it was never the Diocese's intention to include within the ambit of the Settlement Agreement policies such as the OLV Policies that were procured independently by a Contributing Non-Debtor Entity and do not provide shared coverage with either the Diocese or the Additional Debtors. The Diocese believes that OLV's concerns can be addressed in large part by curative language to make clear that (i) such separate policies are not included in the "Subject Insurance Policies" being compromised and sold as part of the proposed Settlement Agreements and (ii) a provision making clear that any language in the proposed sale order relieving a Settling Insurer from its obligations to the Diocese Settling Parties does not extend to obligations arising under such separate policies.

9. Since learning of OLV's concerns, the Diocese has been working with OLV and certain of the larger Settling Insurers, including proposing language to address the concerns raised by OLV. While the parties have not, as of this filing, reached consensus on specific language, if any, acceptable to OLV and the Settling Insurers, with the clarification that the OLV Policies are intended to ride through the settlements unaffected, and subject to receiving confirmation that the Contributing Non-Debtor Entity Claimants who have asserted Contributing Non-Debtor Abuse Claims against OLV have consented to release such claims through the Joint Plan, the Diocese anticipates that the OLV Objection will be resolved and that OLV will agree to participate in the proposed settlements as a Contributing Non-Debtor Entity.

## II. The UST misstates and exaggerates the mandate in *Purdue.*

10. Courts have long recognized that insurance policies constitute property of a debtor's bankruptcy estate, and that third-party claims against an insurer may properly be enjoined where, absent such an injunction, such claims would impair the debtor's ability to settle its own coverage claims to fund creditor recoveries. *See*, *e.g.*, *MacArthur Co. v. Johns-Mansville Corp.*, 837 F.2d, 89, 92093 (2d Cir. 1988) (enjoining contribution claim that would impact the debtor's insurance coverage); *Munford v. Munford (In re Munford, Inc.)*, 97 F.3d 449, 453-55 (11th Cir. 1996) (enjoining contribution claims against settling insurer in aid of settlement).

11. The UST now attempts to convince the Court that *Purdue* overruled this longstanding precedent asserting, wrongly, that "[n]either section 105 nor Bankruptcy Rule 9019 can extend the Court's limited authority under section 363(f), and section 363(f) cannot be used as an end run around Purdue's holding that nonconsensual third-party releases are not permitted by the Bankruptcy Code" *See UST Objection* at p. 12. The Diocese, however, respectfully submits that the holding in *Purdue* is not nearly as sweeping as the UST suggests. The majority

opinion, joined by only five justices, confines its analysis almost entirely to the permissible scope of plan provisions authorized by section 1123(b)(6) of the Bankruptcy Code, and ultimately concludes only that section 1123(b)(6) does not provide a statutory basis for imposing nonconsensual third-party releases in general aid of a debtor's reorganization in a chapter 11 plan. *Purdue*, 603 U.S. at 215-221.[3] The majority acknowledges in a footnote that section 105 of the Bankruptcy Code allows bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, but finds, as the debtor in *Purdue* conceded, that section 105, standing alone, cannot justify nonconsensual third-party releases because it serves only to "carry out" authority otherwise expressly conferred elsewhere in the Bankruptcy Code. *Id*. at 216 n.2.

12. Conspicuously absent from the *Purdue* opinion is any analysis as to whether other provisions of the Bankruptcy Code may provide statutory support for nonconsensual third-party releases.[4] Indeed, in the wake of *Purdue*, courts addressing the issue have held that bankruptcy courts can continue to issue injunctive relief to protect asset purchasers, including non-debtor insurers, from third party claims in conjunction with orders approving settlements where such a settlement involves a sale "free and clear" of claims or other interests pursuant to section 363(f) of the Bankruptcy Code. *See, e.g., In re Commercial Express*, 670 B.R. 573, 584-85 (Bankr. M.D. Fla. May 22, 2025) ("*Purdue* did not address sales of estate property and did not involve injunctive relief necessary to a settlement involving estate property . . . . Section 363(f) expressly authorizes sales free and clear of any interest if such interest is in bona fide dispute, § 363(f)(4),

[3] The conclusion that *Purdue's* holding should be construed as narrowly as possible is further buttressed by the extensive dissent issued by the four other Justices who argue persuasively that, consistent with longstanding practice and in appropriate circumstances, chapter 11 plans may include provisions for nonconsensual third-party releases.

[4] Moreover, as set forth below the Diocese does not believe the Settlement Agreements, as proposed, contain any nonconsensual third-party releases.

or if the holder of the interest could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest, § 363(f)(5)."); *In re Hopeman Bros., Inc.*, 667 B.R. 101, 106-108 (Bankr. E.D. Va. 2025) (*citing Markland v. Davis (In re Centro Grp., LLC)*, 2021 U.S. App. LEXIS 32962 (11th Cir. Nov. 5, 2021) in distinguishing injunctions that are integral to the settlement and buy-back of insurance policies from general injunctions in aid of a debtor's reorganization and noting that "the Court has not found, and has not been pointed to, any decision extending Purdue's decision to § 363 sales"); *In re Roman Catholic Diocese of Rockville Centre*, 665 B.R. 71, 88-89 (Bankr. S.D.N.Y. 2024) (noting that courts routinely grant injunctive relief without requiring an adversary proceeding as part of a "free and clear" sale); *In re Bird Global, Inc*., Case No. 23-bk-20514-CLC (Bankr. S.D. Fla. Aug. 2, 2024) (approving bar order and channeling injunction related to insurance settlement and policy buy-back) *aff'd sub nom Wright v. Bird Glob., Inc.,* No. 24-CV-23086-RAR, 2025 LX 184272 (S.D. Fla. June 11, 2025); *See In re The Roman Catholic Diocese of Syracuse, New York*, Case No. 20-30663-WAK (Bankr. N.D.N.Y. 2020), Transcript of Aug. 27, 2025, H'rg at 46:10-48:9 [Docket No. 3103] ("The Court finds that the U.S. Trustee's reliance on *Purdue* here is misguided. Indeed, several cases have distinguished the facts of *Purdue* with the sale of insurance policies under Section 363."…"*Purdue* was not intended to thwart that process."; *See also In re Diocese of Rochester*, No. 19-20905-PRW (Bankr. W.D.N.Y. 2019), Transcript of June 18, 2025, H'rg at 55:15-55:25 [Docket No. 3219] ("[the *Commercial* case and the *Hopeman* case] convinced me that this is not an attempt to avoid *Purdue*. If anything, it's very faithful to what the majority said, which is that case is limited to 1123(a)(6) and 105. That's not what's happening here.")

13. Here, as in *Commercial Express, Hopeman Bros., Rockville Centre, Bird Global, Diocese of Syracuse, and Diocese of Rochester*, the injunctive relief that the Diocese seeks for

the benefit of the Settling Insurers is a critical component of negotiated settlements of the Diocese's insurance coverage claims and sale of its policies back to the Settling Insurers, and nothing in *Purdue* restricts this Court's ability to fashion such relief.

14. The Diocese further submits that the requested injunctive provisions are appropriate for at least two additional reasons: First, all creditors were provided with notice of the Settlement Motion and no creditor or other party that has asserted a claim against the Diocese, the Diocese Settling Parties, or any of the Settling Insurers, has objected to the requested relief. In fact, with the exception of OLV, whose objection, as discussed above, is based on what amounts to a drafting error, and which the Diocese fully anticipates can be resolved through curative language, the only objecting party is the UST.

15. Second, the UST's assertion that the settlements improperly release direct claims against Settling Insurers is a red herring. The Court can enjoin Abuse Claimants from asserting Abuse Claims (or claims related to Abuse Claims) against the Settling Insurers because none of the Abuse Claimants have a direct right of action against the Settling Insurers. New York law does not generally allow personal injury plaintiffs to proceed directly against an alleged tortfeasor's insurer. *Lang v. Hanover Ins. Co.*, 3 N.Y. 3d 350 (N.Y. 2004). Such direct actions may only be brought to derivatively enforce the rights of the insured for coverage once a plaintiff obtains a judgment, serves the defendant with notice of entry of such judgment, and the judgment remains unsatisfied for thirty days. N.Y. INSURANCE LAW § 3420(b)(1); *D'Arata v. New York Cent. Mur. Fire Ins. Co.*, 76 N.Y. 2d 659 (N.Y. 1990) (plaintiff proceeding under § 3420(b)(1) "'stands in the shoes of the insured' . . . . as subrogee of the insured's rights. . . .").

16. None of the Abuse Actions against the Diocese or other Diocese Settling Parties have progressed to the point of judgment, much less gone unsatisfied for thirty days.

17. Accordingly, the only parties that hold an "interest" in the coverage claims that are being settled, and in the policies that are being sold, are the Diocese and the Diocese Settling Parties, all of whom by entering into the Settlement Agreements will be agreeing to the releases and injunctive relief contemplated therein. Alternatively, to the extent any Abuse Claimant could be said to have an "interest" in such claims or the underlying policies, such an inchoate, non-assertable interest is either (i) subject to bona fide dispute and/or of a nature where the Abuse Claimant could be compelled to accept a money satisfaction, in which case the Court may authorize a sale to the Settling Insurers free and clear pursuant to section 363(f), or (ii) has a zero value and can be enjoined as "fully satisfied" consistent with *Purdue*. 603 U.S. at 206 (expressing no opinion "upon a plan that provides for the full satisfaction of claims against a third-party nondebtor.").

18. Notwithstanding the fact that as a matter of law the Abuse Claimants do not possess direct action claims against the Settling Insurers, the Diocese and the Settling Insurers have followed the approach approved in the *Diocese of Rockville Ctr.* and are not asking the Court to enjoin Direct Claims as part of approving the settlements. Paragraph 22 of the proposed sale order attached to the Settlement Motion makes clear that such Direct Claims are exempted from the Settling Insurer Injunction:

> Nothing in the Settling Insurer Injunction or other injunctions contained herein shall enjoin a Claim (if any) of an Abuse Claimant against any Insurer Released Party to the extent that such Claim (if any) is a direct claim by an Abuse Claimant that is premised on an independent legal duty owed to such Abuse Claimant by an Insurer Released Party and outside the jurisdiction of the Bankruptcy Court.

19. Accordingly, the Diocese respectfully submits that the UST's objection on this point is moot.

### III. The UST Objection Relies on Case Law Distinguishable From the Diocese's Case

20. The UST's attempt to invoke the *Purdue* ruling and other selective cases to limit the scope of relief available under §363(f) is an overreach. The UST cites to several instances where courts, applying the law to the specific facts and circumstances in front of them, have declined to issue injunctive relief under 363(f). However, those cases do not stand for the proposition that 363(f) injunction relief is *per se* improper, or that it should not be available in appropriate cases, like here.

21. In *In re Adelphia Communications Corp.*,[5] for example, the Court authorized the sale of the debtor's insurance policies but rejected the invocation of section 363(f) because the insurance policies in *Adelphia* involved Directors and Officers Liability Insurance Policies where the directors and officers asserted their own direct claims to policy proceeds and the court found that the settlement were not essential to the debtors' chapter 11 case.

22. Here, unlike in *Adelphia*, and with the exception of the OLV Objection, which the Diocese expects to resolve, there has been no objection to the proposed settlements to injunctions raised by any party with an interest under the policies to be settled. Moreover, these settlements are extremely essential to the Diocese's Chapter 11 Case to fund a settlement trust in excess of $326 million to satisfy Abuse Claims. In fact, the Court in *Adelphia* agreed that injunctive relief is appropriate in certain circumstances and stated that "[c]hanneling injunctions are permissible under some circumstances, and indeed perform an essential role in some cases--as, for example, mass tort cases, where a reorganization plan can be confirmed if, but only if, insurers who contribute to a trust or fund to satisfy the tort claims have the comfort that they will not thereafter be sued and asked to contribute even more." This is precisely the type of mass tort case where *Adelphia* suggests injunctive relief is appropriate.

[5] *See In re Adelphia Communs. Corp.*, 364 B.R. 518 (Bankr. S.D.N.Y. 2007).

23. The UST's reliance on *In re Fraser's Boiler Service, Inc.,* is misplaced. The court in *Fraser's Boiler Service, Inc.*, reversed the Bankruptcy Court's ruling on the basis that the non-settling insurers' rights were derived from an entirely separate contract between them and the insurers. Here, there are no such separate contracts that provide any party with a separate right of recovery against the Settling Insurers. Moreover, the District Court in *Fraser's Boiler Service, Inc.* did not rule that releases under section 363(f) are patently prohibited and acknowledged that third-party claims could constitute an "interest" that could be sold free and clear "[if] the claims seek compensation directly from policy proceeds that the debtor owns." Additionally, unlike in *Fraser's Boiler Service, Inc.*, here there are no Non-Settling Insurers who have asserted contribution claims.

24. The UST also cites to *Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re Sportstuff, Inc.)*, 430 B.R. 170, 178 (B.A.P. 8th Cir. 2010), *In re SoyNut Butter Co.*, 2018 WL 3689549, at *4 (Bankr. N.D. Ill. August 1, 2018), and *In re Forty-Eight Insulations, Inc*., 133 B.R. 973, 980 (Bankr. N.D. Ill. 1991), aff'd, 149 B.R. 860 (N.D. Ill 1992)), all of which declined to approve third-party injunctions under section 363(f). However, a major distinction between those cases and the Diocese's Chapter 11 Case is in those cases a party with an interest in the polices being settled contested such relief and asserted that the sale of the insurance policies free and clear could impact their ability to obtain coverage. Here, save OLV which will be resolved, there are no such claims and the only party objecting to the relief being sought by the Diocese is the UST, who has no interest whatsoever in the Subject Insurance Policies.

25. In *In re Sportstuff, Inc.*, for example, vendors selling the debtor's products objected to the settlements on grounds that, *inter alia*, they would abrogate the insurers' separate contractual duties to defend and indemnify the vendors as additional insureds under the policies.

Here, no party other than the Diocese Settling Parties has asserted a right to coverage for Abuse Claims under the Subject Insurance Policies. Moreover, the court in *Sportstuff, Inc.* distinguished the result in *Johns-Manville* by noting that the *Manville* court found 363(f) relief to be appropriate because it advanced the goals of a successful reorganization, which was not applicable because the debtor in *Sportstuff, Inc.* was liquidating and had no prospect of reorganizing. In contrast, the Diocese's Chapter 11 Case is a reorganization case and approval of the Insurer Settlements is imperative to a successful reorganization.

26. Similar to *In re Sportstuff, Inc.,* both *In re SoyNut Butter Co.*, and *In re Forty-Eight Insulations, Inc*., were liquidating cases with no prospect of reorganization. Further, both cases involved objections to 363(f) relief from non-settling insureds. Moreover, the court in *In re SoyNut Butter Co.,* explicitly recognized that its decision "does not mean a sale and buyback agreement in a Chapter 7 mass tort case that relies on a channeling injunction can never be approved by the bankruptcy court" – it simply declined to do so where it found the injunction at issue to be "overly expansive" and where it "impairs the contractual rights" of co-insured parties. Accordingly, the holding in *SoyNut Butter Co.* does not preclude this Court from exercising its power to grant 363(f) injunctive relief. Moreover, as recognized in *King County*, the Court has inherent power to protect settling parties. *See King County v. Travelers Indem. Co.*, No. 14-CV-1957 BJR, 2018 U.S. Dist. LEXIS 64763 (W.D. Wash. Apr. 16, 2018) ("the Court has "the inherent equitable power to enter an order precluding subsequent claims for contribution . . . by non-settling parties.""). Here, no claims are being channeled that are not derivative of an interest the Diocese Settling Parties have in the Subject Insurance Policies, and paragraph 22 of the proposed sale order attached to the Settlement Motion preserves the ability for Abuse Claimants to assert Direct Claims, if any.

27. Further, in *In re Forty-Eight Insulations, Inc*., the court recognized that it had authority to grant section 363(f) injunctive relief by stating "[t]here is, however, circuit level authority that does appear to support the [d]ebtor's position," however, the court, declined to grant such relief and follow the holding in *Manville*, noting that the legal or equitable interests to protect mass tort victims in *Manville* did not exist, and "the [d]ebtor is not reorganizing, but liquidating. No on-going business will be protected by a plan. So this case is not the same as *Manville*." In deep contrast to the court's justification for declining to grant 363(f) injunctions, here, the Diocese will be reorganizing, there will be on-going Diocese operations, and there are strong legal and equitable interests to protect Abuse Claimants.

28. In short, none of the authorities invoked by the UST mandate the denial of 363(f) injunctive relief. Injunctions are routinely granted where insurance policies are sold back to insurers under sections 105(a) and 363(b) and (f) of the Bankruptcy Code. Moreover, courts have recognized that insurance policies are property of a debtor's estate, which may be sold with court approval under section 363 of the Bankruptcy Code. *See, e.g., MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-93 (2d Cir. 1988) (affirming bankruptcy court's approval of insurance settlement and related channeling injunction pursuant to section 363(f) and observing that "[n]umerous courts have determined that a debtor's insurance policies are property of the estate"); *In re Roman Catholic Diocese of Rockville Ctr*., 665 B.R. 71 (Bankr. S.D.N.Y. 2024); *Estate of Lellock v. Prudential Ins. Co.*, 811 F.2d 186,189 (3d Cir. 1987); *In re Boy Scouts of Am. & Del. BSA, LLC,* 642 B.R. 504, 568-69 (Bankr. D. Del. 2022); *In re Diocese of Rochester*, No. 19-20905-PRW (Bankr. W.D.N.Y. 2019); *In re The Roman Catholic Diocese of Syracuse, New York*, Case No. 20-30663-WAK (Bankr. N.D.N.Y. 2020).

## IV. The Gatekeeper Injunction Is Appropriate.

29. The UST argues that the Gatekeeper Injunction exceeds this Court's jurisdiction and statutory authority and is not supported by the traditional injunction factors. However, the Gatekeeper Injunction contemplated in the settlement agreements will be implemented, if at all, through the Joint Plan. Accordingly, the UST's Objection on this point should be reserved for confirmation. Nevertheless, the Gatekeeper Injunction is consistent with what has been approved in this District, as well as the Northern and Southern Districts of New York. In September 2025, Chief Judge Kinsella confirmed the chapter 11 plan of *The Roman Catholic Diocese of Syracuse, New York*, which contained a gatekeeper injunction that is nearly identical to Section 12.13 of the Joint Plan. *See In re The Roman Catholic Diocese of Syracuse, New York*, Case No. 20-30663-WAK (Bankr. N.D.N.Y. Sept. 26, 2025) [Docket No. 3073, ¶¶ 29–31]; see also *In re The Diocese of Rochester*, Case No. 19-20905-PRW (Bankr. W.D.N.Y. 2025) [Docket No. 3379]. In confirming that plan, Judge Kinsella found that the injunctions, including the gatekeeper injunction, were "integral components of the Joint Plan," "appropriate in scope, within the standards of the Second Circuit, and necessary to effectuate the Joint Plan," and "consistent with the Bankruptcy Code and applicable law." *Id.*, ¶ DD. Judge Kinsella also found that each settling insurer required the benefit of the gatekeeper injunction as a condition of its settlement. *Id.*, ¶ O. The operative language of Section 12.14 of the Joint Plan is essentially identical to what was approved in *Syracuse*. Like the *Syracuse* provision, Section 12.14 does not apply to claims seeking recovery from Non-Settling Insurers.

30. Beyond *Syracuse*, the Gatekeeper Injunction also rests on well-established principles. Its roots lie in the *Barton* doctrine, which bars a litigant from pursuing a court-appointed trustee elsewhere for official conduct unless the court that made the appointment first

grants permission. *See Barton v. Barbour*, 104 U.S. 126 (1881). Section 12.14 serves the same purpose. It does not ask this Court to decide the merits of any claim, but to make the threshold determination of whether a proposed claim against a Protected Party is colorable in light of the Joint Plan and the Confirmation Order. This is a question about the meaning and effect of the Court's own orders and squarely within its jurisdiction. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (holding that the bankruptcy court "plainly had jurisdiction to interpret and enforce its own prior orders"). Nor does Section 12.14 add any real burden for claimants. Because the Joint Plan already enjoins Channeled Claims against the Protected Parties, any claimant who files suit elsewhere will face the same threshold question of whether the claim is barred, and that question will almost certainly return to this Court in any event. Requiring that question to be answered here first promotes consistent interpretation of the Joint Plan, avoids conflicting rulings by courts unfamiliar with the Chapter 11 Case, and protects the settlements that the Protected Parties bargained for when they agreed to contribute to the Settlement Trust.

31. Earlier this year, the bankruptcy court in *Lutheran Home* overruled a U.S. Trustee objection to a comparable gatekeeping provision, explaining:

> Consider the converse of what is proposed in the Plan, where there is no "Gatekeeper" provision and a party initiates an action in state court that plainly runs afoul of the release provisions. The Reorganized Debtors (and perhaps others) would inevitably file a motion to reopen this bankruptcy case and seek to enforce the releases and injunction in the Plan, and the parties would end up before me anyway (absent a quick fold by the plaintiff). In practice, regardless of what is specified in the Plan, I am the best-equipped gatekeeper of whether post-confirmation claims run afoul of the Confirmation Order. Funneling all questions of what is and is not barred through me ensures consistency of interpretation and application across the board. And the only thing that really changes by specifying that would-be litigants must start with me is consequences—plaintiffs don't risk being sanctioned for violating the Confirmation Order if they first ask me for leave.

*In re Lutheran Home & Servs. for the Aged, Inc.*, 2026 Bankr. LEXIS 541, at *109–10 (Bankr. N.D. Ill. Mar. 4, 2026). The court further made clear that it read the provision as limited to whether a proposed suit colorably circumvents the plan and confirmation order, not as authority to rule on the underlying merits of any claim, *id.* at *110–11, which is precisely how Section 12.13 is intended to operate.

32. Accordingly, the Gatekeeper Injunction is well supported by both (i) precedent in this District, and (ii) settled principles of bankruptcy law, and the UST's challenge to it is not a basis for not approving the Insurer Settlement Agreements.

**WHEREFORE**, for the reasons set forth above, the Diocese respectfully submits that the Court should overrule the UST Objection and grant the Settlement Motion in its entirety.

Dated: October 13, 2026

BOND, SCHOENECK & KING, LLC

By: /s/ Charles J. Sullivan
Stephen A. Donato
Charles J. Sullivan
Grayson T. Walter
Justin S. Krell
One Lincoln Center
Syracuse, NY 13202-1355
Telephone: (315) 218-8000
Fax: (315) 218-8100
Emails: sdonato@bsk.com
csullivan@bsk.com
gwalter@bsk.com
jkrell@bsk.com

*Attorneys for The Diocese of Buffalo, N.Y.*